# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.G.G., *et al.*,<br><br>*Plaintiffs–Petitioners*,<br><br>           v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants–Respondents*. | Case No: 1-25-00766 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

## INTRODUCTION

Plaintiffs respectfully request immediate action by this Court to avoid irreparable harm to Plaintiffs and the proposed class – and to ensure that this Court is not permanently deprived of jurisdiction.

The President has invoked—or will imminently invoke—a war power, the Alien Enemies Act of 1798 ("AEA"), in an attempt to summarily remove noncitizens from the United States and bypass the immigration laws Congress has enacted.[1] In either circumstance, a Temporary Restraining Order is needed because there may not be sufficient time for this Court to intervene between the time when the Act is invoked and when the planes removing Plaintiffs-Petitioners depart the United States.[2]

But the United States is not at war, and the prerequisites for invocation of the AEA have not been met. *See* 50 U.S.C. § 21. The President can invoke the AEA only in a state of "declared war," or when an "invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government." *Id.* Not surprisingly, therefore, the Act has been invoked only three times in our country's history, all in declared wars: The War of 1812, World War I, and World War II.

The President's imminent Proclamation targets Venezuelan noncitizens whom the government accuses of being part of Tren de Aragua, a criminal gang. But the President's Proclamation is invalid under the AEA for two plain reasons. First, Tren de Aragua is not a "foreign nation or government." Second, Tren de Aragua is not engaged in an "invasion" or "predatory incursions" within the meaning of the AEA, because criminal activity does not meet the longstanding definitions of those statutory requirements—and has never been a sufficient basis for the executive to cast foreign nationals as "alien

---

[1] *See* Remarks of President Trump, March 14, 2025 (addressing the Department of Justice) ("You will read in the papers tomorrow the bad thing we will do to Tren de Aragua.").

[2] *See also* Priscilla Alvarez, et al., *Trump expected to invoke wartime authority to speed up mass deportation effort in coming days*, CNN (Mar. 14, 2025), https://www.cnn.com/2025/03/13/politics/alien-enemies-act-deportation-consideration/index.html ("The Trump administration is expected to invoke [the AEA] to speed up the president's mass deportation pledge in the coming days, according to four sources familiar with the discussions. . . . The primary target remains Tren de Aragua[.]").

enemies" subject to arrest, internment, and removal. As a result, the President's attempt to summarily remove Venezuelan noncitizens exceeds the wartime authority that Congress delegated in the AEA, violates the process and protections that Congress has prescribed elsewhere in the country's immigration laws for the removal of noncitizens, and violates due process.

Based on reports from Plaintiffs and legal service providers, the government has begun moving Venezuelan men who the government claims are part of Tren de Aragua to facilities in Texas. Upon information and belief, these Texas facilities are being used as staging facilities to remove Venezuelan men under the AEA. Plaintiffs-Petitioners J.G.G., J.A.V., G.F.F., W.G.H., and J.G.O. ("Plaintiffs") are noncitizen Venezuelan men in immigration custody who face a substantial risk of imminent removal under the President's AEA Proclamation and have been moved to Texas or are under threat of being transferred to Texas. They have compelling asylum claims—for instance, one fled Venezuela after he was beaten by police because his stepfather was a political dissident. J.G.G. Decl. ¶ 2. All deeply fear removal to a country where they risk persecution.

**Accordingly, Plaintiffs move the Court for a Temporary Restraining Order ("TRO") barring their summary removal under the AEA <u>before the planes can take off and this Court is divested of jurisdiction</u>.**

<u>**LEGAL AND FACTUAL BACKGROUND**</u>

**I.     The Alien Enemies Act**

The AEA is a wartime authority that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens. Passed in 1798 in anticipation of a war with France, the AEA, as codified today, provides that "[w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and

removed as alien enemies." 50 U.S.C. § 21.

During the War of 1812, President Madison required British subjects to register with federal officials and relocate away from the eastern seaboard. *See Lockington v. Smith*, 15 F. Cas. 758 (D. Ct. Penn. 1817). President Wilson invoked the Act against Germany and Austria-Hungary during World War I to regulate and detain Germans and Austro-Hungarians living in the United States. During World War II, President Roosevelt invoked the AEA against Japan, Germany, Italy, Hungary, Romania, and Bulgaria.

## II.    Congress's Comprehensive Reform of Immigration Law

Following World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA"). The INA, and its subsequent amendments, provide for a comprehensive system of procedures that the government must follow before removing a noncitizen from the United States. *See* 8 U.S.C. § 1229a(a)(3) (the INA provides the "sole and exclusive procedure" for determining whether a noncitizen may be removed from the United States).

As part of that reform and other subsequent amendments, Congress prescribed safeguards for noncitizens seeking protection from persecution and torture. These protections codify the humanitarian framework adopted by the United Nations in response to the humanitarian failures of World War II. *See INS v. Cardoza-Fonseca*, 480 U.S, 421, 439-40 (1987) (describing the United States' adoption of the United Nations' post-war refugee protections). One of Congress's "primary purposes" was "to bring United States refugee law into conformance" with international refugee treaties and the bedrock principle that individuals may not be returned to countries where they face persecution or torture. *Id.* at 436. As the Second Circuit has recognized, "[i]t is no accident that many of our asylum laws sprang forth as a result of events in 1930s Europe." *Aliyev v. Mukasey*, 549 F.3d 111, 118 n.8 (2d Cir. 2008).

First, the asylum statute, 8 U.S.C. § 1158, provides that any noncitizen in the United States has a right to apply for asylum. *See* 8 U.S.C. § 1158(a)(1) (providing that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum").

Second, the withholding of removal statute, 8 U.S.C. § 1231(b)(3), provides that noncitizens

"may not" be removed to a country where their "life or freedom" would be threatened based on a protected ground. A grant of withholding is mandatory if the individual meets the statutory criteria. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999). Congress enacted this statute to "conform[] it to the language of Article 33 [of the 1951 U.N. Convention on Refugees]," *INS v. Stevia*, 467 U.S. 407, 421 (1984), which was passed in the wake of the failure of humanitarian protections during World War II. This conforming language makes withholding "mandatory" where the eligibility criteria are satisfied, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 n.25 (1987), and gives the statute broad application where the government seeks to return a noncitizen to a country where he fears persecution, *see Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1089 (9th Cir. 2020), *vacated as moot sub nom. Innovation Law Lab v. Mayorkas*, 5 F.4th 1099 (9th Cir. 2021).

Third, protections under the Convention Against Torture ("CAT") prohibit returning noncitizens to a country where it is more likely than not that they would face torture. *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-.18 (implementing regulations).

## III. The AEA Proclamation and the Impending Unlawful Removals

President Trump is expected to issue a proclamation invoking the AEA with respect to individuals from Venezuela whom the government accuses of belonging to Tren de Aragua, a criminal organization. The Proclamation is expected to characterize Tren de Aragua as a "hybrid criminal state" engaged in perpetrating, attempting, and threatening an invasion, predatory incursions, hostile actions, and irregular warfare against the United States. Although the U.S. government has never previously recognized Tren de Aragua as a foreign nation or government (nor, factually, could it), the Proclamation is expected to identify Tren de Aragua. The Proclamation is expected to further justify Tren de Aragua's designation by stating that the organization has infiltrated, and receives support from, the Venezuelan government—specifically, the Maduro regime. But the Proclamation cannot plausibly assert that the Venezuelan government or the Maduro regime is itself perpetrating, attempting, or threatening an invasion or predatory incursions. Indeed, the Maduro regime disavows Tren de Aragua and is actively

engaged in suppressing it. *See* teleSur, *Venezuela Dismantles Criminal Gang "Tren de Aragua" in Security Operation* (Jan. 20, 2025), https://www.telesurenglish.net/venezuela-dismantles-criminal-gang-tren-de-aragua-in-security-operation.[3]

Upon information and belief, the government plans to immediately commence unlawful summary removals pursuant to the Proclamation, removing individuals including Plaintiffs to Venezuela, or a third country like El Salvador, which has offered to imprison detainees transported from the United States. *See* Remarks of Secretary of State Marco Rubio and Salvadoran Foreign Minister Alexandra Hill Tinoco at the Signing of a Memorandum of Understanding Concerning Strategic Civil Nuclear Cooperation, Feb. 3, 2025.[4]

In addition to violating the substantive terms of the AEA, the executive branch's attempt to use the AEA to summarily remove individuals from the United States deprives them of the process afforded by Congress's comprehensive immigration laws. It also deprives them of the process prescribed by the AEA itself, which permits the President to remove only those "alien enemies" who "refuse or neglect to depart" the United States voluntarily. *See* 50 U.S.C. § 21. The AEA requires that the President generally afford individuals who are removable under the statute a "reasonable time" to depart, "as may be consistent with the public safety, and according to the dictates of humanity and national hospitality," *id.* § 22, as well as the opportunity to "recover[], dispos[e], and remov[e]" their "goods and effects," *id.* Here, however, Defendants are intending to imminently and summarily remove individuals from the United States—including Plaintiffs—in contravention of each of these statutory processes, and without any judicial review of whether any of the AEA's prerequisites have been met.

## IV.     Plaintiffs

Plaintiffs are noncitizens in immigration custody who face a substantial risk of imminent removal

---

[3] Plaintiffs use "the Proclamation" to refer to President Trump's expected invocation of the AEA as well as Defendants' actions to implement detentions and removals pursuant to the AEA.
[4] *Available at*: https://www.state.gov/secretary-of-state-marco-rubio-and-salvadoran-foreign-minister-alexandra-hill-tinoco-at-the-signing-of-a-memorandum-of-understanding-concerning-strategic-civil-nuclear-cooperation.

under the President's AEA Proclamation.

Plaintiff-Petitioner J.G.G. is a Venezuelan national who is detained at El Valle Detention Center in Texas and who, upon information and belief, is at imminent risk of removal under the expected Proclamation. J.G.G. is seeking asylum, withholding of removal, and CAT protection because he fears being killed, arbitrarily imprisoned, beaten and tortured by Venezuelan police since they have done so previously to him. During an interview with ICE, he was detained because the officer erroneously suspected that J.G.G. was a Tren de Aragua member on account of his tattoos. J.G.G. is a professional tattoo artist, and his two tattoos, a rose and skull on his leg, which cover a monkey tattoo that he no longer liked, and an eye with a clock inside it, which a fellow tattoo artist applied as practice—neither are associated with Tren de Aragua. While he was awaiting a hearing on the merits of his applications for protection in Adelanto, California, J.G.G. was awakened at 2:00 am on March 6, 2025, and he was told that he was being released and that he had to sign documents that were available only in English to receive his property. J.G.G. then signed documents under false pretense. Instead of being released, J.G.G. was abruptly and without explanation transferred to El Valle Detention Center in Texas. While in El Valle, he was awakened at 3:00 am on March 14, 2025, and told without explanation that he was going to be transferred elsewhere. He was not transferred because the plane had malfunctioned. J.G.G. fears that he will be removed under the Proclamation because he has tattoos, despite not being involved whatsoever with Tren de Aragua and despite his ongoing asylum proceedings.

Plaintiff-Petitioner J.A.V. is a Venezuelan national who is detained at El Valle Detention Center in Texas, and who, upon information and belief, is at imminent risk of removal under the expected Proclamation. J.A.V. Decl. ¶ 1. J.A.V. is seeking asylum because of his political views and fear of harm and mistreatment from multiple criminal groups, including Tren de Aragua. J.A.V. Decl. ¶ 3. At his asylum interview on February 27, 2025, he was arrested and interrogated by ICE, during which time ICE questioned him about Tren de Aragua. J.A.V. Decl. ¶¶ 4, 5. J.A.V. is not and has never been a member of Tren de Aragua – he was in fact victimized by that group and the group is the reason he cannot return to Venezuela. J.A.V. Decl. ¶ 5. Still, ICE proceeded to detain J.A.V. at Moshannon Valley Processing

Center in Pennsylvania. J.A.V. Decl. ¶ 6. On March 9, 20205, J.A.V was transferred with a group of other Venezuelans to El Valle. J.A.V. Decl. ¶ 7. Notwithstanding the fact that J.A.V. has a master calendar hearing scheduled for March 19, 2025, he was told on March 14, 2025 that that he was being moved in preparation for a later flight with a group of other Venezuelans. J.A.V. Decl. ¶¶ 9, 10. J.A.V has since been informed that he will be put on a plane on Saturday March 15, 2025 or Sunday March 16, 2025. J.A.V. Decl. ¶ 11. J.A.V fears being deported, being unable to speak with his attorney, and being denied adequate medical care. J.A.V. Decl. ¶ 12.

Plaintiff-Petitioner G.F.F. is a 21-year-old Venezuelan national who is detained at El Valle Detention Center in Texas, and who, upon information and belief, is at imminent risk of removal under the expected Proclamation. Carney Decl. ¶ 2. G.F.F. entered the United States in May 2024. *Id.* ¶ 4. He was released on his own recognizance after a credible fear interview. *Id.* G.F.F. was arrested and detained in New York. *Id.* ¶ 6. Upon his detention, DHS filed an I-213 identifying him as an "associate/affiliate of Tren de Aragua." *Id.* ¶ 9. On March 9, 2025, he was moved to Moshannon and then quickly to El Valle. *Id.* ¶¶ 11-12. Only Venezuelans were transferred with him. *Id.* ¶ 13. G.F.F.'s final individual immigration hearing is scheduled for March 17, 2025. *Id.* ¶ 10. On March 14, 2025, ICE officers told G.F.F. that he was going to be deported in the middle of the night on March 14, 2025. *Id.* ¶ 19.

Plaintiff-Petitioner W.G.H. is a 29-year-old Venezuelan national who is detained at El Valle Detention Center in Texas, and who, upon information and belief, is at imminent risk of removal under the expected Proclamation. W.G.H. Decl. ¶ 1. W.G.H. lives in Brooklyn, New York, with his wife and his stepdaughter. W.G.H. Decl. ¶ 4. W.G.H. requested asylum because he was extorted and threatened by multiple criminal groups in Venezuela, including Tren de Aragua. W.G.H. Decl. ¶¶ 3, 11; Lauterback Decl. ¶ 8. On February 20, 2025, ICE arrested W.G.H. and detained him at Moshannon. W.G.H. Decl. ¶¶ 4-5. He was assigned an attorney from Brooklyn Defender Services. W.G.H. Decl. ¶ 6. On March 7, 2025, ICE filed a Form I-213 stating that W.G.H. "has been identified as a Tren de Aragua gang associate." Lauterback Decl. ¶ 7. He is not a member of Tren de Aragua. W.G.H. Decl. ¶ 12. On March 9, 2025, he was abruptly transferred to El Valle, where many other Venezuelans were also present. W.G.H.

Decl. ¶ 7. W.G.H. was scheduled to have a court hearing on March 12, 2025, but W.G.H. was not produced. W.G.H. Decl. ¶ 8; Lauterback Decl. ¶ 13. W.G.H.'s next immigration court hearing is scheduled for March 26, 2025. Lauterback Decl. ¶ 17. He has been told that he will be taken to a plane on March 15 or 16. W.G.H. Decl. ¶ 10; Lauterback Decl. ¶ 21. He is extremely afraid of returning to Venezuela. W.G.H. Decl. ¶ 11.

Plaintiff-Petitioner J.G.O. is a 32-year-old Venezuelan national who is detained at El Valle Detention Center in Texas, and who, upon information and belief, is at imminent risk of removal under the expected Proclamation. Shealy Decl. ¶ 2. On January 30, 2025, ICE officers arrested and detained J.G.O. *Id.* ¶ 4. He was later transported to Moshannon. *Id.* On March 8, 2025, he was abruptly transferred to El Valle in the middle of the night. *Id.* ¶ 5. On March 12, J.G.O. was told to sign papers in English, which is not his native language. *Id.* ¶ 7. He refused to sign. *Id.* ICE officer told J.G.O. that he will be deported on the night of March 14, 15, or 16. *Id.* ¶ 8.

## LEGAL STANDARD

To obtain a temporary restraining order, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *see Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-352 (CJN), 2025 WL 435415, at *1 (D.D.C. Feb. 7, 2025).[5]

## ARGUMENT

**I.    Plaintiffs Are Likely to Succeed on the Merits.**

**A.    The AEA does not authorize the President to summarily remove Plaintiffs from the United States.**

Through the AEA, Congress delegated certain specifically enumerated powers to the President in times of actual or imminent war. *See Ludecke v. Watkins*, 335 U.S. 160, 165 (1948) (AEA vested the

---

[5] The standards for issuing a temporary restraining order and a preliminary injunction are "the same." *Doe v. McHenry*, No. 1:25-cv-286-RCL, 2025 WL 388218, at *2 (D.D.C. Feb. 4, 2025).

President with particular war powers); *Citizens Protective League v. Clark*, 155 F.2d 290, 293 (D.C. Cir. 1946) ("the constitutional power of Congress over alien enemies" is "part of the power to declare war"). Here, the President has exceeded his authority under the AEA for two key reasons. First, no "invasion or predatory incursion" has been "perpetrated, attempted, or threatened against the territory of the United States." 50 U.S.C. § 21. Second, the relevant actions were not perpetrated by a "foreign nation or government." *Id.* Accordingly, the Proclamation violates the AEA—and this Court has authority to restrain Defendants' impending attempt to summarily remove Plaintiffs from the United States. *See Ludecke*, 335 U.S. at 166–70 (recognizing that courts may review whether the statutory conditions for invoking and applying the AEA have been satisfied); *United States ex rel. Von Heymann v. Watkins*, 159 F. 2d 650, 653 (2d Cir. 1947) (finding restraint of foreign national under the AEA unlawful and recognizing that "[t]he executive orders are a justification [for restraining or removing a foreign national] only in so far as they are within the [AEA's] statutory provisions").

### 1. The purported invasion is not by a "foreign nation or government."

The AEA grants power to the President only when the relevant actions are taken by a "foreign nation or government." 50 U.S.C. § 21. The Proclamation is not expected to name the country of Venezuela, nor could it do so since the United States is not in a declared war with Venezuela nor is Venezuela invading the United States. Rather, the Proclamation is expected to name the gang "Tren de Aragua.,"

But Tren de Aragua is plainly not a foreign nation or government. A "nation" is a community of people possessing defined territory and a common government. *See* Samuel Johnson's Dictionary, Nation (1773) ("A people distinguished from another people; generally by their language, original, or government."); Merriam Webster's Dictionary, *Nation*, (2024) ("a community of people composed of one or more nationalities and possessing a more or less defined territory and government," e.g., "Canada"). A "government" is the political body that governs a nation. *See* Samuel Johnson's Dictionary, *Government* (1773) ("An established state of legal authority."); Merriam-Webster's Dictionary, *Government* (2024) ("the body of persons that constitutes the governing authority of a political unit or organization: such as

the officials comprising the governing body of a political unit"). But, as a nonstate actor, Tren de Aragua

possesses neither a defined territory nor a common government.

Congress's strict limitation of the AEA only to actions by a "foreign nation or government"

recognized the grave nature of the power granted. For most countries, including Venezuela, the United

States recognizes a particular government as speaking on behalf of the nation. *See Zivotofsky ex rel.*

*Zivotofsky v. Kerry*, 576 U.S. 1, 11 (2015) ("Recognition is a 'formal acknowledgement' that a particular

'entity possesses the qualifications for statehood' or 'that a particular regime is the effective government

of a state.'"); *see also United States ex rel. D'Esquiva v. Uhl*, 137 F.2d 903 (2d Cir. 1943) (considering

for purposes of AEA analysis the State Department's recognition that Austria had become part of

Germany). With respect to Venezuela in particular, "[t]he United States recognizes the 2015

democratically elected Venezuelan National Assembly as the only legitimate branch of the Government

of Venezuela." U.S. Dep't of State, *U.S. Relations With Venezuela* (July 18, 2024),

https://www.state.gov/u-s-relations-with-venezuela. Not Tren de Aragua.

Indeed, the AEA itself was passed in anticipation of a declared war with a recognized sovereign

nation, France. *See* 5 Annals of Cong. 1453 (Apr. 1798) ("[W]e may very shortly be involved in war . .

."); John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, N.Y. State Bar Ass'n Annual

Meeting: Civil Liberty in War Time, at 8 (Jan. 17, 1919) ("The [AEA] was passed by Congress . . . at a

time when it was supposed that war with France was imminent."); Nikolas Bowie & Norah Rast, *The*

*Imaginary Immigration Clause*, 120 Mich. L. Rev. 1419, 1430 (2022) (noting popular concern that "a

French invasion force might land in America at any moment"). Although the war never materialized—

and, accordingly, the Act was never invoked against France—the historical context reflects Congress's

concern with military conflict against a recognized nation or government, not with an amorphous nonstate

actor. *See also* Cong. Rsch. Serv., Declarations of War and Authorizations for the Use of Military Force 1

(2014) (Congress has never issued a declaration of war against a nonstate actor).

### 2. There is no "invasion" or "predatory incursion" upon the United States.

Text, history, and common sense make clear that the AEA's use of "invasion" and "predatory

incursion" refer to an *actual* military invasion or incursion that is very likely to lead to an *actual* war. In other words, predatory incursions and invasions are escalating military actions taken en route to a declared war. *See, e.g.*, Office of Legislative Affairs, Proposed Amendment to AEA, at 2 n.1 (Aug. 27, 1980) ("The Act contemplates use of its provisions by the President in situations where war is imminent."). Under no reasonable understanding could Tren de Aragua's criminal activities amount to a "predatory incursion" or "invasion" that places our nation on the brink of war.

At the time of the enactment of the AEA, "incursions" were understood to be small-scale military raids. *See* Webster's Dictionary, *Incursion* (1828) ("incursion . . . applies to the expeditions of small parties or detachments of an enemy's army, entering a territory for attack, plunder, or destruction of a post or magazine[6]"). Incursions aimed to destroy military structures or supplies, or to otherwise sabotage the enemy, often in anticipation of a subsequent invasion. *See, e.g.*, *id.*; *see also* Letter from George Washington, Commd'r in Chief of Army, to Thomas Jefferson, Gov. of Va. (Feb. 6, 1781)[7] (describing a British raid that destroyed military supplies and infrastructure in Richmond as a "predatory incursion"). The AEA's addition of "predatory" merely underscores that the purpose of a military party's "incursion" was "plundering" or "pillaging." *See* Webster's Dictionary, *Predatory* (1828). Predatory incursions resulted in military responses. *Id.* (militia required to repel predatory incursion); Letter from George Washington, Commd'r in Chief of Army, to Nathanael Greene, Commd'r in Chief of Southern Dep't of Army (Jan. 29, 1783)[8] ("predatory incursions" by the British could be managed with limited cavalry troops). There is no such incursion here.

Nor is United States under "invasion" by Tren de Aragua within the meaning of the AEA. An "invasion" refers to an escalated military action involving a larger-scale hostile entrance by an army, with

---

[6] A "magazine" is a structure that stores large amounts of ammunition and explosives.

[7] *Available at* https://founders.archives.gov/?q=%22predatory%20incursion%22&s=1111311111&sa=&r=1&s r=.

[8] *Available at* https://founders.archives.gov/?q=%22predatory%20incursion%22&s=1111311111&sa=&r=5&s r=.

the intent to conquer territory. *See* Webster's Dictionary, *Invasion* (1828) ("invasion" is "particularly, the entrance of a hostile army into a country for purpose of conquest or plunder"); *see also* Webster's Dictionary, *Invade* (1828) ("The French armies invaded Holland in 1795"); Webster's Dictionary, *Incursion* (1828) ("Incursion differs from invasion, which is a hostile entrance of any army for conquest."); Samuel Johnson's Dictionary, *Incursion* (1773) ("incursion" is "invasion without conquest"); Letter from Timothy Pickering, Sec'y of State, to Alexander Hamilton, Inspector Gen. of the Army (June 9, 1798)[9] (noting that French "invasion" of English could require France to keep troops in Europe "until the conquest was complete"); Draft of an Address of the Convention of the Representatives of the State of New York to Their Constituents (Dec. 23, 1776)[10] (describing the goal of British invasion as "the conquest of America"). In the context of the Guarantee Clause's contemporaneous use of the term "invasion," the Second Circuit held that "invasion" indicates a "armed hostility from another political entity, such as another state or foreign country that is *intending to overthrow the state's government*." *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) (emphasis added); *New Jersey v. United States*, 91 F.3d 463, 469 (3d Cir. 1996) (same). In essence, invasions were understood as the opening salvo in a war. *See* James Madison, The Report of 1800 (Jan. 7, 1800) ("Invasion is an operation of war.").[11]

In essence, Defendants have cited nothing more than alleged criminal activity in an attempt to unlock an extraordinarily grave war power. But there is simply no "predatory incursion" or "invasion" by a foreign government to support the AEA's invocation. Whatever military actions are encompassed within a predatory incursion or an invasion, the criminal activity of a gang simply does not qualify.

Thus, the Proclamation is both ultra vires and contrary to law under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A).

---

[9] *Available at* https://founders.archives.gov/?q=%22predatory%20incursion%22&s=1111311111&sa=&r=9&sr=.

[10] *Available at* https://founders.archives.gov/?q=invasion%20conquest&s=1111311111&sa=&r=17&sr=.

[11] *Available at* https://founders.archives.gov/?q=%22alien%20enemy%22&s=1111311111&sa=&r=19&sr=.

    **B.**      **The Proclamation Violates the INA.**

    Even if the President had properly invoked the AEA—which he did not—Congress has, in legislation postdating the AEA, carefully specified the procedures by which noncitizens may be removed from the United States. "Unless otherwise specified" in the INA, a removal proceeding before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual. 8 U.S.C. § 1229a(a)(3).

    The Proclamation is expected to entirely bypass the INA's comprehensive process for removal. That ignores the Supreme Court's instruction about how to reconcile statutes enacted over time. *See Brown & Williamson*, 529 U.S. at 143. The AEA permits the President to regulate and detain alien enemies. And it permits the President to remove certain noncitizens—but the INA lays out the specific procedure by which the removal must take place. Accordingly, the Proclamation is unlawful as to Plaintiffs not only because it exceeds the authority granted by Congress in the AEA, , but also—and independently—because it provides for an entirely separate set of immigration procedures that ignore the INA's "sole and exclusive" procedures for removal. 8 U.S.C. § 1229a(a)(3).

    This Court must read the AEA and the INA together, to make sense of Congress's work and to harmonize the AEA's permission to remove certain alien enemies with the INA's subsequently enacted, comprehensive removal processes. *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 304 (2003) ("[W]hen two statutes are capable of co-existence, it is the duty of the court, absent a clearly expressed congressional intent to the contrary, to regard each as effective."); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." (internal quotation marks omitted)).

    The INA leaves little doubt that its procedures must apply to *every* removal, unless otherwise specified by that statute. It directs that, "[u]nless otherwise specified in this chapter," the INA's comprehensive scheme provides "the sole and exclusive procedure for determining whether an alien may be admitted to the United States, or if the alien has been so admitted, removed from the United States. 8

U.S.C. § 1229a(a)(3); *see also United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA."). This language makes clear that Congress intended for the INA to "supersede all previous laws with regard to deportability." S. Rep. No. 1137, at 30 (Jan. 29, 1952).

Presumably, Congress was aware that noncitizens from enemy countries were subject to removal in times of actual or imminent war when considering the INA and its subsequent amendments. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of the existing law); *see also* 8 U.S.C. § 1442(e) (requiring that removal of alien enemies be "consistent with the law"). But the INA does not carve alien enemies out of its standard immigration procedures, even as it expressly provides exceptions for other groups of noncitizens, including noncitizens who pose security risks. *See, e.g.* 8 U.S.C. § 1229a(a)(3) (excepting noncitizens in expedited removal proceedings from the INA's "sole and exclusive" provision); 8 U.S.C. § 1531 *et seq.* (establishing fast-track proceedings for noncitizens posing national security risks).

Ignoring the INA's role as the "sole and exclusive" procedure for determining whether a noncitizen may be removed, the Proclamation results in an entirely separate procedure for removal. Through their creation of an alternative removal system, Defendants have circumvented the carefully crafted scheme that Congress set forth for processing noncitizens prior to removal and usurped Congress's Article I power in the process. But where an agency's interpretation of one statute "tramples the work done" by another statute—as Defendants' sweeping view of the AEA tramples the immigration laws—the agency "bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Epic Sys. v. Lewis*, 138 S. Ct. 1612, 1624, 27 (2018). Defendants can show no such "clear and manifest" intention. *Id.* at 1624. Accordingly, the Proclamation violates the INA by denying Plaintiffs the process due under that law.

### C.   The Proclamation Violates the Specific Protections That Congress Established for Noncitizens Seeking Humanitarian Protection.

Plaintiffs have statutory rights to seek protection from persecution and torture, as Congress has

long prescribed. Consequently, even assuming the Proclamation permits summary removal of some

individuals, it cannot override the more specific, subsequently enacted statutes providing special

protection for those seeking humanitarian relief, such as asylum statutes.

First, the asylum statute, 8 U.S.C. § 1158, provides that "[a]ny alien who is physically present in

the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for

asylum." 8 U.S.C. § 1158(a)(1). Second, the withholding of removal statute, 8 U.S.C. § 1231(b)(3),

provides that a noncitizen "may not" be removed to a country where their "life or freedom" would be

threatened based on a protected ground. Congress creates specific and narrow bars to asylum and

withholding of removal. *See* 8 U.S.C. § 1158(2); 8 U.S.C. § 1231(b)(3)(B). None of those bars apply

here. Third, the CAT prohibits returning a noncitizen to a country where it is more likely than not she

would face torture. There are no bars to eligibility for CAT protection. *See Negusie v. Holder*, 555 U.S.

511, 514 (2009). These forms of relief are generally adjudicated by an immigration judge in full removal

proceedings under 8 U.S.C. § 1229a. *See* 8 C.F.R. §§ 1208.2(b), 1208.16(a).

In short, Congress carefully crafted the statutory provisions governing asylum, withholding, and

CAT protection to ensure that noncitizens could seek review from persecution and torture. In so doing,

Congress sought to satisfy its domestic and international obligations to protect those fleeing from torture.

Defendants' position ignores the invaluable post-war steps that Congress took to ensure humanitarian

protection for individuals who, like World War II refugees, were clearly subjects of an enemy nation but

would face grave harm upon return.

The expected Proclamation and its implementation jettison all those protections and safeguards,

subjecting Plaintiffs to summary deportation back to potential persecution and torture, including, for

some, possible death. Whatever the AEA authorizes, it cannot override the provisions of immigration law

specifically designed to ensure that vulnerable people seeking protection would have access a meaningful

and robust system to assess their claims—even where such individuals have been deemed "alien

enemies," however dubious that designation.

The AEA's general command that noncitizens from enemy countries are "liable to be . . .

15

removed as alien enemies" thus cannot be construed to bypass the specific procedural protections

provided by the asylum, withholding of removal, and torture statutes. *See Radzanower v. Touche Ross &*

*Co.*, 426 U.S. 148, 159 n.2 (1976) ("[T]he more specific legislation will usually take precedence over the

more general.").

> **D.** **The Forced Removal of Plaintiffs, with No Opportunity to Voluntarily Depart,**
> **Violates the AEA and Due Process.**

Even if the AEA authorized the President's expected Proclamation, Section 21 of the statute

permits removal only where noncitizens alleged to be "alien enemies" "refuse or neglect to depart" from

the United States. 50 U.S.C. § 21. Plaintiffs have neither refused nor neglected to depart. Even in the

midst of World War II, courts held that German nationals subject to the AEA were entitled to the

"privilege of voluntary departure" under Section 21 before they could be forcibly removed or restrained

under the statute. *See United States ex rel Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien

must be afforded the privilege of voluntary departure before the Attorney General can lawfully remove

him against his will."); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) ("His

present restraint by the respondent is unlawful in so far as it interferes with his voluntary departure, since

the enforced removal, of which his present restraint is a concomitant, is unlawful before he does 'Refuse

or neglect' to depart" under Section 21).

Moreover, both Section 22 of the AEA and due process require the government to afford

noncitizens alleged to be "alien enemies" sufficient time to settle their affairs and to depart the United

States. *See* 50 U.S.C. § 22. The statute provides that when a person "becomes liable" under Section 21

and "is not chargeable with actual hostility, or other crime against the public safety, he shall be allowed,

for the recovery, disposal, and removal of his goods and effects, and for his departure, the full time which

is or shall be stipulated by any treaty" between the United States and his nation or government. *Id.* If no

treaty exists, then "the President may ascertain and declare such reasonable time as may be consistent

with the public safety, and according to the dictates of humanity and national hospitality." *Id.*

Although the Proclamation is expected to assert as a blanket matter that all individuals accused of

belonging to Tren de Aragua are chargeable with actual hostility, there has been no individualized finding with respect to Plaintiffs. Under these circumstances, the government's refusal to allow Plaintiffs an opportunity and sufficient time to voluntarily depart the United States violates the AEA and due process.

E.     **Defendants' Actions Are Arbitrary and Capricious Under the APA.**

Defendants' final agency action is also arbitrary and capricious under the APA. 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious when the agency did not engage in "reasoned decisionmaking." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Far from reflecting fact-bound, rational decisionmaking, the President's expected Proclamation merely declares that Tren de Aragua is somehow a nation or government, and adopts an arbitrary system for identifying individuals who will be subjected to summary removal under the Proclamation.

II.    **The Administration's Abuse of the Alien Enemies Act Has Caused and Will Continue to Cause Plaintiffs-Petitioners Irreparable Harm.**

Plaintiffs are likely to suffer irreparable harm in the absence of emergency relief.

As a result of the Proclamation and the government's intent to remove individuals from the United States without process, Plaintiffs face an imminent risk that they will be summarily removed from the United States to Venezuela or El Salvador without any meaningful opportunity to assert claims for relief.

For example, the government has already accused J.G.G., a young Venezuelan man, of membership in Tren de Aragua on the basis of his tattoos; abruptly transferred him from detention in California to El Valle Detention Facility in Texas while his proceedings were still ongoing; and told him that he would be taken elsewhere the night of March 14 or in the morning of March 15—all of which

17

makes it substantially likely that his removal under the AEA is imminent. *See* J.G.G. Decl. ¶¶ 1-6.[12] The same thing happened to W.G.H., J.A.V., G.F.F., and J.G.O., all young Venezuelan males who were abruptly transferred from Moshannon in Pennsylvania to El Valle while their proceedings were still in progress. W.G.H. Decl. ¶¶ 5-7; J.A.V. Decl. ¶ 6-7; Carney Decl. ¶ 12 (G.F.F.); Lauterback Decl. ¶ 8 (W.G.H.); Shealy Decl. ¶ 5. Four of five Plaintiffs have been accused by the government of membership in Tren de Aragua or questioned about the gang. Lauterback Decl. ¶ 7 (W.G.H.); Carney Decl. ¶ 6 (G.F.F.); J.G.G. ¶ 3; J.A.V. ¶ 5. And all have pending asylum claims and upcoming hearings.[13] W.G.H. ¶ 3; J.A.V. ¶ 9 (master calendar hearing scheduled for March 19); J.G.G. ¶ 2; Lauterback Decl. ¶ 17 (W.G.H.'s master calendar hearing set for March 26); Carney Decl. ¶ 3 (G.F.F.'s individual calendar hearing set for March 17); Shealy Decl. ¶¶ 3-4.

ICE has told multiple Plaintiffs that the agency intends to put them on a flight sometime between March 14 and March 16. Lauterback Decl. ¶ 21; Shealy Decl. ¶ 8; J.A.V. ¶ 11. For example, officers told G.F.F. that he would be deported in the middle of the night on March 14. Carney Decl. ¶ 19. Plaintiffs are terrified of being removed to Venezuela without an opportunity to present their asylum cases. W.G.H. Decl. ¶ 11; J.A.V. Decl. ¶ 13; J.G.G. Decl. ¶ 6; Carney Decl. ¶ 20 (G.F.F.). At least one Plaintiff has been physically ill at the thought of having to return to Venezuela where they fear persecution. Carney Decl. ¶ 20.

Because Venezuela does not share lists of gang members with the United States, the U.S. government's process for ascertaining who is or is not a member of Tren de Aragua is a haphazard one that relies heavily on guesswork.[14] That guesswork will undoubtedly sweep in individuals like Plaintiffs

---

[12] As J.G.G.'s Declaration explains, his tattoos do not in fact indicate any connection to Tren de Aragua. *See* J.G.G. Decl. ¶ 4.

[13] On March 12, the date of W.G.H.'s first immigration court hearing, no one came for him to appear in court. W.G.H. ¶ 8; Lauterback Decl. ¶ 13.

[14] *See, e.g.*, Laura Strickler, et al., *'Ghost Criminals': How Venezuelan gang members are slipping into the U.S.*, NBC News (June 12, 2024), https://www.nbcnews.com/politics/immigration/tren-de-aragua-venezuelan-gang-members-slip-into-us-rcna156290 (former Border Patrol agent explaining that unless the government receives a

who are not, in fact, members of Tren de Aragua. *See, e.g.*, W.G.H. Decl. ¶ 12; J.G.G. Decl. ¶ 3; J.A.V. Decl. ¶ 5. In fact, several Plaintiffs fled Venezuela specifically *because of* fear of Tren de Aragua. W.G.H. Decl. ¶ 11; J.A.V. Decl. ¶ 3.

In the absence of emergency relief, the government's removal of Plaintiffs to Venezuela or El Salvador would subject them to grave harm. *See, e.g.*, J.G.G. ¶ 2; Carney Decl. ¶ 20 (G.F.F.); J.A.V. Decl. ¶ 13; W.G.H. Decl. ¶ 11 (all discussing fear of violence or death upon return to Venezuela). El Salvador's prisons are notorious for their extraordinarily harsh detention conditions, including police-inflicted torture, other abusive and degrading treatment, extreme overcrowding, lack of access to counsel, rampant filth and disease, and deprivation of basic necessities, including food, water, and health care.[15] The U.S. State Department has described these prison conditions as "life-threatening." U.S. State Dep't, *2023 Country Reports on Human Rights Practices: El Salvador*, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador.

These facts more than satisfy the TRO standard. Numerous courts have held that similar showings of threatened harm upon removal suffice to show irreparable injury. *See, e.g.*, *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (finding harsh conditions at Guantanamo that forced detainees to go on hunger strikes amounted to irreparable harm); *Americans for Immigrant Just. v. U.S. Dep't of Homeland Sec.*, No. 22-cv-3118 (CKK), 2023 WL 1438376, at *20 (D.D.C. Feb. 1, 2023) (finding irreparable harm satisfied for claims involving a lack of access to counsel); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 146 (D.D.C. 2018), *aff'd in part, rev'd in part on other grounds sub nom.*, *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) (finding fear of "domestic violence, beatings, shootings, and death" upon removal constitutes irreparable injury); *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (holding

---

Venezuelan immigrant's criminal history from Interpol, or unless the immigrant already has a criminal record inside the United States, "we won't know who they are").

[15] *See, e.g.*, Human Rights Watch, *El Salvador's prisons are no place for US deportees* (Mar. 13, 2025), https://www.hrw.org/news/2025/03/13/el-salvadors-prisons-are-no-place-us-deportees; Human Rights Watch, *Widespread Human Rights Violations Under El Salvador's "State of Emergency"* (Dec. 7, 2022), https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el#2330.

that removal to a country where one faces harm constitutes irreparable injury); *Demjanjuk v. Holder*, 563 F.3d 565, 565 (6th Cir. 2009) (granting stay for noncitizen who asserted removal would violate CAT); *Devitri v. Cronen*, 289 F. Supp. 3d 287, 296–97 (D. Mass. 2018) (risk of persecution if removed is irreparable harm); *Innovation Law Lab v. Nielsen*, 342 F. Supp. 3d 1067, 1081 (D. Or. 2018) (considering "serious harm—including persecution, torture, and death—that may result if asylum is improperly denied" in finding irreparable harm); *J.B.B.C. ex rel. Barrera Rodriguez v. Wolf*, No. 1:20-cv-1509, 2020 WL 6041870, at *2 (D.D.C. June 26, 2020) ("declaration describing the possible harms that would result from plaintiff's return to Honduras" established irreparable harm); *see also Sessions v. Dimaya*, 584 U.S. 148, 157 (2018) (noting in the void-for-vagueness context the "grave nature of deportation," a "drastic measure" often amounting to lifelong "banishment or exile"). Moreover, "It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citations omitted).

The threat of removal without the opportunity to apply for humanitarian protection further heightens the irreparable injury. *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021) (finding irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide"), *aff'd in part, rev'd in part on other grounds,* 24 F.4th 718 (D.C. Cir. 2022); *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 517 (D.D.C. 2020) (irreparable injury exists where class members were "threatened with deportation prior to receiving any of the protections the immigration laws provide"); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1504–05 (C.D. Cal. 1988) (plaintiffs would suffer irreparable harm if they were summarily removed without being afforded opportunity to exercise their right to apply for asylum).

Plaintiffs would further face irreparable harm if removed under the AEA because the government will falsely paint them as members of Tren de Aragua—putting them at further risk of harm. This harm is irreparable: once these falsehoods about Plaintiffs are made public, they "could not be made secret again." *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (Blackmun, Circuit J.); *Senior Executives Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012) (recognizing that disclosure of

information "is a bell that one cannot unring").

Once inflicted, the harm faced by Plaintiffs cannot be undone. "[O]nce expelled from the United States and outside the jurisdiction of the Court, a judicial remedy may be unavailable." *Huisha-Huisha*, 560 F. Supp. 3d at 172 (collecting cases where courts found deportation can render a remedy unavailable); *see also Int'l Immigrants Found., Inc. v. Reno*, No. 99-CV-5937, 1999 WL 787900, at *1 (E.D.N.Y. Sept. 29, 1999) (finding "irreparable harm" given "the threat of immediate deportation proceedings"). Nor can monetary damages repair the harm. *See New York v. DHS*, 969 F.3d 42, 86 (2d Cir. 2020) ("because money damages are prohibited in APA actions, [injuries that would result from implementation of a federal agency rule] are irreparable"); *see also Richards v. Napolitano*, 642 F. Supp. 2d 118, 134 (E.D.N.Y. 2009) ("absent injunctive relief, plaintiff faces mandatory deportation, which qualifies as 'irreparable injury'"). At bottom, "[u]nlike economic harm, the harm resulting from expulsion from the United States pursuant to an unlawful policy likely cannot be remediated after the fact." *Huisha-Huisha*, 560 F. Supp. 3d at 172.

Accordingly, Plaintiffs have demonstrated that they are at substantial risk of removal and that they will face serious and irreparable harm upon removal.

## III.    The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Temporary Restraining Order.

The balance of equities and the public interest factors merge in cases against the government. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citations omitted). Where, as here, the challenged governmental conduct deprives Plaintiffs of their rights and is contrary to the rule of law, both factors weigh in Plaintiffs' favor. The public—and therefore the government—has an interest in protecting the rights of people in detention and ensuring the rule of law. *See Nken v. Holder*, 556 U.S. 418, 436 (2009) (describing the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm"); *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) ("It is always in the public interest to prevent the violation of a party's constitutional rights." (quotation marks and citations omitted)); *Nunez v. Boldin*, 537 F. Supp. 578, 587 (S.D. Tex. 1982) (protecting the rights of people who face persecution abroad "goes to the very

heart of the principles and moral precepts upon which this country and its Constitution were founded");
*Torres v. U.S. Dep't of Homeland Sec.*, 2020 WL 3124216, at \*9 (C.D. Cal. Apr. 11, 2020) ("[T]he public
has an interest in the orderly administration of justice[.]").

Defendants cannot claim any public interest in proceeding with agency action that exceeds their
statutory authority. "[T]here is a substantial public interest 'in having governmental agencies abide by the
federal laws that govern their existence and operations.'" *League of Women Voters of United States v.
Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir.
1994)); *see also, e.g.*, *Make the Road N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 269 (S.D.N.Y. 2020) ("It is
axiomatic that the President must exercise his executive powers lawfully. When there are serious
concerns that the President has not done so, the public interest is best served by 'curtailing unlawful
executive action.'" (quoting *Hawaii v. Trump*, 878 F.3d 662, 700 (9th Cir. 2017), *rev'd and remanded on
other grounds,* 585 U.S. 667 (2018)). That is particularly true where the unlawful agency action will lead
to wrongful removals to Venezuela or El Salvador's prisons, where Plaintiffs and others will face life-
threatening conditions.

Second, Defendants cannot argue that there is any present risk to public safety to the government
since the individuals immediately subject to removal are already detained and not at liberty to interact
with the public. Nor is there any risk that individuals targeted by the AEA could in any way support the
alleged "invasion" by Tren de Aragua while they remain in detention. And even if the Proclamation
theoretically applies to yet-undetained individuals, law enforcement and immigration enforcement
officials lose no authority or ability to *lawfully* detain such individuals, even if the AEA Proclamation is
enjoined.

Third, not only does the Proclamation deprive Plaintiffs of their rights, *see supra* Sections I & II,
but it results in far-reaching harms to immigrant communities and to the public at large. The vagueness
and breadth of the expected Proclamation, along with the government's haphazard process for accusing
individuals of affiliation with Tren de Aragua, will undoubtedly result in fear and uncertainty about the
Proclamation's scope, and will chill immigrants in their day-to-day activities and the exercise of their

basic constitutional rights. In addition, Defendants' extraordinary and atextual invocation of a war power, outside of the context of an actual or imminent war, raises grave concerns about Defendants' unjustified invocation of war powers more generally—and the broader stability of the United States' legal order.

**IV.     The All Writs Act Confers Broad Power to Preserve the Integrity of Court Proceedings.**

In addition to this Court's general equitable powers, this is a textbook case for use of the All Writs Act ("AWA"), which provides federal courts with a powerful tool to preserve the integrity of their jurisdiction to adjudicate claims before them. *See* 28 U.S.C. § 1651(a) (authorizing federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law"). If Plaintiffs are illegally sent to a foreign country, and the foreign government assumes jurisdiction over the Plaintiffs, the Court will likely lose jurisdiction to remedy the unlawful use of the AEA.

The All Wits Act encompasses a federal court's power to "maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels," *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966), and courts have found that the Act should be broadly construed to "achieve all rational ends of law," *California v. M&P Investments*, 46 F. App'x 876, 878 (9th Cir. 2002) (quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)).

Whereas a traditional preliminary injunction requires a party to state a claim, an injunction based on the AWA requires only that a party identify a threat to the integrity of an ongoing or prospective proceeding, or of a past order or judgment. *Klay*, 376 F.3d at 1097 (a court may enjoin almost any conduct "which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion"). Thus, to issue an injunction pursuant to the AWA, this Court need not even find that there is a likelihood of success on the merits of the underlying claims. *See Wagner v. Taylor*, 836 F.2d 566, 571–72 (D.C. Cir. 1987) (showing of irreparable injury suffices); *Arctic Zero, Inc. v. Aspen Hills, Inc.*, 2018 WL 2018115, at *5 (S.D. Cal. May 1, 2018) (distinguishing AWA injunction from traditional preliminary injunction). Rather, it is sufficient for the Court to find that a party has identified a threat to the integrity of or "natural conclusion" of a federal case.

Courts have explicitly relied upon the AWA in order to prevent even a risk that a respondent's actions will diminish the court's capacity to adjudicate claims before it. *See Kurnaz v. Bush*, No. 04-cv-1135, 2005 WL 839542, *1–2 (D.D.C. Apr. 12, 2005) (enjoining Defense Department from transferring Guantánamo detainee with pending habeas petition, absent notice, outside the jurisdiction of the court); *Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995) (using the AWA to stay an order of deportation "in order to safeguard the court's appellate jurisdiction" and preserve its ability to hear subsequent appeals by the petitioner).

## V.     The Court Should Not Require Plaintiffs to Provide Security Prior to the Temporary Restraining Order.

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damage sustained by any party found to have been wrongfully enjoined or restrained." However, "courts in this Circuit have found the Rule 'vests broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (internal quotation marks, citation, and alterations omitted). District courts exercise this discretion to require no security in cases brought by indigent and/or incarcerated people, and in the vindication of immigrants' rights. *See, e.g.*, *P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020). This Court should do so here.

### <u>CONCLUSION</u>

The Court should grant Plaintiffs' motion for a temporary restraining order.


Dated: March 15, 2025                    Respectfully submitted,

Noelle Smith*                            /s/ *Lee Gelernt*
Oscar Sarabia Roman*                     Lee Gelernt (D.D.C. Bar No. NY0408)
AMERICAN CIVIL LIBERTIES UNION           Daniel Galindo (D.D.C. Bar No. NY035)
FOUNDATION                               Ashley Gorski*
425 California Street, Suite 700         Omar C. Jadwat*
San Francisco, CA 94104                  Hina Shamsi (D.D.C. Bar No. MI0071)

(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Patrick Toomey*
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich*
Skye Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs-Petitioners*

*\*Pro bono representation certificates or
Pro hac vice motions forthcoming*