<u>**GRACE CARNEY ATTORNEY AFFIRMATION:**</u>

<u>**ATTORNEY OF RECORD FOR G.F.F.**</u>

I, Grace Carney, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. My name is Grace Carney. I am a Staff Attorney at The Legal Aid Society within the New York Immigrant Family Unity Project ("NYIFUP"). I represent G.F.F. in his removal and bond proceedings. I first entered my appearance in this case on December 31, 2024.

2. G.F.F. was born in ▇▇▇▇, Venezuela on June 20, 2003, and lived there until he was around 16 years old, when he family fled the country for Ecuador.

3. On January 24, 2025, I filed with the Court a Form I-589, Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture on G.F.F.'s behalf, on the basis of his fear of return to Venezuela. His individual hearing is presently scheduled for March 17, 2025 at 1:00PM EDT at the New York Varick Immigration Court.

4. G.F.F. initially entered the United States at or near El Paso, Texas, on or about May 15, 2024. He was briefly detained by Customs and Border Protection, and a credible fear interview was conducted, before he was ultimately released on his own recognizance. Upon release, he reunited with an older brother, who was living in Chicago, before travelling to New York in November 2024, where he was ultimately detained by ICE.

5. G.F.F. was detained by ICE on December 6, 2024, following an ICE raid at apartment party he attended in the Bronx. Approximate 50 people were in attendance, most of which G.F.F. believed were Venezuelans. G.F.F. attended the party at the insistence of a friend. He did not know anyone else in attendance at the party.

6. Federal officers arrived at the party to execute an S.D.N.Y. arrest warrant for an alleged member of Tren del Aragua. Following the arrest of the individual named in the warrant, federal officers questioned G.F.F. and the other attendees. G.F.F. was thereafter detained at Orange County Jail in Goshen, New York. Upon his detention by ICE, DHS filed an I-213 identifying him as an "associate/affiliate of Tren del Aragua."

7. A motion for custody redetermination was submitted on January 24, 2025. In support, I submitted a copy of G.F.F.'s I-589 Application and a detailed declaration outlining the bases of his claims for asylum.

8. The Immigration Judge scheduled a bond hearing for January 29, 2025. According to DHS's submissions, the individual who was arrested at the party was an alleged member of Tren del Aragua. ICE also filed a ▇▇▇▇ article describing the arrest, wherein G.F.F. was identified as a gang member. ICE additionally filed an informational packet on the organization of Tren del Aragua.

1

9. The Immigration Judge concluded that G.F.F. had not met his burden in his bond proceedings. The Immigration Judge stated that there was insufficient corroboration that, despite no criminal record, G.F.F. presented a danger to the community and a flight risk.. The Immigration Judge based his decision on DHS's I-213 and an ▇▇▇▇▇▇▇▇ identifying G.F.F. as a gang member.

10. G.F.F.'s bond appeal briefing is due to the BIA April 4, 2025. In the interim, G.F.F. and I move forward with preparing for his upcoming individual hearing scheduled for March 17, 2025.

11. On the afternoon of Sunday, March 9, 2025, I learned that G.F.F. had been transferred from Orange County Jail ("OCJ") to Moshannon Valley Processing Center ("MVPC"), in Phillipsburg, Pennsylvania overnight. I confirmed this was the case by checking the ICE Detainee Locator, which indicated that G.F.F. was at Moshannon. I reached out to MVPC that evening via email to schedule a client call at the soonest opportunity.

12. The next morning on Monday, March 10, 2025, I learned from a colleague that her client, a fellow Venezuelan who had also been transferred from OCJ to MVPC over the weekend, had again been transferred to El Valle Detention Facility ("EVDF"), in Raymondville, Texas. I again checked the ICE Detainee Locator and learned that G.F.F. had been again transferred to EVDF. Upon learning this, I reached out to EVDF via email and via telephone to schedule a call with him. I did not receive a response to my multiple attempts to contact EVDF until 6:00PM March 11, 2025.

13. On Wednesday, March 12, 2025, I was able to speak with G.F.F. over video for the first time since he had been transferred. He described the process of his transferred from Orange County to Moshannon, and noted that it appeared only Venezuelans were transferred. He explained he was very nervous and that no one had told him why they were being transferred.

14. At approximately 8:00AM, on Friday morning, March 14, 2025, I was alerted by Legal Aid Society colleagues of rumors of transfers and/or possible deportations of Venezuelan clients from El Valle, Texas, pursuant to reports of President Donald Trump's invocation of the Alien Enemies Act of 1798. Upon learning this, I checked the ICE Detainee Locator, which indicated G.F.F. was still located at EVDF.

15. I immediately contacted EVDF via telephone to inquire as to G.F.F.'s location, and to confirm our scheduled call later that morning. Officer Mary Lou Mesa at EVDF informed me that G.F.F. had been transferred the night before, and explained she was unable to share his location. I indicated that I had a G-28 on file and was the attorney of record in G.F.F.'s case, and that he had an individual hearing scheduled on Monday March 17, 2025. Officer Mesa again informed me that she was unable to share where he was located but confirmed that he was no longer at EVDF.

16. At 1:00PM EDT on March 14, 2025, I received a text message to my work cellphone from EVDF indicating that "A resident from EVDF would like to start a video call." I promptly telephoned EVDF to confirm whether this was my client, or an error, and was informed by

the officer that my client was "back" and available to join the previously scheduled video call. When I inquired about where my client had been, I was told that they could not share that information with me.

17. I joined the video call and was able to speak directly with G.F.F. When I asked what happened, G.F.F. informed me that he had been awoken the night before at 2:30AM by EVDF officers and was told he was being deported. He informed me that he was told to collect his belongings and showed me a bag of his personal effects with him. He said that the officers told him that he was going to be placed on a flight to either Mexico or Venezuela. He explained that he and several other Venezuelans were all told the same thing and brought to a separate room at EVDF to await deportation. He was not told whether he was going to Mexico or Venezuela. He said that the officers told him if he was sent to Mexico, he would be left "on the street."

18. G.F.F. said that he and the other individuals were held in the room from when he was awoken to until right before our call, which was at 1:00PM EDT. At the time of our call, G.F.F. still had his personal effects with him in a bag, as he had yet to go back to his cell. He said that he did not sleep that night or eat, and that his last meal was dinner the evening before.

19. At the time of our conversation, G.F.F. informed me that he was told that his flight was cancelled but did not know why. He shared that the officers told him he would be deported in the "middle of the night" on March 14, 2025. I later learned from colleagues at the Legal Aid Society that the flight was reportedly cancelled due a fire.

20. G.F.F. and I spoke for about thirty minutes about what happened and next steps before he informed me that he felt physically ill due to the prospect of imminent deportation to Venezuela or Mexico. He explained that he had not eaten or slept, and that he was very anxious about being sent to live on the street in Mexico, where he was previously threatened, or Venezuela, where he fears persecution. He told me he wanted to do everything possible to fight his case, and said he could not go back there. G.F.F. thereafter told me he thought that he was going to vomit and said he had to leave, before ending the video call.

21. As of the time of writing this affirmation at 5:00PM EST on March 14, 2025, I have not been informed about what will happen to my client, and whether he will be deported this evening, or whether he will be produced for his hearing on Monday March 17, 2025.

I, Grace T. Carney, affirm under penalty of perjury, that the foregoing is true and correct.

Date: 03/14/2025

Grace T. Carney

3