UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G., et al.,

                Plaintiff(s),

     v.

DONALD J. TRUMP, et al.,

                Defendant(s).

Civil Case
No. 25-00766 JEB

Washington, D.C.

March 17, 2025

------------------------------------------------------------

HEARING
BEFORE THE HONORABLE JAMES E. BOASBERG
UNITED STATES DISTRICT CHIEF JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):    Lee Gelernt, Esquire
                        Daniel A. Galindo, Esquire
                        American Civil Liberties Union
                        125 Broad Street
                        18th Floor
                        New York, New York 10004

                        Skye Perryman, Esquire
                        Somil Trivedi, Esquire
                        Sarah Rich, Esquire
                        Bradley Girard, Esquire
                        Democracy Forward Foundation
                        P.O. Box 34533
                        Washington, D.C. 20043

                        Arthur B. Spitzer, Esquire
                        Scott Michelman, Esquire
                        ACLU Foundation of the
                         District of Columbia
                        529 14th Street Northwest
                        Suite 722
                        Washington, D.C. 20045

APPEARANCES (Cont.):

FOR THE DEFENDANT(S):    Abhishek Kambli, Esquire
                         United States Department of Justice
                         950 Pennsylvania Avenue Northwest
                         Washington, D.C. 20530

                         August E. Flentje, Esquire
                         United States Department of Justice
                         P.O. Box 868 Ben Franklin Station
                         Washington, D.C. 20044


REPORTED BY:             Tammy Nestor, RMR, CRR
                         Official Court Reporter
                         333 Constitution Avenue Northwest
                         Washington, D.C. 20001
                         tammy_nestor@dcd.uscourts.gov

1   The following proceedings began at 5:01 p.m.:

2           THE COURT:  Good afternoon, everybody.

3           THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

4   The public line is connected.  I have made the speech.

5           We are here today for a hearing in Civil Action

6   25-766, JGG, et al. versus President Donald Trump, et al.

7           Beginning with counsel for the plaintiff, please

8   approach the lectern and identify yourself for the record.

9           MR. GELERNT:  Good afternoon, Your Honor.  Lee

10  Gelernt for the plaintiffs from the ACLU.

11          THE COURT:  Good afternoon.  Do you want to introduce

12  the others at your counsel table?  It's up to you.

13          MR. MICHELMAN:  Good afternoon, Your Honor.  Scott

14  Michelman, ACLU of the District of Columbia.

15          THE COURT:  Welcome.

16          MS. PERRYMAN:  Your Honor, good afternoon.  Skye

17  Perryman of Democracy Forward Foundation.

18          THE COURT:  Thank you.

19          MR. SPITZER:  Arthur Spitzer from the ACLU for the

20  plaintiffs.

21          THE COURT:  Good afternoon.

22          MR. TRIVEDI:  Somil Trivedi from the Democracy

23  Forward Foundation also for the plaintiffs.

24          THE COURT:  Great.  Thanks so much.  And I know we've

25  got some others on Zoom.  Thank you.

1      Government.

2      MR. KAMBLI: Good afternoon, Your Honor. Abhishek

3 Kambli for the United States. And I have seated with me

4 August Flentje for the United States as well. And we will

5 be representing all defendants.

6      THE COURT: Great. And I'm sorry. Can you just

7 spell your last name for me.

8      MR. KAMBLI: Yes, Your Honor, Kambli, K as in kilo, A

9 as in alpha, M as in Mike, B as in bravo, L as in Lima, I as

10 in India.

11      THE COURT: Thanks so much. And welcome to you and

12 Mr. Flentje. Thank you.

13      Okay. So the purpose of this hearing today is not to

14 address the merits of my TRO decisions on Saturday which

15 involved the interplay of complex legal doctrines that we

16 have discussed. Those TROs are both on appeal. And I will

17 also, absent a stay from the court of appeals, be

18 considering them again in our Friday hearing after getting

19 briefing from both sides and having more than a few hours to

20 consider the questions, as was the case Saturday.

21      I have called today's hearing solely to perform fact

22 finding about the government's compliance with my orders

23 given both the ambiguous notice filed by the government

24 yesterday and plaintiff's response very early this morning.

25      Now, I know the government has just asked the court

1  of appeals to stay this hearing itself and asked for me to

2  be removed from the case.  I haven't heard that they have

3  done so.  Mr. Kambli, have you?

4          MR. KAMBLI:  I have not, Your Honor.

5          THE COURT:  Okay.  Then we will go ahead.

6          Now, I want to focus here on the time lines involved

7  and also to get a sense of numbers of people here.  And

8  again, I just want to obtain some facts here.  I'm not

9  planning to issue any rulings about the government's conduct

10  today.  It's just to get information.

11          And I will give -- I want to hear from the

12  government, but if the plaintiffs have reason to disagree

13  with the facts the government gives me, I will let you have

14  a chance, Mr. Gelernt.

15          So, Mr. Kambli, why don't you come to the podium

16  then.

17          So let me -- let's start with the question of is it

18  still true, as Mr. Ensign represented on Saturday, that the

19  five individual plaintiffs in the suit who are subject to

20  the first TRO are still in the United States?

21          MR. KAMBLI:  Yes, Your Honor.  That is what we

22  represented, and that is what I have been told is true.

23          THE COURT:  I'm just confirming.  Great.

24          So the first sort of basic question that I wanted to

25  ask, and you have given, I think, a response in your most

recent filing this afternoon, but just to confirm was, how
many planes departed the United States at any point on
Saturday carrying any people being deported solely on the
basis of the proclamation?

MR. KAMBLI:  Your Honor, as we stated in our motion
in response to vacate this hearing, those are operational
issues, and I am not at liberty to provide or authorized to
provide any information on how many flights left.  The
information that I am authorized to provide is that no
planes took off from the United States after the written
order came through.

And the other information that I can relay is that
the two planes that the plaintiffs cite in their filing, the
timing of whether it was during the verbal order or the
written order does not have any material bearing based on
the time lines that they have given.

But that is the only information that I am authorized
to give based on national security concerns, diplomatic
concerns, and that is all I can provide as far as facts.

THE COURT:  Okay.  Well, let's talk about that for a
minute.  First of all, I think you did represent in your
most recent filing, and that seems to be what you are saying
here today, that the third flight that the plaintiffs
identified, and that's the one that the plaintiff identified
as having departed from Texas at 7:37 p.m. and landing in

1    Honduras at 9:46 p.m., that's the one that your pleading at

2    footnote 1 on page 3 says, that flight carried detainees who

3    were removable on grounds other than the proclamation and

4    is, therefore, irrelevant.

5           So what you are saying is that anybody on that plane

6    that left after my written order was not removed from the

7    United States on the basis of the proclamation?

8           MR. KAMBLI:  That is my understanding too, Your

9    Honor.

10          THE COURT:  Okay.  So then the question is, as to the

11    other flights, and so the plaintiffs identify two, and you

12    say it here in the pleading, you refer to two flights.  I'm

13    sorry.

14          So I know you mentioned two flights that the

15    plaintiffs refer to because they give times, one leaving

16    Texas at 5:26 p.m. and one leaving Texas at 5:45 p.m.  So

17    you are saying that there are more than two, or you are not

18    stating whether there are or are not more than two?

19          MR. KAMBLI:  Your Honor, I'm not at liberty to

20    disclose anything about any flights.  And the only reason I

21    mentioned those two is because those were two that

22    plaintiffs explicitly stated.

23          THE COURT:  Okay.  So you are saying you can't

24    mention them publicly?

25          MR. KAMBLI:  I cannot mention them in a public

1    setting, and I don't have the information on any other

2    flight that I can represent.

3         THE COURT:  Okay.  We can put the husher on, and you

4    can come to the bench and tell me so nobody else will hear

5    that information besides me.

6         Wait.  You just said you don't have the information?

7         MR. KAMBLI:  Your Honor, the only information that I

8    am authorized to disclose at this point --

9         THE COURT:  Wait.  To disclose to whom?  To anybody

10   including me?

11        MR. KAMBLI:  Yes, Your Honor, at this time is what's

12   in this motion.

13        THE COURT:  Okay.  So what's the basis of not

14   disclosing it to me?

15        MR. KAMBLI:  Your Honor, it is based on national

16   security concerns with flight patterns and things of that

17   sort.

18        THE COURT:  Okay.  So why -- hold on.  So if you are

19   saying that it's classified, which I haven't heard that word

20   yet, I also review classified information all the time.  In

21   fact, as you well know, I was the presiding judge of foreign

22   intelligence surveillance court in which capacity we only

23   looked at classified information.

24        So are you saying it's classified and that's why I

25   can't see it, or are you saying there's some other basis?

1    MR. KAMBLI:  Your Honor, we can discuss with the

2    clients the possibility of an in camera review, but we would

3    not want to disclose this information even in a closed

4    hearing.

5        THE COURT:  Why are you showing up today and not

6    having answers to why you can't even disclose it, in other

7    words, to me?  That's the purpose of the hearing is so we

8    can find out answers.  And again, maybe those answers are

9    classified.  Maybe they are.  Maybe those answers are not

10   classified, but they shouldn't be for the public.  Fine

11   also.  But you are telling me you don't even -- you can't

12   even tell me which of those applies?

13       MR. KAMBLI:  Your Honor, all I can say is that I'm

14   authorized to say what we have said in this public filing,

15   and to the extent that there's anything more, it's not

16   relevant because we do believe that we complied with the

17   court order, which is that no flights took off from U.S.

18   territory after the written order.

19       THE COURT:  Yeah, but that's not -- that's another

20   question.  That does not comply with my order.  So let's go

21   back to the -- in other words, that's not the extent of my

22   order.  My order is broader than that.  It's not a question

23   of taking off from U.S. territory, as anyone who has

24   reviewed the transcript of the hearing knows.

25       So what I want to know then is you are telling me --

1   so how about if we come back here tomorrow, and then you can

2   tell me that you will provide the information to me in

3   private?  If you tell me it's classified, then we will go

4   down to a classified facility in this building, and you can

5   give me that information then.  And if what you are saying

6   is it's classified and you can't tell me, then you are going

7   to need to make a good showing as to why that is, which can

8   even rely on classified materials.

9         For example, in the states secrets case of United

10  States versus Reynolds, which is 345 U.S.1, 1952 Supreme

11  Court case, which would appear to me the only basis for not

12  being able to tell me this information, even then you would

13  have to make a showing to me of why you can't tell me.  I

14  would be interested to hear what that showing is given other

15  classified information that has been provided.

16        So can you come to me -- can we on this part of the

17  hearing -- can you provide in writing tomorrow by noon what

18  your position is on communicating this information to me?

19        MR. KAMBLI:  Yes, Your Honor.  We can provide that

20  and consult with the clients on that.  But we don't believe

21  that it's necessary because we do believe that we complied

22  with the written order.  And I can talk to the Court a

23  little bit about why we believe that is.

24        THE COURT:  All right.  Hold on.

25        Let me just ask Mr. Gelernt if you want to be

heard -- I'm sorry.  Let me stop for a second.

Let me just tell you the questions that I wished you to answer and that I would be asking you.  And this is what you can tell me, in what setting you will give me this information or why you won't give it to me in any setting.

One is, how many planes departed the United States at any point on Saturday carrying any people being deported solely on the basis of the proclamation?

Second is, how many people in that category were on each plane?

Third, what foreign country or countries did each plane land in?

And for each of those planes, I want to know what time it took off from the United States and from where, what time you contend it left U.S. airspace, what time it landed in each foreign country including if it made more than one stop, and what time individuals were transferred from the plane into that country's custody.

Mr. Kambli, would you like me to repeat those?

MR. KAMBLI:  No, Your Honor.

THE COURT:  You are also obviously free to get a transcript.

MR. KAMBLI:  Yes, Your Honor.  We will get a transcript to verify.  But we do want to be heard on the issue of why we believe that we complied with the

1    injunction --

2         THE COURT:  All right.  And I will give you that

3    opportunity.  And that's sort of the second phase of this.

4    So I'm just going to ask Mr. Gelernt if Mr. Gelernt has

5    any -- if you believe there are other questions that should

6    be asked, and second, if you have any response to my

7    proposal regarding the plaintiffs respond by noon -- I'm

8    sorry, the defendants respond by noon tomorrow explaining to

9    me why they can or cannot divulge this information.

10        So I will just have Mr. Gelernt speak to that for a

11   moment, and then I will bring you back, Mr. Kambli.  I

12   promise.

13        MR. GELERNT:  Thank you, Your Honor.  I want to

14   choose my words very carefully here.  You know, there's been

15   a lot of talk over the last seven weeks about constitutional

16   crisis.  People are throwing that term around.  I think we

17   are getting very close to it.  And what I would ask, the

18   factual questions, they were all exactly what we would want

19   to know with the addition, and maybe this was embedded in

20   your questions, of what specific authority was the basis for

21   the removal on each flight, because one of the things that I

22   think is most prominent in their papers is that -- an

23   admission that there was a flight that left after even your

24   written order, that's the third flight, and they are saying

25   no one was subject to the proclamation.

1    So if there were people on that flight and they were

2    going to another country, I think we would want to know

3    exactly what the authority was and whether they are trying

4    to be somewhat sort of --

5    THE COURT:  But the inquiry here is have they obeyed

6    my order, which is what you raised in your response saying

7    we have reason to believe they didn't.

8    MR. GELERNT:  Right.

9    THE COURT:  Whether there are other people on this

10   flight who aren't --

11   MR. GELERNT:  No, Your Honor, I apologize if I wasn't

12   being clear.  I just meant was there anybody on those --

13   that third flight who was subject to the proclamation.  We

14   obviously -- and we made it clear to you at the hearing that

15   if they have authority to remove people on other grounds,

16   that's not this case.

17   THE COURT:  But they've said -- I'm sorry.  He's

18   represented to me that there was not anybody on that flight.

19   MR. GELERNT:  And, Your Honor, all I would ask is

20   that if they are going to submit something, we would ask

21   that they submit something in a sworn declaration.  This is

22   the second time they are responding to this issue only in

23   pleadings.  And I think you referenced that you have

24   pleadings in front of you but not sworn declarations.

25   I think at this point, we would ask Your Honor to

1    direct the government to provide sworn declarations or have

2    someone come in and testify under oath whether anybody on

3    that third flight was subject to the proclamation.

4         And the only thing I just want to make sure is that

5    the government seems to be trying to nuance between

6    authority under the Alien Enemies Act and authority under

7    the president's executive powers under Article II.  And

8    obviously the proclamation rests on both.  And Your Honor's

9    order was specific to the proclamation.

10        So we hope the government, if someone was subject to

11   the proclamation but they think, oh, well, maybe they were

12   also subject to the executive -- the government's executive

13   powers under Article II, that that's not what they are sort

14   of trying to do here.

15        THE COURT:  Okay.

16        MR. GELERNT:  Thank you, Your Honor.

17        THE COURT:  All right.  Mr. Kambli, any objection to

18   providing a sworn declaration that no one on the third

19   flight was subject to the proclamation?

20        MR. KAMBLI:  Your Honor, we have made that

21   representation.  And if the Court is directing it, we will

22   obviously comply with any court order.

23        But going back to my original point, none of this is

24   necessary because we did comply with the Court's written

25   order and did rely in good faith on it, and I can walk you

1      through the reasons why.

2           THE COURT:  Okay.  That's what we will get to next.

3           So yes, I will require you to file a sworn

4      declaration that no one on that third flight was subject to

5      the proclamation.

6           MR. KAMBLI:  Your Honor, my understanding first of

7      your order was that we will provide a notice as to how this

8      information and under what circumstances, that's what's due

9      at noon tomorrow?

10          THE COURT:  Correct.

11          MR. KAMBLI:  And the --

12          THE COURT:  Is there any reason you can't provide me

13     that sworn declaration by tomorrow too?

14          MR. KAMBLI:  Your Honor, it depends on how the Court

15     rules on the manner in which everything else is provided,

16     because if it is something that's going to be in a closed

17     hearing, then that's something different and the mechanics

18     of getting that would be different.

19          THE COURT:  Well, just a sworn declaration on the

20     record that just supports what you have said in your

21     pleadings.

22          MR. KAMBLI:  And that's limited to the third flight?

23          THE COURT:  Yes.

24          MR. KAMBLI:  Okay.  I can ask the clients about that.

25          THE COURT:  I will require that that be submitted by

1    noon tomorrow.

2          MR. KAMBLI:  Okay.

3          THE COURT:  All right.  So now you can tell me why

4    you think that other flights comply with my order.

5          MR. KAMBLI:  Yes, Your Honor.  So I would direct the

6    Court's attention to page 42 of the transcript.  It says,

7    And I will issue a minute order memorializing this so that

8    you do not have to race to write it down.

9          And the big issue is that this is a fast-moving case

10   where there's a lot of operational national security and

11   foreign relations at risk, and in Bates v. Johnson, 901 F.2d

12   1424, 1427, 7th Cir., 1990, it says, Oral statements are not

13   injunctions and that the written orders always supersede

14   whatever may have been stated in the record.

15         And especially when the Court has said that it will

16   issue a minute order memorializing this so that you don't

17   have to race to write it down, the defendants on good faith

18   understood the written order to be the order of the Court.

19         Now, I was not in the discussions and wouldn't be

20   able to relate attorney-client advice given anyway, but we

21   do believe that that is a good faith interpretation of what

22   the Court said.

23         THE COURT:  So your first argument is that when I

24   said -- and let's go through the record.  I think it was on

25   43.  So when I said, So, Mr. Ensign, the first point is that

1    I -- that you shall inform your clients of this immediately

2    and that any plane containing these folks that is going to

3    take off or is in the air needs to be returned to the United

4    States, but those people need to be returned to the United

5    States.  However that is accomplished, whether turning

6    around a plane or not embarking anyone on the plane -- I

7    think I meant disembarking -- or those people covered by

8    this on the plane, I leave to you, but this is something

9    that you need to make sure is complied with immediately.

10   And then I said, Okay.  We need to set briefing and hearing

11   schedules.

12        So you are telling me, your first argument is that

13   when I said those things, because it wasn't in the --

14   because I didn't say in the minute order that the planes had

15   to be turned around, you didn't have to comply?  That's the

16   argument?

17        MR. KAMBLI:  Your Honor, we believe that there was no

18   order given because the written order is what controls.  An

19   injunction is not ordered until it's in the written filing.

20   And that's what Bates v. Johnson effectively says, oral

21   statements are not injunctions.

22        THE COURT:  These weren't statements.  This was an

23   order.  Now, obviously when one is dealing in a TRO

24   situation, I memorialized it in shorthand, but you are

25   telling me that that very clear point, you are saying that

1    you felt that you could disregard it because it wasn't in

2    the written order?  That's your first argument?

3         MR. KAMBLI:  Your Honor --

4         THE COURT:  Is that a yes?

5         MR. KAMBLI:  Your Honor, I am stating what the

6    position of the United States is, which is that the Court

7    had directed that they will issue a minute order

8    memorializing what would happen.  And the case law has flat

9    out said that when there's a written order, that supersedes

10   whatever may have been stated in a hearing.

11        And without -- there is a reason that this is

12   important, Your Honor.  Without the written order on that

13   issue -- now, obviously the timing of this would have made

14   it nearly impossible to even come close to being able to

15   appeal.  But taking that statement on its own, if it's not

16   reflected in the written order, the United States wouldn't

17   have the ability to appeal it.

18        THE COURT:  You are saying because you couldn't

19   appeal?  Well, there are situations where TROs issue when we

20   all hope that there's time to appeal, but there are

21   occasions when the act to be enjoined is happening so

22   quickly that it's just not practical to appeal.  And that

23   happens from time to time.

24        And this was one of those times.  And it was one of

25   those times because of the government's actions, not because

1    of my actions, that you knew that at -- you knew in the

2    morning that there would be a hearing at 5:00.  So any plane

3    that you put into the air in or around that time, you knew

4    that I was having a hearing at 5:00 about.  So when I said

5    directly to turn the plane around, to turn those planes

6    around, the idea that because my written order was pithier,

7    that this could be disregarded, that's a heck of a stretch,

8    I think.

9         MR. KAMBLI:  Your Honor, it's not about disregarding.

10   And respectfully, the morning order was on the five

11   plaintiffs.  And regardless, even if there is a question

12   about whether that was with -- the verbal statement was

13   within the order or not, we do believe that for all intents

14   and purposes, to the extent that anyone was in international

15   waters, they were removed for the purpose of 50 U.S.C. 21,

16   which --

17        THE COURT:  All right.  So that's the second point.

18        So the first point is we didn't have to obey your

19   oral ruling.  And the second point is even if we did have to

20   obey it, that we, in fact, obeyed it.  Right?

21        MR. KAMBLI:  Yes, Your Honor.

22        THE COURT:  Okay.  Is the argument -- so I guess

23   there's sort of two different pieces of this argument.  One

24   piece could be, well, we were in -- which I have heard as a

25   justification is we were outside United States airspace and,

1    therefore, did not have to -- and, therefore, the Court did

2    not have jurisdiction to order the planes to turn around.

3    Is that your argument?

4            MR. KAMBLI:  Your Honor, that's what the statute

5    says.  It uses the term removal for when it's effectuated.

6    And removal, if you look at Nicusor-Remus v. Sessions, 902

7    F.3d 895, 899 9th Cir., 2018, it says that removed happens

8    when they left the United States regardless of how long the

9    alien remains outside the United States, or two, when the

10   alien departs.  And that aligns with Black's Law Dictionary

11   of the ordinary meaning of the word remove, which is to

12   transfer or move a person from a thing or location,

13   position, or residence to another.

14           THE COURT:  Right, but the problem is the equitable

15   power of United States courts is not so limited.  In fact,

16   it's pretty clear that equity is extraterritorial reach,

17   that it's not a question that the plane was or was not in

18   United States airspace.  The point is that even if the

19   enjoined acts were outside the territory of the jurisdiction

20   of the United States, you can't violate the injunction.  If

21   you don't like it, you can appeal it or seek to modify it.

22   But what argument do you have that equity stops at this

23   country's borders or at least its airspace borders?

24           MR. KAMBLI:  Your Honor, the general presumption is

25   the statute does not apply extraterritorially or any legal

order to begin with.  And this is about whether the United States --

THE COURT:  I'm not talking about the statute.  I'm talking about my use of equity in enjoining you to return the plane.  That has extraterritorial reach.  It doesn't matter whether you are in United States airspace or not.

What's your argument that -- what's your argument that my equitable powers cannot attach anything outside of United States airspace?

MR. KAMBLI:  Your Honor, our argument would be the Court lost jurisdiction the moment that they were outside of U.S. airspace, and that is what the case law in the matter says and that is what the statute says.

And then that is what we have said is that when they have been physically removed, the statute is complete and the Court has lost jurisdiction even if it may believe that it could have had jurisdiction, but the jurisdiction is actually lost because the act is completed.  The Court --

THE COURT:  Okay.  But again, isn't the response to what you think is an unconstitutional or improper or illegal injunction to seek its modification or appeal it?

MR. KAMBLI:  Your Honor, when the planes are in the sky, and these are sensitive operational tasks of national security, that's not a call that can be made in a split second.

1    THE COURT:  All right.  So isn't then the better

2    course to return the plane to the United States and figure

3    out the answer as opposed to going forward and saying we

4    don't care, we will do what we want?

5    MR. KAMBLI:  Your Honor, that is not the approach

6    that we have taken.  That would lead into my third argument,

7    which is the president's inherent authority.  The president

8    is the commander in chief of the armed forces.  He is

9    authorized to direct the movements of military forces in his

10   command.  And he is empowered to engage in diplomatic

11   negotiations and foreign relations.

12       And what the possible options were, what we are

13   talking about is whether there was good faith compliance

14   with the injunction and whether the United States believed

15   it reasonably, which they did in this scenario.

16       And when you talk about what the powers are to

17   continue this operation once the planes have been removed

18   from U.S. territory, it goes back to the Article II powers

19   of the president, and those are not traditionally subject to

20   judicial review.

21       The deposition of Michael Kozak in the D.C. Circuit

22   highlights why that is it.  It says, quote, These

23   arrangements were the result of intensive and delicate

24   negotiations between the United States and El Salvador and

25   between the United States and representatives of the Maduro

regime, and the foreign policy of the United States would

suffer harm if removal of individuals associated with TdA

were prevented taking into account the significant time and

energy expended over several weeks by high-level U.S.

government officials.

THE COURT:  I'm not calling into question the

government's foreign policy.  I'm not calling into question

the length or content of any negotiations.  I am just asking

how you think my equitable powers do not attach to a plane

that has departed the United States even if it's

international airspace.

Now, if your argument is we were wrong, we violated

your order, but we thought we weren't or we did so in good

faith, I will hear that.  I haven't heard it yet.

MR. KAMBLI:  Your Honor, we believe that we complied

with the order.  And the other -- the argument that we are

making is that once they are in international waters, the

president has authority outside of the Alien Enemies Act

which would not have been subject to either order.

And that is the point that we are trying to make in

terms of making military movements, in terms of foreign and

diplomatic negotiations which this all involved.  This

involved sensitive discussions and sensitive operations with

foreign nations.  When they are outside of the U.S.

territory, that is all power that the president has --

1        THE COURT:  Wait a minute.  So this power exists

2  once -- the president's foreign affairs power exists once

3  the plane crosses from U.S. airspace to international

4  airspace, but it doesn't exist before that?

5        MR. KAMBLI:  Your Honor, that's where the president's

6  authority is at its strongest is when it deals with foreign

7  relations.  And this does definitely deal with foreign

8  relations, especially since this was a sensitive operation

9  that was --

10        THE COURT:  I understand but --

11        MR. KAMBLI:  -- over the course of several weeks --

12        THE COURT:  I got that point.  But you are saying

13  that the president somehow has extra powers over a plane

14  once it's crossed into international airspace from U.S.

15  airspace?  That's the point?

16        MR. KAMBLI:  Your Honor, when operation crosses into

17  international territory, there are other powers at play

18  beyond the Alien Enemies Act.  And our point is, first, we

19  do believe that we complied with the written order; two,

20  that the Court lost jurisdiction once the plane crossed

21  outside of the United States, and --

22        THE COURT:  I think, again, I think that my equitable

23  powers are pretty clear that they do not lapse at the

24  water's edge, or I should say actually at the continent's

25  edge or the airspace's edge, that my equitable powers do not

1  lapse at that point.

2       I mean, these are -- they are interesting questions,

3  but it would be better to be arguing them based on an

4  agreed-upon set of facts, which is why I was hoping to get

5  those facts from you today, and then we could have further

6  argument and briefing on it.

7       So I guess what we need to do though first is to see

8  what you are going to tell me about the facts.  But let me

9  just -- I will have you sit down for a moment.

10      And I will just hear from Mr. Gelernt to the extent

11 you want to respond.  And I'm not planning to make any

12 rulings today.  I wasn't even if I had gotten these facts.

13 But I wasn't intending to make any rulings because I want to

14 give people time to brief this about whether there is a

15 violation and about the reach of equity.  But I wanted to

16 get a sense of your position.

17      Mr. Gelernt, I will hear you, again, to the extent

18 you want to put anything on the record responding to that.

19      MR. GELERNT:  Thank you, Your Honor.  I think the

20 critical point is the one you made before about how you deal

21 with a TRO that you don't agree with.  I think the first

22 point is, of course, you come back and clarify what the

23 minute -- whether there was any distance between the minute

24 order and the oral order.  Obviously there was not.  And you

25 started your minute order by saying, as discussed orally.

And you could not have been clearer orally.  And you also made clear that it was in custody.

So if the administration had remotely any thought that there was some reason why you were backing off in your minute order, which is implausible to begin with, they should have come right back to you and clarified it.

The second point is if they thought you didn't have jurisdiction even though these individuals were in U.S. custody simply because they left U.S. airspace, that's a merits question that they should have appealed or asked you to continue the hearing or something along those lines.

So while I grant you that there may be interesting questions there, I mean, I actually think that the Court always retains, I think as Your Honor was suggesting, equity jurisdiction if they are in U.S. custody.  And you know, for example, Judge Sullivan told a plane to turn around in Grace v. Sessions, and that's not uncommon.

Ultimately that's a question that they should have taken up to the D.C. Circuit by a phone call if they wanted or back to you.  So even if you were to decide, well, maybe I didn't have jurisdiction, that gives them no basis for simply not complying with the order.

So I sort of hear them saying two things.  One is, well, that's how we interpreted the order.  On that point, I think I would ask Your Honor respectfully if you would

direct the government to put in a sworn declaration about
who in the government took that position and said to the
operations people don't bother turning the planes around and
we will take the position that it was outside of U.S.
territory if that, in fact, is what happened.

The second point, again, is, you know, you would have
turned the plane around and let the D.C. Circuit appeal go
on, but I don't think that this sort of retrospective look
at that justifies defying the injunction.

THE COURT:  Okay.  Thank you very much.

MR. GELERNT:  Thank you, Your Honor.

A few other last questions for you, Mr. Kambli, that
I hope you will be able to answer for me which do not relate
to the contempt -- or the possible defiance of the court
orders.

The first is I have heard various explanations of
whether the proclamation at issue was actually signed or
issued in secret on Friday and only published on Saturday or
if it was actually -- if it actually was issued on Saturday.
I note it's dated on Saturday.  When I say that, I mean
March 15 as opposed to Friday, March 14.

Can you tell me -- and at the hearing, Mr. Ensign
informed me he would look into the timing and give me the
answer.  So do you have the answer for me?

MR. KAMBLI:  Your Honor, I was only preparing for

1    this -- the particular questions that related to compliance

2    with the TRO, so I don't have the answers right now as to

3    that particular question.

4         THE COURT:  Okay.  Well, I will have you, since

5    Mr. Ensign was finding that out, I will ask that you give

6    that answer to me by noon tomorrow also, which is the timing

7    of the proclamation and what your contention is on when it

8    went into effect.

9         MR. KAMBLI:  Yes, Your Honor.

10        THE COURT:  Okay.  The next issue, and Mr. Gelernt,

11   you may have an answer to this too, is how many people, and

12   a ballpark figure is fine, subject to the proclamation in

13   your view remain in the United States?  And of that number,

14   how many are in U.S. custody now?

15        I trust you are going to tell me you don't have any

16   answer to that, Mr. Kambli.

17        MR. KAMBLI:  I don't have the answer to that at this

18   point, Your Honor.

19        THE COURT:  Mr. Gelernt, do you have a sense of that?

20   That's sort of an interesting question.

21        MR. GELERNT:  We don't, Your Honor, and partly

22   because everything is being done -- I mean, actually, more

23   than partly because everything is being done in secret, and

24   individuals are not even getting a hearing to say that they

25   are not part of this gang and, therefore, are not subject to

the proclamation.  They are just being whisked away.  And
since it's forward-looking, we just don't know how many
people have so far been designated under the proclamation
and certainly not who they intend to going forward.

THE COURT:  But you believe that a number, even
though they haven't been removed, have been designated under
the proclamation?

MR. GELERNT:  We think so, Your Honor, but we are
trying to track that down.  And obviously it would be
helpful if the government would tell us certainly because
they should be giving them individual hearings.

As Your Honor knows, we don't think the Alien Enemies
Act can be used in this context.  But even if it could,
there certainly needs to be hearings to decide whether any
individual is subject to the proclamation.  So we would
welcome the government telling us how many people have been
designated already under the proclamation.

Your Honor, if I could just make one other point, a
factual point, a housekeeping point.  Since Your Honor is
rightly asking the government when this went into effect,
the 14th or the 15th, we believe there may have been flights
scheduled on the 14th with people subject to the
proclamation, so I think if Your Honor would be willing to
broaden its request for facts to ask about flights on the
14th with people subject to the proclamation.

1          THE COURT:  All right.  Let me -- that's not

2     unreasonable.  I want to hear from the government first

3     about what their position on timing is.

4          All right.  So is there an objection, Mr. Kambli, to

5     letting me know also by noon tomorrow how many people in the

6     United States have been designated as subject to the

7     proclamation?

8          MR. KAMBLI:  Your Honor, that obviously is also

9     something that's subject to national security and other

10    concerns, so I would have to discuss that with the clients.

11         THE COURT:  Okay.  And again, you can -- that's

12    another piece of information that you can tell me why -- in

13    what forum you can tell me, or if not, why not.

14         MR. KAMBLI:  Yes, Your Honor.

15         THE COURT:  And then there is something, I think, in

16    writing, but I want you to confirm for me on the record as

17    an officer of the court that no one else will be removed

18    from the United States who is the subject of my order absent

19    further court relief from me or the D.C. Circuit unless they

20    are subject to deportation pursuant to other authorities.

21         MR. KAMBLI:  Yes, Your Honor.

22         THE COURT:  All right.  So then what I will hear from

23    you by noon tomorrow, and I will memorialize this in a

24    written order since apparently my oral orders don't seem to

25    carry much weight, that you will offer me a sworn

declaration why no one -- that no one on the third flight is
subject to the proclamation.  In addition, I will explain
why -- you will explain to me why you can't answer my
questions in public and in what forum you will or will not
answer them, and then also about when the proclamation went
into effect and about the number of people subject to the
proclamation.  So I will issue a written order now that will
memorialize that.

Then again, the briefing, your briefing in seeking to
vacate the TROs or have me reconsider the TROs is due today,
and plaintiffs' response due Wednesday.  And then we will be
back on Friday for our other hearing unless I -- based on
what I -- well, we will be back on Friday for that hearing
unless the court of appeals stays the case.  But we will
also, after I receive your information tomorrow, I will
indicate how I wish to further proceed.

Anything further from the government?

MR. KAMBLI:  No, Your Honor.  Thank you.

THE COURT:  Anything further from plaintiffs?

MR. GELERNT:  No, Your Honor.  Thank you.

THE COURT:  All right.  Thank you all.

(The hearing concluded at 5:43 p.m.)

– – –

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription of the proceedings in the above-entitled

matter.



3/17/25                    s/ Tammy Nestor
                           Tammy Nestor, RMR, CRR
                           Official Court Reporter
                           333 Constitution Avenue NW
                           Washington, D.C. 20001
                           tammy_nestor@dcd.uscourts.gov