PAMELA J. BONDI
*U.S. Attorney General*
TODD BLANCHE
*Deputy Attorney General*
EMIL BOVE
*Principal Associate Deputy*
   *Attorney General*
CHAD MIZELLE
*Acting Associate Attorney General*
YAAKOV M. ROTH
*Acting Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*

AUGUST E. FLENTJE
*Acting Director*
EREZ REUVENI
*Assistant Director*
BRIAN C. WARD
*Acting Assistant Director*
PATRICK GLEN
*Senior Litigation Counsel*
CHRISTINA P. GREER
*Senior Litigation Counsel*

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| J.G.G., *et al.*, | ) |
|  | ) |
| Plaintiffs-Petitioners, | ) |
|  | ) |
| v. | ) |
|  | ) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | ) |
|  | ) |
| Defendants-Respondents. | ) |

Civil Action No. 1:25-cv-00766

## DEFENDANTS' MOTION TO VACATE TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 3

   I.   The Alien Enemies Act ................................................................................ 3

   II.   The President's Proclamation .................................................................... 4

   III.   This Suit ........................................................................................................ 6

ARGUMENT .......................................................................................................... 7

   I.   This Court Has No Jurisdiction Over Plaintiffs' Claims ...................... 7

      A.   There is no jurisdiction to review the President's Proclamation and certainly no viable claim outside of habeas. ...................................................................... 7

      B.   The President's invasion determination is not subject to judicial review under the political question doctrine. ................................................................... 11

   II.   Plaintiffs Cannot Succeed on the Merits of Their Claims. ................. 13

      A.   The Proclamation comports with the requirements of the statute. ............................... 13

         1.   TdA's actions constitute an invasion or a predatory incursion into the territory of the United States ...................................................................................... 14

         2.   Given its intimate connection to Venezuela, TdA is a "foreign nation or government" for purposes of Section 21 ......................................................... 15

      B.   The Proclamation is supported by the President's inherent authority to conduct foreign affairs and address national security risks. ................................................ 17

      C.   Plaintiffs' remaining arguments lack merit. ........................................... 18

   III.   The Remaining Equitable Factors Weigh Strongly in the Government's Favor. ......... 22

A.   Plaintiffs have not established irreparable harm. ........................................... 22

B.   The balance of equities requires dissolving the injunction. ........................... 23

IV.   The Universal TRO Is Overbroad and Unconstitutional. .............................. 24

CONCLUSION ................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Adams v. Vance,*
570 F.2d 950 (D.C. Cir. 1978) ........................................................................... 2, 22

*Amaya v. Stanolind Oil & Gas Co.,*
62 F. Supp. 181 (S.D. Tex. 1945) ............................................................................ 14

*Armstrong v. Bush,*
924 F.2d 282 (D.C. Cir. 1991) ................................................................................. 9

*Baker v. Carr,*
369 U.S. 186 (1962) ................................................................................................. 11

*Biden v. Texas,*
142 S. Ct. 2528 (2022) ............................................................................................. 23

*California v. United States,*
104 F.3d 1086 (9th Cir. 1997) ............................................................................ 11, 12

*Chiles v. United States,*
874 F. Supp. 1334 (S.D. Fla. 1994) ......................................................................... 12

*Citizens Protective League v. Clark,*
155 F.2d 290 (D.C. Cir. 1946) ......................................................................... passim

*Clark v. Memolo,*
174 F.2d 978 (D.C. Cir. 1949) ................................................................................. 9

*Clinton v. Goldsmith,*
526 U.S. 529 (1999) ................................................................................................. 10

*Davrod Corp. v. Coates,*
971 F.2d 778 (1st Cir. 1992) .............................................................................. 14, 15

*El-Shifa Pharm. Indus. Co. v. United States,*
607 F.3d 836 (D.C. Cir. 2010) .......................................................................... 11, 15

*Epic Systems Corp. v. Lewis,*
584 U.S. 497 (2018) ................................................................................................. 18

*Fernandez v. Phillips,*
268 U.S. 311 (1925) ................................................................................................. 9

*Fletcher v. Reilly*,
    433 F.3d 867 (D.C. Cir. 2006) ................................................................................. 8

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ..................................................................................... 9, 21

*Ex parte Gilroy*,
    257 F. 110 (S.D.N.Y. 1919) ................................................................................ 7

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ................................................................................... 12, 16

*Harris v. Med. Transp. Mgmt., Inc.*,
    77 F.4th 746 (D.C. Cir. 2023) .............................................................................. 8

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................................................. 3, 22, 24

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) ......................................................................... 17, 20

*In re Nat'l Nurses United*,
    47 F.4th 746 (D.C. Cir. 2022) ............................................................................ 10

*Kaminer v. Clark*,
    177 F.2d 51 (D.C. Cir. 1949) .............................................................................. 9

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013) ..................................................................................... 23

*Lobue v. Christopher*,
    82 F.3d 1081 (D.C. Cir. 1996) ........................................................................... 1, 9

*Lockington v. Smith*,
    15 F. Cas. 758 (C.C.D. Pa. 1817) ......................................................................... 3

*Ludecke v. Watkins*,
    335 U.S. 160 (1948) ................................................................................. passim

*Makekau v. Hawaii*,
    943 F.3d 1200 (9th Cir. 2019) ........................................................................... 10

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ..................................................................................... 24

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ........................................................................................... 12

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1867) ............................................................................. 6

*Monk v. Sec'y of Navy,*
    793 F.2d 364 (D.C. Cir. 1986) ......................................................................... 9

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ......................................................................................... 18

*Morton v. Mancari,*
    417 U.S. 535 (1974) ......................................................................................... 18

*Nishimura Ekiu v. United States,*
    142 U.S. 651 (1892) ......................................................................................... 17

*Nken v. Holder,* 556 U.S. 418 (2009) ...................................................... 2, 22, 23

*Rasul v. Bush,*
    542 U.S. 466 (2004) ......................................................................................... 24

*Rumsfeld v. Padilla,*
    542 U.S. 425 (2004) ....................................................................................... 1, 8

*Sale v. Haitian Ctrs. Council, Inc.,*
    509 U.S. 155 (1993) ......................................................................................... 19

*Schneider v. Kissinger,*
    412 F.3d 190 (D.C. Cir. 2005) ......................................................................... 11

*Syngenta Crop Prot., Inc. v. Henson,*
    537 U.S. 28 (2002) ........................................................................................... 10

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ......................................................................................... 24

*Trump v. United States,*
    603 U.S. 593 (2024) ........................................................................................... 6

*Tulare Cnty. v. Bush,*
    185 F. Supp. 2d 18 (D.D.C. 2001) ................................................................... 10

*U.S. ex rel. Schlueter v. Watkins,*
    67 F. Supp. 556 (S.D.N.Y.) ......................................................................... 8, 10

*U.S. ex rel. Schwarzkopf v. Uhl,*
   137 F.2d 898 (2d Cir. 1943)................................................................... 8

*U.S. ex rel. Von Heymann v. Watkins,*
   159 F.2d 650 (2d Cir. 1947)........................................................... 21, 23

*United States ex rel. Dorfler v. Watkins,*
   171 F.2d 431 (2d Cir. 1948)................................................................. 21

*United States ex rel. Kessler v. Watkins,*
   163 F.2d 140 (2d Cir. 1947)................................................................. 24

*United States ex rel. Knauff v. Shaughnessy,*
   338 U.S. 537 (1950)........................................................................... 17

*United States ex rel. Von Kleczkowski v. Watkins,*
   71 F. Supp. 429 (S.D.N.Y. 1947).......................................................... 18

*United States v. Cortez,*
   449 U.S. 411 (1981)........................................................................... 22

*United States v. Curtiss-Wright Exp. Corp.,*
   299 U.S. 304 (1936)........................................................................... 16

*United States v. Texas,*
   719 F. Supp. 3d 640 (W.D. Tex. 2024)................................................... 13

*Vetcher v. Sessions,*
   316 F. Supp. 3d 70 (D.D.C. 2018)........................................................ 10

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952)........................................................................... 16

*Zadvydas v. Davis,*
   533 U.S. 678 (2001)........................................................................... 23

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
   576 U.S. 1 (2015)..................................................................... 17, 21, 22

## **Statutes**

8 U.S.C. § 1101.................................................................................... 17

8 U.S.C. § 1158(b)(1)(A)........................................................................ 19

8 U.S.C. § 1189..................................................................................... 5

8 U.S.C. § 1229a(a)(3) ............................................................................................ 17

8 U.S.C. § 1231(b)(3) .............................................................................................. 19

8 U.S.C. § 1231(b)(3)(A) ......................................................................................... 20

21 U.S.C. § 1901 ....................................................................................................... 4

28 U.S.C. § 1651(a) ................................................................................................. 10

28 U.S.C. § 2241 ....................................................................................................... 9

50 U.S.C. § 21 .................................................................................................. passim

50 U.S.C. § 22 .......................................................................................................... 21

### Regulations

8 C.F.R. § 1208.16 ................................................................................................... 19

8 C.F.R. § 1208.16(a) ............................................................................................... 20

## INTRODUCTION

On March 15, 2025, the Court issued two orders that together enjoined—on a nationwide basis—the removal of aliens associated with Tren de Aragua ("TdA"), a designated foreign terrorist organization ("FTO"), under the Alien Enemies Act ("AEA"). These orders are an affront to the President's broad constitutional and statutory authority to protect the United States from dangerous aliens who pose grave threats to the American people. For a host of reasons, the Court lacks the power to review or enjoin the AEA Proclamation, and must therefore dissolve its orders at the first available opportunity.

*First*, the Court lacks jurisdiction because the presidential actions they challenge are not subject to judicial review, as the D.C. Circuit has long and squarely held. *See Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946). And to the extent any review were available, it would be through habeas proceedings, *see Ludecke v. Watkins*, 335 U.S. 160 (1948) (considering challenge to action under AEA as habeas claim)—yet Plaintiffs voluntarily withdrew their habeas claims here. They had little choice, because habeas claims may be filed only in the district of confinement, *see Rumsfeld v. Padilla*, 542 U.S. 425, 435 (2004), and none of the Plaintiffs were detained in the District of Columbia. Plaintiffs tried to circumvent that defect by recasting their case as a putative class action, but D.C. Circuit precedent bars that attempt to avoid the "preclusive effect of habeas jurisdiction." *Lobue v. Christopher*, 82 F.3d 1081, 1083 (D.C. Cir. 1996); *see also id.* at 1085 (plaintiffs "cannot overcome their jurisdictional infirmities ... by reference to the characteristics of putative class members—a class uncertified at the time the jurisdictional issue should have been resolved"). There is similarly no jurisdiction for the Court to order the government to produce additional information about its missions. Accordingly, there was no

1

lawful basis for the Court to enjoin implementation of the President's Proclamation under the AEA.

*Second*, even if review were available in some form, the Court issued the orders without any proper basis to conclude that Plaintiffs are likely to succeed on the merits. The President's action is lawful and consistent with a long history of using war authorities against organizations connected to foreign states. It is properly premised on national security judgments, which are not subject to judicial second-guessing. Contrary to the Court's initial suppositions, TdA qualifies as a foreign "government" for purposes of the AEA, given its intricate connections with the Maduro regime and its own existence as a de facto governing entity in parts of Venezuela. The Proclamation makes those necessary findings, which Plaintiffs have yet to challenge in any briefing. And the illegal entry into the United States by TdA members and affiliates for purposes of engaging in criminal acts hostile to the interests of the United States constitutes an "invasion" or "predatory incursion" under accepted definitions of both terms. All prerequisites to a Proclamation under Section 21 are thus met in this case.

*Finally*, Plaintiffs have not shown the requisite irreparable harm, and the balance of equities weighs strongly against an injunction. Removal alone is not irreparable harm, as the Supreme Court expressly held in *Nken v. Holder*, where the petitioner similarly alleged a risk of persecution if removed. 556 U.S. 418, 422–23, 435 (2009). Regardless, the alleged harms to Plaintiffs are overwhelmingly outweighed by the President's interest in using his statutory and constitutional authority to address what he has identified as an invasion or predatory incursion by a group undertaking hostile actions and conducting irregular warfare. In balancing the interests otherwise, the orders "deeply intrude[] into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978). When dealing with such "sensitive and weighty interests of

national security and foreign affairs," the court must give "deference" to "evaluation of the facts

by the Executive," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–35 (2010), and the balance

of the equities must favor the security of the United States above all else.

## BACKGROUND

**I.      The Alien Enemies Act**

The AEA provides that:

> Whenever there is a declared war between the United States and any
> foreign nation or government, or any invasion or predatory incursion
> is perpetrated, attempted, or threatened against the territory of the
> United States by any foreign nation or government, and the
> President makes public proclamation of the event, all natives,
> citizens, denizens, or subjects of the hostile nation or government,
> being of the age of fourteen years and upward, who shall be within
> the United States and not actually naturalized, shall be liable to be
> apprehended, restrained, secured, and removed as alien enemies.

50 U.S.C. § 21.

Courts have recognized the legitimacy of the AEA as an exercise of the war power reserved

to Congress and the Executive.  The Supreme Court has observed that the AEA is "as unlimited"

a grant of power "as the legislature could make it."  *Ludecke*, 335 U.S. at 164 (quoting *Lockington

v. Smith*, 15 F. Cas. 758, 760 (C.C.D. Pa. 1817)); *see also id.* at 165 n.8 (collecting cases).  Courts

have further explained that the statute encompasses "matters of political judgment for which judges

have neither technical competence nor official responsibility."  *Id.* at 170 (holding that the

President's power under the AEA remained in effect even after actual hostilities in World War II

had ceased).  And the D.C. Circuit has held that this statute confers "[u]nreviewable power in the

President to restrain, and to provide for the removal of, alien enemies."  *Citizens Protective

League*, 155 F.2d at 294.  Courts have therefore limited their review in prior challenges to just a

few, very narrow questions that sound in habeas: "the construction and validity of the statute";

whether, when relevant, there is a "declared war"; and whether the "person restrained is an enemy alien fourteen years of age or older." *Ludecke*, 335 U.S. at 171 & n.17.

## II.    The President's Proclamation

The President published the *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua* (the "Proclamation") on March 15, 2025. *See* https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/.

In the Proclamation, the President made findings that members of the transnational criminal organization TdA, in conjunction with a narco-terrorism enterprise backed by the illegitimate regime of Nicolas Maduro in Venezuela, are "conducting irregular warfare and undertaking hostile actions against the United States." *Id. at* Preamble. TdA has also "engaged in and continues to engage in mass illegal migration to the United States," including to inflict harm on U.S. citizens and support Maduro's regime in undermining democracy. *Id.* Further, TdA is "closely aligned with" and "has infiltrated" Maduro's regime, growing under Tareck El Aissami's governance of the province of Aragua from 2012 to 2017. *Id.* Aissami himself is a "fugitive facing charges arising from his violations of United States sanctions triggered by his" designation as a Specially Designated Narcotics Trafficker under 21 U.S.C. § 1901 *et seq. Id.* And Maduro leads the "Cártel de los Soles, which coordinates with and relies on TdA and other organizations to carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *Id.*

Criminal organizations such as TdA have taken greater control over Venezuelan territory, resulting in the creation of a "hybrid criminal state" that poses "substantial danger" to the United States and is "perpetrating an invasion of and predatory incursion" into the nation. *Id.* (noting also INTERPOL Washington's finding that TdA has infiltrated the flow of immigrants from

4

Venezuela). TdA has independently been designated as an FTO under 8 U.S.C. § 1189 since February 20, 2025. *Id.* That designation has not been challenged in court.

Based on these findings, the President proclaimed that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Id.* § 1. The President further directed that all such alien enemies "are subject to immediate apprehension, detention, and removal." *Id.* § 3. The Attorney General and Secretary of Homeland Security have been tasked with executing these directives, in addition to any separate authority that may exist to apprehend and remove such persons. *Id.* §§ 4, 6.

The President also issued regulations prohibiting the entry, attempted entry, or presence of the alien enemies described in Section 1 of the Proclamation, with any such alien enemies "subject to summary apprehension." *Id.* § 6(a). Apprehended alien enemies are subject to detention until their removal from the United States, and they may be removed to "any such location as may be directed" by those responsible for executing the regulations. *Id.* § 6(b)–(c).

For its part, DHS has also developed a process for identifying TdA members that will be subject to the proclamation. Exhibit 1, Declaration of Robert Cerna, at ¶ 7. Agency personnel carefully vet each individual alien to ensure they are in fact members of TdA. *Id.* Officers and agents well versed in gang activity and TdA in particular reviewed the information gathered on each alien, "identifying TdA members based upon the results of investigative techniques and information such as previous criminal convictions for TdA-related activities, other court records indicating membership in TdA, surveillance, law enforcement encounters, interviews with the TdA member, testimonies and statements from victims of the TdA member, evidence that the alien had committed crimes in coordination with known members of TdA, evidence that the alien had

committed sophisticated financial transactions with known members of TdA, computer indices checks, and admission of TdA membership by the alien." *Id.*

### III.    This Suit

On March 15, 2025, Plaintiffs, five nationals of Venezuela who claim to fear removal under the Proclamation, filed this putative class-action complaint along with a motion for a temporary restraining order.  In their complaint, Plaintiffs allege, among other things, that the Defendants' actions are contrary to the AEA and the INA.

Hours after the complaint was filed, without the actual Proclamation and without hearing from the Government, the Court granted Plaintiffs' motion and ordered that "Defendants shall not remove any of the individual Plaintiffs from the United States for 14 days absent further Order of the Court."  Second Minute Order (Mar. 15, 2025).  The Government appealed the district court's first order and filed an emergency motion to stay it.  *See J.G.G. v. Trump*, No. 25-5067 (D.C. Cir. filed Mar. 15, 2025).

This Court then held a hearing on March 15, 2025, at 5:00 p.m.  Third Minute Order (Mar. 15, 2025).  At that hearing, Plaintiffs dismissed their habeas claims at this Court's suggestion. Afterward, the Court issued an order (1) provisionally certifying a class of individuals determined by the Executive to be members of a designated FTO, defined as "All noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation . . . and its implementation," (2) enjoining the Government "from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court," and (3) setting a briefing schedule for a motion to vacate the TRO.  Fourth Minute Order (Mar. 15, 2025).

The Government also appealed this nationwide order and sought a stay on an emergency basis. *See J.G.G. v. Trump*, No. 25-5068 (D.C. Cir. filed Mar. 15, 2025). The D.C. Circuit has ordered Plaintiffs to file a consolidated response to both emergency stay motions by March 18, 2025, with a reply 24 hours thereafter. *See* Per Curiam Order (Mar. 16, 2025).

## ARGUMENT

### I.    This Court Has No Jurisdiction Over Plaintiffs' Claims

#### A.    There is no jurisdiction to review the President's Proclamation and certainly no viable claim outside of habeas.

This Court lacks jurisdiction to review the Proclamation or enjoin the President's exercise of authority under Article II and the AEA. The Supreme Court has long recognized that courts cannot issue an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (courts have "no jurisdiction … to enjoin the President in the performance of his official duties"); *Trump v. United States*, 603 U.S. 593, 607 (2024) (recounting that the President "has important foreign relations responsibilities: [including] … recognizing foreign governments, … overseeing international diplomacy and intelligence gathering, and managing matters related to terrorism, … and immigration").

Consistent with that general rule, courts have held for over a century that the President's authority and discretion under the AEA is not a proper subject for judicial scrutiny: "The authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint to which they (alien enemies) shall be subject, and in what cases,' is, of course, *plenary and not reviewable*." *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919) (emphasis added); *see also id.* ("Once the person is an alien enemy, obviously the course to be pursued is essentially an executive function, to be exercised in the discretion of the President.").

Indeed, the D.C. Circuit has described the statute as conferring "[u]nreviewable power in

7

the President." *Citizens Protective League*, 155 F.2d at 294.  The court explained:

> As a practical matter, it is inconceivable that before an alien enemy
> could be removed from the territory of this country in time of war,
> the President should be compelled to spread upon the public record
> in a judicial proceeding the method by which the Government may
> detect enemy activity within our borders and the sources of the
> information upon which it apprehends individual enemies. No
> constitutional principle is violated by the lodgment in the President
> of the power to remove alien enemies without resort or recourse to
> the courts.

*Id.*  That is binding circuit precedent.  Unreviewable means *unreviewable*.  It leaves no room for

judicial review, much less sweeping national injunctions.

At most, a plaintiff seeking to challenge application of an AEA proclamation would be

challenging the legality of detention, a habeas claim that is limited in scope.  *See, e.g.*, *Ludecke*,

335 U.S. at 163–64 (reasoning, on appeal from "[d]enial of a writ of habeas corpus," that "some

statutes 'preclude judicial review'" and "the Alien Enemy Act of 1798 is such a statute," as

demonstrated by the clear text and "controlling contemporary construction"); *id.* at 164–65 (noting

that "every judge before whom the question has since come has held that the statute barred judicial

review"); *see also U.S. ex rel. Schlueter v. Watkins*, 67 F. Supp. 556, 565 (S.D.N.Y.), *aff'd*, 158

F.2d 853 (2d Cir. 1946) (reviewing habeas petition challenging detention as an alien enemy and

explaining "courts are without power to review the action of the executive in ordering removal of

an alien enemy in time of war except with respect to the question whether the relator is an enemy

alien"); *U.S. ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 900 (2d Cir. 1943) (similar); *Citizens*

*Protective League*, 155 F.2d at 296 (affirming dismissal, for failure to state a claim, of non-habeas

cases raising constitutional challenges to application of Alien Enemies Act and seeking

injunction).[1]

Plaintiffs' complaint contains a habeas claim, but they withdrew that claim at argument. *See* Mot. Hr'g Tr. at 22:23–25 (Mar. 15, 2025) ("grant[ing] plaintiffs' motion to dismiss their habeas count" and noting "that count is dismissed without prejudice"). They had little choice but to do so, because Plaintiffs by their own admission were not detained in this district, and habeas is available only in the district of detention. *See Padilla*, 542 U.S. at 435; *Fletcher v. Reilly*, 433 F.3d 867, 875 (D.C. Cir. 2006).

Insofar as Plaintiffs try to evade the preclusive effects of habeas jurisdiction by framing their claims in other ways—such as for declaratory or injunctive relief—the D.C. Circuit has rejected such maneuvers. In *Lobue v. Christopher*, for example, the Court of Appeals vacated a decision invalidating an extradition statute, on the ground that the district court lacked jurisdiction because the fugitives had a legal remedy (a petition for habeas relief under 28 U.S.C. § 2241) in the district that certified their extradition. 82 F.3d 1081 (D.C. Cir. 1996). The Court's rationale was that the district court should not have entertained a separate lawsuit for declaratory and injunctive relief where the statutory remedy of habeas corpus was available. *Id.* at 1084; *see also Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) (in habeas petition, fugitive may raise constitutional challenges to validity and scope of extradition treaty).

---

[1] Because jurisdiction in this context is limited to individual habeas claims challenging whether an alien has been properly included in the category of alien enemies—necessarily an individual determination—there is also no basis to certify a class to resolve those claims. *See Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 753 (D.C. Cir. 2023) (class certification not appropriate where "questions of law or fact … affecting only individual members" predominate); Compl. ¶¶ 9–13 (setting out separate factual circumstances of each Plaintiff).

Other circuit precedent underscores the conclusion; plaintiffs cannot avoid limits on habeas by restyling their claims. *See, e.g.*, *Kaminer v. Clark*, 177 F.2d 51, 52 (D.C. Cir. 1949) ("[A] declaratory judgment cannot serve as a substitute for habeas corpus relief in order to give jurisdiction to a district other than where the applicant is detained."); *Clark v. Memolo*, 174 F.2d 978, 981 (D.C. Cir. 1949) ("The action for declaratory judgment is not suitable and does not lie in the District of Columbia in such cases as a substitute ... for habeas corpus in the district where the unlawful detention occurs ..."); *cf. Monk v. Sec'y of Navy*, 793 F.2d 364, 366 (D.C. Cir. 1986) ("In adopting the federal habeas corpus statute, Congress determined that habeas corpus is the appropriate federal remedy for a prisoner who claims that he is in custody in violation of the Constitution ....  This specific determination must override the general terms of the declaratory judgment and federal question statute.").

Nor can Plaintiffs circumvent this problem by invoking the Administrative Procedure Act (APA), as they appear to acknowledge by raising their APA challenge as to all Defendants "except Defendant Trump."  Compl. at 18 (Claim 6).  The President is not an agency, and his actions are not subject to APA review.  *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991).  But, of course, the AEA vests authority in the President, and the President is the one who issued the Proclamation.  There is therefore no avenue under the APA for Plaintiffs to enjoin the Proclamation.  *See Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28–29 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002) (holding that APA review does not extend to agency action "merely carrying out directives of the President" for the same reasons "APA does not apply to presidential action," since "the action in question is an extension of the President's action"); *see also Vetcher v. Sessions*, 316 F. Supp. 3d 70, 78 (D.D.C. 2018) (recognizing that APA review is not available when relief can be had in habeas).

Finally, the All Writs Act does not confer jurisdiction either. *Contra* Mot. 23. That Act allows courts to issue "writs necessary or appropriate in aid of their respective jurisdictions," 28 U.S.C. § 1651(a), but it "does not erase separate legal requirements for a given type of claim." *Makekau v. Hawaii*, 943 F.3d 1200, 1204 (9th Cir. 2019). The All Writs Act thus "does not confer jurisdiction on the federal courts"; it simply permits a court to protect jurisdiction that was properly obtained on some other basis. *See Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32–33 (2002); *Clinton v. Goldsmith*, 526 U.S. 529, 534–35 (1999). As the D.C. Circuit has therefore made clear, if a "court does not and would not have jurisdiction to review the agency action sought by petitioners, it cannot bootstrap jurisdiction via the All Writs Act." *In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022). That is dispositive here.

In short, outside of limited habeas review, "[t]he control of alien enemies has been held to be a political matter in which the executive and the legislature may exercise an unhampered discretion," and an "alien enemy" otherwise "is not, under the Constitution and the Statute, entitled to any hearing." *Schlueter*, 67 F. Supp. at 565. That itself requires dissolving the orders.

## B. The President's invasion determination is not subject to judicial review under the political question doctrine.

The Court lacks power for another reason as well. The President's determination that an "invasion" or "predatory incursion" has occurred under the AEA is a nonjusticiable political question, just like the President's determination to trigger the Constitution's Invasion Clause (Article IV, section 4). *See California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases). Any challenge to that determination is therefore foreclosed.

The Supreme Court has held that the political question doctrine is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962). To guide courts in

determining when such a question is raised, the Supreme Court identified six "formulations" that indicate a question has been committed to the political branches:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* "To find a political question, [the court] need only conclude that one [of these] factor[s] is present, not all." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005). The President's invasion determination under the AEA implicates at least two independently sufficient factors.

*First*, the determination that an "invasion" or "predatory incursion" involving enemy aliens is being perpetrated sits at the intersection of two areas textually committed to the political branches: (1) foreign affairs, *see El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) ("The political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion."); *see also California*, 104 F.3d at 1091 ("[T]he issue of protection of the States from invasion implicates foreign policy concerns which have been constitutionally committed to the political branches."); and (2) immigration policy, *see Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("[T]he responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."). Indeed, "any policy towards aliens is vitally and intricately interwoven with contemporary policies in regard to the conduct of foreign relations,

the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).

*Second*, even without the clear textual commitment to the Executive of the constitutional responsibilities undergirding issuance of the Proclamation, there are no manageable standards that would permit a court to assess exactly when hostile entry and criminal and violent acts within the United States by aliens constitute an "invasion" or "predatory incursion" for AEA purposes. *See California*, 104 F.3d at 1091; *cf. Chiles v. United States*, 874 F. Supp. 1334, 1344 (S.D. Fla. 1994) ("[T]he Court is unable to identify[] a manageable standard for determining when the migration, as well as the costs associated with such migration, reaches the point at which it invades the State of Florida's state sovereignty"). The Constitution simply provides no basis for a court to determine when this AEA trigger has been met, and thus there is no basis for second-guessing the policy judgment by the Executive that such an "invasion" or "predatory incursion" is occurring.

## II.    Plaintiffs Cannot Succeed on the Merits of Their Claims.

### A.    The Proclamation comports with the requirements of the statute.

In all events, the Proclamation and its implementation are perfectly lawful. The AEA grants the President discretion to issue a proclamation directing the apprehension, restraint, and removal of alien enemies when two conditions are found by the President to be met. *First*, there must be "a declared war," *or* "an[] invasion" *or* a "predatory incursion" that is "perpetrated," *or* "attempted," *or* "threatened against the territory of the United States[.]" 50 U.S.C. § 21. *Second*, that hostile action must be by a "foreign nation" *or* "government." *Id.* The Proclamation signed by the President satisfies both conditions.

1.    ***TdA's actions constitute an invasion or a predatory incursion into the territory of the United States.***

As to the first prerequisite, the President determined that TdA is perpetrating an invasion *or* a predatory incursion into the United States. Although the word "invasion" of course includes a military entry and occupation of a country, the accepted definition of that term is far broader. An invasion is "[a]n intrusion or unwelcome incursion of some kind; esp., the hostile or forcible encroachment on another's rights," or "[t]he arrival somewhere of people or things who are not wanted there." Black's Law Dictionary, "Invasion" (12th ed. 2024). Nor is there any requirement that the purposes of the incursion are to possess or hold territory. *See*, *e.g.*, *United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024). Here, the actions of TdA fit accepted conceptions of what constitutes an invasion. TdA's illegal entry into and continued unlawful presence in the United States is an "unwelcome intrusion" that entails hostile acts contrary to the rights of U.S. citizens to be free from criminality and violence.

At minimum, the actions of TdA constitute a "predatory incursion" that justifies invocation of Section 21. The phrase "predatory incursion" encompasses (1) an entry into the United States (2) for purposes contrary to the interests or laws of the United States. *See*, *e.g.*, *Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189–90 (S.D. Tex. 1945) (noting use of the phrase to describe raids in Texas during hostilities with Mexico in the 1840s that fell well short of "invasion"); *see also Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992) (using the phrase to refer to foreign fishing fleets unlawfully entering and fishing in U.S. territorial waters); *Bas v. Tingy*, 4 US 37 (1800) (broadly defining "enemy" and "war"). Here, there is no question that TdA and its members have effected entries into the United States, and similarly no question that the purposes of that entry are contrary to both the interests and laws of this country: trafficking in substances and

14

people, committing violent crimes, and conducting all its business for the benefit of a state whose interests are antithetical to the United States. *See* Proclamation, Sect. 1.

In arguing there is no "invasion" or "predatory incursion," Plaintiffs cherry-pick dictionary definitions limiting those terms to *military* incursions meant to displace a government or conquer territory. *See* Mot. at 10–12. But there is no reason to limit the textual language of Section 21 solely to acts meant to perpetrate active hostilities between two governments, and Plaintiffs' own proffered definitions are incomplete. In fact, every *full* definition they offer supports the government's position. The full definition of "invasion" that Plaintiffs rely on, for instance, includes "[a] hostile entrance into the possessions of another," a definition that encompasses what TdA is undertaking here. *See* Webster's Dictionary, "Invasion" (1828). Likewise, "incursion" is defined to include "entering into a territory with hostile intention." Webster's Dictionary, "Incursion" (1828). Both definitions *include* military action, but neither is *limited to* such action.

### 2. *Given its intimate connection to Venezuela, TdA is a "foreign nation or government" for purposes of Section 21.*

The Proclamation makes clear that TdA qualifies as a "foreign nation or government" for at least two independent reasons. To start, TdA's infiltration of key elements of the Venezuelan state, make it indistinguishable from Venezuela. *See* Proclamation. TdA's growth itself can be attributed to promotion via the actions of former Governor of Aragua Tareck El Aissami, who was later appointed Vice President in the Maduro regime. *Id.* And Maduro's connections to the group, via the regime-sponsored narco-terrorism enterprise Cártel de los Soles, are also clear. *Id.* The Cártel de los Soles "coordinates with and relies on TdA [] to carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *See id*.

Given how significantly TdA has become intertwined in the fabric of the Venezuela's structures, it functions as a governing entity in Venezuela. Through those ties, TdA has become

indistinguishable from the Venezuelan government, and the two may be folded together for purposes of invoking Section 21.

Although Plaintiffs try to depict this invocation of the AEA as novel, the United States has a long history of using war powers against formally nonstate actors. Historically, the United States has authorized the use of force against "slave traders, pirates, and Indian tribes." Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005). It has engaged militarily, during broader armed conflicts, with "opponents who had no formal connection to the state enemy," including during the Mexican–American and Spanish–American Wars. *Id.* at 2066–67. President Wilson famously "sent more than seven thousand U.S. troops into Mexico to pursue Pancho Villa, the leader of a band of rebels opposed to the recognized Mexican government," *id.* at 2067, while, more recently, President Clinton authorized missile strikes on al Qaeda targets in Africa and elsewhere, *see generally El-Shifa*, 607 F.3d 836.

In all events, TdA also acts as a *de facto* government in the areas where it operates. As the Proclamation recognizes, "Venezuela national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA." Proclamation Preamble. In those areas where it operates, TdA is in fact acting as a criminal *government*, independent or in place of the normal civil society and government. Given TdA's governance and organizational structure, as well as its *de facto* control over parts of Venezuela in which it operates with impunity as an effective governing authority unto itself, it is well within the discretion of the President to determine it constitutes a foreign "government" for purposes of invoking Section 21.

Plaintiffs insist the United States' recognition of the "Venezuelan National Assembly as the only legitimate branch of the Government of Venezuela," Mot. 9–10, limits the AEA's scope.

16

By that logic, an invasion by Maduro's regime, which the United States does not recognize, would likewise fall outside the scope of the AEA. That obviously cannot be correct.

**B.    The Proclamation is supported by the President's inherent authority to conduct foreign affairs and address national security risks.**

The President's inherent Article II authority bolsters the Proclamation. Under his authority to protect the nation, the President determined that TdA represents a significant risk to the United States, that it is intertwined and advancing the interests of a foreign government in a manner antithetical to the interests of the United States, and that its members should be summarily removed from this country as part of that threat. The exercise of authority in this case is firmly supported by longstanding Supreme Court precedent. Article II confers on the President expansive authority over foreign affairs, national security, and immigration. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). And where, as here, "the President acts pursuant to an express or implied authorization of Congress," *i.e.*, 50 U.S.C. § 21, coupled with the President's own Article II powers over foreign affairs and national security, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (similar); *see also Ludecke*, 335 U.S. at 164.

If anything, this authority is heightened here. The Supreme Court has consistently noted that "[i]t is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). Thus, laws involving aliens are "implementing an *inherent executive power*." *United States ex rel. Knauff v.*

17

*Shaughnessy*, 338 U.S. 537, 542 (1950) (emphasis added).  The confluence of statutory and constitutional authority puts the President's actions on the strongest possible turf.

### C.    Plaintiffs' remaining arguments lack merit.

Plaintiffs' additional arguments against the legality of the Proclamation all lack merit.

*First*, Plaintiffs are wrong that Proclamation violates the Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq.*, which, according to Plaintiffs, provides the "sole and exclusive" means by which aliens may be removed from the United States.  Mot. at 13–14.  There is no conflict; the INA and AEA are distinct mechanisms for effectuating the removal of certain aliens from the United States, just as Title 42 and the INA constituted different bases for excluding aliens from the United States.  *See generally Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022).

The determination required under the AEA does not relate to the admissibility or deportability of any alien, so there is no reason to believe that Title 8 and its "sole and exclusive" means for addressing those questions is implicated in this case.  *See* 8 U.S.C. § 1229a(a)(3) (removal proceedings are "exclusive" only to the extent the government is determining admissibility or removability, as those terms are defined under Title 8).

In any event, there is no conflict between the AEA and the INA, and a harmonious reading of the Executive's authority under the AEA and its authority under prevailing immigration laws was rendered over 75 years ago in the wake of World War II.  *See United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429, 437 (S.D.N.Y. 1947).  Not all alien enemies will be subject to removal under Title 8 because the authority under Title 50 extends to aliens regardless of lawful status in the United States.  Likewise, not all aliens subject to Title 8 will be subject to removal under the AEA—as removal under the AEA is premised on discrete findings, such as nationality and age, beyond admissibility or removability as defined in the INA.  And for aliens

subject to both Title 8 and Title 50 removals, the Executive has discretion in deciding how and whether to proceed under either or both statutes. *See id.* (recognizing this discretion under pre-INA immigration law). Thus, the AEA and the INA coexist with some overlap that gives the Executive discretion to determine how, whether, or when to apply them. *See, e.g.*, *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When confronted with two Acts of Congress allegedly touching on the same topic, this Court . . . must . . . strive to give effect to both." (cleaned up)).

Even if there *were* a conflict between the AEA and the INA, it is the AEA that would control.  "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).  Here, the AEA provides specific rules for the removal of a subset of aliens—those designated as alien enemies through a discrete mechanism providing authority to the President—against the more general provisions relating to removability provided by the INA.  Thus, to the extent there may be conflict, the AEA provides an exception to the more general applicability of the INA's removal provisions, and this is true regardless of the later enactment of the INA.  *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").

*Second*, Plaintiffs contend (Mot. at 14–15) that the AEA cannot be applied so as to bar applications for asylum and related protection.  Yet alien enemies are not entitled to seek any relief or protection in the country that has designated them enemies, unless the President permits such applications.  *See Citizens Protective League*, 155 F.2d at 294 (noting common law rule that "alien enemies have no rights, no privileges, unless by the king's special favor").  Again, Plaintiffs' argument ultimately relies on an assertion of a conflict between the two statutes.  Yet there is none; the INA provides a system for determining removability and any relief or protection from removal

19

for aliens under the authority of Title 8, whereas the AEA provides its own mechanism permitting the President or his delegates to implement procedures and regulations governing removal, detention, and any other issue related to invocation of the AEA, *see* 50 U.S.C. § 21.

Beyond this fact, there is no *textual* indication that provisions of the INA relating to asylum and related protection place fetters on the President's exercise of authority under Title 50. None of the cited provisions constrain the *President's* actions. *See* 8 U.S.C. § 1158(b)(1)(A) (Attorney General or Secretary of Homeland Security); 8 U.S.C. § 1231(b)(3) (Attorney General); 8 C.F.R. § 1208.16, 1208.18 (Immigration Judges, via delegation from the Attorney General); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 172–73 (1993) (recognizing distinct grants of authority under the INA to, *inter alia*, President and Attorney General). Nor are such constraints implicated just because the President has delegated certain authorities, including implementation of the Proclamation, to the Attorney General. *See Sale*, 509 U.S. at 172 n.28 (in implementing the Proclamation, the Attorney General would be "carrying out an executive, rather than a legislative, command, and therefore would not necessarily [be] bound" by provisions of the INA).

In any event, asylum is a discretionary form of relief, and eligibility for such relief may be foreclosed on a categorical basis, as the D.C. Circuit has previously held in the context of Title 42. *See Huisha-Huisha*, 27 F.4th at 730–31. Here, the AEA disallows relief for covered enemy aliens, and that represents the Executive's categorical conclusion that such aliens are not entitled to relief in the exercise of discretion. The text and structure of the INA, as well its regulatory implementation, likewise support the prohibition on consideration of applications for protection from removal. Those provisions are fundamentally concerned with *removal* under the INA, a legal principle not relevant to the mechanics of the Proclamation at issue in this case. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.16(a), 1208.18(b). The instant Proclamation does not deal with

removal proceedings or any other aspect of removal, and thus any constraint these provisions may impose on the *removal* of an alien are not implicated here.

*Third*, Plaintiffs argue (Mot. at 16–17) that both the statute and due process require that aliens who fall within the purview of the Proclamation be permitted time to voluntarily depart from the United States, and that forcible removal is permissible only where the alien refuses or neglects to do so. That is not a defensible reading of the statute, especially in context. To be sure, Section 21 permits the President to "provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom," 50 U.S.C. § 21, but it also broadly provides that alien enemies within the purview of a Proclamation "*shall be* liable to be . . . removed as alien enemies." In this context, where the alien enemies are members of the hostile force itself, the President cannot be required to provide any period of voluntary departure prior to effectuating removal, and the AEA's entire purpose would be undercut if active participants in hostilities had to be politely asked to depart on their own terms.[2]

For that reason, the Proclamation explains that TdA engaged in "mass illegal migration to the United States to further its objectives of harming United States citizens," and that this activity undermines public safety, while also enhancing the "Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." Proclamation Preamble. Plaintiffs have yet to challenge that reasoning directly.

_____

[2] The cases cited by Plaintiffs do not undercut this assertion, as both cases dealt with an alien who was a citizen of Germany during World War II but who was not a member of any German military unit and was otherwise not engaged in active hostility or criminal acts against the United States. *See* Mot. at 16 (citing *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947)).

Plaintiffs also cite a section allowing the President to, *inter alia*, "declare such reasonable time as may be consistent with the public safety, and according to the dictates of humanity and national hospitality," in which a covered alien enemy may conclude his affairs in the United States and voluntarily depart. 50 U.S.C. § 22.  But that has no application in circumstances where the alien is "chargeable with actual hostility, or other crime against public safety."  *Id.*  The latter is categorically the case here: The Proclamation finds that the covered alien enemies are engaged in active hostility and criminality against the interests of the United States.  *See* Proclamation Preamble.  Section 22 thus has no relevance to the aliens covered by the Proclamation.

*Finally*, Plaintiffs contend that the Proclamation is "arbitrary and capricious" under the APA, *see* Mot. at 17, but the APA does not provide a cause of action for judicial review of the Proclamation.  As noted above, the President is not an "agency," and his actions are not subject to APA review. *See supra*, pp. 9-10 (citing, *inter alia*, *Franklin*, 505 U.S. at 801).  Nor do Plaintiffs otherwise identify any final agency action that *would* be subject to review under the APA.  *See generally* Mot. at 17; *see also supra*, pp. 9-10.

## III.    The Remaining Equitable Factors Weigh Strongly in the Government's Favor.

### A.    Plaintiffs have not established irreparable harm.

Plaintiffs' arguments for irreparable harm are based on the "risk that they will be summarily removed from the United States to Venezuela or El Salvador without any meaningful opportunity to assert claims for relief."  Mot. at 17; *see also id.* at 18–21.  As the Supreme Court has explained, however, "[a]lthough removal is a serious burden for many aliens, it is not categorically irreparable." *Nken*, 556 U.S. at 435.  And the Supreme Court reached that conclusion in a case where the petitioner argued he would face persecution if removed.  *Id.* at 422–23 ("Nken claimed he had been persecuted in the past . . .  would be subject to further persecution if he

returns" and that changed circumstances since he left his home country "made his persecution more likely"). "It is accordingly plain that the burden of removal alone cannot constitute the requisite irreparable injury." *Id*. at 435.

> **B.    The balance of equities requires dissolving the injunction.**

The balance of harms and the equities strongly favor the government here.  The Court's orders prevent the President from using his statutory and constitutional authority to address what he has identified as an invasion or predatory incursion by a group undertaking hostile actions and conducting irregular warfare. It therefore "deeply intrudes into the core concerns of the executive branch," *Adams*, 570 F.2d at 954, and frustrates the "public interest in effective measures to prevent the entry of illegal aliens," *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981).  The Executive Branch's protection of these interests, including "sensitive and weighty interests of national security and foreign affairs" that are implicated when the Executive is combating terrorist groups, warrants the utmost deference.  *Humanitarian Law Project*, 561 U.S. at 33–35.

The Supreme Court has warned of "the danger of unwarranted judicial interference in the conduct of foreign policy."  *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013); *Biden v. Texas*, 142 S. Ct. 2528, 2548 (2022) (Kavanaugh, J., concurring) ("Nothing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations"). This Court's orders do just that, undermining delicate international negotiations to remove dangerous alien enemies, where even a short delay in removal can frustrate removal entirely.  *See Zadvydas v. Davis*, 533 U.S. 678, 696 (2001); Ex. 2, Declaration of Michael G. Kozak.  The orders divest the Executive of its key foreign-affairs and national-security authority oriented towards effectuating removal of alien enemies linked to a designated FTO—efforts that

23

may be forever stymied if halted even temporarily.  *See* Kozak Decl. at ¶ 5.

These equities outweigh the equities Plaintiffs have raised.  *See, e.g.*, *Nken*, 556 U.S. at 436 (noting there "is always a public interest in prompt execution of removal orders" even in cases where an alien asserts a risk of harm, and that interest "may be heightened" in circumstances where "the alien is particularly dangerous").  U.S. national security is of paramount importance.

## IV.    The Universal TRO Is Overbroad and Unconstitutional.

If nothing else, this Court should dissolve the sweeping injunction premised on provisional certification of a nationwide class.  AEA jurisprudence limiting the courts to habeas review sharply contrasts with the universal TRO this Court issued with respect to the members of the provisionally certified class with no habeas claims before the Court.  Precedent establishes that the role of the courts with respect to the AEA is only to assess whether a detainee is subject to the AEA proclamation, not to probe the national-security and foreign-policy judgments of the President in issuing the proclamation itself.  *Ludecke*, 335 U.S. at 164 (providing habeas review only of whether detainee was subject to the proclamation); *United States ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 652 (2d Cir. 1947) (same); *United States ex rel. Kessler v. Watkins*, 163 F.2d 140, 141 (2d Cir. 1947) (same).  Moreover, habeas jurisdiction must reach the custodian, *see Rasul v. Bush*, 542 U.S. 466, 483–84 (2004), but here the Court issued a nationwide injunction where most—if not all—of the provisional class members are beyond this Court's jurisdiction.  That was improper.

The highly truncated class procedures here—in which a nationwide class was certified before the government could even file a brief in opposition—were improper too, and incompatible with "'foundational' limits on equitable jurisdiction."  *Dep't of State v. AIDS Vaccine Advoc. Coal.*, No. 24A831, slip op. 7 (2025) (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, J.J., dissenting) (citation omitted).  The injunction undermines longstanding deference to the Executive

Branch's national security judgments, including the President's responsibility to identify and respond to threats posed by the TdA.  Moreover, Article III does not empower federal courts to "exercise general legal oversight of the Legislative and Executive Branches," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021), much less empower them to assume a position of authority over the governmental acts of another coequal department, "an authority which plainly [courts] do not possess."  *Massachusetts v. Mellon*, 262 U.S. 447, 489 (1923).  To the contrary, courts have recognized the Judiciary's limitations in assessing national-security information and judging the necessity of action to counter national-security threats.  *See Humanitarian Law Project*, 561 U.S at 34 ("[W]hen it comes to collecting evidence and drawing factual inferences in [the national security] area, the lack of competence on the part of the courts is marked").

This Court therefore lacked authority to issue the overbroad, universal TRO.

## CONCLUSION

For these reasons, the Court should vacate both orders.[3]


March 17, 2025                                    Respectfully Submitted,

                                                 PAMELA J. BONDI
                                                 U.S. Attorney General

                                                 TODD BLANCHE
                                                 Deputy Attorney General

                                                 EMIL BOVE
                                                 Principal Associate Deputy
                                                 Attorney General

                                                 CHAD MIZELLE

---

[3] This court has jurisdiction to vacate its TRO, see Fed. R. Civ. P. 62(d), but if this Court disagrees we request an indicative ruling that it would vacate.  *See* Fed. R. Civ. P. 62.1.

Acting Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

<u>s/ Drew C. Ensign</u>
DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Avenue
Washington, DC 20530
Phone: (202) 514-2000
e-Mail: drew.c.ensign@usdoj.gov

AUGUST E. FLENTJE
Acting Director

EREZ REUVENI
Assistant Director

BRIAN C. WARD
Acting Assistant Director

CHRISTINA P. GREER
Senior Litigation Counsel

PATRICK GLEN
Senior Litigation Counsel

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2025, I electronically filed this response with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ August E. Flentje*
*Acting Director*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 514-3309
Email: August.Flentje@usdoj.gov