## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

J.G.G., *et al.*,

*Plaintiffs–Petitioners*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Defendants–Respondents*.

Case No: 1:25-cv-00766-JEB

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE
## TEMPORARY RESTRAINING ORDER

## INTRODUCTION

The government's motion to dissolve the temporary restraining orders should be denied: the government is wrong that Plaintiffs' claims are unreviewable under the political question doctrine. Both the Supreme Court and the D.C. Circuit have made clear in recent decisions that the doctrine should be used sparingly, and that reviewability should be assessed on a claim-by-claim basis. Here, Plaintiffs contend that the specific statutory predicates for invoking the Alien Enemies Act ("AEA") have not been satisfied. No case law, under the AEA or otherwise, suggests that these claims are wholly unreviewable under the narrow political question doctrine.

Indeed, the World War II case on which the government relies heavily, *Ludecke v. Watkins*, 335 U.S. 160 (1948), makes clear that these types of threshold statutory claims are reviewable. The claim *Ludecke* declined to review was whether, where Congress and the President agreed that World War II was not yet over, the Court should declare otherwise. Here, by contrast, the President is trying to write the limits that Congress set out of the Act. The government is likewise incorrect that this case must be brought in habeas in the district of confinement. Under settled law, this is not a "core" habeas action, and consequently, the "immediate custodian" rule on which Defendants rely is inapplicable.

On the merits, the invocation of the Act against a criminal gang cannot be squared with the explicit terms of the statute requiring a declared war or invasion by a foreign government or nation. And given these explicit statutory predicates, the Act has unsurprisingly been invoked only three times in our country's history, all during declared wars.

As to irreparable harm, the government claims that national security will be compromised by pausing summary removals under the AEA. Yet the relevant temporary restraining order makes clear it does not prevent the arrest and detention of any individual, mandate the release of any

2

individual, or preclude removal under the immigration laws. And the government has not claimed that U.S. facilities are ill-equipped to detain these individuals (even assuming they are affiliated with the gang, a fact that is unknown given that none were afforded any opportunity to show that they do not fall under the Proclamation).

The implications of the government's position are staggering. If the President can label any group as enemy aliens under the Act, and that designation is unreviewable, then there is no limit on who can be sent to a Salvadoran prison, or any limit on how long they will remain there. At present, the Salvadoran President is saying these men will be there at least a year and that this imprisonment is "renewable."[1]

## STATEMENT OF FACTS

The AEA is a wartime authority that grants the President specific powers with respect to the regulation, detention, and removal of enemy aliens. Passed in 1798 in anticipation of a war with France, the AEA, as codified today, provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies." 50 U.S.C. § 21.

This Act has only ever been used three times in the country's history and each time in a period of war—the War of 1812, World War I, and World War II. The Act provides that, generally, individuals designated as enemy aliens will have time to "settle affairs" before removal and the

---

[1] Nayib Bukele, X.com post, (Mar. 16, 2025, 5:13AM ET), *available at:* https://perma.cc/52PT-DWMR.

option to voluntarily "depart."[2]  *See, e.g., United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the Attorney General can lawfully remove him against his will.").

On March 14, the President signed the AEA Proclamation at issue here.  It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025).[3]  Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make the invocation public until around 3:53 p.m. EDT on March 15, despite making extensive preparations to remove class members under the Act.  ECF No. 28-1, Second Cerna Decl. ¶ 5; *see generally* ECF No. 1, Complaint.

And the Proclamation does not provide *any* process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation.  Nor does it provide individuals with the statutory grace period in which they can both seek judicial review or arrange their affairs and leave voluntarily.  Instead, the Proclamation invokes the statutory exception to the "reasonable notice" requirement by claiming that the individuals subject to the Proclamation are "chargeable with actual hostility," and pose "a public safety risk"—despite the fact that there is no evidence of the sort of "hostility" that the Act requires, *e.g.*, skirmishes with

---

[2] 50 U.S.C. § 21 (providing for removal of only those "alien enemies" who "refuse or neglect to depart" from the United States); *id.* § 22 (providing for "departure, the full time which is or shall be stipulated by any treaty then in force between the United States and the hostile nation or government of which he is a native citizen, denizen, or subject; and where no such treaty exists, or is in force, the President may ascertain and declare such reasonable time as may be consistent with the public safety, and according to the dictates of humanity and national hospitality").

[3] *Available at*: https://perma.cc/ZS8M-ZQHJ.

U.S. forces, nor any public safety risk because the men can be securely confined. *See infra*; 50 U.S.C. § 22.   The Proclamation also claims to supplant the removal process under the congressionally enacted immigration laws, which, among other things, provide a right to seek protection from persecution and torture. *See, e.g.*, 8 U.S.C. §§ 1158, 1231(b)(3); 1231 note.

To implement the Proclamation, approximately ten days ago, people with upcoming immigration proceedings started being moved overnight from ICE detention facilities around the country and not allowed to appear at their proceedings, where many were seeking asylum. *See* Kim Decl. ¶¶ 2, 4–5, 11–13; Caro-Cruz Decl. ¶¶ 2–6, 13; J.G.G. Decl. ¶¶ 2–5; J.A.V. Decl. ¶¶ 6–7; Thierry Decl. ¶¶ 5–6; Gonzalez Decl. ¶ 4.   After searching for answers in online detainee locators, calling detention centers, and e-mailing officials within the detention system, lawyers for these men began to hear from their clients that they had been taken to detention centers in Texas. *See, e.g.*, Carney Decl. ¶ 12; Shealy Decl. ¶ 5; Kim Decl. ¶¶ 10–14; Caro-Cruz Decl. ¶ 18; Thierry Decl. ¶ 5; Quintero Decl. ¶¶ 2-3.

Detention officials began to tell the men they were to be immediately removed from the country.  Those warnings began on March 14.  Kim ¶ 19; Thierry Decl. ¶ 8.  On March 15, by the time the secret Proclamation was made public, these men, five of whom are the named Plaintiffs here, had been shackled and driven to an airport and told they would get on a plane, despite having no order permitting ICE to remove them and facing grave danger even if they were removed to their home country of Venezuela.  Shealy Decl. ¶ 8; Quintero Decl. ¶ 3; Carney Decl. ¶¶ 11-12; Smyth Decl. ¶ 14.  For several Plaintiffs, their asylum claims were based in part on having been targeted by TdA itself.  *See* J.G.O Decl. ¶ 8, ECF No. 3-5; Lauterback Decl. ¶ 8, ECF No. 3-7; J.A.V. Decl. ¶ 3, ECF No. 3-8; *see also* Carney Decl. ¶ 3; Smyth Decl. ¶ 5.

After being transferred from the El Valle Detention Facility to the airport on March 15,

named Plaintiffs spent hours while waiting for the planes to take off.  Shealy Decl. ¶¶ 11-13; Quintero Decl. ¶¶ 3-5; Carney Decl. ¶¶ 12-14; Smyth Decl. ¶ 14.  Media crews were present, taking pictures and recording video. Shealy Decl. ¶ 9.  There was "chaos" on the planes, as people were crying and frightened about where they were being sent.  Carney Decl. ¶ 13.  When Plaintiffs were pulled off the plane, an officer verbally taunted them and laughed, saying that the group had just hit the lottery because they were not being deported that day.  Shealey Decl. ¶ 11; Quintero Decl. ¶ 4; Carney Decl. ¶ 13; Smyth Decl. ¶ 14.  They sat on the tarmac in the heat without being provided any water, to the point that one man's nose began to bleed, and officers told him to stop being dramatic.  Shealey Decl. ¶¶ 12-13; Quintero Decl. ¶ 5; Carney Decl. ¶ 14.  The five Plaintiffs were eventually driven back to the detention facility where they were finally fed for the first time since the early morning.  Shealey Decl. ¶ 14; Quintero Decl. ¶ 6; Carney Decl. ¶ 15.  Plaintiffs are traumatized by this experience.  Shealey Decl. ¶ 15; Carney Decl. ¶¶ 17-18.  One has been told by officers that he would be deported in 14 days.  Carney Decl. ¶ 17.

What followed for the rest of the group was worse: dozens of Venezuelans were summarily removed the evening of March 15 pursuant to the Proclamation.  *See* Exh. G ¶ 8; Exh. H ¶ 3; Exh. I ¶ 13; Exh J ¶ 14, Exh. K ¶ 14.  The Court's request to the government for the exact number remains pending, *see* Minute Order (March 18, 2025), but various reports *suggest* that well over one hundred were removed.  *See* Oscar Sarabia Roman Decl. Exh. 7 (putting number at 137); *see also* Statement from the White House Press Secretary (Mar. 18, 2025)[4] (describing Proclamation and stating that "nearly 300" people were removed).  These removals occurred despite the Court's March 15 Orders granting temporary restraining orders and ordering that the planes be returned. Response to Defendants' Notice, ECF No. 21.

---

[4] *Available at*: https://perma.cc/5UMH-JDVA.

Because these individuals were removed in secret without any process, Plaintiffs do not have names or information about most of them. But all five of the named Plaintiffs dispute that they are members of the TdA. J.G.G. Decl. ¶ 3, ECF No. 3-3; Exh. J ¶ 3; Exh, H ¶ 4; Lauterback Decl. ¶ 8, ECF No. 3-7; J.A.V. Decl. ¶ 5, ECF No. 3-8.

For example, Plaintiff G.F.F. was accused of gang membership apparently as a result of attending a party with a friend, where he knew no one else, based on the government's claim that TdA members had been present. *See* G.F.F. Decl. ¶¶ 5–6, ECF No. 3-4. Plaintiff J.G.G., a tattoo artist, was questioned about his tattoos as the apparent basis for TdA membership: those tattoos are from a Google image search that turned up an eyeball design that he thought "looked cool." *See* J.G.G. Decl. ¶ 4, ECF No. 3-3. He also has other common tattoo designs. *See id.* (rose and a skull to cover up a monkey tattoo he no longer liked); Exh. K ¶ 9. Reports from counsel for other individuals are the same. One person is reportedly a soccer player with a calf tattoo of a soccer ball and a crown, chosen to resemble the logo of his favorite team, Real Madrid. Tobin Decl. ¶ 7.

In addition, increasing reports by the media suggest that many of the individuals were not members of the gang. *See, e.g.*, Exh. 2 ("families of three men who appear to have been deported and imprisoned in El Salvador told the Miami Herald that their relatives have no gang affiliation"); Exh. 3 ("The families strongly deny that their relatives are connected to the Venezuelan gang known as Tren de Aragua."); Exh. 4 ("A growing chorus of families, elected officials and immigration lawyers have begun coming forward in the news media to reject or cast doubt on the allegations.") Exh. 5 ("several relatives of men believed to be in the group say their loved ones do not have gang ties"); Exh. 6 (family member denied that loved one's tattoo, which ICE officers said linked him to TdA, was gang related); Exh. 8 ("in many cases, they insist the deportation involved a hasty and unjust assumptions that a tattoo identified a terrorist"). Multiple attorneys

have come forward with stories of their clients who were suddenly and without notice transferred to Texas, and removed to El Salvador despite upcoming asylum hearings and strong claims to that relief. *See generally* Tobin Decl.; Thierry Decl.; Caro-Cruz Decl.; Kim Decl.

These reports are consistent with a pattern that has played out over the past six weeks, with the administration overstating information about detainees. For instance, in early February, the administration sent approximately 177 Venezuelans to Guantanamo, calling them the "worst of the worst." Sarabia Roman Decl., Ex. 1. Yet it soon became clear that many of the men had only low-level or no criminal history or had committed only immigration offenses, and were far from the notorious individuals claimed by the administration. *Id.* Indeed, the government ultimately was forced to concede as much in court filings. For example, the government stated in sworn declarations that 51 of 178 of those transferred were classified as "low threat." *See* Ex. M, Jennifer Venghaus Decl. ¶¶ 11–13, (submitted at ECF No. 14-3, *Las Americas Immigrant Advocacy Center v. Noem*, No. 25-cv-418 (D.D.C. Feb. 20, 2025)) (acknowledging 51 out of 178 detainees detained at Guantanamo were classified as "LTIAs," referring to "low threat illegal aliens"); Sarabia Roman Decl., Ex. 1 (reporting that Administration officials confirmed people sent to Guantanamo with no criminal record nor any assessment as high risk).

Notably, even in this case the government has already had to acknowledge that "many of the TdA members removed under the AEA do not have criminal records in the United States" but sought to explain that away by the fact the men have supposedly "only been in the United States for a short period of time." ECF No. 26-1, First Cerna Decl. ¶ 9. Yet the five named Plaintiffs have no criminal history in *Venezuela* either. Remarkably, the government's declaration states that, "the lack of specific information about each individual actually highlights the risk they pose" because that "demonstrates that they are terrorists with regard to whom we lack a complete

profile." *Id.*

Of the removed group, the government's declaration lists "contact" with law enforcement anywhere in the world for 28 people, assuming that the same person is not described multiple times (*e.g.*, as having a foreign arrest and also having a domestic arrest). That includes descriptions of arrests in the U.S. for eight individuals, with no indication of any conviction, and only one individual who was convicted of a crime. *See id.* ¶ 10. It states that "numerous" people labeled as TdA have arrests or investigative notices abroad, identifying nine such people. *Id.* ¶ 11; *see also id.* (no mention of convictions). It further lists ten people as having come into ICE detention after arrests during some form of law enforcement investigation. *See id.* ¶ 12.

Despite acknowledging that it has no information about any crimes committed by many class members, the government asserts that it would be "irresponsible" for the government to keep them in detention, even if only long enough to give them a reasonable chance to contest the government's unilateral accusations. *See id.* In a sworn declaration submitted with this brief, however, Deborah Fleischaker, former Acting ICE Chief of Staff, states that "ICE detention facilities" are "prepared to detain any noncitizen regardless of their security level." Ex. A, Fleischaker Decl. ¶ 7. ICE's custody classification system permits the agency to separate detainees with no criminal history from those with a history of violence. *Id.* ¶ 9. And ICE has "numerous policies in place to ensure a safe and secure environment for both detainees and staff" and "specific tools to address gang recruitment concerns." *Id.* ¶¶ 13, 16. None of the individuals described in Mr. Cerna's declaration struck Ms. Fleischaker as "different than what ICE normally handles." *Id.* ¶ 20.

The members of the provisional class removed to El Salvador face prison conditions that have been deemed "harsh and life threatening," due to "systemic abuse in the prison system."

Bishop Decl. ¶ 21; *see also* Goebertus Decl. ¶ 4. Prison officials use electric shocks, and "beat, waterboard, and use implements of torture on detainees' fingers to try to force confessions of gang affiliation." Bishop Decl. ¶¶ 21, 33, 37, 39, 41; Goebertus Decl. ¶¶ 8, 10, 17 (describing how guards broke a detainee's rib, ruptured another's pancreas and spleen, and forced another into ice water for two hours). These abusive conditions are life threatening. Hundreds of people have died in Salvadorean prisons. Goebertus Decl. ¶ 5; Bishop Decl. ¶¶ 43–50. Inmates have reported that guards sometimes beat prisoners until they are dead, "then bring the body back into the [shared] cell and leave it there until the body started stinking." Bishop Decl. ¶ 39. The physical conditions are equally shocking. Some people at CECOT, the specific facility detaining class members, are held in solitary confinement cells, which are completely dark. Goebertus Decl. ¶ 3. The Salvadorean government announced plans to detain individuals from different gangs together at CECOT which is "certain to result in violence between the gangs." Bishop Decl. ¶ 59. Moreover, if CECOT reaches its full capacity, each prisoner would have just under two feet of space in shared cells. Bishop Decl. ¶¶ 30-31 (describing Salvadorean prisons with as many as 80 prisoners held in cells designed for 12 people). These horrific conditions are "created intentionally" to threaten and intimidate people. Bishop Decl. ¶ 22.

Worse, class members detained at CECOT face indefinite detention. *See* Goebertus Decl. ¶ 3 (quoting the Salvadorean government that people held in CECOT "will never leave"); *id.* ("Human Rights Watch is not aware of any detainees who have been released from that prison."); *see also* Nayib Bukele, X.com post, *supra* n.1 (detainees "were immediately transferred to CECOT . . . for a period of one year (renewable)").

Finally, the government states in its filings that 86 people it has identified as targeted by the Proclamation are in some form of detention and either in removal proceedings or soon to have

proceedings initiated.  ECF No. 28-1, Second Cerna Decl. ¶ 6.  Another 172 people currently in asylum proceedings and not detained, have also been deemed alien enemies.  *Id.*  There is no indication that these 172 people are aware that they have been deemed alien enemies.  *Id.*

## PROCEDURAL HISTORY

Early on March 15, Plaintiffs filed a class action complaint alleging that the invocation of the AEA and Plaintiffs' summary removal from the United States violated the express terms of the statute, illegally bypassed the immigration processes laid out in the Immigration and Nationality Act ("INA"), violated the APA, and did not satisfy the requirements of due process.  Later that morning, this Court entered a temporary restraining order prohibiting Defendants from removing the named Plaintiffs pending a hearing.  Defendants appealed the temporary restraining order within hours.  ECF No. 12.

Late in the afternoon and early evening of March 15, this Court held a hearing and provisionally certified a class consisting of "All noncitizens in U.S. custody who are subject to the March 15, 2025 Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua' and its implementation."  Third Minute Order (Mar. 15, 2025).  The Court then issued a temporary restraining order prohibiting Defendants for 14 days from removing members of the class (who were not otherwise subject to removal) pursuant to the Proclamation.  *Id.*  The Court set the hearing on Defendant's motion to vacate the TROs for Friday, March 21.  *Id.*  Just over an hour later, Defendants appealed the second temporary restraining order.  Notice of Appeal (ECF No. 17).  On Sunday, March 16, Defendants filed emergency motions to stay both TROs pending appeal with the court of appeals.[5]

---

[5] On March 16, Defendants also filed a notice informing the district court that some individuals "subject to removal under the Proclamation had already been removed from United States territory under the Proclamation before issuance of this Court's second order."  ECF No. 19. According to publicly available date and media reports (not disputed by Defendants), no plane

## ARGUMENT

### I.    The Court Can Reach the Merits of Plaintiffs' Claims.

The government advances three threshold arguments.  First, it invokes the political question doctrine to contend that this Court cannot reach the merits of Plaintiffs' claims.  Second, it contends that illegal conduct by the President is unreviewable.  Third, it suggests that this Court is limited to reviewing Plaintiffs' detention—which it conflates with the issue of challenging alien enemy status—and further argues that those claims must be brought in habeas in the district of confinement.  All three arguments fail.

#### A.    The AEA Cases Confirm the Justiciability of Plaintiffs' Claims.

Defendants argue that the AEA "is not a proper subject for judicial scrutiny." Mot. 7.[6]  But the Supreme Court has made clear that claims like Plaintiffs' are justiciable.  In *Ludecke v. Watkins*, the Court emphasized that "resort to the courts" *was* available "to challenge the construction and validity of the statute," explicitly noting that the AEA does not preclude judicial review of "questions of interpretation and constitutionality."  335 U.S. at 163, 171.  Those questions—the "construction" and "interpretation" of the AEA—are precisely what are at issue here.

Plaintiffs raise three key statutory arguments, each of which is justiciable under *Ludecke*: (1) the AEA's use of "invasion" and "predatory incursion" refer only to military action in the

---

containing such individuals had yet landed and the government continued to have custody and control of class members, both when the district court issued its oral order requiring Defendants to "immediately" return anyone still in the air to the United States, and when it issued its written order memorializing the temporary restraining order.  March 15, 5 p.m. Hearing Tr. at 43:6-43:19 (ECF No. 20).  And the government has never claimed that the Defendants themselves, who were enjoined and commanded not to remove any class members, were somehow not under the Court's jurisdiction.  Proceedings to determine whether Defendants violated the court's orders are ongoing.

[6] Mot. refers to the government's brief in support of its motion to vacate the TRO at ECF No. 26.

context of an actual or imminent war; (2) a criminal gang is not a "foreign nation or government"; (3) even if the AEA applies, it still requires (a) an opportunity to contest whether one falls within the Proclamation, (b) compliance with the INA and other later-enacted, more specific statutory protections for noncitizens, and (c) an opportunity to voluntarily depart the United States prior to any removal. Just as *Ludecke* addressed, on the merits, whether the AEA had been lawfully invoked, the Court here has jurisdiction to address whether the statute's predicates have been satisfied. *See* 335 U.S. at 171 (recognizing "the existence of [a] 'declared war'" as reviewable).

*Ludecke* recognized the courts' competence to determine the meaning of the AEA's statutory terms, and whether they had been satisfied. The "political judgment[]" that *Ludecke* declined to revisit, *see* Mot. 3 (quoting *Ludecke*, 335 U.S. at 170), was the question of when a *declared* war would be considered "over" for the purposes of the statute. The petitioner there asserted that World War II had ended—even though Congress had formally declared war and neither Congress nor the President had declared the war over. *Ludecke*, 335 U.S. at 170 & n.15. The Court declined to unilaterally hold that the war had ended, emphasizing that Congress's declaration of war remained in effect. *Id.* at 168. As *Ludecke* itself made clear, that narrow holding in no way precludes judicial review of the claims here: namely, that the President is exceeding the authority granted by, and violating the limits set by, Congress. *See also U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952) ("The statutory power of the Attorney General to remove petitioner as an enemy alien ended when Congress terminated the war."); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) (stating that executive orders exceeded the AEA's authority by failing to provide individual with the opportunity to voluntarily depart the United States).

Rather than fully grapple with *Ludecke*, Defendants point to *Citizens Protective League v.*

*Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946).  *See* Mot. 3, 7–8.  There, the D.C. Circuit merely observed that "[u]nreviewable power in the President to restrain, and to provide for the removal of, alien enemies *in time of war* is the essence of the Act."  *Citizens Protective League,* 155 F.2d at 294 (emphasis added).  In other words, where the AEA's statutory prerequisites have been satisfied, the President has "the power to remove alien enemies."  *Id.* If anything, this statement only underscores that the AEA's activation is limited to times of war and imminent war.  *See infra.* And the court's dicta that the President has power to remove alien enemies "without resort or recourse to the courts," Mot. 8 (quoting *Citizens Protective League,* 155 F.2d at 294), is overread by the government, given that court's own acknowledgment that individuals may challenge their classification as alien enemies, and its merits holding that "[t]he constitutional question raised by appellants was not substantial."  *Citizens Protective League,* 155 F.2d at 294.  In any event, to the extent *Citizens Protective League* might be read to suggest any broader justiciability rule, *Ludecke*'s subsequent holding that courts may review "questions of interpretation and constitutionality"—including the question of whether a "declared war" exists—controls.  *Ludecke*, 335 U.S. at 163, 171.

### B.    The Political Question Doctrine Does Not Apply.

In light of *Ludecke*, there is no question that Plaintiffs' claims are justiciable, and no basis for Defendants' resort to the "political question" doctrine.  But even setting *Ludecke* aside, Defendants' political question arguments are baseless.  Mot. 11-13.  The political question doctrine is a "narrow exception" to courts' presumptive exercise of jurisdiction.  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012).  It does not preclude this Court from deciding Plaintiffs' claims about the construction and interpretation of a federal statute, the applicability of the nation's immigration laws, or the limits Congress has placed on the President's authority—all

14

questions squarely within the judicial function in our system of separated powers.

Indeed, as then-Judge Kavanaugh observed, "[t]he Supreme Court has never applied the political question doctrine in cases involving statutory claims" that "the Executive Branch violated congressionally enacted statutes that purportedly constrain the Executive." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 855 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring).

These are precisely the kinds of legal questions that courts can and must decide. The political question doctrine "is primarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210 (1962), and so the judiciary *must* act when the questions at issue fall within its own competence. *See, e.g.*, *U.S. Dep't of Com. v. Montana*, 503 U.S. 442, 458 (1992) ("As our previous rejection of the political question doctrine in this context should make clear, the interpretation of the apportionment provisions of the Constitution is well within the competence of the Judiciary."); *Al-Tamimi v. Adelson*, 916 F.3d 1, 11 (D.C. Cir. 2019) ("Policy choices are to be made by the political branches and purely legal issues are to be decided by the courts."); *Baker*, 369 U.S. at 216 (courts "will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power"); *see generally Loper Bright Enters. v. Raimondo*, 403 U.S. 369, 385 (2024) (emphasizing that "the final 'interpretation of the laws' [is] 'the proper and peculiar province of the courts'") (quoting Federalist No. 78 (A. Hamilton)).

Nevertheless, Defendants argue that what Congress meant by "invasion" or "predatory incursion" is a nonjusticiable political question. Mot. 12–13. Defendants are wrong.[7]

To start, the question of whether the AEA's "invasion" or "predatory incursion" prongs

---

[7] Notably, the government does not argue—and has waived or forfeited any argument—that the statutory interpretation of "foreign nation or government" is a political question. *See* Mot. 11–13; *see also Keepseagle v. Perdue*, 856 F.3d 1039, 1053 (D.C. Cir. 2017) (discussing waiver and forfeiture).

have been satisfied is not "textually committed" to the executive branch by the Constitution. Mot. 12 (quoting *Baker*, 369 U.S. at 217).   Rather, the statutory question of whether the AEA's prerequisites have been satisfied is quintessentially one for the courts.   As part of this analysis, the Court must consider whether the issues require the Court to "supplant" policy decisions reserved to the executive branch.   *Zivotofsky*, 566 U.S. at 195 (question of whether statute validly allowed individual to obtain the word "Israel" on his passport was distinct from the nonjusticiable question of U.S. policy regarding Israel's sovereignty over Jerusalem).

The fact that the President has certain constitutional powers over foreign affairs, for example, Mot. 12, is not enough to establish a political question.   In *Japan Whaling Association v. American Cetacean Society*, the Supreme Court rejected the idea that a "purely legal question of statutory interpretation" should be held nonjusticiable merely because it "involve[d] foreign relations," explaining that "interpreting congressional legislation is a recurring and accepted task for the federal courts" and the case "call[ed] for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below." 478 U.S. 221, 230 (1986); *see also INS v. Chadha*, 462 U.S. 919, 940–41 (1983) (rejecting argument that Congress's plenary power over immigration renders all immigration-related arguments political questions); *County of Oneida v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 249 (1985) (similar for Congress's power over Indian affairs).   As the D.C. Circuit has held, although "[t]he Executive has broad discretion over the admission and exclusion of aliens, [] that discretion is not boundless.   It extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations.   It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).   Judicial review of Plaintiffs'

challenge *preserves* the separation of powers by ensuring that the President does not exceed the specific authority Congress delegated in the AEA. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring).

Defendants are also wrong to argue that there are no "manageable standards" to review Plaintiffs' claims. Mot. 13. The questions of whether migration and alleged criminal activity are military activities that constitute an "invasion" or "predatory incursion" within the meaning of the AEA are statutory questions, plainly susceptible to judicial determination. They require the Court to engage in statutory analysis, based on the text and history of the AEA and canons of construction. This type of statutory interpretation is a classic judicial exercise. For example, in *Zivotofsky*, the Court held that where the parties' arguments "sound in familiar principles of constitutional interpretation," including reliance on "the textual, structural, and historical evidence"—the exact kind of interpretive tools required to resolve the AEA's metes and bounds— that is "enough to establish that this case does not 'turn on standards that defy judicial application.'" 566 U.S. at 201; *see also Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 514 (D.C. Cir. 2018) ("[A] court must determine whether the circumstances involve an act of war within the meaning of the statutory exception. That interpretive exercise, unlike with a non-justiciable political question, 'is what courts do.'"); *Al-Tamimi*, 916 F.3d at 12 n.6 (D.C. Cir. 2019) ("statutory interpretation is generally committed to the judicial branch").

Defendants cite out-of-circuit precedent addressing the Constitution's Invasion Clause. Mot. 11, 13 (citing *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997)). As an initial matter, that court's broad-brush approach to the political question doctrine cannot be squared with the subsequent guidance from the Supreme Court on the narrow application of the doctrine. In any event, that case involved the interpretation of a constitutional provision, not a statutory provision

delegating power to the executive branch, as in this case. *See Ludecke*, 335 U.S. at 163.

The political question doctrine serves to reinforce the separation of powers. It is particularly critical for the judiciary to enforce the separation of powers when inter-branch disputes arise—where, as here, the executive violates or exceeds a statute. *See El-Shifa Pharm. Indus. Co.*, 607 F.3d at 855 (Kavanaugh, J., concurring); *Al-Tamimi*, 916 F.3d at 12 n.6 ("a statutory claim is less likely to present a political question").

As the Supreme Court has explained, "[t]he Judicial Branch appropriately exercises" review "where the question is whether Congress or the Executive is 'aggrandizing its power at the expense of another branch.'" *Zivotofsky*, 566 U.S. at 197; *cf. Youngstown*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). That is precisely what this case is about.

## C.     Defendants' Action Is Subject to Judicial Review Under the APA and in Equity.

Defendants' remaining jurisdictional arguments are unavailing. Even assuming that President Trump himself cannot be enjoined, Mot. 7, there is no question that the Court can enjoin the remaining Defendants and their implementation of the Proclamation, *see, e.g.*, *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). More generally, there is no question that this Court may review the lawfulness of presidential action like the Proclamation and its implementation. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 675–76 (2018) (reviewing President's authority under the INA to issue proclamation); *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (reviewing President Carter's executive order ending the Iranian hostage crisis); *Youngstown*, 343 U.S. 579 (reviewing constitutionality of President Truman's executive orders); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) (reviewing validity of an executive order issued by President Franklin Roosevelt under the National Industrial Recovery Act in action against officials of the Department of the Interior); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327

(2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").[8]

Defendants' argument that APA review does not extend to agency action carrying out the directives of the President, Mot. 10, is flatly incorrect. *See, e.g.*, *Reich*, 74 F.3d at 1327 ("that the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question"). Defendants' only support for this proposition is a single district court case, *Tulare County v. Bush*, 185 F. Supp. 2d 18, 28–29 (D.D.C. 2001), that was wrongly decided with respect to the scope of APA review and affirmed on entirely separate grounds, *see* 306 F.3d 1138, 1143 (D.C. Cir. 2002) (implying that the plaintiffs' claims could have proceeded under the APA if pled with greater specificity); *cf. State v. Su*, 121 F.4th 1, 15–16 (9th Cir. 2024) ("*Tulare* . . . misapprehended the APA."). Regardless, Defendants' APA argument would not defeat jurisdiction because Plaintiffs' claims are also based in equity. *See* Compl.[9]

### D. Plaintiffs' Claims Need Not Be Brought in Habeas.

Defendants concede that courts have jurisdiction to review whether each person subject to the order "has been properly included in the category of alien enemies." Mot. 9 n.1. That jurisdiction is unquestionable even in the case of a declared war against a foreign nation (where

---

[8] Moreover, President Trump remains a proper defendant because, at a minimum, Plaintiffs may obtain declaratory relief against him. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (concluding that court had jurisdiction to issue writ of mandamus against the President but "opt[ing] instead" to issue declaration).

[9] Defendants concede that the All Writs Act "permits a court to protect [its] jurisdiction," Mot. 11; *see also United States v. N.Y. Tel. Co.*, 434 U.S. 159, 173 (1977) (court can avail itself of auxiliary writs "when the use of such historic aids is calculated in its sound judgment to achieve the ends of justice entrusted to it"), and it can do so here.

nationality is easily proved), and it is even more so here—where alleged criminal gang associations are a highly contestable predicate for invocation of the AEA. *Ludecke*, 335 U.S. at 171. Instead, Defendants argue that the District of Columbia is an improper venue to raise that question because it "sound[s] in habeas." Mot. 3. But there is no bar to Plaintiffs bringing claims outside habeas for the harms they allege.

Habeas is required where a claim (1) "goes directly to the constitutionality of [the] physical confinement itself" and (2) "seeks either immediate release from that confinement or the shortening of its duration." *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973). The government claims that Plaintiffs are "challenging the legality of detention." Mot. 8. That is patently false. Neither TRO contemplates—much less requires—release of any individual. *See* Minute Order (Mar. 15, 2025); Minute Order (Mar. 15, 2025) (covering "noncitizens in U.S. custody"). Indeed, Plaintiffs do not seek release from custody. Mar. 15, 2025 Hearing, Tr. 19 ("[Plaintiffs] are not trying to get out of detention in this lawsuit . . . This lawsuit will not allow them to be released."). Nor are they challenging the validity of their confinement or seeking to shorten its duration. Rather, they challenge their removal without ordinary immigration processes, which is properly considered outside of habeas. *See* Br. for the United States, *DHS v. Thuraissigiam*, 591 U.S. 103 (2020), 2019 WL 6727092, at *33 ("a challenge to an alien's deportation remains outside the 'historical core' of habeas"); *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 159 (D.D.C. 2021) (considering challenge to use of Title 42 to bypass ordinary immigration procedures by class primarily detained in Texas), *aff'd in part, rev'd in part and remanded*, 27 F.4th 718 (D.C. Cir. 2022).

Defendants nonetheless assert that Plaintiffs' claims must be brought in habeas. Mot. 8.

But no court has required that challenges to the AEA be brought in habeas.[10] In fact, the only D.C. Circuit case reviewing threats of removal under the AEA did not involve claims brought in habeas. *See Citizens Protective League v. Clark*, 155 F.2d 290, 291 (D.C. Cir. 1946) (addressing three separate "civil actions" on behalf of 159 German nationals); *see also Citizens Protective League v. Byrnes*, 64 F. Supp. 233, 233 (D.D.C. 1946). The court decided those claims on the merits—not on jurisdictional grounds. *See* Mot. at 8 (conceding that *Clark* involved non-habeas cases and that the court dismissed for failure to state a claim). And, of course, no examples of challenges to AEA removals under the INA or the APA exist because those statutes were not yet in place when any of the prior AEA proclamations or regulations were last issued during World War II.

Indeed, courts within this Circuit regularly review constitutional, statutory, and APA challenges brought by people incarcerated or detained outside of Washington D.C. *See, e.g.*, *J.D. v. Azar*, 925 F.3d 1291, 1300 (D.C. Cir. 2019) (affirming in part injunction against the government's policy on behalf of a class of unaccompanied noncitizen minors in custody nationwide); *Huisha-Huisha*, 560 F. Supp. 3d at 159; *Bailey v. Fulwood*, 793 F.3d 127, 135–36 (D.C. Cir. 2015) (evaluating merits of ex post facto claim brought by prisoner incarcerated outside of D.C.); *see also Damus v. Nielsen*, 313 F. Supp. 3d 317, 323 (D.D.C. 2018) (granting injunction to class of detained plaintiffs challenging parole practices at five ICE field offices across the country); *Ramirez v. U.S. Immigr. & Customs Enf't*, 471 F. Supp. 3d 88, 94 (D.D.C. 2020), *judgment entered,* 568 F. Supp. 3d 10 (D.D.C. 2021) (considering APA challenge by class of detained noncitizens located across the country); *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502

---

[10] While *Ludecke* happened to involve a challenge brought in habeas, nothing in the decision requires AEA challenges to lie in habeas. Moreover, that case preceded Supreme Court cases that distinguish between core and non-core habeas petitions, and it did not address venue or the immediate custodian rule.

F. Supp. 3d 492, 531 (D.D.C. 2020) (certifying class of all unaccompanied noncitizen children who are or will be detained in US government custody in the country and who would be subject to Title 42 expulsions); *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. 18-cv-760, 2019 WL 2077120, at *3 (D.D.C. May 10, 2019) (declining to transfer constitutional and APA challenges by immigration detainees in Georgia and Louisiana from D.C.).

Moreover, this rule applies even when the claim *could* also have been brought in habeas. *See, e.g.*, *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 126–27 (D.D.C. 2018) ("Although . . . many of the relevant cases challenging the government's treatment of asylum seekers lie in habeas, those cases do not stand for the proposition that they *could only* have been brought as habeas petitions."); *R.I.L.-R. v. Johnson*, 80 F. Supp. 3d 164, 185 (D.D.C. 2015) ("Insofar as the Government alternatively argues that Plaintiffs are required to proceed in habeas rather than under the APA, they have not provided a compelling reason why this is so. APA and habeas review may coexist.").[11] *See, e.g.*, *Davis v. U.S. Sent'g Comm'n*, 716 F.3d 660, 666 (D.C. Cir. 2013) (person in federal custody "need bring his claim in habeas only if success on the merits will 'necessarily imply the invalidity of confinement or shorten its duration'") (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005). Defendants' other cases are inapposite—all involved detained individuals who sought release or to shorten their sentence—in other words, core habeas relief. *See Kaminer v. Clark*, 177 F.2d 51, 52 (D.C. Cir. 1949) (plaintiff challenged his detention without a hearing and sought "release on bond"); *Clark v. Memelo*, 174 F.2d 978, 980 (D.C. Cir. 1949) (challenging

---

[11] To the extent *LoBue v. Christopher*, 82 F.3d 1081 (D.C. Cir. 1996), suggests otherwise, the intervening voluminous precedent from both the D.C. Circuit and the Supreme Court clearly control. The court in *LoBue* also noted that Plaintiffs already had pending habeas petitions in other districts. 82 F.3d at 1082. In that way, the case looks more like *Vetcher v. Sessions*, where Plaintiff was challenging his length of confinement—a core aspect of habeas—and "already had a habeas suit" in another jurisdiction. 316 F. Supp. 3d 70, 78 (D.D.C. 2018).

length of criminal sentence); *Monk v. Sec'y of Navy*, 793 F.2d 364, 366 (D.C. Cir. 1986) ("this determination . . . might result in Monk's release from prison and, therefore, must be made in an action for habeas corpus"); *Fletcher v. Reilly*, 433 F.3d 867, 879 (D.C. Cir. 2006) (challenging retroactive application of regulation that "created a significant risk that [petitioner] will be subjected to a lengthier incarceration").

And even assuming habeas were the required vehicle—and it is not—venue in D.C. is still proper. When a petition does not challenge the detention itself as unlawful, and seeks relief other than simple release, the immediate custodian rule does not apply. *Wilkinson v. Dotson*, 544 U.S. 74, 92 (2005). Instead, "because 'the writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody,'" a district court acts 'within [its] respective jurisdiction' within the meaning of § 2241 as long as 'the custodian can be reached by service of process.'" *Rasul v. Bush*, 542 U.S. 466, 467 (2004) (quoting *Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 494–95 (2004)). The entities responsible for this restraint reside in their official capacity in the District of D.C. In contrast, all of the cases cited by the government in support of application of the immediate custodian rule involved core habeas cases seeking release. *See* Mot. 10.

Not only are Defendants' habeas arguments wrong, but the alternative review and relief they purport to offer is illusory. Mot. 8; Def. Appeal Reply 14 (filed Mar. 19, 2025) (claiming that "individuals identified as alien enemies under the President's Proclamation may challenge that status in a habeas petition"). As the events of March 15 show, Defendants are not providing the individuals that it alleges are subject to the Proclamation with any meaningful notice that they have been identified as "enemy aliens" or that they are about to be immediately removed to El Salvador or another unknown country—and so they will have no genuine opportunity to seek relief, habeas

or otherwise, in the absence of the district court's TRO. *See, e.g.*, Compl. ¶¶ 9–13. Through the President's secret signing of the Proclamation, the government's failure to provide notice or an opportunity to voluntarily depart, and its actions to immediately remove class members to a foreign prison, Defendants have sought to thwart the very court review they now claim is available. Should the Court's TRO be terminated prior to further judicial review, Defendants have evidenced every intention of resuming their summary expulsions and removing the Plaintiff class members before they can have any resort to the courts. *See, e.g.*, Def. Appeal Reply 14 (objecting to even a "short delay" in carrying out removals of class members).

## II. Plaintiffs Are Likely to Succeed on the Merits.

### A. The AEA Does Not Authorize the President to Summarily Remove Plaintiffs from the United States.

The AEA, as noted, has been invoked only three times, all during declared wars. Defendants now seek to invoke this limited wartime authority to execute summary removals wholly untethered to any actual war or to the specific conditions Congress placed on this extraordinary authority. When the government asserts "an unheralded power" in a "long-extant statute," courts "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That skepticism is well warranted here.

#### i. There is no "invasion" or "predatory incursion" upon the United States.

There is no "invasion" or "predatory incursion" upon the United States within the meaning of the AEA. Defendants' attempt to redefine these terms—by citing modern dictionaries, contemporary usage, and expansive readings of definitions, Mot. 14–15—is entirely disconnected from the AEA's text and historical context. Both the text and history make clear that the AEA's terms refer to military actions by foreign governments that imminently lead to, or constitute, acts of war. *See, e.g.*, Office of Legislative Affairs, Proposed Amendment to AEA, at 2 n.1 (Aug. 27,

1980) ("The Act contemplates use of its provisions by the President in situations where war is imminent."); *Ludecke*, 335 U.S. at 169 n.13 (explaining that "the life of [the AEA] is defined by the existence of a war").  At the time of the AEA's enactment, the operative understanding of "invasion" was a large-scale military action by an army intent on territorial conquest.  *See* Webster's Dictionary, Invasion (1828) ("invasion" is "*particularly*, the entrance of a hostile army into a country for purpose of conquest or plunder") (emphasis added); Draft of an Address of the Convention of the Representatives of the State of New York to Their Constituents (Dec. 23, 1776) (describing the goal of British invasion as "the conquest of America");[12] Letter from Timothy Pickering, Sec'y of State, to Alexander Hamilton, Inspector Gen. of the Army (June 9, 1798) (noting that French "invasion" of English could require France to keep troops in Europe "until the conquest was complete");[13] James Madison, The Report of 1800 (Jan. 7, 1800) ("Invasion is an operation of war.").[14]

And the operative understanding of "predatory incursion" referred to smaller-scale military raids aimed to destroy military structures or supplies, or to otherwise sabotage the enemy, often as a precursor to invasion and war.  *See* Webster's Dictionary, *Predatory* (1828) ("predatory" underscores that the purpose of a military party's "incursion" was "plundering" or "pillaging"); *id.*, *Incursion* (1828) ("incursion . . . applies to the expeditions of small parties or detachments of an enemy's army, entering a territory for attack, plunder, or destruction of a post or magazine"); Samuel Johnson's Dictionary, Incursion (1773) ("incursion" is "invasion without conquest"); Letter from George Washington, Commd'r in Chief of Army, to Thomas Jefferson, Gov. of Va.

---

[12] *Available at* https://perma.cc/AX3D-EV53.

[13] *Available at* https://perma.cc/Y3GX-R9PM.

[14] *Available at* https://perma.cc/36LL-TFMZ.

(Feb. 6, 1781) (describing a British raid that destroyed military supplies and infrastructure in Richmond as a "predatory incursion"); Letter from George Washington, Commd'r in Chief of Army, to Nathanael Greene, Commd'r in Chief of Southern Dep't of Army (Jan. 29, 1783) ("predatory incursions" by the British could be managed with limited cavalry troops). "Mass illegal migration" or criminal activities are categorically not an "invasion" or "predatory incursion" threatening war. *See United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024) (rejecting argument that cartel's criminal activity and immigration constitute an "invasion").

Defendants cite three cases as examples of a broad understanding of "predatory incursion." Mot. 14 (citing *Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189–90 (S.D. Tex. 1945); *Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992); *Bas v. Tingy*, 4 U.S. 37 (1800)). None of these cases are applicable. *Amaya* used "predatory incursion" in the context of *military* forces or actions—not a criminal gang like TdA. 62 F. Supp. at 184, 189–90. *Davrod* mentioned "predatory incursion" in passing, while analyzing the Magnuson Fishery Conservation and Management Act—a statute whose text and known legislative history make no reference to the term. *See* 971 F.2d at 785; 16 U.S.C. § 1801 *et seq.*; 128 Cong. Rec. 31695 (97th Cong. 2d Sess., Dec. 16, 1982). And *Bas* never used the term "predatory incursion" at all. *See* 4 U.S. 37. Moreover, *Amaya* and *Davrod* both long post-date the AEA's enactment, so none of these cases shed light on the AEA's original meaning of "predatory incursion."

### ii.    The purported invasion is not by a "foreign nation or government."

Defendants scarcely attempt to defend their actions as consistent with the text of the AEA's second—and equally mandatory—requirement: that any "invasion" or "incursion" be perpetuated by a "nation" or "government." They gesture at the President's "findings" and the political branches' historical use of broader "war powers" against certain nonstate actors. Mot. 16–18. Notably, Defendants do not—and cannot—point to any past invocation of the AEA in

26

those instances.  Rather, they assert that TdA acts as a "*de facto* government" in certain areas "where it operates." *Id.* at 16.

At the time of the AEA's enactment, the terms "nation" and "government" were defined by their possession of territory and legal authority.  *See* Samuel Johnson's Dictionary, *Nation* (1773) ("A people distinguished from another people; generally by their language, original, or government."); Samuel Johnson's Dictionary, *Government* (1773) ("An established state of legal authority.").  As a criminal gang, however, TdA possesses neither a defined territory nor a common government.

Moreover, when a "nation or government" is designated under the AEA, the statute unlocks power over that nation or government's "natives, citizens, denizens, or subjects."  50 U.S.C. § 21.  *Countries* have "natives, citizens, denizens, or subjects."  Criminal organizations, in the government's own view, have "members." Proclamation § 1 ("members of TdA").  The Proclamation singles out Venezuelan nationals—but does not claim that Venezuela is invading the United States.  And it designates TdA "members" as subject to AEA enforcement—but "members" are not "natives, citizens, denizens, or subjects."  Similarly, the AEA's presumes that a designated nation possesses treaty-making powers.  *See* 50 U.S.C. § 22 ("stipulated by any treaty . . . between the United States and the hostile nation or government").  Nations—not criminal organizations—are the entities that enter into treaties.  *See, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 505, 508 (2008) (treaty is "a compact between independent nations" and "agreement among sovereign powers") (internal quotation marks omitted); *Holmes v. Jennison*, 39 U.S. 540, 570-72 (1840) (similar).

The glaring mismatch underscores that Defendants are attempting not only to use the AEA in an unprecedented way, but in a way that Congress never permitted—as a mechanism to address,

in the government's own words, a *non*-state actor.  While Defendants attempt to paper over these problems by claiming that TdA and Venezuela are "indistinguishable," Mot. 16, that is plainly wrong, as Defendants themselves distinguish between the two—*Venezuela* has citizens, but TdA (not Venezuela) is designated under the proclamation.  Similarly, Defendants' half-hearted effort to suggest TdA is now a country because it exerts control in certain regions of Venezuela falls flat. *Id.* at 16.  Again, even Defendants do not suggest that people in those regions are "natives, citizens, denizens, or subjects" *of TdA*.  No amount of wordplay can avoid the obvious fact that *Venezuela* is the relevant country here—and TdA is a non-state criminal organization.

In effect, the Government asks this Court to read the nation/government requirement out of the statute entirely, and accept that the AEA reaches the fullest extent of the political branches' more expansive "war powers."  Mot. 15 (analogizing invocation to political branches' use of "war powers against formally nonstate actors").  But the Alien Enemies Act does not encompass the full scope of the political branches' "war powers."  It operates as a specific delegation of authority from Congress to the President, a delegation Congress specifically limited to instances where action is taken by "foreign nation[s]" or "governments."  *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–38 (1952) (Jackson, J., concurring).

If Congress had intended to vest the President with broader authority, it could have said so. After all—as explained in a source that the government itself cites—Congress has long been aware of the distinction between executive branch authority to use "military force against non-traditional actors" and "more traditional conflicts" waged against formally-recognized states—as a source the Government itself cites explains.  Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005); *see also* Mot. 16 (citing same).  Congress knows how to delegate authority over such actors to the Executive Branch

when it wants to.  *See* 22 U.S.C. § 6442a ("review and identify any non-state actors operating in any such reviewed country"); 18 U.S.C. § 2339A (criminalizing providing material support to non-state actors).  But Congress did not make this choice with the AEA. It intentionally limited its scope to actions taken by "foreign nation[s]" and "government[s]."  50 U.S.C. § 21.  And it has never amended the statute to broaden that scope.

While the United States has, at times, asserted war-based authority to use force against non-state actors, Mot. 16, these actions were justified under separate legal frameworks, not under the AEA.  And the AEA's historical record confirms that it was intended to address conflicts with foreign sovereigns, not a criminal gang like TdA.  *See* 5 Annals of Cong. 1453 (Apr. 1798) ("[W]e may very shortly be involved in war . . ."); John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, N.Y. State Bar Ass'n Annual Meeting: Civil Liberty in War Time, at 8 (Jan. 17, 1919) ("The [AEA] was passed by Congress . . . at a time when it was supposed that war with France was imminent."); Cong. Rsch. Serv., Declarations of War and Authorizations for the Use of Military Force 1 (2014) (Congress has never issued a declaration of war against a nonstate actor). If Defendants were allowed to designate any group with ties to officials as a foreign government, and courts were powerless to review that designation, any group could be deemed a government, leading to an untenable and overbroad application of the AEA.

Finally, Defendants' broad argument that the Proclamation is supported by the President's Article II authority, and that his power is at its "maximum" under *Youngstown*, Mot. 17, is plainly wrong because the President is acting in a manner that is not authorized the by the AEA, and his Proclamation also violates Congress's other delegations of statutory authority concerning immigration.  *See infra.* Accordingly, under Justice Jackson's *Youngstown* framework, the President's power is at its "lowest ebb": "Courts can sustain exclusive Presidential control in such

a case only by disabling the Congress from acting upon the subject." 343 U.S. at 637–38.  There is no basis for doing so here.  Under Article I, Congress holds plenary power over immigration, *INS v. Chadha*, 462 U.S. 919, 940 (1983), and has a broad, distinct set of war powers, *Hamdan v. Rumsfeld*, 548 U.S. 557, 591 (2006).  Through the INA and a variety of statutory safeguards, Congress comprehensively regulated the removal of immigrants.  *See infra*.  And through the AEA, Congress granted a specific set of war powers to the President; he is not at liberty to exceed those statutory powers or to exercise them outside of the context of war or imminent war.  There is simply no ground for disabling Congress's specific, bounded delegations of authority in the AEA and the INA, and ultimately Congress's constitutional power to legislate with respect to immigration, including in times of war.

Moreover, even when the executive asserts war powers, the Supreme Court has repeatedly refused to grant the President a blank check as Commander-in-Chief.  *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 732 (2008) (rejecting executive's argument that noncitizens designated as "enemy combatants" outside the United States have no habeas privilege); *Hamdan*, 548 U.S. at 593 (interpreting statutes constraining the President's war powers; rejecting executive's arguments about the scope of the Uniform Code of Military Justice); *Hamdi v. Rumsfeld*, 542 U.S. 507, 530, 535–36 (2004) (plurality op.) (rejecting executive's arguments about the process due to alleged enemy combatants);[15] *Ex Parte Milligan*, 71 U.S. 2, 125 (1866) ("[The Founders] knew—the history of the world told them—the nation they were founding, be its existence short or long, would be involved in war . . . and that unlimited power, wherever lodged at such a time, was especially

---

[15] *See also Hamdi*, 542 U.S. at 530 ("[A]s critical as the Government's interest may be in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict, history and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse of others who do not present that sort of threat.").

hazardous to freemen.").

### iii.    The Proclamation violates the INA.

Defendants' argument that the Proclamation does not conflict with the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., cannot be squared with the statute. The INA provides that, "[u]nless otherwise specified" in the INA, a removal proceeding before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual. 8 U.S.C. § 1229a(a)(3). The INA directs specific procedures and processes by which removals must take place. *Id.* § 1229a(e)(2). The Proclamation here entirely bypasses the INA's comprehensive process.

Defendants' reliance on *Huisha-Huisha* is misguided. While the government *argued* in that case that Title 42 public health authority and the INA provided "distinct mechanisms for effectuating the removal" of noncitizens, Mot. 18, the D.C. Circuit did not accept that view. Rather, the court noted that 8 U.S.C. § 1227(a)(1)(B)—part of the INA—provided the authority to expel. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 729 (D.C. Cir. 2022). Far from supporting Defendants' claim, *Huisha-Huisha* bolsters Plaintiffs' argument that the AEA must be understood in the context of Congress's choice to channel *all* removal into the INA's specific procedures.

Immigration laws have changed substantially since the last invocation of the AEA more than eighty years ago. The enactment of the INA in 1952 "br[ought] together for the first time in our history all the laws regulating immigration and naturalization, into one extensive compilation." *In re Barnes*, 219 F.2d 137, 145 (2d Cir. 1955), *judgment rev'd by United States v. Minker*, 350 U.S. 179 (1956). This "established a comprehensive federal statutory scheme for regulations of immigration and naturalization." *Chamber of Comm. v. Whiting*, 563 U.S. 582 (2011) (internal quotation marks omitted).

Congress was aware that alien enemies were subject to removal in times of war or invasion

31

when it enacted the INA. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of the existing law). Indeed, the AEA had been invoked just a few years earlier; many Members of the Congress that enacted the INA had been Members at that time. With this awareness, Congress designated the INA to have the "sole and exclusive" procedures for deportation or removal. *See United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA."). And Congress did not carve out AEA removals as an exception from standard immigration procedures. Rather, Congress provided that the INA sets forth "the sole and exclusive" procedures for determining removal. 8 U.S.C. § 1229a(a)(3).

To the degree there is conflict between the INA and the AEA, the INA must control. Statutory construction dictates that a later enacted statute generally supersedes an earlier one. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662-63 (2007). While Defendants argue that the AEA is more "specific," Mot. 19, the reality is the AEA says *nothing* about what procedures are to be used in determining whether someone who is allegedly removable should in fact be removed.

By contrast, the INA provides a comprehensive and carefully crafted scheme that Congress set forth for processing noncitizens prior to removal. As one example, the INA describes specific countries to which individuals can and cannot be removed. 8 U.S.C. § 1231. The INA's "sole and exclusive procedure" is thus not only later enacted but also more specific.

Defendants attempt to circumvent the statutory scheme. But where an agency's interpretation of one statute "tramples the work done" by another statute—as Defendants' sweeping view of the AEA tramples the immigration laws—the agency "bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Epic Sys.*

*v. Lewis*, 583 U.S. 497, 510, 515-16 (2018).  Defendants can show no such "clear and manifest" intention.  *Id.* at 510 (internal quotation marks omitted).

None of this is to say the AEA is superfluous after the enactment of the INA.  For example, lawful permanent residents can only be removed in peacetime under certain conditions.  8 U.S.C. § 1227.  But in wartime, the president can deem all noncitizen nationals of a foreign country removable.  The AEA thus does important work—authorizing detention and potential removal of noncitizens otherwise secure against those actions.  But when it comes to what procedural rights are available, and what defenses against deportation may be granted, the AEA is simply silent, while the INA provides an explicitly exclusive answer.

### iv.    The Proclamation violates the specific protections that Congress established for noncitizens seeking humanitarian protections.

The Proclamation also unlawfully overrides statutory protections for noncitizens seeking relief from persecution or torture, subjecting them to removal without considering their claims. Congress intentionally enacted statutory provisions for asylum, withholding, and the Convention Against Torture (CAT) to ensure that noncitizens can seek protection from persecution and torture. *See* 8 U.S.C. §§ 1158 (asylum), 1231(b)(3) (withholding of removal); 1231 note (CAT).  The Proclamation cannot supersede these more specific, subsequently enacted statutes that expressly provide special protections for individuals seeking humanitarian relief.

Specifically, the asylum statute unequivocally provides that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum."  8 U.S.C. § 1158(a)(1).  Similarly, the withholding of removal statute explicitly prohibits the removal of a noncitizen to a country where their "life or freedom" would be threatened based on a protected ground.  *Id.* § 1231(b)(3)(A).  Congress has narrowly defined circumstances under which individuals may be barred from asylum and withholding of

removal, none of which are applicable here.  *See id.* §§ 1158(b)(2)(A), 1231(b)(3)(B).

Additionally, CAT categorically prohibits returning a noncitizen to any country where it is more

likely than not the person would face torture.  *See Huisha-Huisha*, 27 F.4th at 725.

Defendants contend that the INA does not restrain actions taken under the AEA, suggesting

that they may designate noncitizens as "alien enemies" who would then be barred from seeking

any relief against persecution or torture.  Mot. 19-20 (citing *Citizens Protective League*, 155 F.2d

at 294).  This is wrong.  Congress specifically provided humanitarian protections that remain

available regardless of a noncitizen's status or circumstances.  While asylum, withholding, and

CAT protections each are subject to statutory exceptions, being designated "alien enemies" are not

among those exceptions.  *See, e.g.*, 8 U.S.C. § 1158(b)(2)(A)(ii)-(iii) (noncitizens barred from

asylum if convicted of particularly serious crime or if "serious reasons to believe" they "committed

a serious nonpolitical crime" outside the U.S.); *id.* § 1231(b)(3)(B)(ii)-(iii) (same for withholding);

*see also* 8 U.S.C. §§ 1226(c), 1231(a)(6).

Nor does *Citizens Protective League* say otherwise; indeed, that decision long predates

these critical statutory enactments and thus did not consider the extensive statutory rights and

procedural safeguards now available.  *See* Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102

(asylum and withholding); Convention Against Torture art. 3, Dec. 10, 1984, S. Treaty Doc. No.

100-20, at 20 (1988); Pub. L. No. 105-277, Div. G. Title XXI, § 2242(a), 112 Stat. 2681 (1998)

(implementing CAT).  Thus, the AEA's general authority to remove noncitizens designated as

alien enemies must yield to the explicit humanitarian protections provided by Congress in later

and more targeted enactments.  *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017) ("[I]t is a

commonplace of statutory construction that the specific governs the general.") (internal quotation

marks omitted).

"In understanding this statutory text, 'a page of history is worth a volume of logic.'" *Jones v. Hendrix*, 599 U.S. 465, 472 (2023) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)). These humanitarian protections were enacted in the aftermath of World War II, when the United States joined other countries in committing to never again turn our backs on people fleeing persecution and torture. Sadako Ogata, U.N. High Comm'r for Refugees, Address at the Holocaust Memorial Museum, Washington, DC (Apr. 30, 1997).[16] Yet under Defendants' reading of the AEA, a President could simply sweep away these protections.

Finally, the Defendants' reliance on *Huisha-Huisha*, 27 F.4th 718, is again misplaced. Mot. 20. The D.C. Circuit in fact *rejected* the argument offered by the government here, that withholding and CAT protection had no application to Title 42 expulsions. *See Huisha-Huisha*, 27 F.4th at 731-33. And it affirmed the importance of humanitarian protections codified in the INA, emphasizing the prohibition against removing individuals to places where they face persecution or torture. *Id.* at 722. The government's position here is even more extreme: In *Huisha-Huisha* the government at least claimed to have a procedure for torture protection, albeit not for persecution. Here, the government argues that it may remove individuals under the Proclamation without even a torture screening. *See* Reply Br., *Huisha-Huisha*, 27 F.4th 718 (D.C. Cir. 2022), 2021 WL 5579941, at *19. And it does so even though *Congress* has said that every noncitizen is entitled to a torture screening with no exceptions.

In sum, the AEA cannot override the INA provisions that were deliberately enacted to provide vulnerable individuals with meaningful access to protections from prosecution and torture. The individuals sent to a horrific Salvadorean prison are now as vulnerable as it gets.

---

[16] https://perma.cc/X5YF-K6EU.

### v.    The absence of all due process violates the AEA and Due Process.

Due process and the AEA permit removal only where noncitizens alleged to be alien enemies have first been given the opportunity to contest their removals. *See, e.g.*, *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014) ("Both the Supreme Court and this Court have recognized that the right to know the factual basis for [government] action and the opportunity to rebut the evidence supporting that action are essential components of due process."). The AEA also requires that individuals be allowed to depart voluntarily, and removed only if they have explicitly "refuse[d] or neglect[ed] to depart" from the United States voluntarily. 50 U.S.C. § 21.

Courts interpreting the AEA even during World War II recognized that noncitizens designated as "alien enemies" retained the right to voluntary departure. *See United States ex rel. Dorfler v. Watkins*, 171 F.2d at 432 ("An alien *must* be afforded the privilege of voluntary departure before the Attorney General can lawfully remove him against his will.") (emphasis added); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) ("His present restraint by the respondent is unlawful in so far as it interferes with his voluntary departure, since the enforced removal, of which his present restraint is a concomitant, is unlawful before he does 'Refuse or neglect' to depart" under Section 21).

The government incorrectly contends that the voluntary departure procedures do not apply here because the designated individuals are "chargeable with actual hostility, or other crime against public safety." Mot. 22 (citing 50 U.S.C. § 22). But that exception cannot be invoked categorically, without individualized assessments—each noncitizen must specifically be "chargeable" with actual hostility or a crime against public safety to lose eligibility for voluntary departure.

36

**B.    The Equitable Factors Weigh In Favor of Plaintiffs.**

**i.    Plaintiffs will suffer irreparable harm if the TRO is dissolved.**

Plaintiffs face an imminent risk that they will be summarily removed from the United States to El Salvador or to Venezuela without any meaningful opportunity to assert claims for relief.  Contrary to Defendants' arguments, Mot. 22-23, Plaintiffs do not claim irreparable harm from the mere fact of removal.  Instead, as Plaintiffs described in detail in the TRO motion and above, their removal constitutes grave and immediate irreparable harm because of what awaits them upon deportation.  ECF No. 3-2, TRO Mot. 17-21; *see also supra*.  Indeed, the video released by Salvadorean authorities (and approved of by Cabinet-level officials in the United States) leaves no doubt about what awaits individuals in El Salvador.  Nayib Bukele, X.com, *supra* n.1.

If this Court dissolves the TRO, additional members of the provisional class will be sent to El Salvador, where they will be confined in detention centers to face torture and persecution for an indefinite amount of time.  *See* TRO Mot. 17-19; *see generally* Bishop Decl.; Goebertus Decl.  Prison conditions in El Salvador are "harsh and life threatening."  Bishop Decl. ¶ 21; *see also* Goebertus Decl. ¶ 4.    Prison officials engage in widespread physical abuse, including waterboarding, electric shocks, using implements of torture on detainees' fingers, forcing detainees into ice water for hours, and hitting or kicking detainees so severely that it causes broken bones or ruptured organs.  Bishop Decl. ¶¶ 21, 33, 37, 39, 41; Goebertus Decl. ¶¶ 8, 10, 17.  People in detention in El Salvador also face psychological harm, including solitary confinement in pitch dark cells or being forced to stay in a cell with the body of a fellow prisoner who was recently beaten to death.  Goebertus Decl. ¶ 3; Bishop Decl. ¶ 39.  In fact, El Salvador creates these horrific conditions intentionally to terrify people.  Bishop Decl. ¶ 22.  These inhumane conditions clearly amount to irreparable harm.  *Huisha-Huisha*, 27 F.4th at 733 (irreparable harm exists where petitioners "expelled to places where they will be persecuted or tortured"); *Al-Joudi v. Bush*, 406

F. Supp. 2d 13, 20 (D.D.C. 2005) (harsh conditions at Guantanamo that forced detainees to go on hunger strikes amounted to irreparable harm). And there is no escaping the irreparable harm any time soon. *See* Nayib Bukele, X.com, *supra* n.1; *see also* Goebertus Decl. ¶ 3 (quoting the Salvadorean government that people held in CECOT "will never leave"); *id.* ("Human Rights Watch is not aware of any detainees who have been released from that prison.").

While "removal alone cannot constitute the requisite irreparable injury," *Nken v. Holder*, 556 U.S. 418, 435 (2009), these are hardly run-of-the-mill removals. Moreover, not only do Plaintiffs face grave harm, they do so without having received any due process. *See Huisha-Huisha*, 560 F. Supp. 3d at 172 (finding irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide"); *P.J.E.S.*, 502 F. Supp. 3d at 517 (irreparable injury exists where class members were "threatened with deportation prior to receiving any of the protections the immigration laws provide"). Once deported, the harm to Plaintiffs cannot be undone; their deportation "pursuant to an unlawful policy likely cannot be remediated after the fact." *Huisha-Huisha*, 560 F. Supp. 3d at 172; *compare Nken*, 556 U.S. at 435 (noting that deportation is not an irreparable injury where noncitizens can "continue to pursue their petitions for review").

### ii. The remaining equitable factors weigh decidedly in favor of continuing the TRO.

In arguing that the balance of harms and equities favor the government, Defendants summarily claim that Plaintiffs are dangerous gang members who are engaged in an invasion or predatory incursion into the United States, without having given Plaintiffs any opportunity to contest those allegations. Mot. 23. Notably, some Plaintiffs' asylum claims assert the real fear of harm upon returning even to Venezuela because they fled the very same violent gangs the Government has wrongfully accused them of belonging to. Pls. Mot. for TRO at 17-19; *see supra*.

Arguing that the President's assertion of unchecked power is somehow self-justifying, Defendants argue that the balance of equities favors the government because the Court's orders "deeply intrude[] into the core concerns of the executive branch." Mot. 23. But it is the government's very abuse of this power, unchecked authority that tips the balance of equities in favor of Plaintiffs.

Importantly, the TRO does not prevent the government from detaining and removing any individuals who have committed deportable conduct under existing law. And while Defendants cite the public interest in "prompt execution of removal orders," Mot. 24, that interest applies to noncitizens "lawfully deemed removable." *Nken*, 556 U.S. at 436 (emphasizing that "there is a public interest in preventing aliens from being *wrongfully removed*, particularly to countries where they are likely to face substantial harm" (emphasis added)). Plaintiffs here have not been "lawfully deemed removeable"; if they had been, then they could be removed in the usual course and the government would have no need to rely on the AEA. *See, e.g.*, *Hawaii v. Trump*, 878 F.3d 662, 700 (9th Cir. 2017) ("public interest is best served by curtailing unlawful executive action") (cleaned up), *rev'd and remanded on other grounds*, 585 U.S. 667 (2018).

The public interest of ensuring the rule of law also favors Plaintiffs. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.") (citation and internal quotation marks omitted). "The public interest is, of course, best served when government agencies act lawffully," and "the inverse is also true": the public interest is harmed when the government acts unlawfully—and even more so when it does so in secret. *Minney v. U.S. Off. of Pers. Mgmt.*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015). Moreover, "the public has a strong interest in 'preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'" *Huisha-Huisha*, 27 F.4th at 734

(quoting *Nken*, 556 U.S. at 436). In this case, specifically, the public interest is best served by "curtailing unlawful executive action." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *as revised* (Nov. 25, 2015).

## III.   The TRO Is Not Overbroad.

Defendants criticize the scope of the temporary restraining order. But this is not a "nationwide injunction." It is simply an injunction that applies to the members of a provisionally certified class. *See Trump v. CASA, Inc.*, No. 24A884 (U.S.), Gov't's App. for Partial Stay of Inj. 38 (Mar 13, 2025) (arguing that class certification and class-wide preliminary relief, "unlike the issuance of nationwide injunctions, complies with Article III and respects limits on courts' equitable authority"). Defendants' citation to *Department of State v. AIDS Vaccine Advocacy Coalition*, No. 24A831 (U.S. 2025), Mot. 24, is inapposite, as that case was not a class action. *See AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-400, 2025 WL 485324, at *1 (D.D.C. Feb. 13, 2025).

## CONCLUSION

Defendants' motion to vacate the temporary restraining orders should be denied.

Dated: March 19, 2025                        Respectfully submitted,

Noelle Smith                                 */s/ Lee Gelernt*
Oscar Sarabia Roman                          Lee Gelernt (D.D.C. Bar No. NY0408)
My Khanh Ngo                                 Daniel Galindo (D.D.C. Bar No. NY035)
Cody Wofsy                                   Ashley Gorski
AMERICAN CIVIL LIBERTIES UNION               Patrick Toomey
FOUNDATION                                   Sidra Mahfooz
425 California Street, Suite 700             Omar Jadwat
San Francisco, CA 94104                      Hina Shamsi (D.D.C. Bar No. MI0071)
(415) 343-0770                               AMERICAN CIVIL LIBERTIES UNION
nsmith@aclu.org                              FOUNDATION,
osarabia@aclu.org                            125 Broad Street, 18th Floor
mngo@aclu.org                                New York, NY 10004
cwofsy@aclu.org                              (212) 549-2660
                                             lgelernt@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich
Skye Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs-Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 19, 2025                        Respectfully Submitted,

*/s/ Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

*Attorney for Plaintiffs–Petitioners*