# EXHIBIT A

## DECLARATION OF DEBORAH FLEISCHAKER

I, Deborah Fleischaker, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I began working on immigration detention issues in 2011, when I was a career employee at the U.S. Department of Homeland Security's (DHS) Office for Civil Rights and Civil Liberties (CRCL). I was employed by CRCL from March 2011 until September 2021. One year of this (May 2019 - May 2020) was spent on a temporary detail to Senator Patrick J. Leahy's Judiciary Committee staff. An additional four months was spent on a temporary detail at the DHS Office of Policy and three months at U.S. Immigration and Customs Enforcement (ICE). I worked on immigration issues in all of these temporary assignments.

2. Between September 2021 and November 2023, I was employed as a political appointee by DHS's ICE. I was an Assistant Director at ICE and headed the Office of Regulatory Affairs and Policy from September 2021 to November 2022. From November 2022 until November 2023, I served as the Acting ICE Chief of Staff.

3. As the Assistant Director for the Office of Regulatory Affairs and Policy, I spearheaded policy and regulatory initiatives for the agency, with a significant focus on immigration enforcement, detention, and removal. In that position, I worked on a number of enforcement and detention policies, including Secretary Alejandro Mayorkas' enforcement priorities, the DHS sensitive locations and courthouse enforcement policies, and policies relating to the detention of pregnant people, crime victims, and parents.

4. I provide this declaration based on my personal knowledge and experience as well as my review of Robert L. Cerna's Declaration.

5. Mr. Cerna's declaration indicates that ICE is not prepared to detain members of Tren de Aragua ("TdA").

6. Based on my extensive experience with ICE detention policies and practices, that is wrong.

7. ICE detention facilities in the United States are prepared to detain any noncitizen, regardless of their security risk level. This includes people with violent criminal histories, as well as members of gangs and Foreign Terrorist Organizations.

8. Mr. Cerna testifies that gang members in ICE facilities pose a grave risk to nonviolent detainees. That is not true.

9. ICE has a clear custody classification system. Detainees are assessed a custody level and detained at that level. The custody classification system allows ICE facilities to separate detainees with no criminal histories from those with a history of violence. ICE facilities also have "Special Management Units" designed to securely house individuals who cannot be housed safely with the general detainee population. This could include the highest risk and most violent detainees.

10. All but a handful of ICE detention facilities are able to manage all levels of detainees in a safe and secure manner, and ICE is able to ensure that higher risk detainees are housed in appropriately secure facilities.

11. Mr. Cerna also testifies that gang members pose a grave risk to ICE personnel. This is also wrong.

12. As a threshold matter, ICE personnel typically do not serve as guards at detention facilities. Contracted guard services are usually responsible for the safety and security of all detainees and staff, including ICE personnel.

2

13. ICE has numerous policies in place to ensure a safe and secure environment for both detainees and staff. In all facilities, detainees are subject to line-of-sight monitoring, regular searches, and limitations on the amount and type of property they may have in their possession. ICE also maintains staff/detainee ratios that must be met at all detention facilities to ensure the safety and security of the facilities.

14. ICE devotes significant effort and preparation to safety and security, and the agency routinely manages complex populations with high levels of criminality and gang affiliation, all while keeping its personnel safe.

15. Mr. Cerna testifies that holding TdA members risks potential gang recruitment activities in ICE detention. Again, this is untrue and any risks can be appropriately mitigated.

16. ICE facilities have specific tools to address gang recruitment concerns. Detainees may be held in segregation or housed in pods that contain only detainees with the same gang affiliation. Individual cells are regularly searched, telephone calls are monitored, and there is not significant freedom of movement for high-risk detainees.

17. Finally, Mr. Cerna testifies that holding members of TdA without "an immediate mechanism to remove them" is "irresponsible." That is simply not true.

18. ICE routinely holds gang members through their immigration proceedings. ICE also had facilities designated to hold specific gang-affiliated individuals, often separated by gang. I am not aware of any evidence that TdA's presence in ICE units is any more difficult to manage than the presence of other criminal gangs.

19. Mr. Cerna's declaration describes the types of crimes alleged against individuals removed under the AEA. Assuming the allegations in paragraphs 10 and 11 of Mr. Cerna's

declaration are true, it would have been well within ICE's capacity to detain those individuals safely for the duration of their removal proceedings.

20. ICE has always safely and securely detained individuals who are gang members and/or who have been arrested, charged, or convicted, or who have INTERPOL red notices for violent crimes. There is nothing about the situation described by Mr. Cerna that is different than what ICE normally handles. Safe and secure detention of all individuals, regardless of their security risk, is essential to ICE's mission and a core agency function.

Executed on this 19th day of March, 2025 in Washington D.C.

DocuSigned by:
*Deborah T. Fleischaker*
8AA70A96D4E74C5...

Deborah T. Fleischaker

4