# EXHIBIT J

<u>**GRACE CARNEY ATTORNEY AFFIRMATION:**</u>

<u>**ATTORNEY OF RECORD FOR G.F.F.**</u>

I, Grace Carney, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

1. My name is Grace Carney. I am a Staff Attorney at The Legal Aid Society within the New York Immigrant Family Unity Project ("NYIFUP"). I am the attorney of record for plaintiff G.F.F. in his removal and bond proceedings. I first entered my appearance in this case on December 31, 2024.

2. I submit this declaration as a supplement to my prior declaration submitted to the Court on March 15, 2025.

3. G.F.F. has vehemently denied membership or any association with Tren de Aragua. G.F.F. did not know anyone suspected of being in Tren de Aragua would be at that party where he was arrested in December 2024. Notably, G.F.F. and his family fled Venezuela in part due to threats the family faced from Tren de Aragua. Moreover, G.F.F. has outlined individualized threats received from the gang on account of his sexuality. G.F.F. has submitted into the record of his asylum proceedings numerous letters from friends and family corroborating his good character and confirming that G.F.F. has never been involved in the Tren de Aragua criminal gang. Additionally, G.F.F. possesses no criminal history. He maintains, and my own research as his attorney confirms, that he has never been arrested or convicted of a crime in the United States, Venezuela, or any other country.

4. On the morning of March 15, 2025, I received a missed call from a collect call number at around 8:50EDT. I promptly checked the ICE Detainee Locator which indicated G.F.F. was still present at the El Valle Detention Facility. I thereafter contacted the El Valle Detention Facility by telephone to confirm the location of G.F.F. The officer informed me that G.F.F. was still at El Valle at that point and would be produced for our 10:00AM EDT call. Shortly after 10:00AM EDT I called the El Valle Detention Facility to be connected with G.F.F. After being placed on hold I was told that he would not be produced for our call because he was in the process of being "moved."

5. I informed the officer at the El Valle Detention Facility that as of earlier that morning, a temporary restraining order had been issued barring G.F.F.'s removal at this time. I was told by the officer that that information was not shared with her. At 10:22AM EDT, while on the phone, I emailed a copy of the TRO to her and the El Valle officers I had been coordinating with for call scheduling. I also included Harlingen ERO on the email.

6. I thereafter called the Harlingen, Texas ERO Office, the office in charge of El Valle Detention Facility, and left a voicemail about the TRO and G.F.F.'s attempted illegal removal. I additionally reached out to the cellphone of Carlos D. Cisneros, Jr., Assistant

Field Office Director for Harlingen ERO, who was included on a previous email chain with the El Valle Detention Facility regarding access to counsel and call scheduling.

7. At around 10:45AM EDT I spoke with Mr. Cisneros on the telephone about the TRO and the lawsuit filed the evening before. Mr. Cisneros inquired whether I had sent the TRO via email to the Harlingen ERO Outreach, which I confirmed I had. He indicated that he had access to that email and would call back shortly. Mr. Cisneros never called back. My later attempts to reach out to him directly via telephone went straight to voicemail.

8. The remainder of the day I reached out to several ICE contacts with a copy of the TRO and at no point did I receive a response. I also reached out via telephone to the El Valle Detention Facility, Harlingen ERO, and the Port Isabel Detention Facility on multiple occasions throughout the day without any response.

9. At around 11:00PM EDT, I received a call from Rosa, a family friend of G.F.F. indicating that he had returned to the El Valle Detention Facility. She described the call as brief, less than one minute, and that he had only informed her he was still in Texas.

10. The following morning, March 16, 2025, I reached out to El Valle Detention Facility to schedule a video call with G.F.F., but was told I could not schedule a same-day video call, and instead opted for a telephone call that evening at 6:00PM. The officer informed me that he had not been processed back into his unit until 2:00AM that morning.

11. At 6:00PM EDT on March 16, 2025, I was able to speak with G.F.F. for the first time since March 14, 2025. He told me that on the morning of March 15, 2025, he was awoken for breakfast at around 7:30AM CT. During breakfast the officers conducted a count of his unit, which he described was not customary thus far during his time at the El Valle Detention Facility. During the count, twenty-seven Venezuelans in his unit were called from a list. The twenty-seven were taken to a separate room at the El Valle Detention Facility with other Venezuelans. Everyone in the room was told that they were being transferred to the Port Isabel Detention Facility and told to collect their belongings. After collecting their belongings, everyone in the room was handcuffed and their ankles were shackled and led onto buses.

12. G.F.F. informed me that three buses full of Venezuelans left the El Valle Detention Facility. Instead of arriving at the Port Isabel Detention Facility, the buses arrived at the airport about one hour way. When they arrived at the airport, G.F.F. inquired where they were going, but at no point did the officers answer his questions.

13. G.F.F. informed me that he was loaded onto a plane in the afternoon. G.F.F. was on a plane for about forty minutes to an hour while other individuals were being loaded onto the plane. He described the plane as "chaos," people were crying and frightened. After about forty minutes to an hour, a guard boarded the plane and called G.F.F.'s name and three or four others. When G.F.F. inquired as to what was going on, he was told he had "just won the lottery."

2

14. After G.F.F. and the other individuals were pulled off the plane, they waited on a bus on the tarmac at the airport for the next several hours while the remaining planes were being loaded. G.F.F. recalled there being four planes total. While G.F.F. was waiting on the bus on the tarmac, one of his companions suffered a bloody nose. When the men asked for help, because they were shackled, the guards declined. According to G.F.F., one of the guards told the man he was "being dramatic." The guards additionally declined to provide the men water when they asked, despite being in the sun in Texas for several hours that day.

15. G.F.F. and the men were at the airport until the planes were loaded, and then left the airport at about 5:30PM CT. G.F.F. did not return to El Valle until around 8:00PM CT, but was not processed back into his unit until around 2:00AM CT.

16. It was not until later upon being reprocessed did G.F.F. hear from other detainees at El Valle that the guards had been discussing that the plane they were on was set to go to either Guantanamo or El Salvador.

17. During our call, G.F.F. was very emotional, and could not stop crying. He said he was very scared that the government would try to deport him again. He said that the officers told him they would deport him in 14 days. He said the whole time he was being moved in and out of the El Valle Detention Facility on March 15, 2025, he had his paperwork for his March 17, 2025 hearing with him, because he was only ever told he was being transferred to Port Isabel and wanted to use the time to review his case.

18. G.F.F. appeared for his March 17, 2025 hearing despite the events of the weekend, as the Immigration Judge denied his motion for an emergency continuance. During the hearing, G.F.F. explained that he had little sleep and little to eat in the prior 72 hours, and that the government twice tried to deport him during that time. During this hearing G.F.F. testified for around four hours, recounting his fear of harm of return, and vehemently denying any affiliation with Tren de Aragua. The government did not produce any evidence or elicit any testimony to substantiate the allegations that G.F.F. is a member of Tren de Aragua.

I, Grace Carney, affirm under penalty of perjury, that the foregoing is true and correct.

March 19, 2025
New York, NY

Grace T. Carney, Esq