```
 1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3   J.G.G., et al.,              )
                                  )
 4            Plaintiffs,         )
                                  )
 5        vs.                     )  CASE NO. 1:25-cv-00766-JEB
                                  )
 6   DONALD J. TRUMP, et al.,     )
                                  )
 7            Defendants.         )
     _____)
 8

 9                   TRANSCRIPT OF MOTION HEARING
        BEFORE THE HONORABLE JAMES E. BOASBERG, CHIEF DISTRICT JUDGE
10                   Friday - March 21, 2025
                     2:31 p.m. - 3:47 p.m.
11                     Washington, DC

12   FOR THE PLAINTIFFS:
         American Civil Liberties Union
13       BY:  LEE GELERNT and DANIEL A. GALINDO
         125 Broad Street, 18th Floor
14       New York, New York 10004

15       ACLU of the District of Columbia
         BY:  ARTHUR B. SPITZER
16       529 14th Street, NW, Suite 722
         Washington, DC 20045
17
         Democracy Forward Foundation
18       BY:  AUDREY J. WIGGINS, CHRISTINE COOGLE,
         SOMIL TRIVEDI, BRADLEY GIRARD, SKYE PERRYMAN
19       and SARAH RICH
         P.O. Box 34553
20       Washington, DC 20043

21
```

```
22                      SONJA L. REEVES
                    Registered Diplomate Reporter
23                   Certified Realtime Reporter
                    Federal Official Court Reporter
24                   333 Constitution Avenue, NW
                       Washington, DC 20001
25          Transcript Produced from the Stenographic Record
```

**FOR THE DEFENDANT:**
     U.S. Department of Justice
     BY:  DREW C. ENSIGN
     950 Pennsylvania Avenue
     Washington, DC 20004

     DOJ-Civil Division
     BY:  AUGUST E. FLENTJE, BRIAN C. WARD and EREZ REUVENI
     P.O. Box 868, Ben Franklin Station
     Washington, DC 20044

```
 1                (Call to Order of the Court at 2:31 p.m.)

 2           DEPUTY CLERK:  We're here today for a motion hearing

 3   in Civil Action 25-766, J.G.G., et al. versus President Donald

 4   J. Trump, et al.

 5           Beginning with counsel for the plaintiff, if you could

 6   please approach the lectern and identify yourself for the

 7   record.

 8           MR. GELERNT:  Good afternoon, Your Honor.  Lee Gelernt

 9   from the ACLU for plaintiffs.

10           THE COURT:  Good afternoon.

11           MR. GALINDO:  Good afternoon.  Daniel Galindo from the

12   ACLU for the plaintiffs.

13           THE COURT:  Welcome.

14           MS. PERRYMAN:  Your Honor, Skye Perryman of Democracy

15   Forward Foundation for the plaintiffs.

16           MR. TRIVEDI:  Afternoon, Your Honor.  Somil Trivedi

17   from Democracy Forward Foundation for the plaintiffs.

18           THE COURT:  Thank you.

19           MS. COOGLE:  Good afternoon, Your Honor.

20   Christine Coogle from the Democracy Forward Foundation for

21   plaintiffs.

22           MR. SPITZER:  And Arthur Spitzer from the ACLU for the

23   plaintiffs.

24           MS. WIGGINS:  Good afternoon, Your Honor.

25   Audrey Wiggins from Democracy Forward Foundation for the
```

 1   plaintiffs.

 2          THE COURT:  Okay.  Welcome to all of you.

 3          Government?

 4          MR. ENSIGN:  Good afternoon, Your Honor.  Drew Ensign,

 5   Deputy Assistant Attorney General, for the United States.

 6          THE COURT:  Good afternoon.

 7          MR. FLENTJE:  August Flentje, Department of Justice.

 8          THE COURT:  Thank you.

 9          MR. REUVENI:  Good afternoon, Your Honor.

10   Erez Reuveni, Department of Justice.

11          THE COURT:  Thank you.

12          MR. WARD:  Good afternoon, Your Honor.  Brian Ward for

13   DOJ.

14          THE COURT:  Welcome.

15          Okay.  So who will be arguing for the government?

16          MR. ENSIGN:  I will, Your Honor.

17          THE COURT:  Okay.  So, Mr. Ensign, I noticed that

18   after signing all of the pleadings, including the ones claiming

19   my oral ruling wasn't binding and using the kind of intemperate

20   and disrespectful language that I can't remember seeing from

21   the United States, that you didn't even show up for the hearing

22   on Monday to argue the issue about compliance.  Why was that?

23          MR. ENSIGN:  Your Honor, I was working on the motion

24   to dissolve the TRO, which was due at midnight that night.

25          THE COURT:  Okay.  It wasn't because when I said to

1  act on my TRO immediately, that you knew exactly what I meant?

2          MR. ENSIGN:  No.  That was not the reason, Your Honor.

3          THE COURT:  Okay.  And can I ask you now how you

4  interpreted that statement when we had our conversation on

5  Saturday in which I treated all parties with respect and

6  politeness and made that clear without raising my voice,

7  without having any edge?  I made it very clear what you had do

8  to do.  Did you not understand my statements in that hearing?

9          MR. ENSIGN:  Your Honor, I understood your statements

10  and your directive to -- to relay your directives to the

11  clients, which I have done.

12          THE COURT:  So you did tell them that it was an order

13  from me to turn the planes around, or however -- in whatever

14  fashion you could, to bring back people to the United States?

15  You understood that?

16          MR. ENSIGN:  Your Honor, I can speak to my

17  understanding.

18          THE COURT:  That's what I'm asking.

19          MR. ENSIGN:  As to the specifics of what I told my

20  clients, that is potentially covered by attorney-client

21  privilege.

22          THE COURT:  I'm just asking what you understood.  Did

23  you think that that was hypothetical, not serious, that it was

24  going to be modified, or did you understand that when I said

25  "do that immediately" that I meant it?

1          MR. ENSIGN:  Your Honor, I understood your intent,

2     that you meant that to be effective at that time.

3          THE COURT:  So then if your clients or if -- if the

4     pleadings, which have now been filed, say that my oral ruling

5     was not binding, that wouldn't be consistent, then, with what

6     you understood on Saturday?

7          MR. ENSIGN:  Your Honor, I -- as to my understanding

8     in that moment of what you had instructed, I understood your

9     intent to be that what you were pronouncing would be binding.

10          THE COURT:  Okay.  And so, therefore, any statement to

11     the contrary that it wasn't wouldn't be consistent with your

12     understanding?

13          MR. ENSIGN:  Not in my understanding in that

14     particular, you know, 30-minute window of time, Your Honor.

15          THE COURT:  All right.  So here's my other concern,

16     Mr. Ensign, that in the hearing, you told me, the first part of

17     the hearing, which was between 5:00 and 5:22, that you had no

18     details on the plane flights.  Do you remember that?

19          MR. ENSIGN:  Yes, Your Honor.

20          THE COURT:  Okay.  And then we had a recess for

21     38 minutes for you to find details, and when you came back,

22     even though the flights were in the air, which you all agree

23     now, you still represented you had no details at all about

24     those flights, correct?

25          MR. ENSIGN:  That's correct, Your Honor.  I did not

1    personally have knowledge of where the flights were or if there

2    were flights at that moment.

3        THE COURT:  And so either DHS sent someone to argue

4    the hearing who knew nothing about the facts, not the law --

5    that's what you're saying, that they -- no one told you any

6    of -- anything about those flights, so you knew nothing about

7    those flights when you appeared during that whole two hours

8    from 5:00 to 7:00 in which the argument took place?

9        MR. ENSIGN:  Your Honor, I was aware that plaintiffs

10   had submitted evidence to chambers that we were copied on

11   identifying flights, but I didn't have any information from the

12   government as to the status of them.

13       THE COURT:  And so yet, your clients had you come

14   argue this and kept you in the dark about all of that?

15       MR. ENSIGN:  Your Honor, I sought the information in

16   that window between the two hearings and was unable to secure

17   it from my clients.

18       THE COURT:  I'm going to -- I'll say one other thing,

19   Mr. Ensign, before we resume, and that is that I often tell my

20   clerks before they go out into the world to practice law that

21   the most valuable treasure they possess is their reputation and

22   their credibility, and I just would ask you to make sure that

23   your team retains that lesson.

24       Okay.  We're now going to move on.  We're going to

25   move from the compliance question into the legal questions that

1    surround the TRO.

2         So I first want to make clear that nobody contests,

3    including me, that the law and the cases interpreting them make

4    very clear that the President has wide latitude to make

5    decisions in the areas of national security and foreign

6    affairs, including under the AEA, and that he has had such

7    ability since the end of the 18th century via the AEA.

8         It is also clear that individuals must have the chance

9    to show that they are indeed members of a class that the AEA

10   defines.  And my job is to find out where the balance lies.

11        So I would just like you to confirm a few basic facts,

12   which -- and the reason I'm asking this is because we have had

13   unusual public interest in this case, I think it would be

14   helpful for the general public to clarify a few basic facts,

15   which I trust you won't have any dispute about.

16        So first of all, this case is not just about the

17   people removed on the flights on Saturday, correct?

18        MR. ENSIGN:  That's correct, Your Honor.  You

19   certified a nationwide class action.

20        THE COURT:  Well, I disagree with your -- the way you

21   describe that.  But the point is, there are more people

22   involved than who were on the planes, correct?

23        MR. ENSIGN:  That's correct, Your Honor.

24        THE COURT:  In addition -- and what I mean by that is

25   there are more people potentially subject to removal via the

1    proclamation, correct?

2           MR. ENSIGN:  That's correct, Your Honor.

3           THE COURT:  You also understand that my TROs did not

4    order anybody to be released into the United States, correct?

5           MR. ENSIGN:  That's correct, Your Honor.

6           THE COURT:  And they also did not order that the

7    government could not deport anyone via regular INA procedures,

8    correct?

9           MR. ENSIGN:  That's correct, Your Honor.

10          THE COURT:  They only ordered that the government

11   could not summarily deport in-custody noncitizens subject to

12   the proclamation.  If the government wants to continue to

13   deport them, it may do so, but not in reliance on the AEA.

14   Correct?

15          MR. ENSIGN:  That's what I recall your order saying,

16   yes, Your Honor.

17          THE COURT:  All right.  So -- and I'm -- thank you.  I

18   think it's important for the public to make sure that those

19   facts are clear.

20          Now, you have maintained throughout that DHS has been

21   fully complying with the law during these deportations, right?

22          MR. ENSIGN:  That's correct, Your Honor.  We've

23   started to present those arguments in the motion to continue

24   Monday's hearing, I believe, and we will be setting them forth

25   in additional detail in the Tuesday hearing, in response to

1  your order to show cause.

2       THE COURT:  So -- and, again, I'm not even worried

3  about my -- I'm not talking -- you may have -- my question may

4  have not been clear.  What I'm talking about, that you've been

5  fully complying not with my orders, but with the law,

6  generally, in the deportations?

7       I'm not saying you're ignoring my law.  This isn't a

8  trick question.  I'm just saying, the government is complying

9  with the law in its deportations, correct?

10       MR. ENSIGN:  The government is complying with the law

11  as it understands the law to be.

12       THE COURT:  Exactly.  I guess -- and maybe you don't

13  have the answers to this, but what's concerning to me is, if

14  that's so, why was this proclamation essentially signed in the

15  dark on Friday, Friday night, or early Saturday morning, and

16  then these people rushed onto planes?  I mean, it seems to me

17  the only reason to do that is if you know it's a problem and

18  you want to get them out of the country before suit is filed.

19       Can you tell me a little bit about the timing of this?

20       MR. ENSIGN:  Your Honor, I don't have knowledge of

21  those operational details.  Certainly, as to when the -- Your

22  Honor asked the question previously when the proclamation was

23  effective, and it's effective upon when being published.

24       THE COURT:  Right.  And that's 3:53 p.m. Saturday,

25  right?

1          MR. ENSIGN:  That's my understanding, Your Honor.

2          THE COURT:  That's in the declaration by Mr. Cerna?

3          MR. ENSIGN:  That's correct.

4          THE COURT:  But yet -- and I'm not asking for

5    specifics on times, but within a couple of hours, you have

6    agreed because you say the planes cleared U.S. airspace by --

7    certainly by 7:00 p.m.  So within a couple of hours, all these

8    people were put on these flights, collected, put on these

9    flights, and the flight has taken off, right?

10         MR. ENSIGN:  That's my understanding of the record,

11   Your Honor.

12         THE COURT:  So in other words, it's certainly true

13   that ICE had advanced notice of this proclamation because it's

14   impossible that this could have happened within two hours?

15         MR. ENSIGN:  Your Honor, I don't have specific

16   knowledge, but that seems like a reasonable inference.

17         THE COURT:  Okay.  So now -- all right.  Moving to the

18   issue again that we're talking about today.

19         The question, as I've said, teed up is whether the

20   government can summarily deport people without any

21   individualized assessment of whether they actually fall into

22   the category of the proclamation.

23         So again, the proclamation says, in relevant part in

24   Section 1, "I proclaim that all Venezuelan citizens 14 years of

25   age or older who are members of TdA, are within the

1  United States, and are not actually naturalized or lawful

2  permanent residents of the United States, are liable to be

3  apprehended, restrained, secured, and removed as alien

4  enemies."

5          So what happens if someone is not a member of TdA or

6  not a Venezuelan citizen or not a lawful permanent resident?

7  How do they challenge their removal?

8          MR. ENSIGN:  Your Honor, I think the SDNY's decision

9  in the *Watkins* case suggest that review is available under

10  habeas for those individualized determinations.  While that

11  court recognized that you couldn't bring facial challenges to

12  the sufficiency of the President's determinations under the

13  proclamation, the individualized applications of them may be

14  reviewable in habeas.  And that was --

15          THE COURT:  But -- and that's a pre-1952 case, right?

16          MR. ENSIGN:  That's correct, Your Honor.  It was a

17  1946 case that was affirmed by the Second Circuit.

18          THE COURT:  Right.  And so you, of course, know that

19  habeas was the only way to challenge detention prior to the

20  1952 INA, right?

21          MR. ENSIGN:  Your Honor, I don't actually know that

22  specifically.  I mean, certainly, the INA is a more

23  comprehensive immigration regulation statute, but there were

24  other immigration statutes passed in the 1920s, and I am not

25  sure how those might have interacted.

1          Certainly, even after the enactment of the INA, habeas

2     continues to be available in some aspects of immigration law,

3     as I know Your Honor has heard cases to that effect.

4          THE COURT:  I agree.  But the question, ultimately,

5     which we will get to, is whether it's the sole basis to

6     challenge.  So I think they're very interesting questions and

7     the plaintiffs spent a long time in their briefs, you spent a

8     lot of time in your briefs, understandably, deciding whether

9     the courts can adjudicate and whether the issues of terms in

10    the AEA, like "invasion," "predatory incursion," or "foreign

11    nation" or "government" can be reviewed.

12         And your contention is, those are not justiciable,

13    that courts have held that -- that district courts like me

14    cannot review the President's determination of those terms.

15         Is that correct?

16         MR. ENSIGN:  Your Honor, as to whether or not the

17    statutory preconditions of the AEA have been satisfied, that is

18    correct, that is our position.  There are other legal issues.

19    For example, I think plaintiffs challenge that the INA

20    essentially swallows the Alien Enemies Act, that that falls

21    outside of that because that is not challenging the President's

22    determinations, it's raising a separate legal argument that is

23    outside of the sufficiency of the President's determinations.

24         THE COURT:  But I guess -- but you do agree, and I

25    think you just said it, that courts can challenge whether the

1  person is, in fact, an enemy alien covered by the proclamation,

2  right?

3      MR. ENSIGN:  Your Honor, I think that such challenges

4  could potentially be brought in habeas, and certainly courts

5  have recognized previously the ability to do so.  The precise

6  contours of that will depend on various doctrines, and indeed

7  many people -- there have definitely already been habeas suits

8  filed in Texas.  I believe one is even set for trial next week.

9      So certainly, habeas is available to raise issues.

10 The *Ludecke* case itself was a habeas challenge that, you know,

11 notwithstanding the fact that the President's determinations

12 were not reviewable, it did, in fact, review plaintiffs'

13 constitutional challenges, but found them just simply and

14 completely without merit.

15     THE COURT:  But even more narrowly, *Ludecke* says at

16 page 171, footnote 17, "The additional question as to whether

17 the person restrained is, in fact, an alien enemy, 14 years of

18 age or older, may also be reviewed by the courts."

19     And that's sort of a pretty clear statement that the

20 question of whether you fall into the category that the

21 proclamation covers is reviewable by the courts.

22     MR. ENSIGN:  It is reviewable in the courts, is

23 certainly what the *Watkins* case suggests.  That's about all the

24 precedent that we found on the subject.  So, you know, it would

25 be, of course, subject to other precedent that might be

1    developed by courts.  But --

2         THE COURT:  Well, so we've got -- I'm sorry.  I didn't

3    mean to interrupt.

4         MR. ENSIGN:  No, Your Honor.  I was just saying that

5    the case law that's available shows that habeas is available

6    for that.

7         THE COURT:  Right.  So, for example, *Clark* from the DC

8    Circuit, the 1946 case, states at 294, quote, "The one

9    question, whether the individual involved is or is not an alien

10   enemy, is admitted by the attorney general to be open to

11   judicial determination."  And there are a number of other cases

12   including, *Uhl*, U-h-l, a 1943 case from the Second Circuit that

13   says the same thing.  Right?

14        MR. ENSIGN:  Your Honor, I believe that's correct.

15   And I think there's an important distinction between that

16   challenging the President's determinations that the statutory

17   conditions have been met, which are not reviewable, and the

18   rest, which are determinations of the executive in the context

19   of sensitive foreign affairs and immigration, for which I

20   think, you know, a very deferential review would be available,

21   but it's not categorically barred as -- as in the case under

22   *Ludecke* and *Citizens Protective League* for the President's

23   determinations.

24        THE COURT:  All right.  And we will get to that

25   standard in a minute.  But just like the Guantanamo cases, you

1    agree that there the government also had to prove that

2    detainees were members of Al-Qaeda, and that required robust

3    judicial review, even though those people had never set foot in

4    the United States.  Fair?

5          MR. ENSIGN:  Your Honor, certainly the Supreme Court

6    in a series of cases made clear that habeas review was

7    available.  I think as to those challengers, they would dispute

8    the idea that it was robust habeas review, but certainly

9    something was available to them.

10          THE COURT:  Let's talk about whether habeas is the

11    sole avenue of review, because, as we know, the plaintiffs

12    have, at least for now dismissed, without prejudice, their

13    habeas claim, because there may well be a venue issue, which is

14    what you raised in our hearing on Saturday, if they want to

15    proceed in habeas.

16          But it seems that in these national security cases

17    that while review is taking place in the habeas context, and,

18    again, it had to prior to 1952, when the INA modern version was

19    passed, the whole point in those cases is that the individuals

20    were challenging their detention, right?

21          Name one of those cases in which the individual was

22    not challenging their detention.

23          MR. ENSIGN:  Well, Your Honor, I -- I think the

24    Supreme Court's case in *Munaf versus Geren* is particularly

25    instructive, and there it was people held in essentially U.S.

1    custody, alliance custody in Iraq, and they brought -- they

2    brought a habeas challenge to prevent their challenge --

3    their transfer to the government of Iraq.

4           And the first issue that the Supreme Court resolved

5    was that in that case they held that review was available,

6    specifically in habeas, to consider such a challenge, but they

7    recognized the somewhat odd nature of it, notwithstanding the

8    fact that habeas was available, describing it as:  "Here the

9    last thing plaintiffs want is a simple relief -- or simple

10   release.  That would expose them to apprehension by Iraqi

11   authorities by criminal prosecution, precisely what petitioners

12   went to federal court to avoid.  At the end of the day

13   what plaintiffs are really after" --

14           THE COURT:  Go slower.  We have a --

15           MR. ENSIGN:  Oh.  I apologize, Your Honor.

16           -- "is a court order requiring the United States to

17   shelter them from the sovereign government seeking to answer

18   for the alleged crimes."

19           But it's that same sort of somewhat counterintuitive

20   habeas claim where the person is actually using habeas in a way

21   to stay in custody.

22           But I think the right way to understand why this is a

23   core habeas claim is that it's a challenge to the entirety of

24   the federal government's authority to exercise any custody over

25   these particular individuals under the AEA.

1     THE COURT:  But it's not -- they're in custody.  They

2  know they're in custody.  They are not asking -- I mean, they

3  would be happy to be released.  But what they're simply saying

4  is, don't remove me, particularly to a country that's going to

5  torture me.  And we'll get to that shortly.  But that's their

6  challenge, is you cannot remove me.  They're not asking for

7  release.

8     MR. ENSIGN:  Your Honor, I agree that that's an aspect

9  of the challenge, but I think that's not the whole of it, and

10  that's one of the reasons that it sounds in habeas.  If I may,

11  here under the AEA, the AEA authorizes both expulsion and

12  detention, and the inescapable conclusion of their challenges

13  would be that the government is entirely without authority

14  either to hold them in custody indefinitely or to exercise

15  custody over them for long enough to effectuate a removal.

16  They are bringing a categorical challenge to the

17  government's --

18     THE COURT:  They're being removed anyway, and they're

19  subject to INA removal regardless.  So how can you say that's

20  the argument they're making?

21     MR. ENSIGN:  Your Honor, at the end of the day, they

22  are challenging and asserting that the government is entirely

23  without authority under the AEA to exercise custody over their

24  persons.  That is a core habeas claim.

25     THE COURT:  They don't want the government to exercise

1    removal authority over their persons, not custody over their

2    persons.  Yes, they have to be in custody in order to be

3    removed, but I think that's semantic, truly.

4          But let's move to the standard question, which you, I

5    think, alluded to earlier.

6          So if these folks are entitled to some sort of

7    hearing, some sort of individualized process, as *Ludecke* and

8    other courts talk about, so what's the standard of review for

9    the executive evidence?  This was not an issue that was

10   briefed?  And I'm not sure I need to make a definitive finding

11   here one way or the other.  But what do you contend should be

12   the standard of review for that evidence?

13         MR. ENSIGN:  And sorry, Your Honor.  When you say

14   "that evidence," as to which factual question?

15         THE COURT:  Of whether they are, in fact, subject to

16   the proclamation.  In other words, whether they are members

17   of -- essentially members of TdA, as well as being Venezuelan

18   and not out of PRs.

19         MR. ENSIGN:  Your Honor, there's a dearth of case law

20   on that, so I think you have to look to sort of generalized

21   principles because we don't have binding precedent that answers

22   that question.  But because of the sensitive foreign affairs

23   and immigration context, and as well as the war powers aspect,

24   all of which are areas where courts have recognized that where

25   review is available in courts it's done deferentially, given

1    the expertise of the executive in these particular matters.

2        THE COURT:  Let me --

3        MR. ENSIGN:  And so --

4        THE COURT:  I'm sorry.  Go ahead.  I didn't mean to

5    interrupt.  Go ahead.

6        MR. ENSIGN:  So I think several cases provide general

7    guidance as to how those factual determinations would be done.

8    You know, for example, the DC Circuit in *Islamic American*

9    *Relief Agency* said, "Our review in this area at the

10   intersection of national security, foreign policy, and

11   administrative law is extremely deferential."  That's 477 F.3d

12   at 734.

13       *Humanitarian Law Project versus Holder*, the Supreme

14   Court provided, "When it comes to collecting evidence and

15   drawing factual inferences in the national security area, the

16   lack of competence within the part of courts is marked."

17       THE COURT:  There are a few -- okay.  But how about,

18   for example, in Uhl, U-h-l, 137 F.2d at 900, which cites *Walker*

19   *versus Johnson*, the Supreme Court case from 1941, which under

20   the AEA, and *Walker*, of course, required the Court to hold a

21   hearing and really sort of talked about more de novo review,

22   same as *Bauer versus Watkins*, Second Circuit from 1948, and

23   then even more importantly, although it's not under the AEA, is

24   *Hamdi versus Rumsfeld*, our Supreme Court case from 2004, where

25   the Court rejected deference to the executive's factual

1    determination that an American citizen was an enemy combatant,

2    at least without adversarial testing before a neutral

3    decision-maker, that there was more robust judicial factfinding

4    in those matters, wasn't there?

5         MR. ENSIGN:  Your Honor, I believe that's the case.  I

6    mean, I think you can certainly point to competing strains of

7    cases that would need to be resolved in habeas, but most

8    importantly here is that this Court does not have habeas

9    jurisdiction, both because plaintiffs dropped their habeas

10   claim and because venue was never appropriate here to begin

11   with.

12        THE COURT:  And I understand your point on that.  But

13   assuming that I find that that's not necessary, that there is

14   jurisdiction under the APA, how is this going to work?  In

15   other words, are you going to tell each person who is

16   presumably going to be deported that they have the right to

17   challenge?  Do they have to raise it?  Is it good enough that

18   the plaintiffs have raised the class?  What's the role of the

19   courts in ensuring that individuals are not erroneously

20   classified as TdA members and removed to some El Salvadoran

21   prison when they're not even part of the proclamation?  How is

22   this going to happen?

23        MR. ENSIGN:  Your Honor, I think we're likely to

24   discover answers rather soon in that there are courts

25   exercising habeas jurisdiction in Texas that are wrestling with

1    these questions right now.  And certainly, there is a robust

2    history of AEA cases being raised, specifically in the habeas

3    -- I apologize.

4         There's certainly a robust history of AEA claims being

5    challenged in the habeas context.  We've cited multiple cases

6    where that is.  And so certainly, you know, the history shows

7    that the federal courts have a role to play with habeas claims

8    to adjudicate various actions, including, for example, the

9    constitutional claims in *Ludecke*, unlike the factual challenges

10   to the President's determinations were reviewable.  They just

11   were wholly without merit.

12        THE COURT:  And so -- and also, you're -- yeah, I

13   haven't heard you raise the question that these proceedings

14   would be difficult because of national security concerns.

15        You're not -- that's not a problem, correct?

16        MR. ENSIGN:  Your Honor, I mean, this is not such a

17   habeas proceeding.  I'm not -- I'm not counsel to those habeas

18   proceedings.  I think, to the extent that some issues could

19   arise, they would be needed -- they would need to be

20   adjudicated by those habeas corpus courts.  That is not an

21   issue that I've thought through, to be candid.

22        THE COURT:  In fact, Congress has an answer for us,

23   doesn't it?  Because they created the Alien Terrorist Removal

24   Court, and under 8 U.S.C. Section 1533, the government can file

25   ex parte and under seal there.  So if there's a national

1    security concern with having these hearings, whether via habeas

2    or otherwise, you can always go to the ATRC, which would be a

3    first, but that's what it's there for, right?

4            MR. ENSIGN:  That is my understanding, that it's never

5    been used previously, unlike the AEA, which has only been used

6    somewhat sparingly within our history.  But just because the

7    government has another tool in its arsenal does not mean that

8    the AEA has been impliedly repealed or that it's no longer

9    available as authority to the President.

10           THE COURT:  Let me go move on to a couple of other

11   areas for you.

12           I trust that you're not contesting that aliens present

13   in the United States are entitled to due process?

14           MR. ENSIGN:  Your Honor, there are -- due process

15   rights of aliens within the United States are often quite

16   limited, and typically limited to that which is provided by

17   statute, but courts have recognized some such rights.

18           THE COURT:  Including in deportation proceedings?

19           MR. ENSIGN:  Including in deportation proceedings in

20   some very limited context.

21           THE COURT:  Well, for example, in *Reno versus Flores*,

22   a 1993 case with the Supreme Court, the Court said, quote, "It

23   is well established that the Fifth Amendment entitles aliens to

24   due process of law in deportation proceedings."

25           So you agree that's the --

1          MR. ENSIGN:  Your Honor, I agree that's what the

2   Supreme Court said.  Although, as a practical matter, how those

3   cases usually come out is whatever process Congress provided is

4   sufficient to satisfy the process, and as a practical matter,

5   the due process clause very rarely provides any sort of

6   independent basis for setting aside or limiting the authority

7   of the executive.

8          THE COURT:  But if you determine that an alien is an

9   alien enemy under the AEA, and may be summarily removed, then

10  aren't you precluding this due process challenge?  But, again,

11  maybe that brings you back to your point, which is, you agree

12  that aliens -- that folks under this proclamation have the

13  right to challenge it, but it just has to be in a habeas

14  proceeding?

15         MR. ENSIGN:  Your Honor, I think as a factual matter,

16  that has not been the case here.  The five individual

17  plaintiffs filed suit.  They obtained a TRO.  They are still in

18  the United States.  They were able to assert their

19  constitutional claims.  We are here today discussing those very

20  constitutional claims.

21         THE COURT:  Well, but we're not -- all we're doing

22  today is deciding whether they have the right to do it.  We're

23  not discussing, are they, in fact, members of TdA and thereby

24  deportable under the AEA in the proclamation.  We're just --

25  you've been contesting that they even have the right to raise

1  that, correct?

2        MR. ENSIGN:  As to some of the issues, that's correct,

3  Your Honor.  But we -- certainly, a couple things I would say.

4  One is that we're here on facial challenges.  Plaintiffs have

5  not attempted to assert individualized challenges.  And that's

6  certainly not the basis under which they secured a TRO.  And,

7  you know, we're here on a motion to dissolve that TRO.  So

8  those individual claims are not before you.

9        As to the facial claims, that's part of the likelihood

10  of success on the merits that's very much before this court

11  today.  So we are, in fact, now hearing plaintiffs' facial

12  claims.  As to individualized claims, those would need to be

13  brought in habeas.  Plaintiffs originally --

14        THE COURT:  Go ahead.

15        MR. ENSIGN:  Plaintiffs originally asserted habeas

16  claims and elected to withdraw them.  To the extent that those

17  plaintiffs want to file habeas claims in an appropriate venue,

18  they could raise such claims in an appropriate manner.  This

19  suit is not an appropriate manner, though.

20        THE COURT:  So let's go back to, briefly, the cause of

21  action.

22        So you said in your brief that the plaintiffs don't

23  have an APA cause of action because they can't sue the

24  President under the APA, right?

25        MR. ENSIGN:  That's one of the multiple reasons they

1    don't have an APA claim, Your Honor.

2          THE COURT:  Because you would agree that they could

3    use the APA to sue other officials who are implementing the

4    proclamation.  The APA wouldn't bar that, right?

5          MR. ENSIGN:  Here it does, Your Honor, I think in

6    several ways.  As we have cited in the *Tulare* case, actions

7    that merely implement the President's directive are not

8    reviewable under the APA.  So we think that bars APA review.

9          But more fundamentally, the availability of habeas

10   claims as a way of raising challenges to AEA applications means

11   that there's an adequate alternative remedy and that, thus, 5

12   U.S.C. Section 702 precludes an APA claim because habeas is

13   available.

14         THE COURT:  But, for example, and this isn't a Supreme

15   Court case, but a DC Circuit case, and they remind me

16   frequently that I have to follow their holdings as well, so

17   the *Reich* case, which is from 1996 there.  So doesn't that hold

18   that a nonstatutory ultra vires claim can proceed even if it's

19   challenging the legality of a presidential executive order?

20         MR. ENSIGN:  Your Honor, those implied causes of

21   action and equity can in some instances be implied by the

22   courts, but not -- courts have not implied them when

23   alternative methods of review are available.  And so because

24   habeas review is available, an implied cause of action in

25   equity is not here.  And that's a rule that applies in general,

1    but it applies with special force as to the habeas context.

2         You know, for example, many prisoners have

3    constitutional claims that readily fall within the four corners

4    of the text of Section 1983, and so -- but if you were to look

5    at 1983, an express cause of action, they should be able to

6    bring their claims, but the Supreme Court has recognized that

7    where habeas is available, you have to follow that and you

8    can't follow even an express alternative cause of action.  And

9    so for that reason, an implied cause of action in equity is

10   even more unavailable here.

11        THE COURT:  Right.  But the ultra vires claim against

12   the executive proclamation, which you agree is essentially

13   analogous to an executive order, right?

14        MR. ENSIGN:  Your Honor, it has some differences, none

15   of which are probably material here.

16        THE COURT:  Right.  So where it says that, "The

17   executive's action here is essentially that the President does

18   not insulate the entire executive branch from judicial review.

19   We think it's well established that review of the legality of

20   presidential action can ordinarily be obtained in a suit

21   seeking to enjoin the officers who attempt to enforce the

22   President's directive."  That's citing Judge Scalia's

23   concurrence.

24        Further that, "Even if the Secretary were acting at

25   the behest of the President, this does not leave the courts

1   without power to review the legality of the action, for courts

2   have power to compel subordinate executive officials that

3   disobey illegal presidential commands."

4          So that's why it seems that the plaintiffs can bring

5   an APA or ultra vires claim here even without running afoul of

6   the APA's prohibition on suing the president.  But your answer

7   is, only in a non-habeas circumstance?

8          MR. ENSIGN:  Your Honor, I think two elements of that.

9   I think, yes, in a very real sense, the habeas claim is a sort

10  of ultra vires challenge.  It's saying, you are without

11  authority to exercise custody over my body.  And in a very real

12  way, it is an ultra vires claim of its own.

13         And then I'd also direct the Court to an aspect of

14  *Ludecke* where they recognized that the determinations of the

15  attorney general made implementing the President's AEA

16  declaration were not reviewable.  The --

17         THE COURT:  Again, *Ludecke* sort of -- I agree with you

18  entirely, and I said -- that's the first thing I said today,

19  that *Ludecke* does prevent courts reviewing a number of

20  decisions the President makes, such as whether the

21  United States is at war.  But I think footnote 17 is all the

22  plaintiffs need to address -- to get the justiciability on

23  whether their clients are members of the TdA.

24         I just have one brief other area, and I'll release

25  you,  Mr. Ensign, which is, I want to talk about Farra,

1    F-a-r-r-a, 's implementation of the Convention against Torture.

2    And that says, at 8 U.S.C. 1231, "It shall be the policy of the

3    United States not to expel any person to a country in which

4    there are substantial grounds for believing the person would be

5    in danger of being subjected to torture, regardless of whether

6    the person is physically present in the United States."

7         So we'll talk about the availability of a CAT claim,

8    but certainly the plaintiffs have made out in their allegations

9    that they would suffer torture in an El Salvadoran prison,

10    correct?  They've alleged that.  And I actually have

11    declarations to that effect, correct?

12         MR. ENSIGN:  I agree they have alleged that.

13         THE COURT:  So why can't they bring this claim, a CAT

14    claim, under the APA?

15         MR. ENSIGN:  Your Honor, because it would also sound

16    in habeas.  It would be a challenge to how the government was

17    carrying out the AEA in the same sort of manner that has been

18    reviewed in all the other AEA habeas claims.  It would be, you

19    cannot use the APA -- or, sorry, the AEA -- you lack authority

20    to use it to exercise custody over me because the -- because

21    CAT prevents you from doing so.

22         THE COURT:  But in *Huisha-Huisha*, and that's spelled

23    H-u-i-s-h-a, hyphen, H-u-i-s-h-a, against *Mayorkas*, the 2022 DC

24    Circuit case where the circuit found that the executive could

25    deport -- could legally deport migrants for public health

1    reasons under Title 42 during COVID, but had to provide them

2    fair protections before doing so.

3            Why is that any different?  There, they also had to

4    hold the individuals, they had to have custody of them in order

5    to deport them.  So why wouldn't you be arguing they had to

6    have brought that in habeas, too?

7            MR. ENSIGN:  What is that?  Why do they have to bring

8    that in habeas?  Because it, again, is a challenge to the

9    government exercising custody over them on a particular legal

10   basis.  It's another form of saying, you may not use the AEA

11   against me and against my person because I have a legal claim.

12   You know, whether that be my conviction is invalid or other

13   constitutional claims, all of them can be raised in habeas.

14   And so I think a CAT claim could be raised in habeas.  It can't

15   be raised under the APA.

16           THE COURT:  All right.  Thank you very much,

17   Mr. Ensign.

18           MR. ENSIGN:  Thank you, Your Honor.  If you don't

19   mind, I would like to just clarify one thing from earlier, too.

20           We had an exchange about, you know, what my

21   understanding was on Saturday.

22           THE COURT:  Yes.

23           MR. ENSIGN:  But certainly my own personal

24   understanding of the law or aspects of the law that I may not

25   have been aware of because my knowledge of law is limited

1    obviously does not limit the executive branch.  And so --

2          THE COURT:  And I wasn't asking about your knowledge

3    of the law, and I don't expect you to know everything, and in

4    fact for you to show up at that hearing with hours notice, I

5    would not expect -- you knew far more law than I would have

6    expected at that time.

7          I'm asking about the facts.  What I'm concerned about

8    is the facts you knew or didn't know, and more importantly,

9    what you understood me to say, what you understood my order to

10   say.  That doesn't require any knowledge of the law.  It just

11   required common sense, listening to what I said and

12   understanding what I said.  And I think you made clear here

13   today, which I appreciate, that you did understand what I said.

14         MR. ENSIGN:  That's correct, Your Honor.  But

15   certainly, for example, we have set forth in our papers and

16   will do why argument under Rule 65(d) that is not an argument

17   that I was aware of at that time, which may --

18         THE COURT:  Right.  You talk about that it was not

19   binding until it was in writing.

20         MR. ENSIGN:  That's correct.

21         THE COURT:  That's what you mean.  But you didn't

22   think -- we're going around in circles, but I think you have

23   agreed you understood what I said when I told you to have this

24   done immediately, and you intended to comply with that, I

25   trust.

1          MR. ENSIGN:  That was my understanding, Your Honor.

2          THE COURT:  Okay.  Thank you.  Thank you, very much.

3          Mr. Gelernt.  I mean, I know that you spent a lot of

4   time, and we've all spent a lot of time on the justiciability

5   of the AEA issues.  I would rather spend my time where I did

6   with Mr. Ensign.

7          So you're not forfeiting any of those arguments.

8   You're not waiving them.  I know you strongly pressed them, and

9   I think they're tough arguments, both sides.  I think they're

10  hard, the legal issues.  But what would be more helpful for me

11  today, and then I'll give you a chance to say anything else you

12  want, is to focus on the issues that I addressed with

13  Mr. Ensign.  And his principal argument, through response to

14  many of my questions, was habeas, habeas, habeas.  So let's

15  hear you on that.

16         MR. GELERNT:  So a few things, Your Honor.  The first

17  thing I would start off, and before we even get to that

18  question, is that the government is obviously not giving people

19  time to file habeas, so it's an illusory availability of

20  habeas.

21         And I will tell the Court on information and belief,

22  and I hope the Court will direct the government to provide this

23  to you, we understand that the slip of paper that individuals

24  are getting right before they're put on the plane says, "No

25  review of this designation."  And so I hope the government will

1    actually provide that to you.  But that's our understanding --

2          THE COURT:  But, again, you're not saying, I hope,

3    that these are people who are being removed contrary to my

4    order?

5          MR. GELERNT:  Well, Your Honor, whether retroactively

6    your order was violated is a separate question.

7          THE COURT:  Right.

8          MR. GELERNT:  I'm saying this is what the piece of

9    paper the people got.

10         THE COURT:  I'm sorry.  They got previously, that are

11   not getting currently?  They're not getting prospectively?

12         MR. GELERNT:  I assume they are not continuing to

13   violate your order.  But this is our understanding of what

14   people got.  Some of the people, as you know, the five named

15   plaintiffs your TRO stopped, that was in the morning.  But this

16   is our understanding of the piece of paper.  And even if it

17   didn't say that, obviously they're rushing people onto a plane,

18   so it's illusory.  But let me just step back for a second.

19         I think the government is basically asking you to

20   relook at now 50 years of law and several, several of your

21   decisions.  It's very clear, since *Prizer* in the early

22   seventies, habeas, a core habeas, is when you're seeking

23   release, as Your Honor has pointed out multiple times in this

24   hearing and the prior hearing.  We are not seeking release.  We

25   are not seeking to stop them from removing people under the

1    INA.

2          This is not a core habeas, and I think even the

3    government concedes that if it's not a core habeas, the

4    immediate custodian rule doesn't apply.  Could it be brought in

5    habeas?  Yes, but that doesn't mean we can't bring it under

6    other grounds.  That's the *Aracelli* case we've cited, your

7    cases.  Even when it deals with detention, if the exact relief

8    you're seeking is not release, you can bring it in a non-habeas

9    way.  And so that's IRLA case.  That's your *Damus* case.  And so

10   I think we're just going over really well-tread ground here.

11         We could have brought it in habeas.  We didn't have

12   to.  You know, I conceded at the Saturday night hearing, given

13   the time pressure to stop those planes, that for purposes of

14   that TRO, we would take our habeas off, and you said, you know,

15   we can do it without prejudice.  I mean, we would ask you to

16   allow us to reinstate it now, but it's not necessary.

17         THE COURT:  You can certainly amend your complaint to

18   reinstate that.  Again, there was an issue that you remember

19   and the government remembers in the timeframe that you agreed

20   to do that to moot any venue issue.

21         MR. GELERNT:  Right.  Right.  Exactly.  And so I

22   think, you know, the government is basically saying, because it

23   could have been brought in habeas, it has to be brought in

24   habeas and that's the only way.  And the law has been clear for

25   a long time.

1          I would just address the government's, you know,

2    what's essentially a descriptive point, that lots of the AEA

3    cases were in brought in habeas.  As Your Honor has pointed

4    out, that's because it predates many of the current statutes.

5    But there were cases that were not brought in habeas that were

6    allowed, and that's the *Citizens Protective League v. Clark* in

7    the DC Circuit.  That's the *Clark v. Burn* case.  And so those

8    are cases that weren't brought in habeas.

9          I think that, to the extent the government is saying,

10   well, AEA is completely different and doesn't follow any of the

11   rules, I don't even think they're saying that, but if they

12   were, they are AEA cases that were brought in a non-habeas

13   forum.

14         THE COURT:  So let me ask you a couple of questions

15   about that, some of the things that I asked Mr. Ensign.  And,

16   again, as I said to him, I'm not sure we have to figure all of

17   this out today in order for me to maintain or modify my TRO.

18   But how do you expect this process to play out?  In other

19   words, what should the plaintiffs, members of the class have to

20   do?  Do they have to say, before they're being removed, "I

21   challenge my removal, I'm not a member of TdA"?  Does the

22   government have to hold a hearing for everybody to say, you get

23   a hearing, are you a member of TdA, you are, okay, next?  Are

24   you not?

25         Before we even talk about the standard of proof,

1    again, I don't expect you to have this nailed down chapter and

2    verse, just like the government didn't, but can you give me

3    some sense of how you think --

4         MR. GELERNT:  That's a fair question, Your Honor, and

5    we're in really uncharted territory, right?  Because, as Your

6    Honor knows well, it's only been used three times in the

7    country's history, the Alien Enemies Act.

8         Our understanding is the first two times, the War of

9    1812 and World War I, there weren't even removals under those.

10   So the only time there were removals was under World War II.

11   And the government, even though we were in an actual war,

12   because wherever, they set up a hearing board for people to be

13   able to contest it, and then they could go to habeas.  And so

14   we don't know if the government is going to set up a hearing

15   board.  I think that might be the way to go.  It might be that

16   they're individual habeases.

17        Whether the government had to hold hearings without

18   someone affirmatively asking, I think is a question that we

19   would like to give a little more thought to and go back to some

20   of the historical materials in World War II.  But at a minimum,

21   it has to be a meaningful chance.  It can't be, you're going to

22   be put on a plane in two hours, do you want a hearing, not be

23   able to call a lawyer, anything like that.

24        So I would -- you know, and as Your Honor said, and I

25   obviously recognize that's not directly at issue here, but we

1    would ask, if the Court ultimately upholds the TRO, that we

2    would ask for a little more time to brief how that works.  And

3    I suspect the government is going to object to any type of

4    procedure, meaningful procedure, but I don't know.  Obviously,

5    as Mr. Ensign said, we're not there yet.

6         THE COURT:  When you say a hearing board, you're

7    talking an administrative process?

8         MR. GELERNT:  That's our understanding of how World

9    War II worked, and so people got hearings, there was not these

10   kind of summary removals.

11        THE COURT:  And how about venue?  Is that -- would

12   claims be brought here in DC?  Would there be -- would review

13   be brought here?  Would it remain if there is -- if our habeas

14   claims are brought and they did get a hearing, then the habeas

15   would be -- any follow-on habeas would be in Texas?  Any

16   thoughts on that?

17        MR. GELERNT:  Yeah.  I mean, those are all fair

18   questions and hard questions.  I still do not think they would

19   have to be brought in habeas because they would not be seeking

20   their release.  They would simply be stopping their removal

21   under the AEA.  And it may be that the hearing board is set up

22   here.  It may be on video.  I just don't know how the

23   government would do it and whether the government would have an

24   affirmative obligation to hold those hearings for everyone or

25   whether the person would have to make a request.

1          THE COURT:  But are you saying that an administrative

2     hearing would be sufficient?

3          MR. GELERNT:  No.  And I apologize if I wasn't being

4     clear.  An administrative hearing could be the initial way it's

5     done, but there would have to be some judicial review.  Now,

6     the standard of judicial review might depend on how full a

7     hearing there was in the hearing board, whether there was a

8     lawyer at the hearing board, all those types of things.  And I

9     think there's a lot of law about sort of how much judicial

10    review there has to be of hearing boards, and we would want to

11    brief it.  But I think we are a long way from my understanding

12    of the government being willing to provide people with this

13    type of process.

14         THE COURT:  And so would -- get a little more

15    technical, and then I want to go back with some of the

16    questions I asked Mr. Ensign.

17         So then if I believe that a TRO is warranted on the

18    grounds that we have just talked about, which is that

19    individualized hearings and some process are required for

20    people who challenge that they are covered under the

21    proclamation, then isn't the TRO that's issued right now too

22    broad, and that shouldn't it be narrowed to say -- so right

23    now, it says that "The government is enjoined from removing

24    members of such class not otherwise subject to removal pursuant

25    to the proclamation for 14 days."  And, again, the class --

1   this may be a little harder in front of both of you.  But the

2   class, again, is all noncitizens in U.S. custody who are

3   subject to the proclamation and its implementation.

4        So the question is, then, it would -- under the

5   reasoning that I've talked about here, the government would not

6   be enjoined from removing people who admit they're members

7   of -- that they are covered by the proclamation or who don't

8   challenge that.

9        MR. GELERNT:  If there was a fair process for finding

10  out whether they conceded it or weren't challenging it.

11       THE COURT:  So, therefore, would the -- would the

12  injunction have to be modified to include -- to refer to only

13  people who have challenged their removal?  In other words, the

14  class would be something like -- I'm sorry.  Injunction would

15  cover, that the government is enjoined from removing members of

16  such class not otherwise subject to removal and who have

17  challenged their removal pursuant to the proclamation, blah,

18  blah, blah, and so forth.

19       MR. GELERNT:  Right.  So let me make two points, the

20  first directly responsive to what you're asking.

21       I think it would have to be a process that they would

22  submit to you to see whether we all agree that that was

23  providing meaningful process, so that they could actually -- so

24  people could actually contest it, they understood it, they were

25  being provided it in a language, they had time to ask their

1    lawyers what this means, all that.  And so that would be my

2    answer to that.

3            But if I could just step back for one second.

4            THE COURT:  Yeah, go ahead.  Well, let me -- I'm going

5    to let you say that, but if -- you know, I'm also aware that

6    the Court of Appeals has jurisdiction -- has the appeal, and

7    that while I could deny a motion to vacate or motion for

8    reconsideration, if I wanted to substantively modify the TRO, I

9    would probably have to have an indicative ruling saying, if you

10   returned this to me, I would modify it in the following

11   fashion.

12           So what's your position on such -- you're saying the

13   modification -- again, maybe the answer is you need to study

14   the specific language of such modification.

15           MR. GELERNT:  I mean, I probably would.  And on the

16   mechanical issue, I think, you know, we would probably say no,

17   but I think it's more tied to the substantive point I would

18   like to make, and then if you're not accepting that substantive

19   point, I could circle back to the mechanical question of how

20   you do this.

21           THE COURT:  Go ahead.

22           MR. GELERNT:  Fundamentally, there's two issues here,

23   as Your Honor knows.  The one we've been focusing on, I think,

24   is the easy one.  *Ludecke*, as you pointed out, footnote 17,

25   could not have been clearer.  You have to be able to contest

1    whether you fall within the Act; otherwise, anybody could just

2    be taken off the street and removed under the AEA.  That is

3    absolutely true.

4         I think the government is really not, as I understand

5    it, pushing against that.  They're just simply saying, you have

6    to bring it in habeas.  And we've covered that ground.  But the

7    threshold questions about whether the Act can be used in this

8    context, I think are absolutely reviewable and are critical

9    because, otherwise, what we're looking at is the government

10   being able to say, for any group in this country, any

11   nationality, you have a gang and we don't think that's

12   reviewable; so, therefore, we're going to remove anybody we can

13   say is part of this gang under the Alien Enemies Act.

14        Again, to go back to where you started, that doesn't

15   mean people are going to roam the streets.  It doesn't mean

16   people are going to get to stay in the country.  They can be

17   criminally prosecuted.  They can be detained under the

18   immigration laws.  They can be removed.

19        There's the Alien Terrorist Court, but this is a very

20   dangerous road we're going down where the Alien Enemies Act can

21   be invoked against a gang and then anybody who is part of that

22   gang -- and we don't even know what it means to be part of a

23   gang if it's not a formal structure.

24        THE COURT:  You mean the membership in the gang, how

25   do you define membership?

1          MR. GELERNT:  Exactly.  I think as this case goes on,

2    you're going to get a lot of experts saying that there is not

3    all that formal a structure to TdA, probably less than other

4    gangs.

5          THE COURT:  I know they're certainly reporting,

6    raising doubts about whether people are or are not members who

7    are being deported.

8          MR. GELERNT:  So let me try and just focus on the

9    reviewability of the statutory predicates, and I'll start with

10   the broader point that you made to start, which is, this

11   statute gives the government extraordinary powers, gives the

12   President.  That's all the more reason why the statutory

13   predicates have to be reviewable, to make sure the President is

14   acting within the bounds that Congress sets.  So it's

15   ultimately a separation of powers question.

16         The government says those statutory predicates are not

17   reviewable.  Every case the government cites has broad language

18   meant to say, once the statutory predicates are covered and

19   found, then the President has broad power to decide who of that

20   group are going to be removed.

21         But every case addressed statutory predicates or

22   constitutionality.  Because of the time, and I apologize, this

23   is no excuse, but there are many, many, many Alien Enemies Act

24   cases reviewing statutory predicates, and I can just, sort of

25   if I could, just sort of list them for you and give you the

 1  cites.

 2          So just to start with, on the government's cases, the

 3  government cites *Schwarzkopf*.  That reviewed the question of

 4  who was a citizen.

 5          The government cites *ex parte Gilroy*.  That reviewed

 6  who was a denizen within the Act.

 7          The government cites *Citizens Protective League*.  That

 8  consolidated three civil actions addressing multiple questions,

 9  including the constitutionality of the Act.

10          There are additional cases.  There is the *D'Esquiva v.*

11  *Uhl* case that addressed --

12          THE COURT:  Why don't you spell that for the court

13  reporter.

14          MR. GELERNT:  Yes, I'm sorry.  D, apostrophe, capital

15  E-s-q-u-i-v-a, v. Uhl.  And that's Second Circuit, 137

16  F.Circuit 903.

17          There's the *Von Heymann v. Watkins*.  The government

18  cites that.  That also had reviewability.

19          There's the *Schlueter* case, S-c-h-l-u-e-t-e-r.  That's

20  also against Watkins.

21          There are just -- there is the *Jaegeler* case after

22  *Ludecke*, J-a-e-g-e-l-e-r, *v. Carusi*.  That's a SCOTUS case that

23  said that the war was over.

24          In each one of those cases, the statutory predicates

25  were reviewed, and the constitutionality.

1          And *Ludecke* itself could not have been clearer.  It

2     said, "The construction and validity," it made that point

3     twice, "can be reviewed, but what can't be reviewed is, once

4     someone is within the Act," and it was all German nationals,

5     "who from those people who were subject," in that case German

6     nationals, "could be considered dangerous and subject to

7     removal."  That's what was not reviewable.

8          But whether you were a German national was routinely

9     reviewed.  There were cases about whether an Austrian person

10    could be considered German.

11         THE COURT:  I still think those are similar to what

12    we're talking about here, which is the individualized

13    reviewability of whether you fall within the Act, not the

14    reviewability of whether this is an invasion or incursion.

15         MR. GELERNT:  No, but they were all statutory

16    predicate questions.  Are you a citizen within the Act?  Are

17    you -- the constitutionality of the Act, whether you were a

18    denizen within the Act, whether you were a native within the

19    Act.  Each one of them addressed different types of statutory

20    predicates.

21         The reason there was no case about whether there was a

22    foreign government is because it would be unheard of to

23    Congress to be doing what they are doing.  And in that sense, I

24    think the *Utility* Case *v. EPA* says the Court should be wary,

25    very skeptical of a newfound power in a 200-plus-year-old

statute.  I mean, that's why there's no cases about foreign
governments.  That's why there's no cases about invasion or
incursion.

We are so far afield from what Congress intended.
This was passed as a wartime measure in 1798, but I think if
you look at those cases, you will see in every one of those
cases, they weren't about whether the individual was dangerous.
They were about whether they fell within the statutory terms of
the Act.

And so I understand, Your Honor, that there is an
easier path with this TRO, but what that means is that they are
going to find people who are members of the gangs.  They could
be low-level people, whatever membership actually means, or an
associate, and all of a sudden they're going to be in an
El Salvadoran prison.  And then the next time there's going to
be another gang and another gang and another gang.  Any
nationality in this country has gangs, and all of a sudden they
could be subjected.

THE COURT:  I agree, the policy ramifications of this
are incredibly troublesome and problematic and concerning, and
this, I agree, is an unprecedented and expanded use of an Act
that has been used, as we have discussed, in the War of 1812,
World War I, and World War II, where there was no question of
whether there was a declaration of war and who the enemy was.

And the idea that it's being used against certain

1    Venezuelans who have individually come over to the

2    United States, not as members of their government, but

3    ostensibly as a member of a gang that's a quasi-hybrid criminal

4    state, I agree with you that this is a long way from the

5    heartland of the Act.

6         There's still a lot of language in Supreme Court cases

7    that give me pause that I can go ahead and say this isn't a

8    foreign state, this isn't an invasion, it's not an incursion.

9         MR. GELERNT:  Yeah.  So, Your Honor, I guess in that

10   sense, then, you know, we get that you are also under a quick

11   timeframe here.  Then we would ask that you leave the TRO in

12   place and see how the circuit panel addresses that for now.

13        But the one thing I would say is, if Your Honor is

14   even beginning to think about narrowing the injunction at some

15   point down the line, I think if you didn't feel like you could

16   address invasion or whether there is an incursion, which we,

17   again, do think you can address because there is statutory

18   terms, at a minimum, the proclamation doesn't name Venezuela.

19   There is simply no way to say that that is a foreign

20   government, that the TdA is a foreign government.

21        It's not saying -- like, in World War II, they said

22   every German is an enemy alien, but the only ones we are going

23   to act on and remove and detain are those that are dangerous.

24   Here it doesn't say Venezuela is the object of the

25   proclamation, or all Venezuelans.  It says only TdA associates,

1    members.  At a minimum, we think you have jurisdiction.

2         THE COURT:  Venezuelan citizens who are members of

3    TdA.

4         MR. GELERNT:  Right.  But that is, I think,

5    understood.  They're not going around and saying they can take

6    any Venezuelan off the street and send them to El Salvador.

7         We would respectfully urge that, at a minimum, you go

8    at least that far, because, otherwise, I think we are going to

9    see person after person being sent there if they have -- if

10   they can concoct any connection to a gang.  And, obviously,

11   then, it would depend a little on what standard is set for

12   membership, but we're going to get into much more complicated

13   questions that are of the government's doing by using this Act

14   in such a different way.

15        THE COURT:  Can I just ask you last if you want to

16   respond to the government's response on my CAT questions.  I

17   mean, in other words, what I'm asking, again, is why if -- I

18   understand that individuals cannot fight the administration's

19   determinations of their CAT claims without a final removal

20   order.  But why can't they bring claims challenging the fact

21   that the administration never gave them a chance to raise a CAT

22   claim?

23        MR. GELERNT:  They absolutely can, and Your Honor

24   cited how we show that.  I think that's one of the principal

25   cases, because there also, the government wasn't using the

1  Immigration Act to remove someone.  They were using the public

2  health laws, Title 42, and the DC Circuit said, no, you have to

3  at least give them screenings for -- not just CAT, but

4  persecution, as well, under withholding.

5       So if the Alien Enemies Act can be used here, and if

6  someone is found to fall within it, they absolutely have to be

7  screened.  And I think what Your Honor has already seen about

8  what's happening in El Salvadoran prisons would give someone

9  pause not to be doing these screenings.

10      If I could just say one other thing about your order

11 on the third plane.  I know that the government has said those

12 removals were okay even though they took off after the Court's

13 written order, and the government said they weren't solely

14 based on the AEA, I take it from the government's careful

15 language that they had final order, so maybe the other

16 authority was the Immigration Act.  I think that's implausible

17 and we would ask the Court for clarification from the

18 government.

19      The reason I say it's implausible is related to what

20 you're asking me now.  You have to, in your removal, not only

21 have a final removal order, but it has to say where you're

22 going to be sent to.

23      There is no way that these Venezuelans had final

24 orders that said, you're going to be sent to El Salvador,

25 unless after your Court's order during the hearing, they

1 crossed something out and changed it.  There is very clear

2 statutory language saying where someone can be sent, and it's a

3 checklist where people can be sent.  The Supreme Court has gone

4 over that in the *Jama v. ICE* case.

5        There is no way that those Venezuelans could have been

6 sent to El Salvador under any proper statutory interpretation

7 of those provisions, and so we would really question how those

8 people on the third flight were sent after your written order.

9        The other thing I would say, I'm not sure if

10 Your Honor wants this, but we're going to put in an affidavit

11 either tonight or over the weekend letting you know that people

12 were -- who were on those planes were returned, that there were

13 some people.  They were not Venezuelan men, but it goes to the

14 government's saying to you in their motion, well, it wasn't

15 feasible to bring people back.

16        I can't really understand what the government is

17 saying.  Obviously, the Court wasn't saying, make a midair

18 return even if you didn't have fuel.  The government is saying,

19 well, you didn't consider the lack of fuel.  That sort of goes

20 without saying.

21        But there were people who were brought back, and we

22 will put in sworn declarations to show that some people landed

23 but had to be brought back because the El Salvadoran government

24 wouldn't take them because one was a mistake and they were not

25 Venezuelan or El Salvadoran and the others weren't men and the

1    El Salvadoran President said, "I'm not taking women."

2         THE COURT:  I assure you, Mr. Gelernt, the government

3    is not being terribly cooperative at this point, but I will get

4    to the bottom of whether they violated my order, who ordered

5    this, and what the consequences will be.

6         All right.  Thank you very much.

7         MR. GELERNT:  Thank you, Your Honor.

8         THE COURT:  Let me just -- Mr. Ensign, I just have a

9    couple last questions, then, for you, and I'm happy if there is

10   any final point or two you want to make.

11        So you want to give me your response to Mr. Gelernt's

12   last point, which is there's a declaration saying that

13   everybody on that plane, that third plane, was not subject --

14   was not being deported solely on the basis of the proclamation?

15   In fact, let me get that.

16        (Pause)

17        THE COURT:  I have every other piece of paper.  I can

18   pull it up.  But that was -- he stated that -- under oath, that

19   nobody on that plane was sent there via the AEA.

20        So what's your response to Mr. Gelernt's point that

21   there's no way that people deported solely under the INA were

22   being sent to El Salvador, that Venezuelans weren't?

23        MR. ENSIGN:  Your Honor, my understanding is that

24   everyone on that third plane had a final order of removal.

25        THE COURT:  But does it -- and that Venezuelans were

1   being deported to El Salvador?

2   MR. ENSIGN:  Your Honor, I don't know the details of

3   what those orders said, but what I understand and what I have

4   been told is that everyone on the third plane had final orders

5   of removal.

6   THE COURT:  Well, okay.  Then I may -- as we go

7   through this, I will likely require more specific information

8   about that because Mr. Gelernt seems to be raising a reasonable

9   concern about this.

10  Okay.  I'm happy if there are any -- so I'm not sure I

11  gave you this opportunity, but if I gave the government the

12  opportunity to say that you will have individual hearings

13  before you deport anyone to ensure that they are members, to be

14  assured they are actually covered by the proclamation, in other

15  words, members of TdA, Venezuelans, not LPRs, are you prepared

16  to do that?

17  MR. ENSIGN:  No, Your Honor.  I don't have

18  authorization to do that.  The position of the United States is

19  that habeas relief provides whatever due process is available

20  in these circumstances.

21  THE COURT:  Okay.  If you want to make any last point,

22  I would be happy to hear it.

23  MR. ENSIGN:  Yes, Your Honor, two very quick points,

24  if I may.

25  As to habeas, I understood opposing counsel to say

1   that just because we could bring it, that's not dispositive,

2   and I believe he suggested that the law changed in the

3   seventies.

4        Here is what the DC Circuit said in 1996:  "The key to

5   plaintiff's inability to pursue a suit here is jurisdictional,

6   and it rests merely on the availability, not the actual seeking

7   of habeas elsewhere," end quote.

8        And it went on to further explain:  "The availability

9   of a habeas remedy in another district ousted us of

10  jurisdiction over an alien's effort to pose a constitutional

11  attack."

12       THE COURT:  That's in what case?

13       MR. ENSIGN:  That's in *Lobue versus Christopher*, 82

14  F.3d --

15       THE COURT:  I've got that cite.  Thank you.

16       MR. ENSIGN:  Second, Your Honor, as to the cases that

17  opposing counsel cited suggesting that the preconditions were

18  reviewable, we simply disagree with that.  Both *Ludecke* and

19  *Citizens Protective League* involve challenges specifically to

20  whether or not a condition of the AEA were met.

21       In both cases, plaintiffs actually had very strong

22  arguments that there was, in fact, no longer a war.  As a

23  factual matter, VE Day had been declared multiple years before,

24  and Justice Black, in dissent, went on to explain that the idea

25  that the war was still ongoing was pure fiction.  But none of

1    that mattered because President Truman had determined that the

2    war was still going, and that was the end of the matter for the

3    courts.

4            Similarly, as the President's determination there's a

5    war, as to whether or not there's an invasion or a predatory

6    incursion, courts have no meaningful standards to adjudicate

7    what constitutes an invasion.  The Ninth Circuit has said as

8    much in *California versus United States*.  And, similarly, as to

9    what qualifies as a state is a power that is entrusted to the

10   President under Article II.

11           THE COURT:  You would certainly agree that the

12   hypotheticals Mr. Gelernt raises are awfully frightening, that

13   if the courts can't review it, then the President could say

14   that anybody is invading the United States, that if there

15   were -- I think you cite a fishing vessel case, that if some

16   fisherman from a foreign country comes into U.S. waters and the

17   President says that's an invasion, nothing -- these fishing

18   fleets, Chinese fishing fleets are an invasion of U.S. waters,

19   any Chinese fisherman may be held and interned and deported,

20   fair game, nothing we can do, right?

21           MR. ENSIGN:  Your Honor, there could be individualized

22   determinations, but --

23           THE COURT:  If they're fishermen and if they're

24   Chinese, but if they are concededly Chinese fishermen, they are

25   out of luck, right?

1            MR. ENSIGN:  I believe that's how Congress has set

2    this up to be, and certainly what TdA is doing to --

3            THE COURT:  Pretty alarming.  Even you, I trust, would

4    agree such a scenario would be pretty alarming?

5            MR. ENSIGN:  Your Honor, it's entrusted to the

6    political branches, and to the extent that that reaches

7    outcomes that are unacceptable as a policy in political matter,

8    the political branches exist to resolve that.  Certainly,

9    Congress could repeal or amend the AEA at any time.

10           THE COURT:  Okay.  Thank you, all.  I appreciate it.

11           MR. GELERNT:  Your Honor, just one housekeeping thing.

12           THE COURT:  Yes.

13           MR. GELERNT:  This is a small thing, but the

14   government has made a big deal in the Court of Appeals that

15   your class cert findings weren't reduced to writing, so we

16   would respectfully ask that at some point you do that,

17   certifying the class.

18           THE COURT:  I think my minute order does.  Just in

19   terms of you mean on each numerosity to --

20           MR. GELERNT:  The government seems to be suggesting

21   that.  I will leave it to you.  But I'm just mentioning it as a

22   cautionary matter.

23           THE COURT:  All right.  Thank you.  Good weekend,

24   everyone.

25        (Proceedings concluded at 3:47 p.m.)

CERTIFICATE

    I, Sonja L. Reeves, Federal Official Court Reporter in and
for the United States District Court of the District of
Columbia, do hereby certify that the foregoing transcript is a
true and accurate transcript from the original stenographic
record in the above-entitled matter and that the transcript
page format is in conformance with the regulations of the
Judicial Conference of the United States.

    Dated this 21st day of March, 2025.


                              /s/ Sonja L. Reeves
                              SONJA L. REEVES, RDR-CRR
                              FEDERAL OFFICIAL COURT REPORTER

## /

**/s** [1] - 55:8

## 1

**1** [1] - 11:24
**10004** [1] - 1:14
**1231** [1] - 29:2
**125** [1] - 1:13
**137** [2] - 20:18, 43:15
**14** [3] - 11:24, 14:17, 38:25
**14th** [1] - 1:16
**1533** [1] - 22:24
**17** [3] - 14:16, 28:21, 40:24
**171** [1] - 14:16
**1798** [1] - 45:5
**1812** [2] - 36:9, 45:22
**18th** [2] - 1:13, 8:7
**1920s** [1] - 12:24
**1941** [1] - 20:19
**1943** [1] - 15:12
**1946** [2] - 12:17, 15:8
**1948** [1] - 20:22
**1952** [2] - 12:20, 16:18
**1983** [2] - 27:4, 27:5
**1993** [1] - 23:22
**1996** [2] - 26:17, 52:4
**1:25-cv-00766-JEB** [1] - 1:5

## 2

**200-plus-year-old** [1] - 44:25
**20001** [1] - 1:24
**20004** [1] - 2:3
**2004** [1] - 20:24
**20043** [1] - 1:20
**20044** [1] - 2:5
**20045** [1] - 1:16
**2022** [1] - 29:23
**2025** [2] - 1:10, 55:6
**21** [1] - 1:10
**21st** [1] - 55:6
**25-766** [1] - 3:3
**294** [1] - 15:8
**2:31** [2] - 1:10, 3:1

## 3

**30-minute** [1] - 6:14
**333** [1] - 1:24
**34553** [1] - 1:19
**38** [1] - 6:21
**3:47** [2] - 1:10, 54:25
**3:53** [1] - 10:24b

## 4

**42** [2] - 30:1, 48:2
**477** [1] - 20:11

## 5

**5** [1] - 26:11
**50** [1] - 33:20
**529** [1] - 1:16
**5:00** [2] - 6:17, 7:8
**5:22** [1] - 6:17

## 6

**65(d** [1] - 31:16

## 7

**702** [1] - 26:12
**722** [1] - 1:16
**734** [1] - 20:12
**7:00** [2] - 7:8, 11:7

## 8

**8** [2] - 22:24, 29:2
**82** [1] - 52:13
**868** [1] - 2:5

## 9

**900** [1] - 20:18
**903** [1] - 43:16
**950** [1] - 2:2

## A

**ability** [2] - 8:7, 14:5
**able** [6] - 24:18, 27:5, 36:13, 36:23, 40:25, 41:10
**above-entitled** [1] - 55:4
**absolutely** [4] - 41:3, 41:8, 47:23, 48:6
**accepting** [1] - 40:18
**accurate** [1] - 55:3
**ACLU** [4] - 1:15, 3:9, 3:12, 3:22
**act** [2] - 5:1, 46:23
**Act** [22] - 13:20, 36:7, 41:1, 41:7, 41:13, 41:20, 42:23, 43:6, 43:9, 44:4, 44:13, 44:16, 44:17, 44:18, 44:19, 45:9, 45:21, 46:5, 47:13, 48:1, 48:5, 48:16
**acting** [1] - 27:24,

42:14
**action** [11] - 8:19, 25:21, 25:23, 26:21, 26:24, 27:5, 27:8, 27:9, 27:17, 27:20, 28:1
**Action** [1] - 3:3
**actions** [3] - 22:8, 26:6, 43:8
**actual** [2] - 36:11, 52:6
**addition** [1] - 8:24
**additional** [3] - 9:25, 14:16, 43:10
**address** [4] - 28:22, 35:1, 46:16, 46:17
**addressed** [4] - 32:12, 42:21, 43:11, 44:19
**addresses** [1] - 46:12
**addressing** [1] - 43:8
**adequate** [1] - 26:11
**adjudicate** [3] - 13:9, 22:8, 53:6
**adjudicated** [1] - 22:20
**administration** [1] - 47:21
**administration's** [1] - 47:18
**administrative** [4] - 20:11, 37:7, 38:1, 38:4
**admit** [1] - 39:6
**admitted** [1] - 15:10
**advanced** [1] - 11:13
**adversarial** [1] - 21:2
**AEA** [34] - 8:6, 8:7, 8:9, 9:13, 13:10, 13:17, 17:25, 18:11, 18:23, 20:20, 20:23, 22:2, 22:4, 23:5, 23:8, 24:9, 24:24, 26:10, 28:15, 29:17, 29:18, 29:19, 30:10, 32:5, 35:2, 35:10, 35:12, 37:21, 41:2, 48:14, 50:19, 52:20, 54:9
**affairs** [3] - 8:6, 15:19, 19:22
**affidavit** [1] - 49:10
**affirmatively** [1] - 36:18
**affirmed** [1] - 12:17
**afield** [1] - 45:4
**afoul** [1] - 28:5
**afternoon** [10] - 3:8, 3:10, 3:11, 3:16, 3:19, 3:24, 4:4, 4:6, 4:9,

4:12
**age** [2] - 11:25, 14:18
**Agency** [1] - 20:9
**agree** [18] - 6:22, 13:4, 13:24, 16:1, 18:8, 23:25, 24:1, 24:11, 26:2, 27:12, 28:17, 29:12, 39:22, 45:19, 45:21, 46:4, 53:11, 54:4
**agreed** [3] - 11:6, 31:23, 34:19
**ahead** [6] - 20:4, 20:5, 25:14, 40:4, 40:21, 46:7
**air** [1] - 6:22
**airspace** [1] - 11:6
**al** [4] - 1:3, 1:6, 3:3, 3:4
**AI** [1] - 16:2
**Al-Qaeda** [1] - 16:2
**alarming** [2] - 54:3, 54:4
**alien** [7] - 12:3, 14:1, 14:17, 15:9, 24:8, 24:9, 46:22
**Alien** [8] - 13:20, 22:23, 36:7, 41:13, 41:19, 41:20, 42:23, 48:5
**alien's** [1] - 52:10
**aliens** [4] - 23:12, 23:15, 23:23, 24:12
**allegations** [1] - 29:8
**alleged** [3] - 17:18, 29:10, 29:12
**alliance** [1] - 17:1
**allow** [1] - 34:16
**allowed** [1] - 35:6
**alluded** [1] - 19:5
**alternative** [3] - 26:11, 26:23, 27:8
**amend** [2] - 34:17, 54:9
**Amendment** [1] - 23:23
**American** [3] - 1:12, 20:8, 21:1
**analogous** [1] - 27:13
**answer** [5] - 17:17, 22:22, 28:6, 40:2, 40:13
**answers** [3] - 10:13, 19:21, 21:24
**anyway** [1] - 18:18
**APA** [13] - 21:14, 25:23, 25:24, 26:1, 26:3, 26:4, 26:8, 26:12, 28:5, 29:14,

29:19, 30:15
**APA's** [1] - 28:6
**apologize** [4] - 17:15, 22:3, 38:3, 42:22
**apostrophe** [1] - 43:14
**appeal** [1] - 40:6
**Appeals** [2] - 40:6, 54:14
**appeared** [1] - 7:7
**applications** [2] - 12:13, 26:10
**applies** [2] - 26:25, 27:1
**apply** [1] - 34:4
**appreciate** [2] - 31:13, 54:10
**apprehended** [1] - 12:3
**apprehension** [1] - 17:10
**approach** [1] - 3:6
**appropriate** [4] - 21:10, 25:17, 25:18, 25:19
**Aracelli** [1] - 34:6
**area** [3] - 20:9, 20:15, 28:24
**areas** [3] - 8:5, 19:24, 23:11
**argue** [3] - 4:22, 7:3, 7:14
**arguing** [2] - 4:15, 30:5
**argument** [6] - 7:8, 13:22, 18:20, 31:16, 32:13
**arguments** [4] - 9:23, 32:7, 32:9, 52:22
**arise** [1] - 22:19
**arsenal** [1] - 23:7
**ARTHUR** [1] - 1:15
**Arthur** [1] - 3:22
**Article** [1] - 53:10
**aside** [1] - 24:6
**Aspect** [3] - 18:8, 19:23, 28:13
**aspects** [2] - 13:2, 30:24
**assert** [2] - 24:18, 25:5
**asserted** [1] - 25:15
**asserting** [1] - 18:22
**assessment** [1] - 11:21
**Assistant** [1] - 4:5
**associate** [1] - 45:14
**associates** [1] -

46:25
**assume** [1] - 33:12
**assuming** [1] - 21:13
**assure** [1] - 50:2
**assured** [1] - 51:14
**ATRC** [1] - 23:2
**attack** [1] - 52:11
**attempt** [1] - 27:21
**attempted** [1] - 25:5
**Attorney** [1] - 4:5
**attorney** [3] - 5:20,
15:10, 28:15
**attorney-client** [1] -
5:20
**Audrey** [1] - 3:25
**AUDREY** [1] - 1:18
**August** [1] - 4:7
**AUGUST** [1] - 2:4
**Austrian** [1] - 44:9
**authorities** [1] -
17:11
**authority** [9] - 17:24,
18:13, 18:23, 19:1,
23:9, 24:6, 28:11,
29:19, 48:16
**authorization** [1] -
51:18
**authorizes** [1] -
18:11
**availability** [5] -
26:9, 29:7, 32:19,
52:6, 52:8
**available** [17] - 12:9,
13:2, 14:9, 15:5,
15:20, 16:7, 16:9,
17:5, 17:8, 19:25,
23:9, 26:13, 26:23,
26:24, 27:7, 51:19
**Avenue** [2] - 1:24,
2:2
**avenue** [1] - 16:11
**avoid** [1] - 17:12
**aware** [3] - 7:9,
30:25, 31:17, 40:5
**awfully** [1] - 53:12

**B**

**balance** [1] - 8:10
**bar** [1] - 26:4
**barred** [1] - 15:21
**bars** [1] - 26:8
**based** [1] - 48:14
**basic** [2] - 8:11, 8:14
**basis** [5] - 13:5, 24:6,
25:6, 30:10, 50:14
**Bauer** [1] - 20:22
**BEFORE** [1] - 1:9
**begin** [1] - 21:10
**beginning** [2] - 3:5,

46:14
**behest** [1] - 27:25
**belief** [1] - 32:21
**Ben** [1] - 2:5
**between** [3] - 6:17,
7:16, 15:15
**big** [1] - 54:14
**binding** [5] - 4:19,
6:5, 6:9, 19:21, 31:19
**bit** [1] - 10:19
**Black** [1] - 52:24
**blah** [3] - 39:17,
39:18
**board** [6] - 36:12,
36:15, 37:6, 37:21,
38:7, 38:8
**boards** [1] - 38:10
**BOASBERG** [1] - 1:9
**body** [1] - 28:11
**bottom** [1] - 50:4
**bounds** [1] - 42:14
**Box** [2] - 1:19, 2:5
**BRADLEY** [1] - 1:18
**branch** [2] - 27:18,
31:1
**branches** [2] - 54:6,
54:8
**Brian** [1] - 4:12
**BRIAN** [1] - 2:4
**brief** [4] - 25:22,
28:24, 37:2, 38:11
**briefed** [1] - 19:10
**briefly** [1] - 25:20
**briefs** [2] - 13:7, 13:8
**bring** [12] - 5:14,
12:11, 27:6, 28:4,
29:13, 30:7, 34:5,
34:8, 41:6, 47:20,
49:15, 52:1
**bringing** [1] - 18:16
**brings** [1] - 24:11
**Broad** [1] - 1:13
**broad** [3] - 38:22,
42:17, 42:19
**broader** [1] - 42:10
**brought** [19] - 14:4,
17:1, 17:2, 25:13,
30:6, 34:4, 34:11,
34:23, 35:3, 35:5,
35:8, 35:12, 37:12,
37:13, 37:14, 37:19,
49:21, 49:23
**burn** [1] - 35:7
**BY** [5] - 1:13, 1:15,
1:18, 2:2, 2:4

**C**

**California** [1] - 53:8
**candid** [1] - 22:21

**cannot** [4] - 13:14,
18:6, 29:19, 47:18
**capital** [1] - 43:14
**careful** [1] - 48:14
**carrying** [1] - 29:17
**Carusi** [1] - 43:22
**case** [40] - 8:13,
8:16, 12:9, 12:15,
12:17, 14:10, 14:23,
15:5, 15:8, 15:12,
15:21, 16:24, 17:5,
19:19, 20:19, 20:24,
21:5, 23:22, 24:16,
26:6, 26:15, 26:17,
29:24, 34:6, 34:9,
35:7, 42:1, 42:17,
42:21, 43:11, 43:19,
43:21, 43:22, 44:5,
44:21, 49:4, 52:12,
53:15
**Case** [1] - 44:24
**CASE** [1] - 1:5
**cases** [31] - 8:3,
13:3, 15:11, 15:25,
16:6, 16:16, 16:19,
16:21, 20:6, 21:7,
22:2, 22:5, 24:3, 34:7,
35:3, 35:5, 35:8,
35:12, 42:24, 43:2,
43:10, 43:24, 44:9,
45:1, 45:2, 45:6, 45:7,
46:6, 47:25, 52:16,
52:21
**CAT** [8] - 29:7, 29:13,
29:21, 30:14, 47:16,
47:19, 47:21, 48:3
**categorical** [1] -
18:16
**categorically** [1] -
15:21
**category** [2] - 11:22,
14:20
**causes** [1] - 26:20
**cautionary** [1] -
54:22
**century** [1] - 8:7
**Cerna** [1] - 11:2
**cert** [1] - 54:15
**certain** [1] - 45:25
**certainly** [24] - 10:21,
11:7, 11:12, 12:22,
13:1, 14:4, 14:9,
14:23, 16:5, 16:8,
21:6, 22:1, 22:4, 22:6,
25:3, 25:6, 29:8,
30:23, 31:15, 34:17,
42:5, 53:11, 54:2,
54:8
**CERTIFICATE** [1] -
55:1

**certified** [1] - 8:19
**Certified** [1] - 1:23
**certify** [1] - 55:3
**certifying** [1] - 54:17
**challenge** [22] - 12:7,
12:19, 13:6, 13:19,
13:25, 14:10, 17:2,
17:6, 17:23, 18:6,
18:9, 18:16, 21:17,
24:10, 24:13, 28:10,
29:16, 30:8, 35:21,
38:20, 39:8
**challenged** [3] -
22:5, 39:13, 39:17
**challengers** [1] -
16:7
**challenges** [9] -
12:11, 14:3, 14:13,
18:12, 22:9, 25:4,
25:5, 26:10, 52:19
**challenging** [8] -
13:21, 15:16, 16:20,
16:22, 18:22, 26:19,
39:10, 47:20
**chambers** [1] - 7:10
**chance** [4] - 8:8,
32:11, 36:21, 47:21
**changed** [2] - 49:1,
52:2
**chapter** [1] - 36:1
**checklist** [1] - 49:3
**CHIEF** [1] - 1:9
**Chinese** [4] - 53:18,
53:19, 53:24
**CHRISTINE** [1] -
1:18
**Christine** [1] - 3:20
**Christopher** [1] -
52:13
**circle** [1] - 40:19
**circles** [1] - 31:22
**Circuit** [12] - 12:17,
15:8, 15:12, 20:8,
20:22, 26:15, 29:24,
35:7, 43:15, 48:2,
52:4, 53:7
**circuit** [2] - 29:24,
46:12
**circumstance** [1] -
28:7
**circumstances** [1] -
51:20
**cite** [2] - 52:15, 53:15
**cited** [5] - 22:5, 26:6,
34:6, 47:24, 52:17
**cites** [7] - 20:18,
42:17, 43:1, 43:3,
43:5, 43:7, 43:18
**citing** [1] - 27:22
**citizen** [4] - 12:6,

21:1, 43:4, 44:16
**Citizens** [4] - 15:22,
35:6, 43:7, 52:19
**citizens** [2] - 11:24,
47:2
**Civil** [3] - 1:12, 2:4,
3:3
**civil** [1] - 43:8
**claim** [18] - 16:13,
17:20, 17:23, 18:24,
21:10, 26:1, 26:12,
26:18, 27:11, 28:5,
28:9, 28:12, 29:7,
29:13, 29:14, 30:11,
30:14, 47:22
**claiming** [1] - 4:18
**claims** [21] - 22:4,
22:7, 22:9, 24:19,
24:20, 25:8, 25:9,
25:12, 25:16, 25:17,
25:18, 26:10, 27:3,
27:6, 29:18, 30:13,
37:12, 37:14, 47:19,
47:20
**clarification** [1] -
48:17
**clarify** [2] - 8:14,
30:19
**Clark** [3] - 15:7, 35:6,
35:7
**class** [11] - 8:9, 8:19,
21:18, 35:19, 38:24,
38:25, 39:2, 39:14,
39:16, 54:15, 54:17
**classified** [1] - 21:20
**clause** [1] - 24:5
**clear** [14] - 5:6, 5:7,
8:2, 8:4, 8:8, 9:19,
10:4, 14:19, 16:6,
31:12, 33:21, 34:24,
38:4, 49:1
**cleared** [1] - 11:6
**clearer** [2] - 40:25,
44:1
**CLERK** [1] - 3:2
**clerks** [1] - 7:20
**client** [1] - 5:20
**clients** [6] - 5:11,
5:20, 6:3, 7:13, 7:17,
28:23
**collected** [1] - 11:8
**collecting** [1] - 20:14
**COLUMBIA** [1] - 1:1
**Columbia** [2] - 1:15,
55:3
**combatant** [1] - 21:1
**commands** [1] - 28:3
**common** [1] - 31:11
**compel** [1] - 28:2
**competence** [1] -

20:16
**competing** [1] - 21:6
**complaint** [1] - 34:17
**completely** [2] - 14:14, 35:10
**compliance** [2] - 4:22, 7:25
**complicated** [1] - 47:12
**comply** [1] - 31:24
**complying** [4] - 9:21, 10:5, 10:8, 10:10
**comprehensive** [1] - 12:23
**conceded** [2] - 34:12, 39:10
**concededly** [1] - 53:24
**concedes** [1] - 34:3
**concern** [3] - 6:15, 23:1, 51:9
**concerned** [1] - 31:7
**concerning** [2] - 10:13, 45:20
**concerns** [1] - 22:14
**concluded** [1] - 54:25
**conclusion** [1] - 18:12
**concoct** [1] - 47:10
**concurrence** [1] - 27:23
**condition** [1] - 52:20
**conditions** [1] - 15:17
**Conference** [1] - 55:5
**confirm** [1] - 8:11
**conformance** [1] - 55:4
**Congress** [7] - 22:22, 24:3, 42:14, 44:23, 45:4, 54:1, 54:9
**connection** [1] - 47:10
**consequences** [1] - 50:5
**consider** [2] - 17:6, 49:19
**considered** [2] - 44:6, 44:10
**consistent** [2] - 6:5, 6:11
**consolidated** [1] - 43:8
**constitutes** [1] - 53:7
**Constitution** [1] - 1:24
**constitutional** [7] -

14:13, 22:9, 24:19, 24:20, 27:3, 30:13, 52:10
**constitutionality** [4] - 42:22, 43:9, 43:25, 44:17
**construction** [1] - 44:2
**contend** [1] - 19:11
**contention** [1] - 13:12
**contest** [3] - 36:13, 39:24, 40:25
**contesting** [2] - 23:12, 24:25
**contests** [1] - 8:2
**context** [7] - 15:18, 16:17, 19:23, 22:5, 23:20, 27:1, 41:8
**continue** [2] - 9:12, 9:23
**continues** [1] - 13:2
**continuing** [1] - 33:12
**contours** [1] - 14:6
**contrary** [2] - 6:11, 33:3
**Convention** [1] - 29:1
**conversation** [1] - 5:4
**conviction** [1] - 30:12
**Coogle** [1] - 3:20
**COOGLE** [2] - 1:18, 3:19
**cooperative** [1] - 50:3
**copied** [1] - 7:10
**core** [5] - 17:23, 18:24, 33:22, 34:2, 34:3
**corners** [1] - 27:3
**corpus** [1] - 22:20
**correct** [27] - 6:24, 6:25, 8:17, 8:18, 8:22, 8:23, 9:1, 9:2, 9:4, 9:5, 9:8, 9:9, 9:14, 9:22, 10:9, 11:3, 12:16, 13:15, 13:18, 15:14, 22:15, 25:1, 25:2, 29:10, 29:11, 31:14, 31:20
**counsel** [4] - 3:5, 22:17, 51:25, 52:17
**counterintuitive** [1] - 17:19
**country** [7] - 10:18, 18:4, 29:3, 41:10, 41:16, 45:17, 53:16

**country's** [1] - 36:7
**couple** [6] - 11:5, 11:7, 23:10, 25:3, 35:14, 50:9
**course** [3] - 12:18, 14:25, 20:20
**Court** [30] - 1:23, 3:1, 16:5, 17:4, 20:14, 20:19, 20:20, 20:24, 20:25, 21:8, 22:24, 23:22, 24:2, 26:15, 27:6, 28:13, 32:21, 32:22, 37:1, 40:6, 41:19, 44:24, 46:6, 48:17, 49:3, 49:17, 54:14, 55:2, 55:2
**COURT** [110] - 1:1, 3:10, 3:13, 3:18, 4:2, 4:6, 4:8, 4:11, 4:14, 4:17, 4:25, 5:3, 5:12, 5:18, 5:22, 6:3, 6:10, 6:15, 6:20, 7:3, 7:13, 7:18, 8:20, 8:24, 9:3, 9:6, 9:10, 9:17, 10:2, 10:12, 10:24, 11:2, 11:4, 11:12, 11:17, 12:15, 12:18, 13:4, 13:24, 14:15, 15:2, 15:7, 15:24, 16:10, 17:14, 18:1, 18:18, 18:25, 19:15, 20:2, 20:4, 20:17, 21:12, 22:12, 22:22, 23:10, 23:18, 23:21, 24:8, 24:21, 25:14, 25:20, 26:2, 26:14, 27:11, 27:16, 28:17, 29:13, 29:22, 30:16, 30:22, 31:2, 31:18, 31:21, 32:2, 33:2, 33:7, 33:10, 34:17, 35:14, 37:6, 37:11, 38:1, 38:14, 39:11, 40:4, 40:21, 41:24, 42:5, 43:12, 44:11, 45:19, 47:2, 47:15, 50:2, 50:8, 50:17, 50:25, 51:6, 51:21, 52:12, 52:15, 53:11, 53:23, 54:3, 54:10, 54:12, 54:18, 54:23, 55:9
**court** [5] - 12:11, 17:12, 17:16, 25:10, 43:12
**Court's** [3] - 16:24, 48:12, 48:25
**courts** [26] - 13:9, 13:13, 13:25, 14:4, 14:18, 14:21, 14:22, 15:1, 19:8, 19:24,

19:25, 20:16, 21:19, 21:24, 22:7, 22:20, 23:17, 26:22, 27:25, 28:1, 28:19, 53:3, 53:6, 53:13
**cover** [1] - 39:15
**covered** [7] - 5:20, 14:1, 38:20, 39:7, 41:6, 42:18, 51:14
**covers** [1] - 14:21
**COVID** [1] - 30:1
**created** [1] - 22:23
**credibility** [1] - 7:22
**crimes** [1] - 17:18
**criminal** [2] - 17:11, 46:3
**criminally** [1] - 41:17
**critical** [1] - 41:8
**crossed** [1] - 49:1
**CRR** [1] - 55:8
**current** [1] - 35:4
**custodian** [1] - 34:4
**custody** [17] - 9:11, 17:1, 17:21, 17:24, 18:1, 18:2, 18:14, 18:15, 18:23, 19:1, 19:2, 28:11, 29:20, 30:4, 30:9, 39:2

**D**

**D'Esquiva** [1] - 43:10
**Damus** [1] - 34:9
**danger** [1] - 29:5
**dangerous** [4] - 41:20, 44:6, 45:7, 46:23
**Daniel** [1] - 3:11
**DANIEL** [1] - 1:13
**dark** [2] - 7:14, 10:15
**Dated** [1] - 55:6
**days** [1] - 38:25
**DC** [14] - 1:11, 1:16, 1:20, 1:24, 2:3, 2:5, 15:7, 20:8, 26:15, 29:23, 35:7, 37:12, 48:2, 52:4
**de** [1] - 20:21
**deal** [1] - 54:14
**deals** [1] - 34:7
**dearth** [1] - 19:19
**decide** [1] - 42:19
**deciding** [2] - 13:8, 24:22
**decision** [2] - 12:8, 21:3
**decision-maker** [1] - 21:3
**decisions** [3] - 8:5, 28:20, 33:21

**declaration** [4] - 11:2, 28:16, 45:24, 50:12
**declarations** [2] - 29:11, 49:22
**declared** [1] - 52:23
**DEFENDANT** [1] - 2:1
**Defendants** [1] - 1:7
**deference** [1] - 20:25
**deferential** [2] - 15:20, 20:11
**deferentially** [1] - 19:25
**define** [1] - 41:25
**defines** [1] - 8:10
**definitely** [1] - 14:7
**definitive** [1] - 19:10
**Democracy** [5] - 1:17, 3:14, 3:17, 3:20, 3:25
**denizen** [2] - 43:6, 44:18
**deny** [1] - 40:7
**Department** [3] - 2:1, 4:7, 4:10
**deport** [8] - 9:7, 9:11, 9:13, 11:20, 29:25, 30:5, 51:13
**deportable** [1] - 24:24
**deportation** [3] - 23:18, 23:19, 23:24
**deportations** [3] - 9:21, 10:6, 10:9
**deported** [6] - 21:16, 42:7, 50:14, 50:21, 51:1, 53:19
**DEPUTY** [1] - 3:2
**Deputy** [1] - 4:5
**describe** [1] - 8:21
**describing** [1] - 17:8
**descriptive** [1] - 35:2
**designation** [1] - 32:25
**detail** [1] - 9:25
**details** [5] - 6:18, 6:21, 6:23, 10:21, 51:2
**detain** [1] - 46:23
**detained** [1] - 41:17
**detainees** [1] - 16:2
**detention** [5] - 12:19, 16:20, 16:22, 18:12, 34:7
**determination** [4] - 13:14, 15:11, 21:1, 53:4
**determinations** [13] - 12:10, 12:12, 13:22,

13:23, 14:11, 15:16, 15:18, 15:23, 20:7, 22:10, 28:14, 47:19, 53:22
**determine** [1] - 24:8
**determined** [1] - 53:1
**developed** [1] - 15:1
**DHS** [2] - 7:3, 9:20
**differences** [1] - 27:14
**different** [4] - 30:3, 35:10, 44:19, 47:14
**difficult** [1] - 22:14
**Diplomate** [1] - 1:22
**direct** [2] - 28:13, 32:22
**directive** [3] - 5:10, 26:7, 27:22
**directives** [1] - 5:10
**directly** [1] - 36:25, 39:20
**disagree** [2] - 8:20, 52:18
**discover** [1] - 21:24
**discussed** [1] - 45:22
**discussing** [2] - 24:19, 24:23
**dismissed** [1] - 16:12
**disobey** [1] - 28:3
**dispositive** [1] - 52:1
**dispute** [2] - 8:15, 16:7
**disrespectful** [1] - 4:20
**dissent** [1] - 52:24
**dissolve** [2] - 4:24, 25:7
**distinction** [1] - 15:15
**DISTRICT** [3] - 1:1, 1:1, 1:9
**district** [2] - 13:13, 52:9
**District** [3] - 1:15, 55:2
**Division** [1] - 2:4
**doctrines** [1] - 14:6
**DOJ** [2] - 2:4, 4:13
**DOJ-Civil** [1] - 2:4
**DONALD** [1] - 1:6
**Donald** [1] - 3:3
**done** [5] - 5:11, 19:25, 20:7, 31:24, 38:5
**doubts** [1] - 42:6
**down** [3] - 36:1, 41:20, 46:15

**drawing** [1] - 20:15
**DREW** [1] - 2:2
**Drew** [1] - 4:4
**dropped** [1] - 21:9
**due** [7] - 4:24, 23:13, 23:14, 23:24, 24:5, 24:10, 51:19
**during** [4] - 7:7, 9:21, 30:1, 48:25

**E**

**early** [2] - 10:15, 33:21
**easier** [1] - 45:11
**easy** [1] - 40:24
**edge** [1] - 5:7
**effect** [2] - 13:3, 29:11
**effective** [3] - 6:2, 10:23
**effectuate** [1] - 18:15
**effort** [1] - 52:10
**either** [3] - 7:3, 18:14, 49:11
**EI** [12] - 21:20, 29:9, 45:15, 47:6, 48:8, 48:24, 49:6, 49:23, 49:25, 50:1, 50:22, 51:1
**elected** [1] - 25:16
**elements** [1] - 28:8
**elsewhere** [1] - 52:7
**enactment** [1] - 13:1
**end** [5] - 8:7, 17:12, 18:21, 52:7, 53:2
**enemies** [1] - 12:4
**Enemies** [6] - 13:20, 36:7, 41:13, 41:20, 42:23, 48:5
**enemy** [7] - 14:1, 14:17, 15:10, 21:1, 24:9, 45:24, 46:22
**enforce** [1] - 27:21
**enjoin** [1] - 27:21
**enjoined** [3] - 38:23, 39:6, 39:15
**ENSIGN** [77] - 2:2, 4:4, 4:16, 4:23, 5:2, 5:9, 5:16, 5:19, 6:1, 6:7, 6:13, 6:19, 6:25, 7:9, 7:15, 8:18, 8:23, 9:2, 9:5, 9:9, 9:15, 9:22, 10:10, 10:20, 11:1, 11:3, 11:10, 11:15, 12:8, 12:16, 12:21, 13:16, 14:3, 14:22, 15:4, 15:14, 16:5, 16:23, 17:15, 18:8, 18:21, 19:13,

19:19, 20:3, 20:6, 21:5, 21:23, 22:16, 23:4, 23:14, 23:19, 24:1, 24:15, 25:2, 25:15, 25:25, 26:5, 26:20, 27:14, 28:8, 29:12, 29:15, 30:7, 30:18, 30:23, 31:14, 31:20, 32:1, 50:23, 51:2, 51:17, 51:23, 52:13, 52:16, 53:21, 54:1, 54:5
**Ensign** [12] - 4:4, 4:17, 6:16, 7:19, 28:25, 30:17, 32:6, 32:13, 35:15, 37:5, 38:16, 50:8
**ensure** [1] - 15:13
**ensuring** [1] - 21:19
**entire** [1] - 27:18
**entirely** [3] - 18:13, 18:22, 28:18
**entirety** [1] - 17:23
**entitled** [3] - 19:6, 23:13, 55:4
**entitles** [1] - 23:23
**entrusted** [2] - 53:9, 54:5
**EPA** [1] - 44:24
**equity** [3] - 26:21, 26:25, 27:9
**EREZ** [1] - 2:4
**Erez** [1] - 4:10
**erroneously** [1] - 21:19
**ESQUIVA** [1] - 43:15
**essentially** [7] - 10:14, 13:20, 16:25, 19:17, 27:12, 27:17, 35:2
**established** [2] - 23:23, 27:19
**et** [4] - 1:3, 1:6, 3:3, 3:4
**evidence** [5] - 7:10, 19:9, 19:12, 19:14, 20:14
**ex** [2] - 22:25, 43:5
**exact** [1] - 34:7
**exactly** [3] - 5:1, 10:12, 34:21
**Exactly** [1] - 42:1
**example** [12] - 13:19, 15:7, 20:8, 20:18, 22:8, 23:21, 26:14, 27:2, 31:15
**exchange** [1] - 30:20
**excuse** [1] - 42:23
**executive** [11] - 15:18, 19:9, 20:1,

24:7, 26:19, 27:12, 27:13, 27:18, 28:2, 29:24, 31:1
**executive's** [2] - 20:25, 27:17
**exercise** [6] - 17:24, 18:14, 18:23, 18:25, 28:11, 29:20
**exercising** [2] - 21:25, 30:9
**exist** [1] - 54:8
**expanded** [1] - 45:21
**expect** [4] - 31:3, 31:5, 35:18, 36:1
**expected** [1] - 31:6
**expel** [1] - 29:3
**expertise** [1] - 20:1
**experts** [1] - 42:2
**explain** [2] - 52:8, 52:24
**expose** [1] - 17:10
**express** [2] - 27:5, 27:8
**expulsion** [1] - 18:11
**extent** [4] - 22:18, 25:16, 35:9, 54:6
**extraordinary** [1] - 42:11
**extremely** [1] - 20:11

**F**

**F.2d** [1] - 20:18
**F.3d** [2] - 20:11, 52:14
**F.Circuit** [1] - 43:16
**facial** [4] - 12:11, 25:4, 25:9, 25:11
**fact** [13] - 14:1, 14:11, 14:12, 14:17, 17:8, 19:15, 22:22, 24:23, 25:11, 31:4, 47:20, 50:15, 52:22
**factfinding** [1] - 21:3
**facts** [6] - 7:4, 8:11, 8:14, 9:19, 31:7, 31:8
**factual** [7] - 19:14, 20:7, 20:15, 20:25, 22:9, 24:15, 52:23
**fair** [6] - 16:4, 30:2, 36:4, 37:17, 39:9, 53:20
**fall** [6] - 11:21, 14:20, 27:3, 41:1, 44:13, 48:6
**falls** [1] - 13:20
**far** [3] - 31:5, 45:4, 47:8
**Farra** [1] - 28:25
**FARRA** [1] - 29:1

**fashion** [2] - 5:14, 40:11
**feasible** [1] - 49:15
**federal** [4] - 1:23, 17:12, 17:24, 22:7
**Federal** [1] - 55:2
**FEDERAL** [1] - 55:9
**fell** [1] - 45:8
**few** [4] - 8:11, 8:14, 20:17, 32:16
**fiction** [1] - 52:25
**Fifth** [1] - 23:23
**fight** [1] - 47:18
**figure** [1] - 35:16
**file** [3] - 22:24, 25:17, 32:19
**filed** [4] - 6:4, 10:18, 14:8, 24:17
**final** [7] - 47:19, 48:15, 48:21, 48:23, 50:10, 50:24, 51:4
**findings** [1] - 54:15
**first** [9] - 6:16, 8:2, 8:16, 17:4, 23:3, 28:18, 32:16, 36:8, 39:20
**fisherman** [2] - 53:16, 53:19
**fishermen** [2] - 53:23, 53:24
**fishing** [3] - 53:15, 53:17, 53:18
**five** [2] - 24:16, 33:14
**fleets** [2] - 53:18
**FLENTJE** [2] - 2:4, 4:7
**Flentje** [1] - 4:7
**flight** [2] - 11:9, 49:8
**flights** [11] - 6:18, 6:22, 6:24, 7:1, 7:2, 7:6, 7:7, 7:11, 8:17, 11:8, 11:9
**Floor** [1] - 1:13
**Flores** [1] - 23:21
**focus** [2] - 32:12, 42:8
**focusing** [1] - 40:23
**folks** [2] - 19:6, 24:12
**follow** [5] - 26:16, 27:7, 27:8, 35:10, 37:15
**follow-on** [1] - 37:15
**following** [1] - 40:10
**foot** [1] - 16:3
**footnote** [3] - 14:16, 28:21, 40:24
**FOR** [3] - 1:1, 1:12, 2:1
**force** [1] - 27:1

**foregoing** [1] - 55:3
**foreign** [11] - 8:5, 13:10, 15:19, 19:22, 20:10, 44:22, 45:1, 46:8, 46:19, 46:20, 53:16
**forfeiting** [1] - 32:7
**form** [1] - 30:10
**formal** [2] - 41:23, 42:3
**format** [1] - 55:4
**forth** [3] - 9:24, 31:15, 39:18
**forum** [1] - 35:13
**Forward** [5] - 1:17, 3:15, 3:17, 3:20, 3:25
**Foundation** [5] - 1:17, 3:15, 3:17, 3:20, 3:25
**four** [1] - 27:3
**Franklin** [1] - 2:5
**frequently** [1] - 26:16
**Friday** [3] - 1:10, 10:15
**frightening** [1] - 53:12
**front** [1] - 39:1
**fuel** [2] - 49:18, 49:19
**full** [1] - 38:6
**fully** [2] - 9:21, 10:5
**fundamentally** [2] - 26:9, 40:22

### G

**GALINDO** [2] - 1:13, 3:11
**Galindo** [1] - 3:11
**game** [1] - 53:20
**gang** [11] - 41:11, 41:13, 41:21, 41:22, 41:23, 41:24, 45:16, 46:3, 47:10
**gangs** [3] - 42:4, 45:12, 45:17
**Gelernt** [5] - 3:8, 32:3, 50:2, 51:8, 53:12
**GELERNT** [26] - 1:13, 3:8, 32:16, 33:5, 33:8, 33:12, 34:21, 36:4, 37:8, 37:17, 38:3, 39:9, 39:19, 40:15, 40:22, 42:1, 42:8, 43:14, 44:15, 46:9, 47:4, 47:23, 50:7, 54:11, 54:13, 54:20

**Gelernt's** [2] - 50:11, 50:20
**general** [5] - 8:14, 15:10, 20:6, 26:25, 28:15
**General** [1] - 4:5
**generalized** [1] - 19:20
**generally** [1] - 10:6
**Geren** [1] - 16:24
**German** [5] - 44:4, 44:5, 44:8, 44:10, 46:22
**Gilroy** [1] - 43:5
**GIRARD** [1] - 1:18
**given** [2] - 19:25, 34:12
**government** [64] - 4:3, 4:15, 7:12, 9:7, 9:10, 9:12, 10:8, 10:10, 11:20, 13:11, 16:1, 17:3, 17:17, 18:13, 18:22, 18:25, 22:24, 23:7, 29:16, 30:9, 32:18, 32:22, 32:25, 33:19, 34:3, 34:19, 34:22, 35:9, 35:22, 36:2, 36:11, 36:14, 36:17, 37:3, 37:23, 38:12, 38:23, 39:5, 39:15, 41:4, 41:9, 42:11, 42:16, 42:17, 43:3, 43:5, 43:7, 43:17, 44:22, 46:2, 46:20, 47:25, 48:11, 48:13, 48:18, 49:16, 49:18, 49:23, 50:2, 51:11, 54:14, 54:20
**government's** [8] - 17:24, 18:17, 35:1, 43:2, 47:13, 47:16, 48:14, 49:14
**governments** [1] - 45:2
**ground** [2] - 34:10, 41:6
**grounds** [3] - 29:4, 34:6, 38:18
**group** [2] - 41:10, 42:20
**Guantanamo** [1] - 15:25
**guess** [3] - 10:12, 13:24, 46:9
**guidance** [1] - 20:7

### H

**habeas** [80] - 12:10,

12:14, 12:19, 13:1, 14:4, 14:7, 14:9, 14:10, 15:5, 16:6, 16:8, 16:10, 16:13, 16:15, 16:17, 17:2, 17:6, 17:8, 17:20, 17:23, 18:10, 18:24, 21:7, 21:8, 21:9, 21:25, 22:2, 22:5, 22:7, 22:17, 22:20, 23:1, 24:13, 25:13, 25:15, 25:17, 26:9, 26:12, 26:24, 27:1, 27:7, 28:7, 28:9, 29:16, 29:18, 30:6, 30:8, 30:13, 30:14, 32:14, 32:19, 32:20, 33:22, 34:2, 34:3, 34:5, 34:8, 34:11, 34:14, 34:23, 34:24, 35:3, 35:5, 35:8, 35:12, 36:13, 37:13, 37:14, 37:15, 37:19, 41:6, 51:19, 51:25, 52:7, 52:9
**habeases** [1] - 36:16
**Hamdi** [1] - 20:24
**happy** [4] - 18:3, 50:9, 51:10, 51:22
**hard** [2] - 32:10, 37:18
**harder** [1] - 39:1
**health** [2] - 29:25, 48:2
**hear** [2] - 32:15, 51:22
**heard** [2] - 13:3, 22:13
**HEARING** [1] - 1:9
**hearing** [31] - 3:2, 4:21, 5:8, 6:16, 6:17, 7:4, 9:24, 9:25, 16:14, 19:7, 20:21, 25:11, 31:4, 33:24, 34:12, 35:22, 35:23, 36:12, 36:14, 36:22, 37:6, 37:14, 37:21, 38:2, 38:4, 38:7, 38:8, 38:10, 48:25
**hearings** [7] - 7:16, 23:1, 36:17, 37:9, 37:24, 38:19, 51:12
**heartland** [1] - 46:5
**held** [4] - 13:13, 16:25, 17:5, 53:19
**helpful** [2] - 8:14, 32:10
**hereby** [1] - 55:3
**Heymann** [1] - 43:17
**historical** [1] - 36:20

**history** [5] - 22:2, 22:4, 22:6, 23:6, 36:7
**hold** [7] - 18:14, 20:20, 26:17, 30:4, 35:22, 36:17, 37:24
**Holder** [1] - 20:13
**holdings** [1] - 26:16
**Honor** [86] - 3:8, 3:14, 3:16, 3:19, 3:24, 4:4, 4:9, 4:12, 4:16, 4:23, 5:2, 5:9, 5:16, 6:1, 6:7, 6:14, 6:19, 6:25, 7:9, 7:15, 8:18, 8:23, 9:2, 9:5, 9:9, 9:16, 9:22, 10:20, 10:22, 11:1, 11:11, 11:15, 12:8, 12:16, 12:21, 13:3, 13:16, 14:3, 15:4, 15:14, 16:5, 16:23, 17:15, 18:8, 18:21, 19:13, 19:19, 21:5, 21:23, 22:16, 23:14, 24:1, 24:15, 25:3, 26:1, 26:5, 26:20, 27:14, 28:8, 29:15, 30:18, 31:14, 32:1, 32:16, 33:5, 33:23, 35:3, 36:4, 36:6, 36:24, 40:23, 45:10, 46:9, 46:13, 47:23, 48:7, 49:10, 50:7, 50:23, 51:2, 51:17, 51:23, 52:16, 53:21, 54:5, 54:11
**HONORABLE** [1] - 1:9
**hope** [3] - 32:22, 32:25, 33:2
**hours** [6] - 7:7, 11:5, 11:7, 11:14, 31:4, 36:22
**housekeeping** [1] - 54:11
**Huisha** [2] - 29:22
**HUISHA** [2] - 29:23
**Huisha-Huisha** [1] - 29:22
**Humanitarian** [1] - 20:13
**hybrid** [1] - 46:3
**hyphen** [1] - 29:23
**hypothetical** [1] - 5:23
**hypotheticals** [1] - 53:12

### I

**ICE** [2] - 11:13, 49:4

**idea** [3] - 16:8, 45:25, 52:24
**identify** [1] - 3:6
**identifying** [1] - 7:11
**ignoring** [1] - 10:7
**II** [6] - 36:10, 36:20, 37:9, 45:23, 46:21, 53:10
**illegal** [1] - 28:3
**illusory** [2] - 32:19, 33:18
**immediate** [1] - 34:4
**immediately** [3] - 5:1, 5:25, 31:24
**Immigration** [2] - 48:1, 48:16
**immigration** [6] - 12:23, 12:24, 13:2, 15:19, 19:23, 41:18
**implausible** [2] - 48:16, 48:19
**implement** [1] - 26:7
**implementation** [2] - 29:1, 39:3
**implementing** [2] - 26:3, 28:15
**implied** [5] - 26:20, 26:21, 26:22, 26:24, 27:9
**impliedly** [1] - 23:8
**important** [2] - 9:18, 15:15
**importantly** [3] - 20:23, 21:8, 31:8
**impossible** [1] - 11:14
**in-custody** [1] - 9:11
**INA** [9] - 9:7, 12:20, 12:22, 13:1, 13:19, 16:18, 18:19, 34:1, 50:21
**inability** [1] - 52:5
**include** [1] - 39:12
**including** [8] - 4:18, 8:3, 8:6, 15:12, 22:8, 23:18, 23:19, 43:9
**incredibly** [1] - 45:20
**incursion** [6] - 13:10, 44:14, 45:3, 46:8, 46:16, 53:6
**indeed** [2] - 8:9, 14:6
**indefinitely** [1] - 18:14
**independent** [1] - 24:6
**indicative** [1] - 40:9
**individual** [7] - 15:9, 16:21, 24:16, 25:8, 36:16, 45:7, 51:12
**individualized** [9] -

11:21, 12:10, 12:13,
19:7, 25:5, 25:12,
38:19, 44:12, 53:21
**individually** [1] -
46:1
**individuals** [7] - 8:8,
16:19, 17:25, 21:19,
30:4, 32:23, 47:18
**inescapable** [1] -
18:12
**inference** [1] - 11:16
**inferences** [1] -
20:15
**information** [4] -
7:11, 7:15, 32:21,
51:7
**initial** [1] - 38:4
**injunction** [3] -
39:12, 39:14, 46:14
**instances** [1] - 26:21
**instructed** [1] - 6:8
**instructive** [1] -
16:25
**insulate** [1] - 27:18
**intemperate** [1] -
4:19
**intended** [2] - 31:24,
45:4
**intent** [2] - 6:1, 6:9
**interacted** [1] - 12:25
**interest** [1] - 8:13
**interesting** [1] - 13:6
**interned** [1] - 53:19
**interpretation** [1] -
49:6
**interpreted** [1] - 5:4
**interpreting** [1] - 8:3
**interrupt** [2] - 15:3,
20:5
**intersection** [1] -
20:10
**invading** [1] - 53:14
**invalid** [1] - 30:12
**invasion** [9] - 13:10,
44:14, 45:2, 46:8,
46:16, 53:5, 53:7,
53:17, 53:18
**invoked** [1] - 41:21
**involve** [1] - 52:19
**involved** [2] - 8:22,
15:9
**Iraq** [2] - 17:1, 17:3
**Iraqi** [1] - 17:10
**IRLA** [1] - 34:9
**Islamic** [1] - 20:8
**issue** [10] - 4:22,
11:18, 16:13, 17:4,
19:9, 22:21, 34:18,
34:20, 36:25, 40:16
**issued** [1] - 38:21

**issues** [9] - 13:9,
13:18, 14:9, 22:18,
25:2, 32:5, 32:10,
32:12, 40:22
**itself** [2] - 14:10,
44:1

## J

**J.G.G** [2] - 1:3, 3:3
**Jaegeler** [1] - 43:21
**JAEGELER** [1] -
43:22
**Jama** [1] - 49:4
**JAMES** [1] - 1:9
**job** [1] - 8:10
**Johnson** [1] - 20:19
**JUDGE** [1] - 1:9
**Judge** [1] - 27:22
**Judicial** [1] - 55:5
**judicial** [7] - 15:11,
16:3, 21:3, 27:18,
38:5, 38:6, 38:9
**jurisdiction** [6] -
21:9, 21:14, 21:25,
40:6, 47:1, 52:10
**jurisdictional** [1] -
52:5
**Justice** [4] - 2:1, 4:7,
4:10, 52:24
**justiciability** [2] -
28:22, 32:4
**justiciable** [1] -
13:12

## K

**kept** [1] - 7:14
**key** [1] - 52:4
**kind** [2] - 4:19, 37:10
**knowledge** [6] - 7:1,
10:20, 11:16, 30:25,
31:2, 31:10
**knows** [2] - 36:6,
40:23

## L

**lack** [3] - 20:16,
29:19, 49:19
**landed** [1] - 49:22
**language** [7] - 4:20,
39:25, 40:14, 42:17,
46:6, 48:15, 49:2
**last** [5] - 17:9, 47:15,
50:9, 50:12, 51:21
**latitude** [1] - 8:4
**law** [24] - 7:4, 7:20,
8:3, 9:21, 10:5, 10:7,
10:9, 10:10, 10:11,

13:2, 15:5, 19:19,
20:11, 23:24, 30:24,
30:25, 31:3, 31:5,
31:10, 33:20, 34:24,
38:9, 52:2
**Law** [1] - 20:13
**lawful** [2] - 12:1, 12:6
**laws** [2] - 41:18, 48:2
**lawyer** [2] - 36:23,
38:8
**lawyers** [1] - 40:1
**League** [4] - 15:22,
35:6, 43:7, 52:19
**least** [4] - 16:12,
21:2, 47:8, 48:3
**leave** [3] - 27:25,
46:11, 54:21
**lectern** [1] - 3:6
**IEE** [1] - 1:13
**Lee** [1] - 3:8
**legal** [6] - 7:25,
13:18, 13:22, 30:9,
30:11, 32:10
**legality** [3] - 26:19,
27:19, 28:1
**legally** [1] - 29:25
**less** [1] - 42:3
**lesson** [1] - 7:23
**letting** [1] - 49:11
**level** [1] - 45:13
**liable** [1] - 12:2
**Liberties** [1] - 1:12
**lies** [1] - 8:10
**likelihood** [1] - 25:9
**likely** [2] - 21:23,
51:7
**limit** [1] - 31:1
**limited** [4] - 23:16,
23:20, 30:25
**limiting** [1] - 24:6
**line** [1] - 46:15
**list** [1] - 42:25
**listening** [1] - 31:11
**Lobue** [1] - 52:13
**look** [3] - 19:20,
27:4, 45:6
**looking** [1] - 41:9
**low** [1] - 45:13
**low-level** [1] - 45:13
**LPRs** [1] - 51:15
**luck** [1] - 53:25
**Ludecke** [12] - 14:10,
14:15, 15:22, 19:7,
22:9, 28:14, 28:17,
28:19, 40:24, 43:22,
44:1, 52:18

## M

**maintain** [1] - 35:17

**maintained** [1] - 9:20
**maker** [1] - 21:3
**manner** [3] - 25:18,
25:19, 29:17
**March** [2] - 1:10,
55:6
**marked** [1] - 20:16
**material** [1] - 27:15
**materials** [1] - 36:20
**matter** [8] - 24:2,
24:4, 24:15, 52:23,
53:2, 54:7, 54:22,
55:4
**mattered** [1] - 53:1
**matters** [2] - 20:1,
21:4
**Mayorkas** [1] - 29:23
**mean** [21] - 8:24,
10:16, 12:22, 15:3,
18:2, 20:4, 21:6,
22:16, 23:7, 31:21,
32:3, 34:5, 34:15,
37:17, 40:15, 41:15,
41:24, 45:1, 47:17,
54:19
**meaningful** [4] -
36:21, 37:4, 39:23,
53:6
**means** [5] - 26:10,
40:1, 41:22, 45:11,
45:13
**meant** [4] - 5:1, 5:25,
6:2, 42:18
**measure** [1] - 45:5
**mechanical** [2] -
40:16, 40:19
**member** [4] - 12:5,
35:21, 35:23, 46:3
**members** [19] - 8:9,
11:25, 16:2, 19:16,
19:17, 21:20, 24:23,
28:23, 35:19, 38:24,
39:6, 39:15, 42:6,
45:12, 46:2, 47:1,
47:2, 51:13, 51:15
**membership** [4] -
41:24, 41:25, 45:13,
47:12
**men** [2] - 49:13,
49:25
**mentioning** [1] -
54:21
**merely** [2] - 26:7,
52:6
**merit** [2] - 14:14,
22:11
**merits** [1] - 25:10
**met** [2] - 15:17,
52:20
**methods** [1] - 26:23

**midair** [1] - 49:17
**midnight** [1] - 4:24
**might** [5] - 12:25,
14:25, 36:15, 38:6
**migrants** [1] - 29:25
**mind** [1] - 30:19
**minimum** [4] - 36:20,
46:18, 47:1, 47:7
**minute** [2] - 15:25,
54:18
**minutes** [1] - 6:21
**mistake** [1] - 49:24
**modern** [1] - 16:18
**modification** [2] -
40:13, 40:14
**modified** [2] - 5:24,
39:12
**modify** [3] - 35:17,
40:8, 40:10
**moment** [2] - 6:8, 7:2
**Monday** [1] - 4:22
**Monday's** [1] - 9:24
**moot** [1] - 34:20
**morning** [2] - 10:15,
33:15
**most** [2] - 7:21, 21:7
**MOTION** [1] - 1:9
**motion** [7] - 3:2,
4:23, 9:23, 25:7, 40:7,
49:14
**move** [4] - 7:24,
7:25, 19:4, 23:10
**moving** [1] - 11:17
**MR** [107] - 3:8, 3:11,
3:16, 3:22, 4:4, 4:7,
4:9, 4:12, 4:16, 4:23,
5:2, 5:9, 5:16, 5:19,
6:1, 6:7, 6:13, 6:19,
6:25, 7:9, 7:15, 8:18,
8:23, 9:2, 9:5, 9:9,
9:15, 9:22, 10:10,
10:20, 11:1, 11:3,
11:10, 11:15, 12:8,
12:16, 12:21, 13:16,
14:3, 14:22, 15:4,
15:14, 16:5, 16:23,
17:15, 18:8, 18:21,
19:13, 19:19, 20:3,
20:6, 21:5, 21:23,
22:16, 23:4, 23:14,
23:19, 24:1, 24:15,
25:2, 25:15, 25:25,
26:5, 26:20, 27:14,
28:8, 29:12, 29:15,
30:7, 30:18, 30:23,
31:14, 31:20, 32:1,
32:16, 33:5, 33:8,
33:12, 34:21, 36:4,
37:8, 37:17, 38:3,
39:9, 39:19, 40:15,

40:22, 42:1, 42:8, 43:14, 44:15, 46:9, 47:4, 47:23, 50:7, 50:23, 51:2, 51:17, 51:23, 52:13, 52:16, 53:21, 54:1, 54:5, 54:11, 54:13, 54:20

**MS** [3] - 3:14, 3:19, 3:24

**multiple** [5] - 22:5, 25:25, 33:23, 43:8, 52:23

**Munaf** [1] - 16:24

**must** [1] - 8:8

**N**

**nailed** [1] - 36:1

**name** [2] - 16:21, 46:18

**named** [1] - 33:14

**narrowed** [1] - 38:22

**narrowing** [1] - 46:14

**narrowly** [1] - 14:15

**nation** [1] - 13:11

**national** [7] - 8:5, 16:16, 20:10, 20:15, 22:14, 22:25, 44:8

**nationality** [2] - 41:11, 45:17

**nationals** [2] - 44:4, 44:6

**nationwide** [1] - 8:19

**native** [1] - 44:18

**naturalized** [1] - 12:1

**nature** [1] - 17:7

**necessary** [2] - 21:13, 34:16

**need** [6] - 19:10, 21:7, 22:19, 25:12, 28:22, 40:13

**needed** [1] - 22:19

**neutral** [1] - 21:2

**never** [4] - 16:3, 21:10, 23:4, 47:21

**New** [2] - 1:14

**newfound** [1] - 44:25

**next** [3] - 14:8, 35:23, 45:15

**night** [3] - 4:24, 10:15, 34:12

**Ninth** [1] - 53:7

**NO** [1] - 1:5

**nobody** [2] - 8:2, 50:19

**non** [3] - 28:7, 34:8, 35:12

**non-habeas** [3] - 28:7, 34:8, 35:12

**noncitizens** [2] - 9:11, 39:2

**none** [2] - 27:14, 52:25

**nonstatutory** [1] - 26:18

**nothing** [4] - 7:4, 7:6, 53:17, 53:20

**notice** [2] - 11:13, 31:4

**noticed** [1] - 4:17

**notwithstanding** [1] - 14:11, 17:7

**novo** [1] - 20:21

**number** [2] - 15:11, 28:19

**numerosity** [1] - 54:19

**NW** [2] - 1:16, 1:24

**O**

**oath** [1] - 50:18

**object** [2] - 37:3, 46:24

**obligation** [1] - 37:24

**obtained** [2] - 24:17, 27:20

**obviously** [7] - 31:1, 32:18, 33:17, 36:25, 37:4, 47:10, 49:17

**odd** [1] - 17:7

**OF** [2] - 1:1, 1:9

**officers** [1] - 27:21

**Official** [2] - 1:23, 55:2

**OFFICIAL** [1] - 55:9

**officials** [2] - 26:3, 28:2

**often** [2] - 7:19, 23:15

**older** [2] - 11:25, 14:18

**once** [2] - 42:18, 44:3

**one** [22] - 7:5, 7:18, 14:8, 15:8, 16:21, 18:10, 19:11, 25:4, 25:25, 28:24, 30:19, 40:3, 40:23, 40:24, 43:24, 44:19, 45:6, 46:13, 47:24, 48:10, 49:24, 54:11

**ones** [2] - 4:18, 46:22

**ongoing** [1] - 52:25

**open** [1] - 15:10

**operational** [1] - 10:21

**opportunity** [2] -

51:11, 51:12

**opposing** [2] - 51:25, 52:17

**oral** [2] - 4:19, 6:4

**order** [25] - 5:12, 9:4, 9:6, 9:15, 10:1, 17:16, 19:2, 26:19, 27:13, 30:4, 31:9, 33:4, 33:6, 33:13, 35:17, 47:20, 48:10, 48:13, 48:15, 48:21, 48:25, 49:8, 50:4, 50:24, 54:18

**Order** [1] - 3:1

**ordered** [2] - 9:10, 50:4

**orders** [4] - 10:5, 48:24, 51:3, 51:4

**ordinarily** [1] - 27:20

**original** [1] - 55:3

**originally** [2] - 25:13, 25:15

**ostensibly** [1] - 46:3

**otherwise** [6] - 23:2, 38:24, 39:16, 41:1, 41:9, 47:8

**ousted** [1] - 52:9

**outcomes** [1] - 54:7

**outside** [2] - 13:21, 13:23

**own** [2] - 28:12, 30:23

**P**

**p.m** [6] - 1:10, 3:1, 10:24, 11:7, 54:25

**P.O** [2] - 1:19, 2:5

**page** [2] - 14:16, 55:4

**panel** [1] - 46:12

**paper** [4] - 32:23, 33:9, 33:16, 50:17

**papers** [1] - 31:15

**part** [8] - 6:16, 11:23, 20:16, 21:21, 25:9, 41:13, 41:21, 41:22

**parte** [2] - 22:25, 43:5

**particular** [4] - 6:14, 17:25, 20:1, 30:9

**particularly** [2] - 16:24, 18:4

**parties** [1] - 5:5

**passed** [3] - 12:24, 16:19, 45:5

**path** [1] - 45:11

**Pause** [1] - 50:16

**pause** [2] - 46:7, 48:9

**Pennsylvania** [1] -

2:2

**people** [38] - 5:14, 8:17, 8:21, 8:25, 10:16, 11:8, 11:20, 14:7, 16:3, 16:25, 32:18, 33:3, 33:9, 33:14, 33:17, 33:25, 36:12, 37:9, 38:12, 38:20, 39:6, 39:13, 39:24, 41:15, 41:16, 42:6, 44:5, 45:12, 45:13, 49:3, 49:8, 49:11, 49:13, 49:15, 49:21, 49:22, 50:21

**permanent** [2] - 12:2, 12:6

**Perryman** [1] - 3:14

**PERRYMAN** [2] - 1:18, 3:14

**persecution** [1] - 48:4

**person** [12] - 14:1, 14:17, 17:20, 21:15, 29:3, 29:4, 29:6, 30:11, 37:25, 44:9, 47:9

**personal** [1] - 30:23

**personally** [1] - 47:9

**persons** [3] - 18:24, 19:1, 19:2

**petitioners** [1] - 17:11

**physically** [1] - 29:6

**piece** [3] - 33:8, 33:16, 50:17

**place** [3] - 7:8, 16:17, 46:12

**plaintiff** [1] - 3:5

**plaintiff's** [1] - 52:5

**Plaintiffs** [1] - 1:4

**plaintiffs** [27] - 3:9, 3:12, 3:15, 3:17, 3:21, 3:23, 4:1, 7:9, 13:7, 13:19, 16:11, 17:9, 17:13, 21:9, 21:18, 24:17, 25:4, 25:13, 25:15, 25:17, 25:22, 28:4, 28:22, 29:8, 33:15, 35:19, 52:21

**PLAINTIFFS** [1] - 1:12

**plaintiffs'** [2] - 14:12, 25:11

**plane** [10] - 6:18, 32:24, 33:17, 36:22, 48:11, 50:13, 50:19, 50:24, 51:4

**planes** [6] - 5:13, 8:22, 10:16, 11:6, 34:13, 49:12

**play** [2] - 22:7, 35:18

**pleadings** [2] - 4:18, 6:4

**point** [17] - 8:21, 16:19, 21:6, 21:12, 24:11, 35:2, 40:17, 40:19, 42:10, 44:2, 46:15, 50:3, 50:10, 50:12, 50:20, 51:21, 54:16

**pointed** [3] - 33:23, 35:3, 40:24

**points** [2] - 39:19, 51:23

**policy** [4] - 20:10, 29:2, 45:19, 54:7

**politeness** [1] - 5:6

**political** [3] - 54:6, 54:7, 54:8

**pose** [1] - 52:10

**position** [3] - 13:18, 40:12, 51:18

**possess** [1] - 7:21

**potentially** [5] - 5:20, 8:25, 14:4

**power** [5] - 28:1, 28:2, 42:19, 44:25, 53:9

**powers** [3] - 19:23, 42:11, 42:15

**practical** [2] - 24:2, 24:4

**practice** [1] - 7:20

**pre-1952** [1] - 12:15

**precedent** [3] - 14:24, 14:25, 19:21

**precise** [1] - 14:5

**precisely** [1] - 11:17

**precludes** [1] - 26:12

**precluding** [1] - 24:10

**preconditions** [2] - 13:17, 52:17

**predates** [1] - 35:4

**predatory** [2] - 13:10, 53:5

**predicate** [1] - 44:16

**predicates** [8] - 42:9, 42:13, 42:16, 42:18, 42:21, 42:24, 43:24, 44:20

**prejudice** [2] - 16:12, 34:15

**prepared** [1] - 51:15

**present** [3] - 9:23, 23:12, 29:6

**president** [1] - 28:6

**President** [15] - 3:3, 8:4, 23:9, 25:24, 27:17, 27:25, 28:20,

42:12, 42:13, 42:19, 50:1, 53:1, 53:10, 53:13, 53:17
**President's** [12] - 12:12, 13:14, 13:21, 13:23, 14:11, 15:16, 15:22, 22:10, 26:7, 27:22, 28:15, 53:4
**presidential** [3] - 26:19, 27:20, 28:3
**pressed** [1] - 32:8
**pressure** [1] - 34:13
**presumably** [1] - 21:16
**pretty** [3] - 14:19, 54:3, 54:4
**prevent** [2] - 17:2, 28:19
**prevents** [1] - 29:21
**previously** [4] - 10:22, 14:5, 23:5, 33:10
**principal** [2] - 32:13, 47:24
**principles** [1] - 19:21
**prison** [3] - 21:21, 29:9, 45:15
**prisoners** [1] - 27:2
**prisons** [1] - 48:8
**privilege** [1] - 5:21
**Prizer** [1] - 33:21
**problem** [2] - 10:17, 22:15
**problematic** [1] - 45:20
**procedure** [2] - 37:4
**procedures** [1] - 9:7
**proceed** [2] - 16:15, 26:18
**proceeding** [2] - 22:17, 24:14
**Proceedings** [1] - 54:25
**proceedings** [5] - 22:13, 22:18, 23:18, 23:19, 23:24
**process** [16] - 19:7, 23:13, 23:14, 23:24, 24:3, 24:4, 24:5, 24:10, 35:18, 37:7, 38:13, 38:19, 39:9, 39:21, 39:23, 51:19
**proclaim** [1] - 11:24
**proclamation** [25] - 9:1, 9:12, 10:14, 10:22, 11:13, 11:22, 11:23, 12:13, 14:1, 14:21, 19:16, 21:21, 24:12, 24:24, 26:4, 27:12, 38:21, 38:25,

39:3, 39:7, 39:17, 46:18, 46:25, 50:14, 51:14
**Produced** [1] - 1:25
**prohibition** [1] - 28:6
**Project** [1] - 20:13
**pronouncing** [1] - 6:9
**proof** [1] - 35:25
**proper** [1] - 49:6
**prosecuted** [1] - 41:17
**prosecution** [1] - 17:11
**prospectively** [1] - 33:11
**protections** [1] - 30:2
**Protective** [4] - 15:22, 35:6, 43:7, 52:19
**prove** [1] - 16:1
**provide** [5] - 20:6, 30:1, 32:22, 33:1, 38:12
**provided** [4] - 20:14, 23:16, 24:3, 39:25
**provides** [2] - 24:5, 51:19
**providing** [1] - 39:23
**provisions** [1] - 49:7
**PRs** [1] - 19:18
**public** [5] - 8:13, 8:14, 9:18, 29:25, 48:1
**published** [1] - 10:23
**pull** [1] - 50:18
**pure** [1] - 52:25
**purposes** [1] - 34:13
**pursuant** [2] - 38:24, 39:17
**pursue** [1] - 52:5
**pushing** [1] - 41:5
**put** [6] - 11:8, 32:24, 36:22, 49:10, 49:22

# Q

**Qaeda** [1] - 16:2
**qualifies** [1] - 53:9
**quasi** [1] - 46:3
**quasi-hybrid** [1] - 46:3
**questions** [14] - 7:25, 13:6, 22:1, 32:14, 35:14, 37:18, 38:16, 41:7, 43:8, 44:16, 47:13, 47:16, 50:9
**quick** [2] - 46:10,

51:23
**quite** [1] - 23:15
**quote** [3] - 15:8, 23:22, 52:7

# R

**raise** [6] - 14:9, 21:17, 22:13, 24:25, 25:18, 47:21
**raised** [6] - 16:14, 21:18, 22:2, 30:13, 30:14, 30:15
**raises** [1] - 53:12
**raising** [5] - 5:6, 13:22, 26:10, 42:6, 51:8
**ramifications** [1] - 45:19
**rarely** [1] - 24:5
**rather** [2] - 21:24, 32:5
**RDR** [1] - 55:8
**RDR-CRR** [1] - 55:8
**reaches** [1] - 54:6
**readily** [1] - 27:3
**real** [2] - 28:9, 28:11
**really** [7] - 17:13, 20:21, 34:10, 36:5, 41:4, 49:7, 49:16
**Realtime** [1] - 1:23
**reason** [7] - 5:2, 8:12, 10:17, 27:9, 42:12, 44:21, 48:19
**reasonable** [2] - 11:16, 51:8
**reasoning** [1] - 39:5
**reasons** [3] - 18:10, 25:25, 30:1
**recess** [1] - 6:20
**recognize** [1] - 36:25
**recognized** [7] - 12:11, 14:5, 17:7, 19:24, 23:17, 27:6, 28:14
**reconsideration** [1] - 40:8
**Record** [1] - 1:25
**record** [3] - 3:7, 11:10, 55:4
**reduced** [1] - 54:15
**REEVES** [2] - 1:22, 55:8
**Reeves** [2] - 55:2, 55:8
**refer** [1] - 39:12
**regardless** [2] - 18:19, 29:5
**Registered** [1] - 1:22
**regular** [1] - 9:7

**regulation** [1] - 12:23
**regulations** [1] - 55:4
**Reich** [1] - 26:17
**reinstate** [2] - 34:16, 34:18
**rejected** [1] - 20:25
**related** [1] - 48:19
**relay** [1] - 5:10
**release** [7] - 17:10, 18:7, 28:24, 33:23, 33:24, 34:8, 37:20
**released** [2] - 9:4, 18:3
**relevant** [1] - 11:23
**reliance** [1] - 9:13
**relief** [3] - 17:9, 34:7, 51:19
**Relief** [1] - 20:9
**relook** [1] - 33:20
**remain** [1] - 37:13
**remedy** [2] - 26:11, 52:9
**remember** [3] - 4:20, 6:18, 34:18
**remembers** [1] - 34:19
**remind** [1] - 26:15
**Removal** [1] - 22:23
**removal** [17] - 8:25, 12:7, 18:15, 18:19, 19:1, 35:21, 37:20, 38:24, 39:13, 39:16, 39:17, 44:7, 47:19, 48:20, 48:21, 50:24, 51:5
**removals** [4] - 36:9, 36:10, 37:10, 48:12
**remove** [5] - 18:4, 18:6, 41:12, 46:23, 48:1
**removed** [7] - 8:17, 12:3, 18:18, 19:3, 21:20, 24:9, 33:3, 35:20, 41:2, 41:18, 42:20
**removing** [4] - 33:25, 38:23, 39:6, 39:15
**Reno** [1] - 23:21
**repeal** [1] - 54:9
**repealed** [1] - 23:8
**Reporter** [4] - 1:22, 1:23, 1:23, 55:2
**reporter** [1] - 43:13
**REPORTER** [1] - 55:9
**reporting** [1] - 42:5
**represented** [1] - 6:23

**reputation** [1] - 7:21
**request** [1] - 37:25
**require** [2] - 31:10, 51:7
**required** [4] - 16:2, 20:20, 31:11, 38:19
**requiring** [1] - 17:16
**resident** [1] - 12:6
**residents** [1] - 12:2
**resolve** [1] - 54:8
**resolved** [2] - 17:4, 21:7
**respect** [1] - 5:5
**respectfully** [2] - 47:7, 54:16
**respond** [1] - 47:16
**response** [5] - 9:25, 32:13, 47:16, 50:11, 50:20
**responsive** [1] - 39:20
**rest** [1] - 15:18
**restrained** [2] - 12:3, 14:17
**rests** [1] - 52:6
**resume** [1] - 7:19
**retains** [1] - 7:23
**retroactively** [1] - 33:5
**return** [1] - 49:18
**returned** [2] - 40:10, 49:12
**Reuveni** [1] - 4:10
**REUVENI** [2] - 2:4, 4:9
**review** [27] - 12:9, 13:14, 14:12, 15:20, 16:3, 16:6, 16:8, 16:11, 16:17, 17:5, 19:8, 19:12, 19:25, 20:9, 20:21, 26:8, 26:23, 26:24, 27:18, 27:19, 28:1, 32:25, 37:12, 38:5, 38:6, 38:10, 53:13
**reviewability** [4] - 42:9, 43:18, 44:13, 44:14
**reviewable** [14] - 12:14, 14:12, 14:21, 14:22, 15:17, 22:10, 26:8, 28:16, 41:8, 41:12, 42:13, 42:17, 44:7, 52:18
**reviewed** [9] - 13:11, 14:18, 29:18, 43:3, 43:5, 43:25, 44:3, 44:9
**reviewing** [2] - 28:19, 42:24

**RICH** [1] - 1:19
**rights** [2] - 23:15, 23:17
**road** [1] - 41:20
**roam** [1] - 41:15
**robust** [5] - 16:2, 16:8, 21:3, 22:1, 22:4
**role** [2] - 21:18, 22:7
**routinely** [1] - 44:8
**rule** [2] - 26:25, 34:4
**Rule** [1] - 31:16
**rules** [1] - 35:11
**ruling** [3] - 4:19, 6:4, 40:9
**Rumsfeld** [1] - 20:24
**running** [1] - 28:5
**rushed** [1] - 10:16
**rushing** [1] - 33:17

### S

**S-c-h-l-u-e-t-e-r** [1] - 43:19
**Salvador** [5] - 47:6, 48:24, 49:6, 50:22, 51:1
**Salvadoran** [7] - 21:20, 29:9, 45:15, 48:8, 49:23, 49:25, 50:1
**SARAH** [1] - 1:19
**satisfied** [1] - 13:17
**satisfy** [1] - 24:4
**Saturday** [8] - 5:5, 6:6, 8:17, 10:15, 10:24, 16:14, 30:21, 34:12
**Scalia's** [1] - 27:22
**scenario** [1] - 54:4
**Schlueter** [1] - 43:19
**Schwarzkopf** [1] - 43:3
**SCOTUS** [1] - 43:22
**screened** [1] - 48:7
**screenings** [2] - 48:3, 48:9
**SDNY's** [1] - 12:8
**seal** [1] - 22:25
**second** [3] - 33:18, 40:3, 52:16
**Second** [4] - 12:17, 15:12, 20:22, 43:15
**Secretary** [1] - 27:24
**Section** [4] - 11:24, 22:24, 26:12, 27:4
**secure** [1] - 7:16
**secured** [2] - 12:3, 25:6
**security** [6] - 8:5, 16:16, 20:10, 20:15,

22:14, 23:1
**see** [4] - 39:22, 45:6, 46:12, 47:9
**seeing** [1] - 4:20
**seeking** [8] - 17:17, 27:21, 33:22, 33:24, 33:25, 34:8, 37:19, 52:6
**semantic** [1] - 19:3
**send** [1] - 47:6
**sense** [5] - 28:9, 31:11, 36:3, 44:23, 46:10
**sensitive** [2] - 15:19, 19:22
**sent** [10] - 7:3, 47:9, 48:22, 48:24, 49:2, 49:3, 49:6, 49:8, 50:19, 50:22
**separate** [2] - 13:22, 33:6
**separation** [1] - 42:15
**series** [1] - 16:6
**serious** [1] - 5:23
**set** [8] - 14:8, 16:3, 31:15, 36:12, 36:14, 37:21, 47:11, 54:1
**sets** [1] - 42:14
**setting** [2] - 9:24, 24:6
**seventies** [2] - 33:22, 52:3
**several** [4] - 20:6, 26:6, 33:20
**shall** [1] - 29:2
**shelter** [1] - 17:17
**shortly** [1] - 18:5
**show** [6] - 4:21, 8:9, 10:1, 31:4, 47:24, 49:22
**shows** [2] - 15:5, 22:6
**sides** [1] - 32:9
**signed** [1] - 10:14
**signing** [1] - 4:18
**similar** [1] - 44:11
**similarly** [2] - 53:4, 53:8
**simple** [2] - 17:9
**simply** [6] - 14:13, 18:3, 37:20, 41:5, 46:19, 52:18
**skeptical** [1] - 44:25
**Skye** [1] - 3:14
**SKYE** [1] - 1:18
**slip** [1] - 32:23
**slower** [1] - 17:14
**small** [1] - 54:13
**sole** [2] - 13:5, 16:11

**solely** [3] - 48:13, 50:14, 50:21
**someone** [8] - 7:3, 12:5, 36:18, 44:4, 48:1, 48:6, 48:8, 49:2
**somewhat** [3] - 17:7, 17:19, 23:6
**SOMIL** [1] - 1:18
**Somil** [1] - 3:16
**Sonja** [2] - 55:2, 55:8
**SONJA** [2] - 1:22, 55:8
**soon** [1] - 21:24
**sorry** [7] - 15:2, 19:13, 20:4, 29:19, 33:10, 39:14, 43:14
**sort** [14] - 14:19, 17:19, 19:6, 19:7, 19:20, 20:21, 24:5, 28:9, 28:17, 29:17, 38:9, 42:24, 42:25, 49:19
**sought** [1] - 7:15
**sound** [1] - 29:15
**sounds** [1] - 18:10
**sovereign** [1] - 17:17
**sparingly** [1] - 23:6
**special** [1] - 27:1
**specific** [3] - 11:15, 40:14, 51:7
**specifically** [4] - 12:22, 17:6, 22:2, 52:19
**specifics** [2] - 5:19, 11:5
**spell** [1] - 43:12
**spelled** [1] - 29:22
**spend** [1] - 32:5
**spent** [4] - 13:7, 32:3, 32:4
**SPITZER** [2] - 1:15, 3:22
**Spitzer** [1] - 3:22
**standard** [7] - 15:25, 19:4, 19:8, 19:12, 35:25, 38:6, 47:11
**standards** [1] - 53:6
**start** [4] - 32:17, 42:9, 42:10, 43:2
**started** [2] - 9:23, 41:14
**state** [3] - 46:4, 46:8, 53:9
**statement** [3] - 5:4, 6:10, 14:19
**statements** [2] - 5:8, 5:9
**STATES** [1] - 1:1
**States** [20] - 4:5, 4:21, 5:14, 9:4, 12:1,

12:2, 16:4, 17:16, 23:13, 23:15, 24:18, 28:21, 29:3, 29:6, 46:2, 51:18, 53:8, 53:14, 55:2, 55:5
**states** [1] - 15:8
**Station** [1] - 2:5
**status** [1] - 7:12
**statute** [2] - 12:23, 23:17, 42:11, 45:1
**statutes** [2] - 12:24, 35:4
**statutory** [15] - 13:17, 15:16, 42:9, 42:12, 42:16, 42:18, 42:21, 42:24, 43:24, 44:15, 44:19, 45:8, 46:17, 49:2, 49:6
**stay** [2] - 17:21, 41:16
**stenographic** [1] - 55:3
**Stenographic** [1] - 1:25
**step** [2] - 33:18, 40:3
**still** [7] - 6:23, 24:17, 37:18, 44:11, 46:6, 52:25, 53:2
**stop** [2] - 33:25, 34:13
**stopped** [1] - 33:15
**stopping** [1] - 37:20
**strains** [1] - 21:6
**street** [2] - 41:2, 47:6
**Street** [2] - 1:13, 1:16
**streets** [1] - 41:15
**strong** [1] - 52:21
**strongly** [1] - 32:8
**structure** [2] - 41:23, 42:3
**study** [1] - 40:13
**subject** [12] - 8:25, 9:11, 14:24, 14:25, 18:19, 19:15, 38:24, 39:3, 39:16, 44:5, 44:6, 50:13
**subjected** [2] - 29:5, 45:18
**submit** [1] - 39:22
**submitted** [1] - 7:10
**subordinate** [1] - 28:2
**substantial** [1] - 29:4
**substantive** [2] - 40:17, 40:18
**substantively** [1] - 40:8
**success** [1] - 25:10
**sudden** [2] - 45:14, 45:17

**sue** [2] - 25:23, 26:3
**suffer** [1] - 29:9
**sufficiency** [2] - 12:12, 13:23
**sufficient** [2] - 24:4, 38:2
**suggest** [1] - 12:9
**suggested** [1] - 52:2
**suggesting** [2] - 52:17, 54:20
**suggests** [1] - 14:23
**suing** [1] - 28:6
**suit** [5] - 10:18, 24:17, 25:19, 27:20, 52:5
**Suite** [1] - 1:16
**suits** [1] - 14:7
**summarily** [3] - 9:11, 11:20, 24:9
**summary** [1] - 37:10
**Supreme** [12] - 16:5, 16:24, 17:4, 20:13, 20:19, 20:24, 23:22, 24:2, 26:14, 27:6, 46:6, 49:3
**surround** [1] - 8:1
**suspect** [1] - 37:3
**swallows** [1] - 13:20
**sworn** [1] - 49:22

### T

**TdA** [14] - 11:25, 12:5, 19:17, 21:20, 24:23, 28:23, 35:21, 35:23, 42:3, 46:20, 46:25, 47:3, 51:15, 54:2
**team** [1] - 7:23
**technical** [1] - 38:15
**teed** [1] - 11:19
**terms** [5] - 13:9, 13:14, 45:8, 46:18, 54:19
**terribly** [1] - 50:3
**territory** [1] - 36:5
**Terrorist** [2] - 22:23, 41:19
**testing** [1] - 21:2
**Texas** [3] - 14:8, 21:25, 37:15
**text** [1] - 27:4
**THE** [112] - 1:1, 1:9, 1:12, 2:1, 3:10, 3:13, 3:18, 4:2, 4:6, 4:8, 4:11, 4:14, 4:17, 4:25, 5:3, 5:12, 5:18, 5:22, 6:3, 6:10, 6:15, 6:20, 7:3, 7:13, 7:18, 8:20, 8:24, 9:3, 9:6, 9:10,

9:17, 10:2, 10:12, 10:24, 11:2, 11:4, 11:12, 11:17, 12:15, 12:18, 13:4, 13:24, 14:15, 15:2, 15:7, 15:24, 16:10, 17:14, 18:1, 18:18, 18:25, 19:15, 20:2, 20:4, 20:17, 21:12, 22:12, 22:22, 23:10, 23:18, 23:21, 24:8, 24:21, 25:14, 25:20, 26:2, 26:14, 27:11, 27:16, 28:17, 29:13, 29:22, 30:16, 30:22, 31:2, 31:18, 31:21, 32:2, 33:2, 33:7, 33:10, 34:17, 35:14, 37:6, 37:11, 38:1, 38:14, 39:11, 40:4, 40:21, 41:24, 42:5, 43:12, 44:11, 45:19, 47:2, 47:15, 50:2, 50:8, 50:17, 50:25, 51:6, 51:21, 52:12, 52:15, 53:11, 53:23, 54:3, 54:10, 54:12, 54:18, 54:23

**thereby** [1] - 24:23
**therefore** [3] - 6:10, 39:11, 41:12
**they've** [1] - 29:10
**third** [5] - 48:11, 49:8, 50:13, 50:24, 51:4
**thoughts** [1] - 37:16
**three** [2] - 36:6, 43:8
**threshold** [1] - 41:7
**throughout** [1] - 9:20
**tied** [1] - 40:17
**timeframe** [2] - 34:19, 46:11
**timing** [1] - 10:19
**Title** [2] - 30:1, 48:2
**today** [9] - 3:2, 11:18, 24:19, 24:22, 25:11, 28:18, 31:13, 32:11, 35:17
**tonight** [1] - 49:11
**took** [2] - 7:8, 48:12
**tool** [1] - 23:7
**torture** [3] - 18:5, 29:5, 29:9
**Torture** [1] - 29:1
**tough** [1] - 32:9
**TRANSCRIPT** [1] - 1:9
**Transcript** [1] - 1:25
**transcript** [3] - 55:3, 55:3, 55:4

**transfer** - 17:3
**tread** [1] - 34:10
**treasure** [1] - 7:21
**treated** [1] - 5:5
**trial** [1] - 14:8
**trick** [1] - 10:8
**Trivedi** [1] - 3:16
**TRIVEDI** [2] - 1:18, 3:16
**TRO** [15] - 4:24, 5:1, 8:1, 24:17, 25:6, 25:7, 33:15, 34:14, 35:17, 37:1, 38:17, 38:21, 40:8, 45:11, 46:11
**TROs** [1] - 9:3
**troublesome** [1] - 45:20
**true** [3] - 11:12, 41:3, 55:3
**truly** [1] - 19:3
**Truman** [1] - 53:1
**Trump** [1] - 3:4
**TRUMP** [1] - 1:6
**trust** [4] - 8:15, 23:12, 31:25, 54:3
**try** [1] - 42:8
**Tuesday** [1] - 9:25
**Tulare** [1] - 26:6
**turn** [1] - 5:13
**twice** [1] - 44:3
**two** [10] - 7:7, 7:16, 11:14, 28:8, 36:8, 36:22, 39:19, 40:22, 50:10, 51:23
**type** [2] - 37:3, 38:13
**types** [2] - 38:8, 44:19
**typically** [1] - 23:16

## U

**U.S** [6] - 2:1, 11:6, 16:25, 39:2, 53:16, 53:18
**U.S.C** [3] - 22:24, 26:12, 29:2
**Uhl** [4] - 15:12, 20:18, 43:11, 43:15
**UHL** [2] - 15:12, 20:18
**ultimately** [3] - 13:4, 37:1, 42:15
**ultra** [5] - 26:18, 27:11, 28:5, 28:10, 28:12
**unable** [1] - 7:16
**unacceptable** [1] - 54:7
**unavailable** [1] - 27:10

**uncharted** [1] - 36:5
**under** [38] - 8:6, 12:9, 12:12, 15:21, 17:25, 18:11, 18:23, 20:19, 20:23, 21:14, 22:24, 22:25, 24:9, 24:12, 24:24, 25:6, 25:24, 26:8, 29:14, 30:1, 30:15, 31:16, 33:25, 34:5, 36:9, 36:10, 37:21, 38:20, 39:4, 41:2, 41:13, 41:17, 46:10, 48:4, 49:6, 50:18, 50:21, 53:10
**understandably** [1] - 13:8
**understood** [12] - 5:9, 5:15, 5:22, 6:1, 6:6, 6:8, 31:9, 31:23, 39:24, 47:5, 51:25
**unheard** [1] - 44:22
**Union** [1] - 1:12
**United** [20] - 4:5, 4:21, 5:14, 9:4, 12:1, 12:2, 16:4, 17:16, 23:13, 23:15, 24:18, 28:21, 29:3, 29:6, 46:2, 51:18, 53:8, 53:14, 55:2, 55:5
**UNITED** [1] - 1:1
**unless** [1] - 48:25
**unlike** [2] - 22:9, 23:5
**unprecedented** [1] - 45:21
**unusual** [1] - 8:13
**up** [8] - 4:21, 11:19, 31:4, 36:12, 36:14, 37:21, 50:18, 54:2
**upholds** [1] - 37:1
**urge** [1] - 47:7
**Utility** [1] - 44:24

## V

**vacate** [1] - 40:7
**validity** [1] - 44:2
**valuable** [1] - 7:21
**various** [2] - 14:6, 22:8
**VE** [1] - 52:23
**Venezuela** [2] - 46:18, 46:24
**Venezuelan** [7] - 11:24, 12:6, 19:17, 47:2, 47:6, 49:13, 49:25
**Venezuelans** [7] - 46:1, 46:25, 48:23,

49:5, 50:22, 50:25, 51:15
**venue** [5] - 16:13, 21:10, 25:17, 34:20, 37:11
**verse** [1] - 36:2
**version** [1] - 16:18
**versus** [9] - 3:3, 16:24, 20:13, 20:19, 20:22, 20:24, 23:21, 52:13, 53:8
**vessel** [1] - 53:15
**via** [5] - 8:7, 8:25, 9:7, 23:1, 50:19
**video** [1] - 37:22
**violate** [1] - 33:13
**violated** [2] - 33:6, 50:4
**vires** [5] - 26:18, 27:11, 28:5, 28:10, 28:12
**voice** [1] - 5:6
**Von** [1] - 43:17
**vs** [1] - 1:5

## W

**waiving** [1] - 32:8
**Walker** [2] - 20:18, 20:20
**wants** [2] - 9:12, 49:10
**War** [9] - 36:8, 36:9, 36:10, 36:20, 37:9, 45:22, 45:23, 46:21
**war** [9] - 19:23, 28:21, 36:11, 43:23, 45:24, 52:22, 52:25, 53:2, 53:5
**WARD** [2] - 2:4, 4:12
**Ward** [1] - 4:12
**warranted** [1] - 38:17
**wartime** [1] - 45:5
**wary** [1] - 44:24
**Washington** [6] - 1:11, 1:16, 1:20, 1:24, 2:3, 2:5
**waters** [2] - 53:16, 53:18
**Watkins** [5] - 12:9, 14:23, 20:22, 43:17, 43:20
**ways** [1] - 26:6
**week** [1] - 14:8
**weekend** [2] - 49:11, 54:23
**welcome** [3] - 3:13, 4:2, 4:14
**well-tread** [1] - 34:10
**whole** [3] - 7:7,

16:19, 18:9
**wholly** [1] - 22:11
**wide** [1] - 8:4
**WIGGINS** [2] - 1:18, 3:24
**Wiggins** [1] - 3:25
**willing** [1] - 38:12
**window** [2] - 6:14, 7:16
**withdraw** [1] - 25:16
**withholding** [1] - 48:4
**women** [1] - 50:1
**words** [7] - 11:12, 19:16, 21:15, 35:19, 39:13, 47:17, 51:15
**works** [1] - 37:2
**world** [1] - 7:20
**World** [7] - 36:9, 36:10, 36:20, 37:8, 45:23, 46:21
**worried** [1] - 10:2
**wrestling** [1] - 21:25
**writing** [2] - 31:19, 54:15
**written** [2] - 48:13, 49:8

## Y

**years** [4] - 11:24, 14:17, 33:20, 52:23
**York** [2] - 1:14
**yourself** [1] - 3:6