UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | ) | |
|---|---|---|
| J.G.G., *et al.*, | ) | Civil Action No. 1:25-cv-00766 |
| | ) | |
| Plaintiffs-Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | ) ) ) | |
| | ) | |
| Defendants-Respondents. | ) | |
| | ) | |

**NOTICE INVOKING STATE SECRETS PRIVILEGE**

The Executive Branch hereby notifies the Court that no further information will be provided in response to the Court's March 18, 2025 Minute Order based on the state secrets privilege and the concurrently filed declarations of the Secretary of State and the Secretary of Homeland Security.

This is a case about the President's plenary authority, derived from Article II and the mandate of the electorate, and reinforced by longstanding statute, to remove from the homeland designated terrorists participating in a state-sponsored invasion of, and predatory incursion into, the United States. The Court has all of the facts it needs to address the compliance issues before it. Further intrusions on the Executive Branch would present dangerous and wholly unwarranted separation-of-powers harms with respect to diplomatic and national security concerns that the Court lacks competence to address. Accordingly, the states secrets privilege forecloses further demands for details that have no place in this matter, and the government will address the Court's order to show cause tomorrow by demonstrating that there is no basis for the suggestion of non-compliance with any binding order.

I.  **Applicable Law**

The President of the United States is a party to this lawsuit. President Trump is "the only person who alone composes a branch of government." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020).[1] Consequently, this Court owes President Trump "high respect." *Clinton v. Jones*, 520 U.S. 681, 707 (1997). That binding command on this Court ought to—but to this point has not—"inform the conduct of the entire proceeding, including the timing and scope of discovery." *Id.*

"[C]onstitutional confrontation between the two branches should be avoided whenever possible." *Cheney v. U. S. District Court for D.C.*, 542 U.S. 367, 389–90 (2004). "[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996). "[J]udicial deference and restraint" are required to avoid undue interference with the Executive Branch. *Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982). This is necessary to avoid the current "collision course," in which a single district judge has unnecessarily put himself in an "awkward position" that includes "the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives." *Cheney*, 542 U.S. at 389.

In this case, invocation of the "absolute" state secrets privilege prevents the Court from colliding with the Executive. *In re Sealed Case*, 494 F.3d 139, 144 (D.C. Cir. 2007); *Halkin v. Helms*, 690 F.2d 977, 990 (D.C. Cir. 1982) ("[T]he critical feature of the inquiry in evaluating the claim of privilege is not a balancing of ultimate interests at stake in the litigation."). "The state secrets privilege is a common law evidentiary rule that protects information from discovery when

---

[1] Unless otherwise noted, all quotation marks, citations, and alterations are omitted from case citations.

2

disclosure would be inimical to the national security." *In re United States*, 872 F.2d 472, 474 (D.C. Cir. 1989). The privilege may be formally invoked "by the head of the department which has control over the matter, after actual personal consideration by that officer." *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953). The government need only establish that the requested information "poses a reasonable danger to secrets of state." *Halkin*, 690 F.2d at 990. The issue is whether the challenged disclosures "may harm" national security. *United States v. Zubaydah*, 595 U.S. 195, 205 (2022).

Judicial review of the invocation is limited, and the "degree of judicial scrutiny varies according to the importance of the information sought." *Burks v. Islamic Republic of Iran*, 2020 WL 13303322, at *8 (D.D.C. 2020). The Court "must" afford "great deference" to the Executive Branch. *Id.* at *9. This includes being "careful not to force a disclosure of the very thing the privilege is designed to protect." *Id.* "[T]he district court need not have complete knowledge of how disclosure would cause a specific security breach." *In re Sealed Case*, 494 F.3d at 144. Where there is only a "trivial showing of need" for the disclosures, and "the circumstances of the case point to a significant risk of serious harm if the information is disclosed, the trial judge should evaluate (and uphold) the privilege claim solely on the basis of the government's public representations, without an in camera examination of the documents." *Ellsberg v. Mitchell*, 709 F.2d 51, 59 n.38 (D.C. Cir. 1983).

## II. Discussion

The information sought by the Court is subject to the state secrets privilege because disclosure would pose reasonable danger to national security and foreign affairs. Because there is no need for the requested disclosures, the Court must resolve the application based on the Cabinet-level declarations submitted with this motion.

**A. The Court's Requested Disclosures Would Cause Unacceptable Danger**

The state secrets privilege reflects the reality that it is the responsibility of the Executive Branch, "not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising" the Nation's safety. *CIA v. Sims*, 471 U.S. 159, 180 (1985). President Trump's execution of his Article II authorities—which "are of unrivaled gravity and breadth" and include "managing matters related to terrorism . . . and immigration"—requires the "utmost discretion and sensitivity." *Trump v. United States*, 603 U.S. 593, 607, 610–11 (2024). As such, when the government invokes the state secrets privilege, "[n]o competing public or private interest can be advanced to compel disclosure." *Ellsberg*, 709 F.2d at 57.

The Secretary of State's declaration confirms that the removal of the Alien Enemies at issue, namely alien members of the designated foreign terrorist organization Tren de Aragua ("TdA"), were the product of "nonpublic, sensitive, and high stakes negotiation" with one or more foreign countries. Rubio Decl. ¶ 10. Disclosure of the information requested by the Court "could cause the foreign State's government to face internal or international pressure, making that foreign State and other foreign States less likely to work cooperatively with the United States in the future, both within and without the removal context." *Id.* Such disclosure would be viewed as a "breach of the trust on which our foreign relationships are based," and would "impair[] the foreign relations and diplomatic capabilities of the United States." *Id.* ¶¶ 10, 13. The end result would be to "erode the credibility of the United States' assurances that information will be maintained in confidence" and thereby "impede the ability of the United States to secure the cooperation of foreign authorities in critical operations." *Id.* ¶ 14. *See Zubaydah*, 595 U.S. at 208 (applying privilege to disclosures that "can diminish the extent to which the intelligence services of Countries A, B, C, D, etc., will

4

prove willing to cooperate with our own intelligence services in the future"); *Halkin*, 690 F.2d at 990 n.53 ("[T]he privilege extends to matters affecting diplomatic relations between nations."); *Ellsberg*, 709 F.2d at 59 (upholding privilege where disclosure "would disrupt diplomatic relations with foreign governments"); *In re United States*, 872 F.2d at 475 (recognizing that privilege protects "diplomatic security").

Moreover, the Secretary of Homeland Security has established that responding to the Court's inquiries would "directly compromise[] the safety of American officers, contractors, aliens, and the American public" by, for example, divulging "critical means and methods of law enforcement operations," "confirming alleged operational details [that] would cause significant harm to the national security of the United States," and "undermin[ing] the efficacy of American counterterrorism operations." Noem Decl. ¶ 10. Disclosure "would allow others to draw inferences and insight into how future, similar governmental operations will be conducted, and to use that information in a manner adverse to U.S. national security," thereby enabling "enemies of our national security … to stitch together an understanding of the means and methods used to thwart their unlawful and sometimes violent conduct." *Id. See, e.g.*, *Kareem v. Haspel*, 412 F. Supp. 3d 52 (D.D.C. 2019) ("Detailed statements underscore that disclosure of [the privileged] information . . . and the means, sources and methods of intelligence gathering in the context of this case would undermine the government's intelligence capabilities and compromise national security."), *vacated on other grounds*, 986 F.3d 859 (D.C. Cir. 2021); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) (reasoning that courts must be particularly "reluctant to intrude upon the authority of the Executive in military and national security affairs").

"Courts are in no position to gauge what constitutes an acceptable margin of error for determinations that bear on national security," and that is "particularly true where the decisions

involve sensitive and inherently discretionary judgment calls." *Oryszak v. Sullivan*, 565 F. Supp. 2d 14, 19–20 (D.D.C. 2008), *aff'd*, 576 F.3d 522 (D.C. Cir. 2009). Similarly, the Court lacks competence to evaluate risks associated with the "mosaic effect," whereby "bits and pieces of data . . . may aid in piecing together bits of other information, even when the individual piece is not of obvious importance in itself." *Shapiro v. United States Dep't of Justice*, 2014 WL 12912625, at *1 (D.D.C. 2014); *see also Citizens United v. United States Dep't of State*, 460 F. Supp. 3d 12, 19 (D.D.C. 2020) ("[E]ven apparently innocuous information, such as non-sensitive information from ordinary private citizen may be withheld."). For example, confirming the exact time the flights departed, or their particular locations at some other time, would facilitate efforts to track those flights and future flights. *See* Noem Decl. ¶ 10. In turn, disclosing any information that assists in the tracking of the flights would both endanger the government personnel operating those flights and aid efforts by our adversaries to draw inferences about diplomatic negotiations and coordination relating to operations by the Executive Branch to remove terrorists and other criminal aliens from the country. *See id.* Simply put, the Court has no cause to compel disclosure of information that would undermine or impede future counterterrorism operations by the United States.

Finally, the fact that there are allegations and claims in the public domain regarding issues implicated by the Court's questions is not a basis for vitiating the privilege. *Accord* Rubio Decl. ¶ 15; Noem Decl. ¶ 10. Official confirmation of any of those allegations would pose a distinct threat to foreign relations and national security. *See Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) ("[T]he fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods, and operations."). Specifically, "[c]onfirmation" of public claims by "an insider is different in kind

from speculation in the press." *Zubaydah*, 595 U.S. at 208. Thus, "information that has entered the public domain may nonetheless fall within the scope of the state secrets privilege." *Id.* at 207; *see also Halkin*, 690 F.2d at 994 ("We reject, as we have previously, the theory that because some information about the project ostensibly is now in the public domain, nothing about the project in which the appellants have expressed an interest can properly remain classified or otherwise privileged from disclosure."); *Edmonds v. U.S. Dep't of Justice*, 323 F. Supp. 2d 65, 76 (D.D.C. 2004) ("That privileged information has already been released to the press . . . does not alter the Court's conclusion"). Accordingly, the declarations submitted with this Notice establish a valid basis for invocation of the state secrets privilege—and also a dispositive one for ceasing any further inquiry.

### B. There Is No Need For The Requested Disclosures

The "need" for the information at issue is only relevant to "help the court determine how deeply to probe the details of, and basis for, the Government's privilege claim." *Zubaydah*, 595 U.S. at 209–10; *see also Reynolds*, 345 U.S. at 11 ("[E]ven the most compelling necessity cannot overcome the claim of privilege."). Here, because "necessity is dubious," at most, "a formal claim of privilege . . . will have to prevail." *Id.*

The information sought by the Court is irrelevant to plaintiffs' claims and to the Executive Branch's compliance with the Court's operative order. The Court has already devoted more time to these inquiries than it did to evidence and argument on the issue of whether a class should be certified. In any event, the government has already confirmed that "two flights carrying aliens being removed under the AEA departed U.S. airspace before the Court's minute order of 7:25 PM EDT." Doc. 49-1. Further, the Government has not contested for purposes of these proceedings that the planes landed abroad, and that the aliens on board were deplaned, after the issuance of the

Court's minute order. To have proceeded otherwise and turned planes around mid-air without regard to important logistical constraints such as fuel availability or foreign airspace restrictions, especially on the legally infirm basis that the Court retained authority over aircraft operating outside the United States, would have implicated grave safety risks.

No more information is needed to resolve any legal issue in this case. Whether the planes carried one TdA terrorist or a thousand or whether the planes made one stop or ten simply has no bearing on any relevant legal issue. The need for additional information here is not merely "dubious," *Reynolds*, 345 U.S. at 11, or "trivial," *Ellsberg*, 709 F.2d at 59 n.38, it is non-existent. The Executive Branch violated no valid order through its actions, and the Court has all it needs to evaluate compliance. Accordingly, the Court's factual inquiry should end.

### C. There Is No Need For *In Camera* Review

In light of the utter lack of "need" for the information the Court seeks, the Court must address the invocation of the state secrets privilege on the basis of the declarations and without *in camera* review of the information at issue.

*In camera* review is "not required as a matter of course in a claim of the state secrets privilege." *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 401 (D.C. Cir. 1984); *see also In re Agent Orange Product Liability Litigation*, 97 F.R.D. 427, 431 (E.D.N.Y. 1983) ("[*I*]n camera inspection is not routine in cases where the state secrets privilege is invoked."). The *Zubaydah* Court, as well as "*Reynolds* itself contemplated that . . . a claim of privilege could prevail without further examination by the court of the ostensibly privileged evidence." *Zubaydah*, 595 U.S. at 209; *see also Reynolds*, 345 U.S. at 10 ("[T]he court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers.").

When the privilege involved is based on "concern" regarding "diplomatic secrets," "courts should not insist upon an examination of the evidence." *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of the Treasury*, 575 F. Supp. 3d 53, 73 (D.D.C. 2021). "Courts are not required to play with fire and chance further disclosure—inadvertent, mistaken, or even intentional—that would defeat the very purpose for which the privilege exists." *Sterling v. Tenet*, 416 F.3d 338, 344 (4th Cir. 2005). The Supreme Court has "provide[d] that when a judge has satisfied himself that the dangers asserted by the government are substantial and real, he need not—*indeed, should not*—probe further." *Id.* at 345 (emphasis added). That is the appropriate course in this instance.

### III. Conclusion

For the foregoing reasons, the government invokes the state secrets privilege and declines to further respond to the Court's March 18, 2025 Minute Order.

Respectfully Submitted,

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
Attorney General

CHAD MIZELLE
Acting Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

<u>s/ Drew C. Ensign</u>
DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Avenue
Washington, DC 20530
Phone: (202) 514-2000
e-Mail: drew.c.ensign@usdoj.gov

AUGUST E. FLENTJE
Acting Director

EREZ REUVENI
Assistant Director

BRIAN C. WARD
Acting Assistant Director

PATRICK GLEN
Senior Litigation Counsel