## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

J.G.G., *et al.,*

Petitioner,

v.

DONALD J. TRUMP, *et al.,*

Respondents.

No. 1:25-cv-766 (JEB)

Declaration Of Marco Rubio

### DECLARATION OF SECRETARY OF STATE MARCO RUBIO

I, Marco Rubio, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.    I am the Secretary of State of the United States and head of the United States Department of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As Secretary of State, I am the President's chief foreign affairs advisor. I carry out the President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2.    The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3.    The purpose of this Declaration is to assert, in my capacity as Secretary of State and head of the Department of State, a formal claim of the state secrets privilege over

information requested by this Court in its Minute Order of March 18, 2025, in order to protect

the foreign relations and national security interests of the United States.   As explained in this

declaration, disclosure of the information covered by my privilege assertion reasonably could be

expected to cause significant harm to the foreign relation and national security interests of the

United States.  I have discussed with knowledgeable State Department employees the details of

the information over which I am asserting privilege to ensure that the bases for the privilege

assertions set forth in this Declaration are appropriate.

      4.     In the course of my official duties, I am aware that President Trump issued

Executive Order 14157 regarding a process by which Tren de Aragua (TdA) and other

transnational organizations and cartels may be "designated as Foreign Terrorist Organizations,

consistent with section 219 of the INA (8 U.S.C. 1189), or Specially Designated Global

Terrorists, consistent with IEEPA (50 U.S.C. 1702) and Executive Order 13224 of September 23,

2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to

Commit, or Support Terrorism), as amended." *Designating Cartels and Other Organizations as*

*Foreign Terrorist Organizations and Specially Designated Global Terrorists* (Jan. 20, 2025).  As

President Trump recognized in doing so, TdA has engaged in "campaigns of violence and terror

in the United States and internationally," such that it presents "an unusual and extraordinary

threat to the national security, foreign policy, and economy of the United States." *Id.*

      5.     In the course of my official duties, I designated TdA as a Foreign Terrorist

Organization and its members as Specially Designated Global Terrorists. *Specially Designated*

*Global Terrorist Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel*

*de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La*

*Nueva Familia Michoacana,* 90 Fed. Reg. 10030 (Feb. 20, 2025); *Foreign Terrorist Organization*

*Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana*, 90 Fed. Reg. 10030 (Feb. 20, 2025)

6.    In the course of my official duties, I am aware that President Trump has, pursuant to the Alien Enemies Act (50 U.S.C. § 21), "proclaimed that all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Invocation of the Alien Enemies Act Regarding the Invasion of the United States be Tren de Aragua* (Mar. 14, 2025).  President Trump directed "the apprehension, detention, and removal of all members of TdA who otherwise qualify as Alien Enemies under" his proclamation. *Id.*

7.    In the course of my official duties, I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of TdA pursuant to the Alien Enemies Act.

8.    In the course of my official duties, I have been informed that this Court has ordered the Defendants in this action to disclose "the following details regarding each of the two flights leaving U.S. airspace before 7:25 p.m. on March 15, 2025: 1) What time did the plane take off from U.S. Soil and from where? 2) What time did it leave U.S. airspace? 3) What time did it land in which foreign country (including if it made more than one stop)? 4) What time were individuals subject solely to the Proclamation transferred out of U.S. custody? And 5) How many people were aboard solely on the basis of the Proclamation?" Minute Order of 3/18/2025.

9.    After careful and actual personal consideration of this matter, I have concluded that the disclosure of this information could reasonably be expected to cause significant harm to

the foreign relations interests of the United States and, relatedly, the national security interests of
the United States.

10.     When the United seeks to remove individuals to a foreign country, the United
States must negotiate the details of that removal with the foreign country. This requires
nonpublic, sensitive, and high stakes negotiation with the foreign State, particularly where, as
here, the aliens being removed have been deemed enemy aliens and members of a foreign
terrorist organization. Those negotiations cover sensitive issues, including representations
regarding the bases on which the individuals are being removed from the United States, which
can impact the foreign State's willingness to accept the removed aliens and the procedures it will
employ in doing so. Compelled disclosure of the number of aliens aboard any deportation
flight—including the alleged deportation flights addressed in this Court's Minute Order—and the
reasons any of those aliens were placed aboard the deportation flight, threatens significant harm
to the United States' foreign affairs and national security interests. For example, if compelled
disclosure of that information came to light, it could cause the foreign State's government to face
internal or international pressure, making that foreign State and other foreign States less likely to
work cooperatively with the United States in the future, both within and without the removal
context. Disclosure of that information—to anyone—likewise is likely to be viewed as a breach
of the trust on which our foreign relationships are based, leading to a less robust relationship in
the future. And if a disclosure were to in any way undercut or, in the eyes of a foreign State
(fairly or not) cast doubt on representations made in sensitive negotiations with the United
States, that could likewise make that foreign State less likely to work cooperatively with the
United States, both within and outside the removal context.

11.      When the United States seeks to remove individuals to a foreign State, it likewise must negotiate the logistical details of that removal—a sensitive issue that can impact the willingness of that foreign State to accept removed aliens at all.  Those sensitive details, which are negotiated outside of public view, include the destination of the deportation flight, as well as the time of departure and arrival at the destination, and the form and timing of the transfer of custody.  Compelled disclosures of that information, or of information that would allow any third party to determine that information in whole or in part, would allow the national and international public to confirm that a particular flight was indeed a deportation flight—a fact which threatens the willingness of foreign States to accept removed aliens but only if done secretly, and which will more broadly threaten the willingness of foreign States to work with the United States on sensitive and confidential matters, both within and without the removal context. Again, the compelled disclosure—to anyone—of sensitive matters such as this is likely to be seen by foreign nations as a breach of trust that will damage our relationships with allies, negatively affecting the United States' foreign relations and national security.  For these reasons, compelled disclosure of the following information would threaten significant harm to the United States' foreign affairs and national security interests:  1) the time that an alleged deportation flight took off from U.S. soil and from where; 2) the time an alleged deportation flight left U.S. airspace, 3) the time the alleged deportation flight landed in a foreign country; and 4) the location in which the alleged deportation flight landed.

12.      Likewise, compelled disclosure of information that could reveal whether an alleged deportation flight touched down in a third country—neither the United States nor the foreign State to which removal is being made—would threaten significant harm to the United States' foreign affairs and national security interests.  Whether a particular flight, carried out for

a specific purpose, may land in a third country can itself be a matter of sensitive diplomatic discussions and negotiations with the United States' partners and allies. Compelled disclosure of that sensitive information would likely be seen as a breach of trust, threatening the willingness of foreign States to negotiate and cooperate with the United States on confidential and sensitive matters, both within and without the removal context. Moreover, if a flight stopped-over in a foreign State that was unaware of the nature or purpose of the flight, the compelled disclosure of that information—or of other information that could effectively reveal that information—would, if it reached the public, threaten to directly damage the United States' relationship with that foreign State and would make that State and other foreign States less likely to work cooperatively with the United States in the future, both within and outside the removal context.

13.    It is critical to bear in mind that removal operations can be (as they are here) counterterrorism operations. If foreign partners believed that any relevant details could be revealed to third parties, those foreign partners would be less likely to work with the United States in the future. That impairs the foreign relations and diplomatic capabilities of the United States and threatens significant harm to the national security of the United States.

14.    If foreign States believed that the information sought in this Court's Minute Order—or similar information—could be revealed to third parties, simply because a lawsuit has been filed or a judge has asked for the information, it would erode the credibility of the United States' assurances that information will be maintained in confidence and thus impede the ability of the United States to secure the cooperation of foreign authorities in critical operations. Again, this threat to the United States' foreign affairs interests extends beyond the removal context that is the subject of this case.

15.    Importantly, the compelled disclosure of this sensitive information would cause significant harm to the United States' foreign affairs interests even if some of the alleged details have made it into public sources through unofficial means. The disclosure of foreign affairs information only through official acknowledgment or confirmation is vital to the protection of the United States' ability to conduct foreign affairs. There is a difference between official acknowledgement and informal reports: Official disclosures or acknowledgements threaten the United States' national interests in a way that informal reports or statements do not, because informal statements leave an important element of doubt that provides an essential layer of protection and confidentiality. That protection would be lost if the United States were forced to confirm or deny the accuracy of unofficial disclosures or speculation. Thus, even if the public or the press believes certain information to be true, providing an official acknowledgement by confirming or denying specific details threatens the significant diplomatic and foreign relation harms discussed above.

16.    Finally, for at least two reasons, the compelled disclosure of the information sought in this Court's Minute Order threatens the foreign relations and national security interests of the United States even if that information is provided ex parte and in camera. First, as noted above, the mere act of providing the information to the Court will itself likely be seen as a breach of trust—the sharing of sensitive, nonpublic information with a third party outside of the process of negotiating and executing the agreement between the two nations. Second, as a practical matter, the more widely information is shared, the greater the risk that the information will reach the public (even if unintentionally)—either directly or indirectly. Indeed, any order based on the sensitive information at issue here would unavoidably lead to public dissection and speculation as to the bases for the order, even if the underlying information is held under seal. And that increased public

dissection and speculation threatens the significant harm already discussed—reduced cooperation

from the United States' international partners, both within and without the removal context.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and
correct.

Executed this 24th day of March 2025.

Marco Rubio
Secretary of State