UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G., *et al.*,

Petitioner,

v.

DONALD J. TRUMP, *et al.*,

Respondents.

No. 1:25-cv-766 (JEB)

Declaration Of Kristi Noem

**DECLARATION OF SECRETARY OF HOMELAND SECURITY KRISTI NOEM**

I, Kristi Noem, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the United States Secretary of Homeland Security and the head of the United States Department of Homeland Security, an Executive Department of the United States. *See* 6 U.S.C. §§ 111(a), 112(a). As Secretary of Homeland Security, I am the President's chief advisor on public security.

2. The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, Department of Homeland Security employees, and information portals maintained and relied upon by the Department of Homeland Security in the regular course of business, and on my evaluation of that information.

3. The purpose of this Declaration is to assert, in my capacity as United States Secretary of Homeland Security and head of the Department of Homeland Security, a formal claim of the state secrets privilege over information requested by this Court in its Minute Order of March

18, 2025, in order to protect the national security interests of the United States. Disclosure of the information covered by my privilege assertion reasonably could be expected to cause significant harm to the national security interests of the United States. I have discussed with knowledgeable employees of the Department of Homeland Security the details of the information over which I am asserting privilege to ensure that the bases for the assertions set forth in this Declaration are appropriate.

4. In the course of my official duties, I am aware that President Trump created a process by which Tren de Aragua (TdA) and other transnational organizations and cartels may be "designated as Foreign Terrorist Organizations, consistent with section 219 of the INA (8 U.S.C. 1189), or Specially Designated Global Terrorists, consistent with IEEPA (50 U.S.C. 1702) and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended." *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists* (Jan. 20, 2025). As President Trump recognized in doing so, TdA has engaged in "campaigns of violence and terror in the United States and internationally," such that it presents "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *Id.*

5. In the course of my official duties, I am aware that the Department of State has designated TdA as a Foreign Terrorist Organization and its members as Specially Designated Global Terrorists. *Specially Designated Global Terrorist Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana*, 90 Fed. Reg. 10030 (Feb. 20, 2025); *Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel*

*de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana*, 90 Fed. Reg. 10030 (Feb. 20, 2025)

6. In the course of my official duties, I am aware that President Trump has, pursuant to the Alien Enemies Act (50 U.S.C. § 21), "proclaimed that all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Proclamation 10903 of March 14, 2025, Invocation of the Alien Enemies Act Regarding the Invasion of the United States be Tren de Aragua*, 90 Fed. Reg. 13033, 13034 (Mar. 20, 2025N). President Trump directed "the apprehension, detention, and removal of all members of TdA who otherwise qualify as Alien Enemies under" his proclamation. *Id.*

7. In the course of my official duties, I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of TdA pursuant to the Alien Enemies Act.

8. In the course of my official duties, I have been informed that this Court has ordered the Defendants in this action to disclose "the following details regarding each of the two flights leaving U.S. airspace before 7:25 p.m. on March 15, 2025: 1) What time did the plane take off from U.S. Soil and from where? 2) What time did it leave U.S. airspace? 3) What time did it land in which foreign country (including if it made more than one stop)? 4) What time were individuals subject solely to the Proclamation transferred out of U.S. custody? And 5) How many people were aboard solely on the basis of the Proclamation?" Minute Order of 3/18/2025.

9. After careful and actual personal consideration of this matter, I have concluded that the disclosure of this information could reasonably be expected to cause significant harm to the national security of the United States, in at least two ways.

10. *First*, disclosure of information about removal flights—including confirmation or denial of speculation, assumptions, or informal reports about removal flight plans—directly compromises the safety of American officers, contractors, aliens, and the American public.

  A. Removal flight plans—including locations from which flights depart, the planes utilized, the paths they travel, where they land, and how long they take to accomplish any of those things—reflect critical means and methods of law enforcement operations.

  B. Even where discussing a past operation, disclosing, denying, or confirming alleged operational details would cause significant harm to the national security of the United States by exposing the means and methods of ICE operations. Specific information about past governmental operations, such as the details regarding locations, paths, and timing of flights, would allow others to draw inferences and insight into how future, similar governmental operations will be conducted, and to use that information in a manner adverse to U.S. national security.

  C. In addition to flight operations, the number of TdA members on a given removal flight is also information that, if disclosed, would expose ICE's means and methods, thus threatening significant harm to the national security of the United States. Revealing and/or confirming the number of TdA members involved would reveal key details about how the United States conducts these sorts of operations and would allow other aliens (members of TdA and otherwise) to draw inferences about how the Government prioritizes and uses its resources in immigration enforcement and counterterrorism operations. It may even lend TdA and other such organizations the ability to predict operational details to their benefit and to the risk of the ICE officers and contractors involved. That insight would inhibit future enforcement activity. Revealing or

confirming this information—i.e., identifying how many enemy aliens were removed on the basis of the Proclamation, versus under other authorities—also would likely allow our Nation's enemies to determine how the Government is utilizing these distinct sources of authority, which (combined with other information) could likely impair national security.

D. Removal operations involving TdA and similar groups are counterterrorism operations. Disclosing, confirming, or denying details of those operations would inform TdA and similar groups about the means and methods by which the United States plans and carries out operations against them. This would directly help such groups avoid capture. And it would directly undermine the efficacy of American counterterrorism operations.

E. Disclosure of the information sought in this Court's Minute Order would cause significant harm to the United States' national security even assuming some of that information has already entered public sources as a result of assumptions, speculation, public investigation, or informal statements. It is both true and well known that official acknowledgement of a fact may be damaging to national interests in a way that informal suggestions or speculation about that information is not. If the Government were to confirm or deny the information sought by this Court's Minute Order, there would arise a danger that enemies of our national security would be able to stitch together an understanding of the means and methods used to thwart their unlawful and sometimes violent conduct. Again, the result would be a risk of significant harm to the United States' national security interests, particularly in this case involving a gang and terrorist organization that has been determined to be a danger to the public peace and safety of the United States.

11.  *Second*, disclosure of the information sought by this Court's March 18 Minute Order would also threaten significant harm to the United States' national security interests by making it less likely that foreign nations will work productively with the United States on sensitive matters relating to the United States' national security.

   A. Protecting the national security of the United States often involves cooperation with foreign States, which can and do share information and otherwise assist and cooperate in matters beneficial to and protective of the United States' national security.

   B. When the United seeks to remove individuals to a foreign country, the United States must negotiate the details of that removal with the foreign country. This requires nonpublic, sensitive, and high stakes negotiation with the foreign State, particularly where, as here, the aliens being removed have been deemed enemy aliens and members of a foreign terrorist organization. Those negotiations cover sensitive issues, including representations regarding the bases on which the individuals are being removed from the United States, which can impact the foreign State's willingness to accept the removed aliens and the procedures it will employ in doing so. The negotiations also cover the logistical details of that removal—including the destination of the deportation flight, as well as the time of departure and arrival at the destination, and the form and timing of the transfer of custody. All of these issues are sensitive matters that are negotiated with the receiving foreign State outside the public view. The mere fact of compelled disclosure of this information—to anyone—would likely be seen by the foreign State as a breach of trust, making it less likely that the foreign State and other foreign States will cooperate with the United States in the future on sensitive matters impacting its national security.

C. Similarly, if sensitive information covered by a compelled disclosure—for example, the number and nature of aliens removed to the foreign State—were to come to light—the receiving foreign State's government could face internal or international pressure making that foreign State and other foreign States less likely to work cooperatively in the future with the United States on matters affecting its national security.

D. Moreover, if a disclosure were to in any way undercut or, in the eyes of a foreign State (fairly or not) cast doubt on representations made by the United States during sensitive negotiations, that could likewise make that foreign State and other foreign States less likely to work cooperatively with the United States on matters affecting its national security.

E. Likewise, compelled disclosure of information that could reveal whether an alleged deportation flight touched down in a third country—neither the United States nor the foreign State to which removal is being made—would threaten significant harm to the national security of the United States. Whether a particular flight, carried out for a specific purpose, may land in a third country can itself be a matter of sensitive diplomatic discussions and negotiations with the United States' partners and allies. Compelled disclosure of that sensitive information would likely be seen as a breach of trust, threatening the willingness of foreign States to negotiate and cooperate with the United States on confidential and sensitive matters affecting its national security. Moreover, if a flight stopped-over in a foreign State that was unaware of the nature or purpose of the flight, the compelled disclosure of that information—or of other information that could effectively reveal that information—would, if it reached the public, threaten to directly damage the United States' relationship with that foreign

State and would make that State and other foreign States less likely to work cooperatively with the United States in the future on matters affecting the United States' national security.

F. It is critical to bear in mind that removal operations can be (as they are here) counterterrorism operations. If foreign partners believed that any relevant details could be revealed to third parties, those foreign partners would be less likely to work with the United States on counterterrorism operations in the future.

G. As discussed in Paragraph 10.E, *supra*, the compelled disclosure of the sensitive information sought by this Court's March 18 Minute Order would cause significant harm to the United States' national security interests even if some of the alleged details have made it into public sources through unofficial means. There is a difference between official acknowledgement and informal reports: Official disclosures or acknowledgements threaten the United States' national security interests in a way that informal reports or statements do not, because informal statements leave an important element of doubt that provides an essential layer of protection and confidentiality. That protection would be lost if the United States were forced to confirm or deny the accuracy of unofficial disclosures or speculation. Thus, even if the public or the press believes certain information to be true, providing an official acknowledgement by confirming or denying specific details threatens the national security harms discussed above.

12. Finally, for at least two reasons, the compelled disclosure of the information sought in this Court's Minute Order threatens significant harm to the national security of the United States even if that information is provided ex parte and in camera. First, as noted above, the mere act of

providing the information to the Court will itself likely be seen as a breach of trust—the sharing of sensitive, nonpublic information with a third party outside of the process of negotiating and executing the agreement between the two nations. Second, as a practical matter, the more widely information is shared, the greater the risk that the information will reach the public (even if unintentionally), directly or indirectly. Indeed, any order based on the sensitive information at issue here would unavoidably lead to public dissection and speculation as to the bases for the order, even if the underlying information is held under seal. And that increased public dissection and speculation threatens the significant national security harms already discussed: (1) direct threats to the United States' law enforcement operations (here, in the context of a counterterrorism operation); and (2) damage to the United States' ability to obtain cooperation from foreign States on matters affecting its national security.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 24th day of March 2025.

*[signature]*

Kristi Noem
Secretary of Homeland Security