UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| J.G.G., *et al.*, | ) |
| | ) Civil Action No. 1:25-cv-00766 |
| Plaintiffs-Petitioners, | ) |
| | ) |
| v. | ) |
| | ) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | ) |
| | ) |
| Defendants-Respondents. | ) |

**RESPONSE TO ORDER TO SHOW CAUSE**

On March 20, 2025, the Court directed Defendants to "show[] cause why they did not violate the Court's Temporary Restraining Orders by failing to return class members removed from the United States on the two earliest planes that departed on March 15, 2025." Dkt. 47, at 3.[1] That directive refers to flights carrying criminal aliens removed from the United States pursuant to the March 15, 2025 Presidential Proclamation entitled "Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua."

These removals both complied with the law and safeguarded Americans against members of a foreign terrorist organization. The Government will continue to defend the removals before this Court and, if necessary, on appeal challenging this Court's two injunctions issued on March 15. The first injunction, in a written minute order entered before a class was provisionally certified, enjoined the Government from "remov[ing] any of the individual Plaintiffs from the United States for 14 days absent further Order of the Court." Although that first injunction did not comply with

---

[1] This Court provisionally certified a class consisting of "[a]ll noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation." Minute Order (March 15, 2025).

Rule 65(d)(1)(A)'s requirement that the order "state the reasons why it issued," no one disputes that the Government complied with that Order, and Defendants therefore do not discuss it further.

The second injunction issued via a minute order at 7:25 PM: "The Government is ENJOINED from removing members of [the] class (not otherwise subject to such removal) pursuant to the Proclamation for 14 days or until further Order of the Court." That minute order likewise did not comply with Rule 65(d)(1)(A). Regardless, the injunction thus bars the Government from *removing* class members; it does not require the Government to *undo* removals that have already occurred. And for good reason. Even without the challenged Proclamation, the President doubtlessly acts within his constitutional prerogative by declining to transport foreign terrorists into the country. Here, any members of the putative class aboard the referenced flights had already left the United States when the minute order was entered, and thus had already been removed. No court has the power to compel the President to return them, and there is no sound basis to read the Court's minute order as requiring that unprecedented step.

I. **The Government Did Not Remove Any Class Members from the United States After Entry of the Court's Injunctions.**

The Government fully complied with the terms of the Court's 7:25 PM injunction. That order purported to enjoin the Government "from removing" class members under the Alien Enemies Act. The Government did not "remove" any class members after that time under the AEA. To be sure, the Government had *already* removed some *before* the injunction. But nothing in the minute order suggested that the Government had to return already-removed class members to the United States (even assuming the Court could compel such an act consistent with Article II of the Constitution, which it cannot, *infra* § III).

"[A]n injunction must be read in the context of its circumstances." *Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.*, 312 U.S. 287, 298 (1941). Here, Plaintiffs challenged the

2

President's exercise of his authority under the Alien Enemies Act, which authorizes the President to "remove[]" certain dangerous aliens in the event of certain threats against "the territory of the United States." 50 U.S.C. § 21. Because neither the injunction on which the injunction is based nor the statute defines "remove," the "ordinary or natural meaning" controls. *See al Janko v. Gates*, 741 F.3d 136, 140 (D.C. Cir. 2014).

When the Alien Enemies Act was enacted, the ordinary meaning of "remove" was "to take or put away," or "to place at a distance." Samuel Johnson, Dictionary of the English Language (6th ed. 1785) ("To put from its place; to take or put away"; "to place at a distance"); John Ash, The New and Complete Dictionary of the English Language, Vol. II (1795) ("to put from its place, to place at a distance."); Sheridan, A Complete Dictionary of the English Language (3d ed. 1790) ("to put from its place, to take or put away, to place at a distance"). And it continues to mean the same thing today. *See Remove*, The American Heritage Dictionary (5th ed. 2011) ("to move from a place or position occupied"); *Remove*, Webster's New World College Dictionary (4th ed. 2009) ("to move (something) from where it is; lift, push, transfer, or carry away, or from one place to another"); *Remove*, Black's Law Dictionary (defining "removal" as "[t]he transfer or moving of a person or thing from one location, position, or residence to another."). The Court's injunction thus directs the Government not "to take," "move," or "transfer" class members from the United States.

The plain meaning of "remove" aligns with the context of the Alien Enemies Act, a statute with which Congress empowered the President to protect "the territory of the United States" from foreign threats. 50 U.S.C. § 21; *cf. Nicusor-Remus v. Sessions*, 902 F.3d 895, 899 (9th Cir. 2018) (holding, in distinct INA context, that an alien has been removed once he has "left the United States"). Given that purpose, the statute is understandably focused on removing enemy aliens from U.S. territory—not where they go after departing our borders.

3

The Government thus complied with the Court's injunction with respect to the two flights at issue. According to Plaintiffs, those two flights took off approximately two hours *before* the Court's Minute Order of 7:25 PM EDT, and did so from a location very close to the outer limit of U.S. airspace. *See* Dkt. 21, at 3.[2] And, as explained in the Declaration of Robert Cerna of U.S. Immigration and Customs Enforcement, "two flights carrying aliens being removed under AEA departed U.S. airspace before the Court's minute order of 7:25 PM EDT." Dkt. 49-1 at 2. Accordingly, by the time the Court issued its injunction, the planes' occupants had *already* been "transferred"—that is, removed—from United States territory and airspace. The Government thus did not "remove" any class members from the United States after the Court issued its injunction. Indeed, the Government could not possibly have "removed" them from a place they had already departed.

To be clear, the Government did not order any removal flights to return to the United States. But as noted above, declining to bring class members *back* to the United States is not the same thing as *removing* them from the United States. As the injunction said nothing about class members who had already departed the country, there was no violation.

If any doubt remains (and none does), the Court should apply the "longstanding, salutary rule" that favors the party subject to the injunction when that injunction's meaning is uncertain or debatable. *Pasadena City Bd. of Ed. v. Spangler*, 427 U.S. 424, 439 (1976); *accord Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971); *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982) (citing, *inter alia*, *Ford*). Here, the Government enjoys that presumption, which underscores that the Government complied with this Court's injunction.

---

[2] Plaintiffs also identified a third flight that departed later. Dkt. 21, at 4. As the Government has already disclosed, that flight carried detainees who were removable on grounds other than the Proclamation and is therefore irrelevant. Dkt. 24, at 3.

4

In any event, the 7:25 PM Minute Order failed to satisfy Rule 65(d)(1)(A)'s requirement that it "state the reasons why it issued." The order does not contain any such reasoning—only directives. The Minute Order thus failed to satisfy the requirements for issuing a binding injunction. *See*, *e.g.*, *Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481, 483 (7th Cir. 2015); *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007).

## II.     The Court's Written Minute Orders Control.

In suggesting a violation of this Court's orders, Plaintiffs have focused not on the written minute orders—which, as explained above, were fully respected—but instead on oral statements that the Court made during the course of the March 15, 2025 hearing. They suggest that the Court's oral statements (which were made available for viewing at the courthouse or purchase only the next day, Dkt. 20) should control rather than the Court's minute order (which was entered on the docket at 7:25 PM the day of the hearing). *See* Dkt. 21. Specifically, Plaintiffs fixate on a handful of lines in the 46-page transcript, in which this Court said that class members "need to be returned to the United States" "immediately," while "leav[ing]" to the Government the choice of accomplishing that result by "turning around a plane or not embarking anyone on the plane." Hearing Tr. 43:13–19. Thus, Plaintiffs' argument goes, even if the planes were already outside the United States—and even though the minute order itself speaks only to "removal" and not "returning" already-removed class members—the Government had to turn around planes carrying foreign terrorists mid-flight, based on the Court's statements at the hearing that began at 5 PM. Dkt. 21, at 2-3.

This argument ignores blackletter law. It is well-settled that an oral directive is not enforceable as an injunction. *See Bates v. Johnson*, 901 F.2d 1424, 1427 (7th Cir. 1990) ("Oral statements are not injunctions."). Federal Rule of Civil Procedure 65(d) provides that a temporary

5

restraining order or injunction "must … state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Those requirements "contemplate[] the issuance of a *written* order." *Lau v. Meddaugh*, 229 F.3d 624, 633 (2d Cir. 1976) (emphasis added); *see also Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 105 (2d Cir. 2009) (Miner, J., joined by Sotomayor and Katzmann, JJ.) ("Requirements for the form and content of preliminary injunctions and temporary restraining orders are properly met by a written order.").

Thus, "[i]f an injunction is not recorded in writing, the defendant is *under no judicial compulsion*." *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70, 83 (D.D.C. 2003) (emphasis added). As Judge Easterbrook squarely put it: "Oral statements are not injunctions," and "[a] judge who proclaims, 'I enjoin you' and does not follow up with an injunction [in writing] has done nothing." *Bates*, 901 F.2d at 1427; *see also Hispanics United v. Village of Addison*, 248 F.3d 617, 621 (7th Cir. 2001) ("[I]f the district judge neither puts pen to paper nor identifies an authoritative document, nothing of legal significance has happened—for oral statements are not judgments and under Rule 65(d) have no legal effect."). This principle is deeply ingrained in caselaw. "[O]nly concrete language in a written order can be enforced as an injunction," *In re Rockford Prods. Corp.*, 741 F.3d 730, 734 (7th Cir. 2013), and "statements in court … do not change the contents of injunctions," *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 527 (7th Cir. 1988). That accords with the general rule that, "[w]here the record includes both oral and written rulings on the same matter," it is the "written opinion" that matters—"not the oral statements." *PlayMakers LLC v. ESPN, Inc.*, 376 F.3d 894, 897 (9th Cir. 2004).[3]

---

[3] The general rule is inverted in the criminal-sentencing context where a district court's "oral pronouncement of a sentence controls over a written judgment." *United States v. Russell*, 45 F.4th 436, 441 (D.C. Cir. 2022). That rule derives from the Federal Rules of Criminal Procedure and

There are powerful, common-sense reasons why only written injunctions are binding. *First*, the written order may represent a more considered judgment of the court about the proper exercise of its powers: "Oral responses from the bench may fail to convey the judge's ultimate evaluation," and "[s]ubsequent consideration may cause the district judge to modify his or her views." *Ellison v. Shell Oil Co.*, 882 F.2d 349, 352 (9th Cir. 1989). Indeed, that was a very reasonable inference to draw here. Ordering the Government to reverse an extant counterterrorism operation and deliver foreign terrorists to United States soil would have been an astonishingly *ultra vires* exercise of judicial power—and in conflict with basic constitutional principles, *see infra* § III. When the written order did not include that command, the Government could reasonably have understood that as reflecting the Court's more considered view in a quickly evolving situation. And that is true regardless of how Government counsel understood the Court's intent at the time of the hearing.

*Second*, "the specificity provisions of Rule 65(d) are … designed to prevent uncertainty and confusion on the part of those faced with injunctive orders." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). "An injunctive order is an extraordinary writ," and Rule 65 "require[es] that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *Gunn v. University Committee to End War*, 399 U.S. 383, 389 (1970). "[A]n ordinary person reading the court's *order* should be able to ascertain from the

---

special needs of "[c]riminal defendants." *United States v. Godoy*, 706 F.3d 493, 495 (D.C. Cir. 2013) (cleaned up); *see also* Fed. R. Crim. P. 35(c) (defining "sentencing" as "oral announcement of the sentence"); *United States v. Villano*, 816 F.2d 1448, 1452 (10th Cir. 1987) (connecting this exception to the "right to be present at sentencing"). But in the civil context, the written judgment invariably controls. *See* Fed. R. Civ. P. 58(a) (requiring that "[e]very judgment and amended judgment must be set out in a separate *document*," with few exceptions (emphasis added)); *United States v. Moroyoqui-Gutierrez*, 602 F. App'x 378, 379 (9th Cir. 2015) ("[O]utside of [the criminal-sentencing] context the district court's written order is the operative decision.").

7

*document itself* exactly what conduct is prescribed." Wright & Miller, Fed. Prac. & Proc. § 2955 (3d ed. 2024) (emphases added). It would undermine the principles embodied in Rule 65(d) to hold that every syllable uttered at a hearing (whether after briefing or mere hours after the complaint itself was filed) is as binding as a subsequent written order.

This Court itself appeared to recognize that its oral statements did not amount to a binding injunction. Just before explaining its preference that the Government "tur[n] around [the] plane[s]," Hearing Tr. at 43:16, the Court informed counsel that it "w[ould] issue a minute order memorializing [a TRO] so *you don't have to race to write it down*," *id.* at 42:22-23 (emphasis added). And immediately after the oral statement, the Court further stated that it "will issue a minute order memorializing all of this." *Id*. at 46:9-10. Those promises accord with the rule that a court will ensure "those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt*, 414 U.S. at 476. That rule is doubly important in a case like this one, which involves many parties, grave national security concerns, and complex foreign arrangements. And even at the hearing itself, the Court's statements were inconsistent and contradictory—just a few transcript pages before the above remarks, the Court admitted that "once they are out of the country, I'm not sure what I can do there," acknowledging that its jurisdiction ended at the border.[4] Hearing Tr. at 36:20–21. Plaintiffs agreed, conceding that the Court would "*clearly* lose jurisdiction" once the class members exit the country, in support of their irreparable-harm arguments. *Id.* 36:17–19, 22–23 (emphasis added).

---

[4] As noted above, Plaintiffs have asserted that the alleged deportation flights departed at 5:26 and 5:45 PM EDT, from a location very close to the outer limit of U.S. airspace. *See* Dkt. 21, at 3. Plaintiffs also assert that this Court made the oral statements on which they rely "between approximately 6:45 pm ET and 6:48 ET." *Id.* at 1. Based on Plaintiffs' own assertions—which the Government neither confirms nor challenges—the flights thus departed U.S. airspace before this Court made the oral pronouncements on which Plaintiffs rely.

Under Rule 65(d), there is no need to wade into the thicket of parsing contradictory and imprecise verbal exchanges after-the-fact. This Court should decline Plaintiffs' request to transform oral statements into a binding injunction. What matters is the written minute order, which the Court posted 30 minutes after the hearing concluded. Moreover, even if the Court's earlier, oral statements were binding, because Rule 65(d) requires that an injunction set out its terms without reference to any other document, the Court's written order would have superseded its earlier oral statements.[5] *Cf. United States v. Com. of Va.*, 569 F.2d 1300, 1302 (4th Cir. 1978) (holding that an oral statement of "findings of fact and conclusions of law from the bench, with the written order thereafter entered merely making reference to the 'reasons stated from the bench' … did not comply with the provisions of Rules 52(a) and 65(d) of the Federal Rules of Civil Procedure") (footnote omitted). Adherence to this rule is particularly important when, as here, the Court explicitly modifies an earlier order. *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922, 923 (7th Cir. 2019). Either way, the Government has complied with the Court's operative order—the 7:25 PM Minute Order.

### III. In All Events, the President No Longer Needed To Rely on the Proclamation Once the Flights Had Left the United States.

As explained above, the Government fully complied with the Court's injunctions. But even if those orders had purported to prohibit the Government from continuing to transfer class members who were already outside the United States to a foreign country, the orders could only

---

[5] Notably, Plaintiffs themselves have already taken the position that the court's oral instruction to return planes was *not* incorporated into the written minute order. Specifically, Plaintiffs have taken the position that only the 7:25 PM Minute Order was appealed to the D.C. Circuit and that the oral statements regarding planes were entirely separate from this Court's written order. Plaintiffs' counsel thus yesterday told the D.C. Circuit that, unlike the minute order, "I don't think the order to return the planes is before you." Oral Argument at 1:19:39-42, https://media.cadc.uscourts.gov/recordings/docs/2025/03-25-5067.mp3; *id.* at 1:17:29-37 ("The order about bringing people back, or potentially bringing people back, is not before you.").

9

be understood as enjoining such conduct *based on the Proclamation*. *See, e.g.*, 7:25 PM Minute Order (Mar. 15, 2025) (enjoining removals "pursuant to the Proclamation"). Proclamation aside, the President has ample independent authority under Article II to decline to bring foreign terrorists into the United States, including by returning to the United States foreign terrorists who were previously within the United States. For that reason too, the Government's decision not to turn around the alleged deportation flights complied with the Court's orders.

The President is "entrusted with … vast powers in relation to the outside world." *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948). For one, he is the "Commander in Chief" of the armed forces. U.S. Const. art. II, § 2. "As commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual to harass and conquer and subdue the enemy." *Fleming v. Page*, 9 How. 603, 615 (1850). And the Constitution makes the President "not only the Commander-in-Chief but also the guiding organ in the conduct of [this country's] foreign affairs." *Ludecke*, 335 U.S. at 173; *see also First Nat'l Cty. Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972) (the President has "the lead role … in foreign policy").

Indeed, these Presidential powers—implicating "national security, military matters and foreign relations"—are "quintessential sources of political questions." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 45 (D.D.C. 2010). "[A] controversy involves a political question where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (cleaned up). The Court "lacks the authority to decide" cases presenting such questions. *Id.* "The principle that the courts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of

the judiciary is as old as the fundamental principle of judicial review." *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005).  And the reasons counseling against courts intervening in such disputes are only heightened when the relevant facts occur outside the country.  The "lack of discoverable and manageable judicial standards" is exacerbated when judges "sit[] thousands of miles from the field of action."  *DaCosta v. Laird*, 471 F.2d 1146, 1155 (2d Cir. 1973).

The President's ultimate direction of the flights at issue here—especially once they had departed from U.S. airspace—implicated military matters, national security, and foreign affairs outside of our Nation's borders.  As such, it was beyond the courts' authority to adjudicate.  *Cf. Ghaleb Nassar Al-Bihani v. Obama*, 619 F.3d 1, 38 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of rehearing en banc) (noting "the well-established principle that the Judiciary should not interfere when the President is executing national security and foreign relations authority in a manner consistent with an express congressional authorization"); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (holding that courts are "not competent to pass" on Secretary of State's finding that an organization's "terrorist activity" threatens "the national security of the United States").

Two consequences follow.  *First*, to the extent there was any ambiguity about the Court's orders, or about how the Court's oral statements interacted with the subsequent written order, that ambiguity should be resolved in favor of a reading that not only avoids the notice issues associated with imposing penalties for violation of a vague order, but also does not purport to interfere with the President's Article II authorities or decisions beyond judicial review.  Indeed, at the hearing itself, this Court expressed strong doubts that its jurisdiction would extend beyond the border under these circumstances—and Plaintiffs were certain that it did not.  *See* Hearing Tr. 36:17–23.  If courts cannot assess a President's decision to target terrorists on foreign soil, *see Al-Aulaqi v.*

11

*Obama*, 717 F. Supp. 2d at 47; *El-Shifa*, 607 F.3d at 844, they surely cannot require the President to *bring* terrorists *into* the United States. And even if the Court disagrees with that proposition, the Executive Branch cannot be faulted for not interpreting the Court's order as impliedly claiming such extravagant authority. That courts lack authority to micromanage how the President decides to deal with terrorists abroad is simply another reason to reject any broader reading of the Court's order.

*Second*, whatever else the Court's orders may have done, they surely were limited to the use of the Proclamation and the Alien Enemies Act. They did not reach the President's inherent Article II authorities, which were independently sufficient to support his directions with respect to flights and terrorists outside the United States. Again, the minute order in no way directed the Government to do *anything* outside the United States. But, at most, the Court's injunctions and oral statements—in the context of this litigation—concerned the invocation of the Proclamation and use of the Alien Enemies Act. In other words, even if one could broadly and improperly construe the Court's orders as restricting the government from "turn[ing] over" alien enemies "to foreign governments" (Dkt. 21, at 2), or as governing presidential decisions with respect to actions taken outside the United States, that still was limited by its terms to actions taken "pursuant to the Proclamation."

For the reasons explained above, however, once the flights were outside the United States, the President did not need to rely on that Proclamation or Act to justify transferring members of a designated foreign terrorist group to a foreign country. At that point, the Constitution itself provided sufficient authority to act, and any dispute over the President's extraterritorial exercise of that authority would present a non-reviewable political question. For that reason as well, any order that restrained the invocation of the Proclamation could not have thereby compelled the

President to return foreign terrorists from outside the United States—and any governmental refusal to do so was thus not a violation of the Court's orders.

## CONCLUSION

The Court should discharge the order to show cause because the Government has complied with the Court's orders in this case. If the Court concludes otherwise, the Government respectfully requests the opportunity to submit further briefing.

Respectfully Submitted,

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
Attorney General

CHAD MIZELLE
Acting Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Avenue
Washington, DC 20530
Phone: (202) 514-2000
drew.c.ensign@usdoj.gov

AUGUST E. FLENTJE
Acting Director

EREZ REUVENI
Assistant Director

BRIAN C. WARD
Acting Assistant Director

PATRICK GLEN
Senior Litigation Counsel

Case 1:25-cv-00766-JEB   Document 58   Filed 03/25/25   Page 14 of 14