# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| J.G.G., *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No: 1:25-cv-00766-JEB |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

LEGAL AND FACTUAL BACKGROUND ........................................................................... 1

LEGAL STANDARD ............................................................................................................... 8

ARGUMENT ............................................................................................................................ 8

   I.     Defendants' Action is Subject to Judicial Review Under the APA and in Equity, and Need Not Be Brought in Habeas. ........................................................................................ 9

   II.    The Court Can Reach the Merits of Plaintiffs' Claims.................................................... 14

      A.     The AEA Cases Confirm the Justiciability of Plaintiffs' Claims. ............................... 15

   III.   Plaintiffs Are Likely to Succeed on the Merits.............................................................. 21

      A.     The Proclamation Does Not Satisfy the AEA............................................................. 21

      B.     The Proclamation Violates the Specific Protections that Congress Established for Noncitizens Seeking Humanitarian Protection. ..................................................................... 34

      C.     The Proclamation Violates the Procedural Requirements of the INA. ......................... 36

   IV.   The Administration's Abuse of the Alien Enemies Act Has Caused and Will Continue to Cause Plaintiffs Irreparable Harm.......................................................................................... 38

   V.    The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Preliminary Injunction Order. ...................................................................................................................... 40

   VI.   The Court Should Not Require Plaintiffs to Provide Security Prior to the Preliminary Injunction Order. ...................................................................................................................... 41

CONCLUSION........................................................................................................................ 41

CERTIFICATE OF SERVICE ................................................................................................ 43

# TABLE OF AUTHORITIES

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967) ............................................................................................ 11

*Abourezk v. Reagan*,
  785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987) ............................ 16

*Al Warafi v Obama*,
  No. CV 09-2368 (RCL), 2015 WL 4600420 (D.D.C. July 30, 2015), *order vacated as moot*
  (Mar. 4, 2016) ...................................................................................................... 17

*Al-Alwi v. Trump*,
  901 F.3d 294 (D.C. Cir. 2018) .............................................................................. 17

*Al-Joudi v. Bush*,
  406 F. Supp. 2d 13 (D.D.C. 2005) ........................................................................ 33

*Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*,
  121 F.4th 1314 (D.C. Cir. 2024) ............................................................................. 7

*Al-Tamimi v. Adelson*,
  916 F.3d 1 (D.C. Cir. 2019) .................................................................................. 15

*Aracely, R. v. Nielsen*,
  319 F. Supp. 3d 110 (D.D.C. 2018) .................................................................. 8, 11

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ............................................................................................ 11

*Baker v. Carr*,
  369 U.S. 186, 210 (1962) ..................................................................................... 15

*Bauer v. Watkins*,
  171 F.2d 492 (2d Cir. 1948) ............................................................................ 13, 27

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................................ 11

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ............................................................................................ 26

*Braden v. 30th Jud. Cir. Ct. of Kentucky*,
  410 U.S. 484 (1973) .............................................................................................. 9

*Chatman-Bey v. Thornburgh*,
  864 F.2d 804 (D.C. Cir. 1988) .............................................................................. 9

*Citizens Protective League v. Byrnes*,
    64 F. Supp. 233 (D.D.C. 1946) ................................................................. 8

*Citizens Protective League v. Clark*,
    155 F.2d 290 (D.C. Cir. 1946) ...................................................... 8, 13, 14

*County of Oneida v. Oneida Indian Nation*,
    470 U.S. 226 (1985) ................................................................................. 16

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ................................................................................. 11

*Damus v. Nielsen*,
    313 F. Supp. 3d 317 (D.D.C. 2018) ........................................................ 8

*Davis v. U.S. Sent'g Comm'n*,
    716 F.3d 660 (D.C. Cir. 2013) ................................................................. 9

*Demjanjuk v. Holder*,
    563 F.3d 565 (6th Cir. 2009) ................................................................. 33

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S. Ct. 1891 (2020) ............................................................................ 11

*El-Shifa Pharm. Indus. Co. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010) ......................................................... 15, 16

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) ................................................................................. 29

*Ex parte Bollman*,
    8 U.S. (4 Cranch) 75 (1807) .................................................................. 20

*Ex parte Gilroy*,
    257 F. 110 (S.D.N.Y. 1919) .................................................................... 27

*Ex Parte Milligan*,
    71 U.S. 2 (1866) ...................................................................................... 27

*Guerrero-Lasprilla v. Barr*,
    589 U.S. 221 (2020) ................................................................................. 16

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) .......................................................................... 18, 26

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) .......................................................................... 17, 27

iii

*Holmes v. Jennison,*
    39 U.S. 540 (1840) ............................................................................................... 23

*Huisha-Huisha v. Mayorkas,*
    27 F.4th 718 (D.C. Cir. 2022) .................................................... 8, 11, 29, 33

*Huisha-Huisha v. Mayorkas,*
    560 F. Supp. 3d 146 (D.D.C. 2021) ............................................................ 33

*INS v. Chadha,*
    462 U.S. 919 (1983) ................................................................................. 16, 26

*J.D. v. Azar,*
    925 F.3d 1291 (D.C. Cir. 2019) ..................................................................... 8

*J.G.G. v. Trump,*
    No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ............................ passim

*Japan Whaling Association v. American Cetacean Society,*
    478 U.S. 221 (1986) ...................................................................................... 15

*Jarecki v. G.D. Searle & Co.,*
    367 U.S. 303 (1961) ...................................................................................... 21

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) ...................................................................................... 21

*Jones v. Hendrix,*
    599 U.S. 465 (2023) ...................................................................................... 30

*Kaplan v. Cent. Bank of the Islamic Republic of Iran,*
    896 F.3d 501 (D.C. Cir. 2018) ...................................................................... 17

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) .......................................................................... 34

*Leiva-Perez v. Holder,*
    640 F.3d 962 (9th Cir. 2011) ........................................................................ 33

*LoBue v. Christopher*
    82 F.3d 1081 (D.C. Cir. 1996) ........................................................................ 9

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ...................................................................................... 15

*Ludecke v. Watkins,*
    335 U.S. 160 (1948) ....................................................................... 12, 21, 27

*Luokung Tech. Corp. v. Dep't of Def.*,
538 F. Supp. 3d 174, 195 (D.D.C. 2021) ................................................. 34

*Mathis v. U.S. Parole Commission*,
749 F.Supp.3d 8 (D.D.C. 2024) ............................................................... 11

*McQuiggin v. Perkins*,
569 U.S. 383 (2013) ................................................................................. 12

*Medellin v. Texas*,
552 U.S. 491 (2008) ................................................................................. 23

*Miles v. Apex Marine Corp.*,
498 U.S. 19 (1990) ................................................................................... 31

*Munaf v. Geren*,
553 U.S. 674 (2008) ................................................................................... 9

*Nat'l Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) ................................................................ 12

*New York Trust Co. v. Eisner*,
256 U.S. 345 (1921) ................................................................................. 30

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................... 32, 34

*NLRB v. SW Gen., Inc.*,
580 U.S. 288 (2017) ................................................................................. 31

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
502 F. Supp. 3d 492 (D.D.C. 2020) ................................................... 33, 35

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935) ................................................................................. 11

*Porter v. Warner Holding Co.*,
328 U.S. 395 (1946) ................................................................................. 12

*Preiser v. Rodriguez*,
411 U.S. 475 (1973) ................................................................................ 8, 9

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ................................................................ 34

*R.I.L.-R v. Johnson*,
80 F. Supp. 3d 164 (D.C.C. 2015) ........................................................... 11

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) ........................................................................ 28

*Robbins v. Reagan*,
   780 F.2d 37 (D.C. Cir. 1985) .......................................................................... 10

*Sessions v. Dimaya*,
   584 U.S. 148 (2018) ........................................................................................ 22

*Simms v. District of Columbia*,
   872 F. Supp. 2d 90 (D.D.C. 2012) .................................................................. 34

*Skinner v. Switzer*,
   562 U.S. 521 (2011) .......................................................................................... 8

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ........................................................................................ 11

*U.S. Dep't of Com. v. Montana*,
   503 U.S. 442 (1992) ........................................................................................ 15

*U.S. ex rel. D'Esquiva v. Uhl*,
   137 F.2d 903 (2d Cir. 1943) ...................................................................... 13, 17

*U.S. ex rel. Gregoire v. Watkins*,
   164 F.2d 137 (2d Cir. 1947) .......................................................................... 13

*U.S. ex rel. Hoehn v. Shaughnessy*,
   175 F.2d 116 (2d Cir. 1949) .......................................................................... 14

*U.S. ex rel. Jaegeler v. Carusi*,
   342 U.S. 347 (1952) ........................................................................................ 13

*U.S. ex rel. Kessler v. Watkins*,
   163 F.2d 140 (2d Cir. 1947) ...................................................................... 13, 17

*U.S. ex rel. Ludwig v. Watkins*,
   164 F.2d 456 (2d Cir. 1947) ...................................................................... 14, 28

*U.S. ex rel. Schwarzkopf v. Uhl*,
   137 F.2d 898 (2d Cir. 1943) .......................................................................... 13

*U.S. ex rel. Von Heymann v. Watkins*,
   159 F.2d 650 (2d Cir. 1947) ...................................................................... 14, 28

*U.S. ex rel. Zdunic v. Uhl*,
   137 F.2d 858 (2d Cir. 1943) ...................................................................... 13, 17

*United States ex rel. Dorfler v. Watkins*,
    171 F.2d 431 (2d Cir. 1948) ................................................................... 28

*United States ex rel. Zdunic v. Uhl*,
    137 F.2d 858 (2d Cir. 1943) ................................................................... 27

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977) ................................................................................ 11

*United States v. Tinoso*,
    327 F.3d 864 (9th Cir. 2003) ................................................................. 31

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ................................................................................ 18

*Wiborg v. United States*,
    163 U.S. 632 (1896) ................................................................................ 21

*Wilkinson v. Dotson*,
    544 U.S. 74 (2005) .................................................................................... 9

*Wilkinson v. Garland*,
    601 U.S. 209 (2024) ................................................................................ 16

*Wolff v. McDonnell*,
    418 U.S. 539 (1974) .................................................................................. 9

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ........................................................................ passim

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    566 U.S. 189 (2012) ..................................................................... 15, 16, 18

**Statutes**

18 U.S.C. § 2339A .......................................................................................... 25

22 U.S.C. § 6442a ........................................................................................... 25

42 U.S.C. § 265 ................................................................................................ 29

5 U.S.C. § 704 .................................................................................................. 10

50 U.S.C. § 21 ......................................................................................... passim

50 U.S.C. § 22 ............................................................................................ 23, 28

8 U.S.C. § 1158 ................................................................................................ 30

8 U.S.C. § 1229a ................................................................................................ 31, 32

8 U.S.C. § 1531 .................................................................................................. 31, 32

8 U.S.C. § 1532 ........................................................................................................ 31

8 U.S.C. § 1533 ........................................................................................................ 31

8 U.S.C. § 1534 ........................................................................................................ 31

8 U.S.C. §§ 1158 ...................................................................................................... 30

8 U.S.C. §1231 .................................................................................................... 29, 30

8 U.S.C.A. § 1252 ...................................................................................................... 8

Act of July 7, 1798, ch. 67, 1 Stat. 578 .................................................................. 20

Act of July 9, 1798, ch. 68, 1 Stat. 578 .................................................................. 20

Act of May 28, 1798, ch. 48, 1 Stat. 561 ................................................................ 20

C.F.R. §§ 208.16 to 208.18 ...................................................................................... 29

**Other Authorities**

5 Annals of Cong. 1453 (Apr. 1798) ....................................................................... 25

7 Annals of Cong. 58 (May 1797) ........................................................................... 20

Alexander Hamilton, The Federalist No. 78 ............................................................ 15

Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005) ............................................... 25

Jennifer K. Elsea & Matthew C. Weed, Cong. Rsch. Serv., RL3113, Declarations of War and Authorizations for the Use of Military Force 1 (2014) ........................... 26

John Jay, Con't Cong., Draft of an Address of the Convention of the Representatives of the State of New York to Their Constituents (Dec. 23, 1776) ................................ 19

John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, N.Y. State Bar Ass'n Annual Meeting: Civil Liberty in War Time, at 8 (Jan. 17, 1919) .................. 25

Johnson's Dictionary (1773) .................................................................................... 19

Letter from George Washington to Nathanael Greene (Jan. 29, 1783) ................... 19

Letter from George Washington to Thomas Jefferson (Feb. 6, 1781) ..................... 19

Letter from Timothy Pickering, Sec'y of State, to Alexander Hamilton (June 9, 1798).............. 19

S. Rep. No. 82-1137 (Jan. 29, 1952)............................................................................ 31

U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or
    Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988) ..................................... 29

Webster's Dictionary (1828)............................................................................ 18, 19

## INTRODUCTION

The unprecedented Proclamation at the heart of this case is unlawful because the Alien Enemies Act is a wartime measure that cannot be used where, as here, there is neither an "invasion or predatory incursion" nor such an act perpetrated by a "foreign nation or government."  And even if it could be used against a non-military criminal "gang" during peacetime, targeted individuals must be provided with a meaningful chance to contest that they fall within the Proclamation's scope.  That is particularly so given the increasing number of class members who dispute the government's allegations of gang affiliation.  For these and other reasons, Plaintiffs are likely to succeed on the merits.  The remaining factors also decidedly tip in Plaintiffs' favor.  In the absence of an injunction, the government will be free to send hundreds more individuals, without notice, to the notorious Salvadoran prison where they may be held incommunicado for the rest of their lives. The government will suffer no comparable harm given that this Court has not prohibited it from prosecuting anyone who commits a criminal offense, detaining anyone under the Act or other authority, or removing anyone under the immigration laws, and the government has already conceded that some form of judicial review is appropriate.  A preliminary injunction is warranted to preserve the status quo.

## LEGAL AND FACTUAL BACKGROUND

As described in more detail in Plaintiffs' prior filings, on March 14, the President signed a Proclamation announcing that Tren de Aragua ("TdA"), a Venezuelan gang, is "perpetrating, attempting, and threatening an invasion or predatory incursion" against the United States.  *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de

Aragua (Mar. 15, 2025)[1] ("Proclamation"); *see also* Mot. for TRO at 4-5, ECF No. 3-2.[2]  Prior to

the Proclamation, ICE had moved Venezuelan detainees into position such that, when it was made

public, the detainees had already being transported to the airport and were being loaded onto

planes.  *See* Mot. for TRO at 5.  Those flights took off quickly and, despite this Court's order to

return individuals on the flights who were being removed pursuant to the AEA, the planes

continued to El Salvador and the individuals were handed over to El Salvador.  Pls.' Response to

Defs.' Notice, ECF No. 21.  Class members were promptly detained in that country's Terrorism

Confinement Center (CECOT).  Opp. to Mot. to Vacate at 10, ECF No. 44.  As detailed previously,

the conditions in El Salvador's prisons are horrific.  *See generally* Goebertus Decl., ECF No. 44-

3; Bishop Decl. ECF No. 44-4; Opp. to Mot. to Vacate at 9-10.

The government also sent eight Venezuelan women to CECOT, presumably pursuant to

the Proclamation.  Exh. I, Beckman Decl. ¶¶ 8-10; *see also* S.Z.F.R. Decl. ¶ 9, ECF No. 55-1;

E.E.P.B. Decl. ¶ 7, ECF No. 55-2.  However, upon landing, Salvadoran officials informed U.S.

officials that CECOT does not imprison women.  S.Z.F.R. Decl. ¶ 20, ECF No. 55-1; E.E.P.B.

Decl. ¶ 8, ECF No. 55-2.  The government returned the eight Venezuelan women to the United

States, along with a Nicaraguan man whom they also attempted to send to CECOT.  S.Z.F.R.

Decl. ¶ 21, ECF No. 55-1; E.E.P.B. Decl. ¶ 9, ECF No. 55-2; Beckman Decl. ¶ 11.

In the past two weeks, more details have begun to emerge.  Named Plaintiffs received no

advance notice of the basis for their removal.  Exh. C, J.G.G. Second Supp. Decl. ¶ 4; Exh. E,

Shealy Second Supp. Decl. ¶¶ 5-6; Exh. D, Carney Decl. Second Supp. Decl. ¶¶ 3, 5; Exh. F,

---

[1] *Available at* https://perma.cc/ZS8M-ZQHJ.
[2] Plaintiffs incorporate the facts and procedural history from prior filings, *see* Pls.' Mot. for a TRO, ECF No. 3-2 ("TRO Mot."); Pls.' Opp. to Defs.' Mot. To Vacate TRO, ECF No. 44 ("Opp. to Mot. to Vacate"), focusing here on further facts that have come to light and that show that a Preliminary Injunction is warranted.

Lauterback Supp. Decl. ¶¶ 4-5; Exh. G, Smyth Second Supp. Decl. ¶¶ 5-6.  They were never given any paperwork.  Indeed, no government officers bothered to inform them that the plane they were boarding was headed to El Salvador.  *Id*.; *see also* J.G.G. Suppl. Decl. ¶ 4; Exh. L, Thierry Decl. ¶ 10; Smyth Supp. Decl. ¶ 3.  The government suggests they provided individuals with a notice form that asserts the men are alien enemies and pointedly states that they are "not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal."  Exh. S, Sarabia Roman Decl., Exh. 1 (AEA Validation Guide and Notice).  But Plaintiffs and other class members received no such notice.  Their immigration attorneys were never informed or notified of their impending deportation or the basis for the removal.  Shealy Decl. ¶ 6; Thierry Decl. ¶ 9; Exh. M, Caro-Cruz Decl. ¶ 14; Exh. N, Kim Decl. ¶¶ 10-14; Smyth Supp. Decl. ¶ 6.

Whether most (or perhaps all) of the class members lack ties to TdA remains to be seen, because the government secretly rushed the men out of the country and has provided Plaintiffs with no information about the class.  But evidence since the flights on March 15 increasingly shows that many class members removed to El Salvador are not "members" of TdA as is required to fall within the Proclamation; many have no ties to TdA at all.

For instance, one of the deported class members, Andry Jose Hernandez Romero, is a professional makeup artist who identifies as gay and never had an opportunity to contest the government's TdA allegations.  Exh. H, Reyes Decl. ¶¶ 3-4, 25.  While in detention he was tagged as a TdA associate based solely on his tattoos.  *Id*. ¶¶ 4-7.  Specifically, the government has apparently relied *solely* on two crown tattoos for a connection to TdA, having found no contact with gang members, no supporting evidence from intelligence agencies, or any other of its own indicators.  *Id*. ¶¶ 22-24.  Mr. Hernandez Romero has consistently denied affiliation with TdA, as the government's own records show, *id*. (Exhibit A); his crown tattoos, which accompany the

3

words "Mom" and "Dad," have nothing to do with the TdA and reflect his work as a makeup artist for beauty pageants and his hometown's association with the "Three Kings" festival, *id*. ¶¶ 21-23; *see also id*. (Exhibit B). Yet, he was subject to the Proclamation and deported without any notice to him or his attorney. Two days later, at his court hearing, his attorney learned for the first time of his removal. *Id*. ¶¶ 14-17. Even then the government's attorney did not know the basis for removal.

Another deported class member, Jerce Reyes Barrios, was accused of being in TdA based on a tattoo of a soccer ball with a crown. Exh. K, Tobin Decl. ¶ 7. But Mr. Reyes Barrios is a professional soccer player, and the tattoo is similar to the logo for his favorite soccer team, Real Madrid. *Id*. Moreover, the government pointed to a social media post where Mr. Reyes Barrios made a common hand gesture that means "I love you" in sign language. *Id*. ¶ 8. But Mr. Reyes Barrios was never given the opportunity to explain this because he was removed prior to his immigration hearing, which was set for just over a month after the government deported him. *Id*. ¶ 4.

Yet another deported class member, Neri Alvarado Borges, was told by ICE officers that they picked him up because of his tattoos—one of which was an autism awareness ribbon with the name of his brother, who is autistic, on it. Sarabia Roman Decl., Exh. 17 (photo of tattoo). While the ICE agent who inspected his tattoos and his phone said he had nothing to do with Tren de Aragua, the Dallas ICE Field Office decided to keep Mr. Alvarado Borges in detention. *Id*. Mr. Alvarado Borges's U.S.-citizen boss was stunned to hear that his employee—someone who he described as a "stand-up guy" and one of his few close friends—had been detained and ultimately deported. *Id*.

While these errors would be troublesome in any case, they are particularly devastating here,

4

where Plaintiffs have strong claims for relief under our immigration laws and have ended up in one of the worst prisons in the world. For example, Mr. Silva experienced threats of death and physical violence by political opponents in Venezuela because of his parents' political activities. Exh. O, A.V.S.O. Decl. ¶ 4. Mr. Hernandez Romero passed his asylum credible fear interview after suffering persecution on account of his sexual orientation and political opinion at the Venezuelan government sponsored news channel where he worked. Reyes Decl. ¶¶ 4-7. Mr. Reyes Barrios was tortured in Venezuela using electric shocks and suffocation after protesting Maduro's authoritarian regime. Tobin Decl. ¶ 2. And E.V. already had refugee status, after undergoing 17 months of background checks by the United Nations, the International Organization for Migration, and U.S. Citizenship and Immigration Services, and demonstrating the persecution he had faced at the hands of Venezuelan paramilitary groups, *colectivos*, for exposing government shortcomings. Sarabia Roman Decl., Exh. 11.

The government's errors are unsurprising, given the methods it is employing to identify members of TdA. The "Alien Enemy Validation Guide" that, upon information and belief, the government is using to ascertain alien enemy status, requires ICE officers to tally points for different categories of alleged TdA membership characteristics. Sarabia Roman Decl., Exh. 1. If an individual is given a score of 8 points, he is automatically deemed an "alien enemy;" six or seven points requires supervisor approval to label the individual a TdA member. *Id.* But experts have cast serious doubt on the checklist's methodology. For example, the checklist gives four points for "tattoos denoting membership/loyalty to TDA," but experts who study TdA explain that the gang "has never had . . . identity marks such as tattoos that identify its members." Exh. B, Antillano Decl. ¶ 14; Exh. A, Hanson Decl. ¶¶ 22, 24 ("Tattoos are not a reliable way to identify members of the group."); Exh. J, Dudley Decl. ¶ 25 (tattoos are not a "reliable means" of

5

identifying TdA); *see also* Sarabia Roman Decl., Exh. 20 ("Venezuelan gangs are not identified

by tattoos."). Instead, tattoos are a common part of Venezuelan culture and many young people,

whether in a gang or not, have them.[3] Hanson Decl. ¶¶ 22, 24; Antillano Decl.¶ 14; *see also*

Sarabia Roman Decl., Exh. 20 ("gang members also sport tattoos considered culturally popular at

the moment and popular among the general public").[4] The scoring system also gives between

two to four points for the use of hand gestures, symbols, logos, graffiti, or manner of dress but

experts say these are also unreliable ways to identify TdA members. Hanson Decl. ¶¶ 23-24

(TdA does not have "iconography or unifying cultural motifs, such as symbols, insignias, logos,

notations, graffiti tags, music, or drawings" nor "a typical manner of dress . . ." "associated with

them"); Antillano Decl. ¶ 14 (no "symbol" or "identity mark" to identify TdA members). And

there is no evidence that TdA has a constitution or membership certificate—which is worth six

points on the checklist. Antillano Decl. ¶ 14.

       The arbitrariness of Defendants' process, particularly their reliance on tattoos as supposed

---

[3] Documents from the government demonstrate the patent absurdity of using tattoos and dress as
an identifier for TdA. For example, the Chicago Homeland Security Investigations office
identified wearing a Chicago Bulls jersey, especially a Michael Jordan jersey, as a TdA marker—
never mind that the Bulls are the home team and Michael Jordan was one of Chicago's biggest
stars. Sarabia Roman Decl., Exh. 2; *see also id.*, Exh. 20 ("The idea that a Jordan tatoo or jersey
would be used to link someone with Tren de Aragua is close to laughable."); Hanson Decl. ¶ 24
(same). In fact, the government's own intelligence is internally contradictory. *See, e.g.*, Sarabia
Roman Decl. ¶ 3 ("EPT-HUMINT-Gang Unit collections determined that the Chicago Bulls
attire, clocks, and rose tattoos are typically related to the Venezuelan culture and not a definite
indicator of being a member or associate of the TDA.").

[4] Documents from the government demonstrate the patent absurdity of using tattoos and dress as
an identifier for TdA. For example, the Chicago Homeland Security Investigations office
identified wearing a Chicago Bulls jersey, especially a Michael Jordan jersey, as a TdA marker—
never mind that the Bulls are the home team and Michael Jordan was one of Chicago's biggest
stars. Sarabia Roman Decl., Exh. 2; *see also id.*, Exh. 20 ("The idea that a Jordan tatoo or jersey
would be used to link someone with Tren de Aragua is close to laughable."); Hanson Decl. ¶ 24
(same). In fact, the government's own intelligence is internally contradictory. *See, e.g.*, Sarabia
Roman Decl. ¶ 3 ("EPT-HUMINT-Gang Unit collections determined that the Chicago Bulls
attire, clocks, and rose tattoos are typically related to the Venezuelan culture and not a definite
indicator of being a member or associate of the TDA.").

evidence of TdA affiliation, is underscored by Plaintiffs' experience. Indeed, four of the five named Plaintiffs possesses tattoos entirely unrelated to TdA—the fifth has no tattoos at all. *See* ECF No. 3-3 J.G.G. Decl. ¶ 4, ECF No. 3-3; Carney Second Supp. Decl. ¶ 6; Smyth Second Supp. Decl. ¶ 7; Lauterback Supp. Decl. ¶ 4 ; Shealy Second Supp. Decl. for J.G.O. ¶ 6 (no tattoos). All five vehemently deny membership in TdA, yet none was afforded an opportunity to contest this baseless designation. *See* ECF No. 3-3 (J.G.G. Decl.) ¶ 3, ECF No. 3-3; Carney Decl. ¶ 3, ECF No. 44-11; Smyth Decl. ¶¶ 9, 11, ECF No. 44-12; W.G.H. Decl. ¶ 12, ECF No. 3-6; Shealy Decl. ¶ 4, ECF No. 44-9; *see also* Exh. P, M.Y.O.R. ¶¶ 6-7. Likewise, numerous credible reports document additional noncitizens summarily removed under the Proclamation who had tattoos wholly unrelated to TdA—or no tattoos at all—and were similarly denied any chance to dispute their erroneous designations. *See* Sarabia Roman Decl., Exhs. 4-20; *see also* A.V.S.O. Decl. ¶ 9; Exh. Q, M.A.A. Decl. ¶¶ 8-9; M.Y.O.R. Decl. ¶ 6; Exh. R, Y.R.R. Decl. ¶ 10; Beckman Decl. ¶ 3.

Experts who have spent over a decade studying policing, violence, migration, prisons, and organized crime in Venezuela—and TdA in particular—submit declarations with this motion that provide a more accurate, comprehensive picture of TdA and its activities. TdA is a loose, decentralized group without a clear hierarchy or membership. Hanson Decl. ¶¶ 1, 27; Antillano Decl. ¶ 10. Following the Venezuelan government's raid on the gang's prison headquarters in 2023, the group has become even more diffuse and uncoordinated. Hanson Decl. ¶¶ 16, 27; Antillano Decl. ¶ 11; Dudley Decl. ¶ 22. TdA does not act as the de facto government in any region of Venezuela. Hanson Decl. ¶¶ 13-16. Experts further explain that there is no evidence of direct and stable links between the Maduro regime and TdA, nor evidence that the gang is intertwined with the Maduro regime or an arm of the Venezuelan state. Hanson Decl. ¶¶ 1, 14, 17; Antillano Decl. ¶ 13; Dudley Decl. ¶¶ 2, 21, 23.

Experts have also explained that TdA does not have a significant presence in the United States and that its activities here are not widespread or coordinated.  Hanson Decl. ¶¶ 19, 27; Antillano Decl. ¶ 12; Dudley Decl. ¶¶ 2, 24.  They have likewise stated that there is no evidence to indicate that the Venezuelan government has directed TdA to enter the United States or that it controls TdA's activities within the United States.  Hanson Decl. ¶¶ 17, 20; Antillano Decl. ¶13; Dudley Decl. ¶¶ 2, 23-24.  In fact, the government's own intelligence agencies circulated findings in February 2025 that contradict the assertions in the Proclamation.  Sarabia Roman Decl. Exh. 19 (intelligence community assessment concluded that TdA "was not directed by Venezuela's government or committing crimes in the United States on its orders").

## LEGAL STANDARD

To obtain a preliminary injunction, the party must show that (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer harm in the absence of preliminary relief"; (3) "the balance of equities tips in its favor"; and (4) the issuance of a preliminary injunction is "in the public interest." *Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (citation omitted).

## ARGUMENT

Since the Court granted the TRO, the justification for preliminary relief has only grown as evidence of Plaintiffs' irreparable harm grows and sheds doubt on the government's asserted justifications for summary removals.  For the same reasons that the Court correctly granted a TRO, Plaintiffs easily satisfy the factors for a preliminary injunction.  Defendants' actions violate the Alien Enemies Act (AEA), Administrative Procedure Act (APA), Immigration and Nationality Act (INA), and due process.  Plaintiffs have already suffered and will continue to suffer immense and irreparable harm without the Court's intervention, and the balance of the equities and public

interest fall decisively in Plaintiffs' favor.

I.    **Defendants' Action is Subject to Judicial Review Under the APA and in Equity, and Need Not Be Brought in Habeas.**

The Court has jurisdiction over Plaintiffs' claims because they need not be brought in habeas in the district of confinement, and Defendants' conduct is plainly reviewable under the APA and in equity.  Because Plaintiffs are seeking injunctive, declaratory, and other relief that does not require release, this case need not be brought in habeas.  Plaintiffs therefore can pursue their claims outside of habeas, just as courts in this District have allowed detained noncitizens to do in multiple cases over the years.  *See, e.g.*, *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022); *J.D. v. Azar*, 925 F.3d 1291, 1300 (D.C. Cir. 2019); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 323 (D.D.C. 2018); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 126-27 (D.D.C. 2018).  And this Court has already properly rejected the government's contention that because Plaintiffs *could* bring their claims in habeas, they therefore *must* do so and cannot bring their claims under the APA or equity.  Op. 13.[5]

**First**, a habeas action is not required.  Although most past AEA cases were brought in habeas, "that fact is largely a relic of historical happenstance."  Op. 13.  No court has held that AEA challenges must be brought in habeas.  Indeed, in World War II cases, the D.C. Circuit considered non-habeas civil actions seeking "injunction, mandatory injunction and ancillary relief" against the application of the AEA.  *See Citizens Protective League v. Clark*, 155 F.2d 290, 291-92 (D.C. Cir. 1946) (addressing three consolidated actions on behalf of a nonprofit and 159 German nationals); *see also Citizens Protective League v. Byrnes*, 64 F. Supp. 233, 233 (D.D.C.

---

[5] Op. refers to this Court's opinion denying Defendants' motion to vacate the TRO.  *See* ECF No. 53.

1946).  And in *Clark*, although the government argued that one of the consolidated cases had to be brought in habeas, the district court "dismissed the complaints on the merits," 155 F.2d at 292, and the court of appeals affirmed, *id*. at 293.  And when Congress wants to specifically require that certain immigration claims are brought only in a habeas petition, it knows how to do so.  *See* 8 U.S.C.A. § 1252(e)(2) (providing for limited review of expedited removal orders "in habeas corpus proceedings"); *id*. § 1252(a)(2)(A) (stripping review "except as provided in subsection (e)").  Nothing in the AEA or elsewhere remotely requires Plaintiffs' claims to be brought in habeas.

More generally, as this Court thoroughly explained, only "core" claims—those seeking release—must be brought in habeas; here, Plaintiffs are not seeking release.  *See* Op. 16-18; *see also, e.g.*, *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973); *Skinner v. Switzer*, 562 U.S. 521, 534 (2011) (Court has never "recognized habeas as the sole remedy, or even an available one, where the relief sought would 'neither terminat[e] custody, accelerat[e] the future date of release from custody, nor reduc[e] the level of custody'") (citation omitted).  Thus, Plaintiffs can bring "non-core" habeas claims that do not seek release through other types of actions, *see Wolff v. McDonnell*, 418 U.S. 539, 554 (1974); *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005), and the immediate custodian rule does not apply, *see Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 495 (1973).  *See also Davis v. U.S. Sent'g Comm'n*, 716 F.3d 660, 664 (D.C. Cir. 2013) (considering action by individual incarcerated outside of the District because "victory would not secure his immediate release or even a reduction in his time served").

Defendants ignore the Supreme Court and D.C. Circuit's long line of cases differentiating between "core" and "non-core" habeas claims and instead rely primarily on two cases to assert that venue must lie in the district of confinement.  In *LoBue v. Christopher*, the D.C. Circuit held that plaintiffs challenging their extradition to Canada could not seek a declaratory judgment in this

District but rather must pursue their challenge through their already-existing petition for habeas corpus. 82 F.3d 1081, 1082 (D.C. Cir. 1996). But *extradition* has its own specialized body of law. The *LoBue* plaintiffs had to seek habeas because there was no APA review available to them. *Id.* at 1083 ("extension of the APA to *extradition* orders is impossible" as the judges involved do not constitute an agency). The D.C. Circuit itself acknowledged that immigration cases were different from extradition cases since the Supreme Court's decision in *Pedreiro* extended APA review over deportation orders. *Id.*; *see also* Op. 18. Additionally, *LoBue* rested on the unique circumstances in which the plaintiffs had a pending habeas petition in their district of confinement seeking release. The Court thus noted that because success in plaintiffs' declaratory suit would have "preclusive effect" on their pending habeas petition, it would secure release from confinement, thereby precluding the availability of other remedies. 82 F.3d at 1083-844 (citing *Chatman-Bey v. Thornburgh*, 864 F.2d 804 (D.C. Cir. 1988), and *Preiser*, 411 U.S. at 489-90).

*Munaf v. Geren*, 553 U.S. 674 (2008), also does not help Defendants. There, the Supreme Court held only that U.S. citizens who had voluntarily traveled to Iraq *could* bring a habeas challenge seeking to prevent their transfer from the custody of an overseas task force to that of Iraqi authorities for prosecution. 553 U.S. at 680. But the Court never suggested that petitioners were limited to habeas, much less sought to disturb the longstanding general distinction between core and non-core habeas actions. The issue was instead whether the overseas petitioners were in U.S. custody for purposes of habeas jurisdiction. *Id.* at 689.

Finally, and in any event, the government's suggestion that every individual, even those who are unrepresented (the overwhelming majority), could file an individual habeas is, at best, illusory. As demonstrated above, the government is not providing any advance notice of an individual's designation as an alien enemy, let alone providing time to file a habeas action and

obtain a stay of removal.  The notice form that it may be using—which no Plaintiff has reported

receiving—says there is no form of review available.  Moreover, the government has complete

control over where it detains and transfers people, and transfers of class members have occurred

swiftly (and without notice to counsel in the few cases where there is counsel).  The reality is that,

if forced to pursue their claims in habeas, Plaintiffs will face insurmountable hurdles to obtaining

judicial review over the lawfulness of Defendants' actions.  The government has already admitted

as much.  *See  J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *30 (D.C. Cir. Mar. 26, 2025)

(Millett, J., concurring) ("The government's position at oral argument was that, the *moment* the

district court TROs are lifted, it can *immediately* resume removal flights without affording

Plaintiffs notice of the grounds for their removal or any opportunity to call a lawyer, let alone to

file a writ of habeas corpus or obtain any review of their legal challenges to removal.")   *See id*.

at 29 (Millett, J., concurring) ("Only a swift class action could preserve the Plaintiffs' legal rights

before the rushed removals mooted their cases and thrust them into a Salvadorean prison."); 5

U.S.C. § 704.[6]

     ***Second***, there is no question the Court can review and enjoin the agency actions

implementing the Proclamation.  APA review is generally available to plaintiffs absent specific

preclusion by Congress.  *See Robbins v. Reagan*, 780 F.2d 37, 42 (D.C. Cir. 1985); *Dep't of

Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) ("The APA

establishes a 'basic presumption of judicial review [for] one suffering legal wrong because of

agency action.'") (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967)).  Indeed,

---

[6] Even if Plaintiffs' challenges to the use of the AEA were required to be brought in habeas, at a minimum, Plaintiffs' claims that they should be provided notice and an opportunity to contest the government's allegations do not sound in habeas insofar as they are preconditions to any meaningful exercise of habeas.  Thus, there is no "other adequate remedy in a court" for Plaintiffs.

even as to detention claims, Congress "has never manifested an intent to require those challenging an unlawful, nationwide detention policy to seek relief through habeas rather than the APA."  Op. 15 (quoting *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 186 (D.C.C. 2015) (citation omitted)); *see also Huisha-Huisha*, 27 F.4th at 726 (APA challenge to use of public health law to expel noncitizens from the United States); *Aracely*, 319 F. Supp. 3d at 126 ("courts in this jurisdiction facing challenges to similar nation-wide immigration policies have rejected the notion that detainees must proceed through a habeas petition").  Plaintiffs can therefore seek review over Defendants' implementation of the Proclamation as it qualifies as final agency actions consummating the agency's decisionmaking process in a manner from which legal consequences flow.  Op. 15 (citing *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

**Lastly**, there is similarly no question that this Court can review the lawfulness of presidential actions like the Proclamation and its implementation.  *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 675–76 (2018) (reviewing President's authority under the INA to issue proclamation); *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (reviewing President Carter's executive order ending the Iranian hostage crisis); *Youngstown*, 343 U.S. 579 *Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (Jackson, J., concurring) (reviewing constitutionality of President Truman's executive orders); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) (reviewing validity of an executive order issued by President Franklin Roosevelt under the National Industrial Recovery Act in action against officials of the Department of the Interior); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."); *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 173 (1977) (court can avail itself of auxiliary writs "when the use of such historic aids

is calculated in its sound judgment to achieve the ends of justice entrusted to it"). As noted in *Mathis v. U.S. Parole Commission*, "by default, federal courts have 'jurisdiction in equity.'" 749 F.Supp.3d 8, 23 (D.D.C. 2024) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)). "[T]he 'full scope of [this] jurisdiction is to be recognized and applied,'" *id.* (alteration in original) (quoting *Porter*, 328 U.S. at 398), "absent only 'the clearest command' otherwise in a statute," *id.* (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013)). There is not the remotest suggestion in the AEA that equitable power is precluded.

Thus, the Court can review Plaintiffs' claims under the APA and in equity.[7]

## II.    The Court Can Reach the Merits of Plaintiffs' Claims.

Plaintiffs raise three statutory arguments: (1) the AEA's use of "invasion" and "predatory incursion" refer only to military action in the context of an actual or imminent war; (2) a criminal gang is not a "foreign nation or government" within the AEA; and, (3) even if the AEA applies, it requires (a) an opportunity to contest whether an individual falls within the Proclamation, (b) compliance with the INA and other later-enacted, more specific statutory protections for noncitizens, and (c) an opportunity to voluntarily depart the United States prior to any removal.

In prior filings, the government has not directly disputed that Plaintiffs' third set of statutory claims is justiciable and has instead limited its arguments to Plaintiffs' first two statutory claims. The government's justiciability arguments are wrong. The AEA cases confirm that this Court can reach the merits of Plaintiffs' claims. More generally, the political question doctrine poses no bar to judicial review of the proper interpretation of statutes that constrain the executive branch.

---

[7] Plaintiffs do not seek to enjoin the President but he remains a proper defendant because, at a minimum, Plaintiffs may obtain declaratory relief against him. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (concluding that court had jurisdiction to issue writ of mandamus against the President but "opt[ing] instead" to issue declaration).

## A.    The AEA Cases Confirm the Justiciability of Plaintiffs' Claims.

As this Court has already correctly held, it can "construe the terms 'nation,' 'government,' 'invasion,' and 'predatory incursion.'"  Op. 22.  In *Ludecke v. Watkins*, the Supreme Court emphasized that "resort to the courts" *was* available "to challenge the construction and validity of the statute," explicitly noting that the AEA does not preclude judicial review of "questions of interpretation and constitutionality."  335 U.S. 160, 163, 171 (1948).  Those questions—the "construction" and "interpretation" of the AEA—are precisely what are at issue here.  And not only did the *Ludecke* Court make that point twice, but *Ludecke* itself reached the merits of the statutory question presented there: whether a "declared war" no longer existed within the meaning of the Act when "actual hostilities" had ceased (the "shooting war" had ended).  *Id.* at 166-70.  Only after concluding, on the merits, that the statutory term "declared war" did not mean "actual hostilities," but instead referred to the point at which the President and Congress "declared" the war over, did the Court state that its review had come to an end.  *Id.* at 170 & n.15.  In short, the "political judgment[]" that *Ludecke* declined to revisit, *see id.* at 170, was simply the decision of Congress and the President not to choose to formally declare the war over, *see id.* at 169, and *not* a question of statutory interpretation.  Indeed, four years later, the Court reversed a government World War II removal decision because "[t]he statutory power of the Attorney General to remove petitioner as an enemy alien ended when Congress terminated the war."  *U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952).

Consistent with *Ludecke*'s recognition that questions about the "construction and validity" of the AEA are justiciable, 335 U.S. at 171, courts have reviewed a range of issues concerning the AEA's statutory prerequisites.  *See, e.g.*, *U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 143 (2d Cir. 1947) (interpreting the meaning of "foreign nation or government"); *U.S. ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860–61 (2d Cir. 1943) ("[t]he meaning of [native, citizen, denizen, or subject]

15

as used in the statute . . . presents a question of law"; interpreting meaning of "denizen" and remanding for hearing on disputed facts); *U.S. ex rel. Gregoire v. Watkins*, 164 F.2d 137, 138 (2d Cir. 1947) (interpreting the meaning of "native"; discussing alternatives to attain a "logically consistent construction of the statute"); *U.S. ex rel. D'Esquiva v. Uhl*, 137 F.2d 903, 905–07 (2d Cir. 1943) (interpreting the meaning of "native" and reviewing executive branch's position on legal status of Austria); *U.S. ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 903 (2d Cir. 1943) (interpreting the meaning of "citizen" and legal effects of Germany's annexation of Austria); *Bauer v. Watkins*, 171 F.2d 492, 493 (2d Cir. 1948) (holding that the government bears the burden of proof of establishing the citizenship of "alien enemy"); *Citizens Protective League v. Clark*, 155 F.2d 290, 292, 295 (D.C. Cir. 1946) (reviewing whether Proclamation was within "the precise terms" of the AEA, and whether AEA was impliedly repealed); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) (interpreting "within the United States"; requiring executive branch to show that the petitioner "refuse[d] or neglect[ed] to depart" under Section 21); *U.S. ex rel. Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947) (interpreting "refuse or neglect to depart" in Section 21 as creating a "right of voluntary departure" that functions as a "statutory condition precedent" to the government's right to deport enemy aliens); *U.S. ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116, 117–18 (2d Cir. 1949) (interpreting "reasonable time" to depart under Section 22).

The government has leaned heavily on *Ludecke*'s recognition that the AEA vests the President with broad authority to take extraordinary measures. But that is precisely why the statutory perquisites have always been, and must be, interpreted by the courts. Otherwise, the President can employ this authority without regard to the careful limits Congress expressly established in the statute. Notably, Congress did not write that this extraordinary power can be

used when the President unilaterally *deems* there to be an invasion or incursion by a foreign government or nation, but rather, when there "is" such an event.  50 U.S.C. § 21.

The government points to language in the D.C. Circuit's (pre-*Ludecke* decision) *Citizens Protective League*, 155 F.2d at 294, stating that the Act vests "[u]nreviewable power in the President to restrain, and to provide for the removal of, *alien enemies in time of war*."  Mot. to Vacate 3, 7–8, ECF No. 26 (emphasis added).  But, if anything, that statement only underscores that the AEA's activation is limited to times of actual war and does not remotely suggest that courts may not review whether the statutory predicates have been satisfied.  Indeed, the court stated that it could review whether the Presidential Proclamation and Attorney General's regulations came "within the precise terms" of the AEA.  And the court held, on the merits, that "[t]he constitutional question raised by appellants was not substantial."  155 F.2d at 294–95.

### B.    The Political Question Doctrine Does Not Apply.

General political question doctrine and caselaw likewise supports this Court's ability to interpret the meaning of the statutory terms in the AEA.  Particularly in recent decisions, the Supreme Court has emphasized that courts may review—and are duty-bound to interpret— statutory terms, even where they touch on national security and foreign affairs.  Indeed, Plaintiffs are not aware of any Supreme Court decision that has found a statutory claim non-justiciable.  *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 855 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("[t]he Supreme Court has never applied the political question doctrine in cases involving statutory claims" that "the Executive Branch violated congressionally enacted statutes that purportedly constrain the Executive.").

Rather, the political question doctrine is a "narrow exception" to courts' presumptive exercise of jurisdiction.  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012).  The doctrine "is primarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210

(1962), and so the judiciary *must* act when the questions at issue fall within its own competence, *see, e.g.*, *U.S. Dep't of Com. v. Montana*, 503 U.S. 442, 458 (1992) ("As our previous rejection of the political question doctrine in this context should make clear, the interpretation of the apportionment provisions of the Constitution is well within the competence of the Judiciary."); *Al-Tamimi v. Adelson*, 916 F.3d 1, 11 (D.C. Cir. 2019) ("Policy choices are to be made by the political branches and purely legal issues are to be decided by the courts."); *Baker*, 369 U.S. at 216 (courts "will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power"); *see generally Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (emphasizing that "the final 'interpretation of the laws' [is] 'the proper and peculiar province of the courts'") (quoting The Federalist No. 78 at 525 (A. Hamilton)).

As this Court explained in its TRO decision, the fact that a legal claim implicates (or arguably implicates) foreign affairs or national security does not make it a non-justiciable political question. *See* Op. 20; *cf. J.G.G.*, 2025 WL 914682, at *12-16 (Henderson, J., concurring); *id.* at *25-32 (Millet, J., concurring). In *Zivotofsky*, for instance, the Court held that statutory right to passport designation did not raise a political question, even though it implicated the diplomatic status of Jerusalem. 566 U.S. at 196-201. Likewise, in *Japan Whaling Association v. American Cetacean Society*, the Supreme Court rejected the idea that a "purely legal question of statutory interpretation" should be held nonjusticiable merely because it "involve[d] foreign relations," explaining that "interpreting congressional legislation is a recurring and accepted task for the federal courts" and the case "call[ed] for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below." 478 U.S. 221, 229-30 (1986); *see also INS v. Chadha*, 462 U.S. 919, 940–41 (1983) (rejecting argument that Congress's plenary power over immigration renders all immigration-related arguments

political questions); *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 249 (1985) (similar

for Congress's power over Indian affairs). *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir.

1986), *aff'd*, 484 U.S. 1 (1987) (noting that although "[t]he Executive has broad discretion over

the admission and exclusion of aliens, . . . [i]t extends only as far as the statutory authority

conferred by Congress, and stressing it is "the duty of the courts, in cases properly before them, to

say where those statutory and constitutional boundaries lie").

     In short, the political question doctrine serves to reinforce the separation of powers. And

it is especially critical for the judiciary to enforce the separation of powers when inter-branch

disputes arise, such as where the executive violates or exceeds its authority under a statute. *See*

*El-Shifa Pharm. Indus. Co.*, 607 F.3d at 855 (Kavanaugh, J., concurring). Here, judicial review of

Plaintiffs' challenge *preserves* the separation of powers by ensuring that the President does not

exceed the specific authority Congress delegated in the AEA. *See Youngstown*, 343 U.S. at 637–

38 (Jackson, J., concurring). This Court thus rightly acknowledged that it can construe the terms

"nation," "government," "invasion," and "predatory incursion." Op. 22.

     This Court also noted that whether courts are empowered to decide if TdA's characteristics

or conduct satisfy the statutory terms presents a "harder" issue. *Id.* As shown below, however,

the Proclamation, on its face, does not satisfy the AEA's statutory predicates as properly

understood. *See infra* (discussing merits). Consequently, even if this Court were to accept the

Proclamation's conclusory, vague findings, it could still hold that the Proclamation fails to satisfy

the AEA. That would merely involve a straightforward application of law to accepted facts and

would thus be a "familiar judicial exercise." *Zivotofsky*, 566 U.S. at 196; *see also Guerrero-*

*Lasprilla v. Barr*, 589 U.S. 221 (2020); *Wilkinson v. Garland*, 601 U.S. 209, 217 (2024) ("In

*Guerrero-Lasprilla*, this Court held that the statutory phrase 'questions of law' includes the

application of a legal standard to undisputed or established facts, also referred to as mixed questions of law and fact.") (internal quotation marks and citation omitted).

Moreover, even if the Court concluded that the Proclamation's findings, on their face, did establish that TdA is a "foreign government or nation" and that TdA was engaged in an "invasion or predatory incursion," it would still have an independent obligation to examine the factual record on whether those terms were satisfied. *See* Op. 21 (explaining that the *Ludecke* Court "interpreted 'declared war,' defined its termination based on that construction, and decided as a factual matter whether such termination had occurred"). If courts were to simply accept any presidential findings, no matter how conclusory or unfounded, judicial review would be rendered an empty exercise, undermining Congress's decision to place express limits on the executive branch. Thus, even during World War II, the courts examined the facts to ensure that the AEA's statutory limits on presidential power were observed. *See, e.g.*, *U.S. ex rel. Kessler*, 163 F.2d at 143 (reviewing petitioner's factual contention that the German government had ceased to exist after it surrendered and thus was no longer a "foreign nation or government" under the AEA); *U.S. ex rel. Zdunic*, 137 F.2d at 860–61 (interpreting meaning of "denizen" under the AEA and remanding for hearing on disputed facts); *United States ex rel. D'Esquiva*, 137 F.3d at 905–07 (interpreting meaning of "native" under the AEA and reviewing the U.S. government's full course of conduct to ascertain whether and when it had officially recognized Austria's annexation by Germany; remanding for additional factfinding on this question); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004) (plurality op.) (detention of Taliban combatants authorized by the AUMF only "*[i]f the record establishes* that United States troops are still involved in active combat in Afghanistan") (plurality opinion) (emphasis added)); *Al-Alwi v. Trump*, 901 F.3d 294, 298–300 (D.C. Cir. 2018) (Henderson, J.) (evaluating whether "active hostilities" continued under the AUMF; concluding

that "[t]he record so manifests here"); *Al Warafi v Obama*, No. CV 09-2368 (RCL), 2015 WL 4600420 (D.D.C. July 30, 2015), *order vacated as moot* (Mar. 4, 2016); *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 514 (D.C. Cir. 2018) ("[A] court must determine whether the circumstances involve an act of war within the meaning of the statutory exception. That interpretive exercise, unlike with a non-justiciable political question, is what courts do.'").

Even if this Court grants some deference to the executive branch's determinations, that deference does not require the Court to rubber-stamp unsupported, vague, and conclusory allegations in the face of contrary evidence, such as the facts provided by Plaintiffs' experts on TdA. "The Judicial Branch appropriately exercises" review "where the question is whether Congress or the Executive is 'aggrandizing its power at the expense of another branch.'" *Zivotofsky*, 566 U.S. at 197; *cf. Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). That is precisely what this case is about. And where the executive branch exceeds those boundaries, its conduct must be subject to judicial review. *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 591, 635 (2006) (interpreting statutes limiting executive's authority to convene military commissions; "in undertaking to try Hamdan and subject him to criminal punishment, the Executive is bound to comply with the rule of law that prevails in this jurisdiction").

## III.    Plaintiffs Are Likely to Succeed on the Merits.

### A.    The Proclamation Does Not Satisfy the AEA.

The Proclamation is unprecedented, exceeding the President's statutory authority in three critical respects: there is no invasion or predatory incursion; no foreign government or nation; and no process to contest whether an individual falls within the Proclamation. When the government asserts "an unheralded power" in a "long-extant statute," courts "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That skepticism

is well warranted here.

      **1.**      **There Is No "Invasion" or "Predatory Incursion" upon the United States.**

The Proclamation fails on an essential statutory requirement: that there be an "invasion or predatory incursion" directed "against the territory of the United States." The text and history of the Alien Enemies Act make clear that it uses these terms to refer to military actions that are indicative of an actual or impending war. At the time of enactment, an "invasion" was a large-scale military action by an army intent on territorial conquest. *See* Webster's Dictionary, Invasion (1828) ("invasion" is a "hostile entrance into the possession of another; particularly, the entrance of a hostile army into a country for purpose of conquest or plunder, or the attack of a military force"); Johnson's Dictionary, *Invasion* (1773) ("invasion" is a "[h]ostile entrance upon the right or possession of another; hostile encroachment" such as when "William the Conqueror invaded England"); John Jay, Con't Cong., Draft of an Address of the Convention of the Representatives of the State of New York to Their Constituents (Dec. 23, 1776) (describing the goal of British invasion as "the conquest of America")[8]; *see also J.G.G.*, 2025 WL 914682, at *20 (Henderson, J., concurring) (in the Constitution, "invasion" "is used in a military sense" "*in every instance*").

And "predatory incursion" referred to smaller-scale military raids aimed to destroy military structures or supplies, or to otherwise sabotage the enemy, often as a precursor to invasion and war. *See* Webster's Dictionary, *Predatory* (1828) ("predatory" underscores that the purpose of a military party's "incursion" was "plundering" or "pillaging"); *id.*, *Incursion* (1828) ("incursion . . . applies to the expeditions of small parties or detachments of an enemy's army, entering a territory for attack, plunder, or destruction of a post or magazine"); Johnson's Dictionary, *Incursion* (1773)

---

[8]  *Available at*
https://founders.archives.gov/?q=invasion%20conquest&s=1111311111&sa=&r=17&sr=.

("[a]ttack" or "[i]nvasion without conquest"); *see also* Letter from Timothy Pickering, Sec'y of State, to Alexander Hamilton (June 9, 1798) (reporting that "predatory incursions of the French" might result in "great destruction of property" but that militia could repel them);[9] Letter from George Washington to Thomas Jefferson (Feb. 6, 1781) (describing a British raid that destroyed military supplies and infrastructure in Richmond as a "predatory incursion");[10] Letter from George Washington to Nathanael Greene (Jan. 29, 1783) ("predatory incursions" by the British could be managed with limited cavalry troops);[11]   *J.G.G.*, 2025 WL 914682, at *10 (Henderson, J., concurring) (early American caselaw indicates that "predatory incursion" is "a form of hostilities against the United States by another nation-state, a form of attack short of war").

The historical context in which the AEA was passed reinforces what Congress meant by "predatory incursion" and "invasion."  At the time of passage, French ships were already attacking U.S. merchant ships in U.S.   *See, e.g.*, 7 Annals of Cong. 58 (May 1797) (promoting creation of a Navy to "diminish the probability of . . . predatory incursions" by French ships while recognizing that distance from Europe lessened the chance of "invasion"); Act of May 28, 1798, ch. 48, 1 Stat. 561, 561 (permitting U.S. armed vessels to seize French armed vessels that had attacked U.S. vessels or that were "hovering on the coasts of the United States" to do so); Act of July 9, 1798, ch. 68, 1 Stat. 578, 578 (authorizing US ships to seize "any armed French vessel" "found within the jurisdictional limits of the United States").  Congress worried that these attacks against the territory of the United States were the precursor to all-out war with France.   *J.G.G.*, 2025 WL 914682, at *1 (Henderson, J., concurring) ("In 1798, our fledgling Republic was consumed with fear . . . of external war with France.").  This "predatory violence" by a sovereign nation led, in

---

[9] *Available at* https://founders.archives.gov/documents/Hamilton/01-21-02-0282.
[10] *Available at* https://founders.archives.gov/documents/Jefferson/01-04-02-0673.
[11] *Available at* https://founders.archives.gov/documents/Washington/99-01-02-10525.

part, to the AEA.  *See* Act of July 7, 1798, ch. 67, 1 Stat. 578, 578 ("[W]hereas, under authority of the French government, there is yet pursued against the United States, a system of predatory violence").

At the same time, the 1798 Congress was considering whether to authorize the President to raise troops to respond to impending conflict with France. It ultimately did so, authorizing him to raise troops "in the event of a declaration of war against the United States, or of an actual invasion of their territory, by a foreign power, or of imminent danger of such invasion."  Act of May 28, 1798, ch. 47, 1 Stat. 558. As Judge Henderson noted, "[t]his language bears more than a passing resemblance to the language of the AEA, which the Congress enacted a mere thirty-nine days later. *J.G.G.*, 2025 WL 914682, at *9. As such, the historical context makes plain that Congress was concerned about *military* incursions by the armed forces of a foreign nation.

Tellingly, the AEA requires that the predicate invasion or predatory incursion be "against the territory of the United States."  50 U.S.C. § 21.  And at the time of founding, actions "against the territory of the United States" were expressly military in nature.  *See Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 131 (1807) (describing levying war against the United States as "a military enterprize . . . against any of the territories of the United States"); *Wiborg v. United States*, 163 U.S. 632, 633 (1896) (explaining that a group of seamen were charged with preparing for a "military expedition . . . against the territory and dominions of a foreign prince").

Finally, text and history make clear that the AEA's powers extended beyond an existing war only when war was imminent. *Ludecke*, 335 U.S. at 169 n.13 (explaining that "the life of [the AEA] is defined by the existence of a war").  The interpretive canon of *noscitur a sociis* confirms this.  The three terms "declared war," "invasion," and "predatory incursion" appear alongside each other in a related list.  Reading the latter two in light of the company they keep highlights the

24

express military nature of their usage here. *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961).

Unsurprisingly, then, the Department of Justice has explicitly stated to Congress that the AEA contemplates use by the President only "in situations where war is imminent." *See, e.g.*, Office of Legislative Affairs, Proposed Amendment to AEA, at 2 n.1 (Aug. 27, 1980)). This also comports with the common law understanding of the term "alien enemy" as subject of a foreign state at war with the United States. *See Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950) (collecting cases).

An "invasion" or "predatory incursion" are thus military actions by foreign governments that constitute or imminently precede acts of war. "Mass illegal migration" or criminal activities, as described in the Proclamation, plainly do not fall within the statutory boundaries. On its face, the Proclamation makes no findings that TdA is acting as an army or military force. Nor does the Proclamation assert that TdA is acting with an intent to gain a territorial foothold in the United States for military purposes. And the Proclamation makes no suggestion that the United States will imminently be at war with Venezuela. The oblique references to the TdA's ongoing "irregular warfare" within the United States does not suffice because the Proclamation makes clear that it refers to "mass illegal migration" and "crimes"—neither of which constitute war within the Founding Era understanding. It asserts that TdA "commits brutal crimes" with the goal of "harming United States citizens, undermining public safety, and . . . destabilizing democratic nations." But these actions are simply not "against the territory" of the United States. Indeed, if mass migration or criminal activities by some members of a particular nationality could qualify as an "invasion," then virtually any group, hailing from virtually any country, could be deemed enemy aliens.

The courts' role in enforcing the bounds of congressional statutory predicates, like "predatory invasion" and "incursion" is critical. Congress passed the AEA within weeks of the Alien Friends Act ("AFA"). That second law gave the President broader discretion to deport any noncitizen who he considered "dangerous to the peace and safety of the United States," regardless of whether an invasion or war had occurred. An Act Concerning Aliens § 1, 1 Stat. 571. As such, the 1798 Congress clearly meant to grant the President two distinct powers—the power to remove the national of foreign enemy sovereign countries in times of a war or imminent war, and the power to remove particular dangerous noncitizens in times of war or peace. The government's preferred interpretation of the AEA—where the President can remove allegedly dangerous people by deciding that virtually anything qualifies as a predatory incursion or invasion, and no court can review that determination—reads the AEA's power to encompass the authorities granted by both the AEA and the AFA. But it would have made little sense for Congress to pass two laws within weeks of each other, unless those laws were meaningfully different. And the critical difference is, of course, the statutory limitations on when the President can use the AEA—it is a particular tool for a particular situation, namely the presence of nationals of a belligerent country during wartime, which simply does not apply to present circumstances. Moreover, treating the AEA like the AFA is especially untenable given that the AFA was "widely condemned as unconstitutional by Madison and many others" and quickly allowed to lapse. *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring) (the AFA "is one of the most notorious laws in our country's history"); *see also J.G.G.*, 2025 WL 914682, at *1 (Henderson, J., concurring) (AFA was "widely derided as unconstitutional").

### 2. The Purported Invasion Is Not by a "Foreign Nation or Government."

The Proclamation fails to assert that any "foreign nation or government" within the

meaning of the Act is invading the United States.  Put simply, the Proclamation never finds that TdA is a foreign "nation" or "government."  Nor could it.  At the time of enactment, the terms "nation" and "government" were defined by their possession of territory and legal authority.  *See* Johnson's Dictionary, *Nation* (1773) ("A people distinguished from another people; generally by their language, original, or government."); Johnson's Dictionary, *Government* (1773) ("An established state of legal authority.").  As a criminal gang, TdA possesses neither a defined territory nor any legal authority.  Hanson Decl. ¶¶ 13, 16; Antillano Decl. ¶¶ 11, 13; Dudley Decl. ¶ 22.

The Proclamation asserts that "[o]ver the years," the Venezuelan government has "ceded ever-greater control over their territories to transnational criminal organizations."  But the Proclamation notably does *not* say that TdA operates as a government in those regions[12]  In fact, the Proclamation does not even specify that TdA currently controls *any* territory in Venezuela.

The AEA presumes that a designated nation possesses treaty-making powers.  *See* 50 U.S.C. § 22 ("stipulated by any treaty . . . between the United States and the hostile nation or government").  Nations—not criminal organizations—are the entities that enter into treaties.  *See, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 505, 508 (2008) (treaty is "a compact between independent nations" and "agreement among sovereign powers") (internal quotation marks omitted); *Holmes v. Jennison*, 39 U.S. 540, 570-72 (1840) (similar).  It should go without saying that TdA possesses no such power.

Moreover, when a "nation or government" is designated under the AEA, the statute unlocks power over that nation or government's "natives, citizens, denizens, or subjects."  50 U.S.C. § 21.  *Countries* have "natives, citizens, denizens, or subjects."  By contrast, criminal organizations, in

---

[12] Guantanamo Bay provides an analogy.  There, the United States controls the naval base on the island.  But the United States' control of a piece of land does not somehow render it the "government" of Cuba.

the government's own view, have "members." Proclamation § 1 ("members of TdA").  And it designates TdA "members" as subject to AEA enforcement—but "members" are not "natives, citizens, denizens, or subjects."  That glaring mismatch underscores that Defendants are attempting not only to use the AEA in an unprecedented way, but in a way that Congress never permitted— as a mechanism to address, in the government's own words, a *non*-state actor.  *Venezuela* has natives, citizens, and subjects, but TdA (not Venezuela) is designated under the proclamation.  No amount of wordplay can avoid the obvious fact that *Venezuela* is the relevant country for statutory purposes here—and TdA is a non-state criminal organization.

Even as the Proclamation singles out certain Venezuelan nationals, it does not claim that *Venezuela* is invading the United States.  And, as the President's own CIA Director recently testified, the intelligence community has no assessment that says the US is at war with or being invaded by Venezuela.  Ryan Goodman, Bluesky (Mar. 26, 2025).[13]  The AEA requires the President to identify a "foreign nation or government" that is invading or engaging in an invasion or incursion.  Because it does not, the Proclamation fails on its face.

Instead, the Proclamation makes a half-hearted attempt to link TdA to Venezuela by suggesting that TdA is "supporting," "closely aligned with," or "has infiltrated" the Maduro regime.  *See* Proclamation.  To make that link, the Proclamation points to the gang's growth under Tareck El Aissami.  *See id*.  But the Proclamation fails to mention that El Aissami has been arrested by the Maduro government in a corruption probe, which wholly undermines the Proclamation's theory.  Hanson Decl. ¶ 18; Dudley Decl. ¶ 22.  And, more fundamentally, experts are in accord

---

[13] *Available at* https://bsky.app/profile/rgoodlaw.bsky.social/post/3llc4wzbkr22k (Q: "Does the intelligence community assess that we are currently at war or being invaded by the nation of Venezuela?" A: "We have no assessment that says that."); *also available at* https://www.c-span.org/program/house-committee/national-security-and-intelligence-officials-testify-on-global-threats/657380.

that it is "absolutely implausible that the Maduro regime controls TdA or that the Maduro government and TdA are intertwined." *id.* ¶ 17; Antillano Decl. ¶ 13; Dudley ¶¶ 2, 21. "There is no credible evidence that the Maduro regime has directed TdA to enter the United States or directed any TdA activities within the country." Hanson Decl. ¶ 20; Antillano Decl. ¶ 13; Dudley Decl. ¶ 2. As one expert who has done numerous projects for the U.S. government, including on the topic of TdA, explained, the Proclamation's characterization of the relationship between the Venezuelan state and TdA with respect to TdA's activities in the United States is "simply incorrect." Dudley Decl. ¶¶ 5, 17-18. The President's own intelligence agencies reached that same conclusion prior to his invocation of the AEA. *See* Sarabia Roman Decl., Exh. 19 ("shared judgment of the nation's spy agencies" is "that [TdA] was not controlled by the Venezuelan government").

The government has pressed this Court to read the nation/government requirement out of the statute entirely, and to accept that the AEA reaches the fullest extent of the political branches' "war powers." ECF No. 26 at 12-13; Mar. 21 Hearing Tr. at 19. But the Act does not encompass the full scope of the political branches' "war powers." It operates as a specific delegation of authority from Congress to the President, a delegation Congress specifically limited to instances where action is taken by "foreign nation[s]" or "governments." *Cf. Youngstown*, 343 U.S. at 635–38 (Jackson, J., concurring).

If Congress had intended to vest the President with broader authority, it could have said so. After all—as explained in a source that the government has itself cited—Congress has long been aware of the distinction between executive branch authority to use "military force against non-traditional actors" and "more traditional conflicts" waged against formally-recognized states. Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005); *see also* Mot. To Vacate at 16, ECF No. 26 (citing article).

Congress knows how to delegate authority against such actors to the Executive Branch when it wants to. *See* 22 U.S.C. § 6442a ("review and identify any non-state actors operating in any such reviewed country"); 18 U.S.C. § 2339A (criminalizing providing material support to non-state actors). And here, Congress intentionally limited the AEA's scope to actions taken by "foreign nation[s]" and "government[s]." 50 U.S.C. § 21. It has never amended the statute to broaden that scope.

While the United States has, at times, asserted war-based authority to use force against non-state actors, *see* Mot. to Vacate 16, these actions were justified under separate legal frameworks, not under the AEA. And the AEA's historical record confirms that it was intended to address conflicts with foreign sovereigns, not a criminal gang like TdA. *See* 5 Annals of Cong. 1453 (Apr. 1798) ("[W]e may very shortly be involved in war . . ."); John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, N.Y. State Bar Ass'n Annual Meeting: Civil Liberty in War Time, at 8 (Jan. 17, 1919) ("The [AEA] was passed by Congress . . . at a time when it was supposed that war with France was imminent."); Jennifer K. Elsea & Matthew C. Weed, Cong. Rsch. Serv., RL3113, Declarations of War and Authorizations for the Use of Military Force 1 (2014) (Congress has never issued a declaration of war against a nonstate actor). If Defendants were allowed to designate any group with ties to officials as a foreign government, and courts were powerless to review that designation, any group could be deemed a government, leading to an untenable and overbroad application of the AEA.

Finally, Defendants' far-reaching argument that the Proclamation is supported by the President's Article II authority, and that his power is at its "maximum" under *Youngstown*, Mot. to Vacate 17, is plainly wrong. As an initial matter, the President has no authority under Article II to unilaterally *remove* people from the United States. Thus, the sole question here is whether

the executive branch's conduct conflicts with the AEA. But even assuming Justice Jackson's *Youngstown* framework applies, the President's power would be at its "lowest ebb," because the President is taking measures incompatible with the expressed will of Congress: "Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject." 343 U.S. at 637–38. There is no basis for doing so here. Under Article I, Congress holds plenary power over immigration, *Chadha*, 462 U.S. at 940 , and has a broad, distinct set of war powers, *Hamdan*, 548 U.S. at 591 . Through the INA and a variety of statutory safeguards, Congress comprehensively regulated the removal of immigrants. *See infra*. And through the AEA, Congress granted a specific set of war powers to the President; he is not at liberty to exceed those statutory powers or to exercise them outside of the context of war or imminent war. There is simply no ground for ignoring the constraints that Congress has established through the AEA (and the INA, *see infra*), nor for "disabling" Congress's constitutional authority to legislate with respect to its own war powers and to immigration.

Moreover, even when the executive asserts war powers, the Supreme Court has repeatedly refused to grant the President a blank check as Commander-in-Chief. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 732 (2008) (rejecting executive's argument that noncitizens designated as "enemy combatants" outside the United States have no habeas privilege); *Hamdan*, 548 U.S. at 593, 635 (rejecting executive's convening of military commission as unlawful because it failed to satisfy statute's requirements); *Hamdi*, 542 U.S. at 530, 535–36 (rejecting executive's arguments about the process due to alleged enemy combatants); *Ex Parte Milligan*, 71 U.S. 2, 125 (1866) ("[The Founders] knew—the history of the world told them—the nation they were founding, be its existence short or long, would be involved in war . . . and that unlimited power, wherever

lodged at such a time, was especially hazardous to freemen.").[14]

>  **3.    Summary Removals Without Notice and a Meaningful Opportunity to Challenge "Alien Enemy" Designations Violate the AEA, Due Process, and the APA.**

As this Court has already held, Defendants must provide Plaintiffs with a meaningful opportunity to challenge their designation as alien enemies before removal is permissible under the Proclamation.  Op. 23-24, 30; *see also J.G.G.*, 2025 WL 914682, at *21 (Millett, J., concurring) ("the government agrees that individuals are entitled to challenge in court whether they fall within the terms of the AEA or are otherwise not lawfully removable under it.").  The government's concession that there must be an opportunity to contest one's designation as an enemy alien is well taken given that *Ludecke* expressly recognized as much.  335 U.S. at 171 n.17; *see also, e.g., Ex parte Gilroy*, 257 F. 110, 114-24 (S.D.N.Y. 1919); *United States ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860 (2d Cir. 1943); *Bauer*, 171 F.2d at 493-94.

Because the government is currently providing no process or opportunity to contest a designation, the precise contours of such review need not be determined here.  At this stage, even assuming the Court finds that the AEA can be used at all against a "gang" during peacetime, the Court need only hold that the current Proclamation is unlawful in failing to provide any process, even sufficient notice and opportunity to file the individual habeas petitions held out by the government.  At minimum, though, there must be a hearing at which evidence could be introduced and testimony heard, and judicial review.  The AEA, per *Ludecke*, as well due process and the APA, require that noncitizens alleged to be alien enemies receive notice of the factual basis for

---

[14] *See also Hamdi*, 542 U.S. at 530 ("[A]s critical as the Government's interest may be in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict, history and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse of others who do not present that sort of threat.").

removal and a meaningful opportunity to rebut it. *See, e.g.*, *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014) ("Both the Supreme Court and this Court have recognized that the right to know the factual basis for [government] action and the opportunity to rebut the evidence supporting that action are essential components of due process.").[15]

Finally, even if Plaintiffs were properly designated alien enemies (which they were not), this Court has previously held that the President may lawfully remove noncitizens under the AEA only when those designated noncitizens "refuse or neglect to depart" from the United States voluntarily. Op. 30 (citing 50 U.S.C. § 21). Indeed, even during World War II, courts interpreting the AEA consistently recognized that "alien enemies" retained the right to voluntary departure. *See U.S. ex rel. Ludwig*, 164 F.2d at 457 (Section 21 establishes a "right of voluntary departure" that functions as a "statutory condition precedent" to the government's right to deport enemy aliens); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) ("His present restraint by the respondent is unlawful in so far as it interferes with his voluntary departure, since the enforced removal, of which his present restraint is a concomitant, is unlawful before he does 'Refuse or neglect' to depart" under Section 21); *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the Attorney General can lawfully remove him against his will.").

Under Section 21, there is no exception to the general right of voluntary departure; it is a "statutory condition precedent" to removal. *U.S. ex rel. Ludwig*, 164 F.2d at 457. Section 22 establishes separate rights concerning the particular conditions for departure, with an exception for those "chargeable with actual hostility, or other crime against public safety." 50 U.S.C. § 22.

---

[15] This Court has also recognized that, even if Defendants were to implement a meaningful adjudication process, questions would remain regarding the standard of review and the level of deference a reviewing court should afford to agency determinations. Op. 28-29. But the Court need not resolve those questions at this juncture.

However, that exception cannot be invoked categorically. It instead requires individualized assessments—each noncitizen must specifically be "chargeable" with actual hostility or a crime against public safety to lose eligibility for the rights described in Section 22. Defendants have made no such individualized assessments here—much less provided any opportunity to contest such findings.

**B. The Proclamation Violates the Specific Protections that Congress Established for Noncitizens Seeking Humanitarian Protection.**

The Proclamation is unlawful for an additional, independent reason: it overrides statutory protections for noncitizens seeking relief from torture by subjecting them to removal without meaningful consideration of their claims. As this Court has previously recognized, Plaintiffs were not only barred from raising a torture claim but also were effectively precluded from doing so because Defendants never informed them of the country to which they would be removed—directly contravening protections enacted by Congress. *See* Op. 33.

Congress enacted the Foreign Affairs Reform and Restructuring Act ("FARRA") to codify the United Nations Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT") and to ensure that noncitizens have meaningful opportunities to seek protection from torture. *See* U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988); Foreign Affairs Reform and Restructuring Act of 1998 § 2242(a), Pub. L. No. 105-277, Div. G. Title XXI, 112 Stat. 2681 (1998) (codified at 8 U.S.C. § 1231 notes) (implementing CAT); C.F.R. §§ 208.16 to 208.18 (FARRA procedure). CAT categorically prohibits returning a noncitizen to any country where they would more likely than not face torture. *See* 8 U.S.C. §1231 note. These protections apply regardless of the mechanism for removal.

The D.C. Circuit recently addressed a similar issue in *Huisha-Huisha v. Mayorkas*,

34

reconciling the Executive's authority under a public-health statute, 42 U.S.C. § 265, with CAT's anti-torture protections. 27 F.4th 718. The Court held that because § 265 was silent about where noncitizens could be expelled, and CAT explicitly addressed that question, no conflict existed. Both statutes could—and therefore must—be given effect. *Id.* at 721, 731-32 (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When . . . confronted with two Acts of Congress allegedly touching on the same topic," a court "must strive to give effect to both.") (cleaned up)). As this Court has already held, "[t]his case in on all fours" with *Huisha-Huisha*. Op. 32-33. Because no genuine conflict exists between the AEA and FARRA, this Court correctly harmonized these statutes by concluding that FARRA's protections apply to removals under the AEA. *See* Op. 32-33.

Despite this clear statutory framework, Defendants prevented several class members— many of whom have strong claims—from asserting their rights under CAT (and undoubtedly have done the same to other members of the class). *See* ECF No. 3-3 (J.G.G. Decl.) ¶ 2, ECF No. 3-3 (seeking asylum, withholding and CAT after experiencing arbitrary imprisonment, physical abuse and torture); Carney Decl.  ¶ 3, ECF No. 44-11 (describing threats on account of sexual orientation); Smyth Decl. ¶ 5, ECF No. 44-12 (describing physical violence and harassment on account of sexual orientation ); W.G.H. Decl. ¶ 8, ECF No. 3-6 (fear of mistreatment and harm); Shealy Decl. ¶ 3, ECF No. 3-5; *see also* A.V.S.O. Decl. ¶¶ 3-4; M.A.A. Decl. ¶¶ 4-5; Y.R.R. Decl. ¶ 3. Moreover, even if Plaintiffs had been permitted to apply, their opportunity would have been meaningless because Defendants deliberately withheld information about the country to which they were being removed. *See* Op. 33; *see supra*.

The AEA can similarly be harmonized with other subsequently enacted statutes specifically designed to protect noncitizens seeking asylum and withholding. *See* Refugee Act of 1980, Pub.

L. No. 96-212, 94 Stat. 102 (1980) (asylum and withholding); 8 U.S.C. §§ 1158 (asylum), 1231(b)(3) (withholding of removal).  Congress has unequivocally declared that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1).  Similarly, the withholding of removal explicitly bars returning a noncitizen to a country where their "life or freedom" would be threatened based on a protected ground.  *Id.* § 1231(b)(3)(A).

"In understanding this statutory text, 'a page of history is worth a volume of logic.'"  *Jones v. Hendrix*, 599 U.S. 465, 472 (2023) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)).  These humanitarian protections were enacted in the aftermath of World War II, when the United States joined other countries in committing to never again turn our backs on people fleeing persecution and torture.  Sadako Ogata, U.N. High Comm'r for Refugees, Address at the Holocaust Memorial Museum (Apr. 30, 1997).[16]  A President invoking the AEA cannot simply sweep away these protections.

The AEA's general removal authority must yield to the explicit humanitarian protections established by Congress in subsequent, more targeted enactments.  *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017) ("[I]t is a commonplace of statutory construction that the specific governs the general.") (internal quotation marks omitted).  Defendants, however, denied Plaintiffs the opportunity to assert claims for asylum or withholding of removal.  *See*  (J.G.G. Decl.) ¶ 2, ECF No. 3-3; Carney Decl. ¶ 3, ECF No. 44-11;  Smyth Decl. ¶ 5, ECF No. 44-12;  W.G.H. Decl. ¶ 8, ECF No. 3-6; Shealy Decl. ¶ 3 ECF No. 44-9.  Summary removals to the horrific conditions in Salvadoran prisons are precisely what Congress enacted protections to prevent.

C.    **The Proclamation Violates the Procedural Requirements of the INA.**

---

[16] https://perma.cc/X5YF-K6EU.

Since the last invocation of the AEA more than eighty years ago, Congress has carefully specified the procedures by which noncitizens may be removed from the United States. And the INA leaves little doubt that its procedures must apply to every removal, unless otherwise specified by that statute. It directs: "Unless otherwise specified in this chapter," the INA's comprehensive scheme provides "the sole and exclusive procedure for determining whether an alien may be admitted to the United States, or if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3); *see also United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA."). This language makes clear that Congress intended for the INA to "supersede all previous laws with regard to deportability." S. Rep. No. 82-1137, at 30 (Jan. 29, 1952).[17]

Congress was aware that alien enemies were subject to removal in times of war or invasion when it enacted the INA. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of existing law). Indeed, the AEA had been invoked just a few years before passage of the 1952 INA. With this awareness, Congress provided that the INA contains the "sole and exclusive" procedures for deportation or removal and declined to carve out AEA removals as an exception from standard immigration procedures, even as it expressly provided exceptions for other groups of noncitizens, including noncitizens who pose security risks. *See, e.g.*, 8 U.S.C. § 1229a(a)(3) (excepting noncitizens in expedited removal proceedings from the INA's "sole and exclusive" provision); 8 U.S.C. § 1531 et seq. (establishing fast-track

---

[17] One of the processes otherwise specified in the INA is the Alien Terrorist Removal Procedure at 8 U.S.C. § 1531 *et seq.* The Attorney General may opt to use these proceedings when he or she has classified information that a noncitizen is an "alien terrorist." *Id.* § 1533(a)(1). But even that process requires notice, a public hearing, provision of counsel for indigents, the opportunity to present evidence, and individualized review by an Article III judge. *Id.* § 1532(a), 1534(a)(2), (b), (c)(1)-(2). And the government bears the burden of proving, by a preponderance of the evidence, that the noncitizen is subject to removal as an "alien terrorist." *Id.* § 1534(g).

proceedings for noncitizens posing national security risks).

Ignoring the INA's role as the "sole and exclusive" procedure for determining whether a noncitizen may be removed, Defendants purport to bypass the mandated congressional scheme in order to formulate an entirely separate procedure for removal and usurp Congress's Article I power in the process. Accordingly, the Proclamation violates the INA by denying Plaintiffs the process due under that law.

## IV. The Administration's Abuse of the Alien Enemies Act Has Caused and Will Continue to Cause Plaintiffs Irreparable Harm.

In the absence of preliminary relief, Plaintiffs can be summarily removed to places, such as El Salvador, where they face life-threatening conditions, persecution and torture. *See* Op. 33-35 ("Needless to say, the risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm."). And while removal does not by itself ordinarily constitute irreparable harm, *Nken v. Holder*, 556 U.S. 418, 435 (2009), these are hardly run-of-the-mill removals. Plaintiffs' removals constitute grave and immediate irreparable harm because of what awaits them in a Salvadoran prison. *See generally* Bishop Decl.; Goebertus Decl. Prison conditions in El Salvador are "harsh and life threatening." Bishop Decl. ¶ 21; *see also* Goebertus Decl. ¶ 4. Prison officials there engage in widespread physical abuse, including waterboarding, electric shocks, using implements of torture on detainees' fingers, forcing detainees into ice water for hours, and hitting or kicking detainees so severely that it causes broken bones or ruptured organs. Bishop Decl. ¶¶ 21, 33, 37, 39, 41; Goebertus Decl. ¶¶ 8, 10, 17. People in detention in El Salvador also face psychological harm, including solitary confinement in pitch dark cells or being forced to stay in a cell with the body of a fellow prisoner who was recently beaten to death. Goebertus Decl. ¶ 3; Bishop Decl. ¶ 39. In fact, El Salvador creates these horrific conditions intentionally to terrify people. Bishop Decl. ¶ 22; *Huisha-Huisha*, 27 F.4th at 733 (irreparable

harm exists where petitioners "expelled to places where they will be persecuted or tortured"); *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (harsh conditions at Guantanamo that forced detainees to go on hunger strikes amounted to irreparable harm); *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (holding that removal to a country where one faces harm constitutes irreparable injury); *Demjanjuk v. Holder*, 563 F.3d 565, 565 (6th Cir. 2009) (granting stay for noncitizen who asserted removal would violate CAT).  And Plaintiffs may never get out of these prisons. *See* Nayib Bukele, X.com, (Mar. 16, 2025, 5:13AM ET);[18] *see also* Goebertus Decl. ¶ 3 (quoting the Salvadorean government that people held in CECOT "will never leave"); *id.* ("Human Rights Watch is not aware of any detainees who have been released from that prison.").

And even if the government instead removes Plaintiffs to Venezuela, they face serious harm there, too.  In fact, many plaintiffs fled Venezuela for the very purpose of escaping the persecution they faced in Venezuela and have pending asylum cases on that basis.  For example, J.G.G. has already suffered arbitrary detention, torture and abuse by the Venezuelan police for his political views and fears being killed if returned.  J.G.G. Decl. ¶ 2.  And returning to Venezuela labeled as a gang member by the United States government only increases the danger, as they will face heightened scrutiny from Venezuela's security agency, and possibly even violence from rivals of TdA.  Hanson Decl. ¶ 28.

Not only do Plaintiffs face grave harm, they do so without having received any due process. *See Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021) (finding irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide"); *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 517 (D.D.C. 2020) (irreparable injury exists where class members were "threatened with deportation

---

[18] *Available at*: https://perma.cc/52PT-DWMR.

prior to receiving any of the protections the immigration laws provide"); *see also supra* (discussing the lack of notice and meaningful process).  In fact, at the D.C. Circuit, Defendants left no doubt that they intend to begin immediately deporting class members without notice as soon as a court permits.  Oral Arg. 1:44:39-1:46-23, *J.G.G. v. Trump*, 25-5067 (D.C. Cir. 2025)  ("We take the position that the AEA does not require notice . . . [and] the government believes there would not be a limitation [on removal]" absent an injunction).  Critically, moreover, without meaningful process, there is an unacceptably high risk that the government will deport class members who are not in fact members of TdA.

## V.    The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Preliminary Injunction Order.

The balance of equities and the public interest factors merge in cases against the government. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citations omitted).  Here, the balance of hardships overwhelmingly favors Plaintiffs.  The public has a critical interest in preventing wrongful removals to places where individuals will face persecution and torture.  Conversely, the government can make no comparable claim to harm from an injunction.  Op. 36-37; *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 195 (D.D.C. 2021); *see also Nken*, 556 U.S. at 436 (describing the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm"); *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (describing the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations" (citation omitted).  Defendantsm moreover, will retain the ability to prosecute criminal offenses, detain noncitizens under any authority, and remove noncitizens under existing statutory guidelines.

VI.    **The Court Should Not Require Plaintiffs to Provide Security Prior to the Preliminary Injunction Order.**

The court should not require a bond under Federal Rule of Civil Procedure 65. The "courts in this Circuit have found the Rule 'vests broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (internal quotation marks, citation, and alterations omitted). District courts routinely exercise this discretion to require no security in cases brought by indigent and/or incarcerated people, and in the vindication of immigrants' rights. *See, e.g.*, *P.J.E.S.  v. Wolf*, 502 F. Supp. 3d 492, at 520 (D.D.C. 2020).

## CONCLUSION

The motion for a preliminary injunction should be granted.

Dated: March 28, 2025

Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
cwofsy@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Daniel Galindo (D.D.C. Bar No. NY035)
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi (D.D.C. Bar No. MI0071)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org

529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

hshamsi@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich
Skye Perryman (D.C. Bar No. 984573)
Audrey Wiggins (DC Bar No. 482877)
Christine L. Coogle (DC Bar No. 1738913)
Pooja A. Boisture
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org
awiggins@democracyforward.org
ccoogle@democracyforward.org
pboisture@democracyforward.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 28, 2025

Respectfully Submitted,

*/s/ Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

*Attorney for Plaintiffs–Petitioners*