IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.G.G., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Case No: 1:25-cv-00766-JEB |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' INVOCATION
OF THE STATE SECRETS PRIVILEGE**

**INTRODUCTION**

On March 25, the Court directed Plaintiffs to file their response, if any, to Defendants' Notice Invoking the State Secrets Privilege (ECF No. 56).

Two threshold matters bear emphasis. First, Plaintiffs respectfully submit that the Court already possesses the information it needs to conclude that its March 15 oral and written temporary restraining orders were violated. The government has confirmed that "two flights carrying aliens being removed under the AEA departed U.S. airspace before the Court's minute order of 7:25 PM EDT, and before the Court's oral statements during the hearing." Decl. of Robert L. Cerna, Acting Field Office Director, ICE (ECF No. 49-1). The government has also confirmed that it is "not contest[ing] for the purposes of these proceedings that the planes landed abroad, and that the aliens on board were deplaned, after the issuance of the Court's minute order." Defs. Notice Invoking State Secrets Privilege 7–8 (ECF No. 56) ("Defs. Notice"). These facts, standing alone, establish that the government failed to comply with both of the Court's

1

orders. *See also* Pls. Notice Regarding Mar. 19 Order 1–3 (ECF No. 55) (describing additional public details about the flights and submitting declarations refuting the government's contention that it was not feasible for the planes to return class members to the United States). However, if the Court determines that it lacks sufficient information to assess the government's non-compliance with its orders, and that the government must respond to the Court's five questions of March 18 to establish a more complete record, the government should not be permitted to withhold these facts from the Court on the basis of the state secrets privilege.[1]

Second, Plaintiffs are unaware of *any* case in which the state secrets privilege has been invoked to withhold evidence from a court seeking to enforce its own orders. As Plaintiffs explain below, the application of the state secrets privilege in this case is entirely unwarranted. If the government's reasoning here were accepted more broadly, it could thwart judicial investigation of contempt whenever the government asserts a nexus to "foreign affairs" or "national security"—allowing the executive to defy court orders with impunity.

## ARGUMENT

### I.     Legal Standards

Where the state secrets privilege properly applies, it allows the government to withhold evidence due to a "reasonable danger" that disclosure will "expose military matters which, in the interest of national security, should not be divulged." *United States v. Reynolds*, 345 U.S. 1, 10 (1953); *see generally United States v. Zubaydah*, 595 U.S. 195, 204–05 (2022) (discussing cases where the state secrets privilege has applied). As courts have repeatedly admonished, the government may not use the privilege "to shield any material *not strictly necessary*" to prevent

---

[1] While Plaintiffs believe that the Court has the information it needs to conclude that both of its orders were violated, the Court may require additional facts to determine the appropriate remedy. That inquiry, however, can await further proceedings.

harm to national security. *Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C. Cir. 1983) (emphasis added); *In re United States*, 872 F.2d 472, 476 (D.C. Cir. 1989) (same). Courts must "take very seriously [their] obligation to review the government's claims with a very careful, indeed a skeptical, eye, and not to accept at face value the government's claim or justification of privilege." *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1077 (9th Cir. 2010) (en banc) (quoting *Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir.)).

The government bears the burden of establishing that the privilege should apply. *Zubaydah*, 595 U.S. at 209. When reviewing whether the government's invocation of the privilege is justified, "the court must be satisfied from all the evidence and circumstances, and 'from the implications of the question, *in the setting in which it is asked*, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.'" *Reynolds*, 345 U.S. at 9 (quoting *Hoffman v. United States,* 341 U.S. 479, 486–87 (1951)) (emphasis added); *see also Molerio v. FBI*, 749 F.2d 815, 822 (D.C. Cir. 1984) (Scalia, J.) (same).

Here, only the Court is seeking information from the government—in an ex parte, in camera setting—and only for the purpose of ascertaining whether its orders were violated. That context bears heavily on the question of whether the privilege can be justified at all, and whether disclosure *to the Court* in these narrow circumstances poses a danger to national security. *Reynolds*, 345 U.S. at 9.

In assessing the validity of the government's privilege invocation, this Court may require "in camera examination of the actual information sought to be protected, in order to ascertain that the criteria set forth in *Reynolds* are fulfilled." *El-Masri*, 479 F.3d 296, 305 (4th Cir. 2007); *Zubaydah*, 595 U.S. at 212 ("It is true that sometimes a court must personally review the

3

evidence at issue in order to assess the Government's assertion of the state secrets privilege." (plurality op.));[2] *Molerio*, 749 F.2d at 822 n.2 (noting that "in camera inspection of an affidavit" may not "always be sufficient to determine the validity of a claim of privilege for state secrets"). That is because, as the Court in *Reynolds* cautioned, "judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." 345 U.S. at 9–10.[3]

## II. The Court's Required Disclosures Would Not Result in Unacceptable Danger to National Security

Defendants' declarations utterly fail to meet their burden to show that disclosure of the ordered information *to this Court* will endanger national security. Not only are the government's declarations too vague and speculative to support the application of the state secrets privilege, but their core premises are belied by extensive, official government disclosures concerning the information now claimed to be "secrets of state." *In re United States*, 872 F.2d at 475. As this Court explained in its March 19 Order, Secretary Rubio "has revealed many operational details of the flights, including the number of people involved in the flights, many of their identities, the facility to which they were brought, their manner of treatment, and the time window during

---

[2] *See also Zubaydah*, 595 U.S. at 254 (Gorsuch, J. & Sotomayor, J., dissenting) ("[W]hen assessing a state secrets claim courts may—and often should—review the evidence supporting the government's claim of privilege *in camera*."); *id.* at 233 (Kavanaugh, J. & Barrett, J., concurring in part) ("If the requester has demonstrated a "strong" need for the information, the court may under certain circumstances review the requested documents *in camera* to confirm that the information falls within the privilege."); *cf. id.* at 220–23 (Thomas, J. & Alito, J., concurring in part) (not foreclosing in camera review of purportedly privileged material).

[3] Although courts have characterized the privilege as "absolute" where it properly applies, *Ellsberg*, 709 F.2d at 57; *see* Defs. Notice 2, the doctrinal rules concerning the withholding of privileged information from courts are in fact more nuanced. For example, the D.C. Circuit has reviewed and relied on materials withheld under the state secrets privilege to determine what consequences flow from the use of the privilege to withhold evidence, and it has directed district courts to devise procedures that balance the interests of the parties. *See Attorney General v. Irish People, Inc.*, 684 F.2d 928, 954–55 (D.C. Cir. 1982); *see also In re Sealed Case*, 494 F.3d 139, 149–50 (D.C. Cir. 2007) (recognizing that courts may review state secrets information ex parte and in camera to determine if it would establish a "valid defense").

4

which these events occurred." Order 2 (ECF No. 38) (citing Secretary Marco Rubio, @SecRubio, X (Mar. 16, 2025, 8:39 a.m.), https://x.com/SecRubio/status/1901252043517432213 [https://perma.cc/RXH4-XH4R]). The government has not claimed that the information the Court seeks is classified (or even that it is "confidential"), and its assertion that disclosure would reveal *law enforcement* "sources and methods" cannot justify the privilege. For these reasons, the Court should reject Defendants' invocation of the privilege here.

**First**, the number of alleged TdA members on the flights at issue, and the number being removed solely pursuant to the Proclamation, are not state secrets—particularly in light of the U.S. government's extensive official disclosures on this topic. Yet the Noem Declaration ignores these official disclosures and baldly asserts that disclosure of "the number and nature of aliens removed to the foreign state" would "threaten[] significant harm to the United States' national security interests." Noem Decl. ¶¶ 11, 11.C (ECF No. 56-3). Similarly, the Rubio Declaration contends that "[c]ompelled disclosure of the number of aliens aboard any deportation flight"—and "the reasons any of those aliens were placed aboard"—"threatens significant harm to the United States' foreign affairs and national security interests." Rubio Decl. ¶ 10 (ECF No. 56-2).

If these assertions were even remotely true, then President Trump and Secretary Rubio have—through their own public disclosures about the AEA removal operations—already caused the very harms Defendants cite here. On March 16, Secretary Rubio posted on X: "[A]s promised by @POTUS, we sent over 250 alien enemy members of Tren de Aragua which El Salvador has agreed to hold in their very good jails at a fair price that will also save our taxpayer

dollars."[4] Also on March 16, Tom Homan, White House Border Czar, posted on X (and Secretary Rubio reposted): "Last night, 238 Tren de Aragua members along with 21 MS13 gang members, were deported from this country adding to the thousands of criminal aliens already deported."[5] The White House released a statement that same day, claiming that DHS "successfully arrested nearly 300 Tren de Aragua terrorists, saving countless American lives. Thanks to the great work of the Department of State, these heinous monsters were extracted and removed to El Salvador[.]"[6] On March 17, White House press secretary Karoline Leavitt told reporters that approximately 261 people were deported on the flights, including 137 under the Alien Enemies Act.[7] While the statistics differ, the bottom line is that the White House and senior U.S. government officials have had no qualms about publicizing the number of alleged TdA members removed across three flights to El Salvador—and the fact that 137 of them are class members who were removed under the AEA. Thus, the government has failed to meet its burden to show that the disclosure of this information as to *two* flights would harm national security.

More generally, the U.S. government's official disclosures profoundly undermine the credibility of all three declarants' assertions of foreign relations and national security harm. *See,*

---

[4] Secretary Marco Rubio, @SecRubio, X (Mar. 16, 2025, 7:59 a.m.), https://x.com/SecRubio/status/1901241933302825470 [https://perma.cc/S5VX-LBFS].

[5] Thomas D. Homan, @RealTomHoman, X (Mar. 16, 2025, 11:30 a.m.), https://x.com/RealTomHoman/status/1901294938199073009 [https://perma.cc/7HSE-4MAC].

[6] Statement from the Press Sec'y, The White House (Mar. 16, 2025), https://www.whitehouse.gov/briefings-statements/2025/03/statement-from-the-press-secretary-50c7 [https://perma.cc/2W84-L6N4].

[7] Michael Kunzelman & Regina Garcia Cano, *A timeline of the legal wrangling and deportation flights after Trump invoked the Alien Enemies Act*, AP (Mar. 21, 2025), https://apnews.com/article/trump-deportation-courts-aclu-venezuelan-gang-timeline-43e1deafd66fc1ed4e934ad108ead529.

*e.g.*, Noem Decl. ¶¶ 11, 11.C (asserting "significant harm to the United States' national security interests" from disclosure about "the number and nature of aliens removed"); Bondi Decl. ¶ 6 (ECF No. 56-1) (describing Rubio and Noem Declarations as reflecting "studied and well-supported conclusion[s]"). These official disclosures also underscore the facial deficiencies in the declarations. Because Secretaries Rubio and Noem fail to account for the executive branch's publicity campaign touting the AEA removals, their declarations do not even attempt to describe any *marginal* additional harm that could result from disclosure to this Court, given the prior official statements. *See, e.g.*, Rubio Decl. ¶ 10 (speculating about "internal or international pressure" on a foreign state that could result from disclosure of the number of aliens aboard any deportation flight, without addressing what additional harms could possibly result after the U.S. government's public disclosures); *see also infra* (discussing declarations' facial defects).

**Second**, the times of the planes' departures and arrivals, the times they left U.S. airspace, their destinations, and the times that individuals were transferred out of U.S. custody are not state secrets. The Rubio Declaration asserts that the government cannot answer this Court's questions because the United States had to negotiate "logistical details" with a foreign State, including "the destination of the deportation flight, as well as the time of departure and arrival at the destination, and the form and timing of the transfer of custody." Rubio Decl. ¶ 11; *see also* Noem Decl. ¶ 11 (similar). The Noem Declaration further contends that disclosing any details about the operation "would directly help [TdA and similar] groups avoid capture," Noem Decl. ¶ 10.D, and both state that "compelled disclosure of this information—to anyone—would likely be seen by the foreign State as a breach of trust." Noem Decl. ¶ 11.B; *see also* Rubio Decl. ¶ 11 (similar). But the video of Plaintiff class members disembarking from removal flights and being

transferred to Salvadoran custody—a video published by President Bukele of El Salvador,[8] by Secretary Rubio on X,[9] and by President Trump on Truth Social[10]—reveals extensive information about these purportedly "sensitive" "logistical details," including:

- The destination of the deportation flights: El Salvador.

- "Global Crossing Airlines" and "GlobalX" branding on the three planes, which, alongside the U.S. government's disclosure of El Salvador as the destination, permits public and precise tracking of the flights—including locations in the air, as well as the sites of any stopovers—because only three Global Crossing Airlines/GlobalX planes landed in El Salvador that day.[11]

- At least one plane tail number, N837VA, which also permits public tracking of the flight.

- The fact that passengers disembarked from the planes and were transferred to Salvadoran custody after sunset.

- Numerous details about the "form" of the "transfer of custody" to El Salvador, *e.g.*, depictions of forcing the men off the plane, putting them in armored vehicles and on buses, and moving them to the Centro de Confinamiento del Terrorismo.

---

[8] Nayib Bukele, @nayibbukele, X (Mar. 16, 2025, 8:13 a.m.), https://x.com/nayibbukele/status/1901245427216978290 [https://perma.cc/BM73-547H].

[9] Secretary Marco Rubio, @SecRubio, X (Mar. 16, 2025, 8:39 a.m.), https://x.com/SecRubio/status/1901252043517432213 [https://perma.cc/RXH4-XH4R].

[10] President Donald J. Trump, @realDonaldTrump, Truth Social (Mar. 16, 2025, 3:54 p.m.), https://truthsocial.com/@realDonaldTrump/posts/114173862724361939 [https://perma.cc/67LY-FREW].

[11] *See, e.g.*, *Flight Data Shows Timeline of the Venezuelan Deportation Operation*, Reuters (Mar. 17, 2025), https://www.reuters.com/world/americas/flight-data-shows-timeline-venezuelan-deportation-operation-2025-03-17.

In light of the U.S. government's publication of this video through President Trump's and Secretary Rubio's social media channels, as well as other official disclosures,[12] it is inconceivable that the U.S. government's ex parte, in camera response to this Court's questions "threaten[s] significant harm to the United States' foreign affairs and national security interests," Rubio Decl. ¶ 11, or would constitute a "breach of trust" with El Salvador, *id.*; Noem Decl. ¶ 11.E; *see also Reynolds*, 345 U.S. at 9 (when considering whether the privilege applies, court must evaluate "all the evidence and circumstances" and "the setting in which [the question] is asked").

Although the video itself does not supply the exact answers that the Court sought through its questions, the breadth and depth of the government's official disclosures about the flights fatally undermines the declarations' assertions of harm. *See, e.g., Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (CRC), 2020 WL 13303322, at *11 (D.D.C. Aug. 21, 2020) (rejecting government's assertion of state secrets privilege over information linking Iran to improvised bombs in two specific attacks, because the *general* link between Iran and these devices was a matter of "official public record"); *Rahman v. Chertoff*, No. 05-cv-3761, 2008 WL 4534407, at *6 (N.D. Ill. Apr. 16, 2008) (rejecting government's assertion of state secrets privilege over whether plaintiffs were on terrorism watchlist; the plaintiffs had been stopped at the U.S. border on multiple occasions, and that "factual backdrop" made clear that additional disclosure would

---

[12] President Donald J. Trump, @realDonaldTrump, Truth Social (Mar. 17, 2025, 10:00 a.m.), https://truthsocial.com/@realDonaldTrump/posts/114178132439225624 (posting Fox & Friends clip of Tom Homan discussing the removal of alleged TdA members to El Salvador); https://x.com/RapidResponse47/status/1903113239887544544 [https://perma.cc/AD6C-92AY] (President Trump, in interview, describing video originally posted by President Bukele); Statement from the Press Sec'y, The White House (Mar. 16, 2025), https://www.whitehouse.gov/briefings-statements/2025/03/statement-from-the-press-secretary-50c7 [https://perma.cc/2W84-L6N4].

not result in harm to national security). Of particular importance here, by disclosing the planes' branding, destination, and at least one tail number, the U.S. government effectively disclosed the flights' departure and arrival times and locations—making it trivially easy for anyone with internet access to ascertain these details.[13] Thus, although Secretary Rubio contends that it would "erode the credibility of the United States' assurances that information will be maintained in confidence" if the government is forced to respond to the Court's questions, Rubio Decl. ¶ 14, the United States government has itself failed to maintain the details of the flights in confidence.

Even setting aside the official disclosures, the mere fact that the United States negotiated "logistical details" with a foreign country, Rubio Decl. ¶ 11, does not render those details a state secret. The United States negotiates such details as a routine matter, including for ICE's deportation flights. *See* 8 U.S.C. Sec 1231(b)(2)(C)-(E) (setting forth procedure to determine country of removal, including inquiries and responses with foreign government about their willingness to accept removals).  The government has not credibly identified any genuine harm to national security that would flow from disclosure to the Court of the basic facts here.

Similarly, it is difficult to comprehend how disclosing the details of "[r]emoval operations" to this Court could help "TdA and similar groups" "avoid capture." Noem Decl. ¶ 10.D. Even if the information sought by the Court somehow became public, the removal operations at issue have been carried out against individuals who had already been "captured"— they were in government detention facilities. For the same reason, it is difficult to comprehend the basis for the Noem Declaration's subsequent assertion: that disclosure of these details would

---

[13] Even the Rubio Declaration references the ease with which the public can track removal flights: "Compelled disclosures of [the information requested], or of information that would allow any third party to determine that information in whole or in part, would allow the national and international public to confirm that a particular flight was indeed a deportation flight[.]" Rubio Decl. ¶ 11.

"directly undermine the efficacy of American counterterrorism operations." *Id.* These removal operations have already taken place—officially and publicly.

Insofar as the Rubio Declaration contends that the harm to foreign affairs would result from the mere fact that this Court "compel[s]" disclosure, *see* Rubio Decl. ¶¶ 10–11, it is wrong. The privilege protects *secret* information from disclosure, and only if disclosure would endanger national security. Where, as here, the government officially acknowledges information, or otherwise fails to maintain the confidentiality of information, it cannot claim a distinct harm to national security from "compelled" disclosure through judicial process. In any event, foreign nations surely understand that the United States has three coordinate branches of government, which operate under the rule of law. If the executive branch violates or appears to violate a court order, it should come as no surprise to foreign partners that a court may investigate further to ascertain the extent of the violation and what consequences should follow. This is not a situation where the Court has "simply . . . asked for" answers to its questions out of idle curiosity, Rubio Decl. ¶ 14; rather, it asked for these answers to determine whether the government chose to disregard two orders of the Court.

The closest the government comes to identifying potentially sensitive information is its claim that revealing the location of any stopovers (here, Honduras) may be harmful to the United States' relationship with that country. *See* Rubio Decl. ¶ 12; Noem Decl. ¶ 11.E. But this claim fails as well. By officially disclosing the planes' operator (Global Crossing Airlines/GlobalX), their destination, and at least one tail number through the publication of President Bukele's video, *see supra*, the U.S. government disclosed the planes' flight paths—including stopovers. Moreover, the declarations' assertions of harm are entirely too vague and speculative to support the application of the privilege. *See* Rubio Decl. ¶ 12 (stating that this information "*can* itself be"

11

a matter of sensitive diplomatic discussion; compelled disclosure would "likely" be seen as a breach of trust; and hypothesizing about speculative harms that could result from disclosure "if" a foreign state were unaware of the nature or purpose of the flight (emphasis added)); Noem Decl. ¶ 11.E (same). That is especially true here, where the U.S. government has in recent weeks repeatedly identified Honduras as a stopover point for deportations of Venezuelan citizens—and publicly thanked Honduran leaders for their cooperation.[14]

While the state secrets privilege may apply to information that, if disclosed, would "result in . . . disruption of diplomatic relations with foreign governments," *In re United States*, 872 F.2d at 476, the "diplomatic relations" cases involve much stronger evidence of national security harm. For example, in *Zubaydah*, the Court upheld the privilege where a discovery request would have forced former CIA contractors to confirm the location of a CIA detention and torture site abroad. *Zubaydah*, 595 U.S. at 201. The Court ultimately concluded that "confirmation of *confidential* cooperation between the CIA and a foreign intelligence service could damage the CIA's *clandestine* relationships with foreign authorities," *id.* at 208 (emphases added), because foreign cooperation was based on "'mutual trust that the *classified* existence and nature of the relationship would not be disclosed,'" *id.* at 207 (quoting CIA Director's declaration) (emphasis added). But no such harm is remotely plausible here, where public data shows the planes

---

[14] *See, e.g.*, State Department Bureau of Western Hemisphere Affairs, X (Mar. 23, 2025, 10:48 p.m.), https://x.com/WHAAsstSecty/status/1904002353403248653 [https://perma.cc/8GXP-QUAK] ("Today, deportation flights of Venezuelan illegal aliens to their homeland resumed via Honduras. . . . Thank you to Honduran President Castro and her government for partnering to combat illegal immigration."); Silvia Foster-Frau, *Migrants Detained in Guantánamo are Deported Back to Venezuela*, Wash. Post (Feb. 20, 2025), https://www.msn.com/en-us/politics/government/migrants-detained-in-guant%C3%A1namo-are-deported-back-to-venezuela/ar-AA1zthWz [https://perma.cc/ET85-8V9Z] ("U.S. Department of Homeland Security spokeswoman Tricia McLaughlin said that 177 Venezuelan migrants had been flown to Honduras.").

stopping briefly in Honduras and where Defendants have publicly praised Honduras's assistance with their deportation efforts.

**Third**, the declarations fail on their face to establish that the information at issue is secret and that disclosure *to the Court* would harm national security. The government does not contend that any of this information is classified, and for that reason alone, its invocation of the privilege is dubious. As the D.C. Circuit explained in *Halkin v. Helms*, 690 F.2d 977, 996 n.69 (D.C. Cir. 1982), a "matter qualifying as a secret of state will presumably always qualify for classified status." And, as this Court has noted, "[c]lassification is generally considered to be *less* protective than the state-secrets privilege." Order 2 (ECF No. 38); *see also, e.g.*, *Abilt v. CIA*, 848 F.3d 305, 312 n.5 (4th Cir. 2017) (classification itself is "is insufficient to establish the privilege"; treating it as conclusive would "trivialize the court's role" in evaluating whether the privilege properly applies (quoting *Jeppesen*, 614 F.3d at 1082). Yet the government makes no claim that the information the Court seeks is or could be lawfully classified. *See* Executive Order 13526, 75 Fed. Reg. 705 (Dec. 29, 2009). And even if the information *were* classified, the INA specifically contemplates that courts may review such information in immigration proceedings. *See* 8 U.S.C. § 1229a(b)(4)(B) (providing for ex parte review of "national security information"); *id.* §§ 1533–34 (similar in fast-track proceedings for noncitizens alleged to pose national security risks).

If Defendants were to belatedly assert that the information at issue is classified, the Court should require Defendants to provide information about who made the classification decision initially, when it was made, whether all documents were marked appropriately and stored securely, whether all communications were handled via secure means, and whether Secretary Rubio engaged in a declassification review prior to publicizing information related to the

13

deportation flights and operation in his social media post. The Court should also require Defendants to provide the applicable classification guide provisions that they claim to have relied on in making the classification determination.

Indeed, the declarations fail even to state that the specific information requested by the Court is "clandestine" or has been kept "confidential." At most, the information is characterized in passing as "sensitive" and "nonpublic"—but not that it has been maintained as secret. *See* Rubio Decl. ¶ 16. Secretary Rubio also refers to abstract U.S. "assurances" to foreign states that "information will be maintained in confidence," *id.* ¶ 14, but he does not specify that the information at issue here was in fact maintained that way. *Compare, e.g.*, Decl. of Michael Pompeo, CIA Director at 4–5, *In re Application of Zayn Al-Abidin Muhammad Husayn (Abu Zubaydah)*, No. 17-cv-171 (E.D. Wash. Oct. 24, 2017), ECF No. 30-1 ("Decl. of CIA Director") ("The specific foreign countries where the CIA operated detention facilities and the foreign governments that clandestinely assisted the CIA program are classified at the TOP SECRET level[.]").

The declarations' reliance on speculative, vague, and conclusory language is yet another problem. For example, Secretary Noem contends that disclosures about the number of TdA members on a given flight could allow other noncitizens to draw unspecified "inferences" about the government's prioritization of resources in immigration enforcement and counterterrorism operations; that disclosure "*may even lend* TdA and other such organizations the ability to predict operational details"; and that specifying the number of enemy aliens removed on the basis of the proclamation "*could likely impair*" national security. Noem Decl. ¶ 10.C (emphasis added). *Compare, e.g.*, Decl. of CIA Director at 4–5 (asserting that if former CIA contractors were to respond to subpoenas, it "reasonably could be expected to cause serious, and in many

14

instances, exceptionally grave damage to U.S. national security"). Of course, regardless of the government's facial assertions, courts must always evaluate their credibility in the context of the surrounding facts and official disclosures. *See, e.g.*, *Reynolds*, 345 U.S. at 9–10.

As noted above, the declarations also fail to address how disclosure *only to the Court* would result in any marginal harms, given the extent of the government's official, public disclosures about the flights, the fact that the underlying information is not classified, and the presumably large number of DHS and ICE employees and contractors with knowledge of this information. While Secretary Rubio rightly observes that there is "a difference between official acknowledgment and informal reports," Rubio Decl. ¶ 15, he completely fails to account for the extensive and detailed U.S. government disclosures at issue here—including his own.

**Finally**, there is no basis for applying the state secrets privilege to "means and methods of law enforcement operations." Noem Decl. ¶ 10.A. The privilege may properly apply where disclosure would harm the nation's military defense capabilities, diplomatic relations, or *intelligence* sources or methods—not law enforcement activities like removals. *See, e.g.*, *Zubaydah*, 595 U.S. at 204–05 (discussing cases where the state secrets privilege has applied). At bottom, the information at issue here concerns removal operations by ICE, which is not a defense, military, or intelligence agency. Plaintiffs are unaware of any case where the government has asserted the state secrets privilege over information concerning ICE's operations. It cannot be the case that these operations are categorically state secrets, given the D.C. Circuit's recognition of a separate, *qualified* "law enforcement investigatory privilege," which may be overcome by a showing of necessity. *See, e.g.*, *In re Sealed Case*, 856 F.2d 268, 271–72 (D.C. Cir. 1988); *Buzzfeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347, 356, 361–64 (D.D.C. 2018); *see also Mohamed v. Holder*, No. 1:11-cv-50, 2014 WL 11516538, at *1

15

(E.D. Va. Oct. 30, 2014) (distinguishing law enforcement privilege from state secrets privilege). The Noem Declaration's invocation of the state secrets privilege over the "means and methods of law enforcement operations" conducted by ICE effectively seeks to convert the qualified law enforcement privilege into an absolute one. The Court should not accept such a novel and unmerited assertion.

### III. The Court Should Not Blindly Defer to the Executive Branch's Arguments Concerning the Privilege

In *Reynolds*, the case establishing the modern roots of the state secrets privilege, the Supreme Court cautioned that abandonment of judicial control over the privilege would open the door to "intolerable abuses." 345 U.S. at 8. Heeding this admonition, courts have often rejected the government's arguments about the applicability or legal consequences of the privilege. *See, e.g.*, *Ellsberg*, 709 F.2d at 52 (district court erred by permitting the government to withhold, under the state secrets privilege, identities of Attorneys General who authorized wiretaps); *In re United States*, 872 F.2d at 479 ("we, like the district court, remain unpersuaded" by government affidavit claiming that litigation could not continue due to state secrets); *Mohamed*, 2014 WL 11516538, at *1 (information presented by the government was insufficient to establish "reasonable danger" to national security); *Burks*, 2020 WL 13303322, at *11 (rejecting government's assertion of state secrets privilege over certain material due to "official public record"); *Rahman*, 2008 WL 4534407, at *6 (rejecting government's assertion of state secrets privilege in light of "factual backdrop," which made clear that disclosure would not result in harm to national security); *Hepting v. AT&T*, 439 F. Supp. 2d 974, 994, 996 (N.D. Cal. 2006)

(rejecting government's assertion of state secrets privilege over certain material and denying government's motion to dismiss on state secrets grounds).

Courts have also recognized "the risk that government officials may be motivated to invoke the state secrets doctrine not only by their obligation to protect national security," but also by illegitimate and self-serving reasons. *Jeppesen*, 614 F.3d at 1085 n.8. These concerns are borne out in cases in which the government has sought to stretch the state secrets privilege beyond its limits to improperly shield its actions from court review. For example, in *Horn v. Huddle*, 647 F. Supp. 2d 55 (D.D.C. 2009), *vacated upon settlement*, 699 F. Supp. 2d 236 (D.D.C. 2010), the government "committed fraud on [the district court] and the Court of Appeals" by "knowingly failing to correct a declaration" in support of the state secrets privilege "that had been shown to be demonstrably false." 647 F. Supp. 2d. at 58 & n.3. The court concluded that the government's actions "c[ould] only be construed as an attempt to dishonestly gain dismissal," and it ultimately rejected the government's assertion of the privilege. *Id.* at 56–60 & n.3; *see also* 699 F. Supp. 2d 236 (emphasizing that the vacatur did not alter the court's original reasoning); *Ibrahim v. DHS*, 912 F.3d 1147, 1162–65, 1171, 1182 & n.20 (9th Cir. 2019) (en banc) (government had played "discovery games" with the state secrets privilege and "made false representations to the court" about whether it would seek to rely on state secrets at trial).

Indeed, even in *Reynolds* itself, the government had engaged in exactly the kind of abuse that the Supreme Court warned against. *Reynolds* was a suit against the government brought by the estates of civilians killed in a military plane crash. *See* 345 U.S. at 3. When the plaintiffs sought production of the Air Force's accident report, the government asserted that the report should be protected by the state secrets privilege because the aircraft that had crashed was

17

engaged in a "highly secret mission," and disclosure of the report would "seriously hamper[] national security." *Id.* at 3–4. Several decades later, the accident report was declassified—and it turned out to contain no "details of any secret project the plane was involved in" (as the government had declared to the courts), but instead detailed "a horror story of incompetence, bungling, and tragic error." Garry Wills, *Why the Government Can Legally Lie*, 56 N.Y. Rev. of Books 32, 33 (2009); *see also Jeppesen*, 614 F.3d at 1094 n.1 (Hawkins, J., dissenting) (noting that in *Reynolds*, "avoidance of embarrassment—not preservation of state secrets—appears to have motivated the Executive's invocation of the privilege"). The Supreme Court's admonition in *Reynolds*—that judicial control of evidence cannot be abandoned to the caprice of executive officers, lest it open the door to intolerable abuses—is especially apt here, given Defendants' attempts to stonewall this Court's inquiries concerning the violations of its orders.

## CONCLUSION

Plaintiffs reiterate that the Court already possesses the information necessary to conclude that its March 15 oral and written temporary restraining orders were violated. But if the Court determines that it needs the government to respond to its questions to establish a more complete record, Defendants' attempted invocation of the state secrets privilege should be rejected.

Dated: March 31, 2025

Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Evelyn Danforth-Scott*
Cody Wofsy
Cecillia D. Wang (D.D.C. Bar No. CA00042)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Daniel Galindo (D.D.C. Bar No. NY035)
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi (D.D.C. Bar No. MI0071)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION

(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
edanforth-scott@aclu.org
cwofsy@aclu.org
cwang@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich
Skye Perryman (D.C. Bar No. 984573)
Audrey Wiggins (DC Bar No. 482877)
Christine L. Coogle (DC Bar No. 1738913)
Pooja Boisture
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org
awiggins@democracyforward.org
ccoogle@democracyforward.org
pboisture@democracyforward.org

*Attorneys for Plaintiffs*

*\*Pro bono representation certificate forthcoming*

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 31, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 31, 2025

Respectfully submitted,

*/s/ Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

*Attorney for Plaintiffs*