IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.G.G., *et al.*,<br><br>    *Plaintiffs*,<br><br>                    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    *Defendants*. | Case No: 1:25-cv-00766-JEB |

**<u>REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE</u>**

This Court issued an unequivocal oral order that "any plane containing these folks . . . needs to be returned to the United States . . . immediately." Mar. 15 Tr. 43 (ECF No. 20). That command, delivered on the record, and understood in the moment by the government's counsel, *see* Mar. 21 Tr. 5–6 (ECF No. 51), carried the full force of the Court's authority. And its oral command was encompassed by a written minute order shortly thereafter. Yet Defendants admit they never attempted to return the individuals on the planes to the United States, despite having both notice and the ability to do so. *See* Resp. to Order to Show Cause (ECF No. 58) ("OSC Response"). That refusal to return Plaintiff class members was not the result of legal ambiguity.[1]

---

[1] Defendants also sent a third plane to El Salvador, which took off at 7:36 p.m., after this Court's written order was issued. *See* Joyce Sohyun Lee and Kevin Schaul, *Deportation Flights Landed after Judge Said Planes Should Turn Around*, Wash. Post (Mar. 16, 2025), https://perma.cc/Q6NH-ATY8. While the Court has not yet examined the details of that flight, Plaintiffs continue to have grave concerns that Defendants were not reliably sorting people onto planes based on their removal status as the hearing was occurring, given the apparent chaos at the airport and Defendants' wrongful removal of other individuals who were subsequently returned to the United States. *See, e.g.*, ECF No. 44 at 6 (describing "'chaos' on the planes"); Beckman Decl. ¶ 8 (ECF No. 67-11) (describing how "[o]fficers hurriedly ordered men . . . onto the plane" and she "felt that they left in a rush"); *see also* Decl. of Robert Cerna, at 6, 12, 14–15,

1

**I.    The Court's oral order was both binding on its own and was encompassed by the subsequent minute order.**

A court's unambiguous oral order is binding. *See In re LaFande*, 919 F.3d 554, 562 (D.C. Cir. 2019) (judge's "in-person order" sufficient to compel a litigant on penalty of contempt); *see also In re U.S. Bureau of Prisons*, 918 F.3d 431, 437 n.3 (5th Cir. 2019) (citing *Lau v. Meddaugh*, 229 F.3d 121, 123 & n.2 (2d Cir. 2000)); *In re Charlotte Observer*, 921 F.2d 47, 48, 50 (4th Cir. 1990)). And counsel for Defendants stated that he "understood" on March 15 that the Court had orally directed the government to turn planes around immediately. Mar. 21 Tr. 5–6 ("Your Honor, I understood your intent, that you meant that to be effective at that time."); *see United States v. Philip Morris USA Inc.*, 682 F. Supp. 3d 32, 49 (D.D.C. 2023) (declining to construe injunction in favor of the enjoined party where meaning was unambiguous from trial record). Yet Defendants did not turn their planes around.[2] Instead, after the Court's minute order issued at 7:25 PM, two planes landed overseas, and Defendants "deplaned" Plaintiff class members. *See* Defs. Notice Invoking State Secrets Privilege 7–8 (ECF No. 56) (conceding these facts). Put simply, Defendants refused to heed the Court's orders.

Defendants cannot disregard this Court's directive merely because a specific command was delivered orally and then encompassed by a broader written order. Contrary to the

---

*Abrego Garcia v. Noem*, No. 25-cv-00951 (D. Md. Mar. 24, 2025), ECF No. 11-3 (admitting government put on the third plane a man who had been granted withholding of removal to El Salvador). As important, Defendants' claim that Venezuelans were removed to El Salvador under the immigration laws based on final orders is highly dubious, given that immigration judges generally would not issue final orders to Venezuelans designating *El Salvador* as the country of removal and DHS would need to comply with a statutory process for removals of individuals to countries to which they have no connection, especially where torture is a potential. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005).

[2] The government implausibly speculates the Court might have changed its mind in the minutes that elapsed between when it directed Defendants to "return" the airplanes, and when it memorialized that directive as part of a broader-reaching written minute order. *See* OSC Resp. 7.

government's arguments, *see* OSC Resp. 5–6, 7–9, the Court plainly complied with Federal Rule of Civil Procedure 65(d). *See Ueckert v. Guerra*, 38 F.4th 446, 449 (5th Cir. 2022) ("While courts today generally rule through written orders and judgments, they may choose to rule from the bench . . . [F]ederal courts at least have not lost their power to rule from the bench."); *id*. at 450 & n.12 (discussing cases allowing interlocutory appeal of oral orders); *see also In re LeFande*, 919 F.3d at 562; *Maness v. Meyers*, 419 U.S. 449, 458–59 (1975) ("We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal."); *Chapman v. Pacific Tel. & Tel. Co.*, 613 F.2d 193, 194–95 (9th Cir. 1979) (affirming criminal contempt order for "refusal to comply" with the district court's oral order where the reviewing court was "at a loss to see what more the court could have done to clarify and define its order").

The Court's minute order, issued in urgent circumstances as the planes were in flight, expressly stated, "As discussed in today's hearing, . . ."—thus encompassing the prior oral order by reference. Minute Order (Mar. 15, 2025); *see Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982) (meaning of an injunction is properly understood by reference to "the context of the litigation," including "the evidence produced at the hearing on the injunction"); *see also, e.g.*, *Philip Morris USA Inc.*, 682 F. Supp. 3d at 49 (clarifying injunction based on "the way the parties and the Court used the term during trial," including how judge "referred" to its meaning); *In re Baldwin-United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985) (reading injunction in light of "judge's decision upon issuing the injunction," which was delivered orally). And courts' oral statements routinely supply authoritative guidance as to the scope of written orders. *See Sec. & Exch. Comm'n v. McGoff*, 647 F.2d 185, 191 (D.C. Cir.

3

1981) (Ginsburg, J.) (looking to the district court's "order, *read together with*" the court's "statement from the bench" (emphasis added)).[3]

All but two of Defendants' cases are inapposite. *See* OSC Resp. 5–6. They address situations where the district court failed to issue a written order entirely, *see, e.g., In re Rockford Prods. Corp.*, 741 F.3d 730, 734 (7th Cir. 2013); *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 527 (7th Cir. 1988); *Bates v. Johnson*, 901 F.2d 1424 (7th Cir. 1990); *Lau v. Meddaugh*, 229 F.3d 121, 123 (2000)*; Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70, 83-84 (D.D.C. 2003), or the district court never explained what the injunction meant or why it was appropriate, *see, e.g., Hispanics United v. Village of Addison*, 248 F.3d 617, 621 (7th Cir. 2001)*; e360 Insight v. the Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007). In contrast, here the Court followed up with a written order shortly after the oral pronouncement and expressly referenced the oral order.

The other two cases support *Plaintiffs'* position. *See* OSC Resp. 5–6. They show courts of appeals looking to oral statements delivered from the bench as authoritative guidance regarding the contours of a district court's written injunction. *See Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481, 483 (7th Cir. 2015) (injunction invalid because, based on a "transcript of a hearing," "[t]he district judge did not discuss" Rule 65's various requirements); *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 104 (2d Cir. 2009) ("[T]he District Court's statements

---

[3] Defendants wrongly claim Plaintiffs have "taken the position that the court's oral instruction to return planes was *not* incorporated into the written minute order." OSC Resp. 9 n.5. What the government cites is Plaintiffs' position that backward-looking compliance with the Court's orders was not at issue on the emergency appeal to the D.C. Circuit. *See* Oral Arg., at 1:18:00-15, *J.G.G. v. Trump*, No. 25-5067 (D.C. Cir. Mar. 24, 2025), https://media.cadc.uscourts.gov/recordings/docs/2025/03/25-5067.mp3 (discussing district court's procedures on whether Defendants violated the TRO). Plaintiffs' statement simply reflected the fact that Defendants did not make any argument about that compliance in their appeal.

at the hearing do not describe in reasonable detail the extent of the acts restrained[.]").

## II. Defendants violated the Court's order by continuing to remove individuals under the AEA after the Court issued its minute order.

Defendants alternatively contend that they complied with the face of the minute order, arguing that Plaintiffs were "removed" as soon as they left U.S. airspace. OSC Resp. 4. Defendants are wrong. As discussed above, the minute order must be understood in light of the Court's immediately preceding oral order. The purpose of the Court's order was unmistakable—to keep individuals from being handed over to a foreign government. And again, counsel for the government said he understood the Court's order. But even setting that aside, Defendants' novel theory runs counter to the text of the minute order, common sense, and the government's own position in other cases. Nothing in the minute order says, or even implies, that its reach extends only to the edge of U.S. airspace and no further. Rather, the minute order prevents the "removing" of Plaintiffs, who were in U.S. custody when they were being transported by U.S. officials on U.S. planes. And Plaintiffs remained in U.S. custody throughout their continuous journey of being "removed" *to another country*.

While the dispositive issue here is the meaning of the Court's words on March 15, 2025, the eighteenth-century dictionaries cited by Defendants also support this common-sense understanding: when someone is "removed" from the United States, they are not suspended in midair; instead, they are "place[d]" at a distance. OSC Resp. 3. In other words, "removal" from the United States in this context occurs, at the earliest, when individuals were no longer midflight and had disembarked from the planes. Even the government has taken this position; in a separate case before this District, it recently told the court that "the removal process is not complete until the individual reaches the final destination" and the government has "relinquished custody of the detainees." Resp'ts' Opp. to Mot. for Stay of Transfer at 30, 31, *Escalona v.*

5

*Noem*, No. 25-cv-604 (D.D.C. Mar. 10, 2025), ECF No. 14.[4]

And the government would have had no practical problem returning Plaintiffs. Defendants brought back other people who had been on the same planes they had flown to El Salvador, as they did in fact bring back a Nicaraguan man and several women. *See* Defs. Notice Invoking State Secrets Privilege 2 (ECF No. 55).

### III. This Court had the power to bind federal officials carrying out removal orders extraterritorially.[5]

Article III courts routinely adjudicate questions about the proper scope of executive branch authority overseas. *See, e.g.*, *Doe v. Mattis*, 928 F.3d 1, 12 (D.C. Cir. 2019) (deciding a habeas case "in which the government has forcibly transferred an American citizen from one foreign country to another"); *Hamdan v. Rumsfeld*, 548 U.S. 557, 591, 635 (2006) (interpreting statutes limiting executive's authority to convene military commissions at Guantanamo Bay, Cuba; "in undertaking to try Hamdan and subject him to criminal punishment, the Executive is bound to comply with the rule of law that prevails in this jurisdiction."); *Boumediene v. Bush*, 553 U.S. 723, 755 (2008) ("The Court has discussed the issue of the Constitution's

---

[4] The government cites *Nicusor-Remus v. Sessions*, 902 F.3d 895 (9th Cir. 2018), to support its position that a removal is effectuated whenever an individual "leaves the United States." OSC Resp. 3. But *Nicusor-Remus* involved a land removal, *id*. at 899, where an individual who has "left the United States" has necessarily made a physical entry into another country. It has no bearing on individuals removed by planes, who have left U.S. air space but will not physically set foot in another country until they disembark from the plane. Indeed, the government's position here is contrary to the position it recently took in another case in this district. *See supra*. In any event, as noted, it is the intent of this Court's order, not what arguments the government can retroactively contrive.

[5] It is not relevant whether Defendants believed the district court's order was legal or constitutional. *See Walker v. City of Birmingham*, 388 U.S. 307, 320 (1967) (party "cannot bypass judicial review of [an] injunction before disobeying it"). The key is whether the Court had jurisdiction over Defendants and the enjoined party was on notice, a violation of the injunction. Both requirements are met here. *Id.* at 320–21 ("no man can be judge in his own case, however exalted his station").

6

extraterritorial application on many occasions[,]" and "[t]hese decisions" illustrate that the Constitution does not necessarily "stop[] where *de jure* sovereignty ends."). That includes when the executive branch purports to be acting through some inherent "unilateral power" that exists in the absence of any "treaty or statute."[6] *Id.* The government's far-reaching argument to the contrary is flatly wrong. The rule of law does not fall off at our nation's edge. *Id.* at 12; *cf. Hamdan*, 548 U.S. at 635.

As part of their routine exercise of judicial power, district courts also have the inherent authority to fashion equitable remedies that extend extraterritorially. This occurs not-infrequently in the immigration context. *See, e.g.*, *Walters v. Reno*, 145 F.3d 1032, 1050–51 (9th Cir. 1998) (requiring parole into country or other arrangement for hearing attendance for class of noncitizens); *Singh v. Waters*, 87 F.3d 346, 350 (9th Cir. 1996) (ordering government to permit return for immigration hearing following unlawful removal); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 144–45 (D.D.C. 2018) (ordering government to return noncitizens wrongfully removed); *Ms. L v. ICE*, 403 F. Supp. 3d 853, 860 (S.D. Cal. 2019) (court has remedial authority to bring back parents who were wrongfully deported and therefore unlawfully separated from their children); *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 408 (S.D.N.Y. 2004) (ordering noncitizen "be returned to the United States" after unlawful removal); *Dennis v. INS*, No. 01-cv-279, WL 295100, at *4 (D. Conn. Feb. 19, 2002) (same). And for good reason. Equity jurisdiction, after

---

[6] Just as nothing in Article II grants the President the power to unilaterally remove people, nothing in Article II grants the President the inherent authority "to decline to return[] to the United States [alleged] foreign terrorists who were previously within the United States," OSC Resp. 10, and Defendants cite nothing supporting this proposition. Under Article I, Congress holds plenary power over immigration. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 940 (1983); *Abourzek v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) (noting that although "[t]he Executive has broad discretion over the admission and exclusion of aliens, . . . [i]t extends only as far as the statutory authority conferred by Congress").

7

all, is typically exercised *in personam*—that is, against the person whom the court binds, wherever they may be. *See Massie v. Watts*, 10 U.S. (6 Cranch) 148, 158 (1810) ("the principles of equity give a court jurisdiction wherever the person may be found"); *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952) ("[T]he District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction."); *cf. Doe v. Mattis*, 928 F.3d 1, 12 (D.C. Cir. 2019) ("[A] sovereign's prescriptive jurisdiction—its power to regulate conduct—extends to persons located beyond its borders.").

Notably, the "overwhelming majority" of removals are "escorted removals" where "ICE officers maintain custody of the individual" being removed until they arrive at their destination. Resp'ts' Opp. to Mot. for Stay of Transfer at 25, *Escalona v. Noem*, No. 25-cv-604 (D.D.C. Mar. 10, 2025). The government's position would exempt these escorts from U.S. laws—freeing them to treat detainees in any manner they please—once they leave U.S. airspace. Not only is this position in conflict with the cases above, but the government musters no credible support for the adoption of such an arbitrary rule.

Defendants are also wrong to argue that the political question doctrine applies here. OSC Resp. 10–11. That doctrine prevents courts from resolving "matters not legal in nature." *Japan Whaling Ass'n v. Am Cetacean Soc'y*, 478 U.S. 221, 230 (1986). But the mere fact that a legal claim implicates (or arguably implicates) foreign affairs or national security does not place it "beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211 (1962). Indeed, "[t]he Judicial Branch appropriately exercises" review "where the question is whether Congress or the Executive is 'aggrandizing its power at the expense of another branch.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 197 (2012). Here, the salient question is whether the government violated the terms of this Court's orders—*i.e.*, whether Defendants had legal

authority to act as they did. That is a quintessential legal determination, tailor-made for resolution by the courts.

If Defendants' position were accepted, it would mean that the judiciary's power to ensure legal compliance by *any* of the federal officials involved in coordinating and executing the removal flights ended once those flights left U.S. airspace. That is a shockingly broad claim of executive authority, and it is entirely at odds with the judiciary's power to review the executive's extraterritorial conduct. *See Doe v. Mattis*, 928 F.3d 1, 12 (D.C. Cir. 2019). Defendants' cases do not hold otherwise. *Cf. Ghaleb Nassar Al-Bihani v. Obama*, 619 F.3d 1, 38 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of reh'g en banc) (addressing the court's limitation on enforcing international law with respect to wartime detention, not judicial enforcement of injunctions unrelated to release); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (reviewing a designation under a statute that expressly precluded judicial review of national security findings, unlike here, where no statutory restriction limits a court's authority to enforce its own injunction).

*   *   *

In response to the Order to Show Cause, the government makes no effort to demonstrate how it complied with this Court's directive to "return" "to the United States" all airplanes that were "going to take off" or were "in the air" with persons purportedly subject to the AEA even though the government's lawyer represented that he "understood" what the Court's order required at the time. Mar. 21 Tr. 5–6. Instead, it advances atextual readings of the minute order, unmoored from this Court's verbal explanation of what the injunction entailed. But the government's arguments are also unsupportable on their own terms—as a matter of basic textual analysis, of common sense, and in view of foundational separation-of-powers principles. The

government violated this Court's orders.

## CONCLUSION

Defendants violated this Court's orders, and upon such a finding, further proceedings, as appropriate, should follow.

Dated: March 31, 2025

Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Evelyn Danforth-Scott*
Cody Wofsy
Cecillia D. Wang (D.D.C. Bar No. CA00042)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
edanforth-scott@aclu.org
cwofsy@aclu.org
cwang@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Daniel Galindo (D.D.C. Bar No. NY035)
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi (D.D.C. Bar No. MI0071)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich
Skye Perryman (D.C. Bar No. 984573)
Audrey Wiggins (D.C. Bar No. 482877)
Christine L. Coogle (D.C. Bar No. 1738913)
Pooja A. Boisture
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090

10

Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org
awiggins@democracyforward.org
ccoogle@democracyforward.org
pboisture@democracyforward.org

*Attorneys for Plaintiffs*

*\*Pro bono representation certificate forthcoming*

## CERTIFICATE OF SERVICE

    I hereby certify that on March 31, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 31, 2025             Respectfully Submitted,

                                             */s/ Lee Gelernt*
                                             Lee Gelernt (D.D.C. Bar No. NY0408)
                                             American Civil Liberties Union Foundation
                                             125 Broad Street, 18th Floor
                                             New York, NY 10004
                                             (212) 549-2660
                                             lgelernt@aclu.org

                                             *Attorney for Plaintiffs*