```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
     J.G.G., et al.,
 3                                      Civil Case
                     Plaintiff(s),      No. 25-00766 JEB
 4          v.
                                        Washington, D.C.
 5   DONALD J. TRUMP, et al.,
                                        April 3, 2025
 6                   Defendant(s).

 7   ---------------------------------------------------------

 8                      SHOW CAUSE HEARING
              BEFORE THE HONORABLE JAMES E. BOASBERG
 9               UNITED STATES DISTRICT CHIEF JUDGE

10   APPEARANCES:

11   FOR THE PLAINTIFF(S):  Lee Gelernt, Esquire
                            Ashley Gorski, Esquire
12                          Patrick Toomey, Esquire
                            American Civil Liberties Union
13                          125 Broad Street
                            18th Floor
14                          New York, New York 10004

15                          Oscar S. Roman, Esquire
                            American Civil Liberties Union
16                           Foundation
                            425 California Street
17                          Seventh Floor
                            San Francisco, California 94104
18
                            Skye Perryman, Esquire
19                          Somil Trivedi, Esquire
                            Sarah Rich, Esquire
20                          Audrey J. Wiggins, Esquire

21                          Christine Coogle, Esquire
                            Pooja Boisture, Esquire
22                          Democracy Forward Foundation
                            P.O. Box 34533
23                          Washington, D.C. 20043

24

25
```

```
 1    APPEARANCES (Cont.):    Arthur B. Spitzer, Esquire
                              ACLU Foundation of the
 2                             District of Columbia
                              529 14th Street Northwest
 3                            Suite 722
                              Washington, D.C. 20045
 4

 5
      FOR THE DEFENDANT(S):   Drew C. Ensign, Esquire
 6                            United States Department of Justice
                              950 Pennsylvania Avenue Northwest
 7                            Washington, D.C. 20530

 8                            August E. Flentje, Esquire
                              United States Department of Justice
 9                            P.O. Box 868 Ben Franklin Station
                              Washington, D.C. 20044
10

11

12    REPORTED BY:           Tammy Nestor, RMR, CRR
                             Official Court Reporter
13                            333 Constitution Avenue Northwest
                              Washington, D.C. 20001
14                            tammy_nestor@dcd.uscourts.gov

15

16

17

18

19

20

21

22

23

24

25
```

 1    The following proceedings began at 5:00 p.m.:

 2            THE COURT:  Good afternoon, everyone.

 3            THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

 4    We are on the record for Civil Case 25-766, JGG, et al.

 5    versus Donald J. Trump, et al.

 6            Counsel, please approach the lectern and identify

 7    yourselves for the record starting with the plaintiff.

 8            MR. GELERENT:  Good afternoon, Your Honor.  Lee

 9    Gelernt from the ACLU for plaintiffs.

10            THE COURT:  Good afternoon.

11            MR. ENSIGN:  Good afternoon, Your Honor.  Drew Ensign

12    for the United States.

13            THE COURT:  Thank you very much.  Okay.  Welcome,

14    everyone.

15            All right.  We are here today to look into further

16    the defendants' compliance with my TROs on March 15.  Both

17    parties have had an opportunity to brief the issue.

18            Mr. Ensign, why don't we start with you.  So again,

19    this case continues to attract public attention.  We see a

20    full gallery here.  So I think it's worth again reiterating

21    the points and the facts that I think you agreed to last

22    time and that aren't in dispute, but I just want to go over

23    those again and make sure you agree with those regarding the

24    effect of the TRO.

25            So I think that, as I have said before, my TRO

1    opinion makes clear you agree that my TROs did not order any

2    TdA member to be released from custody, right?

3         MR. ENSIGN:  That's correct, Your Honor.

4         THE COURT:  Okay.  And the TROs did not prevent the

5    government from apprehending any TdA member, did they?

6         MR. ENSIGN:  That's also correct, Your Honor.

7         THE COURT:  They also did not order that the

8    government could not deport any TdA member via regular INA

9    procedures, right?

10        MR. ENSIGN:  That's correct, Your Honor.

11        THE COURT:  In fact, the administration this week

12   deported TdA members using those procedures, didn't it?

13        MR. ENSIGN:  That's my understanding, Your Honor.

14        THE COURT:  Mine too.  And that's in part because TdA

15   has been designated a foreign terrorist organization, so you

16   can deport its members with a hearing through regular INA

17   procedures, correct?

18        MR. ENSIGN:  Yes, Your Honor.

19        THE COURT:  So what my TROs did and all they did was

20   order that the government could not summarily deport

21   in-custody noncitizens who were subject to the proclamation

22   without a hearing, right?

23        MR. ENSIGN:  Broadly speaking, yes, Your Honor.

24        THE COURT:  Okay.  And if the government wants to

25   continue to deport these folks, they may do so, just not

1    relying on the AEA, right?

2            MR. ENSIGN:  That's correct, Your Honor, not relying

3    on the proclamation.

4            THE COURT:  Exactly.  So if any of your clients or

5    anyone in the administration continues to make statements

6    that are contrary to what I have just said, those statements

7    would not be truthful, isn't that right?

8            MR. ENSIGN:  Your Honor, if they are contrary to --

9            THE COURT:  Those facts that we have just agreed on,

10   they wouldn't be true?

11           MR. ENSIGN:  Yes, Your Honor.  To the extent that

12   it's contrary to things that are true, they would be false.

13           THE COURT:  They would, indeed.

14           All right.  So now let's proceed and talk about

15   whether the government complied with my TROs issued on

16   March 15.

17           Now, you maintain that DHS has been -- was in full

18   compliance with the law during these deportations on

19   March 15, correct?

20           MR. ENSIGN:  Your Honor, it is our position that the

21   actions of the government complied with this Court's two TRO

22   orders.

23           THE COURT:  Okay.  So it seems to me that there is a

24   fair likelihood that that is not correct, and in fact, that

25   the government acted in bad faith throughout that day.  If

1    you really believed everything you did that day was legal
2    and could survive a court challenge, I can't believe you
3    ever would have operated in the way you did.
4         So let's go through that and see if I'm right or you
5    can convince me otherwise.
6         So let's start, when was the proclamation signed?
7    Was it signed on the 14th or 15th?  That seemed to an issue
8    last time.
9         MR. ENSIGN:  Your Honor, I believe it was signed the
10   14th.  That's when it's dated.  I don't have any
11   information, you know, to contravene that.
12        THE COURT:  And that's what the Federal Register
13   says, the 14th, right?
14        MR. ENSIGN:  I believe that's correct, Your Honor.
15        THE COURT:  So why was it not made public until the
16   15th?
17        MR. ENSIGN:  Your Honor, I don't know, and the record
18   doesn't disclose that.  But a proclamation is only effective
19   upon its announcement.  It's not effective upon its signing.
20        THE COURT:  So you don't think then it had anything
21   to do with trying to put measures in place to get people
22   subject to the proclamation removed from the country before
23   it was possible to challenge it legally, do you?
24        MR. ENSIGN:  Your Honor, I don't have any information
25   on that, and the record doesn't disclose that.  I don't know

1    those operational details.

2         THE COURT:  In fact, the president, himself, said at

3    a news conference, I don't know when it was signed because I

4    didn't sign it.  He said that, right?

5         MR. ENSIGN:  Your Honor, I have seen that reported in

6    the news.

7         THE COURT:  Have you seen the actual statements at a

8    press conference?  Have you seen that, not just as reported,

9    but actually the statements made on tape?

10        MR. ENSIGN:  I have not seen the actual press

11   conference itself.  I have seen the reporting on the press

12   conference.

13        THE COURT:  And so should I do anything with those

14   statements?

15        MR. ENSIGN:  No, I don't believe so, Your Honor.  I

16   don't think that's relevant to any of the compliance issues

17   that are presented here.

18        THE COURT:  Okay.  So ICE said that the proclamation

19   was made public at 3:53 p.m.  I think that's when it was

20   posted on the White House website.  Is that right?

21        MR. ENSIGN:  That's my understanding, Your Honor, and

22   that's what the record shows.

23        THE COURT:  All right.  But ICE clearly knew of the

24   proclamation before 3:53 on March 15, fair?

25        MR. ENSIGN:  I don't personally know that, but I

1    think that's -- that's something that this Court could

2    potentially infer from the other facts.

3        THE COURT:  Is there any way not to infer that?  In

4    other words, you're not saying to me that, starting at

5    3:53 p.m., people in Texas were able to round up three

6    planeloads of people, get them on those planes, figure them

7    all out, and get them off within a couple of hours, again,

8    not deciding the specific time.  So you would agree, pretty

9    unlikely that was the case, right?

10        MR. ENSIGN:  Your Honor, there's no evidence in the

11    record for that; although, I think, certainly, you know,

12    like any national security operation, there may have been

13    preparatory steps that were required in order to carry it

14    out.

15        THE COURT:  In fact, according to scores -- according

16    to declarations submitted by the plaintiffs, so that is

17    evidentiary, it is in the record, that morning the

18    government loaded scores of Venezuelans onto buses, drove

19    them to a nearby airport, and began putting them on three

20    planes.  That occurred that morning.  Is there reason to

21    doubt the accuracy of those declarations?

22        MR. ENSIGN:  Your Honor, we don't have anything in

23    the record that would contradict that.

24        THE COURT:  Right.  So in other words, then if that's

25    true, then it's not that one could arguably infer that they

 1    were -- that ICE was working on this prior to 3:53 p.m., but

 2    that they were working on it prior to that?

 3             MR. ENSIGN:  I think you could draw that inference,

 4    Your Honor, and --

 5             THE COURT:  You could, but isn't that the only --

 6    what other inference could you draw from that?

 7             MR. ENSIGN:  Your Honor, I think you can certainly

 8    draw that.  And you know, I think it's also reasonable that

 9    the government would have engaged in preparatory actions

10    before it began a national security operation.

11             THE COURT:  Right.  So the only inference to draw is

12    that they were acting in preparation of the proclamation

13    before it was posted?  That's the only inference one could

14    draw, right?

15             MR. ENSIGN:  I think from this record, that's

16    correct.  But I don't think that's been a live issue, so

17    that's not something that we have made an effort to develop

18    a record on.

19             THE COURT:  Okay.  So now let's go to the day of

20    March 15.  So my first TRO relating to the class members was

21    entered at 9:40 a.m.  Is that your understanding?

22             MR. ENSIGN:  As to the five individual plaintiffs,

23    Your Honor, I believe that's correct.

24             THE COURT:  Okay.  And so when was that information

25    passed on to ICE?

1          MR. ENSIGN:  Your Honor, I don't specifically know

2     when that was passed on to ICE.  I know that, you know, that

3     first TRO was absolutely complied with, and there's no

4     suggestion that those individuals were put on any planes or

5     that there was any compliance issue that plaintiffs have

6     raised as to that first TRO.

7          THE COURT:  So what time did you learn of it?

8          MR. ENSIGN:  Your Honor, I don't recall.  It wasn't

9     yet on the docket.  It was forwarded to me.  It was sometime

10    in that morning and --

11         THE COURT:  That morning, right?

12         MR. ENSIGN:  I believe so, Your Honor.

13         THE COURT:  So in fact, according to Mr. Reuveney's

14    email to chambers, that TRO had been disseminated to the

15    relevant executive branch agencies by 10:18 a.m., which is

16    the time of his email.  Does that sound about right to you?

17         MR. ENSIGN:  That sounds correct, Your Honor.

18         THE COURT:  And the order that I issued at 9:40 said

19    there would be a Zoom hearing at 4:00 p.m. that day,

20    correct?

21         MR. ENSIGN:  That's my recollection, Your Honor.  I

22    believe it was a hearing set for the class certification.

23         THE COURT:  And then at 11:04 a.m., I moved the

24    hearing to 5:00 p.m., right?

25         MR. ENSIGN:  I believe that's correct, Your Honor.

1      THE COURT:  So why -- I guess what I'm trying to

2   figure out here is, is there any other inference that there

3   was an expedited effort to get people onto planes before my

4   hearing at 5:00 or before I ruled?  Isn't that the inference

5   that you would draw from this?

6      MR. ENSIGN:  I don't believe so, Your Honor.  There's

7   no evidence that, whatever the operational details were,

8   that they were changed in any way as a response to the

9   Court's order.

10      THE COURT:  Again, so you have a proclamation that is

11   signed on the 14th, although not publicized until 3:53 on

12   the 15th, in the afternoon while people are being bused to

13   planes on the morning in order to be removed as quickly as

14   possible so that the plaintiffs couldn't challenge it and so

15   that it couldn't be enjoined by a court, isn't that fair?

16      MR. ENSIGN:  Your Honor, I don't believe so.  I don't

17   think there's any facts in the record for that.  And you

18   know, if so, it certainly did not prevent plaintiffs from

19   filing suit and obtaining that first TRO.

20      THE COURT:  Well, only because I happened to be

21   available at -- when I was alerted to this was at 7:25 on

22   Saturday morning -- only because I was available and could

23   review first the pseudonymous motion, which I had to review

24   as chief judge, and then the case was then transferred to me

25   or assigned to me.  And so it was good fortune that they

1    were filing -- I think they filed their complaint something

2    like 2:14 a.m.  Let's take a look.

3         Sorry.  1:12 a.m. is when they filed it on March 15.

4    And the fact that they were able to file it at 1:12 a.m. and

5    the fact that I was available at 7:30 on Saturday morning is

6    the only reason why they were able to get relief that

7    morning before those people were put on the plane, right?

8         MR. ENSIGN:  The courts were open and available to

9    hear relief, I think, is the reason, yes.

10        THE COURT:  Well, the courts weren't open, but the

11   docket, plaintiffs could still file electronically, and yes,

12   I was available.  But you wouldn't typically say that the

13   window between 1:00 a.m. and 7:00 a.m. on a Saturday is the

14   window in which -- is sufficient time to permit someone to

15   challenge government action, would you?

16        MR. ENSIGN:  Well, speaking generally, not

17   necessarily, Your Honor, though, honestly, TROs are being

18   filed very, very frequently in the last two months, and

19   having them be heard on a schedule not unlike this one is

20   somewhat common.

21        THE COURT:  I'm not sure the filing at 1:00 a.m. and

22   the hearing and the assigning at 7:00 a.m. and deciding it

23   thereafter is anything close to common; although, I agree

24   with you there have been plenty of TROs being filed.

25        And so but let me ask you this.  Why, when you knew

1     that I was having a hearing at 5:00 which was going to

2     relate to class certification and was going to relate to the

3     plaintiffs' attempts to enjoin action against a larger

4     class, why wouldn't the prudent thing be to say, Let's slow

5     down here.  Let's see what the judge says.  He's already

6     enjoined the removal of five people.  It's certainly in the

7     realm of possibility that he would enjoin further removals.

8     Let's see what he says.  And if it's -- if he doesn't enjoin

9     it, we can go ahead, but sure better to be safe than risk

10    violating the order.  Why wouldn't the wise, prudent,

11    considered route be that?

12         MR. ENSIGN:  Well, I guess three responses, Your

13    Honor.  One is that the hearing was only set for class

14    certification.  We didn't have notice that it was going to

15    be also on that second TRO.  A TRO had already issued, and

16    so that, you know -- and we made sure that we had complied

17    with that TRO.  But as, more specifically, to the

18    operational details, I don't have knowledge as to how or

19    when those decisions were made.

20         THE COURT:  So what you were willing to do by trying

21    to do this as quickly as possible and avoid being enjoined

22    by the Court was to risk putting people on those planes who

23    shouldn't have been on the planes in the first place.

24         So we have the example of Mr. Kilmar Abrego Garcia,

25    and you have admitted, haven't you, not you personally, but

1    the administration has admitted that he was removed based on

2    an error, right?

3         MR. ENSIGN:  I believe that's correct, Your Honor.

4    Although, to clarify that, Mr. Abrego was on the third plane

5    for which there are no compliance issues that have been

6    raised by plaintiffs.

7         THE COURT:  On the contrary.  They have raised them.

8    We haven't quite gotten to the bottom of the third one yet.

9         In other words, he is in that group of passengers for

10   three planes that you are rushing to get out of the country

11   before a judge can act, and lo and behold, at least one we

12   know of shouldn't have been there in the first place, right?

13        MR. ENSIGN:  No, Your Honor.  I disagree that there's

14   any evidence that a third plane was rushed.  The government

15   has made clear that it left after the TRO order --

16        THE COURT:  Rushed in the sense it still leaves the

17   same day, correct?  In other words, it leaves within --

18   according to your own time lines, it leaves three and a half

19   hours after the proclamation was posted, right?

20        MR. ENSIGN:  I believe that's correct; although, that

21   third flight was actually not pursuant to the proclamation.

22   It was all Title 8 removals.

23        THE COURT:  So you say, but again, the rush to get

24   him out means you misidentified at least him.

25        So then when I had my hearing at 5:00, I asked you

 1    point blank whether there were any removals under this

 2    proclamation planned in the next 24 or 48 hours.  Do you

 3    remember that?

 4            MR. ENSIGN:  I do, Your Honor.

 5            THE COURT:  And you said you didn't know but that you

 6    could investigate and report back, correct?

 7            MR. ENSIGN:  That's correct, Your Honor.

 8            THE COURT:  Okay.  So then I recessed the hearing

 9    from 5:22 to 6:00 p.m., and when we came back, you still

10    couldn't give me any information about the planes, correct?

11            MR. ENSIGN:  That's correct, Your Honor.

12            THE COURT:  So what I want to know here, as an

13    officer of the court, you are telling me that you had no

14    knowledge whatsoever between 5:00 and 6:00 p.m. on that day

15    that planes were in the air or shortly would be in the air?

16    You had no knowledge whatsoever of that?

17            MR. ENSIGN:  Your Honor, I had no knowledge from my

18    client that that was the case.  I had knowledge from

19    plaintiffs' submissions to the Court that that might have

20    been occurring.  I can also assure you, as an officer of the

21    Court, I diligently tried to obtain that information but was

22    not able to do so.

23            THE COURT:  Is that because they were -- and I

24    appreciate that distinction.  I wasn't asking about the

25    plaintiff, but I appreciate your making that distinction.  I

1    meant from your clients.

2         So why -- so they told you nothing about these

3    planes?  You were there arguing on behalf of the government,

4    and they told you nothing?

5         MR. ENSIGN:  Your Honor, as to the content of those

6    conversations, I think they are covered by attorney-client

7    privilege.  And at least I'm not prepared to make those

8    attorney-client privilege calls on the fly during this

9    hearing.

10        THE COURT:  But what you are prepared to tell me is

11   that they -- no one told you from the administration that

12   planes were in the air or would be within the next 24 or 48

13   hours?  That's what you are telling me?

14        MR. ENSIGN:  Yes, Your Honor.

15        THE COURT:  So now let's talk about the third plane

16   for a minute because the plaintiffs -- I have taken your --

17   there was a declaration by Mr. Cerna, and there have been

18   representations by you and others that there was nobody

19   deported solely on the basis of the proclamation on that

20   third plane, because you agree that if anyone on that plane

21   was being deported solely on the basis of the proclamation,

22   then that would be a clear violation of my order?

23        MR. ENSIGN:  That would appear to violate the order

24   if it were pursuant to the proclamation and not under some

25   separate authority such as Title 8 or --

```
1           THE COURT:  Right.  Solely on the basis of

2   proclamation, it would be a violation of my order?

3           MR. ENSIGN:  That's how we read that order.

4           THE COURT:  Me too.

5           And your arguments regarding oral versus written

6   ruling or what constitutes removal, none of that would be

7   relevant regarding anyone on the third plane, right?

8           MR. ENSIGN:  As to the written, no.  But you know,

9   certainly, I think to clarify as to that third plane, if

10  there was an error under Title 8, I don't believe that would

11  violate the Court's order.  It would still be a removal

12  under Title 8, albeit potentially an erroneous one.

13          THE COURT:  Correct.  Okay.  I agree.

14          So are you saying that everyone on that plane that

15  was removed to El Salvador was Salvadoran?  Because the

16  plaintiffs are saying maybe we're not so sure that this, the

17  third plane, was kosher, in fact, because -- so they are

18  saying what's the basis you had to remove to El Salvador

19  anybody who wasn't Salvadoran under INA procedures?

20          MR. ENSIGN:  Your Honor, the basis would be 8 U.S.C.

21  1231(b) which defines where people can be removed to under

22  final orders of removal.  It has a series of sort of

23  interlocking provisions that are fairly complex.  But it

24  certainly does permit removals to third countries.

25          THE COURT:  Okay.  We will take a look at that.
```

1          And then there were also people who were returned to

2    the United States, and I don't know from which of the three

3    planes, but you agree that there were people who were

4    returned to the United States?  I think it's seven -- I

5    guess eight women and a man.

6          MR. ENSIGN:  That's my understanding, Your Honor, at

7    least broadly speaking.  I'm not sure about those precise

8    numbers.

9          THE COURT:  Sure.  But my point in asking that is

10   it's certainly operationally feasible for those planes to

11   bring individuals back to the United States?

12         MR. ENSIGN:  Your Honor, I don't know anything about

13   those operational details.  I have seen the public reporting

14   regarding, I believe, those eight individuals, but I don't

15   know what the operations were.

16         THE COURT:  Okay.  So let's then wind this area up of

17   that day with just a few other questions.

18         So can you tell me, were there other government

19   officials who were listening at the hearing, the hearing

20   that started at 5:00?

21         MR. ENSIGN:  Your Honor, I believe so.

22         THE COURT:  Can you tell me who those were, please.

23         MR. ENSIGN:  I don't have a comprehensive list.  I

24   know some people --

25         THE COURT:  You can start with the ones you know

```
1    then.
2         MR. ENSIGN:  I believe members of my OIL team were --
3         THE COURT:  Who were they?
4         MR. ENSIGN:  I believe August Flentje.  I believe
5    Erez Reuveney.  I believe Sarah Wilson.
6         THE COURT:  Now, were there any people in the room
7    with you at the time you were making -- you were conducting
8    your arguments for the hearing?
9         MR. ENSIGN:  No, Your Honor.
10        THE COURT:  Okay.  So where were these other people
11   to your knowledge?
12        MR. ENSIGN:  To my knowledge, everyone else was
13   listening by phone as well.  Excuse me, Your Honor.  I was
14   on Zoom, and I believe they were listening by phone.
15        THE COURT:  Okay.  So those are members of your team.
16   Who else from the administration was listening that you are
17   aware of?
18        MR. ENSIGN:  Your Honor, I'm not -- I know my contact
19   was James McHenry, who I talked to.
20        THE COURT:  And can you say for the record his title?
21        MR. ENSIGN:  Associate deputy attorney general.
22        THE COURT:  Okay.  So he was listening.  Anybody
23   else?  Who else are you aware of?
24        MR. ENSIGN:  I don't specifically know, Your Honor.
25        THE COURT:  Okay.  Take a minute to think because I
```

1    want you to be -- here's an opportunity, and I'm giving you

2    time, I want to know then who either you knew at the time or

3    have come to learn since was listening to the call.

4         MR. ENSIGN:  Your Honor, I don't specifically know.

5    I mean, I know people that certainly have an awareness of

6    the case.  I don't know specifically who was listening in to

7    the call.

8         THE COURT:  So you can't tell me anyone else besides

9    those four who were listening in?

10        MR. ENSIGN:  Not that I know that they were

11   specifically listening to the call, no, Your Honor.

12        THE COURT:  Others who you believe were listening?

13        MR. ENSIGN:  Your Honor, to the extent that I believe

14   they might be listening to the call, I think that could get

15   into areas of attorney-client privilege.

16        THE COURT:  How?

17        MR. ENSIGN:  Because the basis of my knowledge that

18   they were --

19        THE COURT:  That's not -- so if they told you, I was

20   listening to the call, how's that provision of legal advice,

21   seeking of legal advice?  That's just -- that's an identity

22   issue.

23        MR. ENSIGN:  Your Honor, it's derived from

24   communications.  You know, I would want to --

25        THE COURT:  Every communication between a lawyer and

1    a client is not attorney-client privilege including I was on

2    the call.  How is that possibly seeking legal advice or

3    providing information for legal advice?

4          MR. ENSIGN:  Your Honor, that may well be correct,

5    but before touching on areas that may have an

6    attorney-client privilege designation, I would want to run

7    that by other experts in order to ascertain that.

8          THE COURT:  Okay.  So whom did you tell about my

9    order?  Whom did you tell about the oral order?  Once we got

10   off the phone, once the hearing was done at close to 7:00,

11   6:50-something, who did you tell about that hearing who

12   wasn't on the call?

13         MR. ENSIGN:  Your Honor, I relayed that information

14   to contacts at DHS and to people at the State Department.

15         THE COURT:  Okay.  Who?

16         MR. ENSIGN:  My email was to James Percival.

17         THE COURT:  Who's he?

18         MR. ENSIGN:  He is in DHS.

19         THE COURT:  Uh-huh.  Who else?

20         MR. ENSIGN:  Joseph Mazzara at DHS.

21         THE COURT:  Spell that, please.

22         MR. ENSIGN:  M-A-Z-Z-A-R-A.

23         THE COURT:  Uh-huh.  Who else?

24         MR. ENSIGN:  And at State, it was Jay -- I want to

25   say Bischoff.

```
 1          THE COURT:  Is that with a B?

 2          MR. ENSIGN:  Yes.

 3          THE COURT:  Anyone else who you informed about my

 4   oral ruling?

 5          MR. ENSIGN:  I believe it was relayed to others

 6   certainly through that, but that was the immediate people

 7   that to whom I directed.

 8          THE COURT:  Okay.  Who else did you tell that

 9   evening --

10          MR. ENSIGN:  Your Honor, I told --

11          THE COURT:  -- either orally or by email?

12          MR. ENSIGN:  Your Honor, I provided that information

13   to others within DOJ.

14          THE COURT:  Who?

15          MR. ENSIGN:  The others that I mentioned on that

16   call, and I may have emailed others too.  I don't

17   specifically remember who all I told, but there certainly

18   was no -- I certainly believed that it would be circulated

19   to the relevant people.

20          THE COURT:  And then how about -- and then how about

21   the written order, to whom did you communicate that?

22          MR. ENSIGN:  I believe to all the same people.

23          THE COURT:  Anybody else in addition to those you've

24   mentioned?

25          MR. ENSIGN:  I don't recall offhand.  It's certainly
```

1   possible that I did.  I don't remember specifically who the

2   email chains were directed to, but certainly there was no

3   intent not to distribute -- have that go to all the

4   relevant...

5        THE COURT:  No, I'm certainly not saying that you

6   were withholding.  I'm interested -- I'm sure you weren't.

7   I would just like to know who you told.

8        So who then gave the order that the planes should not

9   turn around?

10       MR. ENSIGN:  Your Honor, that would be potentially

11   subject to attorney-client privilege as --

12       THE COURT:  Because?  How is that -- in other words,

13   you are aware who -- who made the decision to either not

14   tell the pilots anything or to tell them to keep going?  I

15   would like to know who that was.  Again, you have said that

16   it was perfectly appropriate for the government to act as it

17   did.  So who made that perfectly appropriate decision?

18       MR. ENSIGN:  Your Honor, I don't know that.

19       THE COURT:  What were you told?

20       MR. ENSIGN:  Your Honor, I haven't been told.

21       THE COURT:  So you, standing here, have no idea who

22   made the decision to not bring the planes back or have the

23   passengers not be disembarked upon arrival?

24       MR. ENSIGN:  Your Honor, I do not know those

25   operational details.

```
 1              THE COURT:  Okay.  So since -- I'm certainly
 2    interested in finding that out because as we proceed with
 3    potential contempt proceedings, that may become relevant.
 4    So how do you think the best way to proceed to obtain that
 5    information is?  Would you like to proceed by declaration?
 6    Do you think we should have hearings where people testify
 7    under oath?  What do you think is the best way to obtain
 8    that information?
 9              MR. ENSIGN:  Well, your Honor, I think this should be
10    resolved based on the legal arguments we have raised so far.
11              THE COURT:  I understand.  But if I don't agree, if I
12    don't find your legal arguments convincing and I believe
13    there is probable cause to find contempt, what I am asking
14    is, how should I determine who the contemnor or contemnors
15    are?
16              MR. ENSIGN:  Your Honor, again, assuming that you
17    have rejected all our arguments, which is, I believe, the
18    premise of your question, I think then additional briefing,
19    in particular, with potentially steer from the Court, is the
20    particular details that it's focused on would be a better
21    way to proceed with that.
22              THE COURT:  So briefing, you mean with declarations?
23              MR. ENSIGN:  Yes, Your Honor, to the extent that it
24    called for, you know, a relevant factual record, that would
25    presumably be supplied with declarations attached to the
```

```
 1    brief.

 2         THE COURT:  All right.  So if I find there is

 3    probable cause for contempt and if I require that and

 4    declarations are insufficient, then there is a good chance

 5    that we will have hearings.  So that's something you can

 6    discuss with your clients.

 7         So let me ask you something else, which is, if I find

 8    probable cause for contempt, does the government want an

 9    opportunity to purge the contempt?

10         MR. ENSIGN:  Your Honor, I don't know the position of

11    the United States on that.  I would have to run that up the

12    chain.  That's not something that --

13         THE COURT:  And have you thought about how you would

14    purge it other than the return of the individuals?

15         MR. ENSIGN:  Your Honor, I haven't thought about

16    that.  It would obviously depend on the specifics of what

17    the Court thought the contempt was.  So I think it would be

18    very context-dependent as to both, you know, what that

19    purging would be and, you know, as to what the procedures

20    that would go with that should be.

21         THE COURT:  Okay.  Let's move to one other area,

22    Mr. Ensign -- and I appreciate your standing in there and

23    answering my questions -- which is that I agree with the

24    plaintiffs that I likely can find probable cause -- that I

25    can make such a decision about probable cause, I should
```

1   state, without the specific information that the government

2   claims is covered by the state secrets, the state secrets

3   privilege, but I would like to address this briefly.

4        So I don't see anywhere, unless I missed it, in your

5   pleading on the State invoking the state secrets privilege

6   and the declarations that there is a claim that the

7   information I'm seeking is classified.  Is it?

8        MR. ENSIGN:  That is not a claim in the brief.

9        THE COURT:  Okay.  So fair to say it's a pretty

10  obvious thing to point out if, in fact, it was true?  So are

11  you saying -- maybe I should simply ask you directly.  Is

12  the information you are seeking to protect via state secrets

13  classified?

14       MR. ENSIGN:  Your Honor, I don't know whether there

15  may be aspects of it that might be classified.

16       THE COURT:  But to your knowledge, to your knowledge,

17  though, it is not classified then?

18       MR. ENSIGN:  To my knowledge.

19       THE COURT:  Okay.  So can you point me to a single

20  case where unclassified information is covered by the state

21  secrets privilege?

22       MR. ENSIGN:  Your Honor, I haven't prepped

23  specifically for the state secrets.  I know certainly, I

24  believe, the Reynolds case dealt with information certainly

25  that may otherwise have been in the public domain.  So I

1    think that may be one of the --

2         THE COURT:  Reynolds, the public domain about the

3    specific --

4         MR. ENSIGN:  Your Honor, I might be --

5         THE COURT:  -- helicopter?

6         MR. ENSIGN:  Your Honor, I might be recalling the

7    wrong case.

8         THE COURT:  I think you may.

9         But I'm struggling to see how the state secrets

10   privilege can cover unclassified material.  But you are

11   telling me you are not prepared to address that today.

12        MR. ENSIGN:  Your Honor, not -- and more to the

13   point, it doesn't seem to be a live issue with respect to

14   compliance, as plaintiffs have admitted on pages 1 to 2 of

15   their response, that the Court has all of the facts that it

16   requires in order to determine the status of those two

17   flights at issue.

18        THE COURT:  So my next question, of course, is to ask

19   you what the basis, even if you invoked state secrets and

20   said you couldn't show it to the plaintiffs, what the basis

21   for not showing it to me ex parte in a SCIF -- and for those

22   not in the know, that's a sensitive compartmented

23   information facility where we review classified material all

24   the time including as members of the foreign intelligence

25   surveillance court.

```
 1            So are you prepared to tell me today why this
 2    information can't be given to me in that fashion?
 3            MR. ENSIGN:  Your Honor, I believe that was set forth
 4    in our response --
 5            THE COURT:  Pretty sketchily, I mean, a little bit --
 6    mainly about why it couldn't be shared with the public, but
 7    no one's told me why it can't be shared with me on an
 8    ex parte basis.  Is that something you want to talk about
 9    further?
10            MR. ENSIGN:  Your Honor, as set forth in our brief,
11    there would diplomatic consequences to do that.
12            THE COURT:  Like what?
13            MR. ENSIGN:  Your Honor, that's what the State
14    Department has represented.
15            THE COURT:  But you understand that on state secrets,
16    that I'm not required to accept the government's
17    representations about the harm, that courts, not just me,
18    but courts generally look at what the government says with
19    deference, but they still scrutinize it, true?
20            MR. ENSIGN:  Your Honor, certainly some level of
21    judicial review still exists under the state secrets
22    doctrine.  But certainly, I think, too, as the Reynolds case
23    makes clear, there would have to be some showing of need.
24    And it appears that both plaintiffs and the government here
25    are in agreement that there is no such need.
```

1          THE COURT:  Okay.  Thank you very much, Mr. Ensign.

2     I will hear from Mr. Gelernt.

3          MR. GELERENT:  Good afternoon, Your Honor.

4          THE COURT:  Okay.  Good afternoon, Mr. Gelernt.  So I

5     will let you, if you want to -- obviously this is a hearing

6     to hear from the government why it thinks it didn't violate

7     my order.  You filed a brief stating why you think it has.

8          So I would like to do two things with you.  The first

9     is, if there's anything that the government said today that

10    you want to respond to, I would be happy to hear that.  And

11    then I would like to ask you a little bit about your

12    thoughts, if you have any, regarding potential contempt

13    proceedings.

14         MR. GELERENT:  Right.  So I think Your Honor asked

15    all the questions and got the answers that we would want.  I

16    think the government didn't provide all the information

17    which, I think, leads to your next question.

18         I think we are probably finished with briefing at

19    this point.  I think we've all done about as much briefing

20    as we can on this.  And I think the next step has to be what

21    Your Honor is suggesting, some evidence that's sworn,

22    either -- and I think there's three possibilities, and Your

23    Honor mentioned two of them obviously.  One is declarations,

24    that they try and answer all the questions that you are

25    putting to them.  The other obviously is a hearing where

```
1    people are here under oath and we can actually follow up

2    about vague assertions.  And then I guess the other one

3    would be whether there's depositions that might be helpful

4    to Your Honor.

5         We obviously feel that the order was violated.  At

6    this point, though, you know, I do think on the public

7    information, Your Honor could find that.  But I understand

8    Your Honor would like to know more, and that certainly makes

9    sense.

10        So we would be happy proceeding however Your Honor

11   would choose.  But the only thing I would say, and I think

12   Your Honor is saying this already, is it doesn't seem like

13   the government is prepared to say specifics in a

14   declaration, and so another set of declarations like were

15   just filed is not going to be overly helpful.  If Your Honor

16   wants those declarations, then we can go from there to the

17   next step of either a hearing or depositions.  That's fine

18   with plaintiffs.

19        THE COURT:  Okay.  All right.  Anything else you want

20   to add, Mr. Gelernt?

21        MR. GELERENT:  No, Your Honor.

22        THE COURT:  Okay.

23        MR. GELERENT:  Thank you.

24        THE COURT:  Thank you.

25        All right.  I will review the material and issue an
```

1    order, and I will determine if I have found that probable

2    cause exists to believe that contempt has occurred, and if

3    so, how we will proceed from there.  So I would not expect

4    to issue this opinion before next week.  And I will see you

5    folks back here for the argument regarding preliminary

6    injunction motion next Tuesday, April 8 at 3:00 p.m.  Thank

7    you all.

8            (The hearing concluded at 3:41 p.m.)

9                          - - -

10               C E R T I F I C A T E

11

12        I hereby certify that the foregoing is an accurate

13    transcription of the proceedings in the above-entitled

14    matter.

15

16

17    4/3/25              s/ Tammy Nestor
                          Tammy Nestor, RMR, CRR
18                        Official Court Reporter
                          333 Constitution Avenue NW
19                        Washington, D.C. 20001
                          tammy_nestor@dcd.uscourts.gov
20

21

22

23

24

25