## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

J.G.G., *et al.*,

     *Plaintiffs*,

          v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

     *Defendants*.

Case No: 1:25-cv-00766-JEB

## PLAINTIFFS' REPLY IN SUPPORT OF
## THEIR MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 1

    I.     Plaintiffs' Claims Are Reviewable Under the APA and in Equity and Need Not Be Brought in

Habeas ............................................................................................................................ 1

    II.    Defendants' Use of the AEA to Conduct Summary Removals of Class Members Is Reviewable .. 8

    III.    Plaintiffs Are Likely to Success on The Merits ........................................................ 10

       A.    The Proclamation Fails to Satisfy the AEA ............................................................. 10

       B.    Article II Does Not License the Executive Branch's Summary Removals. ............................ 14

       C.    Summary Removals Without Notice and a Meaningful Opportunity to Challenge "Alien

Enemy" Designations Violate the AEA, Due Process, and the APA. ................................................. 14

       D.    The Proclamation Violates the Specific Protections that Congress Established for Noncitizens

Seeking Humanitarian Protection. ................................................................................ 16

       E.    The Proclamation Violates the Procedural Requirements of the INA ..................................... 19

    IV.    Plaintiffs Face Irreparable Harm Upon Removal to El Salvador, And The Balance of The

Equities Weighs in Plaintiffs' Favor. ............................................................................ 19

    V.    Class Certification Was and Continues to Be Appropriate. ............................................. 23

    VI.    The Court Should Not Require Plaintiffs to Provide Security ......................................... 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner*,
  387 U.S. 136 (1967) .................................................................................... 5

*Abrego Garcia v. Noem*,
  No. 8:25-cv-951 (D. Md.) ............................................................................ 21

*Amaya v. Stanolind Oil & Gas Co.*,
  62 F. Supp. 181 (S.D. Tex. 1945) ............................................................... 11

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .................................................................................... 24

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) .................................................................................... 24

*Aracely, R. v. Nielsen*,
  319 F. Supp. 3d 110 (D.D.C. 2018) .............................................................. 2

*Bas v. Tingy*,
  4 U.S. 37 (1800) ......................................................................................... 11

*Bauer v. Watkins*,
  171 F.2d 492 (2nd Cir. 1948) ..................................................................... 15

*Boudin v. Thomas*,
  732 F.2d 1107 (2d Cir. 1984) ....................................................................... 3

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) .................................................................................. 3, 4

*Brownell v. We Shung*,
  352 U.S. 180 (1956) ..................................................................................... 4

*California v. United States*,
  104 F.3d 1086 (9th Cir. 1997) ...................................................................... 9

*Citizens Protective League v. Clark*,
  155 F.2d 290 (D.C. Cir. 1946) ......................................................... 5, 6, 9, 18

*Clinton v. Goldsmith*,
  526 U.S. 529 (1999) ..................................................................................... 5

*Damus v. Nielsen*,
  313 F. Supp. 3d 317 (D.D.C. 2018) .............................................................. 2

*Davrod Corp. v. Coates,*
  971 F.2d 779 (1st Cir. 1992) ............................................................................. 11

*DSE, Inc. v. U.S.,*
  169 F.3d 21 (D.C. Cir. 1999) .............................................................................. 25

*DHS v. Thuraissigiam,*
  591 U.S. 103 (2020) .............................................................................................. 2

*Epic Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018) ............................................................................................ 17

*Ex parte Gilroy,*
  257 F. 110 (S.D.N.Y. 1919); ......................................................................... 9, 15

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n,*
  636 F.2d 755 (D.C. Cir. 1980) ........................................................................... 25

*Galvan v. Press,*
  347 U.S. 522 (1954) ............................................................................................ 15

*Hamdi v. Rumsfeld,*
  542 U.S. 507 (2004) .............................................................................................. 6

*Huisha-Huisha v. Mayorkas,*
  27 F.4th 718 (D.C. Cir. 2022) ................................................................ 2, 17, 19

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ................................................................................................ 23

*In re Nat'l Nurses United,*
  47 F.4th 746 (D.C. Cir. 2022) .............................................................................. 5

*J.D. v. Azar,*
  925 F.3d 1291 (D.C. Cir. 2019) ........................................................................... 2

*J.G.G. v. Trump,*
  No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ............................. passim

*Kiobel v. Royal Dutch Petroleum Co,*
  569 U.S. 108 (2013) ............................................................................................ 22

*Kiyemba v. Obama,*
  561 F.3d 509 (D.C. Cir. 2009) ........................................................................... 18

*LoBue v. Christopher,*
  82 F.3d 1081 (D.C. Cir. 1996) ............................................................................. 3

*Ludecke v. Watkins*,
   335 U.S. 160 (1948) ........................................................................... 5, 6, 9, 15

*Martin v. Mott*,
   25 U.S. 18 (1827) ............................................................................................. 10

*Makekau v. State*,
   943 F.3d 1200 (9th Cir. 2019) .......................................................................... 5

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) .......................................................................................... 19

*Morton v. Mancari*,
   417 U.S. 535 (1974) .......................................................................................... 19

*Munaf v. Geren*,
   553 U.S. 674 (2008) ..................................................................................... 2, 18

*Nken v. Holder*,
   556 U.S. 418 (S. Ct. 2009)…………………………………………………..20

*O'Banion v. Matevousian*,
   835 F. App'x 347 (10th Cir. 2020) .................................................................... 4

*Page Comms. Eng'rs, Inc. v. Froehlke*,
   475 F.2d 994 (D.C. Cir. 1973 .......................................................................... 25

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
   502 F.Supp.3d 492 (D.D.C. 2020) ................................................................... 25

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ..................................................................... 2

*Sale v. Haitian Centers Council*,
   509 U.S. 155 (1993) .......................................................................................... 18

*Shaughnessy v. Pedreiro*,
   349 U.S. 48 (1955) .............................................................................................. 4

*Skinner v. Switzer*,
   562 U.S. 521 (2011) ............................................................................................ 2

*Stern v. Fed. Bureau of Prisons*,
   601 F. Supp. 2d 303 (D.D.C. 2009) ................................................................... 5

*Syngeta Crop. Prot., Inc. v. Henson*,
   537 U.S. 28 (2002) .............................................................................................. 5

*TikTok Inc. v. Trump*,
   507 F. Supp. 3d 92 (D.D.C. 2020) ............................................................................. 23

*Tulare County v. Bush*,
   185 F. Supp. 2d 18 (D.D.C. 2001) ............................................................................... 4

*United States ex rel. Bejeuhr v. Shaughnessy*,
   177 F.2d 436 (2d Cir. 1949) ......................................................................................... 6

*United States ex rel. Hoehn v. Shaughnessy*,
   175 F.2d 116 (2d Cir. 1949) ......................................................................................... 6

*United States ex rel. Jaegeler v. Carusi*,
   342 U.S. 347 (1952) ...................................................................................................... 9

*United States ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) .................................................................................................... 14

*U.S. ex rel. Ludwig v. Watkins*,
   164 F.2d 456 (2nd Cir. 1947) ..................................................................................... 16

*United States ex rel. Schlueter v. Watkins*,
   158 F.2d 853 (2d Cir. 1946), ...................................................................................... 16

*United States ex rel. Von Kleczkowski v. Watkins*,
   71 F. Supp. 429 (S.D.N.Y. 1947) ............................................................................... 19

*United States ex rel. Zdunic v. Uhl*,
   137 F.2d 858 (2d Cir. 1943) ....................................................................................... 15

*United States v. Cortez*,
   449 U.S. 411 (1981) .................................................................................................... 22

*United States v. Tinoso*,
   327 F.3d 864 (9th Cir. 2003) ...................................................................................... 19

*Vetcher v. Sessions*,
   316 F. Supp. 3d 70 (D.D.C. 2018) ............................................................................... 5

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .................................................................................................... 24

*Zacarias Matos v. Venegas*,
   No. 1:25-cv-57 (S.D. Tex.) ........................................................................................... 8

**Statutes**

5 U.S.C. § 704 ................................................................................................................ 3

8 U.S.C. § 1158(b)(1)(A) ................................................................................................ 18

8 U.S.C. § 1158(b)(2)(A)(ii) ........................................................................................... 22

8 U.S.C. § 1158(b)(2)(A)(iii) .......................................................................................... 22

8 U.S.C. § 1225(b) .......................................................................................................... 20

8 U.S.C. § 1226(c) .......................................................................................................... 22

8 U.S.C. § 1229a(a)(3) ............................................................................................... 19, 20

8 U.S.C. § 1231 ............................................................................................................... 18

8 U.S.C. § 1231(a)(6) ...................................................................................................... 22

8 U.S.C. § 1231(b)(3) ...................................................................................................... 18

8 U.S.C. § 1231(b)(3)(B)(ii) ........................................................................................... 22

8 U.S.C. § 1231(b)(3)(B)(iii) .......................................................................................... 22

8 U.S.C. § 1231(b)(3)(B)(iv) .......................................................................................... 19

8 U.S.C. § 1531 ............................................................................................................... 20

50 U.S.C. § 21 ................................................................................................................. 16

50 U.S.C. § 22 ........................................................................................................... 13, 16

**Regulations and Rules**

8 C.F.R. § 1208.16 .......................................................................................................... 19

8 C.F.R. § 1208.17 .......................................................................................................... 19

8 C.F.R. § 1208.18 .......................................................................................................... 19

Fed. R. Civ. P. 23(b)(2) .................................................................................................. 23

Fed. R. Civ. P. 23(c)(1)(B) ............................................................................................. 23

Fed. R. Civ. P. 23(c)(2) ................................................................................................... 23

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ........................................................................ 12

Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*,
    118 Harv. L. Rev. 2047 (2005) .............................................................................. 12

Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens,*
    98 Colum. L. Rev. 961 (1998), 118 Harv. L. Rev. 2047 (2005)................................... 6

Sheridan, A Complete Dictionary of the English Language (3d ed. 1790) ................................ 12

U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or
    Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988) .................................... 17

## INTRODUCTION

In a thorough opinion, this Court has already correctly found that Plaintiffs' claims need not be brought in habeas; Plaintiffs must be given notice and a meaningful opportunity to contest their inclusion and removal pursuant to the Proclamation; the balance of harms tips decidedly in favor Plaintiffs; and class certification was proper. The government has given the Court no reason to backtrack on any of its prior conclusions.

The Court also correctly found that it may construe the statutory terms of the AEA, as *Ludecke* made clear. At the TRO stage, however, the Court declined to rule on the merits of whether the Proclamation satisfies the statutory predicates for invoking the AEA. As discussed in Plaintiff's opening brief and below—and by Judge Henderson in her concurrence—the Proclamation does not remotely satisfy the AEA's statutory criteria. Importantly, although the Court can, if necessary, review the Proclamations' conclusory factual assertions, it need not do so to find that this Proclamation is unlawful. On its face, the Proclamation fails under a proper construction of the AEA's statutory criteria. Accordingly, in addition to finding that Plaintiffs cannot be denied a meaningful opportunity to contest their inclusion under the Proclamation, the Court should additionally find, as a threshold matter, that the Proclamation is unlawful—even if process were afforded to contest one's inclusion.

## ARGUMENT

### I.    Plaintiffs' Claims Are Reviewable Under the APA and in Equity and Need Not Be Brought in Habeas.

This Court has already correctly found that because Plaintiffs are not seeking their release from detention, their claims need not be brought exclusively in habeas. TRO Op. 13–18.[1] The

---

[1] "TRO Op." refers to the Court's Memorandum Opinion denying Defendants' Motion to Vacate the TRO, ECF No. 53, "PI Mot." to Plaintiffs' Motion for Preliminary Injunction, ECF No. 67-1, and "Opp." to Defendants' Opposition to Motion for Preliminary Injunction, ECF No. 72.

government raises no new arguments to justify revisiting that conclusion.

The touchstone for whether a claim must be sought exclusively in habeas is whether success on the claim will mean immediate release (or a shorter period of confinement). Thus, even where noncitizens detained outside of this District bring claims *related* to their detention, this Court and multiple courts in this District have consistently found those claims can be brought under the APA and equity, as long as success on the claims does not mean immediate release. *See* TRO Op. 17–18; *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *26–27 (D.C. Cir. Mar. 26, 2025) (Millett, J., concurring); PI Mot. 10; *see also, e.g.*, *J.D. v. Azar*, 925 F.3d 1291, 1300 (D.C. Cir. 2019) (access to reproductive care in detention); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 323 (D.D.C. 2018) (APA challenge to compliance with parole directive); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 126–27 (D.D.C. 2018) (APA challenge to deterrence through detention policy); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 186 (D.D.C. 2015) (same); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) (APA case challenging expulsions under Title 42).

As the Supreme Court already explained in *DHS v. Thuraissigiam*, a claim that could result in release but ultimately sought the "right to stay in the country" was "reminiscent of the one [the Court] rejected in *Munaf* [*v. Geren*, 553 U.S. 674 (2008)]" and fell "so far outside the 'core' of habeas." 591 U.S. 103, 119 (2020) (citing *Skinner v. Switzer*, 562 U.S. 521, 535 n.13 (2011)). Defendants do not squarely address the reasoning of *Thuraissigiam* and are simply mistaken in asserting that Plaintiffs' claims are ultimately about their detention. *See J.G.G.*, 2025 WL 914682, at *27 (Millett, J., concurring) ("Like the plaintiffs in *Thuraissigiam* and *Munaf*, Plaintiffs here do not seek release from detention; they want to stay in detention in the United States."). Defendants seem to concede the distinction between claims that do and do not seek release, Opp. 15, but largely ignore that Plaintiffs are plainly not seeking release in this lawsuit. *See* Proposed Order, ECF No.

67-22 (requesting injunction on removal); Minute Order of Mar. 15, 9:40am EDT (enjoining removal of named Plaintiffs); Minute Order of Mar. 15, 7:25pm EDT (same for provisional class members).[2]

Instead, Defendants assert that habeas provides an "adequate remedy" within the meaning of 5 U.S.C. § 704 and therefore should displace APA review.  Opp. 15.  But if habeas were always viewed as adequate remedy under Section 704, the entire line of non-habeas cases would be called into question.  The government misapprehends Section 704's limited purpose.  Indeed, when the Solicitor General first raised Section 704 to the Supreme Court in *Bowen v. Massachusetts*, the Court explained that the provision only precludes the APA's "additional judicial remedies in situations where the Congress has provided special and adequate review procedures," namely, those enacted in "a number of statutes creating administrative agencies defin[ing] the specific procedures to be followed in reviewing a particular agency's action."  487 U.S. 879, 903 (1988) (discussing, as examples, the Federal Trade Commission and National Labor Relations Board).  The Court thus stressed that Section 704 "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action," because "[a] restrictive interpretation of § 704 would unquestionably . . . 'run counter to . . . the Administrative Procedure Act.'"  *Id.* at 903–04 (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)).  The general availability of habeas does not constitute the sort of "special and adequate review procedures," as narrowly defined in *Bowen*, that could preclude APA review.  *Id.* at 903.

And in the immigration context, the Supreme Court has long recognized that the APA's

---

[2] For that reason, as previously explained, the government's reliance on *LoBue v. Christopher*, 82 F.3d 1081 (D.C. Cir. 1996), is inapt since it involved an extradition case and ultimately would have led to the plaintiffs' release.  *See* PI Mot. 10–11.  *Boudin v. Thomas*, is also far afield as it relied on a question the Supreme Court left open to hold that a challenge to conditions of confinement was in substance a habeas petition.  732 F.2d 1107, 1111 (2d Cir. 1984).  That has no relevance here where Plaintiffs are not asking for a change in their conditions of confinement (or release).

"generous review" provisions apply in immigration challenges and provide "a right of judicial review of deportation orders other than by habeas corpus." *Pedreiro*, 349 U.S. at 51–52; *see also Brownell v. We Shung*, 352 U.S. 180, 181 (1956) (habeas and APA both available). Though certain challenges to individual removal orders under Title 8 have since been channeled into petitions for review before the court of appeals, Defendants already concede that Plaintiffs cannot bring their challenges through the procedures in the INA. Opp. 27. And, notably, neither the Solicitor General nor any Justice in *Pedreiro* suggested that Section 704 precluded APA review, notwithstanding the availability of habeas.

Defendants' remaining arguments against APA review are likewise unconvincing. Regardless of whether Plaintiffs can seek an injunction against the President—and they do not seek one here, *see* PI Mot. 14 n.7—the Court can plainly enjoin agency actions implementing the President's Proclamation. *See id.* at 12–14. Unlike in *Tulare County v. Bush*, 185 F. Supp. 2d 18 (D.D.C. 2001), Opp. 16, Plaintiffs are challenging "final" agency actions, as Defendants have clearly consummated the agencies' decisionmaking process and have already removed members of the provisional class under the Proclamation. *See also* ECF No. 44 at 19 (further distinguishing *Tulare*). *O'Banion v. Matevousian*, 835 F. App'x 347 (10th Cir. 2020), on which the government relies, is inapplicable as it addressed a challenge that lower courts treated as an attack on the execution of the prisoner's sentence, and hence, had to be raised in habeas. *See Stern v. Fed. Bureau of Prisons*, 601 F. Supp. 2d 303, 305 (D.D.C. 2009). Similarly, *Vetcher v. Sessions* addressed claims that could be raised in the petition for review process or as a core habeas claim, so APA review was not available. 316 F. Supp. 3d 70, 77–79 (D.D.C. 2018). Here, the government cannot point to any statutory text, much less "clear and convincing evidence" of congressional intent to preclude review of Plaintiffs' AEA challenges under the APA. *Abbott Lab'ys v. Gardner*,

4

387 U.S. 136, 141 (1967).  And Defendants have not even responded to, and thus have waived, Plaintiffs' arguments that they can pursue their claims in equity.  *See* PI Mot. 13–14.[3]

Defendants also renew their argument that AEA cases are special, noting that *Ludecke v. Watkins*, 335 U.S. 160 (1948), was a habeas case.  Opp. 13.  But the AEA contains no provision channeling review exclusively into habeas, and as this Court already found, *Ludecke* does not say AEA challenges can *only* be raised in habeas.  TRO Op. 13, 21; *Ludecke*, 335 U.S. at 170–71. Defendants also ignore that the D.C. Circuit considered non-habeas AEA cases in *Citizens Protective League v. Clark*, 155 F.2d 290, 291–92 (D.C. Cir. 1946), and resolved those consolidated cases on the merits.[4]

Finally, even apart from the fact that habeas is not the exclusive means for Plaintiffs to bring their claims, the government's suggestion that there were no practical impediments to Plaintiffs doing so, Opp. 15, rings hollow.  The right to habeas cannot be vindicated without notice and a reasonable opportunity to pursue that right.  *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 533

---

[3] Defendants argue that Plaintiffs cannot pursue their claims under the All Writs Act, Opp. 16, but their cited cases are inapposite because they: (1) dealt with cases where the courts lacked jurisdiction for unrelated reasons, *see Syngeta Crop. Prot., Inc. v. Henson*, 537 U.S. 28, 33–34 (2002) (no federal jurisdiction over state law claim); *Clinton v. Goldsmith*, 526 U.S. 529, 539–40 (1999) (Court of Criminal Appeals lacked jurisdiction, though respondent could still pursue APA and other claims in different court); (2) affirmed the "unremarkable proposition that the All Writs Act does not erase separate legal requirements for a given type of claim," *Makekau v. State*, 943 F.3d 1200, 1204 (9th Cir. 2019); or (3) actually support Plaintiffs' arguments for a writ of mandamus, *see In re Nat'l Nurses United*, 47 F.4th 746, 755 (D.C. Cir. 2022) (the All Writs Act "allows a court to issue writs, including a writ of mandamus, to protect jurisdiction it already has").
[4] In its habeas section, the government also argues that the scope of habeas review is narrow, quoting a law review article.  Opp. 13.  But even if habeas were the exclusive means of raising Plaintiffs' claims, the government is wrong about the scope of review.  *See infra* (Reviewability Section).  And the government selectively quotes from the article to assert that habeas review is only available to determine whether a noncitizen is covered under the AEA, when in fact that article notes that "courts can review whether war has been declared" and "[r]eview extends to 'the construction and validity of the statute.'"    Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens,* 98 Colum. L. Rev. 961, 994 (1998) (quoting *Ludecke*, 335 U.S. at 171).

(2004) (plurality op.) (alleged "enemy combatant" seeking to challenge his classification must receive notice and a "meaningful" opportunity to be heard). Because notice is so obviously fundamental, it was an uncontroversial aspect of prior AEA cases where the petitioners all received notice as a matter of course. *See, e.g.*, *Citizens Protective League*, 155 F.2d at 295 (describing "thirty-day notification of the order" to depart); *United States ex rel. Bejeuhr v. Shaughnessy*, 177 F.2d 436, 437 (2d Cir. 1949) (petitioner "was notified of the order of removal"); *United States ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116, 117 (2d Cir. 1949) (petitioner was "ordered to depart from the United States within thirty days after receiving notice of the order"). Indeed, as a matter of the AEA's proper construction, it is implausible that Justice Frankfurter would have noted that one can contest their designation under an AEA order, but understood the Act to permit the government to eliminate any advance notice, rendering the right to contest one's designation meaningless as a practical matter.

The uncontroverted record here reflects that the Plaintiff class cannot access habeas relief because the government has not provided notice to class members or their immigration attorneys (if they have them), let alone a meaningful opportunity to seek judicial review.[5] *See, e.g.*, ECF No. 67-5 ¶ 4 ("I was never told that I was being deported because I was being classified as an Alien Enemy."); ECF No. 67-6 ¶ 3 ("[N]o officer informed him that they were planning to remove him to El Salvador, nor did they provide any notice that he was designated an alien enemy under the

---

[5] Plaintiffs have put in sworn declarations: from the named plaintiffs and their lawyers, none of whom have ever received any kind of notice regarding the named plaintiffs' impending removal under the AEA, *see* ECF No. 67-5 ¶ 4; ECF No. 67-6 ¶¶ 3, 5; ECF No. 67-7 ¶¶ 5–6; ECF No. 67-8 ¶¶ 4–5; ECF No. 67-9 ¶¶ 5–6; as well as from the lawyers for three additional class members who also did not receive notice, ECF No. 67-10 ¶ 3; ECF No. 67-14 ¶¶ 9, 12; ECF No. 67-15 ¶ 14; and regarding two individuals who were deported and then were returned, who also did not receive notice, ECF No. 55-1, ¶¶ 7, 12, 17; ECF No. 67-11 ¶¶ 13–14. Even the government has been unable to tell one class member's lawyer the basis for his removal after the fact, where the only possible basis would be the Alien Enemies Act. *See* ECF No. 67-10 ¶¶ 14–20.

Alien Enemies Act."); ECF No. 67-7 ¶ 5 ("Officers never provided any notice whatsoever that he was subject to the Alien Enemies Act."); ECF No. 67-8 ¶ 5 ("I have never been provided any notice that [my client] was designated under the Alien Enemies Act."); ECF No. 67-9 ¶ 6 ("Nor was I, as his lawyer, ever given any notice that the Alien Enemies Act was being used against J.A.V."); ECF No. 67-11 ¶ 13 ("G.T.B. received no notice that the Alien Enemies Act was being invoked against her."). The government has also made clear that if the TRO is lifted, it will immediately resume summary removals without giving class members any opportunity to contest their designation. *See J.G.G.*, 2025 WL 914682, at *30 (Millett, J., concurring); *id.* at *12 (Henderson, J., concurring) ("Indeed, at oral argument before this Court, the government in no uncertain terms conveyed that— were the injunction lifted—it would immediately begin deporting the plaintiffs without notice."). And the government maintains in its opposition to this Court that it need not provide any notice or meaningful opportunity for Plaintiffs to contest their designation. *See* Opp. 23.

To the extent Defendants have sought to provide notice to any of the Plaintiffs, that "notice" consists of merely a piece of paper (provided at the eleventh hour) that Defendants seek to have Plaintiffs sign that expressly states: "You are not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal. Until you are removed from the United States, you will remain detained . . ." ECF No. 67-21, Ex. 1 at 5; *see also* ECF No. 55-1 ("While on the plane the government officials were asking the men to sign a document and they didn't want to. The government officials were pushing them to sign the documents and threatening them. I heard them discussing the documents and they were about the men admitting they were members of TdA.").

Although the government has identified 86 people in detention subject to the Proclamation, and 172 more who are at liberty, *see* Cerna Decl. ¶ 6, ECF No. 28-2, Plaintiffs' counsel is, by

7

chance, aware of the identity and location of only a handful of individuals still in the United States who are class members: including the five named Plaintiffs themselves, and one other represented individual in Texas who was nearly deported with the group on March 15.[6]  And Plaintiffs know of these individuals only because they have immigration counsel who were able to follow their clients' complicated transfers, contact undersigned counsel, and happened to be among the large group that the government sought to remove without any lawful basis, purportedly under the AEA. No individuals have come to counsel's attention as having received advance notice that they are subject to the AEA.  Without either notice or an opportunity to contest, habeas is simply unavailable.

## II.    Defendants' Use of the AEA to Conduct Summary Removals of Class Members Is Reviewable.

As an initial matter, the government understandably does not appear to contest that this Court can review on the merits whether the lack of meaningful advance notice violates the AEA or due process.  Instead, the government renews its same basic arguments that the Court cannot decide if the Proclamation fails to satisfy the AEA's statutory predicates.  These arguments were already properly rejected by the Court.  TRO Op. 19–23; *see also J.G.G.*, 2025 WL 914682, at *5–10 (Henderson, J., concurring) (explaining why the government's justiciability arguments are wrong).

The government ignores *Ludecke*'s point blank affirmation that questions regarding the AEA's "construction and validity" are reviewable, just as the *Ludecke* Court itself interpreted the meaning of "declared war" and applied that interpretation to the facts before it.  335 U.S. at 163,

---

[6] ECF Nos. 67-5, 67-6, 67-7, 67-8, 67-9 (five named plaintiffs); *Zacarias Matos v. Venegas*, No. 1:25-cv-57 (S.D. Tex.) (ECF No. 12); *see also* Mar. 24 D.C. Cir. Tr. at 98:23-25–99:1-2 (Judge Millett: "Is every one of them in the same jurisdiction in Texas?" Mr. Ensign: "I don't know.").

171; *see also United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952) (finding statute's "declared war" requirement no longer met and reversing government removal decision). The government cites *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919), and *Citizens Protective League*, 155 F.2d at 294, for its blanket claim that "the President's authority and discretion under the AEA" is unreviewable. Opp. 11. But those cases show the opposite: both courts interpreted the meaning of terms in the statute and *applied their interpretations* to the facts before them. *See Ex parte Gilroy*, 257 F. at 128 (interpreting and applying the term "denizen"); *Citizens Protective League*, 155 F.2d at 295 (interpreting and applying the term "declared war," just like *Ludecke*); *see also* PI Mot. 15–16 (collecting cases).

Nor does the general political question doctrine preclude the Court's review of Plaintiffs' claims. Opp. 11–12. As the Court rightly concluded in its TRO decision, it can—and must—construe the meaning of the statutory terms, such as, "nation," "government," "invasion," and "predatory incursion." TRO Op. 22; *see also J.G.G.*, 2025 WL 914682, at *5–8 (Henderson, J., concurring) (rejecting government's political question arguments).

The government's arguments to the contrary are baseless. The interpretation of the AEA's terms is in no way "textually committed" by the Constitution to other branches, and certainly not to the executive branch alone, as even Defendants implicitly seem to recognize. *See* Opp. 12. (describing "foreign affairs" and immigration" as two areas committed by the Constitution "to the political *branches*" (emphasis added)).

The government is also wrong to argue that there are no "manageable standards" for interpreting these terms against the factual record. Opp. 12. Their primary support is an out-of-circuit decision, *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). *See id.* at 11–12. But as Judge Henderson explained in her concurrence, this case "is inapposite and—insofar

as it carries any relevance—cuts directly against the government." *J.G.G.*, 2025 WL 914682, at *7 (Henderson, J., concurring); *see also id.* (the decision merely reflects "the inverse of the *Ludecke* principle: just as the courts will not declare a properly declared war ended until the political branches do so, they will not start a war on the government's behalf"). Defendants' other case, *Martin v. Mott*, 25 U.S. 18 (1827), is likewise inapposite. *Martin* addressed a separate statute concerning the use of militias, and its language about executive power rested on the President's need to maintain discipline in military service as leader of the militia. *Id.* at 30–31.

As Plaintiffs have explained, even if the Court were to conclude that the Proclamation's assertions, on their face, satisfy the AEA's preconditions, the Court must still review whether TdA is *in fact* a "foreign government or nation," and whether it has *in fact* engaged in an "invasion or predatory incursion." PI Mot. 20–21. It must consider Tren de Aragua's activities and relationship to the Venezuelan government based on a broader factual record, just as other courts have reviewed similar questions. *See J.G.G.*, 2025 WL 914682, at *7 (Henderson, J., concurring); PI Mot. 20–21.

## III.    Plaintiffs Are Likely to Success on The Merits.

### A.    The Proclamation Fails to Satisfy the AEA.

The Proclamation does not fall within the statutory bounds of the AEA. *First*, there is no invasion or predatory incursion within the meaning of the AEA. Defendants emphasize that "statutes must be read in context." Opp. 20. But Defendants offer no serious response to Plaintiffs' (and Judge Henderson's) arguments demonstrating that the statutory and historical context of "invasion" and "predatory incursion" clearly indicate that Congress intended to cover *military* actions. *See* PI Mot. 24–25 (applying *noscitur a sociis* canon to "declared war," "invasion," and "predatory incursion"); *id.* at 23–24 (discussing historical context in which, in 1798, "invasion"

10

and "predatory incursion" referred to military actions). Instead, Defendants assert sweepingly broad definitions of "invasion" and "predatory incursion" that are wholly unmoored from the statutory and historical context. Defendants' proposed definitions would unlock staggering wartime presidential power in situations that fall well short of the statute's intended scope. And, understandably, Defendants' brief does not make any serious claim that TdA's actions in the United States are military in nature. Notably, Defendants' own declarant emphasizes that TdA must be addressed through "available law enforcement tools." *See* Smith ¶ 21, ECF No. 72-1. The natural inference is that TdA is a law enforcement concern, not a military threat.[7]

*Second*, any purported invasion is not perpetrated by a "foreign nation" or "foreign government." Defendants readily admit that TdA is not a "nation" within the meaning of the AEA. Opp. 20 ("the government has never argued that TdA is itself a "nation"). They instead contend that TdA is sufficiently intertwined with the Venezuelan government to meet the statutory predicate. But the statute requires a "nation." PI Mot. 27–29. And the Proclamation is careful never to say that TdA is a "nation" or "government." Indeed, the only nation at issue here is *Venezuela*. And the Proclamation is notably silent on any invasion or incursion by the nation of Venezuela.

Defendants try to pull findings out of the Proclamation that simply are not there. The Proclamation never says that TdA is "acting as a criminal governing entity," nor that TdA is the "governing authority in the areas where it operates." *See* Opp. 20. Instead, it makes vague

---

[7] Defendants return to the same trio of cases—*Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189–90 (S.D. Tex. 1945), *Davrod Corp. v. Coates*, 971 F.2d 779, 789 (1st Cir. 1992), and *Bas v. Tingy*, 4 U.S. 37 (1800). But Plaintiffs have already explained: *Amaya* used the term "predatory incursion" to describe military actions by a sovereign nation, Mexico, into Texas, 62 F. Supp. at 189–90; the statute in *Davrod* did not use the term "predatory incursion," and the court's use of the term in passing in 1992 sheds little light on its meaning in 1798, 971 F.2d at 785; and *Bas* does not use the terms "invasion" or "predatory incursion" at all, 4 U.S. at 37.

allegations that the Venezuelan government has ceded some level of control to various criminal organizations, not limited to TdA. But that does not establish that TdA is remotely acting as an independent government, under either modern or founding-era definitions. *See, e.g.*, Sheridan, *Government*, A Complete Dictionary of the English Language (3d ed. 1790) ("Form of community with respect to the disposition of the supreme authority; an establishment of legal authority; administration of publick affairs"); *Government*, Black's Law Dictionary (12th ed. 2024) ("The sovereign power in a country or state; the political and administrative authority of a state."). Defendants' argument that TdA's de facto territorial control somehow renders it a "government" is further belied by the fact that the Proclamation names *Venezuela*, not TdA, as the relevant "foreign government."

Defendants attempt to bolster the President's invocation of the AEA against an admittedly non-state actor by pointing to the government's history, in other contexts, of using war powers against such entities. What controls here is the statutory text. Congress knows how to delegate executive authority to act militarily against non-state actors, and at times it does so. *See* Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005) ("Congress was aware that it was authorizing the President to use military force against non-traditional actors."). But Congress specifically limited the delegation here to attacks by a "foreign nation or government"—plainly state actors. It did not, as Defendants suggest, grant a free-ranging "war power" to the President. It is the historical context of the AEA itself which indicates that it was intended to address conflicts with foreign sovereigns, not a criminal gang. *See* PI Mot. 30 (citing historical record). And, tellingly, the AEA has never been invoked against any of the non-state actors that Defendants cite, much less during peacetime.

The rest of the statutory text cuts in Plaintiffs' favor. Defendants dismiss the AEA's treaty

clause as not a "prerequisite to inclusion." Opp. at 21. While a signed treaty between the United States and the parallel sovereign is not necessarily a prerequisite to invocation of the AEA, the statute makes clear that foreign nations and governments are the kinds of state actors that would have the authority to make such a treaty with the United States. *See* 50 U.S.C. § 22. And Defendants simply do not engage with Plaintiffs' point that the Proclamation itself admits that TdA has "members," not "natives, citizens, denizens, or subjects," as required by the statutory text.

In short, the Court need look no further than the face of the Proclamation to find that the President's invocation runs far afield of any "foreign nation or government." The facts set forth by Plaintiffs' experts, Rebecca Hanson, Andres Antillano, and Steven Dudley, only confirm what the Proclamation itself admits: TdA is neither a nation nor a government within the meaning of the statute. In fact, Defendants' declarants, Marcos Charles and Selwyn Smith, are in accord. TdA is not an organized "nation" or "government."[8] Nor is TdA taking any concerted action on behalf of the Venezuelan government within the United States.[9] Indeed, Defendants' primary declarant on TdA points out that the Venezuelan government is investigating multiple members of TdA— directly undermining their argument that the two entities are "indistinguishable." *See* Smith Decl. ¶ 24, ECF No. 72-1.

---

[8] *Compare* Smith Decl. ¶ 10, ECF No. 72-1 (TdA is "a loosely organized criminal syndicate"), *and* Charles Decl. ¶ 7, ECF No. 72-2 (TdA "leadership splintered" in 2023), *with* Antillano Decl. ¶ 11, ECF No 67-4 (since 2023, "the group's coordinating role appears to have weakened"), *and* Hanson Decl. ¶ 16, ECF No. 67-3 ("the gang has become increasingly fragmented and decentralized since 2023"), *and* Dudley Decl. ¶ 22, ECF No. 67-12 ("since 2023, the group has become more dispersed and holds less sway").

[9] *Compare* Smith Decl. ¶ 9, ECF No. 72-1 (TdA is "a loosely affiliated collection of independent calls committing disorganized and opportunistic crimes of violence"), *with* Antillano Decl. ¶ 13, ECF No. 67-4 (TdA is "a decentralized and uncoordinated group"), *and* Hanson Decl. ¶ 17, ECF No. 67-3 (suspected TdA crimes "do not indicate a systemic criminal enterprise"), *and* Dudley Decl. ¶ 24, ECF No. 67-12 ("no evidence of a structured or operational presences in the United States").

**B. Article II Does Not License the Executive Branch's Summary Removals.**

As Plaintiffs have explained, the government is wrong to argue that the President's Article II authority saves the executive's unlawful implementation of the AEA. *Compare* PI Mot. 30–32, *with* Opp. 22–23. *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), is not to the contrary. PI Opp. 23. The government overreads language in *Knauff* about Congress's "implementation" of "inherent executive power" with respect to noncitizens. But nothing in *Knauff* suggests that the President may *ignore* the boundaries Congress sets when it "prescribes a procedure concerning the admissibility of aliens," much less that the executive has the power to ignore the boundaries Congress has created regarding *removal*. *Id.* at 540, 542. And four years later, the Supreme Court confirmed that Congress has exclusive power over immigration policy:

> Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process. But that the formulation of these policies is *entrusted exclusively* to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government.

*Galvan v. Press*, 347 U.S. 522, 531 (1954) (citations omitted) (emphasis added); *see also* PI Mot. 31 (discussing Congress's plenary power over immigration and its distinct set of war powers).

**C. Summary Removals Without Notice and a Meaningful Opportunity to Challenge "Alien Enemy" Designations Violate the AEA, Due Process, and the APA.**

This Court has already correctly held that Defendants must afford Plaintiffs a *meaningful* opportunity to challenge their designation as alien enemies before removal under the Proclamation is permissible. TRO Op. 23–24, 30; *see also J.G.G.*, 2025 WL 914682, at *21 (Millett, J., concurring) ("[T]he government agrees that individuals are entitled to challenge in court whether they fall within the terms of the AEA or are otherwise not lawfully removable under it.").

Meaningful notice and opportunity to obtain judicial review is required under the AEA,

APA, and due process (and as a matter of habeas law, if that were the required means of seeking review). *Ludecke* expressly affirmed that there must be an opportunity to contest an individual's designation "by the courts." 335 U.S. at 171 n.17; *see also, e.g.*, *Ex parte Gilroy*, 257 F. at 114–24; *United States ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860 (2d Cir. 1943); *Bauer*, 171 F.2d at 493–94. It is thus clear that the AEA does not grant the Executive unfettered discretion—it contemplates meaningful opportunity to challenge an individual's designation. *See, e.g.*, *J.G.G.*, 2025 WL 914682, at *14 ("due process requires notice of adverse governmental action"); TRO Op. 30.

Defendants contend that the "statute permits absolute discretion to establish the conditions and processes the Executive will use to implement a Presidential Proclamation . . . and whatever those procedures are effectively constitute due process for purposes of the AEA." Opp. 23. Defendants cite *United States ex rel. Schlueter v. Watkins*, 158 F.2d 853, 853 (2d Cir. 1946), for this sweeping assertion, but *Schlueter*, a pre-*Ludecke* case, carved out that a hearing was necessary precisely "on the issue of whether or not the relator actually is an alien enemy." 158 F.2d at 853. And, as this Court has correctly held, "summary deportation following close on the heels of the Government's informing an alien that he is subject to the Proclamation—without giving him the opportunity to . . . challenge the basis for the order—is unlawful." TRO Op. 30.

Defendants fare no better in invoking 50 U.S.C. § 21 to argue that the President may remove individuals without first providing an opportunity for voluntary departure. Opp. 23–24. Section 21 contains no such exception. To the contrary, the right to voluntary departure is a "statutory condition precedent" to removal under Section 21. *U.S. ex rel. Ludwig*, 164 F.2d at 457; *see also J.G.G.*, 2025 WL 890401, at *14 (Millet, J., concurring). Indeed, even during World War II, courts interpreting the AEA consistently recognized that "alien enemies" retained the right to

voluntary departure. *See* PI Mot. 33 (citing cases). Defendants are remarkably silent on that line of precedent. In any event, whether individuals have a right to voluntarily depart, they certainly have a right, under *Ludecke*, to contest their removal under the Proclamation.

Defendants mistakenly invoke Section 22's exception for those "chargeable with actual hostility, or other crime against public safety" to suggest that voluntary departure rights may be categorically denied. Opp. 24 (citing 50 U.S.C. § 22). But that exception requires a specific, individualized finding—each noncitizen must be "chargeable" with actual hostility or a crime against public safety. Defendants have made no such showing here, let alone afford any process to contest such a determination. In any event, even if the government could override the right to voluntarily depart, it cannot eliminate a meaningful opportunity to contest one's designation.

In sum, the AEA, APA, and due process unequivocally require that Plaintiffs receive meaningful notice and opportunity to obtain judicial review. Their summary removal processes are therefore flatly unlawful.

### D. The Proclamation Violates the Specific Protections that Congress Established for Noncitizens Seeking Humanitarian Protection.

Even if the AEA could be used against TdA during peacetime, and even if process need not be provided to contest one's designation, summary removal would be unlawful for an additional independent reason: it fails to provide designated individuals with an opportunity to seek protection from persecution and torture. Defendants argue that there is no direct conflict between the Foreign Affairs Reform and Restructuring Act ("FARRA") and removals under the AEA because the United States avoids removals to countries where noncitizens will likely be tortured. Opp. 24. But that assertion ignores the record evidence about the Salvadoran prison. More fundamentally, it ignores the central defect in the Proclamation: it categorically forecloses any opportunity for individuals to invoke CAT protections to show they would face torture. Indeed,

this Court recognized that Plaintiffs were not only barred from raising a torture claim but also were effectively precluded from doing so because Defendants never informed them of the country to which they would be removed—directly contravening protections enacted by Congress. *See* TRO Op. 33. Defendants also try to evade CAT protections by arguing that the INA and AEA provide their own separate removal systems. Opp. 25. In doing so, they fail to address *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), which is "on all fours" with this case. *See* TRO Op. 32–33. Both the AEA and INA could—and therefore must—be given effect. *Huisha-Huisha*, 27 F.4th at 721, 731–32 (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When . . . confronted with two Acts of Congress allegedly touching on the same topic," a court "must strive to give effect to both.") (cleaned up)). Because no genuine conflict exists between the AEA and INA, this Court correctly harmonized these statutes by concluding that FARRA's protections apply to removals under the AEA. *See* TRO Op. 32–33.

Defendants next rely on a vague assertion that this Court may not question its determination that a potential recipient country is not likely to torture a detainee. Opp. 24 (citing *Kiyemba v. Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009) and *Munaf*, 553 U.S. at 702). But both those cases involved detainees held by the U.S. military abroad and raised issues of *transfers*—not the domestic enforcement of statutory protection against *removal* to torture. Indeed, *Munaf* expressly noted that CAT "speaks to situations where a detainee is being 'returned' to 'a country,'" and thus it was not likely applicable to petitioners who were already in a different country and seeking to block their transfers within that country. 533 U.S. at 703 n.6 (cleaned up). The government's reliance on *Citizens Protective League*, 155 F.2d 290, fares no better. Opp. 25. That case predates CAT by more than fifty years, but Congress has since enacted obligations that impose an explicit statutory bar on removing individuals to countries where they are more likely than not to face

torture.  8 U.S.C. § 1231 note.  That protection is not discretionary and does not turn on the Executive's unilateral judgment.

The AEA can similarly be harmonized with other subsequently enacted statutes specifically designed to protect noncitizens seeking asylum and withholding of removal.  *See* PI Mot. 35–36. Defendants argue again that the AEA is entirely outside that statutory framework.  Opp. 25–26 (citing 8 U.S.C. §§ 1158(b)(1)(A), 1231(b)(3); *Sale v. Haitian Centers Council*, 509 U.S. 155 (1993)).  But neither the statutory text nor *Sale* supports that sweeping claim.  First, *Sale* addressed the INA's extraterritorial application, not whether it applies to individuals who—like Plaintiffs here—are physically present in the United States and seek to invoke domestic protections.  509 U.S. at 155, 159–60.  And second, while the Attorney General and DHS administer asylum and withholding, their *availability* is governed by Congress and cannot be categorically displaced by Executive discretion.  *See* Opp. 25.  A blanket bar based solely on AEA designation is flatly incompatible with the INA's requirement of case-by-case adjudication, including under 8 U.S.C. § 1231(b)(3)(B)(iv).  The statutory and regulatory framework confirms that eligibility for asylum and withholding turns on individualized determinations.  *See* 8 C.F.R. §§ 1208.16–18.  And *Huisha-Huisha* offers no support for Defendants' position.  There, the D.C. Circuit upheld only limited asylum restrictions based on Section 265's specific reference to suspend the "introduction" of persons—not those already present in the United States—and harmonized the statutes because asylum does not address public health bars.  *See* 27 F.4th at 730–31.  By contrast, the AEA contains no analogous language authorizing blanket exclusions and applies to noncitizens already on U.S. soil.  And asylum already provides specific, case-by-case bars based on danger, criminality, and national security, underscoring that Congress chose not to impose a categorical bar to asylum under the AEA, *see infra*.

**E.  The Proclamation Violates the Procedural Requirements of the INA.**

Defendants recycle their erroneous claim that the AEA and INA constitute wholly separate removal regimes, and that the INA's procedural mechanisms are therefore irrelevant.  Opp. 26–27.  Their reliance on *United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429 (S.D.N.Y. 1947), is misplaced.  Opp. 26.  That decision predates the INA and offers no meaningful insight into how the modern, exclusive removal framework established by Congress applies to AEA removals.  *See* 8 U.S.C. § 1229a(a)(3); *United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003).  Nor do the interpretive canons from *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), or *Morton v. Mancari*, 417 U.S. 535 (1974), support Defendants' position.  Opp. 27.  If anything, they cut the other way.  The INA—not the AEA—is the more specific statute when it comes to removal procedures.  Unlike the AEA, the INA sets forth detailed removal procedures and expressly provides exceptions for specific categories of noncitizens, including those who pose national security risks.  *See, e.g.*, 8 U.S.C. §§ 1227(a)(4), 1229a(a)(3), 1531 *et seq.*  Congress knew of the AEA when it enacted the INA and yet deliberately declined to exclude AEA-based removals from this statutory scheme—even as it carved out express exceptions elsewhere.  *See, e.g.*, §§ 1225(b), 1531.  That choice speaks volumes and reflects Congress's intent to bring all removal processes within a uniform statutory scheme.

**IV.   Plaintiffs Face Irreparable Harm Upon Removal to El Salvador, And The Balance of The Equities Weighs in Plaintiffs' Favor.**

Defendants broadly fall back to asserting "removal does not by itself ordinarily constitute irreparable harm," as if this case involved run-of-the-mill deportations.  Opp. 27 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  It does not.  Defendants removed Plaintiffs in secret, without due process, to a prison in a third country known for dire conditions, torture, and other forms of physical abuse—possibly for life.  *See* Bishop Decl. ¶¶ 2, 21, 33, 37, 39, 41, ECF No. 44-4

19

(describing "harsh and life threatening" conditions in these prisons, including through widespread physical abuse, waterboarding, electric shocks, implements of torture and other mistreatment); Goebertus Decl. ¶¶ 3–4, 8, 10, 17, ECF No. 44-3 (noting "cases of torture, ill-treatment, incommunicado detention, severe violations of due process and inhumane conditions"); *see also* PI Mot. 39 (describing evidence that Plaintiffs may never get out of CECOT). That harm is categorically different than *Nken*. The petitioner Nken had his fear claims adjudicated by an immigration judge, reviewed by the Board of Immigration Appeals (along with a second and third motion to reopen), and considered by the circuit court. *Nken*, 556 U.S. at 422. Plaintiffs here have had no opportunity to have their fear claims as to El Salvador or Venezuela considered by any adjudicator. TRO Mot. 6–8, ECF No. 3-2. And *Nken*, of course, explicitly relied on a removed person's ability to return in concluding that the harm of removal was not irreparable. 556 U.S. at 435. But there is no chance that Plaintiffs can return following a successful petition for review because their claims have not even been adjudicated in the first instance. If the real risk of swift, wrongful removal on flimsy evidence to imprisonment abroad in a prison system known for torture and abuse—with the possibility of return being unknown—is not irreparable harm, it is hard to imagine what would qualify.

Moreover, Defendants' system for identifying alleged TdA members runs the obvious, and quite serious, risk of erroneous designations.[10]  *See* PI Mot. 5–6 (explaining that numerous criteria the government uses to determine membership have no valid basis). And it is now clear that if the government errs—as it did in removing a Salvadoran man to CECOT on the third March 15 flight,

---

[10] All of the named plaintiffs deny membership in TdA. ECF No. 3-3 ¶ 3; ECF No. 3-6 ¶ 12; ECF No. 3-8 ¶ 5; ECF No. 44-11 ¶ 3; ECF No. 44-9 ¶ 4. Evidence demonstrates that similar allegations against other class members do not pass muster. *See, e.g.*, ECF No. 44-5 ¶¶ 7–9; ECF No. 44-6 ¶ 7; ECF No. 44-7 ¶ 9; ECF No. 44-8 ¶ 7; ECF No. 44-13 ¶ 6; ECF No. 67-17 ¶¶ 5, 9; ECF No. 67-18 ¶ 6; ECF No. 67-19 ¶ 9; ECF No. 67-20 ¶ 3. And there are many news stories detailing other erroneous designations. ECF No. 67-21, Exh. 4–18.

despite the fact he had been granted withholding of removal as to El Salvador—it will take no immediate steps to remedy even a confessed error, and will argue that courts have no ability to remedy the situation. *See Abrego Garcia v. Noem*, No. 8:25-cv-951, ECF No. 11-3 ¶¶ 11– 15 (D. Md. Mar. 31, 2025); *id.* ECF No. 12-1, at *8 (Apr. 1, 2025).

Compounding the irreparable injury, "the government has confessed that its preference that plaintiffs use habeas corpus to challenge their eligibility for AEA removal is a phantasm." *J.G.G.*, 2025 WL 914682, at *30 (Millett, J., concurring). As noted, the government's own form states explicitly that the noncitizen is "not entitled to . . . judicial review of this notice." ECF No. 67-21, Ex. 1 at 5. It is undoubtedly "irreparable injury to reduce to a shell game the basic lifeline of due process before an unprecedented and potentially irreversible removal occurs." *J.G.G.*, 2025 WL 914682, at *30 (Millett, J., concurring).

The balance of equities and the public interest factors similarly weigh decidedly in favor of Plaintiffs. The government's purported harm includes allegations about negotiations and foreign policy. Opp. 29 ("foreign actors *may* 'change their minds'") (emphasis added). This ambiguity pales in comparison to the concrete harms Plaintiffs face. *J.G.G.*, 2025 WL 914682, at *11 (Henderson, J., concurring ("Equity will not act 'against something merely feared as liable to occur at some indefinite time.'") (citation omitted). And as the Court has repeatedly stressed, Defendants remain free to detain and remove individuals they believe to be security threats under existing statutory authority and by lawful means. *See e.g.*, 8 U.S.C. §§ 1158(b)(2)(A)(ii)–(iii) (noncitizens barred from asylum if convicted of particularly serious crime or if there are "serious reasons for believing" they "committed a serious nonpolitical crime" outside the U.S.); *id*. § 1231(b)(3)(B)(ii)–(iii) (same for withholding); *see also id*. §§ 1226(c),1231(a)(6). ICE detention is well-equipped to manage detention of gang members. *See* Fleischaker Decl. ¶¶ 18–20, ECF No.

44-2 (ICE regularly detains gang members). One of ICE's core functions is to evaluate security

risks posed by detainees and to ensure the safe and secure detention of anyone who may pose a

risk to the public. *Id.* ¶¶ 10, 20.

Defendants' cases do little to advance their position. In *United States v. Cortez*, 449 U.S.

411, 421 (1981), the Court considered whether officers had a sufficient basis to conduct an

investigatory traffic stop near the border. *Id.* The case merely stands for the uncontroversial

general point that the public has an interest in border security. *Id.* at 421 n.4. *Kiobel v. Royal*

*Dutch Petroleum Co.* similarly does not address irreparable harm or preliminary injunctions and

is not on point. 569 U.S. 108 (2013). *Kiobel* cautions against unwarranted judicial interference

on extraterritorial claims arising in a foreign sovereign's territory, but this case deals with unlawful

actions by the U.S. government within U.S. territory. *Id.* at 116. And while *Humanitarian Law*

*Project* granted deference to the executive branch on a discrete factual question—whether *all*

contributions to a terrorist organization further terrorism—that question has no bearing on the

equities here. 561 U.S. 1, 33–34 (2010).

The Government attempts to justify its extraordinary use of the AEA during peacetime to

summarily deport individuals without due process by relying on vague notions of national security

and executive power. But where an injunction covers only deportation, and the President can

continue to deport individuals under the INA, it places only a very "limited" burden on the

President's statutory power under the AEA. *J.G.G.*, 2025 WL 914682, at *12 (Henderson, J.,

concurring). Nor can the government engage in unlawful conduct contrary to statutory and

constitutional law in order to meet its political goals. *See, e.g.*, *TikTok Inc. v. Trump*, 507 F. Supp.

3d 92, 115 (D.D.C. 2020) ("[t]here is generally no public interest in the perpetuation of unlawful

agency action" (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir.

22

2016)).

In short, the government does not seriously contest that Plaintiffs will face grave harm. And the government's unsubstantiated harm is outweighed by the critical public interest in keeping a check on the Executive's extraordinary overreach of power to curtail the most fundamental constitutional liberties.

**V.    Class Certification Was and Continues to Be Appropriate.**

The only substantive argument the government raises against class certification is that the class lacks the cohesiveness and ascertainability necessary for classwide proceedings.  Opp. 30–31.[11]  This misapprehends Plaintiffs' claims.  Plaintiffs are bringing a systemic challenge to the government's authority to invoke the AEA and remove anyone whom the government designates to be a TdA member without compliance with the AEA, INA, APA, and due process.  Classwide proceedings as to any one of those issues will generate a common answer to at least one common question, which suffices to satisfy commonality.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).  The named Plaintiffs' claims are also typical of, and they adequately represent, the class because the class is defined as those who are "subject to" the Proclamation, regardless of whether they choose to contest TdA membership.  The government suggests that the class is not "ascertainable," Opp. 29, but the class definition here clearly references a specific set of persons designated by the government and identifiable by the criteria that the government has chosen.  *See* Cerna Decl. ¶ 6, ECF No. 28-2 (providing the number of people in the United States designated under the AEA).

Class members also seek the same relief, including an injunction and declaration against

---

[11] The government alludes to Rule 23's requirement that a court "direct appropriate notice [of the class certification decision] to the class," Opp. 30 (quoting Fed. R. Civ. P. 23(c)(1)(B), (2)), but that provision does not apply to Rule 23(b)(2) classes like the one here.

implementation of the Proclamation, as well as a fair process for those "subject to" the Proclamation. Regardless of each class member's individual facts and defenses to an accusation of TdA membership, Plaintiffs need to show only that their proposed *class* claims can be litigated on a classwide basis by rising or falling together.[12] *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459–60 (2013).

Class certification here is not only appropriate and in accordance with Rule 23, but is especially crucial considering the government's express admission that it is *not* providing individuals notice that they will be subject to removal pursuant to the Proclamation, *supra*. And notwithstanding the foregoing reasons for which this court's provisional certification of the class was entirely proper, for the avoidance of doubt, Plaintiffs respectfully request that this Court issue a written decision recertifying the class, defining the class claims, and appointing the undersigned as class counsel under Rule 23(g).

## VI.    The Court Should Not Require Plaintiffs to Provide Security.

Finally, if it grants a preliminary injunction, this Court should waive bond (or impose nominal bond of $1, *see Page Comms. Eng'rs, Inc. v. Froehlke*, 475 F.2d 994, 997 (D.C. Cir. 1973)). Rule 65(c) "vest[s] broad discretion in the district court." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). Consistent with that discretion, this Court "has power" to issue a preliminary injunction but "dispense with any security requirement." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980). Given the nature of this case and the Plaintiff class, bond here is wholly inappropriate. *See P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 550 (D.D.C. 2020).

---

[12] There also is no conflict of interest between Plaintiffs and the class as there was in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), PI Mot. 31, given that Plaintiffs have just as much of an interest in challenging the Proclamation as other members of the class.

**CONCLUSION**

The court should grant a preliminary injunction.

Dated: April 4, 2025

Respectfully submitted,

Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Evelyn Danforth-Scott
Cody Wofsy
Cecilia D. Wang (D.D.C. Bar No. CA00042)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
edanforth-scott@aclu.org
cwofsy@aclu.org
cwang@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Daniel Galindo (D.D.C. Bar No. NY035)
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi (D.D.C. Bar No. MI0071)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich
Skye Perryman (D.C. Bar No. 984573)
Audrey Wiggins (D.C. Bar No. 482877)
Christine L. Coogle (D.C. Bar No. 1738913)
Pooja A. Boisture
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org
awiggins@democracyforward.org
ccoogle@democracyforward.org
pboisture@democracyforward.org

26

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 4, 2025                                    Respectfully Submitted,

                                                               */s/ Lee Gelernt*
                                                               Lee Gelernt (D.D.C. Bar No. NY0408)
                                                               American Civil Liberties Union Foundation
                                                               125 Broad Street, 18th Floor
                                                               New York, NY 10004
                                                               (212) 549-2660
                                                               lgelernt@aclu.org

                                                               *Attorney for Plaintiffs*

28