## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

J.G.G., *et al.,*                                 )
                                     )
     **Plaintiffs,**                           )
                                     )
v.                                                )    **No. 1:25-cv-00766-JEB**
                                     )
DONALD J. TRUMP, *et al.,*                         )
                                     )
     **Defendants.**                           )

 

### ATTACHMENT:

### EMERGENCY MOTION FOR A STAY PENDING APPEAL
### OR, IN THE ALTERNATIVE, A WRIT OF MANDAMUS

Oral Argument Not Yet Scheduled

**No. 25-5124**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

J.G.G., *et al.*,
*Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, in his official capacity as President of the
United States, *et al.*,
*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
No. 1:25-cv-00766
The Hon. James E. Boasberg

**EMERGENCY MOTION FOR A STAY PENDING APPEAL
OR, IN THE ALTERNATIVE, A WRIT OF MANDAMUS**

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
    Attorney General

CHAD MIZELLE
Acting Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20001
Tel: (202) 514-2000
Email: drew.c.ensign@usdoj.gov

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

## INTRODUCTION

"[O]ccasion[s] for constitutional confrontation between the two branches should be avoided whenever possible." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389-90 (2004). The district court's criminal contempt order instead escalates the constitutional stakes by infringing core executive prerogatives. The Supreme Court has already intervened once, vacating the district court's March 15, 2025 temporary restraining orders (TROs) and requiring that any further challenges to detention and removal under the Alien Enemies Act proceed in Texas, where plaintiffs are in custody.

Instead of winding down D.C. proceedings, the district court has pivoted to compelling the Executive Branch to pursue two alternative but equally unconstitutional avenues to address supposed violations of a now-vacated TRO. Either Defendants must aid the court in its efforts to effectuate a contempt prosecution—a step that unconstitutionally commandeers the President's exclusive and preclusive prosecutorial powers. Op.43-44. Or, the Defendants may cure contempt by "assert[ing] custody" of individuals who are in the custody of El Salvador—a step that unconstitutionally compels the Executive Branch to persuade or force a foreign sovereign to accede to the court's demands. Those separation-of-powers violations manifestly warrant this Court's immediate intervention. The district court's commands function like injunctions and are appealable as such. At a

1

minimum, the Executive Branch can obtain immediate review of an order that inflicts immediate, irreparable harms by subjecting the Executive Branch to actions that district courts cannot constitutionally require.

Worse, the district court is putting the Executive Branch to these unconstitutional choices to cure a nonexistent case of criminal contempt. Defendants fully complied with the TROs the district court issued, and certainly did not flout any clear, unambiguous command. The court enjoined the Executive Branch from "removing" certain aliens under the Alien Enemies Act (AEA). Thereafter, the Executive undisputedly stopped removing aliens from the United States under that Act. The district court now reasons that "remove" meant *legal* removal (i.e., transferring custody) not *physical* removal (i.e., moving from U.S. territory). That is legally wrong—but even the court recognized the meaning of "remove" was at least ambiguous, and contempt cannot lie based on a supposedly wrong reading of a facially ambiguous order.

This Court should immediately stay the district court's order and prevent further grave encroachments on the separation of powers.

## BACKGROUND

**The Alien Enemies Act.** The AEA empowers the President to detain and remove alien enemies when there is a "declared war" or "any invasion or predatory incursion" by a "foreign nation or government." 50 U.S.C. § 21. The Supreme Court

has observed that the AEA is "as unlimited" a grant of power "as the legislature could make it." *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948).  The statute confers largely "[u]nreviewable power in the President to restrain, and to provide for the removal of, alien enemies." *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946).

**The President's Proclamation.**  On March 15, 2025, the President published a Proclamation invoking the AEA to detain and remove members of Tren de Aragua (TdA), an entity that the State Department has designated a foreign terrorist organization.  *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua*, 90 Fed. Reg. 13033.  The Proclamation authorizes the detention and removal under the AEA of "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States." *Id.* § 1; *see also id.* § 3.

**District Court Proceedings.**  On Saturday, March 15, plaintiffs—five Venezuelan nationals detained at an immigration detention center in Texas—sued in Washington D.C. to block the government from removing them under the Proclamation.  They moved to certify a class of "[a]ll noncitizens who were, are, or will be subject to the Alien Enemies Act Proclamation and/or its implementation." Compl. 12.  Plaintiffs sought relief under both habeas corpus and the Administrative

3

Procedure Act (APA). And they moved for a TRO "barring their summary removal under the AEA." D. Ct. Doc. 3-2, at 2.

Within hours, and without waiting to hear from the government, the district court granted an initial TRO and ordered Defendants not to "remove any of the individual Plaintiffs from the United States for 14 days absent further Order of the Court." 3/15/25 Second Minute Order.

Later that day, the court held a hearing on the class certification motion. The government explained that plaintiffs' claims sound in habeas and accordingly must be brought in the district (in Texas) in which they are confined. In response, the district court inquired whether plaintiffs might want to dismiss their habeas claims, which they agreed to do. Tr.22:1-3. The court then stated without elaboration that "class certification is warranted under Federal Rule of Civil Procedure 23(a) and 23(b)(2)." Tr.23:1-6. Turning to the merits, the court held that plaintiffs were likely to succeed because the terms "invasion" and "predatory incursion" "really relate to hostile acts perpetrated by enemy nations and commensurate to war." Tr.41:7-18.

The district court next addressed the implementation of its order. The court reassured counsel that it "w[ould] issue a minute order memorializing [a TRO] so you don't have to race to write it down." Tr.42:22-23. Thereafter, in light of an earlier assertion by plaintiffs' counsel that flights removing individuals pursuant to the Proclamation were scheduled to take off during the hearing, the court stated that

"any plane containing these folks that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States," including by "turning around a plane." Tr.43:11-19. The court then repeated its pledge to "issue a minute order memorializing all of this." Tr.46:9-10.

Shortly after the hearing, at 7:25 p.m., the district court issued a minute order provisionally certifying a class and enjoining Defendants "from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court." Critically, the court's written order did *not* direct Defendants to turn around planes or to return already-removed aliens.

**Appellate Proceedings.** The government appealed both TRO orders and filed emergency motions for stays pending appeal. After oral argument, this Court issued a divided ruling denying a stay, with each judge writing separately. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *1 (D.C. Cir. Mar. 26, 2025).

The Supreme Court vacated the TROs, holding that the district court lacked authority to issue them. *Trump v. J.G.G.,* No. 24A931, 2025 WL 1024097 (U.S. Apr. 7, 2025). The Supreme Court held that plaintiffs' claims "fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas," and that "[f]or 'core habeas petitions,' 'jurisdiction lies in only one district: the district of confinement,'" which in this case was in Texas. *Id.* at *1.

**The Contempt Order.**  In the meantime, the district court issued an order to show cause regarding compliance with its TROs and held a hearing on April 3.  As the government explained, it had fully complied with the TROs by (i) not removing the named plaintiffs, and (ii) not removing any other class member from United States territory after the second TRO issued.

The Supreme Court's order vacating those TROs issued 4 days after the show-cause hearing.  Yet, notwithstanding the Supreme Court's judgment, the district court proceeded to issue an order finding probable cause that Defendants had committed criminal contempt by violating the vacated orders.  The court reasoned that its "written TRO and the oral command defining compliance were each sufficiently clear and specific in proscribing the handover of class members to Salvadoran officials"—though the TRO's terms said nothing of the sort.  Op.31.  The court characterized the government's reading of the TRO as "clever" and consistent with "dictionary definitions," but nonetheless rejected it.  Op.24.  The court reasoned that Defendants should have understood the court's TRO in light of the oral statements about turning around the planes.

Having found probable cause, the district court sought to secure prospective compliance by "allow[ing] the [government] an opportunity to purge its contempt" within 7 days.  But the government could only do so, the court prescribed, "by asserting custody of the individuals who were removed in violation of the Court's

6

classwide TRO so that they might avail themselves of their right to challenge their removability through a habeas proceeding," i.e., by taking custody back from El Salvador and bringing those aliens to the United States.  Op.43-44.  (A few hours later, plaintiffs asserted that those individuals already can press habeas claims from El Salvador without any such assertion of custody.  Doc. 85.)

The only other choice, the district court ordered, is for the government to "identify[] the individual(s) who … made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025."  Doc. 80 at 1.  The court would then "'request that the contempt be prosecuted by an attorney for the government.'"  Op.44.  If the government declined to prosecute, the court stated that it "*will* 'appoint another attorney to prosecute the contempt.'"  *Id.* (emphasis added). Under this option, then, the government must identify relevant individuals for prosecution and either prosecute them itself or allow a district court-appointed prosecutor to exert that prosecutorial function.

## ARGUMENT

### I.    The District Court's Contempt Order Is Plainly Unconstitutional.

Whether construed as an appeal of an injunction or as a petition for writ of mandamus, immediate relief from the district court's order is manifestly warranted. The district court's order embarks on criminal contempt proceedings—a remedy of "last resort" that requires the clearest of violations, not the nonexistent violation

7

here. *In re Att'y Gen. of U. S.*, 596 F.2d 58, 65 (2d Cir. 1979). Yet the district court is compelling the government to pursue one of two unconstitutional options to address criminal contempt: prosecute the Executive Branch's own officials, in contravention of obvious separation of powers principles that prohibit the Judiciary from turning the Executive Branch's powers of prosecution against itself. *See Donziger v. United States*, 143 S. Ct. 868, 869 (2023) (Gorsuch, J., dissenting from denial). Or, the government must successfully persuade or force El Salvador to release and return aliens in its custody—unconstitutionally seizing foreign-relations powers. Putting the government to those unconstitutional choices is especially inappropriate because the government did not violate the TRO, let alone unambiguously.

### A. The District Court Cannot Constitutionally Compel the Executive Branch to Prosecute Itself or Transfer Its Prosecutorial Powers.

Because the Judiciary owes senior Executive Branch officials "respect" as representing "another branch of government coequal to the judicial branch in constitutional function and design," pursuing criminal contempt proceedings against such officials must be a "last resort," if resorted to at all. *Att'y Gen.*, 596 F.2d at 65; *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005) (for criminal contempt, "temptation must be resisted in order to maintain separation between executive and judicial roles"). Yet the district court's contempt order initiates further constitutional collision. The court instructed the government to investigate and identify senior

officials responsible for decision-making with respect to the AEA removals—then prosecute them for purportedly disobeying the court's TRO.  *See* Op.44. Recognizing that the Attorney General is unlikely to prosecute a criminal referral, the court indicated its intent to appoint a private attorney to prosecute the criminal contempt charges.  *See* Op.44.  That entire process egregiously intrudes on the Executive Branch's exclusive prosecutorial powers.

"Criminal contempt is a crime in the ordinary sense."  *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 826 (1994).  Thus, prosecuting criminal contempt is a task exclusively for the Executive Branch:  "The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States."  *United States v. Texas*, 599 U.S. 670, 679 (2023); *Trump v. United States*, 603 U.S. 593, 609 (2024) ("Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority.").  And only the Executive Branch, not the Judiciary, decides "whether to prosecute a case."  *United States v. Nixon*, 418 U.S. 683, 693 (1974).  This "power of prosecutorial discretion is rooted in Article II, including the Executive Power Clause, the Take Care Clause, the Oath of Office Clause, and the Pardon Clause."  *In re Aiken Cty*, 725 F.3d 255, 262 (D.C. Cir. 2013) (Kavanaugh, J., concurring).  So "neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive by directing the

Executive    Branch    to    prosecute    particular    individuals" for    criminal
offenses.  *Prosecution for Contempt of Congress of an Executive Branch Official
Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 115 (1984)
("*Prosecution for Contempt*"); *see also United States v. Donziger*, 38 F. 4th 290, 307
(2d Cir. 2022) (Menashi, J., dissenting).

Sometimes, courts have appointed private prosecutors where the Executive
Branch declines to prosecute a contempt case against *private* individuals for non-
substantive reasons—say, lack of resources.  *See Young v. U.S. ex rel. Vuitton et Fils
S.A.*, 481 U.S. 787, 793 (1987).  But that appointment practice lacks any
justification—and transgresses constitutional bounds—when, as here, the Executive
Branch affirmatively decides *against* prosecution on the merits.  *See Prosecution for
Contempt*, 8 Op. O.L.C. at 115; *United States v. Fokker Servs. B.V.,* 818 F.3d 733,
737 (D.C. Cir. 2016) ("It has long been settled that the Judiciary generally lacks
authority to second-guess those Executive determinations" regarding the exercise of
its "charging authority.").

Indeed, the Second Circuit recently upheld the appointment of a private
prosecutor to prosecute a private citizen by explaining that such an appointment is
constitutional only so long as "the Attorney General has the power to direct and even
remove" the court-appointed prosecutor at will and may "take control of and
even . . . terminate the contempt prosecution." *Donziger*, 38 F.4th at 302.  But the

court's proposal here vitiates every guardrail.  The Executive Branch must itself prosecute, or face a court-appointed private prosecutor who would apparently exercise core executive powers of prosecution.  And that private prosecutor would exercise those powers outside the President's or the Attorney General's control, all in service of a prosecution that the Executive Branch opposes.  District courts cannot outsource prosecutorial power to private citizens, insulate them from Executive Branch control, and then unleash them against the Executive Branch.

### B. The District Court Lacks Constitutional Authority to Compel the Government to Cure Putative Contempt via Foreign Diplomacy

Alternatively, the district court's contempt order gives the government just one option "to purge their contempt":  the United States must "assert[] custody of the individuals who were removed" on March 15, 2025.  Op.42-43.  That avenue lacks any legal basis.  Inviting the government to "purge" contempt makes no sense in the context of *criminal* contempt, which is designed to punish rather than induce compliance.  *United States v. Perry*, 116 F.3d 952, 956 (1st Cir. 1997).[1]

Further, forcing the government to successfully execute foreign diplomacy represents an improper attempt to enforce the district court's vacated TRO and

---

[1] In the context of civil contempt, by contrast, invitations to "purge" are generally appropriate—but the district court could not directly pursue civil contempt here given the Supreme Court's vacatur of the TROs.  *See Willy v. Coastal Corp.*, 503 U.S. 131, 139 (1992).

11

intrude on the President's core foreign affairs power.  The only way the government could "purge" is by gaining custody of the Tren de Aragua terrorists being held by El Salvador through negotiations with that foreign sovereign.  Op.42-43.

Yet, under the Constitution, "[s]uch matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952); *see also Trump*, 603 U.S. at 607 (The President's duties are of "unrivaled gravity and breadth" including "meeting foreign leaders, overseeing international diplomacy and intelligence gathering.").  Article II "authorizes the Executive to engag[e] in direct diplomacy with foreign heads of state and their ministers," *Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015), which is why the Supreme Court has "taken care to avoid 'the danger of unwarranted judicial interference in the conduct of foreign policy,'" *Biden v. Texas*, 597 U.S. 785, 805 (2022).  The district court's order impermissibly seeks to wrestle this complex matter of foreign affairs away from the Executive by hanging a contempt Sword of Damocles over senior officials.

### C.    Criminal Contempt Is Unwarranted Because the Government Did Not Violate the TROs, Let Alone Unambiguously.

Relief is especially warranted because the district court's order was fundamentally misconceived from the start, needlessly prompting a constitutional confrontation over criminal contempt that never should have arisen.    The

12

government did not violate the TROs, let alone violate the kind of clear and unambiguous command necessary for contempt.

Even civil contempt is a "potent weapon" that "courts should not resort [to] where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct"—and the bar for criminal contempt is higher. *King v. Allied Vision*, *Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995). Since contempt is such an extreme remedy, the Federal Rules require orders to specifically "describe in reasonable detail" just what "acts" they forbid. *NBA Props., Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990) (quoting Fed. R. Civ. P. 65(d)) (Breyer, J.). When an order is "too vague to be understood, it can be a deadly one." *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982). So the "long-standing, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt." *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971). Indeed, it is "settled law that contempt will not lie for violation of an order of the court unless the order is clear and decisive and contains no doubt about what it requires to be done." *United States v. Joyce*, 498 F.2d 592, 596 (7th Cir. 1974).

Here, the March 15, 2025 TROs—the written orders the court memorialized in writing—prohibited the government from removing aliens under the Alien Enemies Act after the TRO issued. The first TRO, in a written minute order, enjoined Defendants from "remov[ing] any of the individual Plaintiffs from the

13

United States for 14 days absent further Order of the Court." No one disputes the government's compliance with that order.

The second TRO issued via a minute order at 7:25 PM: "The Government is ENJOINED from removing members of [the] class (not otherwise subject to such removal) pursuant to the Proclamation for 14 days or until further Order of the Court." Defendants fully complied: The government undisputedly did not "remove" any class members from United States territory after that time. The ordinary meaning of "removal" is "[t]he transfer or moving of a person or thing from one location, position, or residence to another." *Removal*, Black's Law Dictionary 1409 (9th ed. 2009). No such removal occurred after the district court's TRO.

Nonetheless, the district court ruled that Defendants violated its order based on muddled "context" provided at a hearing. Op.22-30. The court determined that some enemy aliens had been removed from United States territory *before* the order, but were not transferred from United States custody until *after* the order. Under the district court's view, the word "remove" in the TRO did not refer to *physical* removal (which had already occurred) but instead to *legal* removal (which, in the district court's view, did not occur until transfer of custody).

Regardless of the correct answer, the district court itself acknowledged that both definitions are possible—and that alone should have foreclosed contempt. Op.25 (conceding removal "can convey" either "territorial exit" or some form of

14

"legal departure"). "[W]here there is ambiguity in the court's direction, it precludes the essential finding in a criminal contempt proceeding of willful and contumacious resistance." *Joyce*, 498 F.2d at 596.

In all events, the district court's reading is incorrect and implausible. The district court held that "context" made clear that the TRO's reference to removal included not only "flying class members outside of the United States" but also "the further act of relinquishing custody of them into the hands of a foreign government." Op.24. Quite the opposite. Plaintiffs challenged the President's exercise of authority under the AEA, which authorizes the President to "remove[]" dangerous aliens in the event of certain threats against "the territory of the United States." 50 U.S.C. § 21. Given that territorial focus, the most appropriate contextual reading of "removal" is the physical, territorial one—not anything to do with "custody."

The district court's contrary inferences from "context" undermine its post hoc non-territorial interpretation. *First*, the court pointed to a colloquy about compliance with its first TRO. Op.26. But, as counsel stated at the hearing, the named plaintiffs were not "on any plane that has departed" (Tr.4)—consistent with Defendants' understanding that removal meant departure from the United States.

*Second*, the district court pointed to its oral comments about "how the Court would lose equitable jurisdiction." Op.27. But the court sidestepped its most on-point statement: "Right. Sure. I mean, once they are *out of the country*, I'm not sure

what I can do there." Tr.36 (emphasis added). The court later reasoned that this "affirmed Plaintiffs' custody-based articulation" (Op.29), but the statement says the opposite: jurisdiction was *territorial*. Insofar as other comments during a lengthy hearing were inconsistent, that only underscores the ambiguity—and defeats contempt.

*Third*, the district court referred to its oral statements at the hearing directing counsel to "inform" his clients that "any plane … that is going to take off or is in the air needs to be returned to the United States." Tr.43. Critically, however, the court's subsequent written order *omitted* that language, just after the court had stated that it "w[ould] issue a minute order memorializing [a TRO] so *you don't have to race to write it down*." Tr.42. (emphasis added). It is perverse to punish Defendants based on this oral statement after assuring them that they could rely on a forthcoming written order that omitted the relevant language.

Indeed, under black-letter law across multiple circuits, Defendants had to treat the written order as governing. "Oral statements are not injunctions," so "[a] judge who proclaims 'I enjoin you' and does not follow up with an injunction [in writing] has done nothing." *Bates v. Johnson*, 901 F.2d 1424, 1427 (7th Cir. 1990) (Easterbrook, J.). Rule 65(d) provides that a TRO or injunction "must … state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts

16

restrained or required." Those requirements "contemplate[] … a *written* order." *Lau v. Meddaugh*, 229 F.3d 624, 633 (2d Cir. 1976) (emphasis added). Accordingly, "[i]f an injunction is not recorded in writing, the defendant is *under no judicial compulsion*." *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70, 83 (D.D.C. 2003) (emphasis added); *see also Hispanics United v. Village of Addison*, 248 F.3d 617, 621 (7th Cir. 2001) ("[O]ral statements … under Rule 65(d) have no legal effect."). "Where the record includes both oral and written rulings," the "written opinion" is what matters. *PlayMakers LLC v. ESPN, Inc.*, 376 F.3d 894, 897 (9th Cir. 2004).

The district court cited other circuits' cases suggesting that "violation of an oral command" alone "<u>itself</u> is grounds for contempt." Op.40. But the Seventh Circuit, and district courts in this Circuit, have held otherwise. Being on the wrong side of a circuit split cannot be grounds for criminal contempt.

The court also reasoned that, even if its "oral command" was not directly enforceable, Defendants should have understood the TRO's prohibition on "removal" as encompassing the duty to return already-removed alien enemies. Op.30. But longstanding precedent elevates written orders above oral directives precisely because "[o]ral responses from the bench may fail to convey the judge's ultimate evaluation," and "[s]ubsequent consideration may cause the district judge to modify his or her views." *Ellison v. Shell Oil Co.*, 882 F.2d 349, 352 (9th Cir. 1989). And that inference was manifestly reasonable here. Ordering the government

17

to reverse an extant counterterrorism operation and turn planes around to return foreign terrorists to United States soil—without regard to the potential dangers or whether the planes even had adequate fuel—is a staggering command. When the written order excluded that command, the reasonable inference was that the Court took a more considered view in a rapidly evolving situation. Any mistake on that score is not grounds for a willful or contumacious violation.

In sum, "the specificity provisions of Rule 65(d) are … designed to prevent uncertainty and confusion on the part of those faced with injunctive orders." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). "[A]n ordinary person reading the court's *order* should be able to ascertain from the *document itself* exactly what conduct is prescribed." Wright & Miller, Fed. Prac. & Proc. § 2955 (3d ed. 2024) (emphases added). Rule 65(d) would be turned on its head if courts could treat unwritten "context" from a hearing as grounds for criminal contempt.

## II.    This Court Should Stay the Order Pending Appeal Or, Alternatively, Grant Relief Through Mandamus.

The district court's order is properly construed as an appealable injunctive order and thus can, and should, be stayed pending appeal. Although the court did not so label its order, "the label attached to an order is not dispositive." *Abbott v. Perez*, 585 U.S. 579, 594 (2018). Rather, "where an order has the 'practical effect' of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction." *Id.* The order here qualifies: The district court ordered that

18

Defendants take one of two actions: (1) "assert[] custody" of individuals who are in the custody of a foreign sovereign; or (2) aid the court in its efforts to effectuate a contempt prosecution. Op.43-44.

Like other appealable orders, this order "carries many of the hallmarks of a preliminary injunction." *Dep't of Educ. v. California*, 145 S.Ct. 966, 968 (2025). The court requested briefs from both parties in response to an order to show cause; held an adversarial hearing; and "the court's basis for issuing the order [was] strongly challenged." *Sampson v. Murray*, 415 U.S. 61, 86-87 (1974). Further weighing in favor of appealability, the order threatens "serious, perhaps irreparable, consequence" to the separation of powers. *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981).

In any event, the order would qualify as an appealable collateral order. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). The order conclusively determined whether the Executive may lawfully be subjected to contempt proceedings. Those proceedings are separate from the merits of plaintiffs' APA claims—over which the court admittedly lacks jurisdiction. Further, the order is effectively unreviewable on appeal from final judgment because it subjects the Executive to the burdens of contempt proceedings in violation of the separation of powers—burdens that cannot be remedied later. *See Will v. Hallock*, 546 U.S. 345, 352 (2006) ("honoring the separation of powers" is a "particular value of a high

19

order … marshaled in support of the interest in avoiding trial"); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) (denial of President's claim of absolute immunity).

Indeed, the Court has emphasized "the special solicitude due to claims alleging a threatened breach of essential Presidential prerogatives under the separation of powers" in considering the scope of collateral order jurisdiction. *Nixon*, 457 U.S. at 743. The order's severe incursion on the Executive's domain within the separation of powers has already materialized—and any contempt proceeding "would imperil" the separation of powers, "a substantial public interest." *Will*, 546 U.S. at 353.

As such, the Court should stay the district court's order pending appeal. For the reasons explained, the government is likely to win on the merits. And given the grave separation of powers concerns here, the government faces an irreparable harm, which means that the public interest favors a stay as well. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that, in the context of a stay, assessing the harm to the opposing party and weighing the public interest "merge when the Government is the opposing party"). Moreover, since criminal contempt is "punitive and imposed to vindicate the authority of the court," the Plaintiffs will not be injured by a stay. *See Perry*, 116 F.3d at 956. The government has also sought relief in the district court,

but given the 7 day deadline the government needed file with this Court contemporaneously.

Alternatively, this Court should grant mandamus relief. This Court may issue a writ of mandamus to vindicate a "clear and indisputable" right, where "no other adequate means" of relief exists, if the writ is "appropriate under the circumstances." *Cheney*, 542 U.S. at 380-81. As explained above, the Government's right to relief in this case is "clear and indisputable." The contempt order dangerously intrudes on core executive prerogatives over foreign affairs and prosecutorial discretion, presenting a classic case for mandamus to maintain the Constitution's separation of powers. *See Cheney*, 542 U.S. at 382 ("Accepted mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities.").

The Government has no other adequate means of relief. These incursions on Article II functions will occur before any final contempt conviction. *See Ex parte Peru*, 318 U.S. 578, 587 (1943) (mandamus jurisdiction appropriate to ensure that "the action of the political arm of the Government taken within its appropriate sphere be promptly recognized, and that the delay and inconvenience of a prolonged litigation be avoided by prompt termination of the proceedings").

Finally, mandamus is especially appropriate because the district court's only option to purportedly purge contempt is for the Government to "assert custody" over

21

individuals over whom a foreign sovereign currently claims custody. It is well-established that mandamus is appropriate to preclude courts from mandating actions with respect to "the property of a friendly sovereign, as to embarrass the executive arm of the government in conducting foreign relations." *Id.* at 588. In the field of foreign relations, "the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction." *Id.*; *see also Clinton v. Jones*, 520 U.S. 681, 701 (1997) ("[E]ven when a branch does not arrogate power to itself … the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties."). Relief is warranted now, before the district court's proceedings escalate the constitutional confrontation any further.

## CONCLUSION

This Court should stay the contempt order pending appeal, or alternatively grant mandamus relief terminating the criminal contempt proceedings.


Dated: April 17, 2025                     Respectfully submitted,

                                          PAMELA J. BONDI
                                          U.S. Attorney General

                                          TODD BLANCHE
                                          Deputy Attorney General

                                          EMIL BOVE
                                          Principal Associate Deputy
                                            Attorney General

22

CHAD MIZELLE
 Acting Associate Attorney General

*/s/ Drew Ensign*
DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20001
Tel: (202) 514-2000
Email: drew.c.ensign@usdoj.gov

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

*Counsel for Defendants-Appellants*

23

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5190 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point Times New Roman typeface.

*/s/ Drew C. Ensign*
DREW C. ENSIGN

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Drew C. Ensign*
DREW C. ENSIGN

**CERTIFICATE OF CONFERENCE**

I hereby certify that counsel for the Defendants-Appellants contacted Lee Gelernt, counsel for the Plaintiffs-Appellees, who expressed opposition to this motion on behalf of the Plaintiffs-Appellees.

*/s/ Drew C. Ensign*
DREW C. ENSIGN

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| **J.G.G.,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs-Appellees,** | ) | |
| | ) | |
| **v.** | ) | **No. 25-5124** |
| | ) | |
| **DONALD J. TRUMP,** *et al.,* | ) | |
| | ) | |
| **Defendants-Appellants.** | ) | |

## ATTACHMENT A:

## ORDER [DOCKET ENTRY 80]

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **J.G.G.**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 25-766 (JEB)** |
| **DONALD J. TRUMP,** *et al.*, | |
| **Defendants.** | |

### <u>ORDER</u>

Given the finding of probable cause for contempt set forth in the accompanying Memorandum Opinion, the Court ORDERS that:

1. If Defendants opt to purge their contempt, they shall file by April 23, 2025, a declaration explaining the steps they have taken and will take to do so; and

2. If Defendants opt not to purge their contempt, they shall instead file by April 23, 2025, declaration(s) identifying the individual(s) who, with knowledge of the Court's classwide Temporary Restraining Order, made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: April 16, 2025

1

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| **J.G.G.,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs-Appellees,** | ) | |
| | ) | |
| **v.** | ) | **No. 25-5124** |
| | ) | |
| **DONALD J. TRUMP,** *et al.*, | ) | |
| | ) | |
| **Defendants-Appellants.** | ) | |

**ATTACHMENT B:**

**MEMORANDUM OPINION [DOCKET ENTRY 81]**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **J.G.G.,** *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 25-766 (JEB)** |
| **DONALD J. TRUMP,** *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

On the evening of Saturday, March 15, 2025, this Court issued a written Temporary Restraining Order barring the Government from transferring certain individuals into foreign custody pursuant to the Alien Enemies Act. At the time the Order issued, those individuals were on planes being flown overseas, having been spirited out of the United States by the Government before they could vindicate their due-process rights by contesting their removability in a federal court, as the law requires. <u>Trump v. J.G.G.</u>, 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025) (*per curiam*). Rather than comply with the Court's Order, the Government continued the hurried removal operation. Early on Sunday morning — hours after the Order issued — it transferred two planeloads of passengers protected by the TRO into a Salvadoran mega-prison.

As this Opinion will detail, the Court ultimately determines that the Government's actions on that day demonstrate a willful disregard for its Order, sufficient for the Court to conclude that probable cause exists to find the Government in criminal contempt. The Court does not reach such conclusion lightly or hastily; indeed, it has given Defendants ample opportunity to rectify or explain their actions. None of their responses has been satisfactory.

One might nonetheless ask how this inquiry into compliance is able to proceed at all given that the Supreme Court vacated the TRO after the events in question. That Court's later determination that the TRO suffered from a legal defect, however, does not excuse the Government's violation. Instead, it is a foundational legal precept that every judicial order "must be obeyed" — no matter how "erroneous" it "may be" — until a <u>court</u> reverses it. <u>Walker v. City of Birmingham</u>, 388 U.S. 307, 314 (1967). If a party chooses to disobey the order — rather than wait for it to be reversed through the judicial process — such disobedience is punishable as contempt, notwithstanding any later-revealed deficiencies in the order. <u>See id.</u> at 314, 320. That foundational "rule of law" answers not just how this compliance inquiry can proceed, but why it must. <u>See id.</u> at 320. The rule "reflects a belief that in the fair administration of justice no man can be judge in his own case," no matter how "exalted his station" or "righteous his motives." <u>Id.</u> at 320–21.

The Constitution does not tolerate willful disobedience of judicial orders — especially by officials of a coordinate branch who have sworn an oath to uphold it. To permit such officials to freely "annul the judgments of the courts of the United States" would not just "destroy the rights acquired under those judgments"; it would make "a solemn mockery" of "the constitution itself." <u>United States v. Peters</u>, 9 U.S. (5 Cranch) 115, 136 (1809) (Marshall, C.J.). "So fatal a result must be deprecated by all." <u>Id.</u>

## I.    Background

### A.  <u>Factual Background</u>

As just noted, the injunction in question was issued on the evening of Saturday, March 15, a day of events that moved at breakneck speed because of the Government's apparent effort to remove individuals more quickly than the judicial proceedings in which it was actively

(Page 32 of Total)

participating could keep pace.  See generally J.G.G. v. Trump, 2025 WL 890401, at *1, *3–5 (D.D.C. Mar. 24, 2025).

The day prior, the President had seemingly signed — but not yet made public — a Proclamation invoking the Alien Enemies Act.  See 90 Fed. Reg. 13033 (Mar. 14, 2025).  Through that 1798 Act, Congress granted the President broad authority if there is a "declared war" with a "foreign nation or government," or if a foreign government has "perpetrated, attempted, or threatened" an "invasion or predatory incursion . . . against the territory of the United States."  50 U.S.C. § 21.  In such a scenario, and if the President "makes public proclamation of the event," he is authorized to "apprehend[], restrain[], secure[], and remove[]" any "natives, citizens, denizens, or subjects of the hostile nation or government" who are fourteen years or older.  See id.  In his Proclamation, President Trump announced that the Government would use the Act's authorities to apprehend and remove members of Tren de Aragua, a violent Venezuelan transnational gang that had recently been designated a Foreign Terrorist Organization.  See 90 Fed. Reg. at 13033.  To support that finding, the President asserted that the Venezuelan government of Nicolas Maduro indirectly "relies" on Tren de Aragua and has been "infiltrated" by the gang.  Id.  He further announced that Tren de Aragua had committed or attempted an "invasion" or "predatory incursion" upon the United States, including through "drug trafficking," "mass illegal migration," and "irregular warfare," though he provided no examples of the last.  Id.

Although the Proclamation was not published until 3:53 p.m. on Saturday, see ECF No. 28-1 (Robert L. Cerna Second Decl.), ¶ 5, Defendants had begun setting Act-based removals into motion weeks earlier.  Beginning in early March, the Government interrogated Venezuelans in its custody about alleged membership in Tren de Aragua and transferred many of those it deemed

3

gang members to El Valle Detention Facility, located outside Harlingen, Texas, not far from the Mexico border.  The reason for staging them together at El Valle became clear on Saturday.  Early that morning — when the signed Proclamation was still hours from being disclosed to the public — the Government reportedly loaded scores of Venezuelans onto buses, drove them to a nearby airport, and began putting them onto three planes.  See ECF Nos. 44-9 (Karyn Ann Shealy Second Decl.), ¶¶ 3–9; 44-10 (Stephanie Quintero Decl.), ¶¶ 3–4; 44-11 (Grace Carney Third Decl.), ¶¶ 11–13; 44-12 (Melissa Smyth Decl.), ¶¶ 11, 14; see also ECF No. 76 (Apr. 3 Hrg. Tr.) at 9 (Government counsel agreeing Defendants "were acting in preparation of the Proclamation before it was posted").  As the planes sat on the tarmac, officials refused to answer the deportees' questions about where they would be taken.  See Shealy Second Decl., ¶ 10; Carney Third Decl., ¶ 12.

Among those queued on the tarmac or placed onto planes that morning were the five Plaintiffs in this lawsuit.  Apparently catching wind of the impending Proclamation, they filed suit at 1:12 a.m. on Saturday — before the buses left El Valle — and then moved for a TRO preventing their removal under the Proclamation.  In addition to asserting that the Proclamation lacks a legal foundation, each Plaintiff adamantly denies that he is even a member of Tren de Aragua.  See Shealy Second Decl., ¶ 4 (J.G.O.); Carney Third Decl., ¶ 3 (G.F.F.); ECF Nos. 1 (Compl.), ¶¶ 9–10, 12 (J.G.G., J.A.V., W.G.H.); 3-6 (W.G.H. Decl.), ¶ 12; 3-8 (J.A.V. Decl.), ¶ 5.

Around 8:00 a.m., this Court learned that it had drawn the case through the court's random-assignment system.  Chambers then reached out to locate Government counsel.  Less than an hour later, Plaintiffs' counsel informed chambers that at least one Plaintiff was reportedly already aboard a removal flight.  Having not yet heard from the Government, and given the "exigent circumstances" prompting the need to freeze in place the status quo until a hearing

4

could be held, the Court entered an *ex parte* TRO preventing Defendants from removing the five Plaintiffs for 14 days.  See Minute Order of Mar. 15, 9:40 a.m.  Not long after the TRO issued at 9:40 a.m., Government counsel informed chambers by email that the TRO "ha[d] been disseminated to the relevant executive branch agencies."  Sure enough, several of the named Plaintiffs report that they were abruptly removed from planes, see Shealy Second Decl., ¶ 11; Carney Decl., ¶ 13; Smyth Decl., ¶ 14 — evidence that Defendants were able, if they wished, to ensure that people on the ground knew relatively quickly of developments in the Court proceedings.  See also ECF No. 20 (Mar. 15 Hrg. Tr.) at 5 (Government stating on Saturday evening that relevant agencies had "confirmed" named Plaintiffs were not to be removed).

At 10:15 a.m., in an email thread including chambers and counsel for both sides, Plaintiffs asked the Court to hold an emergency hearing on their pending request to provisionally certify a class — comprising them and those similarly situated — and issue a second TRO covering the whole class.  The Government objected that a "broader injunction" and a "hearing" on the issue would be "premature," and it asked the Court to wait until Monday for a hearing. The Government notably did not respond to Plaintiffs' pointed question about whether it was "prepare[d] to halt removals pursuant to the Act" in the interim.  So, just after 11:00 a.m., the Court set an emergency hearing for 5:00 p.m. that same afternoon.

Shortly after the Proclamation appeared on the White House website at 3:53 p.m., and about 45 minutes before the hearing began, Plaintiffs' counsel informed chambers that he believed that two flights, both operated by a contractor used by Immigrations and Customs Enforcement for deportations, were scheduled to depart Harlingen that afternoon.  Counsel expressed concern that the flights might imminently take off with his five clients and members of the potential class on board.  The Government again offered no response.

5

In the 5:00 p.m. hearing, the Court clarified the limited scope of the TRO then in place, see Mar. 15 Hrg. Tr. at 3, and turned to whether it should provisionally certify the class. Id. at 5–6. The Government began by objecting that venue was improper because Plaintiffs' claims could be raised only through a petition for habeas corpus in the federal district in Texas where they were being held, not in the District of Columbia. Id. at 6–11.

Noting that it would benefit from further argument on the issue, the Court pivoted to addressing Plaintiffs' concerns "about imminent deportation." Id. at 11. It asked the Government point blank whether there were any "removals under this Proclamation planned . . . in the next 24 or 48 hours." Id. Government counsel said that he did not know, but that he could "investigate" and "report . . . back." Id. Plaintiffs' counsel then interjected that various "sources" had informed him that the two removal flights that were scheduled to depart that afternoon "may have already taken off," including "during this hearing." Id. at 12. So, at 5:22 p.m., the Court adjourned the hearing until 6:00 p.m. and directed Government counsel to find out whether the Government was in the process of removing people under the Proclamation. Id. at 13–15.

It was. Although the Government has refused to provide the particular details, all evidence suggests that during the short window that the Court was adjourned, two removal flights took off from Harlingen — one around 5:25 p.m. and the other at about 5:45 p.m. See ECF No. 21 (Resp. to Mar. 16 Notice) at 3–4 (relying on flight-tracking data for GlobalX Flights 6143, 6145, and 6122); see also Marianne LeVine et al., White House Official Says 137 Immigrants Deported Under Alien Enemies Act, Wash. Post (Mar. 16, 2025), https://perma.cc/U3NY-V3AS (comparing flight-tracking data with planes visible in three-minute video posted online by President of El Salvador and reposted by President Trump

6

and Secretary of State Rubio); Joyce Sohyun Lee & Kevin Schaul, <u>Deportation Flights Landed</u>

<u>After Judge Said Planes Should Turn Around</u>, Wash. Post (Mar. 16, 2025),

https://perma.cc/QT6J-3SEQ (same); Nayib Bukele (@nayibbukele), X (Mar. 16, 2025, 8:13

a.m. EDT), https://perma.cc/XLE4-DDRW.

Those later-discovered flight movements, however, were obscured from the Court when

the hearing resumed shortly after 6:00 p.m. because the Government surprisingly represented

that it <u>still</u> had no flight details to share.  <u>See</u> Mar. 15 Hrg. Tr. at 15–18; <u>see also</u> ECF No. 51

(Mar. 21 Hrg. Tr.) at 7 (Defendants' counsel later affirming that at that time he had no

"information from the Government as to the status" of the flights).  When pressed, Government

counsel stated that the "operational details" he had learned during the recess "raised potential

national security issues," so they could not be shared while the public and press listened to the

hearing through a call-in line.  <u>See</u> Mar. 15 Hrg. Tr. at 15.  He suggested, however, that the

Government could "provide [the Court] additional details in an *in camera*" setting.  <u>Id.</u>  So the

Court arranged to do just that.  It disconnected the public line so that only counsel for the parties

were present and asked Government counsel to report.  <u>Id.</u> at 15–16.  Except that he did not: he

clarified only that the "additional details" he had just mentioned could <u>eventually</u> be provided *in*

*camera*, but he had no information to share at that time.  <u>Id.</u> at 16.

With the growing realization, then, that the Government might be rapidly dispatching

removal flights in an apparent effort to evade judicial review while also refusing to provide any

helpful information, the Court turned to the pending legal issues.  <u>Id.</u> at 18.  After hearing

argument, it first determined that venue was proper, <u>id.</u> at 18–22, and it next provisionally

certified a class of Plaintiffs covering all noncitizens in custody subject to removal solely under

the Proclamation.  <u>Id.</u> at 23–26; <u>see also id.</u> at 38.

The Court then addressed the sole remaining question: whether it should issue a broader TRO covering the entire class.  It concluded that this was appropriate because Plaintiffs had satisfied the factors governing emergency relief and because the distinct possibility — "unrebutted by the Government" — that flights were "actively departing" or planning to depart required an immediate order preserving the status quo.  Id. at 41–43.  The Court therefore ordered that for 14 days the Government was enjoined from conducting the "removal" of any noncitizens in its custody solely on the basis of the Proclamation.  Id. at 42.  Then, at about 6:45 p.m., the Court delivered an oral command clarifying what compliance with the TRO meant.  It directed Government counsel to "inform your clients of [the Order] immediately" and to notify them that if class members were on a plane "that is going to take off or is in the air, . . . those people need to be returned to the United States.  However that's accomplished, whether turning around a plane or not [dis]embarking anyone on the plane . . . , I leave to you.  But this is something that you need to make sure is complied with immediately."  Id. at 43.  The hearing adjourned at 6:53 p.m.  Id. at 47.  Roughly 30 minutes later, the Court memorialized the TRO in a written Order.  See Minute Order of Mar. 15, 7:25 p.m.  That Order referenced the just-concluded hearing and reiterated that the Government was enjoined from "removing" class members.  Id.

Despite the Court's written Order and the oral command spelling out what was required for compliance, the Government did not stop the ongoing removal process.  According to Defendants, the two planes that took off during the adjournment departed U.S. airspace before the Court's 6:45 p.m. oral command, see ECF No. 49-1 (Robert L. Cerna Third Decl.), ¶ 5, and "landed abroad" sometime after the Court posted the Minute Order at 7:25 p.m.  See ECF No. 56 (State Secrets Notice) at 7–8.  A third flight reportedly took off from Harlingen at 7:36 p.m., see

Lee & Schaul, *supra*, but the Government maintains that all aboard were removed under authorities other than the Proclamation.  See Cerna Second Decl., ¶ 6.  The first two planes — those carrying members of the Plaintiff class covered by the TRO — apparently touched down in Honduras at 7:37 p.m. and 8:10 p.m., and remained there for several hours before taking off again for El Salvador.  See Lee & Schaul, *supra*; LeVine *et al.*, *supra*.  After the planes landed in El Salvador shortly after midnight on Sunday, see Lee & Schaul, *supra*, most of the passengers were apparently transferred into one of that country's prisons, known as the Center for Terrorism Confinement (CECOT).

But not all passengers, it seems.  One Venezuelan woman swears in a declaration that she was on one of the flights that landed in El Salvador but was flown back to the United States along with seven other women, apparently because Salvadoran authorities on the ground refused to accept any female prisoners.  See ECF No. 55-1 (S.Z.F.R. Decl.), ¶¶ 1, 19–21; see also Didi Martinez, Julia Ainsley & Laura Strickler, "We Were Lied To:" Two Women the Trump Administration Tried to Send to El Salvador Prison Speak Out, NBC News (Apr. 2, 2024), https://perma.cc/F5Y6-XCG8.  Her account is corroborated by a declaration from a Nicaraguan man, who avows that he was also on board one of the removal flights but was returned alongside the women because Salvadoran officials would not take custody of Central American nationals such as himself.  See ECF No. 55-2 (Katiana Gonzalez Decl.), ¶¶ 1, 7–9.

By mid-Sunday morning, the picture of what had happened the previous night came into clearer focus.  It appeared that the Government had transferred members of the Plaintiff class into El Salvador's custody hours after this Court's injunction prohibited their deportation under the Proclamation.  Worse, boasts by Defendants intimated that they had defied the Court's Order deliberately and gleefully.  The Secretary of State, for instance, retweeted a post in which, above

9

a news headline noting this Court's Order to return the flights to the United States, the President of El Salvador wrote: "Oopsie . . . Too late 😂."  Nayib Bukele (@nayibbukele), X (Mar. 16, 2025, 7:46 a.m. EDT), https://perma.cc/Y384-4TDW, https://perma.cc/6VTW-5KRD (ellipses in original).

B.  Procedural Background

A filing submitted by Defendants on Sunday afternoon failed to dispel any concerns that they had flouted the Court's injunction.  See ECF No. 19 (Mar. 16 Notice); see also Resp. to Mar. 16 Notice at 1–6.  So the Court set a hearing for Monday, March 17, to determine what had transpired over the weekend.  See Minute Order of Mar. 17, 3:09 p.m. (denying ECF No. 24 (Mot. to Vacate Mar. 17 Hrg.)).  The Court expected that at the hearing, Defendants might explain that, despite appearances otherwise, none of the people on the first two flights was a member of the Plaintiff class.  Or, at worst, Defendants would admit to a grave mistake, explain how it transpired, and detail plans to rectify it.

The United States Government took neither tack.  Rather, what followed in the ensuing days was increasing obstructionism on the part of the Government as it refused to answer basic questions about what had happened, questions that were all ultimately in service of resolving one key fact: whether members of the Plaintiff class — that is, noncitizens removable solely on the basis of the Proclamation — were transferred out of U.S. custody after this Court's injunction preventing their deportation.

Such stonewalling started before the Monday hearing.  Just before it was set to begin, Defendants sought to cancel it as an unnecessary "incursion[] on Executive Branch authority."  Mot. to Vacate Mar. 17 Hrg. at 1.  Nowhere in their filing did they dispute that class members were transferred into Salvadoran custody hours after the injunction issued.  Instead, Defendants

10

set forth several hyper-technical legal arguments for why, in spite of that fact, they had complied

with the Court's Order.  Id. at 2–5.  Such arguments were unconvincing then and remain so now.

Then, in the hearing itself, the Government refused to provide any relevant facts.  The

lawyer the Government sent to the proceeding — conveniently not the counsel who had appeared

at the TRO hearing — repeatedly stated in some form or another that he was not "at liberty to

disclose anything about any flights."  ECF No. 25 (Mar. 17 Hrg. Tr.) at 7.  Although he would

not say that such information was even classified, see id. at 9–10, he claimed that it could not be

shared — even *ex parte* with the Court — because of "diplomatic concerns" and "national

security concerns with flight patterns and things of that sort."  Id. at 6, 8; see id. at 30.  That is,

the Government maintained that it could not share any details about the flights even privately

with the Court despite the fact that, the previous day, Defendants had retweeted a three-minute

video that portrayed a host of operational details.  See Donald J. Trump (@realDonaldTrump),

Truth Social (Mar. 16, 2025, 3:54 p.m. EDT), https://perma.cc/WJ8H-F8HW; Secretary Marco

Rubio (@SecRubio), X (Mar. 16, 2025, 8:39 a.m. EDT), https://perma.cc/ZD8J-KAGH.  In high

definition, the video displayed the planes and the runway where they parked; how migrants were

restrained and transported; the faces and uniforms of many detainees, guards, and other officials;

where the vehicles apparently entered CECOT; and the inside of the prison.  Id.

So, on Monday evening, the Court ordered the Government to submit another filing the

next day.  Seeking to accommodate Defendants' national-security concerns — vague as they

were — yet nonetheless needing answers on how members of the Plaintiff class had been

transferred into a foreign prison hours after the injunction issued, the Court directed the

Government to explain its "position on whether, and in what form, it will provide answers to the

Court's questions regarding the particulars of the flights."  Minute Order of Mar. 17, 6:47 p.m.

The Court again offered that such information could be provided *in camera*, including in a classified setting.  Id.

In their March 18 response, Defendants reiterated their various arguments for why they should not have to share information related to flights, but conceded that if ordered to do so, they would submit "an *in camera* and *ex parte* declaration."  ECF No. 28 (Mar. 18 Notice) at 1–2. The Court ordered Defendants to do just that by noon the next day, and it set out five basic questions that the declaration needed to answer: when the two flights in question took off and from where; when they left U.S. airspace; when they landed in a foreign country (or countries); what time people subject solely to the Proclamation (and not other authorities, such as the Immigration and Nationality Act) were transferred out of U.S. custody; and how many people were on the flights solely on the basis of the Proclamation.  See Minute Order of Mar. 18, 2:27 p.m.

Defendants then reversed course entirely.  On Wednesday morning, the 19th, a few hours before their deadline, they moved this Court to stay its Tuesday Order on various grounds.  See ECF No. 37 (Emergency Mot. to Stay Mar. 18 Minute Order).  Most relevant, they asserted for the first time that they were considering invoking the state-secrets privilege over the flight details and needed more time to make that determination.  See id. at 3–4.  The Court was "unsure" how answering its five questions could "jeopardize state secrets" — Defendants, after all, had publicly shared images of the flights making them trackable and had still not claimed that the questions bore on any classified information, see ECF No. 38 (Mar. 19 Order) at 2 — but nonetheless sought to accommodate their last-minute request.  It gave them yet another day either to answer the five questions or to invoke the state-secrets doctrine.  Id. at 4.

On Thursday, the 20th, the Government "again evaded its obligations."  ECF No. 47

(Mar. 20 Order) at 1.  Rather than invoke the privilege or answer the questions, it submitted a

short declaration from an Immigration and Customs Enforcement officer stationed in Harlingen.

See Cerna Third Decl.  It was his "understand[ing]," he said, that Cabinet Secretaries were then

considering whether to invoke the privilege.  Id. at 2.  In response to this wholly inadequate

response from a low-level official without any actual knowledge, the Court required Defendants

to submit a declaration from someone directly involved with the Cabinet-level discussions and

gave Defendants five days to indicate whether they were invoking the state-secrets privilege.

See Mar. 20 Order at 3.  The Government has since invoked it.  See State Secrets Notice.  The

Court also directed the parties to brief whether Defendants had violated the Court's TROs.  See

Mar. 20 Order at 3.  That briefing is complete, and the Court held a hearing on the matter in early

April.

In parallel to the investigation of Defendants' compliance have been further proceedings

on the TROs' merits.  After briefing and a hearing, the Court denied Defendants' motion to

vacate the TROs; it held that Plaintiffs had shown a likelihood of success on one of their core

claims — i.e., those subject to removal under the Proclamation had a due-process right to

challenge the Government's determination that they were removable — and that they would face

irreparable harm if the TROs were dissolved, a harm that also tipped the balance of equities in

their favor.  See J.G.G., 2025 WL 890401, at *11–14, 16–17.  The Court of Appeals then rejected

Defendants' request to stay the Orders, raising concerns with both the applicability of the Act and

the lack of due-process.  See J.G.G. v. Trump, No. 25-5067, 2025 WL 914682, at *8–10 (D.C.

Cir. Mar. 26, 2025) (Henderson, J., concurring); id. at *13–14 (Millett, J., concurring).

The Supreme Court subsequently vacated the TROs on a narrow ground.  It held that challenges to removal under the Act must be brought through a habeas-corpus proceeding — not, as Plaintiffs did, through the Administrative Procedure Act — and therefore venue lay in the district of the class members' confinement, not the District of Columbia.  See J.G.G., 2025 WL 1024097, at *1.  While the Court split on the venue question, it unanimously held — as this Court did when declining to dissolve the TROs — that those subject to removal under the Act must be allowed to challenge their removability in federal court before being deported.  See id. at *2; id. at *2 (Kavanaugh, J., concurring); id. at *2, 6 (Sotomayor, J., dissenting).  Specifically, all Justices agreed that the Due Process Clause requires the Government to provide anyone it seeks to remove notice "that they are subject to removal under the Act," and to do so "within [a] reasonable time and in such manner as will allow them to actually seek habeas relief" before being removed.  Id. at *2 (per curiam); id. at *6 (Sotomayor, J., dissenting).  In holding as much, the Court effectively said that the Constitution flatly prohibits the Government from doing exactly what it did that Saturday, when it secretly loaded people onto planes, kept many of them in the dark about their destination, and raced to spirit them away before they could invoke their due-process rights.

As this Opinion will shortly explain at greater length, the fact that the Supreme Court determined that this Court's TROs suffered from a venue defect does not affect — let alone moot — the compliance inquiry presently teed up here.

## II.    Analysis

Defendants provide no convincing reason to avoid the conclusion that appears obvious from the above factual recitation: that they deliberately flouted this Court's written Order and, separately, its oral command that explicitly delineated what compliance entailed.  They do not

14

dispute that it was hours after the written Order issued when they disembarked the class members aboard the two planes and transferred them out of U.S. custody.  See State Secrets Notice at 7–8; ECF No. 58 (Resp.) at 4.  Rather than offer a *mea culpa* and attempt to explain this grave error and detail plans to rectify it, Defendants offer various imaginative arguments for why they nevertheless technically complied with the Order.  None of their positions withstands scrutiny.

Defendants' core contention — that in prohibiting class members' removal, the written Order barred only their physical exit from the United States, not their subsequent transfer into Salvadoran custody — requires ignoring the clear context in which the Order was issued.  Their other arguments amount only to retroactive attacks on the legal validity of the injunction, but that road leads nowhere: even a legally defective order must be complied with until reversed through the appeals process.  Defendants' conduct, moreover, manifests a willful disregard of the Court's legally binding proscriptions.  Given the evidence at this early stage in the inquiry, and offered no persuasive reason to conclude otherwise, the Court finds that there is probable cause that Defendants acted contemptuously.

The following analysis first sets out the parameters of criminal contempt and then explains why court orders, regardless of their ultimate validity, must be complied with.  The Court last analyzes why Defendants' willful and knowing actions here constitute probable cause for a finding of contempt.

A.  Contempt

1.  *Legal Standard*

When Congress established lower federal courts in the Judiciary Act of 1789, it conferred on them the power "to punish by fine or imprisonment, at the discretion of said courts, all

15

contempts of authority in any cause or hearing before the same." 1 Stat. 83; see Bloom v. Illinois, 391 U.S. 194, 202 (1968). In doing so, Congress "gave federal courts the discretionary power to punish for contempt as that power was known to the common law." United States v. Barnett, 376 U.S. 681, 687 (1964); see id. at 699–700 ("The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge.") (quotation marks omitted); United States v. Dixon, 509 U.S. 688, 694–95 (1993). Although Congress eventually pared back federal courts' statutory contempt power, it preserved their authority to punish, among other transgressions, "'disobedience or resistance' to court orders." Dixon, 509 U.S. at 694 (quoting 4. Stat. 488); see Bloom, 391 U.S. at 202–04.

That statutory authority is now codified in 18 U.S.C. § 401, which provides that any "court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." For a contemnor to be convicted of criminal contempt under § 401(3), it must be shown beyond a reasonable doubt: (1) that the court order was "clear and reasonably specific"; (2) "that the defendant violated the order"; and (3) "that the violation was willful." United States v. Young, 107 F.3d 903, 907 (D.C. Cir. 1997) (quoting United States v. NYNEX Corp., 8 F.3d 52, 54 (D.C. Cir. 1993)).

The Court here inquires only into whether there is probable cause that Defendants violated § 401. Such an inquiry does not appear to be strictly necessary. The statute does not include a probable-cause requirement, and as the Department of Justice has explained in an internal manual, "It is unclear whether probable cause that a willful violation has occurred is a condition precedent to the commencement of a criminal contempt action." U.S. Dep't of Just.,

16

Criminal Resource Manual § 763, https://perma.cc/Z5DV-RUNU.  In practice, "the vast majority of criminal contempt decisions make no mention of such a requirement."  Id.  Some courts, however, have opted to make or require findings of probable cause before initiating criminal-contempt proceedings.  See, e.g., In re Res. Tech. Corp., 2008 WL 5411771, at *4 (N.D. Ill. Dec. 23, 2008); Beyond Blond Prods., LLC v. Heldman, 2025 WL 902445, at *1 (C.D. Cal. Mar. 25, 2025); In re Sydor, 132 B.R. 243, 245–46 (E.D.N.Y. Bankr. 1991); Reed v. Rhodes, 500 F. Supp. 363, 376, 404 (N.D. Ohio 1980); United States v. Hovind, 2014 WL 12887669, at *2 (N.D. Fla. July 8, 2014); In re United Corp., 166 F. Supp. 343, 345 (D. Del. 1958).  The Court finds that practice to be a prudent way of affording alleged contemnors the procedural protections associated with other criminal proceedings and so follows it here.

### 2.  *Effect of Supreme Court Vacatur*

But hold on, Defendants protest.  If the Supreme Court has since vacated the TROs, how can contempt lie?  See ECF No. 78 (Notice Regarding Supreme Court Decision) at 1.  The Supreme Court long ago answered that question: it is firmly settled that a court order "must be obeyed" until it is "reversed for error" by the issuing court or a "higher" one.  Walker, 388 U.S. at 314 (quoting Howat v. Kansas, 258 U.S. 181, 189–90 (1922)).  That, in turn, means that a party "may be punished for criminal contempt for disobedience of an order later set aside on appeal" for being defective.  United States v. United Mine Workers of Am., 330 U.S. 258, 294–95 (1947).  If a party believes that a court order suffers from legal deficiencies, it therefore "must have the injunction modified or vacated; [it] cannot simply ignore it."  Evans v. Williams, 206 F.3d 1292, 1299 (D.C. Cir. 2000).  The so-called collateral-bar rule enforces that principle.  It provides that if a party is charged with contempt for disobeying a court order, it cannot raise the legal invalidity of the order as a defense.  See id. (citing Walker, 388 U.S. 307).  Defendants

17

were thus obligated to comply with this Court's TRO until vacated by this Court or a higher one; if they failed to comply, the fact that the TRO was legally unsound is no obstacle to a contempt conviction.

There are only two narrow exceptions to this rule, neither of which applies here. First, an enjoined party can violate an order and then challenge its validity in a contempt proceeding if — and only if — "there was no opportunity for effective review of the order before it was violated." 11A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2960 (3d ed. Apr. 2025 update). Defendants do not seek cover behind this exception. For good reason. Just as they had sought emergency appellate relief for the first TRO mere hours after it issued, see ECF No. 12 (First Notice of Appeal), they notified this Court while the planes were en route to El Salvador that they intended to do the same for the TRO in question, see ECF No. 17 (Second Notice of Appeal) (filed 8:37 p.m.), docketing their appeal only minutes after the planes landed in that country. See Corrected Emergency Mot. for a Stay Pending Appeal, J.G.G. v. Trump, No. 25-5067 (D.C. Cir. Mar. 16, 2025) (filed 1:07 a.m. Sunday). Defendants also could have sought relief from this Court, including, for example, requesting a stay of the TRO pending appeal. See Fed. R. App. P. 8(a)(1)(A); J.G.G., 2025 WL 914682, at *22–23 (Millett, J., concurring) (noting failure to do so). Defendants, moreover, nowhere identify a reason that the transfer had to occur early Sunday morning. If they considered waiting for appellate relief impracticable or unattractive given the speed at which events transpired, that circumstance was entirely of their own making, not the result of any bona-fide obstacle to effective review. Indeed, the appellate process worked at a breakneck pace. Cf. Walker, 388 U.S. at 318–19 (case is "different" if party faces "delay or frustration of their . . . claims" in appellate courts).

Second, a party need not obey an injunction that is "transparently invalid or had only a frivolous pretense to validity." Id. at 315. That is an exceedingly high bar. This narrow carveout does not apply if the order was "arguably proper" or "had any pretence to validity at the time it was issued." Matter of Providence J. Co., 820 F.2d 1342, 1347 (1st Cir. 1986). The exception therefore applies "[o]nly in the rarest of situations." Zapon v. U.S. Dep't of Just., 53 F.3d 283, 285 (9th Cir. 1995). This is not one. The Supreme Court has admittedly held that Plaintiffs' claims should have been brought in habeas, see J.G.G., 2025 WL 1024097, at *1, but this Court's view of the issue at the time of the Orders was not patently frivolous. Rather, the question was "substantial," United Mine Workers, 330 U.S. at 293, dividing both the Court of Appeals and the Supreme Court. See J.G.G., 2025 WL 914682, at *23–31 (Millett, J., concurring); id. at *34–37 (Walker, J., dissenting); J.G.G., 2025 WL 1024097, at *1; id. at *7–10 (Sotomayor, J., dissenting).

To be sure, some courts outside this Circuit have suggested that when a court lacks subject-matter jurisdiction to adjudicate a dispute, an enjoined party may raise that fact as a defense to contempt. See, e.g., In re Novak, 932 F.2d 1397, 1401–02 (11th Cir. 1991); In re Estab. Inspection of Hern Iron Works, Inc., 881 F.2d 722, 726–27, 726 n.12 (9th Cir. 1989) (but noting pervasive uncertainty on the issue). Those statements, however, do not control here, not least because they are incompatible with the Supreme Court's subsequent opinion in Willy v. Coastal Corp., 503 U.S. 131 (1992). See United States v. Straub, 508 F.3d 1003, 1006, 1010 (11th Cir. 2007) (upholding 18 U.S.C. § 401(3) contempt charge even though court lacked jurisdiction "over the underlying controversy," and noting Willy "resolve[d] this issue").

In Willy, a district court imposed Rule 11 sanctions — which function like criminal contempt, as they are "designed to punish a party who has already violated the court's rules," 503

U.S. at 139 — even though it was later shown that it did not have subject-matter jurisdiction when the sanctionable conduct occurred; indeed, it issued the final sanctions order after its lack of jurisdiction had been determined by the court of appeals. Id. at 133–34. The Supreme Court nonetheless upheld the sanctions order. Id. at 135–39. "A final determination of lack of subject-matter jurisdiction," the Court explained, "precludes further adjudication of" the case's merits, but a sanctions order is "collateral to the merits," so a court's lack of subject-matter jurisdiction poses no constitutional bar. Id. at 137–38; see also id. at 137 (explaining that United Mine Workers, 330 U.S. 258, "upheld a criminal contempt citation even on the assumption that the District Court issuing the citation was without jurisdiction over the underlying action"). Following Willy, the D.C. Circuit has made clear that "subject-matter jurisdiction over an underlying action is not a precondition of a federal court's authority to sanction those who violate its orders." In re LeFande, 919 F.3d 554, 561 (D.C. Cir. 2019) (citing Willy, 503 U.S. at 137). Notwithstanding whether a court is later determined to have lacked subject-matter jurisdiction at the time of the violation, then, a party can be held in contempt for disobedience, and the same court can impose the sanctions even after its lack of jurisdiction has been revealed.

In any event, this Court possessed such jurisdiction. Recall, the Supreme Court held in its per curiam opinion that claims challenging removal under the Alien Enemies Act "must be brought in habeas." J.G.G., 2025 WL 1024097, at *1. That conclusion rested on a line of cases holding that habeas is the "exclusive remedy" for state prisoners challenging their sentences, even though such claims "may come within the literal terms of" another statute. Heck v. Humphrey, 512 U.S. 477, 481 (1994); see also Preiser v. Rodriguez, 411 U.S. 475, 489–90 (1973). In such circumstances, the Court has previously explained, the availability of habeas relief means a separate "cause of action . . . does not accrue." Heck, 512 U.S. at 489–90. By

analogy, the same occurred here.  In holding that habeas is the exclusive remedy for Plaintiffs, the Supreme Court denied that they possessed a valid cause of action under the APA when this Court granted the classwide TRO; it did <u>not</u> hold that this Court lacked subject-matter jurisdiction.  In fact, Justice Kavanaugh noted in his concurrence that the availability of habeas relief constitutes an "adequate remedy" barring suit under the APA.  See <u>J.G.G.</u>, 2025 WL 1024097, at *2 (Kavanaugh, J., concurring) (quoting 5 U.S.C. § 704); <u>see also</u> <u>J.G.G.</u>, 2025 WL 914682, at *34 (Walker, J., dissenting) (making same point).  The adequate-remedy bar, however, is not a jurisdictional one: on the contrary, the D.C. Circuit has explained that § 704 "determine[s] whether there is a cause of action under the APA, not whether there is federal subject matter jurisdiction."  <u>Perry Capital LLC v. Mnuchin</u>, 864 F.3d 591, 621 (D.C. Cir. 2017).  Under either habeas or APA precedents, then, both paths lead to the same destination: the relevant defect in this Court's classwide TRO was not jurisdictional.

At worst, as the Supreme Court held here, "<u>venue</u> [was] improper in the District of Columbia."  <u>J.G.G.</u>, 2025 WL 1024097, at *1 (emphasis added).  Indeed, regardless of how the issue is framed, the Court has been clear that any reference to habeas "jurisdiction" does not refer to a court's "subject-matter jurisdiction."  <u>Rumsfeld v. Padilla</u>, 542 U.S. 426, 434 n.7 (2004).  Rather, the "territorial-jurisdiction rule[]" is a question of proper "venue."  <u>Id.</u> at 452 (Kennedy, J., concurring); <u>see also</u> <u>Chatman-Bey v. Thornburgh</u>, 864 F.2d 804, 812–13 (D.C. Cir. 1988) (similar).  And it is black-letter law that while subject-matter jurisdiction goes to whether any federal court may even hear the dispute, venue determines <u>which</u> jurisdiction-possessing court is the most convenient.  See 14D Wright & Miller, *supra*, § 3801 (4th ed. Apr. 2025 update); <u>Neirbo Co. v. Bethlehem Shipbuilding Corp.</u>, 308 U.S. 165, 167–68 (1939) (same).  Just

like the availability of a cause of action under the APA, that question has been determined by statute — the federal habeas statute.  See 28 U.S.C. §§ 2241–2242.

The upshot is that, after the Supreme Court's decision in this case, it has been preliminarily determined that Congress channeled a challenge to removal under the Alien Enemies Act to a habeas petition filed in a detainee's district of confinement.  This Court's decision to recognize a cause of action under the APA in the District of Columbia, while ultimately found erroneous by the Supreme Court, therefore is not a defect that would excuse compliance under any of the recognized exceptions.

The "firmly established" "rule of law" that even a legally unsound order must be obeyed at the risk of contempt therefore focuses the present inquiry.  Walker, 388 U.S. at 319.  The question presented here is whether there is probable cause that Defendants deliberately or recklessly disregarded a clear and reasonably specific order.  See Young, 107 F.3d at 907, 910.  The question is not — as many of Defendants' evasive legal arguments imply — whether that Order was legally impeccable.

### 3. *Sufficiently Clear, Reasonably Specific, and Unequivocal Order*

The first element of contempt requires that the injunction be "clear," "reasonably specific," Young, 107 F.3d at 907 (quotation marks omitted), and "unequivocal at the time it is issued."  In re Holloway, 995 F.2d 1080, 1082 (D.C. Cir. 1993) (quoting Traub v. United States, 232 F.2d 43, 47 (D.C. Cir. 1955)).  To "determin[e] whether an order is sufficiently clear and specific," courts "apply an objective standard that takes into account" not just "the language of the order" but also "the objective circumstances surrounding the issuance of the order."  Young, 107 F.3d at 907.  Thus, "[w]hether an order is clear enough depends on the context in which it [was] issued," which includes "the audience to which it [was] addressed," id. at 907–08 (quoting

22

In re Levine, 27 F.3d 594, 596 (D.C. Cir. 1994)), as well as "the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." Common Cause v. Nuclear Regul. Comm'n, 674 F.2d 921, 927 (D.C. Cir. 1982) (quotation marks omitted).

The question here, then, is whether it was sufficiently clear to the Government that the Court was prohibiting it from transferring class members into another country's custody — something Defendants admit to doing hours after the written Order issued. See State Secrets Notice at 7–8. The Government, however, now contends that the Court's Order should be understood to have enjoined it only from transporting class members outside of U.S. territory, not from relinquishing custody of them once they were already outside the United States. That narrower Order, it argues, was one with which it fully complied. That interpretation is deliberately blind to the Court's unequivocal language and the context surrounding its Order.

At 7:25 p.m. on Saturday evening, roughly 30 minutes after the hearing adjourned, see Mar. 15 Hrg. Tr. at 47, the Court issued its written Order. See Minute Order of Mar. 15, 7:25 p.m. Expressly referencing the hearing, the Order certified a Plaintiff class consisting of all noncitizens in U.S. custody who were subject to the Proclamation, and, relevant here, memorialized the TRO using the same language as in the hearing. See Mar. 15 Hrg. Tr. at 42, 46–47. Specifically, this part of the Order stated:

> As discussed in today's hearing, the Court ORDERS that . . . [t]he Government is ENJOINED from removing members of [the] class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court.

Minute Order of Mar. 15, 7:25 p.m.

As already explained, the Government does not dispute that after this written TRO issued, it temporarily landed two planeloads of class members in Honduras, flew them to El

23

Salvador, deplaned them there, and then — critically — transferred them from U.S. to

Salvadoran custody.  See State Secrets Notice at 7–8.  Indeed, the Government does not

challenge that this transfer of custody happened some five hours, at least, after the written Order

was docketed.  See LeVine *et al.*, *supra* (planes landed in El Salvador at 12:10 and 12:18 a.m.).

Defendants offer a novel interpretation of the Order that, if adopted, would mean that

they were not in violation.  The linchpin of their argument is that in forbidding them from

"removing" class members, see Minute Order of Mar. 15, 7:25 p.m., the TRO prohibited only

flying class members outside of the United States, not the further act of relinquishing custody of

them into the hands of a foreign government.  See Resp. at 2–4.  And, they continue, because

both planes had already departed U.S. airspace before the written Order posted (and before the

oral command preceding it), everyone on board had already been removed before the Order

issued.  See id.  While perhaps clever, this argument does not carry the day.

Defendants agree that an injunction must be understood in the context in which it is

issued.  See Young, 107 F.3d at 907–08; Resp. at 2.  But they would have the Court search for

context in all the wrong places.  After observing that the written TRO did not define "remove,"

Resp. at 3, they seek to show that the term has a clear meaning under the Act, with the

implication that the Court incorporated that definition into its Order.  They do not make their

case.

Across a couple paragraphs, Defendants halfheartedly seek to root their narrow reading

of "removal" in the Act.  They cite several dictionary definitions from around the time that

Congress passed the Alien Enemies Act in 1798, but these are far from conclusive.  See Resp. at

3.  They also suggest that their territorial understanding makes sense because the Act speaks of

"the territory of the United States."  Id. (quoting 50 U.S.C. § 21).  This, too, is hardly definitive:

24

just because an "invasion" or "predatory incursion" must be "against the territory of the United

States" to trigger the Act's authorities does not resolve whether the process of removal comprises

a physical departure or a transfer of custody.  Defendants therefore fall well short of showing that

"removal" carries a definitive meaning under the Act.

As a fallback of sorts, Defendants gesture toward the adjacent INA context, but that

undercuts their position.  They cite a lone case in which the Ninth Circuit held that an INA

removal order is executed when the person physically exits the United States.  Nicusor-Remus v.

Sessions, 902 F.3d 895, 898, 899 (9th Cir. 2018) (citation omitted).  That court, however,

recognized that departure can convey a "physical departure" (territorial exit) or, conversely, a

"legal departure" (implicating questions of one's legal admission to and status in the country of

destination), and it found that the former controlled only because the INA's own statutory

definition made that conclusion unavoidable.  Id. at 899–900 (noting statute defined "deported or

removed" as having "left the United States") (quotation marks omitted).  Here, by contrast, as

Defendants concede, see Resp. at 3, we have no statutory definition that might be dispositive.

Insofar as INA cases are relevant, moreover, they demonstrate that, at the time the TRO

issued, the Government understood removal to mean the exact opposite of what they now claim.

But don't take the Court's word for it.  Just listen to the argument the Government made a mere

five days before the events in question here.  In a different case in this district — with some of

the same Defendants, and in a filing signed by some of the same lawyers signing Defendants'

show-cause response — the Government argued that "removal" under the INA is a "term of art,"

and that "[t]o effectuate a departure or removal, the alien must lawfully enter another country,"

as "the fact that [he] is physically on foreign soil is not alone sufficient to establish that he has

legally departed the United States." <u>Escalona v. Noem</u>, No. 25-604, ECF No. 14 (Opp. to Mot. for Stay of Transfer) at 29–30 (D.D.C. Mar. 10, 2025) (citations omitted); <u>see</u> <u>id.</u> at 40 (lawyers).

Defendants, then, do not show that "removal" carries the specific meaning they urge under the Act. For that reason, rather than a smattering of late-18th-century dictionaries and an inconclusive fragment of the Act's text, the better — indeed the <u>obvious</u> — place to look for the meaning of "removal" in the Court's written TRO is the hour-plus-long hearing that immediately preceded it. <u>See</u> <u>Young</u>, 107 F.3d at 907–08 (context for determining meaning of injunction includes "objective circumstances surrounding the issuance of the order" and "audience to which it is addressed") (quotation marks omitted).

Anyone paying attention to the hearing (as the Government presumably was) would have known that the <u>ultimate</u> action Plaintiffs sought to prevent through a TRO was not their mere transportation across the U.S. border, but instead their discharge from U.S. custody into a foreign country or into foreign hands. <u>Common Cause</u>, 674 F.2d at 927 (context for determining meaning of injunction includes "the relief sought by the moving party" and "mischief that the injunction seeks to prevent"). When the Court accordingly referred to removal or deportation in the hearing, it consistently used those terms to mean a <u>legal</u> departure that was complete upon discharge from U.S. custody, not upon mere physical exit from U.S. territory.

*First*, mark the opening exchange of the hearing. The Court asked the Government to confirm that none of the five named Plaintiffs was "on any plane that has departed," Mar. 15 Hrg. Tr. at 4, as the first TRO then in place prohibited their "remov[al] . . . from the United States." Minute Order of Mar. 15, 9:40 a.m. Government counsel said that he had "confirmed" that they would "not be removed." <u>See</u> Mar. 15 Hrg. Tr. at 5. The Court then clarified what that must entail, stating: "I would assume that means that they are either not on the planes or that <u>they</u>

will not be removed from the planes and will be brought back once the planes land in El

Salvador." Id. (emphasis added). The Government did not disagree with that characterization.

Id. From the start, then, the Court plainly considered removal (from the United States) — *i.e.*,

the action that would violate the TRO — to mean a legal removal, and specifically a process that

culminated not in a detainee's movement out of U.S. airspace or arrival in a foreign country, but

instead upon his transfer out of U.S. custody. Similarly, during a later exchange on irreparable

harm, the Court expressly said that it viewed "the status quo" (which Plaintiffs sought to

maintain) as "keeping [class members] in ICE custody but not deporting them." Mar. 15 Hrg. Tr.

at 35. Again, the issue was custody, not physical location.

  *Second*, consider the recurring discussion about when and how the Court would lose

equitable jurisdiction. These exchanges make clear that the Court considered a TRO to be

appropriate in part to preserve the status quo; that the Court (and Plaintiffs) felt that this entailed

ensuring that it did not lose jurisdiction; and that it was concerned that it would lose jurisdiction

not when class members exited U.S. airspace but instead when they left U.S. custody. The

Government listened to and indeed participated in these exchanges.

  To start, prior to the mid-hearing adjournment, Plaintiffs' counsel interjected that

"sources" "on the ground" had indicated that planes were actively departing or could be at any

moment. Id. at 12. That created time pressure, he said, but not because class members would

simply be flown outside the United States; instead, it was because they could imminently "end[]

up in a Salvadoran prison," and that eventuality might "divest this Court of jurisdiction." Id.

  The reason was explained later in the hearing, when the discussion returned to irreparable

harm. The Government said that it did not understand Plaintiffs' irreparable-harm argument,

which it construed to be "predicated on the premise that this Court would somehow lose

27

jurisdiction if [class members] were" "in the United States" but "not in D.C."  Id. at 35.  The

Court clarified for the Government that Plaintiffs' "argument in part is [that class members] are

going to be sent to Salvadoran or Honduran prisons."  Id. (emphasis added).  Indeed, that event,

Plaintiffs again agreed, was the crux: not only did they face "real danger . . . if they end up in a

Salvadoran prison," but if that were to occur, "the Court would lose jurisdiction because it

wouldn't be able to offer a remedy" — and a TRO was needed to prevent both things from

happening.  Id. at 36–37.  The Government surely understood the black-letter principle that to

have jurisdiction, a Court must be able to redress the plaintiff's injury.  See Uzuegbunam v.

Preczewski, 592 U.S. 279, 291 (2021).  Plaintiffs here clearly recognized that if they were turned

over to Salvadoran authorities, the Court might lose its ability to offer any remedy: while a

federal court can exercise equitable powers over U.S. officials even if they are overseas, it cannot

directly control foreign officials, see Doe v. Mattis, 928 F.3d 1, 22 (D.C. Cir. 2019), meaning that

this Court could not order the guards at CECOT to release class members.  But see Abu Ali v.

Ashcroft, 350 F. Supp. 2d 28, 30–31, 47–50 (D.D.C. 2004) (denying motion to dismiss habeas

petition filed by U.S. citizen held in Saudi prison at United States's behest because prisoner was

in "constructive" U.S. custody); Munaf v. Geren, 553 U.S. 674, 686 (2008) (one is "held 'in

custody' by the United States when" a U.S. official "has 'the power to produce' him") (citation

omitted).

      In an egregious case of cherry-picking, Defendants selectively quote only a fragment of

the Court's response here to mischaracterize its position, suggesting that the Court acknowledged

that it lacked jurisdiction once class members left U.S. airspace.  See Resp. at 8; see also id. at

11.  But that contention overlooks that the first words of the response — "Right.  Sure.  I mean,

once they are out of the country, I'm not sure what I can do there," Mar. 15 Hrg. Tr. at 36 —

28

affirmed Plaintiffs' custody-based articulation of why it would lose jurisdiction.  Defendants'
suggestion also ignores the Court's prior and repeated references to removal as a transfer of
custody.  Any lingering doubt on this score is dispelled by the exchange that occurred just a few
minutes later.  Immediately after the Court ruled on the TRO and delivered the oral command on
how it should be implemented (which will be addressed shortly), see id. at 42–43, Plaintiffs
provided an update on the two flights that they understood to have taken off that afternoon; one
had ended up in El Salvador and the other in Honduras, they said.  Id. at 44.  In response, the
Court said:

> Again, just so we are clear, if planes have already landed and
> discharged their occupants, aside from the five Plaintiffs I enjoined
> earlier, then . . . I don't have jurisdiction to require [the occupants']
> return.

Id. (emphasis added).  "Right," agreed Plaintiffs.  Id.  If the Court believed jurisdiction to be
territorial, it would not have said the emphasized portion; instead, its answer would have been,
"If the planes have left the United States, I don't have jurisdiction to require their return."

In short, then, these exchanges on equitable jurisdiction — in which the Government was
both "audience" and participant, Young, 107 F.3d at 907–08 — demonstrate that Plaintiffs sought
a classwide TRO that would ensure that the Court retained that jurisdiction over class members;
that the Court agreed that it would lose such jurisdiction upon class members' handover to
foreign authorities, and not before; and that the only TRO the Court was considering granting
was one that would prevent such an eventuality.

*Third*, return to the oral ruling and command.  At around 6:45 p.m., the Court ruled on
Plaintiffs' request for a broader TRO covering all class members.  After explaining the reasons
that a TRO covering the Plaintiff class was "appropriate," the Court spelled out its scope: the
TRO "would be to prevent the removal of the class for 14 days or until further order of the Court.

29

And the class will be all noncitizens in U.S. custody who are subject to the Proclamation . . . and [to] its implementation." Mar. 15 Hrg. Tr. at 42 (emphasis added). After noting that it would "memorializ[e]" the TRO through a Minute Order, the Court then addressed "where we go from here," id., and turned to the Government to emphasize "the first point":

> [Y]ou shall inform your clients of [the Order] immediately, and that any plane containing [class members] that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not [dis]embarking anyone on the plane . . . , I leave to you. But this is something that you need to make sure is complied with immediately.

Id. at 43 (emphasis added).

From this command alone, it was clear and unequivocal that the ultimate action proscribed by the TRO was not class members' removal from U.S. territory, but instead their transfer from U.S. custody into foreign hands. If the Court's TRO only prohibited class members from being transported out of U.S. territory, much of the oral command would be nonsensical. It would make no sense to command that "people" who had never left the United States needed "to be returned to the United States." Id. (emphasis added). Nor would it make any sense for the Court to have ordered the Government not to deplane "anyone on [a] plane." Id. The inescapable meaning of that directive, particularly in light of the exchanges leading up to it, was that anyone on a removal flight that had already landed abroad should not be discharged from U.S. custody and turned over to Salvadoran (or Honduran) authorities. That was clearly the ultimate harm Plaintiffs sought to prevent and the jurisdiction-terminating event they endeavored to preclude by freezing the status quo. If the injunction only prevented class members' exit from U.S. airspace, the Court would have had no need to detail how they should be handled if their plane had already landed abroad.

* * *

In sum, numerous exchanges throughout the hearing, including the ultimate unequivocal oral command that clarified how the TRO must be obeyed, demonstrate that the Court consistently considered removal to be not mere physical removal, but instead legal deportation that was complete upon transfer out of U.S. custody. Defendants' proposition — that the written Order used removal in a dramatically narrower sense — flies in the face of this overwhelming context. And they provide no convincing explanation for why, after its emphatic oral command, the Court would have made an abrupt U-turn in the 30-minute window between the end of the hearing and the docketing of the Order. Contra Resp. at 7. Indeed, the Court twice told the Government in the hearing that it would "memorializ[e]" the TRO in the written Order, see Mar. 15 Hrg. Tr. at 42, 46; the only objectively reasonable expectation, then, was that the written order enshrined the injunction unchanged unless the Court expressly drew attention to any discrepancies between what was said and what was recorded in writing. Nor did the Government seek to clarify the relationship between the oral command and written Order, which it plainly should have done had it felt any confusion. The Court therefore concludes that the written TRO and the oral command defining compliance were each sufficiently clear and specific in proscribing the handover of class members to Salvadoran officials.

    4. *Violation*

The second element of contempt requires that the sufficiently clear and specific order was in fact violated. Young, 107 F.3d at 907. Defendants do not dispute that, if the Order indeed proscribed transferring class members out of U.S. custody, they plainly violated it hours after it issued. Rather than mount any factual defense, they rely on *post-hoc* legal arguments to attack the validity of the Order itself. These positions are without merit, but, more important, they are

31

not even available to Defendants.  As previously explained, per the collateral-bar rule, what matters is whether they violated the terms of the Order, not whether the Order itself was legally valid.

a.  Separation of Powers

Defendants first claim that even if the TRO used the term "removal" to describe a legal departure and thereby did enjoin class members' transfer into foreign custody, it did not prohibit — indeed could not prohibit — Defendants from making such a transfer if the class members "were already outside the United States" at the time of the Order.  See Resp. at 9; id. at 2, 9–13. That argument sails wide of the mark.

Underpinning their claim is a sweeping assertion: they contend that once the class members exited U.S. airspace, Defendants' authority over them flowed solely from the President's Article II powers, not from the congressional grant of immigration authority invoked by the Proclamation.  Id. at 10, 12.  In their view, from El Valle to the U.S. border, Defendants transported class members pursuant to the Act; upon exiting U.S. airspace, however, the Act fell away, and Defendants continued on under only the President's Article II powers.

From that bold premise, Defendants urge two points.  They first posit that because it only enjoined removals effectuated "pursuant to the Proclamation," Minute Order of Mar. 15, 7:25 p.m., the TRO "by its terms" did not reach conduct outside of United States territory taken pursuant to Article II.  See Resp. at 9–10, 12.  Even were the premise solid (which it is not), this is simply another argument about how the TRO should be construed based on its language.  But we have already been down this path: the TRO should be understood in light of the circumstances in which it issued — not given a belated gloss by virtue of sweeping separation-of-powers theories raised for the first time in briefing.  To reiterate again, the relevant context here demonstrates that the Order clearly and specifically prohibited Defendants from transferring

32

any class members into a Salvadoran prison, even — in fact, especially — if they had already been flown outside the United States.  See *supra* pp. 26–30.

To the degree that Defendants' objection does not concern the Order's interpretation, it melds into their secondary argument: even if the Court's Order prohibited (or "purported to" prohibit, see Resp. at 9) transferring custody of class members already outside the United States, the Court lacked the constitutional power to enjoin such transfers.  Id. at 11 (Executive Branch's handling of class members abroad "was beyond the courts' authority to adjudicate").  This position does not persuade.

First and most important, the collateral-bar rule stops it in its tracks.  Even if Defendants' theory of Article II power were sound, it would not help them in this contempt inquiry.  The argument, at bottom, is an attack on the legal validity of the TRO: by restraining their conduct, Defendants say, the Order infringed on the President's Article II powers and thus violated the Constitution.  See Resp. at 7; id. at 12 ("extraterritorial exercise" of President's Article II authority "present[s] a non-reviewable political question").  But, as explained above, Defendants cannot "defend contempt charges by asserting the unconstitutionality of the injunction."  Carroll v. President & Comm'rs of Princess Anne, 393 U.S. 175, 179 (1968) (citing Walker, 388 U.S. 307).  If Defendants believed — correctly or not — that the Order encroached upon the President's Article II powers, they had two options: they could seek judicial review of the injunction but not disobey it, or they could disobey it but forfeit any right to raise their legal argument as a defense against criminal-contempt charges.  See *supra* pp. 17–18.  They chose the latter course.

Even if their Article II argument could be construed as something other than a barred collateral attack on the legal soundness of the Orders, it would still come up short.  There is no

33

merit to their contention that outside U.S. airspace, Defendants somehow operated solely under the President's Commander-in-Chief powers, not the Alien Enemies Act. The Constitution gives Congress "plenary authority" over immigration, INS v. Chadha, 462 U.S. 919, 940 (1983), so any "discretion over the admission and exclusion of aliens" possessed by the Executive "extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations." Abourzek v. Reagan, 785 F.2d 1043, 1061 (D.C. Cir. 1986). Since the Act's passage, moreover, an unbroken line of cases has considered the "disposition of alien enemies during a state of war" to be within Congress's constitutional ambit, not the President's. See Ludecke, 335 U.S. at 173; id. at 161; Brown v. United States, 12 U.S. (8 Cranch) 110, 126 (1814) (Marshall, C.J.) (Act "affords a strong implication that" President "did not possess" power over "alien enemies" "by virtue of [a] declaration of war"); Citizens Protective League v. Clark, 155 F.2d 290, 293 (D.C. Cir. 1946).

Although Defendants offer certain soundbite-ready assertions, see State Secrets Notice at 1 (declaring "President's plenary authority, derived from Article II and the mandate of the electorate . . . to remove from the homeland designated terrorists"), they cite no legal authority that Defendants here operated pursuant to a presidential power preclusive of both congressional and judicial power. Such an extraordinary claim "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 638 (1952) (Jackson, J., concurring). Yet across multiple filings they muster not a single case in direct support of the proposition that when the Government carries out deportations pursuant to a grant of statutory authority, that authority is necessarily eclipsed by the Executive's exclusive constitutional prerogative when deportees leave U.S. territory. See State Secrets Notice at 1–2; Resp. at 9–13; Mot. to Vacate Mar. 17 Hrg. at 4–5.

34

Were that true, Executive Branch officials could do as they please with deportees abroad, regardless of statutory constraints that plainly apply — for example, by rerouting a plane to discharge deportees into a country where they would be tortured, even though federal law expressly forbids that outcome. <u>See</u> <u>Huisha-Huisha v. Mayorkas</u>, 27 F.4th 718, 721–22 (D.C. Cir. 2022). The Constitution cannot tolerate that result.

Even when the Supreme Court has found that an immigration statute does not apply extraterritorially, its reasoning undercuts Defendants' claim. In <u>Sale v. Haitian Centers Council, Inc.</u>, 509 U.S. 155 (1993), the Court considered the legality of a program in which the Coast Guard interdicted Haitian refugees on the high seas and repatriated them. The executive order authorizing those operations relied on an INA provision that allowed the President to "suspend the entry of" aliens in certain circumstances, <u>id.</u> at 172 (quoting 8 U.S.C. § 1182(f)), but it also gestured toward the President's constitutional powers. <u>Id.</u> at 164 n.13. The challengers urged that the operations violated a separate provision of the INA from the one undergirding the operation. <u>Id.</u> at 170–71. The Court held that the second provision did not apply to extraterritorial actions, but that was a matter of statutory interpretation, <u>not</u> because any Article II powers dissolved all statutory constraints. <u>Id.</u> at 171–74, 177.

Defendants' extravagant assertion of Article II power, moreover, runs headlong into the fact that courts regularly adjudicate — and sometimes, through their equitable powers, restrain — Executive Branch conduct abroad. Indeed, this occurs even when national-security concerns are at their apex and Article II powers robust. <u>See, e.g.</u>, <u>Hamdan v. Rumsfeld</u>, 548 U.S. 557 (2006) (holding Executive's military commissions on Guantanamo Bay cannot proceed given their unlawful structure and procedures); <u>Boumediene v. Bush</u>, 553 U.S. 723 (2008) (concluding that U.S. courts retain authority to constrain Executive action in Guantanamo Bay through writ

of habeas corpus).  In <u>Doe v. Mattis</u>, for instance, the U.S military held a dual U.S./Saudi citizen in Iraq, believing him to be a member of the Islamic State.  <u>See</u> 928 F.3d at 3.  The district court enjoined the U.S. military from transferring him into another country's custody without 72 hours' notice.  <u>Id.</u> at 3–4.  After the military then provided such notice, the court enjoined the ensuing transfer on the ground that the military lacked legal authority.  <u>Id.</u> at 4.  The D.C. Circuit upheld both orders, agreeing that the military had failed to satisfy the legal preconditions for such a transfer.  <u>Id.</u> at 4–5.

That courts can enjoin U.S. officials' overseas conduct simply reflects the fact that an injunction operates *in personam*, meaning that it "is directed at someone, and governs that party's conduct."  <u>Nken v. Holder</u>, 556 U.S. 418, 428 (2009).  It therefore binds the enjoined parties wherever they might be; the "situs of the [violation], whether within or without the United States, is of no importance."  <u>New Jersey v. City of New York</u>, 283 U.S. 473, 482 (1931); <u>Steele v. Bulova Watch Co.</u>, 344 U.S. 280, 289 (1952) ("Where . . . there can be no interference with the sovereignty of another nation, the District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction."); <u>cf.</u> <u>Massie v. Watts</u>, 10 U.S. (6 Cranch) 148, 158 (1810) ("[T]he principles of equity give a court jurisdiction wherever the person may be found."); <u>Mallory v. Norfolk S. Railway Co.</u>, 600 U.S. 122, 128 (2023).

To argue that this Court did something more than what courts routinely do, Defendants must grossly mischaracterize its Order and oral command.  They contend that this Court ordered "the Government to reverse an extant counterterrorism operation and deliver foreign terrorists to United States soil," Resp. at 7; <u>see</u> <u>id.</u> at 10–11 (similar), including by mandating that they "turn[] planes around mid-air without regard to important logistical constraints such as fuel

availability or foreign airspace restrictions." State Secrets Notice at 8. Hardly. The fair reading of the TRO is that it only prevented class members' transfer from American into foreign custody. See *supra* pp. 26–30. To be sure, in its oral command, the Court said: "[A]ny plane containing [class members] that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States." Mar. 15 Hrg. Tr. at 43. But the Court made clear in the same breath: "However that's accomplished" — *i.e.*, however custody is retained — "whether turning around a plane or not [dis]embarking anyone [on it] . . . , I leave to you." Id. The overriding implication was therefore that U.S. officials needed to retain custody. The Court thus warned that if retaining custody hinged on ensuring that planes did not take off, or turned around, or did not discharge their passengers, then such actions needed to happen — but it was up to Defendants to comply however they saw logistically and operationally prudent. See J.G.G., 2025 WL 914682, at *21 (Millett, J., concurring) (TROs did "nothing remotely like" Government's characterization, as they "only directed immigration officials to preserve their custody, and thus the court's jurisdiction, over the Plaintiffs"). And if the Government indeed voluntarily delivered nine passengers back to U.S. soil, see *supra* p. 9, the choice to hold them in the United States as opposed to somewhere else was the Government's, not this Court's.

Once the dust Defendants kick up is cleared away, it is evident that the TRO merely did what courts consistently do: review and sometimes restrict Executive actions, including when the officials are overseas and the issues implicate national security or foreign affairs. It in no way invaded any Article II powers, despite Defendants' effort to incant new ones into existence. In any event, even if the TRO did somehow overstep the Court's Article III power, Defendants cannot now evade a contempt charge on that basis.

37

b. Rule 65(d)

Defendants next seek protection in one of the Federal Rules of Civil Procedure. Rule 65(d)(1), which sets out the parameters for issuing a preliminary injunction or TRO, provides that "every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required." Defendants argue that the written Minute Order failed to satisfy Rule 65(d)'s requirements because it did not "state the reasons why it issued" and was thus not binding upon them. And, they contend, neither was the oral command standing alone. See Resp. at 2, 5–9. On each point, they are mistaken.

*First,* the collateral-bar rule once again renders this entire line of argument a non-starter. As will shortly be explained, the written Order fully satisfied Rule 65(d). But even if the written Order had been deficient, it would not have been void and thus non-binding; instead, it would have been subject to reversal or vacatur on appeal, while binding the parties in the interim. See 11A Wright & Miller, *supra*, § 2955 ("A court's failure to comply with the prerequisites in Rule 65(d) as to the proper scope or form of an injunction or restraining order does not deprive it of jurisdiction or render its order void. But an order challenged on appeal should be set aside if it fails to comply with the rule.") (footnotes omitted). By disobeying the Order rather than pursuing appellate relief, Defendants cannot now rely on any nonconformity with Rule 65(d) as a defense to contempt. See *supra* pp. 17–18.

To suggest otherwise, Defendants cite two cases from the Seventh Circuit. See Resp. at 5. But both undercut their contrarian proposition, as that Circuit considered a failure to satisfy Rule 65(d) as reason either to reverse the injunction or to remand for an explanation, but not to declare the injunction void. Adkins v. Nestle Purina PetCare Co., 779 F.3d 481, 483 (7th Cir. 2015); e360 Insight v. The Spamhaus Project, 500 F.3d 594, 604 (7th Cir. 2007). Defendants'

38

argument, moreover, makes little sense.  They nowhere explain why a failure to fulfill Rule 65(d)'s requirements is a unique legal defect, rendering an injunction void rather than — like all other defects — binding but potentially reversible.  Other circuits, unsurprisingly, hold the exact opposite.  See In re U.S. Bureau of Prisons, 918 F.3d 431, 437 n.3 (5th Cir. 2019); Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559, 577 (5th Cir. 2005); Lau v. Meddaugh, 229 F.3d 121, 123 n.2 (2d Cir. 2000); Bethlehem Mines Corp. v. United Mine Workers of Am., 476 F.2d 860, 862 (3d Cir. 1973); Va. Coal. for Immigrant Rts. v. Beals, 2024 WL 4601052, at *3 (4th Cir. Oct. 27, 2024); see also Lawrence v. St. Louis-San Francisco Ry. Co., 274 U.S. 588, 591–92 (1927) (failure to adhere to analogous requirements set forth by statute — requiring "every order of injunction" to "set forth the reasons for [its] issuance" — "did not render the [order] void," but instead meant it "must be . . . reversed").

*Second*, in any event, the written TRO did comply with Rule 65(d).  Defendants assert that it did not contain any "reasoning," although they acknowledge that it contained "directives." Resp. at 5.  They overlook, however, that the written Order expressly incorporated the reasoning provided during the hearing.  See Mar. 15 Minute Order, 7:25 p.m. ("As discussed in today's hearing . . . .); Mar. 15 Hrg. Tr. at 41–42 (explaining reasons why TRO issued).  Defendants nowhere suggest that that reasoning was insufficient for purposes of Rule 65(d).  They are wrong, furthermore, insofar as they contend that a TRO falls short of Rule 65(d) if its reasoning is expounded orally in a hearing (and not reiterated in the written Order).  Although this section of their Response relies heavily on Seventh Circuit cases, they conspicuously neglect to address the one in which that court squarely held that to satisfy the requirements of Rule 65(d), the "explanation can be oral rather than written."  EEOC v. Severn Trent Servs., Inc., 358 F.3d 438, 442 (7th Cir. 2004); see Dexia Credit Loc. v. Rogan, 602 F.3d 879, 885 (7th Cir. 2010) (same for

similar rule); see also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 400–01 (6th Cir. 1997) (similar).  Defendants muster no contrary authorities.

That rule makes sense, moreover, in light of the purposes behind Rule 65(d).  One is to ensure that parties understand their legal obligations.  Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n, 389 U.S. 64, 75–76 (1967).  That concern is not present if the bound party — here, the Government — has direct knowledge of the Court's reasoning, regardless of whether it was in written or oral form.  Another purpose is to facilitate judicial review.  Schmidt v. Lessard, 414 U.S. 473, 477 (1974).  Although a written opinion is presumably better on this score, a court can review the correctness of an injunction by reviewing a Court's oral exposition of its reasoning.  See, e.g., Six Clinics Holding Corp., 119 F.3d at 400–01.

*Third*, even if the written Order were somehow completely out of the picture — that is, if Defendants were able to show that the written TRO failed to satisfy Rule 65(d) and was therefore void, despite no legal support for that view — a violation of the oral command itself is grounds for contempt.  The Fifth Circuit, for instance, has held that contempt can lie where — as here — the oral command was "not tentative" and the court "made clear that [it] would be effective immediately."  In re U.S. Bureau of Prisons, 918 F.3d at 437 & n.3; see also Malautea v. Suzuki Motor Co., 987 F.2d 1536, 1542 n.7 (11th Cir. 1993) ("Oral orders are just as binding on litigants as written orders"); United States v. Elcock, 851 F. App'x 299, 302 (3d Cir. 2021) (citing id. for same); In re Charlotte Observer, 921 F.2d 47, 50 (4th Cir. 1990) (treating oral injunction as enforceable but vacating on merits); Lau, 229 F.3d at 123 & n.2 (noting Rule 65(d) "contemplates" a written order but "oral order" is not "void" by virtue of not being "memorialize[d]").  Indeed, consider the absurd mischief that Defendants' position would license: if an oral command is not binding for purposes of contempt unless or until memorialized

40

in a written Order, the enjoined party could race to accomplish the plainly proscribed act before the court could put pen to paper.

* * *

In sum, each of Defendants' arguments about whether there was a violation — arguments crafted for the most part as this contempt litigation has developed — are, at root, attacks on the TRO's legal soundness and are therefore precluded by the collateral-bar rule. Even if they were not, however, they do not pass muster. The Court therefore must conclude that probable cause exists to find that Defendants violated its Order.

     5. *Willful*

Having so determined, the sole remaining question is whether such defiance was willful. See Young, 107 F.3d at 907. "To establish willfulness," the Court must determine that Defendants "acted with deliberate or reckless disregard of [their] obligation[s] under the" Order. Id. at 909 (citing In re Holloway, 995 F.2d at 1082); accord United States v. Rapone, 131 F.3d 188, 195 (D.C. Cir. 1997). Several aspects of Defendants' conduct strongly support such a conclusion. Cf. In re Holloway, 995 F.2d at 1082 (analyzing whether there was willful "intent properly encompasses the contemnor's behavior in related incidents such as disobedience or resistance to other orders of the court").

From the opening hours of Saturday, the Government's conduct betrayed a desire to outrun the equitable reach of the Judiciary. See *supra* pp. 2–10; J.G.G., 2025 WL 1024097, at *9 (Sotomayor, J., dissenting). Hustling class members to an airport before the Proclamation had even been published and in the face of a suit that sought a TRO was bad enough. The decision to launch planes during the afternoon hearing was even worse. The Government knew as of that morning that the Court would hold a hearing on whether anyone in its custody could, consistent

41

with the law, be removed pursuant to the Act — and yet it nonetheless rushed to load people onto planes and get them airborne. Such conduct suggests an attempt to evade an injunction and deny those aboard the planes the chance to avail themselves of the judicial review that the Government itself later told the Supreme Court is "obviously" available to them. See Government Reply in Support of Application at 1, Trump v. J.G.G., No. 24A931 (U.S. Apr. 2, 2025).

Second, although Defendants now seek to muddy the waters, at no point on Saturday evening — not when the Court delivered the oral command directly to the Government, nor at any time after the written Order issued — did the Government so much as hint that it was not "clear . . . precisely what action [was] proscribed." Young, 107 F.3d at 907 n.5 (quotation marks omitted). After the oral command, the hearing progressed for another five minutes. See Mar. 15 Hrg. Tr. at 43–47. Although the Government spoke for the majority of that time, it never mentioned — much less asked the Court to clarify — the injunction just issued. See id. Government counsel has since confirmed that he understood the oral command and communicated it up the chain. See Mar. 21 Hrg. Tr. at 5. Additionally, that night — after the oral injunction was relayed to the agencies, see Apr. 3 Hrg. Tr. at 21, and as custody-transfer operations proceeded — the Government never contacted the Court with any questions about the injunctions' scope. That is telling. The Government had been in regular email contact with chambers throughout the day, and it thus knew that it would get a rapid reply to any question it might have about the injunction. Indeed, that is exactly what had happened that morning: on the email chain that included the Government, Plaintiffs asked the Court to confirm whether the first TRO covered only named Plaintiffs, and the Court replied a mere nine minutes later. Only now

42

does the Government suggest that the Court ordered something less than what it unequivocally stated in the hearing.

Finally, the Government plainly had an opportunity to avoid noncompliance — and yet it chose to press ahead. As previously explained, the Government pulled named Plaintiffs from removal flights in response to the Court's first TRO, and two class members now aver that they were among the nine people who landed in El Salvador early Sunday morning but were later returned to the United States. See supra pp. 5, 9. Although Defendants maintain that they "did not order any removal flights to return to the United States," Resp. at 4, they offer no evidence to support that assertion or discredit the first-hand declarations of class members.

Taken together, this behavior indicates "deliberate or reckless disregard" of the Order, Young, 107 F.3d at 909, leading this Court to conclude that there is probable cause that Defendants willfully disobeyed a binding judicial decree.

B. Next Steps

So now what? The Court last details the next steps that these proceedings may take.

First, before initiating any criminal-contempt proceedings, courts typically allow the contumacious party an opportunity to purge its contempt — that is, to remedy its violation by voluntarily obeying the court order. See Yates v. United States, 355 U.S. 66, 75 (1957) ("[A] court should first apply coercive remedies in an effort to persuade a party to obey its orders, and only make use of the more drastic criminal sanctions when the disobedience continues."); cf. 9A Wright & Miller, supra, § 2465 ("The district judge normally will preface a contempt citation with an order directing either compliance with the subpoena or a showing of an excuse for the noncompliance."). The most obvious way for Defendants to do so here is by asserting custody of the individuals who were removed in violation of the Court's classwide TRO so that they might

43

avail themselves of their right to challenge their removability through a habeas proceeding.  See
J.G.G., 2025 WL 1024097, at *2.  Per the terms of the TRO, the Government would not need to
release any of those individuals, nor would it need to transport them back to the homeland.  The
Court will also give Defendants an opportunity to propose other methods of coming into
compliance, which the Court will evaluate.

In the event that Defendants do not choose to purge their contempt, the Court will
proceed to identify the individual(s) responsible for the contumacious conduct by determining
whose "specific act or omission" caused the noncompliance.  See Cobell v. Norton, 334 F.3d
1128, 1147 (D.C. Cir. 2003); United States v. Voss, 82 F.3d 1521, 1525–27 (10th Cir. 1996).  At
the suggestion of the Government in the last hearing, the Court will begin by requiring
declarations.  See Apr. 3 Hrg. Tr. at 24–25.  Should those be unsatisfactory, the Court will
proceed either to hearings with live witness testimony under oath or to depositions conducted by
Plaintiffs.  Id. at 29–30 (Plaintiffs suggesting declarations, depositions, hearings).  The next step
would be for the Court, pursuant to the Federal Rules of Criminal Procedure, to "request that the
contempt be prosecuted by an attorney for the government."  Fed. R. Crim. P. 42(a)(2).  If the
Government "declines" or "the interest of justice requires," the Court will "appoint another
attorney to prosecute the contempt."  Id.

* * *

Finally, a note on Defendants' invocation of the state-secrets privilege, which "permits
the Government to prevent disclosure of information when that disclosure would harm national
security interests."  United States v. Zubaydah, 595 U.S. 195, 204 (2022).  They invoke the
privilege as a ground for not providing certain details related to the movement of flights and
class members before and after this Court's TROs.  Sharing such details, they assert, could make

44

foreign countries less likely to collaborate with the U.S. in the future, and would disclose means used to thwart alien enemies, allowing them to evade capture and risking the security of removal personnel.  See State Secrets Notice at 4–6; see also ECF Nos. 56-2 (Marco Rubio Decl.), ¶¶ 10, 13; No. 56-3 (Kristi Noem Decl.), ¶ 10.  Defendants also add that there is also no need for the information in this case, as this Court "has all of the facts it needs to address the compliance issues."  State Secrets Notice at 1; see id. at 8–9.

Judicial review of a state-secrets invocation is circumscribed, but not nonexistent.  The Government's claim is to be afforded the utmost deference, and the Court must evaluate whether "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged."  United States v. Reynolds, 345 U.S. 1, 10 (1953); but see El-Masri v. United States, 479 F.3d 296, 312 (4th Cir. 2007) ("[T]he state secrets doctrine does not represent a surrender of judicial control over access to the courts."); Linder v. Dep't of Def., 133 F.3d 17, 23 (D.C. Cir. 1998) (describing proper examination of information's national-security impact).

The Court is exceedingly doubtful that the privilege applies here.  It is not inquiring into the diplomatic agreements that facilitated the flights nor the operational specifics of how Defendants apprehended and transported class members.  Instead, the Court is simply seeking to confirm times and numbers: how many passengers the two flights carried, whether they were all deported pursuant to the Proclamation, and when they were transferred out of U.S. custody.  See Minute Order of Mar. 18, 2:27 p.m.  The Court is skeptical that such information rises to the level of a state secret.  As noted, the Government has widely publicized details of the flights through social media and official announcements, see supra p. 11 (reposting video showing operational details); ECF No. 69 (Resp. to State Secrets) at 4–10, thereby revealing snippets of

45

the information the Court seeks and raising doubts that such information would jeopardize future diplomatic engagements or operational security. Defendants, moreover, have still not asserted that the information is even classified, and they have identified no case in which unclassified material was nonetheless protected by the privilege. Nor is the Court yet persuaded that even if publicly disclosing the information might harm state secrets, sharing it only *ex parte* with a federal court would do the same.

At this point in the contempt inquiry, however, the information at issue is not necessary to proceed, so the Court will not resolve whether the invocation is warranted. Reynolds, 345 U.S. at 11 ("necessity" of information "determine[s] how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate"). But if the information turns out to be necessary later in these proceedings, the Court may revisit the invocation.

## III.    Conclusion

For the foregoing reasons, the Court will find probable cause that Defendants' actions constitute contempt. It will provide them an opportunity to purge such contempt. If they opt not to do so, the Court will proceed to identify the contemnor(s) and refer the matter for prosecution. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: April 16, 2025

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| **J.G.G.,** *et al.,* | **)** | |
| | **)** | |
| **Plaintiffs-Appellees,** | **)** | |
| | **)** | |
| **v.** | **)** | **No. 25-5124** |
| | **)** | |
| **DONALD J. TRUMP,** *et al.,* | **)** | |
| | **)** | |
| **Defendants-Appellants.** | **)** | |

**ATTACHMENT C:**

**TRANSCRIPT OF MOTION HEARING HELD MARCH 15, 2025 [DOCKET ENTRY 20]**

```
1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2
     J.G.G., et al.,
3                                      Civil Case
                     Plaintiff(s),     No. 25-00766 JEB
4            v.
                                       Washington, D.C.
5    DONALD J. TRUMP, et al.,
                                       March 15, 2025
6                    Defendant(s).

7    ---------------------------------------------------------

8                    MOTION HEARING HELD VIA ZOOM
               BEFORE THE HONORABLE JAMES E. BOASBERG
9                UNITED STATES DISTRICT CHIEF JUDGE

10   APPEARANCES:

11   FOR THE PLAINTIFF(S):   Lee Gelernt, Esquire
                             Daniel A. Galindo, Esquire
12                           American Civil Liberties Union
                             125 Broad Street
13                           18th Floor
                             New York, New York 10004
14
                             Skye Perryman, Esquire
15                           Somil Trivedi, Esquire
                             Sarah Rich, Esquire
16                           Democracy Forward Foundation
                             P.O. Box 34533
17                           Washington, D.C. 20043

18
     FOR THE DEFENDANT(S):   Drew C. Ensign, Esquire
19                           United States Department of Justice
                             950 Pennsylvania Avenue Northwest
20                           Washington, D.C. 20530

21
     REPORTED BY:            Tammy Nestor, RMR, CRR
22                           Official Court Reporter
                             333 Constitution Avenue Northwest
23                           Washington, D.C. 20001
                             tammy_nestor@dcd.uscourts.gov
24

25
```

1    The following proceedings began at 5:00 p.m.:

2         THE COURTROOM DEPUTY:  We are here today for a motion

3    hearing in Civil Action 25-766, JGG, et al. versus President

4    Donald Trump, et al.

5         Beginning with counsel for the plaintiff, please

6    state your name for the record.

7         MR. GELERNT:  Good afternoon, Your Honor.  Lee

8    Gelernt for the plaintiffs from the ACLU.

9         THE COURT:  Good afternoon.

10        MR. GALINDO:  Good afternoon, Your Honor.  Daniel

11    Galindo for the plaintiffs from the ACLU.

12        THE COURT:  Thank you.

13        MS. PERRYMAN:  Good afternoon, Your Honor.  Skye

14    Perryman for the plaintiffs from Democracy Forward

15    Foundation.

16        THE COURT:  Welcome.

17        MR. TRIVEDI:  Somil Trivedi from the Democracy

18    Forward Foundation for the plaintiffs.

19        THE COURT:  Thank you.

20        MS. RICH:  Good afternoon, Your Honor.  Sarah Rich

21    for the plaintiffs, also from Democracy Forward Foundation.

22        THE COURT:  Thank you.  Nice to see all of you.

23        THE COURTROOM DEPUTY:  Okay.  And defense?

24        MR. ENSIGN:  Good afternoon, Your Honor.  Drew Ensign

25    for the federal defendants.

1          THE COURT:  Thanks, Mr. Ensign.

2          Okay.  So first, apologies for my attire.  I went

3    away for the weekend and brought with me neither a robe nor

4    tie nor appropriate shirt, so thank you all for being

5    appropriately attired and hope you will forgive my casual

6    ones.

7          Thanks also for everybody's availability on such

8    short notice.  Again, I only learned of this case first

9    thing this morning, and I know everybody has been working

10   hard to get up to speed on it since that time.

11         So I have a few -- just a couple preliminary points

12   and questions, and then we will move forward.

13         So the first is I was told first thing this morning

14   that at least one of the named plaintiffs was at that point

15   being placed on a plane or imminently being placed on a

16   plane to be deported, and my ruling this morning was,

17   because I was not aware of the issuance of any proclamation

18   and I don't think one had been issued at the time I ruled,

19   my ruling was based on my belief that under the INA, there

20   was no authority to immediately deport folks who were named

21   plaintiffs.

22         So my ruling was not a preventive ruling related to

23   the AEA because I didn't believe it had been -- there had

24   been a proclamation at that time.  I now see that there has

25   been a proclamation issued.

1          Mr. Ensign, do you have a time of day that that was

2     issued you can put on the record?

3          MR. ENSIGN:  I do not, Your Honor.  We are happy to

4     look into that and get back to you.  I know it was just put

5     on the presidential website about an hour ago.

6          THE COURT:  But fair to say this afternoon?

7          MR. ENSIGN:  Your Honor, I don't know the answer to

8     that question.

9          THE COURT:  Okay.

10          MR. GELERNT:  Your Honor, I apologize for

11     interrupting.  This is Mr. Gelernt.  My understanding from

12     the proclamation is that it was signed yesterday.  It may

13     not have been made public until today, but that it was

14     signed and, I guess, kept secret until today.

15          THE COURT:  It's an interesting question of when it

16     is effective if it's not published.  Thank you for that.

17     But just making clear that my ruling was INA-based this

18     morning.

19          Okay.  The second question which I think the

20     plaintiffs have raised in alerting my chambers to the

21     proclamation is that they expected planes to be departing

22     within the last couple of hours.

23          And so I will ask you, Mr. Ensign, if any of the

24     named plaintiffs are, in fact, on any plane that has

25     departed?

1          MR. ENSIGN:  Your Honor, I don't know specifically as

2     to particular planes, but we have confirmed with the clients

3     that these five plaintiffs that are named, the individual

4     named plaintiffs that are a subject of the TRO, will not be

5     removed during the course of that 14 days.

6          THE COURT:  Okay.  But then I would assume that means

7     that they are either not on the planes or that they will not

8     be removed from the planes and will be brought back once the

9     planes land in El Salvador.  Is that fair?

10          MR. ENSIGN:  Your Honor, I don't know the status of

11     the planes.  If there are removal flights, the five would

12     not be on them.

13          THE COURT:  Okay.  I'm sorry.  Was it not six,

14     Mr. Gelernt?

15          MR. GELERNT:  It was five, Your Honor.

16          THE COURT:  Sorry.  Okay.  All right.  So thank you,

17     Mr. Ensign.

18          And I also understand just from looking at the docket

19     that the government has appealed my TRO ruling.  And that's

20     obviously your right, Mr. Ensign.  So I won't go into,

21     because I don't think I have jurisdiction given the appeal,

22     to reargue the TRO ruling, but what we will just look at

23     today is the class question.  And then if I do, in fact,

24     certify provisionally, then we can talk.

25          I think what that would likely mean is that the

1    plaintiffs could then seek a TRO on behalf of a certified

2    class, and then we can talk about how we want to go from

3    there.  I think we are having an echo.

4         THE COURTROOM DEPUTY:  It is.  I am having difficulty

5    with the public line.  It may be too many people on here.

6    I'll keep it as long as I can, Your Honor.

7         THE COURT:  Okay.  Thank you.

8         So let me ask the government then what your position

9    is regarding the class issue only.

10        MR. ENSIGN:  Your Honor, we oppose class

11   certification.  The principal reason is one of venue and

12   authority.  Under -- I think we are getting the echo again.

13        THE COURT:  We are, but let's try to go ahead, and as

14   annoying as it is, let's see if we can push through with the

15   echo.

16        MR. ENSIGN:  Thank you, Your Honor.  Will do.

17        These are claims that plaintiffs have brought that

18   fundamentally sound in habeas.  When the supreme court

19   considered the last AEA case in Ludecke versus Watkins, 355

20   U.S. 160, these were all considered within the scope of

21   habeas.  And because this is a habeas case, because it

22   sounds in habeas and because plaintiffs have specifically

23   included a habeas claim, I believe it's Count 9 of their

24   complaint, then the venue rules of habeas apply.

25        Under the supreme court decision in Rumsfeld v.

1    Padilla, venue was only appropriate for a habeas case solely

2    in the location where the person is being detained or where

3    (unintelligible), and so because of that --

4             (There was an interruption by the court reporter.)

5             THE COURT:  Sorry, Tammy, the court reporter.

6         I think when there's an echo, I think you might have

7    to sort of proceed sentence by sentence and pause and let

8    the echo go through and then continue.

9         And, Tammy, we'll hope that will be satisfactory.

10        So, Mr. Ensign, again, the issue is venue.  You are

11   saying that it must be brought where the warden or the --

12   typically prisoner cases, it's the warden, but here, whoever

13   is actually detaining the plaintiffs.  Is that correct?

14        MR. ENSIGN:  That's correct, Your Honor.  In

15   addition, this Court has recognized, and I believe Your

16   Honor in the Vetre versus Sessions case, which is

17   316 F. Supp. 70, that when habeas is available, then that is

18   an -- that's an adequate alternative remedy that precludes

19   APA claims under Section 702, and so all the claims would

20   have to be considered under habeas.

21        And because of that, you know, to the extent that

22   there could ever be a class, it could only be solely within

23   a single judicial district of people there.  And of course,

24   it would still have to satisfy all the other requirements of

25   classes, but certainly that venue issue precludes this Court

```
 1        certifying a nationwide class.

 2             THE COURT:  Okay.  Thank you very much.

 3             Mr. Gelernt, can you respond to the venue question?

 4             MR. GELERNT:  Sure, Your Honor.  I think initially --

 5        I guess I don't have an echo, so I can continue.

 6             Initially we have -- we think this conflates the

 7        merits.  And you know, you issued a TRO.  You found you had

 8        jurisdiction to issue a TRO.  So we think that's sufficient

 9        at this point.  I think we are veering pretty far into the

10        merits.

11             But just taking it on those terms, for one thing, we

12        filed both a habeas and APA 1331.  And you can challenge the

13        Enemy Aliens Act without habeas.  There are cases like Clark

14        that do that.  But also, for habeas, I would also say that

15        the immediate custodian rule does not apply because this is

16        not core habeas asking for relief.  It's to stop the

17        transfer and challenge the constitutionality.

18             So both because we haven non-habeas fonds of

19        jurisdiction and because the immediate custodian rule

20        doesn't immediately apply in this case, I think that's more

21        than sufficient for this Court to proceed.

22             THE COURT:  So, Mr. Ensign, Mr. Gelernt is right that

23        they are not seeking release, so tell me why you think your

24        venue argument is still appropriate.

25             MR. ENSIGN:  Your Honor, because these claims
```

1    inherently sound in habeas.  Plaintiffs recognize that

2    themselves by bringing a habeas case.  The supreme court

3    itself has recognized that it's appropriate to consider this

4    in habeas when it did so in the Ludecke case.

5         And where habeas applies, it displaces a lot of other

6    law including specifically the APA, as this court found in

7    the Vetre case.  It also displaces even statutory causes of

8    action.  You know, Heck v. Humphrey, for example, even

9    though you would otherwise have a 1983 suit for most

10   constitutional claims, the second they sound in habeas,

11   habeas, you know, cuts off 1983 entirely and forces you to

12   go through the route of habeas.

13        And so the habeas rule has some real teeth and is

14   ultimately an attack on the authority of wardens to turn

15   people over, you know, to be removed, and they would -- I

16   mean, what they are seeking ultimately is the equivalent to

17   telling the immigration, equivalent to a warden, you may not

18   release these people to be removed from the country.

19        THE COURT:  Isn't that the exact opposite of habeas

20   where you just said you are ordering them you may not be

21   released as opposed to habeas which is you must be released,

22   right?

23        MR. ENSIGN:  Your Honor, it is -- in this

24   application, it is a little odd, but certainly the way the

25   supreme court has considered it previously, like,

1    specifically challenges to the AEA sounded in habeas.  And

2    that was an utterly uncontroversial aspect of the Ludecke

3    decision.  Even though it was five-four about, you know, the

4    intricacies of the AEA, it nonetheless was uncontroversial

5    there that this was properly heard as a habeas claim.

6        THE COURT:  Do you want to respond to that,

7    Mr. Gelernt?

8        MR. GELERNT:  Your Honor, I would just say that the

9    fact that some cases can be brought in habeas certainly

10   doesn't preclude them being brought under 1331 and the APA

11   and this court.  And Your Honor has opinions along those

12   lines with detainees outside of the district in Damus and I

13   think Heredia Mons as well.

14       As Your Honor said, this is not a core habeas.  We

15   certainly can proceed in habeas in this district, but we

16   don't need to proceed in habeas.  We are not aware of any

17   case that says we cannot challenge the Alien Enemies Act on

18   non-habeas grounds.

19       THE COURT:  All right.  Well, this is obviously an

20   issue that has not been briefed.

21       I should have said earlier at the beginning of the

22   hearing, although it is implicit, that there is no

23   broadcasting or recording of this hearing, and I am being

24   informed that it is, in fact, being broadcast by a certain

25   individual.  That's in violation of the court's rules.  That

```
1   can be punishable by contempt.  You may not broadcast or

2   record any court proceedings.  And further -- I am getting

3   further information we will shut down the public line.

4        THE COURTROOM DEPUTY:  Your Honor, I did make that

5   statement.

6        THE COURT:  Thank you.

7        THE COURTROOM DEPUTY:  You're welcome.

8        THE COURT:  So I think it would be very helpful for

9   me to get some expedited briefing on this.  And I know that

10  given the circumstances, the plaintiffs are justifiably

11  concerned about imminent deportation.

12       Can you tell us, Mr. Ensign, are imminent

13  deportations and removals under this proclamation planned?

14  When I say imminent, I mean in the next 24 or 48 hours.

15       MR. ENSIGN:  Your Honor, I don't know the answer to

16  that question.  We can certainly investigate that and report

17  that back to you.  But I don't know that -- the answer to

18  that.  I know what plaintiffs have said to the clerk's

19  office.  I don't yet know -- have an ability to confirm that

20  or, you know, contest that.

21       THE COURT:  Okay.  So how soon can you get that

22  information?

23       MR. ENSIGN:  Your Honor, I can certainly talk to them

24  ASAP and see.  You know, it is Saturday.  I will try to get

25  people as quickly as possible and find out that information.
```

1    You know, I think we were certainly planning on opposing the

2    TRO by tomorrow night in advance of the hearing on Monday if

3    that's still going forward.  We can certainly include it in

4    that filing if that works.

5         THE COURT:  So, Mr. Gelernt, do you want to propose a

6    schedule for me?  I think I would like the -- we should

7    probably have the government first respond saying there

8    is -- arguing just on the venue issue of class

9    certification, and then you can respond to that and I would

10    rule quickly.

11         MR. GELERNT:  Your Honor, a couple of things.  One is

12    that I recognize it's Saturday, but on the other hand, the

13    government appears to be moving planes very rapidly to

14    El Salvador with hundreds of people.  So we hope that in the

15    next five minutes, counsel for the government can get an

16    answer to that.

17         Our understanding from people on the ground, from

18    different sources, is that planes are going right now taking

19    Venezuelans to El Salvador and may be ending up in a

20    Salvadoran prison.  Not only will that divest this Court of

21    jurisdiction, but I think those people are in real trouble,

22    Venezuelans put into a Salvadoran prison.

23         So we had two flights that we believe were scheduled

24    for this afternoon that may have already taken off or during

25    this hearing, so I think in the next five minutes.

```
 1          And we would further ask Your Honor that you issue a

 2    class-wide TRO pending the briefing, and we will be prepared

 3    to get the venue briefing in as soon as the government can

 4    do it and you would like.  But I think there is so much

 5    urgency here and there is so much harm at stake and this

 6    Court's jurisdiction is at stake.

 7          And just one clarification, Your Honor, we don't

 8    believe we would need to amend the TRO because the TRO did

 9    ask for a class-wide TRO.  The complaint was a class

10    complaint.  We have class papers, and the TRO was seeking a

11    class TRO.

12          So we would respectfully urge this Court to issue a

13    class TRO now to avoid any more harm and then brief the

14    venue as fast as the government would like.  And we would

15    respond in eight hours or so or ten hours or whatever the

16    Court thinks is appropriate.

17          THE COURT:  I think it would probably be helpful if

18    we adjourned this hearing briefly and let Mr. Ensign do some

19    digging and then returned and talked about this further.  So

20    why don't we -- can we adjourn this hearing until

21    6:00 Eastern Time, at which time, Mr. Ensign, I will want to

22    know, have planes, in fact -- is deportation of people under

23    the proclamation pursuant to the AEA in motion now and will

24    it be for the next 48 hours, because that would require a

25    more immediate decision.  All right, Mr. Ensign?
```

1          MR. ENSIGN:  We can do that, Your Honor.  I mean,

2     briefly on the irreparable harm point, as the supreme court

3     said in Nken, Although removal is a serious burden for many

4     aliens, it's not categorically irreparable as some courts

5     have said.  It is accordingly plain that the burden of

6     removal alone cannot constitute the requisite irreparable

7     injury.

8          THE COURT:  I think they have made out more than just

9     removal.  I think they have made out the harm that will

10    befall the individual plaintiffs upon removal.

11         So what we will do is we will adjourn the hearing

12    until 6:00 p.m. Eastern Time.  We will resume the hearing at

13    that point and get information from Mr. Ensign, and then I

14    will also try to have a better sense of whether I am

15    prepared to -- again, it could be issuing a separate TRO

16    covering this provisional class or not.

17         Okay.  Any objection to that, Mr. Gelernt?

18         MR. GELERNT:  No, Your Honor.  Thank you.

19         THE COURT:  Good.

20         Mr. Ensign?

21         MR. ENSIGN:  No, Your Honor.  We will proceed as you

22    instruct.

23         THE COURT:  Okay.  See everybody in 38 minutes.

24    Thanks.

25         THE COURTROOM DEPUTY:  This honorable court is

1    adjourned until 6:00 p.m.

2            (The hearing adjourned at 5:22 p.m.)

3            THE COURT:  Thanks, Nikki.

4            Welcome back, everybody.  I don't think we need to

5    have everyone identify themselves again.  I've got the same

6    counsel present.

7            Mr. Ensign, let's hear your report.

8            MR. ENSIGN:  Your Honor, unfortunately I don't have

9    many details to share.  I have talked to the clients who let

10   me know the sort of operational details as to what is going

11   on with raised potential national security issues,

12   particularly ones if discussed with a public line.  So I do

13   not have additional details I can provide at this time.

14           They raised that we may be able to provide Your Honor

15   additional details in an in camera hearing if we were to --

16           THE COURT:  Fine.  Maybe what we should do -- Nikki,

17   can we either disconnect the public line, or can you put us

18   in breakout rooms?  Can we disconnect and then reconnect the

19   public line, or can we go into a breakout room?

20           THE COURTROOM DEPUTY:  I can just remove the public

21   line right now.

22           THE COURT:  And then can you reinstate it?

23           THE COURTROOM DEPUTY:  I believe so.  If it

24   disconnects, I can call it without interrupting as well.

25   It's different than the courtroom.

```
 1            THE COURT:  Okay.  So we are going to disconnect the
 2    public line for this in camera proceeding, and then we will
 3    come back.
 4            (The public line was disconnected.)
 5            THE COURT:  Okay.  The public line is disconnected.
 6            Mr. Ensign.
 7            MR. ENSIGN:  Your Honor, I am still trying to get
 8    additional details.  I don't -- we would have to sort out
 9    what can still be provided in camera.  They suggested that
10    as a way to potentially provide some details, but I do not
11    personally have those right now.
12            THE COURT:  So you have no details for us in camera?
13            MR. ENSIGN:  Not at this time, Your Honor.  We would
14    have to figure out what could be provided in camera.
15            THE COURT:  Okay.  Well, when is that going to be
16    determined?
17            MR. ENSIGN:  I don't know.  I have been trying to get
18    those details, and I don't presently know when I would be
19    able to get that.  I'm certainly trying to get that
20    information, but that is not something, the details, that I
21    know.
22            MR. GELERNT:  Your Honor, I'm sorry.
23            THE COURT:  Sure.  Go ahead.
24            MR. GELERNT:  Your Honor, what we understand is that
25    two flights went to El Salvador this afternoon, one very
```

```
 1    recently, and there's another one, we are not sure where

 2    it's scheduled to go exactly.  It may be Honduras.  We are

 3    not sure.  But it's supposed to leave at 6:23.

 4         THE COURT:  All right.  Let's reconnect the public

 5    line.

 6         THE COURT REPORTER:  Your Honor, is the in camera

 7    portion of the hearing under seal?

 8         THE COURT:  I trust not, Mr. Ensign, since we didn't

 9    hear anything.  Any reason we need to put that under seal,

10    Mr. Ensign?

11         MR. ENSIGN:  No objection, Your Honor.

12         THE COURT:  Okay.  So no, Tammy.

13         (The public line was reconnected.)

14         THE COURT:  All right.  It looks like it's -- is it

15    back up, Nikki?

16         THE COURTROOM DEPUTY:  Yes, Your Honor.

17         THE COURT:  Okay.  So for the public, there were no

18    representations that were able to be made in our private

19    session, so the public has not missed anything.

20         All right.  So, Mr. Gelernt, why don't you just

21    repeat your statement.

22         MR. GELERNT:  We understand that two flights went to

23    El Salvador this afternoon; one very recently, and then

24    another flight is scheduled for 6:23, we believe, to

25    Honduras, but we are not entirely sure.  And the flight
```

1    destinations have changed for these past two flights.  But

2    we believe it's scheduled for 6:23, so only in a matter of

3    minutes.

4        THE COURT:  So, Mr. Ensign, you can't -- can you

5    confirm that people -- you can't even confirm -- well, I

6    guess on the public line, you're not -- and actually

7    couldn't make any representations even privately what's

8    happening with any flights.

9        So let me just go over then a few issues that we

10    discussed earlier.  So the first is the people who would be

11    subject to be certified as a class and then further

12    requested TRO, Mr. Gelernt, they are, as you believe, all

13    currently held under INA?

14        MR. GELERNT:  They are all in proceedings as far as

15    we understand, and so what the government apparently is

16    doing is using the Alien Enemies Act to circumvent the

17    immigration laws and to remove them before they actually

18    have a final order.  That's the case with the five

19    plaintiffs, and that's what we understand to be happening

20    around the country.

21        THE COURT:  Right, but what I'm trying to look at is

22    the venue and habeas question.

23        MR. GELERNT:  Right.

24        THE COURT:  And so I guess -- it seems that you are

25    not seeking to challenge the fact or duration of their

1    confinement.  Is that true?

2         MR. GELERNT:  That's absolutely right, Your Honor.

3    And I think that's the critical distinction here, that it's

4    not a core habeas challenging release.  They are not trying

5    to get out of detention in this lawsuit.  They are going to

6    be held in detention presumably unless they have some

7    individual basis under the INA to get out.  This lawsuit

8    will not allow them to be released, but it will stop their

9    removal hopefully under the Alien Enemies Act so they can

10   continue their proceedings under the immigration law.  So

11   it's absolutely not a core habeas.

12        THE COURT:  So --

13        MR. GELERNT:  I apologize, Your Honor.  I was just

14   going to add the point --

15        THE COURT:  Go ahead.

16        MR. GELERNT:  -- even if it could be brought in

17   habeas, that doesn't mean it has to be.  So your decision in

18   RILR makes that point, Araceli.  There's a number of cases

19   in this district.  You made the point very clearly in your

20   IRLR decision that even if it could be brought in habeas, it

21   doesn't have to be.

22        THE COURT:  Mr. Ensign, why do you think then that

23   they are challenging the fact or duration of confinement?

24        MR. ENSIGN:  Your Honor, I think that this sounds in

25   habeas for several reasons.  I think one is that because the

1    AEA vests all its authority, relevant authority, with the

2    president himself and the APA can't be used to challenge

3    presidential actions, the only claims that we are left with

4    here are habeas claims.

5        We think the supreme court's decision in the 1948

6    case in Ludecke also indicates that this is a habeas case.

7    And it's ultimately challenging, you know, the exercise of

8    the authority over their person under the AEA in a way that

9    has been recognized to sound in habeas previously.

10        But on top of all those things, we think that even if

11    wasn't core habeas, it would still be subject to the habeas

12    rule.  Notably this court in the Vetre case --

13        THE COURT:  You keep saying this court, and I don't

14    think you mean me.  Do you?

15        MR. ENSIGN:  I actually do, Your Honor.

16        THE COURT:  Okay.  So the 316 F. Supp. 70?

17        MR. ENSIGN:  Yes.  316 F. Supp. 3d.

18        THE COURT:  Right.  So I'm saying that F. Supp.

19    predates my time here.  Okay.  Sorry.  Go ahead.

20        MR. ENSIGN:  I apologize, Your Honor.  Of course when

21    I mean the court, I mean the district for the District of

22    Columbia.

23        THE COURT:  Right, which I'm not bound by.  So if you

24    will distinguish, I try to do that in my opinions, if you

25    would be so kind.

1          MR. ENSIGN:  Absolutely, Your Honor.  In the Vetre

2     case, there were non-core habeas claims including

3     conditions.  And in that case, this court recognized, this

4     was in a somewhat odd posture, that within DDC, that because

5     prison condition cases could be brought in habeas, they had

6     to be.  And so similarly, because these claims can be

7     brought in habeas, they have to be.

8          THE COURT:  The prison condition cases, again, relate

9     to the nature of confinement and duration of your

10    confinement.  And here, they are not arguing that they can't

11    be confined.  They are just saying they can't be removed,

12    right?

13         MR. ENSIGN:  Your Honor, we are using it to address

14    whether this is core or non-core.  In Vetre, a non-core

15    habeas claim was transferred under the venue rule.  So

16    whether this is core habeas, as we have argued, and clearly

17    where the venue rule would apply or even if this were

18    non-core habeas, then nonetheless the venue rule still

19    applies to it as this court has recognized.

20         MR. GELERNT:  Your Honor, I would just say that that

21    case involved, I think you were getting at this, but the

22    length of someone's confinement.

23         THE COURT:  Again, I have not gone back and reviewed

24    that case because your citation earlier, Mr. Ensign, led me

25    to believe it was not my case.  I know IRLR is.

1          I guess your -- do you want to dismiss your habeas

2    claim, Mr. Gelernt?  I don't know.  It's certainly not your

3    primary claim.  You may have other reasons for including it.

4          MR. GELERNT:  Your Honor, I think if the Court felt

5    like it needed us to dismiss the habeas in order to issue a

6    class-wide TRO, then we are prepared to do that.  We

7    certainly don't feel like we need it.

8          On the other hand, I think the Court could just hold

9    it in abeyance.  I mean, I think that it's very clear that

10   if you don't need to bring it in habeas, you don't have to

11   and you can bring it -- in other words, I think Your Honor

12   could not have been clearer in IRLR.  There are a number of

13   cases that say that.  Otherwise, virtually every case would

14   be brought in habeas.

15         THE COURT:  Again, I think this is a reasonably close

16   question, but I've got to rule on it with essentially 40

17   minutes' notice given that this was first raised by the

18   government in our hearing.  And I'm not blaming the

19   government at all because they haven't had an opportunity to

20   brief it.

21         And so as brief as my research has been at this

22   period of time, I don't think that venue bars certification.

23   I will, for clarity, I will grant the plaintiffs' -- first

24   grant the plaintiffs' motion to dismiss their habeas count.

25   So that count is dismissed without prejudice at this point.

```
 1            But I do find that class certification is warranted

 2    under Federal Rule of Civil Procedure 23(a) and 23(b)(2).

 3    So I will certify a class, and the class will be -- let's

 4    talk about the definition.  The plaintiffs ask for all

 5    noncitizens who were, are, or will be subject to the AEA

 6    proclamation and its implementation.

 7            So now that we actually have a proclamation that we

 8    have been able to review, Mr. Gelernt, is there a reason to

 9    modify that class definition?

10        MR. GELERNT:  I think certainly, Your Honor, if you

11    want to insert the name of the proclamation and the date,

12    that would be fine with us, or we could submit it to the

13    Court.  But I think, if I'm understanding you correctly, I

14    think that's what you are getting at, and that would make

15    sense.

16        THE COURT:  Or if there's other -- that's one point,

17    but whether there's another modification that you would

18    make.

19        MR. GELERNT:  Yeah.

20        THE COURT:  Go ahead.

21        MR. GELERNT:  I think the other point would be that

22    it seems to be the government's position that they can begin

23    these removals pursuant to the act without publicizing and

24    publicize after the removals have started.  So that makes us

25    very concerned that there could be another proclamation
```

```
1    coming tomorrow naming a different gang, MS-13 or some other
2    gang.
3          So I guess we could start with this one if Your Honor
4    would like to proceed more slowly, but there may be a
5    modification that could say any proclamation that names a
6    non-state actor.
7          THE COURT:  Yeah, I'm just -- I appreciate that.  I
8    feel that that's going farther than I would be prepared to
9    go as to deal with a hypothetical --
10         MR. GELERNT:  Right.
11         THE COURT:  -- proclamation.
12         MR. GELERNT:  Understood.
13         THE COURT:  So let me ask you, Mr. Ensign.  I know
14   you are objecting to the certification of the class, and
15   this is a provisional certification only, but do you have
16   concerns, if certified, with the wording, and would you
17   propose amendments to that?
18         MR. ENSIGN:  Your Honor, first, just for the record,
19   we do object to the class certification, as you know.  I am
20   trying to pull up the specific language right now.
21   Candidly, it's not a question I have given thought to
22   before.
23         THE COURT:  No, I understand.  I understand.
24   Everybody here is operating on the fly a bit.  I can tell
25   you what the -- I think I wrote the -- the language I wrote
```

1    down earlier was all noncitizens who were, are, or will be

2    subject to the AEA proclamation.

3         I mean, I think -- I don't know why -- Mr. Gelernt,

4    is there a reason we can't simply say all noncitizens who

5    are subject to the proclamation?

6         MR. GELERNT:  I would prefer that we have will be,

7    but I understand if Your Honor thinks that are covers the

8    waterfront.

9         THE COURT:  I think so.  So the language would be all

10   noncitizens who are subject to the AEA proclamation, and we

11   will get the specifics, and its implementation.

12        MR. GELERNT:  And so I assume, Your Honor, that would

13   mean that anybody who is designated a week from now, I mean,

14   will be would cover it obviously, assuming it's going to

15   continue designating people, so I assume that's why it is in

16   there.

17        THE COURT:  Yes.  Well, when you say designated, you

18   mean for removal?

19        MR. GELERNT:  Well, I think they have to say you are

20   designated.  I gather what the government is doing is

21   designating you as someone subject to the Alien Enemies Act,

22   and then they can do whatever they want to them, detain

23   them, remove them.  And so that's why the will is in there.

24   But if Your Honor is stating on the record that are would

25   cover anybody who in the future is subject to it --

```
 1              THE COURT:  Yes.

 2              MR. GELERNT:  Okay.

 3              THE COURT:  Now or in the future is.

 4              MR. GELERNT:  Right.

 5              THE COURT:  So back to you, Mr. Ensign.  Any

 6     modification of that?

 7              MR. ENSIGN:  No, Your Honor.  I mean, no, Your Honor.

 8     We don't believe we have a basis to dictate to plaintiffs

 9     how they would, you know, define their own class.

10              THE COURT:  Okay.

11              MR. ENSIGN:  But as to the substitution of, you know,

12     the specific proclamation at issue, to make it specific to

13     that, that we don't have objection specifically to that.  I

14     would preserve, you know, our objections to -- we focused on

15     venue, but we don't believe the other requirements of class

16     certification have been met here.  In particular, for

17     typicality, there may be very different claims as to those

18     that were lawfully admitted to the United States and those

19     who, you know, never had lawful admission.

20              THE COURT:  Okay.  I think, again, at this

21     provisional time, and I guess -- what we will say is APA

22     proclamation of March 15, 2025, and we can actually use the

23     specific title which I see based on the text of that.

24              Okay.  So plaintiffs then are also seeking a TRO

25     related to that class.  And again, so -- I'll just say a few
```

1    things here, that this is obviously a difficult question.

2    My ruling earlier related to the INA.  This is difficult for

3    a few reasons.  And again, I'm just looking at the

4    likelihood of success on the merits.  And under our circuit,

5    the question is is there a serious legal question presented,

6    not is there necessarily a 51 percent chance of prevailing.

7         And there are really sort of two issues on this.  The

8    first is does the political question doctrine or other -- or

9    do other prudential considerations bar judicial scrutiny of

10   the proclamation in the first place, and second, if they do

11   not bar such scrutiny, is the proclamation illegal.

12        I think that the first question is harder than the

13   second.  And again, we have tried to do quick research on a

14   very expedited time frame, and I'm well aware of the

15   president's broad authority to apprehend, restrain, and

16   remove noncitizens deemed alien enemies.

17        For example, the president has unreviewable authority

18   to determine whether a state of war actually exists, and if

19   so, to remove enemy aliens in the manner he wishes.

20        So the question is does such authority extend to

21   other determinations within the statute such as invasion or

22   predatory incursion or foreign nation or government.  And

23   that, unfortunately, is a question of first impression here.

24        We certainly looked at some of the cases like

25   Ludecke, L-U-D-E-C-K-E, the 1948 supreme court case, in

1    addition to Lockington versus Smith from the hoary vintage

2    of 1817, as well as Clark, which is the D.C. Circuit case

3    from 1946, and Von Heyman, H-E-Y-M-A-N, Second Circuit,

4    1947.

5            These are difficult questions.  There's also a

6    helpful law review by Professor Vladeck, V-L-A-D-E-C-K, from

7    2007 in the Lewis & Clark Law Review about enemy aliens,

8    enemy property, and access to courts which sets some of

9    these points out as well.

10           So I guess, Mr. Ensign, maybe you are prepared to

11   deal with this and maybe you are not yet, but tell me why,

12   given the lack of authority regarding the president's --

13   whether the president's authority extends to his

14   determination of some of those other terms, I should hold

15   that it does.

16           Again, I know this was going to be a class cert

17   hearing and we are all racing to get up to speed on this,

18   but I will be happy to hear you if you want to discuss that.

19           MR. ENSIGN:  Sure, Your Honor.  As you know, there

20   isn't a lot of precedent on this, but what there is, you

21   know, recognizes the quite broad discretion of the president

22   here.

23           In particular, the Ludecke case arose from a

24   circumstance where a German plaintiff, you know, was still

25   being held under the AEA, who had a facially quite

 1    reasonable claim, you know, that the war has ended, the war

 2    has been over for three years, what are you doing still, you

 3    know, exercising AEA authority over me.

 4        And the court said quite clearly, like, no, this is

 5    left to the discretion of the president, and the president

 6    has determined that the war is continuing notwithstanding

 7    the fact that they are not -- you know, there is not

 8    fighting going on and that, in fact, the E-day was, I

 9    believe, more than three years in the rearview mirror at

10    that point.

11        And so certainly when the supreme court reached this,

12    it recognized the very broad discretion of the president.

13    There's other language in that case towards the tail end of

14    it that I unfortunately don't have at my fingertips but

15    again underscores the extent to which discretion is vested

16    in the president as to these sorts of questions.

17        THE COURT:  Right.  But isn't -- and again, read

18    broadly, Ludecke certainly supports you, and certainly even

19    read narrowly, I understand the courts can't question the

20    president's power to remove enemy aliens or even his

21    determination that a state of war continues to exist, but it

22    did seem to accept that courts could hear challenges to the

23    construction and validity of the statute and in that case

24    challenges raising whether the person restrained is, in

25    fact, an enemy alien 14 years of age or older.  That's at

1    page 171, footnote 17.

2         So read more narrowly, why doesn't it leave open the

3    question that judicial review is available to look at

4    whether certain preconditions have been met for the

5    president to invoke the statute?

6         MR. ENSIGN:  Your Honor, I think the nature of the

7    claims here are ones that are more of the sort that are the

8    political questions.  For example, plaintiffs are very much

9    advancing the concept that, you know, war is not something

10   that can be engaged in or, you know, is a concept that has

11   relevance as to subnational actors.  I think that is a

12   question that has been reserved for the political branches.

13        In particular, for example, the Congress in 2001 gave

14   the president authorization of war powers to use against

15   subnational actors such as Al-Qaeda.  Here, we have TDA has

16   specifically been designated as a foreign terrorist

17   organization.  So you have a recognition that the war powers

18   do extend to this sort of context as to which plaintiffs are

19   advancing a claim.

20        And so I think that sort of claim that plaintiffs are

21   raising here sounds in that sort of core political question

22   that has been reserved for the political branches.

23        THE COURT:  Mr. Gelernt, do you want to respond to

24   that?

25        MR. GELERNT:  I think Your Honor made the point that

1    I was going to make.  I mean, this is ultimately a

2    separation of powers question.  What was going on in Ludecke

3    was whether the war was over, and it was a declared war by

4    Congress, and Congress has not stated that the war was over.

5    I think that's what the supreme court was ultimately saying.

6         I don't read Ludecke as saying that the

7    preconditions, the statutory preconditions, can't be

8    challenged; otherwise, there would be no end to what the

9    executive branch could do.  This is a delegation from

10    Congress.  There are very specific terms.  And we read

11    Ludecke as saying that the construction of the statute can

12    be challenged and whether someone fits within the

13    proclamation can be challenged.  I think Ludecke was

14    ultimately, again, about separation of powers.

15         THE COURT:  And then it would seem that Clark and

16    Von Heyman are better cases for you even though they are --

17    they precede Ludecke, Mr. Gelernt.  Do you agree with that?

18         MR. GELERNT:  Your Honor, I don't want to get ahead

19    of myself.  I have not looked back on those cases before

20    this hearing.

21         THE COURT:  Okay.

22         MR. GELERNT:  I think there are certainly additional

23    cases.  I was simply responding to Ludecke.  But I think

24    there are many other cases that allow -- that challenge the

25    statutory preconditions.  I think that's, you know, sort of

1    fundamental separation of powers law.  This is not sort of

2    the president invoking his inherent authority under the

3    constitution.  We don't think that he would have the power

4    to do it anyway.  But this is the president invoking a

5    specific statutory provision that Congress has laid out very

6    clear guidelines, and I think it would be fundamentally

7    inconsistent with separation of powers for this Court not to

8    be able to review whether those preconditions were met.

9            THE COURT:  Let me ask you, in looking at the

10   language of the proclamation, why on the merits, if I got to

11   it and found it's not a political question, why don't you

12   think, Mr. Gelernt, that the proclamation suffices to say

13   that TDA is part of the Venezuelan government that is

14   involved in an invasion or predatory incursion?

15           MR. GELERNT:  Well, Your Honor, I think the

16   government -- I think the proclamation doesn't even go as

17   far as actually stating that TDA is a foreign government.

18   And the language is pretty clear in the statute that you

19   need a foreign government.  As Your Honor knows, the statute

20   has only been invoked three times in the history of the

21   country and always during a declared war, the War of --

22           THE COURT:  Let me interrupt.  So it says that, and

23   I'm reading from the proclamation, Venezuelan national and

24   local authorities have ceded ever greater control over their

25   territories to transnational criminal organizations

1    including TDA.  The result is a hybrid criminal state that

2    is perpetrating an invasion of and predatory incursion into

3    the United States.

4         So why don't you think that's a foreign nation?

5         MR. GELERNT:  Well, I think there's a lot of law, and

6    we will be prepared to reply to the government's submission

7    at the TRO and talk more about it at the TRO on the merits,

8    but I think there is a lot of law about what constitutes a

9    foreign government.  And I don't think the United States

10   recognizes TDA as a foreign government.  They recognize

11   Venezuela as a foreign government.  I think that's the

12   historic understanding of the statute.

13        We also would take issue with the fact that we think

14   the Court certainly can review whether immigration

15   constitutes some kind of invasion.  You know, it may be that

16   the Court can't second-guess how much of an invasion a

17   foreign government is making, that that may be a matter of

18   degree, but certainly that sort of threshold legal question

19   about whether immigration constitutes an invasion is

20   something the Court can rule on.  And we know of no

21   historical precedent that would suggest that straight

22   migration or noncitizens coming and committing crimes

23   constitutes an invasion within the meaning of the statute or

24   the constitution.

25        THE COURT:  Mr. Ensign, do you want to respond to

```
 1    that?

 2         MR. ENSIGN:  Certainly.  A few things, Your Honor.  I

 3    think first, they are trying to draw a distinction between

 4    the statutory preconditions at issue here from Ludecke, but

 5    it was statutory preconditions in both cases.  Whether or

 6    not there's, in fact, a war was very much the issue in

 7    Ludecke.  That is one of the statutory conditions.  They are

 8    challenging others.  But it's -- they are all part of the

 9    same statutory preconditions, you know, framework, are they

10    met or not.  And the Court just straight up deferred to the

11    president in circumstances where a lot of people would think

12    there was not a war.

13         I guess two other things I would say.  One is that

14    this -- I think this discussion very much illustrates why

15    additional briefing would be desirable to resolve this.

16         THE COURT:  No, no, absolutely.  I couldn't agree

17    with you more.  But the question is what do we do in the

18    interim, right?  No, I want further briefing from both

19    sides.  I want to look at this longer.  This is not easy.

20    These are not easy issues.  And I appreciate everyone's

21    diligence on such short notice.  But the question in a case

22    like this is why shouldn't a TRO issue to maintain the

23    status quo on difficult issues while you folks figure it

24    out.

25         In other words, maybe there's some national security
```

 1     or other concerns that you have that you haven't raised yet

 2     because you haven't learned of them yet that you could tell

 3     me and I would hear, but right now it seems that the status

 4     quo is keeping these folks in ICE custody but not deporting

 5     them.  And I'm not sure what the prejudice to the government

 6     is from such a determination.

 7          I mean, tell me if I'm -- to the extent you can say

 8     anything that's not national security to respond to that.

 9          MR. ENSIGN:  Your Honor, I think two responses.  The

10     first is that much of plaintiffs' irreparable harm arguments

11     were predicated on the premise that this Court would somehow

12     lose jurisdiction if people were not -- I mean, not in D.C.,

13     but in the United States.  I think that was more a question

14     of habeas.  Now that we are past habeas and we are really

15     just talking about APA, I don't understand why this Court

16     would necessarily lose jurisdiction.

17          THE COURT:  If they are deported?

18          MR. ENSIGN:  And I think second is how Nken looks at

19     it as irreparable harm where --

20          THE COURT:  I think the argument -- the argument,

21     excuse me for interrupting and I will let you respond, but

22     the argument in part is these folks are going to be sent to

23     Salvadoran or Honduran prisons, which were not going to be

24     terribly receptive to Venezuelans, particularly whom you

25     have labeled TDA, and so not only are they going to be

1  deported, but it's not going to be to a friendly

2  countryside, but to prisons.  So why isn't -- don't you

3  think that's irreparable?

4      MR. ENSIGN:  Your Honor, I don't think that's been

5  established by their filings.  More generally, I would just

6  point out that this cuts to the core of the president's

7  Article II powers.  And so interfering with that, you know,

8  both in the -- both in the -- this goes to foreign powers --

9  or foreign policy.  This goes to war powers.  This goes to

10 immigration.  These are core Article III -- or sorry,

11 Article II areas that -- I mean, this would cut very deeply

12 into the prerogatives of the executive, and for that basis,

13 we think the balance of harms are tipped sharply in our

14 direction.

15     THE COURT:  So, Mr. Gelernt, do you want to respond

16 to the irreparable harm issue?

17     MR. GELERNT:  Yes, Your Honor, a few things.  One is

18 I think the Court would lose jurisdiction because it

19 wouldn't be able to offer a remedy.

20     THE COURT:  Right.  Sure.  I mean, once they are out

21 of the country, I'm not sure what I can do there.

22     MR. GELERNT:  Right.  So you clearly would lose

23 jurisdiction.  I think that alone is critical.

24     The other point is that this is just not straight

25 removal, as Your Honor has pointed out.  They may be sent to

```
 1    El Salvador.  It seems like many of them already have been

 2    sent to El Salvador.  They are in real danger, I can't

 3    express that strongly enough, if they end up in a Salvadoran

 4    prison.  But even if they end up back in Venezuela, many of

 5    them, all of our plaintiffs and many of them, will have

 6    asylum claims, and they have been tagged now as the worst of

 7    the worst by the president, and so they will be in real

 8    danger in Venezuela.

 9         Now, ultimately some of them may lose their asylum

10    claims in the U.S., but they are entitled, we believe, to

11    finishing that, and the Aliens Enemy Act can't circumvent

12    that point.

13         And the government keeps bringing up the Nken case.

14    Nken was very clear that the court was not going to lose

15    jurisdiction in that petition for review, that particular

16    petition for review, but also that if there was harm like

17    torture or persecution, then that would be irreparable harm.

18    The court was just making the simple point that not every

19    deportation involves irreparable harm.  They could be

20    removed to the UK, and there may not be irreparable harm.

21         So I think this goes far beyond the normal type of

22    irreparable harm.  And even in removal cases, of course,

23    this Court often stays things while it figures it out.

24    These are individuals who are in detention, so it's not as

25    if they are roaming around.  I think for the government to
```

```
 1        say that the delay in doing this is irreparable --

 2             THE COURT:  Let me ask you, Mr. Gelernt, let me just

 3        interrupt you for a second.  I think there was a little bit

 4        of confusion or uncertainty in your response earlier on this

 5        point.  Is it fair that -- I think you equivocated a little

 6        bit, and I'm not saying that in a negative way, on whether

 7        all of the potential class was actually held by -- was

 8        actually currently in custody in the United States.  Do you

 9        know the answer to that?

10             MR. GELERNT:  We believe that everyone right now who

11        is going to be put on flights is in custody.  I don't know

12        that the proclamation limits it to that, but I think --

13             THE COURT:  So let me ask you.  So what if the class

14        were narrowed to all noncitizens in United States custody?

15             MR. GELERNT:  Right.  I think two points about that.

16        One is that would solve the immediate problem of them being

17        put on planes, because if they are not in detention, they

18        can't be put on planes.

19             But the other point, I think, in terms of irreparable

20        harm is obviously the government remains free to arrest them

21        if they've committed an immigration violation or a criminal

22        violation and put them in detention.  And as Your Honor

23        pointed out earlier, we are not seeking their release from

24        U.S. facilities.  So we are not in any way saying that the

25        government needs to allow them to continue roaming the
```

```
 1    streets.  But if Your Honor feels like at this stage issuing

 2    a TRO for the class of individuals who are currently in

 3    detention or will be imminently put in detention, I think

 4    that would work given that we are all moving very quickly

 5    and I know Your Honor is trying to figure this out on the

 6    fly.

 7         THE COURT:  So back to you, Mr. Ensign.  In terms

 8    of -- so harm to the United States by a TRO of short

 9    duration regarding only people who are already in detention

10    so they can't cause any harm within the United States and

11    enjoin their removal from the United States, what's the harm

12    to the government by such a status quo TRO?

13         MR. ENSIGN:  I mean, I think it cuts to the core of

14    the president's authority over critical areas that have been

15    assigned to them, that war powers, immigration, you know,

16    conducting foreign policy, like, those are harms of, you

17    know, significant sorts.

18         This is where you have an express statutory

19    authorization, so this is a Youngstown Steel, you know,

20    category 1 type case in our perspective.  So we certainly

21    think there are very substantial harms.

22         I mean, you know, certainly we object to any TRO.

23    Our preference would obviously be a narrower one if there is

24    one, but we believe that any TRO impermissibly and

25    unconstitutionally infringes upon the prerogatives of the
```

```
 1    president, no more so here than it would have been for the

 2    supreme court in Ludecke to tell the president, you know

 3    what, you're wrong, World War II is over.

 4          THE COURT:  Right.  And that sort of is the

 5    justiciability argument, not the balance of the equities

 6    argument, right?

 7          MR. ENSIGN:  No, Your Honor.  I think it sounds in

 8    both.  Certainly you see it more frequently in that context,

 9    and usually where it applies, you will never get to

10    irreparable harm because it's not justiciable.  But those

11    sorts of harms to the executive have been recognized, you

12    know, certainly as to anything that enjoins an act of

13    Congress.  Maryland versus King recognizes that's

14    irreparable harm.

15          The same principle applies to, you know, the

16    injunction against the president exercising his powers both

17    inherent in Article II and those given to him by statute

18    such as the AEA.

19          THE COURT:  All right.  Any response to that,

20    Mr. Gelernt?

21          MR. GELERNT:  No, Your Honor.  I think I --

22          THE COURT:  Right.

23          MR. GELERNT:  I apologize.  I just wanted two

24    housekeeping things, but I will do that after you finish,

25    Your Honor.
```

1          THE COURT:  Okay.  I am prepared to rule.  Again, I

2     think these are hard questions, close questions, and

3     particularly hard questions on the expedited time frame that

4     we are talking about here.  But I believe that the

5     plaintiffs have sufficiently made out and satisfied the TRO

6     factors.

7          I think the hardest remains the likelihood of success

8     on the merits because of the justiciability question.  But

9     at this point, they have certainly presented a serious

10    question that this is justiciable because it's outside of

11    what Ludecke talked about, and that once it is justiciable,

12    I think they have certainly presented a serious question

13    that the president's proclamation is not legal under the

14    AEA, or a different way of saying it is that the AEA does

15    not provide a basis for the president's proclamation given

16    that the terms invasion, predatory incursion really relate

17    to hostile acts perpetrated by enemy nations and

18    commensurate to war.

19         Also the terms nation and government do not apply to

20    non-state actors like criminal gangs.  And the statute

21    doesn't refer in my interpretation to unauthorized presence

22    of individuals here including individuals who have entered

23    illegally.

24         And so as a result, I don't think the AEA provides a

25    basis for removal under this proclamation.

1           I think on the other three factors, the plaintiffs

2     have an easier time.  I think there's clearly irreparable

3     harm here given that these folks will be deported and many

4     or a vast majority to prisons in other countries or even

5     back to Venezuela where they face persecution or worse.

6           Again, based on the record that I have, balance of

7     the equities, I think is reasonably straightforward inasmuch

8     as a brief delay in their removal does not cause the

9     government harm, and I haven't heard any harm from the

10    government beyond general infringement on presidential

11    powers which, again, I don't take lightly, but I think

12    that's more of an issue that relates to the justiciability

13    than it does to the balance of the equities.  And again, the

14    public interest in a case like this runs with the factors I

15    have already mentioned.

16          So I find that a TRO is appropriate for the class

17    members, and it would be to prevent the removal of the class

18    for 14 days or until further order of the Court.  And the

19    class will be all noncitizens in U.S. custody who are

20    subject to the proclamation of March 15, 2025 and its

21    implementation.

22          And I will issue a minute order memorializing this so

23    you don't have to race to write it down.

24          So we need to talk about where we go from here

25    because I want to revisit this after some more briefing.

1    And again, these are hard questions, and I may end up coming

2    out the other way on some of them after I have had more time

3    to think about them and hear from both sides.  But what I am

4    tasked to do today is to make the best ruling I can under

5    the law and the circumstances.

6        And particularly given the plaintiffs' information

7    unrebutted by the government that flights are actively

8    departing and plan to depart, I do not believe that I am

9    able to wait any longer and that I am required to act

10   immediately, which I have done so.

11       So, Mr. Ensign, the first point is that I -- that you

12   shall inform your clients of this immediately, and that any

13   plane containing these folks that is going to take off or is

14   in the air needs to be returned to the United States, but

15   those people need to be returned to the United States.

16   However that's accomplished, whether turning around a plane

17   or not embarking anyone on the plane or those people covered

18   by this on the plane, I leave to you.  But this is something

19   that you need to make sure is complied with immediately.

20       We need to set briefing and hearing schedules.

21   Otherwise, Mr. Gelernt, did your housekeeping matters relate

22   to those or something else?

23       MR. GELERNT:  No, they didn't, Your Honor.

24       THE COURT:  So do you want to raise those now?

25       MR. GELERNT:  Oh, they were very, very small.  One is

1    that of the two flights I mentioned that took off this

2    afternoon, I had said that both went to El Salvador.  We are

3    now hearing that maybe only one went to El Salvador, and one

4    may have gone to Honduras.  I just wanted to correct the

5    record.

6        THE COURT:  Again, just so we are clear, if planes

7    have already landed and discharged their occupants, aside

8    from the five plaintiffs I enjoined earlier, then this

9    order -- I don't have jurisdiction to require their return.

10       MR. GELERNT:  Right.  And the other thing was also

11   very small.  It's just we would just -- if Your Honor is

12   going to use March 15 as the date, just to say that it was

13   published on the 15th, but we do think it was a March 14

14   order because that's when it was signed by the president.

15       THE COURT:  Well, I will be sure to cite the title so

16   there won't be any confusion.

17       MR. GELERNT:  Thank you, Your Honor.

18       THE COURT:  Okay.  So, Mr. Ensign, I want to hear

19   from you since you are now the party being restrained what

20   you would like to do in terms of briefing and hearing.  I

21   had set a hearing for Monday.  Given what's now happened,

22   that's not in stone, so what would you like?

23       MR. ENSIGN:  Your Honor, offhand, I think we would be

24   prepared to file a brief Monday night.  We could potentially

25   do so earlier, but in particular, many of the people subject

1      to this order, many, most, or all of them are incredibly

2      dangerous individuals, and so we would like to be able to

3      develop that as appropriate to --

4           THE COURT:  No, given -- let me just say, as I said,

5      you are the one being restrained, so I will give you as much

6      time as you want because you are the one now who's being

7      disadvantaged, so it's your motive to expedite.

8           MR. ENSIGN:  Thank you, Your Honor.  Could we

9      tentatively set, you know, Monday night, and then we will

10     inform the Court if we think we need additional time, and

11     then we would ask that the plaintiffs' response be on a

12     similarly expedited basis given that the government is now

13     under a TRO.

14          THE COURT:  Okay.  So March 17, and that will give

15     you until midnight for the government's opposition, and so

16     this will be, again, to their -- I guess your brief then

17     would be to -- I think your brief would be to vacate the

18     TRO, which, as opposed to an opposition to their request, it

19     should be, I think, to vacate the TRO.

20          And then the government can -- I'm sorry, the

21     plaintiffs then, I will give you the same amount of time, 48

22     hours till the end of March -- till March 19 to oppose.

23          And then for a hearing, we could do Friday, the 21st.

24     Again, because I will need time to review this myself, could

25     we do 2:00 or 2:30 on the 21st, Mr. Gelernt?  And this,

```
1    again, can be by Zoom.
2         MR. GELERNT:  2:30 works in person or Zoom, Your
3    Honor.
4         THE COURT:  Mr. Ensign?
5         MR. ENSIGN:  That should work for us, Your Honor.
6         THE COURT:  Okay.  I will say 2:30.
7         So I'm vacating the March 17 hearing.  It will be
8    March 21 at 2:30.
9         Okay.  So I will issue a minute order memorializing
10   all of this.  And again, it will be -- Mr. Ensign, it's
11   going to be to vacate the current TRO, because the other TRO
12   is on appeal, so it won't be obviously the reason -- well,
13   the reason is somewhat different because now the
14   proclamation has been filed.  But I do not have jurisdiction
15   to act on the prior TRO, so this would be for the current
16   TRO.
17        MR. ENSIGN:  Understood, Your Honor.  And one point
18   related to that if I might.
19        THE COURT:  Sure.
20        MR. ENSIGN:  Would this TRO apply to aliens that
21   otherwise have final orders of removal, because from our
22   perspective, that would be an independent basis to
23   effectuate their removal.
24        THE COURT:  Right.
25        MR. ENSIGN:  And the 1252 jurisdictional bars on this
```

```
 1     Court would also apply if --

 2            THE COURT:  Right.  Yes.  No, I think that that's

 3     fair.

 4            I would think not, Mr. Gelernt.

 5            MR. GELERNT:  Your Honor, if they are not removing

 6     someone based on the Alien Enemies Act but based on some

 7     other authority, it wouldn't fall within this jurisdiction.

 8            THE COURT:  Right.  So yes, Mr. Ensign, I agree.

 9            MR. ENSIGN:  Okay.

10            THE COURT:  Anything else, Mr. Gelernt?

11            MR. GELERNT:  No, Your Honor.

12            THE COURT:  Mr. Ensign?

13            MR. ENSIGN:  No, Your Honor.

14            THE COURT:  All right.  Again, thanks, everyone, for

15     your diligent work.  I will issue the order, and we will see

16     you on Friday.  Thank you.

17            MR. GELERNT:  Thank you, Your Honor.

18            MR. ENSIGN:  Thank you, Your Honor.

19            (The hearing concluded at 6:53 p.m.)

20                            - - -

21

22

23

24

25
```

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription of the proceedings in the above-entitled

matter.



3/16/25                    s/ Tammy Nestor
                           Tammy Nestor, RMR, CRR
                           Official Court Reporter
                           333 Constitution Avenue NW
                           Washington, D.C. 20001
                           tammy_nestor@dcd.uscourts.gov