**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| J.G.G., *et al.*, | ) | No. 1:25-cv-766-JEB |
| | ) | |
| *Plaintiffs*, | ) | Hon. James Boasberg, U.S.D.J. |
| | ) | |
| v. | ) | |
| | ) | |
| Donald J. Trump, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**PROPOSED AMICUS BRIEF OF PUTATIVE AMICUS CURIAE COOLIDGE-REAGAN
FOUNDATION AGAINST PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING
ORDER AND CONTEMPT SANCTIONS FOR DEFENDANTS**

Dan Backer, Bar # 996641
Chalmers, Adams, Backer & Kaufman LLC
10521 Judicial Drive, Suite 200-A
Fairfax, VA 22030
Tel: (202) 210-5431
dbacker@ChalmersAdams.com

*Counsel for Putative Amicus*
*Coolidge Reagan Foundation*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................................................................................ii

INTERESTS OF AMICUS CURIAE ........................................................................................ 1

SUMMARY OF ARGUMENT.................................................................................................. 1

ARGUMENT ............................................................................................................................. 3

I.     THIS COURT SHOULD NOT HOLD EITHER PRESIDENT DONALD J.
<u>TRUMP OR ANY MEMBERS OF HIS ADMINISTRATON IN CONTEMPT</u>............... 3

      A.    *Defendants Did Not Violate the Injunction Because This*
*Court's Written Order Did Not Direct Them to Return*
*Class Members Who Had Already Been Removed from*
<u>*U.S. Territory to International Waters or a Foreign Country*</u>.............................. 3

      B.    <u>*This Court May Not Hold President Trump in Contempt*</u> ..................................... 7

II.    INDIVIDUALS WHO HAVE BEEN DEPORTED OR ARE
OTHERWISE NOT IN U.S. CUSTODY LACK JUSTICIABLE
OR SUBSTANTIVELY VALID CLAIMS FOR HABEAS RELIEF
<u>AND THIS COURT LACKS JURISDICTION TO COMPEL RELIEF</u>.......................... 8

III.   COMPELLING EQUITABLE CONSIDERATIONS STRONGLY
MITIGATE AGAINST PROVIDING FURTHER EQUITABLE
<u>RELIEF OR HOLDING ANY DEFENDANTS IN CONTEMPT</u> ................................. 10

CONCLUSION....................................................................................................................... 22

## TABLE OF AUTHORITIES

*Cases*

*Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022) ........................................................................ 19

*Arizona v. United States*, 567 U.S. 387 (2012) ................................................................... 19, 20

*Armstrong v. Executive Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993) ............................ 6

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ....................................................................... 19

*Awe v. Napolitano*, 494 F. App'x 860 (10th Cir. 2012) ............................................................. 10

*Bates v. Johnson*, 901 F.2d 1424 (7th Cir. 1990) .................................................................... 2, 6

*Bluman v. Federal Election Commission*, 800 F. Supp. 2d 281 (D.D.C. 2011) (per curiam) ...... 17

*Casa, Inc. v. Trump*, No. DLB-25-201, 2025 WL 408636 (D. Md. Feb. 5, 2025) ...................... 20

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ...................................................... 21

*Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) ...................................................................... 19

*Dep't of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020) ........................................ 8-9

*Dilone v. Nielsen*, 358 F. Supp. 3d 490 (D.D.C. 2019) ............................................................... 9

*Evenwel v. Abbott*, 578 U.S. 54 (2016) ...................................................................................... 17

*Foley v. Connelie*, 435 U.S. 291 (1978) .................................................................................... 18

*Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023) ............................................. 12

*FTC v. S.W. Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982) ............................................................ 5

*Guerra v. Meese*, 786 F.2d 414 (D.C. Cir. 1986) ...................................................................... 10

*Hatten-Gonzales v. Hyde*, 579 F.3d 1159 (10th Cir. 2009) ..................................................... 2, 5

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) ............................................................... 21

*Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70 (D.D.C. 2003) ........................................ 2, 6

*Lee v. Wetzel*, 244 F.3d 370 (5th Cir. 2001) .............................................................................. 10

*Lindaastuty v. Attorney General*, 186 F. App'x 294 (3d Cir. 2006)................................................9

*Mathews v. Eldridge*, 424 U.S. 319 (1976)........................................................................21

*McClendan v. City of Albuquerque*, 79 F.3d 1014 (10th Cir. 1996)........................................6

*Meltzer v. Bd. of Pub. Instr.*, 480 F.2d 552 (5th Cir. 1973) ................................................5-6

*Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867) .....................................................2, 8

*Munaf v. Green*, 553 U.S. 674 (2008) ....................................................................................9

*Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010)..........................................................8

*Nixon v. United States*, 506 U.S. 224 (1993) .....................................................................11

*Parker v. United States*, 153 F.2d 66 (1st Cir. 1946) ........................................................12

*Pigford v. Veneman*, 265 F. Supp. 2d 41 (D.D.C 2003) ......................................................7

*Potter v. District of Columbia* 126 F.4th 720 (D.C. Cir. 2025)..........................................12

*Preiser v. Rodriguez*, 411 U.S. 475 (1973) ..........................................................................8

*Proj. B.A.S.I.C. v. Kemp*, 947 F.2d 11 (1st Cir. 1991)........................................................6

*Rucho v. Common Cause*, 588 U.S. 684 (2019).................................................................11

*Rumsfeld v. Padilla*, 542 U.S. 426 (2004)..........................................................................10

*Sanders v. Airline Pilots Ass'n Int'l*, 472 F.2d 244 (2d Cir. 1972)......................................5

*Seattle-First Nat'l Bank v. Manges*, 900 F.2d 795 (5th Cir. 1990) .....................................5

*Schmidt v. Lessard*, 414 U.S. 473 (1974)..............................................................................5

*Spencer v. Karma*, 523 U.S. 1 (1998) ...................................................................................9

*Trump v. J.G.G.*, No. 24-A-931, 604 U.S. ___ (Apr. 7, 2025)...........................................10

*United States ex rel. Yelverton v. Fed. Ins. Co.*, 831 F.3d 585 (D.C. Cir. 2016).............2, 6

*United States v. Armour & Co.*, 402 U.S. 673 (1971).........................................................7

*United States v. Kuan*, 827 F.2d 1144 (7th Cir. 1987).........................................................7

*United States v. NYNEX Corp.*, 8 F.3d 52 (D.C. Cir. 1993) .................................................... 2, 6

*United States v. Philip Morris USA Inc.*, 2023 WL 4057501 (D.D.C. June 19, 2023) ................. 6

*United States v. Trump*, 603 U.S. 593 (2024) ........................................................................ 2, 8

*United States v. Young*, 107 F.3d 903 (D.C. Cir. 1997) ............................................................ 3, 4

*Washington v. Trump*, No. C25-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025) ......... 20

## Constitutional Provisions, Statutes, and Rules

Fed. R. Civ. P. 65 .................................................................................................................... 1, 5

U.S. Const. amend. XIV, § 1 ....................................................................................................... 19

U.S. Const. amend. XIV, § 2 ....................................................................................................... 17

## Other Authorities

*10 Members of "Tren de Aragua" Gang Indicted in Sprawling
NYC Gun Trafficking Ring*, NBC New York (Jan. 29, 2025) ................................................. 16-17

American First Policy Institute, *Examining
the Asylum Fraud Loophole* at 3 (Apr. 5, 2023) ........................................................................ 14

Andrew R. Arthur, *Half-Million Aliens Skipped Immigration
Court Under Biden*, Center for Immigration Studies (Apr. 16, 2025) ........................................ 14

*Biden Administration Ends Trump-Era "Remain in Mexico" Policy*, PBS (Aug. 9, 2022) ........ 14

Center for Immigration Studies, *Foreign-Born Number and Share
of U.S. Population at All-Time Highs in January 2025* (Mar. 12, 2025) .................................... 12

Muzaffar Chishti, et al., *How the Rebuilt U.S. System Resettled
the Most Refugees in 30 Years*, Migration Policy Institute (Oct. 30, 2024) ................................ 15

Congressional Research Service, *Apportioning Seats
in the U.S. House of Representatives Using the 2013
Estimated Citizen Population* (Oct. 30, 2015) ....................................................................... 3, 18

Emily Mae Czachor, *Man Convicted of Murder in Death of Laken Riley,
Georgia Nursing Student Killed on Jogging Trail*, CBS News (Nov. 20, 2024) ........................ 15

Equal Representation Act, H. Rpt. No. 118-476 (Apr. 29, 2024) ................................ 19

Dep't of State, *Foreign Terrorist Organization Designations of Tren de Aragua, et al.*, 90 Fed. Reg. 10,030 (Feb. 20, 2025) ............................15-16

Dep't of State, *Specially Designated Global Terrorist Designations of Tren de Aragua, et al.*, 90 Fed. Reg. 10,030 (Feb. 20, 2025) .......................... 15

Dan Gooding, *Colorado Town Being "Overrun" By Venezuelan Gangs*, Newsweek (Aug. 30, 2024) ..................................................... 16

Chairman Mark E. Green, MD, *Border Crisis Startling Stats* (Sept. 10, 2024) ........................ 12

Brian Maass, *Colorado Law Firm Report Claims Venezuelan Gang Has "Stranglehold" on Apartments, Takeover Began in 2023*, CBS News (Sept. 5, 2024) ..................................... 16

*Man Pleads Guilty to Michigan Killing that Stoked Anti-Immigrant Campaign Rhetoric*, A.P. News (Sept. 23, 2024) ............................... 16

William Ty Mayton, *Birthright Citizenship and the Civic Minimum*, 22 Geo. Immigr. L.J. 221 (2008) ..................................................... 20

Nick Miroff, *After Border Bill Failure, ICE Considers Mass Releases to Close Budget Gap*, Wash. Post (Feb. 14, 2024) ............................. 13

Jeffrey S. Passel & D'Vera Cohn, *How Removing Unauthorized Immigrants from Census Statistics Could Affect House Reapportionment*, Pew Research Center (July 24, 2020) ............................ 3, 18

Peter Schuck & Rogers Smith, Citizenship Without Consent: Illegal Aliens in the American Polity (1985) ..................................... 20

*Plyler v. Doe*, 457 U.S. 202 (1982) ................................................................ 20

Tex. Dep't of Public Safety, *Texas Criminal Illegal Noncitizen Data* ........................................ 16

Manuela Tobias, *Has There Been a 1,700 Percent Increase in Asylum Claims Over the Last 10 Years?*, PolitiFact (June 21, 2018) ......................... 14

*Salvadoran Fugitive Convicted in Deadly Attack of Maryland Killer*, A.P. News (Apr. 14, 2025) ............................................. 15

U.S. Customs and Border Protection, *Criminal Alien Statistics* ............................... 16

U.S. House Oversight Comm., *Hearing Wrap Up: Biden*

*Administration's Catch and Release Operation Has Inflamed
the Raging Crisis at the Southern Border* (Feb. 16, 2024) ........................................................ 13

U.S. House Judiciary Comm., *How the Biden
Administration's Lax Immigration Enforcement
Allows Dangerous Criminal Aliens to Run Free
in American Communities* (Apr. 16, 2024). ........................................................................ 12-13

U.S. Immigration and Customs Serv., *2024 Annual Report* (Dec. 19, 2024) ............................. 13

Charles Alan Wright et al., 11A Federal Practice and Procedure § 2955 (3d ed. 2013) ............... 6

## INTERESTS OF AMICUS CURIAE

Putative amicus curiae Coolidge-Reagan Foundation ("CRF") is a 501(c)(3) nonprofit corporation formed in Commonwealth of Virginia with offices in the District of Columbia. It is devoted to promoting fundamental First Amendment principles of freedom of expression, as well as free and fair elections and the constitutional right to vote. CRF seeks to file this amicus brief to aid the Court in properly defining the scope of the Temporary Restraining Orders at issue in this case. More importantly, it seeks to place Defendants' challenged conduct in greater context. It is untenable to our system of justice for courts to protect Democratic administrations changing the apportionment of both House seats and Electoral College positions through systematic failure to enforce immigration laws and allow - even facilitate - the admission of millions of illegal aliens and spurious asylees, while simultaneously imposing searching scrutiny upon Republican administrations who attempt to undo this lawless damage to our nation, and demand rigorous individualized scrutiny of illegal aliens who allegedly also belong to foreign gangs and terrorist organizations.

## SUMMARY OF ARGUMENT

This Court should not hold any governmental defendants in contempt because the order prohibited Defendants only from removing any plaintiff class members from the country pursuant to the Alien Enemies Act. Memorandum Opinion, D.E. #53, p. 16, 22 (Mar. 24, 2025) (quoting Minute Order of Mar. 15, 7:25 P.M.). It did not go further by directing the Government to return illegal aliens who allegedly belong to the designated foreign terrorist group Tren de Aragua and had already been removed from U.S. territory, including to a foreign country. Defendants may not be held in contempt for acting inconsistently with statements this Court made during its hearing

that it failed to memorialize in its written Temporary Restraining Order pursuant to Federal Rule of Civil Procedure 65(d)(1)(A)-(C).

An injunction must be construed based solely on the "four corners of the order" and cannot depend on outside documents, such as a hearing transcript, for its proper interpretation. *Hatten-Gonzales v. Hyde*, 579 F.3d 1159, 1168 (10th Cir. 2009). Oral directives that have not been reduced to writing are not binding injunctions. *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70, 83-84 (D.D.C. 2003) (quoting *Bates v. Johnson*, 901 F.2d 1424, 1427 (7th Cir. 1990)). Moreover, contempt will lie only when the order is "clear and unambiguous." *United States v. NYNEX Corp.*, 8 F.3d 52, 55 (D.C. Cir. 1993). As the Court's lengthy explanation of the intentions it expressed during the hearing demonstrate, the order's terse prohibition on removal neither clearly nor unambiguously directs the return of alleged foreign terrorists who already had been removed from American territory. To the extent the order was ambiguous, any such ambiguities must be resolved in the Government's favor. *United States ex rel. Yelverton v. Fed. Ins. Co.*, 831 F.3d 585, 588 (D.C. Cir. 2016). Even if a violation did occur, this Court lacks authority to hold President Donald J. Trump in contempt for his official actions in defending this nation from illegal aliens who apparently belong to a foreign terrorist organization. *United States v. Trump*, 603 U.S. 593, 614 (2024); *see also Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867).

This Court should also refrain from imposing additional individualized procedural requirements for the President's deportation of alleged foreign terrorists. For years the courts have deployed a wide range of principles including the generalized grievance doctrine, preemption, and various theories of constitutional interpretation to allow Democratic Presidents to systematically refuse to enforce federal immigration law, or twist it to allow the admission of millions of illegal aliens and spurious asylees. No concerns about "separation of powers", "dictatorship," or "rule of

law" were raised. The waves of illegal aliens Democratic Presidents have admitted have shifted representation in both the House of Representatives and Electoral College to Democratic strongholds based solely on aliens who should not be here in the first place. Congressional Research Service, *Apportioning Seats in the U.S. House of Representatives Using the 2013 Estimated Citizen Population* 17-19 (Oct. 30, 2015); Jeffrey S. Passel & D'Vera Cohn, *How Removing Unauthorized Immigrants from Census Statistics Could Affect House Reapportionment*, Pew Research Center (July 24, 2020). It is completely untenable for the judiciary to allow Democratic Presidents to import millions of people without regard to legal constraints while imposing rigorous individualized scrutiny of Republican Presidents' attempts to deport illegal aliens—particularly those accused of terrorism.

## ARGUMENT

I.    **THIS COURT SHOULD NOT HOLD EITHER PRESIDENT DONALD J. TRUMP OR ANY MEMBERS OF HIS ADMINISTRATON IN CONTEMPT**

This Court should decline to hold any Defendants in contempt for several reasons. Contempt is available only for conduct that clearly violates the terms of a court's written order. The Court's attempt to incorporate by reference oral statements and directives from its hearings as "context" is improper. Construed properly, Defendants did not violate this Court's restraining orders. Even if this Court holds violations did occur, however, it lacks authority to hold President Donald J. Trump in contempt.

A.    *Defendants Did Not Violate the Injunction Because This Court's Written Order Did Not Direct Them to Return Class Members Who Had Already Been Removed from U.S. Territory to International Waters or a Foreign Country*

Defendants' conduct did not violate this Court's restraining orders, properly construed in light of applicable precedents. This Court recently concluded probable cause existed to conclude violations occurred. It declared, "The fair reading of the TRO is that it only prevented class

3

members' transfer from American into foreign custody." Memorandum Opinion, D.E. #53, p. 16, 22 (Mar. 24, 2025) (citing *United States v. Young*, 107 F.3d 903, 907 (D.C. Cir. 1997)). Accordingly, this Court contended, "The question here, then, is whether it was sufficiently clear to the Government that the Court was prohibiting it from transferring class members into another country's custody . . . ." *Id*. at 23.

The Court's Temporary Restraining Order stated, "As discussed in today's hearing, the Court ORDERS that . . . [t]he Government is ENJOINED from removing members of [the] class (not otherwise subject to removal) pursuant to the Proclamation for 14 days . . . ." *Id*. (quoting Minute Order of Mar. 15, 7:25 P.M.). The Court pointed out that, after this TRO issued, the Government "temporarily landed two planeloads of class members in Honduras, flew them to El Salvador, deplaned them there, and then—critically—transferred them from U.S. to Salvadoran custody." *Id*. at 23-24. The "transfer of custody happened some five hours, at least, after the written Order was docketed." *Id*. at 24. This Court rejected the Government's argument that, "because both planes had already departed U.S. airspace before the written Order posted (and before the oral command preceding it), everyone on board had already been removed before the Order issued." *Id*.

The Court acknowledges its order does not define the term "remove." *Id*. To give meaning to the term, this Court's recent opinion begins by citing the Government's position as expressed in a different context in a transcript from a completely different case. *Id*. a 25-26. It then states the "obvious" place to look for the term's meaning is "the hour-plus-long hearing that immediately preceded" the Court's issuance of its TRO. *Id*. at 26. The Court declares, throughout that hearing, "it consistently used" the term "removal" to "mean a legal departure that was complete upon discharge from U.S. custody, not upon mere physical exit from U.S. territory." *Id*. After quoting

4

from various portions of the hearing to explain the Court's intentions, *id*. at 26-28, it noted the Court's admonition toward the end to the Government's attorney, "[Y]ou shall inform your clients of [the Order] immediately, and that any plane containing [class members] that is going to take off or is in the air needs to be returned to the United Staes, but those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not [dis]embarking anyone on the plane . . . , I leave to you." *Id*. at 30 (quoting Mar. 15 Hrg. Tr. at 43).

This Court's focus on its statements at the hearing under the guise of "context" is improper. Rule 65 specifies, "Every order granting an injunction and every restraining order must state the reasons why it issued; state its terms specifically; and describe in reasonable detail—***and not by referring to the complaint or other document***—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(A)-(C) (emphasis added). This Rule is not a "mere technical requirement." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Rather, "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id*. Moreover, appellate review of an injunction is impeded if the appellate court cannot identify the order's "precise bounds." *Id*. at 477.

This Court suggests the injunction should be construed in light of the hearing transcript. But Rule 65(d) requires that an injunction be interpreted based on "the four corners of the order." *FTC v. S.W. Sunsites, Inc.*, 665 F.2d 711, 724 (5th Cir. 1982); *accord Sanders v. Airline Pilots Ass'n Int'l*, 472 F.2d 244, 247 (2d Cir. 1972). Moreover, that Rule expressly prohibits a court from describing enjoined acts by reference to some document outside the four corners of the injunction itself. *Hatten-Gonzales v. Hyde*, 579 F.3d 1159, 1168 (10th Cir. 2009) (holding that Rule 65's "strict approach mandates that the parties 'be able to interpret the injunction from the four corners of the order'" (quoting *Seattle-First Nat'l Bank v. Manges*, 900 F.2d 795, 800 (5th Cir. 1990) (quotation marks omitted))); *cf. Meltzer v. Bd. of Pub. Instr.*, 480 F.2d 552, 554 (5th Cir. 1973)

(holding prohibitions in an injunction may not be defined in terms of a previous order issued by the court).

Additionally, in the context of criminal contempt proceedings, the D.C. Circuit has held, "[C]ontempt will lie only if the putative contemnor has violated an order that is **clear and unambiguous**." *United States v. NYNEX Corp.*, 8 F.3d 52, 55 (D.C. Cir. 1993) (quoting *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1279 (D.C. Cir. 1993)) (emphasis added); *accord Proj. B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991)). The Court's probable cause analysis demonstrates its order falls far short of this demanding standard. Moreover, its interpretive approach likewise violates the D.C. Circuit's admonition that "'omissions or ambiguities' in the order" must be resolved "in favor of the enjoined party." *United States ex rel. Yelverton v. Fed. Ins. Co.*, 831 F.3d 585, 588 (D.C. Cir. 2016) (quoting Charles Alan Wright et al., 11A Federal Practice and Procedure § 2955 (3d ed. 2013)); *accord United States v. Philip Morris USA Inc.*, 2023 WL 4057501 (D.D.C. June 19, 2023).

Finally, duties that are not reduced to writing are not subject to enforcement as an injunction. This Court's own precedents clarify:

> In order to become effective, an injunction must be reduced to writing; "[a] judge who proclaims 'I enjoin you' and does not follow up with an injunction has done nothing." If an injunction is not recorded in writing, "the defendant is under no judicial compulsion." Thus, the timing here is crucial. Although the Court had announced its intention to enjoin the parties, and matters of ethics and common sense counsel obedience to that intention, the order could not be contumaciously violated until it was entered.

*Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70, 83-84 (D.D.C. 2003) (quoting *Bates v. Johnson*, 901 F.2d 1424, 1427 (7th Cir. 1990)); *see also McClendan v. City of Albuquerque*, 79 F.3d 1014, 1021 (10th Cir. 1996).

This Court's minute order prohibited the government from "removing" members of the plaintiff class from the country. Memorandum Opinion, D.E. #53, p. 23 (quoting Minute Order of Mar. 15, 7:25 P.M.). That order did not state it required the return of people who were already outside of U.S. territorial waters or in some other country. *See id*. While this Court's oral statements during the hearing revealed its intent to compel such conduct, such obligations are not a reasonable construction of the minute order. An enjoined party is not a partner with the Court with a duty to construe an injunction as broadly as possible to effectuate the Court's goals to the greatest extent. Rather, it must follow the Court's orders as the Court has chosen to craft them. *Cf. United States v. Armour & Co.*, 402 U.S. 673, 683 (1971) ("[A]lthough the relief the [plaintiff] seeks may be in keeping with the purposes of the antitrust laws, we do not believe that it is supported by the terms of the consent decree under which it is sought."); *accord Pigford v. Veneman*, 265 F. Supp. 2d 41, 48 (D.D.C 2003). Accordingly, Defendants' conduct does not violate this Court's injunction.

B.    *This Court May Not Hold President Trump in Contempt*

The Court has declared if the Defendants do not purge their contempt, "the Court will proceed to identify the individual(s) responsible for the contumacious conduct by determining whose 'specific act or omission' caused the noncompliance." Memorandum Opinion, D.E. #81, at 44 (Apr. 16, 2025). The Court's order does not specify any limitations on its scope. This Court may not, however, hold President Trump in contempt. As an initial matter, this Court's original orders did not expressly specify they applied to the President. In the absence of an express, unambiguous statement, the constitutional avoidance doctrine prohibits this Court from construing them from regulating the Chief Executive's exercise of executive power. *See, e.g.*, *United States v. Kuan*, 827 F.2d 1144, 1151 (7th Cir. 1987) (construing injunction narrowly to avoid serious constitutional questions). Moreover, this Court likely lacks constitutional authority to have

7

enjoined the President regarding his deportation of alleged members of foreign terrorist organizations. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010) ("A court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions.").

Finally, any actions President Trump took in connection with deportations were exercises of his authority under Article II of the Constitution, regardless of any alleged violation of this Court's orders. Accordingly, he is entitled to presidential immunity from proceedings in this Court. *See United States v. Trump*, 603 U.S. 593, 614 (2024). For these reasons, this Court is constitutionally restrained from targeting the President. It may direct its punishment only at government officials caught between the orders of a district court judge and their duty to carry out lawful orders of the President who acted in good faith to promote the national interest by deporting illegal alien gang members.

## II.    INDIVIDUALS WHO HAVE BEEN DEPORTED OR ARE OTHERWISE NOT IN U.S. CUSTODY LACK JUSTICIABLE OR SUBSTANTIVELY VALID CLAIMS FOR HABEAS RELIEF AND THIS COURT LACKS JURISDICTION TO COMPEL RELIEF.

This Court has declared Defendants may purge their contempt by "asserting custody of the individuals who were removed in violation of the Court's classwide TRO so they might avail themselves of their right to challenge their removability through a habeas proceeding." Memorandum Opinion, D.E. #81, at 42-43 (Apr. 16, 2025). Under the circumstances of this case, such relief makes no sense. "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973); *see also Dep't of Homeland*

*Security v. Thuraissigiam*, 591 U.S. 103, 117 (2020) ("The writ simply provided a means of contesting the lawfulness of restraint and securing release.").

At the present moment, the deported members of the plaintiff class are not being held unconstitutionally or illegally within the custody of the American government. *Cf.* 28 U.S.C. § 2241; *Lindaastuty v. Attorney General*, 186 F. App'x 294, 298 (3d Cir. 2006) ("[B]ecause [the Petitioner] has already been deported and is, therefore, no longer in custody, the challenge to her detention is moot and the habeas petition must be dismissed."); *Spencer v. Karma*, 523 U.S. 1 (1998). Ordering the return of deported class members to the custody of the American government so that this Court may address constitutional challenges to the American government's custody and transfers of such class members through a habeas petition comes perilously close to manufacturing an Article III controversy. While courts sometimes claim power to "un-moot" controversies, in the unique context of habeas corpus, where the core relief is release from unconstitutional custody, the restoration of such custody is inappropriate.

In *Dep't of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 119 (2020) (citing *Munaf v. Green*, 553 U.S. 674, 692 (2008)), this Court recognized an order seeking to "block [a person's] transfer" to a particular company is "so far outside the 'core' of habeas [that it] may not be pursued through habeas." Habeas was likewise inapplicable where "the Government is happy to [release] the applicant—provided the release occurs in the cabin of a plane bound for [a foreign country]." *Id*. The deported class members have already obtained the full relief—release from the custody of the U.S. Government—habeas may afford. Ordering the otherwise unlawful return of admittedly illegal aliens for a different species of habeas relief would be contrary to equitable principles. *See Dilone v. Nielsen*, 358 F. Supp. 3d 490, 501 (D.D.C. 2019) ("[A] court may not order a federal

agency to violate a valid statute." (citing *Awe v. Napolitano*, 494 F. App'x 860, 866 (10th Cir. 2012)).

Finally, this Court lacks authority to entertain a claim for habeas relief to any members of the plaintiff class who are not held by a custodian in this judicial district. Plaintiffs seek to amend their Complaint to add habeas claims to prevent the removal of class members pursuant to the Alien Removal Act. Such a claim, even though it does not involve immediate release, nevertheless must be brought against "the entity or person who exercises legal control with respect to the challenged 'custody.'" *Rumsfeld v. Padilla*, 542 U.S. 426, 437 (2004). The Supreme Court's earlier order in this case expressly declared "jurisdiction lies in only one district: the district of confinement" for each individual illegal alien. *Trump v. J.G.G.*, No. 24-A-931, 604 U.S. ___ (Apr. 7, 2025) (quoting *Rumsfeld*, 542 U.S. at 437). This Court dismissed such concerns as merely dealing with "venue," but venue is jurisdictional in habeas cases. *See Lee v. Wetzel*, 244 F.3d 370, 373 (5th Cir. 2001) ("[T]he district of incarceration is the only district that ***has jurisdiction*** to entertain a defendant's § 2241 petition.") (emphasis added); *Guerra v. Meese*, 786 F.2d 414, 415 (D.C. Cir. 1986) ("A district court may not entertain a habeas corpus action unless it has ***personal jurisdiction*** over the custodian of the prisoner.") (emphasis added). Accordingly, future habeas proceedings in this case—the only type of relief the Supreme Court has not categorically rejected in its earlier ruling—may not involve a nationwide class.

## III.    COMPELLING EQUITABLE CONSIDERATIONS STRONGLY MITIGATE AGAINST PROVIDING FURTHER EQUITABLE RELIEF OR HOLDING ANY DEFENDANTS IN CONTEMPT.

Even if this Court retains jurisdiction over certain claims, it should decline to enter further equitable relief impeding the Government's efforts to identify, seize, and deport illegal immigrants—particularly non-citizens alleged to be members of violent gangs and foreign terrorist

organizations. Likewise, it should decline to hold any Government officials in contempt for violation of any earlier orders. The judiciary cannot allow itself to become a one-way ratchet making it easy for Democratic administrations to import millions of illegal aliens and false asylees on a large-sale basis despite statutory restrictions, while impeding Republican administrations from deporting them by imposing onerous individualized procedural requirements and lengthy judicial proceedings. Such asymmetries result in the permanent presence of an ever-increasing population of illegal aliens. This one-sided arrangement systematically enhances the Democratic party's political power through apportionment of congressional and Electoral College seats based on the mere presence of illegal aliens and false asylees, as well as birthright citizenship for their children. The courts should not allow Democratic administrations to allow waves of illegal aliens and spurious asylees to enter or otherwise release them into the country exponentially faster than Republican administrations can deport them.

"Rule of law" and other broad constitutional concerns cannot apply to the policies of Presidents of only one party. The actions of the Trump Administration should not be viewed in the abstract, but rather as a specific tailored response to the unique systemic refusal of the Obama and Biden Administrations to enforce immigration law which is threatening to fundamentally reshape our nation in terms of language, culture, economics, and especially partisan control. The Judiciary should not insert itself into the middle of this quintessentially political dispute. *See Rucho v. Common Cause*, 588 U.S. 684, 721 (2019) (holding any constitutional prohibition on political gerrymandering constitutes a non-justiciable political question); *Nixon v. United States*, 506 U.S. 224, 238 (1993) (holding the nature of a federal judge's individual right to have the Senate "try" him before removal from office was a non-justiciable political question). And while some of CRF's concerns are best addressed to the Supreme Court, they may also inform the exercise of this Court's

11

broad equitable discretion. *See Potter v. District of Columbia* 126 F.4th 720, 725 (D.C. Cir. 2025)

("When deciding whether to punish for criminal contempt, the district court enjoys a discretion

akin to the non-prosecution power in the executive." (citing *Parker v. United States*, 153 F.2d 66,

70 (1st Cir. 1946))).

According to the Center for Immigration Studies, there are between 15.4 and 15.8 million

illegal immigrants in the United States. Center for Immigration Studies, *Foreign-Born Number

and Share of U.S. Population at All-Time Highs in January 2025* (Mar. 12, 2025).[1] This is nearly

5% of the American population, or one out of every twenty people. At least one-third of these

illegal aliens—5.4 million people—were admitted over the past four years due to the Biden

Administration's willful, deliberate decision to systematically refrain from enforcing federal

immigration law and other related abuses of the system. *Id*. At the very outset of the Biden

Administration, his Department of Homeland Security "made a discrete change in detention

policy" for illegal aliens "from 'release only if there is a compelling reason to' to 'release unless

there is a compelling reason not to.'" *Florida v. United States*, 660 F. Supp. 3d 1239, 1272 (N.D.

Fla. 2023). The Administration also approved the "mass-parole" of "1.4 million inadmissible aliens

into the United States," including by creating an online app to allow "more than 852,000 otherwise

inadmissible aliens . . . into the United States on parole." Chairman Mark E. Green, MD, *Border

Crisis Startling Stats* (Sept. 10, 2024).[2]

Over the course of Biden's term, "more than 1.8 million known illegal alien 'gotaways'

have evaded Border Patrol and escaped into the United States." U.S. House Judiciary Comm., *How

---

[1] https://cis.org/Report/ForeignBorn-Number-and-Share-US-Population-AllTime-Highs-January-2025.

[2] https://homeland.house.gov/wp-content/uploads/2024/10/September-24-Startling-Stats.pdf.

*the Biden Administration's Lax Immigration Enforcement Allows Dangerous Criminal Aliens to Run Free in American Communities* (Apr. 16, 2024).[3] President Biden then impeded efforts to identify and arrest them. In the Administration's final year, the number of illegal aliens which ICE arrested within our nation plummeted by 1/3 to barely 100,000. U.S. Immigration and Customs Serv., *2024 Annual Report* at 16 (Dec. 19, 2024).[4] And "[a]rrests by ICE resulting in a deportation [fell] from about 80,000 per year under Trump [in his first term] to roughly 35,000 per year during Biden's first three years, according to the Office of Homeland Security Statistics." Nick Miroff, *After Border Bill Failure, ICE Considers Mass Releases to Close Budget Gap*, Wash. Post (Feb. 14, 2024).[5]

The Biden Administration went even further by "releas[ing] nearly 4.7 million illegal aliens into American communities." U.S. House Judiciary Comm., *supra*. Due to the Biden Administration's signature catch-and-release program., approximately 85% of illegal aliens caught by the Border Patrol sneaking in through the southern border were released into the country. *Id.*; *see also* U.S. House Oversight Comm., *Hearing Wrap Up: Biden Administration's Catch and Release Operation Has Inflamed the Raging Crisis at the Southern Border* (Feb. 16, 2024)[6] (stating that, in December 2023, the Biden Administration's catch-and-release program caused over 75% of illegal aliens encountered by the Border Patrol to be released into the country and not

---

[3] https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2024-04-16-How-the-Biden-Administration's-Lax-Immigration-Enforcement-Allows-Dangerous-Criminal-Aliens-to-Run-Free-in-American-C.pdf.

[4] https://www.ice.gov/doclib/eoy/iceAnnualReportFY2024.pdf.

[5] https://www.washingtonpost.com/immigration/2024/02/14/immigration-customs-enforcement-budget-deficit-republicans/.

[6] https://oversight.house.gov/release/hearing-wrap-up-biden-administrations-catch-and-release-operation-has-inflamed-the-raging-crisis-at-the-southern-border

subsequently removed). Throughout that Administration, over a half million aliens skipped their immigration hearings, and the Government perfidiously granted a "quiet amnesty" to more than 700,000 others by terminating, dismissing, or closing removal proceedings against them. Andrew R. Arthur, *Half-Million Aliens Skipped Immigration Court Under Biden*, Center for Immigration Studies (Apr. 16, 2025).[7]

The asylum process itself has been abused to allow hundreds of thousands of ineligible aliens into the country. Back in 2018, PolitiFact confirmed, over the previous decade, there was a 1,700% increased in asylum claims. *See* Manuela Tobias, *Has There Been a 1,700 Percent Increase in Asylum Claims Over the Last 10 Years?*, PolitiFact (June 21, 2018).[8] President Biden nevertheless revoked President Trump's "Remain in Mexico" policy which prohibited asylees from entering the country unless they were actually entitled to relief. *Biden Administration Ends Trump-Era "Remain in Mexico" Policy*, PBS (Aug. 9, 2022).[9] More than four out of five aliens who claim asylum at the border are released into the community pending final adjudication of their claims. "Many of these illegal aliens never show up to immigration court, and only 15% who claim asylum or credible fear at the border are granted asylum. . . . None of the aliens denied asylum [were] deported under the Biden Administration's nonenforcement policies." American First Policy Institute, *Examining the Asylum Fraud Loophole* at 3 (Apr. 5, 2023).[10] Biden also allowed

---

[7] https://cis.org/Arthur/HalfMillion-Aliens-Skipped-Immigration-Court-Under-Biden.

[8] https://www.politifact.com/factchecks/2018/jun/21/donald-trump/1700-percent-increase-asylum-claims/

[9] https://www.pbs.org/newshour/politics/biden-administration-ends-trump-era-remain-in-mexico-policy.

[10] https://americafirstpolicy.com/assets/uploads/files/Expert_Insight_-_Examining_The_Asylum_Fraud_Loophole.pdf

over 100,000 refugees to resettle within the United States, "the largest resettlement number in 30 years and a remarkable rebound" from the end of the Trump Administration, where only 11,400 people were permitted to resettle in this country. Muzaffar Chishti, et al., *How the Rebuilt U.S. System Resettled the Most Refugees in 30 Years*, Migration Policy Institute (Oct. 30, 2024).[11]

The American people have suffered the consequences of the Biden Administration's systemic lawlessness. Twenty-two-year-old nursing student Laken Riley, for example, was kidnapped and murdered by illegal alien Jose Antonio Iberra in August 2023. *See* Emily Mae Czachor, *Man Convicted of Murder in Death of Laken Riley, Georgia Nursing Student Killed on Jogging Trail*, CBS News (Nov. 20, 2024).[12] Illegal alien Victor Martinez-Hernandez raped and murdered 37-year-old Rachel Morin, a mother of five while she was jogging in February 2024. *Salvadoran Fugitive Convicted in Deadly Attack of Maryland Killer*, A.P. News (Apr. 14, 2025).[13] The Biden Administration released Iberra into the country despite his reported membership in Tren de Aragua, a Venezuelan gang the Trump Administration has designated as a Foreign Terrorist Organization, *see* Dep't of State, *Specially Designated Global Terrorist Designations of Tren de Aragua, et al.*, 90 Fed. Reg. 10,030, 10,030 (Feb. 20, 2025); Dep't of State, *Foreign Terrorist Organization Designations of Tren de Aragua, et al.*, 90 Fed. Reg. 10,030, 10,030-31 (Feb. 20, 2025).

The next month, illegal alien Brandon Ortiz-Vite murdered 25-year-old Ruby Garcia. *Man Pleads Guilty to Michigan Killing that Stoked Anti-Immigrant Campaign Rhetoric*, A.P. News

---

[11] https://www.migrationpolicy.org/article/rebuilt-us-refugee-resettlement-biden.

[12] https://www.cbsnews.com/news/laken-riley-murder-trial-jose-ibarra-verdict/.

[13] https://apnews.com/article/rachel-morin-trial-conviction-f0de768c732c01f5ccf7dd20d0bbd6b9.

(Sept. 23, 2024). Over the past fifteen years, in Texas alone, 323,000 illegal aliens have been charged with over a half-million criminal offenses, including over one thousand homicides, 15,000 sexual assaults and other sexual offenses, and 73,500 assaults—and these statistics reflect only aliens who were apprehended and identified as non-citizens. Tex. Dep't of Public Safety, *Texas Criminal Illegal Noncitizen Data*;[14] *see also* U.S. Customs and Border Protection, *Criminal Alien Statistics*.[15] Failure to enforce the border has led to foreign gangs and terrorist groups infiltrating the country, including the Venezuelan group Tren de Aragua seizing control of apartment buildings in Colorado, *see* Brian Maass, *Colorado Law Firm Report Claims Venezuelan Gang Has "Stranglehold" on Apartments, Takeover Began in 2023*, CBS News (Sept. 5, 2024);[16] Dan Gooding, *Colorado Town Being "Overrun" By Venezuelan Gangs*, Newsweek (Aug. 30, 2024),[17] and running a "sprawling" gun trafficking operation across New York City, Julian Nazario, *10 Members of "Tren de Aragua" Gang Indicted in Sprawling NYC Gun Trafficking Ring*, NBC New York (Jan. 29, 2025).[18]

---

[14] https://www.dps.texas.gov/section/crime-records/texas-criminal-illegal-noncitizen-data.

[15] https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/criminal-noncitizen-statistics.

[16] https://www.cbsnews.com/colorado/news/colorado-law-firm-report-claims-venezuelan-gang-stranglehold-apartments-takeover-began-2023/?utm_source=chatgpt.com.

[17] https://www.newsweek.com/aurora-colorado-overrun-venezuelan-gangs-court-order-issued-1946966?utm_source=chatgpt.com.

[18] https://www.nbcnewyork.com/news/local/crime-and-courts/members-tren-de-aragua-gang-indicted-gun-trafficking/6127076/.

Illegal aliens' demand for housing also helps to drive rental and real estate prices to unattainable heights. *See* Steven A. Camarota, Director of Research, Center for Immigration Studies, "The Consequences of Illegal Immigration for Housing Affordability, Government Budgets, and American Workers," Testimony Before the Subcomm. on National Security, the Border, and Foreign Affairs, H. Comm. on Oversight and Accountability 6-8 (Sept. 25, 2024). https://oversight.house.gov/wp-content/uploads/2024/09/Camarota-Testimony.pdf. Millions of illegal aliens have also stolen American jobs, whether illegally or through work authorizations,

Perhaps more saliently for this Court, illegal immigration directly impacts the distribution of political power in this country. It undermines the right to vote of Republicans by illegally and artificially enhancing the power of Democratic states in both the U.S. House of Representatives and Electoral College. Representatives—and, by extension, seats in the electoral college—are apportioned among states based on total population, including illegal aliens. *See* U.S. Const. amend. XIV, § 2 ("Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed . . . ."); *see also Evenwel v. Abbott*, 578 U.S. 54 (2016). The Biden Administration's decision to allow millions of illegal aliens to enter and remain in the nation has dramatically enhanced the power of the Democratic Party across the nation based on concentrations of people who are not members of the American political community and, constitutionally, may not share in political authority. *See Bluman v. Federal Election Commission*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (per curiam) ("[T]he United States has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process."), *summarily aff'd*, 565 U.S. 1104 (2012); *see also Foley v. Connelie*, 435 U.S. 291, 295-96 (1978) ("[A] State's historical power to exclude aliens from participation in its democratic political institutions . . . [is] part of the sovereign's obligation to preserve the basic conception of a political community.") (internal quotations marks omitted).

---

thereby simultaneously depressing wages and bolstering unemployment for American citizens. *Id.* at 13-16; *see also* National Academies of Sciences, Engineering, and Medicine, *The Economic and Fiscal Consequences of Immigration* 264, 266 (2017) (explaining rapid, large-scale immigration negatively impacts wages, and employment and wage consequences are harshest for the young, unskilled, and recent prior immigrants).

The non-partisan Congressional Research Service shows California received four additional House seats following the 2010 census due solely to non-citizens, while New York, Florida, and Texas each received one additional seat—leading to a net gain of three (3) seats for Democratic strongholds. Congressional Research Service, *Apportioning Seats in the U.S. House of Representatives Using the 2013 Estimated Citizen Population* 17-19 (Oct. 30, 2015). In contrast, Louisiana, Missouri, Montana, North Carolina, Ohio, Oklahoma, and Virginia all lost seats relative to the number they would have had if seats were apportioned based solely on citizens, leading to a further net loss of five (5) seats for Republican states. *Id*. Such reapportionment similarly occurs, though to a lesser extent, based solely on illegal aliens, as well. *See* Jeffrey S. Passel & D'Vera Cohn, *How Removing Unauthorized Immigrants from Census Statistics Could Affect House Reapportionment*, Pew Research Center (July 24, 2020).[19]

As the House Oversight Committee explained:

> In addition to failing to enforce the law against millions of illegal aliens, President Biden has abused limited statutory authority to parole into the country inadmissible aliens—for significant public benefit or urgent humanitarian reasons—millions of illegal aliens who will take up residence in the United States. . . . [T]hese millions of illegal aliens will be counted for purposes of apportionment, erode the "one person, one vote" principle, and reward a President who has placed illegal aliens and desire for a politically strategic advantage for his party in the electoral college over his constitutional duty to take care to faithfully execute the laws of the United States.

Equal Representation Act, H. Rpt. No. 118-476, at 6 (Apr. 29, 2024). The Biden Administration's systemic failure to enforce federal immigration law and mass importation of non-citizens is simply a cynical ploy to cement a permanent Democratic majority in violation of Republicans' constitutional right to vote.

---

[19] https://www.pewresearch.org/short-reads/2020/07/24/how-removing-unauthorized-immigrants-from-census-statistics-could-affect-house-reapportionment/

Moreover, the presence of illegal aliens shifts the composition of the electorate itself through the fiction of so-called "birthright citizenship." When an illegal alien unlawfully enters in the country and is permitted to remain, any children they deliver within the physical bounds of the United States are, incorrectly, said to receive U.S. citizenship. *See* U.S. Const. amend. XIV, § 1 ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States . . . .").

The Article III judiciary has allowed itself to become a tool in this partisan scheme. The courts stood by as the Biden Administration rolled out a red carpet for unprecedented numbers of illegal aliens, spurious putative asylees, and others without regard to the "rule of law" or concerns about "dictatorial" presidential discretion. Courts have generally refused to consider challenges to the admission of millions of illegal aliens, parolees, false asylees, and others due to lack of standing or under the "generalized grievance" doctrine. *See, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 386-87 (6th Cir. 2022); *Arpaio v. Obama*, 797 F.3d 11, 18-20 (D.C. Cir. 2015); *Crane v. Johnson*, 783 F.3d 244, 252-55 (5th Cir. 2015). At the same time, the federal courts have bolstered Democratic Presidents' refusal to enforce federal immigration law by holding that states are preempted from attempting to deter or arrest illegal aliens, even where their statutes are consistent with federal law. *Arizona v. United States*, 567 U.S. 387, 401-07 (2012). The judiciary has recognized states "may have understandable frustrations with the problems caused by illegal immigration," but nevertheless flatly prohibited them from attempting to do much about it. *Id*. at 416.

The judiciary has likewise enjoined President Trump's efforts to block illegal aliens from claiming citizenship for "anchor babies" born in the United States as a result of their parents' disregard for federal law. *See, e.g.*, *Washington v. Trump*, No. C25-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025); *Casa, Inc. v. Trump*, No. DLB-25-201, 2025 WL 408636 (D. Md.

Feb. 5, 2025). It has rejected historically grounded explanations as to why illegal aliens are excluded from the Fourteenth Amendment's Citizenship Clause. *See, e.g.*, Peter Schuck & Rogers Smith, Citizenship Without Consent: Illegal Aliens in the American Polity 78-79, 118 (1985); *see also* William Ty Mayton, *Birthright Citizenship and the Civic Minimum*, 22 Geo. Immigr. L.J. 221, 225 (2008) ("[P]ersons who have unlawfully entered the United States ought not to hold such a right [to Fourteenth Amendment birthright citizenship]."). And the judiciary has gone so far as to create yet another affirmative beacon to attract illegal immigrants from around the world. Setting the Constitution directly at odds with federal immigrant policy, it bizarrely declared that the Equal Protection Clause protects illegal aliens from discrimination by states. *Plyler v. Doe*, 457 U.S. 202, 210 (1982). Accordingly, the Constitution requires states to provide free public education to the children of illegal aliens, including children who are themselves illegal aliens. *Id*. at 230.

There is nothing this Court can do about many of these precedents. But it can recognize the Trump Administration – overwhelmingly elected by both popular and electoral college majorities – is exercising the democratic will of the people exactly as it said it would in seeking to restore American democracy, protect the constitutional right to vote, and provide for the safety of U.S. citizens by removing the millions of illegal aliens distorting the allocation of political power in our nation. This is a compelling governmental interest that, given the magnitude of the problem, cannot be achieved at the necessary scale through more narrowly tailored means. This Court should not contribute to a fundamentally unfair asymmetry where Democratic administrations can allow and even facilitate the illegal entry of waves of millions of people without meaningful individualized scrutiny, while hamstringing Republican administrations by requiring individualized judicial assessments of each person and careful consideration of a range of excuses

and defenses. "[W]hile the Constitution protects against invasions of individual rights, it is not a suicide pact." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963).

Due process is a flexible concept which "calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). "The essential requirements of due process . . . are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). And that opportunity may be before the government agency seeking to take adverse action against a person, not necessarily a court. *Id*. Here, the alleged illegal alien members of a foreign gang and/or terrorist organization apparently received all the process to which they were due. As this Court itself recognizes, "[T]he Government interrogated Venezuelans in its custody about alleged membership in Tren de Aragua"—a designated foreign terrorist organization—"and transferred many of those it deemed gang members to El Valle Detention facility" for removal. Memorandum Opinion, D.E. #53, p. 3-4 (Mar. 24, 2025). Thus, plaintiff class members had the opportunity to deny they were illegal aliens or belonged to the foreign terrorist group. The Government, unpersuaded by their apparent lies, chose to proceed with the removal. Accordingly, this Court should refrain from granting further extraordinary relief to prevent the Trump Administration from using the Alien Enemies Act to deport alleged non-citizens who belong to violent foreign terrorist groups and gangs. It should likewise decline to pursue contempt proceedings against the Defendants in this case.

## <u>CONCLUSION</u>

For these reasons, *amicus* Coolidge-Reagan Foundation respectfully requests this Court to deny any requests for further equitable relief and decline to hold the defendants in contempt for any previous actions.

Respectfully submitted,

<u>/s/ *Dan Backer*</u>
Dan Backer, Bar # 996641
Chalmers, Adams, Backer & Kaufman LLC
10521 Judicial Drive, Suite 200-A
Fairfax, VA 22030
Tel: (202) 210-5431
dbacker@ChalmersAdams.com

*Counsel for Putative Amicus*
*Coolidge Reagan Foundation*

22