## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.G.G., *et al.*, <br><br> *Plaintiffs–Petitioners*, <br><br>           v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> *Defendants–Respondents*. | Case No: 1-25-00766 |

### PLAINTIFFS'[1] MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYMS

---

[1] Pursuant to Local Civil Rule 7(m), Plaintiffs' counsel sought to confer with Defendants as to their position on the relief requested in this motion prior to this filing, but did not obtain a response.

## INTRODUCTION

Plaintiffs are five asylum seekers who have suffered past persecution in Venezuela. Plaintiffs fear that their persecution will become more severe if their identities and status as asylum applicants are publicly disclosed. Because of the "sensitive and highly personal" nature of their cases, they seek leave to proceed under the pseudonyms G.F.F., J.G.O., J.G.G., W.G.H., and J.A.V. *See Nat'l Ass'n of Waterfront Emp'rs v. Chao*, 587 F. Supp. 2d 90, 99 (D.D.C. 2008).[2] Plaintiffs ask this Court to grant them leave to proceed under a pseudonym for the following reasons: (1) the complaint filed contemporaneously with this motion and subsequent pleadings will contain sensitive, personal information, including details of their asylum claims and of Plaintiffs' current whereabouts; (2) Plaintiffs face imminent removal from the United States to Venezuela; (3) Plaintiffs are at risk of harm in Venezuela; (4) Plaintiffs fear that, should their information become public, including the government's unsubstantiated allegations that they are members of Tren de Aragua, they would likely become victims of retributive violence in Venezuela. For these reasons, Plaintiffs respectfully request leave to proceed pseudonymously.

## I.    The Use of Pseudonyms Is Justified Here.

While the general rule is that complaints state the names of the parties, *see* Fed. R. Civ. P. 10(1), this Court has the discretion to allow a plaintiff to proceed anonymously. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995). Courts may permit the use of pseudonyms when "the impact of the plaintiff's anonymity" outweighs "the public interest in open proceedings and on fairness to the defendant." *Chao*, 587 F. Supp. 2d at 99; *see also Qualls*

---

[2] The full names, A numbers, and dates of birth for the following Plaintiffs are: (1) G.F.F: ██████████████████████████████; (2) J.G.O.: ███████████ ███████████████████████████████; (3) J.G.G.: ██████ ████████████████ Plaintiffs provide the full names of the remaining Plaintiffs: (4) W.G.H.: ███████████████████; (5) J.A.V.: ███████████████. Plaintiffs can provide A numbers and birth dates for W.G.H. and J.A.V., if necessary.

*v. Rumsfeld*, 228 F.R.D. 8, 10 (D.D.C. 2005). At the time of filing, plaintiffs need only make a

"colorable argument in support of the request." *Qualls*, 228 F.R.D. at 10. Courts examine: (1)

whether the plaintiff's request is intended "to preserve privacy in a matter of a sensitive and

highly personal nature"; (2) whether the plaintiff has a reasonable expectation of "physical or

mental harm"; (3) whether the plaintiff is a minor; (4) whether the defendant is the government;

and (5) the type of prejudice the defendant might experience if the plaintiff proceeds

anonymously. *Chao*, 587 F. Supp. 2d at 99; *see also United States v. Hubbard*, 650 F.2d 293,

317–21 (D.C. Cir. 1980) (setting forth a balancing test that considers, inter alia, "the strength of

the . . . property and privacy interests" involved with the "possibility of prejudice" to those

opposing disclosure). Courts in this District have exercised broad discretion to "allow plaintiffs

to proceed under a pseudonym in cases involving matters of a sensitive and highly personal

nature." *Doe v. Cabrera*, 307 F.R.D. 1, 4 (D.D.C. 2014) (citing *Chao*, 587 F. Supp. 2d at 99); *see

also Yaman v. U.S. Dep't of State*, 786 F. Supp. 148, 152–53 (D.D.C. 2011); *Doe v. Von

Eschenbach*, No. 06–2131, 2007 WL 1848013, at *2 (D.D.C. June 27, 2007).

      Here, Plaintiffs' claims are sensitive and highly personal. Plaintiffs are asylum seekers

who face significant risk of persecution—including possible physical harm or death—if their

identities are publicly revealed through this lawsuit. Moreover, individuals who are publicly

alleged to be Tren de Aragua members by the U.S. government face a real risk of serious harm if

they are returned to Venezuela based on these unsubstantiated allegations. Each of the

Defendants is a government agency or official sued in an official capacity, and Defendants will

experience no prejudice from allowing Plaintiffs to proceed pseudonymously. In light of the

extreme sensitivities of Plaintiffs' case and the potential danger posed to Plaintiffs and their

families, the public interest does not require the use of their full names. In short, the relevant

factors in this case weigh heavily in favor of allowing Plaintiffs to proceed under pseudonyms. *See Chao*, 587 F. Supp. 2d at 99.

> **A.**    **Plaintiffs' Claims Are Sensitive and Highly Personal, and Public Disclosure Could Result in Physical or Mental Harm to Plaintiffs and Their Families.**

Plaintiffs seek to proceed under pseudonyms to protect their privacy and safety, as well as the safety of family members who remain in their countries of origin. While the public typically has an interest in "knowing the facts surrounding judicial proceedings," this case is one in which anonymity is necessary "to preserve privacy in a matter of a sensitive and highly personal nature" and to protect Plaintiffs from possible future harm. *Doe v. Von Eschenbach*, 2007 WL 1848013, at *1–2 (D.D.C. June 27, 2007).

Each of Plaintiffs' asylum claims is highly sensitive and personal:

Plaintiff G.F.F. is a trans person from Venezuela. G.F.F. fled Venezuela following threats based on gender and sexuality. G.F.F. has always known that they wanted to be like the women around them and wear their clothes. G.F.F. attended parties organized by gay and trans people in Venezuela. Neighbors would sometimes call the police, and the police would regularly shut down the parties and try to arrest people. At one party, members of the Tren de Aragua gang approached G.F.F. and their friends, called them by a slur for gay individuals, and threatened to hurt them if they did not leave. G.F.F. fears returning to Venezuela because they wants to live their life openly as a trans women and would not be able to do so in Venezuela. G.F.F. was released into the United States after a credible fear interview. G.F.F. applied for asylum, withholding, and protection under the Convention Against Torture. G.F.F.'s final merits hearing is scheduled for ██████████ before the Varick Immigration Court in New York.

Plaintiff J.G.G. fled Venezuela after the Venezuelan police arbitrarily imprisoned, beat, and tortured him. J.G.G. fears that Venezuelan police will target J.G.G. again if he is removed to

Venezuela because his stepfather is a known political dissident. J.G.G. also fears that the Venezuelan police will arbitrarily imprison, beat, torture, or even kill him because of his political opinion or because the U.S. government has claimed that he is a member of Tren de Aragua. J.G.G. applied for asylum in the United States.

Plaintiff J.G.O. is a Venezuelan dissident who fled the country out of fear of being harmed or imprisoned by the Maduro regime for participating in peaceful protests of the regime's human rights violations. J.G.O. fled after he was threatened by armed government officials at protests. J.G.O. applied for asylum in the United States. He fears future persecution and imprisonment if he is forced to return to Venezuela.

Plaintiff J.A.V. is a Venezuelan man. He currently in asylum proceedings in the United States because he fears serious harm or death based on his political views in Venezuela. He also fears harm from criminal groups in Venezuela, including Tren de Aragua, because he was victimized by Tren de Aragua when he lived in Venezuela.

Plaintiff W.G.H. fled Venezuela after he was extorted and threatened by multiple criminal groups, including Tren de Aragua. He applied for asylum in the United States due to his fear of harm from those groups in Venezuela. W.G.H.'s wife and minor step-daughter live in the United States.

Given these dangers, Plaintiffs face further risk of harm if their identities were disclosed publicly. They fled their countries of origin because they were persecuted and/or feared persecution if they remained. As asylum seekers fleeing danger, they fall within a particularly vulnerable class of migrants for whom confidentiality about the nature and existence of their claims is particularly important, as their "identification [could] create[] a risk of retaliatory physical or mental harm." *Qualls*, 228 F.R.D. at 10-11 (internal quotation marks and citation

omitted); *see also* U.N. High Comm'r for Refugees, *Advisory Opinion on the Rules of Confidentiality Regarding Asylum Information* ("UNHCR Advisory Opinion") (Mar. 31, 2005) at 2-3, http://www.refworld.org/docid/42b9190e4.html ("[P]rivacy and its confidentiality requirements are especially important for an asylum-seeker, whose claim inherently supposes a fear of persecution by the authorities of the country of origin and whose situation can be jeopardized if protection of information is not ensured."). Indeed, if Plaintiffs' persecutors learned of their asylum claims, this lawsuit, or the circumstances of Plaintiffs' immigration to the United States and current whereabouts, it could leave them in significant danger.

Plaintiffs also face further harm if the U.S. government publicly identifies them as Tren de Aragua members, without evidence, as part of this lawsuit. This harm is irreparable: once these allegations about Plaintiffs are made public, they "could not be made secret again." *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (Blackmun, J., denying application for stay); *Senior Executives Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012) (recognizing that disclosure of information "is a bell that one cannot unring").

The federal immigration regulations reflect this concern for the sensitivity of asylum applications and the attendant need for confidentiality. Asylum regulations provide for the confidentiality of asylum applicants and credible fear interviewees, including the fact that an applicant has applied for asylum or received a credible fear interview. *See* 8 C.F.R. §§ 208.6, 1208.6. The Department of Homeland Security has acknowledged the importance of these regulations to the future safety of asylum applicants. *See Anim v. Mukasey*, 535 F.3d 243, 253 (4th Cir. 2008) ("As DHS recognizes, the confidentiality regulations are of utmost importance in protecting asylum applicants because the 'regulations safeguard information that, if disclosed publicly, could subject the claimant to retaliatory measures by government authorities or non-

state actors in the event that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin.'") (quoting U.S. Citizenship & Immig. Serv. Asylum Div., U.S. Dep't of Homeland Sec., *Fact Sheet: Fed. Regulations Protecting the Confidentiality of Asylum Applicants* (2005)). For the same reasons, when the Board of Immigration Appeals issues published asylum-related decisions, it routinely uses only the initials of the applicant. *See, e.g., Matter of M-H-Z-*, 26 I. & N. Dec. 757 (B.I.A. 2016).

In recognition of the powerful interest that asylum seekers possess in maintaining their confidentiality, numerous courts have allowed them to proceed with pseudonyms or initials. *See, e.g.*, *M.A. v. Mayorkas*, No. CV 23-1843, 2023 WL 5321924 (D.D.C. July 6, 2023); *Las Americas Immigrant Advocacy Center v. DHS*, No. 24-CV-1702, Dkt. 60 (D.D.C. Nov. 18, 2024); *Nora v. Wolf*, No. 1:20-CV-00993, 2020 WL 12956896, at *2 (D.D.C. Apr. 16, 2020); *O.A. v. Trump*, No. 18-cv-2718, 2019 WL 3536334 (D.D.C. Aug. 2, 2019), ECF No. 3; *N.L.A. v. Holder*, 744 F.3d 425, 428 n.1 (7th Cir. 2014); *Doe v. Holder*, 736 F.3d 871, 872 n.1 (9th Cir. 2013); *Doe v. Holder*, 651 F.3d 824, 826 (8th Cir. 2011); *Al Otro Lado, Inc. v. Nielsen*, 2017 WL 6541446, at *8 (S.D. Cal. Dec. 20, 2017); *M.M.M. v. Sessions*, No. 18-1759-BAH (D.D.C. July 27, 2018), ECF No. 2; *M.G.U. v. DHS*, No. 18-cv-1458-BAH (D.D.C. June 21, 2018), *Ms. L. v. ICE*, No. 18-428 (S.D. Cal. Mar. 6, 2018), ECF No. 26.

**B. Defendants Are Government Officials Who Will Not Be Prejudiced, and The Public Interest Will Be Served.**

Allowing Plaintiffs to proceed pseudonymously is especially appropriate where, as here, Defendants are government officials sued in their official capacity. *See, e.g.*, *Chao*, 587 F. Supp. 2d at 99 n.9 ("[W]hen a plaintiff challenges the government or government activity, courts are more like[ly] to permit plaintiffs to proceed under a pseudonym than if an individual has been

accused publicly of wrongdoing." (citing *Yacovelli v. Moeser*, 2004 WL 1144183, at *8 (M.D.N.C. May 20, 2004))).

Moreover, Defendants will suffer no prejudice should Plaintiffs be allowed to proceed under pseudonym. Because Defendants will know Plaintiffs' true identities, allowing Plaintiffs to proceed pseudonymously would pose no "risk of unfairness to the opposing party." *Chao*, 587 F. Supp. 2d at 99; *see also Al Otro Lado*, 2017 WL 6541446, at *6 (finding no prejudice to government defendants who "know the Individual Plaintiffs' names" and "have the information they need to defend against the claims"). Additionally, any public interest in disclosing Plaintiffs' identities is greatly outweighed by the significant risk of harm that such disclosure would pose to Plaintiffs. Finally, forcing Plaintiffs to publicly expose their identities, including to their persecutors, in order to pursue litigation "creates an unnecessary risk of chilling the willingness of asylum seekers from litigating important issues like the ones raised in this case." *Al Otro Lado*, 2017 WL 6541446, at *7. Thus, permitting Plaintiffs to use pseudonyms "will serve the public's interest in this lawsuit by enabling it to go forward." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1073 (9th Cir. 2000).

## CONCLUSION

For the foregoing reasons, Plaintiffs should be permitted to proceed in this suit under their proposed pseudonyms.

Dated: March 15, 2025

Noelle Smith*
Oscar Sarabia Roman*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Daniel Galindo (D.D.C. Bar No. NY035)
Ashley Gorski*
Omar C. Jadwat*
Hina Shamsi (D.D.C. Bar No. MI0071)
Patrick Toomey*

7

nsmith@aclu.org
osarabia@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich*
Skye Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs-Petitioners*

*\*Pro bono representation certificates or
Pro hac vice motions forthcoming*

8

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 15, 2025, I electronically filed the foregoing with the Clerk

of the Court for the United States District Court for the District of Columbia by using the

CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that

service will be accomplished by the CM/ECF system.

Dated: March 15, 2025                    Respectfully Submitted,

                                         */s/ Lee Gelernt*
                                         Lee Gelernt (D.D.C. Bar No. NY0408)
                                         American Civil Liberties Union Foundation
                                         125 Broad Street, 18th Floor
                                         New York, NY 10004
                                         (212) 549-2660
                                         lgelernt@aclu.org

                                         *Attorney for Plaintiffs–Petitioners*

**DECLARATION OF** ███████████████

I, ███████████████ , declare:

1.   I was born in Barcelona, Anzoategui, Venezuela, on ███████████ . Prior to being detained, I was living in Pittsburg, California. I am currently detained at the El Valle Detention Facility in Raymondville, Texas.

2.   My only entry into the United States was on March 25, 2024, through El Paso, Texas. I came to the United States because I fear being killed, arbitrarily imprisoned, beaten and tortured by Venezuelan police since they have already tortured, arbitrarily imprisoned me, and beaten me. I fear that the Venezuelan police and government will target me because of my actual/imputed political opinion, my familial connection to my stepfather who is a known political dissident, and because the U.S. government erroneously suspects that I am a Tren de Aragua member. Due to this fear, I am seeking asylum, withholding, and CAT protection before the immigration court in Adelanto, California. I am awaiting a hearing on the merits of my applications for protection.

3.   ICE erroneously claims that I am a Tren de Aragua member. However, I am not a Tren de Aragua member, and I have never been a Tren de Aragua member. The sole reason ICE claims that I am a Tren de Aragua member is because of my tattoos.

4.   I was instructed by ICE to come to their office on October 3, 2024, for an interview. During that interview, I was detained by ICE because they erroneously suspected that I was a Tren de Aragua member on account of my tattoos. I am a tattoo artist, and I told them that none of my tattoos are associated with Tren de Aragua. One of the two tattoos that ICE questioned me about is a tattoo of an eye, which is located on my left bicep. I got the eye tattoo because I saw it on Google, and I thought it looked cool. A friend did the tattoo for me. Another tattoo of mine that ICE questioned me about is a tattoo on my right leg that has a rose and a skull. I got that tattoo because I previously had a monkey tattoo on my right leg that I wanted to cover up. I am not and have never been a member of or associated with Tren de Aragua in any way. I also have not been arrested for or convicted of any crime anywhere in the world, and I have never been a member or associated with any other criminal organization.

5.   I was taken to Golden State Annex (GSA) in McFarland, California on October 4, 2024, and was detained there until March 6, 2025. On March 6, 2025, at approximately 2am, I was awoken, taken out of my cell and told that I was being released and made to sign papers in English, which is not my native language. I asked what the papers were concerning, and I was told that I was being released, and the papers were to get by property returned to me. I signed them under the false pretext that I was being released. I was not released and instead was taken to an unknown location. I called my friend ███ and my attorney frantically because I was terrified, and I did not know what was happening. I was then transferred to El Valle Detention Facility in Raymondville, Texas, but I did not learn my destination until I arrived. When I got to El Valle Detention

Facility, I met other Venezuelans who were also recently transferred there. I learned that these other Venezuelans, like me, do not have any criminal history and are suspected Tren de Aragua members.

6.    On March 14, 2025, at approximately 3am, I was awakened and was told that I was going to be transferred elsewhere. The guards told me to grab all my things because I was going to be taken immediately. I asked the guards where they were taking me, but they said that they did not know, and they refused to give me more information. Soon after, they told me that the plane that I was supposed to get on malfunctioned and that I would be taken elsewhere either at night on March 14, 2025, or in the morning on March 15, 2025. I was then returned to my dorm. At this time, I do not know where I am being taken, and I am terrified of where I will end up or what will happen to me. I called my attorney, Stephanie Quintero, at approximately 9:45am and informed her of what happened.

7.    I ask that I be properly allowed to pursue my applications for protection in the U.S., where I would be safe from harm.

I, ██████████████████, swear under penalty of perjury that the forgoing declaration was read back to me in Spanish, and that it is true and correct to the best of my knowledge and recollection.

_____████████_____        ___03/14/2025___
                                                Date

I, John Cardenas, swear under penalty of perjury that I am fluent in the English and Spanish languages, that I read the foregoing declaration to ██████████████████ in Spanish, and that he agreed with its contents.

_____John Cardenas_____                    ___03/14/2025___
Name:  John Cardenas                            Date

**Declaration of** ██████████████

1. My name is ██████████████████ and I was born in Venezuela. I am a 29-year-old man. I am currently detained by ICE at the El Valle Detention Facility in Raymondville, Texas.

2. I entered the United States on December 15, 2023.

3. I filed for asylum from Venezuela on September 9, 2024 due to my fear of harm and mistreatment from multiple criminal groups, including the Tren de Aragua gang.

4. On February 20, 2025, ICE detained me in front of my wife and stepdaughter at the homeless shelter where we were living in Brooklyn, New York. ICE officers did not tell me why I was being arrested.

5. ICE detained me at the Moshannon Valley Processing Center in Pennsylvania.

6. I was assigned a free lawyer, Molly Lauterback from Brooklyn Defender Services. I learned that my first immigration court date would be on March 12, 2025 and my attorney was preparing my case for a bond hearing.

7. On March 9, 2025, I was transferred by plane to the El Valle Detention Facility in Texas. There are many other Venezuelans detained at El Valle.

8. On March 12, 2025, the date of my court hearing, no one came to get me for my hearing. I was detained at El Valle but not brought to court.

9. On March 14, 2025, myself and a group of people who I believe were also Venezuelan were told that we would be moved in preparation for a later flight. While we were waiting, we were told that there was a problem and they returned us to detention at El Valle.

10. ICE is telling us that we will be taken to the plane on Saturday, March 15th or Sunday, March 16th.

11. I am extremely afraid to be returned to Venezuela. I fled Venezuela and requested asylum in the United States because I was being extorted and threatened by multiple criminal groups including Tren de Aragua.

12. I am not and was not a member of Tren de Aragua. I fear them and need protection from them.

1

13. My wife and minor stepdaughter live in the United States. Being separated from them is a nightmare.

14. I swear under penalty of perjury that the forgoing declaration was read back to me in Spanish, and that it is true and correct to the best of my knowledge and recollection.

I, Molly Lauterback, swear under penalty of perjury that I am fluent in the English and Spanish languages, that I read the forgoing declaration to ███████████████████ in Spanish, and that he agreed with its contents.


_____                    03/14/2025_____

Name: Molly Lauterback

**Declaration of Molly Lauterback**

1. I am a Senior Staff Attorney in the Immigration Practice at Brooklyn Defender Services ("BDS").

2. BDS is a nonprofit legal services provider which represents detained clients in removal proceedings under the auspices of the New York Immigrant Family Unity Project ("NYFIUP").

3. Through NYFIUP, qualified indigent people who are detained by Immigration and Customs Enforcement ("ICE") are entitled to free legal representation when they are facing deportation.

4. I met with Mr. ▮▮▮▮▮▮▮▮▮▮ on February 27, 2025 over video. At that time, he was detained at the Moshannon Valley Processing Center. I assessed that he was eligible for our services.

5. Mr. ▮▮▮▮▮▮▮▮▮'s Notice to Appear ("NTA"), which I have reviewed, states that he is a citizen of Venezuela who entered the United States at or near Eagle Pass, Texas on December 15, 2023 and charges him as inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i) as a noncitizen present in the United States without being admitted or paroled or who arrived in the United States at any time or place other than as designated by the Attorney General.

6. On February 27, 2025, I entered my appearance as his attorney with the Elizabeth Immigration Court in New Jersey.

7. On March 7, 2025, ICE filed a Form I-213 in Mr. ▮▮▮▮▮▮▮▮▮'s case. The I-213 states that he "has been identified as a Tren de Aragua gang associate." ICE has not provided any information beyond that one sentence to support that allegation.

8. Mr. ▮▮▮▮▮▮▮▮ has a pending application for asylum, which he timely filed on August 30, 2024, and the basis for which is his fear of harm and mistreatment from multiple criminal groups, including the Tren de Aragua gang.

9. On March 7, 2025, Mr. ▮▮▮▮▮▮▮▮'s wife informed our office that she was unable to add money into Mr. ▮▮▮▮▮▮▮▮'s commissary account because it had been deactivated.

10. That same day, I sent an email to ICE stating "As you know, Mr. ▮▮▮▮▮▮▮▮▮ has counsel and a pending removal proceeding before the Elizabeth Immigration Court and therefore cannot be transferred. Can you confirm that Mr. ▮▮▮▮▮▮▮▮ is not being transferred to a different facility?" In response, I received an email on Monday, March 10, 2025 that the matter was being investigated.

11.  On March 10, 2025, Mr. ███████████'s location in the ICE Detainee Locator site was changed to the El Valle Detention Facility in Texas.

12.  On March 10, 2025, I sent an email to the El Valle Detention Facility contacts asking for a video call with my client and attaching my Form G-28, Notice of Entry of Appearance as Attorney and Attorney ID Card. I received multiple bounce back auto-responses, but I did not receive any actual responses to my request for a call with my client.

13.  On March 12, 2025, I appeared for Mr. ███████████'s first master calendar hearing before the Immigration Court. Mr. ███████████ was not produced.

14.  During the March 12 immigration hearing, the ICE attorney stated that she believed Mr. ███████████ was at El Valle and that he would be transferred again. When asked where he would be transferred, the ICE attorney stated that she did not know.

15.  I explained on the record that I had been unable to speak with my client since his transfer to El Valle and that ICE's failure to allow for our communication was interfering with his due process rights.

16.  During the hearing, the ICE attorney did not mention anything about my client's supposed association with the Tren de Aragua.

17.  The Immigration Judge reset the case for a master calendar hearing for ███████████ and instructed ICE to submit to the court a completed Form I-830, Notice to EOIR: Alien Address, which informs the Immigration Court of a noncitizen's address and detention status.

18.  The Immigration Judge also instructed ICE to assist in facilitating calls between my client and me.

19.  I made several attempts to contact my client after ICE failed to produce him for his Master Calendar Hearing.

     a.  On March 13, 2025, I emailed the ICE attorney who had appeared in court. She did not respond.  On March 14, 2025, I emailed her again and she responded saying "at this point you are ahead of what I am aware of." When I asked her where my client would be transferred next, I did not receive a response.

     b.  On March 14, 2025, I emailed El Valle for the third time to speak to my client and finally received this response at 10:19 am EST: "Good morning, you client [] is no longer at EVDF." When I asked where he was, I was told "We do not have that information."  After receiving that email, I forwarded it to multiple ICE deportation officers for whom I have contact information.

     c.  I did not hear back via email so, later in the day on March 14, 2025, I called Assistant Field Office Director Francis Kemp to ask where my client was. Mr. Kemp

instructed me to send him an email because he was not in his office and stated that my need to know my client's whereabouts was not his problem.

20. At approximately 11:00 am EST on March 14, 2025, ICE filed via ECAS Form I-830, Notice to EOIR: Alien Address, showing that my client was detained at the El Valle Detention Center.

21. The afternoon of March 14, 2025, my client called me from a paid recorded call. After ICE told him he was being moved in preparation for a flight, he was returned to El Valle and called me. I understand ICE is saying they will put him on a flight Saturday, March 15 or Sunday, March 16.

22. I emailed the El Valle Detention Facility at around 1:30pm on March 14, 2025 requesting a confidential call with my client. I received an email stating, "At the moment non-citizen has not arrived to their dorm, once he is available, we will try our best to connect." Later that day, I again spoke to my client from El Valle when he called me from a paid recorded line. During the call he said he had no privacy. I was finally able to have confidential conversation with my client the evening of March 14.

23. Acting Assistant Field Office Director Joseph Pujol responded to my earlier email stating, "Your client remains detained at El Valle at this time." When I asked where he was going to be transferred next, Officer Pujol stated, "Unfortunately he is not a NYC case so I have no further information." Officer Pujol connected me to Deportation Officer Josh Belcher who emailed me and said, "I am monitoring his case, however, I am unable to provide reasoning for his transfer." When I asked where my client would be transferred next, I did not receive a response.


I, Molly Lauterback, swear under penalty of perjury that the forgoing declaration is true and correct to the best of my knowledge and recollection.



_____                    03/14/2025_____

Name: Molly Lauterback

**DECLARATION OF** ███████████████

I, ████████████████, declare:

1. My name is ███████████████ and I am a national of Venezuela. I am a 32-year-old man. I am currently detained by ICE at the El Valle Detention Facility in Raymondville, Texas.

2. I entered the United States around May 3, 2023.

3. I filed for asylum from Venezuela because of my political views and my fear of harm and mistreatment from multiple criminal groups, including the Tren de Aragua gang.

4. At my asylum interview on February 27, 2025, I was arrested and interrogated by ICE.

5. When ICE officers entered my asylum interview, they asked me about the Tren de Aragua gang. I am not and was not a member of the Tren de Aragua gang. I was victimized by that group, which is one of the reasons I cannot return to Venezuela.

6. ICE first detained me at the Moshannon Valley Processing Center in Pennsylvania.

7. Then, on approximately March 9, 2025, I was transferred with a group of other Venezuelans to El Valle Detention Center in Texas.

8. I was assigned a free lawyer, Melissa Smyth, from Brooklyn Defender Services. My attorney explained that she could represent me in my asylum case before the Elizabeth Immigration Court in New Jersey.

9. I have an immigration court Master Calendar Hearing scheduled for ██████████.

10. On March 14, 2025, I was told that I was being moved in preparation for a later flight with a group of other Venezuelans. I was not told where we were going. We were then told that there was a problem and they returned us to detention at El Valle.

11. We are now being told we will be put on a plane on Saturday, March 15th or Sunday, March 16th.

12. Being sent away and deported would be terrible. I need to be able to speak with my attorney to prepare for my court appearances. Also, I was receiving important medical treatment in New York, and I am afraid I will become terribly sick if I do not have access to the proper medical care. I have already missed multiple days of my daily medication when I was initially detained by ICE and again when I was transferred to El Valle.

13. I am terrified to be deported to Venezuela, where I fear I would be seriously harmed or killed.

14. I swear under penalty of perjury that the forgoing declaration was read back to me in Spanish, and that it is true and correct to the best of my knowledge and recollection.


I, Melissa Smyth, swear under penalty of perjury that I am fluent in the English and Spanish languages, that I read the forgoing declaration to ███████████ in Spanish, and that he agreed with its contents.


_____                        03/14/2025_____

Name: Melissa Smyth

2

## GRACE CARNEY ATTORNEY AFFIRMATION:

## ATTORNEY OF RECORD FOR G.F.F.

I, Grace Carney, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. My name is Grace Carney. I am a Staff Attorney at The Legal Aid Society within the New York Immigrant Family Unity Project ("NYIFUP"). I represent G.F.F. in his removal and bond proceedings. I first entered my appearance in this case on December 31, 2024.

2. G.F.F. was born in Valencia, Venezuela on ███████████, and lived there until he was around 16 years old, when he family fled the country for Ecuador.

3. On January 24, 2025, I filed with the Court a Form I-589, Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture on G.F.F.'s behalf, on the basis of his fear of return to Venezuela. His individual hearing is presently scheduled for ████████████████ at the New York Varick Immigration Court.

4. G.F.F. initially entered the United States at or near El Paso, Texas, on or about May 15, 2024. He was briefly detained by Customs and Border Protection, and a credible fear interview was conducted, before he was ultimately released on his own recognizance. Upon release, he reunited with an older brother, who was living in Chicago, before travelling to New York in November 2024, where he was ultimately detained by ICE.

5. G.F.F. was detained by ICE on December 6, 2024, following an ICE raid at apartment party he attended in the Bronx. Approximate 50 people were in attendance, most of which G.F.F. believed were Venezuelans. G.F.F. attended the party at the insistence of a friend. He did not know anyone else in attendance at the party.

6. Federal officers arrived at the party to execute an S.D.N.Y. arrest warrant for an alleged member of Tren del Aragua. Following the arrest of the individual named in the warrant, federal officers questioned G.F.F. and the other attendees. G.F.F. was thereafter detained at Orange County Jail in Goshen, New York. Upon his detention by ICE, DHS filed an I-213 identifying him as an "associate/affiliate of Tren del Aragua."

7. A motion for custody redetermination was submitted on January 24, 2025. In support, I submitted a copy of G.F.F.'s I-589 Application and a detailed declaration outlining the bases of his claims for asylum.

8. The Immigration Judge scheduled a bond hearing for January 29, 2025. According to DHS's submissions, the individual who was arrested at the party was an alleged member of Tren del Aragua. ICE also filed a *New York Post* article describing the arrest, wherein G.F.F. was identified as a gang member. ICE additionally filed an informational packet on the organization of Tren del Aragua.

1

9.  The Immigration Judge concluded that G.F.F. had not met his burden in his bond proceedings. The Immigration Judge stated that there was insufficient corroboration that, despite no criminal record, G.F.F. presented a danger to the community and a flight risk.. The Immigration Judge based his decision on DHS's I-213 and an article from the *NY Post* identifying G.F.F. as a gang member.

10. G.F.F.'s bond appeal briefing is due to the BIA April 4, 2025. In the interim, G.F.F. and I move forward with preparing for his upcoming individual hearing scheduled for ███████ ███.

11. On the afternoon of Sunday, March 9, 2025, I learned that G.F.F. had been transferred from Orange County Jail ("OCJ") to Moshannon Valley Processing Center ("MVPC"), in Phillipsburg, Pennsylvania overnight. I confirmed this was the case by checking the ICE Detainee Locator, which indicated that G.F.F. was at Moshannon. I reached out to MVPC that evening via email to schedule a client call at the soonest opportunity.

12. The next morning on Monday, March 10, 2025, I learned from a colleague that her client, a fellow Venezuelan who had also been transferred from OCJ to MVPC over the weekend, had again been transferred to El Valle Detention Facility ("EVDF"), in Raymondville, Texas. I again checked the ICE Detainee Locator and learned that G.F.F. had been again transferred to EVDF. Upon learning this, I reached out to EVDF via email and via telephone to schedule a call with him. I did not receive a response to my multiple attempts to contact EVDF until 6:00PM March 11, 2025.

13. On Wednesday, March 12, 2025, I was able to speak with G.F.F. over video for the first time since he had been transferred. He described the process of his transferred from Orange County to Moshannon, and noted that it appeared only Venezuelans were transferred. He explained he was very nervous and that no one had told him why they were being transferred.

14. At approximately 8:00AM, on Friday morning, March 14, 2025, I was alerted by Legal Aid Society colleagues of rumors of transfers and/or possible deportations of Venezuelan clients from El Valle, Texas, pursuant to reports of President Donald Trump's invocation of the Alien Enemies Act of 1798. Upon learning this, I checked the ICE Detainee Locator, which indicated G.F.F. was still located at EVDF.

15. I immediately contacted EVDF via telephone to inquire as to G.F.F.'s location, and to confirm our scheduled call later that morning. Officer Mary Lou Mesa at EVDF informed me that G.F.F. had been transferred the night before, and explained she was unable to share his location. I indicated that I had a G-28 on file and was the attorney of record in G.F.F.'s case, and that he had an individual hearing scheduled on ████████████████. Officer Mesa again informed me that she was unable to share where he was located but confirmed that he was no longer at EVDF.

16. At 1:00PM EDT on March 14, 2025, I received a text message to my work cellphone from EVDF indicating that "A resident from EVDF would like to start a video call." I promptly telephoned EVDF to confirm whether this was my client, or an error, and was informed by

the officer that my client was "back" and available to join the previously scheduled video call. When I inquired about where my client had been, I was told that they could not share that information with me.

17. I joined the video call and was able to speak directly with G.F.F. When I asked what happened, G.F.F. informed me that he had been awoken the night before at 2:30AM by EVDF officers and was told he was being deported. He informed me that he was told to collect his belongings and showed me a bag of his personal effects with him. He said that the officers told him that he was going to be placed on a flight to either Mexico or Venezuela. He explained that he and several other Venezuelans were all told the same thing and brought to a separate room at EVDF to await deportation. He was not told whether he was going to Mexico or Venezuela. He said that the officers told him if he was sent to Mexico, he would be left "on the street."

18. G.F.F. said that he and the other individuals were held in the room from when he was awoken to until right before our call, which was at 1:00PM EDT. At the time of our call, G.F.F. still had his personal effects with him in a bag, as he had yet to go back to his cell. He said that he did not sleep that night or eat, and that his last meal was dinner the evening before.

19. At the time of our conversation, G.F.F. informed me that he was told that his flight was cancelled but did not know why. He shared that the officers told him he would be deported in the "middle of the night" on March 14, 2025. I later learned from colleagues at the Legal Aid Society that the flight was reportedly cancelled due a fire.

20. G.F.F. and I spoke for about thirty minutes about what happened and next steps before he informed me that he felt physically ill due to the prospect of imminent deportation to Venezuela or Mexico. He explained that he had not eaten or slept, and that he was very anxious about being sent to live on the street in Mexico, where he was previously threatened, or Venezuela, where he fears persecution. He told me he wanted to do everything possible to fight his case, and said he could not go back there. G.F.F. thereafter told me he thought that he was going to vomit and said he had to leave, before ending the video call.

21. As of the time of writing this affirmation at 5:00PM EST on March 14, 2025, I have not been informed about what will happen to my client, and whether he will be deported this evening, or whether he will be produced for his hearing on ████████████ .

I, Grace T. Carney, affirm under penalty of perjury, that the foregoing is true and correct.

Date: 03/14/2025 _____        _____
                                          Grace T. Carney

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J.G.G., *et al.*,<br><br>*Plaintiffs–Petitioners*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States, *et al.*,<br><br>*Defendants–Respondents*. | Case No: 1-25-00766 |

**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYMS[1]**

Upon consideration of Plaintiffs' Motion for Leave to Proceed Under Pseudonyms and for good cause shown, the motion is GRANTED. It is hereby ORDERED that Plaintiffs are given leave to proceed under the pseudonyms G.F.F., J.G.O., J.G.G., W.G.H., and J.A.V.

DATE: _____          _____
                                United States District Court Judge

---

[1] Pursuant to Local Civil Rule 7(m), Plaintiffs' counsel sought to confer with Defendants as to their position on the relief requested in this motion prior to this filing, but did not obtain a response.