## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf
of FRENGEL REYES MOTA,
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

D.A.R.H.,* as next friend on behalf of ANDRY
JOSE HERNANDEZ ROMERO,
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

M.Z.V.V., as next friend on behalf of J.A.B.V.,*
El Valle Detention Facility
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

M.Y.O.R., as next friend on behalf of M.A.O.R.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

M.M.A.A., as next friend on behalf of G.A.A.A.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

DORYS MENDOZA, as next friend on behalf of
M.R.M.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

EYLAN SCHILMAN, as next friend on behalf of
T.C.I.,*
c/o American Civil Liberties Union,

Case No. 1:25-cv-00766-JEB

**AMENDED CLASS ACTION
PETITION FOR WRIT OF
HABEAS CORPUS AND
COMPLAINT**

125 Broad Street, 18th Floor
New York, NY 10004;

*Petitioners–Plaintiffs,*

J.G.G.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

G.F.F.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

J.G.O.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

W.G.H.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

J.A.V.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, The White House,
1600 Pennsylvania Avenue, NW, Washington,
D.C. 20500;

PAMELA BONDI, Attorney General of the United States, in her official capacity, 950 Pennsylvania Ave., NW, Washington, DC, 20530;

KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity, 245 Murray Lane SW, Washington, DC 20528;

U.S. DEPARTMENT OF HOMELAND SECURITY, 245 Murray Lane SW, Washington, DC 20528;

MADISON SHEAHAN, Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement, in her official capacity, 500 12th Street, SW, Washington, DC 20536;

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, 500 12th St. SW, Washington, DC 20536;

MARCO RUBIO, Secretary of State, in his official capacity, 2201 C Street, NW, Washington, DC 20520;

U.S. STATE DEPARTMENT, 2201 C Street, NW, Washington, DC 20520;

PETE HEGSETH, Secretary of Defense, in his official capacity, 100 Defense Pentagon, Washington, DC 20301; and,

U.S. DEPARTMENT OF DEFENSE, 100 Defense Pentagon, Washington, DC 20301;

*Respondents–Defendants.*

**INTRODUCTION**

1.      Petitioners–Plaintiffs ("Petitioners") and Plaintiffs[1] are Venezuelan men threatened with imminent removal or who have already suffered removal under the President's Proclamation invoking the Alien Enemies Act ("AEA"), a wartime measure that has been used only three times before in our Nation's history: the War of 1812, World War 1, and World War II.

2.      The Proclamation authorizes "immediate" removal of noncitizens that the Proclamation deems to be alien enemies, without any opportunity for judicial review. It also contorts the plain language of the AEA: arrivals of noncitizens from Venezuela are deemed an "invasion" or "predatory incursion" by a "foreign nation or government," where Tren de Aragua, a Venezuelan gang, is deemed to be sufficiently akin to a foreign nation or government.

3.      But the AEA has only ever been a power invoked in time of war, and plainly only applies to warlike actions: it cannot be used here against nationals of a country—Venezuela—with whom the United States is not at war, which is not invading the United States, and which has not launched a predatory incursion into the United States.

4.      Multiple judges—including this Court—have already held that there is likely no authority for the government's actions. *See, e.g.*, *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *5–10 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (AEA predicates of

---

[1] Plaintiffs are the original Plaintiffs in *J.G.G. v. Trump*. Because Plaintiffs have filed habeas actions in their districts of confinement and do not seek relief in this Court through the writ of habeas corpus, they continue to be designated as "Plaintiffs," not "Petitioners." Petitioners-Plaintiffs ("Petitioners") refer to the newly amended individuals who are designated under the Proclamation and detained in El Salvador or criminal custody in the United States. Petitioners are pursuing their claims through habeas in addition to APA and equity.

"invasion" or "predatory incursion" not met); *id*. at *13 (Millett, J., concurring) ("The Constitution's demand of due process cannot be so easily thrown aside."); *D.B.U v. Trump*, No. 1:25-cv-01163, 2025 WL 1163530, at *9–12 (D. Colo. Apr. 22, 2025); *J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 890401, at *2 (D.D.C. Mar. 24, 2025) (Boasberg, J.) ("before [petitioners] may be deported, they are entitled to individualized hearings to determine whether the Act applies to them at all").

5.      Nevertheless, the government has twice attempted (once successfully) to remove individuals under the AEA without any meaningful process. First, on March 15, the government secretly loaded people onto planes, published the Proclamation, and removed at least 137 people within hours to a brutal prison in El Salvador. Those removed received no notice of their designation nor any opportunity to contest it. Second, on April 17, the government provided individuals with an English-only notice form that did not inform them of their right to seek judicial review. Hours after distributing the notices, the government loaded people onto buses and drove them towards the airport, only turning around after counsel filed an emergency appeal in the Supreme Court.

6.      These repeated attempts to use the Proclamation to remove noncitizens without any review of the determination that they are alien enemies violate the AEA, the APA, and the Constitution. For that reason, Petitioners, Plaintiffs, and the putative class that they represent seek this Court's intervention to restrain these summary removals, and to determine that this use of the AEA is unlawful and must be halted.

7.      Petitioners also bring this challenge to remedy the unlawful detention of a subclass held in the notorious Terrorism Confinement Center ("CECOT") prison in El Salvador. The 137 people wrongly deported on March 15 remain incommunicado and have not spoken to

their families or attorneys in over a month now. Their families are deeply concerned for their

safety, especially given reports of widespread physical and psychological abuse in Salvadoran

prisons. The continuing detention of the CECOT Subclass in El Salvador violates the AEA, Fifth

Amendment, Sixth Amendment, and Eighth Amendment.

## JURISDICTION AND VENUE

8.      This case arises under the Alien Enemies Act ("AEA"), 50 U.S.C. §§ 21–24; the

Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*; the Immigration and Nationality

Act ("INA"), 8 U.S.C. § 1101, *et seq.* and its implementing regulations; the Convention Against

Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub.

L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to

8 U.S.C. § 1231); and the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution.

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 2241 et seq. (habeas

corpus), art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1331 (federal

question), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 1361 (mandamus), and 28

U.S.C. § 1651 (All Writs Act). Respondents-Defendants ("Respondents") have waived sovereign

immunity for purposes of this suit. 5 U.S.C. §§ 702, 706.

10.      The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the

Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; 28 U.S.C. § 1331; the All Writs Act, 28

U.S.C. § 1651; and the Court's inherent equitable powers.

11.      Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because

Respondents are agencies of the United States or officers of the United States acting in their

official capacity, Respondents reside in this District, and a substantial part of the events or

omissions giving rise to the claim occurred in this District.

# PARTIES

**Petitioners and Plaintiffs**

12.     Petitioner Frengel Reyes Mota is a Venezuelan national who has been transferred by the government from an immigration detention facility in Texas to CECOT. Mr. Reyes Mota fled Venezuela and sought asylum in the United States after violence from paramilitary groups. As his "next friend," his wife Liyana Sanchez, brings this action on his behalf. Mr. Reyes Mota's wife saw his name on a public list of Venezuelans deported to El Salvador and became alarmed that the U.S. government had removed and detained him at CECOT. Ms. Sanchez has not been able to speak with her husband since his removal. She desires that her husband be able to challenge his designation as an "alien enemy" and to defend himself against the false allegations of his membership in a gang.

13.     Petitioner Andry Jose Hernandez Romero is a Venezuelan national who has been transferred by the government from an immigration detention facility in Texas to CECOT. Mr. Hernandez Romero sought asylum in the United States after he was targeted for his sexual orientation as well as his refusal to promote government propaganda while working for a government-affiliated television station. Before he fled Venezuela, armed men connected to the government had been following and threatening him. Mr. Hernandez Romero entered using the CBP One app and passed his credible fear interview. As his "next friend," his mother D.A.R.H., brings this action on his behalf. Mr. Hernandez Romero's mother discovered that her son had been deported when his name appeared in a news article listing Venezuelans deported to El Salvador. She later heard from a journalist who told her that Andry was at CECOT, was being mistreated by guards, and was begging for his release. D.A.R.H. has done everything possible to support her son since his deportation, including speaking with his lawyer and trying to find any

information about where he is. But D.A.R.H. has been unable to contact her son since he was

sent to El Salvador. She desires that her son be able to challenge his designation as an "alien

enemy" and to defend himself against the false allegations of gang membership.

14.    Petitioner J.A.B.V. is a Venezuelan national who has been transferred by the

government from an immigration detention facility in Texas to CECOT. He fled Venezuela and

sought asylum in the United States after he was violently targeted after the campaigned for the

opposition leader. J.A.B.V. was abducted by masked men, beaten, and told he would be killed if

he campaigned again. He was then held for several days at a police center, where he was

tortured. J.A.B.V. passed his credible fear interview. As his "next friend," his mother, M.Z.V.V.,

brings this action on his behalf. M.Z.V.V. saw J.A.B.V.'s name on a public list of Venezuelans

deported to El Salvador and became alarmed that the U.S. government had removed and detained

him at CECOT. M.Z.V.V. has not been able to speak with her son since his removal. She desires

that her son be able to challenge his designation as an "alien enemy" and to defend himself

against the false allegations of his membership in a gang.

15.    Petitioner M.A.O.R. is a Venezuelan national who has been transferred by the

government from an immigration detention facility in Texas to CECOT. He was in the process of

seeking protection in the United States. As his "next friend," his sister, M.Y.O.R., brings this

action on his behalf. M.Y.O.R. saw M.A.O.R.'s name on a public list of Venezuelans deported to

El Salvador and became alarmed that the U.S. government had removed and detained him at

CECOT. M.Y.O.R. has not been able to speak with her brother since his removal. She desires

that her brother be able to challenge his designation as an "alien enemy" and to defend himself

against the false allegations of his membership in a gang.

16.    Petitioner G.A.A.A. is a Venezuelan national who has been transferred by the government from an immigration detention facility in Texas to CECOT. He fled Venezuela and sought asylum in the United States due to the violence in his town at the hand of a paramilitary group. As his "next friend," his mother, M.M.A.A., brings this action on his behalf. M.A.A.A. saw J.A.B.V.'s name on a public list of Venezuelans deported to El Salvador and became alarmed that the U.S. government had removed and detained him at CECOT. M.M.A.A. has not been able to speak with her son since his removal. She desires that her son be able to challenge his designation as an "alien enemy" and to defend himself against the false allegations of his membership in a gang.

17.    Petitioner M.R.M. is a Venezuelan national who is currently has been transferred by the government from an immigration detention facility in Texas to CECOT. As his "next friend," his mother Dorys Mendoza, brings this action on his behalf. Ms. Mendoza saw M.R.M.'s name on a public list of Venezuelans deported to El Salvador and became alarmed that the U.S. government had removed and detained him at CECOT. Ms. Mednoza has not been able to speak with her son since his removal. She desires that her son be able to challenge his designation as an "alien enemy" and to defend himself against the false allegations of his membership in a gang.

18.    Petitioner T.C.I. is a Venezuelan national who is currently in criminal custody and detained in New Jersey. After leaving Venezuela, he turned himself into immigration authorities and was granted humanitarian parole. As his "next friend," his criminal defense attorney Eylan Schilman, brings this action on his behalf. T.C.I. informed Mr. Schilman that officials approached him to sign a form in English that he was a member of Tren de Aragua and subject to removal. T.C.I. refused to sign because he denies membership in Tren de Aragua or any other

gang. Mr. Schilman desires that his client be able to challenge his designation as an "alien enemy" and to defend himself against the false allegations of his membership in a gang.

19.    Plaintiff J.G.G. is a Venezuelan national who is detained at El Valle Detention Center in Texas. J.G.G. is seeking asylum, withholding of removal, and CAT protection because he fears being killed, arbitrarily imprisoned, beaten, or tortured by Venezuelan state police, since they have previously done so to him. J.G.G. was nearly removed on March 15 pursuant to the Proclamation. He was pulled off the plane at the last minute due to this Court's TRO. Despite the fact that J.G.G. is not involved whatsoever with Tren de Aragua, he fears that the government will continue trying to deport him because he has tattoos and because they have previously attempted to deport him under the Proclamation.

20.    Plaintiff J.A.V. is a Venezuelan national who is detained at El Valle Detention Center in Texas. J.A.V. is seeking asylum because of his political views and fear of harm and mistreatment by multiple criminal groups, including TdA. J.A.V. is not and has never been a member of TdA—he was in fact victimized by that group and it is the reason why he cannot return to Venezuela. J.A.V. was nearly removed on March 15 pursuant to the Proclamation. However, he was spared from immediate deportation due to this Court's TRO. J.A.V. fears that the government will continue trying to deport him because he has previously been designated an alien enemy.

21.    Plaintiff G.F.F. is a 21-year-old Venezuelan national who is detained at Orange County Jail in New York. G.F.F. and his family fled Venezuela in part due to threats from TdA based on his sexual orientation and gender non-conformity. He also fears persecution from Venezuelan state actors, including police and paramilitary groups. G.F.F. entered the United States in May 2024 and was released on his own recognizance after passing a credible fear

interview. G.F.F. was nearly deported pursuant to the Proclamation on March 15; he was taken off the plane after this Court issued its initial TRO. G.F.F. strongly denies any association with TdA. G.F.F. fears that the government will continue trying to deport him because it has filed an I-213 identifying him as an "associate/affiliate of Tren de Aragua" and because the government previously attempted to deport him under the Proclamation.

22.     Plaintiff W.G.H. is a 29-year-old Venezuelan national who is detained at El Valle Detention Center in Texas. W.G.H. is seeking asylum because he was extorted and threatened by multiple criminal groups in Venezuela, including TdA. W.G.H. is extremely afraid of returning to Venezuela or being sent to El Salvador. W.G.H. was almost deported on March 15, despite the fact that he has repeatedly denied any connection to TdA whatsoever. He was removed from the plane after this Court's TRO. W.G.H. W.G.H. fears that the government will continue trying to deport him because it has filed an I-213 stating that W.G.H. "has been identified as a Tren de Aragua gang associate" and because he was previously designated under the Proclamation.

23.     Plaintiff J.G.O. is a 32-year-old Venezuelan national who is detained at Orange County Jail in New York. J.G.O. is seeking asylum in the United States because he actively protested against the Maduro regime in Venezuela and fears torture, imprisonment, or death on account of his political activism if he returns. J.G.O. was nearly deported on March 15, but was removed from the plane after this Court's TRO. J.G.O. fears that the government will continue trying to deport him pursuant to the AEA because he has been questioned about gang affiliation and because he has already been designated under the Proclamation. J.G.O. vehemently denies any affiliation with a gang.

**Respondents-Defendants**

24.     Respondent Donald Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Proclamation under the Alien Enemies Act.

25.     Respondent Pamela J. Bondi is the U.S. Attorney General at the U.S. Department of Justice, which is a cabinet-level department of the United States government. She is sued in her official capacity.

26.     Respondent Kristi Noem is the Secretary of the U.S. Department of Homeland Security, which is a cabinet-level department of the United States government. She is sued in her official capacity. In that capacity, Respondent Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

27.     Respondent U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include Immigration and Customs Enforcement ("ICE"). Respondent DHS is a legal custodian of Petitioners.

28.     Respondent Todd Lyons is the Acting Director of ICE. Respondent Lyons is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Respondent Lyons is a legal custodian of Petitioners. Respondent Lyons is sued in his official capacity.

29.     Respondent ICE is the subagency of DHS that is responsible for carrying out removal orders and overseeing immigration detention. Respondent ICE is a legal custodian of Petitioners.

30.     Respondent Marco Rubio is the Secretary of State, which is a cabinet-level department of the United States government. He is sued in his official capacity. In that capacity, Respondent Rubio negotiates and enters into contracts or agreements with El Salvador for the

removal and detention of Petitioners and others, and would be responsible for facilitating the return of Petitioners sent to El Salvador or any other country.

31.    Respondent U.S. Department of State ("DOS") is a cabinet-level department of the United States federal government.

32.    Respondent Pete Hegseth is the Secretary of Defense, which is a cabinet-level department of the United States government. He is sued in his official capacity. In that capacity, Respondent Hegseth oversees the Department of Defense and acts as the principal defense policy maker and advisor.

33.    Respondent U.S. Department of Defense ("DOD") is a cabinet-level department of the Unite States federal government.

## **BACKGROUND**

**The Alien Enemies Act**

34.    The AEA is a wartime authority enacted in 1798 that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens.

35.    The AEA, as codified today, provides that "[w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies." 50 U.S.C. § 21.

36.     The AEA can thus be triggered in only two situations. The first is when a formal declared war exists with a foreign nation or government. The second is when a foreign nation or government perpetrates, attempts, or threatens an invasion or predatory incursion against the territory of the United States.

37.     To trigger the AEA, the President must make a public proclamation of the declared war, or of the attempted or threatened invasion or predatory incursion. *Id.*

38.     Section 21 of the AEA also provides that noncitizens must be afforded a right of voluntary departure. Only noncitizens who "refuse or neglect to depart" are subject to removal. *Id.* § 21.

39.     Section 22 of the AEA specifies the terms of departure for aliens designated as enemies. It grants noncitizens the full time to depart as stipulated by any treaty between the United States and the enemy nation, unless the noncitizen has engaged in "actual hostility" against the United States. If no such treaty exists, the President may declare a "reasonable time" for departure, "according to the dictates of humanity and national hospitality." *Id.* § 22.

40.     The Act has been used only three times in American history, all during actual or imminent wartime.

41.     The AEA was first invoked several months into the War of 1812, but President Madison did not use the AEA to remove anyone from the United States during the war.

42.     The AEA was invoked a second time during World War I by President Wilson. Upon information and belief, there were no removals effectuated pursuant to the AEA during World War I.

43.     The AEA was used again during World War II, though it was never used as a widespread method of removal.

11

44.     On December 7, 1941, after the Japanese invaded Hawaii in the attack on Pearl Harbor, President Roosevelt proclaimed that Japan had perpetrated an invasion upon the territory of the United States. The President issued regulations applicable to Japanese nationals living in the United States. The next day Congress declared war on Japan.

45.     On the same day, President Roosevelt issued two separate proclamations stating that an invasion or predatory incursion was threatened upon the territory of the United States by Germany and Italy. The President incorporated the same regulations that were already in effect as to Japanese people for German and Italian people. Three days later Congress voted unanimously to declare war against Germany and Italy.

46.     Congress declared war against Hungary, Romania, and Bulgaria on June 5, 1942. Just over a month later, President Roosevelt issued a proclamation recognizing that declaration of war and invoking the AEA against citizens of those countries.

47.     Under these proclamations, the United States infamously interned noncitizens from Japan, Germany, Italy, Hungary Romania, and Bulgaria (with U.S. citizens of Japanese descent subject to a separate order that did not rely on the AEA).

48.     It was not until the end of hostilities that the President provided for the removal of alien enemies from the United States under the AEA. On July 14, 1945, President Truman issued a proclamation providing that alien enemies detained as a danger to public peace and safety "shall be subject upon the order of the Attorney General to removal from the United States." The Department of Justice subsequently issued regulations laying out the removal process. *See* 10 Fed. Reg. 12189 (Sept. 28, 1945). It was never used as a widespread method of removal.

**Systemic Overhaul of Immigration Law in 1952**

49.    Following the end of World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA").

50.    The INA, and its subsequent amendments, provide for a comprehensive system of procedures that the government must follow before removing a noncitizen from the United States. The INA provides the exclusive procedure by which the government may determine whether to remove an individual. 8 U.S.C. § 1229a(a)(3).

51.    In addition to laying out the process by which the government determines whether to remove an individual, the INA also enshrines particular forms of humanitarian protection.

52.    First, the INA provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status," may apply for asylum. 8 U.S.C. § 1158(a)(1). To qualify for asylum, a noncitizen must show a "well-founded fear of persecution" on account of a protected ground, such as race, nationality, political opinion, or religion. 8 U.S.C. § 1101(a)(42)(A).

53.    Second, Congress has barred the removal of an individual to a country where it is more likely than not that he would face persecution on one of these protected grounds. 8 U.S.C. § 1231(b)(3). That protection implements this country's obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees. The relevant form of relief, known as "withholding of removal," requires the applicant to meet a higher standard with respect to the likelihood of harm than asylum; granting that relief is mandatory if the standard is met absent limited exceptions.

54.    Third, the Convention Against Torture ("CAT") prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture. *See*

8 U.S.C. § 1231 note. That protection implements the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242. As with withholding of removal, CAT relief also requires the applicant to meet a higher standard with respect to the likelihood of harm than asylum and relief is mandatory if that standard is met. There is no exception to CAT relief.

**President Trump's Proclamation Invoking the AEA**

55.     On March 14, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025).[2]

56.     Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make the invocation public until around 3:53 p.m. EDT on March 15.

57.     The Proclamation alleges that Tren de Aragua is perpetrating, attempting, and threatening predatory incursions, hostile actions, and irregular warfare.

58.     The Proclamation thus states that all Venezuelan citizens ages fourteen or older alleged to be members of Tren de Aragua—and who are not U.S. citizens or lawful permanent residents—are alien enemies.

59.     The Proclamation provides no means or process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation. Nor

---

[2] *Available at* https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua.

does it provide individuals with an opportunity for voluntary departure, as required by Section 21. Nor does it provide the grace period required under Section 22, during which individuals can arrange their affairs. The Proclamation instead invokes Section 22's exception by claiming that all individuals subject to the Proclamation are "chargeable with actual hostility," and pose "a public safety risk."

60.    As multiple judges have already found, the Proclamation is likely unlawful.

61.    First, the Proclamation does not satisfy the statutory requirements for proper invocation of the Alien Enemies Act. Tren de Aragua, a criminal organization, is not a nation or foreign government and is not part of the Venezuelan government. The United States is not in a declared war with Venezuela. The United States cannot declare war against Tren de Aragua because it is not a nation. And neither Venezuela nor Tren de Aragua have invaded or threatened to invade the United States, nor has either engaged in a "predatory incursion" within the meaning of the AEA.

62.    Moreover, there is no meaningful notice or meaningful opportunity for individuals to challenge their designation as alien enemies. There is thus a significant risk that even individuals who do not fall under the terms of the Proclamation will be subject to it.

63.    The Proclamation also violates the process and protections that Congress has prescribed elsewhere in the country's immigration laws for the removal of noncitizens.

64.    As a result, countless Venezuelans are at imminent risk of removal pursuant to the Proclamation without any hearing or meaningful review, regardless of the absence of any ties to TdA or the availability of claims for relief from and defenses to removal. And for some people, it is too late. As described in more detail below, over 130 individuals were removed on March 15

to a prison in El Salvador known for dire conditions, torture, and other forms of physical abuse—

possibly for life. They have lost all contact with their attorneys, family, and the world.

**Implementation of the Proclamation and Subsequent Litigation**

65.     Upon information and belief, prior to the public issuance of the Proclamation,

Respondents developed a memorandum for federal law enforcement officers with guidance on

implementation of the Proclamation.

66.     Prior to the public issuance of the Proclamation, ICE had moved Venezuelan

detainees into position such that, when the Proclamation was made public, the detainees were

already being transported to the airport and loaded onto planes.

67.     Those flights took off quickly and, despite this Court's order to return individuals

on the flights who were being removed pursuant to the AEA, the planes continued to El Salvador

where the individuals were promptly detained in that country's notorious Terrorism Confinement

Center ("CECOT").

68.     The government also sent eight Venezuelan women to CECOT, presumably

pursuant to the Proclamation. However, upon landing, Salvadoran officials informed U.S.

officials that CECOT does not imprison women. The government returned the eight Venezuelan

women to the United States, along with a Nicaraguan man whom they also attempted to send to

CECOT.

69.     Petitioners received no advance notice of the basis for their removal. Neither

Petitioners nor their attorneys were told that they had been designated "alien enemies." They

were not told that they could challenge that designation. Nor were they given an opportunity to

do so. They were not even told where the plane was going when they boarded.

70.    It later emerged that Respondents had a notice form asserting that an individual is an "alien enemy" and stating that they are "not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal." But the CECOT Subclass received no such notice. Nor did their lawyers.

71.    It also emerged that Respondents used a checklist to identify alleged TdA members. The checklist gave points for certain characteristics. Eight points meant the individual was "verified" as TdA. The checklist included characteristics such as "subject has tattoos denoting membership/loyalty to TDA" and "subject possesses written rules, constitution, membership certificates, bylaws, etc. indicating . . . membership of or allegiance to TDA."

72.    Whether most (or perhaps all) of the class members lack ties to TdA remains to be seen, because the government secretly rushed the men out of the country and has provided Petitioners with no information about the class. But evidence since the flights on March 15 increasingly shows that many members of the CECOT Subclass removed to El Salvador are not "members" of TdA as is required to fall within the Proclamation; many have no ties to TdA at all.

73.    Respondents' errors are unsurprising because the methods they employ in the checklist are flawed. For example, the checklist relies on indicators like tattoos or other iconography, despite the fact that TdA does not have common tattoos or symbols. It also relies on possessing an official "indicia" of the organization, like membership certificate or written rules—but the government's own declarants have conceded that TdA is "decentralized" and "loosely organized."

74.    These mistakes are devastating. Individuals who are wrongly designated are deported to El Salvador's notorious CECOT prison, as has already occurred to a number of class

17

members. Respondents have repeatedly taken the position that they cannot or will not take any meaningful steps to facilitate the return of individuals from CECOT.

75.     Since March 15, Respondent DOD has operated at least one flight transporting individuals from the United States to CECOT in El Salvador. Several of those individuals were alleged to be affiliated with TdA.

76.     Respondents have custody or constructive custody over the individuals designated under the AEA, including those detained at CECOT. Respondents are responsible for the restraints on the liberty of these individuals.

77.     Individuals detained at CECOT are detained at the behest of Respondents, and Respondents are paying El Salvador millions of dollars to detain them, as Respondent Secretary Rubio has publicly explained.

78.     Respondents are outsourcing part of the United States' prison system to El Salvador. Respondent Secretary Noem has publicly described the transfer of U.S. residents to CECOT as "one of the tools" in the United States' "toolkit" "that we will use if you commit crimes against the American people."

79.     Upon information and belief, Respondents are aware that the Salvadoran government mistreats and tortures individuals detained in CECOT.

80.     Respondents are attempting to deliberately prevent individuals designated under the AEA, including individuals detained at CECOT, from seeking judicial review.

81.     Respondents have also taken the position that noncitizens subject to the Proclamation are not be afforded credible fear interviews, nor will claims for protection under the Convention Against Torture ("CAT") be recognized.

82. Petitioners obtained a TRO against Respondents' unlawful action from this Court on March 15. Respondents sought a stay of the TRO in the D.C. Circuit. The D.C. Circuit denied the motions for stay in a per curiam opinion. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025). Judge Henderson, concurring, found that the orders were appealable but that Respondents had failed to establish a likelihood of success on the merits because, in her preliminary view, that the AEA's statutory predicates of "invasion" and "predatory incursion" were not met. *Id.* at *1–13 (Henderson, J., concurring). Judge Millett, also concurring, wrote that the order was not appealable and that if the court were to reach the merits, Respondents were unlikely to prevail on their jurisdictional arguments and that the balance of equities weighed against Respondents. *Id.* at *13–31 (Millett, J., concurring). Judge Walker dissented, acknowledging that Petitioners had a right to contest their designation as enemy aliens under the Proclamation but contending that those claims must be brought in habeas in the district of confinement. *Id.* at *31–40 (Walker, J., concurring).

83. Respondents then sought a stay in the Supreme Court. The Court held that "AEA detainees must receive notice after the date of this order that they are subject to removal under the Act . . . within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025).

84. Despite the Supreme Court's clear instructions, Respondents again attempted to remove individuals under the AEA with inadequate process. On April 16, within hours of a district court in the Northern District of Texas denying a TRO and deferring decision on class certification, the government gave detainees a Bluebonnet Detention Center in Texas an English-only form, not provided to any attorney, which nowhere mentioned the right to contest the

designation or removal, much less explained how detainees could do so. ICE officers told detainees that they would be removed within 24 hours.

85.    Petitioners' counsel sought relief at the Fifth Circuit and the Supreme Court. Petitioners' counsel also sought relief in this court, in the form of a request to expedite their TRO regarding notice. This Court held a hearing in which Respondents stated that they would not remove anyone that same day, but Respondents reserved the right to remove people under the AEA the following day.

86.    At 12:51 a.m. EDT on Saturday, April 19., the Supreme Court directed the government not to remove any member of the putative class of detainees from the United States until further order of the Court.

87.    On April 23, 2025, Respondents submitted a declaration in the Southern District of Texas, under seal, with information about the notice process that the government had for individuals designated for removal under the AEA. *See* Cisneros Decl., *J.A.V. v. Trump*, No. 1:25-cv-072 (S.D. Tex. filed Apr. 23, 2025), ECF No. 45, Exhibit D. That declaration and its accompanying exhibit were unsealed the next day. Oral Order, *J.A.V. v. Trump*, No. 1:25-cv-072 (S.D. Tex. Apr. 24, 2025). The declaration states that individuals are given 12 hours' notice ahead of scheduled removal and that if they express an intent to file a habeas petition, they are given 24 hours to actually file that petition. Cisneros Decl. ¶ 11. The notice process is patently inadequate as a matter of due process.

## CLASS ALLEGATIONS

88.    Petitioners and Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

89.     This Court has already certified a class of "All noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua' and its implementation."

90.     Petitioners and Plaintiffs seek to amend the class definition to: "All noncitizens who have been, are or will be subject to the March 2025 Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua' and/or its implementation."

91.     Petitioners further seek to certify the following subclasses under Federal Rules of Civil Procedure 23(a) and 23(b)(2):

   a.   "CECOT Subclass": All noncitizens in custody at the Terrorism Confinement Center ("CECOT") in El Salvador who were, are, or will be subject to the March 2025 Presidential Proclamation entitled "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua" and/or its implementation.

   b.   "Criminal Custody Subclass": All noncitizens in criminal custody who were, are, or will be subject to the March 2025 Presidential Proclamation entitled "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua" and/or its implementation.

92.     Petitioners and Plaintiffs, together, seek to represent the class, and seek injunctive and declaratory relief for Claims I–VIII, as specified below.

93.     Petitioners Frengel Reyes Mota, Andry Jose Hernandez Romero, J.A.B.V., M.A.O.R., G.A.A.A., and M.R.M. are currently detained in CECOT and also seek to represent

the CECOT Subclass. They seek habeas, injunctive, and declaratory relief for Claims I–XIII, as specified below.

94.    Petitioner T.C.I. is currently detained in criminal custody and also seeks to represent the Criminal Custody Subclass. He seeks habeas, injunctive, and declaratory relief for Claims I–IX, as specified below, in addition to Claims X–XIII, as specified below, insofar as the Criminal Custody Subclass face an imminent risk of removal and detention at CECOT or a facility with equivalent conditions.

95.    Plaintiffs are the original Plaintiffs in *J.G.G. v. Trump*: J.G.G., G.F.F., J.G.O, W.G.H., and J.A.V. Because Plaintiffs have filed habeas actions in their districts of confinement and do not seek relief in this Court through the writ of habeas corpus, they continue to be designated as "Plaintiffs," not "Petitioners." Among other things, Plaintiffs continue to seek—as a matter of due process—meaningful notice of the government's intent to remove them. *See J.G.G. v. Trump*, No. 24A931, 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025) (per curiam) (due process requires government to provide detainees notice that they are subject to removal "within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue"). Because this claim is a precondition to the effective exercise of habeas rights, it lies outside of habeas. In addition, Plaintiffs continue to advance their original claims in equity and under the Administrative Procedure Act. *See* Claims, *infra*.

96.    The proposed class and subclasses satisfy the requirements of Rule 23(a) and Rule 23(b)(2).

97.    The proposed class and both subclasses satisfy the requirements of Rule 23(a)(1) because they are so numerous that joinder of all members is impracticable. Besides the five originally named petitioners who were nearly removed on March 15, 2025, there are at least 137

individuals were actually removed to the CECOT prison on March 15 pursuant to the AEA. After those removals, on March 18, 2025, the government identified 54 members of TdA in detention, 32 in criminal custody and 172 on its nondetained docket. That means there were roughly nearly 400 people in the entire class as of mid-March 2025, of whom at least 137 were in the CECOT subclass and 32 in Criminal Custody subclass. The government also confirmed that it continues to monitor and identify more TdA members. On April 18, 2025, the government attempted to remove dozens more Venezuelan men pursuant to the AEA.

98.     Joinder is also impracticable because class members are largely detained and unrepresented, in addition to being geographically spread out. Joinder is also impracticable because many in the proposed class and subclasses are pro se, indigent, have limited English proficiency, and/or have a limited understanding of the U.S. judicial system. Despite over 130 subclass members at CECOT, Respondents have not provided information about the individuals detained there and are holding them incommunicado, without any access to the outside world, let alone the ability to communicate with any existing or potential counsel. Due to their imprisonment and isolation from the world, the CECOT subclass members cannot practically bring their own challenges. Similarly, Respondents will not provide information about any of the class members in the United States, even to their immigration counsel. Because of the swift timeline for notice and removals, class and subclass members are not able to effectively seek judicial review on an individual basis.

99.     The proposed class and both subclasses satisfy the commonality requirements of Rule 23(a)(2). The members of the proposed class and subclasses are subject to a common practice: designation under the Proclamation and either the threat or actual summary removal pursuant to the AEA. The suit raises at least one question of law common to the entire class:

what notice and process is due for those who are designated under the Proclamation. The suit also raises other questions of law common to members of the proposed class and both subclasses, including whether the Proclamation and its implementation violate the AEA, the INA, and the statutory protections for asylum seekers. Moreover, the subclasses share common questions of law and fact regarding the conditions of confinement at CECOT, and whether their current or imminent imprisonment there violates the Fifth, Sixth, and Eighth Amendments.

100.    The proposed class and both subclasses satisfy the typicality requirements of Rule 23(a)(3), because the claims of the representative Plaintiffs and Petitioners are typical of the claims of the class. Each proposed class member, including the Plaintiffs, has experienced the same principal injury (inability to challenge their designation), based on the same government practices (the implementation of the Proclamation without meaningful notice), which is unlawful as to the entire class. Each proposed CECOT subclass member, including the proposed CECOT subclass representatives, Frengel Reyes Mota, Andry Jose Hernandez Romero, J.A.B.V., M.A.O.R., G.A.A.A., and M.R.M., has experienced or faces the same principal injury (unlawful removal to CECOT), based on the same government practice (the Proclamation and its implementation), which is unlawful as to the entire subclass because it violates the AEA, the INA, the APA, and various provisions of the Constitution. Similarly, each proposed Criminal Custody subclass member, including the proposed Criminal Custody subclass representative, T.C.I., also faces the same principal injury (imminent removal to CECOT), based on the same government practice (the Proclamation and its implementation), which is unlawful as to the entire subclass because it violates the AEA, the INA, the APA, and various provisions of the Constitution.

101.     The proposed class and both subclasses satisfy the adequacy requirements of Rule 23(a)(4). The representative Plaintiffs and Petitioners seek the same relief as the other members of the class, including a meaningful procedure for notice and opportunity to be heard that comports with due process. The representative Petitioners seek the same relief as the other members of both subclasses—among other things, an order declaring the Proclamation unlawful and an injunction preventing enforcement of the Proclamation and to facilitate their return to the United States. In defending their rights, Plaintiffs and Petitioners will defend the rights of all proposed class members and subclass members fairly and adequately.

102.     Both the class and subclasses are represented by experienced attorneys from the American Civil Liberties Union and the Democracy Forward Foundation. Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens.

103.     The class and subclasses also satisfy Rule 23(b)(2). Respondents have acted (or will act) on grounds generally applicable to the class and subclasses by subjecting them to summary removal under the Proclamation rather than affording them the protection of immigration laws. Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole. Habeas, injunctive and declaratory relief is also appropriate with respect to both subclasses as a whole.

## HARM TO PLAINTIFFS AND PETITIONERS

104.     Countless Venezuelans fear imminent removal under the Proclamation based on flimsy allegations that they will have no change to rebut. And named Plaintiffs J.G.G., J.A.V., G.F.F., W.G.H. and J.G.O. all fear removal under the Proclamation because the government has previously attempted to remove them as alien enemies. While the named Plaintiffs as of today

have obtained temporary relief in other proceedings, that relief is temporary and in the absence of it, they are at imminent risk of unlawful removal.

105.    For the Plaintiffs, Petitioners, and putative class members who have not yet been removed to El Salvador, they face serious harm if they are removed to El Salvador, where they will be subject to egregious conditions at CECOT. Many Plaintiffs and Petitioners also fear return to Venezuela, where they have a well-founded fear of persecution.

106.    Petitioner T.C.I. also fears removal under the Proclamation because the government has previously pressured him to sign a paper stating that he was a member of Tren de Aragua and subject to removal. He has not obtained any temporary relief and is at imminent risk of unlawful removal.

107.    Petitioner T.C.I. also fears removal to Venezuela, where he will be targeted by gang members, as with many putative subclass members.

108.    Petitioners Frengel Reyes Mota, Andry Jose Hernandez Romero, J.A.B.V., M.A.O.R., G.A.A.A., and M.R.M. are already facing serious harm after being removed to El Salvador, where they are currently subject to egregious conditions at CECOT.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Ultra Vires, Violation of 50 U.S.C. § 21**
**(Class and Subclasses against All Respondents)**

109.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

110.    The AEA does not authorize the removal of noncitizens from the United States absent a "declared war" or a "perpetrated, attempted, or threatened" "invasion or predatory incursion" into the United States by a "foreign nation or government." *See* 50 U.S.C. § 21. The

Proclamation mandates Petitioners' and Plaintiffs' removal under the AEA where those preconditions have not been met, and Petitioners imprisoned at CECOT have already been removed under the AEA where those preconditions were not met.

111.    The AEA also does not authorize the removal of noncitizens from the United States unless they "refuse or neglect to depart" from the United States. *See* 50 U.S.C. § 21. The Proclamation mandates Petitioners' and Plaintiffs' removal under the AEA where those preconditions have not been met, and Petitioners have been removed under the AEA where those preconditions were not met.

112.    The AEA Process, which was purportedly established pursuant to the authority of 50 U.S.C. § 21, was not authorized by that law.

113.    The application of the AEA Process to Petitioners and Plaintiffs is therefore ultra vires.

114.    The application of the AEA Process to Petitioners and Plaintiffs is contrary to law. *See* 5 U.S.C. § 706(2)(A).

**SECOND CLAIM FOR RELIEF**

**Violation of 8 U.S.C. § 1101, *et seq.***
**(Class and Subclasses against All Respondents)**

115.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

116.    The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

117.    The INA provides that a removal proceeding before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine

whether to remove an individual, "[u]nless otherwise specified" in the INA. 8 U.S.C.

§ 1229a(a)(3).

118.    The AEA Process creates an alternative removal mechanism outside of the

immigration laws set forth by Congress in Title 8.

119.    The INA's "exclusive procedure" and statutory protections apply to any removal

of a noncitizen from the United States, including removals authorized by the AEA. Because the

AEA Process provides for the removal of Petitioners and Plaintiffs without the procedures

specified in the INA, it violates 8 U.S.C. § 1229a and the INA.

120.    As a result, the application of the AEA to Petitioners and Plaintiffs, which will

result or has resulted in their removal from the United States, is contrary to law. See 5 U.S.C.

§ 706(2)(A).

121.    In addition, by refusing to grant Petitioners and Plaintiffs access to the procedures

specified in the INA, Respondents have withheld and unreasonably delayed actions mandated by

the statute. 5 U.S.C. § 706(1).

### THIRD CLAIM FOR RELIEF

**Violation of 8 U.S.C. § 1158, Asylum**
**(Class and Subclasses against All Respondents)**

122.    All of the foregoing allegations are repeated and realleged as if fully set forth

herein.

123.    The INA provides, with certain exceptions, that "[a]ny alien who is physically

present in the United States or who arrives in the United States (whether or not at a designated

port of arrival and including an alien who is brought to the United States after having been

interdicted in international or United States waters), irrespective of such alien's status, may apply

for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

124.    Respondents' application of the AEA Process to Petitioners and Plaintiffs prevents them from applying for asylum in accordance with 8 U.S.C. § 1158(a)(1), and is therefore contrary to law. *See* 5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1231(b)(3), Withholding of Removal
### (Class and Subclasses against All Respondents)

125.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

126.    The "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C. § 1231(b)(3), bars the removal of noncitizens to a country where it is more likely than not that they would face persecution.

127.    Respondents' AEA Process and regulations violate the withholding of removal statute because they do not provide adequate safeguards to ensure that Petitioners and Plaintiffs are not returned to a country where it is more likely than not that they would face persecution. As a result, Respondents' actions against Petitioners and Plaintiffs are contrary to law. *See* 5 U.S.C. § 706(2)(A).

128.    In addition, by refusing to grant Petitioners and Plaintiffs the procedural protections to which they are entitled, Respondents have withheld and unreasonably delayed actions mandated by the statute. 5 U.S.C. § 706(1).

## FIFTH CLAIM FOR RELIEF

### Violation of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"),
### codified at 8 U.S.C. § 1231 note
### (Class and Subclasses against All Respondents)

29

129.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

130.    FARRA prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.

131.    Respondents' AEA Process and regulations violate FARRA because they do not provide adequate safeguards to ensure that Petitioners and Plaintiffs are not returned to a country where it is more likely than not that they would face torture. As a result, Respondents' actions against Petitioners and Plaintiffs are contrary to law. *See* 5 U.S.C. § 706(2)(A).

132.    In addition, by refusing to grant Petitioners and Plaintiffs the procedural protections to which they are entitled, Respondents have withheld and unreasonably delayed actions mandated by the statute. 5 U.S.C. § 706(1).

### SIXTH CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**(Class and Subclasses against All Respondents except Respondent Trump)**

133.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

134.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion." 5 U.S.C. § 706(2)(A).

135.    Respondents' actions are arbitrary and capricious. Respondents have failed to consider relevant factors in applying the AEA Process, including the risk of torture and other inhumane treatment at CECOT, and Venezuelans' fear of persecution and torture in their home country. Respondents also relied on factors Congress did not intend to be considered, and offered no sufficient explanation for their decision to remove them from this country.

136.    The subjection of Petitioners and Plaintiffs to the AEA Process is arbitrary and capricious because it also departs from existing agency policies prohibiting the return of individuals who fear persecution or torture, without providing a reasoned explanation for departing from these policies.

## SEVENTH CLAIM FOR RELIEF

### *Ultra Vires*, Violation of 50 U.S.C. § 22
### (Class and Subclasses against All Respondents)

137.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

138.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

139.    The AEA requires that noncitizens whose removal is authorized by the AEA, unless "chargeable with actual hostility, or other crime against the public safety," be allowed the full time stipulated by treaty to depart or a reasonable time in which to settle their affairs before departing. *See* 50 U.S.C. § 22. The Proclamation denies Petitioners and Plaintiffs any time under Section 22 to settle their affairs, because it declares everyone subject to the Proclamation to be "chargeable with actual hostility" and to be a "danger to public safety," without any kind of individualized determination.

140.    The AEA Process thus contravenes 50 U.S.C. § 22 and is *ultra vires*.

141.    The application of the AEA Process to Petitioners and Plaintiffs is contrary to law. *See* 5 U.S.C. § 706(2)(A).

**EIGHTH CLAIM FOR RELIEF**

**Violation of Due Process Under the Fifth Amendment
(Class and Subclasses against All Respondents)**

142.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

143.    The Due Process Clause of the Fifth Amendment provides in relevant part that: "No person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

144.    In denying Petitioners and Plaintiffs adequate notice and meaningful procedural protections to challenge their removal, the Proclamation violates due process.

145.    The Proclamation also denies Petitioners and Plaintiffs the opportunity to voluntarily depart and any time to settle their affairs before departing and thus violates the due process.

**NINTH CLAIM FOR RELIEF**

**Violation of Habeas Corpus
(Subclasses against All Respondents)**

146.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

147.    Detainees have the right to file petitions for habeas corpus to challenge the legality of their detention and raise other claims related to their detention or to the basis for their removal.

148.    The ongoing or imminent detention of Petitioners under the Alien Enemies Act has violated, continues to violate, and will violate their right to habeas corpus. *See* U.S. Const. art. I, § 9, cl. 2 (Suspension Clause); 28 U.S.C. § 2241.

**TENTH CLAIM FOR RELIEF**

**Ultra Vires, Post-Removal Imprisonment in Violation of 50 U.S.C. § 21**
**(Subclasses against All Respondents)**

149.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

150.    When the AEA's conditions have been met, the AEA authorizes a series of actions the executive branch may take with respect to alien enemies residing in the United States: in particular, alien enemies are liable to be "apprehended, restrained, secured, and removed." 50 U.S.C. § 21. But the AEA does not authorize the detention of alien enemies *after* they have been removed from the United States.

151.    The ongoing or imminent imprisonment of Petitioners in El Salvador, following their removal, contravenes the AEA and is *ultra vires*.

152.    The ongoing or imminent imprisonment of Petitioners in El Salvador, following their removal, is contrary to law. *See* 5 U.S.C. § 706(2)(A).

**ELEVENTH CLAIM FOR RELIEF**

**Punitive Civil Detention in Violation of the Fifth Amendment**
**(Subclasses against All Respondents)**

153.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

154.    Detention under the auspices of the AEA, like other forms of immigration detention, is civil detention. Civil detention is subject to due process constraints and must therefore be justified by a regulatory, nonpunitive purpose. *See Bell v. Wolfish*, 441 U.S. 520, 535, 538-39 (1979). Those held in such detention have a due process right not to be subjected to any condition, practice, or policy that constitutes punishment.

155.    Respondents are detaining or will imminently detain Petitioners at CECOT for the purpose of punishment and with the expressed intent to punish.

156.    Respondents have identified no legitimate reason for transferring and holding detainees at the notorious CECOT prison in El Salvador, other than to deter future migration to the United States, induce self-deportation, and coerce people into giving up claims and accepting deportation. These are impermissible justifications for civil immigration detention.

157.    Respondents' ongoing or imminent detention of Petitioners at CECOT also subjects them to punitive conditions that violate their due process rights as civil detainees. *See Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

158.    Respondents' ongoing or imminent detention of Petitioners at CECOT subjects them to harsher detention conditions than they would face in U.S. prisons and immigration detention facilities—hallmarks of punitive detention.

159.    For these reasons, detention at CECOT constitutes unlawful punishment, in violation of the Fifth Amendment of the U.S. Constitution.

## TWELFTH CLAIM FOR RELIEF

### Criminal Punishment in Violation of the Fifth and Sixth Amendments
### (Subclasses against All Respondents)

160.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

161.    Imprisonment at CECOT, based on unproven accusations of criminal conduct, constitutes criminal punishment in violation of the Fifth and Sixth Amendments. Respondents' intent to criminally punish Petitioners is plain from the circumstances of their confinement at CECOT and from Respondents' own statements. Hallmarks of criminal punishment include a

finding that a person committed acts in violation of a criminal law, the stigma inherent in such a determination, and a resulting deprivation of liberty.

162. Respondents have made or will imminently make summary determinations that Petitioners are "terrorists" and members of a "criminal organization," with no due process.

163. Senior U.S. government officials, including President Trump, have made statements reiterating these accusations and conclusory findings that Petitioners are "criminals," making their intent to punish clear and amplifying the resulting stigma.

164. Respondents have deprived or will imminently deprive Petitioners of their liberty, subjecting them to criminal detention at CECOT in some of the most punitive conditions imaginable.

165. The Fifth and Sixth Amendments guarantee fundamental protections in connection with criminal punishment, including the right to notice of the government's allegations, the right to counsel, the right to trial by a jury, the right to proof beyond a reasonable doubt, and the protection against double jeopardy.

166. Respondents have not afforded Petitioners any of these protections, despite subjecting them to ongoing or imminent criminal punishment.

167. By the actions described above, Respondents have denied or will imminently deny Petitioners the process they are due with regard to their ongoing seizure and detention, in violation of the Due Process Clause of the Fifth Amendment.

168. By the actions described above, Respondents have denied or will imminently deny Petitioners the fundamental protections of the Sixth Amendment.

169. For these reasons, the ongoing or imminent imprisonment of Petitioners at CECOT constitutes criminal punishment that violates the Fifth and Sixth Amendments.

## THIRTEENTH CLAIM FOR RELIEF

### Conditions of Confinement in Violation of the Eighth Amendment
### (Subclasses against All Respondents)

170.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

171.    The Eighth Amendment prohibits cruel and unusual punishment.

172.    Under the Eighth Amendment, Respondents must provide for Petitioners' basic human needs, including food, shelter, medical care, and reasonable safety. *DeShaney v. Winnebago County Dept. of Social Svcs*., 489 U.S. 189, 199-200 (1989). Respondents must also avoid the use of excessive physical force.

173.    In subjecting Petitioners to ill treatment, unsafe conditions, inadequate subsistence, inadequate medical care, and excessive physical force at CECOT, Respondents are violating or will imminently violate Petitioners' Eighth Amendment rights to decent and humane treatment in criminal confinement.

### PRAYER FOR RELIEF

WHEREFORE, Petitioners and Plaintiffs respectfully pray this Court to:

a.    Certify this action as a class action on behalf of the proposed class and subclasses, appoint the Petitioners and Plaintiffs as class representatives; Petitioners as subclass representatives; and undersigned counsel as class counsel;

b.    Order Respondents to provide notice of AEA designation to Plaintiffs, Petitioners, and class counsel, and an opportunity to challenge such designation at least 30 days prior to the removal date;

c.  Grant a writ of habeas corpus that (1) enjoins Respondents from removing Petitioners pursuant to the Proclamation or, in the event they have already been removed to CECOT, that orders Respondents to facilitate their return to the United States; and (2) enjoins Respondents from detaining Petitioners or otherwise regulating them pursuant to the Proclamation;

d.  Enjoin Respondents from removing Petitioners and Plaintiffs from the United States pursuant to the Proclamation;

e.  Enjoin Respondents from detaining or otherwise regulating Petitioners and Plaintiffs pursuant to the Proclamation;

f.  Declare unlawful the Proclamation and the AEA Process, including detention of Petitioners at CECOT;

g.  Order Respondents to facilitate the return of the CECOT Subclass to the United States;

h.  Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

i.  Grant such further relief as the Court deems just, equitable, and appropriate.


Dated: April 24, 2025                        Respectfully submitted,

                                             /s/ *Lee Gelernt*

Noelle Smith                                 Lee Gelernt (D.D.C. Bar No. NY0408)
Oscar Sarabia Roman                          Daniel Galindo (D.D.C. Bar No. NY035)
My Khanh Ngo                                 Ashley Gorski
Cody Wofsy                                   Patrick Toomey
AMERICAN CIVIL LIBERTIES UNION               Sidra Mahfooz
FOUNDATION                                   Omar Jadwat
425 California Street, Suite 700             Hina Shamsi (D.D.C. Bar No. MI0071)
San Francisco, CA 94104                      AMERICAN CIVIL LIBERTIES UNION
(415) 343-0770                               FOUNDATION
nsmith@aclu.org                              125 Broad Street, 18th Floor
osarabia@aclu.org                            New York, NY 10004

mngo@aclu.org
cwofsy@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
Aditi Shah (D.C. Bar No. 90033136)*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org
ashah@acludc.org


*Admission to DDC Bar pending

(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich
Skye Perryman (D.C. Bar No. 984573)
Audrey Wiggins (DC Bar No. 482877)
Christine L. Coogle (DC Bar No. 1738913)
Pooja Boisture
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org
awiggins@democracyforward.org
ccoogle@democracyforward.org
pboisture@democracyforward.org

*Attorneys for Petitioners-Plaintiffs*