# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf of
FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

## PETITIONERS-PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Petitioners–Plaintiffs ("Petitioners") file this motion seeking urgent preliminary relief on behalf of two subclasses who are already facing or imminently face grave and irreparable harm from the government's unlawful use of the Alien Enemies Act ("AEA") to summarily expel individuals from the United States and imprison them in El Salvador. The two subclasses include: (1) individuals whom the government has already unlawfully removed under the AEA and are imprisoned in El Salvador's notorious Terrorism Confinement Center ("CECOT") (the "CECOT Subclass"); and (2) individuals who are currently in criminal custody in the United States but have been or will be designated under the AEA (the "Criminal Custody Subclass"). For reasons explained below, the Court has jurisdiction over Petitioners' claims, including their habeas claim, and venue is proper in this District.

Petitioners seek two primary forms of preliminary relief. First, for the CECOT Subclass, Petitioners seek an Order requiring Respondents to immediately request and take all reasonable steps to facilitate the return of the subclass to the United States from Respondents' jailer in El Salvador. *See Noem v. Abrego Garcia*, 604 U.S. ---, 2025 WL 1077101 (U.S. Apr. 10, 2025) (per curiam); *Abrego Garcia v. Noem*, No. 8:25-cv-00951, ECF No. 79 at 4 (D. Md. Apr. 15, 2025); *J.O.P. v. DHS*, No. 8:19-CV-01944, ECF No. 253 at 12–15 (D. Md. Apr. 23, 2025). That includes, but is not limited to, requiring Respondents to request that their contractors and agents in El Salvador transfer the CECOT Subclass to the physical custody of the United States, and requiring Respondents to cease paying their contractors and agents in El Salvador to detain the CECOT Subclass. Second, for the Criminal Custody Subclass, Petitioners seek an Order enjoining Respondents from removing any subclass member from the United States under the President's AEA Proclamation; and requiring Respondents to provide immediate, adequate

notice of designation to each subclass member and class counsel, and a reasonable opportunity of no less than 30 days to challenge their designation, detention, and removal under the AEA, consistent with due process. *See Trump v. J.G.G.*, 604 U.S. ---, 2025 WL 1024097, at *2 (Apr. 7, 2025) (per curiam); *see also J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *14–15 (D.C. Cir. Mar. 26, 2025) (Millett, J., concurring).

As to the preliminary injunction factors, the unprecedented Proclamation at the heart of this case is unlawful because the AEA is a wartime measure that cannot be used where, as here, there is neither an "invasion or predatory incursion" nor such an act perpetrated by a "foreign nation or government." 50 U.S.C. § 21. And even if it could be used against a non-military criminal "gang" during peacetime, targeted individuals must be provided with a meaningful chance to contest that they fall within the Proclamation's scope. That is particularly so given the increasing number of class members who dispute the government's allegations of gang affiliation. For these and other reasons, Petitioners are likely to succeed on the merits. The remaining factors also decidedly tip in Petitioners' favor. In the absence of an injunction, the government will be free to send hundreds more individuals to the notorious Salvadoran prison where they may be held incommunicado for the rest of their lives. The government will suffer no comparable harm given that the injunction would not prevent it from prosecuting anyone who commits a criminal offense, detaining anyone under the Act or other authority, or removing anyone under the immigration laws—and the Supreme Court has already ruled that due process requires reasonable notice and the opportunity to obtain judicial review. A preliminary injunction is warranted to preserve the status quo.

## LEGAL AND FACTUAL BACKGROUND

As described more fully in the prior preliminary injunction motion, ECF No. 67-1, the President has invoked the AEA on the theory that Tren de Aragua ("TdA"), a Venezuelan gang, is "perpetrating, attempting, and threatening an invasion or predatory incursion" against the United States. *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025) ("Proclamation").[1] This is despite the fact that experts—and the government's own intelligence agencies and declarants in this case— characterize TdA as a loose, decentralized group without a clear hierarchy or membership. ECF No. 67-1 at 7; ECF No. 77 at 13 & nn.8–9. Experts also maintain that there is no evidence of direct and stable links between the Maduro regime and TdA or evidence of a coordinated TdA presence in the United States. ECF No. 67-1 at 7–8.

As this Court is aware from prior hearings, the government has twice attempted to remove Petitioners under this unlawful Proclamation, both times with inadequate notice. The first time, the government began staging Petitioners on planes in the Southern District of Texas before the Proclamation was even issued and gave them no notice or opportunity to contest their designation. ECF No. 67-1 at 2. It unlawfully removed more than 130 class members to the Centro de Confinamiento del Terrorismo ("CECOT"), a notorious prison in El Salvador. Those individuals remain imprisoned at CECOT.

After this first wave of removals, the Supreme Court clarified that individuals "must receive notice . . . that they are subject to removal under the Act," and such "notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *J.G.G.*, 2025 WL 1024097, at *2.

---

[1] *Available at* https://perma.cc/ZS8M-ZQHJ.

But the government continued its pattern of inadequate notice. Stymied by a subsequent TRO in the Southern District of Texas, the government moved a large group of Venezuelans to the Northern District of Texas. After a judge in that district denied a TRO as to the named petitioners and deferred decision on class certification—based on his understanding that the government's representations "strongly suggest[ed]" it would not seek to remove class members under the Proclamation without adequate notice, *W.M.M. v. Trump*, No. 1:25-cv-00059, ECF No. 27 at 8–9 (N.D. Tex. Apr. 17, 2025)—the government quickly distributed AEA notices to detainees and not long after began loading them onto vehicles, *W.M.M. v. Trump*, No. 1:25-cv-00059, ECF No. 30 at 1 (N.D. Tex. Apr. 18, 2025). The English-only form, not provided to any attorney, nowhere mentioned the right to contest the designation or removal, much less explained how detainees could do so. ECF No. 92-1. It also did not provide a timeline by which designees needed to seek habeas relief. *Id.*

The government later informed a judge in the Southern District of Texas—in a declaration initially filed under seal and later unsealed by the court—that designees have 12 hours to indicate or express an intent to file a habeas petition (despite no reference to that option in the notice). Cisneros Decl. ¶ 11 & Notice Form (ECF Nos. 49 & 49-1), *J.A.V. v. Trump*, No. 1:25-cv-72 (S.D. Tex. Apr. 24, 2025) (ordered unsealed per Apr. 24, 2025 Minute Order). If the designee does not express any such intention, ICE may proceed with the removal. *Id.* Once a designee expresses an intent to file a habeas petition, they have 24 hours to do so. If no petition is filed within 24 hours, ICE can proceed with the removal. *Id.* While designees are permitted a phone call, Respondents do not explain how pro se detained individuals, who often do not speak English, could reasonably file a habeas petition in under 24 hours.

The lack of adequate notice is all the more concerning because, as explained in the prior preliminary injunction motion, ECF No. 67-1, designees are at grave risk of erroneous removal due to the government's dubious methods for identifying alleged TdA members. Indeed, family members of those in CECOT maintain that they have no connection at all to TdA. Exh. F (Sanchez Decl.) ¶ 14; Exh. G (D.A.R.H. Decl.) ¶ 11; Exh. H (M.Z.V.V. Decl.) ¶ 10; Exh. I (M.Y.O.R. Decl.) ¶ 11; Exh. J (M.M.A.A. Decl.) ¶ 10; Exh. K (Mendoza Decl.) ¶ 10. These errors are particularly devastating because many class members came to the United States precisely because of arbitrary arrests and detention by their government, and have strong claims for relief under our immigration laws. *See, e.g.,* Exh. F (Sanchez Decl.) ¶ 2; Exh. G (D.A.R.H. Decl.) ¶ 3; Exh. H (M.Z.V.V. Decl.) ¶ 3; Exh. I (M.Y.O.R. Decl.) ¶ 3; Exh. J (M.M.A.A. Decl.) ¶ 4.

The group of men sent to El Salvador is already suffering extreme harm due to Respondents' actions. The conditions the members of the CECOT Subclass are facing in El Salvador are horrific. *See* ECF No. 53 at 34; *see also* Exh. D (Bishop Decl.); Exh. E (Goebertus Decl.). Absent a preliminary injunction, the same fate awaits the members of the Criminal Custody Subclass, who currently remain in the United States.

## LEGAL STANDARD

To obtain a preliminary injunction, the party must show that (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer harm in the absence of preliminary relief"; (3) "the balance of equities tips in its favor"; and (4) the issuance of a preliminary injunction is "in the public interest." *Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (citation omitted).

## ARGUMENT

I.    **The Court Can Reach the Merits of Petitioners' Claims.**

A.    **Jurisdiction and Venue Are Proper in this District.**

a.    **CECOT Subclass**

i.    **The Court has habeas jurisdiction because the CECOT Subclass is in the constructive custody of Respondents.**

As other courts have recently held, the United States government plainly "exerts control over each of the nearly 200 migrants sent to CECOT." *Abrego Garcia v. Noem*, No. 8:25-CV-00951-PX, --- F. Supp. 3d ----, 2025 WL 1014261, at \*5 (D. Md. Apr. 6, 2025), *denying stay pending appeal*, No. 25-1345, 2025 WL 1021113, at \*4 (4th Cir. Apr. 7, 2025) (Thacker, J., with King, J., concurring) (district court properly determined that the U.S. government has power over CECOT detainees), *denying in part application to vacate*, 604 U.S. ---, 2025 WL 1077101 (U.S. Apr. 10, 2025) (per curiam). Thus, this Court possesses jurisdiction because the CECOT subclass members are in Respondents' constructive custody and can challenge their unlawful removal to and detention in El Salvador.

To maintain a habeas corpus action, the petitioner must be "in custody," 28 U.S.C. § 2241(c), but the Supreme Court "has given the custody requirement a liberal construction, and it is not necessary that the petitioner be in physical control of the respondent." *Steinberg v. Police Court of Albany*, 610 F.2d 449, 453 (6th Cir. 1979) (citing, *inter alia*, *Braden v. 30th Judicial Court of Ky.*, 410 U.S. 484, 498–99 (1973)); *see also, e.g.*, *Jones v. Cunningham*, 371 U.S. 236, 239, 242–43 (1963) (holding that parolee was "in custody" of parole board because of the "significant restraints" on his liberty; explaining that habeas "has not been restricted to situations in which the applicant is in actual, physical custody"). Indeed, "courts have universally held that

actual physical custody of an individual by the respondent is unnecessary for habeas jurisdiction to exist." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 47 (D.D.C. 2004) (collecting cases). Rather, habeas jurisdiction exists "where the official possesses either actual or 'constructive' custody of the petitioner. *Id.* (citing *LoBue v. Christopher*, 82 F.3d 1081, 1082 (D.C. Cir. 1996)).

A petitioner can establish constructive custody where, as here, "the respondent was responsible for significant restraints on the petitioner's liberty." *Id.* at 48 (holding that individual detained in Saudi Arabia, allegedly at the behest of U.S. officials, may establish habeas jurisdiction). Courts have also found actual or constructive custody where respondents are "working through an intermediary or an agent to detain the prisoner." *See id.* at 48–49 (citing *Braden*, 410 U.S. at 489 n.4, 498–99); *see also Munaf v. Geren*, 553 U.S. 674, 686 (2008) ("An individual is held 'in custody' by the United States when the United States official charged with his detention has 'the power to produce him,'" even if such custody "could be viewed as 'under . . . color of' another authority, such as [multinational forces].'"

Respondents plainly have custody over the CECOT Subclass. There is no question that the U.S. government is responsible for the imprisonment of the CECOT Subclass in El Salvador: it removed these Petitioners to El Salvador for the purpose of detention at CECOT. Nor is there any question that the U.S. government is working through an intermediary or agent to detain the CECOT Subclass: El Salvador is detaining these individuals at the behest of the U.S. government, and the U.S. government is paying El Salvador to house them. *See Abrego Garcia*, 2025 WL 1021113, at *4 (Thacker, J., with King, J., concurring) ("the district court properly determined that 'just as in any other contract facility, Defendants can and do maintain the power to secure and transport their detainees'"); *see, e.g.*, Exh. M (Sarabia Roman Decl.), at Exhs. 7, 11 (social media posts by Secretary of State Marco Rubio discussing U.S. agreement with Salvadoran government

to detain individuals in exchange for payment); *id.* Exh. 6 (White House spokesperson Karoline Leavitt stating the detention cost "approximately $6 million, to El Salvador").

As the *Abrego Garcia* district court found, "the federal government struck an agreement with El Salvador whereby it would pay the Salvadoran government six-million dollars for placement of the detainees in 'very good jails at a fair price that will also save our taxpayer dollars.'" 2025 WL 1014261, at *3 (quoting post by Secretary Rubio). The Salvadoran President, Nayib Bukele, "has publicly touted the agreement terms," while the El Salvador Ministry of Foreign Affairs has published its memorandum reflecting the agreement for that country to hold detainees for one year, pending the United States' decision on their "long term disposition." *Id.* President Bukele has posted on social media that El Salvador "offered the United States of America the opportunity to outsource part of its prison system," and that the United States "will pay a very low fee" to detain alleged TdA members at CECOT. *See* Exh. M (Sarabia Roman Decl.), at Exhs. 8, 10. In addition, DHS Secretary Kristi Noem has personally toured the CECOT facility and declared that transferring those previously on U.S. soil to CECOT is "one of the tools in our [the United States'] toolkit that we will use if you commit crimes against the American people." *Id.* at Exh. 9. Thus, "all publicly available information . . . indicates that the [U.S.] Government has 'outsource[d] part of the [United States'] prison system'" to El Salvador. *Abrego Garcia*, 2025 WL 1021113, at *4 (Thacker, J., with King, J., concurring); *see also* Exh. M (Sarabia Roman Decl.), at Exhs. 4–11.

Finally, the fact that Respondents have sought to "deliberately shield" the CECOT Subclass from seeking judicial review further supports habeas jurisdiction here. *Abu Ali*, 350 F. Supp. 2d at 54 ((petitioner "being held indefinitely, and without benefit of any legal proceeding," weighs in

favor of habeas jurisdiction) (citing *Rasul v. Bush*, 542 U.S. 466, 487–88 (2004) (Kennedy, J., concurring))).

### ii.  Venue is proper in this District because the CECOT Subclass is being detained abroad and outside any judicial district.

This Court is the proper venue for habeas petitions from class members detained in CECOT. *See, e.g.*, *Rasul*, 542 U.S. at 484 (holding that 28 U.S.C. § 2241 "confers on the [D.C.] District Court jurisdiction to hear [noncitizens'] habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base"). As a general rule, when a detainee is confined *within* the United States, his petition for writ of habeas corpus must name as a respondent the immediate custodian of the detainee, and the petition must be filed in the district where the detainee is confined. *See, e.g.*, *Gherebi v. Bush*, 338 F. Supp. 2d 91, 95 (D.D.C. 2004). However, the Supreme Court's decisions in *Rasul*, 542 U.S. at 484, and *Rumsfeld v. Padilla*, 542 U.S. 426, 447 n.16 (2004), "recognize an exception to the 'immediate custodian' and 'district of confinement' rules" where, as here, "the petitioner and his immediate custodian are outside the territory of any district court." *Abu Ali*, 350 F. Supp. 2d at 44 (cleaned up). In these circumstances, "the petitioner may name as respondents any of his custodians (not just the immediate custodians) and may file the claim in the court that has jurisdiction over those respondents." *Id.* Venue is proper here because the CECOT Subclass is in U.S. custody overseas, and Respondents, based in D.C., are responsible for outsourcing U.S. detention to CECOT.

### iii.  In the alternative, the Court has non-habeas jurisdiction to order Respondents to facilitate Petitioners' return to the United States, just as the Supreme Court ordered in *Abrego Garcia*.

Regardless of whether the claims of the CECOT Subclass proceed in habeas or in equity and under the APA, this Court has the authority to order Respondents to facilitate their return. As demonstrated in *Abrego Garcia*, courts have the authority to order the government to "facilitate"

the return of individuals who were "improperly sent to El Salvador." 2025 WL 1077101 at *1; *see also, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009) (removed individuals "can be afforded effective relief by facilitation of their return"); *Abrego Garcia*, 2025 WL 1021113, at *4 & n.7 (Thacker, J., with King, J., concurring) (observing that the government "can—and does—return wrongfully removed migrants as a matter of course" and collecting cases); Pls. Reply at 6–9 (ECF No. 70) (discussing courts' power to fashion equitable remedies that extend extraterritorially and collecting cases).

### b. Criminal Custody Subclass

#### i. Venue is proper in this District.

This Court is also the proper habeas venue for individuals in *criminal* custody to challenge their AEA designation. *See Padilla*, 542 U.S. at 444 (immediate custodian rule does not apply when "challeng[ing] . . . *future* confinement") (emphasis added); *Braden*, 410 U.S. at 495 ("So long as the custodian can be reached by service of process, the court can issue a writ[.]"). As part of the expansion of the "custody" requirement for habeas, courts "made it possible for prisoners in custody under one sentence to attack a sentence which they had not yet begun to serve." *Braden*, 410 U.S. at 498. Such a habeas claim also "enable[s] a petitioner held in one State to attack a detainer lodged against him in another State." *Id.*; *see also Chatman-Bey v. Thornburgh*, 864 F.2d 804, 805 (D.C. Cir. 1988) (en banc) (federal prisoner incarcerated outside the District of Columbia could maintain habeas action to determination of parole eligibility date by respondents in this District).

Over a month ago, the government stated that approximately 32 alleged members of Tren de Aragua subject to the Proclamation are in "criminal custody" with detainers on them. Cerna Decl. ¶ 6 (ECF No. 28-1). One such person is Petitioner T.C.I., who has received an AEA notice

and is awaiting sentencing while in federal criminal custody in New Jersey. Exh. L (Schulman Decl.) ¶¶ 2-4. He and the rest of the Criminal Custody Subclass are challenging Respondents' *future* exercise of AEA removal authority. Thus, regardless of where they are presently detained in criminal custody, members of this subclass may seek habeas relief from the Court here because it has jurisdiction over the Respondents who are responsible for implementing the AEA process. *See Chatman-Bey*, 864 F.2d at 813 ("[T]he physical presence of [the petitioner] within this district is not required for the federal court of this district to have jurisdiction over his habeas claim. *Braden* holds as much.").

### B. Petitioners' Claims Are Justiciable.

The Court can resolve all of Petitioners' claims in this case. As the Supreme Court recently confirmed, courts can review not only whether an individual "is in fact an alien enemy" under the AEA, but also "'questions of interpretation and constitutionality' of the Act." *J.G.G.*, 2025 WL 1024097, at *2 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 n.17 (1948)). Thus, Petitioners' claims that the AEA's statutory predicates have not been met—because TdA is not a "nation or government," and is not engaged in an "invasion" or "predatory incursion"—are fully within this Court's jurisdiction.[2]

*Ludecke* itself reached the merits of the statutory question presented there: whether a "declared war" no longer existed within the meaning of the Act when "actual hostilities" had ceased—*i.e.*, the "shooting war" had ended. 335 U.S. at 161, 166–70. The Court concluded, on the merits, that the statutory term "declared war" did not mean "actual hostilities," and that once Congress declares war, the war continues for purposes of the AEA until the political branches

---

[2] The Supreme Court also held that noncitizens subject to the AEA must receive certain procedural protections. *J.G.G.*, 2025 WL 1024097, at *1–2 (addressing plaintiffs' "due process rights"). Petitioners' substantive and procedural claims are therefore all justiciable.

declare it over. *Id.* at 170 & n.15. The "political judgment" that *Ludecke* declined to revisit, *id.* at 170, was simply the decision of Congress and the President not to formally declare the war over, *id.* at 169. Nowhere did *Ludecke* suggest that questions of statutory interpretation are beyond the courts' competence. Indeed, four years later, the Court reversed a government World War II removal decision because "[t]he statutory power of the Attorney General to remove petitioner as an enemy alien ended when Congress terminated the war." *U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952).

Consistent with *Ludecke*'s recognition (twice in the opinion) that questions about the "construction," "interpretation," and "validity" of the AEA are justiciable, 335 U.S. at 163, 171, courts have reviewed a range of issues concerning the meaning and application of the AEA's terms. *See, e.g.*, *U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 143 (2d Cir. 1947) (interpreting the meaning of "foreign nation or government"); *U.S. ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860–61 (2d Cir. 1943) ("[t]he meaning of [native, citizen, denizen, or subject] as used in the statute . . . presents a question of law"; interpreting meaning of "denizen" and remanding for hearing on disputed facts); *U.S. ex rel. Gregoire v. Watkins*, 164 F.2d 137, 138 (2d Cir. 1947) (interpreting the meaning of "native"; discussing alternatives to attain a "logically consistent construction of the statute"); *U.S. ex rel. D'Esquiva v. Uhl*, 137 F.2d 903, 905–07 (2d Cir. 1943) (interpreting the meaning of "native" and reviewing executive branch's position on legal status of Austria); *U.S. ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 903 (2d Cir. 1943) (interpreting the meaning of "citizen" and legal effects of Germany's annexation of Austria); *Bauer v. Watkins*, 171 F.2d 492, 493 (2d Cir. 1948) (holding that the government bears the burden of proof of establishing the citizenship of "alien enemy"); *Citizens Protective League v. Clark*, 155 F.2d 290, 292, 295 (D.C. Cir. 1946) (reviewing whether Proclamation was within "the precise terms" of the AEA, and whether AEA

was impliedly repealed); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) (interpreting "within the United States"; requiring executive branch to show that the petitioner "refuse[d] or neglect[ed] to depart" under Section 21); *U.S. ex rel. Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947) (interpreting "refuse or neglect to depart" in Section 21 as creating a "right of voluntary departure" that functions as a "statutory condition precedent" to the government's right to deport enemy aliens); *U.S. ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116, 117–18 (2d Cir. 1949) (interpreting "reasonable time" to depart under Section 22). These kinds of questions—concerning the "construction" and "interpretation" of the AEA, *Ludecke*, 335 U.S. at 163, 171—are squarely at issue here.

Nor does the political question doctrine pose any barrier to this Court interpreting the statutory terms of the AEA. The Supreme Court foreclosed that possibility in *J.G.G.* and *Ludecke*, by instructing courts to resolve questions of the AEA's "construction and validity" and "interpretation and constitutionality." *Id.* at 163, 171; *J.G.G.*, 2025 WL 1024097, at *2; *see also, e.g.*, *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *6–8 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (rejecting government's political-question arguments).

More generally, the political question doctrine is a "narrow exception" to courts' jurisdiction, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012), and exists primarily to reinforce the separation of powers, *Baker v. Carr*, 369 U.S. 186, 210 (1962). But applying the doctrine here would undermine Congress's constitutional authority, because it would render the limits that Congress wrote into the statute unenforceable. Petitioners are not aware of any Supreme Court decision that has found a statutory claim non-justiciable. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 855–56 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("The Supreme Court has never applied the political question doctrine in a case involving alleged

*statutory* violations."). Here, judicial review of Petitioners' challenge *preserves* the separation of powers by ensuring that the President does not exceed the specific authority Congress delegated in the AEA. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (Jackson, J., concurring). Indeed, the AEA states that the President has the power to detain and remove alien enemies when there "is" a declared war or where there "is" an invasion or predatory incursion, thereby making clear that the President cannot simply *find* or *deem* there to be a war, invasion, or incursion. *Compare* 8 U.S.C. § 1182(f) (allowing the President to suspend entry of noncitizens into the country where *he* "finds" it not in the "interests of the United States").[3]

## II.    Petitioners Are Likely to Succeed on the Merits.

### A.    The Proclamation Is Unlawful.

#### i.    Summary Removals Without Notice and a Meaningful Opportunity to Challenge "Alien Enemy" Designations Violate the AEA, Due Process, and the Supreme Court's Ruling.

As the Supreme Court has now made clear, both the AEA and Due Process require Respondents to provide Petitioners with notice and a meaningful opportunity to challenge their designation as alien enemies before removal is permissible under the Proclamation. *See J.G.G.*, 2025 WL 1024097, at *2 ("The notice must be afforded within a reasonable time and in such a manner as will allow [AEA detainees] to actually seek habeas relief in the proper venue before such removal occurs."); *see also J.G.G.*, 2025 WL 914682, at *14–15 (Millett, J., concurring) ("At its most basic, due process requires notice of adverse governmental action, an opportunity to be heard, and the right to an unbiased decisionmaker.").

---

[3] As noted at the TRO hearing, Petitioners do not seek to enjoin the President, but he remains a proper defendant because, at a minimum, Petitioners may obtain declaratory relief against him. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (concluding that court had jurisdiction to issue writ of mandamus against the President but "opt[ing] instead" to issue declaration).

As described above, Respondents have now disclosed that they give class members only 12 hours to express an intent to file a habeas petition, and only an additional 24 hours to actually file such a petition. Cisneros Decl. ¶ 11 & Notice Form (ECF Nos. 49 & 49-1), *J.A.V. v. Trump*, No. 1:25-cv-72 (S.D. Tex. Apr. 24, 2025) (ordered unsealed). That is patently insufficient. Indeed, a federal court in Colorado recently ordered that individuals detained under the Proclamation receive at least 21 days notice of the government's intent to remove them. *D.B.U. v. Trump*, No. 25-cv-1163, 2025 WL 1163530, at *1 (D. Colo. Apr. 22, 2025). That order further required that the notice be provided in a language the individual understand, inform the individual of their right to judicial review and to consult with counsel, and explain that the government seeks to remove them under the Proclamation. *Id.* That relief accords with longstanding principles of due process and reinforces that Respondents may not shortcut these requirements.

As during World War II, Defendants must provide notice to individuals at least 30 days before any attempt to remove them under the AEA. Notice must also be provided in a language that the individual understands, must state that they may seek judicial review, and must simultaneously be provided to undersigned class counsel. The notice must additionally include the factual basis for the individual's alien enemy designation. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014) ("Both the Supreme Court and this Court have recognized that the right to know the factual basis for [government] action and the opportunity to rebut the evidence supporting that action are essential components of due process."). Especially given the possibility that Defendants may seek to remove individuals with as little as 24 hours' notice, a preliminary injunction is warranted to ensure that Defendants do not remove individuals before they receive *adequate* notice and a *reasonable* opportunity to

obtain judicial review, consistent with due process. *J.G.G.*, 2025 WL 1024097, at *2 ("'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings.").

The notice requirement flows not only from due process but from the AEA itself. That is clear from the Supreme Court's understanding of the AEA in *Ludecke*, which recognized that individuals would have the opportunity to seek court review of their designation under the Act. *See, e.g.*, 335 U.S. at 171 n.17. And it is clear from the statute, which affords individuals designated as alien enemies an opportunity to voluntarily depart the United States and to settle their affairs. *See* 50 U.S.C. §§ 21–22. Among other things, the President may lawfully remove noncitizens under the AEA only when those designated noncitizens "refuse or neglect to depart" voluntarily. *See J.G.G. v. Trump*, No. 25-766, --- F. Supp. 3d ---, 2025 WL 89040130, at *14 (D.D.C. Mar. 25, 2025) (citing 50 U.S.C. § 21). Indeed, even during World War II, courts interpreting the AEA consistently recognized that "alien enemies" retained the right to voluntary departure. *See U.S. ex rel. Ludwig*, 164 F.2d at 457 (Section 21 establishes a "right of voluntary departure"); *U.S. ex rel. Von Heymann*, 159 F.2d at 653 (similar); *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the Attorney General can lawfully remove him against his will."). Under Section 21, there is no exception to the general right of voluntary departure; it is a "statutory condition precedent" to removal. *U.S. ex rel. Ludwig*, 164 F.2d at 457. Section 22 establishes separate rights concerning the particular conditions for departure, with an exception for those "chargeable with actual hostility, or other crime against the public safety." 50 U.S.C. § 22. However, that exception cannot be invoked categorically. It instead requires individualized assessments: each noncitizen must specifically be "chargeable" to lose eligibility for the rights

described in Section 22. Defendants have made no such individualized assessments here—much less provided any opportunity to contest such findings.

### ii.    The Proclamation Does Not Fall within the Statutory Bounds of the AEA.

The AEA has only ever been invoked in times of declared war: the War of 1812, World War I, and World War II. The government seeks to invoke this limited wartime authority to execute removals wholly untethered to any actual or imminent war or to the specific conditions Congress placed in the statute.

*First*, as Judge Henderson explained, *J.G.G.*, 2025 WL 914682, at *8–10, there is no "invasion" or "predatory incursion" upon the United States. Starting with contemporaneous dictionary definitions, as Judge Henderson did, *id.* at *8, it is clear that Congress understood those terms to mean a military intrusion into the territory of the United States. *See Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023) ("We start where we always do: with the text of the statute."); *see also* Webster's Dictionary, *Invasion* (1828) (underscoring that "invasion" is "particularly, the entrance of a hostile army into a country for the purpose of conquest or plunder, or the attack of a military force"); Johnson's Dictionary, *Invasion* (1773) ("invasion" is a "[h]ostile entrance upon the right or possession of another; hostile encroachment" such as when "William the Conqueror invaded England"); Webster's Dictionary, *Predatory* (1828) ("predatory" underscores that the purpose of a military party's incursion was "plundering" or "pillaging"); Johnson's Dictionary, *Incursion* (1773) ("[a]ttack" or "[i]nvasion without conquest").

Other contemporary founding era usages of the terms are in accord. The Founders frequently used both "invasion" and "predatory incursion" in the military sense. *See, e.g.*, Letter from Timothy Pickering to Alexander Hamilton (June 9, 1798) (reporting that "predatory incursions of the French" might result in "great destruction of property" but that the militia could

repel them);[4] Letter from George Washington to Thomas Jefferson (Feb. 6, 1781) (describing a British raid that destroyed military supplies and infrastructure in Richmond as a "predatory incursion");[5] Letter from George Washington to Nathanael Greene (Jan. 29, 1783) ("predatory incursions" by the British could be managed with limited cavalry troops);[6] John Jay, Con't Cong., Draft of an Address of the Convention of the Representatives of the State of New York to Their Constituents (Dec. 23, 1776) (describing the goal of British invasion as "the conquest of America").[7] Courts did the same. *Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch) 1, 11 (1805) ("predatory incursions" by Native American nation led to "an Indian war"); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 10 (1831) ("incursions" by Native American nations led to retaliatory "war of extermination"); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 545 (1832) (explaining that Pennsylvania's royal charter included "the power of war" to repel "incursions" by "barbarous nations"). And "*in every instance*" that the term "invasion" or "invade" appears in the Constitution, it "is used in a military sense." *J.G.G.*, 2025 WL 914682, at *9 (Henderson, J., concurring).

The interpretive canon of *noscitur a sociis* confirms Petitioners' interpretation. That canon "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (internal quotation marks omitted). Courts thus look to "[t]he words immediately surrounding" the language to be interpreted to ascertain the "more precise content" of that language. *Id.* (internal quotation marks omitted). Accordingly, in this case, "invasion" and "predatory incursion" should be read in light of the immediately neighboring term, "declared war."

---

[4] https://perma.cc/H2UY-XTTK.

[5] https://perma.cc/6UBY-6PRB.

[6] https://perma.cc/TY8Y-MTMA.

[7] https://perma.cc/K4SX-4KYB.

*See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) (term "gathers meaning from the words around it"). Doing so highlights the express military nature of their usage here—they are more specific than just any hostile entrance. *Cf.* Office of Legislative Affairs, Proposed Amendment to AEA, at 2 n.1 (Aug. 27, 1980) (AEA contemplates use by the President only "in situations where war is imminent"). This also comports with the common law understanding of the term "alien enemy" as subject of a foreign state at war with the United States. *See Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950) (collecting cases).

Indeed, the same Congress that passed the AEA also passed another law with strikingly similar statutory bounds. In response to concerns about impending war with France, the 1798 Congress authorized the President to raise troops "in the event of a declaration of war against the United States, or of an actual invasion of their territory, by a foreign power, or of imminent danger of such invasion." Act of May 28, 1798, ch. 47, 1 Stat. 558. This language, which, as Judge Henderson noted, "bears more than a passing resemblance to the language of the AEA," *J.G.G.*, 2025 WL 914682, at *9, makes plain that Congress was concerned about military incursions by the armed forces of a foreign nation.

Tellingly, the AEA requires that the predicate invasion or predatory incursion be "against the territory of the United States." 50 U.S.C. § 21. And at the time of founding, actions "against the territory of the United States" were expressly understood to be military in nature. *See Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 131 (1807) (describing levying war against the United States as "a military enterprize [sic] . . . against any of the territories of the United States"); *Wiborg v. United States*, 163 U.S. 632, 633 (1896) (explaining that a group of seamen were charged with preparing for a "military expedition . . . against the territory and dominions of a foreign prince").

If any doubt were left about the military nature of the terms, the historical context dispels

it. *See Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 279 (2024) (considering the "historical context" of statute for purposes of interpretation). At the time of passage, the United States was preparing for possible war with France and already under attack in naval skirmishes. French ships were attacking U.S. merchant ships in United States waters. *See, e.g.*, 7 Annals of Cong. 58 (May 1797) (promoting creation of a Navy to "diminish the probability of . . . predatory incursions" by France while recognizing that distance from Europe lessened the chance of "invasion"). Congress worried that these attacks against the territory of the United States were the precursor to all-out war with France. *J.G.G.*, 2025 WL 914682, at *1 (Henderson, J., concurring) ("In 1798, our fledgling Republic was consumed with fear . . . of external war with France."). This "predatory violence" by a sovereign nation led, in part, to the AEA. *See* Act of July 7, 1798, ch. 67, 1 Stat. 578, 578 ("[W]hereas, under authority of the French government, there is yet pursued against the United States, a system of predatory violence").

Under the statutory text, canons of construction, and historical context, then, "invasion" or "predatory incursion" are military actions by foreign governments that constitute or imminently precede acts of war. "Mass illegal migration" or criminal activities, as described in the Proclamation, plainly do not fall within the statutory boundaries. On its face, the Proclamation makes no findings that TdA is acting as an army or military force. Nor does the Proclamation assert that TdA is acting with an intent to gain a territorial foothold in the United States for military purposes. And the Proclamation makes no suggestion that the United States will imminently be at war with Venezuela. The oblique references to the TdA's ongoing "irregular warfare" within the United States do not suffice because the Proclamation makes clear that it is referring to "mass illegal migration" and "crimes"—neither of which constitute war within the founding era understanding. The Proclamation asserts that TdA "commits brutal crimes" with the goal of

"harming United States citizens, undermining public safety, and . . . destabilizing democratic nations." But these military actions are simply not "against the territory" of the United States. Indeed, if mass migration or criminal activities by some members of a particular nationality could qualify as an "invasion," then virtually any group, hailing from virtually any country, could be deemed enemy aliens.

*Second*, by no stretch of the statutory language can TdA be deemed a "foreign nation or government." Those terms refer to an entity that is defined by its possession of territory and legal authority. *See* Johnson's Dictionary, *Nation* (1773) ("A people distinguished from another people; generally by their language, original, or government."); Webster's Dictionary, *Nation* (1828) ("A body of people inhabiting the same country or united under the same sovereign government; as the English nation"); Johnson's Dictionary, *Government* (1773) ("An established state of legal authority."). Applying the whole-text canon again, *see supra*, confirms that Congress had in mind state actors. First, the AEA presumes that a designated nation possesses treaty-making powers. *See* 50 U.S.C. § 22 ("stipulated by any treaty . . . between the United States and the hostile nation or government"). Nations—not criminal organizations—are the entities that enter into treaties. *See, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 505, 507 (2008) (treaty is "a compact between independent nations" and "agreement among sovereign powers") (internal quotation marks omitted); *Holmes v. Jennison*, 39 U.S. 540, 570–72 (1840) (similar). Second, when a "nation or government" is designated under the AEA, the statute unlocks power over that nation or government's "natives, citizens, denizens, or subjects." 50 U.S.C. § 21. *Countries* have "natives, citizens, denizens, or subjects." By contrast, criminal organizations, in the government's own view, have "members." Proclamation § 1 ("members of TdA").

Historical context also reflects Congress's intent to address conflicts with foreign

sovereigns, not criminal gangs. *See* 5 Annals of Cong. 1453 (Apr. 1798) ("[W]e may very shortly be involved in war . . ."); John Lord O'Brian, Special Ass't to the Att'y Gen., N.Y. State Bar Ass'n Annual Meeting: Civil Liberty in War Time, at 8 (Jan. 17, 1919) ("The [AEA] was passed by Congress . . . at a time when it was supposed that war with France was imminent."). This comports with the founding-era, common law understanding of the term "alien enemy" as subject of a foreign state at war with the United States. *See Johnson*, 339 U.S. at 769 n.2 (collecting cases).

On this statutory element, the Proclamation again fails on its face. It never asserts that TdA is a foreign "nation" or "government." For good reason. As a criminal gang, TdA possesses neither a defined territory nor any legal authority. Exh. A (Hanson Decl.) ¶¶ 13, 16; Exh. B (Antillano Decl.) ¶¶ 11, 13; Exh. C (Dudley Decl.) ¶ 22. The Proclamation asserts that "[o]ver the years," the Venezuelan government has "ceded ever-greater control over their territories to transnational criminal organizations." But the Proclamation notably does *not* say that TdA operates as a government in those regions. In fact, the Proclamation does not even specify that TdA currently controls *any* territory in Venezuela. And even as the Proclamation singles out certain Venezuelan nationals, it does not claim that *Venezuela* is invading the United States.[8]

Moreover, the Proclamation designates TdA "members" as subject to AEA enforcement— but "members" are not "natives, citizens, denizens, or subjects" within the meaning of the statute. That glaring mismatch underscores that Defendants are attempting not only to use the AEA in an

---

[8] And, as the President's own CIA Director recently testified, the intelligence community has no assessment that says the U.S. is at war with or being invaded by Venezuela. *See National Security and Intelligence Officials Testify on Global Threats* at 57:59–58:10, C-SPAN (Mar. 26, 2025), https://www.cspan.org/program/house-committee/national-security-and-intelligence-officials-testify-on-globalthreats/657380 (Q: "Does the intelligence community assess that we are currently at war or being invaded by the nation of Venezuela?" A: "We have no assessment that says that."); *also available at* https://www.cspan.org/program/house-committee/national-security-and-intelligence-officials-testify-on-globalthreats/657380.

unprecedented way, but in a way that Congress never permitted—as a mechanism to address, in the government's own words, a *non*-state actor. *Venezuela* has natives, citizens, and subjects, but TdA (not Venezuela) is designated under the proclamation. No amount of wordplay can avoid the obvious fact that *Venezuela* is the relevant country for statutory purposes here—and TdA is a non-state criminal organization.

The Court need go no further than finding that the Proclamation fails on its face. But even if this Court were going to look at the Proclamation's conclusory "findings," those findings cannot survive even the most minimally searching inquiry because they are simply incorrect as a factual matter.[9] Experts who have spent years studying TdA are in accord that Venezuela is not directing, controlling, or otherwise influencing TdA's actions in the United States. Exh. A (Hanson Decl.) ¶ 17 ("absolutely implausible" that Maduro regime controls TdA or that the two are intertwined); Exh. B (Antillano Decl.) ¶ 13 (no evidence that TdA "maintains stable connections with the Venezuelan state or that the Maduro regime directs its actions toward the United States"); Exh. C (Dudley Decl.) ¶¶ 23 ("no evidence that the Maduro regime has directed Tren de Aragua to migrate to the United States or to commit any crimes within the United States"). As one expert who has done numerous projects for the U.S. government, including on the topic of TdA, explained, the Proclamation's characterization of the relationship between the Venezuelan state and TdA with

---

[9] Where necessary, courts during World War II routinely examined the facts to ensure that the AEA's statutory limits on presidential power were observed. *See, e.g.*, *U.S. ex rel. Kessler*, 163 F.2d at 143 (reviewing petitioner's factual contention that the German government had ceased to exist after it surrendered and thus was no longer a "foreign nation or government" under the AEA); *United States ex rel. D'Esquiva*, 137 F.2d at 905–07 (reviewing the U.S. government's full course of conduct to ascertain whether and when it had officially recognized Austria's annexation by Germany; remanding for additional factfinding); *U.S. ex rel. Zdunic*, 137 F.2d at 860–61 (remanding for factfinding on statutory predicate; *cf. Al-Alwi v. Trump*, 901 F.3d 294, 298–300 (D.C. Cir. 2018) (evaluating whether "active hostilities" continued under the AUMF after September 11th; concluding that "[t]he record so manifests here").

respect to TdA's activities in the United States is "simply incorrect." Exh. C (Dudley Decl.) ¶¶ 5, 17–18. The President's own intelligence agencies reached that same conclusion prior to his invocation of the AEA. *See* Exh. M (Sarabia Roman Decl.), at Exh. 17 ("shared judgment of the nation's spy agencies" is "that [TdA] was not controlled by the Venezuelan government").

The courts' role in enforcing the bounds of congressional statutory predicates, like "predatory invasion" and "incursion" is critical. Congress passed the AEA within weeks of the Alien Friends Act ("AFA"). That second law gave the President broader discretion to deport any noncitizen who he considered "dangerous to the peace and safety of the United States," regardless of whether an invasion or war had occurred. An Act Concerning Aliens § 1, 1 Stat. 571 ("Alien Friends Act" or "AFA"). As such, the 1798 Congress clearly meant to grant the President two distinct powers—the power to remove the nationals of foreign enemy sovereign countries in times of a war or imminent war, and the power to remove particular dangerous noncitizens in times of war or peace. The government's preferred interpretation of the AEA—where the President can remove allegedly dangerous people by deciding that virtually anything qualifies as a predatory incursion or invasion and any entity qualifies as a foreign nation or government, and no court can review those determinations—conflates the different statutory powers Congress conferred separately in the AEA and the AFA. But it would have made little sense for Congress to pass two laws within weeks of each other, unless those laws were meaningfully different. And the critical difference is, of course, the statutory limitations on when the President can use the AEA—it is a particular tool for a particular situation, namely the presence of nationals of a belligerent country during wartime, which simply does not apply to present circumstances. Moreover, treating the AEA like the AFA is especially untenable given that the AFA was "widely condemned as unconstitutional by Madison and many others" and quickly allowed to lapse. *Sessions v. Dimaya*,

584 U.S. 148, 185 (2018) (Gorsuch, J., concurring) (the AFA "is one of the most notorious laws in our country's history"); *see also J.G.G.*, 2025 WL 914682, at *1 (Henderson, J., concurring) (AFA was "widely derided as unconstitutional").

Finally, the government cannot elide these statutory bounds by pointing to the President's inherent Article II power. The President has no constitutional power to unilaterally remove people. Under Article I, Congress holds plenary power over immigration, *INS v. Chadha*, 462 U.S. 919, 940 (1983). The AEA operates as a specific delegation of authority from Congress to the President, a delegation that Congress limited to instances of war or imminent war by a foreign nation or government. *Cf. Youngstown*, 343 U.S. at 635–38 (Jackson, J., concurring). The President is not at liberty to exceed those statutory powers.

Under Justice Jackson's *Youngstown* framework, the President is taking measures incompatible with the expressed will of Congress, and accordingly, he is acting as his "lowest ebb" of power. *Id*. at 637. Because he has no inherent constitutional power to unilaterally remove people, Congress's powers prevail. Courts "can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject." *Id*. at 637–38. But there is simply no ground for ignoring the statutory constraints that Congress has established, nor for disabling Congress's constitutional authority to legislate with respect to immigration and its own war powers. *See Chadha*, 462 U.S. at 940; *Hamdan v. Rumsfeld*, 548 U.S. 557, 591 (2006) (discussing Congress's distinct war powers).

### iii.    The Proclamation Violates the Specific Protections that Congress Established under the INA for Noncitizens Seeking Humanitarian Protection.

Summary removal under the AEA is unlawful for an additional independent reason: it fails to provide designated individuals with an opportunity to seek protection from persecution and

torture. Congress enacted the Foreign Affairs Reform and Restructuring Act ("FARRA") to codify the United Nations Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT") and to ensure that noncitizens have meaningful opportunities to seek protection from torture. *See* U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988); Foreign Affairs Reform and Restructuring Act of 1998 § 2242(a), Pub. L. No. 105-277, Div. G. Title XXI, 112 Stat. 2681 (1998) (codified at 8 U.S.C. § 1231 notes) (implementing CAT); C.F.R. §§ 208.16 to 208.18 (FARRA procedure). CAT categorically prohibits returning a noncitizen to any country where they would more likely than not face torture. *See* 8 U.S.C. §1231 note. These protections apply regardless of the mechanism for removal.

The D.C. Circuit recently addressed a similar issue in *Huisha-Huisha v. Mayorkas*, reconciling the Executive's authority under a public-health statute, 42 U.S.C. § 265, with CAT's anti-torture protections. 27 F.4th 718 (D.C. Cir. 2022). That case is "on all fours" with this one. *J.G.G.*, 2025 WL 890401, at *15. The D.C. Circuit held that because § 265 was silent about where noncitizens could be expelled, and CAT explicitly addressed that question, no conflict existed. Both statutes could—and therefore must—be given effect. *Huisha-Huisha*, 27 F.4th at 721, 731–32 (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When . . . confronted with two Acts of Congress allegedly touching on the same topic," a court "must strive to give effect to both.") (cleaned up)).

The AEA can similarly be harmonized with other subsequently enacted statutes specifically designed to protect noncitizens seeking asylum and withholding because of feared persecution. *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) (asylum and withholding); 8 U.S.C. §§ 1158 (asylum), 1231(b)(3) (withholding of removal). Congress has unequivocally

declared that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). Similarly, the withholding of removal explicitly bars returning a noncitizen to a country where their "life or freedom" would be threatened based on a protected ground. *Id.* § 1231(b)(3)(A). "In understanding this statutory text, 'a page of history is worth a volume of logic.'" *Jones v. Hendrix*, 599 U.S. 465, 472 (2023) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)). These humanitarian protections were enacted in the aftermath of World War II, when the United States joined other countries in committing to never again turn our backs on people fleeing persecution and torture. Sadako Ogata, U.N. High Comm'r for Refugees, Address at the Holocaust Memorial Museum (Apr. 30, 1997).[10] A President invoking the AEA cannot simply sweep away these protections.

Indeed, the AEA *must* be read in the context of the INA. Since the last invocation of the AEA more than eighty years ago, Congress carefully specified the procedures by which noncitizens may be removed from the United States. And the INA leaves little doubt that its procedures must apply to every removal, unless otherwise specified by that statute. *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017) ("specific governs the general" in statutory construction). It directs: "Unless otherwise specified in this chapter," the INA's comprehensive scheme provides "the sole and exclusive procedure for determining whether an alien may be admitted to the United States, or if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3); *see also United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA."). This language makes clear that Congress intended for the INA to "supersede all previous laws with regard to

---

[10] https://perma.cc/X5YF-K6EU.

deportability." S. Rep. No. 82-1137, at 30 (Jan. 29, 1952).[11]

Congress enacted these procedures with the full awareness that alien enemies were subject to removal in times of war or invasion—in fact, the AEA had been invoked just a few years prior to passage of the 1952 INA. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of existing law). But Congress declined to carve out AEA removals as an exception from standard immigration procedures, even as it expressly provided exceptions for other groups of noncitizens, including noncitizens who pose security risks. *See, e.g.*, 8 U.S.C. § 1531 *et seq.* (establishing fast-track proceedings for noncitizens posing national security risks).

Ignoring the INA's role as the "sole and exclusive" procedure for determining whether a noncitizen may be removed, Respondents have refused to commit to providing class members— many of whom have strong claims—with an opportunity to assert their rights under any humanitarian statute, as required under the INA. *See, e.g.*, *G.F.F. v. Trump*, No. 1:25-cv-2886, ECF No. 41 at *1 ("Petitioners are not entitled to seek asylum, statutory withholding of removal, or voluntary departure, and this Court cannot review a determination that removal will not violate the Convention Against Torture."). And even if Petitioners could apply, the opportunity is meaningless insofar as Respondents withhold information about the country to which they will be removed. *See J.G.G.*, 2025 WL 890401, at *15. But summary removals to the horrific conditions in Salvadoran prisons are precisely what Congress enacted these protections to prevent.

---

[11] One of the processes otherwise specified in the INA is the Alien Terrorist Removal Procedure at 8 U.S.C. § 1531 *et seq.* The Attorney General may opt to use these proceedings when he or she has classified information that a noncitizen is an "alien terrorist." *Id.* § 1533(a)(1). But even that process requires notice, a public hearing, provision of counsel for indigents, the opportunity to present evidence, and individualized review by an Article III judge. *Id.* § 1532(a), 1534(a)(2), (b), (c)(1)-(2). And the government bears the burden of proving, by a preponderance of the evidence, that the noncitizen is subject to removal as an "alien terrorist." *Id.* § 1534(g).

**B.      Petitioners' Detention at CECOT Violates the Constitution and the AEA.**

**i.      The AEA Does Not Permit Petitioners' Post-Removal Imprisonment.**

Class members' post-removal detention in El Salvador violates the AEA. The statute does not authorize the President to imprison alien enemies once they have been removed from the United States. The statute's text, structure, and history make this clear.

The statute's text indicates that the President's power culminates with removal. The AEA authorizes a series of actions the executive branch may take with respect to alien enemies residing in the United States: alien enemies are liable to be "apprehended, restrained, secured, and removed." 50 U.S.C. § 21. The statute goes on to describe these escalating steps—the President may first "direct the conduct to be observed" by alien enemies in the United States; then set "the manner and degree of the restraint to which they shall be subject" and "upon what security their residence shall be permitted"; and finally, "provide for the removal" of those who refuse or neglect to depart. *Id.* Removal is the culminating action—once an alien enemy is removed from the United States, there is no longer any basis to detain them under the Act.

The AEA's structure confirms this reading. *See Mont v. United States*, 587 U.S. 514, 524 (2019) ("whole-text canon" requires consideration of "the entire text"). Section 24 permits U.S. marshals to "caus[e] a removal of such alien [enemy] outside of the territory of the United States." 50 U.S.C. § 24. It does not contemplate that the marshal can *detain* the individual once he is deposited outside of the territory of the United States. Similarly, the right of voluntary departure inherent in Section 21, *see supra*, confirms that Congress authorized only measures to control the actions of alien enemies *within* the United States—not their imprisonment abroad. Congress specifically provided that alien enemies must be afforded the opportunity to depart the

country voluntarily, free of further restraint, and gave the executive branch no power to restrain or confine them once they are no longer in the country.

The AEA's historical context leads to the same conclusion. The AEA reflected contemporaneous fears that alien enemies present in the United States would foment discord or otherwise support the enemy state. *See* 5 Annals of Cong. 1575 (citing fear of "the crowd of spies and inflammatory agents" present in the United States); Letter from John Adams to Thomas Jefferson (June 14, 1813) ("French spies then swarmed in our cities and in the country" and that "to check these was the design of the [AEA].")[12]; *see also* 65 Annals of Cong. 4279, 4425 (expressing concern about the "expressions and activities" of German-born female spies living in the United States in amending the AEA to cover women). These fears were ultimately about "the residence of alien enemies existing in the bosom of the country"—not outside of it. 5 Annals of Cong. 1581. Once removed, the risk posed by alien enemies dissipated. Indeed, the Act has never been used to detain anyone *after* removal outside of the United States, even during an actual war.

At bottom, the AEA authorizes the President to apprehend, restrain, secure, and remove alien enemies when the statute's conditions are met—but it does not authorize the President to imprison alien enemies in foreign prisons after their removal.

### ii.    Petitioners' Imprisonment in CECOT Violates Their Substantive Due Process Rights.

The government's imprisonment of Petitioners in CECOT, detaining them under extreme conditions of isolation and completely cut off from the world, constitutes impermissible punishment in violation of the Due Process Clause. Immigration detention, including detention

---

[12] https://founders.archives.gov/?q=%22alien%20enemy%22&s=1111311111&sa=&r=38&sr=.

under the AEA, is supposed to be "undisputedly civil—*i.e.*, non-punitive in nature." *R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164, 187 (D.D.C. 2015); *United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347 (1952) (per curiam) (President's AEA powers end when Congress terminates war). Those held in such detention therefore have a due process right not to be subjected to any "condition, practice, or policy [that] constitutes punishment." *Block v. Rutherford*, 468 U.S. 576, 583 (1984).

The test of whether civil detention "amount[s] to punishment" is if it is "imposed for the purpose of punishment," or is not "rationally related to a legitimate nonpunitive governmental purpose," or "appears excessive in relation to that purpose." *Bell v. Wolfish,* 441 U.S. 520, 538, 561 (1979); *see Kingsley v. Hendrickson*, 576 U.S. 389, 398–99 (2015). Here, the government's continued detention of the CECOT Subclass constitutes punishment in at least three ways.

*First*, the U.S. government is detaining people at CECOT for the purpose of punishment—indeed, with "an expressed intent to punish." *Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 538)); *see also Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963) ("punitive nature of the sanction" comes into play "on a finding of scienter"). For instance, during her tour of CECOT in late March 2025, DHS Secretary Kristi Noem recorded and aired a video of herself from inside the prison, standing in front of a crowded cell, to project this message: "If you come to our country illegally, this is one of the consequences you could face. . . . Know that this facility is one of the tools in our toolkit that we will use." Exh. M (Sarabia Roman Decl.), at Exh. 19. Her accompanying post on X.com stated: "President Trump and I have a clear message to criminal illegal aliens: LEAVE NOW. If you do not leave, we will hunt you down, arrest you, and you could end up in this El Salvadoran prison." *Id.*; *see also infra* Section II.B(iii) (U.S. government statements characterizing CECOT Subclass as criminals and CECOT detention as a means of accountability).

*Second*, and relatedly, there is no legitimate nonpunitive governmental purpose behind the detention of Petitioners at CECOT. Officials make no attempt to hide the fact that this detention is designed to frighten immigrants, deter migration, induce self-deportation, and punish those at the facility. *See, e.g.*, Exh. M (Sarabia Roman Decl.), at Exh. 19 (Secretary Noem stating that the purpose of detention at CECOT is "to incarcerate them and have consequences"); *id.* at Exh. 14 (President Trump thanking Bukele for "taking the criminals" and describing CECOT, sarcastically, as "a wonderful place to live"); *id.* at Exh. 17 (White House press release quoting that "President Trump gave illegal gang members a one-way ticket to the world's more feared prison"); *id.* (White House press release quoting "Salvadoran prisons . . . are much worse for them than anything they faced in Venezuela"). But multiple courts have held that detaining people to send a message of deterrence and to encourage self-deportation are impermissible purposes in the civil context, not rationally related to any non-penological goal. *See Kansas v. Crane*, 534 U.S. 407, 412 (2002) (explaining that civil detention cannot be a "mechanism for retribution or general deterrence— functions properly those of criminal law"); *R.I.L.-R*, 80 F. Supp. 3d at 188–89 (striking down detention policy where "justification urged by the Government" was "deterrence of mass migration" because the lack of connection between the government's interest and person's detention "was out of line with analogous Supreme Court decisions"); *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 153 (D.D.C. 2018) (holding that policy of considering immigration deterrence when making parole decisions violated the agency's own directive); *Jacinto-Castanon de Nolasco v. U.S.I.C.E.*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018) ("no compelling or legitimate governmental objective" served by detaining parents away from their children to "deter[] immigration"). Because frightening immigrants, deterring migration, inducing self-deportation, and punishing immigrants are not legitimate grounds for civil detention, the detention of the CECOT Subclass violates due process.

*Third*, the government has subjected immigrant detainees at CECOT to "excessive" punitive conditions, in violation of their due process rights as civil detainees. *Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 561). *See generally* Exh. D (Bishop Decl.); Exh. E (Goebertus Decl.). Civil immigrant detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 210 (D.D.C. 2020) ("Because civil immigration detainees . . . have not been convicted of any present crime, they may not be subjected to punishment of any description.") (citation and quotation marks omitted); *D.A.M. v. Barr*, 474 F. Supp. 3d. 45, 63 (D.D.C. 2020) (same). But the individuals detained at CECOT have been subjected to conditions that are much worse than those at ICE detention facilities in the United States and indeed, those for prisoners serving criminal sentences in most places in the world. The government is thus acting with deliberate indifference with knowledge and disregard of the excessive risk to the safety of detainees at CECOT. *Kingsley*, 576 U.S. 389 (2015) (objectively unreasonable use of force is unconstitutional punishment).

As described below, detainees at CECOT are subject to torture—including regular beatings, waterboarding, and use of implements on fingers to force confessions—in addition to ill treatment, overcrowding, lack of access to counsel, lack of access to healthcare and food, and physical abuse by both prison personnel and gangs. Exh. D (Bishop Decl.) ¶¶ 21-22, 25-35, 37, 40-41; Exh. E (Goebertus Decl.) ¶¶ 2-6, 8-12, 15-17. That is more than sufficient to establish a due process violation. Moreover, detainees' complete lack of access to the outside world, especially counsel, is indisputably worse than the level of access to legal resources provided in ICE detention facilities, federal prisons, or to law-of-war detainees at Guantánamo. Conditions in civil detention that are equivalent to or more restrictive than detention in criminal custody, like they are here, are

presumptively unconstitutional. *See Ams. for Immigrant Just. v. DHS Sec.*, No. 22-3118, 2023 WL 1438376, at *11–12 (D.D.C. Feb. 1, 2023) (collecting cases). Beyond the complete lack of access to counsel, the conditions at CECOT plainly do not meet the minimum standards for an individual serving a criminal sentence, let alone a civil immigration detainee. *See, e.g.*, *Inmates of Attica v. Rockefeller*, 453 F.2d 12, 22–23 (2d Cir. 1971) (abusive conduct by prison guards "far exceeded" what is tolerated for "defenseless prisoners" and violated Eighth Amendment); *Baker v. Dist. of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (deliberate indifference to prisoner's serious medical needs violates Eighth Amendment); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 210 (D.D.C. 2020) (Constitution requires government to ensure "reasonable safety" of civil immigration detainees); *Farmer v. Brennan,* 511 U.S. 825, 833 (1994) ("prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners"); *Harris v. Angelina Cnty.*, 31 F.3d 331, 335 (5th Cir. 1994) ("overcrowding had resulted in a denial of basic human needs of the jail population"); *Caldwell v. Caesar*, 150 F. Supp. 2d 50, 65 (D.D.C. 2001) (finding the "depriv[ation] . . . of adequate food necessary to maintain [a prisoner's] health" could "constitute cruel and unusual punishment" under the Eighth Amendment).

### iii.    Petitioners' Imprisonment at CECOT Constitutes Criminal Punishment in Violation of the Fifth, Sixth, and Eighth Amendments.

In addition, imprisonment at CECOT, based on unproven accusations of criminal conduct, constitutes *criminal* punishment in violation of the Fifth and Sixth Amendments. As a result, the inhumane conditions Petitioners face at CECOT also violate the Eighth Amendment.

Confinement at CECOT is an "infamous punishment"—the kind the Supreme Court long ago found to be criminal in nature. *Wong Wing v. United States*, 163 U.S. 228, 234, 237 (1896). Moreover, in assessing whether a sanction is civil or criminal, if the *intent* is to impose punishment,

"that ends the inquiry." *Smith v. Doe*, 538 U.S. 84, 92 (2003).[13] Other hallmarks of criminal punishment can include a finding that a person "committed acts that violate a criminal law," "the stigma inherent in such a determination," and a resulting "deprivation of liberty." *Breed v. Jones*, 421 U.S. 519, 529 (1975).

Respondents' intent to punish is unmistakable—based on their choice of CECOT, which is a maximum security prison not a civil detention center, and based on their own statements. For example, President Trump has accused Petitioners of being "vicious, violent, and demented criminals, many of them deranged murderers," and he thanked President Bukele for "taking the criminals that were so stupidly allowed, by the Crooked Joe Biden Administration, to enter our Country."[14] Similarly, the White House Press Secretary has described detention of Petitioners in El Salvador as costing "pennies on the dollar in comparison to the cost of life, and the cost it would impose on the American taxpayer *to house these terrorists in maximum security prisons here in the United States of America*." Louis Casiano, *US Paid El Salvador to Take Venezuelan Tren de Aragua Members: 'Pennies on the Dollar,' White House Says*, Fox News (Mar. 17, 2025).[15] And the CECOT Subclass's ongoing imprisonment in El Salvador has been expressly justified by claims that they must be punished as alleged criminals. Tom Homan, the current administration's "border czar," bluntly acknowledged that Respondents' purpose is to punish Petitioners for allegedly "killing thousands of Americans" through drug trafficking and violence: "I see the video that President Bukele put out. It was a beautiful thing. These people are going to be held

---

[13] Moreover, even if the stated intent is civil, courts must further examine whether the scheme is "so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Smith*, 538 U.S. at 92.

[14] Exh. M (Sarabia Roman Decl.), at Exh. 16; *id.* at Exh. 14.

[15] Exh. M (Sarabia Roman Decl.), at Exh. 7.

accountable.[16] *See also* Exh. M (Sarabia Roman Decl.), at Exh. 19 (thanking El Salvador for accepting alleged TdA members and for "incarcerat[ing] them and to have consequences for the violence that they have perpetuated").

The other hallmarks of criminal punishment are obvious as well. Respondents have made summary determinations that the CECOT Petitioners are "terrorists" and members of a "criminal organization," with no due process. *See* AEA Proclamation. The weight and stigma of those conclusory findings have only been amplified by repeated accusations of criminality by officials including President Trump. *See supra*. And Petitioners face a dire—and potentially indefinite— loss of liberty. Under these circumstances, Petitioners are functionally criminal detainees, subject to a one-year, renewable term of imprisonment in some of the most punitive conditions imaginable.[17]

Yet Petitioners have not been afforded any of the fundamental constitutional protections that accompany the imposition of criminal punishment—such as the right to notice of the government's allegations, the right to counsel, the right to proof beyond a reasonable doubt, and the protection against double jeopardy. *See, e.g.*, *In re Gault*, 387 U.S. 1, 12–14, 36, 42–57 (1967); *Breed*, 421 U.S. at 528–31; *In re Winship*, 397 U.S. 358, 365–66 (1970). When a person has not been convicted of a crime, "he may not be punished." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (citing *Jones v. United States*, 463 U.S. 354, 369 (1983)). But the government's own statements leave no question that Petitioners' imprisonment at CECOT is intended to inflict "an infamous punishment, and hence conflicts with the Fifth and Sixth Amendments of the Constitution, which declare that no person shall be held to answer for a capital or otherwise infamous crime unless on

---

[16] Exh. M (Sarabia Roman Decl.), at Exh. 21.

[17] Exh. M (Sarabia Roman Dec.), at Exh. 20.

a presentment or indictment of a grand jury, and that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." *Wong Wing*, 163 U.S. at 234, 237.

Finally, because the CECOT Subclass is subject to criminal confinement, the horrific conditions they face violate the Eighth Amendment's prohibition against "cruel and unusual punishment." *Farmer*, 511 U.S. at 833. Under the Eighth Amendment, officials have duties, ranging from avoiding the "use of excessive physical force" to "provid[ing] humane conditions of confinement" including "adequate food, clothing, shelter, and medical care," as well as ensuring "reasonable measures to guarantee the safety of the inmates." *Id.* at 833 (citing cases). But as discussed above, the extreme conditions and abuse that Petitioners face at CECOT fall well below the constitutional floor for those serving criminal sentences. As such, Respondents have violated the CECOT Subclass's Eighth Amendment right against cruel and unusual punishment.

## III.    Respondents' Abuse of the AEA Has Caused and Will Continue to Cause Petitioners Irreparable Harm.

In the absence of preliminary relief, Petitioners will face—or will continue to face—life-threatening conditions, persecution, and torture in places like El Salvador. *J.G.G.*, 2025 WL 1024097, at *5 (Sotomayor, J., dissenting) ("[I]nmates in Salvadoran prisons are 'highly likely to face immediate and intentional life-threatening harm at the hands of state actors.'"). And while removal does not by itself necessarily constitute irreparable harm, *Nken v. Holder*, 556 U.S. 418, 435 (2009), these are hardly run-of-the-mill removals. Petitioners' removals constitute grave and immediate irreparable harm because of what they are already enduring or what awaits them in a Salvadoran prison. *See generally* Exh. D (Bishop Decl.); Exh. E (Goebertus Decl.). Prison conditions in El Salvador are "harsh and life threatening." Bishop Decl. ¶ 21; *see also* Exh. E (Goebertus Decl.) ¶ 4. Prison officials there engage in widespread physical abuse, including

37

waterboarding, electric shocks, using implements of torture on detainees' fingers, forcing detainees into ice water for hours, and hitting or kicking detainees so severely that it causes broken bones or ruptured organs. Exh. D (Bishop Decl.) ¶¶ 21, 33, 37, 39, 41; Exh. E (Goebertus Decl.) ¶¶ 8, 10, 17.

People in detention in El Salvador also face psychological harm, including solitary confinement in pitch dark cells or being forced to stay in a cell with the body of a fellow prisoner who was recently beaten to death. Exh. E (Goebertus Decl.) ¶ 3; Exh. D (Bishop Decl.) ¶ 39. In fact, El Salvador creates these horrific conditions intentionally to terrify people. Exh. D (Bishop Decl.) ¶ 22; *See also Huisha-Huisha*, 27 F.4th at 733 (irreparable harm exists where petitioners "expelled to places where they will be persecuted or tortured"); *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (holding that removal to a country where one faces harm constitutes irreparable injury); *Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005) ("irreparable harm" where petitioners face "forced separation and likely persecution" "if deported"); *Demjanjuk v. Holder*, 563 F.3d 565, 565 (6th Cir. 2009) (granting stay for noncitizen who asserted removal would violate CAT). And Petitioners may never get out of these prisons. *See* Exh. M (Sarabia Roman Decl.), at Exh. 20; *see also* Exh. E (Goebertus Decl.) ¶ 3 (quoting the Salvadorean government that people held in CECOT "will never leave"); *id.* ("Human Rights Watch is not aware of any detainees who have been released from that prison.").

And even if Respondents instead remove Petitioners to Venezuela, they face serious harm there, too. In fact, many Petitioners fled Venezuela for the very purpose of escaping the persecution they faced in Venezuela and have pending asylum cases on that basis. For example, Petitioner Hernandez Romero has already been targeted for both his sexual orientation and his refusal to promote government propaganda. Exh. G (D.A.R.H. Decl.) ¶ 2. And returning to

Venezuela labeled as a gang member by the United States government only increases the danger, as they will face heightened scrutiny from Venezuela's security agency, and possibly even violence from rivals of TdA. Exh. A (Hanson Decl.) ¶ 28.

Not only do Petitioners face grave harm, they do so without having received adequate notice and due process. *See Huisha-Huisha*, 560 F. Supp. 3d at 172 (finding irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide"); *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 517 (D.D.C. 2020) (irreparable injury exists where class members were "threatened with deportation prior to receiving any of the protections the immigration laws provide"); *see also supra* (discussing the lack of notice and meaningful process). Critically, moreover, without meaningful process, there is a dangerously high risk that the government will continue to deport class members who are not in fact members of TdA to foreign prisons and locations where they face grave harm.

## IV.    The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Preliminary Injunction Order.

The balance of equities and the public interest factors merge in cases against the government. *Nken*, 556 U.S. at 435. Here, the balance of hardships overwhelmingly favors Petitioners. The public has a critical interest in preventing wrongful removals to places where individuals will face persecution and torture. *Id.* at 436 (describing the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm"). Conversely, Respondents can make no comparable claim to harm from an injunction. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (describing the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations" (citation omitted)); *Minney v. U.S. Off. of Pers.*

*Mgmt.*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015) ("The public interest is, of course, best served when government agencies act lawfully," and "the inverse is also true", explaining that the public interest is harmed when the government acts unlawfully). Respondents, moreover, will retain the ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under existing statutory immigration laws. *See e.g.,* 8 U.S.C. §§ 1158(b)(2)(A)(ii)-(iii) (noncitizens barred from asylum if convicted of particularly serious crime or if "serious reasons to believe" they "committed a serious nonpolitical crime" outside the U.S.); 8 U.S.C. § 1231(b)(3)(B)(ii)-(iii) (same for withholding); *see also* 8 U.S.C. §§ 1226(c), 1231(a)(6). And fundamentally, the public maintains a strong interest in avoiding overbroad and vague invocations of the AEA that reach outside its scope and history to curtail the most the most basic liberties of the population. *See Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464 (2020).

## V.    The Court Should Not Require Petitioners to Provide Security.

The Court should not require a bond under Federal Rule of Civil Procedure 65. The "courts in this Circuit have found the Rule 'vests broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (internal quotation marks, citation, and alterations omitted). District courts routinely exercise this discretion to require no security in cases brought by indigent and/or incarcerated people, and in the vindication of immigrants' rights. *See, e.g.*, *P.J.E.S.*, 502 F. Supp. 3d at 520.

## CONCLUSION

The motion for a preliminary injunction should be granted.


Dated: April 24, 2025                                Respectfully submitted,

Noelle Smith

Oscar Sarabia Roman
My Khanh Ngo
Evelyn Danforth-Scott
Cody Wofsy
Cecilia D. Wang (D.D.C. Bar No. CA00042)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
edanforth-scott@aclu.org
cwang@aclu.org
cwofsy@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
Aditi Shah (D.C. Bar No. 90033136)*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org
ashah@acludc.org


*Admission to DDC Bar pending

/s/ Lee Gelernt
Lee Gelernt (D.D.C. Bar No. NY0408)
Daniel Galindo (D.D.C. Bar No. NY035)
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi (D.D.C. Bar No. MI0071)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich
Skye Perryman (D.C. Bar No. 984573)
Audrey Wiggins (DC Bar No. 482877)
Christine L. Coogle (DC Bar No. 1738913)
Pooja Boisture
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org
awiggins@democracyforward.org
ccoogle@democracyforward.org
pboisture@democracyforward.org


Attorneys for Petitioners-Plaintiffs

41