# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

J.G.G. et al.,

       *Plaintiffs*;

LIYANARA SANCHEZ, as next friend
on behalf of FRENGEL REYES MOTA,
et al.,

       *Petitioners–Plaintiffs*,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United
States, et al.,

       *Respondents–Defendants*.

Case No. 1:25-cv-00766-JEB

**RESPONDENTS–DEFENDANTS'
OPPOSITION TO PLAINTIFFS'
AND PETITIONERS–
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

# Table of Contents

Introduction ................................................................................................ 1

Background .................................................................................................. 2

Legal Standard ............................................................................................ 4

Argument .................................................................................................... 5

    I.    This Court Lacks Jurisdiction. ........................................................ 5

        A.    The United States does not have constructive custody of the terrorists in El Salvador. ........................................... 5

        B.    This Court lacks jurisdiction over the putative criminal custody subclass's claims............................................ 13

    II.    Petitioners' Constitutional Claims Fail.................................... 14

        A.    The Government is providing adequate due process. ............... 14

        B.    The Government is not illegally detaining or punishing aliens after removal ............................................... 19

            1.    Petitioners' substantive due process claims fail............. 19

            2.    Petitioners' Fifth, Sixth, and Eighth Amendment claims fail as well................................................ 22

            3.    The AEA does not control this issue. ............................. 25

    III.    Petitioners' Challenges to the AEA Fail.................................. 26

        A.    Petitioners' claims are nonjusticiable........................................ 26

        B.    The INA and other statutes do not supersede the AEA............. 31

        C.    The Proclamation satisfies the statutory prerequisites............ 35

            1.    TdA's actions constitute an invasion or predatory incursion.................................................................... 35

            2.    Given its intimate connection to Venezuela, TdA is a foreign nation or government. ........................................ 38

            3.    Petitioners are not entitled to a period for voluntary departure.......................................................... 41

IV.    The Remaining Equitable Factors Weigh Strongly in the Government's Favor. ................................................................ 42

    A.    Petitioners have not established irreparable harm. .................. 42

    B.    The balance of equities and public interest favor denial of preliminary injunctive relief. ....................................................... 43

Conclusion ............................................................................................................ 45

Exhibit A: Declaration of Deputy Secretary of State Christopher Landau

Exhibit B: Declaration of Assistant Field Office Director Carlos D. Cisneros

## Introduction

This is Petitioners' second attempt to challenge the President's invocation of the Alien Enemies Act (AEA) with respect to Tren de Argua (TdA) in a district in which none of the affected individuals are located.[1] The Supreme Court decisively rejected the first attempt. *See Trump v. J.G.G.*, 145 S. Ct. 1003, 1005 (2025) (per curiam). This second one should meet the same fate.

The President properly designated members of TdA as alien enemies and terrorists in the Proclamation. Proclamation No. 10,903, *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua*, 90 Fed. Reg. 13,033, 13,033 (Mar. 20, 2025). As a result, the government has been steadfastly attempting to remove them while fully complying with the law. Petitioners have responded by attempting to disrupt that lawful process by throwing theories at the wall and seeing what sticks. Unsatisfied with the Supreme Court's rejection of their first-line theories, Petitioners have concocted two new innovations to establish jurisdiction in this court. First, they claim that *some* Respondent in this district must have constructive custody over the aliens removed to El Salvador. Not so. Those aliens are in the custody of a foreign nation pursuant to its laws. The United States does not have custody so there is no jurisdiction. Second, Petitioners claim aliens in criminal custody *may* be removed to El Salvador at *some* undefined point in the future, thus custody exists in this district as well. Such speculation cannot establish

---

[1] For brevity, "Petitioners" will refer to the parties styled Plaintiffs and Petitioners–Plaintiffs, and "Respondents" will refer to the parties styled Respondents–Defendants.

custody or jurisdiction. So this Court lacks jurisdiction to grant the extraordinary relief Petitioners seek.

In any event, Petitioners' claims fail on the merits. The United States has and will continue to provide procedural due process. Petitioners' substantive due process and Fifth, Sixth, and Eighth Amendment claims, however, are not cognizable against the United States and are baseless in any event. Petitioners' complaints with the Proclamation are similarly nonjusticiable. But even if they were, the President had ample basis to determine that TdA, for purposes of the AEA, is a foreign nation or government invading or engaging in a predatory incursion in the United States. Given that, Petitioners are not likely to succeed on the merits. Nor do the equities or public interest favor Petitioners, as an injunction would disrupt the government's sensitive foreign affairs relationships and keep terrorists in the United States. As a result, the Court should deny the Petitioners' motion for a preliminary injunction.

## Background

In March, the President issued Proclamation No. 10,903, invoking the AEA, 50 U.S.C. § 21, to detain and remove Venezuelan nationals "who are members of TdA." 90 Fed. Reg. at 13,034. In the early hours of March 15, the five named Plaintiffs, representing a putative class, initiated this litigation and sought immediate injunctive relief against their removal under the AEA. ECF 1, 4. In the complaint, Plaintiffs sought relief in habeas but then dismissed their habeas claims and proceeded on their other causes of action. ECF 1 at 20–21; Mar. 15 Hr'g Tr. at 22:21–25. This Court issued two temporary restraining orders (TROs) preventing any removal of the named Plaintiffs and preventing removal under the AEA of a

provisionally certified class consisting of "[a]ll noncitizens in U.S. custody who are subject to" the Proclamation, Minute Order on Class Cert., and later extended the TROs for up to an additional 14 days, ECF 66.

After the D.C. Circuit denied the government's stay motions, the government applied to the Supreme Court to vacate the TROs. The Supreme Court granted that application, holding that, because the aliens' claims "fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas," "jurisdiction lies in only one district: the district of confinement." *J.G.G.*, 145 S. Ct. at 1005 (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)). The Court further held that the aliens are "entitled to notice and opportunity to be heard 'appropriate to the nature of the case,'" including notice "that they are subject to removal under" the AEA, "within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.* at 1006 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).

In defiance of the Supreme Court's decision, Petitioners persist in their efforts to anchor this habeas litigation outside the jurisdiction of confinement. After an unsuccessful attempt at a third TRO, Petitioners amended their complaint to add new claims on behalf of two new subclasses, a subclass of aliens detained at the Terrorism Confinement Center (CECOT), and a subclass of criminal detainees. Petitioners have now moved for emergency injunctive relief a fourth time. ECF 102 ("Mot."). This time they seek an order requiring the government to facilitate the return of the putative CECOT subclass to the United States and an order enjoining

AEA removals of members of the putative criminal subclass. *Id*. at 1–3. As Deputy Secretary Landau makes clear, however, the members of TdA in CECOT are being detained under the authority of El Salvador, a sovereign nation. Ex. A ("Landau Decl.") ¶ 3. There is no binding arrangement between the United States and El Salvador that provides the United States with control over these individuals.

### Legal Standard

A plaintiff seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). The "first and most important factor" is whether the moving party has "established a likelihood of success on the merits." *Aamer*, 742 F.3d at 1038. "[W]hen a plaintiff has not shown a likelihood of success on the merits, [the court] need not consider the other factors." *Greater New Orleans Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011). The last two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)). That is especially true, as here, where the requested injunction "would alter, rather than preserve, the status quo by commanding some positive act;" so courts

require the moving party to "meet a higher standard than in the ordinary case by showing a clear entitlement to relief to avoid extreme or very serious damage." *Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (Jackson, J.) (collecting cases).

**Argument**

## I.    This Court Lacks Jurisdiction.

### A.    The United States does not have constructive custody of the terrorists in El Salvador.

Petitioners' first innovation[2] to get around the Supreme Court's ruling is to argue that the United States has "custody" of prisoners held in the territory of—and by agents of—a separate, sovereign nation. That is not the case. There is no basis on which Petitioners can claim that the United States exercises plenary, indefinite control over El Salvador. To the extent the United States and El Salvador made a bilateral arrangement, it is not an enforceable agreement providing that the United States can obtain or retain control over aliens imprisoned on Salvadoran soil by Salvadoran guards. And in any case, the burden is on *Petitioners*, not Respondents, to make a clear showing that this Court's orders will likely effect the desired outcome of their habeas petition—release from Salvadoran custody. Because Petitioners cannot make that showing, this Court lacks both constitutional and statutory jurisdiction over Petitioners in El Salvador.

---

[2] That is, setting aside Petitioners' inappropriate attempt to aggregate habeas claims in a class action, not to mention the problems with their putative classes. Respondents will address those issues in a separate filing opposing Petitioners' motion for class certification.

At the outset, the Supreme Court's own definition of "custody" for habeas purposes demonstrates the futility of Petitioners' argument. Begin with the statute: it applies to those held "in custody under or by color of the authority of the United States." 28 U.S.C. § 2241(c)(1). And a person is "held 'in custody' by the United States when the *United States official* charged with his detention has 'the power to produce' him." *Munaf v. Geren*, 553 U.S. 674, 686 (2008) (emphasis added) (quoting *Wales v. Whitney*, 114 U.S. 564, 574 (1885)).

It is undisputed that Petitioners in El Salvador are not actually within the United States' physical custody. Nor can Petitioners invoke "constructive custody" by asserting that "the imprisoning sovereign is the respondent's agent." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 47 (D.D.C. 2004) (quoting *Steinberg v. Police Ct. of Albany, N.Y.*, 610 F.2d 449, 453 (6th Cir. 1979)). Agency requires *control*. *See* Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006); *id.* cmt. f(1) ("An essential element of agency is the principal's right to control the agent's actions."). The United States has no *control* over the actions of a foreign sovereign.

As courts have repeatedly confirmed, plenary and indefinite control over the detention site is key. This case is not like *Boumediene v. Bush*, 553 U.S. 723, 765 (2008), where the United States held "plenary control" over the place of imprisonment despite *de jure* sovereignty by Cuba. Instead, this case is closer to *Johnson v. Eisentrager*, 339 U.S. 763 (1950). As the Supreme Court explained, "the United States' control over the prison in Germany [housing the petitioners in *Eisentrager*] was neither absolute nor indefinite." *Boumediene*, 553 U.S. at 768. The same was true

in *Al Maqaleh v. Gates*, 605 F.3d 84, 97 (D.C. Cir. 2010), where the D.C. Circuit found no habeas jurisdiction even though the aliens were held by the U.S. military at an Air Force base because the U.S. was merely leasing the base and did not have *de facto* sovereignty over it. Here, not only does the government not have sovereignty over CECOT, but it does not even have a military presence or a lease. That defeats habeas jurisdiction.

Even more analogous is *United States ex rel. Keefe v. Dulles*, 222 F.2d 390 (D.C. Cir. 1954). There, the petitioner pled guilty to crimes while stationed in France and was serving a five-year sentence in a French civilian prison. *Id.* at 391. The petitioner's wife had petitioned for a writ of habeas corpus on his behalf, naming various United States officials as respondents instead of, "[f]or obvious reasons," "the foreign jailer." *Id.* The D.C. Circuit held there was no habeas jurisdiction because the petition "show[ed] on its face that Keefe [was] not in the custody of the respondents." *Id.* at 392. Moreover, "because [the petition] allege[d] he [was] detained by French civil authorities, that there [was] no one within the jurisdiction of the court who [was] responsible for his detention and who would be an appropriate respondent." *Id.* This was despite allegations that the Secretary of State, the Secretary of Defense, and the Secretary of the Army "acting through their agents, servants, or employees . . . 'actually have deprived the [petitioner] of his liberty.'" *Id.* at 391. Likewise in *Koki Hirota v. Gen. of the Army McArthur*, the Supreme Court rejected a habeas petition against General McArthur because the petitioners were Japanese citizens in Japanese custody even though McArthur established the military tribunals that

convicted the petitioners. 338 U.S. 197, 198 (1948) (per curiam).[3] Courts have been "hesitant" to expand even the collateral-consequences doctrine to avoid habeas mootness because it "could infringe upon the domain of the branches of government responsible for the external relations of the Nation." *Gul v. Obama*, 652 F.3d 12, 17 (D.C. Cir. 2011). That is especially true for constructive custody here given the involvement of a separate sovereign's own custody. So this Court should avoid significantly expanding constructive custody in this novel manner.

Indeed, here there is even less reason than in *Eisentrager*, *Koki Hirota*, or *Al Maqaleh* to find the United States has plenary "control" over prisons in El Salvador, let alone for an "indefinite" time. El Salvador is a separate sovereign over which the United States has no control. Landau Decl. ¶3. There is no bilateral treaty between the United States and El Salvador governing prisoner detention in El Salvador; El Salvador makes its own decisions regarding detentions. *Id.* And any bilateral arrangement there may be between the United States and El Salvador is not an enforceable agreement that somehow allows the United States to retain some degree of jurisdiction or control over these individuals. Indeed, the "corrective machinery specified in the [agreement] itself is nonjudicial." *Holmes v. Laird*, 459 F.2d 1211, 1221–22 (D.C. Cir. 1972). The prisons are operated exclusively by the Salvadoran government, which has its own law and procedures.

---

[3] *See also Rasul v. Bush*, 542 U.S. 466, 481–82 (2004) ("At common law, courts exercised habeas jurisdiction over the claims of aliens detained within . . . dominions under the sovereign's control."); *Medvid ex rel. Medvid v. Lambert*, 621 F. Supp. 575, 576 (E.D. La. 1985) (finding no control over petitioner—"except in the most indirect, metaphysical sense"—where respondents were alleged to have constructive custody over seaman on Soviet vessel because of United States' "administrative ability to deter the ship's departure").

It is not for U.S. courts to question a separate sovereign's choices. In fact, the D.C. Circuit credited the United States declaration that it no longer had custody or control of Guantanamo Bay detainees transferred to Afghanistan and Sudan. *Gul*, 652 F.3d at 17. While petitioners argued that their habeas petitions were not moot due to collateral consequences, the court held that the harms were "traceable to the act of a foreign sovereign, and that any decision to lift those restrictions will depend upon an exercise of broad and legitimate discretion a court cannot presume either to control or to predict." *Id.* (cleaned up). Indeed, "[t]he interests of international comity are ill-served by requiring a foreign nation . . . to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced." *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990).

Petitioners' limited citations to *Abu Ali* and *Munaf* do not serve them. Those cases reiterate the point that United States *control* over the detainee is required for habeas jurisdiction. *See Munaf*, 553 U.S. at 688 (holding habeas jurisdiction exists where petitioners "held overseas in the immediate 'physical custody' of American soldiers who answer only to an American chain of command"); *Abu Ali*, 350 F. Supp. 2d at 68 (reciting factors used in the inquiry for constructive custody, including whether the petitioner "would be released upon nothing more than a request by the United States"). Moreover, these cases underscore the importance of citizenship to the inquiry—when it comes to detention abroad, the writ may run to citizens where it does not run to aliens. *See Munaf*, 553 U.S. at 688 (declining to extend the holding of *Kiko Hirota* "to preclude American citizens held overseas by American soldiers

9

subject to a United States chain of command from filing habeas petitions"); *Abu Ali*, 350 F. Supp. 2d at 41, 53–57, 60–65 (emphasizing throughout that the petitioner was a United States citizen). And no Petitioner here alleges United States citizenship. ECF 101, ¶¶ 12–17 (alleging Venezuelan nationality for all Petitioners alleging membership in putative CECOT subclass).

Petitioners' primary evidence that the United States has custody comes from a handful of vague statements by a few officials that the United States is paying El Salvador to detain Petitioners. Mot.7–8. In related contexts, public statements by officials have not been credited as evidence of the purpose behind an executive policy. *See Trump v. Hawaii*, 585 U.S. 667, 701–02 (2018). Such limited, out-of-context statements cannot establish that Petitioners are more likely than not to succeed on their novel constructive custody theory. This is contrasted by a clear official declaration under oath that the United States does not have custody or control over the Petitioners; El Salvador makes its own detention choices as a separate sovereign. *See* Landau Decl. ¶ 3; *Gul*, 652 F.3d at 17 (crediting declaration that U.S. did not have custody). That should suffice.

Moreover, Petitioners' position is at odds with this Court's interpretation of its own TRO. This Court interpreted its TRO enjoining the government from "removing members of [the] class" to prohibit "transferring class members into another country's custody." ECF 81, at 23. The Court then found probable cause that the government violated that order by "transferring class members out of U.S. custody." *Id.* at 31. So the Court ordered the government to "purge" contempt namely "by asserting custody

of the individuals." *Id.* at 43. Petitioners defended the Court's interpretation, findings, and order on appeal. Yet the Court's order already established that Respondents do *not* have custody over Petitioners, El Salvador does. If the United States retained custody, as Petitioners now insist, then it could not have violated the Court's order. Nor could the government "purge" the putative contempt by asserting custody over Petitioners if it always had custody to begin with. *Id.* Petitioners cannot have it both ways.[4] This Court, the United States, and even the Petitioners realize the reality: the government does not have custody of the Petitioners in CECOT, the separate sovereign nation of El Salvador does. That ends the inquiry.

One last point related to custody. Even if the United States were to take steps to "facilitate" Petitioners' release and return to the United States, as Petitioners seek, Mot. 2, Petitioners have not shown that these actions would have a "substantial likelihood" of effectuating their release from Salvadoran custody, as it is their burden to show Article III standing for preliminary relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017). Nor have they even attempted to. They present no facts or allegations that the United States could obtain the release of any Petitioner merely by asking. Mot. 7–9. They instead focus on whether the United States sent the detainees to El Salvador—which is undisputed—and its motives for doing so. *See, e.g.*, *id.* at 8 (noting Secretary of State Rubio's remark that it would

---

[4] Respondents still disagree with the Court's interpretation of its TRO and finding of probable cause for criminal contempt. Respondents' point is that the Court has already found that the government transferred custody to a separate sovereign (which Petitioners agreed with on appeal).

"save our taxpayer dollars" if detainees were no longer held in United States custody); *id.* (alleging, without any factual support, that "Respondents have sought to 'deliberately shield'" Petitioners "from seeking judicial review").

Petitioners merely assume—without any factual support—that the existence of any bilateral agreement about detainees means that the United States is their effective custodian. That is not just contrary to the realities of international affairs, it is a failure of proof on an essential element of the "irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560; *see also Elec. Priv. Info. Ctr.*, 878 F.3d at 377 ("[T]he plaintiff cannot 'rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts' that, if 'taken to be true,' demonstrate a substantial likelihood of standing."). Indeed, the D.C. circuit rejected a similar argument that the court "might order the Government to take all steps within its power to alleviate their injury" because the injury was "traceable" to a foreign sovereign with broad discretion on how to act regardless of what a court ordered the United States to do. *Gul*, 652 F.3d at 18. So the remedy sought is "too speculative" because it relies on the "the unfettered choices made by independent actors not before the court[ ]"—here, the separate sovereign of El Salvador. *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 869–70 (9th Cir. 2002) (quoting *Lujan*, 504 U.S. at 560) (no standing because remedy relied on actions of third parties). Thus, this Court lacks jurisdiction because the United States does not have custody of the Petitioners and Petitioners do not have standing for the remedy they seek.[5]

---

[5] Petitioners meekly suggest (Mot. 9–10) that *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025), establishes a separate type of jurisdiction here. But a remedy in a separate case, not involving the

**B.    This Court lacks jurisdiction over the putative criminal custody subclass's claims.**

The second innovation Petitioners try in order to skirt the Supreme Court's ruling is to argue that a putative class of "individuals in *criminal* custody" may challenge their "*future* confinement" in this Court. Mot. 10. That argument fails for all the reasons Petitioners' constructive-custody arguments fail. And doubly so. It is completely speculative that anyone (much less every member of the putative criminal custody subclass) will be confined in CECOT under the constructive custody of one of the Respondents in this district. *See Dremann v. Francis*, 828 F.2d 6, 7 (9th Cir. 1987) (no habeas jurisdiction because "such potential confinement is considered too speculative to warrant federal habeas corpus protection"); *Hilton v. Johnson*, 82 F. App'x 521, 522 (9th Cir. 2003) (rejecting speculative possibility of future constructive custody). Indeed, some of the class members may be in state custody for years. Much can change by then. *Braden v. 30th Judicial Circuit Court of Kentucky* is not to the contrary because Kentucky issued a detainer actively seeking the petitioner's confinement in the district and the petitioner's habeas challenge was to a "present denial of a speedy trial." 410 U.S. 484, 487 (1973).[6] So the confinement and injury there were immediate and concrete, whereas here it is wholly speculative. In any

---

AEA, cannot justify jurisdiction here because the Supreme Court already held that, absent habeas jurisdiction, Petitioners' claims cannot be maintained in this Court. *J.G.G.*, 145 S. Ct. at 1005.

[6] *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 805 (D.C. Cir. 1988), is inapposite because it did not involve future confinement, but rather which district was proper for a habeas challenge to parole eligibility. That case rested on the premise that the custodian for all prisoners could be in D.C. because the district of confinement is not jurisdictional, jurisdiction can be based on "service of process," and the government waived its defenses. *Id.* at 812–13. The Supreme Court rejected this view of habeas jurisdiction. *See Padilla*, 542 U.S. at 443 (rejecting service of process because "jurisdiction lies in only one district: the district of confinement").

event, named Petitioner T.C.I. is currently in custody in New Jersey. Like the named Petitioners who originally brought this case, the putative criminal custody subclass should try petitioning for habeas where they are in custody first. *See, e.g., G.F.F. v. Trump*, No. 1:25-cv-2886 (S.D.N.Y.); *J.A.V. v. Trump*, No. 1:25-cv-00072 (S.D. Tex.).[7] The Court lacks jurisdiction over this putative subclass's claims.

## II.    Petitioners' Constitutional Claims Fail.

### A.    The Government is providing adequate due process.

Petitioners once again argue that they are not receiving sufficient notice and opportunity to seek habeas to challenge their designations under the Alien Enemies Act. Mot. 14. That is wrong. Due process is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). This is especially true in the realm of immigration and foreign affairs, where the "Constitution gives the political department of the government plenary authority to decide which aliens to admit" and thus "the power to set the procedures to be followed." *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (cleaned up) (holding that expedited removal does not violate the Suspension Clause). What the Supreme Court required is notice that "they are subject to removal under the Act . . . within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *J.G.G.*, 145 S. Ct. at 1005. That is precisely what the government provides.

---

[7] It is unclear whether those original named Petitioners are part of the putative criminal custody subclass or if they seek preliminary relief at all. If so, those claims lack jurisdiction for the same reasons. In addition (as will be explained more in the opposition to class certification), their exact claims were rejected by the Supreme Court for a lack of jurisdiction. *See J.G.G.*, 145 S. Ct. at 1005. And they are pursuing identical claims through habeas petitions in their districts of confinement.

The government gives individual notice to all aliens who are detained or may be removed under the Proclamation who have been determined to be members of TdA and are subject to removal under the AEA. Ex. B, Cisneros Decl. ¶¶ 4, 9. The notice is provided in a language the aliens can understand, generally through an interpreter. *Id.* ¶¶ 5, 9. The alien is also informed that they can make a call to anyone they choose, including counsel. *Id.* ¶ 10. Once an alien receives notice, they have *at least* 12 hours to express an intent to file a habeas petition. *Id.* ¶ 11. After that, they have *at least* 24 hours to file a petition. *Id.* In practice, they often receive more time, as they can file at any time prior to their removal. *Id.* Generally, once a habeas petition is filed the alien will not be removed until the petition is adjudicated. *Id.* ¶ 12. Given the serious national security interests at stake in removing members of a designated foreign terrorist organization, that is more than sufficient due process.

In fact, courts have rejected due process challenges to Alien Enemies Act removal procedures, including a case without a hearing. *See United States ex rel. Schlueter v. Watkins*, 158 F.2d 853, 853–54 (2d Cir. 1946) (no hearing before removal). The ability to seek a full habeas adjudication is even greater here. And the amount of notice provided to seek such habeas relief has been deemed sufficient in analogous contexts.

Take expedited removal under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. The entire purpose of the Act was to "substantially shorten and speed up the removal process" for those "who [are] arriving in the United States[,]" or have not shown that they were "physically present in the United States

continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618–19 (D.C. Cir. 2020) (quoting 8 U.S.C. § 1225(b)(1)(A)(i), (iii)). If an immigration officer determines that an alien is inadmissible because they do not have valid entry documents, the "officer shall order the alien removed . . . without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). Even if the individual claims asylum or a fear of persecution, the "process is scarcely more involved" because the immigration officer can quickly deny the claim. *Make the Rd. N.Y.*, 962 F.3d at 618–19 (citing 8 U.S.C. § 1225(b)(1)(B)(iii)(III)). In fact, Congress was explicit on how fast this process was supposed to be: "Review shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination under subclause (I)." *Id.* § 1225(b)(1)(B)(iii)(III).

    The D.C. Circuit has held that this suffices for due process. *See Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 58 (D.D.C. 1998), *aff'd*, 199 F.3d 1352, 1357 (D.C. Cir. 2000) ("We see no reason to disturb the district court's analysis, and so we affirm the dismissal of these claims substantially for the reasons stated in the court's thorough opinion."). This was because the Supreme Court has been clear that "the power to expel or exclude aliens is a fundamental sovereign attribute exercised by the Government's political departments, largely immune from judicial control." *Id.* (quoting *Fiallo v. Bell,* 430 U.S. 787, 792 (1977)). That logic applies equally here: "[w]hatever the procedure authorized by Congress is, it is due process."

*Thuraissigiam*, 591 U.S. at 139 (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)) (holding that expedited removal does not violate the Suspension Clause for similar reasons). Indeed, much like the Alien Enemies Act, the executive branch is given "sole and unreviewable discretion" to determine who is subject to the 2-year period for expedited removal. 8 U.S.C. § 1225(b)(1)(A)(iii)(I). And as in this case, "'[j]udicial review' of expedited removal orders is only 'available in habeas corpus proceedings.'" *I.M. v. CBP*, 67 F.4th 436, 437–38 (D.C. Cir. 2023) (quoting 8 U.S.C. § 1252(e)(2)). So if 24 hours for someone who may have resided in the United States for two years is sufficient to satisfy due process, then surely it is sufficient for that category of persons whom the Commander-in-Chief has determined to be enemies invading the United States under United States law. Indeed, it would be perverse to hold otherwise. So if the government provides at most 24 hours of notice, there is no due process issue. And as noted, in practice, aliens receive much more time.

Petitioners point to a district court order and practices during World War II to argue for a longer period. A TRO from another district that is being appealed does not justify the sweeping nationwide one-size-fits-all relief that Petitioners request. *See D.B.U. v. Trump*, 2025 WL 1163530, at *4 (D. Colo. Apr. 22, 2025). Indeed, because "due process is flexible" and based on the circumstances, it is questionable whether broad relief is ever appropriate. *Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018) (citation omitted) (raising questions over applicability of class actions for due process claims). As to the 30 days provided in World War II, the D.C. Circuit noted

17

that the proclamation was "less" than the scope of the Act and the procedures reflected the "restraint with which the Attorney General has exercised his authority." *Citizens Protective League v. Clark*, 155 F.2d 290, 295 (D.C. Cir. 1946). In addition, more time was required to provide notice, communicate, file claims, and hold hearings in World War II due to technological limitations. Given the generous procedures provided at the time, the process afforded during World War II hardly marks the minimum requirements of due process.

Regardless, many of the named Petitioners here have received sufficient notice and due process. For example, T.C.I., the representative for the putative criminal custody subclass, has been in custody since January 2024 and has had notice of his removability under the AEA for weeks. ECF 102-13 ¶¶ 3, 5. The original named Petitioners have been in custody for months and have filed habeas petitions that are, and will be, adjudicated. *See, e.g.*, *G.F.F. v. Trump*, No. 1:25-cv-2886 (S.D.N.Y.); *J.A.V. v. Trump*, No. 1:25-cv-00072 (S.D. Tex.).[8] This is likely true of the other class members who have yet to be removed (which illustrates why class certification is improper). And the Supreme Court has stayed removal in the Northern District of Texas for two weeks, offering more than enough time to seek habeas. *See A.A.R.P. v. Trump*, 145 S. Ct. 1034 (2025). By the time they can be removed, they may have had more time than even Petitioners' extreme position demands. In addition, even those who have already been removed had some notice prior to their removal. In any event,

---

[8] Again, it is unclear whether the original named Petitioners are part of this motion. If so, they and their class members have had notice and opportunity to seek habeas for a significant period.

the Supreme Court made clear that the notice and opportunity it ordered was prospective, "after the date of this order." *J.G.G.*, 145 S. Ct. at 1006. So none of the Petitioners' procedural due process rights have been violated.

## B.    The Government is not illegally detaining or punishing aliens after removal

As has been made clear, the government does not have custody over the Petitioners in El Salvador. So the government cannot be detaining or punishing aliens it has already removed from its custody. Petitioners assert that detaining them after removal violates the AEA and constitutes a criminal punishment in violation of substantive due process, the Fifth, Sixth, and Eighth Amendments. Mot. 29–37. This theory remains contrary to this Court's contempt order (and Petitioners' support for that order on appeal), which found probable cause that the government transferred "class members into another country's custody" in violation of the Court's interpretation of its TRO. ECF 81, at 10–15, 22–43. That order acknowledges that the aliens were "transferred . . . from U.S. to Salvadoran custody." *Id.* at 24. So even if the government had constructive custody for habeas purposes, it could not control how El Salvador—a sovereign nation—detains and treats its detainees. And Petitioners cannot raise or sustain such claims in any event.

### 1.    Petitioners' substantive due process claims fail.

Petitioners claim that detaining them after removal constitutes criminal punishment in violation of substantive due process. Mot. 30. Again, the government does not have custody of Petitioners and is not responsible for El Salvador's detainment. Landau Decl. ¶ 3. And even if the government had constructive custody

19

of Petitioners for habeas purposes, that would not mean it had control over the conditions in—or the conduct of El Salvador regarding—Salvadoran prisons. If Petitioners are being punished, it is pursuant to Salvadorian laws and procedures, a separate sovereign. *Id.* Courts cannot remedy the "the act of a foreign sovereign" that depends on that sovereign's "exercise of broad and legitimate discretion." *Gul*, 652 F.3d at 18. "It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." *Sahagian v. United States*, 864 F.2d 509, 514 (7th Cir. 1988) (quotation omitted). "Such an assumption would directly conflict with the principle of comity . . . ." *Id.* So conduct in El Salvador cannot be attributed to the United States and courts cannot get involved in the procedures and conditions of another country.

In any event, even if the United States had some control, courts must be "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Applying substantive due process regarding confinement to alien enemies being detained by a foreign sovereign would be a massive expansion of substantive due process. As a general matter, the D.C. Circuit has held that even detainees in Guantanamo Bay cannot bring substantive due process claims regarding their conditions of confinement or treatment. *See Ali v. Trump*, 959 F.3d 364, 369 (D.C. Cir. 2020) (rejecting substantive due process challenge to 17-year detainment), *id.* at 373 (Randolph, J., concurring) (making it clear that detainees do not have procedural due process either). This is so

even though detainees in Guantanamo can bring habeas claims because the compound is under *de facto* United States control. *See Boumediene*, 553 U.S. at 771. By contrast, the writ did not run to those held in United States custody at Bagram Air Force Base because the United States was merely leasing the land—it did not have "*de facto* sovereignty" over the land. *Al Maqaleh*, 605 F.3d at 97. If the writ runs to those detained at Guantanamo but they could not assert substantive due process, then those detained at Bagram certainly could not raise substantive due process claims. That is triply true here, where the United States not only lacks *de facto* sovereignty over CECOT, but unlike Bagram it does not even have a lease or military presence there. Since CECOT is operated by El Salvador, detainees cannot bring substantive due process claims against the United States *even if* it had custody and some degree of control.

And even if Petitioners could raise substantive due process claims, they could not prove they would likely prevail on the merits. To show intent to punish, Petitioners rely on vague statements from one Respondent that she wants to deter illegal immigrants. Mot. 31–32. Such statements do not demonstrate a purpose by the government to punish aliens by removing them to El Salvador. Even statements by the President have been held not to establish the purpose behind a particular executive policy. *See Hawaii*, 585 U.S. at 701–02. Instead, the legitimate nonpunitive purpose is public safety. *See Smith v. Doe*, 538 U.S. 84, 103 (2003) (public safety is a legitimate and rationally related purpose that is nonpunitive). As noted, the Secretary of State designated TdA as a foreign terrorist organization. 90 Fed. Reg. at

13,034. Yet the government could not remove TdA members to Venezuela, who would not accept them. Substantial deference must be afforded to the government's stated public-safety intent, so "only the clearest proof'" will demonstrate a punitive intent. *Smith*, 538 U.S. at 92. Petitioners have made no such showing here.

Petitioners conclude that confinement is "excessive" compared to normal detention. Mot. 33. It is unclear what Petitioners mean by this. If they are raising an excessive force claim under *Kingsley*, they have not pleaded it or proved it in their motion. *See Kingsley v. Hendrickson*, 576 U.S. 389, 398–99 (2015). If, as Petitioners suggest, this is a "deliberate indifference" claim, Mot. 33, then they still need to establish that Respondents "subjectively disregard[ed]" a substantial risk. *Strain v. Regalado*, 977 F.3d 984, 992 (10th Cir. 2020). That analysis would fail for much of the same reasons already stated. But what Petitioners really seem to be arguing (Mot. 33–34) is that the conditions at CECOT amount to torture and prove that their detention is punitive. That fails for the reasons explained and for additional reasons laid out below. Petitioners cannot maintain a substantive due process claim against the United States while in detention in El Salvador.

### 2. Petitioners' Fifth, Sixth, and Eighth Amendment claims fail as well.

Petitioners' Fifth and Sixth Amendment arguments just reflect their argument that detention here is criminal and thus requires criminal process. Mot. 34–36. In addition, Petitioners argue that detention at CECOT imposes torture in violation of the Eighth Amendment. *Id.* These claims largely rest, again, on an intent to punish. Thus they fail for many of the same reasons. Namely, the United States does not have

custody over Petitioners, so it is not, nor does it intend to, punish them through confinement at CECOT. More fundamentally, as with the substantive due process claim, even under United States custody, aliens held in a foreign nation's sovereign territory cannot raise Fifth or Eighth Amendment claims against the United States. *See Ali v. Rumsfeld*, 649 F.3d 762, 772 (D.C. Cir. 2011) ("They offer no reason—and we see none ourselves—why the plaintiffs' Fifth and Eighth Amendment claims would be any stronger than the Suspension Clause claims of the Bagram detainees.").

So even if the government has constructive custody, it does not control what El Salvador does within its prison. *See Gul*, 652 F.3d at 18. Indeed, the analogous realm of foreign extradition illustrates why Petitioners' theory is implausible and would severely hamper foreign affairs. Petitioners do not have constitutional rights "when surrendered to a foreign country." *Neely v. Henkel*, 180 U.S. 109, 122 (1901). If knowledge that a foreign nation seeking extradition might violate United States standards of due process or even inflict cruel and unusual punishment could create a constitutional claim against the United States, it would disrupt sensitive extradition treaties. *See Extradition of Chen*, 161 F.3d 11 (9th Cir. 1998) (rejecting claim that United States participation in extradition to Singapore where he could face the death penalty allowed an Eighth Amendment claim). To prevent such upheaval, courts avoid the "responsibility for supervising the integrity of the judicial system of another sovereign nation." *Sahagian*, 864 F.2d at 514 (quotation omitted). Thus, the rule is that "a surrender of an American citizen required by treaty for purposes of a foreign criminal proceeding is unimpaired by an absence in the foreign judicial system of

safeguards in all respects equivalent to those constitutionally enjoined upon American trials." *Holmes v. Laird*, 459 F.2d 1211, 1219 (D.C. Cir. 1972). The same is true here. If every constitutional concern that could arise in a removal nation could be imputed on the United States, it would upend the immigration system and foreign affairs.

Petitioners' argument is better suited for a Convention Against Torture ("CAT") claim, not a constitutional one. *See Cadet v. Bulger*, 377 F.3d 1173, 1196 (11th Cir. 2004). Petitioners are effectively trying to constitutionalize CAT. But there is a reason CAT exists separately, it allows the executive to determine valid claims without the disruption of a full court proceeding. *See* 8 C.F.R. § 1208.18(e) (strictly confining judicial review). And, as explained further below, courts cannot question "the Executive's assessment of the likelihood a detainee will be tortured by a foreign sovereign." *Arar v. Ashcroft*, 585 F.3d 559, 578 (2d Cir. 2009) (quoting *Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009)). Indeed, the Supreme Court did not question the United States determination that transferring a detainee to Iraqi custody was not likely to result in torture. *See Munaf*, 553 U.S. at 702. The United States's policy continues to be not to remove aliens to places where they are likely to be tortured. That should resolve this issue.

And even if Petitioners could bring claims, they have not established the government intends to punish them for the same reasons expressed earlier. Tweets and statements do not establish a governmental purpose. And the government has a nonpunitive public safety interest in keeping terrorists detained. Petitioners'

argument that their classification is itself a punishment or strong evidence of such intent is absurd. Mot.36. If that was the case, then every time the Act was used the fully panoply of criminal procedural protections would apply. Yet that was not the case in World War II. *See Watkins*, 158 F.2d at 853–54 (no hearing prior to removal); *Citizens Protective League*, 155 F.2d at 294. So Petitioners' claims of punishment and torture are incorrect and, in any event, not cognizable or attributable to the United States.

### 3.    The AEA does not control this issue.

Petitioners argue that the Alien Enemies Act does not authorize detention after removal. Mot. 29. Again, Petitioners are not in United States custody, and the government has no control over what El Salvador does in its prisons. The fact that the Alien Enemies Act is silent on what another sovereign country does after removal is unsurprising and irrelevant. In any event, if Petitioners were correct that the government maintains custody over the alien enemies, then it makes sense that the government would seek to keep those enemies detained for national security purposes. Such concerns are why the Act provides broad authority for detention during a proclamation. 50 U.S.C. §§ 21–23. At a minimum, the Act certainly does not foreclose such custody. Although not about removal under the Act, the Supreme Court in *Eisentrager* relied on the Alien Enemies Act to support its holding that foreigners held abroad (even by the United States military) do not have habeas rights. 339 U.S. at 773–75. Indeed, there are other ways the government can detain enemy aliens abroad. *See Al Maqaleh*, 605 F.3d at 96 (alien enemies could be detained by U.S.

military in Iraq without habeas). So the statute does not foreclose detention (whether by the United States or a foreign sovereign) after removal.

## III.    Petitioners' Challenges to the AEA Fail.

### A.    Petitioners' claims are nonjusticiable.

Courts cannot review the Proclamation or enjoin the President's exercise of authority under Article II and the AEA. The Supreme Court has long recognized that courts cannot issue an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties"); *Trump v. United States*, 603 U.S. 593, 607 (2024) (recounting that the President "has important foreign relations responsibilities: [including] . . . recognizing foreign governments . . . overseeing international diplomacy and intelligence gathering, and managing matters related to terrorism . . . and immigration"); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him.").

Consistent with that general rule, courts have held for more than a century that the President's authority and discretion under the AEA is not a proper subject for judicial scrutiny: "The authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint to which they (alien enemies) shall be subject, and in what cases,' is, of course, *plenary and not reviewable*." *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919) (emphasis added); *see also United States ex rel. Schlueter v. Watkins*, 67 F. Supp. 556, 565 (S.D.N.Y. 1946) (reviewing habeas petition challenging detention as an alien enemy and explaining "courts are without

power to review the action of the executive in ordering removal of an alien enemy . .
. except with respect to . . . whether the relator is an enemy alien"), *aff'd*, 158 F.2d
853 (2d Cir. 1946). Ultimately, "[t]he very nature of the President's power to order
the removal of all enemy aliens rejects the notion that courts may pass judgment
upon the exercise of his discretion." *Ludecke v. Watkins*, 335 U.S. 160, 163–64 (1948)
(reasoning, on appeal from "[d]enial of a writ of habeas corpus," that "some statutes
'preclude judicial review'" and "the Alien Enemy Act of 1798 is such a statute," as
demonstrated by the clear text and "controlling contemporary construction"); *id.* at
164–65 (noting that "every judge before whom the question has since come has held
that the statute barred judicial review"). For that reason, it has long been established
that "[u]nreviewable power in the President . . . is the essence of the" AEA. *Citizens
Protective League*, 155 F.2d at 296.

Thus, as the Supreme Court has already held in this case, the AEA "largely
preclude[s] judicial review," only permitting very "limited" review. *J.G.G.*, 145 S. Ct.
at 1006 (quoting *Ludecke*, 335 U.S. at 163). The limited review that is permitted, via
habeas, involves "'questions of interpretation and constitutionality' of the Act as well
as whether he or she 'is in fact an alien enemy fourteen years of age or older'" *Id.*
(quoting *Ludecke*, 335 U.S. at 163 n.17). The questions Petitioners raise about
whether the AEA's prerequisites have been met are neither of those questions—they
are political questions which the Supreme Court has said that courts are ill-suited
and without authority to review. And that makes sense—the President recognizes
foreign nations, receives ambassadors, and is Commander-in-Chief of the armed

forces. *See Trump*, 603 U.S. at 607. His powers are at their zenith in the realm of foreign and military affairs. *See, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 15 (2015) ("Between the two political branches, only the Executive has the characteristic of unity at all times. And with unity comes the ability to exercise, to a greater degree, '[d]ecision, activity, secrecy, and dispatch.'").

*Ludecke* does not support Petitioners' view that a court can override a political judgment that the prerequisites of the AEA have been satisfied. Despite a vigorous dissent contesting otherwise, the Supreme Court explained that "[w]hether and when it would be open to this Court to find that a war though merely formally kept alive had in fact ended, is *a question too fraught with gravity* even to be adequately formulated when not compelled." *Ludecke*, 335 U.S. at 169 (emphasis added). These are matters of political judgment for which judges have neither technical competence nor official responsibility." *Id.* Thus, the Court did not "reach[] the merits" of whether the nation was still at war with Germany. Mot. 11. So *Ludecke* stands for the proposition that the courts may not to review a political judgment that the AEA's prerequisites have been met and persist. *See also Citizens Protective League*, 155 F.2d at 295 ("[I]t is not for the courts to determine the end of a war.").

Petitioners' other citations do not prove the contrary. The bulk are for the proposition that a court may review the meaning of terms not at issue here—"denizen," "citizen," "within the United States," "reasonable time" to depart, etc.—or who bears the burden of proof. Again, the government does not contest that a court can interpret the words of the statute. The point is that a court cannot review the

President's determination that those statutory prerequisites have been met. Even Petitioner's case for the proposition that a court may review whether some entity is a "foreign nation or government," *United States ex rel. Kessler v. Watkins*, 163 F.2d 140 (2d Cir. 1947), takes the same tack on that question as *Ludecke* did on "declared war." That decision is consonant with the principle that a court must respect political judgments, not override them. Courts can interpret statutes. But here, where complex questions of foreign affairs are involved, court may not second guess the President's determinations that the statutory requirements have been established.

This Court lacks power to review the President's Proclamation for another reason as well: Whether the AEA's preconditions are satisfied is a political question committed to the President's discretion, no different from the President's determination to trigger the Constitution's Invasion Clause (Article IV, section 4). *See California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995). Any challenge to that determination is therefore foreclosed.

The Supreme Court has held that the political-question doctrine is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962). The President's determination under the AEA goes to the core of separation of powers and raises thorny questions that are not amenable to manageable judicial standards.

*First*, the determination that an "invasion" or "predatory incursion" is being perpetrated sits at the intersection of two areas the Constitution commits to the political branches: (1) foreign affairs, *see Barclays Bank PLC v. Franchise Tax Bd.*,

512 U.S. 298, 327–28 (1994); and (2) immigration policy, *see Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Indeed, "any policy towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). Similarly, the power to recognize foreign states and governments "resides in the President alone." *Zivotofsky ex rel. Zivotofsky*, 576 U.S. at 28; *see also El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) ("The political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion.").

*Second*, even without the clear textual commitment to the Executive of the constitutional responsibilities undergirding issuance of the Proclamation, there are no manageable standards permitting courts to assess exactly when hostile entry and criminal and violent acts constitute an "invasion" or "predatory incursion" for AEA purposes. *See Martin v. Mott*, 25 U.S. 18, 31–32 (1827) (Story, J.). Thus there is no basis for second-guessing the Executive's policy judgment that such an "invasion" or "predatory incursion" is occurring. *See Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports

neither are nor ought to be published to the world. It would be intolerable that courts . . . should review and perhaps nullify actions of the Executive taken on information properly held secret.").

AEA proclamations are thus conclusive and preclusive. As for whether the Act's preconditions are satisfied, that is the President's call alone; the federal courts have no role to play.

### B.    The INA and other statutes do not supersede the AEA.

Nor are Petitioners correct that the INA is the sole mechanism for removing an alien. The AEA does not require an "admissibility" or "deportability" determination of any alien, so there is no reason that Title 8 and its "sole and exclusive" means for addressing *those* questions is implicated here. *See* 8 U.S.C. § 1229a(a)(3) (removal proceedings are "exclusive" only to the extent the government is determining admissibility or removability, as those terms are defined under Title 8). Rather, the INA and AEA are distinct mechanisms for effectuating the removal of certain aliens, just as Title 42 and the INA constitute different bases for *excluding* aliens. *See generally Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022).

In fact, the immigration laws and AEA have been read harmoniously for more than 75 years. *See United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429, 437 (S.D.N.Y. 1947). Not all alien enemies will be subject to removal under Title 8 because the authority under Title 50 extends to aliens regardless of lawful status. On the other hand, the AEA applies to a fairly narrow set of aliens and circumstances, as reflected in the Proclamation. And for aliens subject to both Title 8 and Title 50, the Executive has discretion in deciding how and whether to proceed under either or

both statutes. *See id.* (recognizing this discretion under pre-INA immigration law). Thus, the AEA and INA coexist with some overlap that gives the Executive discretion to determine how, whether, or when to apply them. *See, e.g., Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When confronted with two Acts of Congress allegedly touching on the same topic, this Court ... must ... strive to give effect to both.").

Petitioners' argument is that Congress effectively repealed a 150-year-old law that was just used with nary a mention. Indeed, the INA was enacted less than a decade after the use of the AEA during World War II. This Court must not interpret the INA to impliedly repeal such a recently used statute without a peep from the legislature. *See TVA v. Hill*, 437 U.S. 153, 189–90 (1978) (reiterating the "cardinal rule . . . that repeals by implication are not favored" (quoting *Morton v. Mancari*, 417 U.S. 535, 549 (1974)) and collecting cases). If Congress intended the repeal of a law dating back to the beginnings of the Republic, it would have said so.

And even if there *were* a conflict between the AEA and the INA, the AEA would control here. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). Here, the AEA provides specific rules for removing a subset of aliens—those designated alien enemies—against the more general provisions relating to removability provided by the INA. Thus, to the extent there may be any conflict, the AEA provides an exception to the more general applicability of the INA's removal provisions, and this is true regardless of the later enactment of the INA. *See, e.g., Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("Where there is no clear intention otherwise, a specific

statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").

Nor is there a colorable argument that enemy aliens *must* be permitted to seek relief or protection before removal. Such relief is generally permitted only in the exercise of Executive discretion. *See Citizens Protective League*, 155 F.2d at 294 (noting common-law rule that "alien enemies have no rights, no privileges, unless by the king's special favor"). Petitioners' asserted conflict between the INA and the AEA is illusory. The INA provides a system for determining removability and any relief or protection from removal for aliens under the authority of Title 8, whereas the AEA provides its own mechanisms to implement procedures and regulations governing removal and detention. *See* 50 U.S.C. § 21.

With respect to asylum and statutory withholding of removal related to persecution claims, none of the cited provisions constrain the *President's* actions under Title 50. *See* 8 U.S.C. § 1158(b)(1)(A) (Attorney General or Secretary of Homeland Security); 8 U.S.C. § 1231(b)(3) (Attorney General); 8 C.F.R. §§ 1208.16, 1208.18 (immigration judges, via delegation from the Attorney General); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 172–73 (1993) (recognizing distinct grants of authority under the INA to the President and Attorney General among others). Nor are such constraints implicated just because the President has delegated certain authorities, including implementation of the Proclamation, to the Attorney General. *See id.* at 172 n.28 (in implementing Proclamation, Attorney General is "carrying out

an executive, rather than a legislative, command, and therefore would not necessarily [be] bound" by provisions of the INA).

In any event, individuals subject to removal under Title 50 are barred from asylum and withholding of removal. Asylum is a discretionary form of relief, and eligibility for such relief may be foreclosed on a categorical basis. *See Huisha-Huisha*, 27 F.4th at 730–31. Here, the AEA disallows relief for covered enemy aliens, representing the categorical conclusion that such aliens are not entitled to relief in the exercise of discretion. Likewise, aliens subject to removal under the AEA would not be eligible for statutory withholding of removal because the President's invocation of the AEA suggests that "there are reasonable grounds to believe that [such aliens are] a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B)(iv).

Nor may this Court review Petitioners' claims under the Convention Against Torture, as codified by the Foreign Affairs Reform and Restructuring Act ("FARRA"). As a threshold matter, the D.C. Circuit among other circuits has held there is no jurisdiction to consider CAT claims in habeas, under 8 U.S.C. § 1252(a)(4). *See Omar v. McHugh*, 646 F.3d 13, 18 (D.C. Cir. 2011); *Kapoor v. DeMarco*, 132 F.4th 595, 608 (2d Cir. 2025); *Mironescu v. Costner*, 480 F.3d 664, 676–77 (4th Cir. 2007).

Moreover, there is no direct conflict between the United States' obligations under the CAT and removals under the AEA. The United States continues to abide by its policy not to remove aliens to countries in which they are likely to be tortured. *See Munaf v. Geren*, 553 U.S. 674, 702 (2008). And "[s]eparation of powers principles . . . preclude the courts from second-guessing the Executive's assessment of the

likelihood a detainee will be tortured by a foreign sovereign." *Arar v. Ashcroft*, 585 F.3d 559, 578 (2d Cir. 2009) (en banc) (ellipsis in original) (quoting *Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009)). "Under *Munaf* . . . the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee." *Kiyemba*, 561 F.3d at 514. The United States continues to uphold its anti-torture policy and obligations.

### C.    The Proclamation satisfies the statutory prerequisites.

In all events, the Proclamation and its implementation are perfectly lawful. The AEA grants the President discretion to issue a proclamation directing the apprehension, restraint, and removal of alien enemies when two conditions are met. First, there either must be "a declared war," "invasion," or a "predatory incursion" that is "perpetrated," "attempted," or "threatened against the territory of the United States." 50 U.S.C. § 21. Second, that hostile action must be by a "foreign nation" or "government." *Id.* The Proclamation satisfies both conditions.

### 1.    TdA's actions constitute an invasion or predatory incursion.

As to the first prerequisite, the President determined that TdA is perpetrating an invasion *or* a predatory incursion into the United States. Although the word "invasion" includes a military entry and occupation of a country, the accepted definition of that term is far broader, as definitions contemporaneous with the passage of the AEA make clear. "Invasion" was defined to include a "hostile entrance," *see*, *e.g.*, 1 John Ash, *The New and Complete Dictionary of the English Language* (1775), or a "hostile encroachment" on another's territory, *see* Thomas Sheridan, *A*

*Complete Dictionary of the English Language* (2d ed. 1789). Nor is there any requirement that the purpose of the incursion be to possess or hold territory. *See, e.g.,* *United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024). Here, the actions of TdA fit accepted conceptions of an invasion. TdA's encroachment on U.S. territory is a hostile act contrary to the rights of citizens to be free from criminality and violence. *See* Smith Decl., ECF 72-1 ¶¶ 8–18.

At a minimum, the actions of TdA constitute a "predatory incursion" that justifies invocation of Section 21. The phrase "predatory incursion" encompasses (1) an entry into the United States (2) for purposes contrary to the interests of the United States. *See, e.g.,* *Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189–90 (S.D. Tex. 1945) (noting use of the phrase to describe raids during hostilities with Mexico falling well short of "invasion"); *see also Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992) (using the phrase to refer to foreign fishing fleets unlawfully fishing in territorial waters); *Bas v. Tingy*, 4 U.S. (4 Dall.) 37 (1800) (broadly defining "enemy" and "war").

Petitioners are wrong that "invasion" and "predatory incursion" both *necessarily* entail military actions or the opening salvo of war meant to displace a government or conquer territory. There is no question that both terms include military actions, but both unquestionably have broader meanings not foreclosed by any source Petitioners cite. In fact, many of the sources relied on by Petitioners contain definitions supporting the government's argument. *See Webster's Dictionary*, "Invasion" (1828) ("[a] hostile entrance into the possessions of another); *id.*,

"Incursion" ("entering into a territory with hostile intention"). In short, both definitions *include* military action, but neither is *limited to* such action.

The canon of *noscitur a sociis* does not aid Petitioners, either. Although "declared war" certainly connotes certain military and political formalities, that term alone cannot rob "invasion" and "predatory incursion" of their meanings, especially in light of the purpose of the AEA. The statute gives the President the power to act even outside of a declared war—as it must. The United States' enemies do not invariably announce their intent to attack. Merely consider the surprise Japanese attack on Pearl Harbor, or al-Qaeda's attacks on September 11, 2001. The President, acting on public reports or intelligence information, must have the ability to restrain and remove aliens who might, by virtue of their legal allegiance to an attacking force, work against the nation's interests. *Citizens Protective League*, 155 F.2d at 294 ("The President not only has the power, under the broad grants by the Congress, but has the solemn responsibility to make certain that the conduct of war is not only unimpeded but suffers from no threat of impediment."). The Founders realized this, which is why they permitted the President to act upon something less than armed conflict between militaries. "Invasion" and "predatory incursion" must have capacious meanings, untethered to "declared war," to give the President the ability to act in emergencies, as the Founders intended. *See Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923) ("That a word may be known by the company it keeps is, however, not an invariable rule, for the word may have a character of its own not to be submerged by its association.").

Here, there is no question that TdA members have effected entries into the United States for purposes contrary to both the interests and laws of this country: trafficking in substances and people, committing violent crimes, and conducting criminal business with interests antithetical to those of the United States. *See* 90 Fed. Reg. at 13,034. These grave problems affecting the safety of the entire nation are caused by the concerted efforts of aliens adhering to a foreign enemy, may be deemed by the President to be tantamount to acts of war by a foreign enemy for purposes of the AEA. Congress intended that the President have the ability as Commander-in-Chief to respond to such acts by restraining or removing those liable to join in those efforts. *Citizens Protective League*, 155 F.2d at 294.

### 2. Given its intimate connection to Venezuela, TdA is a foreign nation or government.

The Proclamation makes clear that TdA is a "foreign nation or government" for purposes of the AEA for at least two independent reasons. First, TdA's infiltration of key elements of the Venezuelan government make it indistinguishable from that government. *See* 90 Fed. Reg. at 13,033. TdA's growth itself can be attributed to promotion via the actions of former Governor of Aragua Tareck El Aissami, who was later appointed Vice President in the Maduro regime. 90 Fed. Reg. at 13,033. And Maduro's connections to the group, via the regime-sponsored narco-terrorism enterprise Cártel de los Soles, are also clear. *Id*. The Cártel de los Soles "coordinates with and relies on TdA . . . to carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *Id*. Given how significantly TdA is intertwined

in the fabric of Venezuela's structures, it functions as a governing entity. And through those ties, TdA has become indistinguishable from the Venezuelan government.

Although Petitioners try to depict this invocation of the AEA as novel, the United States has a long history of using war powers against formally nonstate actors. Historically, the United States authorized the use of force against "slave traders, pirates, and Indian tribes." Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005). It has engaged militarily, during broader armed conflicts, with "opponents who had no formal connection to the state enemy," including during the Mexican–American and Spanish–American Wars. *Id.* at 2066–67. President Wilson famously sent U.S. troops into Mexico to pursue Pancho Villa, the leader of rebels opposed to the Mexican government. *Id.* at 2067. And more recently, President Clinton authorized missile strikes on al-Qaeda targets in Africa and elsewhere. *See generally El-Shifa Pharm. Indus.*, 607 F.3d 836.

This history is important because statutes must be read "but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). The AEA is a war-powers statute and thus must be read in light of a robust history of employing war powers against nonstate actors.

In all events, TdA also acts as a governing authority in the areas where it operates. As the Proclamation recognizes, "Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal

organizations, including TdA." 90 Fed. Reg. at 13,033. In those areas where it operates, TdA acts as a criminal governing entity, independent or in place of the normal civil society and government. *See id.* Given TdA's governance and organizational structure, as well as its *de facto* control over parts of Venezuela where it operates with impunity, it is well within the President's discretion to determine it constitutes a foreign "government" for purposes of invoking § 21.

Petitioners' contrary arguments lack merit. The government is not arguing that TdA is itself a "nation." But the control and authority TdA exercises in Venezuela is consistent with Founding-era definitions of "government." *See* Thomas Dyche & William Pardon, *A New General English Dictionary* (1754) ("the power or authority that one person exercises over another"). Additionally, although the AEA references the possibility that a covered entity *may* be able to enter a treaty with the United States, the statute does not establish treaty-making authority as a prerequisite to inclusion. *See* 50 U.S.C. § 22 (contemplating circumstances "where no such treaty exists"). Nor is there any reason that specific terminology used in the Proclamation should weigh against the President's determination. Members of TdA are clearly "subject" to the authority of that criminal organization and the governance it wields. *See* Dyche & Pardon, *supra*.

Fundamentally, Petitioners argue that other individuals do not agree with the President's determination that TdA and the government of Venezuela are sufficiently intertwined to justify invocation of the AEA. Mot. 22–24. Yet the President is entitled to examine the available evidence, including intelligence not available to others, and

make a final determination based on his *own* assessment. *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (noting "the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information" unavailable to others); *cf. United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) ("[T]he President alone has the power to speak or listen as a representative of the nation."). It is not the role of this Court to second-guess those determinations based on a handful of declarations by individuals not involved with the assessment of evidence or decisionmaking culminating in the Proclamation. *See Chi. & S. Air Lines*, 333 U.S. at 111.

### 3.    Petitioners are not entitled to a period for voluntary departure.

Petitioners contend that a period of voluntary departure is *required* by the AEA. Mot. 16. It is not. While the AEA permits the President to "provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom," 50 U.S.C. § 21, it also dictates that they "*shall be* liable to be . . . removed as alien enemies." *Id.* (emphasis added). In this context, where the alien enemies are members of the hostile force itself, the President cannot be required to provide any period of voluntary departure prior to effectuating removal. Indeed, the Act expressly reflects this understanding, as voluntary departure is available only if an alien enemy is "not chargeable with actual hostility, or other crime against public safety." 50 U.S.C. § 22. This is because the AEA's entire purpose would be undercut if active participants in hostilities must be allowed to depart on their own terms.

For that reason, the Proclamation explains that TdA engaged in "mass illegal migration" with the objective of "harming United States citizens," and that this activity undermines public safety, while also enhancing the "Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." 90 Fed. Reg. at 13,033. So all members of TdA have been so charged under the Proclamation and through their designation as members of a Foreign Terrorist Organization. 90 Fed. Reg. at 13,034. That finding negates Petitioners' assertion that a period of voluntary departure is statutorily required. And Petitioners cite no authority for their conclusory assertion that 50 U.S.C. § 22 "cannot be invoked categorically." Mot. 16. So there is no basis for imposing an arbitrary and uniform period for notice on the government.

## IV. The Remaining Equitable Factors Weigh Strongly in the Government's Favor.

### A. Petitioners have not established irreparable harm.

Because no Petitioner in this case can make a clear showing that irreparable harm is likely without preliminary relief, Petitioners' requested injunction must be denied.

First, Petitioners have not made a showing of likely irreparable harm from "life-threatening conditions, persecution and torture" if removed to El Salvador. Mot. 37. Correctly conceding that "removal does not by itself ordinarily constitute irreparable harm," *id.* (citing *Nken*, 556 U.S. at 435), Petitioners instead emphasize allegations of harsh conditions in Salvadoran prisons. But, as explained above, the United States continues to abide by its policy not to remove aliens to countries where

42

they are likely to be tortured. *See Munaf*, 553 U.S. at 702; *Arar*, 585 F.3d at 578. Nor have Petitioners demonstrated a likelihood of persecution in El Salvador. Their only evidence to that effect are conclusory "expert" declarations. Mot. 37–38. That is not enough to make the clear showing of likely irreparable harm that is their burden to demonstrate.

And as to Petitioners still in the United States, they can make no showing of irreparable harm either. As explained above, the process provided to Petitioners is adequate to provide them notice and opportunity to meaningfully challenge their designation as an alien enemy or raise any questions of interpretation or constitutionality, which is precisely the judicial review available to Petitioners under the AEA. *J.G.G.*, 145 S. Ct. at 1006. Indeed, the Petitioners in this case have already filed a habeas petition and are receiving due process through those proceedings.

**B.    The balance of equities and public interest favor denial of preliminary injunctive relief.**

The balance of harms and the equities strongly favor the government here as an injunction irreparably harms the conduct of foreign policy. An injunction effectively usurps the President's statutory and constitutional authority to address what he has identified as an invasion or predatory incursion by a group undertaking hostile actions and conducting irregular warfare. Such an injunction "deeply intrudes into the core concerns of the executive branch," *Adams*, 570 F.2d at 954, and frustrates the "public interest in effective measures to prevent the entry of illegal aliens," *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). The Executive's protection of these interests, including "sensitive and weighty interests of national

43

security and foreign affairs" inherent to combating terrorist groups, warrants the utmost deference. *Humanitarian Law Project*, 561 U.S. at 33–35; *see also Barr v. DOJ*, 819 F.2d 25, 26 (2d Cir. 1987). Here the government's inability to remove them as quickly as possible—let alone a requirement to facilitate their *return* to the United States—would cause substantial harm to the government and public interest; especially where TdA is a designated foreign terrorist organization whose members threaten the public safety, Smith Decl., ¶¶ 15–25, pose a danger to their government custodians, and take up limited space for detaining aliens, Charles Decl., ECF 72-2 ¶ 9.

Additionally, the Supreme Court has warned of "the danger of unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013); *Biden v. Texas*, 597 U.S. 785, 816 (2022) (Kavanaugh, J., concurring) ("Nothing in the relevant immigration statutes . . . suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations."). An injunction does just that, impeding the Executive's ability to swiftly remove alien enemies under the Proclamation. *See, e.g.*, *Nken*, 556 U.S. at 436 (noting there "is always a public interest in prompt execution of removal orders" even where an alien asserts a risk of harm, and the interest "may be heightened" if "the alien is particularly dangerous").

An injunction also risks compromising the ability of the United States to negotiate in the future on key foreign-affairs and national-security issues, as foreign

actors may "change their minds regarding their willingness to accept" alien enemies or might otherwise seek to "leverage [any delay] as an ongoing issue." Kozak Decl., ECF 26-2 ¶¶ 3, 4.

Because Petitioners have not shown the balance of the equities and public interest lie in their favor, they have not made this essential showing for injunctive relief.

## Conclusion

Petitioners' motion for a preliminary injunction should be denied.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

s/Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney General
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 514-2000
drew.c.ensign@usdoj.gov

AUGUST FLENTJE
Special Counsel for Immigration

TIBERIUS T. DAVIS
Counsel to the Assistant Attorney General

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

ERNESTO MOLINA
Deputy Director

*Counsel for Respondents–Defendants*

Dated: May 1, 2025