**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

LIYANARA SANCHEZ, as next friend on behalf
of FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

---

**<u>PETITIONERS' REPLY IN SUPPORT OF</u>**
**<u>THEIR MOTION FOR A PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ……………………………………………………………………...1

ARGUMENT…………………………………………………………………………...1

  I.  The Court Can Reach the Merits of Petitioners' Claims…………………………………1

    A. Petitioners' Claims Are Justiciable………………………………...………………...1

    B. The Court Has Jurisdiction Over the CECOT Subclass…………..………………….2

    C. The Court Has Jurisdiction Over the Criminal Custody Subclass………………..…7

  II.  Petitioners Are Likely to Succeed on the Merits ................................................ 8

    A. The Proclamation is Unlawful……………………………………………………8

      1. The Notice Process Violates Due Process Clause and the AEA...……………..8

      2. The Proclamation Fails to Satisfy the AEA…………………………...…12

      3. The Proclamation Violates the Specific Protections That Congress Established for Noncitizens Seeking Humanitarian Protection, and the INA's Procedural Requirements………………………………………………………...…..15

    B. Petitioners' Detention at CECOT Violates the Constitution and the AEA………...…19

      1.The AEA Does Not Permit Petitioners' Post-Removal Imprisonment…...……19

      2. Petitioners' Imprisonment at CECOT Violates their Substantive Due Process Rights…………………………………………………………………19

      3. Petitioners' Imprisonment at CECOT Constitutes Criminal Punishment in Violation of the Fifth, Sixth, and Eighth Amendments………………….…...…23

  III.  The Remaining Factors Favor Petitioners……………………………….………....24

CONCLUSION……………………………………………………………………..25

## INTRODUCTION

As this Court has already recognized, Petitioners face serious and irreparable harm so long as they remain in a notorious Salvadoran prison or are threatened with summary removal under the AEA. And since Petitioners' opening brief, in related litigation, a district court in the Southern District of Texas has issued classwide relief, holding on the merits that the Proclamation does not satisfy the statutory prerequisites for invoking the AEA because there is no invasion or predatory incursion. The Tenth Circuit also recently denied the government's request to stay a classwide TRO ruling on the merits in which the district likewise found there is no invasion or incursion. Given the likelihood of success on the merits of any one of the multiple claims and the grave harm Petitioners and the subclasses face, a preliminary injunction is warranted. Nor is there any question that this Court has jurisdiction and authority to order the government to take steps to bring individuals back from CECOT.

## ARGUMENT

## I.    The Court Can Reach the Merits of Petitioners' Claims.

### A.    Petitioners' Claims Are Justiciable.

In arguing that Petitioners' claims are not justiciable, Opp. 26–31, Respondents rehash arguments this Court and others have already cast doubt on or outright rejected. *See J.G.G. v. Trump*, 2025 WL 890401, at *9–10 (D.D.C. Mar. 24, 2025); *J.G.G. v. Trump*, 2025 WL 914682, at *6–8 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); *J.A.V. v. Trump*, 2025 WL 1257450, at *7–11 (S.D. Tex. May 1, 2025) (granting summary judgment); *D.B.U. v. Trump*, 2025 WL 1163530, at *7 (D. Colo. Apr. 22, 2025). For reasons Petitioners have explained at length, nothing in the AEA cases, the political-question doctrine, or Article II is an obstacle to judicial review of the claims here. Mot. 11–14, 25; First PI Mot. 15–21, 30–32, ECF No. 67-1. That includes the

mixed question of whether the AEA's preconditions have been met. *See J.G.G.*, 2025 WL 890401, at *10 (observing that "courts can assess the record to decide whether something as dynamic and murky as 'active combat' is then occurring"); *J.G.G.*, 2025 WL 914682, at *7 (Henderson, J., concurring) ("Indeed, we have previously considered the precise sort of question that the government contends we cannot."); First PI Mot. 20–21 (collecting AEA cases).

### B.    The Court Has Jurisdiction Over the CECOT Subclass.

The Court has statutory jurisdiction over the CECOT Subclass's habeas claims because these detainees are in Respondents' constructive custody, and they are incarcerated in violation of U.S. law. Mot. 6–9; 28 U.S.C. § 2241(c)(1), (c)(3); *see Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 46, 50 (D.D.C. 2004) (explaining that subsection 2241(c)(3) "sweeps even more broadly" than (c)(1)).

For the purposes of this Court's jurisdiction under 28 U.S.C. § 2241, the sole issue is whether the CECOT Subclass is "in custody" within the meaning of the statute. Under *Munaf v. Geren*, 553 U.S. 674, 686 (2008), the answer is yes. An individual is "in custody" if U.S. respondents have "the power to produce him"—even if he is physically held by another authority. *Id.* (citing Section 2241(c)(1)). There is no question that the U.S. government still exerts control over the nearly 200 people it sent to CECOT. *See Abrego Garcia v. Noem*, 2025 WL 1021113, at *4 (4th Cir. Apr. 7, 2025) (Thacker, J., with King, J., concurring); *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025) (district court properly required government to facilitate petitioner's release). Moreover, courts have found constructive custody where, as here, Respondents are "responsible for significant restraints on the petitioner's liberty." *Abu Ali*, 350 F. Supp. 2d at 48 (collecting cases).

While no one disputes that El Salvador is an independent sovereign, Opp. 6, it is also true that the U.S. government has power over the detainees it removed to CECOT, Mot. 6–8. Indeed,

on April 29, President Trump publicly affirmed this power in an ABC News interview. Discussing the case of Kilmar Abrego Garcia, the interviewer observed: "You could get him back [from El Salvador]. There's a phone on this desk," pointing to the phone on the Oval Office desk.

President Trump:   "I could."

Interviewer:   "You could pick it up, and with all—"

President Trump:   "I could."

Interviewer:   "the power of the presidency, you could call up the president of El Salvador and say, 'Send him back right now.'"

President Trump:   "And if he were the gentleman that you say he is, I would do that."[1]

Respondents' attempts to minimize Petitioners' evidence of constructive custody— including public statements from Secretary Rubio, Secretary Noem, and the White House spokesperson—fall flat. *See* Opp. 10 (discussing Mot. 7–8). These are not "vague" or "out-of-context" statements by a few nameless officials, *id.*; rather, they are direct evidence that the U.S. government has outsourced part of its prison system to El Salvador; that Subclass members were detained "at the behest of" Respondents; that the ongoing detention is "at the direction of the United States," which has "enlist[ed] a foreign state as an agent or intermediary"; and that Subclass members would be released upon U.S. request. *Abu Ali*, 350 F. Supp. 2d at 68 (listing factors in constructive custody analysis). Respondents' efforts to prevent the Subclass from seeking judicial review are yet another factor supporting jurisdiction. *See id.* at 54 ("[T]he federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the [f]ederal courts for the protection of their rights in those tribunals." (quoting *Ala. Great S.R. Co.*

---

[1] Fritz Farrow, *Trump says 'I could' get Abrego Garcia back from El Salvador*, ABC News (Apr. 29, 2025), https://perma.cc/57A9-6AQY.

*v. Thompson*, 200 U.S. 206, 218 (1906)).[2]

Respondents argue that the Landau Declaration is a "clear official declaration under oath that the United States does not have custody or control over the Petitioners." Opp. 10. Not so. Respondents significantly overstate the declaration's far more modest claims. *Compare id.*, *with* Landau Decl., ECF No. 108-1 ¶ 3 ("El Salvador is a sovereign independent nation, with its own domestic law and international obligations governing the detention of individuals. El Salvador makes its own sovereign decisions, including with respect to detention."). Puzzlingly, Respondents also rely on *Gul v. Obama*, 652 F.3d 12, 17–18 (D.C. Cir. 2011), Opp. 9, 10, 12, but that case only underscores the inadequacy of their showing here. In *Gul*, the government's declaration specifically stated that detainees were "'transferred entirely to the custody and control of the [receiving] government.'" 652 F.3d at 18 (quoting declaration). The Landau Declaration makes no such assertion—nor could it, given the public representations by Respondents, including President Trump.

The primary cases cited by the government have nothing to do with constructive custody or Section 2241. Instead, they concern the Suspension Clause, which involves an entirely separate analysis. Opp. 6, 8 (citing *Boumediene v. Bush*, 553 U.S. 723, 765 (2008); *Al Maqaleh v. Gates*, 605 F.3d 84, 97 (D.C. Cir. 2010); *Johnson v. Eisentrager*, 339 U.S. 763 (1950)); *see also Rasul v. Bush*, 542 U.S. 466, 476–78 (2004) (explaining that *Eisentrager* was a constitutional habeas case). Because the Court has statutory habeas jurisdiction, it need not reach the question of whether it has constitutional habeas jurisdiction over the CECOT Subclass. *See, e.g.*, *Boumediene*, 553 U.S. at 736–39 (addressing constitutional question only because Congress precluded designated enemy

---

[2] *See, e.g.*, Zolan Kanno-Youngs, et al., *Behind Trump's Deal to Deport Venezuelans to El Salvador's Most Feared Prison*, N.Y. Times (Apr. 30, 2025), https://perma.cc/RU6C-82LV.

combatants from invoking Section 2241).

The government tries to use the Suspension Clause cases to argue against statutory jurisdiction, claiming that the U.S. government's lack of "military presence or a lease" at CECOT automatically defeats jurisdiction here. Opp. 7. But a military presence or lease is not a prerequisite for statutory habeas jurisdiction. *See Abu Ali*, 350 F. Supp. 2d at 48, 68. It is not even a requirement for application of the Suspension Clause. No Suspension Clause case requires this degree of U.S. control over the site of detention. Instead, the constitutional habeas cases consider *multiple* factors in assessing whether jurisdiction exists. *See, e.g.*, *Boumediene*, 553 U.S. at 766–71.

That CECOT Subclass members are not U.S. citizens, Opp. 9–10, in no way precludes habeas jurisdiction. Citizenship has nothing to do with whether a person is "in custody" under Section 2241. It is true that, in cases involving habeas claims by U.S. citizens held overseas, courts have highlighted the petitioner's citizenship. *Id.* But even in the constitutional habeas cases, "alien citizenship" "does not weigh against the[] claim" to jurisdiction. *Al Maqaleh*, 605 F.3d at 96.

The other cases cited by Respondents are irrelevant. For example, the government relies on *Koki Hirota v. McArthur*, 338 U.S. 197 (1948) (per curiam), Opp. 7–8, but "[t]hat slip of a case cannot bear the weight the Government would place on it," *Munaf*, 553 U.S. at 686. The petitioners there had been convicted by the International Military Tribunal for the Far East, which was "not a tribunal of the United States." *Id.* (quoting *Koki Hirota*, 338 U.S. at 198). Under those circumstances, U.S. courts lacked power to review the sentences imposed by that tribunal. *Id.* Here, of course, El Salvador did not convict CECOT Subclass members of any crime. Similarly, in *U.S. ex rel. Keefe v. Dulles*, 222 F.2d 390 (D.C. Cir. 1954), the petitioner was convicted of robbery under French law and was sentenced to imprisonment by a French court. The D.C. Circuit reasoned that, insofar as U.S. respondents had not "prevent[ed] the French" from convicting Keefe, that

alone would not render them custodians. *Id.* at 391; *see also Abu Ali*, 350 F. Supp. 2d at 56 (distinguishing *Keefe*). Here, in contrast, Respondents are directly responsible for the detention of the CECOT Subclass and maintain power over them. Mot. 6–8.

Respondents also wrong to claim that Petitioners' constructive custody argument is "at odds with this Court's interpretation of its own TRO." Opp. 10. The TRO addressed the *physical* transfer of custody to any foreign country—recognizing that a transfer would complicate the nature of the relief that could be ordered by the Court. ECF No. 81 at 28 (U.S. federal court cannot "directly" control CECOT guards, even where Petitioners are in constructive U.S. custody). Relatedly, the Court's proposal that Respondents purge contempt "by asserting custody of the individuals who were removed in violation of the Court's classwide TRO" is entirely consistent with a judicial finding of constructive custody over the Subclass. *Id.* at 43–44. Respondents continue to deny any form of custody over these detainees, and against that backdrop, the Court proposed that Respondents retake physical custody of the detainees to restore the status quo ante.

Finally, Respondents assert that Petitioners have failed to satisfy Article III's standing requirements. Opp. 11–12. But the Supreme Court has already held that a district court "properly require[d] the Government to 'facilitate' Abrego Garcia's release from custody in El Salvador"— without raising a causation or redressability concern. *Abrego Garcia*, 145 S. Ct. at 1018. Here, Petitioners have shown that the U.S. government exerts control over the people it sent to CECOT, and its facilitation of their release and return is substantially likely to redress their injuries. *See* Mot. 6–8; Pet. Proposed Order, ECF No. 102-15 (proposing that the Court order Respondents to take steps such as requesting transfer of physical custody and ceasing payments to El Salvador); *see also* Exh. 6 to Exh. M, ECF No. 102-14 at 28 (U.S. government has not yet paid full $15 million to El Salvador for detentions). Lastly, Respondents do not challenge venue and have

waived or forfeited any such argument.[3]

### C.    The Court Has Jurisdiction Over the Criminal Custody Subclass.

Under *Rumsfeld v. Padilla*, 542 U.S. 426, 444 (2004), and *Braden v. 30th Judicial Court of Kentucky*, 410 U.S. 484, 495 (1973), this Court has jurisdiction over the Criminal Custody Subclass. Opp. 13. As an initial matter, the government misunderstands the Subclass, *see id.*, which consists of noncitizens in criminal custody who are or will be subject to the AEA Proclamation—regardless of whether the government intends to transfer them to CECOT. As in *Braden*, the Subclass does not argue that their current criminal detention is unlawful, nor do they raise any dispute with their current physical custodians. 410 U.S. at 486–89, 499–500. Rather, they challenge their *future* transfer to Respondents' immigration custody pursuant to the AEA, just as the petitioner in *Braden* challenged a "confinement that would be imposed in the future." *Padilla*, 542 U.S. at 438 (quoting *Braden*, 410 U.S. at 488–89). *Cf. Trump v. J.G.G.*, 145 S. Ct. 1003, 1005 (2025) (requiring only that individuals *already* detained under the AEA bring habeas claims in the district of confinement).

Respondents misread *Padilla*. Opp. 13 n.6. There, the Supreme Court expressly acknowledged that "the immediate physical custodian rule . . . does not apply when a habeas petitioner challenges something other than his *present* physical confinement." 542 U.S. at 437–38,

---

[3] Though the Court need not reach the question, it also has constitutional habeas jurisdiction under the multi-factor test in *Boumediene*, 553 U.S. at 766–71. The status of the CECOT Subclass members—who are not detained as enemy combatants—and the patent inadequacy of the process preceding removal weigh heavily in their favor. The apprehension and initial detention of Subclass members took place inside the territorial United States. *Cf. Al Maqaleh*, 605 F.3d at 96. And any "practical obstacles" in this case are nothing like the obstacles in *Eisentrager* and *Al Maqaleh* that counseled against extending the Suspension Clause. *Cf. Al Maqaleh*, 605 F.3d at 97 (Afghanistan remained "a theater of war," and in *Eisentrager*, "many of the problems of a theater of war remained"); *see also id.* at 99 (recognizing that "manipulation by the Executive might constitute an additional factor" in a future case concerning application of the Suspension Clause).

444 (emphasis added). Here, because the Criminal Custody Subclass challenges their future physical confinement pursuant to the AEA, *Padilla* is no bar to this Court's habeas jurisdiction.

The government also argues that the Subclass's injuries are "speculative," Opp. 13, but the government itself has identified approximately 32 alleged TdA members in criminal custody subject to the Proclamation, Mot. 10—making their injuries imminent and concrete. *See also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 164 (2014) (plaintiff has standing for pre-enforcement challenge where he faces "substantial risk" of injury). *Dremann v. Francis*, 828 F.2d 6 (9th Cir. 1987), and *Hilton v. Johnson*, 82 F. App'x 521 (9th Cir. 2003), do not suggest otherwise. Opp. 13. Both courts concluded that there was no habeas jurisdiction where the petitioner speculated that he might be detained because of the failure to pay a fine or complete a course, but it was well established that these types of failures are insufficient to satisfy the "in custody" requirement of the habeas statute. *See Dremann*, 828 F.2d at 7. Unlike the petitioner in *Dremann*, the Subclass does not "hold[] the keys to the jailhouse door." *Id.*

## II.    Petitioners Are Likely to Succeed on the Merits.

### A.    The Proclamation Is Unlawful.

#### 1.    The Notice Process Violates Due Process Clause and the AEA.

The Supreme Court has prescribed at least two essential components of the process due to Petitioners: "notice must be afforded within a *reasonable time* and in such a manner as will allow them to *actually seek habeas relief* in the proper venue before such removal occurs." *J.G.G.*, 145 S. Ct. at 1006 (emphasis added). Respondents dwell on their new notice procedures, but the CECOT Subclass received *no* meaningful notice or opportunity to obtain judicial review before being summarily removed. As this Court has already recognized, Respondents' actions on March 15 violated these basic due process requirements. *See J.G.G.*, 2025 WL 890401, at *11–14. And

indeed, the form some detainees apparently received as they were being sent to CECOT expressly stated that "no review" is available. ECF No. 67-21, Exh. 1. That is unsurprising given a recently disclosed memorandum issued by Attorney General Bondi on March 14, 2025, which stated that alleged alien enemies are not entitled to "judicial review of the [AEA] removal order in any court of the United States."[4] Because the CECOT Subclass received no notice or opportunity to seek review, the removal of those class members was illegal for that reason alone.

In any event, Respondents' new notice procedure does not remotely satisfy the Supreme Court's ruling. The notice form is provided only in English, does not inform individuals that they may contest their designation, and does not state how to do so or how long they have to do so. Nor does the notice—or anything else—provide them with the factual basis for their designation. *See Francis v. Fiacco*, 942 F.3d 126, 143–44 (2d Cir. 2019) ("merely notifying a prisoner . . . and then placing upon him the burden of navigating the legal system, from his prison cell and without counsel, does not satisfy" due process); *D.B.U.*, 2025 WL 1163530, at *11–12 (AEA notice insufficient). Even more fundamentally, Respondents now state that they will provide individuals with just 12 hours to express an intent to file a habeas petition, and only 24 hours beyond that to actually file the petition. Cisneros Decl. ¶ 11, ECF No. 108-2. *See Lane Hollow Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 137 F.3d 799, 807 n.14 (4th Cir. 1998) (collecting cases holding several days' notice does not satisfy due process). Respondents thus expect frightened immigrants with little to no understanding of English or the American legal system to comprehend that they must specifically state they want to file a habeas petition, and then rapidly find a way to file such a petition in the appropriate court. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306,

---

[4] Att'y Gen. Pam Bondi, *Guidance for Implementing the Alien Enemies Act* 5, Mar. 14, 2025, https://www.documentcloud.org/documents/25915967-doj-march-14-memo-alien-enemies-act/#document/p1.

315 (1950) (the "means employed must be such as one desirous of actually informing" the individual of their rights); *see also, e.g.*, *A.S.R. v. Trump*, No. 3:25-113 (W.D. Pa. Apr. 29, 2025), ECF No. 57-10 (Brunsink Decl.) (describing practical difficulties of finding a lawyer or filing a pro se habeas petition from immigration detention); *id.* at ECF No. 57-11 (Nguyen Decl.) (same); *D.B.U. v. Trump*, No. 1:25-cv-1163 (D. Colo. Apr. 25, 2025), ECF No. 45-10 (Sherman Decl.) (same).[5]

Respondents claim that "courts have rejected due process challenges to Alien Enemies Act removal procedures," Opp. 15, but they cite only one court—and they misdescribe its holding. Though Respondents suggest that *United States ex rel. Schlueter v. Watkins*, 158 F.2d 853, 853–54 (2d Cir. 1946), held that no hearing is necessary prior to removal, they omit the Second Circuit's recognition that a hearing *is* required "on the issue of whether or not the relator actually is an alien enemy." *Id.* That issue is one of the core reasons Petitioners seek process here. Moreover, the Supreme Court has now spoken on due process in this very case.

Respondents attempt to analogize the process due here to the expedited removal procedures in immigration law, Opp. 15–17, but the analogy is inapt. Expedited removal is typically a much more straightforward administrative proceeding where immigration officers, for example, determine whether the noncitizen is seeking admission without valid documents. *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(7). That inquiry bears no resemblance to determining whether an individual is, in fact, a member of a criminal gang who may be detained or expelled as an "alien

---

[5] Contrary to Respondents' claim, Opp. 18, the fact that a small handful of individuals—all of whom had counsel—have managed to seek judicial review only underscores that the vast majority have not. For example, of the dozens of detainees at Bluebonnet who were given notices, *no one* who was previously unrepresented managed to bring their own case prior to the government's rapid effort to remove them.

enemy."[6]

The government tries to brush off the fact that 30 days' notice was deemed reasonable at the height of World War II, claiming that this was the product of "technological limitations." Opp. 17–18. But Respondents cite no evidence for their theory. And if anything, the circumstances of that conflict support Petitioners: the United States had come under direct, catastrophic attack by Japan and had declared war against multiple foreign powers—yet the government still believed it reasonable and necessary to provide alleged alien enemies with at least 30 days' notice to voluntarily depart, prior to any forced removal. *See Citizens Protective League v. Clark*, 155 F. 2d 290, 295 (D.C. Cir. 1946). Significantly, that notice period applied even to those the government deemed "dangerous to the public peace and safety of the United States." *Id.*

Finally, Respondents fare no better in arguing that the government may remove individuals without first providing an opportunity for voluntary departure. Opp. 41–42. Section 21 affords *all* "alien enemies" the right to voluntary departure prior to any forced removal, with no exception. *See U.S. ex rel. Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947) (opportunity to voluntarily depart is a "statutory condition precedent" to forced removal); *J.G.G.*, 2025 WL 890401, at *14;

---

[6] Even if the analogy had any traction, the particulars of expedited removal can involve far more substantial procedures than Respondents acknowledge. Noncitizens who assert a fear of return or who seek asylum receive additional process, whereby the government must provide: (1) "information concerning" the asylum screening process and a meaningful opportunity to "consult" with an attorney or other individual in advance, 8 U.S.C. § 1225(b)(1)(B)(iv); (2) a non-adversarial interview with a trained asylum officer and a "written record," 8 U.S.C. § 1225(b)(1)(B)(iii)(II), 8 C.F.R. § 208.9(b), where the individual's claim for asylum is subject to a statutorily mandated "low screening standard," *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020); and (3) review by an immigration judge, 8 C.F.R. § 1208.30(g)(2). All told, this process spans significantly more than 12 or 24 hours. Respondents focus exclusively on the statutory provision addressing how long the immigration judge should take to complete the *final* step in the process. Opp. 16 (quoting 8 U.S.C. § 1225(b)(1)(B)(iii)(III)). But cherry-picking language about how long the final adjudicator may take has no bearing on how much notice and process are due to Petitioners here. Nothing in the expedited removal procedures remotely suggests that 12 hours' notice, with no administrative or judicial review, could satisfy due process.

*U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) (ongoing detention and forced removal unlawful where it "interferes with" alien enemy's "voluntary departure"). Respondents are wrong that Section 22's exception for those "chargeable with actual hostility, or other crime against public safety" means that voluntary departure rights under Section 21 may be categorically denied. Opp. 41. Section 22's exception applies to a separate issue: whether designees receive an additional period of time to settle their affairs under bilateral treaties or "national hospitality"—not the baseline right of voluntary departure under Section 21. *See Citizens Protective League*, 155 F. 2d at 295 (describing *additional* 30-day period where alien enemies not deemed dangerous may settle their affairs). In any event, Section 22's exception requires a specific, individualized finding: each noncitizen must be "chargeable" with actual hostility or a crime against public safety. *See U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 141 (2d Cir. 1947). Respondents have made no such showing here.

### 2.      The Proclamation Fails to Satisfy the AEA.

First, as Judge Rodriguez recently held in granting summary judgment to Petitioners, the terms "invasion" and "predatory incursion" fundamentally demand military and warlike action. *See J.A.V.*, 2025 WL 1257450, at *15–16 (at the time of the AEA's enactment, the ordinary meaning of "invasion" and "predatory incursion" required entry by a military force or an organized armed force); *J.G.G.*, 2025 WL 914682, at *8–10 (Henderson, J., concurring) ("an invasion is a military affair," and a "predatory incursion" is "a lesser form of invasion"); *D.B.U.*, 2025 WL 1163530, at *9–11 (similar). In contrast, Respondents' sweepingly broad definitions of "invasion" and "predatory incursion" have no support in the historical meaning of the statute, *J.A.V.*, 2025 WL 1257450, at *16 ("Although other uses exist for these terms, those rare uses do not represent the ordinary meaning of those terms."), and would unlock staggering wartime presidential power in

circumstances far outside the statute's intended scope. *See id.* at *15 & App'x (reviewing "numerous historical records using 'invasion,' 'predatory incursion,' and 'incursion' for the period from 1780 through 1820," and finding definitions "strongly supported the Petitioners' position").

Respondents protest that "invasion" and "predatory incursion" permit the President to act outside of a declared war because of the possibility of a surprise attack. Opp. 37. Even so, there still must be an actual or impending *military attack*. The terms "invasion" and "predatory incursion" remain tethered to their statutory neighbor, declared war, *J.G.G.*, 2025 WL 914682, at *8 (three terms are "interrelated" and each must be read "in light of the company it keeps"); *see also* Opp. 37 (declared war "connotes certain military formalities"), and are rooted in the historical context of the AEA, which exudes concern for *military* attacks, *J.G.G.*, 2025 WL 914682, at *9 ("War was front and center in the minds of the enacting legislature."). Those terms do not, as the government argues, grant generalized power to "act in emergencies." *Cf.* 50 U.S.C. §§ 1621–51 (authorizing president to declare a "national emergency" and imposing procedural requirements on presidential exercise of emergency power). The examples provided by Respondents only confirm the military nature of these terms.

The Proclamation also claims that TdA has engaged in irregular warfare, but, as Judge Rodriguez explained, *J.A.V.*, 2025 WL 1257450, at *18 & n.11, it describes only ordinary criminal activity, just as its own declarant states. *See* Smith Decl., ECF No 72-1 (never mentioning military activities but stating 15 times that TdA engaged in "crimes" or "criminal activity" warranting a "law enforcement" response).

Second, any purported invasion is not perpetrated by a "foreign nation or government." Respondents contend that TdA is intertwined with the Venezuelan government to satisfy the statutory predicate. But the statute requires a "nation." Mot. 21–23. There would be no need for

TdA to undertake hostile actions *at the direction* of the Maduro regime if TdA was itself a foreign nation or government. *See D.B.U.*, 2025 WL 1163530, at *11. Respondents' argument that TdA's de facto territorial control somehow renders it a "government" is further belied by the fact that the Proclamation names Venezuela, not TdA, as the relevant "foreign government." The Proclamation thus fails to assert a foreign nation or government is invading the United States. Mot. 21–23.

If Congress had intended to vest the President with broader authority, it would have said so. After all—as explained in a source the government itself cites—Congress has long been aware of the distinction between executive branch authority to use "military force against non-traditional actors" and "more traditional conflicts" waged against formally recognized states. Opp. 39 (citing Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005)). Congress knows how to confer authority against such actors. *See* 22 U.S.C. § 6442a ("review and identify any non-state actors operating in any such reviewed country"); 18 U.S.C. § 2339A (criminalizing providing material support to non-state actors). Here, Congress intentionally limited the AEA's scope to actions taken by "foreign nation[s]" and "government[s]." 50 U.S.C. § 21. It has never amended the statute to broaden that scope.

In sum, the Court need look no further than the Proclamation's face: Even accepting the findings, they do not assert that TdA is a foreign nation or government that has citizens or exercises treaty powers or other formal governmental powers. Nor do the findings claim that TdA has engaged in a *military* invasion or incursion against U.S. territory. Insofar as the Court wishes to go beyond the face of the Proclamation, the facts set forth in the PI motion and declarations by Petitioners' experts only confirm what the Proclamation itself acknowledges: TdA is neither a nation nor a government within the meaning of the statute. In fact, Respondents' declarants are in

14

accord: TdA is not an organized "nation" or "government,"[7] and TdA is not taking concerted action on behalf of the Venezuelan government within the United States.[8]

### 3. The Proclamation Violates the Specific Protections That Congress Established for Noncitizens Seeking Humanitarian Protection, and the INA's Procedural Requirements.

Respondents attempt to evade the INA's procedural requirements and humanitarian protections by arguing that the INA and AEA provide wholly separate removal regimes. Opp. 31. But Respondents fail to grapple with *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), which, as this Court has already found, is on all fours with this case. Both the AEA and INA could—and therefore must—be given effect. *See id.* at 721, 731–32. Far from supporting Respondents' claim, *Huisha-Huisha* bolsters Petitioners' position: the AEA must be construed in the context of Congress's express decision to channel *all* removal through the INA's specific procedures. *Id.* Respondents' reliance on *United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429 (S.D.N.Y. 1947), only highlights their error. Opp. 31. That case predates the INA and provides no meaningful insight into how the modern, exclusive removal framework established by Congress applies to AEA removals. *See* 8 U.S.C. § 1229a(a)(3); *United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003); *Chamber of Comm. v. Whiting*, 563 U.S. 582, 587 (2011) (through the INA, Congress "established a comprehensive federal statutory scheme for regulation of

---

[7] *Compare* Charles Decl. ¶ 7, ECF No. 72-2 (government states TdA "leadership splintered" in 2023), *with* Antillano Decl. ¶ 11, ECF No. 102-3 (since 2023, "the group's coordinating role appears to have weakened"), *and* Hanson Decl. ¶ 16, ECF No. 102-2 ("the gang has become increasingly fragmented and decentralized since 2023"), *and* Dudley Decl. ¶ 22, ECF No. 102-4 ("since 2023, the group has become more dispersed and holds less sway").

[8] *Compare* Smith Decl. ¶ 9, ECF No. 72-1 (government states TdA is "a loosely affiliated collection of independent cells committing disorganized and opportunistic crimes of violence"), *with* Antillano Decl. ¶ 13, ECF No. 102-3 (TdA is "a decentralized and uncoordinated group"), *and* Hanson Decl. ¶ 17, ECF No. 102-2 (suspected TdA crimes "do not indicate a systemic criminal enterprise"), *and* Dudley Decl. ¶ 24, ECF No. 102-4 ("no evidence of a structured or operational presence in the United States").

immigration and naturalization" (internal quotation marks omitted)).

Nor do the interpretive canons from *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), or *Morton v. Mancari*, 417 U.S. 535 (1974), support Respondents' position. Opp. 32–33. If anything, those canons cut against them. The INA—not the AEA—is the more specific statute when governing removal procedures, because it sets forth detailed removal procedures and provides exceptions for specific categories of noncitizens, including those who pose national security risks. *See, e.g.*, 8 U.S.C. §§ 1227(a)(4), 1229a(a)(3), 1531 *et seq*. Congress was fully aware of the AEA when it enacted the INA, and yet deliberately declined to exclude AEA-based removals from this statutory scheme—even as it carved out exceptions elsewhere. *See, e.g.*, *id.* §§ 1225(b), 1531; *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 519 (2019) ("a later adopted provision takes precedence over an earlier, conflicting provision of equal stature.").

The AEA therefore can and must be harmonized with its later-enacted humanitarian protections under the INA, including asylum and withholding of removal. Respondents argue that the AEA operates entirely outside the INA framework. Opp. 33–34 (citing 8 U.S.C. §§ 1158(b)(1)(A), 1231(b)(3); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 172–73 (1993)). But neither the statutory text nor *Sale* supports that sweeping claim. First, *Sale* addressed the INA's extraterritorial application, not whether it applies to individuals who—like Petitioners here—were or are or physically present in the United States seeking to invoke domestic protections. 509 U.S. at 155, 159–60. And second, while the Attorney General and DHS administer asylum and withholding, their availability is governed by Congress and cannot be categorically displaced by Executive discretion. Respondents' reliance on *Citizens Protective League*, 155 F.2d at 294, fares no better. Opp. 33. That case predates INA's humanitarian protections by more than fifty years; Congress has since enacted obligations that impose an explicit statutory bar on removing

individuals seeking those protections. *See* 8 U.S.C. §§ 1158(a)(1), 1231(b)(3)(A); 1231 note. That protection is not discretionary and does not turn on the Executive's unilateral judgment.

Contrary to Respondents' argument, Opp. 34, a categorical bar based solely on AEA designation is flatly incompatible with the INA's requirement of case-by-case adjudication, including under 8 U.S.C. § 1231(b)(3)(B)(iv). The statutory and regulatory framework confirms that eligibility for asylum and withholding turns on individualized determinations. *See* 8 C.F.R. §§ 1208.16–18. Respondents cite *Huisha-Huisha*, Opp. 34, but that case only undermines their position. There, in a tentative ruling during an emergency, the court upheld limited asylum restrictions based on Section 265's reference to suspend the "introduction" of persons—not those already present in the United States—and harmonized the statutes because asylum does not address public health bars. *See* 27 F.4th at 730–31. By contrast, the AEA contains no analogous language authorizing blanket exclusions and applies to those already on U.S. soil. And asylum already provides specific, case-by-case bars based on danger, criminality, and national security, underscoring that Congress chose not to authorize an AEA-based categorical bar to asylum.

Respondents next argue that this Court lacks jurisdiction to consider Petitioners' claims under the Convention Against Torture ("CAT"). Opp 24, 34 (citing 8 U.S.C. § 1252(a)(4)). But that provision merely channels review of individual CAT claims to petitions for review. Here, there can be no petition for review from an immigration proceeding because Petitioners have been plucked from those proceedings for removal under the AEA. *Id.* Where a petitioner has "no opportunity to raise these issues before an [Immigration Judge] . . . there can be no judicial review as contemplated in . . . section 1252(a)(4)." *D.V.D. v. U.S. Dept. of Homeland Sec.*, 2025 WL 1142968, at *9 (D. Mass. Apr. 18, 2025); *see also Huisha-Huisha*, 27 F.4th at 730 (reviewing claim

that government could not bypass CAT using public health laws).[9]

Respondents further insist that there is no direct conflict between CAT and removals under the AEA because the government avoids removals to countries where noncitizens will likely be tortured. Opp. 34. But that assertion ignores the record evidence about the Salvadoran prison. More fundamentally, it ignores the central defect in the Proclamation: it categorically forecloses any opportunity for individuals to invoke CAT protections to show they would face torture. And as a practical matter, the CECOT Subclass was precluded from raising a torture claim because Respondents never informed them of the country to which they would be removed—directly contravening protections enacted by Congress.

Finally, Respondents are wrong to assert that this Court may not question their determination that a potential recipient country is not likely to torture a detainee. Opp. 34–35 (citing *Kiyemba v. Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009) and *Munaf*, 553 U.S. at 702). *Munaf* involved transfers to foreign sovereigns—not removals from U.S. territory in violation of domestic statutes barring removals to countries where torture is likely. Indeed, *Munaf* expressly noted that CAT "speaks to situations where a detainee is being 'returned' to 'a country,'" and declined to decide its applicability to the facts before it. 533 U.S. at 703 n.6 (cleaned up). Respondents' reliance on *Kiyemba* is likewise misplaced. Even *Kiyemba* recognized that judicial intervention may be warranted where the transfer process is a "ruse." 561 F.3d at 515 n.7. And that is precisely what is occurring here. When Respondents fail to provide meaningful notice, *see supra*, and senior government officials publicly assert that "the only 'process' you are entitled to is deportation,"

---

[9] Petitioners ask that the Court preliminarily enjoin Respondents from, *inter alia*, carrying out removals under the AEA without complying with CAT obligations. Only after a determination that the AEA does not override the INA's humanitarian protections could Petitioners then pursue relief on the merits of their individual CAT claims in the appropriate forum.

they dispel any illusion that these removals are the result of meaningful legal process. Luke Broadwater, *Trump Challenges Migrants' Due Process Rights, Undercutting Bedrock Principle*, N.Y. Times (Apr. 23, 2025).[10] Such positions confirm that the government has abandoned any pretense of compliance with its statutory obligations—and that the process here is not merely flawed, it is a ruse. Neither *Kiyemba* nor *Munaf* support the extraordinary proposition that individuals present on U.S. soil—who invoke statutory protections against removal to torture—may be denied judicial review.

### B.    Petitioners' Detention at CECOT Violates the Constitution and the AEA.

#### 1.    The AEA Does Not Permit Petitioners' Post-Removal Imprisonment.

Respondents variously argue that either Petitioners are not in U.S. custody or that "there are other ways the government can detain enemy aliens abroad." Opp. 25. But Petitioners have already demonstrated that the CECOT Subclass remains in constructive U.S. custody. *See supra*. And even if the government has "other ways" to detain enemy aliens abroad, that says nothing about the AEA. Respondents also contend that the AEA does not foreclose detention abroad. Opp. 25. But the question here is whether the statute *authorizes* such detention post-removal on behalf of the United States. It clearly does not, and the government does not argue otherwise.[11]

#### 2.    Petitioners' Imprisonment at CECOT Violates Their Substantive Due Process Rights.

Respondents do not contest that, as a matter of law, CECOT detention on behalf of the United States would be impermissible if it were (1) "imposed for the purpose of punishment"; (2) not "rationally related to a legitimate nonpunitive governmental purpose," such as to send a

---

[10] *Available at* https://perma.cc/F85W-2PFN.

[11] Respondents cite *Eisentrager*, 339 U.S. at 773–75, and *Al Maqaleh*, 605 F.3d at 96. But neither involved detention under the AEA, and their holdings regarding the availability of constitutional habeas, *see supra*, are not relevant to whether the AEA permits post-removal imprisonment.

message of deterrence or to encourage self-deportation; or (3) "excessive in relation to that purpose." *Bell v. Wolfish*, 441 U.S. 520, 538, 561 (1979); *see Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015).[12] Nor do they contest:

- Statements by President Trump, Secretary Noem, and other government officials characterizing members of the CECOT Subclass as "criminals" and detention at CECOT as a means of holding them accountable. *See* Mot. 31–32, 35–36.

- Statements by President Trump, Secretary Noem, and other officials announcing that the purpose of detention at CECOT is to frighten immigrants, deter migration, induce self-deportation, and punish those at the facility. *See* Mot. 31–32, 35–36.

- The fact that detainees at CECOT are subject to "regular beatings, waterboarding, and use of implements on fingers to force confessions …, overcrowding, lack of access to counsel, lack of access to healthcare and food, physical abuse by both prison personnel and gangs," and complete isolation from the outside world. *See* Mot. 30, 33.

Indeed, the government does not contest that the conditions at CECOT would violate due process if they were occurring on U.S. soil. And because the CECOT Subclass members are in constructive U.S. custody, their detention is punishment in violation of their due process rights.

Respondents complain that Petitioners ask the Court to intervene in El Salvador's sovereign affairs. Opp. 20. But Petitioners seek only an order requiring the *U.S.* government to request and take reasonable steps to facilitate the release and return to the United States of individuals unlawfully removed—who are all being held at the behest of the U.S. government. *See supra*.

Respondents also cite *Ali v. Trump*, 959 F.3d 364 (D.C. Cir. 2020), to argue that the CECOT

---

[12] Respondents claim not to understand Petitioners' argument that confinement at CECOT is "excessive," Opp. 22, yet the very case they cite makes clear that civil detainees—like Petitioners here—cannot be treated as convicted inmates because such treatment is "excessive in relation to [the] purpose" of the civil detention. *Kingsley*, 576 U.S. at 398. Respondents also ignore Petitioners' other two theories for why detention at CECOT is punitive. *See* Mot. 30–32.

Petitioners cannot raise substantive due process claims. Opp. 20.[13] But there, the D.C. Circuit *rejected* the argument "that the Due Process Clause is categorically inapplicable to detainees at Guantanamo Bay"; addressed the petitioner's substantive due process *on the merits*; and specifically reviewed whether the detention was serving a legitimate purpose. *Ali*, 959 F.3d at 368, 370–71. If courts can review the purpose behind a law-of-war detainee's detention, this Court can review the purpose of the CECOT Subclass's detention as well—especially when *no* judicial or even administrative court has considered or upheld the government's "alien enemy" allegations for anyone in that group.

The government would have the Court ignore the statements by President Trump, Secretary Noem, and other officials, based on *Trump v. Hawaii*, 585 U.S. 667 (2018), Opp. 21, but there the Court applied rational basis review to decide whether a facially neutral Proclamation restricting travel to the United States violated the Establishment Clause, concluding that it would "uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 585 U.S. at 705.[14] But rational basis review has no application to this Court's evaluation of whether detention at CECOT is intended to punish or serves impermissible purposes. Rather, courts routinely look to statements by policymakers and related materials to discern the underlying intent of a challenged policy. *See, e.g.*, *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 169–83 (1963); *see also* Mot. 30–32 (collecting cases striking down detention policies based on government's stated justifications).

The government also argues that "only the clearest proof" of punitive intent can refute the

---

[13] Respondents cite *Al Maqaleh*, 605 F.3d at 97, *see* Opp. 21, but that case says nothing about due process, and its Suspension Clause analysis supports Petitioners. *See supra* Section I.B.

[14] Even in that posture, the Court "look[ed] behind the face of the Proclamation" at statements and other extrinsic evidence to determine the government's purpose. *Hawaii*, 585 U.S. at 704–05.

"public safety" purpose asserted in its brief. Opp. 22 (quoting *Smith v. Doe*, 538 U.S. 84, 92 (2003)). But Respondents provide no evidence whatsoever that public safety requires Petitioners' detention at CECOT—nor could they, given the abusive conditions there. Respondents claim they had no alternative because Venezuela "would not accept" Petitioners, but that appears to be false. *Compare* Opp. 22, *with* Sarah Blaskey *et al.*, *Trump's 48-Hour Scramble to Fly Immigrants to a Salvadoran Prison*, Wash. Post, May 4, 2025 ("[T]hey pressed forward with removals, even as Venezuela agreed to accept deportation flights[.]").[15] Beyond these basic deficiencies, *Smith*'s requirement applies only where policymakers' stated intent was "to enact a regulatory scheme that is civil and nonpunitive." 538 U.S. at 92. Here, both the Proclamation itself—which rests on a summary determination that Petitioners are "terrorists" and members of a "criminal organization"—and officials' public statements made the punitive purpose of using CECOT obvious from the start. Because the intent is to punish, "that ends the inquiry." *Id*. Even if the "clearest proof" is required, Petitioners have provided it. *See* Mot. 32–34.

Finally, the government does not contest—because it cannot—that the conditions at CECOT are "excessive" relative to any legitimate purpose for Petitioners' detention. Respondents suggest that Petitioners must establish deliberate indifference, but that is not the legal standard for their due process claim. *See C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 211 (D.D.C. 2020) (citing *Kingsley*, 576 U.S. at 398, and examining whether detention conditions "appear excessive in relation to" a legitimate nonpunitive purpose); *O.M.G. v. Wolf*, 474 F. Supp. 3d 274, 287 (D.D.C. 2020) (same); *D.A.M. v. Barr*, 474 F. Supp. 3d. 45, 64 (D.D.C. 2020) (same).

---

[15] *Available at* https://perma.cc/64C3-B4X2.

3.      **Petitioners' Imprisonment at CECOT Constitutes Criminal
          Punishment in Violation of the Fifth, Sixth, and Eighth Amendments.**

Respondents do not contest the statements by President Trump and other officials characterizing members of the CECOT Subclass as "criminals" and their detention at CECOT as a means of holding them accountable—it simply asks the Court to disregard them. Opp. 24. Nor does the government seriously contest the other hallmarks of criminal punishment, including Respondents' summary determination that Petitioners are "terrorists" and members of a "criminal organization";[16] the stigmatization of Petitioners through repeated accusations of criminality by President Trump and other officials; and Respondents' choice to detain Petitioners at a notorious prison like CECOT, perhaps indefinitely. *See* Mot. 35–36; *see also Breed*, 421 U.S. at 529. Nor can Respondents contest that CECOT Petitioners have been imprisoned without any of the constitutional protections that accompany the imposition of criminal punishment. Thus, the only conclusion available is that Respondents have subjected Petitioners to an "infamous punishment" in violation of their Fifth and Sixth Amendment rights. *See Wong Wing v. United States*, 163 U.S. 228, 234, 237 (1896). And because the CECOT conditions fall far below the constitutional floor for those serving criminal sentences—which Respondents do not contest—their imprisonment violates the Eighth Amendment as well. *See* Mot. 37.[17]

Respondents' reliance on *Ali v. Rumsfeld* is misplaced, as there the court held only that the particular constitutional *Bivens* claims raised in that case were not "clearly established" to defeat qualified immunity. 649 F.3d 762, 771 (D.C. Cir. 2011). The government also cites case law

---

[16] Contrary to the government's characterization, Opp. 24–25, Petitioners do not argue that their mere classification under the AEA is punishment, but that their classification as "criminals" is evidence of criminal punishment, as the Supreme Court has recognized. *See Breed v. Jones*, 421 U.S. 519, 529 (1975).

[17] These claims do not, as Respondents assert, seek to "constitutionalize CAT," Opp. 24, but address the government's constitutional duties to people in its custody.

involving extradition, but extradition is not "analogous," *cf.* Opp. 23, to what the government has done here: namely, to pay the government of El Salvador to detain Petitioners on its behalf. Nor, as discussed above, do Petitioners seek to interfere with El Salvador's operation of its prison or justice system, but rather facilitation of their return.

### III.    The Remaining Factors Favor Petitioners.

Respondents cannot credibly refute the extraordinary irreparable harms facing Petitioners who have been deported and who are at risk of deportation under the AEA. *See* Bishop Decl. ¶¶ 2, 21, 33, 37, 39, 41, ECF No. 102-5; Goebertus Decl. ¶¶ 3–4, 8, 10, 17, ECF No. 102-6. The government's assertion that such harm is speculative is belied by its removal of the CECOT Subclass. If the imminent threat of wrongful removal without due process to places of imprisonment, torture, and abuse is not irreparable harm, it is hard to imagine what would qualify. And, here, the government has declared that even if it errs, courts have no ability to remedy the situation. *See Abrego Garcia v. Noem*, 2025 WL 1135112, at *2 (4th Cir. Apr. 17, 2025).

The government's purported harm includes allegations about negotiations and foreign policy. Opp. 44–45 ("foreign actors *may* 'change their minds'") (emphasis added). This ambiguity pales in comparison to the concrete harms Plaintiffs face. *J.G.G.*, 2025 WL 914682, at *11 (Henderson, J., concurring) ("Equity will not act 'against something merely feared as liable to occur at some indefinite time.'") (citation omitted).

Respondents also point to vague notions of executive power, but the government cannot engage in unlawful conduct to meet its political goals. *See, e.g.*, *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Moreover, the preliminary injunction Plaintiffs seek would result in only a very "limited" burden on the President's power. *J.G.G.*, 2025 WL 914682, at *12 (Henderson, J., concurring). And the government's unsubstantiated harm is

outweighed by the public interest in preventing the Executive's unlawful use of the AEA—an extraordinary abuse of power that violates the most fundamental constitutional liberties.[18]

## CONCLUSION

The Court should grant a preliminary injunction.

---

[18] Respondents do not contest that the district court should decline to require a bond. Mot. 40.

Dated: May 5, 2025

Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
cwofsy@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
Aditi Shah (D.C. Bar No. 90033136)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org
ashah@acludc.org

*Attorneys for Petitioners–Plaintiffs*
*\*Admission to D.D.C. Bar pending*

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Daniel Galindo (D.D.C. Bar No. NY035)
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi (D.D.C. Bar No. MI0071)
Michael K.T. Tan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org
m.tan@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich
Skye Perryman (D.C. Bar No. 984573)
Audrey Wiggins (DC Bar No. 482877)
Christine L. Coogle (DC Bar No. 1738913)
Pooja Boisture
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org
awiggins@democracyforward.org
ccoogle@democracyforward.org
pboisture@democracyforward.org