UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
G.F.F., *et al.*,                                    :
                                                     :          **OPINION AND ORDER**
                                     Petitioners,    :          **GRANTING PRELIMINARY**
                     -against-                       :          **INJUNCTION**
                                                     :
                                                     :
DONALD J. TRUMP, *et al.*,                           :          25 Civ. 2886 (AKH)
                                                     :
                                     Respondents.    :
-------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

    This nation was founded on the "self-evident" truths "that all men are created equal, that

they are endowed by their Creator with certain unalienable Rights, [and] that among these are

Life, Liberty and the pursuit of Happiness." Declaration of Independence, at ¶ 2 (1776). Our

Constitution embodies these truths, in a limited government of enumerated powers, in its system

of checks and balances separating the executive, legislative and judicial branches, and in its

guarantee that neither citizen nor alien be "deprived of life, liberty, or property, without due

process of law." U.S. Const. amend. V; *see Plyler v. Doe*, 457 U.S. 202, 210-12 (1982)

(extending these protections to aliens).

    Yet, in March 2025, more than 200 aliens were removed from this country to El

Salvador's Terrorism Confinement Center ("CECOT"), with faint hope of process or return. The

sweep for removal is ongoing, extending to the litigants in this case and others, thwarted only by

order of this and other federal courts. The destination, El Salvador, a country paid to take our

aliens, is neither the country from which the aliens came, nor to which they wish to be removed.

But they are taken there, and there to remain, indefinitely, in a notoriously evil jail, unable to

communicate with counsel, family or friends.

Respondents purport to act under Presidential Proclamation No. 10903, 90 Fed. Reg. 13,033 (2025) (the "Presidential Proclamation"), which invoked a 1798 Act of Congress, the Alien Enemies Act ("AEA"), 50 U.S.C. §§ 21-24, to detain and deport suspected members of Tren de Aragua ("TdA"), a Venezuelan gang and designated foreign terrorist organization. Respondents cite only the section of the AEA that grants power to the President to "apprehend[], restrain[], secure[], and remove[]" aliens when "invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government." 50 U.S.C. § 21. Conveniently, Respondents fail to mention another section of the AEA that imposes a "duty" on the federal courts to give a "full examination and hearing" to the Executive's "complaint" against the alien, and to order the alien's removal only upon "sufficient cause appearing." 50 U.S.C. § 23. Thus, under the AEA, and a recent decision of the United States Supreme Court, removal may not occur except after notice and hearing. *See Trump v. J.G.G.,* 145 S. Ct. 1003, 1006 (2025).

The Court grants Petitioners' motion for a preliminary injunction against removal. This Opinion gives the reasons. It discusses the whole of the AEA, and shows that the Presidential Proclamation, in mandating removal without due process, contradicts the AEA. The Opinion goes on to discuss the requirements of notice and hearing under both the AEA and the Constitution. And it concludes that since Respondents have not demonstrated the existence of a "war," "invasion" or "predatory incursion," the AEA was not validly invoked by the Presidential Proclamation.

**BACKGROUND**

## I. Procedural Posture

Petitioners G.F.F. and J.G.O., proceeding under pseudonyms, were initially detained in the Orange County Jail, located in the Southern District of New York. ECF No. 1 at ¶¶ 11-12. In March 2025, they were transferred to a U.S. Immigration and Customs Enforcement ("ICE") detention facility in Texas, to be deported to El Salvador, only to be pulled off an airplane after a temporary restraining order was issued by the United States District Court for the District of Columbia (later vacated on jurisdictional grounds by the United States Supreme Court). *See id.* Subsequently, Respondents returned G.F.F. and J.G.O. to the Orange County Jail, where they are currently detained, and still remain under threat of imminent removal. *Id.* On April 8, 2025, Petitioners filed for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241, on behalf of themselves and a similarly situated class, and moved for a temporary restraining order against removal. ECF Nos. 1-2, 4. The case was randomly assigned to me. I set argument for the next day, April 9, 2025. ECF No. 6.

After hearing argument from both sides, I issued a temporary restraining order, *see* ECF No. 31, which, as amended, enjoined Respondents from removing Petitioners from the United States under the Presidential Proclamation, unless upon notice in English and Spanish and hearing, and from transferring Petitioners from the Southern District of New York. ECF No. 35. I also granted Petitioners' motion for class certification, *see* ECF No. 32, which, as amended, defined the Class:

> All noncitizens in federal, state, or local custody in the Southern District of New York who were, are, or will be subject to the March 2025 Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua' and/or its implementation, who have not been given notice following the Supreme Court's decision of April 7, 2025,

> *Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, and granted a hearing. The notice to be provided shall be written in English and Spanish, the language of those sought to be expelled, and if needed, Spanish-to-English interpreters shall be provided for hearings.

ECF No. 34.

On April 22, 2025, within the fourteen-day period allowed for temporary restraining orders, and after full briefing, I heard argument on Petitioners' motion for a preliminary injunction. I extended the temporary restraining order another two weeks, until May 6, 2025, or further order of the Court, to permit full consideration of the issues and the writing of this opinion. *See* ECF No. 78; *see also* Fed. R. Civ. P. 65(b)(2); *SEC v. Unifund Sal*, 910 F.2d 1028, 1034-35 (2d Cir. 1990) (courts may extend a temporary restraining order while "reserving decision on a motion for a preliminary injunction.").

## II. The Alien Enemies Act

The AEA gives the President authority to detain and deport aliens in two instances: (1) a declared war between the United States and a foreign nation or government; or (2) an "invasion" or "predatory incursion" against this country by a foreign nation or government. 50 U.S.C. § 21.

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

*Id*. Section 21 goes on to provide what the President then may do:

> The President is authorized in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being

> permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety.

*Id.*

The AEA gives aliens who are "not chargeable with actual hostility, or other crime against the public safety" a "reasonable time" to self-deport and settle their affairs. 50 U.S.C. § 22.

> When an alien who becomes liable as an enemy, in the manner prescribed in section 21 of this title, is not chargeable with actual hostility, or other crime against the public safety, he shall be allowed, for the recovery, disposal, and removal of his goods and effects, and for his departure, the full time which is or shall be stipulated by any treaty then in force between the United States and the hostile nation or government of which he is a native citizen, denizen, or subject; and where no such treaty exists, or is in force, the President may ascertain and declare such reasonable time as may be consistent with the public safety, and according to the dictates of humanity and national hospitality.

*Id.*

The AEA also requires a "complaint" against the alien, that is, specific notice of acts committed, and judicial review by an Article III court to determine if there is "sufficient cause appearing," before an alien may be removed. 50 U.S.C. § 23.

> After any such proclamation has been made, the several courts of the United States, having criminal jurisdiction, and the several justices and judges of the courts of the United States, are authorized and it shall be their duty, upon complaint against any alien enemy resident and at large within such jurisdiction or district, to the danger of the public peace or safety, and contrary to the tenor or intent of such proclamation, or other regulations which the President may have established, to cause such alien to be duly apprehended and conveyed before such court, judge, or justice; and after a full examination and hearing on such complaint, and sufficient cause appearing, to order such alien to be removed out of the territory of the United States, or to give sureties for his good behavior, or to be otherwise restrained, conformably to the proclamation or regulations established as aforesaid, and to imprison, or otherwise secure such alien, until the order which may be so made shall be performed.

5

*Id.*

### III.  The Presidential Proclamation

On March 14, 2025, Respondent Donald J. Trump issued his Presidential Proclamation under authority of the AEA. His "findings" declare that TdA is "perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States," and is doing so "at the direction, clandestine or otherwise, of the Maduro regime in Venezuela." 90 Fed. Reg. at 13,034.

> Section 1.  I find and declare that TdA is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States. TdA is undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela. I make these findings using the full extent of my authority to conduct the Nation's foreign affairs under the Constitution. Based on these findings, and by the authority vested in me by the Constitution and the laws of the United States of America, including 50 U.S.C. [§] 21, I proclaim that all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies. I further find and declare that all such members of TdA are, by virtue of their membership in that organization, chargeable with actual hostility against the United States and are therefore ineligible for the benefits of 50 U.S.C. [§] 22. I further find and declare that all such members of TdA are a danger to the public peace or safety of the United States.

*Id.*

Accordingly, based on these findings, and without supporting evidence, the Presidential Proclamation directs the "immediate . . . removal" of TdA members. 90 Fed. Reg. at 13,034. But the Presidential Proclamation makes no mention of the "complaint" and "full examination and hearing" provisions of the AEA, nor the duty it imposes on Article III courts. *See* 50 U.S.C. § 23.

> Sec. 3.  I direct that all Alien Enemies described in section 1 of this proclamation are subject to immediate apprehension, detention, and

removal, and further that they shall not be permitted residence in the United States.

Sec. 4.  Pursuant to the Alien Enemies Act, the Attorney General and the Secretary of Homeland Security shall, consistent with applicable law, apprehend, restrain, secure, and remove every Alien Enemy described in section 1 of this proclamation. The Secretary of Homeland Security retains discretion to apprehend and remove any Alien Enemy under any separate authority.

Sec. 5.  All executive departments and agencies (agencies) shall collaborate with law enforcement officials of the United States and with appropriate State, local, and tribal officials, to use all lawful means to apprehend, restrain, secure, and remove Alien Enemies described in section 1 of this proclamation.

90 Fed. Reg. at 13,034.

Finally, the Presidential Proclamation establishes various regulations "in the premises and for the public safety," permitting "removal to any such location as may be directed by the officers responsible for the execution of these regulations." 90 Fed. Reg. at 13,035. The Presidential Proclamation makes no mention of an indefinite detention in a foreign jail hired by the United States for such purpose.

(a) No Alien Enemy described in section 1 of this proclamation shall enter, attempt to enter, or be found within any territory subject to the jurisdiction of the United States. Any such Alien Enemy who enters, attempts to enter, or is found within such territory shall be immediately apprehended and detained until removed from the United States. All such Alien Enemies, wherever found within any territory subject to the jurisdiction of the United States, are subject to summary apprehension.

(b) Alien Enemies apprehended pursuant to this proclamation shall be subject to detention until removed from the United States in such place of detention as may be directed by the officers responsible for the execution of these regulations.

(c) Alien Enemies shall be subject to removal to any such location as may be directed by the officers responsible for the execution of these regulations consistent with applicable law.

(d)  All property in the possession of, or traceable to, an Alien Enemy, which is used, intended to be used, or is commonly used to perpetrate the hostile activity and irregular warfare of TdA, along with evidence of such hostile activity and irregular warfare, shall be subject to seizure and forfeiture.

*Id*.

## IV.  The United States Supreme Court

On April 7, 2025, the Supreme Court ruled that detainees subject to removal under the AEA "are entitled to notice and opportunity to be heard." *J.G.G.,* 145 S. Ct. at 1006. Specifically, they "must receive notice after the date of this order [April 7, 2025] that they are subject to removal under the [AEA]," which "must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.* The Court held that habeas relief must be sought in the district where the alien is in custody, and accordingly vacated the order of the United States District Court for the District of Columbia, which had enjoined the Government from removing these aliens, since they were not in custody within the territorial jurisdiction of that district court. *Id.*

More recently, on April 19, 2025, the Supreme Court enjoined the deportation of a putative class of detainees confined in the Northern District of Texas under the Presidential Proclamation and AEA, citing the All Writs Act, 28 U.S.C. § 1651(a). *A.A.R.P. v. Trump*, 145 S. Ct. 1034, 1034 (2025).

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "Where, as here, the government is a party to the suit, the

final two factors merge." *New York v. U.S. Dep't of Homeland Security*, 969 F.3d 42, 58-59 (2d Cir. 2020).

## DISCUSSION

### I.   Judicial Review

As a threshold matter, this Court has jurisdiction to interpret the AEA and review the Presidential Proclamation. "[A]n individual subject to detention and removal under that statute is entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy.'" *J.G.G.*, 145 S. Ct. at 1006 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172, n.17 (1948)). This Court has the duty and burden to provide such judicial review.

In *Ludecke*, Justice Frankfurter wrote that the President's power to consider World War II continuing, even though active hostilities had ceased, to justify detention and removal of suspected saboteurs, could not be judicially reviewed. *Ludecke*, 335 U.S. at 170. The Supreme Court in *J.G.G.*, writing *per curiam*, and cognizant of *Ludecke*, ruled clearly that aliens are entitled to notice and a habeas hearing before they can be removed pursuant to the AEA. *J.G.G.*, 145 S. Ct. at 1006.

### II.   Notice and hearing

Respondents, having failed previously to provide notice, now concede that notice is required, but only in the most cursory form, and not always. In Texas, ICE officers gave aliens about to be removed copies of "Form AEA-21B," which advises them, in English, that:

> You have been determined to be at least fourteen years of age; not a citizen or lawful permanent resident of the United States; a citizen of Venezuela; and a member of Tren de Aragua. Accordingly, under the Alien Enemies Act, you have been determined to be an Alien Enemy subject to apprehension, restraint, and removal from the United States. Until you are removed from the United States, you

9

> will be detained under Title 50, United States Code, Section 21. Any statement you make now or while you are in custody may be used against you in any administrative or criminal proceeding. This is not a removal under the Immigration and Nationality Act. If you desire to make a phone call, you will be permitted to do so.

See *J.A.V. v. Trump*, 25 Civ. 72 (S.D. Tex.), ECF No. 49; *W.M.M. v. Trump*, 25 Civ. 59 (N.D. Tex.), ECF No. 34. The notice is a fleeting affair, for if the alien fails to express an intent to file a petition for habeas relief within a dozen hours of being served with a "Form AEA-21B," or to actually file a petition within another 24-hour period, ICE "may proceed with removal." *J.A.V. v. Trump*, 25 Civ. 72 (S.D. Tex.), ECF No. 49, ¶ 11. And even if an alien files for habeas relief, Respondents state that they still may deport him if the court does not grant a temporary restraining order, or takes too long to conduct the proceeding. *Id.* at ¶ 12. The declaration of Carlos D. Cisneros, an Assistant Field Office Director for ICE, states:

> 11. Although there may be fact-specific exceptional cases, in a general case, after an alien is served with Form AEA 21-B, the alien is given a reasonable amount of time, and no less than 12 hours, including the ability to make a telephone call, to indicate or express an intent to file a habeas petition. If the alien does not express any such intention, then ICE may proceed with the removal, though such removal may not actually occur for many more hours or days, giving the alien additional time to express an intent. If the alien does express an intent to file a habeas petition, the alien is given a reasonable amount of time, and no less than 24 hours, to actually file that petition. If the alien does not file such a petition within 24 hours, then ICE may proceed with the removal, though such removal may not actually occur for many more hours or days, giving the alien additional time to file the petition. Further, because aliens subject to the AEA are often detained for several days before removal, they frequently have much more time to express an intent to file a habeas petition or to actually file such a petition. Moreover, these timeframes are consistent with, if not more generous than, the timeframes used for expedited removal procedures under Title 8.

> 12. In nearly every case in which an alien files a habeas petition based on detention related to the AEA, the alien also seeks a Temporary Restraining Order (TRO). The TRO request is typically adjudicated quickly, sometimes within hours of being filed.

> Although there may be fact-specific exceptional cases, in a general case, ICE will not remove under the AEA an alien who has filed a habeas petition while that petition is pending. However, ICE may reconsider that position in cases where a TRO has been denied and the habeas proceedings have not concluded within a reasonable time.

*Id.* at ¶¶ 11-12. Respondents' proposal for notice is insufficient under the AEA, the Supreme Court's ruling in *J.G.G.*, and Constitutional due process.

Under the AEA, after the President issues a proclamation, an alien becomes "liable to be apprehended, restrained, secured, and removed." 50 U.S.C. § 21. The President then can "provide for the removal" of the alien. *Id.* But the Executive must do so by filing a "complaint" before an Article III court. 50 U.S.C. § 23. The court then has the "duty" to conduct a "full examination and hearing," to determine if "sufficient cause" exists and, if it does, to order such alien to be removed. *Id.* The complaint serves as the notice to the alien.

A complaint is a document with content, customarily alleging facts and grounds leading to an outcome. *Cf.* Fed. R. Civ. P. 8; Fed. R. Crim. P. 3; 8 U.S.C. § 1229(a)(1). It is not a bare bones form letter. The notice must advise the alien of the acts he committed that justify his removal. *See Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950) (notice must "apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" and "must be of such nature as reasonably to convey the required information"); *see also* 8 U.S.C. § 1229(a)(1) (requiring, under the INA, for notice to specify the "nature of the proceedings against the alien," the "legal authority under which the proceedings are conducted," the "acts or conduct alleged to be in violation of law," and the "charges against the alien and the statutory provisions alleged to have been violated."). The notice also must give the alien a reasonable amount of time to prepare and file, or to find counsel to prepare and file, a habeas petition. *See* 8 U.S.C. § 1229(b)(1) (requiring, under the INA, for a hearing to be held no

fewer than ten days after service of notice "[i]n order that an alien be permitted the opportunity to secure counsel").

The notice proposed by Respondents does not moot this issue. Petitioners have not been given notice of what they allegedly did to join TdA, when they joined, and what they did in the United States, or anywhere else, to share or further the illicit objectives of the TdA. Without such proof, Petitioners are subject to removal by the Executive's dictate alone, in contravention of the AEA and the Constitutional requirements of due process.

The Supreme Court's opinion in *J.G.G.* reflects its view as to what due process requires under the AEA. As the Supreme Court stated:

> Although judicial review under the AEA is limited, we have held that an individual subject to detention and removal under that statute is entitled to "'judicial review'" as to "questions of interpretation and constitutionality" of the Act as well as whether he or she "is in fact an alien enemy fourteen years of age or older." *Ludecke*, 335 U.S. at 163, 172, n. 17 . . . .
>
> So, the detainees are entitled to notice and opportunity to be heard "appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 313 (1950). More specifically, in this context, AEA detainees must receive notice after the date of this order that they are subject to removal under the Act. The notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs.

*J.G.G.*, 145 S. Ct. at 1006. Notice sufficient to enable a person to defend himself is basic to due process.

> "The fundamental requisite of due process of law is the opportunity to be heard." This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.

*Mullane*, 339 U.S. at 314 (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)). Interested parties must be given notice of the "pendency of the action" so that they have the "opportunity to

present their objections." *Mullane*, 339 U.S. at 314. This right of notice applies to aliens as well as to citizens, *see Reno v. Flores*, 507 U.S. 292, 306 (1993); *Plyler*, 457 U.S. at 210-12, and I hold that here, pursuant to the All Writs Act, it cannot be defeated by moving a petitioner from one place of confinement to another. *See* 28 U.S.C. § 1651(a); *Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n*, 965 F.2d 1224, 1237 (2d Cir. 1992) ("Once the district court acquires jurisdiction over the subject matter of, and the parties to, the litigation, the All Writs Act [28 U.S.C. § 1651] authorizes a federal court to protect that jurisdiction.").

The Supreme Court has provided a framework to enable lower courts to assess how much process is due in individual cases. *See Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976). "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors:" (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. at 335.

"The requirements of the due process clause are flexible and dependent on the circumstances of the particular situation examined." *Augustin v. Sava*, 735 F.2d at 32, 37 (2d Cir. 1984). Here, the private interests of Petitioners to protect their liberty and not to be deported to CECOT for indefinite detention are exceptionally strong. *See Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) (the private interest of an alien in being free from imprisonment "is the most significant liberty interest there is"). And the risk of erroneous deprivation of an alien's liberty interest, without a "full examination and hearing" following the filing of a complaint by the Government, as required by the AEA, is great. Indeed, the summary procedures used by

13

Respondents have already resulted in the wrongful removal of at least two individuals to CECOT. *See Noem v. Abrego Garcia*, No. 24A949, 2025 WL 1077101, at *1 (April 10, 2025); *J.O.P. v. U.S. Dep't of Homeland Security*, 19 Civ. 1944, 2025 WL 1180191, at *7 (D. Md. Apr. 23, 2025).

The third consideration set out by *Mathews*, the "Government's interest," is more complicated. Drafting complaints with particular allegations against individual aliens, providing aliens with time to contact counsel and file a habeas petition, and preparing for a hearing before a federal judge takes time and manpower. However, it is the nature of due process to cause fiscal and administrative burdens. Rule by the *ipse dixit* of a President is likely more efficient than the deliberative procedures of a court. But it is what our Constitution, and the rule of law, demand. And due process, once surrendered, is difficult to reinstate.

The Immigration and Nationality Act ("INA") has ample procedures to cause the removal of aliens without sacrificing their right to notice and a hearing. It also contains provisions for the expedited removal of certain eligible aliens. *See* 8 U.S.C. §§ 1225, 1228. Respondents argue, however, that they have a choice to proceed either under the INA or the AEA. That is so, but if Respondents wish to proceed under the AEA, they must follow all of its provisions, and may not throw Constitutional due process protections to the wayside.

The Presidential Proclamation, in order to empower the Executive beyond the provisions of the AEA, subtly changes the clause "shall be liable to be . . . removed" in the AEA, 50 U.S.C. § 21, to "shall be subject to immediate . . . removal," in the Presidential Proclamation, 90 Fed. Reg. at 13,034. This change is *ultra vires*; the Proclamation gives the President no more authority than the act of Congress prescribes. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). If the President wishes to bypass the INA and use

the AEA, he must do so according to the requirements of the AEA and Constitutional due process.

### III.   The statutory bases for invoking the Presidential Proclamation have not been satisfied

The AEA can be invoked by the President in two instances: (a) "[w]henever there is a declared war between the United States and any foreign nation or government," or if (b) "any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government." 50 U.S.C. § 21. The President then can make "public proclamation of the event." *Id.* Here, the Presidential Proclamation found and declared that the second of the two events had occurred, specifically, "that TdA is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States," and that it is doing so "directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela." 90 Fed. Reg. at 13,034. Respondents aver that TdA members have infiltrated the stream of Venezuelan refugees who have entered our borders, are "conducting irregular warfare and undertaking hostile actions against the United States," and constitute "a danger to the public peace or safety of the United States." *Id.*

Respondents argue that the courts are without power to review these findings. Courts, however, by their nature, interpret statutes. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule."); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385, 387 (2024). As the Supreme Court ruled:

> Although judicial review under the AEA is limited, we have held that an individual subject to detention and removal under that statute is entitled to "'judicial review'" as to "questions of interpretation and constitutionality" of the Act as well as whether he or she "is in

> fact an alien enemy fourteen years of age or older." *Ludecke*, 335
> U.S. at 163, 172, n. 17.

*J.G.G.*, 145 S. Ct. at 1006.

A statute should be interpreted as to its plain meaning at the time of its adoption, in the context of the events of that time. *See Wisconsin Central Ltd. v. United States*, 585 U.S. 274, 277 (2018) ("As usual, our job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'") (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979))); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself."); *see also Utah v. Evans*, 536 U.S. 452, 492 (2002) ("Dictionary definitions contemporaneous with the ratification of the Constitution inform our understanding.") (Thomas, J., concurring). In 1798, the United States was engaged in an undeclared war with France. *See* David McCullough, *John Adams*, at 499-505 (2001). Their respective navies fought each other at sea. *Id*. at 499. The American government feared incursions by the French in the territories west of the Appalachian Mountains. *See id*. Congress appropriated money to arm merchant ships and to pay for an army. *Id*. A declaration of war was discussed, and the Alien and Sedition Acts, including the AEA, were passed. *Id*. at 503-504. The AEA reflects the condition of its time.

An "invasion," as used in the AEA, was understood as a "[h]ostile entrance upon the right or possessions of another" or a "hostile encroachment," such as when "William the Conqueror invaded England." Samuel Johnson, *Invasion*, A Dictionary of the English Language (4th ed. 1773). Another dictionary defined "invasion" as a "hostile entrance into the possession of another; particularly the entrance of a hostile army into a country for the purpose of conquest or plunder, or the attack of a military force." Noah Webster, *Invasion*, American Dictionary of the English Language (1828). The Constitution itself uses the term "invasion" on three

16

occasions, all of which occur within the context of military action by a foreign state against the territorial integrity of the United States. Specifically, Section 8 of Article I of the Constitution provides Congress with the power to "call[] forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasion," Section 9 of Article I, also known as the "Suspension Clause," bars the suspension of the habeas writ, "unless when in Cases of Rebellion or Invasion the public Safety may require it," and Section 4 of Article IV, also known as the "Invasion Clause," provides that the federal government "shall protect [the states] against Invasion." *See also Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) (affirming dismissal of a count of a complaint against the federal government, alleging a violation of the Invasion Clause for failing to protect New York from an influx of aliens, since "[i]n order for a state to be afforded the protections of the Invasion Clause, it must be exposed to armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government.").

In a similar vein, an "incursion" was understood to mean an "[a]ttack" or "[i]nvasion without conquest." Samuel Johnson, *Incursion*, A Dictionary of the English Language (4th ed. 1773). And early cases used the term "predatory incursion" to refer to military-like conflicts waged by an Indian tribe or a foreign nation-state, as opposed to civil immigration violations. *See, e.g.*, *Huidekoper's Lesssee v. Douglass*, 7 U.S. 1, 7 (1805) (referring to a measure intended to "repel the predatory incursions of the Indians" as an antidote to an Indian war); *Cherokee Nation v. Georgia*, 30 U.S. 1, 10 (1831) ("The place, to which they removed under this last treaty, is said to be exposed to incursions of hostile Indians, and that they are engaged in constant scenes of killing and scalping, and have to wage a war of extermination with more powerful tribes, before whom they will ultimately fall."); *Worcester v. Georgia*, 31 U.S. 515, 545 (1832)

("These barbarous nations, whose incursions were feared, and to repel whose incursions the power to make war was given, were surely not considered as the subjects of Penn, or occupying his lands during his pleasure.").

The modern definitions are similar. An incursion means "a hostile inroad or invasion" or "a sudden attack." *Incursion*, Oxford English Dictionary (1971). Another dictionary defines the term "incursion" as "a hostile entrance into or invasion of a place or territory, esp[ecially] one of sudden character," or a "raid." *Incursion*, The Random House Dictionary of the English Language (1967). And the term "invasion" is defined as "the action of invading a country or territory as an enemy; an entrance of incursion with armed force; a hostile inroad," *Invasion*, Oxford English Dictionary (1971), or "the act or instance of invading or entering as an enemy, esp[ecially] by an army," *Invasion*, The Random House Dictionary of the English Language (1967).

Accordingly, I hold that the predicates for the Presidential Proclamation, that TdA has engaged in either a "war," "invasion" or a "predatory incursion" of the United States, do not exist. Others courts have resolved this issue similarly. *See, e.g.*, *J.G.G. v. Trump*, No. 25-5068, 2025 WL 914682, at *8-10 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); *J.A.V. v. Trump*, 25 Civ. 72, 2025 WL 1257450, at *12-18 (S.D. Tex. May 1, 2025); *D.B.U. v. Trump*, 25 Civ. 1163, 2025 WL 1163530, at *9-11 (D. Col. Apr. 22, 2025). There is nothing in the AEA that justifies a finding that refugees migrating from Venezuela, or TdA gangsters who infiltrate the migrants, are engaged in an "invasion" or "predatory incursion." They do not seek to occupy territory, to oust American jurisdiction from any territory, or to ravage territory. TdA may well be engaged in narcotics trafficking, but that is a criminal matter, not an invasion or predatory incursion.

Thus, I find that the Presidential Proclamation exceeds the scope of the AEA, and I enjoin Respondents, their officers, agents, servants, employees, attorneys, and any persons who are in active concert or participation with them, from enforcing it. *See* Fed. R. Civ. P. 65(d)(2). I also hold that Petitioners have made the requisite showing for a preliminary injunction as to their likelihood to succeed on the merits here.

## IV. Petitioners have demonstrated irreparable harm

I further find that Petitioners have demonstrated that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Generally, deportation "alone cannot constitute the requisite irreparable injury," since typically, "[a]n alien who has been removed may continue to pursue a petition for review, and those aliens who prevail can be afforded effective relief by facilitation of their return." *Nken v. Holder*, 556 U.S. 418, 435 (2009). But here, this is not so.

In the case of Kilmar Abrego Garcia, who the Government concedes was deported to El Salvador as "the result of an "'administrative error,'" Respondents have not been able to secure his release and return to the United States, notwithstanding the Supreme Court's ruling that the district court "properly require[d] the Government to 'facilitate' Abrego Garcia's release from custody in El Salvador." *Abrego Garcia*, 2025 WL 1077101, at *1. In Abrego Garcia's case, Respondents have averred in a brief that since he was already deported to El Salvador, the court lacks jurisdiction, and Abrego Garcia cannot show redressability. *See Abrego Garcia v. Noem*, 25 Civ. 951, ECF No. 12-1, at 7-12.

"Unlike economic harm, the harm resulting from expulsion from the United States pursuant to an unlawful policy likely cannot be remediated after the fact." *Huisha-Huisha v. Mayorkas,* 560 F. Supp. 3d 146, 172 (D.D.C. 2021), *aff'd in part, rev'd in part, and remanded*

*on other grounds*, 27 F.4th 718 (D.C. Cir. 2022); *see also Doe v. Mattis*, 928 F.3d 1, 22 (D.C. Cir. 2019) (finding irreparable harm likely to result from the transfer of a dual citizen to an unidentified country since he would be in the custody of that country "without any continuing oversight by—or recourse to—the United States."). Here, absent a preliminary injunction, Petitioners would be removed from the United States to CECOT, where they would endure abuse and inhumane treatment with no recourse to bring them back. If that is not irreparable harm, what is?

## V. The remaining requirements for a preliminary injunction have been satisfied

I also hold that Petitioners have met their burden as to the other prerequisites for a preliminary injunction, since the final two factors—the public interest and the balance of the equities—which merge in suits against the Government, *see New York*, 969 F.3d at 58-59, also favor granting a preliminary injunction here. Petitioners are currently detained in federal immigration custody, and thus do not pose a risk to the public's safety. But the public has a strong interest in ensuring that the branches of our government do not exceed their powers and violate the rights of others in the process. *See Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) ("It is evident that '[t]here is generally no public interest in the perpetuation of unlawful agency action.'" (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016))). "Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. And equity demands enjoining unlawful conduct that cannot be readily undone to ensure individuals' Constitutional rights are safeguarded. Thus, I find that the public interest and balance of the equities here, too, favor granting a preliminary injunction in favor of Petitioners.

20

## VI.  Security Bond

I decline to order Petitioners to post a security bond. "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm, or where the injunctive order was issued to aid and preserve the court's jurisdiction over the subject matter involved." *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (citation omitted). Here, there is no proof of likelihood of harm to Respondents that would result from the issuance of this preliminary injunction, and thus, Petitioners need not post bond.

**CONCLUSION**

Based on the foregoing, I grant Petitioners' motion for a preliminary injunction. Accordingly, Respondents, their officers, agents, servants, employees, attorneys, and any persons who are in active concert or participation with them, are hereby:

1.    Enjoined, pending further order of this Court, from enforcing, in the Southern District of New York, Presidential Proclamation No. 10903, 90 Fed. Reg. 13,033 (2025) entitled "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua," and are thus prohibited from, *inter alia*, removing Petitioners, including members of the Certified Class, from the United States, under authority of said Presidential Proclamation.

2.    Ordered, pending further order of this Court, pursuant to the All Writs Act, 28 U.S.C. § 1651(a), not to transfer Petitioners, including members of the Certified Class, ECF No. 34, from the Southern District of New York, provided, however, that nothing in this Order shall be construed to bar the removal, or release from immigration detention, of Petitioners pursuant to proceedings held under the Immigration and Nationality Act.

3.    Ordered that Petitioners shall not be required to furnish security, since Respondents

have not shown proof of likelihood of harm that would result from the issuance of this preliminary injunction.

This Order shall remain in effect during the pendency of this action, or until further order of this Court.

The parties shall settle, on two days' notice, the terms of a proposed amended preliminary injunction order, consistent with this Opinion.

The parties are hereby ordered to appear for a pre-trial conference on May 21, 2025, at 2:30 p.m., in Courtroom 14D. By May 19, 2025, the parties shall submit to the Court (via the email address HellersteinNYSDChambers@nysd.uscourts.gov) a joint list of attorneys expected to appear on the record at this conference, and an agenda of what they wish to discuss.

SO ORDERED.

Dated:     May 6, 2025
           New York, New York                 ALVIN K. HELLERSTEIN
                                              United States District Judge