UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.G.G., *et al.*,<br><br>　Plaintiffs,<br><br>LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, *et al.*,<br><br>　Petitioners-Plaintiffs,<br><br>　　v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>　Respondents-Defendants. | Civil Action No. 25-766 (JEB) |

## ORDER

Now arrives the latest installment in this complex and at times fast-moving lawsuit challenging President Trump's invocation of the Alien Enemies Act. Frengel Reyes Montoya, Andry Jose Hernandez Romero, and four other Venezuelan men were transferred by Defendants to a Salvadoran mega-prison known as CECOT (short for Terrorism Confinement Center). See ECF No. 101 (Am. Compl.), ¶¶ 12–17. Claiming that they are held there at the behest of the United States, they now seek to file a habeas-corpus claim for themselves and a class of similarly situated Venezuelan inmates. The necessary threshold question is whether these Petitioners are in "custody" for purposes of habeas. The Court believes that some discovery could aid its analysis.

The federal habeas statute extends to, among others, any "prisoner" who is "in custody" "under or by color of the authority of the United States" or "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(1), (3). While "custody" is thus

1

central to statutory jurisdiction under § 2241, courts have — in keeping with the broad statutory language — "very liberally construed" what that requirement entails. Maleng v. Cook, 490 U.S. 488, 492 (1989); see Chatman-Bey v. Thornburgh, 864 F.2d 804, 807 (D.C. Cir. 1988) (*en banc*) (noting "strong High Court disapproval of formalistic analysis in the context of habeas corpus" and emphasizing "the breadth and flexibility of the Great Writ in vindicating the fundamental concern in a democratic society of checking the powers of the state *vis-à-vis* an individual in custody").

In particular, it has long been true that "the use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical custody." Jones v. Cunningham, 371 U.S. 236, 239 (1963). The Supreme Court has, for instance, found federal habeas jurisdiction where a petitioner is free on parole but remains subject to restraints imposed by respondent officials, see id. at 241–43, and when an individual awaiting trial is released on personal recognizance. See Hensley v. Municipal Court, 411 U.S. 345, 351–53 (1973); Justices of Boston Municipal Court v. Lydon, 466 U.S. 294, 300–01 (1984). Courts have also recognized that habeas jurisdiction lies where a petitioner was imprisoned by a private party at the behest of the U.S. Government, see United States v. Jung Ah Lung, 124 U.S. 621, 666 (1888) (captain of steamship); Stokes v. U.S. Parole Comm'n, 374 F.3d 1235, 1238 (D.C. Cir. 2004) (private prison), or was imprisoned in one jurisdiction but subject to a detainer in the respondent's jurisdiction. See Braden v. 30th Jud. Circuit Court of Ky., 410 U.S. 484, 498–99 (1973). Finally — and most relevant for present purposes — one court in this district has held that federal habeas jurisdiction was possible (indeed, likely) where a U.S. citizen was held abroad in a Saudi Arabian prison at the behest of U.S. authorities. See Abu Ali v. Ashcroft, 350 F. Supp. 2d 28, 31, 67–69 (D.D.C. 2004).

The organizing principle for such disparate situations is the concept of "constructive custody." See, e.g., U.S. *ex rel.* Keefe v. Dulles, 222 F.2d 390, 392 (D.C. Cir. 1954) (habeas jurisdiction "depends on whether [petitioner] is held in actual or constructive custody"); LoBue v. Christopher, 82 F.3d 1081, 1082 (D.C. Cir. 1996) (petitioners released on bail were in "constructive custody" of U.S. Marshal). According to one leading formulation, constructive custody exists whenever "the imprisoning sovereign is the respondent's agent," the prisoner's "liberty is restrained by the respondent's parole conditions," or the prisoner "can point to some continuing collateral disability which is the result of the respondent's action." Steinberg v. Police Court of Albany, 610 F.2d 449, 453 (6th Cir. 1979). In Braden, moreover, the Supreme Court explained that a state "holding the prisoner in immediate confinement acts as agent" for a state with a detainer against that individual, such that the prisoner can bring a habeas action in the latter jurisdiction. See 410 U.S. at 498–99. As a result, when a "respondent official . . . work[s] through an intermediary or an agent to detain" someone, that prisoner may bring a habeas petition against the respondent. Abu Ali, 350 F. Supp. 2d at 48. In such instances, the detained individual — even if jailed by foreign agents — may be in "custody under or by color of the authority of the United States," 28 U.S.C. § 2241(c)(1), because U.S. officials retain "'the power to produce' him." Munaf v. Geren, 553 U.S. 674, 686 (2008) (quoting Wales v. Whitney, 114 U.S. 564, 574 (1885)).

Likewise, custody "in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2241(c)(3), may also establish habeas jurisdiction. To be sure, the actions of U.S. officials against noncitizens abroad will implicate federal rights — including constitutional habeas — only in exceptional situations. Cf. Johnson v. Eisentrager, 339 U.S. 763, 777 (1950); but see Boumediene v. Bush, 553 U.S. 723, 732–33 (2008). But "there is little

3

reason to think that Congress intended the geographical coverage of the [habeas] statute to vary depending on the detainee's citizenship." Rasul v. Bush, 542 U.S. 466, 481 (2004) (emphasis added). Petitioners, moreover, are resident aliens who assert that they have been removed from the United States under the authority of an illegal Proclamation, denied any opportunity to challenge that removal, transferred by U.S. authorities to a foreign prison under contract with the U.S. Government, and held there indefinitely without trial. Those claims, if ultimately borne out, would show that Respondents have violated federal law and Petitioners' due-process rights. See Abu Ali, 350 F. Supp. 2d at 50. In such a case, the Government's use of a foreign intermediary would not alone necessarily defeat habeas jurisdiction and shield its actions from judicial scrutiny. Indeed, our Circuit has already held that "teaming up with foreign agents cannot exculpate officials of the United States from liability . . . for [those] officials' unlawful acts." Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1542–43 (D.C. Cir. 1984) (*en banc*), vacated on other grounds, 471 U.S. 1113 (1985); cf. Ala. Great S. Ry. Co. v. Thompson, 200 U.S. 206, 218 (1906) ("[T]he Federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts [for] the protection of their rights in those tribunals."). Rather, when the United States "work[s] through" foreign officials "to detain" rights-holders "indefinitely without due process of law," federal habeas may be available to test the legality of that executive action. Abu Ali, 350 F. Supp. 2d at 50.

Given that habeas jurisdiction can lie when the detainees are in constructive U.S. custody, the question becomes whether such jurisdiction does lie here. As indicated, Petitioners allege that "[i]ndividuals detained at CECOT are detained at the behest of Respondents, and Respondents are paying El Salvador millions of dollars to detain them." Am. Compl., ¶ 77; see ECF No. 102-14 (Oscar Sarabia Roman Decl.) at ECF pp. 20, 24, 28–29, 36 (news reports from

Fox News, Associated Press, and Forbes reporting that United States is paying El Salvador to confine individuals, including Venezuelans transferred under Alien Enemies Act); id. at ECF p. 24 (quote from El Salvador's ministry of foreign affairs that Venezuelans are to be held at CECOT for one year "pending the United States' decision on their long term disposition"); id. at ECF pp. 40, 69 (statement by Secretary of State Marco Rubio explaining that El Salvador agreed to confine 250 alleged members of Tren de Aragua in "their very good jails at a fair price that will also save our taxpayer dollars"); id. at ECF pp. 42, 50 (statements by El Salvador's president that it is holding 238 alleged members of Tren de Aragua for a "fee" paid by the United States). This opportunity to hold prisoners, El Salvador's president has publicly stated, "offered the United States of America the opportunity to outsource part of its prison system." ECF No. 102-1 (P.I. Mot.) at 8 (quoting Roman Decl. at ECF p. 50). Petitioners have therefore offered support for their allegation that their "detention is at the behest and ongoing direction of United States officials." Abu Ali, 350 F. Supp. 2d at 67.

Some questions nevertheless remain about the precise nature of the confinement. The Court will accordingly authorize jurisdictional discovery into whether Petitioners are "in the actual or constructive custody of the United States," an inquiry that should include, but not necessarily be limited to, whether:

> (i) [Petitioners were] detained at the behest of United States officials; (ii) [their] ongoing detention is at the direction of the United States enlisting a foreign state as an agent or intermediary who is indifferent to the detention of the prisoner[s]; (iii) [they are] being detained in the foreign state to deny [them] an opportunity to assert [their] rights in a United States tribunal; and (iv) [they] would be released upon nothing more than a request by the United States.

Id. at 68 (footnotes omitted).

Such discovery may very well implicate "matters of the most delicate diplomacy," id. at 64 (quotation marks omitted), and "considerations of the separation of powers." Id. at 68. Even so, "the legal questions at issue in this case and the discovery they necessitate are not unique, or even uncommon, for the federal judiciary." Id. Courts frequently allow discovery into whether they can exercise jurisdiction, as long as the party seeking discovery has "a good faith belief that such discovery will enable it to show that the court has jurisdiction over the defendant." TIG Ins. Co. v. Rep. of Argentina, 110 F.4th 221, 240 (D.C. Cir. 2024) (cleaned up). They do so even in other situations involving potentially complex and sensitive discovery burdens on defendants. For example, courts have authorized discovery into whether a government official can claim qualified immunity when the plaintiff "has supported his claim with sufficient precision and factual specificity to raise a genuine issue as to the illegality of defendant's conduct at the time of the alleged acts." Schultea v. Wood, 47 F.3d 1427, 1434 (5th Cir. 1995) (*en banc*); accord Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987) (acknowledging that "tailored" discovery regarding question of qualified immunity "may be necessary"). Courts have also allowed jurisdictional discovery — albeit "carefully controlled and limited" discovery — into whether a foreign sovereign's presumptive immunity falls under certain statutory exceptions. See, e.g., TIG Ins. Co., 110 F.4th at 240 (quotation marks omitted).

Having concluded that Petitioners have made an adequate showing to justify further inquiry into the potential basis for this Court's jurisdiction, it will follow well-established practice and authorize jurisdictional discovery. As explained at the conclusion of yesterday's hearing, the Court therefore ORDERS that:

1. By May 9, 2025, Respondents shall submit any declarations they wish to provide regarding whether the United States has constructive custody over the proposed CECOT class;

2. By May 12, 2025, Petitioners shall submit to the Court a notice regarding whether they wish to seek jurisdictional discovery, and, if so, the specific discovery they propose to propound; and

3. By May 14, 2025, Respondents shall submit any response to Petitioners' discovery proposal.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: May 8, 2025