```
 1                   IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3       J.G.G., et al.,                ) Civil Action
                                        ) No. 25-cv-766
 4                     Plaintiffs,      )
                                        ) MOTION HEARING
 5       vs.                            )
                                        ) Washington, DC
 6       Donald J. Trump, et al.,       ) May 7, 2025
                                        ) Time:  5:00 p.m.
 7                     Defendants.      )
         _____
 8
                        TRANSCRIPT OF MOTION HEARING
 9                             HELD BEFORE
                   THE HONORABLE JUDGE JAMES E. BOASBERG
10                     UNITED STATES DISTRICT JUDGE
         _____
11
                          A P P E A R A N C E S
12
         For Plaintiff:     Lee Gelernt
13                          Ashley Gorski
                            Patric Toomey
14                          American Civil Liberties Union
                            125 Broad Street, 18th Floor
15                          New York, NY  10004
                            Email:  Lgelernt@aclu.org
16                          Email:  Agorski@aclu.org
                            Email:  Ptoomey@aclu.org
17
                            Scott Michelman
18                          Arthur B. Spitzer
                            Aditi Shah
19                          American Civil Liberties Union
                            529 14th Street NW, Suite 722
20                          Washington, DC  20045
                            Email:  Smichelman@acludc.org
21                          Email:  Aspitzer@acludc.org
                            Email:  Ashah@acludc.org
22
                            Brian D. Netter
23                          Democracy Forward Foundation
                            P.O. Box 34553
24                          Washington, DC  20043
                            Email:  Bnetter@democracyforward.org
25
```

```
 1    For Defendant:         Abhishek Kambli
                             Drew Ensign
 2                           Tiberius Davis
                             DOJ-USAO
 3                           950 Pennsylvania Avenue, NW
                             Washington, DC  20530
 4                           Email:  Abhishek.kambi@usdoj.gov
                             Email:  Drew.c.ensign@usdoj.gov
 5                           Email:  Tiberius.davis@usdoj.gov

 6    _____

 7    Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
                             Official Court Reporter
 8                           United States Courthouse, Room 6523
                             333 Constitution Avenue, NW
 9                           Washington, DC  20001
                             202-354-3267

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *s
 2              THE COURT:  Okay.  Good evening, everyone.
 3              THE COURTROOM DEPUTY:  Good evening.
 4              All right.  We're here today for a motion hearing in
 5    civil action 25-766, J.G.G., et al. versus President Donald
 6    Trump, et al.
 7              Beginning with counsel for the plaintiff, if you
 8    would please approach the lectern and identify yourself for the
 9    record.
10              MR. GALERNT:  Good afternoon, Your Honor.  Lee
11    Galernt from the ACLU for petitioner/plaintiffs.
12              THE COURT:  Welcome.  And with your -- with your
13    team, who I don't know if you want to introduce, or we'll just
14    note their presence.
15              If that puts you in a hard position --
16              MR. GALERNT:  Yeah.  There's a lot of them.
17              Your Honor, with your -- with your permission, we may
18    potentially have my co-counsel, who can introduce herself, take
19    one small part of the argument, if that's okay with Your Honor.
20              THE COURT:  Yes, because I plan to split it into
21    sections.  So maybe -- I hope that that will correspond with
22    what she wants to handle.
23              MS. GORSKI:  Ashley Gorski for petitioners.
24              THE COURT:  Can you spell that?
25              MS. GORSKI:  A-S-H-L-E-Y.  Last name is G-O-R-S-K-I.
```

1          THE COURT:  Thank you.

2          MS. GORSKI:  Thank you.

3          THE COURT:  Okay.  Government.

4          MR. KAMBLI:  Good afternoon, Your Honor.  Abhishek

5    Kambli, along with Tiberius Davis and Drew Ensign for the

6    United States.

7          THE COURT:  Okay.  Good afternoon to you folks.

8          All right.  So what I'd like to do is I'd like to

9    split this into three sections.  One will be the issue of

10   classes and custody, then the second will be the question of

11   violation, and the third will be question of remedy.  So I

12   think we'll go back and forth on it that way.

13         So let's start with, first, question of classes and

14   custody with plaintiffs.

15         MR. GALERNT:  Yes, Your Honor.

16         THE COURT:  All right.  So let's talk about the

17   classes for a minute.  So it seems to me that the Supreme

18   Court's ruling -- well, it doesn't seem -- they did vacate my

19   minute orders, and one -- part of one of the minute orders was

20   the certification of the class.  And, so, it seems to me that

21   that is likely vacated and, therefore, we need to start again.

22         And so the question is, for you, why -- what's the

23   point of keeping a broader class of noncitizens who are or will

24   be subject to the proclamation?

25         It seems to me that what you should be trying to do

```
1    or we should be talking about is certification of -- of the

2    two, what you call subclasses.  But it would seem to me those

3    are the two classes you want to certify because I'm not sure

4    what -- what relief you could seek for this overall class

5    anymore, given where things now stand.

6              MR. GALERNT:  Your Honor, I apologize if our papers

7    were not clear.  And I think we would have -- we have a reply

8    brief, but I just want to clear that up now.  We are not, as

9    Your Honor suggests -- and it may have been mistakenly

10   written -- we are not seeking a class for the whole entire

11   group.

12             THE COURT:  Okay.

13             MR. GALERNT:  It's for the exact two subclasses

14   you're talking about.

15             THE COURT:  All right.  So we'll -- let's refer to

16   them as two classes, since they won't be subclasses of a

17   greater group of people.

18             MR. GALERNT:  Right.  Absolutely, Your Honor.

19             THE COURT:  Then, similarly, the named plaintiffs who

20   were originally in the case, they're no longer part of those

21   classes, correct?

22             MR. GALERNT:  No, Your Honor.  We have new class

23   reps.

24             THE COURT:  Okay.  Got it.

25             All right.  Okay.  So let's -- let's talk -- I think
```

1      the harder case for you is the criminal custody class, and

2      so let's talk about that for a minute.

3              Why isn't *Padilla* a problem for you here, in the

4      sense that -- that shouldn't -- shouldn't venue lie in the

5      District from where the detainer issued or the District where

6      they will be held pursuant to the AEA prior to removal, as

7      opposed to here?

8              MR. GALERNT:  Well, Your Honor, this -- this is the

9      actual issue that my cocounsel is going to address.

10             THE COURT:  Okay.

11             MR. GALERNT:  But I'll just give you a quick answer,

12     that right now we don't know where they're going to be

13     detained, and given the 12-hour notice issue, I think that's

14     the problem.  And so the Supreme Court has said if you don't

15     know where the custodian is, you can challenge future custody,

16     and so I think that's how we understand *Rumsfeld*.  But I think

17     if Your Honor wants to address it more fully, I would let my

18     cocounsel state that.

19             THE COURT:  Okay.  Ms. Gorski, so -- so, Mr. Galernt

20     has given me the top-line question -- or the top-line position,

21     but can you explain a little bit in more detail why *Padilla*

22     doesn't foreclose your position here?

23             MS. GORSKI:  Yes, Your Honor.  Under *Braden* and

24     *Padilla*, when challenging future confinement, a petitioner may

25     bring their claim against the person or entity who will have

1    future legal custody over them.  And *Padilla* is very clear that

2    that concept of future -- future legal custody still applies in

3    a context like this.

4         And given that, you know, the respondents named here

5    are the individuals and the entities that will have future

6    legal custody over the criminal custody class, and they will

7    have that custody pursuant to the AEA.

8         THE COURT:  But why -- why -- again, it's got to be a

9    habeas claim that you're bringing, ultimately, on their behalf,

10   right?

11        MS. GORSKI:  Well, Your Honor, we do think it makes

12   sense to proceed in habeas.  They are maintaining their

13   equitable and APA claims, but, first and foremost, yes, they --

14   they are proceeding in habeas and under *Braden* a petitioner can

15   file a petition against the -- the person or entity that will

16   have that future legal custody.

17        THE COURT:  But why -- but in *Padilla* that ended up

18   being the -- the person in charge of the Naval brig in

19   Charleston, South Carolina, not a cabinet official in

20   Washington.

21        And so why isn't that true here, that -- Mr. Galernt

22   says, well, we're worried about timing, but isn't the answer

23   that once they're moved somewhere, then it's the custodian

24   there who you -- who you need to challenge.

25        Because in *Braden*, it was -- it was Kentucky, the

1    second state, the second jurisdiction, right, and not -- and so

2    here, I'm not sure how you get to Washington, D.C.

3            MS. GORSKI:  So starting with the concern about

4    *Padilla*.  There, *Padilla* was challenging his present

5    confinement and that is why the court said, the proper

6    respondent had to be the commander of the brig.  He was not

7    challenging future confinement.

8            And the court was very clear to distinguish *Braden.*

9    The court in *Padilla* said *Braden* was different because *Braden*,

10   unlike *Padilla*, was challenging future confinement and, thus,

11   in a *Braden* situation, the general rule that a habeas

12   petitioner has to bring suit with respect to the immediate

13   custodian and in the District of confinement, those general

14   rules would not apply in a *Braden* scenario.

15           And what we have here is exactly like *Braden* because

16   here, the AEA designation from these respondents in D.C. is the

17   equivalent of the detainer that Kentucky issued.  And just as

18   *Braden* was able to bring suit in Kentucky, even though he was

19   detained in Alabama, the criminal custody subclass here should

20   be able to bring their habeas petition in this jurisdiction.

21           THE COURT:  Right.  But he was going to be detained

22   in Kentucky and -- and these folks are not going to be detained

23   in Washington, D.C., right?

24           MS. GORSKI:  Well, Your Honor, we don't precisely

25   know where they will be detained, but I --

1          THE COURT:  Pretty clear not here, though, fair?

2          MS. GORSKI:  I am not aware of an immigration

3     detention facility in Washington, D.C.

4          THE COURT:  Nor am I.

5          MS. GORSKI:  But I would -- I would underscore that

6     *Padilla* emphasizes that in this analytical framework from

7     *Braden*, what is relevant is the future legal custodian.  It is

8     not about the -- the warden of the facility that has physical

9     custody over the petitioner when the petitioner is challenging

10    future confinement.

11         When the petitioner challenges future confinement,

12    what matters is legal custody, and here the -- the people and

13    entities who have legal custody with respect to this future AEA

14    designation are the respondents in D.C.

15         THE COURT:  Okay.  That would be the case not under

16    the AEA, that would be the case if you're going to be detained

17    by any reason by some -- in a federal institution that you

18    could argue that the -- that the -- those in charge of

19    confinement were the federal officials who ordered it.

20         But, you know, then do you think *Padilla* could have

21    sued in Washington when -- before he was transferred to

22    Charleston?

23         MS. GORSKI:  I do -- if *Padilla* had received notice

24    in advance of the transfer to Charleston and brought a habeas

25    petition in the Southern District of New York while -- well,

1    actually, brought a habeas petition in Washington while he was

2    in the Southern District of New York, before the transfer, yes.

3          But under the circumstances of that case, he was

4    detained physically in South Carolina, was challenging the

5    detention in South Carolina, and that is why there was not

6    jurisdiction in the Southern District of New York.

7          THE COURT:  Okay.  I will -- it's an interesting

8    question.  Thank you.  I will move on to the next issue.

9          So, unless there's something you want to add.

10          MS. GORSKI:  The only thing I would add here,

11    Your Honor, is that the proposed representative for this class

12    has already been designated under the AEA, has received a

13    notice.  That is absolutely --

14          THE COURT:  And to -- that they said where he will

15    be, is going to be transferred?

16          MS. GORSKI:  No.

17          THE COURT:  And where is he now?

18          MS. GORSKI:  New Jersey.

19          THE COURT:  Okay.

20          MS. GORSKI:  But that designation is very -- very

21    clearly analogous to the detainer in *Braden*.

22          THE COURT:  Okay.  All right.  Thank you.

23          All right.  Mr. Galernt, I'll have you return and

24    we'll move to custody now.

25          So, one of the questions I'm wrestling with is should

1    we have some jurisdictional discovery regarding custody?  And

2    although I think you have a lot of facts in your favor on

3    constructive custody, the question is:  Do you want to take

4    some discovery?  And if you do, what else would you like to

5    learn?

6         I mean, for example, in the *Abu Ali* case, which is

7    Judge Bates's case, he authorized jurisdictional discovery

8    into, quote, whether Abu Ali was detained at the behest of

9    United States officials, that's one.  Two, his ongoing

10   detention is at the direction of the United States enlisting a

11   foreign state as an agent or intermediary who was indifferent

12   to the detention of the prisoner.  Three, he's being detained

13   in a foreign state to deny him an opportunity to assert his

14   rights in the -- in a United States tribunal.  And, four, he

15   would be released upon nothing more than a request by the

16   United States.  So that's what Judge Bates authorized

17   jurisdiction.

18        Do you want it?  And if you want it, in what form

19   would you like it and what would you seek?

20        MR. GALERNT:  Right.  So I think we do feel like we

21   have enough facts for Your Honor -- for Your Honor to order

22   them to facilitate, just as in *Abrego* at this point.  I mean,

23   the discovery in *Abrego* happened after --

24        THE COURT:  Well, I think the discovery there was

25   much more remedy discovery, rather than a custody discovery.

1          MR. GALERNT:  I -- I think that's right, Your Honor,

2     except that the two blend because ultimately she -- the

3     judge -- the district court judge in that case had to find

4     addressability and traceability, which obviously goes to

5     whether the U.S. had the ability -- some ability to get

6     Mr. Abrego Garcia out of, and the Supreme Court affirmed that

7     and said facilitate.

8          I do think, given the facts that we're relying on,

9     the government hasn't disputed that there was payment, that

10    they sent these individuals to CECOT.  And I think these

11    individuals are Venezuelan.  So the Salvadoran government

12    has even less interest in holding them.  They're clearly

13    holding them at our direction.

14         But, nonetheless, I think if Your Honor feels like

15    discovery would help in making the in-custody determination,

16    then that's fine with us.  The only thing I would caution, I

17    think, and I don't really need to belabor this point with

18    Your Honor, is that I think we're going to run into a lot of

19    obstacles with the -- with the government saying they can't

20    produce anything.

21         But I -- I think we would start with some document

22    production, interrogatories, and depositions.  I don't think

23    that we would want to go to -- straight to live witnesses, that

24    could be something at the end of the day.

25         But I do think if we get a lot of obstacles to

1    discovery and it drags forever and these men are sitting in

2    CECOT, I do think Your Honor has enough facts to find

3    constructive custody for the same reason that they did in

4    Abrego Garcia.

5              THE COURT:  Yeah, no.  I -- right.  If we go into

6    discovery -- and we'll talk to the government -- it would be

7    abbreviated -- it would be truncated and brief, without a

8    doubt, because, again, I'm not sure I need it.

9              Okay.  Thank you.  Let me talk to the government

10    about these issues.

11              MR. KAMBLI:  Yes, Your Honor, I'm Abhishek Kambli.

12              THE COURT:  Why don't you just spell it for the

13    record?

14              MR. KAMBLI:  Yeah, first name A-B-H-I-S-H-E-K.  Last

15    name Kambli, K-A-M-B-L-I.

16              THE COURT:  Okay.  All right.  So, I see that you

17    filed your opposition to class cert. just a few hours ago, and

18    I'm in trial so I haven't read it.  So I'm not sure why you

19    waited that long, since I've got to -- in order to grant the PI

20    I need to also certify the class, and so it would be helpful to

21    get your thoughts on that.  But what arguments are you making

22    against the CECOT, certification of the CECOT class.

23              MR. KAMBLI:  Yes, Your Honor.  Let's begin from the

24    proposition that the Supreme Court stated that District of D.C.

25    was not the proper venue, but that there was venue in Texas.

1    The hook that plaintiffs are using in this case to have

2    District of D.C. be the proper venue is the idea the

3    United States has constructive custody after they were removed

4    to El Salvador, and it boils down to whether the United States

5    has agency.  And I wanted to point to --

6             THE COURT:  So that's the custody -- so that's the

7    constructive custody question, but you're saying the class

8    issue is dependent on that?

9             MR. KAMBLI:  Yes, Your Honor, whether the Court can

10   even decide.

11            THE COURT:  So you're saying if I find constructive

12   custody, then it's obvious that the class exists.

13            MR. KAMBLI:  Well, there's still some issues that we

14   briefed on in terms of class certification.  But, the main

15   issue is for the Court to even get to the point where it can

16   decide the class certification issue, it has to determine that

17   it has venue over the habeas claims and the --

18            THE COURT:  Okay.  So you'll agree, before we get to

19   that, that if there is constructive custody, then venue is

20   appropriate here under, for example, *Rumsfeld v. Padilla* and

21   other cases, right?

22            MR. KAMBLI:  Yes, Your Honor.

23            THE COURT:  Then all we have to do is figure out

24   constructive custody.  So let's -- and, again, just so the

25   public understands, that in order to have venue here and in

1    order for plaintiffs to be able to proceed, the government has

2    to have constructive custody over the individuals at CECOT who

3    were transferred there on or about March 15th or 16th.

4            So in looking at constructive custody, why don't we

5    start with you saying -- you're saying that the petitioners

6    present no reason to believe that the United States could

7    obtain the release of any petitioner merely by asking, right?

8            MR. KAMBLI:  Yes, Your Honor.

9            THE COURT:  Okay.  But, didn't the President say,

10   just last week, that he could secure the return of Mr. Abrego

11   Garcia simply by picking up the phone and asking the president

12   of El Salvador to release him?  So is the President not telling

13   the truth, or could he secure the release of Mr. Abrego Garcia?

14           MR. KAMBLI:  Your Honor, this gets into what I wanted

15   to talk about, which was two different concepts.  Influence

16   does not equate to constructive custody.  And I want to delve

17   into the case cited by the plaintiffs for the proposition,

18   *Munoz v. Green*, a little bit.

19           THE COURT:  Why don't we start with my questions.

20   Then if there's something else you wanted to answer --

21           MR. KAMBLI:  That's fine.

22           THE COURT:  So my question is:  Was the President

23   telling the truth when he said he could pick up the phone and

24   have Mr. Abrego Garcia released, or not?

25           MR. KAMBLI:  So, Your Honor, that goes towards the

1    President's belief about the influence that he has.  And the

2    question rests on, though, does the decision ultimately lie

3    with El Salvador or does the decision lie with the

4    United States for the constructive custody issue?  The fact

5    that the -- El Salvador gets to say negates the constructive

6    custody.

7         THE COURT:  But, for example, then we've got the --

8    El Salvador's vice president, Mr. Ulloa, U-L-L-O-A, when

9    speaking to Senator Van Hollen, said that the issue, has to be

10   solved in the United States and that his, Mr. Abrego Garcia's,

11   release was up to the United States.  So that sounds like a lot

12   more than influence, doesn't it?

13        MR. KAMBLI:  So, Your Honor, it goes towards whether

14   El Salvador has a say at all or not.  If they have some say,

15   that does negate.  And that's why I wanted to talk a little bit

16   about the cases that plaintiff cited on that point, since it

17   does shed some light into that.

18        THE COURT:  You wouldn't disagree -- I'm sorry.  You

19   wouldn't dispute that in terms of custody, there's no

20   difference between Mr. Abrego Garcia and the plaintiffs in this

21   case?

22        MR. KAMBLI:  There are some differences, Your Honor,

23   because, one, Abrego Garcia, that was in the District of

24   Maryland, so at some point he was housed there.  So, the issue

25   didn't turn on whether the District of D.C. had venue because

1    he was detained abroad.  So it's a little bit of a different

2    question than this case.

3              THE COURT:  But in terms of whether El Salvador has

4    constructive custody over him, that's no different from whether

5    there's constructive custody of the other people at CECOT.

6              MR. KAMBLI:  There are some nuances that are

7    different in this case, Your Honor.  The main issue is they

8    didn't get to the habeas question in Abrego Garcia.  They --

9    this one turns solely on whether the District of D.C. --

10             THE COURT:  Right.  In fact, you didn't dispute the

11   question of custody in front of Judge Xinis, did you?

12             MR. KAMBLI:  So, Your Honor, I'm not --

13             THE COURT:  I don't mean you personally, Mr. Kambli.

14   The government never even disputed that question in front of

15   her, correct?

16             MR. KAMBLI:  So, Your Honor, the government does take

17   the position that they are not able to return him at this

18   point, and that's been the position.  Obviously, the transcript

19   of that hearing, it said what it said, and I won't dispute that

20   part.

21             THE COURT:  So, but even assuming you hadn't conceded

22   the issue in front of her, what I'm still asking is currently,

23   what's the difference between the custody that El Salvador

24   holds of Mr. Abrego Garcia and these plaintiffs?

25             MR. KAMBLI:  So, Your Honor, it does boil down to, in

1    both cases, whether El Salvador has a say before the power to

2    produce can be effectuated, and if they do, then under the

3    Supreme Court precedent in *Munoz v. Green* and other cases, that

4    does negate the issue.

5            THE COURT:  Right.  But so -- but that's not --

6    that's why they're the same, not why there's a distinction.  So

7    there is no distinction, right?

8            MR. KAMBLI:  There might be some, mainly because they

9    weren't seeking District of D.C. as the venue in that case

10   because it was in District of Maryland where Mr. Abrego Garcia

11   was held at some point in the process.

12           THE COURT:  I understand that.  That's a venue

13   question.  But, again, it seems that -- I still haven't heard

14   you tell me the difference between whether he is in U.S.

15   constructive custody or compared to these plaintiffs being in

16   U.S. constructive custody.  You say none of them is, but

17   there's no way for me -- for Courts to say Mr. Abrego Garcia is

18   in constructive custody and these folks are not.

19           MR. KAMBLI:  Well, Your Honor, I can speak to that

20   because the remedy that was offered there was facilitating his

21   return.  The idea that there has to be facilitation alone

22   negates the issue of constructive custody is my point overall

23   for both, and that applies to both cases.

24           THE COURT:  So back, again, to the U.S.-El Salvador

25   relationship.  So is the United States paying El Salvador to

```
 1    house the migrants?

 2           MR. KAMBLI:  Your Honor, here's what I can present to

 3    the Court as far as that goes -- and I do want to be careful of

 4    how I'm wording it, since it is foreign government information:

 5    But there is no agreement or arrangement whereby the

 6    United States maintains any agency or control over the

 7    prisoners, and by that I mean no treaty, binding agreement or

 8    nonbinding arrangement where El Salvador provides us the

 9    constructive custody on the people that we send them.

10           And what exists is a letter to El Salvador on the

11    issue of the detention, but that letter does not provide

12    constructive custody to the U.S.

13           THE COURT:  So there's a formal notice of the

14    $4.76 million grant to El Salvador dated March 22nd, which

15    notes the purpose of the grant is to provide funds to be used

16    by Salvadoran law enforcement and correction agencies for its

17    law enforcement needs, which include costs of detaining the 238

18    TDA members recently deported to El Salvador, right?

19           MR. KAMBLI:  Your Honor, what I can represent is that

20    there were grants that were made to El Salvador for law

21    enforcement anticrime purposes that can be used for the

22    detention of these individuals.  But at the same time, these

23    individuals are detained under the laws of El Salvador.

24           THE COURT:  But, for example, so your note from

25    Mr. Landau, his declaration, you're certainly not thinking
```

1    that's in any way controlling here, since all he says is

2    El Salvador makes its own sovereign decisions, including with

3    respect to detention.  But that's not even in respect to -- I'm

4    sorry.  That doesn't even apply specifically in his declaration

5    to these people at CECOT, right?

6         MR. KAMBLI:  So, Your Honor, the detention in CECOT

7    is pursuant to El Salvador laws, and even the plaintiffs'

8    evidence of some of their news articles show that they do have

9    an avenue to challenge their detention within El Salvador.

10   There were news reports of the government of Venezuela sending

11   lawyers to argue in El Salvador for their release.  So there is

12   an avenue that's being challenged within that nation as well.

13        THE COURT:  So that seems to go to whether they have

14   other forms of relief.

15        So, spokes -- White House Press Secretary, Karoline

16   Leavitt said it was approximately $6 million to El Salvador for

17   the detention of these foreign terrorists.  So is she wrong,

18   that that's not what happened?

19        MR. KAMBLI:  So, Your Honor, what I can represent is

20   what I already stated, which is that there were grants

21   provided.  Those grants can be utilized to provide some of the

22   costs for the detention.

23        THE COURT:  And then Secretary Noem said that CECOT

24   is one of the tools in our tool kit that we will use if you

25   commit crimes against the American people.  So, again, is she

1    wrong about that?

2              MR. KAMBLI:  So, Your Honor, I'm not going to

3    necessarily parse out every statement, and sometimes public

4    statements lack the nuance of any given situation.  But what

5    I --

6              THE COURT:  Is that another way of saying a number of

7    these statements just aren't true?

8              MR. KAMBLI:  No, Your Honor.  That's not what I'm

9    saying at all.  What I'm just saying is that the question of

10   constructive custody turns on whether we do have the ability to

11   immediately produce them before the Court.  And the evidence

12   before you indicates that we do not.  So that's the point I was

13   trying to make on that.

14             THE COURT:  So what's your thought then on some

15   further discovery, since you've given us a little more

16   information already today than we had in your filings, and

17   certainly more than in the declaration of Mr. Landau?  So,

18   what's the -- if, in fact, this is the case, what you're

19   telling is the case about the relationship, are you willing to

20   provide that information in declarations or to provide

21   documents that substantiate that?

22             MR. KAMBLI:  So, Your Honor, we don't believe that

23   jurisdictional discovery is necessary, but I can consult with

24   the State Department to see what else that they are able to

25   provide.  But we don't believe that jurisdictional discovery is

1    necessary at this time because we believe that even the

2    plaintiffs conceded avenue for relief which is facilitation

3    alone negates the idea of constructive custody, and that's

4    based on a couple of cases that I was going to get into.

5              THE COURT:  Okay.  Go ahead.  I'll hear you on that.

6              MR. KAMBLI:  *Munoz v. Green*, that was the one case

7    that the plaintiffs were citing for the issue of the power to

8    produce being what constructive custody turns on.  And that

9    case cited *Wales v. Whitney* on the -- and that's 114 U.S. 564,

10   574, 1885, and it stated there that all these provisions

11   contemplate a proceeding against some person who has the

12   immediate custody of the party detained with the power to

13   produce the body of such party before the Court or Judge, that

14   he may be liberated if no sufficient reason is shown to the

15   contrary.

16             So, the idea is there is some immediacy, and none of

17   the cases that plaintiff cited involved asking a foreign

18   sovereign before a decision is made.  The fact that there is a

19   foreign sovereign that has their own decision that they can

20   make on the issue cuts against the idea that we have the

21   constructive custody, especially when you're talking about

22   immediate custody and the power to produce --

23             THE COURT:  Why doesn't *Abu Ali*?  Why didn't -- why

24   isn't that the case?

25             MR. KAMBLI:  So, Your Honor, in that case he was held

1    by -- by Americans in that scenario.  He wasn't held

2    specifically by the foreign government.  In this case, once

3    they're transferred over, they're in full El Salvadorian

4    custody.

5              THE COURT:  Well, he -- the question is was he

6    detained at their behest, not -- not whether he wasn't in a

7    U.S. facility there by -- incarcerated by U.S. officials.

8              MR. KAMBLI:  Your Honor, that's not the only

9    question.  The question is can we immediately produce him

10   without another entity having a say in it?

11             THE COURT:  The same as Saudi Arabia.  You have to --

12   they had to consult with Saudi Arabia.

13             Again, this -- the facts may have been somewhat

14   different, but they couldn't just spirit him out of the country

15   with no -- with no consultation there.

16             MR. KAMBLI:  Yes, Your Honor.  There's consultation,

17   but there's a difference between consultation versus

18   El Salvador being able to say no.  And that's the case, there

19   was no evidence that Saudi Arabia could say no.  That's the

20   main difference, Your Honor.

21             THE COURT:  All right.  Let me -- I want to -- okay.

22   Let me just talk to you for a few minutes about the other

23   class --

24             MR. KAMBLI:  Yes, Your Honor.

25             THE COURT:  -- the criminal custody class.

1          So I guess the first question is:  Are there, in

2    fact, still 32 individuals in criminal custody with active

3    detainers against them?

4          MR. KAMBLI:  So, Your Honor, I don't know the full

5    number of people.  I don't have any reason to believe that the

6    named plaintiff in new Jersey did not have one, but we believe

7    that there's actually bigger problems with that -- if you want

8    to call it class or subclass than Your Honor was asking about.

9          And the -- the big problem, even with the named

10    plaintiff, or the named petitioner, is we don't know how long

11    it will be before he's ever going to actually be subject to the

12    proclamation in the sense of we know that he's being held in

13    pretrial detention in the District of New Jersey, but we don't

14    really have any information on what crime he's charged with,

15    what type of sentence he's looking at, how many years he's in

16    custody.

17          And one of the important -- one of the reasons that

18    that's particularly important is that this is a preliminary

19    injunction where the plaintiffs also have to demonstrate

20    irreparable harm under the heightened D.C. Circuit standard.

21    So without -- with that limited information, I don't think the

22    Court can be in a position where they say -- where it can say

23    that there's immediate harm that can only be remedied by

24    injunctive relief.

25          THE COURT:  And do you know -- do you know who the

1    person issuing the detainers for these 32 is?

2            MR. KAMBLI:  I do not, Your Honor.

3            THE COURT:  So, let's assume for a minute that --

4    that all of these people will be removed after their criminal

5    proceedings have run their course and that those 32 could

6    challenge their future removal through a habeas petition.

7            Would you agree that then the venue would be here?

8            MR. KAMBLI:  It depends, Your Honor, because if

9    they're going to another location within the United States --

10           THE COURT:  I mean, assuming they're not -- assuming

11   they're not coming here, because they won't be coming here.

12           MR. KAMBLI:  Right.

13           THE COURT:  So assuming they're going somewhere else

14   in the United States.

15           MR. KAMBLI:  So if they're going somewhere else

16   within the United States, that other place within the

17   United States would be the venue to challenge habeas, not the

18   District of D.C.

19           They're -- it's operating off the assumption that

20   they're going to be sent to CECOT or somewhere else.  But, one,

21   for all we know, it could be a decade before any transfer

22   happens, depending on how long their criminal sentence is.  And

23   then, two, we have to assume that there won't be any stops in

24   between.  And when it gets that speculative, there's just not

25   any relief that the Court can really grant to that class, given

1    that it would -- that -- that venue here at some point in the

2    future is going to be speculative.

3                THE COURT:  Okay.  All right.  Thank you, Mr. Kambli.

4                I will return to the plaintiffs.

5                Mr. Galernt, when we do -- before we move to the

6    violation issue, do you want to respond just on the irreparable

7    harm point Mr. Kambli made?  Which is, look, we don't know --

8    it's not -- this isn't immediate -- the harm is not immediate

9    because we don't know how long these folks are going to be in

10   their criminal proceedings.

11               MR. GALERNT:  Yeah, Your Honor.  I think the problem

12   is -- well, I just want to reemphasize one point that my

13   colleague made, which is that the named petitioner has already

14   been designated, gotten a notice re.

15               And so under the government, as Your Honor knows, the

16   last time we were here the government was talking about 24

17   hours.  They've now -- in a sealed document sent to the

18   District of Texas, which Judge Rodriguez unsealed, they're now

19   down to 12 hours.

20               So the problem, I think, for the named petitioner and

21   the class, is at 8 o'clock at night, they could move someone

22   out of criminal custody to ICE custody in Texas, or whatever,

23   and that person is gone by 8 a.m., and so I think that's really

24   the issue for us.

25               Yes, we don't know when they're going to remove them

1    under the designation.  We would love for them to tell us and

2    we would love for them to give us more notice.

3            But as Your Honor is aware of what happened in

4    Bluebonnet in the Northern District of Texas, it happens at

5    night and then by the morning they're gone and then they're

6    here saying, "We get them out."

7            So that's ultimately the issue for us.  I think if

8    they were operating under a 30-day notice and they were giving

9    notice to class counsel, we would be in a very different

10   situation.  It might be cumbersome for us to go around the

11   country filing all the different ones, but that would -- I

12   mean, that's our response.

13           THE COURT:  Okay.  On the violation question -- I

14   don't want to talk about the AEA at all.

15           But on due process, assuming that the process they --

16   do you have any representations on any process that the -- that

17   the CECOT class got?

18           MR. GALERNT:  Your Honor, I think when we were here

19   the very first time or the second time, we put in information

20   which we've recited in our briefs that they got no notice.

21           And I just want to be clear about it.  There were

22   declarations that said some of the people, we don't know that

23   all, may have been handed a piece of paper as they're being

24   loaded onto the buses to the airport.  That's not even 12

25   hours.

1        The other thing about that notice was, unlike the

2    notice now where they took out "No review is available," on the

3    top, they've taken that out.  They still haven't put, "Review

4    is available," or given you a box to check or anything like

5    that.  But that -- that notice that they handed out to those

6    people said no review available on the top of the notice and

7    they got no time to do it, and it was in English.

8        So we don't even need to -- for the CECOT class, even

9    need to argue about whether 12 hours is deficient or not.  They

10   got no notice and I think that the -- the fact that the notice

11   said no review comes from the fact that the Attorney General's

12   memo that was just discovered, I think by the media, said in

13   her memo, "These individuals are not entitled to any review."

14       A few days later, they told the Supreme Court, "Well,

15   of course they're entitled to review," but...

16       So that -- that's what our position is, at least for

17   the CECOT class.  There was no notice and that's enough to say

18   there was a violation.

19       THE COURT:  So then -- okay.  So assuming that's the

20   case, then -- so what due process -- so then due process does

21   entitle you to a meaningful opportunity to file habeas

22   petitions.

23       MR. GALERNT:  Right.

24       THE COURT:  So aren't you doing just that now?  In

25   other words, aren't -- are you being -- do you believe you're

1    being given due process now?

2         MR. GALERNT:  Well, I don't think so, Your Honor,

3    for -- for a couple of reasons.  One is that unless -- it

4    depends on whether Your Honor is going to reach the threshold

5    question of whether the proclamation is consistent with the

6    statutory predicate, so that's one thing.  If it says it was

7    not consistent, then that's a violation as to all.

8         But as to the second point, to Your Honor's due

9    process point, I mean we would have to have each of these

10   individuals at CECOT have the opportunity to then prove that

11   they were not gang members or the government to prove that they

12   were gang members.  I don't know how that's going to happen

13   from CECOT.

14        THE COURT:  But if I find that the proclamation did

15   not properly invoke the AEA, then that's moot anyway; right?

16        MR. GALERNT:  That's the end and you would bring them

17   all back.  But I think even if Your Honor wasn't going to go

18   there -- and we would respectfully urge the Court to do it now

19   that at least three district courts have -- even on the notice

20   point, I think they would all be entitled, as the Supreme Court

21   said, to contest whether they fall within the proclamation, and

22   there's just simply no way they can do that from CECOT.

23        THE COURT:  Okay.  All right.  Thank you.

24        Mr. Kambli, so you certainly agree that the Supreme

25   Court required that individuals subject to the proclamation

1    must receive notice, quote, within a reasonable time and in

2    such a manner as will allow them to actually seek habeas relief

3    in the proper venue before such removal occurs, end quote,

4    right?

5           MR. KAMBLI:  Yes, Your Honor.  That was prospective,

6    from that moment onward.

7           THE COURT:  And how -- so you're saying that -- that

8    this is prospective, but, remember, the Supreme Court doesn't

9    say this in connection with the AEA, they said it's a

10   constitutional violation.

11          So how is that prospective?

12          MR. KAMBLI:  Yes, Your Honor.  I was just noting that

13   the 12-hour notice was provided after that Supreme Court

14   ruling.

15          THE COURT:  Right.  So, right.  I'm sorry.

16          So you're -- you are not disagreeing that these folks

17   did not get due process before they were transferred to CECOT?

18          MR. KAMBLI:  Your Honor, they got some notice.  I'm

19   not sure the precise contours of that, but it wasn't the 12

20   hours that we are providing at this moment.

21          THE COURT:  Okay.  But -- so if it wasn't even

22   12 hours, you're not going to stand here and say they received

23   due process.

24          MR. KAMBLI:  So, Your Honor, some people did

25   challenge it, as did the named plaintiffs in this case, but I

1    can't say that it was the same as what they're getting right

2    now.

3    THE COURT:  All right.  So in other words, so if they

4    didn't receive due process, then there was a violation.  So

5    transferring them to CECOT without the due process that the

6    Supreme Court said was required meant that you violated their

7    rights; fair?

8    MR. KAMBLI:  So, Your Honor, I don't know if I would

9    frame it in those terms, but they are able to challenge their

10   status right here in this case, if that were -- that is the

11   whole point of this proceeding.

12   THE COURT:  Okay.  So what -- so what remedy then,

13   if -- if, again, assuming I find constructive custody, and --

14   and you've essentially admitted that their rights were

15   violated, so what's their remedy?  That they get to file a

16   habeas claim here?  And so do we have individualized hearings

17   to see if they are TDA members?

18   MR. KAMBLI:  So, Your Honor, the precise contours of

19   that would have to be spelled out.  But they do get an

20   opportunity to challenge, if the Court were to find there was

21   jurisdiction.  So it doesn't necessarily end the inquiry.

22   THE COURT:  All right.  And also -- I mean, again,

23   the AEA now, as Mr. Galernt points out, we've got a judge in

24   the Southern District of New York, a judge in the District of

25   Colorado, a judge in the Southern District of Texas, as well as

1    Judge Henderson in our Circuit, all finding that invasion and

2    predatory incursion have military connotations, and as a result

3    the proclamation did not properly invoke the AEA.

4         You agree that that's -- that's where things stand,

5    right?

6         MR. KAMBLI:  Yes, Your Honor.  That is what the

7    judges ruled.

8         THE COURT:  And I know that -- I know your clients

9    continue to maintain that the Supreme Court held that the

10   AEA -- upheld the proclamations invocation of the AEA, but you

11   agree the Supreme Court never did that, right?

12        MR. KAMBLI:  So, Your Honor, the Supreme Court says

13   that it's largely immune from judicial review, outside of

14   questions of interpretation and constitutionality.  So we don't

15   believe that that -- we believe that's a very limited review,

16   in addition to determining whether each individual fits the

17   description.

18        THE COURT:  Right.  But my question was:  The Supreme

19   Court never said that the AEA could -- was properly invoked by

20   the proclamation.

21        MR. KAMBLI:  Your Honor, the Court, I believe, said

22   that they didn't get to that question.

23        THE COURT:  Right.  Correct.

24        MR. KAMBLI:  But they did say that it's largely

25   precluded from legal review.  So the question then becomes what

1    is the appropriate legal review, which we believe that

2    the Court's --

3            THE COURT:  But if your clients are -- have been

4    saying publicly -- and, again, part of this hearing, I trust,

5    is to try to make difficult issues plainer to the public.

6            But to the extent they're claiming that the Supreme

7    Court upheld the invocation of the AEA in the proclamation,

8    that is incorrect?

9            MR. KAMBLI:  So, Your Honor, it does stay -- it did

10   allow the proclamation to take effect, which -- which did

11   happen as a result of the stay.

12           THE COURT:  Okay.  Maybe I'll then read it since --

13   maybe to refresh your recollection, I'll read the quote for

14   you.

15           Quote, They -- meaning the petitioners -- challenged

16   the government's interpretation of the act -- that's the AEA --

17   and assert that they do not fall within the category of

18   removable alien enemies, but we do not reach those arguments,

19   end quote.

20           So doesn't that mean the Supreme Court did not

21   decide, one way or the other, about the -- the validity of the

22   proclamations invocation of the AEA?

23           MR. KAMBLI:  So, Your Honor, they did have that line,

24   though, that there is very limited review.  So with that

25   caveat, we do agree that they did not analyze that precise

1    issue.

2              THE COURT:  Okay.  I assume that's a yes.

3              Okay.  So moving -- so is your position here that all

4    these judges are just wrong and that -- and that the

5    proclamation did validly invoke the AEA?

6              MR. KAMBLI:  Well, Your Honor, there's a few issues

7    with that.  So, first, obviously, we have had a number of cases

8    where a number of district court judges came out one way and

9    the Supreme Court came out another, so it is still --

10             THE COURT:  Well, you keep saying the Supreme Court

11   came out another way.  The Supreme Court did not address --

12             MR. KAMBLI:  I didn't mean in this case, Your Honor.

13             THE COURT:  Okay.

14             MR. KAMBLI:  I meant in other cases.

15             So just because there were some District Court

16   decisions, there is still a process for what the ultimate

17   answer will be on that issue.

18             THE COURT:  I agree that that -- I'm not asking you

19   to throw in the towel on that, I'm going to -- but it's also

20   Judge Henderson from the Circuit, who I certainly have to pay

21   attention to here, but I trust -- so you're -- I trust your --

22   you believe that your stronger argument is the justiciability

23   argument, not the -- not the interpretation of the AEA?

24             MR. KAMBLI:  No, Your Honor.  We do believe that we

25   are correct on the merits of that as well, otherwise we

```
 1    wouldn't have made that argument and had the proclamation.

 2           So, first is the justiciability issue and what can be

 3    considered -- and I don't want to rehash everything in the

 4    brief, since we did make our arguments there -- but one of the

 5    key issues is whether courts are second-guessing the

 6    President's factual determinations as to whether the

 7    prerequisites are met, which if they are doing that, that is

 8    already going past the point where it's justiciable because the

 9    political question doctrine forecloses review for two reasons.

10    One, it's in the area of foreign affairs and immigration where

11    POTUS's power is at --

12           (Reporter interruption.)

13         MR. KAMBLI:  -- where the President's power is at its

14    zenith and, two, there are no judicially manageable standards.

15           So I don't want to keep hammering the point since

16    it's all in the brief, but what we do believe is that the

17    statutory preconditions being met are not justiciable issues.

18         THE COURT:  Okay.  All right.  Thank you.

19         We'll move on to remedy, Mr. Galernt.

20         Okay.  So I want to talk a little bit about this.  So

21    let's assume, both counsel for a minute, that I find

22    constructive custody and that I find a violation.  I have

23    different options in such a circumstance.  One is to ask the

24    government:  What do you propose to do?  But I'd like to chat a

25    little bit about that in case I get to that point.
```

1              So, for the CECOT class, you know, you've said a

2       number of times that the remedy is to order the government to

3       facilitate their return.  Now, there are also other options, it

4       would seem, that the government may have here, including giving

5       appropriate notice and hearing while in CECOT, putting --

6       moving them from CECOT to Guantanamo or some other facility

7       that's not in the homeland, so to speak.

8              So would you -- would you agree that if I make those

9       precondition findings, then we're back in INA land because --

10      and, I'm sorry, I meant -- to the extent I said anything about

11      an AEA hearing under -- that obviously wouldn't be the case

12      because that -- the AEA would be gone.  So the only source of

13      holding would be INA, and that would be the procedures they

14      would have to offer.  But what would those entail, from your

15      perspective?

16             MR. GALERNT:  So all of the individuals here are --

17      were in immigration proceedings, that's why they're using, as

18      Your Honor knows, the AEA to take them out of immigration

19      proceedings.  And we don't know all of the individuals, but

20      most of them were applying for some form of protection, whether

21      it be asylum, withholding of removal, or convention against

22      torture, so...  And then there are other forms of relief.

23             So I think if they were brought back and put back in

24      immigration proceedings, they would go through their

25      immigration proceedings.  If they prevailed, then, you know,

1      they would get whatever protection is available under the

2      immigration laws.  It might be that their removal is

3      temporarily suspended, unless another country is willing to

4      take them.  It could be that it's permanently suspended.

5              But if they didn't prevail, they would be removed.

6      And I think Your Honor has stressed that over and over for the

7      last weeks, that nothing about this case prevents them from

8      being removed, if they don't prevail in their immigration.

9              So I think that's where we are.  I think that -- that

10     would be our understanding, is that they would be put back in

11     the place they were, which is immigration proceedings, because

12     the Alien Enemies Act can't be invoked properly.

13             THE COURT:  I'm not asking you to spell all of this

14     out concretely.

15             MR. GALERNT:  Yeah.

16             THE COURT:  Because if we get to that stage, I would

17     certainly give the government the opportunity to do so first.

18             But what would -- what would that look like on the

19     ground, if it were -- if it were not returning them all to the

20     detention facilities in the United States?

21             MR. GALERNT:  Right.  So, I think it's a nonstarter

22     that it could go on at CECOT, or even in El Salvador.  That

23     seems like a nonstarter.

24             I just want to deal with Your Honor's hypothetical

25     about Guantanamo.  We have control over Guantanamo.  I think we

1    would need to be able to visit them.  I don't know how they

2    would engage in their immigration proceedings without us being

3    able to talk to them and help them through their immigration

4    proceedings.  There would have to be video.  I think it would

5    be probably harder for the government, harder for everyone to

6    hold them at Guantanamo.

7              I don't want to say that the Alien Enemies Act

8    precludes that, but I think Your Honor would have to take

9    serious steps to facilitate counsel visiting there and to

10   ensure that they actually got proper immigration proceedings.

11             THE COURT:  All right.  Thank you.

12             So, Mr. Kambli, again, I'm not asking you to spell

13   everything out at this point either because I don't know if

14   we're going to get there, but if we do and I found constructive

15   custody and I found the proclamation didn't validly invoke the

16   AEA, then what options do you believe you have, beyond

17   returning them to the U.S.?

18             MR. KAMBLI:  So, Your Honor, we would have to brief

19   that further in consultation with State, if it got to that

20   point, since there are -- there are a lot of issues with that.

21   And, yeah, and I don't mean to say that one particular -- when

22   I was stating that they challenged it, I didn't necessarily

23   mean that that's the avenue.  But that also shows the issues

24   with constructive custody, if they are at CECOT under the

25   control of another country and then there are all these

1    alternate arrangements made.  That goes towards the question of

2    whether we truly have constructive custody over these

3    individuals, which should be thought about before the thought

4    of remedy.

5              THE COURT:  Okay.  All right.  I'm going to have you

6    stay up there for a second.

7              So here's what I am going to do:  I am going to

8    order -- I think plaintiffs may well have sufficiently made out

9    a case for constructive custody, but I think additional facts

10    would be helpful for me.  So what I'm going to do, I'll issue

11    an order tomorrow explaining the contours of a brief order

12    regarding constructive custody.

13              I will give you, Mr. Kambli, as you sought, an

14    opportunity to file any further declarations from the State

15    Department or anyone else regarding the constructive custody

16    issue, and I'll give you until the end of the day Friday to do

17    that.  So, again, even though my order won't issue until

18    tomorrow morning, I'm telling you what -- you can get a start

19    on that now.

20              Okay.  Thanks.  You may have a seat.

21              Then, Mr. Galernt, what I'll do is I'll give you

22    until Monday to -- having reviewed that, to say this is enough,

23    or we want more and this is what we propose, this is the

24    discovery we propose.  And it would have to be -- if it is

25    interrogatories, if it is document requests, if it is

1    depositions, I want to know specific interrogatories, requests,

2    deponents.

3              MR. GALERNT:  Understood, Your Honor.

4              THE COURT:  And, again, I would -- this would be a

5    cabined, expedited proceeding.

6              MR. GALERNT:  Understood, Your Honor.

7              THE COURT:  By Monday.  And then I will give the

8    government until Wednesday -- and I'll put this all in an

9    order, too -- to give their responses on whether they have any

10   objections to what the plaintiffs propose.  We'll then -- I

11   will then issue an order the next day saying this is what I'm

12   ordering and this is the timeframe, which will be compressed.

13   Then, I will order each side to file a supplemental brief

14   regarding the facts that have been adduced since today and how

15   each side believes those affect the constructive custody

16   question.  Again, on a fairly short timeframe.

17             And after that, I will issue my opinion, which will

18   resolve the constructive custody question.  And if I believe

19   there is such custody, I will move on to the -- assessing

20   whether a violation has occurred.  If I do find that, I won't

21   order the remedy, I'll give the government a chance to talk

22   about that.  This opinion will also address the class

23   certification, and that includes the criminal custody class.

24             Any questions about that procedure, Mr. Galernt?

25             MR. GALERNT:  Not from petitioners, Your Honor.

```
 1                  THE COURT:  Mr. Kambli?

 2                  MR. KAMBLI:  No, Your Honor.

 3                  THE COURT:  Okay.  Thanks, everybody.  Appreciate

 4     your being here late today.  My trial required our flexibility.

 5                  Thank you.  Have a nice evening.

 6                            *   *   *

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4     foregoing constitutes a true and accurate transcript of my

5     stenographic notes and is a full, true and complete transcript

6     of the proceedings to the best of my ability.

7                         Dated this 8th day of May, 2025

8

9

10                         /s/_____

11                         Janice E. Dickman, CRR, CMR, CCR
                           Official Court Reporter
12                         Room 6523
                           333 Constitution Avenue, N.W.
13                         Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25