**EXHIBIT 1**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LIYANARA SANCHEZ**, as next friend on Behalf of **FRENGEL REYES MOTA**, et al.,<br><br>Petitioners-Plaintiffs,<br><br>**J.G.G.**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD J. TRUMP**, in his official capacity as President of the United States, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Case No: 1-25-cv-00766-JEB** |

## [PROPOSED] MOTION TO UNPROCEED UNDER PSEUDONYMS

Pursuant to his qualified First Amendment right of access to judicial records and also his common law right of access to judicial records, Intervenor Paul M. Dorsey ("Dorsey") moves to have this court revoke its two previous orders that granted Plaintiffs and Petitioners-Plaintiffs the right to proceed under pseudonyms in order to enable Dorsey's access to their full names.

Specifically, this court's Minute Order of March 15, 2025 (no ECF number issued) granted Plaintiffs Motion to Proceed Under Pseudonyms (ECF# 2) and this Court's Memorandum Order and Opinion of May 8, 2025 (ECF #117) granted Petitioners-Plaintiffs' Motion to Proceed Under Pseudonyms (ECF #113).

All five Plaintiffs are proceeding under pseudonyms: J.G.G.; G.F.F.; J.G.O.; W.G.H.; and J.A.V. Relative Petitioners-Plaintiffs (e.g. – those petitioners-plaintiffs and/or their next friends seeking anonymity) are D.A.R.H, (as next friend of Andry Jose Hernandez Romero); M.Z.V.V., as next friend on behalf of J.A.B.V.; M.Y.O.R., as next friend on behalf of M.A.O.R.;

M.M.A.A., as next friend on behalf of G.A.A.A.; M.R.M.; and T.C.I.[1]  Two Petitioners-Plaintiffs are identified by name: Frengel Reyes Mota and Jose Hernandez Romero.  Three next friends are also identified by name:  Liyanara Sanchez; Dorys Mendoza; and attorney Eylan Schilman.  Of the fourteen people, five are named and nine are anonymous.  In support of this motion to unproceed under pseudonyms, Dorsey states the following:

## 1.  BACKGROUND

This is a case brought by twelve foreigners rounded up under the invasion clause of the Alien Enemies Act pursuant to President Donald J. Trump's Proclamation of March 14, 2025 (see "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua" (available at *https://perma.cc/ZS8M-ZQHJ*)).  By all accounts, this is only the fourth time in our nation's history that the Alien Enemies Act of 1798 ("AEA") has ever been invoked.  More importantly, this is the <u>first</u> time the AEA has been invoked pursuant to its invasion clause.  Likewise, the plaintiffs' attempt to challenge their removal under pseudonyms was - and is - a matter of first impression for this Court.

Dorsey's first "theory of the case" is that on March 14-15, 2025, Plaintiffs' priority was on keeping themselves physically in America.  They used what precious little time they had to draft their Complaint (ECF #1) and their three page Emergency Application for a TRO (ECF #3) along with its 26 page supporting memorandum of law (ECF #3-2) in order to stop the transport flights.

---

[1] Petitioner / Next Friend D.A.R.H. does not appear to have been included in the list of parties actually moving for permission to proceed under pseudonym, nor in the discussion portion of the supplemental motion (see ECF #113).  However, the court ordered "All parties shall use the pseudonyms listed in the Amended Complaint [ECF #101] in all documents filed in this action" ECF #117, Memorandum Opinion and Order, May 8, 2025, ¶2 on page 6.

The memorandum of law is supported by six declarations and/or affirmations (see ECF #3-3 thru #3-8). In its 26 pages, the memorandum of law references those six declarations 77 times. Both the Memo and its six supporting declarations are clearly customized to the rapidly unfolding circumstances of the time; namely, the specter (from the plaintiffs' perspective) of removal from the US via the Alien Enemies Act ("Plaintiffs and the proposed class are [in] imminent danger of being removed tonight or early tomorrow morning under the Alien Enemies Act" (Motion for TRO, ECF 3-2 at 1. **Bolding** removed).

And both the Memo and its six supporting declarations are clearly "in sync" with each other: meaning not only does the Memo reference the six declarations 77 times, but the contents of the six declarations actually offers relevant evidentiary support for the Memo's more pedestrian claims (e.g. – plaintiff "x" is from Venezuela; plaintiff "x" has applied for asylum; the reason why plaintiff "x" has applied for asylum (otherwise unsupported alleged fear of being killed, otherwise unsupported alleged political views, otherwise unsupported alleged gender dysphoria, otherwise unsupported alleged victimization from criminal gangs, etc.); descriptions of the recent transfers of plaintiff "x" within the federal system, etc.).

In contrast, the Motion to Proceed Under Pseudonyms (filed the same day as the Complaint and the TRO Motion) (*see* redacted version, ECF #100) was apparently a much lower priority. Dorsey suspects Plaintiffs, driven by extreme time constraints, simply took a pre-existing motion template that had been originally drafted for use by foreigners who were appealing asylum denial decisions and submitted that motion in this action challenging their removal under the Alien Enemies Act.

Dorsey's suspicion is supported by three sets of hard mathematical facts. The first hard set of mathematical facts is that the 26 page Memo (ECF #3-2) mentions "Alien Enemies Act"

eight (8) times and "AEA" sixty-one (61) times; but only mentions "asylum" 20 times. Combined, it's a 69 to 20 (or 3.45 to 1) usage ratio of "AEA" to "asylum." In contrast the (suspected) refashioned 23 page Motion to Proceed Under Pseudonyms mentions "Alien Enemies Act" exactly one (1) time and "AEA" exactly zero (0) times; but mentions "asylum" thirty one (31) times (a combined 1 to 31 usage ratio of "AEA" to "asylum").

The second set of hard mathematical facts is that while the 26 page Memo (ECF #3-2) references its supporting declarations seventy seven (77) times, the 23 page Memo (ECF #100) references its "supporting" declarations exactly zero (0) times.

The third set of hard mathematical facts is that the five declarations filed with the Motion to Proceed Under Pseudonyms (see ECF #100 at ECF pgs 11-23) were identical to five of the six declarations supporting the Memo (ECF #3-3 thru ECF #3-8). Compare J.G.G. (ECF #100 at ECF pgs 11-12 with ECF 3-3); G.F.F. (ECF #100 at ECF pgs 20-23 with ECF 3-4); W.G.H. (ECF #100 at ECF pgs 13-17 (two declarations) with ECF 3-6 and ECF 3-7); J.A.V. (ECF #100 at ECF pgs 18-19 with ECF 3-8). (The missing declaration in the Motion to Proceed Under Pseudonyms was for J.G.O. (also known as "J.L.G.O." (see ECF #3-5))).

Dorsey presents his first "theory of the case" to the Court to explain why the Plaintiffs' Motion is so deficient. Dorsey explains how the Plaintiffs' Motion is so deficient further below. Dorsey's second "theory of the case" is that the motivation for both motions to proceed under pseudonyms is that counsel does not want to be embarrassed by their clients' life histories. This second "theory of the case" will not be further developed.

## 2. INTRODUCTION

Dorsey is challenging the plaintiffs' pseudonym status because neither of this court's orders granting pseudonym status to the plaintiffs gave proper consideration (if any) to the

historic role of the AEA and how it should be weighed in the court's decisions. Instead, the orders were based on past, inapposite, asylum-seeking cases. In addition, on a more mundane level, the court's March 15, 2025 Minute Order is woefully insufficient in justifying pseudonym status of the original five plaintiffs.

Furthermore, given the world-wide dissemination of the list of 238 names of the people removed to the CECOT facility in El Salvador, the recently added petitioners have already been effectively publicly identified by their counsels' inexplicable decision to refer to them by their initials instead of the more generic "Enemy Alien #1, Enemy Alien #2, etc." Finally, NONE of the petitioners' "next friends" have expressed <u>any</u> concerns about their own personal safety that could be used to justify their own pseudonym status.

Dorsey is a native born citizen of Connecticut who is concerned that courts are fairly run and that their proceedings and records are open to the public. Over the years, Dorsey has acted from time to time on his concerns by exercising his rights to object to litigants' attempts to seal various filings in federal and state courts. He has also intervened to challenge numerous sealing orders issued by various courts.

In Connecticut Superior Court, Dorsey has filed numerous objections (see HHD-CV15-6066060-S, *Johnson, Robert II, v. Bank of America, et al*; HHD-CV-16-6067796 *Boone, Geralynn, Executrix v. Boehringer Ingelheim Pharmaceuticals, Inc., el al*; and HHD-CV-17-6079494-S, *Bragoni, Federico, et al v. Francalangia, Carl, et al*). In the *Bragoni* case, Dorsey successfully appealed an unfavorable decision in the Superior Court to the Appellate Court (see AC 182090 *Federico Bragoni et al. v. Carl Francalangia et al*).

In the U.S. District Court for the District of Colorado, Dorsey has filed numerous objections to motions to restrict access filed by parties (see *Martensen v. Koch*, 2013-cv-2411

(doc 231); *Phelps Oil and Gas, LLC v Noble Energy, Inc. et al*, 2014-cv-2604 (doc 193); *Long v. Wyss*, 2014-cv-3200 (doc 20); *Antero Resources Corp. v. South Jersey Resources Group, LLC*, et al, 2015-cv-0656 (doc 182); and *Turnkey Solutions Corp. v. Hewlett-Packard Company*, 2015-cv-1541 (doc 174)).

More recently, Dorsey filed a motion to intervene for the limited purpose of unsealing all warrant material in the criminal case involving the FBI search of President Trump's residence at Mar-a-Lago, Florida (see *USA v. Sealed Search Warrant*, 9:22-mj-08332-BER, doc 52, filed August 15, 2022) and unsuccessfully appealed the magistrate judge's order denying that intervention (see USA v. Dorsey, USCA11, Case 22-12708).

### 3. LEGAL STANDARDS

### A.    THERE IS A QUALIFIED FIRST AMENDMENT RIGHT OF ACCESS TO JUDICIAL RECORDS, INCLUDING THE IDENTITIES OF THE PARTIES.

**The Constitutional Right Of Access Applies To Habeas Proceedings And Their Records**

The First Amendment's express guarantees of "free speech, freedom of the press, and the right to petition the government carry with them an implicit right of public access to particular government information." *Dhiab v. Obama*, 70 F. Supp. 3d 486, 492 (D.D.C. 2014), citing *Richmond Newspapers Inc. v. Virginia*, 448 U.S. 555, 575-76 (1980). This right of access is based upon "the common understanding that a major purpose of [the First] Amendment was to protect the free discussion of government affairs . . . to ensure that the individual citizen can effectively participate in and contribute to our republican form of self-government." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (internal quotation marks and citations omitted).

The Supreme Court has developed a so-called "experience and logic" test to determine

where the constitutional access right applies. *Press-Enterprise v. Superior Ct*, 478 U.S. 1, 9.

("*Press-Enterprise II*").  Under the two-part test, the constitutional right of access attaches to a

government proceeding if "the place and the process have historically been open to the press and

general public" and public access "plays a significant positive role in the function of the

particular process." *Id* at 7-8 (experience and logic confirm right of access to pre-trial hearing);

see also 464 U.S. 501 *Press Enterprise v Superior Ct* (1984), 464 U.S 501, 505-10 ("*Press-*

*Enterprise I"*) (experience and logic confirm access right to jury voir dire).

      Once the right is determined to apply to a type of government proceeding, the right

necessarily extends to those records that are fundamental to the proceeding. *See, e.g., Hartford*

*Courant Co. v. Pellegrino*, 380 F.2d 83, 96 (2d Cir. 2004) ("[D]ocket sheets enjoy a presumption

of openness and [ ] the public and the media possess a qualified First Amendment right to inspect

them").  It is now firmly settled that wherever the right attaches, "[t]he first amendment

guarantees the press and the public a general right of access to court proceedings and court

documents unless there are compelling reasons demonstrating why it cannot be observed." *Wash.*

*Post Co. v. Robinson*, 935 F.2d 282, 287.

      This court (CJ Hogan and J. Sullivan) has already used the First Amendment access right

in another habeas corpus case. *See Zayn al Abidin  Muhammad Husayn v Lloyd Austin, et. a.l.,*

case 1:08-cv-1360. (*See also In re Guantanamo Bay Detainee Litigation*, 624 F. Supp. 2d 27

(D.D.C. 2009)) Mr. Husayn, more commonly known as Abu Zubaydah ("Zubaydah"), is the first

individual alleged to have been subjected to enhanced interrogation techniques in the aftermath

of 9/11, on the direct approval of high-ranking government officials.

      In 2009, the Associated Press, New York Times, and USA Today (the "Press

Interveners") sought to intervene in the case for the limited purpose of opposing a motion by the

Government to designate all information in its factual returns in all Guantanamo proceedings as "protected" from public disclosure. *See* 08-cv-1360*id*, Mot. to Intervene, Dkt. 90. Then Chief Judge Hogan recognized that disclosure of the factual returns would "play a significant positive role" and would benefit both parties because "[t]he government's detention decisions would gain the legitimacy that accompanies transparency." Dkt. 173, at 16. Chief Judge Hogan held both that (a) the press had standing to intervene and enforce public access rights, and (b) the First Amendment and common law access rights apply to the judicial records of the habeas proceeding. See ECF #173 at 11, 17, 18-19.

The DC Circuit later reversed Chief Judge Hogan's opinion, but as Judge Sullivan explained in a much later order/opinion (ECF #645, filed June 27, 2023) ("The panel was unanimous in reversing the district court, but divided on whether the First Amendment guarantees a right of public access to classified documents filed in Guantanamo Bay habeas corpus proceedings. [ ] Accordingly, the Court will assume a qualified First Amendment right of access to the classified information for the purpose of this motion and will evaluate whether the Government has met its burden under the *Press-Enterprise II* standard"). Footnote omitted.

Other courts have similarly applied the First Amendment standard to habeas cases. *See also Newman v. Graddick*, 696 F.2d 796, 801 (11th Cir. 1983) (applying the First Amendment right of access to proceedings challenging "conditions of confinement"); *Osband v. Ayes*, 2007 WL 3096113, at *1 (E.D. Cal. Oct 22, 2007) (applying constitutional right to habeas proceeding); see also, *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring) ("Secrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges").

Indeed, openness improves the functioning of habeas proceedings in all the same ways it improves other trial-type proceedings, and is especially important in the habeas context where an individual's liberty is at stake. See *Omar v. Harvey*, 514 F. Supp. 2d 74, 78 (D.D.C. 2007) ("There is no higher duty of a court, under our constitutional system, than a careful processing and adjudication of petitions for writs of habeas corpus." (quoting *Harris v. Nelson*, 394 U.S. 286, 292 (1969)).

## B.    THERE IS ALSO A QUALIFIED COMMON LAW RIGHT OF ACCESS TO JUDICIAL RECORDS, INCLUDING THE IDENTITY OF THE PARTIES.

Courts have also upheld access to habeas records under common law which provides an independent basis for relief. See *Gabrion v. United States*, No. 1:15-CV-447, WL 2354745, at * 1 (W.D. Mich. May 15, 2015) (applying common law right); *Ashworth v. Bagley*, 351 F. Supp. 2d 786, 792 (S.D. Ohio 2005) (same). But because the First Amendment right applies, and is more protective than the common law, the Court need not separately consider the common law right. *United States v. Erie Cnty.*, 763 F.3d 235, 241 (2d Cir. 2014).

"In addition to the First Amendment right of access to judicial records, the Supreme Court has recognized a common law right "to inspect and copy judicial records*." Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); see  also *In re NBC*, 653 F.2d 609, 612 (D.C.Cir.1981). Although courts traditionally avoid constitutional questions if adequate statutory or common law relief is available, our Court of Appeals has made clear that courts should look first to the Constitutional right of access where judicial records are at issue. *Washington Post v. Robinson*, 935 F.2d 282, 288 n.7 (D.C.Cir.1991) ("Appellant also claims that there is a common law right of access to court records and documents. Like our sister circuits, however, we reach the constitutional issues raised in the appeal because of the different and

9

heightened protections of access that the first amendment provides over common law rights"). Because the Court finds that Intervenors have a Constitutional right of access to the videotapes at issue, it need not reach Intervenors' common law claim." *Dhiab v. Obama*, 70 F.Supp.3d 486, 491-492(?) n. 2 (D.D.C. 2014).

## C.   THE BURDEN IS ON THE PLAINTIFFS AND PETITIONER-PLAINTIFFS TO DEMONSTRATE A LIGITIMATE BASIS FOR PROCEEDING UNDER PSEUDONYMS.

". . . [I]t is the litigant seeking to proceed under pseudonym that bears the burden to demonstrate a legitimate basis for proceeding in that manner.'" *Sandberg v. Vincent* 319 F. Supp. 3d 422, 426 (DC Cir. 2018) (quoting *Qualls v. Rumsfeld* , 228 F.R.D. 8, 13 (D.D.C. 2005)

## D.   THE FIVE FACTOR *JAMES* TEST VERSUS THE SECOND CIRCUIT'S TEN FACTOR TEST

The D.C. Circuit applies the five-factor *James* test, as first described in *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993) ("This Court shall join others in this Circuit that apply the five-factor *James* test") *Sandberg v. Vincent* 319 F. Supp. 3d 422, 426 (DC Cir. 2018): "[1] [W]hether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; [2] whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; [3] the ages of the persons whose privacy interests are sought to be protected; [4] whether the action is against a governmental or private party; and, relatedly, [5] the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously." *Id*

However, the D.C. Circuit ha[s] no quarrel with the use of the Second Circuit's ten factor list "which encompasses the five factors from *James*, as long as these factors inform the ultimate

balancing of the public and private interests at stake." *In re Sealed Case*, 931 F.3d 92, 97 (D.C. Cir. 2019).

The Second Circuit's ten factor list first invoked in *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2nd Cir. 2008). Relevant factors are as follows:

(1) - (5) [Not shown]. (6) whether the defendant is prejudiced by allowing the plaintiff to press his claims anonymously, whether the nature of that prejudice (if any) differs at any particular stage of the litigation, and whether any prejudice can be mitigated by the district court; (7) whether the plaintiff's identity has thus far been kept confidential; and (8) - (10) [Not shown].

## E.  THE FIVE FACTOR *JAMES* TEST IS NON-EXHAUSTIVE.

"We continue to think those five [James] factors serve well as guidepost from which a court ought to <u>begin</u> its analysis." *In re Sealed Case*, 931 F.3d 92, 97 (D.C. Cir. 2019).

## 4. ARGUMENT

## 1.  THE COURT'S MINUTE ORDER IS WOEFULLY INSUFFICIENT OF D.C. CIRCUIT STANDARDS REQUIRED TO JUSTIFY PSEUDONYM STATUS.

On March 15, 2025, this Court issued a Minute Order granting the plaintiffs' motion to proceed under pseudonyms. The entire entry (no ECF number issued, but listed immediately after ECF #5) on the docket states:

> "MINUTE ORDER granting 2 SEALED MOTION to Proceed Under Pseudonym. The Court has reviewed Plaintiffs' [ECF #] 2 Motion to Proceed Pseudonymously. Given the expedited nature of this matter, it determines that a full Opinion is not practical at this time. Believing the Plaintiffs have made the required showing on the relevant factors, the Court ORDERS that: 1) Their [ECF #] 2 Motion is GRANTED; and 2) They shall be permitted to proceed pseudonymously unless and until the assigned judge determines otherwise." [brackets added].

Minute Order of March 15, 2025 (follows ECF #5)

There are three fatal problems with this Minute Order.  Before analyzing those problems, this Movant will pause to note that he is aware that the Court issued the order under extreme time pressure and is no doubt aware of the Order's deficiencies.  Moving on, then, the first fatal problem is that the criteria used by the district court is wrong, since it is clearly relying solely on what the Plaintiffs showed, without balancing what was shown against the countervailing interest in open judicial proceedings.  The order plainly states that the " . . . Plaintiffs have made the required showing on the relevant factors."  Well, whatever the facts and/or circumstances that the plaintiffs showed, those facts and circumstances needed to be balanced against the countervailing interests of public disclosure:  " . . . we hold that the appropriate way to determine whether a litigant may proceed anonymously is to balance the litigant's legitimate interest in anonymity against countervailing interests in full disclosure" *In re Sealed Case*, 931 F.3d 92, 96 (D.C. Cir 2019).

The second fatal problem with the Minute Order is that it doesn't even list out the "relevant factors" that were considered by this court.  "[W]e review a court's application of those criteria only for an abuse of discretion.  In so doing we must consider 'whether the decision maker failed to consider a relevant factor [or] relied on an improper factor, and whether the reasons given reasonably support the conclusion'" *id* (second "[ ]" in the original).

The third fatal problem with the minute order is that it doesn't provide <u>any</u> reasoned analysis of the relevant factors that were actually considered by this court (it is, after all, a minute order).  The Minute Order was issued early on the morning of March 15, 2025.  The expedited nature of the plaintiffs' situation make the lack of a reasoned opinion understandable.  But it's been almost <u>three</u> months since that Minute Order was issued.  Admittedly, that is not a long time for a normal case, but this case has spawned <u>three</u> appeals to the D.C. Circuit (See 25-

5067, 25-5068 and 25-5124) and <u>two</u> applications to the Supreme Court (one of which was accepted - see 24A931) in under sixty five days. Furthermore, this case is likely headed for a third trip to the Supreme Court, regardless of how this case is ultimately decided in this court and then again in the D.C. Circuit. Despite the passage of almost three months' time, this Court has still not issued a "full Opinion" properly explaining the pseudonym status of the original Plantiffs.

This Movant notes that this Court <u>did</u> issue a Memorandum Opinion and Order on May 8, 2025 (ECF # 117) ("Opinion") (discussed further below at pages 31-35) that granted the new Petitioners-Plaintiffs ("Petitioners") pseudonym status. But a careful reading of that 5 ¼ page Opinion shows that its analysis exclusively deals with the new Petitioners and not with the original Plaintiffs.

True, that Opinion makes two fleeting references to the original Plaintiffs: "Most of those Petitioner-Plaintiffs and their next friends now seek to proceed pseudonymously, the same as the original Plaintiffs to this suit." (Order at 1); and "[t]hat tally resolves the matter in Petitioners' favor and accords with this Court's prior grant of the original named Plaintiffs' request for pseudonymity." (Order at 5). Those two fleeting references to the original Plaintiffs can not be seen as incorporating the Opinion's analysis to the Plaintiffs so as to buttress the judicial viability of the Minute Order.

Together or standing alone, the three fatal problems with the Minute Order means the plaintiffs should not be allowed to continue under pseudonyms (assuming, of course, that the Minute Order continues to stand alone, without a newly drafted supporting opinion).

## 2.    THE PLAINTIFFS' MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYMS SHOULD BE DENIED OR REVOKED.

The Minute Order, for all its glaring shortcomings, was based on a review of Plaintiffs'

Motion to Proceed Under Pseudonyms (see sealed ECF #2 and its redacted, public version, ECF

#100) ("Plaintiffs' Motion #1"). A review of that Motion is therefore in order. So, first a brief

introductory overview of the Motion, then a discussion of some troubling items in the Motion to

highlight its shortcomings, then a more structured review of the Motion under the five factor

*James* test (along with a couple of relevant factors from the 2nd Circuit's ten factor test).

## A.  Introductory Overview to Plaintiffs Motion to Proceed Under Pseudonyms.

Plaintiffs opening sentence states that "Plaintiffs are five asylum seekers who have

suffered past persecution in Venezuela." This is a half-truth: Plaintiffs are accused Alien

Enemies who have each made asylum claims, the underlying details of which are irrelevant to

any judicial review of their removal proceedings under the AEA[2]. *See Trump v. J.G.G.*, 604 U.

S. ____ , _____ (2025) No. 24A931 ("Although judicial review under the AEA is limited, we

have held that an individual subject to detention and removal under that statute is entitled to "

'judicial review' " as to "questions of [1] interpretation and [2] constitutionality" of the [AEA] as

well as [3] whether he or she "is in fact an alien enemy fourteen years of age or older"). (internal

citations omitted) [brackets added].

Plaintiffs opening paragraph "ask[s] this Court to grant them leave to proceed under

pseudonyms for the following reasons: (1) the complaint filed contemporaneously with this

motion and subsequent pleadings will contain sensitive, personal information, including details

of their asylum claims and of Plaintiffs' current whereabouts; (2) Plaintiffs face imminent

removal from the United States to Venezuela; (3) Plaintiffs are at risk of harm in Venezuela;

[and] (4) Plaintiffs fear that should their information become public, including the government's

---

[2] While the fact that the Plaintiffs' have all filed asylum claims is relevant to Plaintiffs case, the actual underlying details of those asylum claims is not relevant to the AEA challenge.

unsubstantiated allegations that they are members of Tren de Aragus, they would likely become victims of retributive violence in Venezuela"

Reason 1 will be analyzed further below under the first *James* factor (see below, pages 20-24); Reason 2 was admittedly a valid concern of the Plaintiffs at the time of the motion's filing in mid March, but is no longer relevant due to various TROs, the Supreme Court ruling requiring due process to the alien enemies (i.e. – Plaintiffs) and the fact that Plaintiffs are destination bound to the CECOT facility in El Salvador (where they will receive free room and board) and not back to Venezuela.  Reason 2 will not be analyzed further.  Reason 3, whatever its theoretical validity, is likewise no longer relevant and will not be analyzed further.  Reason 4 will be analyzed further below under the second *James* factor (see below, pages 24-29).

**B.  Some Troubling Issues in Plaintiffs' Motion**

**1.**  The most troubling issue in Plaintiffs' motion is its artfully unstated proposition that the weight afforded to the public's interest in these proceedings (where detainees are challenging the Alien Enemies Act in a U.S. District Court) is – or should be - the same weight that is afforded in proceedings where asylum seekers are challenging their removal in an administrative hearing.  Its apples and bowling balls, to quote the Phil Leotardo character in the HBO series *The Sopranos*.

This movant believes the public's interest in openness in AEA removal proceedings is vastly higher than a run-of-the-mill asylum claim.  How much the AEA should be weighed in the balancing of the American public's interest in full disclosure versus the alien enemies interest in privacy is a matter of first impression.

**2.**  The second most troubling issue in Plaintiffs' motion is its inaccurate editing of the second *James* factor that this Court is required to evaluate.  Plaintiffs falsely describe the second

factor as follows: "(2) whether the plaintiff has a reasonable expectation of 'physical or mental harm'" (See ECF #100 at ECF pg 3). Plaintiffs do not cite to *James*. Instead they cite [*Nat'l Ass'n of Waterfront Emp'rs v] Chao*, 587, F. Supp. 3d 90, 99 (D.D.C. 2008). In reality, *Chao* states "(2) whether identification poses a risk of <u>retaliatory</u> physical or mental harm to the requesting party or even more critically, to innocent non-parties; *id* (underlining added).[3]

Plaintiffs presumably knew (or should have known) the critical importance of the adjective "retaliatory" in the court's evaluation: its mentioned in their motion's opening paragraph[4], which lists four reasons to justify plaintiffs being granted pseudonym status. The fourth reason ("Reason Four") states "Plaintiffs fear that, should their information become public, including the government's unsubstantiated allegations that they are members of Tren de Aragua, they would likely become victims of <u>retributive</u> violence in Venezuela." (ECF #100 at ECF pg 2). Underlining added.

**3.** The third most troubling issue in Plaintiffs' motion is its citation to 8 C.F.R. ¶¶ 208.6 and 1208.6. (ECF 100 at ECF pg 6) to prop up its argument for confidentiality. Plaintiffs claim "federal immigration regulations reflect this concern for the sensitivity of asylum applications and the attendant need for confidentiality. Asylum regulations provide for the confidentiality of asylum applicants and credible fear interviewees, including the fact that an applicant has applied for asylum or received a credible fear interview. See 8 C.F.R. §§208.6, 1208.6" *id*

This is a half-truth teetering on outright deception. Federal immigration regulations reflect the overriding, long standing public policy of favoring the American public's interest in

---

[3] The second factor in the *James* five factor test is identical to *Chao's* second factor.
[4] Plaintiffs actually use the phrase "retributive violence" instead of *James'* "retaliatory physical or mental harm." This movant believes the phrases are equivalent. To the extent the Court believes otherwise, Plaintiffs' motion is even more deficient, since that would mean Plaintiffs are not even alleging the proper James factor, let alone proving it.

open courts over the privacy interests of foreigners attempting asylum.  Specifically, 8 C.F.R.

§208.6 states, in relevant part:

> (a) Information contained in or pertaining to any application for . . . asylum,
> . . . under section 241(b)(3) of the Act or, [ ] records pertaining to any
> credible fear determination conducted pursuant to § 208.30, [ ] shall not be
> disclosed without the written consent of the applicant, except as permitted by
> this section or at the discretion of the Secretary.

> (b) The confidentiality of other records kept by DHS . . . that indicate that a
> specific alien has applied for . . . asylum . . . under section 241(b)(3) of the
> Act . . . or has received a credible fear . . . interview [ ] shall also be protected
> from disclosure, except as permitted in this section.

> **(c) This section shall not apply to any disclosure to:**
> > [ ]
> > **(2) Any Federal, State, or local court in the United States
> > considering any legal action:**
> > > [ ]
> **(ii) Arising from the proceedings of which the asylum application, credible
> fear determination, or reasonable fear determination is a part.**

> (d)
> > (1) **Any information** contained in an application for . . .
> > asylum . . . and applicable information supporting that
> > application, any information regarding an alien who has filed
> > such an application . . . **may be disclosed**:
> > > [ ]
> > > (v) As part of any proceeding arising under the
> > > immigration laws, including proceedings arising under
> > > the Act; and

> > > (vi) As part of the Government's defense of any legal
> > > action relating to the alien's immigration or custody
> > > status, including petitions for review filed in accordance
> > > with 8 U.S.C. 1252.

> > (2) If information may be disclosed under paragraph (d)(1) of
> > this section, the disclosure provisions in paragraphs (a), (b),
> > and (c) of this section shall not apply.

8 C.F.R. §208.6 (**Bolding** added).

The regulation, by first imposing a broad, sweeping non-disclosure protocol, then specifically exempting court proceedings (like the instant action) from those protocols clearly establishes that, contrary to what Plaintiffs would have the court believe, federal immigration regulations do not "reflect" concerns about "sensitivity" of asylum claims - in the context of a court proceeding. 8 C.F.R. §1208.6 is virtually identical to 8 C.F.R. §208.6 and will not be further analyzed.

**4.** The fourth most troubling issue in Plaintiffs' motion is that G.F.F.'s identity was effectively disclosed in his attorney's Affirmation (see "Grace Carney Attorney Affirmation: Attorney of Record for G.F.F.," ECF #100, pgs 20-23). Specifically, see Paragraph 4 ("G.F.F initially entered the United States . . . on or about May 15, 2024"); Paragraph 5 ("G.F.F. was detained by ICE on December 6, 2024, following an ICE raid at [an] apartment party he attended in the Bronx. Approximate[ly] 50 people were in attendance . . . ") and Paragraph 8 ("ICE also filed a *New York Post* article describing the arrest, wherein G.F.F. was identified as a gang member.") Also, see the Amended Complaint, Paragraph 21 on page 7 ("Plaintiff G.F.F. is a 21-year-old Venezuelan national").

A quick and simple query via an internet search engine (in the spirit of Plaintiff's use of "J.G.G." "G.F.F."; "J.G.O."; "W.G.H."; and "J.A.V." let's call the search engine "D.D.G.") using the search parameter "ICE raid Bronx December 2024") yields a *New York Post* article from December 20, 2024 that describes a December 5th ICE raid (*see https://nypost.com/2024/12/20/us-news/feds-raid-migrant-tren-de-aragua-gang-house-in-nyc-after-tracking-gps-ankle-monitor-to-hideout/* (last accessed June 11, 2025)) *see also https://perma.cc/RE5M-P6ZA.*

Of the 50 people in attendance, the article actually identifies five individuals – "Jarwin Valero-Calderon" (the "troublesome 28-year-old Venezuelan national"); "Jhonaiker Alexander Gil Cardozo, 24"; "30-year-old Jesus Manuel Quintero Granado"; "Angel Gabriel Marquez Rodriguez, 19" and "[y]et another migrant gangbanger busted in the raid, 21-year-old [NAME WITHHELD BY MOVANT], was being processed for deportation after getting caught at the border in May."

Setting aside the obvious matching of this fifth person's initials to "G.F.F," this fifth person is the only person mentioned in the article who is 21 years old (the other's ages are 19, 24, 28 and 30).  He is also the only person mentioned in the article who entered the U.S. in May, 2024.  Combined, it conclusively establishes "G.F.F's" true identity.  The entire process of uncovering the true identity of "G.F.F." took under three minutes.  As the plaintiffs pointed out in their motion, " . . . disclosure of information 'is a bell that one can not unring'" (ECF 100, at ECF page 6 of 23).

**5.**  Another somewhat troubling issue with Plaintiffs' motion is that there is an apparent discrepancy in G.F.F's life story, as told by attorney Grace Carney ("G.F.F. was born in Valencia, Venezuela on [redacted], and lived there until he was around 16 years old, when he [and his] family fled the country for Ecuador") (Carney Affirmation, ECF #100, page 20, paragraph 2) versus G.F.F.'s background as described in the body of the motion ("G.F.F. fled Venezuela following threats based on gender and sexuality") (ECF #100, ECF page 4 of 23).

**6.**  Another troubling issue with Plaintiffs' motion is that it doesn't appear that J.G.O even provided a declaration in support of his request for pseudonym status.  There is an Attorney Affirmation from Karyn Ann Shealy (see ECF 3-5) for "J.L.G.O."  If "J.L.G.O." is the same

person as "J.G.O." his lawyer's affirmation, consisting of just nine number paragraphs, is devoid of any relevant information that would justify this court granting him pseudonym status.

7.  Yet another troubling issue with Plaintiffs' motion is that Plaintiffs are in no danger of being sent back to Venezuela.  While this was understandable a legitimate concern, destination-wise, at the time of Plaintiffs original filing, it clearly is no longer valid.  Plaintiffs are headed for the CECOT facility in El Salvador, where they will receive free room and board.

8.  A final troubling issue with Plaintiffs' motion is that the details of plaintiffs' asylum claims are irrelevant to these proceedings, per the Supreme Court's April 7, 2025 ruling: (604 U. S. ____ (2025)) "Although judicial review under the AEA is limited, we have held that an individual subject to detention and removal under that statute is entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older.'" *Id* at 3.

## B.  A More Structured Review of Plaintiffs' Motion Under the Five Factor *James* Test

1.  The first factor in the *James* test is "whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature." *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993).

This first factor aligns with the first reason given by Plaintiff's in their opening paragraph of their motion for leave to Proceed Under Pseudonyms: "[t]he complaint filed contemporaneously with this motion and subsequent pleadings will contain sensitive, personal information, including details of their asylum claims and of Plaintiffs' current whereabouts."

To be sure, a normal (or at least credible) asylum claim would include sensitive and highly personal matters, as the following cases illustrate (all cited by Plaintiffs in their Motion to Proceed Under Pseudonyms (ECF #100 at ECF pg 7):

> "The Complaint reveals 'intimate or sensitive personal information' about each Plaintiff of the kind 'traditionally recognized under this factor, such as sexual activities, reproductive rights, [and] bodily autonomy.' *Doe v. Rogers*, No. 12-1229, 2023 WL 1470007, at *2 (D.D.C. Feb. 2, 2023) (quoting *Doe v. Bogan*, 542 F. Supp. 3d 19, 23 (D.D.C. 2021)). Specifically, it describes in <u>vivid detail</u> particular threats and instances of physical and sexual violence that Plaintiffs have experienced or witnessed in their countries of origin. See, e.g., Compl., ¶ 20." (Underlining added).

*M.A. v. Mayorkas*, Case 1:23-cv-01843-TSC, ECF 13 at pgs 3-4 (D.D.C. 07/06/23);

> "Plaintiffs have filed declarations under seal <u>detailing</u> the abuse, harassment, and threats they suffered that prompted their claims of asylum in the first place. See Exs. 1–10 to Pls.' Mot. (sealed); see Exs. 1–11 to Pls.' Am. Mot. (sealed). The underlying asylum claims are highly relevant to this action." (Underlining added).

*Las Americas Immigrant Advocacy Center v. DHS*, No. 24-CV-1702, Dkt. 60 at pg 9 (D.D.C. Nov. 18, 2024);

> "Each adult plaintiff has filed a declaration under seal <u>detailing the abuse and harassment they and their children suffered</u> that prompted their claims of asylum in the first place. *See* Pls.' Mot. Exs. 1–11. The highly personal and sensitive nature of the trauma they suffered, including kidnapping, rape, and torture, clearly shows the plaintiffs do not attempt to secure anonymity merely to "avoid ... annoyance [or] criticism." *In re Sealed Case*, 931 F.3d at 97; *see also* Pls.'s Mot. at 6–7 (detailing the trauma each plaintiff suffered). Moreover, plaintiffs all worry that they are at risk of persecution in Mexico should their identities and locations be revealed. Pls.' Mot. at 5–6." (Underlining added).

*Nora v. Wolf*, No. 1:20-CV-00993, 2020 WL 12956896, at *1 (D.D.C. Apr. 16, 2020).

Despite the Plaintiffs' claim that their motion and subsequent pleadings would contain sensitive, personal information, a review of the Plaintiffs' Motion and their subsequent Complaint and other filings reveals that for at least four of the five plaintiffs, <u>no</u> sensitive, personal information was revealed.

The one possible outlier, G.F.F., is described as a "trans person" (ECF 100 at ECF page 4) who "has always known that they [sic] wanted to be like the women around them [sic] and wear their clothes." *id*  Also " . . . G.F.F . . . wants to live their [sic] life openly as a trans women" *id.*

However, even if the Court sets aside the rather odd ball fact that G.F.F.'s peculiar mind-set is only mentioned in the body of the plaintiffs' motion to proceed under pseudonyms (see ECF 100 at ECF pg. 4) and NOT in his attorney's affirmations (see ECF 3-4 and ECF 100 at ECF pgs. 20-22) NOR in the complaint (see ECF 1 at ECF page 6, ¶11) NOR in the memorandum in support of Plaintiffs' motion for a temporary restraining order (see ECF 3-2 at ECF pg. 8) and even if the Court then assumes, *in arguendo,* that G.F.F.'s alleged trans person status rises to the level of sensitive, personal information that warrants pseudonym status - G.F.F still is not entitled to pseudonym status!

G.F.F. is not entitled to pseudonym status for the simple reason that his full name – all five of them – has already been effectively outed by G.F.F.'s counsel.   (See sub-section 4 on pages 18-19 above for a description of this Movant's three minute track down of the New York Post article containing G.F.F.'s true name).

With regard to the other four plaintiffs' promised "sensitive, personal information," their tales of woe (as presented in the Complaint (ECF #1), the Motion to Proceed Under Pseudonyms (ECF #100) and the plaintiffs' declarations (ECF #3-3 - #3-8, ECF #100 at ECF pgs 11-22)) simply do not reveal "intimate or sensitive personal information" of the kind "traditionally recognized under this factor, such as sexual activities, reproductive rights, [and] bodily autonomy." *M.A. v. Mayorkas, id.*

> "Note: Beyond those traditionally confidential business records, the Refinery
> has made no showing that its mere identity in this litigation is a sensitive or

> highly personal matter. That factor commonly involves intimate issues such as sexual activities, reproductive rights, bodily autonomy, medical concerns, or the identity of abused minors. See, e.g., [*Plaintiff B v.*] *Francis*, 631 F.3d [1310 (11th Cir. 2011)] at 1316–1318 (protecting plaintiffs' identities in case involving sexual abuse of minors); see also *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 685 (11th Cir. 2001) (terming 'abortion as the paradigmatic example of the type of highly sensitive and personal matter that warrants a grant of anonymity'."

*In re Sealed Case*, 971 F.3d 324, 327 (D.C. Cir. 2020),

With regard to the details of the plaintiffs' asylum claims, despite the Plaintiffs' claim that their motion and subsequent pleadings would contain details of their asylum claims, a review of the Plaintiffs' Motion and their subsequent Complaint and other filings reveals that no meaningful details of their asylum claim are revealed. As previously discussed in the "Background" section above (see page 2-4) Dorsey suspects Plaintiffs refashioned a motion template designed for an appeal of a denial of asylum application and submitted it in this lawsuit without making the appropriate changes. In any event, *see*, "Declaration of W.G.H.," ECF #100 at ECF pg 13, ¶3 ("I filed for asylum from Venezuela on September 9, 2024 due to my fear of harm and mistreatment from multiple criminal groups, including the Tren de Aragua gang"); *See also* "Declaration of J.A.V.," ECF #100 at ECF pg 18, ¶3 ("I filed for asylum from Venezuela because of my political views and my fear of harm and mistreatment from multiple criminal groups, including the Tren de Aragua gang"); *See also* "Plaintiff J.G.O." paragraph, ECF #100 at ECF pg 5 ("J.G.O. fled after he was threatened by armed government officials at protests. . . . He fears future persecution and imprisonment if he is forced to return to Venezuela").

Plaintiff J.G.G.'s filings provides slightly more information about his asylum application than the others. *See* Complaint, ECF #1, ¶9 on ECF pg 5 ("J.G.G. is seeking asylum, withholding of removal, and CAT protection because he fears being killed, arbitrarily imprisoned, beaten and tortured by Venezuelan police since they have done so previously to

him.") *see also* its less miraculous version ". . . I fear being killed, arbitrarily imprisoned, beaten

and tortured by Venezuelan police since they have already tortured, arbitrarily imprisoned me,

and beaten me" (Declaration of J.G.G., ECF 3-3, ¶2 and ECF #100 at ECF pg 11, ¶2).

In the final analysis, the "details" of the plaintiffs' asylum claims has to be something

more than the underlying reason the plaintiff filed for asylum. *See In re Sealed Cases*, 971 F.3d

at 326 ("moving party must show[ ] * * * he has a substantial privacy right") (all internal

citations omitted). Plaintiffs have not shown that the mere mention of a litigant's status as an

asylum seeker, and/or the reason for applying for asylum (ie – "political views", "threats," etc) is

sufficient to meet the first *James* factor ("to preserve privacy in a matter of sensitive and highly

personal nature"). Under the D.C. Circuit's *Sandberg* ". . . it is the litigant seeking to proceed

under pseudonym that bears the burden to demonstrate a legitimate basis for proceeding in that

manner.'" This factor favors disclosure.

2. The second factor in the *James* test is "whether identification poses a risk of

retaliatory physical or mental harm to the requesting party or even more critically, to innocent

non-parties" *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993)

This second factor aligns with the fourth reason given by Plaintiff's in their opening

paragraph of their Motion for leave to Proceed Under Pseudonyms: "(4) Plaintiffs fear that,

should their information become public, including the government's unsubstantiated allegations

that they are members of Tren de Aragua, they would likely become victims of retributive

violence in Venezuela." ECF 100 at ECF pg 2.

Despite the Plaintiffs' claim that they fear retributive violence in Venezuela, a review of

the five declarations reveals that none of the five declarations actually mention a plaintiff fearing

retributive violence in Venezuela. To be sure, each declaration mentions a fear of violence in

Venezuela if they were returned – but not retributive violence (or even *James'* "retaliatory physical or mental harm"). This makes a difference. *See Doe v. Von Eschenbach* No. 06-2131, 2007 WL 1848013, at *2 (D.D.C. June 27, 2007) ("Moreover, the Affidavits do not allege retaliation for filing a lawsuit. Under *Qualls* [*v. Rumsfeld*, 228 F.R.D. 8 (D.D.C.2005)], this is insufficient. '[W]hile each declaration alleges retaliation or bias . . . none alleges retaliation in connection with bringing suit in court.' 288 F.R.D. at 11." ).

The five declarations (A – E) are examined in depth immediately below:

- A) The <u>only</u> discussion of violence in the first declaration is in paragraph 2 (ECF #100, ECF pgs 11-12, paragraph 2). Paragraph 2 states in pertinent part "I came to the United States because I fear being killed, arbitrarily imprisoned, beaten and tortured by Venezuelan police since they have already tortured, arbitrarily imprisoned me, and beaten me. I fear that the Venezuelan police and government will target me because of my actual/imputed political opinion, my familial connection to my stepfather who is a known political dissident, and because the U.S. government erroneously suspects that I am a Tren de Aragua member."

Discussion: This declarant (his identifying initials are not given) admits/alleges that he has suffered violence in Venezuela. That violence clearly predates his invasion entry into the US. His expressed fears of future violence in Venezuela, based on his past experience (as alleged) are no doubt relevant to a run-of-the-mill asylum hearing, which may or may not include Convention Against Torture (CAT) protection protocols.

But this is not an asylum hearing. This is an AEA removal hearing in which this declarant is trying to proceed under pseudonym. And the fact of the matter is that this Declarant has not expressed a fear of violence based on retaliation for his filing of this lawsuit. The closest declarant comes to even suggesting that factor is at issue ("I fear that the Venezuelan police and

government will target me . . . because the U.S. government erroneously suspects that I am a Tren de Aragua member") doesn't actually meet the factor's criteria.

His fear is that he will be harmed on account of the Venezuelan authorities suspecting him of being a Tren de Aragua member (based on the U.S. government's actions pursuant to the President's Proclamation) – and not on account of the filing of this lawsuit. It's an important if subtle distinction. More importantly, from a practical standpoint, is that regardless of whether or not the public learns of Declarant A's identity, the US government already knows his name and if and when Declarant A is removed, his true identity and the circumstances surrounding his removal under the President's Proclamation will become known to the receiving country. Declarant A has not claimed otherwise, and under the D.C. Circuit's *Sandberg* " . . . it is the litigant seeking to proceed under pseudonym that bears the burden to demonstrate a legitimate basis for proceeding in that manner.'"

Perhaps most importantly, Declarant A is not under threat of removal to Venezuela or Mexico. He is headed to El Salvador. One final note – Declarant A is the only declarant who expressed any fear of violence on account of being erroneously suspected of being a Tren de Aragua member. That is the only tangential tie between this lawsuit and a "risk of retaliatory physical or mental harm."

• B. The <u>only</u> discussion of fear and/or violence in the second declaration is in paragraphs 3, 11 and 12 (ECF #100 at ECF pgs 13-14, ¶¶3, 11-12). Those paragraphs state: "3. I filed for asylum from Venezuela on September 9, 2024 due to my fear of harm and mistreatment from multiple criminal groups, including the Tren de Aragua gang. [ ] 11. I am extremely afraid to be returned to Venezuela. I fled Venezuela and requested asylum in the United States because I

was being extorted and threatened by multiple criminal groups including Tren de Aragua.  12. I

am not and was not a member of Tren de Aragua.  I fear them and need protection from them."

Discussion:  Like Declarant A, Declarant B alleges past problems in Venezuela and a fear

of future problems ("I am extremely afraid to be returned to Venezuela").  Declarant B (unlike

Declarant A) was extorted and threatened.  Declarant B (unlike Declarant A) does not explicitly

state that his fear is based on past incidences of extortion and being threatened in Venezuela, but

it's clearly implied.  Either way, Declarant B does not claim that future extortion and threatening

will be triggered by his identification with this lawsuit.

- C. The <u>only</u> discussion of fear and/or violence in the third declaration is in paragraph 8

(*id* at ECF pgs 15-17, ¶8).  Paragraph 8 states "Mr. [redacted] has a pending application for

asylum, which he timely filed on August 30, 2024, and the basis for which is his fear of harm

and mistreatment from multiple criminal groups, including the Tren de Aragua gang.

Discussion:  Unlike Declarant A and B, Declarant C does not even allege any actual past

problems in Venezuela.  Declarant C only claims (thru his attorney's Declaration) a fear of harm

and mistreatment.  Declarant C does not claim, let alone establish, that his identification with this

lawsuit poses a risk of retaliatory physical or mental harm.

- D. The <u>only</u> discussion of fear and/or violence in the fourth declaration is in paragraphs

3, 5 and 13 (*id* at ECF pgs. 18-19, ¶¶3, 5 and 13).  Those paragraphs state: "3.  I filed for asylum

from Venezuela because of my political views and my fear of harm and mistreatment from

multiple criminal groups, including the Tren de Aragua gang." [ ] "5. . . . I am not and was not a

member of the Tren de Aragua gang.  I was victimized by that group, which is one of the reasons

I cannot return to Venezuela." [ ] "13.  I am terrified to be deported to Venezuela, where I fear I

would be seriously harmed or killed."

Discussion:  Like Declarants A and B, Declarant D alleges past problems in Venezuela (a

bare-bones "I was victimized by that group").  Like Declarants A, B and C, Declarant D fears

future harm should he be returned to Venezuela.  Alas, like the other Declarants, Declarant D

does not claim, let alone establish, that his identification with this lawsuit would pose a risk of

retaliatory physical or mental harm.

- E.  The <u>only</u> discussion of fear and/or violence in the fifth declaration (a/k/a

"affirmation") is in paragraphs 3 and 20 (*id* at ECF pgs 20-22, ¶¶3, 20).  Those paragraphs state,

in pertinent part: "3 . . . I filed [an] Application for Asylum . . . and Protection under the

Convention Against Torture on G.F.F's behalf, on the basis of his fear of return to Venezuela." [

]  "20 . . . he was very anxious about being sent to live on the street in Mexico, where he was

previously threatened, or Venezuela, where he fears persecution."

Discussion:  From Attorney Carney (J.F.F.'s attorney) invoking of C.A.T protocols , a

reasonable reader could infer that J.F.F. (like Declarants A, B and D) had past problems in

Venezuela.  Attorney Carney's Affirmation also states an anxiety (a/k/a "fear") from J.F.F. about

future persecution should he be returned to Venezuela.  But, once again, the provided affirmation

does not claim, let alone establish, that J.F.F.'s identification with this lawsuit would pose a risk

of retaliatory physical or mental harm.

**Plaintiffs' Families:**

As previously mentioned, Plaintiffs listed four reasons for asking this Court to grant them

pseudonym status.  The fourth reason given (their fear that they would become victims of

retributive violence in Venezuela) did not mention any concern about their respective families.

Nonetheless, Plaintiffs' motion would later prominently state in a section header: "Plaintiffs'

Claims Are Sensitive and Highly Personal, and Public Disclosure Could Result in Physical or

Mental Harm to Plaintiffs <u>and Their Families</u>." (Underlining added). (see "Section A" header, ECF 100 at ECF pg 4). This reference to families is encompassed in the back half of the second factor in the *James* test "whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, <u>to innocent non-parties</u>"

Here, like Plaintiffs bold proclamation of Reason Four on ECF page 2 ("Plaintiffs fear . . . retributive violence in Venezuela") (ECF #100 at ECF pg 2) that did not find any evidentiary support in the five declarations, this broad claim about the plaintiffs' families is also without evidentiary support in the five declarations. No declarant even mentions, let alone establishes, a concern about physical or mental harm to their families:

Declarant A mentions "a stepfather who is a known political dissident" (*id* at ECF pg 11, ¶2). Nowhere does he express <u>any</u> concerns about the stepfather's safety. Declarant B mentions his "wife and stepdaughter at a homeless shelter in Brooklyn" (*id* at ECF pg 13, ¶4). Nowhere does he express <u>any</u> concerns about the wife's or stepdaughter's safety. Declarant C's attorney, Molly Lauterback mentions Mr. [redacted]'s wife (*id* at ECF pg 15, ¶9). Nowhere does Attorney Lauterback express <u>any</u> concerns about the wife's safety. Declarant D doesn't even mention his family, let alone any concern about their safety (*id* at ECF pgs 18-19, ¶¶1 - 14), but manages to mention his concerns about <u>his</u> health and <u>his</u> missed medications (*id* at ECF pg 18, ¶12). Declarant E mentions his family and an older brother, who he later abandoned in Chicago (*id* at ECF pg 20, ¶¶2, 4). Nowhere does he express <u>any</u> concern about his family's or his abandoned brother's safety. Accordingly, this factor favors disclosure.

3. The third factor in the *James* test is "the ages of the persons whose privacy interests are sought to be protected" This does not seem to be a relevant factor in this case. Plaintiffs' have not mentioned if any of the plaintiffs are under age. Under the D.C. Circuit's *Sandberg*

" . . . it is the litigant seeking to proceed under pseudonym that bears the burden to demonstrate a legitimate basis for proceeding in that manner.'" This factor favors disclosure.

4. The fourth factor in the *James* test is "whether the action is against a governmental or private party" As far as the original Plaintiffs are concerned, this factor admittedly tips towards the plaintiffs' favor. But see this Court's opinion regarding the petitioners – "the fourth factor weighs slightly against pseudonymity as well" (Opinion and Order, ECF 117 at 4).

5. The fifth and final factor in the *James* test is "the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously." Here, at the current stage of proceedings, this factor does not favor disclosure. But see discussion immediately below for a discussion of the 2nd Circuit's Factor #6, which is an enhanced version of the fifth *James* test.

## C. A Couple of Relevant Factors From the 2nd Circuit's Ten Factor Test

1. – 5. Not used.

6. The sixth factor in the 2nd Circuit's Ten Factor Test is "(6) whether the defendant is prejudiced by allowing the plaintiff to press his claims anonymously, whether the nature of that prejudice (if any) differs at any particular stage of the litigation, and whether any prejudice can be mitigated by the district court." This factor closely aligns with the fifth *James* test. It is included here because of the importance of the second clause – "whether the nature of that prejudice (if any) differs at any particular stage of the litigation."

Plaintiffs are currently raising arguments related to "questions of interpretation and constitutionality of the [AEA]" (604 U. S. ____ (2025)) At this stage, the factor admittedly favors pseudonymity. If and when they lose those arguments, and this litigation stages into the question of whether the plaintiffs are "in fact alien enem[ies] fourteen years of age or older," *id* then the factor would switch – big time - into favoring disclosure. Specifically, if the public

knew the identities of the alien enemies, they could come forward and assist the government with whatever information that might be helpful in establishing the alien enemy's ties to Tren de Aragua.

7. The seventh factor in the 2nd Circuit's Ten Factor Test is "(7) whether the plaintiff's identity has thus far been kept confidential." With regard to the five original Plaintiffs, G.F.F.'s identity has not been kept confidential. See sub-section 4 on pages 18-19 above for a description of this movant's three minute track down of the New York Post article containing G.F.F.'s true name. (*also see https://nypost.com/2024/12/20/us-news/feds-raid-migrant-tren-de-aragua-gang-house-in-nyc-after-tracking-gps-ankle-monitor-to-hideout/* (last accessed June 11, 2025)) *see also https://perma.cc/RE5M-P6ZA.*

## 3.  THE PETITIONER-PLAINTIFFS' SUPPLEMENTAL MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYMS ("MOTION II") SHOULD BE DENIED OR REVOKED

### A. Introduction

As an initial matter, the court's Memorandum Opinion and Order (ECF #117) is a normal, properly structured order, unlike the court's previous woefully insufficient Minute Order of March 15 (no ECF # issued). But that does not mean the Opinion is not without its fatal flaws: namely, failing to consider or otherwise discuss the fact that <u>all</u> of the new petitioners' full names have already been effectively disclosed to the public. The Opinion has other fatal flaws, discussed further below.

With regard to the underlying Supplemental Motion filed by the petitioners, it shares the same defining characteristic as the original Motion to Proceed Under Pseudonyms: namely, making broad and legally important factual claims about the Petitioners having highly sensitive and personal reasons for remaining under pseudonym that fail to find support in the evidence

(meaning - the declarations) submitted.  The Supplemental Motion also makes claims about

needing to protect the Petitioners and Next Friends from possible future harm, but NONE of the

"next friends" express any worries or concerns about their own safety from retaliatory harm.

The Supplemental Motion has other fatal flaws, discussed further below at pages 35-45.

## B. Fatal Flaws in the Court's Opinion

1. **The Biggest Flaw.** The biggest flaw in the Court's Opinion is that is does not address

the fact that four of the five petitioners seeking pseudonimity have been "named in [ ] public."

The Supplemental Motion states "[b]eing named in a public CBS list does not alter the analysis,

as the government of El Salvador has no way of knowing which specific individuals who wish to

remain anonymous are challenging their detention there, and the general nature of the list does

not link any particular anonymous Petitioner to a known person detained at CECOT." (ECF #113

at pg 7).

Setting aside the fact that this self-serving statement from petitioners is patently false,[5]

the fact that the Court's Opinion does not consider whether the plaintiff's identity has thus far

been kept confidential is an abuse of discretion.  See *In re Sealed Case*, 931 F.3d 92, 96 (D.C.

Cir. 2019) ("[W]e review a court's application of those criteria only for an abuse of discretion.

In so doing we must consider 'whether the decision maker failed to consider a relevant factor

[or] relied on an improper factor, and whether the reasons given reasonably support the

---

[5] See sub-section 3 further below on page 36 for a link to the "public CBS list" and a brief, but
blunt discussion as how the specific "nature" of the names on the list decisively links four out of
the five anonymous Petitioner to a name on the list (to the exclusion of all other names on the
list).  The fifth name, "T.C.I." was effectively disclosed by Attorney Eylan Schulman's
Declaration ("I represent T.C.I. is a pending federal criminal case in the Eastern District of New
York" and "T.C.I. was arrested in January 2024. . . "). (ECF #102-13, ¶¶2, 6).  See discussion at
sub-section 4 on page 38.

conclusion'" (second "[ ]" in the original).  The CBS list was specifically brought to the Court's attention by the Plaintiffs (see ECF #113 at pg 7).

   **2. Preserving Privacy Flaw**.  Another flaw in the Court's Opinion is its analysis of the first factor ("(1) whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of [a] sensitive and highly personal nature").  Specifically, the Court states "For instance, several Petitioners allege that the Amended Complaint contains details of their asylum claims, such as the abuse and danger that they faced in Venezuela at the hands of political leaders or paramilitary groups. See Mot. at 4–5." (ECF #117 at 3).  The Petitioners actually offer only two examples (not several) – "For example, J.A.B.V. fled Venezuela after he campaigned for the opposition leader . . . Similarly, G.A.A.A. fled Venezuela and sought asylum in the United States due to violence in his hometown at the hand of a paramilitary group." (ECF #113 at 5).  A review of the Amended Complaint shows that the other three petitioners seeking pseudonimity (M.O.A.R.; M.R.M.; and T.C.I.) do not reveal ANY details of their asylum claims. *see* ECF 101 at ECF 8-10 ¶¶15, 17-18.  In fact, the word "asylum" does not even appear in their respective biographies in the Amended Complaint.  *Id.*

   Accordingly, it is not reasonable for this court to have ruled that "this factor thus supports pseudonymity" for all <u>five</u> petitioners seeking pseudonimity when the reason given – ("several Petitioners allege that the Amended Complaint contains details of their asylum claims . . .") only offers support for those "several" petitioners - J.A.B.V. and G.A.A.A.  Again, ("[W]e review a court's application of those criteria only for an abuse of discretion.  In so doing we must consider . . . whether the reasons given reasonably support the conclusion'" (second "[ ]" in the original).  *In re Sealed Cases,* 931 F.3d 92, 96 (D.C. Cir 2019).

**3. Federal Regulation.** Another flaw in the Court's Opinion is its apparent acceptance of the Plaintiffs' false argument that "federal immigration regulations 'provide for the confidentiality of asylum applicants'" To the extent the Court relied on 8 C.F.R. §208.6, it was an erroneous reliance. As discussed above on pages 16-18 at ¶3, federal immigration regulations specifically allow unlimited disclosure of asylum applicants' information in a judicial setting, whether federal, state or local. ("we review *de novo* the criteria used by a district court to decide whether to grant a motion to proceed anonymously. . ."). *Id.*

**4. Retaliatory Violence.** The Court's Opinion analyzed the second factor ("(2) whether identification poses a risk of retaliatory physical or mental harm to the requesting party or[,] even more critically, to innocent non-parties"). Specifically, the Court stated "[t]he second factor tips the same way, as Petitioners and their next friends clearly seek to avoid "retaliatory physical or mental harm." Given the claims in the asylum applications, public identification of these individuals could subject them or their families to retaliatory violence or persecution. See Mot. at 4–5." (internal citations omitted).

Here, the Court did not fail to consider a relevant factor (retaliatory violence). Nor did it rely on an improper factor. And the reason given reasonably supports the conclusion. The problem lies with the fact that the evidence provided by the Petitioners (ie – the various declarations) does not support the broad, conclusory statements they made in their motion. Accordingly, the second factor will be analyzed further below (see paragraph #2 on pgs 42-44).

**5.** The fifth and final flaw in the Court's Opinion is found in the last paragraph: "In sum, the first, second, and fifth factors weigh in favor of granting the Motion to proceed pseudonymously. That tally resolves the matter in Petitioners' favor and accords with this Court's prior grant of the original named Plaintiffs' request for pseudonymity. See First

Minute Order of Mar. 15, 2025." (ECF #117 at pg 5).

The statement implies that the court is making a simply math calculation (here, 3 to 2 in favor of pseudonymity). This *pro-se* Movant knows of no case law that supports such a simply mathematical approach. Nor did the Court cite to any case. To the extent that it is relevant, *see In re Sealed Case*, 931 F.3d at 97 (D.C. Cir. 2019) ("We advance no hard and fast formula for ascertaining whether a party may sue anonymously"). There is also a matter of common sense: by way of an example, the privacy needs of a victim of multiple rape seeking pseudonymity should not get counterbalanced out by the fact that he is 25 years old (as it would under the Court's simplistic "tally" approach). Some factors weigh more heavily than others and its up to a Court to decide, based on the relevant facts and circumstances of the case, to decide such weighing. See *Nixon v. Warner Communication* 435 U.S. 589, 599 (" . . . the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case").

## C. Some Troubling Issues in Plaintiffs' Supplemental Motion

1.    Plaintiffs claim that "[t]hey do so in a time of extreme anti-immigrant rhetoric and hostility. (ECF 113 at 1). However, they fail to provide evidentiary support for such a statement. Counsel for plaintiffs have filed numerous motions in other U.S. District Courts handling AEA removals and have made similar false statements about "anti-immigrant rhetoric" in each of them.[6] However, in those other cases, counsel has provided those courts with evidentiary support. Counsel lists some of these other cases in its Supplemental Motion on page 2. The "page 2" cases, and the ECF reference to the "evidence" are as follows: G.F.F. v. Trump, No.

---

[6] This Movant can not read counsels' collective minds, but they are probably referring to the general public's hostility to illegal immigration and the widespread misuse of the asylum process by illegal immigrant invaders. *See* Presidential election results from November, 2024.

1:25-cv-2886 (S.D.N.Y. Apr. 8, 2025), ECF #3 at 5-6; D.B.U. v. Trump. No. 1:25-cv-1163 (D.

Colo. Apr. 14, 2025), ECF #3 at 5; A.S.R. v. Trump, No. 3:25-cv-11[3] (W.D. Pa. Apr. 15,

2025), ECF #7 at 5; W.M.M. v. Trump, No. 1:25-cv-59 (N.D. Tex. Apr. 16, 2025), ECF #4-1 at

5-6; and J.A.V. v. Trump, No. 1:25-cv-72 (S.D. Tex. Apr. 24, 2025), ECF #5 at 4-5.

  In the interest of judicial economy, this Movant will not comment further on items not in

evidence before the Court.  If Plaintiffs submit evidence to support their arguments, instead of

withholding it, this Movant will respond accordingly.

2. Plaintiffs' Supplemental Motion repeats the same inaccurate editing of the second *James*

factor as in the original Motion to Proceed Under Pseudonyms.  Namely, they removed the

adjective "retaliatory."  Plaintiffs describe the second factor as "(2) whether the petitioner has a

reasonable expectation of 'physical or mental harm'" (ECF 113 at pg 3).  As previously

discussed on pages 15-16 above, the actual factor is "(2) whether identification poses a risk of

retaliatory physical or mental harm to the requesting party or even more critically, to innocent

non-parties." *Chao*, 587, F. Supp. 3d 90, 99 (D.D.C. 2008). Underlining added.

3. The public CBS list:  This Movant first became aware of the CBS list of Venezuelans

transferred to the CECOT facility by reading about the list in Plaintiffs' Supplemental Motion.

(ECF #113 at pg 7).  A quick internet search using a well known search engine ("D.D.G.")

quickly yielded the following web – site: *https://www.cbsnews.com/news/venezuelans-deported-*

*el-salvador-names/*.  The list is also available at *https://perma.cc/9M8L-WTL9*.  The relevant

portion of Plaintiffs' Supplemental Motion states as follows:

   "Retributive violence is a regular occurrence at CECOT [citation omitted],
   and such a high-profile challenge to their detention would almost certainly
   incur consequences for Petitioners.  Being named in a public CBS list does
   not alter the analysis, as the government of El Salvador has no way of
   knowing which specific individuals who wish to remain anonymous are
   challenging their detention there, and the general nature of the list does not

> link any particular anonymous Petitioner to a known person detained at CECOT."

ECF #113 at pg 7.

Plaintiffs' claim that the government of El Salvador has no way of matching the 238 names on the list – which is in alphabetic order - to the five petitioners' initials is simply untrue. Admittedly, names with four initials are somewhat cumbersome. But matching the specific, individual plaintiff's initials to a unique name on the list (meaning to the exclusion of all other names on the list) is a straightforward process. This Movant believes that the average citizen could accomplish the simple matching task in under five minutes. And just to be clear, five minutes is the estimate for matching all four names, not the estimate per name.

The five minute estimate is calculated as follows: the first pseudonymized name, "J.A.B.V." requires a review of the fourteen last names that begin with "B" (no need to exam 238 names!). Only two names match the required "B.V." in "J.A.B.V." Of the two, only one first name can not be eliminated, leaving only one match to the required "J.A." Allowing for 3 seconds to review each of the 14 names beginning with "B" yields 42 seconds. The second pseudonymized name "M.A.O.R." requires a review of only the four last names that begin with "O" (4 names x 3 seconds a name = 12 seconds); The third name, "G.A.A.A" (nine names start with "A" – 27 seconds); The fourth name, "M.R.M." (thirty six names starting with "R" and twenty five names starting with "M" - so 61 names and 183 seconds). 42 + 12 + 27 + 183 seconds = 264 seconds (or 4 minutes, 24 seconds).

Plaintiffs' description of "the general nature of the list" is . . . bizarre. Respectfully, this Movant does not know what the Plaintiffs mean by referring to the list's "general nature" nor why they would describe it that way, other than to confuse the court or otherwise misdirect it.

If the Plaintiffs do not concede the fact that the four plaintiffs – "J.A.B.V." "M.A.O.R.,"
"G.A.A.A." and "M.R.M." have been conclusively identified through a matching of their initials
to the CBS list (again, available at *https://perma.cc/9M8L-WTL9*) then this Movant will publish
the names as part of his reply brief argument.  This Movant is aware of this Court's order ("The
Court accordingly ORDERS that: [ ] 2. All parties shall use the pseudonyms listed in the
Amended Complaint in all documents filed in this action; . . . ") (ECF 117 at pg 6) and has
proposed amending that order as part of his proposed order required under LCvR 7(c).

4.      The fifth name, "T.C.I." was effectively disclosed by Attorney Eylan Schulman's
Declaration ("I represent T.C.I. is a pending federal criminal case in the Eastern District of New
York" and "T.C.I. was arrested in January 2024. . . ") (ECF #102-13, ¶¶2, 6).  A quick query on
the PACER.gov web-site reveals T.C.I.'s true identity and his truly dreadful back-story, which is
otherwise beyond the scope of this motion.

        To wit, under the "Advanced Party Search" tab in PACER, entering 1) "Schulman" in the
"Last Name" field; 2) "Eylan" in the "First Name" field; 3) "Criminal" in the "Court Type" field;
4) Selecting "Eastern District of New York" in the "Region" field; and 5) "1/1/2024" and
"12/31/2024" in the "Date Filed" fields yields exactly <u>four</u> cases.  The search in PACER takes a
lot less than five minutes.  A review of the four names takes less than one minute.  And if one
was to start at the top of the list, less than ten (10) seconds!  Accordingly, "T.C.I.," (like
"J.A.B.V." "M.A.O.R.," "G.A.A.A." and "M.R.M.") has a minimal privacy interest to be
protected.

5.      Next Friend Petitioner "D.A.R.H" (next friend to Andry Jose Hernandez Romero) did
not move to proceed under pseudonym: "Petitioners-Plaintiffs and Next Friends M.Z.V.V.,

J.A.B.V., M.Y.O.R., M.A.O.R., M.M.A.A., G.A.A.A., M.R.M., and T.C.I. move for permission to proceed under pseudonyms in the above-captioned case." (ECF 113 at 1).

In addition, the Supplemental Motion does not offer any reason to justify D.A.R.H. proceeding under pseudonym.  See Supplemental Motion at pages 7-8, for a discussion of the reasons to justify the other next friends proceeding under pseudonyms: "Next Friends (M.Z.V.V., M.Y.O.R., M.M.A.A.): Next Friends also have legitimate reasons to proceed pseudonymously." (ECF 113 at 7).

A declaration from someone identifying themselves as "D.A.R.H." was provided (ECF 102-8 a/k/a "Exhibit G").  The Declaration is written in English, but it is not known if D.A.R.H. is fluent in English.  She identifies herself as the mother of Andry Jose Hernandez Romero but awkwardly refers to herself as "D.A.R.H." without explanation ("I, D.A.R.H., declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:") *id* at 2. Frankly, it doesn't appear as though she understands English, nor does she claim to.  If she had given her real name, and redacted it, it would have made sense.  She apparently signed her real name, but redacted it.  It's very puzzling.  In any event, one thing is clear - D.A.R.H. did not move to proceed under pseudonym.  Accordingly, she is not entitled to proceed under pseudonym.

6.    Another troubling item in Plaintiffs Supplemental Motion is in its repeating of a false claim made in its original motion:  namely, its citation to 8 C.F.R. ¶¶ 208.6 and 1208.6.  (see ECF 113 at pg 6 and ECF 100 at ECF pg 6) to artfully prop up its argument for confidentiality. Plaintiffs claim "federal immigration regulations reflect this concern for the sensitivity of asylum applications and the attendant need for confidentiality.  Asylum regulations provide for the

confidentiality of asylum applicants and credible fear interviewees, including the fact that an

applicant has applied for asylum or received a credible fear interview. See 8 C.F.R. §§208.6."

As fully explained on pages 16-18 above, asylum regulation do NOT provide for confidentiality

of asylum applicants and credible fear interviewees including the fact that an applicant has

applied for asylum or received a credible fear interview in a judicial setting. The argument in sub

section B 3 above on pages 16-18 are hereby incorporated.

**D.      A More Structured Review of Plaintiffs' Supplemental Motion Under the Five Factor *James* Test**

    **1.  The first factor in the *James* test is** "[1]  whether the justification asserted by the

requesting party is merely to avoid the annoyance and criticism that may attend any litigation or

is to preserve privacy in a matter of sensitive and highly personal nature." *James v. Jacobson*, 6

F.3d at 238 (4th Cir. 1993).  Petitioners' Supplemental Motion states that "[h]ere, Petitioners'

claims are sensitive and highly personal." (ECF 113 at pg 3).  The Supplemental Motion also

states "[f]irst, the amended complaint contains sensitive, personal information, including details

of their asylum claims"  *Id* at 5.  In fact, however, the amended complaint does not contain

sensitive, personal information as that term is used in the D.C. Circuit.  *See In re Sealed Case*,

971 F.3d at 327 (D.C. Cir. 2020) ("[t]hat [sensitive or highly personal matter] factor commonly

involves intimate issues such as sexual activities, reproductive rights, bodily autonomy, medical

concerns, or the identity of abused minors.").  Specifically:

    The "A" Team – Andry Jose Hernandez Romero and next friend D.A.R.H:  As

previously discussed in paragraph number five (pgs 38-39) above, D.A.R.H. has not moved this

Court to proceed under pseudonym. First, Mr. Romero has already disclosed his name, so his

pseudonym status is not at issue.  Second, his mother, D.A.R.H.'s only claim that remotely

touches on a "sensitive or highly personal matter" involves her son Andry's homosexuality. To the extent that is her claim, it fails for the simply reason that she has stated he is "openly gay" (ECF 102-8, ¶3 at pg 2). If Mr. Romero flaunts his sexual preference, then Mr. Romero clearly does not view his homosexuality as a sensitive matter. Accordingly, neither should this Court.

The "B" Team – J.A.B.V. and next friend M.Z.A.A.: Petitioners identify J.A.B.V.'s sensitive and highly personal matter as his campaigning for the opposition leader, being subsequently adducted by masked men, being beaten and being told he would be killed if he campaigned again. (*see* ECF 113 at pgs 4-5), As explained previously, these type of matters qualify J.A.B.V. for pseudonym status in administrative hearings, per 8 C.F.R. §§ 208.6, 1208.6. (see discussion above at pgs 16-18). They do not qualify Mr. "B.V." for pseudonym status using D.C. Circuit precedent. With regard to next friend M.Z.A.A., no sensitive and highly personal matter is asserted that would justify pseudonym status– only that she faces serious risk of harm if her identity is disclosed (see ECF 113 at pg 7-8), which is a separate factor in the *James* test. Furthermore, of the three cases cited by petitioners (*McCutchen v. Becerra*, *M.J. v. D.C.* and *Asylumworks v. Wolf*) (see ECF 113 at pg 8), all involve Next Friends of minor children. All of those cases grant pseudonym status to the Next Friend in order to protect the minor children. Here, J.A.B.V. is 24 (ECF 102-9, ¶1 at pg 2), so none of the cases cited are apposite.

The "C" Team – M.A.O.R. and next friend M.Y.O.R.: Petitioners do not identify a single sensitive and highly personal matter for M.A.O.R. Furthermore, the Amended Complaint (ECF #101, ¶14 at pg 8) and M.Y.O.R.'s declaration (ECF #102-10) provide nothing that could be remotely classified as a "sensitive and highly personal matter." With regard to Next Friend M.Y.O.R., no sensitive and highly personal matter is asserted that would justify her pseudonym status. M.A.O.R. is 36 years old (ECF 102-10, ¶1 at pg 2).

The "D" Team – G.A.A.A (a/k/a "G.A.A.") and next friend M.M.A.A.: Petitioners apparently identify G.A.A.A.'s sensitive and highly personal matter as his asylum claim. Again, like J.A.B.V., that is sufficient justification for pseudonym status in administrative hearings, per 8 C.F.R. §§ 208.6, 1208.6, but not in a judicial setting in the D.C. Circuit. With regard to Next Friend M.M.A.A., no sensitive and highly personal matter is asserted that would justify her pseudonym status. Mr. "A.A.'s" age is not stated, but he is believed to be an adult. See M.M.A.A's Declaration, ECF #102-11, ¶5 at pg 2 ("While he was in the United States waiting for his asylum claims to be heard, he and his wife settled in Louisville, Texas and in June 2024, they gave birth to a baby boy").

The "E" Team – M.R.M. and Next Friend Dorys Mendoza: As an initial matter, in addition to "M.R.M." being outed in the CBS list (available at *https://perma.cc/9M8L-WTL9*), Mother Dorys (whose last name is Mendoza) specifically refers to her son as "Miguel" (see ECF #102-12, ¶1 at pg 2). Petitioners do not identify a single sensitive and highly personal matter for M.R.M. Furthermore, the Amended Complaint (ECF #101, ¶17 at pg 9) and Dorys Mendoza's declaration (ECF #102-12) provide nothing that could be remotely classified as a "sensitive and highly personal  matter." M.R.M. is about 32-33 years old ("Miguel was born in 1992") *id* ¶2

The "F" Team – T.C.I. and Next Friend Eylan Schilman: Petitioners do not identify a single sensitive and highly personal matter for T.C.I. Furthermore, the Amended Complaint (ECF #101, ¶18 at pgs 9-10) and Attorney Schilman's declaration (ECF #102-13) provide nothing that could be remotely classified as a "sensitive and highly personal matter."

**2. The second factor in the *James* test** is "[2] whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties." *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993). Petitioners' Supplemental

Motion states that "*Second*, Petitioners detained at CECOT have legitimate reason to fear that, should their information become public, and should it come to light that they are challenging their detention, they would likely become victims of retributive violence at CECOT. Retributive violence is a regular occurrence at CECOT, see Bishop Decl. ¶¶ 2, 210, ECF No. 102-5, and such a high-profile challenge to their detention would almost certainly incur consequences for Petitioners." (ECF #113 at pg 7).

This Movant read the Bishop Declaration, and not just the two referenced paragraphs. The Bishop Declaration does not provide any evidentiary support for Petitioners' claim that they have a legitimate reason to fear retributive violence. For starters, ¶2 is an entirely conclusory statement and ¶210 doesn't even exist - the last paragraph is ¶63! Furthermore, ¶2 relates to violence in general and NOT retributive violence. ¶2 states in its entirety: "Deportees who are imprisoned in El Salvador are highly likely to face immediate and intentional life-threatening harm at the hands of state actors and a secondary threat of violence from incarcerated gang members." ECF 102-5, ¶2. Bishop's Declaration mentions the word "violence" twenty six times in its sixty three paragraphs: It mentions "retaliatory" exactly zero (0) times. Petitioners' preferred variation of retaliatory, "retributive" is likewise never mentioned.

It should be noted that in presenting their argument for whether identification posed a risk of retaliatory physical or mental harm, it was here that the Petitioners acknowledged the existence of a public CBS list containing the full names of all 238 Venezuelans who were removed pursuant to the AEA. Petitioners then proposed that the government of El Salvador would have no way of knowing which specific petitioner were challenging their detention. The argument is preposterous (see discussion above at pages 36-38, paragraph #3). In any event, Petitioners presumably felt the need to make the case that the Petitioners' identities were not

already known to the staff at the CECOT facility as otherwise there would be no need for this Court to continue to offer anonymity to the Petitioners).

Some of the Petitioners' Next Friends' Declarations (ECF #102-8 thru 102-13) make various statements about violence that the Petitioners have encountered in the past or fear encountering in the future:  J.A.B.V. ("he was abducted by masked men . . . beaten, and told he would be killed if he campaigned again." ECF #102-9, ¶3); G.A.A.A. ("Due to the violence in our town at the hands of this group, my son fled." ECF #102-11, ¶4); T.C.I. ("He fears that, if sent there, he would face torture or even death . . . " ECF #102-13, ¶8).

Petitioners provided these statements about violence to support their argument that their claims involved matters of a sensitive and highly personal nature.  Plaintiffs relied on 8 C.F.R.§§ 208.6 and 1208.6 for that classification.  As discussed previously, 8 C.F.R. §§ 208.6 and 1208.6 do not apply and can not be used to convert simply statements about violence into "matters of a sensitive and highly personal nature." (see discussion of 8 C.F.R. §§ 208.6 and 1208.6 at pages 16-18).

This Movant provides these statements about violence to establish that they are only general statements about violence and not statements that establish risk of retaliatory physical or mental harm to the petitioners should they lose their pseudonym status.

**3. The third factor in the *James* test** is the age of the petitioners.  This Movant concurs with the Court' analysis (this factors "weighs against pseudonymity"). ECF #117 at pg 4.

**4. The fourth factor of the James test** is whether the action is against the government.  This Movant concurs with the Court analysis (This factors "weighs slightly against pseudonymity as well"). *Id.*

**5.** **The fifth factor of the James test** is "risk of unfairness" to the government. This Movant concurs with the Court's analysis (favoring pseudonymity) *id*, but only at this stage of the litigation.  Should the case reach a point where the judicial review is deciding "whether the petitioner 'is in fact an alien enemy fourteen years of age or older'" then the conclusion would change.

## 5. CONCLUSION

For the above stated reasons, this Court should:

1. Revoke pseudonym status for the five original Plaintiffs (J.G.G., G.F.F., J.G.O., W.G.H. and J.A.V.);

2. Revoke pseudonym status for five added Petitioners (J.A.B.V., M.A.O.R., G.A.A.A., M.R.M. and T.C.I.); and

3. Revoke pseudonym status for the four Next Friends (D.A.R.H., M.Z.V.V., M.Y.O.R. and M.M.A.A.)


Respectfully Submitted

Paul M. Dorsey
110 Westminster Drive
West Hartford, CT  06107
(860) 521-0081
p.dorsey@comcast.net