```
1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3    J.G.G., et al.,
                                        Civil Case
                          Plaintiff(s),  No. 25-00766 JEB
4          v.
                                        Washington, D.C.
5    DONALD J. TRUMP, et al.,
                                        July 24, 2025
6                    Defendant(s).

7    ---------------------------------------------------------

8               STATUS CONFERENCE HELD VIA ZOOM
             BEFORE THE HONORABLE JAMES E. BOASBERG
9               UNITED STATES DISTRICT CHIEF JUDGE

10   APPEARANCES:

11   FOR THE PLAINTIFF(S):  Lee Gelernt, Esquire
                            American Civil Liberties Union
12                          125 Broad Street
                            18th Floor
13                          New York, New York 10004

14                          Aditi Shah, Esquire
                            Arthur B. Spitzer, Esquire
15                          American Civil Liberties Union
                            529 Fourth Street Northwest
16                          Suite 722
                            Washington, D.C. 20043
17

18   FOR THE DEFENDANT(S):  Tiberius T. Davis, Esquire
                            United States Department of Justice
19                          950 Pennsylvania Avenue Northwest
                            Washington, D.C. 20530
20

21   REPORTED BY:           Tammy Nestor, RMR, CRR
                            Official Court Reporter
22                          333 Constitution Avenue Northwest
                            Washington, D.C. 20001
23                          tammy_nestor@dcd.uscourts.gov

24

25
```

1    The following proceedings began at 10:01 a.m.:

2            THE COURT:  Good morning, everyone.

3            THE COURTROOM DEPUTY:  Good morning, Your Honor.

4            All right.  Good morning, everyone.  We are here

5    today for a status hearing in Civil Action 25-766, JGG,

6    et al. versus President Donald Trump.

7            Beginning with counsel for the plaintiff, if you

8    would please approach the lectern and identify yourself for

9    the record.

10           MR. GELERNT:  Good morning, Your Honor.  Lee Gelernt

11   from the ACLU for plaintiffs.

12           THE COURT:  Good morning.

13           MR. DAVIS:  Good morning, Your Honor.  Tiberius Davis

14   on behalf of the government.

15           THE COURT:  Okay.  Good morning.

16           Nikki, do we have the public line?

17           THE COURTROOM DEPUTY:  Yes.

18           THE COURT:  All right.  So I brought everybody here

19   today to see if there are any updates on the parties'

20   positions in the case given the fairly significant factual

21   developments that have occurred recently, in particular, the

22   release of the CECOT prisoners to Venezuela.

23           I am aware that while administrative stays from the

24   court of appeals remain in place regarding both contempt

25   proceedings and my preliminary injunction, that I have very

1    limited power to award any relief, but I still maintain

2    jurisdiction over the underlying case to determine the

3    parties' positions.

4         So I begin with a brief recap.  As everyone knows,

5    the proceedings here have been moving, or to be more

6    accurate, right now not moving on two separate tracks, the

7    contempt track and the merits track.

8         On the contempt track, on April 16, this Court found

9    probable cause the defendants were in contempt for violating

10   its order barring the government from transferring certain

11   individuals into foreign custody pursuant to the Alien

12   Enemies Act.  I ordered the government to either purge its

13   contempt or identify the contemnors so that the matter could

14   be referred for prosecution.

15        The government appealed and obtained an

16   administrative stay, not a merit stay, which has now been in

17   place for three months.  I have no doubt that such a lengthy

18   stay has been frustrating to plaintiffs, especially now that

19   the recent whistleblower allegations by Mr. Reuveni, to the

20   extent they prove accurate, have only strengthened the case

21   for contempt.

22        I assure you that if and when the stay is finally

23   lifted, this Court will follow up on these revelations and

24   how they affect the contempt proceedings.

25        In addition, whether or not I am ultimately permitted

1    to go forward with the contempt proceedings, I will

2    certainly be assessing whether government counsel's conduct

3    and veracity to the Court warrant a referral to state bars

4    or our grievance committee which determines lawyers' fitness

5    to practice in our court.

6         On the merits track, on June 4, this Court issued a

7    preliminary injunction.  It first found that the government

8    did not have constructive custody over the men deported

9    under the AEA and then housed at CECOT in El Salvador.  I

10   note as an aside that some recent developments may have

11   called the government's representations on that issue into

12   question.

13        In any event, the Court also found that there had

14   been a due process violation in the men's summary removal,

15   and it ordered the government to advise the Court how it

16   intended to facilitate the ability of the CECOT class to

17   seek habeas relief.

18        The court of appeals also entered an administrative

19   stay, again not a merits stay, of that ruling over a month

20   ago.

21        Now, as of last week, those class members have been

22   sent to Venezuela as part of a prisoner exchange, so I want

23   to explore with the plaintiffs how, if at all, this changes

24   the posture of the case.

25        So to begin, Mr. Gelernt, can you tell me whether the

1    men are now held in any capacity in Venezuela or if they are

2    free in Venezuela or some combination?

3         MR. GELERNT:  So, Your Honor, we are trying to

4    contact all of the plaintiffs.  We know that some are out

5    now.  We believe that initially they were all detained for

6    processing.  Whether they all have been released or all

7    eventually will be released, I think, remains a question.

8         As far as I know, they are all not out of detention

9    yet, but I don't want to say that for certain because it's

10   been a very fluid situation.  I don't know if the government

11   knows or not whether the president of Venezuela has released

12   them all at this point.

13        THE COURT:  Mr. Davis, do you know the answer to

14   that?

15        MR. DAVIS:  The United States government doesn't have

16   relations with the Maduro regime, so we don't really have

17   insight.  What Mr. Gelernt said is our understanding as

18   well, that they were initially held for some processing.  We

19   think that he's going to release them all, or at least most

20   of them, but if he holds them in custody, that's purely up

21   to the Maduro regime and their own sort of law and

22   processes.

23        THE COURT:  So the next question, Mr. Gelernt, and I

24   think, as you say, this is a fluid process so you are not

25   going to have full answers, but maybe you can think this

 1    through, which is, what do they feel about their current

 2    status?  In other words, are some of them happy to stay in

 3    Venezuela as long as they are released and they don't want

 4    any further proceedings here?  Do others still wish to

 5    challenge their AEA removal?

 6        Maybe the answer is you are going to need some time

 7    to find that out, but I wonder if you even have a sense of,

 8    some you have talked to, where they stand on it.

 9        MR. GELERNT:  Your Honor, we have not been able to

10    talk to any of them yet.  We have heard from them through

11    emails and texts.  We want to be sure that we can talk to

12    each one of them to ask exactly the question you are raising

13    here and make sure that they are talking freely and not

14    under surveillance.

15        My sense is that there may be some who feel like it's

16    too dangerous to come back here and risk being sent to CECOT

17    again.  But as Your Honor knows, the individuals that were

18    removed under the Alien Enemies Act were taken out of

19    immigration proceedings where they were applying for asylum.

20        So what's happened now is we are thrilled that the

21    litigation has pushed to get them out of CECOT, which, as

22    Your Honor has noted in various opinions and is widely

23    understood, is basically a torture chamber.

24        That part is good, that they are back in Venezuela.

25    But, of course, many of them, perhaps most of them, who were

1    removed under the Alien Enemies Act, maybe all of them, were

2    seeking asylum precisely because they were in danger in

3    Venezuela.

4         If I had to speculate, I would say there may be some

5    mix of ideas, but we intend to try to reach them all

6    immediately assuming they are all out of detention.  And

7    I'll keep the Court apprised of what we are learning.

8         I suspect this is your next question, but I mean, you

9    know, what we would sort of like to see, but I can hold off

10   on --

11        THE COURT:  So I guess that's sort of a combination

12   of my next question and your next answer, which is, so for

13   those who want to have -- who are seeking asylum, it would

14   seem that under my ruling, again, which is currently stayed,

15   they would first have an AEA hearing to determine whether

16   it's appropriate that they were summarily removed under the

17   AEA, and then if the answer to that is no, then they would

18   be back in immigration proceedings.

19        Now, again, it would seem that that might well be in

20   U.S. custody, some form of U.S. custody, for both of those.

21   And so, as you are well aware, they have to weigh whether

22   they want that, so, I guess, which is the lesser evil.

23        MR. GELERNT:  Right.

24        THE COURT:  So you're right.  So my question is, for

25   those who aren't satisfied with remaining in Venezuela, what

1    will you be asking for?

2         MR. GELERNT:  Yeah.  So I think that we are going to

3    need a bit of time to figure out all the legal permutations.

4    As Your Honor probably knows, the government filed briefs

5    very late last night in the circuit laying out a little bit

6    of it, and we need to respond to all those briefs by Monday.

7         THE COURT:  Can I ask you --

8         MR. GELERNT:  I'm sorry.

9         MR. DAVIS:  I'm sorry to interrupt, but that was the

10   contempt panel, not the --

11        MR. GELERNT:  Both.

12        THE COURT:  Both?  Okay.

13        MR. GELERNT:  Both panels asked for -- the contempt

14   panel asked for a longer brief.  The PI CECOT panel asked

15   for sort of responses.

16        THE COURT:  I'm sorry.  Please go ahead.

17        MR. GELERNT:  So I think just sort of stepping back,

18   there's no question, I think, the big takeaway is the

19   government needs to bring people back who want to come back.

20   What the government's papers did not say sort of

21   conspicuously last night is whether they are willing to

22   allow people to come back.  They danced around it with a lot

23   of jurisdictional arguments.

24        And that was a fairly remarkable absence in my view

25   because the government filed a declaration in another case

1    involving just one individual, but we submitted -- I think

2    the government also submitted it to the circuit from

3    Ms. Harper, which said that Maduro will not stand in the way

4    of anybody returning for a court proceeding.

5        And as Your Honor knows, the big fundamental issue

6    when they were at CECOT was the government claiming they had

7    no way to get people out.  Well, now it's all up to the U.S.

8    government.

9        So I hope the government will stand up today and say,

10   if there are proceedings in the U.S., whether those are

11   habeas proceedings, immigration proceedings, they will allow

12   individuals to come back.

13       I mean, certainly if the government is going to

14   continue with their jurisdictional arguments, we are going

15   to brief those in the circuit and they are already teed up.

16   As Your Honor has noted, they have been sitting there for a

17   while.  We think clearly the Court was right to use equity

18   for the due process claim.  Whether the constructive custody

19   claim changes now in light of various developments, you

20   know, I think that's something we are thinking through.

21       THE COURT:  I think there's not only the U.S.

22   government's involvement in the prisoner exchange, but

23   certainly El Salvador's representations to the United

24   Nations were relevant --

25       MR. GELERNT:  Absolutely.  And as Your Honor knows,

1    habeas attaches at the time of filing, so that's another

2    element, as well as the U.S.'s participation in this

3    transfer because it's not clear, at least from the public

4    reporting, what El Salvador got out of this transfer.

5            So it seems like the U.S. and Venezuela were actually

6    doing the negotiating, and El Salvador was -- and the

7    individuals were basically pawns in what people refer to

8    technically as chain refoulement where they ended up where

9    they were fleeing from because of a chain of events the U.S.

10   put in place.

11           So back to your point about your order and getting

12   habeas, I think a number of scenarios are possible.  The

13   individuals will certainly be told that if the U.S. wants to

14   detain them, they probably have no choice if they come back

15   and be detained.  And it may be that that's too much for

16   them, but it may be more just that if we can assure them

17   they are not going to CECOT again, they're willing to be in

18   detention because they are in such danger in Venezuela.

19           The government is saying if we have to detain them,

20   so be it, and then they can have habeas.  I don't know that

21   they will necessarily go forward with their individual

22   habeases immediately because it may be that ultimately the

23   Supreme Court says the Alien Enemies Act can't be invoked at

24   all, and that ends the matter.

25           If the Supreme Court says it can be invoked, then

```
 1    they will go forward to show that they are not TdA.  Maybe
 2    some will want to do it in reverse order.
 3         The government pointed out in the circuit, well, it
 4    would be odd for us to now bring them back and detain them.
 5    We are obviously happy if the government brings them back
 6    and doesn't detain them.  Then they could go forward with
 7    their immigration proceedings or they could be at large if
 8    the government choses that.  And if they ultimately were
 9    going to be removed under the AEA at that point, they would
10    reinstate their habeases.
11         I just don't want the government to be able to get
12    away with sort of form over substance.  Ultimately the
13    government has sent them away.  They have a right to come
14    back.  The government has now made an enormous concession
15    that the foreign government will not block them coming back.
16    So it's all on the U.S. government now to pointedly say we
17    will let them back or we will not.
18         THE COURT:  And then to the extent, right, we will
19    see what the Supreme Court says about the validity of the
20    AEA.  If the Supreme Court upholds its validity, meaning,
21    again, not the act itself, but the proclamation pursuant to
22    the act, then those habeas -- and the individuals are
23    brought back, then those habeas claims would be heard in the
24    districts where they are confined, do you believe, or do you
25    think --
```

```
 1           MR. GELERNT:  I think that's still an open question.

 2     You know, I think if the government brings them back, it

 3     depends where they bring them back.  I mean, Your Honor had

 4     floated Guantanamo.  We hope that that won't be the case.

 5     But if that's true, then I think the individual habeases

 6     would be heard here.

 7           If they are in a different place of confinement, I

 8     suspect the government will take that position and we will

 9     have to assess that, but it may be that that's where the

10     habeases would go forward.

11           I would just say that if it comes down to that and

12     the Supreme Court upholds the invocation of the act, upholds

13     proclamation, the use of the proclamation, and they have

14     individual habeases, I suspect that a good portion, maybe

15     almost all of them, will win those cases to show they are

16     not TdA given the evidence that's emerged even since we've

17     been here before you that it was largely tattoos that have

18     no bearing on whether you are a TdA member.

19           THE COURT:  Let me just wind up, Mr. Gelernt.  Is

20     there anything that you are asking the Court to do now,

21     number one; and number two -- I'll start with that.

22           Is there anything you want me to do?  Otherwise, I

23     would think we would have status reports going forward as

24     you ascertain the desires of the class members.

25           MR. GELERNT:  I think certainly status reports would
```

1    be welcome on our part, and we intend to do it.  I think in

2    addition to that, we would hope that Your Honor can ask the

3    government today whether they intend to allow people to come

4    back and how they intend to facilitate that.

5        I think we need to think a little more about what, if

6    anything, you can do while the cases are in the circuit.

7    Our view is that there may be some things you can do

8    including potentially some discovery as to the PI.

9        You know, as Your Honor pointed out, the decision

10   about constructive custody was based on the then-current

11   record.  A lot has happened.  There may be discovery that we

12   think you can do.  There may be other things.  But I think

13   we would prefer to brief you on that if we think there is

14   additional stuff to do other than the status reports, if

15   that's okay.

16       THE COURT:  Yes, definitely.  And what -- in terms of

17   status reports timing, do you want to do every 30 days?  Is

18   that -- what --

19       MR. GELERNT:  I think we would like to do --

20       THE COURT:  More frequently?

21       MR. GELERNT:  -- more frequently, if my team is not

22   going to be angry about that.  I think the first status

23   report at least, I think we would like to give you in two

24   weeks.  And we are hoping that we can reach individuals

25   then.  I think it's going to be a question of both have they

1    been released, can we get phone numbers for them, and do

2    they feel like they can talk freely in Venezuela.

3          I don't know that we are going to be able to visit

4    them, but I would prefer if we could at least do the initial

5    status report in two weeks.

6          THE COURT:  All right.  So that will be August 7.  I

7    will memorialize that in an order.  Okay.  Thank you very

8    much.

9          MR. GELERNT:  Thank you, Your Honor.

10         THE COURT:  All right.  Mr. Davis, so now that you

11   have facilitated the release of this class from CECOT to

12   Venezuela, what is your plan?

13         MR. DAVIS:  Well, currently we think that there's no

14   jurisdiction for this Court to do anything.  The two issues

15   where the Court arguably would still have jurisdiction are

16   on appeal, and so the D.C. Circuit is currently asking

17   questions about that.  They will resolve those questions,

18   and we will see where that goes.

19         Otherwise, you know, my colleague mentioned the JOP

20   case where there's an order currently to facilitate the

21   return of an individual there, and we will do that because

22   we are not challenging that.  If the individual wants to, we

23   think a good first step is for them to go find out what each

24   of their members want.

25         But if there is a lawful order to facilitate them,

1    Venezuela has made assurances that they will allow us to do

2    that.  Maduro can be very mercurial so it's hard to know how

3    that would play out.  But if there is a lawful order, we

4    will follow through with that.  We just don't believe right

5    now there's jurisdiction.

6         THE COURT:  All right.  I understand that I can't

7    issue an order bringing -- ordering you to bring these folks

8    back because that would relate to my due process proceedings

9    which I agree are stayed.  But you are saying if -- I will

10   let you respond.

11        Do you want to respond?  Go ahead, Mr. Gelernt.

12        MR. GELERNT:  I don't want to respond.  I would never

13   interrupt.

14        I was told -- I apologize for this.  I was told to

15   tell the Court that the public line is not working.  And I

16   don't know if that's deliberate, but I apologize for

17   interrupting.

18        THE COURT:  No.  Thank you.  Not deliberate.

19        THE COURTROOM DEPUTY:  No, not deliberate.  It could

20   be that it reached its max of participants.  I will send a

21   message to OIT.

22        THE COURT:  All right.  We are going to be done soon

23   anyway.

24        Okay.  So I acknowledge, Mr. Davis, my lack of power

25   at this point to do -- to issue such an order, but you are

1    saying that if an order to return these class members for

2    AEA habeas hearings is issued, that the government is

3    prepared to comply with that?

4        MR. DAVIS:  I mean, if we take appeals, it's not

5    stayed, all of that, yes.

6        THE COURT:  Okay.  And if in the event that the

7    Supreme Court finds the proclamation invalid according to

8    the AEA, then are you also willing to return these people

9    for their immigration proceedings?

10       MR. DAVIS:  I think that the plaintiffs would have to

11   bring different claims than the ones they currently do.  The

12   ones they currently have are premised on removal under the

13   AEA, and we believe that those have to be brought in habeas

14   and thus require custody.

15       So we would have to see what those claims look like.

16   And I don't have an analysis at my fingerprints of what that

17   would look like absent AEA.

18       THE COURT:  Right.  But the main point is that a

19   valid order to return them for AEA habeas hearings you would

20   comply with?

21       MR. DAVIS:  We would comply with the lawful order.

22   Obviously we may take it up and try to stay it, but if --

23       THE COURT:  No.  I say that meaning a lawful order

24   that is affirmed.

25       MR. DAVIS:  Yes.

1        THE COURT:  All right.  Anything else you want to
2   state, Mr. Davis?
3        MR. DAVIS:  I just sort of want to clarify the facts
4   on the ground a little bit.  The state department just gave
5   statements to the UN this morning on this matter so this is
6   public.
7        This initiated in April with Bukele reaching out to
8   the Maduro regime about wanting to send the people back in
9   exchange for the release of political prisoners in
10  Venezuela.  He initiated that.  It fell apart.  This was in
11  the record, I believe, before you.  Kozak talked about it.
12  There are tweets about it.
13       Those talks restarted and the U.S. was an
14  intermediary partially because Bukele and Maduro hate each
15  other; although, we also don't have official relationships
16  with the Maduro regime.  And the essential agreement that
17  Venezuela and Maduro wanted to make was to send the 252
18  people, the entire class of Venezuelans, to Venezuela and
19  that the Maduro regime would release 80 political prisoners
20  and then also send back 10 American prisoners.
21       Bukele wanted this presumably because he thinks that
22  it makes him look more humanitarian, it makes him look like
23  he's a master on the world stage and undermines Maduro to
24  have some of his own political prisoners released.
25       So everybody who was released for the Americans came

1    back to Venezuela or to El Salvador first, and they had a

2    press conference.

3         So the primary movers here were El Salvador and

4    Venezuela.  The United States had involvement in negotiating

5    it and obviously got the return of prisoners out of it.  I

6    don't think -- if anything, the fact that this had to happen

7    and the way that it happened shows that we did not have

8    constructive custody.

9         I think the Abrego Garcia situation where it took six

10   weeks for anything to happen and an indictment shows we

11   didn't have constructive custody.

12        The UN documents was -- frankly, we are not sure how

13   that came about.  We weren't aware of it at the time.  But

14   it was sort of in line with some of the things in the record

15   which are under seal so I can't get into a lot of detail

16   about but where there were a lot of misunderstandings from

17   lower-level Salvadoran officials about the arrangement and

18   that that was clarified.

19        And so we think that's just part and parcel of that,

20   and this development shows we didn't have constructive

21   custody.  And we certainly don't have constructive custody

22   when they are in Venezuela now and may not even be in

23   custody at all in Venezuela.

24        THE COURT:  I agree you don't have constructive

25   custody now.  Okay.  Thank you very much.

1          Mr. Gelernt, anything else?

2          MR. GELERNT:  Yeah.  I mean, obviously we disagree

3     with all of that characterization, but I won't get into it.

4          Just two quick points.  I think one question for the

5     government is they didn't really push back when you said

6     there was no due process at all.  They have been going back

7     and forth to the Supreme Court trying to get the Supreme

8     Court to allow them to have minimal due process, first 12

9     hours, then 24 hours.  The Supreme Court put its foot down

10    and said 24 hours is not remotely feasible.

11         But Your Honor found that there was no due process.

12    So even if the Supreme Court had signed off on 12 hours,

13    given that the government didn't really push back on that

14    finding because they couldn't factually push back on it,

15    it's not clear to me why the government, now that they can

16    bring people back, now that there's not the problem with

17    El Salvador and CECOT, is not just willing to allow the

18    individuals to come back.

19         I think they are now saying they will comply with an

20    order.  That's great obviously for this administration to

21    say that, but I don't know why the government can't just

22    allow the individuals to come back.  They really haven't

23    contested that there was a due process violation.  They can

24    allow the individuals back.  We hope that the government

25    will change its mind and allow these individuals to come

1    back.

2         The second point I just wanted to make is more of a

3    housekeeping point.  Your Honor has noted on a few occasions

4    that some of the individuals were removed on the ground,

5    according to the government, that they had Title 8

6    immigration orders and were not removed, quote/unquote,

7    solely under the AEA.

8         We still haven't gotten to the bottom of that.  The

9    government has not given us the removal orders.  We now are

10   finding out more and more information including the

11   possibility that some of those removal orders were dated on

12   the 15th, the very day the plane took off.

13        I just want to put a pin in that that I think we will

14   be pursuing that because if those individuals were under the

15   AEA or there was something untoward going on there, that

16   plane was clearly on the ground.  And so they would not only

17   come within the class, but I think that would be a clear

18   issue, additional issue, for contempt.

19        THE COURT:  Okay.

20        MR. GELERNT:  Thank you, Your Honor.

21        THE COURT:  Thank you very much.

22        All right.  Thank you all.  I will issue an order

23   stating that the first plaintiffs' status report will be due

24   August 7, and then I will ask both sides to continue to keep

25   me updated if further developments affect the posture of the

1    case.

2         MR. GELERNT:  Your Honor, will the government be --

3    sorry.

4         I think it would be helpful for the government to

5    file status reports to the extent that they have any

6    additional or new information as well.

7         THE COURT:  I would ask for joint status reports.

8         Mr. Davis, you may or may not have other information

9    at that point, but certainly I'm most interested in hearing

10   about plaintiffs' positions.

11        Okay.  Thank you all.

12        (The hearing concluded at 10:27 a.m.)

13                           - - -

14                  C E R T I F I C A T E

15

16        I hereby certify that the foregoing is an accurate

17   transcription of the proceedings in the above-entitled

18   matter.

19

20

21   7/24/25              s/ Tammy Nestor
                          Tammy Nestor, RMR, CRR
22                        Official Court Reporter
                          333 Constitution Avenue NW
23                        Washington, D.C. 20001
                          tammy_nestor@dcd.uscourts.gov
24

25