**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

**PETITIONERS-PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 3

LEGAL STANDARD ................................................................................................ 8

ARGUMENT ............................................................................................................ 9

I. THE COURT HAS JURISDICTION ................................................................ 9

  A. The Court Has Equitable Jurisdiction Over Plaintiffs' Due Process Claim. ...................... 9

  B. The Court Has Habeas Jurisdiction Because Plaintiffs Were in the Constructive Custody of the United States at CECOT ................................................................... 9

    1. New evidence confirms that Plaintiffs were in the constructive custody of Defendants at CECOT. ................................................................................. 11

    2. New evidence shows that Defendants' conclusory assertions in the Kozak Declaration cannot be credited. ............................................................ 21

    3. Plaintiffs continue to suffer collateral consequences that this Court can redress. ........ 25

  C. The Court Also Has Habeas Jurisdiction Because Plaintiffs' AEA Designation Subjects Them to Continuing Restraints in Venezuela........................................................ 27

II. ON THE MERITS, THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION ORDERING DEFENDANTS TO FACILITATE CLASS MEMBERS' ABILITY TO CONTEST THEIR AEA DESIGNATIONS. ................................................. 28

  A. Plaintiffs Are Likely to Succeed on Their Due Process Claim. ..................................... 28

  B. The Government's Flagrant Disregard for Due Process Is Causing Plaintiffs Irreparable Harm. .............................................................................................. 29

  C. For the Reasons Already Identified by this Court, the Balance of Equities and Public Interest Weigh Decidedly in Favor of a Preliminary Injunction Order. ............................. 31

CONCLUSION......................................................................................................... 32

## INTRODUCTION

Petitioners-Plaintiffs ("Plaintiffs") file this motion seeking preliminary relief on behalf of the class of Venezuelan men who were unlawfully removed pursuant to the Alien Enemies Act ("AEA") on March 15 and 16, 2025, and detained at El Salvador's notorious CECOT prison until July 18, 2025, when they were transferred to Venezuela. While these men are no longer at CECOT, Defendants' illegal actions mean that they now face the risk of persecution and serious harm in Venezuela.[1]

The Court has jurisdiction on three independent grounds. First, Plaintiffs continue to have a due process claim in equity. *See* ECF 148 ("June 4 Op.") at 27-31. As the Supreme Court recognized in another AEA case involving an analogous situation, Defendants cannot sidestep this claim by invoking the "self-defeating notion that the right to the *notice* necessary to 'actually seek habeas relief' must itself be vindicated through individual habeas petitions, somehow by plaintiffs who have not received notice." *A.A.R.P. v. Trump*, 605 U.S. 91, 98 (2025) (quoting *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025)). Second, this Court has habeas jurisdiction over Plaintiffs' due process claim because Plaintiffs were in Defendants' constructive custody when they were imprisoned at CECOT and habeas jurisdiction attaches at the time of filing—precisely so that the courts do not lose jurisdiction because of a respondent's decision to move a detainee from place to place. Although this Court previously declined to find constructive custody on the

---

[1] Because the D.C. Circuit vacated this Court's June 4 Opinion, which included decisions on both class certification and preliminary relief, Plaintiffs have simultaneously filed a renewed motion for class certification. Plaintiffs seek certification of substantially the same class this Court previously certified:

> All noncitizens removed from the United States and transferred to the Terrorism Confinement Center (CECOT) in El Salvador on March 15 and 16, 2025, pursuant solely to the Presidential Proclamation entitled, "Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua."

then-existing record, substantial new evidence calls for the Court to revisit that finding. Third, Plaintiffs remain in Defendants' constructive custody in Venezuela because of the serious ongoing restraints resulting from their AEA designation.

Regardless of how the Court reaches the merits, Plaintiffs prevail. As this Court previously found, the government violated class members' due process rights: the class members were whisked away without receiving any process *at all*, and the Supreme Court has squarely held that "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster." *A.A.R.P.*, 605 U.S. at 95 (staying removal of AEA detainees). Defendants have never contested that finding before this Court. *See generally* ECF 169 (July 24 Hearing Tr.).

The remaining preliminary injunction factors weigh heavily in Plaintiffs' favor. Plaintiffs never had the opportunity to challenge the government's allegations of their Tren de Aragua ("TdA") membership or present claims for humanitarian relief—instead, they were plucked from immigration proceedings and forced back to the very country they fled. Plaintiffs not only face ongoing grave and irreparable harm from persecutors they attempted to escape in the first place, but they also now face the added burden of navigating the consequences of being labeled as members of TdA—including intimidation from the Venezuelan government, possible violence from other Venezuelan gangs, and even the threat of attacks from TdA itself. And Defendants can no longer claim any alleged foreign affairs barriers to facilitating Plaintiffs' ability to contest their AEA designations, as the government has acknowledged it has an agreement in place with Venezuela to permit facilitation of habeas relief. ECF 168-1 (Mellissa B. Harper Decl.) ¶ 9; July 24 Hearing Tr. 14:25-15:5.

Plaintiffs ask the Court to again order the government to "facilitate Plaintiffs' ability to proceed through habeas and ensure that their cases are handled as they would have been if the Government had not provided constitutionally inadequate process." June 4 Op. at 67. To ensure an expeditious resolution, Plaintiffs seek a Court order requiring the government to submit a notice to the Court advising how it intends to facilitate the ability of class members to contest their AEA designations.

## BACKGROUND

The Court is already familiar with this case and has recounted its background in detail. *See* June 4 Op. at 5-12. Accordingly, Plaintiffs describe only the Court's June 4 Memorandum Opinion and subsequent developments.

The June 4 Opinion granted a preliminary injunction and ordered the government to facilitate Plaintiffs' ability to pursue habeas relief to challenge their removal under the AEA. *Id.* at 67, 69. Ruling on Plaintiffs' due process claim, the Court held that "the CECOT Class was removed from the United States before its members had any meaningful opportunity 'to actually seek habeas relief,' thereby violating their due-process rights." *Id.* at 13 (quoting *J.G.G.*, 604 U.S. at 673). The Court therefore ordered that "members of the CECOT Class must be allowed the practical opportunity to seek habeas relief that they were previously denied" and that "Defendants must facilitate as much." *Id.* at 13-14. The Court then gave Defendants a week to submit a notice to the Court "advising how they intend to facilitate the ability of the CECOT Class to seek habeas relief." *Id.* at 69.

Defendants did not offer a proposal. Instead, they appealed the decision and sought a stay pending appeal. Defs.' Emer. Mot. for Stay Pending Appeal and Admin. Stay, *J.G.G. v. Trump*, No. 25-5217 (June 10, 2025) (hereinafter "Defs.' Stay Mot."). The stay motion claimed that this

Court lacked jurisdiction but did not contest its merits holding. The panel issued an administrative stay and ordered briefing. Order, *J.G.G. v. Trump*, No. 25-5217 (D.C. Cir. June 10, 2025).

While the motion remained pending at the D.C. Circuit, important new facts came to light. The former Acting Deputy Director for the Department of Justice's Office of Immigration Litigation ("DOJ OIL"), Erez Reuveni, submitted a whistleblower disclosure to Congress that described the events of March 15 and 16 in more detail. ECF 158-1 (Reuveni Whistleblower Disclosure). He later provided text messages, emails, and telephone logs to corroborate his initial disclosure. Exhs. F (evidence in support of Mr. Reuveni's whistleblower disclosure), G (same). The emails demonstrate that Mr. Reuveni, a member of Defendants' AEA litigation team, gave clear instructions to Department of Homeland Security ("DHS") and State Department officials not to deplane Plaintiffs in El Salvador; the emails also included the then-Acting Director for OIL. Exh. F-3 at 10; Exh. F-4 at 15-19; Exh. F-5 at 24.[2] Mr. Reuveni's disclosure describes additional emails from the Deputy Assistant Attorney General on March 15 to DHS and State Department officials reflecting the same understanding of the injunction and instructing compliance. ECF 158-1 (Reuveni Whistleblower Disclosure) at 15-16.[3]

Around the same time, a report was made public from the United Nations Office of the High Commissioner for Human Rights, Working Group on Enforced or Involuntary Disappearances investigating the disappearance of several individuals sent to CECOT. ECF 160-1 ("U.N. Report"). The Report included El Salvador's response to U.N. inquiries about the individuals, with the following statement:

---

[2] Citations for all exhibits attached to this motion are to the page numbers provided in the original document.

[3] Citations for all ECF cites are to the ECF page number.

The Salvadoran State emphatically states that its authorities have not arrested, detained, or transferred the persons referred to in the communications of the Working Group. The actions of the State of El Salvador have been limited to the implementation of a bilateral cooperation mechanism with another State, through which it has facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of that other State. *In this context, the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities,* by virtue of international agreements signed and in accordance with the principles of sovereignty and international cooperation in criminal matters. In this regard, the actions attributable to the Salvadoran State are limited to its sovereignty and territorial jurisdiction, and therefore it cannot be held responsible for the failure to observe the principle of non-refoulement with respect to the persons mentioned.

*Id.* at 5, 9, 13 (emphasis added) (identical responses for three individuals); *see also id.* at 17 (response to subsequent U.N. inquiry for fourth individual "reiterat[ing]" that El Salvador "has only facilitated the use of Salvadoran prison infrastructure for the reception and custody of persons detained within the scope of the justice system and law enforcement of another State" and that "the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities, by virtue of international agreements signed and in accordance with the principles of sovereignty and international cooperation in criminal matters").

Additionally, reporting in July revealed that the United States had worked to negotiate a deal to free several Americans and political prisoners in Venezuela in exchange for the transfer of Venezuelans imprisoned at CECOT to Venezuela. Exh. J (Smith Decl.) at Exh. 6 (noting initial negotiations by Defendants Secretary of State Marco Rubio and the State Department occurred through May 2025); *id.* at Exh. 11 (same).[4] The exchange ultimately occurred on July 18, 2025: ten U.S. citizens and permanent residents detained in Venezuela were released to the United

---

[4] Although this negotiation plainly fell within the scope of ordered discovery, *see* ECF 128 (explaining scope of ordered discovery), Defendants provided no information or communications in discovery regarding this issue, including no relevant entries on a privilege log.

States; 80 Venezuelan political prisoners were released from Venezuelan jails; and all 252

Venezuelans detained at CECOT were sent to Venezuela. Exh. J (Smith Decl.) at Exh. 7.

The day of the exchange, the government filed a declaration by an ICE official in a

different case, in response to a court order requiring the government to provide information about

the current location of one Venezuelan who had been detained at CECOT. *See* Decl. of Mellissa

B. Harper, Acting Ass't Dir., Removal Division, ICE Enf. & Removal Ops., *J.O.P. v. DHS*, No.

8:19-cv-1944 (D. Md. July 18, 2025), ECF 352. Plaintiffs then submitted that declaration to this

Court. *See* ECF 168 & Exh. A (Harper Decl.). As relevant here, the Harper Declaration states

that:

> As part of these negotiations, the United States obtained assurances from the
> Maduro regime that (1) if and when U.S. legal proceedings reach a stage where the
> appearance of one of the 252 Venezuelan nationals formerly housed at CECOT may
> be called for in legal proceedings or required by a court; (2) if the U.S. government
> is prepared to facilitate the person's travel to the United States for that purpose; and
> (3) if the individual is willing to travel to the United States for that purpose, the
> Maduro regime will not impose obstacles to the individual's travel.

ECF 168-1 (Harper Decl.) ¶ 9.

This Court held a status conference a few days later. The government confirmed that "if

there is a lawful order to facilitate" the return of class members, "Venezuela has made assurances

that they will allow us to do that." July 24 Hearing Tr. 14:25-15:5; *see also id.* at 16:18-25

(Court: "But the main point is that a valid order to return them for AEA habeas hearings you

would comply with?" Government counsel: "We would comply with the lawful order."").

Although government counsel claimed that the "primary movers here were El Salvador and

Venezuela," counsel acknowledged that "the United States had involvement in negotiating [the

deal] and obviously got the return of prisoners out of it." *Id.* at 18:3-8.

In light of the "intervening events," the D.C. Circuit elected to "vacate the district court's order and remand for further proceedings." Order at 1, *J.G.G. v. Trump*, No. 25-5217 (D.C. Cir. Aug. 8, 2025) (hereinafter "D.C. Circuit Order").

Plaintiffs' counsel has been in communication with class members since their transfer to Venezuela, where they face threats and extortion from the government, as well as other harms and restrictions. Exh. C ¶¶ 14-17; Exh. E ¶¶ 4-8; *see also* Exh. A (Andres Antillano Supp. Decl.) ¶¶ 5-6. Plaintiffs have struggled to find work because they have been labeled as TdA members and terrorists. Exh. C ¶ 19; Exh. E ¶ 10. They fear that they are unable to travel outside of Venezuela now due to the label. Exh. B ¶¶ 13-14; Exh. C ¶ 18; Exh. D ¶ 14; Exh. E ¶ 6. Class members strongly wish to clear their names, Exh. C ¶ 20; Exh. D ¶ 15; Exh. E ¶ 15, and as Plaintiffs' counsel notified this Court, "many class members reached wish to pursue their cases to return to the United States," ECF 170 (Aug. 7 Status Report) at 1-2; *see also* Exh. B ¶ 11; Exh. C ¶¶ 20-21; Exh. D ¶ 16; Exh. E ¶ 16. Further, now that Plaintiffs are no longer held incommunicado at CECOT, they have been able to provide new evidence that they were held in the custody of the United States there, including statements to them by Salvadoran officials that they could only be released at the direction of the United States. Exh. B ¶¶ 4-6; Exh. C ¶¶ 9-10; Exh. D ¶¶ 7-8; Exh. E ¶ 3.

In addition to this torrent of new factual developments, a CNN article reported on emails from "days before" the March 15 flights between President Bukele's brother Ibrajim and Michael Needham, chief of staff to Secretary of State Marco Rubio, describing the proposed arrangement between the United States and El Salvador. Exh. J (Smith Decl.) at Exh. 8. CNN both directly quoted and paraphrased the emails:

- CNN stated that in the emails, Ibrajim Bukele requested requirements for those deported to El Salvador, and Mr. Needham responded that the "baseline requirements do not differ from El Salvador's for the treatment of prisoners." *Id.* (quoting Mr. Needham's email).

- CNN stated that the emails describe the arrangement as including the U.S. providing transportation and related costs and paying a one-time fee of $10 million. *Id.*

- CNN quoted an email as stating: "Upon all nine being returned, (El Salvador) will provide (US government) a 50% discount for year 2, if necessary, of the original TdAs." CNN describes the "nine" as a reference to a request by El Salvador for nine MS-13 members. *Id.*

Defendants did not disclose any such emails to Plaintiffs or include them on a privilege log, although they would fall within the scope of Plaintiffs' first request for production. *See* ECF 125-1 (Pls.' Proposed Discovery Requests) at 3 (requesting "[a]ll documents memorializing, documenting, or describing the arrangements between the United States and El Salvador concerning the detention of alleged Tren de Aragua members in El Salvador"); ECF 128 (discovery order) at 2. *See United States v. Arevalo-Chavez*, No. 2:22-cr-00429, ECF 185 at 26 (E.D.N.Y. Jul. 16, 2025) (citing the CNN article as providing information consistent with documents unsealed by the court in that case and noting that "the proverbial cat was largely already out of the bag" prior to unsealing).[5]

## LEGAL STANDARD

---

[5] In *Arevalo-Chavez*, the government moved to dismiss charges against an alleged high-level MS-13 leader under seal, in order to send him to El Salvador. No. 2:22-cr-00429, ECF 185 at 2. In unsealing the motion, the *Arevalo-Chavez* court noted "the apparent link between El Salvador's request for the MS-13 leaders in U.S. custody and the Venezuelans who were sent to El Salvador on March 15 pursuant to the AEA." *Id.* at 25.

To obtain a preliminary injunction, the moving party must show that (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in its favor"; and (4) the issuance of a preliminary injunction is "in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

## ARGUMENT

## I.    THE COURT HAS JURISDICTION.

### A.    The Court Has Equitable Jurisdiction Over Plaintiffs' Due Process Claim.

The Court's prior jurisdictional analysis stands. First, a due-process claim is available to Plaintiffs in equity. June 4 Op. at 27-31. "Just like litigants have since the beginning of our legal tradition," Plaintiffs "may invoke this Court's equitable authority to restrain the Government from infringing upon constitutional protections." *Id.* at 31; *see also A.A.R.P.*, 605 U.S. at 98 (rejecting the "self-defeating" "notion that the right to the *notice* necessary to 'actually seek habeas relief' must itself be vindicated through individual habeas petitions, somehow by plaintiffs who have not received notice"). Second, venue is proper in the District of Columbia because Plaintiffs have "named proper defendants and sued them in the district in which they reside." June 4 Op. at 32-33. The intervening events do not alter these conclusions. Accordingly, for the reasons the Court previously set forth, the Court should find it has jurisdiction in equity to rule on Plaintiffs' due process claim.

### B.    The Court Has Habeas Jurisdiction Because Plaintiffs Were in the Constructive Custody of the United States at CECOT.

Independently, the Court should also find habeas jurisdiction. The Court has habeas jurisdiction over Plaintiffs' claims because Plaintiffs were in Defendants' constructive custody when they were imprisoned at CECOT. While the Court declined to find constructive custody in

June, it acknowledged that this was "a close question" and that its decision was based only on the "current record" at the time. June 4 Op. at 23. Significant new evidence supporting a custody finding has emerged in the interim.

As this Court previously explained, the petitioner in a habeas corpus action must be "in custody," 28 U.S.C. § 2241(c), but the Supreme Court "has given the custody requirement a liberal construction, and it is not necessary that the petitioner be in physical control of the respondent," *Steinberg v. Police Ct. of Albany*, 610 F.2d 449, 453 (6th Cir. 1979) (citing, *inter alia*, *Braden v. 30th Jud. Ct. of Ky.*, 410 U.S. 484, 498-99 (1973)); *see also Jones v. Cunningham*, 371 U.S. 236, 239, 242-43 (1963) (holding that parolee was "in custody" of parole board because of the "significant restraints" on his liberty; explaining that habeas "has not been restricted to situations in which the applicant is in actual, physical custody"); June 4 Op. at 15-17. Indeed, "courts have universally held that actual physical custody of an individual by the respondent is unnecessary for habeas jurisdiction to exist." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 47 (D.D.C. 2004) (collecting cases). Rather, habeas jurisdiction exists "where the official possesses either actual or 'constructive' custody of the petitioner." *Id.* (citing *LoBue v. Christopher*, 82 F.3d 1081, 1082 (D.C. Cir. 1996)).

A petitioner can establish constructive custody where, as here, "the respondent was responsible for significant restraints on the petitioner's liberty." *Abu Ali*, 350 F. Supp. 2d at 48 (holding that individual detained in Saudi Arabia, allegedly at the behest of U.S. officials, could establish habeas jurisdiction). Courts have also found actual or constructive custody where respondents are "working through an intermediary or an agent to detain the prisoner." *See id.* at 48-49 (citing *Braden*, 410 U.S. at 489 n.4, 498-99); *see also Munaf v. Geren*, 553 U.S. 674, 686 (2008) ("An individual is held 'in custody' by the United States when the United States official

charged with his detention has 'the power to produce him,'" even if such custody "could be viewed as 'under . . . color of' another authority, such as [multinational forces].").

Custody, moreover, is assessed based on the date of filing of the habeas petition. *See Carafas v. LaVallee*, 391 U.S. 234, 238 (1968); *see also Hill v. Smoot*, 308 F. Supp. 3d 14, 22 n.4 (D.D.C. 2018); *Allen v. Allen*, No. 25-cv-848, 2025 WL 1334644, at *1 (D.D.C. Apr. 1, 2025); 17B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4262 (3d ed. September 2025 update) ("The critical moment in determining custody is when the habeas corpus petition is filed.").

The new evidence that has emerged since this Court's June 4 opinion shows that Defendants had constructive custody over Plaintiffs at CECOT when the operative complaint was filed in April 2025.

### 1. New evidence confirms that Plaintiffs were in the constructive custody of Defendants at CECOT.

The Court's prior opinion adopted the four factors set out in *Abu Ali v. Ashcroft* to assess whether the United States had constructive custody while Plaintiffs were detained at CECOT. 350 F. Supp. 2d at 47, 68; *see* June 4 Op. at 20. The Court should use the same starting point here. Applying that framework, courts consider whether: (i) a petitioner was detained "at the behest" of U.S. officials; (ii) the United States directed the "ongoing detention" by enlisting a foreign state "indifferent to the detention of the prisoner"; (iii) the United States intended the detention to be outside U.S. territory to evade judicial scrutiny; and (iv) the petitioner could be released on the United States' request. *See Abu Ali*, 350 F. Supp. 2d at 68. These factors provide a set of considerations to guide the Court's analysis, but they are not exhaustive, nor did *Abu Ali* suggest that all four must be satisfied. *Id.* at 68 n.42. Based on the new evidence and the preexisting record, these factors establish that the United States had constructive custody over

11

Plaintiffs at CECOT. *See* ECF 145 (Pls.' Sealed Resp.) at 1-15 (addressing *Abu Ali* factors in relation to evidence existing at the time).

    ***First* Abu Ali *Factor.*** Plaintiffs were detained in El Salvador at the United States' behest. As this Court previously observed, "[n]o one disputes that [Plaintiffs] are noncitizens apprehended inside the United States by U.S. officials pursuant to U.S. law and subsequently transferred to Salvadoran custody." June 4 Op. at 21. The United States "initiated [Plaintiffs'] arrest" in the United States, *Abu Ali*, 350 F. Supp. 2d at 67; transferred Plaintiffs to El Salvador; and then explicitly directed and paid for Plaintiffs' imprisonment at CECOT. Not only did U.S. officials deliver Plaintiffs to their jailers in El Salvador, *see* Exh. B ¶ 2; Exh. C ¶¶ 5-7; Exh. D ¶ 6, but the United States also orchestrated Plaintiffs' detention following their transfer, paying El Salvador $4.76 million as part of a prison outsourcing arrangement, Exh. H (grant agreement between United States and El Salvador referencing "sum of $4,760,000," including to cover "costs associated with detaining" Plaintiffs); *see also* ECF 102-1 (Second Mot. for PI) at 7-8 (collecting public statements by U.S. officials and Salvadoran President describing arrangement); ECF 102-14 (Sarabia Roman Decl.) at 56, 86 (DHS Secretary Kristi Noem threatening detention at CECOT as "one of the tools in our [*i.e.*, the United States'] toolkit"); Exh. J (Smith Decl.) at Exh. 2 (Secretary Noem stating on September 3, 2025, "If you are in America illegally, you could find yourself in CECOT"), Exh. 3 (same, in joint social media post with DHS, on September 4), Exh. 4 (DHS threatening detention at CECOT as among "every tool available" to the United States, on July 8).

    As noted, U.N. documents that came to light after this Court's June 4 ruling contain statements to the U.N. by El Salvador that El Salvador merely "facilitated the use of the Salvadoran prison infrastructure," while "the jurisdiction and legal responsibility for these

persons l[ay] exclusively with the competent foreign authorities" (i.e., the United States). ECF 160-1 (U.N. Report) at 5, 9, 13, 17; *see also id.* at 5,9, 13, 17 (explaining that Plaintiffs' detention reflected "implementation of a bilateral cooperation mechanism" with the United States concerning persons "detained within the scope of the justice system and law enforcement of" the United States). Indeed, El Salvador expressly disclaimed having "arrested, detained, or transferred" the class members. *Id.* at 5, 9, 13, 17. El Salvador's admission that it acted as a facilitator and agent in this arrangement underscores that Plaintiffs' detention was at the United States' behest. That is consistent with the prison outsourcing arrangement between the United States and El Salvador described above.

And Plaintiffs received a similar message while detained at CECOT. *See, e.g.*, Exh. B ¶¶ 5-6 (guards told Plaintiffs that they were detained on U.S. orders and that they would only be released on U.S. orders); Exh. C ¶¶ 9-10 (same); Exh. D ¶ 8 (same); Exh. E ¶ 3 (same). Indeed, the Director of CECOT told the men that "if it were up to me, I would let you go," but that the order "comes from Donald Trump." Exh. B ¶¶ 3-4; Exh C ¶ 9 (similar); Exh. D ¶¶ 7-8 (similar); Exh. E ¶ 3 (similar). This new evidence further confirms that Plaintiffs' detention in El Salvador was the express objective of U.S. officials, and a direct consequence of their actions. *See* ECF 160-1 (U.N. Report) at 17 (El Salvador explaining that Salvadoran prison infrastructure was used "for the reception and custody of persons detained within the scope of the justice system and law enforcement of another State," *i.e.*, the United States).

As the *Abu Ali* court recognized, "the presence of a formal relationship between the countries that governs the detention, in the nature of a treaty or otherwise, may bear on the jurisdictional question." 350 F. Supp. 2d at 68 n.42. Unlike the situation in *Abu Ali*, where there was no indication of any kind of formal agreement, the evidence here demonstrates that such a

13

"formal relationship," committed to writing, exists. *See* ECF 145-1 at Exhs. 2-4; *see also* ECF 145 (Pls.' Sealed Resp.) at 15 (describing evidence).

Moreover, even if El Salvador had played a greater role, that would also be consistent with the United States' direction of Plaintiffs' detention. Constructive custody does not require detention to be *solely* at the United States' behest. Respectfully, insofar as the prior opinion intended to suggest that detention must be "solely" at the United States' behest, that is too narrow an understanding of constructive custody. *See* June 4 Op. at 24; *Abu Ali*, 350 F. Supp. 2d at 50 (habeas not barred by the United States "work[ing] through [another country's] officers" or "teaming up with foreign agents"); *Munaf*, 553 U.S. at 686 (habeas petitioner may be in "actual custody" of one authority while also in custody "under . . . color of" another authority (quoting 28 U.S.C. § 2241(c))); *cf. Maqaleh v. Hagel*, 738 F.3d 312, 322 (D.C. Cir. 2013) (where United States asserted that it had relinquished custody of petitioner to Pakistan, framing constructive custody test as whether detainee was now in "sole custody of the government of Pakistan" and remanding for further factfinding).

**Second Abu Ali *Factor***. El Salvador was "indifferent" to Plaintiffs' detention at CECOT. *Abu Ali*, 350 F. Supp. 2d at 68. Although this Court previously found that El Salvador had "reasons . . . to detain Plaintiffs at CECOT," June 4 Op. at 24, those reasons overwhelmingly trace back to the United States' desire to imprison Plaintiffs abroad. *See id.* at 23-24 (describing "diplomatic arrangement" resulting in Plaintiffs' detention).  Even if El Salvador could gesture at an independent interest in Plaintiffs' detention—and nothing in the record supports such an interest—that would not defeat habeas jurisdiction under *Abu Ali* and *Braden*.

The second *Abu Ali* factor stems from *Braden v. 30th Judicial Circuit Court of Kentucky*, which permitted "a petitioner held in one State to attack a detainer lodged against him by another

14

State" through habeas. 410 U.S. 484, 498 (1973); *see Abu Ali*, 350 F. Supp. 2d at 49, 68 & n.39. As *Braden* explained, "[i]n such a case, the State holding the prisoner in immediate confinement acts as agent for the demanding State, and the custodian State is presumably indifferent" to the petitioner's challenge to the other state's detainer. 410 U.S. at 498-99. In other words, *Braden* recognizes habeas jurisdiction even where there is dual custody—*i.e.*, where the first state has its own legal basis for holding the petitioner, but is also acting as a second state's agent with respect to the challenged detainer.

Here, El Salvador's indifference is—if anything—even clearer. Plaintiffs are Venezuelan citizens, and there is no dispute that they were selected by *the United States* for detention in El Salvador. There is no evidence that El Salvador requested or decided to hold specific Venezuelan detainees. *Compare* Exh. I (U.S. Embassy, Diplomatic Note from March 13, 2025)[6] (sending Salvadoran "gang leader requested by President Bukele"), *with id.* (no mention of "request" for Venezuelan detainees); *see also* Exh. H (U.S. grant letter to El Salvador). Moreover, El Salvador made no claim that Plaintiffs had violated Salvadoran law, that it intended to prosecute Plaintiffs, or that it had any independent basis to detain Plaintiffs other than the U.S.-El Salvador agreement. *See Abu Ali*, 350 F. Supp. 2d at 33 (referencing evidence that petitioner detained in Saudi Arabia had "not violated Saudi laws" and that there were "no plans to prosecute him in Saudi Arabia"); *see also* ECF 145 (Pls.' Sealed Resp.) at 8 n.4; Exh. B ¶¶ 5-6 ("we had never broken any laws in El Salvador"); Exh. C ¶ 8 (similar); Exh. D ¶ 8 (similar). Finally, as in *Braden*, El Salvador had no interest in Plaintiffs' challenge to their AEA designation in another jurisdiction, *i.e.*, in the U.S. courts. *See* 410 U.S. at 499.

---

[6] This document is now publicly available on the State Department website at https://foia.state.gov/FOIALIBRARY/QNI2.aspx (select "May 2025" and "25-0001CQN – El Salvador – 3.14.2025).

If there were any doubt before, El Salvador's indifference is confirmed by the new evidence concerning its representations to the United Nations. In its submission to the United Nations' Working Group on Enforced or Involuntary Disappearances, El Salvador disclaimed "jurisdiction and legal responsibility" over Plaintiffs during their detention. ECF 160-1 (U.N. Report) at 5, 9, 13, 17. Instead, jurisdiction and responsibility lay "exclusively with the competent foreign authorities," *i.e.*, the United States. *Id.* As far as El Salvador was concerned, it "emphatically" had not "arrested, detained, or transferred" Plaintiffs, and thus—it argued—could not be held responsible for breaches of international law concerning Plaintiffs. *Id.* at 5, 9, 13.

The fact that El Salvador saw a diplomatic and monetary benefit in acting as the United States' jailer, and decided to reap those rewards, only reinforces the conclusion that El Salvador was acting as the United States' agent for constructive custody purposes. That bargain does not give El Salvador an independent interest in Plaintiffs' detention.[7] It would prove far too much if constructive custody could be defeated whenever a foreign government accepted money to hold U.S. prisoners (like a private prison) and then claimed that the resulting payments and diplomatic goodwill gave it a legally distinct interest in the detainees.

***Third* Abu Ali *Factor.*** The United States transferred Plaintiffs to CECOT to evade judicial scrutiny. The Court referenced but did not squarely address this factor in its earlier decision. *See* June 4 Op. at 20. But the record, now supplemented with whistleblower evidence,

---

[7] The reported emails between President Bukele's brother and Secretary Rubio's chief of staff describing the arrangement for Plaintiffs' detention in El Salvador only further confirm that Plaintiffs' detention was at the behest of the United States and that El Salvador was indifferent. For example, one of the emails states: "Upon all nine [MS-13 members] being returned [to El Salvador], (El Salvador) will provide (US government) a 50% discount for year 2, if necessary, of the original TdAs." Exh. J (Smith Decl.) at Exh. 8. This email further shows how Plaintiffs' detention was a prison outsourcing arrangement at the behest of the United States, from which El Salvador merely extracted remuneration.

overwhelmingly shows that Respondents sought to summarily remove Plaintiffs from the country before the courts could review the government's use of the AEA or its unilateral claim that Plaintiffs are members of TdA.

The AEA Proclamation was signed in secret on March 14, the day before Plaintiffs were hurried onto planes. 90 Fed. Reg. 13036; June 4 Op. at 5-6.[8] Plaintiffs were provided neither advance notice of their AEA designation nor any opportunity to seek court review. They were handed papers, in English, alleging their involvement in TdA once they were already in El Salvador. Exh. C ¶ 6. When they refused to sign the papers, they were forced off the plane and into Salvadoran hands anyway. Exh. C ¶ 7; Exh. E ¶¶ 5-6; June 4 Op. at 35; *see also* Exh. J (Smith Decl.) at Exh. 5 at 32:40-34:24 (Stephen Miller, now White House Deputy Chief of Staff for Policy and Homeland Security Advisor, advancing now-President Trump's use of the AEA if elected because it "allows you to suspend . . . due process" and "to instantaneously remove any non-citizen foreigner from an invading country age 14 or older," and criticizing ordinary removal proceedings because, by contrast, noncitizens have access to "federal Article III appellate courts"); Exh. J (Smith Decl.) at Exh. 1 (Attorney General's Guidance for Implementing the Alien Enemies Act) §§ 5(a), 8(a) (authorizing "immediate removal" and stating that detainees are not entitled "to judicial review of the removal order in any court of the United States").

In addition, the government proceeded to remove Plaintiffs from the United States even as the Court convened an emergency hearing to address claims that Plaintiffs were being illegally removed, without informing the Court about those flights as they were underway. June 4 Op. at 6-8. This Court has already recognized the government's "apparent effort[s]" both "to remove

---

[8] There is evidence that Defendants may even have attempted to send some Plaintiffs to CECOT on March 14, but it is unnecessary for the Court to find that for present purposes. *See* ECF 44-6 ¶ 8; ECF 44-9 ¶ 7.

individuals more quickly than the judicial proceedings in which it was actively participating could keep pace" and "to evade judicial review while also refusing to provide any helpful information." ECF 81 (Opinion re Probable Cause Order) at 2-3, 7. This Court also observed that there were "intimat[ions]" by Defendants that they "defied the Court's Order deliberately and gleefully." *Id.* at 9.

And now new whistleblower evidence confirms the government's intention to illegally transfer Plaintiffs to avoid court review. Mr. Reuveni, the former Acting Deputy Director for DOJ OIL, disclosed that the day before Plaintiffs' transfers to CECOT, DOJ officials discussed the possibility that the courts might block the government's planned removals. Mr. Reuveni stated, in his whistleblower disclosure, that the Principal Assistant Deputy Attorney General said that in that event DOJ would need to consider telling the courts "fuck you" and ignoring the court order. ECF 158-1 at 10 (Reuveni Whistleblower Complaint); *see also* Exh. F-1 at 2 (contemporaneous text messages between Mr. Reuveni and August Flentje, then-Acting Director of DOJ OIL, referencing this statement).

The new evidence also shows that DOJ attorneys contemporaneously understood that this Court's TRO barred the government from deplaning individuals subject to the AEA and communicated this directive to their clients. Exh. F-4 at 15 ("Please confirm asap no one lacking a title 8 final order will be taken off these planes when they land. We need to address this asap to avoid contempt."); Exh. F-5 at 24 ("As a reminder our advice here on injunction compliance was to not deplane anyone from these planes who is subject to an AEA removal . . . ."); *see also* Exh. F-3 at 10; Exh. F-4 at 15-19; ECF 158-1 at 15-16 (Mr. Reuveni's disclosure, describing email from the Deputy Assistant Attorney General on March 15 at 7:31 PM to DHS Senior Counselor to the Secretary and DHS Acting General Counsel, describing both the oral and written

18

injunction and reflecting the same understanding of the injunction as preventing deplaning); *id.* (same, for email from the Deputy Assistant Attorney General on March 15 at 7:33 PM to State Department counsel).

The whistleblower evidence further shows that the clients failed to respond to DOJ inquiries about compliance. Mr. Reuveni inquired six times about the status of individuals subject to the AEA who were on flights in the air during the March 15 hearing. Exh. F-4 at 15-18; Exh. F-5 at 24. There was apparently no response to this inquiry from any DHS, ICE, or State Department official for at least 13 hours, through Mr. Reuveni's final email inquiry on March 16 at 8:07 AM. Exh. F-5 at 24. Mr. Reuveni was copied on the Deputy Assistant Attorney General's emails to DHS and State Department officials and likewise did not receive any response. ECF 158-1 (Reuveni Whistleblower Disclosure) at 15-16. On March 19, 2025, Mr. Reuveni sent a text message to Mr. Flentje: "At this point why dont [sic] we just submit an emoji of a middle finger as our filing." Exh. F-5 at 29. As this Court found even *before* the disclosure of the whistleblower information, "the Government's actions on that day demonstrate[d] a willful disregard for [this Court's] Order." ECF 81 (Opinion re Probable Cause Order) at 1. It is now even clearer that the United States sought to "rapidly dispatch[] removal flights in an apparent"—now evident—"effort to evade judicial review." *Id.* at 7.

**Fourth** **Abu Ali** *Factor.* The fourth factor goes to whether the Plaintiffs "would be released upon . . . a request by the United States." *Abu Ali*, 350 F. Supp. 2d at 68. The Court acknowledged "the President's unofficial assertion of his power to request a release," but ultimately pointed to the Kozak Declaration's claim that Plaintiffs' "detention" and "ultimate disposition" were "matters within the legal authority of El Salvador." June 4 Op. at 23 (quoting ECF 129 (Redacted Michael G. Kozak Decl.) ¶ 9). As explained below, the Kozak Declaration's

vague assertion is entirely compatible with the United States' ability to request and obtain Plaintiffs' release. But regardless, new evidence confirms that the United States had the ability to secure Plaintiffs' release when it wished, just as President Trump described.

The United States could always have had Plaintiffs transferred out of El Salvador's custody by requesting their release—and it has now obtained that transfer. *See* ECF 111 (Reply ISO Second Mot. for PI) at 2-6 (describing, among other evidence, President Trump's agreement that he could "call up the president of El Salvador" and secure the return of detainees like Kilmar Abrego Garcia); ECF 145 (Pls.' Sealed Resp.) at 4-15 (describing diplomatic evidence of constructive custody). Under the United States and El Salvador's arrangement, Plaintiffs' detention was ultimately at the United States' pleasure. *See* Exh. B ¶ 6 (describing Salvadoran officials' statements that class members "would be released" only "if the United States ordered it"); Exh. C ¶¶ 9-10 (guards told Plaintiffs that they "couldn't leave until the United States gave the word"); Exh. D ¶ 8 (similar); Exh. E ¶ 3 (similar). According to the March 22 agreement prepared by the United States, El Salvador agreed "to accept and house approximately 300 members of TdA removed for up to one year *or until another decision is made on their disposition*." Exh. H at 1 (emphasis added). The newly available evidence in the United Nations Report further confirms that the United States could secure Plaintiffs' release, as El Salvador emphasized that it merely "facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of that other State"—*i.e.*, the United States. ECF 160-1 (U.N. Report) at 5, 9, 13, 17.

In fact, the United States has twice successfully sought the transfer of detainees it sent to CECOT on the March 15 flights. On June 6, in response to a court order, the United States returned Kilmar Abrego Garcia to the United States from El Salvador. *See Abrego Garcia v.*

*Noem*, No. 8:25-cv-00951-PX, 2025 WL 2062203, at *2 (D. Md. July 23, 2025). Then, on July 18, U.S. officials orchestrated Plaintiffs' transfer from CECOT to Venezuela in a prisoner swap deal. In return, "ten Americans who were detained in Venezuela" were released. *See* Exh. J (Smith Decl.) at Exh. 9; D.C. Cir. Order at 6; Exh. J (Smith Decl.) at Exh. 10 (reporting email from Mr. Kozak stating that "we did ask for and receive 10" Americans); Exh. J (Smith Dec.) at Exh. 11 (describing statement from "senior administration official" that El Salvador's offer to detain Plaintiffs "provided the 'opportunity' to initiate negotiations for an exchange" and reporting an initial "exchange being negotiated by the State Department in May" that fell through); *see also* Exh. J at Exh. 6 (describing prior State Department negotiations that "had advanced to the point where in May Venezuela was set to send a state plane to El Salvador to retrieve" Plaintiffs while freeing political prisoners and Americans imprisoned in Venezuela for the U.S.). El Salvador of course complied with the release of Plaintiffs given its arrangement with the United States.

No Salvadorans appear to have been released or exchanged as part of the deal, nor is there any indication that El Salvador received any payment or other thing of value as part of the exchange. *Cf.* July 24 Hearing Tr. at 17:21-24; *see also* Exh. B ¶ 9 (guards told plaintiffs they would be released "because Venezuela had come to an agreement with the United States"). Regardless, the United States' central role in negotiating the prisoner swap, the direct benefits it received, and the use of Plaintiffs as human bargaining chips further show that the United States had the ability to request and obtain Plaintiffs' release when it wanted.

For all these reasons, under the factor analysis outlined in *Abu Ali*, the United States had constructive custody over Plaintiffs during their detention at CECOT.

       **2.  New evidence shows that Defendants' conclusory assertions in the Kozak Declaration cannot be credited.**

Moreover, the Court's conclusion in the June 4 Opinion that Plaintiffs were not in Defendants' constructive custody relied on "the truthfulness and reliability of the Kozak Declaration." June 4 Op. at 24. That declaration by Michael G. Kozak, Senior Bureau Official in the State Department's Bureau of Western Hemisphere Affairs, asserted:

> It was and remains my understanding that the detention and ultimate disposition of those detained in CECOT and other Salvadoran detention facilities are matters within the legal authority of El Salvador in accordance with its domestic and international legal obligations.

ECF 129 (Redacted Kozak Decl.) ¶ 9. Mr. Kozak's claim that Plaintiffs' detention was "within the legal authority of El Salvador," June 4 Op. at 22, is simply a claim that El Salvador believed its detention of Plaintiffs was consistent with its domestic law. But even taking the declaration at face value, that claim and Mr. Kozak's "understanding" are entirely compatible with U.S. control, responsibility, and influence over Plaintiffs' detention. *See Abu Ali*, 350 F. Supp. 2d at 68. Thus, as another court has observed with respect to the Kozak Declaration, this "understanding" is "hardly equivalent to an official declaration as to the aliens' status," "giv[es] the impression" of being mere "opinion based upon a review of the record," "raises more questions than it answers," and "leaves the issue of ultimate control over the alien detainees murky." *E.D.Q.C. v. Warden, Stewart Detention Ctr.*, No. 4:25-cv-50-CDL-AGH, 2025 WL 1829416, at *3-4 (M.D. Ga. July 2, 2025).

In its prior opinion, the Court noted that in comparable cases government declarations "were substantially more on point," but it nevertheless relied on the declaration as "conclusive" because Plaintiffs provided, as rebuttal evidence, only public statements. June 4 Op. at 24, 25. But whatever force the Kozak Declaration may have previously had, the new evidence described above—El Salvador's representations to the United Nations, the CECOT Director's and other

22

Salvadoran officials' representations to class members, Mr. Reuveni's whistleblower disclosures (including contemporaneous email and text messages), and the deal between the United States and Venezuela swapping Plaintiffs for Americans imprisoned in Venezuela—undermines the Kozak Declaration's claims and shows that the Court can no longer "take the Government at its word." June 4 Op. at 26-27 (noting the "possibility . . . that the Government has adopted and presented its arrangement with El Salvador as a 'ruse—and a fraud on the court—designed to maintain control over the detainees beyond the reach of the writ'" (quoting *Kiyemba v. Obama*, 561 F.3d 509, 515 n.7 (D.C. Cir. 2009))).

The paltry assertions in the Kozak Declaration cannot be conclusive as to constructive custody. Mr. Kozak backs up his "understanding" only with points that are irrelevant. Mr. Abrego Garcia's transfer, ECF 129 (Redacted Kozak Decl.) ¶ 10, is irrelevant here: he is not a class member and was plainly differently situated as a Salvadoran erroneously removed to El Salvador, not on the basis of the Proclamation. The fact that *some* members of Congress were denied a visit, *id.*, is not dispositive as to the degree of U.S. *executive branch* control over Plaintiffs—particularly in light of Secretary Noem's much-touted tour of CECOT, ECF 102-14 at 86, and reports from class members that other U.S. officials visited the prison during their detention, *see* Exh. B ¶¶ 7-8 (describing visits from other U.S. officials and U.S. military); Exh. C ¶ 11 (describing visits by Americans); Exh. D ¶ 9 (same). And general claims that the United States and El Salvador have mutual respect and "make[] [their] own determinations" about the other's requests, ECF 129 (Redacted Kozak Decl.) ¶ 11, are essentially meaningless—particularly because Plaintiffs' argument is that the two states reached a specific agreement that El Salvador would hold Plaintiffs for a prescribed, renewable term at the behest of the United States.

While courts may credit declarations by executive officials, such declarations are not conclusive in the face of contrary evidence, nor have courts wholly deferred to them—including in the cases this Court previously relied upon in "tak[ing] the Government at its word." June 4 Op. at 24-25, 27; *see Kiyemba*, 561 F.3d at 515 n.7 (relying on government's representations in declarations "*in the absence of contrary evidence*" and further explaining that doing so was "[i]n view of the Government's sworn declarations, *and of the detainees' failure to present anything that contradicts them*" (emphasis added)); *Gul v. Obama*, 652 F.3d 12, 18 (D.C. Cir. 2011) ("credit[ing]" government declaration only, not treating as *per se* conclusive); *In re Petitioners Seeking Habeas Corpus Relief*, 700 F. Supp. 2d 119, 128 (D.D.C. 2010) (holding that petitioners' "blanket allegations" were insufficient in light of government declarations and distinguishing *Abu Ali* based on "detailed, extensive evidence" in contrast to "no evidence" in *In re Petitioners*); *Al Hajji v. Obama*, No. 05-0429 (RJL), 2009 WL 4251108, at *1-2 (D.D.C. Nov. 23, 2009) ("no basis on this record" for determination that petitioners were in constructive custody of United States where petitioners provided only "rank speculation," in contrast to government declaration). As these cases demonstrate, courts have regularly evaluated constructive custody on the basis of the record as a whole.

More broadly, courts regularly decline to credit government declarations where they are too vague, lack factual support, or are contradicted by other available evidence. *See, e.g.*, *Gul v. Biden*, 573 F. Supp. 3d 148, 165-66 (D.D.C. 2021) (court "not persuaded" by government declarations and assertions about foreign groups' affiliation given lack of specific evidentiary support); *In re United States*, 872 F.2d 472, 479 (D.C. Cir. 1989) (court "unpersuaded" by FBI declaration "ostensibly describ[ing] the harms that would be dealt to our nation's security and diplomatic interests" were case to proceed); *Leopold v. FBI*, No. 22-1921 (BAH), 2025 WL

445183, at *1, *11 (D.D.C. Feb. 10, 2025) (government declarant's claim that law enforcement proceedings were reasonably likely "crumble[d] with no more weight than dust and just as little persuasiveness" given "developments in the real world"). Such skepticism is especially warranted when a declaration is contradicted or undercut by the public statements of the President or other senior officials. *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. U.S. DOGE Serv.*, No. 25-cv-511 (CRC), 2025 WL 863947, at *5 (D.D.C. Mar. 19, 2025) (government declaration that Elon Musk did not work at U.S. DOGE Service was "contradicted by President Trump's and Musk's own statements," including statement made by President during television interview); *Florida v. Mayorkas*, 2023 WL 11760754, at *4 (N.D. Fla. May 15, 2023) ("First and foremost, the Court does not give much weight to the declaration relied on by DHS . . . because some of the representations in the declaration are directly contradicted by public statements made by the DHS Secretary [during a CNN interview].").[9]

### 3. Plaintiffs continue to suffer collateral consequences that this Court can redress.

While Plaintiffs are no longer imprisoned at CECOT, they continue to suffer collateral consequences that are a direct result of the government's AEA designation, removal, and violation of due process. Even if a habeas petitioner is no longer in physical custody, his claims remain justiciable so long as there are collateral consequences flowing from the prior conviction, designation, or removal that a court can still redress. *See, e.g.*, *Carafas*, 391 U.S. at 237-38;

---

[9] If the Court were to believe additional information is necessary to find constructive custody, it should rule on Plaintiffs' due process claim on the basis of equity (as it did last time), while ordering further discovery and deferring a decision as to the habeas claim in light of the substantial new evidence. *See Abu Ali*, 350 F. Supp. 2d at 63 n.34 (describing evidentiary hearings in similar cases involving the relationship between the United States and a foreign sovereign). This resolution would ensure that Plaintiffs may proceed given the irreparable harm that they face, while any discovery as to constructive custody simultaneously moved forward.

*Zegarra-Gomez v. INS*, 314 F.3d 1124, 1127 (9th Cir. 2003). Here, Plaintiffs continue to suffer a host of collateral consequences. Most obviously, they have all been removed from the United States and continue to be deprived of the opportunity to contest their designation and removal, as required by due process. *See J.G.G.*, 604 U.S. at 673. Moreover, due to their wrongful AEA designation and removal, they are subject to all the ongoing restrictions in the AEA Proclamation itself, including: being barred from entering the United States despite their desire to return; being separately barred from "resid[ing] in the United States" despite their desire to live in the country, including by obtaining asylum; being "subject to immediate apprehension, detention, and removal" should they return to the United States; and being subject to the seizure and forfeiture of certain property, wherever located. 90 Fed. Reg. 13034-35, §§ 3-4, § 6(a)-(d); *see* Exh. B ¶¶ 11-12 (class member desires to return and reside in the U.S.); Exh. C ¶ 21 (same); Exh. D ¶ 16 (same); Exh. E ¶ 16 (same).

In addition, because Defendants have designated Plaintiffs as alleged members of TdA under the AEA Proclamation, they are also subject to restrictions that apply to alleged members of foreign terrorist organizations, including the freezing of their assets and a bar on entry. *See* 18 U.S.C. § 2339B(a)(2); 8 U.S.C. § 1182(a)(3)(B)(i)(V). Finally, as a result of their designation and removal under the AEA by Defendants, Plaintiffs are unable to access removal proceedings or seek humanitarian protections in the United States—procedures to which they are statutorily entitled. *Compare* 8 U.S.C. § 1158(a) (noncitizen physically present in the United States or who arrives in the United States has right to apply for asylum), *with id.* § 1158(b)(2)(A)(v) (noncitizen does not have right to apply for asylum if Attorney General determines, *inter alia*, that noncitizen has engaged in terrorist activity). For all these reasons, Plaintiffs continue to suffer collateral consequences due to Defendants' unlawful actions.

C.    **The Court Also Has Habeas Jurisdiction Because Plaintiffs' AEA Designation Subjects Them to Continuing Restraints in Venezuela.**

Plaintiffs are in constructive custody for an independent reason: Defendants' designation and removal of Plaintiffs under the AEA imposed significant restraints on their liberty, and because Plaintiffs are still subject to these restraints, Plaintiffs are *still* in the constructive custody of the United States while in Venezuela.

Constructive custody is satisfied by "significant restraints" on liberty not imposed "upon the public generally." *Jones*, 371 U.S. at 242. The Supreme Court has thus extended habeas review to petitioners released on parole, *id.* at 242-43; released on their own recognizance pending execution of a sentence, *Hensley v. Mun. Ct.*, 411 U.S. 345, 349, 351 (1973); and free on bail, *Lefkowitz v. Newsome*, 420 U.S. 283, 291 & n.8 (1975). Special prohibitions on entry, freedom of movement, or residence that apply to an individual or class will support habeas jurisdiction—even if the individual or class is "free to go anywhere else in the world." *Jones*, 371 U.S. at 239; *see, e.g.*, *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 895 (2d Cir. 1996) (permanent banishment orders subjected former Indian tribe members to constructive custody because in the future they would be "no longer welcome to 'come'" onto tribal land); *Lesbian/Gay Freedom Day Comm., Inc. v. INS*, 541 F. Supp. 569, 576 (N.D. Cal. 1982) (policy "of excluding homosexuals per se from entry" to the United States sufficient for constructive custody), *aff'd on other grounds*, 714 F.2d 1470 (9th Cir. 1983).

Here, as noted, Plaintiffs are prohibited from entering or residing in the United States as a result of their AEA designation. *See* 90 Fed. Reg. 13035 (designated alien enemies are prohibited from "enter[ing]" or "attempt[ing] to enter" the United States); *id.* at 13034, § 3 (designated alien enemies are not "permitted residence in the United States"). If they do enter the United States, they will be subject to "immediate" detention. *Id.* at 13034, § 3. And, regardless of whether they

27

enter the United States, their property is subject to seizure and forfeiture and their assets can be frozen. *See id.* at 13035, § 6(a)-(d); 18 U.S.C. § 2339B(a)(2); 8 U.S.C. § 1182(a)(3)(B)(i)(V); *see also supra* Section B.3. The Proclamation renders Plaintiffs "liable to be apprehended, restrained, secured, and removed" so long as it remains in effect, 50 U.S.C. § 21—imposing extraordinary restraints that, until 2025, had been used just three times in more than two centuries. Moreover, designation as dangerous gang members and terrorists also impedes their ability to travel freely to countries other than the United States, Exh. B ¶ 13; Exh. C ¶ 18; Exh. D ¶ 14; Exh. E ¶ 6, and to support themselves in Venezuela, Exh. C ¶ 19; Exh. D ¶ 13; Exh. E ¶ 10. These are plainly exceptional restraints not shared by the "public generally." *Jones*, 371 U.S. at 242.

Because of the continuing restraints on Plaintiffs due to their AEA designation and removal, they are currently in Defendants' constructive custody.

## II.    ON THE MERITS, THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION ORDERING DEFENDANTS TO FACILITATE CLASS MEMBERS' ABILITY TO CONTEST THEIR AEA DESIGNATIONS.

### A.    Plaintiffs Are Likely to Succeed on Their Due Process Claim.

Regardless of whether the Court finds jurisdiction on non-habeas or habeas grounds, Plaintiffs are likely to succeed on their due process claim, as the Court has already found. June 4 Op. at 35 (Plaintiffs here "did not receive even the anemic process that the Government subsequently committed to provide"); *see also* ECF 124 (May 7 Hearing Tr.) at 30:19-30:20 (conceding that the CECOT Class did not receive "the 12 hours that we are providing at this moment").

On appeal, Defendants' stay motion argued that Plaintiffs' transfer to Venezuela presented a new threshold barrier: that the "entire action" is now moot because Plaintiffs are no longer in

physical custody in Venezuela. *See* Defs.' Resp. to Mot. to Suppl. the Rec., *J.G.G. v. Trump*, No. 25-5217 (July 23, 2025). But because Plaintiffs remain outside the United States and unable to seek humanitarian protection due to Defendants' due process violations, it is clearly not "impossible for a court to grant any effectual relief," *Chafin v. Chafin*, 568 U.S. 165, 172 (2013), and so Plaintiffs' due process claims are decidedly not moot.

**B.    The Government's Flagrant Disregard for Due Process Is Causing Plaintiffs Irreparable Harm.**

In its June 4 Opinion, this Court held that class members, who were then confined in a Salvadoran prison, readily met the irreparable harm criteria. June 4 Op. at 56. In light of the prisoner exchange, the D.C. Circuit stated that "the transfer alters the harm experienced by plaintiffs." D.C. Circuit Order at 7. While the harm is different now, it remains severe, ongoing, and irreparable.

Many class members fled Venezuela after experiencing persecution and danger there, and many have pending claims for humanitarian relief in the United States on that very basis. *See, e.g.*, ECF 102-7 ¶ 2 (Plaintiff Reyes Mota sought asylum based on violence from paramilitary groups); ECF 102-8 ¶ 3 (Plaintiff Hernandez Romero was targeted for his sexual orientation and his unwillingness to publicly support the Venezuelan government); ECF 102-9 ¶¶ 3-4 (Plaintiff J.A.B.V. sought asylum based on abduction, beating, and threats due to his political activities); ECF 44-7 ¶¶ 2-6 (same); ECF 102-10 ¶ 3 (Plaintiff M.A.O.R. was in the process of seeking protection in the U.S.); ECF 102-11 (Plaintiff G.A.A. sought asylum based on paramilitary violence in his hometown); *see also* Exh. B ¶ 11; Exh. C ¶ 2; Exh. D ¶¶ 2-3; Exh. E ¶ 12.

Even prior to the transfer, this Court recognized that Plaintiffs were in danger of being transported to Venezuela, "where they would also risk severe injury." June 4 Op. at 56 (citing Kozak Declaration and its description of "apparent proposal to send Plaintiffs to Venezuela"); *see*

*Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021) (finding irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide"), *aff'd in relevant part*, 27 F.4th 718 (D.C. Cir. 2022); *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 517 (D.D.C. 2020) (irreparable injury exists where class members were "threatened with deportation prior to receiving any of the protections the immigration laws provide"). Indeed, members of the Plaintiff class had approval to settle in the United States *as refugees* due to the persecution that they faced in Venezuela. ECF 67-21 at 122. The complete lack of opportunity to pursue relief prior to removal sets the harm in this case apart from run-of-the-mill removal cases.

Moreover, Defendants have placed Plaintiffs at even greater risk of harm in Venezuela by labeling them as members of the TdA criminal gang. Upon return, government officials dropped putative class members off at their homes, emphasizing that the government would be monitoring them. Exh. C ¶ 15; Exh. D ¶ 10; *see also* Exh. E ¶ 8 (describing threats of monitoring from government). Class members have become high-profile political pawns in Venezuela: they face retribution from the Maduro regime if they refuse to participate in government propaganda and threats from opposition groups if they do. Exh. A (Antillano Supp. Decl.) ¶¶ 2-7; *see also* Exh. D ¶ 11; Exh. E ¶¶ 11-12. They also face extortion from government officials, who have threatened prosecution for treason if they do not pay. Exh. C ¶¶ 15-16; Exh. D ¶ 12; *see also* Exh. E ¶ 5 (describing government threats for being a traitor). Danger comes from beyond the government, too. Plaintiffs face the risk of attacks from rival gangs who believe the erroneous TdA accusations. Exh. A (Antillano Supp. Decl.) ¶ 9; ECF 102-2 ¶ 28. And they risk harm from TdA and associated gangs who incorrectly assume that the men faked membership in TdA while in the United States. Exh. A (Antillano Supp. Decl.) ¶ 9. Finally, class members fear that,

because the United States has labeled them as gang members and terrorists, they will be arrested if they attempt to leave Venezuela and enter any other country—effectively trapping them in the country they fear. Exh. B ¶¶ 13-14; Exh. C ¶ 18; Exh. D ¶ 14; Exh. E ¶ 6. Accordingly, Plaintiffs face severe and irreparable harm in the absence of preliminary relief.

**C.    For the Reasons Already Identified by this Court, the Balance of Equities and Public Interest Weigh Decidedly in Favor of a Preliminary Injunction Order.**

This Court previously held that the "substantial public interest in having governmental agencies abide by the federal laws" outweighed Defendants' claimed concern that the government's ability to conduct foreign affairs could be compromised by an injunction. June 4 Op. at 56-57 (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). That balance now tips even more sharply in Plaintiffs' favor. While the public retains its substantial interest in the government obeying the law, Defendants have now conceded that they already have an agreement in place to permit facilitation of habeas relief. ECF 168-1 (Harper Decl.) ¶ 9; July 24 Hearing Tr. 14:25-15:5. Accordingly, the government can no longer argue that "separation of powers prevents the district court from ordering the Executive to retake custody from El Salvador," which "would be akin to ordering an invasion of a foreign country or a directive to negotiate a diplomatic deal." Defs.' Stay Mot. at 15. As such, preliminary relief would not infringe on the conduct of foreign affairs. And as this Court recognized, in any event "[t]he Supreme Court has made clear that" concerns regarding the conduct of foreign affairs, "while surely weighty, do not defeat the need for the Government to fix its legal wrongs." June 4 Op. at 57 (citing *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025)).

*                    *                    *

Accordingly, Plaintiffs request a renewed preliminary injunction ordering Defendants to facilitate Plaintiffs' ability to contest their AEA designations.[10]

## CONCLUSION

The motion for a renewed preliminary injunction should be granted.

Dated: October 15, 2025

Respectfully submitted,

/s/ *Lee Gelernt*

| | |
|---|---|
| Noelle Smith | Lee Gelernt (D.D.C. Bar No. NY0408) |
| Oscar Sarabia Roman | Daniel Galindo (D.D.C. Bar No. NY035) |
| My Khanh Ngo | Ashley Gorski |
| Cody Wofsy | Patrick Toomey |
| Spencer Amdur | Sidra Mahfooz |
| AMERICAN CIVIL LIBERTIES UNION | Omar Jadwat |
| FOUNDATION | Hina Shamsi (D.D.C. Bar No. MI0071) |
| 425 California Street, Suite 700 | Michael K.T. Tan |
| San Francisco, CA 94104 | Sean M. Lau |
| (415) 343-0770 | AMERICAN CIVIL LIBERTIES UNION |
| nsmith@aclu.org | FOUNDATION |
| osarabia@aclu.org | 125 Broad Street, 18th Floor |
| mngo@aclu.org | New York, NY 10004 |
| cwofsy@aclu.org | (212) 549-2660 |
| samdur@aclu.org | lgelernt@aclu.org |
| | dgalindo@aclu.org |
| | agorski@aclu.org |
| Arthur B. Spitzer (D.C. Bar No. 235960) | ptoomey@aclu.org |
| Scott Michelman (D.C. Bar No. 1006945) | smahfooz@aclu.org |
| Aditi Shah (D.C. Bar No. 90033136) | ojadwat@aclu.org |
| AMERICAN CIVIL LIBERTIES UNION | hshamsi@aclu.org |
| FOUNDATION OF THE DISTRICT OF | m.tan@aclu.org |
| COLUMBIA | slau@aclu.org |
| 529 14th Street, NW, Suite 722 | |
| Washington, D.C. 20045 | |
| (202) 457-0800 | Brian D. Netter (D.C. Bar No. 979362) |
| aspitzer@acludc.org | Bradley Girard (D.C. Bar No. 1033743) |
| smichelman@acludc.org | Christine L. Coogle (DC Bar No. 1738913) |
| ashah@acludc.org | DEMOCRACY FORWARD FOUNDATION |
| | P.O. Box 34553 |

---

[10] The Court previously required Plaintiffs to post a $1.00 bond. June 4 Op. at 69. The Court's original reasoning for setting a nominal bond remains. Plaintiffs continue to "seek[] to vindicate fundamental rights," and they remain "vulnerable" and "lack the monetary resources necessary to post a bond." June 4 Op. at 69. Accordingly, the Court should again require a $1.00 bond.

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500
Khuddleston@aclu.org

*Barred in Texas and Arizona only;
supervised by a member of the D.C. Bar

Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
bnetter@democracyforward.org
bgirard@democracyforward.org
ccoogle@democracyforward.org

Counsel for Petitioners–Plaintiffs