# EXHIBIT C

1. ███████████████████████████████████████
2. I originally came to the United States from Venezuela to seek asylum ███████████ ██████████████ ████████████████████████ ████████
3. I was first taken into ICE custody on ██████████. ICE took my money, my phone, and my documents. I haven't seen any of my stuff since then. I assume that ICE confiscated it and doesn't plan to return it, since I'm in Venezuela now.
4. I applied for asylum, but I was never able to defend my case because I was removed to CECOT on March 15, 2025, under the Alien Enemies Act.
5. My removal began when I was put on a plane in El Valle, Texas. The officials on the plane had "ICE" written on their uniforms but they did not have name tags. Some wore hoods over their faces. I had seen similar uniforms on ICE officials in detention in the United States, but all of the prior times I interacted with ICE officials, the uniforms had always included name tags. It seemed to me like they were intentionally trying to hide their identities.
6. When the plane landed in El Salvador, the ICE officials tried to force us to sign a form. One Venezuelan man who spoke English translated the form. It accused us of being members of Tren de Aragua. They told us that we had to sign the paper in order to proceed with our cases. We didn't understand what this meant but we refused to sign it because we are not members of Tren de Aragua. We all refused to sign it.
7. We could see from our windows that the men getting off of the first plane were being beaten by Salvadoran officials. We were scared to get off the plane and refused to do so. The ICE officials told us that, if we did not get off the plane, they would force us off. Then they started to beat us and punch us to make us get out. They even choked one of the women on the plane who was crying out for them to stop hitting us.
8. After we were taken off the plane, we were transported to CECOT. I was confused why I was in prison in El Salvador because I have never committed a crime in El Salvador (or anywhere).
9. Once we arrived at CECOT, there was no doubt in my mind that the United States was in charge of our detention. A man announced to us that he was the Director of CECOT. He told us that he was waiting on U.S. orders about what to do with us. Our Salvadoran guards told us the same thing. They said that the United States was responsible for our detention and that we couldn't leave until the United States gave the word.
10. On multiple occasions throughout our detention, we would ask the guards what was going on with our situation. The guards consistently told us that they did not know and that it was up to the United States what happened to us.
11. While I was at CECOT, I met a Salvadoran detainee who was employed by the prison as a janitor. He told me that he was doing extra cleaning because Americans were coming to

visit. Soon after, there were men in suits speaking English who walked through the prison.

12. Around early July, I learned from the guards that our release from CECOT was being negotiated between Venezuela and the United States. A week or two prior to our release, they stopped beating us. They also gave us creams to heal our bruises and other medications. They allowed us to eat a little more food.

13. On July 18, 2025, we were sent from CECOT to Venezuela.

14. I don't feel safe in Venezuela. When I first got back to Venezuela, the government forced me to give them my address and all my personal details. I didn't have a choice. Someone from the government took me to my house and dropped me off so they know exactly where I lived. They told me that they would be paying attention to me and visiting me.

15. This scared me because the government in Venezuela is very strong. The government official who dropped me off at my home threatened me that I would have to pay money if I was stopped by the government outside of my home. I know that people associated with the government (either government officials or members of colectivos associated with the government) have similarly approached my friends who have returned from the United States to force them to pay this kind of "extortion fee" as a punishment for living in the United States. My friends knew they were associated with the government because the people knew personal details that only the government had access to. The government officials call these "fees" a "vaccine" because they protect us from retribution by the government. I'm scared about what would happen if I refused to pay the fee, but I also don't have many resources available to pay.

16. They made other threats, too. For example, the government threatened to initiate a case against me for being a traitor to Venezuela—solely because I left to go to the United States. I think the government feels like it can extort money from me because this threat of legal action makes me easy to exploit. I know this threat is real because I know innocent people in Venezuela who have been imprisoned for years for being "traitors" for speaking out against the government.

17. [redacted] I try not to go out as much as possible because I'm afraid that someone associated with the government will recognize me and the threats will start again. I don't travel to other towns or cities. I don't think I can ever return to my normal life here now that I've been so publicly portrayed as a gang member.

18. I'm also afraid to travel outside of Venezuela because of the U.S. government's false accusations. I'm afraid that, because the United States has called me a "terrorist," I will be arrested if I try to go to another country.

19. [redacted]

2

20. It is very important to me to clear my name. I'm not guilty of what the United States accused me of. I have never been involved in any gang or criminal activity and I don't even have any tattoos. I would like the opportunity to prove that to a judge in the United States.

21. I would also like to return to the United States to continue my asylum claim. I don't feel safe in Venezuela, and



Sworn on this 9th day of October 2025

3

## CERTIFICATE OF TRANSLATION

  I, Jennifer Reyes, certify that I am fluent in both English and Spanish. On October 9, 2025, I personally spoke with ▮▮▮▮ and read the foregoing declaration to him, translated into Spanish faithfully and accurately, over the phone. ▮▮▮▮. affirmed that he understood my translation and that the information in the above declaration is true and accurate.

  I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

_____
Jennifer Reyes
Paralegal
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2635
jreyes@aclu.org

4