# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

J.G.G. et al.,

        *Plaintiffs*;

LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, et al.,

        *Petitioners–Plaintiffs*,

     v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

        *Respondents–Defendants*.

Case No. 1:25-cv-00766-JEB

**RESPONDENTS–DEFENDANTS' RESPONSE IN OPPOSITION TO PETITIONERS–PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# Table of Contents

Introduction ................................................................................................... 1

Background .................................................................................................... 2

Legal Standard .............................................................................................. 5

Argument ....................................................................................................... 6

    I.    This Court Lacks Habeas Jurisdiction ....................................... 6

        A.    As the Court has already recognized, Petitioners were not in the United States' constructive custody while at CECOT. ................................................................................. 7

            1.    Ambassador Kozak's declaration—now corroborated by further statements and developments—shows that the United States did not have constructive custody of Petitioners at CECOT. ................... 8

            2.    The *Abu Ali* factors confirm that the United States did not have constructive custody of Petitioners at CECOT ................................................................ 11

        B.    In any event, Petitioners are no longer in CECOT custody. ...... 20

        C.    Petitioners are not currently in the United States' constructive custody ................................................................ 24

    II.    Petitioners Cannot Prevail on a Freestanding Due-Process Claim. .............................................................................. 27

        A.    Petitioners cannot pursue due-process claims outside of habeas. .......................................................................... 27

        B.    Petitioners cannot obtain injunctive relief to "facilitate" filing habeas claims ............................................................ 31

        C.    As a result, Petitioners' injuries are not redressable ................ 33

        D.    Petitioners have no clearly articulated due-process interest ........................................................................... 34

    III.    Preliminary Injunctive Relief Is Inappropriate, and Plaintiffs Have Not Met Their Burden on the Equitable Factors .......................... 35

A.    The proposed relief is not "preliminary."....................................35

B.    Petitioners have not shown that they will suffer irreparable harm absent an injunction...........................36

C.    The balance of equities favors denial............................................38

IV.    This Court Should Stay Any Injunction Pending Appeal.....................40

Conclusion..............................................................................................................41

Exhibit A: Declaration of Deputy Secretary of State Christopher Landau

Exhibit B: Declaration of Secretary of State Marco Rubio

## Introduction

This is Petitioners' *third* attempt to challenge their designation under the President's invocation of the Alien Enemies Act ("AEA") in a district in which no affected individuals are or were detained or otherwise located.[1] The Supreme Court rejected the first attempt, *Trump v. J. G. G.*, 604 U.S. 670, 671–72 (2025) (per curiam), and the D.C. Circuit expressed "serious constitutional questions" over the second, *J.G.G. v. Trump*, No. 25-5217, 2025 WL 2317650, at *3 (D.C. Cir. Aug. 8, 2025). Petitioners' third attempt lies on even weaker foundations than before given the intervening factual developments. The Court should deny their motion.

The President designated members of Tren de Aragua ("TdA") as alien enemies in Proclamation No. 10,903, *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua*, 90 Fed. Reg. 13,033, 13,033 (Mar. 20, 2025) (the "Proclamation"). Petitioners were designated under the Proclamation and removed to El Salvador. Petitioners have been fighting their removal since, using a range of increasingly novel legal theories. Following their first and second failures, Petitioners now try a third time, rehashing one habeas theory (constructive custody) that this Court already rejected and renewing a meritless "equitable jurisdiction" theory despite the D.C. Circuit's constitutional concerns. Yet Plaintiffs provide no material new evidence on the former, and no more viable legal theory on the latter. Meanwhile, their release from El Salvador has further undermined their claims.

---

[1] For brevity, "Petitioners" will refer to the parties styled Plaintiffs and Petitioners–Plaintiffs, and "Respondents" will refer to the parties styled Respondents–Defendants.

Even more emphatically than before, thist Court lacks jurisdiction over these claims. Once Petitioners were released to El Salvador, the United States lost and never regained custody over them. And now that they have returned home to Venezuela, even Petitioners' deficient constructive-custody theory has become moot. Nor can the Court avoid the jurisdictional problems through freewheeling equitable jurisdiction to remedy due-process claims long past, especially where the remedy sought is the alleged right to be *retaken* into custody to pursue release via habeas.

Petitioners are thus not likely to succeed on the merits. And the equities and public interest do not favor them either, as an injunction at this juncture would disrupt sensitive foreign affairs relationships. Indeed, because the remedy Petitioners seek is not a preliminary but rather a permanent injunction, this Court should deny the motion as an improperly filed and premature motion for summary judgment.

## Background

In March, the President issued Proclamation No. 10,903, invoking the AEA, 50 U.S.C. § 21, to detain and remove certain Venezuelan nationals "who are members of TdA." 90 Fed. Reg. at 13,034. In the early hours of March 15, the five named Petitioners, representing a putative class, initiated this litigation and sought immediate injunctive relief against their removal. ECF 1, 4. In the complaint, Petitioners sought relief in habeas, but they then dismissed their habeas claims to proceed on their other causes of action. ECF 1 at 20–21; Mar. 15 Hr'g Tr. at 22:21–25. This Court issued two temporary restraining orders ("TROs") preventing removal

from the United States under the AEA of a provisionally certified class consisting of all aliens in United States custody who are subject to the Proclamation.

After the D.C. Circuit denied Respondents a stay, Respondents applied to the Supreme Court to vacate the TROs. The Supreme Court granted that application, holding that, because Petitioners' claims "fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas," "jurisdiction lies in only one district: the district of confinement." *J. G. G.*, 604 U.S. at 672 (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)). Plaintiffs were not confined in the District of Columbia, and therefore this Court lacked jurisdiction over their habeas claims. The Court further observed that the aliens are "entitled to notice and opportunity to be heard 'appropriate to the nature of the case,'" including notice "that they are subject to removal under" the AEA, "within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.* at 673 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).

Petitioners have nonetheless persisted in their efforts to anchor this habeas litigation in this Court. After an unsuccessful attempt at a third TRO, Petitioners amended their complaint to add new claims on behalf of two new classes, a class of removed aliens detained at El Salvador's Terrorism Confinement Center ("CECOT"), and a class of criminal detainees. This Court denied certification and preliminary relief to the criminal-detainee class. *J.G.G. v. Trump*, 786 F. Supp. 3d 37, 73, 80 (D.D.C. 2025). And this Court found that it likely lacked habeas jurisdiction over the

CECOT class because the United States did not have constructive custody over the aliens in CECOT. *Id.* at 59.

This Court did find, however, that it had jurisdiction in equity to entertain a claim that the government violated the CECOT class's due-process rights by failing to provide them with sufficient notice before they were removed under the AEA. *Id.* at 61. And finding it likely that Petitioners would prevail on the merits of this equitable claim, this Court certified a redefined CECOT class and awarded it a preliminary injunction, ordering Respondents to facilitate custody of the CECOT class to permit Petitioners to bring habeas claims against their AEA designations. *Id.* at 79–82.

Respondents appealed this Court's order and sought a stay pending appeal. The D.C. Circuit granted an administrative stay that remained in place for months. While the appeal was pending, El Salvador transferred the CECOT class to Venezuela as part of a prisoner swap. ECF 168-1 ¶ 7. The D.C. Circuit then vacated this Court's order and remanded the case for this Court to consider whether the new circumstances have "alter[ed] the appropriateness of injunctive relief." *J.G.G.*, 2025 WL 2317650, at *3 (quoting *Goland v. CIA*, 607 F.2d 339, 370 n.7 (D.C. Cir. 1978)). In particular, the court noted that "the transfer alters the harm experienced by [Petitioners]" and could well "render[] the entire action moot." *Id.* In doing so, the D.C. Circuit noted the lack of custody and said the "order presented serious constitutional questions." *J.G.G.*, 2025 WL 2317650, at *3. That is because "federal courts likely cannot order the Executive Branch to engage in diplomacy or to reach

specified diplomatic goals." *Id.* (citing *United States ex rel. Keefe v. Dulles*, 222 F.2d 390, 394 (D.C. Cir. 1954); *Edye v. Robertson*, 112 U.S. 580, 598 (1884); *Chi. & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948)).

Petitioners now move yet again for "preliminary" injunctive relief. ECF 177-1 ("Mot."). They cite purported "new evidence" that Petitioners were in the United States' constructive custody while in El Salvador, decrying a career diplomat's declaration as incredible. They also renew their equitable due-process claim, notwithstanding their release from CECOT. And they again seek an order requiring the government to facilitate the return of substantially the same putative class of aliens, now in their home country of Venezuela and apparently no longer in anyone's custody, to the United States.

## Legal Standard

A petitioner seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alterations in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). The "first and most important factor" is whether the moving party has "established a likelihood of success on the merits." *Id.* "[W]hen a plaintiff has not shown a likelihood of success on the merits, [the court] need not consider the other factors." *Greater New Orleans Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011). The last two factors merge when the government opposes the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)). That is especially true when, as here, the injunction "would alter, rather than preserve, the status quo by commanding some positive act"; so courts require the moving party to "meet a higher standard than in the ordinary case by showing a clear entitlement to relief to avoid extreme or very serious damage." *Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (Jackson, J.) (collecting cases).

## Argument

## I.    This Court Lacks Habeas Jurisdiction.

Once again, Petitioners fundamentally challenge the validity of their removals. As the Supreme Court ruled in rejecting Petitioners' APA claims, these claims sound in habeas. *J. G. G.*, 604 U.S. at 673. Habeas jurisdiction requires custody, actual or constructive. *See*, *e.g.*, *Maleng v. Cook*, 490 U.S. 488, 490 (1989). Because Petitioners were not in the United States' custody when they filed their amended complaint and are certainly not in its custody now, this Court lacks jurisdiction in habeas.

Begin with the statute: it applies only to those held "in custody under or by color of the authority of the United States." 28 U.S.C. § 2241(c)(1). And a person is "held 'in custody' by the United States when the United States official charged with his detention has 'the power to produce' him." *Munaf v. Geren*, 553 U.S. 674, 686 (2008) (emphasis added) (quoting *Wales v. Whitney*, 114 U.S. 564, 574 (1885)). No one disputes that Petitioners, after being released to El Salvador, were not within the

United States' physical custody. Nor are they today. So "constructive custody"—in which "the imprisoning sovereign is the respondent's agent"—is Petitioners' only remaining option. *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 47 (D.D.C. 2004) (quoting *Steinberg v. Police Ct. of Albany*, 610 F.2d 449, 453 (6th Cir. 1979)). That theory fails.

### A.    As the Court has already recognized, Petitioners were not in the United States' constructive custody while at CECOT.

This Court already correctly found that the United States did not have constructive custody of Petitioners while they were at CECOT. *J.G.G.*, 786 F. Supp. 3d at 57. At the time, Petitioners were being held by an independent sovereign, for its own reasons, at its own prison. Petitioners now attempt to relitigate the question based on alleged "new evidence." But none of their "new evidence" justifies reconsideration of this Court's finding, and it is not even relevant now that Petitioners are in Venezuela. Rather, events that have transpired since this Court's previous ruling only reaffirm that the United States never had constructive custody over Petitioners in El Salvador.

Petitioners' version of events is perplexing. As they would tell the story, Respondents paid El Salvador to detain Petitioners in CECOT for a year, but then quickly began negotiations with Maduro to send Petitioners to Venezuela. The truth is more sensible. As the United States explained to the Inter-American Commission on Human Rights on July 24, 2025, at that time, the Maduro regime was refusing for political reasons to accept the return of Venezuelan nationals to their home country. *United States: Human Rights Situation of Migrants, Refugees, and Asylum Seekers*, Comisión            Interamericana            de            Derechos            Humanos,

https://www.youtube.com/watch?v=5zJpvgzxnwg ("CIDH Video"), at 35:10. Unable to repatriate the Venezuelan nationals associated with TdA, the United States instead reached an arrangement with El Salvador, which would accept them if the United States also repatriated certain MS-13 members. ECF 177-11. Importantly, El Salvador provided assurances that it would abide by its antitorture and other international and domestic legal obligations. *Id.* The arrangement was not enforceable and did not require the detention of any TdA members. ECF 177-11. And the associated monetary grant to El Salvador was to support the United States' and El Salvador's mutual anticrime and antidrug interests—the March 22 letter grant left it purely to El Salvador's discretion whether to use any portion of those funds for housing Petitioners, with a requirement to report by June 30, 2026, on how it spent the money. ECF 177-10. As Ambassador Kozak made clear, Petitioners were held under the authority of Salvadoran law and discretion alone, at a Salvadoran prison, on Salvadoran soil, by Salvadoran guards. *See* ECF 129 ("Redacted Kozak Decl.") ¶ 9.

> 1.  **Ambassador Kozak's declaration—now corroborated by further statements and developments—shows that the United States did not have constructive custody of Petitioners at CECOT.**

This Court rightly "presume[d] the truthfulness and reliability of the Kozak declaration"—which was "a sworn declaration from a knowledgeable government official attesting that the CECOT Class's ongoing detention is a question of Salvadoran law." *J.G.G.*, 786 F. Supp. 3d at 57. The same is true now.

While Petitioners attempt to cast doubt on the specificity and reliability of the declaration by claiming it "is entirely compatible with the United States' ability to

request and obtain Petitioners' release," Mot. 19–20, they have not presented any evidence to undermine the Court's determination nor any basis to doubt Ambassador Kozak's credibility. He is a career diplomat with over 50 years of experience, having served in the State Department under both Republican and Democratic administrations. Redacted Kozak Decl. ¶ 1. And he gave specific examples to demonstrate that El Salvador—not the United States—controlled the detainees at CECOT and their ultimate disposition. *E.g.*, *id.* ¶¶ 9–10.

Indeed, Ambassador Kozak's declaration has been corroborated by other government officials. The Deputy Secretary of State has made clear that El Salvador had sovereign discretion on the ultimate disposition of the TdA members held at CECOT. *See* Ex. A ("Landau Decl.") ¶ 4. The State Department also made this fact clear at a public hearing of the Inter-American Commission on Human Rights. *See* CIDH Video 35:16–48; 36:54–37:13; 38:21–34. The Secretary of State made similar statements about the extent of Salvadoran control of detainees at CECOT in the *Abrego Garcia* case. Ex. B ("Rubio Decl.") ¶¶ 2–3. El Salvador manifestly exercised its sovereign discretion over their ultimate disposition when President Bukele offered to exchange them for political prisoners held by the Maduro regime and followed through on the offer several weeks later by releasing them to be repatriated to Venezuela. Landau Decl. ¶¶ 5, 8–9. Those corroborating statements and factual developments only further show that this Court was correct to rely on Ambassador Kozak's declaration.

Under the law, nothing more is needed to defeat Plaintiffs' habeas claims. In *Kiyemba v. Obama,* the court concluded based on a government declaration that detainees cannot "prevail on the ground that [a] foreign sovereign is an agent of the United States merely because . . . the Government 'engages in a dialogue to ascertain or establish what measures the receiving government intends to take pursuant to its own domestic laws . . . .'" 561 F.3d 509, 515 n.7 (D.C. Cir. 2009) (quoting the record); *see also id.* at 521 (Kavanaugh, J., concurring) (stating the declaration suffices "to demonstrate that the proposed transfer of an alien to the custody of a foreign national is not the same thing as the U.S. Government's maintaining the detainee in U.S. custody"). Likewise, in *In re Petitioners Seeking Habeas Corpus Relief in Relation to Prior Detentions at Guantanamo Bay* ("*Guantanamo Bay*"), 700 F. Supp. 2d 119, 128 (D.D.C. 2010), the court fully credited the government's declarations and accepted that foreign governments, not the United States government, are responsible for any continuing restraints on those petitioners' liberty. Here, Petitioners' allegations do not satisfy their burden, especially with the credible, sworn declaration of Ambassador Kozak to the contrary, bolstered by those of both Secretary Rubio and Deputy Secretary Landau. *Cf. Al Hajji v. Obama*, 2009 WL 4251108, at *1–2 (D.D.C. Nov. 23, 2009) (holding, based on a declaration, that former detainees were not in United States' constructive custody).

In short, because the Kozak Declaration establishes that Plaintiffs were not in the constructive custody of the United States while at CECOT, this Court never had habeas jurisdiction over their claims. *See also Rasul v. Bush*, 542 U.S. 466, 481–82

(2004) ("At common law, courts exercised habeas jurisdiction over the claims of aliens detained within . . . dominions under the sovereign's control."); *Medvid ex rel. Medvid v. Lambert*, 621 F. Supp. 575, 576 (E.D. La. 1985) (finding no control over petitioner— "except the most indirect, metaphysical sense"—where respondents were alleged to have constructive custody over seaman on Soviet vessel because of United States' "administrative ability to deter the ship's departure").

> **2.    The *Abu Ali* factors confirm that the United States did not have constructive custody of Petitioners at CECOT.**

Plaintiffs lean on *Abu Ali* for the notion that this Court continues to have habeas jurisdiction, but this Court's previous determination relying on Ambassador Kozak's declaration is dispositive, and the nonbinding *Abu Ali* factors need not be considered.

Even if the court were to apply the nonbinding *Abu Ali* factors, they only further demonstrate that Respondents never had constructive custody over Petitioners in CECOT. The nonbinding and nondispositive factors the court weighed in *Abu Ali* were whether (i) the petitioner "was detained at the behest of United States officials; (ii) his ongoing detention is at the direction of the United States enlisting a foreign state as an agent or intermediary who is indifferent to the detention of the prisoner; (iii) he is being detained in the foreign state to deny him an opportunity to assert his rights in a United States tribunal; and (iv) he would be released upon nothing more than a request by the United States." 350 F. Supp. 2d at 68. Each factor weighs against a finding of constructive custody here.

a.    Petitioners were not detained in CECOT at Respondents' "behest" such that the United States retained constructive custody of Petitioners. Even if "[c]onstructive custody does not require detention to be *solely* at the United States' behest," Mot. 14, as already explained, the nonbinding arrangement between El Salvador and the United States did not require El Salvador to detain Petitioners. Rather, El Salvador chose to detain Petitioners at CECOT in its own prison for its own reasons. *See J.G.G.*, 786 F. Supp. 3d at 57 (finding that El Salvador had "reasons . . . to detain [Petitioners] at CECOT"). Accordingly, Petitioners were not detained on the behest of United States, nor was their ongoing detention because of the United States.

Petitioners argue that the March 13–14 arrangement between the United States and El Salvador is evidence of a formal relationship governing the detention "in the nature of a treaty or otherwise." Mot. 13–14. Regardless of whether it was in writing, the arrangement was not legally enforceable and was nonbinding under international law. *See* ECF 118-1 ("Sealed Kozak Decl.") ¶¶ 3–8. And in any case, Petitioners' objection is a non-sequitur because, as explained before, the arrangement did not require El Salvador to detain them. While there was a one-time payment to El Salvador to support anticrime and antidrug efforts, done through a letter grant concluded March 22, the March 13–14 arrangement left El Salvador free to use its own discretion on what to do with the TdA members and the payment subject to Salvadoran law and El Salvador's international obligations. *See* ECF 177-10; ECF 177-11. And, as explained above, Petitioners were being held under the authority of

Salvadoran law and discretion alone, at a Salvadoran prison, on Salvadoran soil, and by Salvadoran guards. *See J.G.G.*, 786 F. Supp. 3d at 57; Redacted Kozak Decl. ¶¶ 9–10. The United States did not have control of or even a presence at CECOT. There was no legally binding agreement between the United States and El Salvador that gave the United States control over Petitioners. *See Al Maqaleh v. Gates*, 605 F.3d 84, 97 (D.C. Cir. 2010) (no habeas jurisdiction where there was lack of control over leased Air Force base).

Petitioners' evidence that the United States had custody comes from a handful of informal statements to the effect that the United States was paying El Salvador to detain Petitioners. Mot. 12. First, that is not "new evidence" that would justify this Court's reconsideration of its previous ruling. Second, limited, out-of-context public statements by officials have not been credited as evidence of the purpose behind executive policy. *See Trump v. Hawaii*, 585 U.S. 667, 701–02 (2018); *J.G.G.*, 786 F. Supp. 3d at 57. By contrast, the record contains clear, official declarations under oath that the United States did not have custody or control over the Petitioners at CECOT and that El Salvador makes its own detention choices as a separate sovereign. *See* Redacted Kozak Decl. ¶¶ 9–10; Landau Decl. ¶ 4; Rubio Decl. ¶¶ 2–3; *Gul v. Obama*, 652 F.3d 12, 18 (D.C. Cir. 2011) (crediting declaration that United States did not have custody); *Kiyemba*, 561 F.3d at 515 (crediting declaration that "[a]fter [the petitioners'] release from the custody of the United States, any prosecution or detention the petitioners might face would be effected 'by the foreign government pursuant to its own laws and not on behalf of the United States'").

Petitioners also rely on a purportedly new document concerning El Salvador's representations to a United Nations ("UN") Human Rights Council-created group known as the Working Group on Enforced or Involuntary Disappearances. ECF 160-1 ("UN Report"). Petitioners are wrong that the UN Report demonstrates that the United States had constructive custody of Petitioners at CECOT. The document was prepared by the working group. ECF 160-1 at 2–3. It consists of the working group's summary of allegations submitted to it about Venezuelan nationals in Salvadoran detention and El Salvador's response, which appears copied and modified with ellipses. *Id.* at 3. A months-old submission, ostensibly by an unknown and unidentified Salvadoran official, whose level of authority in the Salvadoran government is unknown, and then modified by a UN working group, cannot overcome sworn statements from top State Department officials that the United States does "not retain custody, constructive or otherwise, over the deported individuals." Rubio Decl. ¶¶ 2–5; *see also J.G.G.*, 786 F. Supp. 3d at 57–58; *Kiyemba*, 561 F.3d at 515; *Gul*, 652 F.3d at 18 & n.*.

Moreover, the cited language from the working group's report is confusing and unclear on its face. Read in its full context, the report appears to be referring only to the removals of the individuals from the United States, not their subsequent detention in and by El Salvador. *See* UN Report 3 (arguing that El Salvador cannot be held "responsible for a failure to observe the principle of non-refoulement"). Nonrefoulement is a principle limiting a state from returning a person to countries under certain circumstances, not present and ongoing detention.

Finally, to the extent that the unnamed Salvadoran official who drafted El Salvador's response to the working group meant to suggest that the United States retained custody, that was simply wrong and seems to reflect misunderstandings that the United States corrected after the UN Report was written on April 3, 2025. *See* ECF 141-2, Exs. 12 & 13. The reality of the diplomatic understanding and the facts on the ground are accurately reflected by the government's declarations, not the UN report. *See*, *e.g.*, Redacted Kozak Decl. ¶¶ 9–10; *J.G.G.*, 786 F. Supp. 3d at 57–58; Rubio Decl. ¶¶ 2–5.

Petitioners also rely on self-serving declarations that CECOT guards informed them they were being detained on orders from the United States and could only be released at the direction of the United States. But those declarations are not reliable—they contain multiple levels of hearsay. The declarations are Petitioners' out-of-court accounts of the CECOT guards' alleged statements, which in turn relay what other individuals supposedly told those guards, what those guards allegedly heard or think they heard, or what certain records stated. For each level of hearsay to be admissible, it must be covered by either an exemption or exception to the hearsay rule. Fed. R. Evid. 805. Nor is there evidence that those guards had any personal knowledge of what they asserted. Fed. R. Evid. 602. There is no basis to think low-level guards or even the warden at CECOT would have any personal knowledge about the United States' intentions or its arrangement with El Salvador. Even at the preliminary injunction stage, this evidence is largely unreliable and should be afforded little if any weight. Indeed, the problems with the reliability of

15

other Salvadoran statements regarding the United States' purported custody—which were specifically addressed and rebutted by Ambassador Kozak, *see* Sealed Kozak Decl. ¶¶ 4–5, 11; *see also* ECF 141-2; ECF 141-3—are further reason not to credit the CECOT guards' supposed statements.

b.    Contrary to Petitioners' contention that "El Salvador was 'indifferent' to [Petitioners'] detention at CECOT," Mot. 14, this Court previously disagreed with this assertion and found that El Salvador had its own interest in the ongoing detention of Petitioners for reasons outside of the Court's purview. *J.G.G.*, 786 F. Supp. 3d at 57 ("El Salvador has chosen—in negotiation with the United States and for reasons far outside the ken of a federal district court—to detain [Petitioners] at CECOT."). Indeed, it made sense from the perspective of public safety for El Salvador to detain foreigners it believed were TdA members. And President Bukele has also made clear his tough stance on gang members. *See, e.g.*, *Full Remarks: President Trump and El Salvador President Nayib Bukele Hold Press Briefing*, LiveNOW from FOX, https://www.youtube.com/watch?v=QhY79kjmhh4, at 20:30–45 ("[W]e're not very fond of releasing terrorists into our country. We just turned the murder capital of the world into the safest country of the Western Hemisphere, and you want us to go back into . . . releasing criminals so we can go back to being the murder capital of the world? No, that's not going to happen.").

Petitioners also cite *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484 (1973), to suggest that El Salvador's reasons for holding Petitioners in custody are irrelevant even if El Salvador had its own interest in doing so. Mot. 14–

16. That just ignores a factor of the *Abu Ali* analysis that Petitioners insist on applying: whether the foreign country is indifferent to their detention. Even so, *Braden* was about challenging a separate restraint imposed by another state. Here, there was no such separate restraint imposed by the United States. If El Salvador had released Petitioners instead of detaining them in CECOT, the United States would not and could not have rearrested them in El Salvador.

c.    Nor could the United States have obtained Petitioners' release upon request. Once Petitioners were transferred to CECOT, El Salvador—not the United States—had custody and control over the disposition of Petitioners in their physical custody. Ambassador Kozak, Deputy Secretary Landau, and Secretary Rubio have made clear that El Salvador had control over the Petitioners at CECOT. Redacted Kozak Decl. ¶ 9–10; Landau Decl. ¶ 4; Rubio Decl. ¶¶ 2–3. Petitioners do not address the fact that El Salvador accommodated congressional delegations' requests to visit CECOT and transferred Abrego Garcia out of CECOT without seeking the approval of the United States government beforehand. Redacted Kozak Decl. ¶ 10. And they make no effort to contend President Bukele's unilateral offer to Maduro to repatriate Petitioners and  subsequent follow-through on it—indeed exercising El Salvador's sovereign discretion over the detainees' disposition.

Petitioners claim that the fact that El Salvador returned Abrego Garcia proves that Respondents could produce the detainees at CECOT. But El Salvador did not return Abrego for months—and only did so after there were formal criminal charges instituted against him in the United States. Redacted Kozak Decl. ¶ 9; Rubio Decl.

¶¶ 2–5. And El Salvador did not reliably respond to the United States' inquiries about "Cristian" in the *J.O.P.* case, nor did it return him. *See* Landau Decl. ¶ 7. If Respondents really had control over the detainees at CECOT, the Abrego Garcia and "Cristian" matters would have been resolved much more readily and quickly.

Errant statements by a Salvadoran official in the UN Report or supposedly by CECOT guards—to the extent they can be credited—do not prove otherwise. Some in El Salvador made this mistake, and the United States Ambassador to El Salvador was quick to correct that misunderstanding directly with El Salvador's Foreign Minister. ECF 141-2, Exs. 12 & 13. The arrangement—under which El Salvador was free to detain or not to detain Petitioners—and Ambassador Kozak's declaration, along with those of Secretary Rubio and Deputy Secretary Landau in related cases, trump the uncorroborated statements of anonymous Salvadoran officials.

And then El Salvador, in an exercise of its own sovereign discretion, transferred all class members to the custody of the Maduro regime on July 18, 2025, and they flew to Venezuela on Venezuelan aircraft. Landau Decl. ¶¶ 8–9; CIDH Video 39:10. Petitioners' attempt to argue that the United States orchestrated this arrangement falls short, and it is also irrelevant. Although the United States helped facilitate the deal between El Salvador and Maduro's regime and American detainees and Venezuelan political prisoners were released as a result, the evidence overwhelmingly demonstrates that El Salvador's president was spearheading the deal and exercised independent judgment in effectuating release. Landau Decl. ¶ 8; CIDH Video 39:21–40:29 (quoting President Bukele: "Today, *we* have handed over all

the Venezuelan nationals detained in *our* country. . . . As was offered to the Venezuelan regime back in April, *we* carried out this exchange in return for a considerable number of Venezuelan political prisoners . . . as well as the American citizens it was holding as hostages. . . . For *us*, the reward is the happiness of the fulfilled duty that *we've* been able to free 80 Venezuelans and 10 American citizens who are now going home." (emphases added)). For its part, the United States sought and received assurances from the Maduro regime that the regime would not impose obstacles to any transferred Venezuelan's travel if various conditions were all met. Landau Decl. ¶ 8. Such assurances were to ensure compliance with court orders and nothing more.

In short, once Petitioners were transferred to the custody and control of El Salvador, the United States no longer had either, nor would Petitioners have been released upon request of the United States.

d.    As for the final factor, Petitioners are wrong that the "United States transferred [them] to CECOT to evade judicial scrutiny." Mot. 16. Petitioners were removed quickly because the United States determined Petitioners to be TdA members and believed the AEA allowed for their immediate removal. Petitioners' own evidence shows as much. *See* ECF 177-12, Ex. 1 (Attorney General memorandum); ECF 177-12, Ex. 5 (transcript of conversation between Charlie Kirk and Stephen Miller), at 33:11–34:40.

Petitioners' contrary evidence is improperly leaked, privileged information that does not show that Respondents attempted to avoid review. That "whistleblower

evidence" consists of internal discussions about the interpretation of this Court's second TRO of March 15. Parts of the leaked information make clear that high-level officials believed the TRO did not apply once a flight was outside the United States. ECF 177-8, at 27. Respondents' counsel said at a hearing that he couldn't contest Petitioners' evidence—that is hardly evasion. ECF 20, at 11. And the D.C. Circuit even had this evidence when it granted Respondents' petition for mandamus with respect to this Court's probable-cause order. Indeed, Judge Katsas agreed that there had been no violation of the TRO. *J.G.G. v. Trump*, 147 F.4th 1044, 1046 (D.C. Cir. 2025) (Katsas, J., concurring). Petitioners' reliance on this Court's vacated probable-cause order and the leaked "whistleblower evidence" is an improper attempt to relitigate these issues, which are no longer within this Court's jurisdiction because the mandate has yet to issue.

In the end Petitioners' "new evidence" does not remotely demonstrate that the United States had constructive custody of Petitioners at CECOT. If anything, events and evidence since Petitioners' transfer to and from El Salvador prove the opposite.

### B.    In any event, Petitioners are no longer in CECOT custody.

Even if Petitioners had been in constructive custody while in El Salvador, that would not support the continued exercise of habeas jurisdiction now that they have been released from El Salvador. Petitioners concede as much. *See* Mot. 25. So they now argue that this Court retains habeas jurisdiction by virtue of supposed collateral consequences flowing from Petitioners' AEA designations. That is mistaken.

Collateral consequences are additional legal restraints that apply to individuals after a conviction; they allow for review in habeas corpus even after

release from custody so long as there are concrete consequences of the underlying conviction. *Gul*, 652 F.3d at 15–17. But "[t]he Supreme Court has cautioned against extension of the presumption of collateral consequences." *Id.* at 16 (citing *Spencer v. Kemna*, 523 U.S. 1 (1998)). Even parole revocation is typically not enough to satisfy collateral consequences. *Spencer*, 523 U.S. at 14. Because it is Petitioners' burden to demonstrate collateral consequences, they must show a concrete, continuing injury caused by their AEA designations and the "'likelihood' that a favorable decision would redress the injury or wrong." *Gul*, 652 F.3d at 14, 17–21; *see Spencer*, 523 U.S. at 11 (holding "it is the burden of the party who seeks the exercise of jurisdiction in his favor, clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute" (internal quotation marks omitted)). As relevant here, the D.C. Circuit has found that detainees transferred to foreign countries were not burdened by sufficiently concrete collateral consequences so as to be in custody for habeas purposes in the context where they were designated enemy combatants in an armed conflict. *See Gul*, 652 F.3d at 14, 17–21.

Petitioners' removal and AEA designations, which resulted in their inability to reside in the United States, are not collateral consequences sufficient to preserve habeas jurisdiction. *See Guantanamo Bay*, 700 F. Supp. 2d 119, 127–37 (D.D.C. 2010) (rejecting as collateral consequences (1) conditions imposed by foreign governments; (2) stigma; (3) a prohibition of travel to the United States; and (4) an inability to bring a damages action). More is required.

In *Gul*, an issue analogous to this case arose regarding the "No Fly List." 652 F.3d at 18. The former detainees in *Gul* argued, among other things, that their habeas cases were not moot because as long as they were designated as enemy combatants, they would suffer the collateral consequence of being on the "No Fly List" and thus barred from flights entering the United States. *Gul*, 652 F.3d at 19. The D.C. Circuit, however, rejected this argument because an order granting a former detainee's habeas petition would not lead to their removal from the "No Fly List." *Id.* The court explained that "'any individual who was a detainee held at . . . Guantanamo Bay,'" *id.* (quoting 49 U.S.C. § 44903(j)(2)(C)(v)), was to be included on the "No Fly List." Thus, the petitioners would be "barred from flights entering the United States regardless of whether a court declares they were unlawfully detained." *Id.* The court further explained that "[a]n order granting a detainee's habeas petition would not mean his exoneration, nor would it be a determination he does not pose a threat to American interests; it would mean only that the Government has not proven the detainee more likely than not" satisfied the detention standard in the Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), including being "'part of' a force associated with al Qaeda or the Taliban." *Id.*

By analogy, here, an order granting a former detainee's habeas petition would not remedy any claimed impact on them pursuant to United States law, much less the kind of impact that should lead a court to vastly expand the narrow collateral consequences habeas rule. Petitioners would face substantial barriers to entering the United States irrespective of the AEA designation. *See Gul*, 652 F.3d at 19. Even if

they received a favorable determination, Petitioners may still not be able to return to the United States under various authorities in Title 8, including expedited removal. Those independent statutory provisions would entail separate determinations that are not necessarily limited by a ruling in this case. Courts have long held the fact that someone cannot enter the United States for other reasons defeats collateral consequences. *Perez v. Greiner*, 296 F.3d 123, 126 (2d Cir. 2002) (holding that "because [petitioner] is permanently inadmissible to the United States due to his prior drug conviction, collateral consequences cannot arise from the challenged robbery conviction, and the petition is moot"); *Abreu v. Superintendent Smithfield SCI*, 971 F.3d 403, 407 (3d Cir. 2020) (holding that, although the petitioner cannot reenter the United States because of his federal drug-trafficking conviction, wholly apart from his state conviction, his fear that reentry would cause him to serve the maximum remaining balance of his state sentence or subject him to federal prosecution for illegal reentry are not valid collateral consequences).

Despite their release in Venezuela, Petitioners claim that they continue to suffer "collateral consequences flowing from the prior conviction, designation, or removal that a court can still redress." Mot. 25–26. But in *Gul*, the Supreme Court rejected the petitioners' argument that a "deported alien faces collateral consequences because domestic law either bars him permanently from the United States or requires him to wait some period of years before seeking re-entry, 8 U.S.C. § 1182[(a)](9)(A)," and found it "too speculative" to give the Court jurisdiction. 652 F.3d at 19–20. Likewise, the Court found that any claimed injury—such as travel

restrictions—that might arise from the immigration laws of any other country must be speculative as well. *Id.* at 20. Indeed, "nonstatutory consequences"—like those "dependent upon the discretionary decisions made by an employer or a sentencing judge"—are generally not actionable collateral consequences. *Spencer*, 523 U.S. at 13.

Petitioners also point to their inability "to access removal proceedings or seek humanitarian protections in the United States." Mot. 26. But asylum is a discretionary matter, 8 U.S.C. § 1158(b)(1)(A); it therefore cannot be a basis for collateral consequences. *See, e.g.*, *Bacilio-Sabastian v. Barr*, 980 F.3d 480, 483 (5th Cir. 2020) (explaining that the approval of any work authorization is subject to USCIS discretion and therefore "any collateral consequence . . . is too attenuated for habeas relief"). The possibility of being able to bring a habeas claim that would redress any of these supposed collateral consequences is thus too speculative to sustain this Court's exercise of jurisdiction. *See Spencer*, 523 U.S. at 14–16 (rejecting alleged collateral consequences of parole revocation because not concrete, "attributable" to revocation, or redressable by habeas); *Lane v. Williams*, 455 U.S. 624, 633 n.13 (1982) (where prior parole violation does not automatically make individual ineligible for future parole but is instead "simply one factor, among many, that may be considered by the parole authority," possibility parole will be denied after future conviction is insufficiently concrete to constitute injury meeting case-or-controversy requirement).

## C. Petitioners are not currently in the United States' constructive custody.

Plaintiffs also repeat the gist of their "collateral consequences" arguments in support of an alternative theory—that they remain in the constructive custody of the

United States despite being home in Venezuela, and as far as the United States is aware, not in any custody at all. *See* July 24 Hr'g Tr. 4:19–5:22; *see also I.M. v. CBP*, 67 F.4th 436, 444 (D.C. Cir. 2023) (aliens returned to their home country are no longer in custody). This theory fails for all the same reasons discussed above.

To be clear, Petitioners' AEA designations do not put them in the United States' constructive custody while they are in Venezuela. Although it may be true that certain restrictions on liberty other than physical custody may suffice to confer habeas jurisdiction, that situation arises in the context of restrictions enforceable by an entity who would otherwise have the power to confine—for example, when a state puts a criminal inmate on supervised release or parole in lieu of continued confinement. *See United States v. Verrusio*, 758 F. App'x 2, 3 (D.C. Cir. 2019) ("For petitioners released from a prison or detention facility, the Supreme Court has found custody only when they demonstrated a significant impingement on their freedom of movement."). Here, the United States has no power to confine Petitioners while they remain outside the United States. That is the end of the analysis.

A restriction on entering or residing in the United States is not "custody" for purposes of habeas jurisdiction. *See* Mot. 27. If it were, then *every* prohibition on entry to the United States, such as a travel restriction or restrictions based on designation of a foreign terrorist organization ("FTO"), would let an alien file a habeas claim for entry. If such an avenue for relief existed, entire nations of individuals could bring habeas claims because they cannot enter the United States—despite lacking any

right to be in United States in the first place. *See Hawaii*, 585 U.S. at 701–02. That is plainly wrong.

Moreover, as discussed above, a designation as an "enemy combatant"—as a result of which a person is "barred from flights entering the United States"—does not continue custody for habeas purposes after the enemy combatant is transferred to a foreign nation. *Gul*, 652 F.3d at 19. If such restrictions do not suffice for collateral consequences, then surely they cannot establish custody in the first place. *Id.*

It does not matter that if Petitioners were to return to the United States, they would be subject to immediate apprehension, detention, removal, and the seizure and forfeiture of their property. That is because they do not have a legal right to be in United States to begin with, entirely apart from any AEA designation. *See Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) ("It is clear that Mandel personally, as an unadmitted and nonresident alien, had no constitutional right of entry to this country as a nonimmigrant or otherwise.").

Nor do Petitioners' allegations that they are at greater risk of harm in Venezuela because they have been labeled members of TdA create "custody" for habeas purposes. Petitioners have not shown that the United States has, for example, asked other countries to arrest them or restrict their travel based on their TdA designation. The alleged harms they describe are threats from independent third parties, including the Maduro regime, not under the United States' control. Those purported injuries are "caused not by a party before the court but by a stranger to the case"—one "beyond the power of the court to redress." *Gul*, 652 F.3d at 18. In any

event, it is wholly speculative that removing the AEA designation would remedy those harms.

Ultimately, there is no serious argument that Respondents have constructive custody over 137 free individuals in a foreign country controlled by a regime hostile to the United States. All of Plaintiffs' habeas theories are dead ends.

## II.    Petitioners Cannot Prevail on a Freestanding Due-Process Claim.

Petitioners put little effort into their standalone due-process claim. They merely adopt this Court's theory from the vacated preliminary-injunction decision— without any analysis, without addressing the arguments raised in Respondents' motion for a stay pending the appeal of this Court's previous preliminary injunction, and without acknowledging the D.C. Circuit's expression of serious constitutional questions with the remedy this Court previously ordered. This Court should reject Petitioners' slapdash incorporation by reference of a now-vacated ruling.

### A.    Petitioners cannot pursue due-process claims outside of habeas.

Petitioners' due-process claims sound in habeas. The Supreme Court made that clear in this very case. Their "claims for relief 'necessarily imply the invalidity' of their confinement and removal under the AEA," so "their claims fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas." *J. G. G.*, 604 U.S. at 672. Applying this logic, the Court vacated this Court's TROs that were, in part, premised on a due-process claim that Petitioners had not received adequate notice before removal. *Id.*; ECF 1 ¶¶ 101–04; ECF 3-2, at 16–17; ECF 53, at 24.

Petitioners' "new" theory is the same, and it continues to sound in habeas. The point of the due-process claim is to challenge the validity of their removal. Plaintiffs'

argument is that they did not get enough process before removal and thus were unable to dispute the basis for it. *J.G.G.*, 786 F. Supp. 3d at 82; *I.M.*, 67 F.4th at 443 (treating request for hearing as habeas remedy, because a "hearing can result in release"). This Court acknowledged this when it said that the violation requires "restoration of the status quo ante and an injunction barring deprivation of the [Petitioners'] rights without the requisite procedural protections." *J.G.G.*, 786 F. Supp. 3d at 64 (quoting *Ray v. Foltz*, 370 F.3d 1079, 1085 n.8 (11th Cir. 2004)). Restoration of the status quo means undoing the removal, thus "necessarily imply[ing]" its "invalidity." *J. G. G.*, 604 U.S. at 672. Notice is core to due process, and "due process rights have historically been vindicated by the writ of habeas corpus." *Hamdi v. Rumsfeld*, 542 U.S. 507, 555 (2004) (Scalia, J., dissenting). So due-process claims *are* core habeas claims. *See Brown v. Davenport*, 596 U.S. 118, 128–29 (2022) ("[H]abeas was no less than 'the instrument by which due process could be insisted upon.'").

Indeed, this case bears striking similarities to another milestone case in habeas jurisprudence: *Heck v. Humphrey*, 512 U.S. 477 (1994). There, the petitioner, convicted of manslaughter and imprisoned, sought compensatory and punitive monetary damages for alleged due-process violations such as "unlawful, unreasonable, and arbitrary" investigation leading to his arrest, the "knowing[]" destruction of exculpatory evidence, and the use of "an illegal and unlawful voice identification procedure" at trial. *Id.* at 479. But he did not ask for release from custody. *Id.* The Supreme Court held that, even though the petitioner had not sought

release, the fact that establishing his claim "would necessarily imply the invalidity of his conviction or sentence" rendered the claim not cognizable under 28 U.S.C. § 1983—absent reversal on direct appeal, expungement by executive order, or a declaration by a competent tribunal (such as through a writ of habeas corpus) that the conviction or sentence was invalid. *Id.* at 486–87.

Likewise here. Petitioners argue that their removals were effectuated without due process. And if a removal violated due process, even for "inadequate" notice, it is "void." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). Indeed, if Petitioners were right, due-process challenges to a criminal defendant's trial would not challenge the validity of the conviction. *Contra Heck*, 512 U.S. at 486–87. But such due-process claims are core to habeas and cannot be brought through standalone equitable challenges. *See Mack v. City of Chicago*, 723 F. App'x 374, 376 (7th Cir. 2018) ("Mack's due-process claim based on an unfair criminal trial necessarily would impugn the validity of his conviction"); *Dominguez v. Hendley*, 545 F.3d 585, 588 (7th Cir. 2008) ("[A] § 1983 claim for a due process violation based on the denial of a fair criminal trial may be brought only after the conviction is set aside."). So too for challenges to a lack of notice before a hearing. *See Early v. Blankenship*, 221 F.3d 1342 (8th Cir. 2000) (challenge to notice of disciplinary hearing "would necessarily imply the invalidity of [the] disciplinary result" and thus must be brought in habeas). Petitioners' due-process claim strikes at the heart of their removals' validity, and packaging the claim as notice-related does nothing to change that fact.

Nor are Petitioners aided by the Supreme Court's later dicta that it is "skeptical of the self-defeating notion that the right to the *notice* necessary to 'actually seek habeas relief' must *itself* be vindicated through individual habeas petitions, somehow by plaintiffs who have not received notice." *A. A. R. P. v. Trump*, 605 U.S. 91, 98 (2025) (per curiam) (quoting *J. G. G.*, 604 U.S. at 673). The majority in *A. A. R. P.* was responding to the dissent's arguments there regarding *classwide relief* and defending the proposition that such claims could proceed for a putative class— not that they could proceed outside of habeas. *Id.* Indeed, that case was a habeas action, filed in the correct venue. *Id.* Nothing in *A. A. R. P.* calls into question the Supreme Court's ruling in *this* case, just weeks earlier, that challenges to AEA detention or removal must proceed in habeas. If anything, the due-process theory is even more of a "core" habeas challenge because it involves removals that have already occurred (and thus that would necessarily be invalidated if Petitioners prevail). Petitioners cannot metamorphose their habeas claims into a standalone equitable due-process claim.

To be sure, habeas jurisdiction may not be available *ex post* if (as here) the government no longer has custody—just as a criminal defendant can no longer challenge his trial after he has served his sentence. *See, e.g.*, *Savory v. Cannon*, 947 F.3d 409, 431 (7th Cir. 2020) (en banc) (rejecting argument that "release from custody and the unavailability of habeas relief means that section 1983 must be available as a remedy"). But that is not a reason to ignore jurisdictional limits. *See id.* at 420 ("[T]here is not always a . . . remedy for every constitutional wrong.").

In short, Petitioners' due-process claims must be pursued in habeas. And if habeas is no longer available because of lack of custody, that simply means these claims can no longer be brought. This Court cannot instead order the government to manufacture habeas jurisdiction that does not exist.

### B.    Petitioners cannot obtain injunctive relief to "facilitate" filing habeas claims.

The equitable due-process theory also fails for a related reason: An injunctive remedy cannot be used to "facilitate" filing habeas claims. That is internally inconsistent. Respondents cannot "facilitate" habeas if Petitioners are not in United States custody. And if Petitioners *were* in custody, then they could just bring a habeas claim. But the United States lacks custody of Petitioners, so Respondents cannot facilitate their ability to file for habeas.

Petitioners have not been in *any* custody since they were released to the Maduro regime. No federal court would have jurisdiction over Petitioners' petitions because—as this Court found—the United States does not exercise custody over them and so cannot release them. *J.G.G.*, 786 F. Supp. 3d at 59. And giving Petitioners the ability to file a petition over which no federal court would have jurisdiction is no remedy at all. It would not meaningfully provide them the ability to be heard and bring their claims—the very injuries for which they seek redress. *See id.* at 66.

Nor can this Court force the United States to regain custody of Petitioners. That would require diplomatic or military action by the Executive. To be sure, the assurances the State Department received from the Maduro regime should theoretically make doing so easier than before. Still, an order to retake custody of

Petitioners is ultimately an order to engage with a hostile foreign entity. And, as with any endeavor in foreign affairs, there is no way to enforce such an order—the United States could ask, of course, but despite his regime's assurances back in July, Maduro may well decline. And though such an outcome would be frustrating, it would be beyond the jurisdiction of this Court to force Maduro to bend to its will, or to force the Executive to undertake a specific foreign policy or military action to achieve a particular diplomatic outcome. Indeed, the United States' relationship with the Maduro regime has deteriorated significantly within the past month. *See, e.g.*, U.S. Dep't of War, *Statement from Chief Pentagon Spokesman Sean Parnell on U.S. Force Posture Changes in the U.S. Southern Command Area of Responsibility* (Oct. 24, 2025), https://www.war.gov/News/Releases/Release/Article/4325782/statement-from -chief-pentagon-spokesman-sean-parnell-on-us-force-posture-change/ (announcing deployment of aircraft carrier group to area of responsibility that includes Venezuela); Sec'y of War Pete Hegseth, X.com, https://x.com/SecWar/status /1974150886084485503 (Oct. 3, 2025, 12:33 PM) (announcing lethal strike on narco-terrorist vessel off coast of Venezuela).

As these changing circumstances illustrate, foreign affairs are complicated and multifaceted. They are in constant flux. That is why courts should not and cannot dictate that the Executive seek to obtain a particular diplomatic goal under threat of contempt. *See J.G.G.*, 2025 WL 2317650, at *3 (stating that "federal courts likely cannot order the Executive Branch to engage in diplomacy or to reach specified diplomatic goals"). For good reason, matters of foreign affairs are "so exclusively

entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952). Article II "authorizes the Executive to engag[e] in direct diplomacy with foreign heads of state and their ministers," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015), which is why the Supreme Court has "taken care to avoid 'the danger of unwarranted judicial interference in the conduct of foreign policy,'" *Biden v. Texas*, 597 U.S. 785, 805 (2022). The President's power to speak for the country "in the field of international relations" is both "plenary and exclusive." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936). An order to facilitate Petitioners' ability to seek habeas relief would, in effect, let a single judge usurp that "power to speak . . . as a representative of the nation." *Id.* That cannot be right. *See J.O.P. v. DHS*, No. 25-1519, 2025 WL 1431263, at *14–15 (4th Cir. May 19, 2025) (Richardson, J., dissenting) ("[H]owever far 'facilitate' goes, it cannot encompass an order requiring specific diplomatic communication from the Executive Branch.").

### C.    As a result, Petitioners' injuries are not redressable.

Even if Petitioners could proceed outside of habeas, their due-process claims are a dead end. The government lacks custody, and with no custody comes no remedy. This means there is no real Article III case or controversy.

It is not "'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023). When the "existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control

or to predict,'" Plaintiffs bear an especially heavy burden to prove "redressability of injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Petitioners can only demonstrate redressability in such cases if "substantial evidence of a causal relationship between the government policy and the third-party conduct . . . leav[es] little doubt as to . . . the likelihood of redress." *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665–66 (D.C. Cir. 2025). Mere "guesswork as to how independent decisionmakers will exercise their judgment" is insufficient. *Id.*

As explained above, the only way to "facilitate" habeas relief here would be for the United States to regain custody from a foreign entity. But that relief would be wholly speculative and dependent on the conduct of that independent foreign entity, which cannot suffice for Article III. Given the already inherent unpredictability of foreign relations, compounded by the Maduro regime's mercurial nature, there is more than a "little doubt" about the likelihood of redress, despite the assurances that were given earlier this year. *Id.*

In the end, Petitioners' only injury traceable to the United States is a purely *past* one: that they were removed without adequate notice or an opportunity to file habeas. *See J.G.G.*, 786 F. Supp. 3d at 66. That is not an ongoing or imminent injury that can justify prospective injunctive relief.

### D.    Petitioners have no clearly articulated due-process interest.

Finally, Petitioners have not explained what protected interest they have for the remedy they now seek. Surely illegal aliens have no protected interest in remaining in the country. *DHS v. Thuraissigiam*, 591 U.S. 103, 138 (2020). And the Supreme Court has also recognized that "an expectation of receiving process is not,

without more, a liberty interest protected by the Due Process Clause." *Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 648 (D.C. Cir. 1987) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250 n.12 (1983)). Certainly there is some liberty interest in avoiding wrongful removal. But for Petitioners to obtain the *process* interest they now ask for, the United States must take them back into custody. It cannot be that the remedy for a due-process violation of a liberty interest is for the United States to take a person— free in his own country—back into custody. Indeed, Petitioners cite no authority for this novel and backwards position.

### III. Preliminary Injunctive Relief Is Inappropriate, and Plaintiffs Have Not Met Their Burden on the Equitable Factors.

#### A. The proposed relief is not "preliminary."

A preliminary injunction is an extraordinary form of relief. *Munaf*, 553 U.S. at 689–90, intended for the limited purpose of preventing irreparable harm from occurring during the pendency of a case. It requires Petitioners to demonstrate that they will likely suffer irreparable harm without *preliminary* relief. *Id.* Yet any injunction requiring Respondents to provide Petitioners with a route to habeas would provide *final relief* to their alleged process-only injury. As a result, the requested injunction is not "preliminary" and is not properly teed up in this posture. *See Am. Fed'n of State Cnty. & Mun. Emps., AFL-CIO v. U.S. Off. of Mgmt. & Budget*, 25-cv-08302, 2025 WL 3018250, at *25 (N.D. Cal. Oct. 28, 2025).

Indeed, if Petitioners obtain their proposed "preliminary" relief, their cause of action would become moot, leaving no further dispute to adjudicate. Relatedly, there will be no way to "unring the bell" if Respondents ultimately prevail. Petitioners'

motion for a "preliminary injunction" should thus be denied as an improperly filed and premature motion for summary judgment. *See* LCvR 7(h)(1).

### B.    Petitioners have not shown that they will suffer irreparable harm absent an injunction.

Petitioners have not carried their burden to demonstrate that they will suffer irreparable harm unless this Court grants them their requested "preliminary" injunction. As the Supreme Court has said, wrongful removal is not irreparable when aliens can be returned after the fact. *Nken*, 556 U.S. at 435. Indeed, Petitioners are trying to have it both ways—they cannot both say that it is now easier to bring them back to the United States because of the assurances of the Maduro regime *and* that they have suffered irreparable harm from being removed.

Petitioners are no longer in CECOT, so they cannot still rely on their detention there as an alleged irreparable harm—which was this Court's prior ground for finding that element satisfied. Instead, they are now apparently free in their own country, as the D.C. Circuit acknowledged. *J.G.G.*, 2025 WL 2317650, at *3.

Petitioners also claim harm from being in the country from which they seek asylum. But none has prevailed on an asylum claim, and their declarations are not enough evidence to prove a likelihood of persecution in Venezuela. At minimum, there is no proof common to the entire class. So there is certainly no showing of *classwide* irreparable harm requiring *classwide* injunctive relief.

Indeed, the collateral harms Petitioners allege are merely speculative. Petitioners believe that their designations and removal under AEA have resulted in third parties acting differently towards them, and they fear other possible

36

consequences. But they provide no evidence other than their self-serving declarations based on such beliefs and fears. Nor do Petitioners explain how those harms would be redressed if a United States court invalidates their past designations. Equity will not act "against something merely feared as liable to occur at some indefinite time." *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931); *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017). In all circumstances, the irreparable harm alleged must be "concrete and corroborated, not merely speculative." *Benoit v. D.C.*, No. CV 18-1104, 2018 WL 5281908, at *6 (D.D.C. Oct. 24, 2018). And again, at minimum, Petitioners offer no evidence these particular alleged harms are common to the class as a whole.

Not only have Petitioners failed to establish irreparable harm capable of being prevented by preliminary relief, Petitioners fail to commit to taking advantage of the relief they seek. Although four of the named Petitioners express a desire to return to the United States, they mainly express a desire to pursue asylum, going far beyond "core" habeas relief. ECF 177-4 ¶ 11; ECF 177-5 ¶ 21; ECF 177-6 ¶ 16; ECF 177-7 ¶ 16. None addressed his willingness to return to custody or to being detained— which, given their identifications as members of an FTO, would be an inevitable part of returning to United States custody.

Certainly there is not irreparable harm to the entire putative class if some members do not want to return to the United States. And they likely do not want to return for good reason. They were all illegally present in the United States. If they were to return, they would be detained under authorities including not just the AEA

but also Title 8—many in expedited removal and as FTO members. They would be detained for a potentially lengthy period and likely removed again. Even if some members could raise valid claims to remain, but that is too speculative even for an individual Petitioner to receive relief, let alone the entire class.

Further, the passage of time undermines Petitioners' request for preliminary relief. Petitioners were returned to their native Venezuela on July 18, 2025. But Petitioners did not file their renewed preliminary-injunction motion for nearly three months. The timing of their motion reveals that they do not face imminent irreparable harm supporting their requested "preliminary" relief. *See, e.g., Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (collecting cases).

Because Petitioners cannot show irreparable harm absent this Court's grant of a preliminary injunction, their motion fails.

### C.    The balance of equities favors denial.

The final two factors—the balance of equities and the public interest—merge when the government is the opposing party. *Cf. Nken*, 556 U.S. at 435 (acknowledging this in the stay context). They cut against preliminary relief too.

Petitioners are wrong that the government has minimal interests or that the government can bring them back without engaging in diplomacy or military action. It is true that the United States received certain assurances from the Maduro regime, but those assurances are not enforceable at law, and there is more than a "little doubt" about what Maduro would actually do the inherent unpredictability of foreign affairs and the possibility that the Maduro regime may break its promise. Even a requirement to engage in diplomatic outreach with a hostile regime infringes on the

Executive's constitutional function. Moreover, even if this Court were convinced that the Petitioners who submitted declarations are not TdA members, Petitioners have not put forward evidence that the *other* 133 Petitioners are wrongly designated as TdA members. The risk is high that bringing the class back would bring back more than just a few foreign enemies. Certainly, given the meager showing of irreparable harm to Petitioners absent an injunction, that magnitude of risk from an injunction does not justify issuing one.

An injunction "deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and frustrates the "public interest in effective measures to prevent the entry of illegal aliens," *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). The Executive's protection of these interests, including "sensitive and weighty interests of national security and foreign affairs" inherent in combating terrorist groups, warrants the utmost deference. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–35 (2010)*; see also Barr v. DOJ*, 819 F.2d 25, 26 (2d Cir. 1987). Here, a requirement to facilitate Plaintiffs' return to the United States would cause substantial harm to the government and public interest, especially where TdA is a designated FTO whose members threaten the public safety, pose a danger to their custodians, and take up limited space for detaining aliens. *See* ECF 72-1 ¶¶ 15–25; ECF 72-2 ¶ 9.

Because Petitioners have not shown the balance of equities and public interest lie in their favor, they have not made that essential showing for injunctive relief.

**IV.    This Court Should Stay Any Injunction Pending Appeal.**

If this Court grants any injunctive relief, it should stay that relief pending appeal. The factors for a stay pending appeal are similar to those for seeking injunctive relief. *See Nken*, 556 U.S. at 434.

First, the merits. As explained above, Respondents will likely prevail on appeal because this Court lacks jurisdiction over this matter. Indeed, this Court's orders granting Petitioners temporary or preliminary injunctive relief have been vacated at least twice, and its order finding probable cause was vacated by a writ of mandamus. In other words, the higher courts have consistently rejected the kind of relief Petitioners have been seeking.

Second, Respondents will suffer irreparable harm from injunctive relief requiring any kind of facilitation of Petitioners' return to United States custody. Any requirement to return members of a designated FTO with no right to be in the United States both infringes on the Executive's prerogative in foreign affairs and diplomacy and risks harm to the agency officials who will be charged with transporting and securing those aliens. Beyond that, the government will incur costs in doing so, costs that Petitioners "in all likelihood" will not be able to repay. *J.G.G.*, 786 F. Supp. 3d at 83. Those costs are thus irreparable. *Carabillo v. ULLICO Inc. Pension Plan & Tr.*, 355 F. Supp. 2d 49, 55 (D.D.C. 2004) ("Courts have also recognized that economic loss may constitute 'irreparable harm' where the defendant would become insolvent or otherwise judgment-proof prior to the conclusion of litigation, thus making the plaintiff's alleged damages unrecoverable.").

Third, as explained above, Petitioners have not shown that they suffer any ongoing injury traceable to Respondents, for they are apparently at liberty in their home country, and any ongoing threats to their health and safety come from third parties not before this Court.

And finally, to the extent that the public interest does not merge with Respondents' interests when the government seeks a stay, the public itself would be irreparably harmed by the reintroduction of TdA members without a right to be in the United States. Those illegal aliens and members of a designated FTO will pose safety risks to the United States citizens and lawful residents who would have to hold them in custody—or the public at large should they somehow leave custody. Not to mention that the (in all likelihood irrecoverable) costs imposed on the government to transport and house Petitioners would be passed on to the taxpayers at large.

## Conclusion

Petitioners' motion for a preliminary injunction should be denied. If this Court grants preliminary injunctive relief, this Court should stay it pending appeal.

Respectfully submitted,

**Brett A. Shumate**
Assistant Attorney General
Civil Division

**Yaakov M. Roth**
Principal Deputy Assistant Attorney General
Civil Division

**Drew C. Ensign**
Deputy Assistant Attorney General
Civil Division
Office of Immigration Litigation

**August Flentje**
Special Counsel for Immigration
Civil Division

s/Tiberius T. Davis
**Tiberius T. Davis**
Counsel to the Assistant Attorney General
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 514-2000
tiberius.davis@usdoj.gov

**Anthony Nicastro**
Acting Director
Office of Immigration Litigation

**Ernesto Molina**
Deputy Director
Office of Immigration Litigation

Dated: October 31, 2025          *Counsel for Respondents–Defendants*