**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

LIYANARA SANCHEZ, as next friend on behalf
of FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

---

**PETITIONERS–PLAINTIFFS' REPLY IN SUPPORT OF**
**RENEWED MOTION FOR PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

   I. THE COURT CAN DECIDE PLAINTIFFS' DUE PROCESS CLAIM IN EQUITY. ........ 2

   II. THE COURT ALSO HAS HABEAS JURISDICTION. ................................................... 4

      A. The Court Has Habeas Jurisdiction Because Plaintiffs Were in the Constructive
      Custody of the United States at CECOT. ................................................................... 4

         1. Applying the *Abu Ali* factors, the record shows that Plaintiffs were in the
         constructive custody of Defendants at CECOT. ..................................................... 5

         2. Defendants fail to salvage the Kozak Declaration. ........................................... 13

         3. Plaintiffs continue to suffer collateral consequences that this Court can redress.
          ................................................................................................................................ 17

      B. The Court Also Has Habeas Jurisdiction Because Plaintiffs' AEA Designation
      Subjects Them to Continuing Constructive Custody in Venezuela. ............................ 20

   III. THE COURT SHOULD ORDER DEFENDANTS TO FACILITATE PLAINTIFFS'
   ABILITY TO CONTEST THEIR AEA DESIGNATIONS. .................................................. 21

      A. Plaintiffs Are Likely to Succeed on Their Due Process Claim. ............................... 21

      B. The Government Can "Facilitate" Plaintiffs' Pursuit of Habeas Relief. ................... 21

      C. Plaintiffs' Injuries Are Redressable .......................................................................... 21

      D. Facilitating Plaintiffs' Ability to Pursue Habeas Relief is Preliminary Relief......... 22

      E. Plaintiffs Continue to Suffer Irreparable Harm. ....................................................... 23

      F. For the Reasons Already Identified by this Court, the Balance of Equities and Public
      Interest Weigh Decidedly in Favor of a Preliminary Injunction Order. ...................... 25

   IV. THE COURT SHOULD NOT STAY AN INJUNCTION PENDING APPEAL ............ 25

CONCLUSION ................................................................................................................. 25

## INTRODUCTION

This Court previously held that Petitioners-Plaintiffs' ("Plaintiffs") "removal from the United States, before [they] had received constitutionally adequate notice of the reason for that removal or any meaningful opportunity 'to actually seek habeas relief,' violated their Fifth Amendment right to 'due process of law.'" ECF No. 148 ("June 4 Op.") at 39 (citing *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025)). The government does not, and could not, dispute that merits ruling. The Court has also already correctly concluded that it has jurisdiction to consider that due process claim in equity. Defendants offer no persuasive reason to revisit the Court's reasoning. Thus, as it previously did, the Court should order the government to "facilitate Plaintiffs' ability to proceed through habeas and ensure that their cases are handled as they would have been if the Government had not provided constitutionally inadequate process." *Id.* at 67. Moreover, substantial new evidence now shows that the Court also has habeas jurisdiction. The government's arguments for ignoring that new evidence are unconvincing. Because the government has made clear that it would appeal any jurisdictional ruling based on equity (as it did the first time), Plaintiffs respectfully request that the Court reach the constructive custody issue and find habeas jurisdiction as an alternative jurisdictional ground, thereby reducing the likelihood of piecemeal litigation.

At bottom, the government's position is that because it succeeded in illegally transferring Plaintiffs to El Salvador (despite a clear order from this Court that Saturday night in March), Plaintiffs are simply out of luck. Opp. 31 (arguing the Court lacks jurisdiction and that "simply means these claims can no longer be brought"); Marco Rubio (@marcorubio), X (Mar. 16, 2025), https://perma.cc/6VTW-5KRD (retweeting post after Plaintiffs were deplaned in El Salvador: "Oopsie . . . Too late"). That is not the law, as this Court properly made clear the first time.

**ARGUMENT**

**I.    THE COURT CAN DECIDE PLAINTIFFS' DUE PROCESS CLAIM IN EQUITY.**

Defendants provide no basis for this Court to revisit its prior conclusion that Plaintiffs can assert a standalone due process claim. *See* June 4 Op. at 27-31. Defendants argue that Plaintiffs' due process claim necessarily challenges the validity of their removals and thus sounds in habeas. Opp. 27-31. But that premise is wrong: it conflates a challenge to procedure with an attack on the outcome. *See* June 4 Op. at 27-31. As this Court explained: "Plaintiffs' due-process claim 'attack[s] only the wrong procedures' (*i.e.*, the process that denied them a chance to actually seek habeas relief), 'not the wrong result' of the sought-after procedures (*i.e.*, removal)." *Id.* at 30 (citing *Wilkinson v. Dotson*, 544 U.S. 74, 80 (2005)).

That distinction matters because success on Plaintiffs' claim, and restoration to the status quo, "mean[t] at most" a new hearing. *Id.* at 28-29 (citing *Wilkinson*, 544 U.S. at 82). Indeed, "[t]he federal reporters are replete with examples of that distinction," *id.* at 29 (collecting cases), which Defendants disregard entirely. Neither *Brown v. Davenport*, 596 U.S. 118 (2022), nor the dissent in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), Opp. 28, addressed the distinction at issue here, and neither suggested that all due process claims must be vindicated only through habeas. As this Court recognized, "while claims that actually 'seek[ ]' habeas relief must be brought through the writ itself, claims that 'simply relate[ ] to . . . core habeas corpus relief' need not." June 4 Op. at 29-30 (citation omitted).

Defendants cite *Heck v. Humphrey*, 512 U.S. 477 (1994), and out-of-circuit cases in an effort to erase that distinction. Opp. 28-29. But *Heck* supports Plaintiffs, making clear that "action[s] should be allowed to proceed" outside of habeas where, as here, "even if successful, [they] will *not* demonstrate the invalidity" of the petitioner's confinement and removal. 512 U.S. at 487. Defendants' other cases only confirm this point: each involved a challenge to the fairness

2

of an adjudication whose results were inseparable from the outcomes, so success necessarily invalidated detention. *See Mack v. City of Chicago*, 723 F. App'x 374, 376 (7th Cir. 2018) (unpublished) ("unfair criminal trial necessarily would impugn the validity of his conviction"); *Dominguez v. Hendley*, 545 F.3d 585, 588 (7th Cir. 2008) (same); *Early v. Blankenship*, 221 F.3d 1342, at *1 (8th Cir. 2000) (unpublished) (challenge "would necessarily imply the invalidity of [the] disciplinary result").

Defendants rely on *J.G.G.*, 604 U.S. at 672, Opp. 28, but this Court already properly held that *J.G.G.* supports *Plaintiffs*, June 4 Op. at 27-28. There, the Supreme Court held that claims challenging the legality of *detention and removal itself* under the AEA must proceed in habeas because they would "necessarily imply the invalidity of [petitioners'] confinement and removal under the AEA." *J.G.G.*, 604 U.S. at 672. The Court did not hold that a standalone procedural claim, such as the denial of notice or meaningful opportunity to be heard, must *itself* be brought in habeas. *See id.* at 673 (holding that AEA detainees must receive notice consistent with specified due process requirements, pursuant to their claim "s[eeking] equitable relief against summary removal").

Moreover, the Supreme Court in *A.A.R.P. v. Trump* rejected the "self-defeating notion" that the right to proper notice "must *itself* be vindicated through individual habeas petitions, somehow by plaintiffs who have not received notice." 605 U.S. 91, 98 (2025). If such a claim could only be brought in habeas, then Defendants could remove detainees without providing any opportunity to bring a habeas action (as admittedly occurred here) and then claim that the detainees should have challenged the lack of notice in a habeas petition. That is not the law. The government notes that the *A.A.R.P.* petitioners proceeded in habeas and that the question the Court was addressing was whether a habeas class was required. Opp. 30. But that misses the Court's fundamental point: that

the government cannot create a catch-22 in which it requires a habeas petition but provides no opportunity for the detainee to file a petition. If the denial of notice prevents individuals from invoking habeas in the first place, then an equitable action is available to restore that process and vindicate Plaintiffs' constitutional rights. *See* June 4 Op. at 30-31 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327, 329 (2015)).

## II.    THE COURT ALSO HAS HABEAS JURISDICTION.

### A.    The Court Has Habeas Jurisdiction Because Plaintiffs Were in the Constructive Custody of the United States at CECOT.

On constructive custody, the government's opposition begins with word games, denying that it arranged for El Salvador to "det[ain]" Plaintiffs at all—just to "accept" and possibly "hous[e]" them. Opp. 8. The government thus portrays El Salvador's detention of class members as some completely independent act, neither requested nor paid for by the United States. That is false, as is clear from even a glance at senior U.S. officials' statements and the two countries' diplomatic agreements. *See, e.g.*, ECF No. 102-1 at 7-8 (collecting quotes); Renewed Mot. for Prelim. Inj. ("Mot.") 12.[1]

Along the way, the government asks the Court to ignore virtually all the new evidence before it, including El Salvador's own representations to the United Nations, whistleblower information regarding the events of March 14-16, and Plaintiffs' own accounts of their detention at CECOT. Together with the prior record, this new evidence demonstrates that class members were in the government's constructive custody. The government fails to rebut Plaintiffs' showing,

---

[1] Although the Court previously described Plaintiffs' due-process and habeas claims as "mutually exclusive," June 4 Op. at 15, the Court should find both claims available on the current record—as independent bases for jurisdiction—before determining how to proceed on the merits. While Plaintiffs may not need to rely on their freestanding due process claim if the Court already has habeas jurisdiction here, this approach ensures that Plaintiffs have the ability to pursue habeas relief on either path.

proffering two declarations from U.S. officials in other cases and a video of U.S. testimony before the Inter-American Commission on Human Rights (the "IACHR"), all of which—like the Kozak Declaration—are conclusory in their assertions.

      **1.   Applying the *Abu Ali* factors, the record shows that Plaintiffs were in the constructive custody of Defendants at CECOT.**

All four *Abu Ali* factors point towards constructive custody. *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 68 (D.D.C. 2004). Although the government asserts that these factors are "nonbinding," Opp. 11, it offers no alternative standard beyond total deference to executive branch assertions, *see id.* at 8-11. But the Great Writ requires more searching judicial review, especially when the executive has turned to foreign jailers to imprison individuals without due process. *See Ameziane v. Obama*, 620 F.3d 1, 5-6 (D.C. Cir. 2010) (in "detainee cases," courts "exercise greater caution in deciding to defer"); *see also* June 4 Op. at 26.

***First* Abu Ali *Factor*.** Plaintiffs' detention at CECOT was at the United States' behest. The government rightly does not dispute that it arrested each Plaintiff in the United States, chose them for AEA removal, delivered them to their Salvadoran jailers, and did so under an arrangement contemplating payment for "costs associated with detaining" Plaintiffs. Mot. 2, 12; *see* ECF No. 182-1 (Landau Decl.) ¶ 3 (acknowledging that "DHS had responsibility for identifying the individuals to be removed under the arrangement"). Instead, the government insists that its arrangement was "not legally enforceable" and "nonbinding" and did not "require El Salvador to detain Petitioners." Opp. 12. But even if that were true, constructive custody does not require a legally enforceable contract. This Court has already rejected the idea that it requires "legal *control* over the jailer," June 4 Op. at 19, which would "essentially preclude finding constructive custody whenever a foreign sovereign holds the keys." *Id.* at 19-20 (citing *Braden v. 30th Jud. Circuit Ct. of Ky.*, 410 U.S. 484, 498-99 (1973), and *Munaf v. Geren*, 553 U.S. 674, 685-86 (2008)). And even

if not enforceable, the agreement's formality points towards constructive custody. *See Abu Ali*, 350 F. Supp. 2d at 68 n.42 ("[T]he presence of a formal relationship between the countries …, in the nature of a treaty *or otherwise*, may bear on the jurisdictional question." (emphasis added)). The government's statement to the IACHR that it posted the agreement online in compliance with the Case-Zablocki Act underscores the degree of formality. *United States: Human Rights Situation of Migrants, Refugees, and Asylum Seekers*, Comisión Interamericana de Derechos Humanos (July 24, 2025), https://www.youtube.com/watch?v=5zJpvgzxnwg ("CIDH Hearing"), at 35:42-36:08 (cited at Opp. 9); *see* U.S. Dep't of State, *Qualifying Non-Binding Instruments* (July 9, 2025), https://perma.cc/N3EJ-W2UT; 1 U.S.C. § 112b.

The government's related contention that it did not ask El Salvador to detain Plaintiffs— only to "accept" them, Opp. 8, 12—is both a meaningless distinction and inconsistent with the record. *See, e.g.*, ECF No. 177-11, Ex. I (diplomatic note to El Salvador referencing "treatment of prisoners"); ECF No. 177-10, Ex. H at 6 (U.S. grant letter describing grant's "purpose" as "to support costs related to detention of members of TdA"); *id.* (grant's use "may include costs associated with the detention of [TdA] members . . . whom El Salvador accepted from the United States"); *id.* at 5 (funds cannot be used related to individuals "associated with terrorism," but exception "to support the detention of such individuals, including TdA members removed from the United States"); *see also* Mot. 12.[2]

The government unsuccessfully tries to handwave away Plaintiffs' extensive evidence. *First*, the government would have this Court ignore unambiguous statements by DHS Secretary

---

[2] The government also asserts that El Salvador "accept[ed]" Plaintiffs only after Venezuela "refus[ed]" to "accept" them. Opp. 7-8. This appears to be false. *See* Sarah Blaskey et al., *Trump's 48-Hour Scramble to Fly Immigrants to a Salvadoran Prison*, Wash. Post (May 4, 2025), https://perma.cc/64C3-B4X2 ("[T]hey pressed forward with removals, even as Venezuela agreed to accept deportation flights[.]").

Kristi Noem and others threatening detention at CECOT, including after this Court's June 4 decision. *Compare, e.g.*, ECF No. 177-12 (Smith Decl.) at Exs. 3, 4, 5 (*e.g.*, Secretary Noem stating on September 3, 2025, "If you are in America illegally, you could find yourself in CECOT"), *and* ECF No. 102-14 (Sarabia Roman Decl.) at Exs. 13, 19 (Secretary Noem threatening detention at CECOT as "one of the tools in our [*i.e.*, the United States'] toolkit"), *with* Opp. 13 (dismissing such statements as "limited" and "out-of-context"). Indeed, President Trump recently stated to the U.N. General Assembly: "I want to thank the country of El Salvador for the successful and professional job they've done in receiving and jailing so many criminals that entered *our* country." C-SPAN, *President Trump, Other World Leaders Address United Nations General Assembly*, Day 1, Part 1 at 1:10:39-1:10:52 (Sept. 23, 2025) (emphasis added), https://www.c-span.org/program/united-nations/president-trump-other-world-leaders-address-united-nations-general-assembly-day-1-part-1/666088; *cf.* Nayib Bukele (@nayibbukele), X (Mar. 16, 2025, at 8:13 AM ET), https://perma.cc/295B-RWDE ("The United States will pay a very low fee for them, but a high one for us.").

Courts routinely rely on such public statements when making findings about the government's actions. *See, e.g.*, *ACLU v. CIA*, 710 F.3d 422, 429 (D.C. Cir. 2013) (public statements by President and his advisor "le[ft] no doubt" about United States involvement in drone strikes); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 146 (D.D.C. 2018). *Trump v. Hawaii* does not help the government, Opp. 13, because there the Supreme Court was applying rational-basis review, not addressing the fact-bound question of constructive custody. *See* 585 U.S. 667, 704-05 (2018). A policy's legal defensibility under that test says nothing about whether courts can consider officials' public statements writ large, let alone when they speak directly to the *factual* question of whether the government arranged Plaintiffs' detention at CECOT.

*Second*, the government would have this Court ignore new evidence concerning El Salvador's own representations, made to a U.N. Working Group and documented in its report, that Plaintiffs' detention at CECOT was directed by the United States. *See* Mot. 12-13. Defendants suggest that this is hearsay, Opp. 14, but courts routinely accept hearsay statements in preliminary injunction proceedings. *See Talbott v. United States*, 775 F. Supp. 3d 283, 300 (D.D.C. 2025) (collecting cases). And even if trial-stage evidentiary rules applied, El Salvador's statements would be admissible as "statement[s] of a public office." Fed. R. Evid. 803(8); *see F.A.A. v. Landy*, 705 F.2d 624, 632-33 (2d Cir. 1983) ("telex sent by the German government" and incorporated into F.A.A. report was admissible). So too would the rest of the U.N. Report. *See Alinejad v. Islamic Republic of Iran*, No. 19-cv-3599 (GMH), 2023 WL 4684929, at *17 & n.21 (D.D.C. July 6, 2023) (collecting cases holding U.N. reports admissible). Defendants' suggestion that the meaning of El Salvador's statements was "modified" by the U.N. Working Group, Opp. 14, is without basis. And it is hardly "confusing and unclear," *id.*, for El Salvador to represent that it merely "facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of that other State," *i.e.*, the United States, ECF No. 160-1 at 5, 9, 13, 17. Indeed, that follows from the fact that the United States was paying for the detentions.

*Third*, the Director of CECOT and other Salvadoran officials have made multiple clear statements about the United States' role. *See, e.g.*, Mot. 3 (Belarmino Garcia, Director of CECOT: "if it were up to me, I would let you go," but the order "comes from Donald Trump"); *id.* (collecting additional statements). Analogous statements were considered in *Abu Ali*. *See* 350 F. Supp. 2d at 67 (taking into account petitioners' "conversations with . . . Saudi officials"). Such statements are especially important given Plaintiffs' limited ability to obtain discovery from their captors in El

Salvador. *See id.* at 69; *cf. Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014) (observing that "direct evidence" may be sparse in "cases of forced disappearance" but the "indirect evidence may be overwhelming").

***Second* Abu Ali *Factor*.** El Salvador was "indifferent" to Plaintiffs' detention under *Abu Ali* and *Braden*. The government dismisses *Braden*, *see* Opp. 16-17, but *Abu Ali* directly relied on it for this second factor—and *Braden* plainly supports constructive custody here. *See Abu Ali*, 350 F. Supp. 2d at 49, 68 & n.39. In *Braden*, both states—Alabama and Kentucky—each had their own independent bases for detaining the petitioner. But the Supreme Court recognized that Alabama was "presumably indifferent" to Braden's challenge to Kentucky's attempt to detain him, and it allowed the Kentucky habeas petition to proceed. *Braden*, 410 U.S. at 499; *see also Abu Ali*, 350 F. Supp. 2d at 49. El Salvador's "indifference" is even more obvious, because it lacked any independent reason to detain Plaintiffs, *Venezuelan* nationals. Its interest in detaining Plaintiffs derived entirely from its agreement to act as a paid agent and jailer for the United States. El Salvador, too, agrees it was indifferent. To the United Nations, it disclaimed any "jurisdiction and legal responsibility" over Plaintiffs, explaining that those lay "exclusively with the competent foreign authorities"—*i.e.*, the United States. S*ee* Mot. 5 (citing ECF No. 160-1 at 5, 9, 13, 17). The government has no meaningful answer to this straightforward admission. And as explained, the record contradicts Defendants' implausible assertion that it never arranged for El Salvador to detain Plaintiffs.

Fishing for a reason why El Salvador might detain Plaintiffs, the government asserts that detention of TdA members "made sense" from a "public safety" perspective. Opp. 16. But Defendants have nothing to say about why El Salvador might "accept" alleged TdA members from the United States in the first place. *Id.* at 8. The answer is that the United States handpicked

Plaintiffs for removal and detention abroad, and paid El Salvador to loan its prison infrastructure to assist in that plan.

*Third* **Abu Ali** *Factor.* The United States transferred Plaintiffs to CECOT to evade judicial scrutiny. Plaintiffs have identified overwhelming evidence that Defendants sought to use the AEA to bypass judicial review, kept the Proclamation secret even after it was signed, hurried Plaintiffs onto planes without advance notice, and removed Plaintiffs while disregarding this Court's order. *See* Mot. 16-19. The government's opposition does not dispute the accuracy of the contemporaneous emails and text messages submitted in the whistleblower complaint, and that evidence confirms that the government intended to, and did, transfer Plaintiffs to CECOT in an effort to evade this Court's jurisdiction. *See, e.g.*, ECF No. 158-1 at 10 (according to whistleblower, Principal Assistant Deputy Attorney General said DOJ would need to consider telling the courts "fuck you"); ECF No. 177-8 at 7 ("guess its find out time on the 'fuck you'"; "Yup. It was good working with you."); *see generally* Mot. 18-19 & ECF Nos. 177-8, 177-9. And the government all but admits that it sought to evade judicial review, asserting merely that it "believed" that it was "allowed" to remove Plaintiffs before anyone caught on. *See* Opp. 19 ("[T]he United States . . . believed the AEA allowed for [Plaintiffs'] immediate removal."). New public reporting provides even further evidence of the government's efforts to evade judicial scrutiny. Wash. Post, *Rubio Promised to Betray U.S. Informants to Get Trump's El Salvador Prison Deal* (Oct. 19, 2025), https://perma.cc/J3NC-L5MT ("The White House was concerned that if the Venezuelans weren't deported immediately, a federal judge could order their release . . . .").

Defendants' disregard of the Court's March 15 order is just one part of this analysis, but the Court may properly consider it. The government protests jurisdiction, given that its appeal of this Court's probable-cause contempt order remains pending. *See id.* at 20. But that appeal has no

bearing on the Court's ability to rely on the underlying *facts* to address the legally distinct issue of constructive custody. *See, e.g.*, *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 233-34 (5th Cir. 2009) (district court could consider facts relating to loss-causation issue even after making findings on "practically identical" but legally distinct issue that was subject of pending interlocutory appeal). The record here—including planes taking off during the emergency hearing and the new whistleblower information, Mot. 17—overwhelmingly shows that Defendants sought to outrun judicial review, regardless of whether Defendants are ultimately liable for contempt. Indeed, from the very beginning, with the Attorney General's March 14 AEA memo, Defendants took the position that "no review" was required. Smith Decl. at Ex. 1.

   ***Fourth* Abu Ali *Factor*.** The United States could have had Plaintiffs released on request—and it ultimately did so by negotiating their transfer to Venezuela. Their release reflected the terms of the U.S. grant agreement, under which El Salvador would hold Plaintiffs "for up to one year *or until another decision is made on their disposition*." ECF No. 177-10, Ex. H at 4 (emphasis added). This provision would have been superfluous if the United States had no say in the "decision" about Plaintiffs' detention and "disposition" once they were in El Salvador.

   The government offers non-sequiturs in response. It asserts that El Salvador did not return the *J.O.P.* plaintiff to the United States, Opp. 18, but has refused to say whether it even *asked* for that return. *See* Defs.' Br. in Opp. to Probable Cause Mot. at 23-24, *J.O.P. v. DHS*, No. 19-cv-1944 (D. Md. Sept. 11, 2025), ECF No. 395 (asserting state secrets privilege to prevent such disclosure); *see also J.O.P. v. DHS*, No. 19-cv-1944, 2025 WL 1513298, at *1 (May 28, 2025) (after district court ordered government to make "good faith request" to release plaintiff, government's response was "functional equivalent of, 'We haven't done anything and don't intend to'"). Likewise, that Abrego Garcia "did not return . . . for months," Opp. 18, cannot matter as Defendants do not

represent when they requested his return—and, in any event, Abrego Garcia is a Salvadoran national and thus differently situated in El Salvador from Plaintiffs.

Defendants wrongly suggest that constructive custody requires every action by El Salvador to be traceable to a U.S. request. But constructive custody through a foreign sovereign does not require that sovereign to lack all agency. *See Munaf*, 553 U.S. at 685-86 (finding constructive custody over petitioners held by "multinational agents" despite contention that petitioners were held under "international authority," not by authority of the United States); *Abu Ali*, 350 F. Supp. 2d at 59-60 (a "finding that [a sovereign] detained an individual at the request of the United States" does not turn that sovereign into the United States' "puppet"). Thus, El Salvador's supposed independent action, Opp. 17, says nothing about the U.S.' continuing control.[3]

Similarly, Defendants assert that El Salvador made a "unilateral offer to Maduro to repatriate" Plaintiffs. Opp. 17. But if Defendants mean the United States had no role in El Salvador's decision to make that offer or the terms of the deal, that is unsupported by the record— and in fact is directly contradicted by both the U.S. government's long-running role in negotiations with Venezuela and the quid pro quo release of U.S. citizens held by Venezuela. *See* Mot. 5-6. Similarly unsupported and insufficient is Defendants' claim that El Salvador's president was "spearheading the deal" leading to Plaintiffs' transfer to Venezuela and that he "exercised independent judgment." Opp. 18. Again, even if Defendants' claims were supported by the record,

---

[3] Defendants cite *Rasul v. Bush*, 542 U.S. 466 (2004), but *Rasul* was not concerned with the constructive custody standard, and its holding that the habeas statute can apply where the United States does not have "ultimate" sovereignty only helps Plaintiffs. *See id.* at 475, 483. And in *Medvid ex rel. Medvid v. Lambert*, 621 F. Supp. 575 (E.D. La. 1985), a court held that the United States did not have constructive custody over a Soviet seaman on a Soviet ship in U.S. territorial waters merely because the United States might have had an "administrative ability to deter the ship's departure." *Id.* at 575-76. The United States' minimal potential for involvement in *Medvid* is far removed from its control here.

that would be fully consistent with the United States' ability to secure Plaintiffs' release on request—which is exactly what happened. It is further telling that the United States and Venezuela received released prisoners from the swap—and El Salvador did not.

### 2. Defendants fail to salvage the Kozak Declaration.

Defendants continue to lean heavily on the Kozak Declaration, arguing that it effectively overrides the *Abu Ali* factors, but the declaration does not even assert that the United States lacked control over Plaintiffs' detention. Even taken at face value, the declaration is fully consistent with U.S. control, responsibility, and influence over Plaintiffs' detention in El Salvador. Mot. 22. This Court's prior opinion recognized that past government declarations in analogous cases "were substantially more on point," June 4. Op. at 25, but concluded that it would treat the declaration as "conclusive" where Plaintiffs had provided only public statements in rebuttal, *id.* at 24. Now, Plaintiffs have proffered substantial new evidence: El Salvador's statements to the United Nations, Salvadoran officials' statements to class members, internal emails and texts contemporaneously exchanged within the U.S. government, and, critically, the prisoner swap between Venezuela and the United States leading to Plaintiffs' release from CECOT.

Against this wealth of new information from multiple sources, Defendants double down on the Kozak Declaration, continuing to cite *Kiyemba v. Obama*, 561 F.3d 509 (D.D.C. 2009), and *In re Petitioners*, 700 F. Supp. 2d 119 (D.D.C. 2010), Opp. 10, for the idea that declarations by executive officials are conclusive. But as Plaintiffs explained and Defendants failed to address, those cases did not treat government declarations as automatically conclusive and only relied on them in the absence of contrary evidence. Mot. 24. Courts regularly evaluate constructive custody on the entirety of the record. *Id.*; *see also Kiyemba*, 561 F.3d at 515 n.7 (information contradicting government declarations may be indication of "a ruse" by the government).

13

Defendants argue, however, that Mr. Kozak "gave specific examples to demonstrate that El Salvador—not the United States—controlled the detainees at CECOT and their ultimate disposition." Opp. 9. But the paragraphs Defendants cite do not assert, much less show, that the United States lacked control over Plaintiffs at CECOT. Mot. 23. Defendants do not address Plaintiffs' arguments that denial of a visit for *some* members of Congress does not negate executive branch control and that transfer of Abrego Garcia, as a Salvadoran, does not meaningfully bear on constructive custody for Plaintiffs. *See id.*

The Kozak Declaration's discussion of Salvadoran President Bukele's tweets regarding a possible prisoner exchange, Opp. 9 (citing Kozak Decl. ¶ 9), proves Plaintiffs' point: The actual prisoner exchange in July resulted in the transfer of the Venezuelans at CECOT to Venezuela, the release of American residents in Venezuela, and no benefit for El Salvador—entirely consistent with El Salvador's role as a paid jailer for the United States, indifferent to Petitioners' detention, akin to a private contractor. *See* Mot. 5-6, 14-16; Smith Decl. at Exs. 7, 11. Notably, ICE official Mellissa Harper stated in a declaration about the prisoner swap: "As part of these negotiations, *the United States* obtained assurances *from the Maduro regime* . . . " ECF No. 168-1 (Harper Decl.) ¶ 9 (emphasis added). This description of direct negotiations between the United States and Venezuela is consistent with public reporting describing the negotiations and exchange as between those two countries. Smith Decl. at Exs. 7, 11. It provides further evidence that the United States in fact "was responsible for significant restraints on [Petitioners'] liberty," *Abu Ali*, 350 F. Supp. 2d at 48, and maintained custody.

Most fundamentally, Mr. Kozak's sworn declaration *at no point* says that "El Salvador— not the United States—controlled the detainees at CECOT and their ultimate disposition," as Defendants now argue in their brief. *Compare* Opp. 9, *with* ECF No. 129 (Kozak Decl.).

Defendants recycle post-hoc government declarations from other litigation, but those declarations do not make such a statement either.

Neither Deputy Secretary of State Christopher Landau's declaration, filed September 11, 2025, in the *J.O.P.* litigation, nor Secretary Rubio's June 24, 2025 declaration in the *Abrego Garcia* litigation, furthers Defendants' argument. The Landau Declaration states that Venezuelan detainees "were in the custody of El Salvador"—which is true, insofar as El Salvador had *physical* custody. Landau Decl. ¶ 4. Moreover, the declaration's single-line statement that "El Salvador had sovereign discretion over their ultimate disposition," *id.*, is not inconsistent with the United States' ability to request and obtain Plaintiffs' release under the two countries' diplomatic and financial agreement. The Rubio Declaration's only statement as to custody regarding Plaintiffs—not the subject of the case in which he provided the declaration—*relies on this Court's prior custody determination* and cannot be credited as an independent evaluation of Plaintiffs' custody, much less viewed as a conclusive statement. ECF No. 182-2 (Rubio Decl.) ¶ 2. Notably, the Landau Declaration describes Secretary Rubio as "personally handling the discussions with the government of El Salvador regarding persons subject to court orders . . . detained in El Salvador," Landau Decl. ¶ 6, but the government does not provide a declaration in this litigation from Secretary Rubio. And even if the declarations did provide assertions Plaintiffs were not in Defendants' constructive custody, they would—as described—be contradicted by extensive countervailing evidence.

Defendants also cite a video of a presentation by State Department officials to the IACHR. Opp. 9. But there, the officials also relied on this Court's prior determination as to the custody question. CIDH Hearing at 36:48-37:08. And the statements by U.S. officials to the IACHR do not appear to have been under oath—and Defendants make no such representation. *Cf. Kiyemba*, 561

F.3d at 515 n.7 (relying on "sworn declarations"). As to the prisoner swap, the official asserted that it was El Salvador's "decision[] . . . to make," *id.* at 38:27-38:34, but that bare assertion says nothing about the *United States'* role in negotiating, approving, and implementing the deal. In fact, the official described the assurances the United States obtained from Venezuela—which directly concern Plaintiffs and their ability to travel to the United States for court proceedings—and noted the U.S. aircraft that picked up Americans held in Venezuela, *id.* at 38:34-39:10. Indeed, as noted, the Harper Declaration expressly stated that "[a]s part of these negotiations, the United States obtained assurances from the Maduro regime." Harper Decl. ¶ 9; *see also* July 24 Hearing Tr. at 14:25-15:5, ECF No. 169. These facts undermine any suggestion that the United States had no decisional role.

Defendants argue that Plaintiffs' evidence is "self-serving," Opp. 15, but it is Defendants who rest on nothing more than their own statements. Plaintiffs' new evidence comes from a wide variety of sources that paint a consistent picture: El Salvador writing to the United Nations; Salvadoran officials—including the CECOT Director—speaking to Plaintiffs about their detention; executive branch lawyers and officials communicating with each other about this litigation; and the plain fact that Venezuela received Plaintiffs, the United States received released American residents, and El Salvador received no meaningful benefit from the prisoner swap. Mr. Kozak's declaration, in the face of this new evidence, is not conclusive.[4]

---

[4] In fact, federal courts previously declined to rely on a declaration from Mr. Kozak himself that "opine[d]" as to the intent of specific treaty provisions where Mr. Kozak was not present for the relevant negotiations. *Coplin v. United States*, 6 Cl. Ct. 115, 131 n.16 (U.S. Cl. Ct. 1984); *Harris v. United States*, 768 F.2d 1240, 1245 (11th Cir. 1985).

### 3.  Plaintiffs continue to suffer collateral consequences that this Court can redress.

Plaintiffs' transfer to Venezuela does not moot their habeas claims. *Contra* Opp. 2. There are clear collateral consequences for which this Court can provide relief. Indeed, the government does not even offer a real response to most of the collateral consequences identified by Plaintiffs: the ongoing violation of their due process rights; their inability to *reside* in the United States; and property restrictions to which they are subject. *See* Mot. 26.

Further, Defendants ignore that an "inability to seek to return to the United States" is an "obvious collateral consequence" that maintains a live controversy for a habeas claim. *Zegarra-Gomez v. INS*, 314 F.3d 1124, 1127 (9th Cir. 2003); *see also Leitao v. Reno*, 311 F.3d 453, 456 (1st Cir. 2002) (similar); *Zalawadia v. Ashcroft*, 371 F.3d 292, 297-98 (5th Cir. 2004) (similar). Defendants also largely ignore Plaintiffs' loss of immigration status and the opportunity to seek immigration status as collateral consequences. The government asserts that these are not true collateral consequences because asylum is "discretionary." Opp. 24. But discretion is perfectly consistent with a live controversy. *See, e.g.*, *Lopez-Sorto*, 103 F.4th at 248 ("the possibility that the agency may exercise its discretion to deny [petitioner] relief does not mean his case is moot"). Plaintiffs have been deprived of their statutory "right to apply for asylum." *See Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306 (RDM), 2025 WL 1825431, at *42 (D.D.C. July 2, 2025); *O.A. v. Trump*, 404 F. Supp. 3d 109, 151 (D.D.C. 2019) (similar); Mot. 26.

The government cites cases where a petitioner's reduced chance of a future favorable exercise of discretion was too remote to be redressable. *See Lane v. Williams*, 455 U.S. 624, 632-63 (1982) (decision of hypothetical "employer or a sentencing judge" would be "more directly influenced by … the underlying conduct" underpinning conviction than by conviction itself); *Spencer v. Kemna*, 523 U.S. 1, 13 (1998) (effect of parole revocation on future parole

determinations would be "simply one factor … that may be considered" (citation omitted)); *Bacilio-Sabastian v. Barr*, 980 F.3d 480, 483 (5th Cir. 2020) (applying *Spencer* to possibility of obtaining work authorization). But those cases are beside the point where, as here, Defendants have *directly* stopped Plaintiffs from accessing their statutory rights by removing them and preventing their return. *See, e.g.*, *Sadhvani v. Holder*, 596 F.3d 180, 183 (4th Cir. 2009) (presence in United States necessary to be eligible for asylum); *Lopez-Sorto*, 103 F.4th at 249 (presence necessary for obtaining deferral of removal).

And the government speculates that Plaintiffs "may" not be able to return to the United States "under various authorities." Opp. 23. But such non-specific speculation cannot insulate unlawful removals from review. In a challenge to a person's removal, a court need not "guarantee" that the person will return to the United States in order to provide effectual relief; it is enough that an order "will at least increase his chances of being allowed to do so." *Del Cid Marroquin v. Lynch*, 823 F.3d 933, 936 (9th Cir. 2016); *see also Lopez-Sorto*, 103 F.4th at 253 (improved "possib[ility]" of return sufficient). Thus, if a plaintiff challenges only one of two possible entry restrictions through habeas, a court can provide effectual relief unless the unchallenged restriction makes it *impossible* to enter the United States. *See, e.g.*, *Kamagate v. Ashcroft*, 385 F.3d 144, 150-51 (2d Cir. 2004) (habeas petition not moot); *Blandino-Medina v. Holder*, 712 F.3d 1338, 1342 (9th Cir. 2013) (INA petition for review not moot).

By contrast, in the cases cited by the government, petitioners faced separate bars on entry that were categorical. *Compare Perez v. Greiner*, 296 F.3d 123, 126 (2d Cir. 2002) (controlled substance conviction meant that petitioner was "permanently barred from this country on a wholly separate ground"), *and Abreu v. Superintendent Smithfield SCI*, 971 F.3d 403, 408 (3d Cir. 2020) (controlled substance conviction "permanently prevent[ed] [petitioner] from returning to the

United States"), *with Rodriguez Urena v. Barr*, 777 F. App'x 551, 554 (2d Cir. 2019) (explaining that Attorney General's ability to waive inadmissibility for controlled substance convictions is "strictly limited"). There is nothing like that here. The government specifically mentions only expedited removal, Opp. 23, but that is not a mandatory bar on entry, but a *process* to determine whether a person can enter the United States. *See* 8 U.S.C. § 1228(b). The government also omits the many reasons why that process may not apply to Plaintiffs, including because they have asylum claims, have legal status, or have been in the United States for two or more years. *See Make the Road N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 WL 2494908, at *14 (D.D.C. Aug. 29, 2025).

*Gul v. Obama* does not help the government. 652 F.3d 12 (D.C. Cir. 2011); *see also In re Petitioners*, 700 F. Supp. 2d 119 (D.D.C. 2010) (cited by Defendants) (district court decision affirmed by *Gul*). *Gul* held that certain grounds of inadmissibility, *i.e.*, placement on the No Fly List and FTO membership, were not redressable collateral consequences because the petitioners' habeas challenges to their enemy combat status, even if successful, would not have removed those inadmissibility grounds. 652 F.3d at 19. But here, a successful habeas challenge would lift the entry restriction arising from Plaintiffs' AEA designations—including inadmissibility from alleged FTO membership, which, like AEA status, also turns on whether Plaintiffs are in fact TdA members. The government's speculation about what "may" happen under "various" other authorities thus comes to nothing. Opp. 23. Moreover, *Gul* emphasized that the petitioners never indicated that they "actually wishe[d] to enter the United States," making the harm posed by their bar on entry "exceedingly remote." 652 F.3d at 19. But Plaintiffs' unrebutted evidence is that they want to return to the United States. ECF No. 177-4 ¶ 11; ECF No. 177-5 ¶ 21; ECF No. 177-6 ¶ 16; ECF No. 177-7 ¶ 16. And that makes sense, given that they face danger in Venezuela, ECF No.

177-5 ¶¶ 14-17; ECF No. 177-6 ¶¶ 2, 10-12; ECF No. 177-7 ¶¶ 8-12, and were seeking asylum, ECF No. 177-4 ¶ 11; ECF No. 177-5 ¶¶ 2, 21; ECF No. 177-7 ¶ 16.

      **B.**      **The Court Also Has Habeas Jurisdiction Because Plaintiffs' AEA Designation Subjects Them to Continuing Constructive Custody in Venezuela.**

Because of the restraints Plaintiffs continue to face in Venezuela as a result of their AEA designation, they not only suffer collateral consequences from their earlier custody but also *remain* in U.S. constructive custody. Severe restrictions on freedom of movement "not shared by the public generally" suffice for constructive custody—including restrictions on entry to the United States, even if a person is "free to go anywhere else in the world." *Jones v. Cunningham*, 371 U.S. 236, 239-40 (1963); *see, e.g.*, *Lesbian/Gay Freedom Day Comm., Inc. v. INS*, 541 F. Supp. 569, 576 (N.D. Cal. 1982) (policy that only applied to gay individuals and prohibited them from entering the United States subjected them to constructive custody); Mot. 7. The Proclamation's restrictions on Plaintiffs—including its prohibitions on entry, prohibitions on residence, requirement of mandatory detention in the United States, and property seizures—fall squarely in this category. Mot. 27-28. The government argues that restrictions applicable to "entire nations of individuals" do not count as constructive custody, Opp. 25, but the Proclamation's restrictions apply only to individuals designated under the AEA, and are "not shared by the public generally." *See* Mot. 27-28. The government's unprecedented use of the AEA is exactly the kind of "case[] of special urgency" that the constructive custody inquiry was designed to identify, for which "federal adjudication is necessary to guard against governmental abuse." *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 894 (2d Cir. 1996) (quoting *Hensley v. Mun. Ct.*, 411 U.S. 345, 349, 351 (1973)); *see also Abu Ali*, 350 F. Supp. 2d at 48 (similar).

**III.    THE COURT SHOULD ORDER DEFENDANTS TO FACILITATE PLAINTIFFS' ABILITY TO CONTEST THEIR AEA DESIGNATIONS.**

**A.    Plaintiffs Are Likely to Succeed on Their Due Process Claim.**

As this Court explained, Plaintiffs' "removal from the United States, before [they] had received constitutionally adequate notice of the reason for that removal or any meaningful opportunity 'to actually seek habeas relief,' violated their Fifth Amendment right to 'due process of law.'" June 4 Op. at 39 (citing *J.G.G.*, 604 U.S. at 673). Plaintiffs are thus likely to succeed on their due process claim whether brought in equity or in habeas. Defendants' arguments about the existence of a protected interest or the expectation of process, Opp. 39-40, do not alter this Court's analysis or its conclusion, June 4 Op. at 33-39.

**B.    The Government Can "Facilitate" Plaintiffs' Pursuit of Habeas Relief.**

This Court has already concluded that "Defendants must facilitate Plaintiffs' ability to proceed through habeas." June 4 Op. at 67; *see also Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025); *J.O.P. v. DHS*, 779 F. Supp. 3d 570, 582 (D. Md. Apr. 23, 2025), *app. for stay denied*, 2025 WL 1431263 (4th Cir. May 19, 2025). Defendants' assertion that foreign affairs considerations bar such facilitation, Opp. 31-33, are without merit and have already been rejected by this court when it ordered "facilitation" in its June 4 opinion. The government has already acknowledged that it has "obtained assurances" from Venezuela to permit facilitation of habeas relief. That only makes it *easier* for the government to facilitate the filing of habeas petitions than when the Court ordered facilitation while Plaintiffs were in El Salvador.

**C.    Plaintiffs' Injuries Are Redressable**

Defendants perplexingly argue that Plaintiffs' due process claim is not redressable because Plaintiffs are not in physical custody. Putting aside that Defendants previously argued that Plaintiffs' claims were not redressable because they *were* in custody, the argument has no merit.

21

Courts routinely order the government to facilitate the return of wrongly deported individuals by allowing for their return or taking whatever other steps are necessary to allow their return. *See, e.g.*, *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 58 (D.D.C. 2020) (ordering defendants to return noncitizens to the United States); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 145 (D.D.C. 2018) (same). Indeed, the fact that they are *not* in custody should make it that much easier to facilitate their return. Moreover, the Harper Declaration specifically states that Maduro will not block the return of Plaintiffs. The government's only response is that Maduro "may" change his mind. Opp. 38. That speculation is hardly sufficient for this Court to declare that Plaintiffs' claims are not redressable at this stage of the case.

### D.    Facilitating Plaintiffs' Ability to Pursue Habeas Relief is Preliminary Relief.

As this Court stated when it ordered facilitation the first time, "*preliminary* relief is warranted here." June 4 Op. at 13 (emphasis added) (granting preliminary injunction). Defendants' mootness argument misstates the nature of the relief sought. Opp. 35-36. A preliminary injunction restoring Plaintiffs' access to habeas review does not resolve the case; it merely preserves it. *See, e.g.*, *Abrego Garcia*, 145 S. Ct. at 1018 (holding district court's *preliminary* injunction "order *properly* requires the Government to 'facilitate'" return of noncitizen "and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador"). Even after granting preliminary relief here, the controversy remains live because this Court must issue a final judgment as to whether Defendants violated due process and determine what permanent relief is warranted.[5]

---

[5] In the alternative, this Court has discretion to convert to a motion for summary judgment. *See* Fed. R. Civ. P. 65(a)(2); *Mar. for Life v. Burwell*, 128 F. Supp. 3d 116, 124 (D.D.C. 2015).

### E.    Plaintiffs Continue to Suffer Irreparable Harm.

This Court has already recognized that Plaintiffs "risk severe injury" in Venezuela. June 4 Op. at 56. That risk of harm is far from "merely speculative." Opp. 36. Plaintiffs have submitted substantial evidence of the harm they initially fled, as well as the ongoing harm they face in Venezuela. *See, e.g.*, ECF No. 102-7 ¶ 2 (describing violence and threats experienced by plaintiff in Venezuela prior to fleeing); ECF No. 102-8 ¶ 3 (same); ECF No. 102-9 ¶¶ 3-4 (same); ECF No. 44-7 ¶¶ 2-6 (same); *see also* ECF No. 177-5 ¶¶ 2, 14-17 (describing past harm and additional evidence of ongoing harm upon return); ECF No. 177-6 ¶¶ 2-3, 11-12 (same); ECF No. 177-7 ¶¶ 5, 8, 12 (same). Such declarations are routinely used to establish irreparable harm. *See, e.g.*, *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 173 (D.D.C. 2021) (collecting cases). Indeed, numerous putative class members have already passed credible fear interviews with respect to Venezuela or even established sufficient risk of harm there to be approved for refugee resettlement. ECF No. 67-21 (Sarabia Roman Decl.) at Ex. 11 (refugee); *id.* at Ex. 16 (same); Complaint at ¶¶ 23-26, *Agelviz-Sanguino v. Noem*, No. 4:25-cv-2116 (S.D. Tex. May 9, 2025), ECF No. 1 (same); ECF No. 102-8 ¶ 5 (plaintiff passed credible fear interview); ECF No. 102-9 ¶ 4 (same). In contrast to cases where courts have certified classes of individuals facing only the *threat* of removal to a country where they would face violence or persecution, Plaintiffs are already physically present in such a country—which only magnifies the ongoing harm. *See, e.g.*, *L.G.M.L. v. Noem*, No. 25-cv-2942 (TJK), 2025 WL 2671690, at *17 (D.D.C. Sept. 18, 2025); *Huisha-Huisha*, 560 F. Supp. 3d at 171-72.

Defendants' argument that Plaintiffs cannot establish harm because "none has prevailed on an asylum claim," Opp. 36, is astounding. Plaintiffs were seeking asylum and other humanitarian

protection when they were removed from their immigration proceedings before their claims could be adjudicated.

Defendants' other arguments are similarly unavailing. Any delay in filing this motion is only further indication of the serious risks Plaintiffs face in Venezuela. Class members are understandably afraid to speak about persecution by Venezuela's authoritarian government while physically present there. When they arrived in Venezuela, Plaintiffs were "held for several days, made to tell their stories on state television," and, in some cases, personally escorted home by government officials. Julie Turkewitz, *et al.*, *'You Are All Terrorists': Four Months in a Salvadoran Prison*, N.Y. Times (Nov. 8, 2025), https://perma.cc/A4NY-LZDX; *see also* ECF No. 177-5 ¶¶ 14-15; ECF No. 177-6 ¶ 10. And arranging secure calls and ensuring class members are in a location where they can speak openly took substantial time. *Cf.* Joint Status Report at 2, *J.O.P. v. DHS*, No. 8:19-cv-1944 (D. Md. Sept. 26, 2025), ECF No. 408 (counsel unable to reach former CECOT detainee for more than a month); *see also Lopez-Chavez v. Ashcroft*, 383 F.3d 650, 651 (7th Cir. 2004) (considering "serious or fatal difficulty in pursuing relief" from home country); *Immigr. Defs. v. Mayorkas*, No. 20-cv-9893 JGB (SHKx), 2023 WL 3149243, at *27 (C.D. Cal. Mar. 15, 2023) (noting DHS Secretary's "significant concerns about the practical obstacles to interacting with counsel across an international boundary"). Moreover, class members are still recovering from the serious harm, including trauma, they experienced at CECOT, and many needed time before they could even begin to speak with counsel.

Nor is the irreparable harm too disparate for classwide relief. Plaintiffs all face the same harm from the illegal removals. *Huisha-Huisha*, 560 F. Supp. 3d at 171-72 (rejecting argument that "inherently individualized nature" of asylum seekers' potential harms undermines classwide irreparable harm); *see also* Mot. Class Cert. Reply at 2-3. Finally, Defendants contend that

24

Plaintiffs "fail to commit to taking advantage of the relief they seek." Opp. 37. But Plaintiffs have stated clearly that they wish to challenge their AEA designation, exactly what this motion seeks. ECF No. 177-4 ¶¶ 11, 14; ECF No. 177-5 ¶¶ 20-21; ECF No. 177-6 ¶ 15; ECF No. 177-7 ¶ 15.

**F.      For the Reasons Already Identified by this Court, the Balance of Equities and Public Interest Weigh Decidedly in Favor of a Preliminary Injunction Order.**

The final two prongs weigh in Plaintiffs' favor. Defendants' asserted foreign affairs and national security interests do not override Plaintiffs' concrete harm or the public interest in the government acting lawfully. *See* June 4 Op. at 56-57 ("fears that [the government's] ability to conduct foreign affairs may be 'compromised' by an injunction . . . do not defeat the need for the Government to fix its legal wrongs" (citing *Abrego Garcia*, 145 S. Ct. at 1018)); *A.A.R.P.*, 605 U.S. at 95-96 (government must pursue national security interests lawfully).

## IV.    THE COURT SHOULD NOT STAY AN INJUNCTION PENDING APPEAL.

Defendants fail to satisfy the heavy burden for this Court to grant an "intrusion into the ordinary processes of administration and judicial review." *See Nken v. Holder*, 556 U.S. 418, 427, 434 (2009); *see* Opp. 40-41. If the Court chooses to do so, however, it should provide only a brief stay to allow the government to seek a stay from the Court of Appeals.

## CONCLUSION

The Court should grant the motion for a renewed preliminary injunction.

Dated: November 12, 2025

Respectfully submitted,

/s/ *Lee Gelernt*

Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo (D.D.C. Bar No. CA00219)
Cody Wofsy
Spencer Amdur
Michael K.T. Tan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
cwofsy@aclu.org
samdur@aclu.org
m.tan@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
Aditi Shah (D.C. Bar No. 90033136)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org
ashah@acludc.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500
Khuddleston@aclu.org

*Barred in Texas and Arizona only;
supervised by a member of the D.C. Bar*

Lee Gelernt (D.D.C. Bar No. NY0408)
Daniel Galindo (D.D.C. Bar No. NY035)
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi (D.D.C. Bar No. MI0071)
Sean M. Lau (D.D.C. Bar No. NY0680)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org
slau@aclu.org

Brian D. Netter (D.C. Bar No. 979362)
Bradley Girard (D.C. Bar No. 1033743)
Christine L. Coogle (DC Bar No. 1738913)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
bnetter@democracyforward.org
bgirard@democracyforward.org
ccoogle@democracyforward.org

*Counsel for Petitioners–Plaintiffs*