IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

**DEFENDANTS' RESPONSE TO COURT ORDER**

    This Court has directed the parties to propose next steps for its inquiry into potential referral for criminal contempt. Defendants respectfully submit that no further steps are warranted. As Defendants have previously explained and reiterate below—and as Judge Katsas agreed in his concurring opinion on appeal—Defendants did not violate this Court's order. Defendants stand by that legal position: Their interpretation of the Court's order is correct, and at minimum their interpretation is reasonable and therefore not grounds for contempt.

    Insofar as this Court continues to disagree, Defendants identify below the officials who made and advised on the decision not to recall the flights in transit and instead to transfer detainees out of U.S. custody on March 15 and 16, 2025, which is the only remaining information necessary for this Court to proceed with a referral. If the Court believes any further information is needed for that purpose, Defendants respectfully request an opportunity to provide that information to the Court by way of declarations in the first instance (as even Plaintiffs agree is appropriate).

1

1. At approximately 6:45 PM on March 15, 2025, the Court orally directed counsel for the Government to inform his clients of the Court's oral directives at the hearing, including statements directing that any removed class members "need to be returned to the United States." By that point, two flights carrying individuals designated under the Alien Enemies Act (AEA) had already departed from the United States and were outside United States territory and airspace.

2. At approximately 7:25 PM, the Court memorialized its temporary restraining order in a written order, as the Court had indicated at the hearing it would do. The written order enjoined Defendants "from removing" class members pursuant to the AEA. The written order, unlike the oral directives, said nothing about returning class members who had already been removed.

3. Deputy Assistant Attorney General Drew Ensign promptly conveyed both this Court's oral directives and its written order to the Department of Homeland Security (DHS), through its Office of General Counsel, and to the leadership of the Department of Justice (DOJ).

4. Deputy Attorney General Todd Blanche and Principal Associate Deputy Attorney General Emil Bove provided DHS with legal advice regarding the Court's order as to flights that had left the United States before the order issued, through DHS Acting General Counsel Joseph Mazzara. Mr. Mazzara then conveyed that legal advice, as well as his own legal advice, to Secretary of Homeland Security, Kristi Noem. *See* 6 U.S.C. § 113(a)(1)(J). After receiving that legal advice, Secretary Noem directed that the AEA detainees who had been removed from the United States before the Court's order could be transferred to the custody of El Salvador. As explained below, that decision was lawful and was consistent with a reasonable interpretation of the Court's order.

5. Although the substance of the legal advice given to DHS and Secretary Noem is privileged, the Government has repeatedly explained in its briefs—both in this Court and on

appeal—why its actions did not violate the Court's order, much less constitute contempt. Specifically, the Court's written order did not purport to require the return of detainees who had already been removed, and the earlier oral directive was not a binding injunction, especially after the written order.

6. Judge Katsas's opinion concurring in the D.C. Circuit's grant of mandamus relief in this case explains that "[p]lain language, legal context, and the Court's first TRO all support the government's narrower reading of the second TRO as keyed to physical expulsion from United States territory" and, as such, inapplicable to those who had already been removed. *J.G.G. v. Trump*, 147 F.4th 1044, 1052 (D.C. Cir. 2025) (Katsas, J., concurring). *First*, the plain meaning of "remove" connotes physical displacement, not transfer of custody. *Id. Second*, statutory context "reinforces this understanding" because the AEA itself "repeatedly ties removal to physical expulsion." *Id.* The Immigration and Nationality Act (INA) "likewise supports an understanding of *removal* to mean the physical expulsion of an alien from the United States." *Id.* at 1052-53. *Third*, this Court's earlier TRO (as to the named plaintiffs) "was expressly territorial in focus," suggesting that the word removal in the subsequent TRO was similarly territorial. *Id.* at 1054. For all of those reasons, the Court's written order did not enjoin the Government from transferring custody of AEA detainees who had been removed from the United States before the issuance of the order, or otherwise require their return.

7. As Judge Katsas further explained, this Court's oral directives at the TRO hearing were inconsistent, "garbl[ed]," and, if read in isolation, "indefensible," to the point that this Court "itself disclaimed" at least two of its own oral commands in later opinions. *Id.* at 1054-55. All of that confirms that it was appropriate to construe the written order as having superseded any oral directives, even assuming the latter "can ever be binding." *Id.* at 1056.

3

8. In short, the Government's "territory-based interpretation of the TRO rest[s] on written, conventional, and publicly available sources for construing that binding legal text," while the competing interpretation rests "on generalized appeals to the purpose of the TRO, as well as fine parsing of the court's statements at an oral argument—the transcript for which was unavailable until after the assertedly contemptuous acts had already occurred, and the substance of which the district court never reduced to writing and later disclaimed in significant part." *Id.* at 1057.

9. Accordingly, the Government maintains that its actions did not violate the Court's order—certainly not with the clarity required for criminal contempt—and no further proceedings are warranted or appropriate. Indeed, the mere fact that Judge Katsas agreed with Defendants' interpretation of the TRO means that the order could not have been so "clear and decisive" that it left "no doubt about what it require[d] to be done," as criminal contempt requires. *United States v. Joyce*, 498 F.2d 592, 596 (7th Cir. 1974); *see also Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971) ("long-standing, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt"); *United States ex rel. Yelverton v. Fed. Ins. Co.*, 831 F.3d 585, 587 (D.C. Cir. 2016) (same).

10. Nevertheless, insofar as the Court has inquired into the identities of the decision-making officials for purposes of making a potential criminal referral, the actions were taken by DHS (through Secretary Noem) after being formally advised about compliance with this Court's order both by DOJ leadership and the Acting General Counsel of DHS.

11. Defendants do not believe any further facts are relevant to the Court's potential referral, but if the Court determines otherwise, Defendants request an opportunity to provide any such information by way of declarations in the first instance—as even Plaintiffs appear to agree would be a necessary first step (Dkt. 193 at 1). No live testimony is warranted at this time.

12. Defendants object to the involvement of Plaintiffs in these collateral proceedings. Because criminal contempt concerns the "dignity of the court," it "no longer involves the original litigants as the parties of interest," and Plaintiffs thus lack standing to participate as anything other than fact witnesses. *See Ramos Colon v. U.S. Atty. for Dist. of Puerto Rico*, 576 F.2d 1, 5 (1st Cir. 1978); *see also Jones v. Clinton*, 206 F.3d 811, 812 (8th Cir. 2000); *United States v. Concord Mgmt. & Consulting LLC*, 2019 WL 7758635, at *6 (D.D.C. July 1, 2019). It would be inappropriate for an interested party to essentially be conducting a criminal investigation on behalf of the court.[1]

Dated: November 25, 2025

Respectfully submitted,

Brett A. Shumate
Assistant Attorney General
Civil Division

Drew C. Ensign
Deputy Assistant Attorney General
Office of Immigration Litigation

*/s/ Tiberius Davis*
Tiberius Davis
Counsel to the Assistant Attorney General
Civil Division
U.S. Department of Justice

Anthony Nicastro
Acting Director
Office of Immigration Litigation

*Counsel for Respondents–Defendants*

---

[1] Defendants also maintain, for preservation purposes, their objection that criminal contempt cannot be pursued for alleged violation of an order entered without jurisdiction. *See Ex parte Fisk*, 113 U.S. 713, 714 (1885) ("When … a court of the United States undertakes, by its process of contempt, to punish a man for refusing to comply with an order which that court had no authority to make, the order itself, being without jurisdiction, is void, and the order punishing for the contempt is equally void.'"); *In re Novak*, 932 F.2d 1397, 1401 (11th Cir. 1991).