BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA


J.G.G., et al.,                      .
                                     .  Case Number 25-cv-766
          Plaintiffs,                .
                                     .
      vs.                            .
                                     .
DONALD J. TRUMP, in his              .
official capacity as President .  Washington, D.C.
of the United States, et al.,  .  November 19, 2025
                                     .  2:00 p.m.
          Defendants.                .
- - - - - - - - - - - - - - - - -


                    TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE JAMES E. BOASBERG
                     UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          LEE GELERNT, ESQ.
                             American Civil Liberties Union
                             125 Broad Street
                             18th Floor
                             New York, New York 10004

For the Defendants:          TIBERIUS DAVIS, ESQ.
                             U.S. Department of Justice
                             Civil Division
                             950 Pennsylvania Avenue Northwest
                             Washington, D.C. 20530




Official Court Reporter:     SARA A. WICK, RPR, CRR
                             333 Constitution Avenue Northwest
                             Room 4704-B
                             Washington, D.C. 20001
                             202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY:  Good afternoon, everyone.  We are here for a motion hearing on Civil Action 25-766, *J.G.G.*, et al., v. President Donald Trump, et al.

Beginning with counsel for the plaintiff, if you would please approach the lectern and identify yourself for the record.

MR. GELERNT:  Good afternoon, Your Honor.  Lee Gelernt from the ACLU for plaintiffs.

THE COURT:  Good afternoon.

MR. DAVIS:  Good afternoon, Your Honor.  Tiberius Davis on behalf of the defendants, and with me at counsel's table is Mr. Bailey.

THE COURT:  All right.  Good afternoon to both of you.

All right.  So we have returned here after the Court of Appeals' interesting five to three to one to two split on the contempt question, as well as being here for the preliminary injunction hearing.

So let's just talk about the contempt issue first.  The bottom line is that the Court of Appeals has permitted me to go forward with my inquiry.  And just so we're all clear here, particularly given the public interest in the case, my inquiry is not to determine whether to hold the government in contempt but, rather, to find whether there is sufficient information to

make a contempt referral.

And I am permitted to go forward either under the authority of the original panel, two judges of which, Judge Rao and Judge Pillard, both agreed I could go forward, and certainly, based on the en banc court's decision not to go en banc since six votes, at least six votes plainly permit that.

And so just quoting from the statement by Judge Pillard, Judge Wilkins, and Judge Garcia, which is the narrowest ground on which I was permitted to go forward, they point out that "the first step to judicial exercise of contempt authority may require factual inquiry regarding the seeming defiance, including finding out who is responsible."

Those judges also said that the original panel agreed that I retain discretion to proceed to consider whether the facts support a criminal contempt referral.

So I am authorized to proceed just as I intended to do in April, seven months ago.

Another quote from that opinion, from Judge Pillard, Wilkins, and Garcia, "The judicial court remains free to require the government to identify the decisionmakers who directed the potentially contemptuous actions and to carefully consider next steps."

So I am certainly carefully considering those next steps, and so I have asked the parties to weigh in today on how they think I should proceed.  It seems that a factual inquiry is in

order, and the best way to proceed would appear to me to bring in witnesses and have them testify under oath.

Now, there have certainly been a number of significant developments since my earlier opinion in April, most particularly the revelations from the whistleblower, Mr. Reuveni. So he would appear to be a witness we would like to hear from.

But I will hear from both sides about how they think we should proceed and the timetable. But again, this has been sitting for a long time, and I believe that justice requires me to move promptly on this.

So, Mr. Gelernt, I will hear first from you on what you would propose.

MR. GELERNT: Thank you, Your Honor.

First of all, we're in agreement that things should move quickly. It, obviously, has been a long time. And the overriding point is we agreed with your initial assessment that an investigation, at a minimum an investigation of the facts, was warranted. Now there's a mountain of evidence to suggest that an investigation is warranted.

So I think there's one of two ways to go. You can issue your initial order without the purge -- actually, let me just back up for a second.

I don't think, for the reasons Judge Pillard said and other judges said, it's necessary to have the purge option. The

government didn't seem to want to take up that offer.  It complicates matters.  And more importantly, I think as Your Honor knows, we now have a preliminary injunction motion before you to get the men back.  So I think you would just put that aside.

THE COURT:  I certainly would not intend to offer the government a purge option, which Judge Rao found wasn't permissible anyway.

And to the extent my opinion finding probable cause has been vacated, I think I need to begin to hear evidence to find out if I think there is probable cause.

MR. GELERNT:  Right.  And so I think there's one of two ways to go.  Either is fine.  You can issue your order to say tell me the people involved in the decision as a starting point, or, you know, I think at the same time, you could do that and begin to call witnesses.

And obviously, you've identified Mr. Reuveni, the whistleblower.  But I would suggest maybe doing them simultaneously, because I think there's probably more -- obviously, there's more people involved than even Mr. Reuveni could mention in his complaint.

So I think probably both things simultaneously and, as you said, probably on a quick track, given that we're now going all the way back seven months.

THE COURT:  Okay.  Thank you.

Mr. Davis?

MR. DAVIS:  Your Honor, the government objects to any further proceedings on criminal contempt.  We think there is no basis for criminal contempt on two grounds.

THE COURT:  So I should just completely disregard what the Court of Appeals said?

You would agree that a majority of the Court of Appeals said that I could go forward with criminal contempt proceedings.

MR. DAVIS:  Your Honor, that was a denial of an en banc split 3-1-2.  That's not a holding.  That's nothing that's binding.

THE COURT:  So you would agree that the original panel, two judges said I could go forward on contempt?

MR. DAVIS:  Judge Rao said that you were not prohibited from doing so.  The only thing that mandamused was the order at issue.  But I will also quote from her.  "With the issuance of this writ of mandamus, I would not assume that such an extraordinary step is forthcoming."  So she certainly cautioned against it.  I don't think that that means you must go forward with it.

THE COURT:  Well, six judges of the Court of Appeals, not even including Judge Rao, have now said that I may go forward with it.  So I will be going forward with it, following the Court of Appeals's direction.

So my question for you is not whether I should be going

forward, but what steps do you think I should take?

MR. DAVIS:  Your Honor, again, objecting to this and thinking that there's not actually jurisdiction for criminal contempt because the original order was vacated for a lack of jurisdiction, we think that's a fundamental problem here that that the Court cannot move forward on.

THE COURT:  Again, I've already covered that in *Walker v. City of Birmingham*.  So again, I appreciate the fact that you disagree with six judges on the Court of Appeals.  But my question is, do you want to go forward via hearings?  Would you like the opportunity to give me declarations under oath from everybody involved in the deportation on March 15 and 16 that explains exactly who gave the orders to defy my ruling, or should we begin with hearings with witnesses?

MR. DAVIS:  I think a first step would be identifying the relevant people, as you were going down the first instance, and then potentially declarations would be preferable before moving straight to witness testimony.  If there's nothing there, I don't think hauling high-level officials, or I don't know who actually made the decision, so whoever that might be, into court would necessarily be an appropriate first step.

THE COURT:  Well, then, what I will have both sides do, then, is by Monday, that for the -- I will let both sides give me in writing by Monday their proposals on how you believe I should proceed.

And so Mr. Gelernt, that will include also which witnesses you believe we should call to begin with.  Now, I imagine if we have factual hearings, that we will learn from those hearings the identity of other people.  So I don't plan to have a closed list of witnesses from the outset.  I feel like Mr. Reuveni, I would assume Mr. Ensign, we will begin to get an idea of what happened here, and then we will see where that leads.

So I would ask what you then, Mr. Gelernt, propose in terms of proceeding just with hearings, whether also seeking declarations from the government, and then if -- in either event, names of proposed witnesses you believe we should begin with.

Mr. Davis, you can also give -- you can start giving me declarations from people who can tell me what they did or didn't do, and you can give me names of people you believe had a role in this, and we will see.

Again, if you want to give -- if you want to provide me full declarations from people explaining precisely what happened, that might obviate the need to call certain people as witnesses.  But I certainly intend to find out what happened on that day, and the government can assist me to whatever degree it wishes.  But if you wish to avoid having people testify, then you can start submitting declarations.

Any questions about that?

MR. DAVIS:  We stand on our objections to the

proceeding, but we understand, Your Honor.

THE COURT:  Thank you.  Okay.  Thanks very much.

All right.  Let's move on to the preliminary injunction. So, Mr. Gelernt, I will have you return.

MR. GELERNT:  Thank you, Your Honor.

THE COURT:  Let me start with an issue that the defense raises that I think is an interesting question, which is whether this is really preliminary relief that you're seeking and whether the better course here would be to consolidate a preliminary injunction with a summary judgment hearing, which would yield a permanent injunction.

I'm not telling you anything you don't know, but again, to make things clear for the public, that the main point that the government makes is if my order, a preliminary order to facilitate the return of the 137 men who were deported, their argument is that wouldn't vary from final relief, this would not be a form of preliminary relief.

I guess my question to you is, why do you think it's a form of preliminary relief, or if not, what's your position on consolidation?

MR. GELERNT:  Well, let me start with the second part. I don't want to fight too hard about keeping it as a preliminary injunction.  I don't think we have any particular objection to you consolidating and treating it as summary judgment, a final judgment.

But having said that, I think it would be preliminary. Maybe it's overly formal, but I think you are saying as a preliminary matter, you finding a due process violation, you would still ultimately have to issue a ruling that this is my final ruling, I have decided that the due process preliminary injunction should be converted to summary judgment.

I also think it may depend on whether you proceed through equity as you did originally in your June 4th opinion or find there's constructive custody for habeas and then they're proceeding with their actual claims on the merits.

THE COURT:  What I'm hearing, and tell me if I'm wrong, is that you're saying the preliminary decision would be regarding liability, and the final decision would be regarding remedy.

But -- I mean, is that what you're saying?

MR. GELERNT:  No, and I apologize if I wasn't being clear.  I was just sort of making the technical point that any preliminary injunction ultimately needs a second step where the Court decides yes, I was correct in my preliminary injunction assessment, now I want to make it a summary judgment.

But because it's a straight legal issue, you know, it's fair to say well, what actually is left to be done, and that's why I don't want to fight too hard on the summary judgment point.

The only additional point I was making is if you decide

you're going to find constructive custody, that means that the habeas claims can go forward immediately, because the merits of the habeas are before you in our complaint.  And so then I think that would be anything but preliminary.  You would be then looking to see whether these were TdA members and, more fundamentally, whether the Alien Enemies Act can even be used during peacetime without an invasion of predatory incursion.

So it would depend a little bit on how you want to proceed jurisdictionally.  But again, I don't want to fight too hard on pushing you to do it through a preliminary injunction, because from our standpoint we're somewhat agnostic.

THE COURT:  Under the rule, and we are talking about Rule 65, I do need to give notice before consolidating a preliminary injunction with trial and the merits with a final proceeding.

So are you opposed to -- I will hear what the government has to say, but if the government says we want to be able to submit more material regarding liability or relief that we weren't able to submit here, I don't know what that would be, but don't you believe that I would have to give them that opportunity to do so?

MR. GELERNT:  I think they're right, Your Honor, and fair that you don't want to take any shortcuts in this case.  And so that's one very practical reason to proceed as a preliminary injunction matter.  I don't think it's fair for the

government to say you can't proceed as a matter of preliminary injunction focus.

And given that I suspect the government's going to ask for a lot of time and put a lot of stuff in, this has been -- I don't need to tell you.  It's been long running, and the men were sent to CECOT now a long time ago and now back to Venezuela.

And so I think if the government were to stand up and say let's just treat the papers as summary judgment papers, I don't want to fight too hard about that.  But if the government is saying no, we need a long time to convert it to summary judgment, then I think you could proceed as a preliminary injunction matter.  I don't think there's any reason why you can't.  It's just a matter of sort of, I think, at this point preference.

THE COURT:  Right, but I think I've got to give them notice, and I'm sure you wouldn't object at all, I'm assuming, if they get up and say we're happy for you to consolidate this with --

MR. GELERNT:  Right, I don't want to fight that.  If they want to do that, that's okay.

THE COURT:  Okay.  So I will talk to them about that.

So if we're looking at preliminary relief, then one issue you have to show is irreparable harm, which is not true for summary judgment.

Can you tell me -- and I know this is complicated and complex with people in Venezuela who are difficult to reach and hard to contact and unclear where they are, but some of the government's points, and this relates to class certification also, relate to how can we treat this group as a unit.  But we will talk about that in a minute.

On irreparable harm, can you give me a little more information about how many people of the 137 have you contacted?  Can you say that 100 percent of them are suffering irreparable harm now?  How many declarations do you have, and how many are you expecting to be able to get?  Can you give me a little bit more quantification?

MR. GELERNT:  Yeah, let me try and do that but sort of treading carefully with attorney-client.

THE COURT:  Yes.

MR. GELERNT:  And also, you're right to say it's hard to reach them.  It's very hard to reach them often.  But the other factor is even when we reach them, there is real fear about talking.  There is word out there that they are being surveilled, that their phones are being tapped.  And so to some extent, we have stopped trying to have these candid conversations with them at this point before the Court rules and we know what we can specifically tell them so we don't put them in danger.

What we have basically found is that overwhelmingly they

want to pursue their case.  And so -- the irreparable harm, I think, takes two forms.  One is in a due process violation.  That's harm in itself.  It's a constitutional violation.  They didn't have a chance to show that they weren't TdA members or that the Alien Enemies Act shouldn't have been invoked in the first place.  We think that's sufficient.

But there's no question, as the illustrative affidavits that were put in show, that people are in danger in Venezuela.  And I think the very fact that they fled Venezuela is what we would point to.  There's no reason to believe that's subsiding, and the people we've talked to that that's the case.

And I know Your Honor knows this, but you could look to *J.D. v. Azar.*  At this point, the commonality is the due process violation.  How many people will ultimately decide they want that relief or want some variation on the relief is not the question at this point.  I think if Your Honor were to rule that the government has to put a plan in to facilitate, and that's all we're asking for at this point.

We understand Your Honor may want to defer to the government on a plan.  I think we would then, if the government doesn't appeal, and I think that's a big if, we would go back to the men and say, you know, this is what the plan is and the judge would like to see affidavits from all of you or, you know, illustrative affidavits.

But at this point, we have spoken to, I would say, of the

137 about 33 percent.  About 33 percent we've been able to reach and they have been willing to have candid conversations.

THE COURT:  You're saying that overwhelmingly that group wishes to return to -- wishes to return to the United States?

MR. GELERNT:  Wishes to pursue their claims, absolutely, and to return to the U.S.  There are some people who really --

THE COURT:  Hold on.  But even understanding -- we'll talk about this in a minute for remedy -- that if they return to the United States, they're very likely to be in custody in the United States.

MR. GELERNT:  Right.

THE COURT:  So the bottom line here is they would rather be in custody in the United States with a chance of a hearing than free in Venezuela?

MR. GELERNT:  So I want to be careful here so that I don't reveal attorney-client.  What I think is happening is yes, that's true for some.  For some, they're hesitant.  They're repeatedly asking us do we need to make this decision now and will there be a remote option.  Because we have told them that's one thing that we want to raise with the Court is that there could potentially be a remote option, just like there have been at Guantanamo, and that could be filing petitions and if Your Honor or whatever judge ultimately hears the habeas petitions, I

think it would be Your Honor if it was remote, whether that's an option.

But I think what they're really telling us is tell us what's going to happen for a lot of them sort of.  And I think the reason is not that they wouldn't prefer to be in detention necessarily than being in danger in Venezuela.  It's we tell them that we cannot guarantee they are not going to end up in CECOT again.

THE COURT:  Or South Sudan.

MR. GELERNT:  Right.  And so the tricky part about these conversations is when they say can you guarantee us, and they are still very, very traumatized by what happened at CECOT. I'm sure Your Honor has seen some of the media that's come out about it.  It's not anywhere near full about what happened at CECOT.

So our problem is saying to them it won't be just detention, we can guarantee you won't end up in South Sudan or CECOT.  So I think there's a lot of them waiting.  And we've told them that the Court doesn't need to know 100 percent exactly what relief you would accept at this point because of the *J.D. v. Azar* case, and I think that's right under the law, that exactly how many people will take advantage of which relief is not the relevant question at this stage, either for class action or on the merits, class certification or the merits.

THE COURT:  So if my ruling, though, is consistent

with my prior ruling in terms of the claim that you actually have and that I find that the claim you have is an equitable due process claim, not a habeas claim, if you look at the remedy that you're seeking, which is facilitation -- and let's be very clear here, is it facilitating their return to the United States so that they can bring a habeas claim or another type of claim, or is it simply to more narrowly to -- or, I guess, more broadly to facilitate their ability to have a habeas claim, which might be remote?

MR. GELERNT:  Right.  I think that's exactly the right question, and it's fair.

From our standpoint, we would say it should be an option. They can either come back to the U.S., and maybe some will want to come back immediately, notwithstanding that the government says they just need to detain them at least initially, and the fear that maybe they get sent to CECOT again or South Sudan as you said.  Some may want to know if there is a remote option if they found a sufficiently safe hiding place within Venezuela.

And so I think if Your Honor were to repeat the June 4th remedy of the government should provide a plan of how facilitation would work, I think we would want to potentially object to it if we thought it wasn't fair.  I know Your Honor would want to look at it, as you said in the June 4th opinion.

And then once we've all decided on what their options are going to be for people, we would go back to them and talk to

them.

And I think those who are not in any safe place and can't find a hiding place and feel like they're being surveilled and some of them are more high profile than others, I think they may want to rush back into U.S. custody.

THE COURT: But do you -- and let's talk about what that means. Again, if I get to this point and I issue an order similar to the one I issued in June which says I'm not telling you, government, how to do this yet, I want to hear from you, if you take the remote -- if you put the remote option aside for a minute, what do you think the government should be proposing that they do? Should it require that these folks have to make their way to the U.S. border, and once they're there, then the government has to take them? Or are you suggesting the government has to do more than that?

MR. GELERNT: If the facilitation is going to be the U.S., you're asking?

THE COURT: Yes.

MR. GELERNT: So at a minimum, it obviously has to be that they don't throw up any road blocks to them coming if they can make it themselves.

We would hope that because there was such a clear due process violation that the government's not fighting anymore, the government should be required to do more than that and actually facilitate, whether it's a plane or somehow through --

but I'm worried about getting too far ahead of myself before the government proposes something.  My own feeling is that it's going to be very hard for people to make their way here, and the government has to take on some of the logistics burden.

THE COURT:  Okay.  And if I get to that point, that I'm certainly not -- wouldn't be dictating what the government has to do at this point.

So looking at the class question for a minute, it's your position that the class should be the 137 people again who were deported pursuant to AEA authorities only as opposed to some narrower class of people who say they want this remedy?

What I'm trying to get at is, if the government says look, we don't even know that all these people want such a remedy, they may be just happy that they're out of CECOT, they're in Venezuela, they're okay, should the class only cover people who are actually seeking relief, or is the idea that the relief be made available to all and those who want to take it can?

MR. GELERNT:  The latter, Your Honor.  And I don't want to beat a dead horse, but I think it's worth looking at the *J.D. v. Azar* decision from the D.C. Circuit where that very issue came up of will everyone want to take advantage of the remedy of being able to get an abortion from a detention facility.  And the Court said no, you don't look at that now.

And I think that's hornbook law that at this point, have all the people suffered that injury, whether they all want the

remedy, I think, is at the later stage.  It's too hard in a (b)(2) class to know whether everyone is going to accept the remedy or force them.

So I think that's, as I understand it, the law in this circuit and certainly more generally.  So we would say that the government attempting to say you have to tell us exactly who wants the remedy before we've even -- before the government's even proposed what they would do to facilitate is not right.  And that's our position.

THE COURT:  And so is the class you want certified the same class that I certified in my June 4th opinion?

MR. GELERNT:  Exactly.  And I just want to put a pin in this, because I know this is not really for now.  You and I have talked about the rest of the -- there were 250 plus.  We are still trying to find out exactly whether those individuals were really Title 8 immigration removals, but I don't want to belabor that now.  So for now, it would just be the 137 that we believe were removed solely based on the Alien Enemies Act.

THE COURT:  Last thing I want to ask is, what's your position, and I know this wasn't raised in the papers, about certifying an issue class under Rule 23(c)(4)?

Now, I know that can only get you declaratory, not injunctive, relief.  But the issue is whether due process was afforded to this class.  I don't know if that is something you have any interest in or not.

MR. GELERNT:  I think the question is sort of how the government would react to that.  So if Your Honor found that there was a due process violation, you know, founded under (c)(4), I think the government would take the position that they're not going to do anything.

And so if that was the government's position and, therefore, it had no practical effect, I would be very concerned about it.  I understand.  It's a fair question.  But I think what we're likely to see then is the government saying well, we're not under any obligation to do anything.

THE COURT:  All right.  Thank you.  I will give you a few minutes for rebuttal.

MR. GELERNT:  Thank you, Your Honor.

THE COURT:  Okay.  Mr. Davis.

All right.  Why don't we start with the same question I started with Mr. Gelernt with, which is consolidation of the preliminary injunction with a merits determination since one of the points that you raised, which I think is an interesting point, in your papers is this isn't an appropriate relief for a PI.

Now, Mr. Gelernt says it is, but he's also amenable to consolidation.  So tell me your position on that.

MR. DAVIS:  We think this should be transformed into a motion for summary judgment.  I would have to go back and ask to see if there's anything else we wanted to put in, and we could

probably get you an answer to that on Monday with everything else.

I think we believe that this is primarily a legal issue and that the relevant record evidence is here, and so there's probably not a need for anything else.  So we do think that that can move fast.

At least on whether this should be a preliminary injunction, on at least the due process part, our understanding is that that's to facilitate habeas, but in doing so, we believe we would have to take them back into custody, because that's a jurisdictional prerequisite.  And in order to do that, we would probably have to take them back to the United States Gitmo, which is still de facto United States sovereignty.

And at that point, that is sort of the final relief that they're seeking under that, and then they would have individual habeas claims that get filed in whatever is the proper district court.

So we do think that would be essentially a final permanent injunction.

THE COURT:  Your proposal is reasonable to me.  So what I would let you do -- and, Mr. Gelernt, this is without prejudice to the plaintiff, but what I will do is I will let you on Monday, by Monday, Mr. Davis, let me know if you have any objection to consolidation, and if you do, I think I would require you to explain your objection, but I would expect, for

example, if there was other information you wanted before me that would be before me in a motion for summary judgment that wouldn't be before me in a PI, which I can't think of what that would be, to let me know how quickly you would provide that, but I would be requiring a very fast turn-around on that, as in probably by the end of next week, maybe the Monday, given it's Thanksgiving.  But I will let you tell me on Monday about that issue.

MR. DAVIS:  Understood.

THE COURT:  And I think it is appropriate to give the government notice before consolidation.  I don't think it's appropriate for me to sua sponte consolidate without notice.

Okay.  So I'm not going to get into the constructive custody question today.  I didn't get into it with Mr. Gelernt.  But let me ask you, you may not have agreed that there is jurisdiction for me to consider a due process claim in equity as I held in my June 4th opinion, but do you want to tell me why you think I was wrong in that?

MR. DAVIS:  We think, Your Honor, that it still sounds in habeas, and so it has to be brought in habeas.  We think the *J.G.G.* decision by the Supreme Court actually shows that.  Their due process claim without habeas was one of the core things they were raising there, and the Supreme Court said --

THE COURT:  Why doesn't *AARP*, which followed *J.G.G.*, why shouldn't I follow that language where they express

skepticism that the right to notice must be vindicated via habeas by plaintiffs who never received notice?  Why isn't that language there a guide for me to consider how -- whether I have jurisdiction on an equitable due process claim?

MR. DAVIS:  Your Honor, I think frankly that was -- obviously, that case was done very fast with limited briefing, including on these issues.  It was interim --

THE COURT:  Couldn't I say the same about the *J.G.G.* case in the Supreme Court?

MR. DAVIS:  Understood, Your Honor.  But that's still being litigated in the Fifth Circuit.  And I think the fundamental point is that case was brought as habeas in the correct district and is still being litigated as a habeas case. What I understood the majority there to be responding to is the dissent's point that this really shouldn't be putative class relief at this stage, especially when the district court denied class certifications.  They're like no, no, no, we're moving fast, we need to make sure that the planes don't go off and these people can pursue their claims, and that case is still going on in a habeas forum because they filed habeas in the proper venue.

THE COURT:  All right.  So if I believe I was correct on that jurisdictional issue in my June 4th opinion, which I understand you contest, and it's, I think, an interesting question, I trust you stand by the government's concession in

the briefing and argument there that there was in fact a due process violation?

MR. DAVIS:  I don't believe we ever conceded that, but we're not making the argument here because we believe the jurisdictional bars are what's important, and we think that that's a bit of a complicated question.

I remember in your opinion -- we talked about the retroactivity piece.  There was a bit of action there.  And you disagreed with us that the Supreme Court's decisions in *J.G.G.* and *AARP* are only prospective.  But we still think there's a question there since these should be habeas claims.  *Teague*, although in successive context, is about the retroactivity of constitutional claims.  So we think that's a bit complicated.

But I don't think --

THE COURT:  But I think you admitted in your opposition in that briefing that you are required to provide detainees with notice of their designation under the AEA and an opportunity to seek habeas relief prior to removal, didn't you?

MR. DAVIS:  I believe we offered them notice, although obviously not what the Supreme Court has since said would satisfy, and they did not receive --

THE COURT:  Hold on.  So you agree that you did not give them the notice that the Supreme Court has said is required?

MR. DAVIS:  Not at the time that they've since said is

required.

THE COURT:  So your sole point, and I think you just made it and I want to be clear, is a retroactivity point?

MR. DAVIS:  Yes.  But again, we're not really briefing or fighting about due process.  We're focused on the jurisdictional claims, but we're not conceding that there is a violation.

THE COURT:  Okay.  So let's -- so if I rule consistently with my June 4th ruling, namely on the jurisdictional issue and the violation issue, let's talk about remedy with you also for a minute.

So I trust again -- and I know you're not conceding the violation.  But if I find one and the jurisdiction, I trust you agree with the Supreme Court that the proper remedy is for you to facilitate the restoration of these folks's habeas rights; correct?

I mean, isn't that what *Abrego Garcia* said?

MR. DAVIS:  I think putting aside the jurisdictional and the merits concerns, if we're just talking about remedy, I think that's probably right.

THE COURT:  Okay.  So I think the language was that the government must facilitate -- and I'm not quoting.  The holding was that the government must facilitate Abrego Garcia's rerelease from custody in El Salvador and ensure that his case is handled as it would have been had he not been improperly sent

there.

So what Mr. Gelernt says I should do if I rule for him is to do what I did last time, which is to say okay, government, how are you going to -- how do you propose facilitating their return.

And I actually -- the case in Massachusetts that the government cites, which is the *D.V.D.* case from the District of Massachusetts, I think that's Judge Murphy, he cites in a footnote at the end of the opinion something that I didn't have in front of me before, which is ICE Policy Directive 11061.1, which is entitled "Facilitating the Return to the United States of Certain Lawfully Removed Aliens."

And in this case, the policy is, ICE's own policy is absent extraordinary circumstances, a lawfully removed alien who prevails on his appeals, that ICE will facilitate the alien's return to the United States if his presence is necessary for continued administrative removal proceedings and that facilitation -- the policy is to engage in activities that allow a lawfully removed alien to travel to the United States such as by issuing a boarding letter to permit commercial air travel and, if warranted, parole the alien into the United States upon his or her arrival at a U.S. port of entry.

So I trust that if we get that far, the government would agree to do at least this.

MR. DAVIS:  I think we -- as Your Honor ordered in the

first instance, for us to propose what we think going forward would make sense. I don't know that I can commit us to what we would do at this moment.

I do think there are some complications here from the normal case in the sense that from the United States's perspective, these people are members of TdA. Obviously, petitioners contest that, but that's still our position, and that they're members of a foreign terrorist organization.

So I don't think the typical policy would necessarily apply in that situation. But some of the options to facilitate, as I think the policy said, would be to remove domestic barriers so that if they came back they could file.

THE COURT: Right. But you certainly, I trust, wouldn't object to my giving you a subsequent opportunity to explain what facilitation you would engage in?

MR. DAVIS: No.

THE COURT: Okay. Let's talk about the class for a minute.

So your, I think, central concern regarding the class is that the people seek different relief and maybe have different circumstances that they want to -- and that, therefore, the typicality or, I guess, really commonality and the injury inflicted upon them is not the same; right?

MR. DAVIS: I think that's basically right. I think some of the collateral consequences and restraints they point to

for their constructive custody arguments and I also think some of the injuries they claim for irreparable harm are things like restrictions on entry to the United States, ability to file asylum, situations that are occurring to them in Venezuela that we have no basis to understand are common among the entire class members or that the declarations are typical of those class members.  So yeah.

THE COURT:  But the injury they are complaining of, though, is not what's happening to them in Venezuela or what might happen to them in the United States or where they might get sent.  It's that they were denied the hearing and the due process they deserved.

That's the injury they're claiming; right?

MR. DAVIS:  Yes, but I don't think that's necessarily the irreparable harm.

THE COURT:  Okay.  There's a difference there.  But in terms of whether the injury inflicted under 23(b) is the same injury on all of them, isn't it?

MR. DAVIS:  Initially, we had made the argument in class certification the last time that we think due process claims have to be individualized.  We know Your Honor disagreed with that.

But putting that aside, if the class is literally just was there a due process violation, which I also don't think would justify a class-wide PI because the PI would have irreparable

harm -- maybe that doesn't matter if we consolidate.  But I think that would be the only possible grounds for commonality, would be whether there was a due process violation.

THE COURT:  Okay.  I will give you a few minutes if there's anything else that you would like to point out that you either didn't put in your brief or that you would like to respond to Mr. Gelernt on.

MR. DAVIS:  Just I want to spend a second on why we think it sounds in habeas besides the Supreme Court's ruling in *J.G.G.*  Custody is jurisdictional, and we're not even sure that it's waivable when it's whether there's custody in the first place, which is at issue here.

So we think that the United States would probably have to take people back into custody and back into the United States.  And if that's the case, then saying that the removals were done in violation of due process is going to the validity of the removal itself.

Now, it's true that we can redo the removal, which I think was plaintiffs' point.  Like well, if we prove that they are TdA, maybe we can remove them again.  But that's true of all sort of due process habeas claims, to challenge proceedings.

THE COURT:  But if they were able to have remote hearings from Venezuela, some of them, then they wouldn't be in U.S. custody to do so.  In other words, it's not required.

MR. DAVIS:  I'm not sure that we can do that if this

isn't constructive custody, if it's a due process violation. They're not in custody.  We're facilitating habeas.  I think to facilitate habeas, they have to be in our custody one way or another.

I'm not going to rule out that we couldn't consent to that, but I don't think we could be ordered to, and I think it's questionable whether we could even consent to that.  *Maleng v. Cook* seems to indicate that the question of whether there's custody at all is subject matter jurisdiction.  Venue might be more personal jurisdiction.  So I'm not sure that we can even consent to that.

And if we have to take them into custody, I think that that is undoing the removal.  Now, sure, we can have the hearings and maybe remove them later, but that's true of like, let's say, *Early v. Blankenship*, which is an Eighth Circuit case we cite. There, he was saying there was a due process problem, that he didn't get notice of a disciplinary hearing, and they said that sounds in habeas.  Sure, they could redo it with the proper notice, but that's still saying that the actually procedures were invalid and you have to do it over.  That still sounds of habeas.

*Savory*, an en banc --

THE COURT:  Slow down a little for our court reporter.

MR. DAVIS:  The Seventh Circuit opinion, *Savory*, which is en banc, the person was pardoned.  He tried to sue saying

like this proves that the procedures for my conviction were invalid under 1983, and all but one judge on the Seventh Circuit said no, that sounds in habeas, because you're challenging the process by which you were convicted, and that challenges the invalidity. Sure, maybe there would be a mistrial, you get a new trial, and maybe the outcome is the same, but that's still habeas. And so we think that's going to be the same case here.

We also think as far as implementing the facilitation of habeas, if we have to take them into custody, might not be particularly simple, given the tensions with the Maduro regime. We obviously negotiated for assurances with them, but who knows if they will actually follow through. So redressability could be an issue there as well.

THE COURT: I don't disagree that relations between the countries are in a different place from where they were a number of months ago.

Okay. Thank you very much, Mr. Davis.

Mr. Gelernt, I will give you a few minutes for rebuttal, if there's anything you want to add.

MR. GELERNT: Thank you, Your Honor. Just very quickly on the class and remedy and all that.

I think the page to look at in *J.D. v. Azar* is 1315 where it said it doesn't matter at this stage whether people are interested in pursuing a remedy. And certainly, you can have remedial subclasses if it actually came down to that.

And the other thing is that the named class members are all saying they're suffering in Venezuela, suffering irreparable harm, and obviously, they stand in for the class.

On the remote thing, I guess a few things. One is, obviously, the government feels that you should find -- if you were going to have remote and pursue habeas, it would be necessary to find constructive custody.

I don't want to belabor it. We do feel in our papers that the new evidence makes clear that there is constructive custody, there was constructive custody at CECOT at the time of filing. Your Honor said it was a close question on June 4. We feel like the cumulative evidence now shows that the *Abu Ali* factors are satisfied.

But the other point I wanted to make is that if you decide to give a remote option, through due process equity, people should be allowed to raise all their merits claims through that. I don't think *J.G.G.* contemplated the government moving people, evading an order, which obviously you haven't made that finding but we do think they evaded the order, but being shuffled out of the country without any opportunity to file a habeas, not being allowed back in the country, the government saying well, we don't have custody over them, and that's the end of the matter.

So I don't think, if you just find equity due process, the remote option is off the table. I do think people can raise all their merits claims through that. But we would ask you also to

consider the possibility that the new evidence shows constructive custody.

THE COURT:  But it's not something that I can rule either/or, because I think the only reason you would have a due process claim is because you don't have constructive custody; correct?

MR. GELERNT:  And I recognize --

THE COURT:  That's what I said.

MR. GELERNT:  Yeah, in your June 4th opinion, I recognize you were saying they were mutually exclusive.

I think what you can do, though, Your Honor, is say this is an alternative holding.  The reason we think that's important, maybe it wouldn't be in other cases, is that it seems as if it's difficult for Your Honor to do anything now without the government appealing immediately.

And so at this point, given how long things have dragged out, an alternative holding about constructive custody or an alternative holding about due process inequity I think wouldn't be improper, and you could still say, obviously, the Court thinks these are mutually exclusive, but in the interest of avoiding another round of piecemeal appeals, you can find both.

So I think that's why we had made somewhat of a big deal in our papers about Your Honor reaching that issue.

The government is picking apart each piece of new evidence and saying well, that doesn't ultimately prove it.  It's now at

this point, there's so much cumulative evidence, that it's hard for the government really to say that the *Abu Ali* factors are not satisfied, and just picking out one, the evading judicial review, I think there's no question the whistleblower evidence shows that they were trying to avoid the writ applying.

So in that respect, we would ask that Your Honor make both findings and again find that both are available.  But I think these more difficult questions about how remote would work and what can be raised through remote, maybe wait for the government's facilitation --

THE COURT:  I don't see any reason, if I rule for you, that I need to decide all that yet.

MR. GELERNT:  Okay.

THE COURT:  So let me ask each one last question, which is, if we proceed with contempt hearings, I want to ask about schedule.  My intent, I think, if counsel and witnesses are available, is to begin the Monday after Thanksgiving, so in other words a week from Monday.

So let me just ask you, Mr. Gelernt, for your team -- and you don't have to give specific days you're not available, but are you generally available the first three weeks --

MR. GELERNT:  We will work around the Court's schedule for sure, Your Honor.

And this is somewhat of a housekeeping, and I'm not entirely sure I know technically what's right or wrong.  But I

think the mandate in the contempt issues this Friday.  So it may be that -- this discussion, obviously, is appropriate and proper, but it may be that your order in the contempt may want to wait until Friday just until the mandate issues.

THE COURT:  I'm waiting to hear on Monday.

MR. GELERNT:  But even an order telling the government to -- I don't want to overstep.

THE COURT:  You may well be right, but I thought that the order that accompanied the Court of Appeals decision had issued the mandate.

MR. GELERNT:  Immediately?

THE COURT:  I think so.

MR. DAVIS:  I think they wait seven days.

MR. GELERNT:  You may be able to do scheduling orders now.  I don't know, Your Honor.  I don't want to overstep my bounds.

THE COURT:  I appreciate that, and I'm certainly not planning to do anything --

MR. GELERNT:  We will be available when Your Honor wants to start.

THE COURT:  All right.  Mr. Davis, same, just last question to you.  If we have hearings, any reason we can't go forward in the first few weeks of December?

MR. DAVIS:  I mean, I think it depends on what the next steps are, which have yet to be decided.  If it involves

witnesses, I don't know who those witnesses are and what their availability will be.  I can be around, but otherwise, I don't know.

THE COURT:  All right.  Thanks, everyone.  I appreciate it.

(Proceedings adjourned at 2:53 p.m.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick_____          November 21, 2025_____

SIGNATURE OF COURT REPORTER          DATE