## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf of
FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

### PETITIONERS-PLAINTIFFS' RESPONSE TO MOTION FOR RECONSIDERATION

A majority of the Court of Appeals made unmistakably clear that this Court may investigate the facts related to the events of the weekend of March 14 to 16. *See J.G.G. v. Trump*, No. 12-7111, 2025 WL 3198891, at *4 (D.C. Cir. Nov. 14, 2025) (en banc) (Pillard, Wilkins, and Garcia, JJ., respecting denial of rehearing en banc) (district court may "proceed . . . within his sound discretion" to obtain factual information); *id.* at *5 n.1 (Pan, J., dissenting from denial of rehearing en banc) ("Six of the eleven active judges on this court opine that the district court did not err."). That is all this Court has thus far ordered—an investigation into the facts. Nothing in any of the opinions of the Court of Appeals remotely suggested that the Court should be hamstrung and can proceed only by affidavit or, even worse, must accept patently deficient two-sentence affidavits.

The government argues that nothing remains for this Court to investigate, because it has already found probable cause of criminal contempt. Mot. to Reconsider, ECF 201 (Mot.). Of

course, as the government recognizes, a splintered panel of the D.C. Circuit vacated that prior order, meaning this Court now must fashion a new one. Regardless, this Court only made a preliminary finding that probable cause existed, while recognizing that further fact-finding was necessary before determining whether a referral was appropriate as to any specific individuals. Contempt Op. 44, ECF 81. That prudent step was precisely what a majority of the Circuit has now endorsed. The Court may thus gather additional facts related to the existence of probable cause, including facts about the role played by the individuals Defendants have already identified, the potential involvement of additional individuals in the decision to violate the Court's orders on March 15 and 16, and the question of whether each person's conduct was willful—a core element of the probable-cause inquiry, and one that is necessarily individualized.

Further, additional facts may also demonstrate probable cause of criminal contempt due to Department of Justice attorneys' "[m]isbehavior . . . in [the Court's] presence or so near thereto as to obstruct the administration of justice" before, during, and after this Court's March 15 temporary restraining order hearing. 18 U.S.C. § 401(1). Indeed, Defendants themselves note that this Court "may summarily prosecute" criminal contempt committed in its presence. Mot. 2 (citing 18 U.S.C. § 402).

Nor are Defendants remotely correct that there are no more facts to find in light of the anemic declarations they have submitted. As shown below, additional fact-finding is warranted regarding whether government officials (including but not limited to Secretary Noem) intended to, and ultimately did, willfully disobey this Court's March 15 order and whether DOJ attorneys obstructed this Court's administration of justice. Indeed, the government's affidavits raise more questions than they answer.

Defendants' arguments also ignore the Court's inherent powers to investigate and sanction misconduct committed against it, powers that reach even more broadly than the inquiry into criminal contempt and which independently support its ongoing fact-finding efforts. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). In this Circuit, those sanctions generally require specifically establishing bad faith. *Parsi v. Daioleslam*, 778 F.3d 116, 130-31 (D.C. Cir. 2015).

The government's attorney-client privilege arguments offer no basis to prevent the testimony the Court has ordered from former and current DOJ lawyers. The government has put the legal advice it received at issue, thereby waiving the privilege, through the numerous arguments it has made about its supposedly good-faith understanding of the Court's order. Moreover, the crime-fraud exception to the privilege does not permit the government to shield attorney testimony in circumstances, where, as here, there is evidence that attorney-client communications have been used to further criminal contempt and fraud in litigation. DOJ lawyers are also entitled to disclose client confidences to respond to charges of wrongdoing against them. Similarly, the attorney-client privilege does not prevent government lawyers from disclosing information related to possible criminal wrongdoing—which is precisely what the Court is examining here.

Finally, Plaintiffs' participation in the proceedings is warranted. At this fact-finding stage, the Court has every right to seek assistance from those with particular knowledge of the relevant events.

## I.    The Court Has Authority to Continue Its Pre-Referral Inquiry to Gather the Facts Necessary to Determine Whether and For Whom Referral is Warranted.

The Court may solicit testimony from relevant actors because material facts surrounding Secretary Noem's decision remain unknown and are necessary for this Court's determination as to a possible criminal referral or sanctions. The Court has already found that neither Secretary

3

Noem's declaration nor the other declarations submitted by Defendants "provide enough information" to "understand the bases of the decision to transfer." ECF 200 at 1-2. As this Court has explained, "the Court cannot at this juncture find probable cause" as to a specific referral of Secretary Noem for prosecution, and such a referral "would be premature." *Id.* at 1.

Information about DOJ attorneys' representations to DHS officials, including Secretary Noem, is important to evaluating whether there is probable cause that Secretary Noem or others *willfully* violated the temporary restraining order. And determining whether other individuals provided input—in the form of advice, consultation, guidance, and/or direction—to Secretary Noem (beyond the three lawyers identified by the government) is likewise critical. This inquiry is not a punitive response to Defendants' successful appeal, *contra* Mot. 3, 5, but the straightforward factual development the D.C. Circuit recognized this Court may undertake before determining whether referral is warranted, *see J.G.G.*, 2025 WL 3198891, at *4, *5 n.1.

The Court may also appropriately assess whether other officials were part of a deliberate attempt to ignore the Court's order or mislead the Court in the hours leading up to, during, or after the March 15 hearing. Resolving those questions requires understanding the actions and communications of multiple officials whose conduct may independently support probable cause of contempt and certainly also bears on what decisions Secretary Noem may have made and on what basis she made them.

Referral may also prove appropriate and necessary for additional material misrepresentations and omissions made directly to the Court. *See* 18 U.S.C. § 401(1) ("[m]isbehavior of any person in its presence or so near thereto as to obstruct the administration of justice" is criminal contempt of court). The government argues that testimony by opposing counsel is disfavored and irrelevant, Mot. 9, but seeking testimony from Mr. Ensign and Mr.

Reuveni on these unresolved issues is a measured and necessary step to identify any additional actors who may properly be the subject of contempt proceedings and the basis for such proceedings.

###### A.    Defendants' Anemic Declarations Raise Numerous Questions Relevant to the Court's Contempt Inquiry.

Testimony by Mr. Ensign and Mr. Reuveni will illuminate relevant categories of information necessary for the Court's threshold inquiry, including: (1) what direction, advice, and consultation all relevant parties provided to Secretary Noem; (2) whether additional individuals beyond those already named provided direction, advice, and consultation to any decisionmakers or others; (3) why the government failed to notify the Court as to its understanding of the injunction or to seek to clarify the injunction; (4) why advice to DHS from DOJ attorneys within the Office of Immigration Litigation (OIL) and from more senior DOJ leadership apparently diverged and was not resolved prior to the decision to deplane; (5) the timeline of events, including the time at which officials communicated advice, consultation, and direction, the time at which various officials knew the status of the flights, the time at which the decision to deplane was communicated, and the time that deplaning occurred; and (6) which officials in the government took what actions before, during, and after the hearing that may have obstructed or attempted to obstruct the administration of justice. The following issues and questions are merely illustrative, not exhaustive:

**Use of the Alien Enemies Act:** Basic questions about the government's invocation of the Alien Enemies Act and execution of Alien Enemies Act removals are relevant both to this Court's inquiry as to whom (if anyone) to refer for willful violation of the Court's order and to a determination as to whether Mr. Ensign and/or others should be subject to criminal contempt proceedings for misbehavior in or near the court's presence "obstruct[ing] the administration of justice." 18 U.S.C. § 401(1).

5

1. When did Mr. Ensign, Mr. Reuveni, and others at the Department of Justice learn that the Alien Enemies Act would be invoked and used to carry out removals?

2. When did each plane take off from the United States; leave U.S. airspace; land in Honduras; take off from Honduras; land in El Salvador; and deplane Plaintiffs in El Salvador?

**March 14 Meeting:** Mr. Reuveni's whistleblower disclosure describes a meeting on Friday, March 14, 2025, that included DOJ senior leadership, including Mr. Bove, and OIL attorneys, including Mr. Ensign and others. Reuveni Disclosure at 7, ECF 158-1.[1] The disclosure notes that Mr. Bove stated that "one or more planes containing individuals subject to the AEA would be taking off over the weekend – meaning Saturday, March 15 and Sunday, March 16" and "stated that DOJ would need to consider telling the courts 'fuck you' and ignore any such court order" enjoining removals. *Id.* at 7.

3. Who were the attendees of this meeting?

4. What precisely was said at that meeting about the timing of AEA removal flights over the weekend of March 14-16?

5. Did DOJ attorneys who attended the meeting leave with an understanding that DOJ senior leadership was directing or advising them to mislead the courts and/or defy court orders regarding removals under the Alien Enemies Act?

**Morning of March 15:** On the morning of Saturday, March 15, Plaintiffs' counsel, government counsel, and the Court had correspondence regarding the timing for a hearing on the classwide TRO. At 10:18 AM, government counsel emailed Plaintiffs' counsel and the Court requesting argument on Monday, March 17 and "reasonable time" to submit a brief prior to argument. Exh. A. Government counsel's email stated: "A broader injunction before the government has had an opportunity to file a brief and ascertain facts on the ground would be in our view premature and

---

[1] https://www.judiciary.senate.gov/imo/media/doc/06-24-2025_-_Protected_Whistleblower_Disclosure_of_Erez_Reuveni_Redacted.pdf.

inappropriate on this limited, speculative record." *Id.* At 10:47 AM, government counsel sent an email to Plaintiffs' counsel and the Court opposing the Court's proposal of a hearing at 5 PM on March 15. Government counsel stated that "such a hearing would be premature and potentially prejudicial to our defense." *Id.*

6. Who within the government directed, consulted, and/or advised on the decisions to request argument on Monday, March 17 and to oppose the proposed hearing at 5 PM on Saturday, March 15?

7. Why didn't the government inform the Court that a hearing on Monday would be too late to prevent scheduled removals over the weekend?

**March 15 Hearing and After:** On Saturday, March 15 at 5 PM, this Court held its TRO hearing notwithstanding the government's attempts to delay such a hearing until Monday. At the hearing, the Court inquired into the status of AEA removal flights. The government failed to provide the Court with the requested information either during or after the hearing, despite the fact that such flights took off during the hearing and government counsel received information about the flights before the hearing ended. The government also failed to clarify the injunction with the Court after the conclusion of the hearing, if government attorneys and/or officials did in fact disagree with Mr. Reuveni's understanding that the Court's order prohibited transfer of Plaintiffs to Salvadoran physical custody.

8. In an email disclosed by Mr. Reuveni and sent on March 15 at 6:50 PM, an individual with an @ice.dhs.gov email address sent an email stating: "Two flights departed at about 5:15 and 5:45. They are still in the air." ECF 177-8 at 17. The hearing adjourned at 6:53 PM. Who was the sender and who were all the recipients of this email? Why did DOJ attorneys fail to communicate this information to the Court, either before or immediately after the end of the hearing?

9. At the March 15 hearing, this Court asked Mr. Ensign whether "imminent deportations and removals under this proclamation" were planned, "in the next 24 or 48 hours." Mar. 15 Hearing Tr. at 11:12-14, ECF 20. Mr. Ensign responded, "Your Honor, I don't know the answer to that question." *Id.* at 11:15-16. Did Mr. Ensign appear at the hearing with no information about the specific planned AEA removal flights? Did Mr. Ensign seek

information about the flights prior to the hearing? If so, from whom, and what information did they provide him?

10. This Court recessed to provide Mr. Ensign with time to ascertain whether "deportation of people under the proclamation pursuant to the AEA [is] in motion now and will it be for the next 48 hours, because that would require a more immediate decision." Mar. 15 Hearing Tr. at 13:19-25. Following the recess, Mr. Ensign stated that he "talked to the clients," but Mr. Ensign did not provide the Court with any relevant information. *Id.* at 15:9, 16:12-14 (The Court: "So you have no details for us in camera?" Mr. Ensign: "Not at this time, Your Honor. . . . I'm certainly trying to get that information, but that is not something, the details, that I know."). With whom did Mr. Ensign speak? What factual information did they relay? Why did Mr. Ensign fail to provide the Court with the requested information given that flights had "departed at about 5:15 and 5:45," according to a subsequent email from an ICE official?

11. Mr. Ensign's declaration states, "[a]t 7:26pm, I received an email from this Court's ECF system that included the Court's written minute order. I forwarded that email to DHS senior staff and the Office of the Legal Advisor at the Department of State." ECF 201-1 (Ensign Decl.) ¶ 4. Mr. Reuveni's whistleblower disclosure states that Mr. Ensign's emails to James Percival, Senior Counselor to the Secretary of Homeland Security, and Joseph Mazzara, Acting General Counsel for the Department of Homeland Security, at 7:31 PM and to Department of State counsel two minutes later "informed the recipients of both the oral and written injunctions, informed the agency counsel that their clients were required to not remove anyone within the class definition, and reflected that Ensign understood the judge to be requiring that DHS not deplane any planes that had departed U.S. airspace." Reuveni Disclosure at 12-13. What specific information did Mr. Ensign provide to Mr. Mazzara and others in these emails? Did he provide verbatim notes of what this Court said at the hearing given the absence of a transcript at the time?

12. Why did the government fail to seek clarification of the injunction from the Court given that at minimum Mr. Reuveni, who listened to the hearing as counsel on the case, was emphatic that the Court's order did not permit the transfer of Plaintiffs to the physical custody of El Salvador, a view apparently shared by Mr. Ensign, who argued the case?

13. Mr. Reuveni's whistleblower disclosure states that Mr. Ensign informed Mr. Reuveni "[s]ometime around midnight" that "DOJ would be filing a notice with the court, signed by Bove, explaining its interpretation of the court order." Reuveni Disclosure at 13. Mr. Reuveni's disclosure further states that roughly twenty minutes later, Mr. Ensign informed Mr. Reuveni that "Bove would no longer be filing either a notice of appearance or a notice to the court explaining the government's interpretation of the court's orders." *Id.* Why did the government fail to provide this information to the Court at that time, instead of waiting until 3:46 PM on Sunday, March 16. *See* ECF 19. Who was involved in the decision not to file the notice explaining the government's interpretation of the order?

14. Given the lack of a transcript of the hearing, did DOJ attorneys provide verbatim notes to Mr. Blanche, Mr. Bove, and Mr. Mazzara? Did Mr. Blanche, Mr. Bove, and/or Mr. Mazzara listen live to the March 15 TRO hearing?

**Mr. Ensign's Actions:** Mr. Ensign is the Deputy Assistant Attorney General for the Office of Immigration Litigation and also argued for the government at the March 15 TRO hearing. Mr. Ensign's understanding of the order and the information that he conveyed to DHS and DOJ officials is relevant both to this Court's determination of who (if anyone) to refer for criminal contempt proceedings for willful violation of this Court's order and to a determination as to whether Mr. Ensign and/or others should be sanctioned for misbehavior in or near the court's presence "obstruct[ing] the administration of justice." 18 U.S.C. § 401(1).

15. Did Mr. Ensign participate in any planning prior to the March 14 meeting for AEA removal flights? If so, did such planning include efforts to evade judicial review of AEA removals?

16. What was Mr. Ensign's contemporaneous understanding of the order?

17. Was Mr. Ensign aware of Mr. Reuveni's interpretation of the order?

18. What interpretation of the order did Mr. Ensign convey to DHS officials (including Mr. Mazzara), Department of State officials, and senior DOJ leadership? Did Mr. Ensign convey that the order did not permit the transfer of Plaintiffs to the physical custody of El Salvador? If so, what was their reaction? If not, why not?

19. With whom did Mr. Ensign speak regarding the order?

20. When did Mr. Ensign learn of the flights on March 15 and who informed him?

**Secretary Noem's Decision:**

21. Did Secretary Noem receive advice, consultation, guidance, and/or direction from any individual besides Mr. Blanche, Mr. Bove, and Mr. Mazzara in making the decision to deplane?

22. Did Secretary Noem receive advice, consultation, guidance, and/or direction from any individual besides Mr. Blanche, Mr. Bove, and Mr. Mazzara in making the decision to fly the planes to El Salvador after they landed in Honduras, rather than returning to the United States?

23. What did Mr. Blanche, Mr. Bove, Mr. Mazzara, and any other individual who provided advice, consultation, guidance, and/or direction convey to Secretary Noem as to the legal requirements of the injunction? Did they inform Secretary Noem that deplaning was legally permissible? Did they inform her that some DOJ attorneys assigned to the case believed it would squarely violate the Court's order to transfer custody.

24. At what times did each person involved in the decision to deplane Plaintiffs in El Salvador communicate with Secretary Noem, and with each other?

25. At what time did Secretary Noem communicate a decision to deplane Plaintiffs?

26. Mr. Reuveni's whistleblower disclosure states that on March 15 at 10:13 PM, Mr. Reuveni "emailed DHS to ask about whether guidance had been disseminated with direction for DHS to turn any planes around if not yet landed or to not deplane the people on board if already landed," and that "[s]hortly thereafter, DHS responded via email that they were holding issuance of guidance pending a decision from the Attorney General." Reuveni Disclosure at 13. Why did DHS decide to withhold guidance? Was the Attorney General in fact involved in the decision-making process?

These questions and many others are relevant to determining whether government officials misled or defied the Court prior to, during, and after the March 15 hearing. And they are plainly not answered by the affidavits submitted to the Court. In addition to live testimony on these and other questions, the Court may also order the filing of additional affidavits as it deems necessary.

**B.    The Court May Inquire Into Defendants' Willfulness and State of Mind.**

Defendants acknowledge that willfulness is an element of criminal contempt, but argue the Court cannot seek any information that would shed additional light on that element. Mot. 3. That would represent an extraordinary limit on the Court's ability to investigate misconduct by the parties and attorneys before it, and Defendants cite no law that would support such a limitation. *See Backertop Licensing LLC v. Canary Connect, Inc.*, 107 F.4th 1335, 1344 (Fed. Cir. 2024) ("[I]t was reasonable for the District Court here to require in-person testimony in furtherance of its authority to investigate attorney and party misconduct."); *Melendres v. Arpaio*, No. 2:07-cv-02513, ECF 1792 (D. Ariz. Aug. 19, 2016) (referring Maricopa County sheriff, Sheriff's Office employees, and Sheriff's Office attorney for criminal contempt proceedings following 21-day evidentiary

hearing); *Melendres*, No. 2:07-cv-02513, 2016 WL 3996453 (D. Ariz. July 26, 2016) (describing evidentiary hearing). Defendants suggest that because they have now identified (at least some of) the individuals involved in the decision to violate the Court's orders, and because the Court previously made a (now vacated) *preliminary* finding of probable cause, its factual inquiry must be at an end. Mot. 3. But willfulness is an individualized determination that turns on a person's state of mind, and the Court must assure itself that there is probable cause for each of the individuals it ultimately decides to refer for criminal contempt. *See United States v. Young*, 107 F.3d 903, 909-10 (D.C. Cir. 1997) (to establish willfulness, the contemnor must have "acted with deliberate or reckless disregard of her obligation under the [court] order").

Defendants' cursory declarations show precisely why the Court is entitled to seek additional information relevant to willfulness, including testimonial evidence, before making its probable cause determination. Secretary Noem has asserted that she consulted with counsel prior to making the decision to violate the Court's order. ECF 198-1. Mr. Blanche, Mr. Bove, and Mr. Mazzara have asserted that they provided "legal advice" to Defendant Noem "regarding the decision whether to continue the transfer of custody of [Plaintiffs]." ECF 198-3 ¶ 1 (Blanche Decl.); ECF 198-2 ¶ 1 (Mazzara Decl.); ECF 199 ¶ 5 (Bove Decl.). This information plainly raises questions as to whether Secretary Noem relied in good faith on legal advice, or instead chose to disregard legal advice, and whether Mr. Blanche, Mr. Bove, and Mr. Mazzara in fact provided good-faith legal advice given the contrary legal opinions of senior attorneys assigned to the case, such as Mr. Reuveni.

And Mr. Ensign has asserted that he "informed DOJ senior staff" what this Court had stated on the record at the hearing, but has not addressed whether he, his superiors, or his clients willfully misled or withheld material information from the Court as it formulated its orders, which would

also shed light on the willfulness of those involved in the decision-making process. ECF 201-1 ¶ 3 (Ensign Decl.). Mr. Reuveni's information about the March 14 meeting with Mr. Bove and other DOJ attorneys indicates that senior DOJ leadership may have in fact *willfully* violated this Court's order, but requires further fact-finding for a probable-cause determination. Reuveni Disclosure at 7. Before determining whether probable cause exists, the Court may obtain both direct and circumstantial evidence that sheds light on the state of mind of each of the individuals involved in violating its orders. That is a prerequisite to any criminal contempt referral, and well within the Court's authority.

### C.    The Court's Inquiry May Address Other Possible Sanctions.

In addition to these unanswered questions and other potential contemnors, the Court's investigation should continue in light of the other possible sanctions that might be imposed based on its findings. The Court has broad inherent authority to impose a range of sanctions for misconduct by attorneys and litigants who mislead the Court and defy its orders. *See Chambers*, 501 U.S. at 44–45; *Shepherd v. American Broadcasting Cos.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995). In this Circuit, most sanctions imposed under the court's inherent power are generally available only in cases in which the offender's conduct constituted, or was tantamount to, "bad faith." *Parsi*, 778 F.3d at 130-31; *cf. Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980) (to award attorneys' fees under inherent sanction power, trial court first had to "make a specific finding" of "bad faith"). The concept of bad faith encompasses "a broad range of willful improper conduct," *Fink v. Gomez*, 239 F.3d 989, 991-92, 994 (9th Cir. 2001), but the touchstone is an "intent" to stymie the business of the court, *United States v. Wallace*, 964 F.2d 1214, 1219 (D.C. Cir. 1992); *see also United States v. Pope*, No. 21-CV-128, 2025 WL 2105571, at *2 (D.D.C. July 28, 2025) (summarizing these requirements). Assessing the propriety of such additional sanctions would

require the Court to determine whether Secretary Noem intentionally violated the Court's orders, and whether other officials or attorneys intentionally misled or obstructed the Court. These additional sanctions provide an independent reason why the Court's investigation of those facts must continue.[2]

## II.    The Government's Privilege Arguments Are Wrong.

The attorney-client privilege is "strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Lindsey*, 158 F.3d 1263, 1272 (D.C. Cir. 1998), *cert. denied*, 525 U.S. 996 (internal quotation marks and citation omitted). As a threshold matter, the privilege does not excuse a witness from appearing for live testimony; the "correct process" is to "take the stand" and assert privilege and its basis as to each question. *See In re LeFande*, 919 F.3d 554, 563 (D.C. Cir. 2019) (lawyer not excused from testifying on ground that he might reveal client confidences). Defendants are thus wrong as a threshold matter in asserting that the scheduled hearing should not proceed based on privilege concerns. *See* Mot. 8-10.

Defendants' assertion that Mr. Reuveni and Mr. Ensign's testimony would "unquestionably implicate[]" privilege is also incorrect. *Id. First*, Defendants have waived privilege, including by putting at issue their understanding of the Court's order. *Second*, the crime-fraud and self-defense exceptions to privilege apply. There is therefore no need for a protective

---

[2] Defendants argue that civil contempt is "unavailable here because the Court's TROs were vacated," Mot. 3 n.1, but they ignore that civil compensatory contempt may be sought where an order has lapsed but was not beyond the Court's authority. *See, e.g.*, *Fidelity Partners, Inc. v. First Trust Co. of N.Y.*, 142 F.3d 560, 565 (2d Cir. 1998) (collecting cases); *Sisney v. Kaemingk*, 15 F.4th 1181, 1201 (8th Cir. 2021). Thus, in addition to the Court's ability to sanction abuses of the judicial process through criminal contempt or its inherent authority, compensatory civil contempt to remedy the injuries inflicted on Plaintiffs by the government's violation of this Court's order remains an option, though the Court need not address that issue here.

order. *Third*, government lawyers are required to disclose alleged crimes within the executive branch, and privilege cannot be used to shield that disclosure.

### A.    Defendants Have Waived Attorney-Client Privilege.

Defendants say they are entitled to wait until a contempt trial before deciding whether to waive privilege through a formal advice-of-counsel defense. *See* Mot. 6. But Defendants have already waived privilege. Before this Court and the D.C. Circuit, Defendants placed their attorney-client communications at issue by making arguments that rested on their supposedly good-faith and reasonable interpretation of the Court's order. And when ordered to "detail" the roles of "all individuals in the decision not to halt" the planes, ECF 196 at 2, Defendants' submissions set out only that three of the individuals provided legal advice and that Secretary Noem, having received the legal advice, made her decision not to obey the Court's order. *See* Bove Decl. ¶ 5; Mazzara Decl. ¶¶ 1-2; Blanche Decl. ¶ 1; ECF 198-1 (Noem Decl.) ¶¶ 1-2. None of these actions is consistent with the confidentiality of attorney-client communications that the privilege demands. *See In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989) (privilege "must be jealously guarded by the holder of the privilege lest it be waived").

### 1.    Defendants have placed their understanding of the Court's order at issue.

A party waives privilege by "plac[ing] otherwise privileged matters in controversy." *Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 151 (D.C. Cir. 1997). Courts routinely find waiver when a party argues that it interpreted the law or another's representation in good faith; such an argument places at issue the attorney-client communications that contributed to the interpretation. *See, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (defendant's testimony that he "thought his actions were legal" waived privilege over "conversations with counsel regarding the legality of his schemes"); *United States v. Exxon Corp.*,

94 F.R.D. 246, 249 (D.D.C. 1981) (defendant's good-faith defense, based on its "subjective interpretation and understanding" of government's representations, waived privilege over attorney-client communications concerning that interpretation and understanding); *Feld v. Fireman's Fund Ins. Co.*, 292 F.R.D. 129, 140 (D.D.C. 2013) (insured who put "his knowledge and understanding of [insurer's] representations . . . squarely at issue" waived privilege). An argument that one's interpretation was "justifiable" or "reasonable" similarly waives privilege. *See Minebea Co., Ltd v. Papst*, 355 F. Supp. 2d 518, 524 (D.D.C. 2005) (licensee's argument that it justifiably relied on licensor's representations waived privilege). Alternatively, a party can waive privilege by asserting an advice-of-counsel defense to negate willfulness or other culpable intent, though this defense remains "just one example" of at-issue waiver. *See Savignac v. Jones Day*, 763 F. Supp. 3d 17, 31, 34 (D.D.C. 2025) (law firm waived privilege even though it had not asserted advice-of-counsel defense).

Defendants have waived privilege by arguing that they interpreted the Court's order in good faith and that their interpretation was reasonable. *See, e.g.*, March 17 Hearing Tr., ECF 25 at 14:24-15:1 ("[W]e did comply with the Court's written order and did rely in good faith on it, and I can walk you through the reasons why."); *id.* at 16:17-18 ("[T]he defendants on good faith understood the written order to be the order of the Court."); *id.* at 22:12-15 ("[W]hat we are talking about is whether there was good faith compliance with the injunction and whether the United States believed it reasonably, which they did in this scenario."); Resp. to Order to Show Cause, ECF 58 at 7 ("When the written order did not include that command, the Government could reasonably have understood that as reflecting the Court's more considered view in a quickly evolving situation."); Emergency Mot. 14-15, *J.G.G. v. Trump*, No. 25-5124 (D.C. Cir. Apr. 18, 2025) (arguing that contempt should be "foreclosed" based on "Defendants' *understanding* that removal

meant departure from the United States") (emphasis added); Appellants' Resp. to Mot. to Dismiss 17, *J.G.G. v. Trump*, No. 25-5124 (D.C. Cir. Apr. 25, 2025) (arguing no contempt because "the government in good faith interpreted the limited written order to mean territorial removal"). Each of these assertions is inconsistent with maintenance of the privilege and permits examination of attorney-client communications that contributed to Defendants' state of mind concerning the Court's order.

Recently, Defendants have sought to shield themselves behind the legal advice that they received. On November 25, they argued that they "did not violate this Court's order," that their "interpretation of the Court's order [was] correct," and that this interpretation was "reasonable." Defs.' Resp. to Court Order, ECF 195 at 1. Defendants also asserted that Secretary Noem received legal advice from Mr. Blanche, Mr. Bove, and Mr. Mazzara, and—after receiving that advice— decided to transfer Plaintiffs. *Id.* at 2. This decision, Defendants contend, was "lawful" and "consistent" with Defendants' "reasonable interpretation of the Court's order." *Id.* These assertions, taken together, amount to an argument that Defendants relied on the legal advice they received, irrespective of any affirmative defenses that Defendants have formally asserted. *See Davenport v. Djourabchi*, No. 16-02445, 2020 WL 7042813, at *11 (D.D.C. Nov. 30, 2020) (privilege waivers are "not limited to reliance on advice of counsel as an affirmative defense; they also apply wherever the party resisting discovery raised as a defense that which transpired between client and counsel") (internal quotation marks and citation omitted).

### 2. Defendants have partially disclosed privileged communications.

In addition, disclosure of "part of a privileged communication" waives privilege "as to all other communications relating to the same subject matter." *In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982). Not only have Defendants opened exploration of their attorney-client communications through the *arguments* they have made; they have now disclosed some of those

16

communications' *contents*. In their November 25 filing, Defendants represented that "the actions were taken by DHS (through Secretary Noem) *after being formally advised about compliance with this Court's order*" by "DOJ leadership." Defs.' Resp. to Court Order ¶ 10 (emphasis added), *i.e.*, by Mr. Bove and Mr. Blanche, *id.* ¶ 4; *see also* ECF 177-8 at 27 (email from then-Acting Assistant Attorney General Yaakov Roth that Mr. Bove had advised DHS that "the deplaning of the flights that had departed US airspace prior [to] the court's minute order *was permissible under the law and the court's order*" (emphasis added)). Defendants' partial disclosure of advice through their November 25 filing is thus a further basis for waiver. *See, e.g.*, *Smith v. Ergo Solutions, LLC*, No. 14-382, 2017 WL 2656096, at *4 (D.D.C. June 20, 2017) (disclosure of "key conclusions" of legal advice waived privilege); *Vasquez v. Whole Food Markets, Inc.*, No. 17-cv-112, 2021 WL 11432979, at *3 (D.D.C. Nov. 29, 2021) (similar).

## B. The Crime-Fraud and Self-Defense Exceptions to Attorney-Client Privilege Apply.

Apart from waiver, Defendants' attorney-client communications are not protected by privilege under other exceptions.

### 1. The crime-fraud exception applies.

Because "privilege takes flight" where the attorney-client relationship is abused, *Clark v. United States*, 289 U.S. 1, 15 (1933), privilege does not protect communications "made in furtherance of a crime, fraud, or other misconduct." *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985). For example, attorney-client communications will not be privileged if used to perpetuate "fraud in litigation." *See id.* at 401 (exception applied to misconduct, including subordination of perjury and destruction of evidence, which "necessarily str[uck] at the very foundations of the adversary system and the judicial process"); *see also JTR Enter., LLC v. Columbian Emeralds*, 697 F. App'x 976, 988 (11th Cir. 2017) ("massive fraud of the court" was

"more than sufficient basis" for applying crime-fraud exception) (internal quotation marks omitted). Similarly, communications that "revolve[] around [the client's] intent to commit criminal contempt" will fall "outside the scope of the attorney-client privilege." *In re Chinese Manufactured Drywall Prods. Liability Litig.*, MDL No. 2047, 2014 WL 7135657, at *4 (E.D. La. Dec. 12, 2014). Privilege will also not protect communications used to further misconduct—even if not criminal or fraudulent—that is "fundamentally inconsistent with the basic premises of the adversary system." *In re Sealed Case*, 676 F.2d at 812; *see, e.g.*, *Recycling Solutions, Inc. v. District of Columbia*, 175 F.R.D. 407, 409 (D.D.C. 1997) (crime-fraud exception satisfied by actions "designed to facilitate" racial discrimination).

For the crime-fraud exception to apply, this Court need not find the misconduct established; it is enough that there is "evidence that if believed . . . would establish the elements of an ongoing or imminent crime." *In re Sealed Case*, 754 F.2d at 399; *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997) (same). Instead, all that is needed to lose the benefit of attorney-client privilege is for a communication to have been made or received with intent to further misconduct and for the misconduct to have then occurred. *See id.* at 49; *In re Sealed Case*, 223 F.3d 775, 778 (D.C. Cir. 2000) (same).

On the existing record, there is ample evidence that, if believed, would show that federal government attorneys furthered an unlawful scheme to evade judicial review including—if necessary—by disobeying court orders and misleading courts. According to Mr. Reuveni's whistleblower disclosure, on March 14—the day before Plaintiffs' transfers—the Principal Assistant Deputy Attorney General announced that DOJ would need to consider telling the courts "fuck you" if courts blocked planned removals. Reuveni Disclosure at 11; *see also* ECF 177-8 at 2 (contemporaneous text messages referencing this statement). Then, on March 15, as this Court

has explained, the government's conduct "betrayed a desire to outrun the equitable reach of the Judiciary." Probable Cause Order, ECF 81 at 41, including by "def[ying] the Court's Order deliberately and gleefully," *id.* at 9. On that evening, according to Mr. Reuveni, a government attorney also "willfully misled the court" about plans for AEA removals, falsely representing that he did not know whether deportations or removals were planned for the next twenty-four to forty-eight hours. Reuveni Disclosure at 9. And in the days that followed, Defendants opted for a strategy of "stonewalling" and "increasing obstructionism" over answering the Court's questions as to what transpired that weekend. Probable Cause Order at 10.

The crime-fraud exception therefore applies, because Defendants' conduct is of a kind that "defile[s]" the "very temple of justice." *See Chambers*, 501 U.S. at 46 (internal quotation marks and citation omitted). In *Chambers*, the Supreme Court affirmed sanctions against a party for actions similar to those of Defendants here, including "intentionally with[holding] information from the court" during a TRO hearing, *id.* at 37, and "attempt[ing] to deprive the [c]ourt of jurisdiction, fraud, misleading, and lying to the [c]ourt," *id.* at 41 (internal quotation marks and citation omitted). If anything, Defendants' conduct here is even worse: in *Chambers*, the defendant and his lawyer sought to deprive a court of jurisdiction over a mere property dispute, but here, Defendants schemed to send Plaintiffs to a foreign prison known for torture while evading judicial scrutiny. The crime-fraud exception thus applies to Defendants' disobedience of the Court's order; to withholding of information from the Court; to misleading the Court; and to their "entire course of conduct" and "sordid scheme to defeat a valid claim." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 110 (2017) (internal quotation marks omitted) (discussing the facts of *Chambers*).

### 2. Testifying attorneys may avail themselves of the self-defense exception.

In addition, attorneys who testify at the scheduled hearing may disclose otherwise privileged information to respond to charges of misconduct. "When a serious charge against an attorney arises out of his or her representation of a client, courts have allowed attorneys to disclose confidential information obtained from the client." *Rosen v. NRLB*, 735 F.2d 564, 576-77 (D.C. Cir. 1984) (lawyers accused of soliciting false testimony "clearly could have argued that the privilege was inapplicable"); *see also United States v. Rasheed*, 663 F.2d 843, 854 (9th Cir. 1981) (lawyer could be questioned about client conversations where client had failed to produce documents and lawyer "was in danger of becoming an accessory to the obstruction of justice"). This self-defense exception to privilege can apply even though an attorney has not been formally charged with wrongdoing. *See United States v. Weger*, 709 F.2d 1151, 1157 (7th Cir. 1983) (explaining that it would be "senseless" to require lawyers "to be stigmatized by an indictment prior to allowing them to invoke" the exception); *Rosen*, 735 F.2d at 576 (accusation by witnesses during administrative hearing was sufficient).

For example, to the extent that Mr. Ensign has been identified as a possible wrongdoer, he would be able to reveal client confidences to defend himself. *Cf.* Reuveni Disclosure at 9 (whistleblower disclosure stating that Mr. Ensign "willfully misled" this Court). The government is thus doubly wrong to assert that live testimony by Mr. Reuveni and Mr. Ensign would "unquestionably implicate[]" privilege. *See* Mot. 8.

### C.    The Attorney-Client Privilege Cannot Be Invoked to Prevent Government Attorneys from Disclosing Criminal Misconduct.

Further, when criminal misconduct is at issue, the attorney-client privilege does not apply to government attorneys as it does to personal attorneys, because government attorneys' client is, ultimately, the public. *In re Lindsey*, 158 F.3d at 1272 (holding that government attorneys could not rely on attorney-client privilege with respect to information related to criminal misconduct,

including by governmental officials, because of their duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *In re Grand Jury Subpoena Duces Tecum,* 112 F.3d 910, 921 (8th Cir. 1997), *cert. denied,* 521 U.S. 1105 (holding that governmental attorney-client privilege could not be invoked for information regarding criminal misconduct because "to allow any part of the federal government to use its in-house attorneys as a shield against the production of information relevant to a federal criminal investigation would represent a gross misuse of public assets"). In particular, for government attorneys, the privilege does not cover communications that "reveal information relating to possible criminal wrongdoing." *In re Lindsey*, 158 F.3d at 1276.

In invoking the privilege in an attempt to block this Court's criminal contempt inquiry, Defendants fundamentally misunderstand the role of government attorneys and their duty of loyalty. Where there is a question of criminal misconduct by the government, "the loyalties of a government lawyer . . . cannot and must not lie solely with his or her client agency." *Id*. at 1273. Here, the government attorney's duty "is not to defend clients against criminal charges and it is not to protect wrongdoers from public exposure," *id.* at 1272, but to vindicate the public interest in "honest government and in exposing wrongdoing," *id.* at 1266; *see also In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir. 1997) (similar).

Government attorneys' unique duty to disclose misconduct is also reflected in rules of professional conduct and federal statute. The D.C. Bar Rules of Professional Conduct provide that "[a] lawyer may use or reveal client confidences or secrets . . . when permitted by these Rules or required by law or court order" and, "*if a government lawyer*, when permitted or authorized by law." D.C. Bar Rule 1.6(e) (emphasis added). The Whistleblower Protection Act expresses a clear governmental policy of encouraging whistleblower disclosures, protecting such disclosures to audiences that include the general public. Pub. L. No. 101–12, 103 Stat. 16. 28 U.S.C. § 535(b)

provides that government attorneys *must* "expeditiously report[]" information "relating to violations of Federal criminal law involving Government officers or employees." *See In re Lindsey*, 158 F.3d at 1274 ("Section 535(b) suggests that all government employees, including lawyers, are duty-bound not to withhold evidence of federal crimes"). Federal statute and the rules of professional conduct thus provide a further basis for a government attorney's inability to assert attorney-client privilege regarding "information pertinent to possible criminal violations." *Id.*

This Circuit has recognized that to permit a federal employee to shield evidence of criminal wrongdoing by invoking the attorney client privilege would be "a gross misuse of public assets." *Id.* (quoting *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d at 921). Rather, when an "executive branch attorney is called . . . to give evidence about alleged crimes within the executive branch, reason and experience, duty, and tradition dictate that the attorney shall provide that evidence." *In re Lindsey*, 158 F.3d at 1272. Here, not only may the government attorney disclose information relating to criminal misconduct—they have an obligation to do so based on their duty of loyalty to the public. And they certainly may not hide behind the privilege to shield criminal misconduct from being disclosed to the public.

*   *   *

Finally, Defendants argue that Plaintiffs cannot participate in aiding the Court's investigation of what happened to their clients on March 15. *See* Mot. 10. But they cite only cases about parties participating in the *prosecution* of contempt. Plaintiffs are not acting as prosecutors because this is simply a preliminary investigation into the basic facts of what occurred. Moreover, as explained, Plaintiffs have additional interests in this investigation because of the availability of

sanctions under the Court's inherent powers. *See supra*.[3] At an absolute minimum, it is clear that Plaintiffs may participate in this pre-referral inquiry in some capacity to aid the Court.

## CONCLUSION

The Court should deny the motion to reconsider.

---

[3] Defendants warn that Mr. Ensign's testimony may give Plaintiffs an opportunity to "probe" other cases, Mot. 10, but they offer no support for this speculative concern and, in any event, the normal rules of relevance will ensure that the testimony focuses on the matter at issue.

Dated: December 11, 2025

Noelle Smith
Oscar Sarabia Roman (D.C. Bar No. 90011262)
My Khanh Ngo (D.D.C. Bar No. CA00219)
Cody Wofsy
Spencer Amdur
Evelyn Danforth-Scott
Michael K.T. Tan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
cwofsy@aclu.org
samdur@aclu.org
edanforth-scott@aclu.org
m.tan@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
Aditi Shah (D.C. Bar No. 90033136)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org
ashah@acludc.org

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt
Daniel Galindo
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi (D.D.C. Bar No. MI0071)
Sean M. Lau (D.D.C. Bar No. NY0680)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org
slau@aclu.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500
Khuddleston@aclu.org

*Barred in Texas and Arizona only;
supervised by a member of the D.C. Bar*

*Counsel for Petitioners-Plaintiffs*