Form 14.4

**Petition to Nobile officium**



*cause reference number*_____

UNTO THE RIGHT HONOURABLE THE LORDS OF COUNCIL AND SESSION

The Petition of Borealis S. Hedling
8640 Ridge RD Ellicott City, Maryland 21043 (mailing address currently homeless)
Brought Pro Se under Rule 14.3 (d) & Article 13 of the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment


**HUMBLY SHEWETH:-**

1. The Petitioner is an American Human Rights Defender  sent a blast email to the entire Scottish Parliament 3/12/24 after the UK and Canada violated international instruments seeking assistance from the global community. The Advocate General stated they could not help the Petitioner in a form letter response ignoring torture of a human rights defender and crimes against humanity. Against Jus Cogens and International law. The Petitioner is seeking "competent authorities" to "promptly" and "impartially" examine evidence per Article 13 of the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. As the parliament and executive branches are incompetent and commiting torture by shunning a victim of torture. You can't charge a fee and even as noted below it is a procedural barrier to justice. Given the Petitioner was deprived of liberty by the Connecticut Department of Corrections withholding a filing fee for their Writ of Habeas that is also torture. The Petitioner wants Scotland to reaffirm the value of human rights and not to misgender the Petitioner. Or support the below.

> **17b-112a states:**
> For purposes of this section, allegations of domestic violence by a victim may be sufficient to establish domestic violence where the Department of Social Services has no independent, reasonable basis to find the applicant or recipient not credible. Upon alleging domestic violence an applicant or recipient may be required to provide a sworn statement or to submit to the department any evidence of such violence available to the applicant or recipient. Evidence of domestic violence may include, but is not limited to: (1) Police, government agency or court records; (2) documentation from a shelter worker, legal, medical, clerical or other professional from whom the applicant or recipient has sought assistance in dealing with domestic violence; or (3) a statement from an individual with knowledge of the circumstances which provide the basis for the claim of domestic violence. We may want to think about if/how we incorporate #3 (statement of individual with knowledge). If we do not incorporate, we need to be prepared to answer why.
>
> As for not needing a police report or restraining order, I understand the commissioner's concern about the risk of pursuing those documents, but these benefits are a LOT of money, we have to have some way of substantiating the client's claims. If they already have those documents then great, but if they don't I feel like the application would have to come from a DV shelter. Yes, the plan is to set up an application process with DV shelters. We discussed this in our previous meeting and it sounded like the shelters were on board with doing the applications for clients they are already working with. But if the purpose of the benefit is to help the person escape their DV situation, they also need to take some steps on their end to make that happen and provide us with some sort of proof that they are taking some form of action (which would be a police report OR restraining order OR seeking help from a shelter). It would be great if we could collect information on other DV supports being received by the client, even if just for reporting purposes.

2. On February 27th 2023 the Petitioner informed Astread Ferron-Poole chief of staff for the Connecticut Department of Social Services (DSS) they were not using all allowable proof of allegations for the Domestic Violence Cash Benefit Program (DVCBP) P.A. 21-78 Section 14 (e). Per the above a snippets from an email from 15/12/2022 obtained via the Connecticut Freedom of Information Act. The language of Subsection B Conn Gen § 17b-112a is "plain" and "unambiguous" not subject to statutory construction by DSS under Conn Gen § 1-2z. The issue could have been fixed with a single email. Clearly money was more important than lives to DSS.

4. By 1/5/23 the Petitioner had begun using the Freedom of Information Act and concurrently asked their State Senators office to question why the Connecticut Department of Social Services was applying Subsection B Conn Gen § 17b-112a incorrectly. The below is a response from 3/5/23.

**From:** Seifel, David <David.Seifel@ct.gov>
**Sent:** Wednesday, May 3, 2023 8:19 AM
**To:** Gilligan, Matt <Matt.Gilligan@cga.ct.gov>
**Subject:** RE: Sen Rahman Constituent inquiry

Good Morning Matt,

Per page three of the attached DV Cash Program Procedures Guide, verification of current domestic violence must be in the form of: a police report, protective order, or restraining order that was signed and executed within the ninety days immediately preceding the request for assistance, or documentation from a domestic violence agency that confirms the applicant experienced a domestic violence event, within the ninety days immediately preceding the request for assistance. The guidance is consistent with the statute.

CGS 17b-112a (b) states:

(b) For purposes of this section, allegations of domestic violence by a victim may be sufficient to establish domestic violence where the Department of Social Services has no independent, reasonable basis to find the applicant or recipient not credible. **Upon alleging domestic violence an applicant or recipient may be required to provide a sworn statement or to submit to the department any evidence of such violence available to the applicant or recipient. Evidence of domestic violence may include, but is not limited to: (1) Police, government agency or court records; (2) documentation from a shelter worker, legal, medical, clerical or other professional from whom the applicant or recipient has sought assistance in dealing with domestic violence; or (3) a statement from an individual with knowledge of the circumstances which provide the basis for the claim of domestic violence.**

To develop a consistent process that is administered fairly to those requesting assistance and provides needed guidance to staff screening for eligibility, the verification rules shared in the guide were established. The process includes referral to an organization that specializes in providing help to those experiencing domestic violence so victims can receive other help in addition to the cash benefit provided by the DV Cash program.

I hope this information is helpful.
Best
Dave

5. The 2nd response 29/6/23 regarding a Law P.A. 22-82 that made victims of DV a protected class 1/10/22 was even more absurd. The characterization victims of domestic violence let alone DSS Social workers who run the Protective Services for the Elderly Program can't identify mental abuse and by default victims are not credible is cruel.

> **From:** Gilligan, Matt <Matt.Gilligan@cga.ct.gov>
> **Sent:** Thursday, June 29, 2023 1:40:54 PM
> **To:** Jeremy Lawson <j_emt@hotmail.com>
> **Subject:** RE: Sen Rahman Constituent inquiry
>
> Hi Jeremy,
>
> I have pasted below the response from DSS to your policy questions.
>
> " Public Act 22-82, Section 21 added victim of domestic violence to other protected classes that **shall not be considered as limiting factors in state administered programs involving the distribution of funds to qualify applicants for benefits authorized by law.** The constituent inquiry requests clarification as to whether 'narrowing the allowable verifications' to establish an applicant as a victim of domestic violence translates into discrimination against victims of domestic violence as a protected class. The response - not at all. The process to determine eligibility for the Domestic Violence Cash Program, including establishing an applicant as a victim of domestic violence, is one that incorporates referral to professionals that are experts in identifying domestic violence, especially when it pertains to situations where abuse is mental rather than physical. DSS staff who are not domestic violence professionals can find it challenging to determine the difference between what constitutes mental abuse versus a disagreement of ideas or what rises to the level of coercion. Medical reports are not often written in plain language and are not easy for a layman to understand. The intent of the Department is to minimize the need to provide verifications and make the eligibility process as simple as possible while ensuring program requirements are met. By no means is an applicant prevented from submitting a medical report for consideration as they establish themselves as a victim of domestic violence. If a police report or restraining/protective order is not provided, the domestic violence professional will need to be consulted to assist in the establishment of the applicant as a victim of domestic violence. The domestic violence professional will review the medical report if it is needed. Chances are the medical report will not be needed. Connecting with a professional who can provide support above and beyond what the Domestic Violence Cash Program benefit can provide should be recognized for the helpful and effective process that it is. It is hard to think of a reason that an applicant would prefer to connect with a DSS staff who does not specialize in the area of need instead of a specialist who can provide the most help. I don't believe domestic violence professionals have a reputation for being unpleasant, unhelpful, or difficult to work with.
>
> TFA Diversion Assistance is a program for households with children that does require verification of income, assets, and all other eligibility criteria that applies to the TFA program. A household may be eligible for the program, but it often requires a lengthier application process due to the verifications needed. The Department did not find it beneficial to model the Domestic Violence Cash Assistance Program after the TFA Diversion Program as it would add time and difficulty to the application process."
>
> Matthew Gilligan
> Legislative Aide to State Senator MD Rahman 4th District
> Matt.Gilligan@cga.ct.gov |860-240-5302

6. By 23/10/23 the Petitioner had resigned citing the laws DSS was breaking. Made a Whistleblower complaint with the Connecticut Auditors of Public Accounts 10/5/24. Done a 1 hour and 14 minute "fair hearing" with dozens of exhibits. With a denied reconsideration 10/8/23. Then filed a 3 times Amended Conn Gen § 4-176 Petition which allows anyone to request a declaratory ruling by state agencies on any regulation or procedure. This was a way of avoiding revealing the Petitioner applied for the DVCBP. This was the initial reply.

**STATE OF CONNECTICUT**
*DEPARTMENT OF SOCIAL SERVICES*

Andrea Barton Reeves, J.D.
Commissioner



Ned Lamont
Governor

Susan Bysiewicz
Lt. Governor

**OFFICE OF THE COMMISSIONER**

Dear Mx. Lawson,

I am reaching out in response to your email dated September 25, 2023. I appreciate you sharing your experience and feedback regarding the Domestic Violence Cash Program, your concerns around the application process, and the Department's recognition of domestic violence survivors as a protected class. I also acknowledge receipt of your Petition for Declaratory Ruling on September 18th and the Petition for Declaratory Ruling Amendment on September 26, 2023. I would also like to express my sincere sympathy for the difficult personal circumstances you are experiencing as shared. While I am unfamiliar with the details, I do hope for a successful resolution to the challenges you face.

The concerns you raised about the Domestic Violence Cash Program ("DV Cash Program") guidelines and procedures include your view that: the process unnecessarily limits the ways in which domestic violence is verified for receipt of the DV Cash Program benefit; verifications submitted with an application are not being retained by the Department; and detailed information about the DV Cash Program is not on the DSS website. The DV Cash Program application and eligibility determination procedure includes an evaluation that the applicant is currently experiencing and/or threatened by domestic violence. Aside from police reports or restraining orders, the process to determine eligibility for the DV Cash Program is one that incorporates referral to professionals at the Connecticut Coalition Against Domestic Violence ("CCADV"), who are experts in identifying domestic violence and connects those experiencing domestic violence with additional resources beyond what the DV Cash Program provides. DSS does not limit CCADV as to how domestic violence is verified. In partnering with CCADV, it is the Department's intent to provide fairness and consistency in the determinations made, minimize the need to provide verifications, and make the eligibility process as simple as possible while ensuring program requirements are met.

While the DSS website currently includes a general description of some of the domestic violence services provided, along with the CCADV's phone number, updates to the website to include a detailed description of the DV Cash Program are underway.

Verifications submitted with a DV Cash Program application were not retained to promote confidentiality and reduce exposure of sensitive information that may pose risks to applicants if disclosed but, along with improvements to the DSS website, this also will be further reviewed.

I requested a review of your application and hearing based on your report that CCADV's opinion and other items were ignored during the eligibility and hearings process. It is my understanding that you submitted a DV Cash Program application on or about July 24, 2023, and with it included verification from CCADV that your situation meets the domestic violence criteria needed to grant assistance. I also understand that your DV Cash Benefit was granted on or about July 27, 2023 and ultimately received by you.

Phone: (860) 424-5008 • Fax: (860) 424-5057
TTY: 1-800-842-4524
E-mail: Commis.DSS@ct.gov
Hartford, Connecticut 06105-3730
www.ct.gov/dss

*An Equal Opportunity/Affirmative Action Employer*

Page 2
Mx. Lawson

As for your hearing request contesting DSS' eligibility determination regarding a previously-submitted DV Cash Program application, it is my understanding that the Fair Hearings Officer ordered DSS to reopen your application which, ultimately, lead to your receipt of the benefit as noted above. The DV Cash Program benefit is intended to be a one-time benefit.

Lastly, Public Act 22-82 passed with an effective date of October 1, 2022, and DSS fully-supports and recognizes victims of domestic violence as a protected class – including the receipt of statewide training offered by the Commission on Human Rights and Opportunities.

Please note that the Department will separately respond to your Petition for Declaratory Ruling, as amended. I thank you for reaching out and hope the information provided herein helps address some of your concerns.

Best regards,

Andrea Barton Reeves, JD
Commissioner

7. Obviously this is gaslighting a tactic the Petitioner was exposed to intensely.



Gaslighting is an insidious form of emotional abuse in which the abuser makes the victim question their own memory, perception, and judgment.

NO MORE    #DVAM #JoinTheChorus

8. DSS chose not to rule on the petition and when they updated their website in 2023/12 included the illegal criteria for applying for benefits. Even as in 6/7/23 the Petitioner pointed out the Connecticut Coalition Against Domestic Violence (CCADV) did not agree with DSS. Would sadly treat the Coalition like a DV Victim even referring to them as the State's "partner".

**RE: Sen Rahman Constituent inquiry**

**From:** Liza Andrews landrews@ctcadv.org
**To:** Jeremy Lawson j_emt@hotmail.com
**Cc:** Tonya Johnson tjohnson@ctcadv.org
**Sent:** Thursday, July 6, 2023, 3:33 p.m.

Hi Jeremy,

Thank you for sharing this additional information. All of your frustrations are valid and we appreciate you sharing your story with us. It points to some flaws within the state's response to domestic violence that CCADV can use to strengthen our advocacy across the system, including state law, state agency policies & procedures, and within the domestic violence service system itself. While I'm sure you understand that CCADV does not have the ability to create or approve state agency policies, procedures, or regulations, we always want programs to be as accessible as possible. And while we recognize that fiscal restraints do not always allow for that, we will continue our advocacy to ensure all survivors can access needed benefits and services. Your story and experience will help inform that work, so again, thank you. I do hope you have a positive resolution to your fair hearing.

I did discuss your case with our COO, Tonya Johnson (cc'd here), and we do have some limited funding available that we may be able to provide you to assist with something like relocation if that would be helpful. Please let us know and Tonya will be happy to discuss details.

Thank you,
Liza



Liza Andrews, MSW
Pronouns: She/Her
Director of Public Policy & Communications
(direct) 959.202.5003 | (cell) 860.919.9707
landrews@ctcadv.org | www.ctcadv.org
655 Winding Brook Drive | Suite 4050
Glastonbury, CT 06033

9. Eventually the Petitioner filed a Immediate EX Parte Temporary Injunction without hearing or notice concurrent to a manipulated process by the Connecticut Commission on Human Rights and Human Rights. Which any organization with the word "Justice" and "Human Rights" that looks at the first screenshot and just does not speak out is ethically compromised by default.

Jeremy M. Lawson
V.
The Connecticut Department of Social Services
https://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=HHDCV245082046S

10. Judge Susan Cobb illegally denied it 23/2/24. The Petitioner withdrew it 27/2/24 the 1 year anniversary after reporting the illegal activity. Gave the original copy of the injunction to their state representative Geoff Luxenberg to pursue impeachment. He still has it. Eventually after reaching out to the Attorney General and Governor. Just to be stonewalled he Petitioner started started using creative civil protest. As they were around 105 lbs and homebound with a house with a mortgage in default. They pursued simple acts like sending the Governor Domestic violence awareness materials 11/3/24 with gift receipts.



11. The Petitioner knowing DSS had a training contract with the University of Connecticut used FOIA to see if there were any illegal traing materials drafted to perpetuate this illegal activity. Of course there was… With a giant checkmark to remind staff to absolutely not to trust or grant benefits to victims of domestic violence.



12. The Petitioner reached a point of enough continuous harm to file a 2nd more damning injunction unfortunately without redactions that now are irrelevant as the Petitioner has no privacy left.

Jeremy M Lawson
V.
The Connecticut Department of Social Services et al.
https://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=HHDCV245082600S

13. The University of Connecticut showed in another FOIA request DSS lied to their General Counsel 6/3/24 with proof directly attached to the email to continue illegally operating the DVCBP. By 8/4/24 the Petitioner with dozens of state employees and the US Department of Justice Office of Justice Programs in a blast email identified they were going to sue under 42 U.S.C. § 1983, 1985 (2+3), 1986. Concurrently as the Petitioner was attempting to redact information and add conditionally under seal Exhibits to the 2nd injunction. The Connecticut State Police were about to be used by the Attorney General to enforce disappear The Petitioner 11/4/24. The following is an excerpt from an application to set aside an Interim order in a case in the King's Bench Court Claim # KB-2024-004260 as the Civil Justice Council was ignoring very problematic data since 26/10/24-present. Emergency Injunctive Relief should not be stalled by fee waivers.

Jeremy M Lawson
V.
THE CIVIL JUSTICE COUNCIL

"The Claimant decided to go make a report to the Connecticut State Police on individuals such as the Governor and Attorney General under Conn Gen § 53-20 "cruelty to persons" "unlawful punishment". Moments before the Claimant was notified of the warrant for their arrest on a $75,000 unplayable bond. The state knew based on the mortgage default notice in the injunction and application for domestic violence benefits to the Office of Victim Compensation the Claimant was destitute. The Claimant sent numerous emails to the Chief Information Officer of the Connecticut State Police showing their innocence which was already apparent by the injunction supplemental EX 2. The Claimant walked into Troop H and voluntarily surrendered themselves with 4 stacks of conditionally under seal evidence the police on body camera refuse to review just like the injunction. While the Claimant naively believes only the Department of Social Services is complicit in filing a false report consistently on police body camera citing the Class D Felony dozens of state employees would commit or commit conspiracy to commit over the next few months Conn Gen § 53-20 "cruelty to persons" "unlawful punishment". Since the Claimant was falsely charged with Conn Gen § 53-183a "Harassment 2" of DSS which requires "no legitimate purpose" in contacting the victim.

The Claimant never saw those 4 stacks of conditionally under seal evidence again after 9:20p 11/4/24 at Hartford County Correctional. Their one phone call was to Liza Andrews Director of Public Policy at the Connecticut Coalition Against Domestic Violence. Who was also cced on all emails to the Chief Information Officer at the CT State Police 11/4/24. At which point the Claimant's enforced disappearance starts; they spent 18 days in solitary confinement with

no toilet paper. Ask to go to the hospital 14 times since 3 Correctional officers and a nurse put them in a separate cell for days as they were on the floor going through severe potentially fatal forcible Ativan Withdrawal. They challenged them with paperwork showing they were not provided the 4 stacks of conditionally under seal evidence for a rushed illegal arraignment 12/4/24 just labeled "misc paperwork". At that point after days of being awake in excruciating pain the Claimant was having extreme suicidal Ideations and was beginning to hallucinate due to lack of sleep. The cell the Claimant was left in to die was next to a loud buzzing door in the day time.

Upon seeing evidence of the evidence withheld from a court complicit in this Act of torture the guards dragged the Claimant down the hallway by the arm to another cell (#15 they were in #16 before being put into the separate cell for the attempted extrajudicial killing). The Claimant fainted briefly as their vision blurred and a guard stated "stop acting". Later he would make the veiled threat "next time you might fall on your face". They stripped the Claimant naked and took all their property records. Putting them in a "turtle suit" which is a velcro smok in which you are basically naked. The Claimant immediately reported the abuse and they were never outright subjected to that again. However, the next day a Department of Corrections APRN Patty Mckenzie tried to gaslight the Claimant while they met the Claimant in the "turtle suit" chained mostly naked to a table in the day room. Stating the Claimant requested to be separated for a "spiritual accommodation" and to take an antipsychotic because they were delusional. Eventually as the Claimant kept refusing the antipsychotic and mentioning the Injunction supplemental EX 2 the guard who had dragged them by the arm after leaving them to die on a jail cell floor. Had them meet with Dr. Guzman a Department of Corrections psychiatrist who threatened to have the Claimant "beaten" if they did not take the antipsychotic or mentioned the Injunction. Only 1 officer in all of this time Corrections officer Lepinski helped by opening the conditionally under seal evidence, but his supervisors "passed it off". He won't lie under oath for them and was happy to see the Claimant eventually moved to a facility that was still a living nightmare, but not as horrifying as the inpatient medical unit at Hartford County Correctional who still employs all the staff noted feel free to explore it more in US District Court District of Connecticut Case No: 3:24-cv-01016-MPS. Claimant can't afford PACER and original records are in Connecticut a place the Claimant refuses to ever go. This entire action so far besides listing the claim # has been drafted from memory up to here.

Lawson
V.
Tong et al.
https://www.pacermonitor.com/public/case/53858703/Lawson_v_Tong_et_al

Eventually per Supplemental Exhibit 7 a log of the Court records showing a total global sentence of 133 days 11/4/24-23/8/24 when the Claimant finally met the only judge on earth with integrity Judge Chaplin who did not deny the Claimant their right to be heard. Who helped the Claimant record into record dozens of state employees had committed Conn Gen § "53-20" "cruelty to persons" "deprivation of property". Along with taking an Alford Plea since the maximum penalty for Conn Gen § 53-183a is 90 days and the judge was ferreting out the commission of the felony in open court 23/8/24 by the Attorney General and Public Defenders office. Got them on record to state the plea they wanted to offer was a 90 day suspended sentence with 1 year of probation. Which the Claimant asked if it would restrict

their freedom of movement to Connecticut. The answer was yes, but the judge keenly noted "it was a good question". A demonstration of the exact reason why individuals with disabilities or vulnerable parties especially ones subject to torture and gross abuse of procedural law will prevail with oral testimony. In front of a judge with integrity and who listens as every party the Claimant sues has no legally defensible answers under law. Or in relation to substantive law in regards to actual evidence and explained by the Claimant. Which in writing is torture and revictimizing since even when pleadings are formatted with memorandums of law, subject matter jurisdiction, and request viable relief they will due to implicating public officials inevitably be administratively blocked or recieve a cursory review by disinterested judges who allow attitudinal biases surrounding mental health to disregard the actions. In violation of the overriding principles and vulnerable party practice directions to deny access to the courts and justice. Or to even be heard.

The Claimant then fled to Canada 24/8/24 to claim Asylum just to be illegally detained for 16 days 25/8/24-10/9/24 for per the action the Plaintiff attempted to file in the Federal Court of Canada in Ottawa 5/12/24 under the Crimes Against Humanity and War Crimes Act of 2000. Attempting to file an action with the duty judge of the Superior Court of Quebec Division of Montreal as the above case demonstrated the United States could not be designated a "third safe country" under Factor 3 of Section 102 (2) of the Immigration and Refugee Protection Act as it requires independent courts and commitment to civil rights. Which the United States demonstrably did not even have before the Claimant's torture by Connecticut and the US Federal Government ignoring it. They also sought to "end the Practice of deadnaming and misgendering of Trans and Non-binary individuals in all Government services". See supplemental EX 8 the entire below action still not acted on by the Federal Court of Canada efiled as a Tort against the Crown 5/12/24.

Jeremy M Lawson
V.
Minister of Citizenship and Immigration
Minister of Public Safety and Emergency Preparedness
Minister of Global Affairs
The Canada Border Services Agency
The Superior Court of Quebec Division of Montreal
The Immigration and Refugee Board of Canada
The Office of the Public Sector Integrity Commissioner of Canada

https://drive.google.com/drive/folders/1-vlFvbC1LmuiwFvwM-lElRwyDFD7qV "

14. It is hopefully clear why the Petitioner did not want to relive the above trauma by recording it again for yet another court. From Canada the Petitioner took a train to DC and sued the US Department of Justice 11/9/24. In the US District Court District of Columbia Case No 1:24-cv-02615.

Lawson
V.
The Department of Justice

Which now is 140 Exhibits and originally asked for the injunctive and declaratory relief:

"Declare the Connecticut Coalition Against Domestic Violence and University of Connecticut can advocate for the Civil rights of victims and survivors of domestic violence. Without fear of retaliation from the State of Connecticut. With adequate federal intervention to do so."

"Determine if the court can charge a $405 filing fee as a matter of equity"

"End the practice of whistleblower retaliation using the US Criminal Justice system."

15. The Petitioner told the UN including the Office of the High Commissioner on Human Rights and Office of the High Commissioner on Refugees. The International Criminal Court press office 12/9/24. Attempted to claim Emergency Diplomatic asylum at the Swiss Embassy they did not help. Ended up sleeping outside near Union Station. Finally got an emergency gift to fly to Amsterdam 15/9/24. The Netherlands automatically detain Asylum Seekers. So the Petitioner wrote an Injunction given the Asylum process was used as abuse in Canada. Ended up claiming Asylum on the layover in Iceland 15/9/24. The Reykjavik District Court turned them away with a post it note 16/9/24. The Petitioner was subjected to a "Asylum interview" in which they were coerced into another illegal withdrawal of a valid international protection claim. Here is the 29 minute recording…

https://drive.google.com/drive/folders/1qDkPN4bR3EwT3iR9u3l0KH3VyolFC3KR

16. The Petitioner did put in a concurrent Rule 39 Interim measures request to the European Court of Human Rights to have them administratively blocked by the Filtering section falsely classifying Category 1 cases as Category 6 and 7. Or asking for absurd verifications or information already provided or that was logistically impossible to provide. This is all 6 of them that were filed in Iceland.

https://drive.google.com/drive/folders/19KJLs7-FpZFoYoLA-Fn1jfDIEaEcvtQD

17. The Petitioner was left to die on the streets of Reykjavik without medication or adequate warm clothing 30/9/24. The homeless shelter and red cross turned them away. They went to Landspitali Hospital and got discharged illegally 9/10/24 for reporting a doctor. The US State Department tried to get the Petitioner to refoul themself. The Petitioner was readmitted 10/10/24 after they confirmed with the US Consulate in Montreal the US Embassy in Reykjavik had the same access to information. So knew about the illegal incarceration in the US and arbitrary detainment in Canada. 16/10/24 the Petitioner faced another illegal discharge. Claimed Asylum in Iceland again. Was forced into another "asylum interview" 21/10/24. Actually was able to express this was illegal the interview was terminated.

18. 22/10/24 the Petitioner went to the Canadian Embassy to try to get them to gather their Asylum record to drown the Icelandic Government in even more evidence. Since their blast emails had been very frequent and included so many Governments, NGOs, The EU, UN, and NATO it is absurd. 23/10/24 they were forced to sign a form saying they would attend another "interview". The Petitioner filed an Ex Parte Injunction in Reykjavik District Court. Went to the Canadian Embassy who printed them out a map to the British Embassy. They left the Petitioner out in the rain even though their father was born in England. Thus had right to

citizenship by descent. The Foreign Secretary knew about this since 22/9/24. The Petitioner had already sued the Home Secretary in the King's Bench Court while experiencing severe PTSD the evidence was solid the pleadings were not contextually examined under the overriding principles or vulnerable party practice directions.

19. 24/10/24 the Petitioner was subjected to a 3-4 hour interview with an automatic denial at the end of the interview. Even sending 100s of documents via email to the interviewer. Since the US is considered "safe" by default which is discrimination based on country of origin against Article 3 of the UN Convention on the status of Refugees. Absurd gaslighting. The Petitioner immediately appealed to the Immigration Appeals Board who ignored reems of evidence since 27/9/24 when the Petitioner tried to appeal the coerced withdrawal.

20. The Petitioner entered more exhibits into the injunction in Reykjavik District Court. Hand delivered copies to the President of Iceland's office asking her to exercise constitutional powers she had to save the Petitioner. The injunction was illegally denied again using procedural law saying to appeal the 24/10/24 decision that did not exist 23/10/24 when the injunction was filed. The Petitioner tried to do an Ex Parte TRO to postpone the US election. Given the White House absolutely knew and the California Trial Counsel and DC Bar Counsel chose protecting Kamala Harris and Merrick Garland over the ethics of their profession and democracy.

21. By 9/11/24 the Petitioner had to make the 6th Interim measures request. Given the Icelandic Government gave them a USB drive with records of these torture interviews, but wanted it back. The Petitioner made a International Criminal Court referral with the Rule 39 request and all 58 Exhibits 11/11/24. Was very clear to pretty much every embassy, especially the French the Petitioner was coming to claim Emergency Diplomatic asylum. 12/11/24 the Icelandic police showed up with no paperwork, took the Petitioner's phone, and literally kidnapped them. Refouling them back to the US knowing this could induce their suicide. With the full consent of the US Government. Apparently banning them from the entire Schengen region.

22. The Petitioner was left to dissociate suicidal in the Baltimore Airport. They were found by police even though the Petitioner asked for an ambulance. Maryland due to lack of resources brings individuals with mental health crises to the hospital in police cars handcuffed. 13/11/24 in the ER the Petitioner emailed a good amount of records to Harbor hospital's press office. The press office withheld records and advanced directives from the Petitioner's care team. Harbor would not mail out the Petitioner's legal mail.

23. The Petitioner was discharged to a Crisis Bed at Sheppard Pratt 19/11/24 they provided documents to the Patient Advocate who withheld them too. The Petitioner started good faith reporting on a myriad of civil rights issues and kept writing injunctions. Found out about the UN Special Procedures reporting filing requests for aid 23/11/24 and 1/12/24 with consistent updates to mandate holders via email. As noted in the excerpt from the stalled King's Bench Claim in point 13 the Petitioner attempted to efile in the Federal Court of Canada in Ottawa 5/12/24 under the Crimes Against Humanity and War Crimes Act of 2000.

24. 9/12/24 the Petitioner filed the King's Bench Court Claim. Eventually given the Petitioner kept exposing corruption and demanding their patient rights be respected 10/12/24 Sheppard

Pratt tried to discharge them to a homeless shelter and label them as delusional / non-compliant. They went to St Joseph's hospital expressing they would rather be dead than homeless with a plan to take an entire bottle of fioricet. The level of information Sheppard Pratt's CEO, Patient Advocate, and Marketing team have on file. Along with their General Counsel the Petitioner sent a cease and desist 8/12/24 is beyond damning.

25. St Joseph did their best and found the actual on hand proof convincing. The Social worker there helped make 100s of pages of copies and mail out all the Petitioner's legal mail neither Harbor Hospital or Sheppard Pratt would send in violation of Maryland state law. Including mail to the Office of the Inspector General at the State Department. An Emergency Petition for a Writ of Certiorari to the US Supreme Court, US Attorney for Maryland Erek Barron, and US Attorney for DC Matthew Graves. Items in concurrent CT cases. Mainly motions to transfer cases out of the corrupt district courts.

26. The Petitioner was discharged to another Crisis Bed 18/12/24. Has faced a staff member who was not authorized to threaten the Petitioner with homelessness 23/12/24 knowing this was a major trigger. Along with a new consumer at the crisis housing since 2/1/25 who has made most of the other consumers uncomfortable with displays of racism, misogyny, and transphobia. As the Petitioner attempted to point out behaviors like saying "White Power" as not being okay. This eventually caused the offending consumer to attempt to kick in the Petitioner's door 5/1/25. The consumer was briefly taken to the hospital then allowed to return. Again around midnight police were called when the consumer yelled at a staff member. The police and management have done nothing. Apparently are now leaving it to the Petitioner to seek a no contact order or just let every other consumer live in fear.

27. Concurrently the Petitioner begged countries who signed the Convention on Diplomatic Asylum to just pick them up to claim Emergency Diplomatic asylum as DC is less than 2 hours away. Including filing a request for precautionary measures to the Inter-American Commission on Human Rights 28/12/24. In addition to exposing to the entire Canadian parliament over their winter break Minister LeBlanc detained the Petitioner illegally for 16 day. So blatantly it is sad. The Petitioner successfully worked out Canadian Case law to write a new mandatory interlocutory injunction with the revised Subject matter jurisdiction and request for relief. Efiling it in the Federal Court of Canada in Ottawa.

"Subject Matter Jurisdiction: This court has subject matter jurisdiction to hear this case under section 18.2 RSC 1985, c F-7 of the Federal Courts Act. The Crimes Against Humanity and War Crimes Act of 2000. Under Article 13 and 14 of the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. Under Article 24 of the Canadian Charter of Rights and Freedoms. Along with International Customary Law.

Relief sought:
1. Waive all fees and bear the cost of bringing this action due to the public importance of the matter.
2. Take this action formatted "as is" and allow Plaintiff to use chosen name instead of dead name in case header.
3. Suspend the United States designation as a "safe third country" under s. 159.3 of the Immigration and Refugee Protection Act for failure to meet Factor 3 under s. 102 (2).
4. Declare everyone has the right to advocate for human rights individually and collectively.

5. End the Practice of deadnaming and misgendering of Trans and Non-binary individuals in all Government services.
6. Grant the Plaintiff's claim of international protection. Provide Plaintiff The means to from the United States as soon as feasible
7. Canada provides the Plaintiff the "full means to rehabilitation as possible" as required under the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
8. Any such further order that this Honourable Court deems appropriate."

28. All it takes under International law or even to provide the beginning of relief is 1 court to have integrity like Judge Chaplin did 23/8/24. As Scottish law allows this mechanism to fill gaps in law. Also courts in Scotland are courts of law and equity. Historically the Nobile Officium has been used to help the vulnerable and suspend procedural barriers that destroy justice. Per a resource the Petitioner found in the decision in the petition of A and OTHERS P420/24 [2024].

"The continuing possibility for extraordinary circumstances to arise which cannot be adequately dealt with by existing legal remedies surely reserves to the nobile officium a continuing utility—not to mention its symbolic certification that courts are not mere slavish applicators of law, but vehicles for the attainment of justice."

-Stephen Thomson, The Nobile Officium in Civil Jurisdiction: Equitable Gap-Filling in Scotland [2014] vol 24 Tulane European & Civil Law Forum 125 at 135

29. For all the foregoing reasons even if it takes filing on every Court on this planet the Petitioner will not stop until victims of domestic violence in the State of Connecticut can get emergency benefits based on their word as required by law. John Marshall Chief Justice of the US Supreme Court famously stated there must be a remedy under law for every issue. Sadly the rule of law no longer exists in the World Government. Or even basic morality unless a court orders it.

IT THEREFORE please your Lordships to grant the Petitioner review of this petition without charging fees. Declare the Petitioner is a human being. Declare everyone has the right to advocate for human rights individually and collectively. Grants this review and relief under their jurisdictional discretion. E d the Practice of deadnaming and misgendering of Trans and Non-binary individuals in all Government services.

According to Justice, etc.
Legal name: Jeremy M Lawson
Chosen name: Borealis S Hedling
They / Them 7/1/25

*[Signature: Borealis Serenity Hedling]*



cause reference number_____

THE COURT OF SESSION

The Petition

of

Borealis S. Hedling

for

Allowing everyone to be able to advocate for human rights individually and collectively without fear.