## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **J.G.G.**, *et al.*, <br><br> **Plaintiffs,** <br><br> **LIYANARA SÁNCHEZ**, as next friend on behalf of **FRENGEL REYES MOTA**, *et al.*, <br><br> **Petitioners-Plaintiffs,** <br><br> **v.** <br><br> **DONALD J. TRUMP**, *et al.*, <br><br> **Respondents-Defendants.** |

Civil Action No. 25-766 (JEB)

## <u>MEMORANDUM OPINION</u>

Nine months ago, six Venezuelan men were hustled out of a detention center in Texas, loaded onto planes, and shipped to an infamous mega-prison in El Salvador with no explanation and no opportunity to challenge the reason for their hasty removal.  On behalf of themselves and a putative class of similarly situated detainees, they have turned to the courts to vindicate their constitutional right to due process.  These efforts have precipitated multiple trips up and down the assorted tiers of the federal judiciary, complicated by their subsequent transfer to and release in their native Venezuela.  After the D.C. Circuit vacated this Court's prior preliminary injunction, Plaintiffs have again moved for an order enjoining the Government to facilitate their return to the United States to pursue their individual habeas claims.  The parties then agreed to consolidate this Motion into Cross-Motions for Summary Judgment.

The Court ultimately finds that the United States maintained constructive custody over Plaintiffs while they were imprisoned in El Salvador, thus affording the Court habeas jurisdiction

over this action.  In addition, it will certify a class of Plaintiffs who were removed on March 15 and seek to enforce their right to a hearing.  On the merits, the Court concludes that this class was denied their due-process rights and will thus require the Government to facilitate their ability to obtain such hearing.  Our law requires no less.

## I.     Background

The facts and winding procedural history of this case are well trodden.  The Court thus offers a reasonably brief recap.

In early March of this year, the Department of Homeland Security began interviewing Venezuelan detainees about possible gang membership and moving them to El Valle Detention Facility in Texas.  J.G.G. v. Trump, 772 F. Supp. 3d 18, 26 (D.D.C. 2025).  Sometime around March 14, the President secretly invoked the Alien Enemies Act, 50 U.S.C. § 21, to sign a Proclamation asserting that a Venezuelan gang named Tren de Aragua had committed an invasion and predatory incursion upon the United States.  See Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua, White House (Mar. 15, 2025) (signature dated Mar. 14), https://perma.cc/D3GM-5YBM; ECF No. 28-1 (Robert L. Cerna Second Decl.), ¶ 5.  Pursuant to the AEA, the President directed immigration officials to apprehend and remove any such gang members from the United States.  See Proclamation No. 10903, 90 Fed. Reg. 13033, 13034 (Mar. 20, 2025).

In the early morning hours of March 15, Venezuelans at El Valle were taken from their cells, shackled, and loaded onto planes.  J.G.G. v. Trump, 786 F. Supp. 3d 37, 44 (D.D.C. 2025), vacated and remanded, No. 25-5217, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025); ECF Nos. 44-9 (Karyn Ann Shealy Second Decl.), ¶¶ 7–8; 44-10 (Stephanie Quintero Decl.), ¶¶ 2–3; 44-11 (Grace Carney Second Decl.), ¶¶ 11–13; 44-12 (Melissa Smyth Decl.), ¶¶ 13–14.  Unbeknownst

to them, the Government had deemed them all members of Tren de Aragua and sought to remove them immediately pursuant to the Proclamation, which had yet to be shared with the public or with them.  These men were given "no advance notice of the basis for their removal," nor were they informed that they could challenge their designation.  See ECF No. 101 (Am. Compl.), ¶ 69. The only reason that this Court was made aware of these impending removals was because a few of the men moved to El Valle had been able to contact their lawyers the day before, who rightly surmised that such a Proclamation either had secretly issued or was about to issue and thus filed this action at 1:12 a.m. on March 15.  See ECF Nos. 3-2 (TRO Br.) at 1–2; 3-3 (J.G.G. Decl.), ¶ 6; 3-4 (Grace Carney First Decl.), ¶¶ 17–20.  The Court granted the five named Plaintiffs' request for a temporary restraining order that same morning, which enjoined their removal, and it scheduled an emergency hearing for 5:00 p.m. that day to consider the Motion to Certify a Class. See Minute Orders 2, 3 of March 15, 2025.

Just an hour before the hearing, the Proclamation was made public.  J.G.G., 786 F. Supp. 3d at 47.  Less than two hours after the Proclamation was published, and while the emergency hearing was ongoing, the Government flew 252 Venezuelan men, including 137 putative class members, out of the United States.  J.G.G. v. Trump, 778 F. Supp. 3d 24, 32–33 (D.D.C. 2025). Rather than heading to Venezuela, however, these planes were bound for El Salvador.  Id. at 35. At the hearing, meanwhile, the Court certified a class of all individuals subject to removal under the Proclamation, including the individuals on the planes, and issued a TRO enjoining their removal for fourteen days.  See Minute Order of Mar. 15, 2025, 7:25 p.m.  Despite this Court's Order to not relinquish physical custody of the men, id., the Government disembarked the Venezuelans in El Salvador, where they were imprisoned in the Terrorism Confinement Center

(CECOT).  J.G.G., 778 F. Supp. 3d at 34–35.  The Government's actions are the subject of a separate contempt inquiry.  See J.G.G v. Trump, 2025 WL 3198891 (D.C. Cir. Nov. 14, 2025).

An interim ruling by the Supreme Court then reshaped the contours of this litigation. Trump v. J.G.G., 604 U.S. 670 (2025).  The Justices held that Plaintiffs' claims must be brought in habeas and thus in the location of their confinement.  Because class members were detained in various centers across the country, but not here in D.C., the Supreme Court vacated this Court's TRO for improper venue.  Id. at 673.

While detained at CECOT, a new set of named Plaintiffs, including Frengel Reyes Mota and Andry Jose Hernandez Romero, filed this Amended Complaint against the Government, alleging that Plaintiffs were improperly removed without a hearing.  See Am. Compl., ¶¶ 109–73 (filed Apr. 24, 2025).  On behalf of themselves and a putative class of detainees imprisoned in CECOT, Plaintiffs sought preliminary relief in the form of an injunction requiring the Government to facilitate their return to the United States.  See ECF No. 102-1 (Mot. PI) at 1.  A separate named Plaintiff sought to enjoin the Government from removing via the Proclamation individuals currently in criminal custody here in the United States.  Id. at 1–2, 10–11.  Plaintiffs thus moved to certify two subclasses: those already removed and imprisoned at CECOT, and those in criminal custody at risk of future removal.  See ECF No. 103 (Mot. Class Cert.) at 2.

For the CECOT class, the Court ordered limited jurisdictional discovery into whether Plaintiffs were in the constructive custody of the United States when they were imprisoned in CECOT.  See ECF Nos. 116 (Juris. Disc. Ord.); 128 (Further Juris. Disc. Ord.).  It then issued a Memorandum Opinion on June 4 that granted in part and denied in part Plaintiffs' Motions. J.G.G., 786 F. Supp. 3d at 83.  That Opinion explained that the Court viewed jurisdiction to consider Plaintiffs' habeas and due-process claims as "mutually exclusive."  Id. at 52.  While the

Court believed the question to be "close," it found that Plaintiffs had not shown constructive custody under the available record — in large part given the declaration of a State Department officer — thereby foreclosing habeas jurisdiction. Id. at 57–59. On the other hand, the Court held that it had jurisdiction over Plaintiffs' due-process claims in equity. Id. at 59–61. From there, it affirmed that Plaintiffs were exceedingly likely to succeed on the merits of their claim that the Government's hasty removal procedures had violated their due-process rights. Id. at 62. The Court also certified a class comprising individuals then detained at CECOT who had been removed solely pursuant to the AEA. Id. at 79–80. It found that the proposed criminal-custody class, conversely, did not meet the stringent standard for a preliminary injunction or the Rule 23 standards for class certification. Id. at 66–75, 80. It then ordered the Government to facilitate the CECOT detainees' ability to obtain the process they were denied and instructed it to notify the Court of its proposed plan to do so. Id. at 82. The Government appealed. See ECF No. 150 (Not. Appeal).

While the appeal was pending, the facts on the ground shifted once again. On July 18, all 252 Venezuelans in CECOT, including our 137 class members, were released back to Venezuela. See ECF No. 168-1 (Mellissa Harper Decl.), ¶ 7. In exchange, Venezuela released ten U.S. nationals, as well as eighty Venezuelan political prisoners. Id. As recently as July 24, the Government has represented to this Court that the Venezuelan government would not oppose the effort of Plaintiffs who seek to return to the United States pursuant to their lawsuit. See ECF No. 169 (July 24 Hr'g Tr.) at 14:25–15:2; Harper Decl., ¶ 9.

The D.C. Circuit subsequently vacated the preliminary injunction "[i]n light of the[] developments" on the ground — namely, the transfer to and release of the putative class members in Venezuela. J.G.G. v. Trump, 2025 WL 2317650, at *3 (D.C. Cir. Aug. 8, 2025).

Following the appellate court's vacatur, Plaintiffs now move again for a preliminary injunction, requesting that this Court, as it did in June, require the Government to restore Plaintiffs' ability "to proceed through habeas" and give effect to their due-process rights.  See ECF No. 177-1 (Renewed Mot. PI) at 3.  The scope of the requested injunction is limited to that procedural facilitation; Plaintiffs in their Motion do not directly challenge the validity of the President's Proclamation invoking the AEA, see Am. Compl., ¶ 110, the propriety of removing noncitizens outside the processes in the Immigration and Nationality Act, id., ¶ 50, nor their individual designations as TdA members.  See, e.g., ECF Nos. 177-5 (Redacted Decl. 2), ¶ 20; 177-6 (Redacted Decl. 3), ¶ 5.  Instead, they simply seek the chance to raise these arguments before a United States court and ask that this Court help facilitate such opportunity.

## II.    Legal Standard

Although Plaintiffs sought preliminary relief in their instant Motion, the parties have since consented to converting this Motion and the Government's Opposition into Cross-Motions for Summary Judgment.  See ECF Nos. 197 (Nov. 19 Hr'g Tr.) at 10:16–11:11 (Plaintiffs are "somewhat agnostic" about proceeding as preliminary injunction or summary judgment); 194 (Gov. Not.) at 2 (Defendants "do not object to treating the preliminary injunction briefing as cross motions for summary judgment").  The Court will thus consolidate the preliminary injunction with the trial on the merits under Rule 65(a)(2) because "further discovery would not alter [its] analysis," and "only legal issues remain."  Gov. Not. at 1.

"When faced with cross-motions for summary judgment, the Court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  Family Tr. of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (cleaned up) (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)).

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

## III.  Analysis

The Court first addresses threshold questions of its own jurisdiction and the propriety of class certification. It then turns to the merits of Plaintiffs' claims and the appropriate remedy.

### A.  Justiciability

In looking at the justiciability of this lawsuit, the Court considers Defendants' filing as akin to a Rule 12(b)(1) motion to dismiss for lack of jurisdiction. See 5B Wright & Miller's Federal Practice & Procedure § 1350 (4th ed. 2025) ("[A] motion for summary judgment under Federal Rule of Civil Procedure 56 [is an] inappropriate method[] for challenging the district court's subject matter jurisdiction."); Lake Pilots Ass'n, Inc. v. U.S. Coast Guard, 257 F. Supp. 2d 148, 163 n.16 (D.D.C. 2003) (styling justiciability arguments during summary-judgment motion as separate motion for dismissal under 12(b)(1) grounds)); Na'im v. Rice, 577 F. Supp.

2d 361, 366 n.1 (D.D.C. 2008) (construing failure-to-exhaust arguments as motion to dismiss, although party had moved for summary judgment).  Although 12(b)(1) motions can be decided on the complaint alone, "when necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  Na'im, 577 F. Supp. 2d at 369 (citing Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992)).

Defendants press two arguments for why this Court may not hear Plaintiffs' claims: it lacks subject-matter jurisdiction, and the claims are moot.

1.    *Subject-Matter Jurisdiction*

As with any case, the Court must first assure itself of its jurisdiction.  The parties correctly note that because Plaintiffs were confined in El Salvador at the time they filed their Amended Complaint, the question of jurisdiction is more complicated than it would be otherwise.  In Noem v. Abrego Garcia, 145 S. Ct. 1017 (2025), the Supreme Court encountered a similar problem.  There, it considered the case of Kilmar Abrego Garcia, who had been arrested in the United States and sent to CECOT on one of the same planes as Plaintiffs despite a 2019 order expressly prohibiting his removal to El Salvador.  Id. at 1018.  The Court affirmed that the district court had "properly required" the Government to facilitate Abrego Garcia's return to the United States, implicitly confirming that there was jurisdiction in the district court to hear his claims even though he was detained in CECOT.  Id.  The Court did not clarify what theory of jurisdiction applied but nonetheless ratified the district court's order.  Id.  This Court likewise concludes today that it has jurisdiction to hear Plaintiffs' claims.  Although this Court previously found jurisdiction available under equity, J.G.G., 786 F. Supp. 3d at 61, new information leads it to proceed under habeas jurisdiction today without revisiting the question of its equitable

authority.  Nothing in this Opinion should be read to upend the Court's prior due-process jurisdictional analysis, however, and that pathway would remain available to Plaintiffs if habeas were not.

Under 28 U.S.C. § 2241(c), a district court may hear a habeas petition only if it was filed while the petitioner was in custody "under or by color of the authority of the United States." Because "[c]ustody and jurisdiction are intertwined under the habeas statute," In re Petitioners Seeking Habeas Corpus Relief in Rel. to Prior Detentions at Guantanamo Bay, 700 F. Supp. 2d 119, 127 (D.D.C. 2010), a court must determine whether the petitioner was in U.S. custody at the time his petition was filed in order to determine "whether it has jurisdiction over the habeas petition in th[e] case." Abu Ali v. Ashcroft, 350 F. Supp. 2d 28, 41 (D.D.C. 2004).  Here, Plaintiffs filed their Amended Complaint while detained at CECOT.  While there is thus no doubt that they were in custody at the time of filing, the key question is whether custody was "under or by color of the authority of the United States."  28 U.S.C. § 2241(c).

The Court briefly notes that Plaintiffs' subsequent release to Venezuela does not affect its statutory jurisdiction, as § 2241(c) requires only that petitioners be in custody at the time their habeas petition is filed.  See 17B Wright & Miller § 4262 ("The critical moment in determining custody is when the habeas corpus petition is filed."); Allen v. Allen, 2025 WL 1334644, at *1 (D.D.C. Apr. 1, 2025) ("To satisfy the statute's 'in custody' requirement, 'a petitioner must have been in custody at the time the habeas petition was filed.'") (quoting Banks v. Gonzales, 496 F. Supp. 2d 146, 149 (D.D.C. 2007)).  While subsequent release can, in some situations, moot a petitioner's habeas claims, the Court finds that it did not do so here, for the reasons discussed in further detail below.  See infra Section III.A.2 (Mootness).

Back now to the question of U.S. custody.  Plaintiffs bear the burden of establishing the Court's statutory jurisdiction to entertain their habeas suit.  See In re Petitioners, 700 F. Supp. 2d at 127.  At the same time, it is settled that "the Supreme Court has 'very liberally construed the "in custody" requirement for purposes of federal habeas.'"  Abu Ali, 350 F. Supp. 2d at 46 (quoting Maleng v. Cook, 490 U.S. 488, 492 (1989)).  Custody need not be actual or physical to satisfy 18 U.S.C. § 2241(c); constructive custody will suffice for jurisdiction purposes.  Jones v. Cunningham, 371 U.S. 236, 238–39 (1963); Justs. of Bos. Mun. Ct. v. Lydon, 466 U.S. 294, 300 (1984) (quotation marks and citation omitted) ("Our cases make clear that the use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical custody.").

Here, no one disputes that the United States lacked physical custody over Plaintiffs in CECOT.  Plaintiffs argue instead that their CECOT detention was so intertwined with United States control that it amounted to constructive custody.  See Renewed Mot. PI at 9.  In other words, they allege that El Salvador was acting as the United States's agent when it detained Plaintiffs in CECOT, and the United States thus can be held accountable under the Great Writ for producing Plaintiffs.  See Steinberg v. Police Ct., 610 F.2d 449, 453 (6th Cir. 1979) (explaining that constructive custody exists when "the imprisoning sovereign is the respondent's agent").

In its June 4 Opinion, the Court concluded that the issue of custody was a "close question."  J.G.G., 786 F. Supp. 3d at 57.  It ultimately found, however, that Plaintiffs had failed to establish constructive custody with the information available at that time.  Id.  The Court instead proceeded to consider Plaintiffs' causes of action as standalone due-process claims, which the Court did have jurisdiction to hear.  Id. at 59–61.  As new facts have developed in the intervening months, the Court must revisit the issue.  In previously considering the question of

10

constructive custody, the Court drew on the factors thoughtfully outlined by Judge John Bates in

Abu Ali to organize its assessment of the relevant evidence.  It will do so again here.

Those factors look at whether:

> (i) [Petitioners are] detained at the behest of United States officials;
> (ii) [their] ongoing detention is at the direction of the United States
> enlisting a foreign state as an agent or intermediary who is
> indifferent to the detention of the prisoner[s]; (iii) [they are] being
> detained in the foreign state to deny [them] an opportunity to assert
> [their] rights in a United States tribunal; and (iv) [they] would be
> released upon nothing more than a request by the United States.

Abu Ali, 350 F. Supp. 2d at 68 (footnotes omitted).  As explained in Abu Ali itself, these factors

are not an exhaustive or binding test of constructive custody.  Instead, they provide a framework

for organizing information relevant to the question of custody, identifying key facts that may

strongly indicate that a foreign state is acting as an agent for the United States in detaining a

petitioner.  Id.  At the end of the day, the critical question remains whether Plaintiffs' detention

in CECOT was sufficiently dictated by the United States such that it can be said that El Salvador

acted as the United States's agent in detaining them.  Cf. id. at 48; In re Petitioners, 700 F. Supp.

2d at 127.

The Court begins with a summary of the facts.  While the facts in the record are

essentially undisputed, the parties spar over their legal significance.  On March 15, Plaintiffs

were flown out of the United States without prior notice of their removal or an opportunity to file

habeas petitions.  See Am. Compl., ¶ 5.  Although none of them hailed from El Salvador,

Plaintiffs were taken there, imprisoned in CECOT, and detained in the mega-prison for the next

four months.  Around the same time, the United States transferred 4.7 million dollars to El

Salvador "to be used by Salvadoran law enforcement and corrections agencies for its law

enforcement needs, which include costs associated with detaining" Plaintiffs.  See ECF No. 177-

10 (U.S. Grant Letter) at ECF p. 2.  In July 2025, Plaintiffs were released from CECOT and sent to Venezuela at the same time that Venezuela released ten Americans and eighty Venezuelan political prisoners.  See ECF No. 177-12 (Noelle Smith Decl.), Exh. 11 at 1–2 (*Washington Post* report on prisoner swap).

Alongside these facts are statements from the relevant entities about what they believed their role in Plaintiffs' detention to be.  In addition to the declaration submitted last time from Michael G. Kozak, Senior Bureau Official at the United States Department of State, the Government provided two additional declarations by the Secretary of State and Deputy Secretary of State, which concern the United States's conduct in securing the return of two individuals from CECOT in two separate and unrelated cases.  See ECF Nos. 182-1 (Christopher Landau Decl.); 182-2 (Marco Rubio Decl.).

Plaintiffs counter with a report by the United Nations Office of the High Commissioner for Human Rights, Working Group on Enforced or Involuntary Disappearances, investigating the disappearance of several individuals sent to CECOT, see ECF No. 160-1 (U.N. Report), which was made available to this Court only after its last foray into constructive custody.  See ECF No. 160 (Not. of U.N. Report) (alerting Court to U.N. Report on July 7, 2025).  In a statement to the U.N. Office, El Salvador expressly disclaimed responsibility for the detainees, contending instead that "the jurisdiction and legal responsibility for these persons l[ay] exclusively with the competent foreign authorities."  U.N. Report at 3, 6, 9.  Plaintiffs also submitted a copy of a June whistleblower complaint made by former DOJ lawyer, Erez Reuveni, statements made by the Director of CECOT to prisoners, and public statements made by top United States officials.  See Reuveni Whistleblower Disclosure at 10; ECF No. 177-4 (Redacted Decl. 1), ¶¶ 3–4; Redacted Decl. 2, ¶ 9; Redacted Decl. 3, ¶¶ 7–8; Smith Decl., Exh. 2 at 1.

Relying on the totality of the evidence, the Court now examines the four <u>Abu Ali</u> factors.

a.    Behest of the United States

The Court first considers whether El Salvador detained Plaintiffs at the behest of the United States. This factor asks which government — the United States or the host country — directed the choice to detain someone. In other words, once Plaintiffs had been removed to El Salvador, did the United States direct that country's choice to imprison them? Here, the facts suggest that this was the case

Before removing Plaintiffs from this country, the United States arranged for El Salvador to detain them in exchange for money. <u>See</u> ECF No. 177-11 (Embassy Comms.) at ECF p. 4. In this arrangement, El Salvador agreed to "accept" and "accommodate" Plaintiffs "for a duration of one year unless or until a determination concerning their long-term disposition is made." <u>Id.</u> at ECF p. 2–3. "In recognition of El Salvador's assistance on this matter," <u>id.</u> at ECF p. 3, the United States transferred $4.7 million to that country "to be used by Salvadoran law enforcement and corrections agencies for its law enforcement needs, which include costs associated with detaining" Plaintiffs. <u>See</u> U.S. Grant Letter at ECF p. 2. Its Ministry of Foreign Affairs itself described the deal as follows: "The Republic of El Salvador confirms it will house [Plaintiffs] for one (1) year, pending further decisions on their long-term disposition. . . . We also wish to express our appreciation for the United States offer of in-kind and financial support to El Salvador in recognition of this cooperation." Embassy Comms. at ECF p. 4.

The existence of such an agreement strongly indicates that the United States dictated the choice to detain Plaintiffs in CECOT. <u>Abu Ali</u>, 350 F. Supp. 2d at 68 n.42 ("[T]he presence of a formal relationship between the countries that governs the detention, in the nature of a treaty or otherwise, may bear on the jurisdictional question."). Defendants do not dispute the existence of

13

this arrangement but simply argue that it "was not enforceable."  ECF No. 182 (Gov. Opp. PI) at 8.  But the Court is not adjudicating a contract dispute.  The arrangement need not be legally enforceable to bear on the question of whether El Salvador was detaining Plaintiffs at the United States's request.

Beyond the agreement's mere existence, its structure also supports the conclusion that the United States dictated Plaintiffs' detention.  It is certainly true that we can arrange for another country to accept custody of prisoners in a way that cedes all control over them to the recipient country, such that any subsequent detention by such country would not be at the behest of the United States.  Our caselaw is rife with these kinds of international agreements.  See Kiyemba v. Obama, 561 F.3d 509, 515 (D.C. Cir. 2009); Gul v. Obama, 652 F.3d 12, 18 (D.C. Cir. 2011); In re Petitioners, 700 F. Supp. 2d at 127–29; Al Hajji v. Obama, 2009 WL 4251108, at *2 (D.D.C. Nov. 23, 2009).  This arrangement was structured differently, and its features strongly support a finding of continued United States control over Plaintiffs.

First, in describing and detailing the nature of the arrangement, Defendants' declarations on their face make no mention of the United States relinquishing control over Plaintiffs, whereas all the other arrangements where we did cede control over detainees do.  Compare, e.g., Obaydullah v. Bush, No. 08-1173, ECF No. 15-1 (Sandra L. Hodgkinson Decl.), ¶ 5 (D.D.C. Aug. 12, 2008) (stating unequivocally that once transferred, detainees are "no longer in the custody and control of the United States"), and Kiyemba, 561 F.3d at 515 (quoting declaration from Deputy Assistant Secretary of Defense for Detainee Affairs stating that after release from U.S. custody, detention by foreign sovereign was "pursuant to its own laws and not on behalf of the United States"), with ECF No. 129 (Michael G. Kozak Redacted Decl.), ¶ 9 (stating only that "the detention and ultimate disposition of those detained in CECOT and other Salvadoran

detention facilities are matters within the legal authority of El Salvador").  "If the United States had intended to wash its hands of responsibility for the alien detainees sent to El Salvador, it could have clearly and explicitly done so in its agreement with El Salvador," just as was done in those other arrangements.  E.D.Q.C. v. Warden, Stewart Det. Ctr., 2025 WL 1829416, at *3 (M.D. Ga. July 2, 2025).  But it did not.

Second, if the United States intended to relinquish control over Plaintiffs, it is hard to understand why the arrangement with El Salvador explicitly included a one-year time horizon. Per the agreement, El Salvador agreed to detain Plaintiffs for a year or "until a determination concerning their long-term disposition is made."  U.S. Grant Letter at ECF p. 2.  If El Salvador, upon accepting Plaintiffs, could dispose of them however it wished, there would be no need for the agreement to mention any sort of time limit or conditional provision.  These undisputed features of the arrangement point strongly toward El Salvador's acting at America's behest.

Additional statements from both nations bolsters this conclusion.  In a response to the United Nations Working Group, El Salvador itself indicated that it was working at the behest of the United States: it "facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of that other State." U.N. Report at 3, 6, 9.  If this alone were not clear enough, El Salvador next stated that "the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities . . . ."  Id.; compare id., with Abu Ali, 350 F. Supp. 2d at 38 (Saudi Arabian officials "acknowledged publicly that the United States has been involved throughout his detention, and have told United States officials that they would release Abu Ali at the request of the United States.").

The Government argues that the reliability of the U.N. Report is undercut by the anonymity of the Salvadoran official who made the statement.  See Gov. Opp. PI at 14.  The Court finds this argument unpersuasive; even if the official is not named, these are statements made to an international governing body in an official capacity.  U.S. Dep't of State v. Ray, 502 U.S. 164, 179 (1991) ("We generally accord Government records and official conduct a presumption of legitimacy.").  In any case, the same sentiment was echoed by an identifiable Salvadoran official — the Director of CECOT, who told the men that "if it were up to me, I would let you go," but that the order to continue their detention "comes from Donald Trump." Redacted Decl. 1, ¶¶ 3–4; Redacted Decl. 2, ¶ 9; Redacted Decl. 3, ¶¶ 7–8.

Officials on the other side of the arrangement appear to share the same sentiments.  In the months following the Court's June 4 Opinion, Department of Homeland Security Secretary Kristi Noem and her office have made multiple public statements casting CECOT as an extension of U.S. detention facilities.  See Smith Decl., Exh. 2 at 1 (Secretary Noem stating on September 3, 2025, "If you are in America illegally, you could find yourself in CECOT."); id., Exh. 3 at 1 (same, in joint social-media post with DHS, on September 4); id., Exh. 4 at 1 (DHS on July 8 threatening detention at CECOT as among "every tool available" to United States); see also ECF No. 102-14 (Oscar Sarabia Roman Decl.) at 56, 86 (DHS Secretary Kristi Noem threatening detention at CECOT as "one of the tools in our [i.e., the United States's] toolkit"). These statements strongly undermine the Government's contention that El Salvador retains complete discretion over what to do with individuals removed from the United States; if it did, how could a United States official ensure that an individual removed to El Salvador would be placed in CECOT?  At the very least, these statements indicate that our Government believed

that it had the power to control whether deportees sent to El Salvador were placed into CECOT after their removal.

The Government waves such statements away as immaterial in light of the sworn declarations submitted to the Court.  See Gov. Opp. PI at 13.  Yet it is significant that Noem — the very official who apparently made the decision to relinquish U.S. physical custody over Plaintiffs, see ECF No. 198-1 (Kristi Noem Decl.) at 1 — is the one who made them.  If Noem herself conceived of CECOT as an extension of U.S. detention facilities, and publicly framed it as such, that bears on the ultimate legal question: whether El Salvador was acting at the behest of the United States when it detained Plaintiffs in CECOT.  As explained later, these statements are also compatible with the sworn declarations submitted by the Government.  See infra Section III.A.1.e (Government Declarations).

> b.    El Salvador's Indifference

The Court next considers whether El Salvador was indifferent to Plaintiffs' detention. Abu Ali, 350 F. Supp. 2d at 68.  This factor is a bit of a misnomer; total indifference is not the test.  Instead, courts should ask whether the recipient country retains any independent interest in the actions it chooses to undertake, or if its interest is simply derivative of the principal nation's interest.  The question in this case is thus whether El Salvador had an interest in Plaintiffs' detention that was distinct from that of the United States.  The Court concludes that it did not.

Consider the chain of events: the United States selects Plaintiffs for removal with no input from El Salvador.  We then fly Plaintiffs there, although not a single Plaintiff or putative class member is El Salvadoran or was wanted under El Salvador law.  Indeed, there is no allegation that Plaintiffs had any connection whatsoever to that country.  See ECF No. 145 (Pls. Sealed Resp.) at 8 n.4; Redacted Decl. 1, ¶¶ 5–6 ("[W]e had never broken any laws in El

Salvador."); Redacted Decl. 2, ¶ 8 (similar); Redacted Decl. 3, ¶ 8 (similar).  El Salvador then

places Plaintiffs in CECOT, where they are detained for months, most likely via payment from

the United States.  Four months later, El Salvador sends Plaintiffs to Venezuela, and Venezuela

sends ten Americans back to the United States and releases several Venezuelan political

prisoners.  El Salvador ultimately received nothing in this July exchange.  All this poses a single

glaring question: what independent interest did El Salvador possibly have in detaining hundreds

of Venezuelan nationals removed from the United States?  The Court cannot find one in this

record.

The Government's only real counter is weak.  It argues that El Salvador has an interest in

detaining dangerous individuals to prevent them from running amok throughout the country.  See

Gov. Opp. PI at 16.  Yet that simply raises the question of why El Salvador allowed Plaintiffs

into its country in the first place.  All record evidence indicates that it detained Plaintiffs not

because of any independent interest in their detention, but purely because it would receive a

financial benefit via its arrangement with the United States — just as any agent would in

honoring an agreement with its principal.

### c.    Evading Judicial Review

The Court next examines whether Plaintiffs' detention was intended to deprive them of

judicial review, which fact would also support a finding of constructive custody.

To begin, Plaintiffs' hasty and secretive removal from the United States was certainly

intended to deprive them of an opportunity to secure prior judicial review.  First, the President

invoked the AEA but waited to publicize the Proclamation.  J.G.G., 786 F. Supp. 3d at 47–48.

Plaintiffs were then put on flights leaving the country before the Proclamation was ever

announced, and they were kept in the dark as to the reason for their removal.  Id. at 47.  As the

Government has conceded, Plaintiffs had no opportunity to contest their designation as TdA members prior to removal. See ECF No. 124 (May 7 Hr'g. Tr.) at 30:19–30:20 (conceding that CECOT Class did not even receive "the 12 hours [of notice] that we are providing at this moment"). They were then flown out of the country literally as this Court conducted an emergency hearing on the validity of their removal. J.G.G., 786 F. Supp. 3d at 48. For what reason? Plaintiffs were already detained, so there was no threat that announcement of the Proclamation would somehow lead to their evading capture. Reuveni's whistleblower statements corroborate the Court's conclusion. According to his disclosure, the Principal Assistant Deputy Attorney General stated in a meeting that if courts attempted to stop the removals, DOJ would need to consider telling the courts, "Fuck you" and ignore any court order. See Reuveni Whistleblower Disclosure at ECF p. 10; see also ECF No. 177-8 (Reuveni Exhibits), Exh. 1 at 2 (contemporaneous text messages between Reuveni and August Flentje, then-Acting Director of DOJ OIL, referencing this statement).

While the purpose of Plaintiffs' hasty removal is evident, it is less clear whether their subsequent detention in CECOT was also intended to serve such a purpose. CECOT detention certainly had the effect of erecting barriers to judicial review; at the most basic level, detainees there often have no outside-world contact, including with their lawyers. See Am. Compl., ¶ 64; ECF No. 102-7 (Liyanara Sánchez Decl.), ¶ 10. And because it sent Plaintiffs to be detained abroad, the Government now contests this Court's ability to hear their claims and argues that it lacks jurisdiction, all while supplying no alternative forum for Plaintiffs to challenge their already-executed removals. See Gov. Opp. PI at 6–27. Indeed, the Court has had to devote nearly twenty pages to untangling the tricky jurisdictional questions created by a Complaint filed from El Salvador. It is nonetheless hard to say whether the detention itself was intended to help

evade judicial review, or if that is simply a byproduct of the United States's other motivations for detaining Plaintiffs in CECOT, such as deterring future migrants by subjecting deportees to maximum pain and suffering.  See, e.g., Smith Decl., Exh. 3 at 1 (statement of Kristi Noem) ("If you are in America illegally, you could find yourself in CECOT . . . . Avoid arrest and self deport NOW using the CBP Home App.").  While the question is close, the Court accordingly finds that this factor is neutral as to the question of constructive custody.

d.    Returned upon Request

In many constructive-custody cases, it is hard for a court to discern whether petitioners would be released upon a respondent's request.  Not so here.  Petitioners have indeed been released upon the United States's request.  Since this Court's June 4 Opinion, multiple developments have shown that the United States is able to request, and has successfully requested, the release of CECOT detainees.  First, after the Government was ordered to facilitate the return of Abrego Garcia from CECOT, he was brought back to the United States on June 6. See Abrego Garcia v. Noem, 2025 WL 2062203, at *2 (D. Md. July 23, 2025).  This return followed public statements made by the President of the United States agreeing that he could "call up the president of El Salvador" to secure the return of detainees like Abrego Garcia.  See ECF No. 111 (Reply ISO Second Mot. for PI) at 3.

Second, Plaintiffs in this case were indeed released upon the United States's request, in what appears to be a clear prisoner exchange between our country and Venezuela.  In July, all 252 Venezuelans removed from the United States and detained in CECOT were sent to Venezuela.  See Harper Decl., ¶ 7.  At the same time, ten U.S. nationals were released from Venezuela and sent back to the United States.  See Smith Decl., Exh. 10 at 2 (reporting email from Kozak stating that "we did ask for and receive 10" Americans).  As the Government

20

previously conceded to this Court, Plaintiffs served essentially as bargaining chips in a prisoner swap with Venezuela.  See July 24 Hr'g Tr. at 18:3–8 (Government acknowledging that United States "had involvement in negotiating [the deal] and obviously got the return of prisoners out of it").  The Government tries to downplay its role in Plaintiffs' release and its corresponding legal significance, arguing that it was up to the discretion of the El Salvadoran government.  See Gov. Opp. PI at 18–19.  But that argument is at odds with the undisputed record.  If that were the case, why would El Salvador not arrange an exchange where it benefited?  To find that the swap was coordinated solely between Venezuela and El Salvador, but with no benefit to the latter, belies reality.

The Court thus concludes that the Government retained, and exercised, the power to control the return of CECOT detainees.

### e.    Government Declarations

In rebuttal, the Government relies almost exclusively on the three declarations from Kozak, Landau, and Rubio to argue that Plaintiffs have not proven constructive custody.  See Gov. Opp. PI at 10.  It principally contends that none of Plaintiffs' proffered evidence can overcome sworn Government declarations to the contrary.  The Supreme Court has indeed made clear that courts are "not suited to second-guess" Government representations regarding foreign affairs.  Munaf v. Geren, 553 U.S. 674, 702 (2008).  And just as it did in its prior Opinion, this Court fully credits the assertions made in the Government declarations.  It nonetheless finds constructive custody to be consistent with those declarations.

First, as this Court previously noted, the Kozak declaration is substantially less on point than the declarations that determined analogous cases.  J.G.G., 786 F. Supp. 3d at 58.  Far from establishing that the United States has relinquished all custody and control over Plaintiffs,

Kozak's statement that "the detention and ultimate disposition of those detained in CECOT and other Salvadoran detention facilities are matters within the legal authority of El Salvador in accordance with its domestic and international legal obligations" does not preclude a finding of constructive custody. See Michael G. Kozak Redacted Decl., ¶ 9. As one other court noted, this assertion in the Kozak declaration "leaves the issue of ultimate control over the alien detainees murky." E.D.Q.C., 2025 WL 1829416, at *3–4. It does not undercut the evidence provided by Plaintiffs that the United States continued to play a role in their detention. This is because constructive custody does not require that the respondent be the sole holder of control over the petitioner; shared control over a petitioner is, after all, the very essence of an agent-principal model of constructive custody. See Braden v. 30th Jud. Cir. Ct., 410 U.S. 484, 498–99 (1973). Kozak's commentary on El Salvador's control over Plaintiffs, without noting whether that control is singular and without commenting on the extent of the United States's control over Plaintiffs, is thus consistent with a finding of constructive custody. The declarations that dispose of constructive-custody questions tend to unambiguously state that the United States has "no control over the disposition of detainees transferred there" or that decisions about the petitioners fell within "the sole discretion of the Afghanistan government under its domestic laws." In re Petitioners, 700 F. Supp. 2d at 128. None of that language is present here. The Court thus finds it can fully credit the Kozak declaration and nonetheless conclude that constructive custody exists.

The Rubio and Landau declarations, originally submitted in two other unrelated cases and repurposed by Defendants for this case, are of limited import here. Rubio's concerns then-ongoing efforts to retrieve Abrego Garcia. See Rubio Decl., ¶ 2. Landau's relates to an individual from CECOT who is covered by a separate settlement agreement and provides

additional information on the logistics of the July 2025 prisoner swap.  See Landau Decl., ¶ 2.
The Government cites them primarily for the inference that the United States's difficulty in
retrieving them from CECOT shows that it lacks constructive custody over detainees located
there.  See Gov. Opp. PI at 17–18.  But, as Plaintiffs point out, those declarations do not make
clear the extent to which the United States requested the return of those individuals and whether
El Salvador declined to return them.  See ECF No. 187 (Pl. Rep.) at 11–12.  Without information
on the United States's conduct in these negotiations, these declarations say little about the fourth
Abu Ali factor.

        In addition, commentary about El Salvador's sovereignty does not exclude the possibility
that it acted as an agent for the United States and that constructive custody is therefore present.
For instance, the Landau declaration states that "El Salvador had sovereign discretion over [the]
ultimate disposition" of those detained in CECOT.  See Landau Decl., ¶ 4.  But El Salvador
could very well exercise its sovereign discretion to act at the behest of the United States pursuant
to an arrangement to house detainees in exchange for money.  Like the Kozak declaration,
neither of the others contains any statement that the United States relinquished all control over
Plaintiffs or that El Salvador was solely responsible for them.

        In sum, "[n]one of the documents produced by Respondents demonstrate relinquishment
of control by the United States over the final disposition of the detainees or El Salvador's
unfettered right to release them from custody."  E.D.Q.C., 2025 WL 1829416, at *3.  Even when
fully credited, consequently, the Government's submitted declarations do little to undermine
Plaintiffs' evidence of constructive custody.

        What the Government overstates as total deference to its declarations in prior cases is
more accurately interpreted as a rejection of those petitioners' conclusory and speculative

allegations of custody.  See Kiyemba, 561 F.3d at 515 n.7 (relying on government declarations "in the absence of contrary evidence" and petitioner's "failure to present anything that contradicts them"); In re Petitioners, 700 F. Supp. 2d at 128 (holding that petitioners' "blanket allegations" were insufficient in light of government declarations); Al Hajji, 2009 WL 4251108, at *1–2 ("no basis on this record" for determination that petitioners were in constructive custody of United States where they provided only "rank speculation," in contrast to government declaration); Maqaleh, 738 F.3d at 323 n.5 (finding government declaration would be sufficient if detainee's evidence "fails to impugn" declaration's accuracy).

Plaintiffs here, in contrast, do provide specific evidence to support their claims of constructive custody, including ample evidence previously unavailable to the Court when it first addressed this question — statements by El Salvadoran officials, whistleblower statements by Government officials, public statements by top U.S. officials, and even clear evidence of a U.S.-Venezuelan prisoner swap.

\*       \*       \*

All in all, the undisputed factual record indicates that the United States and El Salvador have behaved as principal and agent in the detention and subsequent release of Plaintiffs.  The Abu Ali factors help crystallize the evidence into three takeaways supporting a finding of constructive custody: El Salvador acted at the behest of the United States, it was indifferent to Plaintiffs' detention outside of honoring its arrangement with the United States, and the United States retained the ability to control their release from CECOT.

Plaintiffs' habeas claims are therefore properly before this Court under § 2241(c). Because this habeas action may proceed regarding Plaintiffs' detention abroad, this Court sitting in the District of Columbia would be the proper venue for those claims, a point the Government

has previously conceded.  See May 7 Hr'g. Tr. at 14:18–24; Rumsfeld v. Padilla, 542 U.S. 426, 447 n.16 (2004); Rasul v. Bush, 542 U.S. 466, 483–84 (2004).

### 2.    *Mootness*

The Government next argues that even if there was custody in April, any challenge to Plaintiffs' detention in CECOT is now moot because they have since been released back to Venezuela.  Release from custody will not moot a habeas claim, however, if the petitioner continues to suffer "collateral consequences of his prior detention."  In re Petitioners, 700 F. Supp. 2d at 129.  A collateral consequence must be a concrete injury that is redressable by a favorable decision on the petitioner's claim.  Spencer v. Kemna, 523 U.S. 1, 7 (1998).

Under the collateral-consequences doctrine, as well as a more general evaluation of fundamental mootness principles, Plaintiffs' claims remain justiciable by this Court even after their release from CECOT.  This is because Plaintiffs attack not their now-ended detention in CECOT, but their failure to receive a hearing to challenge the AEA Proclamation and designation as TdA members that sent them there.  Although their detention has now ended — likely after much suffering by Plaintiffs, see Julie Turkewitz et al., 'You Are All Terrorists': Four Months in a Salvadoran Prison, N.Y. Times (Nov. 8, 2025), https://perma.cc/FB47-ZQ2U — other consequences continue.

The Proclamation itself lists a set of restrictions that applies to Plaintiffs as a result of their designation, including barring their entry into the United States, barring their residing in this country, and subjecting them to property seizure and forfeiture.  See 90 Fed. Reg. at 13034–35.  Similarly, their designations under the Proclamation also subject them to other restrictions that apply to members of foreign terrorist organizations (FTOs), such as the freezing of their assets and an additional bar on entry into the United States.  See 18 U.S.C. § 2339B(a)(2); 8

U.S.C. § 1182(a)(3)(B)(i)(V).  Plaintiffs are also prevented from applying for asylum as a result of their designation.  Compare 8 U.S.C. § 1158(a) (noncitizen physically present in United States or who arrives in United States may apply for asylum), with id., § 1158(b)(2)(A)(v) (no right to apply for asylum if Attorney General determines, inter alia, that noncitizen is a member of terrorist organization).  If Plaintiffs were to succeed in their challenge to their designation as TdA members and alien enemies, these ongoing injuries would be remedied.  Plaintiffs would not then be subject to the restrictions under the AEA, nor to the additional restrictions imposed on members of FTOs, nor barred from asylum based on FTO membership.  This reasoning holds even if all the Court grants Plaintiffs is the opportunity to challenge their designations because that remedy would significantly increase the odds that they may change their designation.  Utah v. Evans, 536 U.S. 452, 464 (2002) (injury redressable if court decision creates "a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered").  Plaintiffs' habeas claims thereby continue to present redressable injuries for this Court to consider.

Defendants cite to Gul v. Obama, 652 F.3d 12, 18 (D.C. Cir. 2011), to argue that Plaintiffs' travel restrictions cannot amount to a collateral consequence.  See Gov. Opp. PI at 22. Even if that were true, the other remaining restrictions on Plaintiffs keep this case alive.  That said, the Court finds that the Government has overread Gul's travel-restrictions holding, which turned on two key facts not found in this case.

First, it was unclear whether petitioners in that case even wanted to travel back to the U.S., such that the harm of being barred from doing so was too remote to constitute an injury. See Gul, 652 F.3d at 18.  Plaintiffs here, conversely, have filed sworn declarations stating a desire to return to our shores.  See Redacted Decl. 1, ¶ 11; Redacted Decl. 2, ¶ 21; Redacted

Decl. 3, ¶ 16; ECF No. 177-7 (Redacted Decl. 4), ¶ 16.  Second, the travel restrictions raised as collateral consequences were not redressable in Gul.  Petitioners there were placed on the No Fly List because they had previously been detained in Guantanamo Bay, and "any individual who was a detainee held at . . . Guantanamo Bay" must be included on the No Fly List.  See 49 U.S.C. § 44903(j)(2)(C)(v).  Even if the court had found their designation as enemy combatants to be unlawful, that finding would have had no impact on the petitioners' travel restrictions: "Gul and Hamad will accordingly be barred from flights entering the United States regardless whether a court declares they were unlawfully detained."  Gul, 652 F.3d at 19.  This is markedly different from our case, where a grant of Plaintiffs' Motion could result in vitiating the restrictions they currently face.

For these reasons, the Court finds that Plaintiffs' habeas claims continue to present a case or controversy for review.  As their claims are justiciable via habeas jurisdiction, the Court need not assess its equitable due-process jurisdiction.  J.A.V. v. Trump, 781 F. Supp. 3d 535, 554 (S.D. Tex. 2025).

B.    Class Certification

Next up is the question of class certification.  The Court first considers whether it is ever permissible in habeas cases, then if the putative class should be certified in this case.

1.    *Habeas Class Actions*

The Government contends that because "habeas petitions are incompatible with class actions," this Court cannot certify Petitioners' putative class.  See ECF No. 183 (Gov. Opp. Class Cert.) at 5.  True, the Supreme Court has "never decided whether Federal Rule of Civil Procedure 23, providing for class actions, is applicable to petitions for habeas corpus relief."  Schall v. Martin, 467 U.S. 253, 261 n.10 (1984).  Even if the "precise provisions" of Rule 23 do

not govern habeas claims, United States ex rel. Sero v. Preiser, 506 F.2d 1115, 1125 (2d Cir.

1974), the Supreme Court has held many times over that courts overseeing habeas actions have

the ability and the obligation to adopt procedures enabling them to "provide a prompt and

efficacious remedy for whatever society deems to be intolerable restraints."  Fay v. Noia, 372

U.S. 391, 401–02 (1963); see Harris v. Nelson, 394 U.S. 286, 291 (1969) (federal courts "not

only may" apply procedures to support habeas inquiry but "must do so upon an appropriate

showing" of need for them) (emphasis added); Hensley v. Mun. Ct., San Jose Milpitas Jud. Dist.,

411 U.S. 345, 350 (1973) ("[W]e have consistently rejected interpretations of the habeas corpus

statute that would suffocate the writ in stifling formalisms . . . .").  Where "habeas corpus

jurisdiction and the duty to exercise it [are] present, the courts may fashion appropriate modes of

procedure" to govern habeas proceedings.  Harris, 394 U.S. at 299 (rejecting applicability of

Rule 33 to habeas action but permitting similar interrogatory procedure through All Writs Act).

        The Second Circuit, relying on Harris, reasoned that the All Writs Act granted courts the

authority to adopt features of Rule 23 to adjudicate aggregated claims in habeas proceedings.

Sero, 506 F.2d at 1125–26.  That Act empowers federal courts to "issue all writs necessary or

appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of

law."  28 U.S.C. § 1651(a).  The All Writs Act does not "enlarge" a court's jurisdiction, Clinton

v. Goldsmith, 526 U.S. 529, 535 (1999), or grant courts some freestanding authority to act

"[w]here a statute specifically addresses the particular issue at hand."  Pa. Bureau of Corr. v.

U.S. Marshals Serv., 474 U.S. 34, 43 (1985).  It does permit courts to issue orders "'in aid of' the

issuing court's jurisdiction."  Clinton, 526 U.S. at 534 (quoting 28 U.S.C. § 1651(a)), or to

prevent actions that would "frustrate the implementation of a court order or the proper

administration of justice."  United States v. N.Y. Tel. Co., 434 U.S. 159, 174 (1977).  Even if

"[t]here is no evidence that habeas class actions existed at the Founding," Gov. Opp. Class Cert. at 10, a court may issue orders that "fill[] the interstices of federal judicial power when those gaps threaten[] to thwart the otherwise proper exercise of federal courts' jurisdiction." Pa. Bureau, 474 U.S. at 41; see also ITT Cmty. Dev. Corp. v. Barton, 569 F.2d 1351, 1359 (5th Cir. 1978) (when its jurisdiction is threatened, court may "employ procedures necessary" for resolution of issues before it).

The Government argues that the All Writs Act does not authorize habeas class actions because a class would never be "necessary or in appropriate aid of [the courts'] respective jurisdictions" in a habeas case. See Gov. Opp. Class Cert. at 9–10 (alteration in original) (quoting 28 U.S.C. § 1651(a)). That cannot be right. Take this case, where the Government has the sole discretion to exempt named Plaintiffs from the effects of the policy they challenge, thereby selectively mooting their claims and depriving this Court of jurisdiction. Class certification can mitigate the Government's ability to unilaterally moot any claims and so be "necessary or in appropriate aid of [this Court's] jurisdiction." U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 398 (1980) ("When . . . there is no chance that the named plaintiff's expired claim will reoccur, mootness still can be avoided through certification of a class prior to expiration of the named plaintiff's personal claim."); see also Adam S. Zimmerman, The Class Appeal, 89 U. Chi. L. Rev. 1419, 1456 (2022) (habeas class actions "preserve courts' jurisdiction in situations where the executive branch effectively controls whether the case will expire before judgment"). The Court thus holds that the All Writs Act authorizes courts to order class-like aggregation of habeas claims in cases like the one before it.

Courts so agreeing are legion. "[T]he broad consensus among the circuit courts is that representative actions akin to a class action may be brought in habeas proceedings." Guerrero

Orellana v. Moniz, 2025 WL 3033769, at *7 (D. Mass. Oct. 30, 2025) (collecting cases); see also

Mead v. Parker, 464 F.2d 1108, 1112–13 (9th Cir. 1972) (while "usual habeas corpus case" is

not suitable for class-action treatment, when "the relief sought can be of immediate benefit to a

large and amorphous group," class action "may be appropriate"); Williams v. Richardson, 481

F.2d 358, 361 (8th Cir. 1973) (similar).  The D.C. Circuit signaled as much when it rejected the

argument that "there is no equivalent to class actions in habeas," noting that "courts have in fact

developed such equivalents."  LoBue v. Christopher, 82 F.3d 1081, 1085 (D.C. Cir. 1996)

(resolving case on other grounds).

    The Government protests that habeas is "an individualized writ" that is not "amenable to

classwide resolution."  Gov. Opp. Class Cert. at 5.  It is indeed true that when a prisoner protests

the validity of his criminal conviction, that challenge would be fundamentally at odds with class-

wide adjudication.  See Lee Kovarsky & D. Theodore Rave, Habeas Class Actions, 139 Harv. L.

Rev. (forthcoming 2026) (manuscript at 24), https://perma.cc/FQ2B-X5U7.  But those individual

variations in conviction type, detention length, or procedural history may not matter when

petitioners challenge a universally applicable policy or procedure.  Certifying a class, then,

seems exactly the sort of procedural mechanism that allows courts to administer habeas actions

"with the initiative and flexibility necessary to insure that miscarriages of justice within its reach

are surfaced and corrected."  Harris, 394 U.S. at 291.

    Other courts, moreover, have held that precisely the action petitioners bring — one

challenging the removal of noncitizens under the Alien Enemies Act without due process — is

ideal for class-wide resolution.  See D.B.U. v. Trump, 349 F.R.D. 228, 235–36 (D. Colo. 2025);

Arevalo v. Trump, 785 F. Supp. 3d 644, 668 (C.D. Cal. 2025); J.A.V. v. Trump, 349 F.R.D. 152,

155 (S.D. Tex. 2025) (citing Harris to hold that "unusual circumstances of the case presented a

compelling justification for allowing a multi-party proceeding similar to the class action authorized by the Rules of Civil Procedure") (quotation marks omitted); but see W.M.M. v. Trump, 782 F. Supp. 3d 370, 380 (N.D. Tex. 2025) (denying class certification for failure to satisfy Rule 23 prerequisites), vacated by A.A.R.P. v. Trump, 605 U.S. 91 (2025). "Given the nature of the case, there can be no genuine issues of fact" that differentiate the putative class members. Bijeol v. Benson, 513 F.2d 965, 968 (7th Cir. 1975). A class-like representative action is thus an appropriate and optimal way to determine "[t]he single issue of law presented." Id.; see also Richardson, 481 F.2d at 361 (discussing class-action advantages of judicial economy and benefit to similarly situated individuals in habeas proceedings).

This Court agrees that the aggregation of individual claims in a class-like procedure is permissible in habeas actions and that such aggregation could be appropriate here. It next evaluates whether the CECOT class still satisfies Rule 23, as the Court held it did in its June 4 Opinion. J.G.G., 786 F. Supp. 3d at 76–79.

2.    *Rule 23(a) Prerequisites*

While not required in a habeas class-action equivalent, other courts have applied Rule 23(a)'s prerequisites to evaluate an action's suitability for class-wide adjudication. See, e.g., J.A.V., 349 F.R.D. at 156 ("When determining whether a procedure analogous to a Rule 23 class action is appropriate in a particular habeas corpus proceeding, courts can consider the Rule 23 factors."); M.A.P.S. v. Garite, 349 F.R.D. 631, 636 (W.D. Tex. 2025); D.B.U., 349 F.R.D. at 235–36. This Court follows suit to ensure that the same "procedural protections built into the Rule to protect the rights of absent class members during litigation" are also in place here. Ortiz v. Fibreboard Corp., 527 U.S. 815, 847 (1999).

a.    Numerosity

The numerosity requirement reserves class certification for cases in which "the class is so numerous that joinder of all members is impracticable," Fed. R. Civ. P. 23(a)(1); otherwise, plaintiffs should simply be joined as named parties under Rule 20(a)(1).  Courts have interpreted numerosity to encompass an "inherently fact-based analysis" concerning both the quantity of plaintiffs — "'41 or more is usually sufficiently numerous'" — and "the ability of individual class members to pursue their cases through the use of joinder."  In re Modafinil Antitrust Litig., 837 F.3d 238, 249–50 (3d Cir. 2016) (quoting 5 Moore's Federal Practice § 23.22); see 1 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 3:12 (6th ed. 2025); Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993).  The "factors relevant to the practicability of joinder" include "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, [and] the ability of claimants to institute individual suits."  Robidoux, 987 F.2d at 936.

Plaintiffs' putative class clears the numerosity bar with room to spare.  The CECOT class includes at least 137 detainees — well over the "general benchmark" of 40.  R.I.L.-R v. Johnson, 80 F. Supp. 3d 164, 181 (D.D.C. 2015); see J.G.G., 786 F. Supp. 3d at 77.  This Court previously found that joinder would be impracticable when the class members were imprisoned at CECOT because they "lack[ed] contact with the outside world and fac[ed] challenges in procuring legal representation."  J.G.G., 786 F. Supp. 3d at 77.  Those hurdles have only compounded following their transfer to Venezuela.  Logistical difficulties, geographical dispersion, and fear of surveillance in Venezuela thwart counsel's efforts to contact detainees and represent them in this suit, making joinder to this suit or pursuit of individual claims even more challenging than when they were confined in the same location at CECOT.  See Nov. 19 Hr'g Tr. at 13:16–24;

Robidoux, 987 F.3d at 936 ("geographic dispersion" over single state weighed in favor of numerosity); J.D. v. Azar, 925 F.3d 1291, 1323 (D.C. Cir. 2019) ("dispersion of class members across the country" is "non-numerical consideration[] that might make joinder impracticable"). Far from the Government's contention that the class fails numerosity because it is not "ascertainable," Gov. Opp. Class Cert. at 16, the hurdles in contacting each individual detainee bolster this action's suitability for class-wide treatment.

b.      Commonality

Commonality requires proponents of class certification to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement captures "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009) (emphasis in original).

This Court has already found fundamental similarities across the class — namely, the detainees were all corralled onto a couple of airplanes and "remov[ed] to CECOT without adequate notice and an opportunity to file a habeas petition." J.G.G., 786 F. Supp. 3d at 77. The thrust of the commonality among the class remains the same: all were deported from the United States at the same time, in the same way, pursuant to the same invocation of the Alien Enemies Act. See Am. Compl., ¶¶ 64–74. They likewise seek uniform answers to the same questions: do individuals have a right to some minimum process prior to their removal under the Act? And did the Government violate the class members' due-process rights by removing them as it did? The answer to those questions is either "yes" or "no" for all class members because of the identical process (or lack thereof) they received. The removal process cannot simultaneously be lawful as to some class members' claims and violative as to others'. Where, as here, "there are genuinely

common issues" such that "the accuracy of the[ir] resolution . . . is unlikely to be enhanced by repeated proceedings," courts should "resolve those issues in one fell swoop." Mejdrech v. Met-Coil Sys. Corp., 319 F.3d 910, 911 (7th Cir. 2003).

The Government seeks to muddy the waters by pointing to differences in the class members' circumstances now that they have been transferred to Venezuela. See Gov. Opp. Class Cert. at 13 (noting that "little is known about the class members' current circumstances"). Those differences all arose after the CECOT class was removed under the AEA Proclamation and do not bear on the central question of whether that removal deprived Plaintiffs of due-process rights to "contest their AEA designations." Renewed Mot. PI at 2. The determination of that question "will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). Even if every Plaintiff must bring later claims separately in a different court, there would be no need to relitigate the validity of his removal procedures in the first place. McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491 (7th Cir. 2012).

Nor does the fact that some class members might prefer to stay in Venezuela rather than return to the United States defeat commonality. Within any class, some members might elect not to claim a particular remedy. J.D., 925 F.3d at 1314. But the availability of a remedy to "uninterested individuals" does not threaten class certification unless it prompts a "'conflict of interest between named parties and the class they seek to represent.'" Id. (alterations omitted) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997)). Plaintiffs here seek the opportunity to assert their various habeas claims and an injunction requiring the Government's assistance to do so. See Renewed Mot. PI at 3. Whether five, fifty, or all of the class members take advantage of such relief, the ability of other class members to obtain a remedy will not be

34

affected. Cf. Amchem, 521 U.S. at 626 (conflict between interest in "generous immediate payments" for certain plaintiffs and "an ample, inflation-protected fund for the future" for others weighed against class certification).

    c.  Typicality

  Typicality, which "often overlaps with commonality," J.G.G., 786 F. Supp. 3d at 78 (cleaned up), assesses whether the named Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977) (quotation marks omitted). Plaintiffs, as with "all members of the putative CECOT class," were removed "solely under the [AEA] Proclamation." J.G.G., 786 F. Supp. 3d at 78 (redefining class to exclude potentially atypical class members subject to final orders of removal under INA. Indeed, any detainee so removed on the first two planes that departed from Texas on March 15 could be a class representative under this metric. See Kovarsky & Rave, Habeas Class Actions (manuscript at 44) (referring to Petitioners' claims and noting that "[i]n advancing their own claims, they would advance the class's interest at the same time").

    d.  Adequacy of Representation

  The Government does not dispute that Plaintiffs' counsel would ably represent both the class representatives and the unnamed class members' interests. See Gov. Opp. Class Cert. at 12–17. The Court nonetheless examines the sufficiency of the named Plaintiffs' proposed representation of absent class members given the Government's argument that only a detainee or his "next friend" can bring an action in habeas. Id. at 7.

  A non-detainee can apply for a writ of habeas corpus on behalf of a detainee under 28 U.S.C. § 2242 (contemplating that "[a]pplication for a writ of habeas corpus" may be brought "by someone acting on [detainee's] behalf"). That "next friend" must "provide an adequate

explanation . . . why the real party in interest cannot appear on his own behalf to prosecute the action" and "must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate." Whitmore ex rel. Simmons v. Arkansas, 495 U.S. 149, 163 (1990). These requirements bar "intruders or uninvited meddlers" from thrusting themselves forward and prevent third parties with no stake in someone else's habeas petition from litigating their claims. Id. at 164. In this case, the named Plaintiffs functionally seek to serve as the "next friend" for all other CECOT Class members.

The "next friend" inquiry dovetails neatly with Rule 23(a)(4)'s requirement that courts must determine whether "the representative parties will fairly and adequately protect the interests of the class." The animating question in both doctrines is whether the named parties can provide sufficient "guarantees of loyalty" to "those whose rights must ultimately be adjudicated in absentia" — here, the unnamed detainees. See Samuel Issacharoff, Governance and Legitimacy in the Law of Class Actions, 1999 Sup. Ct. Rev. 337, 341 (delineating "due process approach" to class certification). Such guarantees are easier to obtain when there are no "conflicts of interest between named parties and the class they seek to represent." Amchem, 521 U.S. at 625. Here, all class members have the same interest in having their removals under the AEA declared unlawful. The Court perceives no opportunity for abuse of the "next friend" status.

Quite the opposite: the strictures of Rule 23 protect exactly the interests that "next friend" requirements do. Here, the unnamed class members "cannot appear on [their] own behalf to prosecute the action," Whitmore, 495 U.S. at 163, because they are scattered throughout Venezuela with little ability to talk freely to counsel. The named members thus gave "an adequate explanation" of why they should bring the action in place of their unavailable counterparts. Id. What is more, the typicality requirement ensures that the named plaintiffs have

36

"suffer[ed] the same injury as the [unnamed] class members," E. Tex. Motor Freight Sys., 431

U.S. at 403 (quotation marks omitted) — which in turns means they are not evading standing

requirements.  See Whitmore, 495 U.S. at 164 (raising this concern).  A robust Rule 23(a)

inquiry thus achieves the same ends as the "next friend" protection.  See Kovarsky & Rave

(manuscript at 44) (linking "fundamental constitutional requirement" that Rule 23(a) protects

with § 2242's representative-litigation provision).

        2.    *Rule 23(b)(2)*

        Just as the CECOT Class can be treated as a cohesive unit under Rule 23(a)'s

prerequisites, it meets Rule 23(b)(2)'s requirement that the Government "has acted or refused to

act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate

respecting the class as a whole."  The Government retorts that Rule 23(b)(2) "does not authorize

certification here" because (b)(2) classes are inappropriate "when each individual class member

would be entitled to a different injunction."  Gov. Opp. Class Cert. at 18 (quotation marks

omitted).  It once again sidesteps the relief Plaintiffs actually seek: an injunction affording them

the ability to return to the United States to challenge their AEA designations via process they

previously lacked.  See Renewed Mot. PI at 3.  Class certification to adjudicate and remedy the

initial harm, common to all Plaintiffs, thus comports with Rule 23(b)(2)'s standard.  J.G.G., 786

F. Supp. 3d at 79 (certification of (b)(2) class appropriate when "'single injunction' would . . .

'provide relief to each member of the class'") (quoting Wal-Mart, 564 U.S. at 360).

                    *         *         *

        The Court, accordingly, will certify the same class as before: All noncitizens removed

from U.S. custody and transferred to the Terrorism Confinement Center (CECOT) in El Salvador

on March 15 and 16, 2025, pursuant solely to the Presidential Proclamation entitled, "Invocation

of the Alien Enemies Act Regarding the Invasion of The United States by Tren de Aragua."

J.G.G., 786 F. Supp. 3d at 79–80; see also ECF No. 178 (Renewed Mot. Class Cert.) at 1

(seeking "certification of the same class" Court previously certified).

        C.    Merits

    Having now determined its jurisdiction and delineated the group seeking relief, the Court

may at last consider the merits of Plaintiffs' suit.  Its inquiry is guided by their request that they

be permitted to "contest their AEA designations" and that the Government "ensure [Plaintiffs']

cases are handled as they would have been if the Government had not provided constitutionally

inadequate process."  Renewed Mot. PI at 3 (quotation marks omitted).  The instant Motion does

not, in other words, ask the Court to rule at this juncture that Proclamation 10903 exceeded the

statutory bounds of the Alien Enemies Act because, for example, the United States is not

experiencing an "invasion or predatory incursion" from a "foreign nation or government."

Plaintiffs similarly are not at this point asking for a ruling on their designation as TdA members.

    Their contention in this Motion is simpler: they and every member of the CECOT class

were prevented from "contest[ing] their AEA designations" because the Government "provided

constitutionally inadequate process" before removing them under the AEA.  See Renewed Mot.

PI at 3 (quotation marks omitted).  They seek, as this Court ordered in June, an injunction

requiring the Government to "facilitate Plaintiffs' ability to proceed through habeas," as if they

had not been improperly removed in the first instance.  Id. (quotation marks omitted).  Put

differently, they could have challenged the validity of the President's Proclamation invoking the

AEA, see Am. Compl., ¶ 110, the propriety of removing noncitizens outside the processes in the

Immigration and Nationality Act, id., ¶ 50, and their individual designations as TdA members,

see, e.g., Redacted Decl. 2, ¶ 20; Redacted Decl. 3, ¶ 5, back in March had they been afforded

the opportunity to do so before their hasty removal.  They now seek the chance to raise each of those arguments, and presumably more, in United States courts upon return to this country.

The merits of Plaintiffs' due-process claim are easily resolved.  Even if the AEA was properly invoked as a general matter, it is beyond cavil that designated "alien enemies" under that act must be afforded some process to contest their designation.  A.A.R.P., 605 U.S. at 94–95.  Here, Plaintiffs received none.  They were not told of their designation or informed that they could challenge it before being loaded onto planes and shipped out of the United States mere hours after Proclamation 10903 was made public.  See Am. Compl., ¶¶ 66–67, 69; see also, e.g., ECF Nos. 102-10 (M.Y.O.R. Decl.), ¶ 10; 102-8 (D.A.R.H. Decl.), ¶ 15.  The Supreme Court has unequivocally affirmed that in circumstances like these, "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster."  A.A.R.P., 605 U.S. at 95.  Other courts have consistently required that detainees receive an opportunity spanning days — not hours — to file a habeas petition challenging their designation before deportation.  See Gutierrez-Contreras v. Warden, 2025 WL 1202547, at *4 (C.D. Cal. Apr. 25, 2025) (14 days); D.B.U. v. Trump, 779 F. Supp. 3d 1264, 1269 (D. Colo. 2025) (21 days); A.S.R. v. Trump, 782 F. Supp. 3d 224, 249–50 (W.D. Pa. 2025) (21 days).  By any measure, the detainees surely fell victim to constitutionally inadequate process.

At various points in this litigation, the Government itself has not even contested that the detainees who now make up the CECOT class received inadequate process prior to their removal.  See generally July 24 Hr'g Tr. (Government not contesting Court's finding on merits of due-process violation); Gov. Opp. PI (same); May 7 Hr'g Tr. at 29:24–31:21.  There can be no genuine dispute about this question now.  Because all detainees were subject to an identical

removal, see Am. Compl., ¶¶ 64–74, the Court holds that the entire class received constitutionally inadequate process on the weekend of March 14–16, 2025, when class members were given no meaningful notice of their AEA designations and no opportunity to challenge them.  The Court thus turns to an appropriate and feasible remedy to rectify this constitutional violation.

D.    Remedy

It is well settled that statutory habeas-corpus remedies are not confined to release. Carafas v. LaVallee, 391 U.S. 234, 239 (1968) ("[T]he statute does not limit the relief that may be granted to discharge of the applicant from physical custody.  Its mandate is broad with respect to the relief that may be granted."); 28 U.S.C. § 2243 (instructing courts to "dispose of [a petition] as law and justice require").  "[I]f, at the time the habeas corpus petition is considered, justice requires relief for the applicant, a federal court possesses power to grant any form of relief necessary to satisfy the requirement of justice."  Levy v. Dillon, 415 F.2d 1263, 1265 (10th Cir. 1969).  The flexibility of habeas remedies is "essential to insure that miscarriages of justices within its reach are surfaced and corrected."  Harris, 394 U.S. at 291; Jones, 371 U.S. at 243 (habeas is not "a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose"); Velasco Lopez v. Decker, 978 F.3d 842, 855 (2d Cir. 2020) ("Habeas corpus, as the Supreme Court has said, is an 'adaptable remedy,' the 'precise application and scope' of which changes 'depending upon the circumstances.'  The equitable and flexible nature of habeas relief also gives the reviewing court considerable latitude 'to correct errors that occurred during the [prior] proceedings.'") (alteration in original) (citation omitted) (quoting Boumediene v. Bush, 553 U.S. 723, 786 (2008)).

By granting the Motion, this Court is declaring that Plaintiffs should not have been removed in the manner that they were, with virtually no notice and no opportunity to contest the bases of their removal, in clear contravention of their due-process rights.  The Government, furthermore, does not dispute that the Proclamation was the sole basis for their removal.  See Gov. Opp. PI at 1–2.

Had Plaintiffs not been removed to El Salvador, granting their Motion would have led this Court to enjoin the Government from removing them pursuant to the Proclamation until they had received the opportunity to challenge their designations under the AEA and the validity of the Proclamation.  See J.A.V., 781 F. Supp. 3d at 565 (granting permanent injunction barring government from "detaining, transferring, or removing [named plaintiffs] and the members of the certified class, under the Alien Enemies Act"); Renewed Mot. PI at 32.  It obviously cannot do so here as removal has already taken place.

The remedy must thus adapt to meet the injury that has occurred.  The Court finds that the only remedy that would give effect to its granting of Plaintiffs' Motion would be to order the Government to undo the effects of their unlawful removal by facilitating a meaningful opportunity to contest their designation and the Proclamation's validity.  Otherwise, a finding of unlawful removal would be meaningless for Plaintiffs, who have already been sent back to Venezuela against their wishes and without due process.  Expedited removal cannot be allowed to render this relief toothless.  If secretly spiriting individuals to another country were enough to neuter the Great Writ, then "the Government could snatch anyone off the street, turn him over to a foreign country, and then effectively foreclose any corrective course of action."  J.G.G., 786 F. Supp. 3d at 82 (citing Abrego Garcia, 145 S. Ct. at 1019 (statement of Sotomayor, J.)).

The Supreme Court has already unanimously agreed that facilitating an individual's return to the United States is a proper remedy, one that does not upset the Executive Branch's exclusive authority over foreign affairs. Abrego Garcia, 145 S. Ct. at 1018 (finding district court order "properly requires the Government to 'facilitate' Abrego Garcia's release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador"). Even so, the Court remains mindful of the deference due to the Executive Branch on issues of foreign affairs. Id. (instructing district court to act with "due regard for the deference owed to the Executive Branch in the conduct of foreign affairs"). For that reason, the Court will allow the Government to articulate what steps it proposes to facilitate the return of Plaintiffs.

The Court agrees with the District of Massachusetts that the fact that Plaintiffs are "not held by any foreign government" should make facilitating their return easier. D.V.D. v. U.S. Dep't of Homeland Sec., 784 F. Supp. 3d 401, 412 n.10 (D. Mass. 2025). Further, it notes that as recently as July 2025, the Venezuelan government has signaled that it would not oppose the return of removed individuals to the United States. See Harper Decl., ¶ 9 (explaining that Government has "obtained assurances from" Venezuela that "the Maduro regime will not impose obstacles" if individual previously detained at CECOT wished to return to United States). Finally, the Court proffers that ICE's policy on returning lawfully removed individuals provides some tangible starting points for the Government, including actions such as "issuing a Boarding Letter to permit commercial air travel" or "parol[ing] the alien into the United States upon his or her arrival at a U.S. port of entry." U.S. Immigr. & Customs Enf't, Policy Directive No. 11061.1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens, § 3.1 (Feb. 24, 2012); see also Abrego Garcia v. Noem, 2025 WL 1135112, at *1 (4th Cir. Apr. 17,

42

2025) ("'Facilitate' is an active verb."). The Government could also theoretically offer Plaintiffs a hearing without returning them to the United States so long as such hearing satisfied the requirements of due process.

The Court will give the Government two weeks to submit its proposal.

## IV. Conclusion

For the foregoing reasons, the Court will grant Plaintiffs' Motion for Class Certification, grant Plaintiffs' Motion for Summary Judgment, and deny the Government's Motion for Summary Judgment. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: December 22, 2025