IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, *et al.*, <br><br> *Petitioners–Plaintiffs*, <br><br> J.G.G., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> *Respondents–Defendants*. | Case No: 1:25-cv-00766-JEB |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' REMEDIAL PROPOSAL**[1]

The Court directed Defendants to provide a proposal "to facilitate the return of Plaintiffs to the United States or to otherwise provide them with hearings that satisfy the requirements of due process." Order, ECF No. 214. Defendants have failed to proffer any meaningful proposal. First, Defendants ignore obvious alternatives. For class members who are no longer in Venezuela or who may be able to travel to a third country (as some have), there is no obstacle: Defendants can facilitate remote proceedings, including from U.S. embassies and consulates overseas—just as DHS's own policies contemplate—and they can also facilitate class members' transportation, return, and reentry to the United States from third countries. Second, Defendants' conclusory

---

[1] In light of the court's closure yesterday due to inclement weather, Plaintiffs understand the deadline for this response to have been extended by one day. *See* Fed. R. Civ. P. 6(a)(3).

explanations for why it is not feasible at this time to provide due process for those class members in Venezuela are insufficient.

### I.  DEFENDANTS HAVE FAILED TO ADDRESS ALTERNATIVES THAT CAN PROVIDE RELIEF FOR CLASS MEMBERS.

Even setting aside Defendants' contention that, at this time, they cannot ensure due process for those in Venezuela (via remote hearings or their return to the United States), the government's claim that there is *no* feasible path forward for class members to obtain relief fails to account for ways in which Defendants routinely facilitate access to immigration proceedings from outside the United States. Thus, even if the Court were to credit Defendants' claims about Venezuela at present, any such issues are plainly surmountable for class members who are able to reach a third country.

ICE guidance contemplates the possibility of remote immigration proceedings, stating that ICE may "arrang[e] for video teleconferencing or telephonic testimony, if appropriate." Third Supplemental Declaration of Oscar Sarabia Roman, Exh. 1. The guidance observes: "Most courts and many foreign embassies have the technology to support your participation in your immigration hearing by either video teleconferencing or by phone." Sarabia Roman Third Supp. Decl., Exh. 2. Indeed, "Venezuelan applicants for nonimmigrant visas can apply at any U.S. Embassy or Consulate around the world." Sarabia Roman Third Supp. Decl., Exh. 3. Many Venezuelans apply at the U.S. Embassy in Bogota where the U.S. Department of State's Venezuela Affairs Unit has been housed since 2019.

Class members could likewise travel from a third country to the United States directly and be paroled into the United States. That is consistent with ICE Directive 11061.1, which says that ICE will:

> engage in activities which allow a lawfully removed alien to travel to the United States (such as by issuing a Boarding Letter to permit commercial air travel) and . . . parole the alien into the United States upon his or her arrival at a U.S. port of entry.

Sarabia Roman Third Supp. Decl., Exh. 4.[2]

None of Defendants' objections to remote proceedings from Venezuela have any relevance to proceedings from a third country. For example, Defendants complain that they "could not meaningfully enforce perjury laws against witnesses in Venezuela" due to the lack of an extradition treaty. Defs.' Resp. 3. The D.C. Circuit has previously rejected an almost identical argument. *See El-Hadad v. United Arab Emirates*, 496 F.3d 658, 669 (D.C. Cir. 2007) (permitting video testimony despite argument that, "with no extradition treaty between the United States and Egypt," witness "could not be prosecuted for perjury"). And in any event, Colombia and other countries to which class members may be able to travel do have extradition treaties with the United States.

Accordingly, the Court should order Defendants to provide options from third countries for class members immediately.

## II.  DEFENDANTS' EXPLANATION FOR WHY THEY CANNOT PROVIDE DUE PROCESS FOR THOSE IN VENEZUELA IS UNPERSUASIVE.

Even for those class members in Venezuela, Defendants' conclusory explanations for why it is not feasible to provide due process are unpersuasive. Some, perhaps many, cases can likely be resolved on the papers, without the need for live testimony. And Defendants' speculative and conclusory objections provide no basis to find live testimony infeasible. Finally, the Rubio

---

[2] This Directive specifically describes ICE policy for "facilitating the return to the United States" of individuals who were "lawfully removed" while their petition for review (PFR) was pending. Sarabia Roman Third Supp. Decl. Exh. 4. If their PFR is "granted by a U.S. court of appeals or the U.S. Supreme Court," the policy describes how ICE may facilitate their return. *Id.* There is no reason similar procedures cannot be followed as to individuals, like class members, *unlawfully* removed.

3

Declaration's explanation for why it is not possible at this time to allow class members to return from Venezuela is too conclusory to warrant deference without further elaboration.

    1. As an initial matter, habeas proceedings need not proceed to an evidentiary stage: "on the facts admitted, it may appear that, as matter of law, the prisoner is entitled to the writ and to a discharge." *Walker v. Johnston*, 312 U.S. 275, 284 (1941). And, like other civil cases, habeas claims may be granted upon a motion for summary judgment. 1 Fed. Habeas Corpus Practice & Proc. § 17.3 (describing the appropriateness of petitioner-initiated summary proceedings where "no facts are in dispute"); Fed. R. Civ. P. 81(a)(4) (describing applicability of the Federal Rules of Civil Procedure to habeas corpus proceedings); *e.g.*, *Foster v. Barbour*, 613 F.2d 59, 60-61 (4th Cir. 1980) (granting writ without evidentiary hearing where such a hearing would "not have developed any further facts" to affect the court's decision).

    It is likely that in many cases there will be no genuine dispute of material fact after the petitioner puts forward their petition and seeks summary judgment on the basis that the government was wrong to designate them as a member of TdA. *See, e.g.*, *Bacha v. Obama*, 2009 WL 2365846, at *1 (D.D.C. July 30, 2009) (granting habeas relief after government conceded that it "no longer treat[ed] petitioner as detainable"); *Abdah v. Obama*, 717 F. Supp. 2d 21, 36 (D.D.C. 2010) (granting habeas relief because government presented "no evidence that [petitioner] has any connection to Al Qaeda").

    To begin, the evidentiary record and independent reporting show that there is no indication that the overwhelming majority of class members have any connection to TdA whatsoever, and that the government's criteria for designation were arbitrary and irrational—such that mass erroneous designations were entirely predictable. Scores of individuals appear to have been designated as TdA based largely on innocuous tattoos. But experts who study TdA explain that

4

TdA "has never had . . . identity marks such as tattoos that identify its members." Antillano Decl. ¶ 14 (ECF No. 67-4); Hanson Decl. ¶¶ 22, 24 (ECF No. 67-3) ("Tattoos are not a reliable way to identify members of the group."); Dudley Decl. ¶ 25 (ECF No. 67-12) (tattoos are not a "reliable means" of identifying TdA); *see also* Sarabia Roman Decl., Exh. 20 (ECF No. 67-21) ("Venezuelan gangs are not identified by tattoos."). Rather, tattoos are commonplace within Venezuelan culture, particularly among young people, irrespective of gang affiliation. *See* Hanson Decl. ¶¶ 22, 24; Antillano Decl. ¶ 14; *see also* Sarabia Roman Decl., Exh. 20 (ECF No. 67-21) ("gang members also sport tattoos considered culturally popular at the moment and popular among the general public").

The government's own documents reveal the patent absurdity of using tattoos and attire as indicators of TdA membership, as they have done for many class members. For instance, the Chicago Homeland Security Investigations office identified wearing a Chicago Bulls jersey, particularly one bearing Michael Jordan's name, as a TdA marker. *See* Sarabia Roman Decl., Exh. 2. Experts characterize this theory as "close to laughable," given the Bulls' status as Chicago's home team and Jordan's universal popularity. Sarabia Roman Decl., Exh. 20 ("The idea that a Jordan tattoo or jersey would be used to link someone with Tren de Aragua is close to laughable."); Hanson Decl. ¶ 24 (same). Even the government's own intelligence contradicts the practice. *See, e.g.*, Sarabia Roman Decl. Exh. 3 ("EPT HUMINT-Gang Unit collections determined that the Chicago Bulls attire, clocks, and rose tattoos are typically related to the Venezuelan culture and not a definite indicator of being a member or associate of the TDA.").

Nor has the government's reliance on hand gestures, symbols, logos, graffiti, or manner of dress fared any better. Experts agree that TdA lacks consistent iconography, unifying symbols, or a distinctive style of clothing. Hanson Decl. ¶¶ 23-24 (TdA does not have "iconography or unifying

5

cultural motifs, such as symbols, insignias, logos, notations, graffiti tags, music, or drawings" nor "a typical manner of dress . . ." "associated with them"); Antillano Decl. ¶ 14 (no "symbol" or "identity mark" to identify TdA members). And there is no evidence whatsoever that TdA maintains a constitution or issues membership documentation—yet these too were treated as purported indicators of affiliation. *See* Antillano Decl. ¶ 14.

Moreover, approximately 75 percent of individuals sent to El Salvador had no criminal record in the United States or abroad, and many entered the United States lawfully, including several who arrived as highly vetted refugees. *See* Cecilia Vega, *U.S. Sent 238 Migrants to Salvadoran Mega-prison; Documents Indicate Most Have No Apparent Criminal Records*, CBS News (Apr. 6, 2025), https://perma.cc/DE3L-BLKN; Mica Rosenberg et al., *Trump Administration Knew Vast Majority of Venezuelans Sent to Salvadoran Prison Had Not Been Convicted of U.S. Crimes*, ProPublica (May 30, 2025), https://perma.cc/KF7N-KY9K; Bloomberg News, *About 90% of Migrants Sent to El Salvador Lacked U.S. Criminal Record*, Los Angeles Times (Apr. 10, 2025), https://perma.cc/Q5LW-8JZC; Veronica Egui Brito, *Despite Refugee Status in the U.S., Young Venzuelan Was Deported to Salvadoran Prison*, Miami Herald (Mar. 21, 2025), https://perma.cc/D6UJ-TLE3; David J. Bier, *50+ Venezuelans Imprisoned in El Salvador Came to US Legally, Never Violated Immigration Law*, Cato Institute (May 19, 2025), https://perma.cc/M68R-2KJS; *Agelviz-Sanguino v. Noem*, No. 25-cv-2116, ECF No. 1 ¶ 1 (S.D. Tex. May 9, 2025) (Venezuelan noncitizen "was previously approved for refugee resettlement," yet the government "unlawfully removed him to El Salvador"). Even the government's own declarant in this litigation has conceded "that many of the TdA members removed under the AEA do not have criminal records in the United States." Cerna Decl. ¶ 9 (ECF No. 26-1).

In short, even if remote hearings were not feasible, *but see infra*, many—and perhaps most—cases could be resolved on a paper record given that the government will likely have little or no evidence to connect class members to TdA.

2. Defendants' objections to remote hearings from Venezuela are conclusory and speculative, at best. Defendants claim, for instance, that they "may not be able to verify the identity of individuals" testifying in such proceedings. Defs.' Resp. 3. But class members were in Defendants' custody prior to being sent to torture in El Salvador, and Defendants typically collect personal information, including photographs that would allow them to identify an individual in remote video proceedings. Indeed, it is incredible to imagine that Defendants did *not* collect such information for individuals that they designated under the AEA. Defendants' additional assertions regarding hurdles to remote proceedings in Venezuela—claims about lack of access to counsel, "a serious risk of intentional interference," and that such proceedings "may prompt diplomatic issues," *id.* at 3—are speculative and unsubstantiated. Secretary Rubio's conclusory statements do not provide a meaningful basis for the Court to determine why this remedial process is in fact infeasible. And concerns based on access to evidence due to "the fluid and volatile situation in Venezuela," *id.* at 3, describe the kind of hurdles that individuals coming from countries in turmoil regularly face in the immigration context. Moreover, if any individual class member believes that he lacks access to the needed evidence, he can always choose not to go forward at this time.

3. Secretary Rubio's declaration states that the situation is too delicate at this time to facilitate the return of class members. But as to these men, the declaration conspicuously fails to explain why there is any reason to believe the current head of Venezuela—Maduro's former Vice President—would not honor the specific agreement made by the Maduro regime to "not impose

7

obstacles to [their] travel" to the United States as appropriate for legal proceedings. Harper Decl. ¶ 9 (ECF No. 168-1).

Defendants additionally argue—but not in a sworn affidavit—that they "are unable to retrieve class members from Venezuela at this time, as civilian travel into and out of Venezuela has become heavily restricted." Defs.' Resp. 3. But as of January 10, "[s]ome commercial airlines have resumed operations from Venezuela"—according to the State Department itself. U.S. Embassy Caracas, *Do Not Travel to Venezuela; Depart Immediately* (Jan. 10, 2026), https://perma.cc/B96Y-R7Q9. Moreover, Defendant DHS has expanded deportation flights to Venezuela since the ouster of Maduro, sending three flights in the past week and expecting to regularly send three flights per week. In a statement, DHS attributed the increased flights to the President's "actions bringing stability to Venezuela"—contrary to Defendants' argument that Venezuela's *in*stability prevents class members from receiving meaningful relief. Annie Correal et al., *Facing U.S. Pressure, Venezuela Agrees to Take More Deportees*, N.Y. Times (Jan. 23, 2026), https://perma.cc/N43J-FRM5.

Given that Defendants have been able to negotiate and implement expanded deportation flights from the United States following Maduro's ouster, Defendants provide no meaningful basis for concluding that facilitating the return of class members from Venezuela via U.S. transport would be infeasible. *See* Supp. Decl. of Sec'y of State Marco Rubio (ECF No. 229-1) ¶ 4 (providing no reasoned explanation for assertion that a "proposal . . . to transport class members to a U.S. jurisdiction" would harm "U.S. foreign policy interests in Venezuela").

It is not unusual for a court to order the executive branch to take specific steps to facilitate an individual's return where, as here, the removal was patently unlawful. These steps may include: purchasing airline tickets; working with relevant airlines to pre-clear an individual's flight;

working with third-country immigration authorities to facilitate transit through those countries; and providing documentation necessary for re-entry into the United States. *See, e.g.*, *Yaide v. Wolf*, No. 19-cv-7874, 2019 WL 6896148, at *4 (N.D. Cal. Dec. 18, 2019); *Rantesalu v. Cangemi*, No. 04-cv-1375, 2004 WL 898584, at *7 n.8 (D. Minn. Apr. 23, 2004); *see also, e.g.*, *Walters v. Reno*, 145 F.3d 1032, 1050–51 (9th Cir. 1998) (requiring parole into country or other arrangement for hearing attendance for class of noncitizens); *Dennis v. INS*, No. 01-cv-279, 2002 WL 295100, at *3 (D. Conn. Feb. 19, 2002) (noting that cost of plane ticket was "not great in any sense"); *Abrego Garcia v. Noem*, 348 F.R.D. 589, 592 n.1 (D. Md. 2025) (detailing government's efforts in other cases to facilitate return). Defendants make the blanket objection that they "are unable to retrieve class members from Venezuela at this time," Defs.' Resp. at 3, but they offer no explanation as to why they cannot take each of these steps.

Additionally, Defendants should retrieve and immediately return class members' passports and identity documents that were confiscated by U.S. authorities and never returned. Possession of such papers will assist class members in traveling to the United States or to third countries where their habeas petitions can be adjudicated.

## PROPOSED RELIEF

This Court should require that:

- Defendants expeditiously submit a new proposal providing for remote proceedings in third countries and travel by class members to the United States from third countries.

- For class members who are currently unable to travel to a third country, the Court should allow individual habeas actions to proceed on written submissions.

- For class members who are currently unable to travel to a third country, the Court should also require Defendants to more fully explain why Plaintiffs cannot return or have remote

9

hearings from Venezuela. If, however, the Court concludes that Defendants need not facilitate Plaintiffs' return from Venezuela or provide remote hearings from Venezuela, the Court should require Defendants to provide regular status reports as the situation in Venezuela evolves, so that the Court may assess the availability of relief for class members who remain in Venezuela.

- Defendants should immediately return class members' passports and identity documents.

Dated: January 27, 2025

Respectfully submitted,

/s/ *Lee Gelernt*

Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
Spencer Amdur
Michael K.T. Tan
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
cwofsy@aclu.org
samdur@aclu.org
m.tan@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960) Scott Michelman (D.C. Bar No. 1006945)
Aditi Shah (D.C. Bar No. 90033136)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800

Lee Gelernt (D.D.C. Bar No. NY0408)
Daniel Galindo (D.D.C. Bar No. NY035)
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi (D.D.C. Bar No. MI0071)

Sean M. Lau
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

slau@aclu.org

*Counsel for Petitioners–Plaintiffs*

aspitzer@acludc.org
smichelman@acludc.org
ashah@acludc.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500
Khuddleston@aclu.org

*Barred in Texas and Arizona only; supervised by a member of the D.C. Bar*