IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, *et al.*,<br><br>*Petitioners–Plaintiffs*,<br><br>J.G.G., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Respondents–Defendants*. | Case No: 1:25-cv-00766-JEB |

**REPLY REGARDING REMEDIAL PROPOSAL**

  This Court's January 28 Minute Order directed Defendants to submit a reply addressing (1) Petitioners' proposal (ECF 234) regarding remote proceedings in third countries, (2) their request for the immediate return of passports and identity documents, and (3) whether Defendants will parole class members who arrive at a U.S. port of entry, and relatedly whether they will issue boarding letters for air travel to the United States for Plaintiffs in Venezuela or third countries. Reserving all objections regarding this Court's jurisdiction and prior orders, Defendants respond to each point and elaborate on the significant practical and legal obstacles to Petitioners' proposals.

  **1. Remote Hearings Are Both Legally and Practically Impossible.**

  Petitioners propose (ECF 234 at 1-2) offering all overseas class members remote hearings on their yet-to-be-filed habeas petitions. Remote habeas hearings on the validity of Petitioners' AEA designations would present insuperable legal bars and substantial practical problems that together render this an untenable and unacceptable proposal.

1

To start, if Petitioners seek to file habeas petitions while remaining overseas and beyond the custody and control of the United States, there would be no jurisdiction over these as-yet-unfiled petitions. As the Supreme Court made clear in this case, individuals must file their own habeas petitions to challenge their factual and legal designation under the Proclamation. *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025). As a jurisdictional matter, habeas requires custody. *See Maleng v. Cook*, 490 U.S. 488, 494 (1989); *Alexander v. Maass*, 82 F.3d 422 (9th Cir. 1996). Custody cannot be waived, consented to, or ordered as a legal fiction. *See Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 474 (D.C. Cir. 1976). Yet, as everyone agrees, Petitioners are not currently in the custody of the United States. Remote hearings from Venezuela or a third country would not put Petitioners back into Defendants' custody, and therefore would not generate habeas jurisdiction.

To be clear, this defect exists independent of the Court's incorrect ruling that Defendants had constructive custody over Petitioners when they filed the instant claims. The Court's remedy proposal contemplates that Petitioners will file new habeas petitions; those petitions will not be jurisdictionally proper unless Petitioners return to custody before filing them, since any "petitioner must demonstrate that he was in custody *at the time he filed the petition*." *Qassim v. Bush*, 466 F.3d 1073, 1078 (D.C. Cir. 2006) (emphasis added). Nor does this Court's holding that this case is not moot due to "collateral consequences" supply jurisdiction over future habeas petitions. Collateral consequences may prevent a habeas case from becoming moot *after* a detainee's release. *See United States v. Rydle*, 58 F.4th 14, 17 (1st Cir. 2023). But "the collateral consequences … are not themselves sufficient to render an individual 'in custody' for the purposes of a habeas attack" in the first instance. *Maleng*, 490 U.S. at 491–92; *see also Stanbridge v. Scott*, 791 F.3d 715, 718–19 (7th Cir. 2015) (sex offender status may have been a collateral consequence, but it did not count as custody). There is no legal basis for holding remote habeas hearings without *custody*.

Remote hearings also present severe practical difficulties, as described in Defendants' last submission. ECF 229 at 3. In addition to current sensitivities in Venezuela given the "fluid" situation described by Secretary Rubio, ECF 229-1 at ¶ 3, the United States cannot enforce perjury or other procedural rules in Venezuela, or even verify the identity of witnesses. Moreover, these habeas proceedings by their nature are likely to implicate sensitive or classified information; developing procedures to protect that information when the proceedings are occurring over potentially unsecure lines in foreign settings is a non-starter. Further, the conduct of a habeas proceeding overseas by the United States—even at a U.S. Embassy or Consulate—would be an infringement on the sovereignty of a foreign state absent that state's consent. This Court has made clear that any habeas hearings must "satisfy the requirements of due process," but there would be no way to do so if the hearings occur remotely with Petitioners in Venezuela or neighboring foreign countries. ECF 215 at 4.

Petitioners respond (ECF 234 at 2) that remote hearings occur in immigration proceedings. But those remote telephonic or video proceedings generally occur *within the United States*, not in foreign countries. In any event, immigration hearings are administrative matters that lack the procedures and formalities of Article III courts; they are thus not a suitable model for federal habeas proceedings. *See Miranda v. Garland*, 34 F.4th 338, 359-61 (4th Cir. 2022) (collecting cases holding that due process protections are reduced in immigration proceedings); *cf. Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 138–39 (2020) (discussing due process in the immigration context).

Finally, Petitioners speculate (ECF 234 at 3-7) that many petitions could be resolved on the papers alone. That is both premature and dubious. Petitioners have the burden to demonstrate that they are not members of TdA. *See Ex parte Gilroy*, 257 F. 110, 114 (S.D.N.Y. 1919) ("the burden

is on Alexander to show that he is not an enemy alien, and not upon the United States to show that he is"); *Waite v. Jacobs*, 475 F.2d 392, 394 (D.C. Cir. 1973) ("long-standing rule that the burden of proof is on the petitioner in habeas corpus").  The habeas cases Petitioners cite that resolved on the papers either presented no dispute or raised pure legal issues.  Much of Petitioners' evidence contesting their TdA membership, however, has been in the form of declarations; evaluating that evidence will thus necessarily turn on their credibility.  The government thus has a right to examine Petitioners, precluding proceedings on the papers.

For all of these reasons, remote hearings are not possible here, either legally or practically.  Rather, the only jurisdictionally proper means of permitting new habeas proceedings would be for aliens to return to United States custody, which itself presents grave national security and foreign policy impediments, as discussed further below.

**2. Defendants Do Not Generally Maintain Petitioners' Passports or Identity Documents.**

Apparently for the first time in this litigation, Petitioners belatedly request that Defendants "retrieve and immediately return class members' passports and identity documents that were confiscated by U.S. authorities and never returned." ECF 234 at 9.  They do not identify any particular passports or other identity documents or particular class members to whom they belong; nor do they explain how this relief relates to this litigation or is necessary for any of the proposals that the Court is considering.

In all events, Defendants understand from the Department of Homeland Security that Petitioners' property, including any identity documents, was transferred to El Salvador along with Petitioners in March 2025.  To the extent that any passports or identity documents may remain in a petitioner's file with DHS, Defendants are prepared to turn those over upon an individual request from a counsel who represents that individual petitioner.

4

### 3. Facilitating Travel and Granting Parole to Petitioners Would Be Untenable.

Petitioners also propose (ECF 234 at 2-3) that the United States provide them with boarding letters to facilitate their travel to the United States, and then parole them into the country, where they would presumably be detained pending removal. This option is not tenable either, while the United States can in theory lower domestic barriers to entry, *see* ECF 234 at 2-3, the facts of this case make that option a legal and factual nonstarter.

For one thing, this approach would not avoid the foreign-policy harms vis-à-vis Venezuela that Secretary Rubio set forth in his previous declaration. ECF 229 at ¶ 4. Whether done directly or indirectly, retrieving Petitioners to take them into custody would require diplomacy with top leaders in the Delcy Rodriguez interim regime or foreign sovereigns in third countries and thus raise separation of powers issues. *See J.G.G. v. Trump*, 147 F.4th 1044, 1059-60 (D.C. Cir. 2025) (Katsas, J., concurring); *id.* at 1069 (Rao, J., concurring) (granting mandamus in part based on forcing the Executive to engage in diplomacy). Moreover, with the myriad of other high-priority matters that the United States is pursuing in Venezuela to stabilize the security and economic situation in the country, it is untenable to expect the United States to add to the negotiations with the Rodriguez regime the matter of sending designated TdA members back to the United States for renewed detention. ECF 229 at ¶¶ 3-4; ECF 234 at 7-9. Secretary Rubio discussed in detail the tenuous situation in Venezuela and the State Department's priority engagements with the regime in testimony before the Senate Foreign Relations Committee on January 28. *See, e.g.*, Secretary of State Marco Rubio, Testimony Before the Senate Foreign Relations Committee, Jan. 28, 2026, https://www.foreign.senate.gov/download/012826_rubio_testimonypdf, at 2 (describing the United States' intention to "closely monitor the performance of the [Rodriguez] interim authorities as they cooperate with our stage-based plan to restore stability to Venezuela."); Hearing

5

Video, https://www.foreign.senate.gov/hearings/us-policy-towards-venezuela, at 45:40 (Secretary Rubio describing "hard asks" the United States is making of the Rodriguez regime and emphasizing "there's a lot of work to be done here" to move Venezuela from the stabilization phase to the transition phase); *id.* at 2:04:04 (Secretary Rubio explaining "we're not even four weeks into this thing … and if … six months, nine months, a year from now … progress isn't being made, we'll have very different feelings about it," and "this is not the end state that we want").

Diplomacy will be required again *after* any habeas case, because even if a petitioner is successful in challenging his AEA designation, he will remain removable under the INA. Given the high-profile nature of this case, including Petitioners' affiliation with an organization notorious for terrorizing the Venezuelan people, the United States will have to negotiate with the Rodriguez regime or whatever entity succeeds it to accept these individuals back, injecting an extremely complicated issue into what is already a delicate situation, potentially negatively affecting U.S. efforts toward stabilization and transition that aim to benefit tens of millions of Venezuelans. Petitioners' proposal thus poses an unacceptable risk of bringing about the material damage to U.S. foreign policy interests in Venezuela that Secretary Rubio warned about in his declaration. ECF 229-1 at ¶ 4.

More generally, Petitioners have been determined to be members of a foreign terrorist organization (FTO). That determination is separate and independent from their AEA status and itself precludes admission to the United States and many forms of discretionary relief. *See* 8 U.S.C. §§ 1182 (a)(3)(B)(i)(IV)-(V); 1227 (a)(1)(A); 1158(b)(2)(A)(v). So "any order to bring suspected members of a foreign terrorist organization into the United States would … face[] an objection that the judiciary cannot override the statutory prohibition on the admission of such aliens." *J.G.G.*, 147 F.4th at 1055 (Katsas, J., concurring). At minimum, Defendants are not prepared (absent a

court order) to issue letters enabling members of an FTO to board commercial flights to the United States, and certainly would never release them within the United States.

\* \* \*

If, over Defendants' vehement legal and practical objections, the Court issues an injunction, Defendants intend to immediately appeal, and will seek a stay pending appeal from this Court (and, if necessary, from the D.C. Circuit).

Dated: February 2, 2025                    Respectfully submitted,

                                           Brett A. Shumate
                                           Assistant Attorney General
                                           Civil Division

                                           Drew C. Ensign
                                           Deputy Assistant Attorney General
                                           Office of Immigration Litigation

                                           */s/ Tiberius Davis*
                                           Tiberius Davis
                                           Counsel to the Assistant Attorney General
                                           Civil Division
                                           U.S. Department of Justice

                                           Anthony Nicastro
                                           Acting Director
                                           Office of Immigration Litigation

                                           *Counsel for Respondents–Defendants*