```
                      UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA

     J.G.G., et al.,
                                         Civil Case
                       Plaintiff(s),     No. 25-00766 JEB
              v.
                                         Washington, D.C.
     DONALD J. TRUMP, et al.,
                                         February 9, 2026
                       Defendant(s).

     ----------------------------------------------------------

                         MISCELLANEOUS HEARING
                BEFORE THE HONORABLE JAMES E. BOASBERG
                   UNITED STATES DISTRICT CHIEF JUDGE

     APPEARANCES:

     FOR THE PLAINTIFF(S):   Lee Gelernt, Esquire
                             Daniel A. Galindo, Esquire
                             Sean Ming-Jun Lau, Esquire
                             American Civil Liberties Union
                             125 Broad Street
                             18th Floor
                             New York, New York 10004

                             Aditi Shah, Esquire
                             American Civil Liberties Union
                             529 Fourth Street Northwest
                             Suite 722
                             Washington, D.C. 20043
```

APPEARANCE(S) (Cont.):

FOR THE DEFENDANT(S):    Tiberius T. Davis, Esquire
                         John Bailey, Esquire
                         United States Department of Justice
                         950 Pennsylvania Avenue Northwest
                         Washington, D.C. 20530


REPORTED BY:             Tammy Nestor, RMR, CRR
                         Official Court Reporter
                         333 Constitution Avenue Northwest
                         Washington, D.C. 20001
                         tammy_nestor@dcd.uscourts.gov

The following proceedings began at 10:01 a.m.:

THE COURT:  Okay.  Good morning, everyone.

THE COURTROOM DEPUTY:  Good morning, Judge.

Good morning, everyone.  We are here on Civil Matter 25-cv-766, J.G.G., et al. versus President Donald Trump, et al.

Beginning with counsel for the plaintiff, if you would please approach the lectern and identify yourself for the record.

MR. GELERNT:  Good morning, Your Honor.  Lee Gelernt for plaintiffs.

THE COURT:  Good morning.

MR. DAVIS:  Good morning, Your Honor.  Tiberius Davis for defendants.  And with me is John Bailey at counsel's table.

THE COURT:  Good morning to you.

All right.  We are here today for hearing regarding the remedy in this matter.  And I have gotten submissions from both sides.  So, Mr. Gelernt, if you would like to start.

MR. GELERNT:  Thank you, Your Honor.  I want to start by sort of saying where we are, where we think we are, and make a proposal that I think is eminently fair.

We think for people who are or will make it to a third country, they should have the immediate right to

either return, do a remote hearing, or start with a paper filing to see if there actually are any disputed facts.

As to people who are in Venezuela and will not be able to get out, I think we have a compromise proposal that we do think is eminently fair, is that if they want to start with a paper filing, they should be able to do so.  That should not present any diplomatic issues.

As to bringing them back from Venezuela, remote hearings, we are -- we would accept the government filing in two to three weeks, whatever Your Honor thinks makes sense, a status report.

And the reason I say that is because things are moving in Venezuela.  When we originally filed our papers, the government said, well, there's not really commercial flights.  Now we find out that there are deportation flights and things are moving.  We have also recently learned that there is a temporary embassy that's gone up and there's work being done there.  So we assume that progress is going to be made.  And we can't see this being an indefinite situation.

So two to three weeks from now, I think the government ought to let you know what the latest status is, but at a minimum, people file habeases from Venezuela.

And certainly as to the third countries, it just seems like the government is throwing stuff against the wall.  But I can't see any reason why someone who's made it

out of Venezuela -- you know, I don't need to belabor this point with Your Honor, but it's now been 331 days as of today that these individuals have been stuck.

It seems as if no matter what we propose, ultimately the government is not going to accept it.  And obviously I don't need to tell you, but I have been practicing a long time.  I don't think I have ever seen a justice department submission end the way this did with sort of a veiled threat that if you do a single thing, we will appeal immediately rather than a respectful we would seek a stay.

THE COURT:  I have been used to that tone in this case unfortunately.

MR. GELERNT:  Right.  So that would be where we would start.  And I am happy if you want to turn to the government and then address any reasons why they think that proposal would not work, but that's where we would be.

THE COURT:  And I agree that I'm happy to give the government a little more time for people who are in Venezuela, that again, I have attempted throughout this proceeding to be deferential and respectful to the government's diplomatic and foreign affairs prerogatives and powers, and so I do think there's -- we are in a different situation with people who either are in a third country or make it to a U.S. port of entry versus people who are currently in Venezuela.

MR. GELERNT:  Right.  And I would just emphasize that I do think, Your Honor, even with that amount of deference, there should be no reason why people can't start a paper filing from Venezuela if they are inclined to do it.

THE COURT:  Right.  And so let's -- let's see if we can get a little more information about facts on the ground regarding the plaintiffs.  Again, I know, Mr. Gelernt, there's difficulty reaching everybody, particularly now given what's been happening in Venezuela, it makes it more difficult, both communications and willingness of your clients to be in touch, but do you have a sense of how many are already in third countries --

MR. GELERNT:  Yeah.

THE COURT:  -- to start?

MR. GELERNT:  With Your Honor's permission, I would rather not name the countries for the moment just for safety reasons if that's okay.

THE COURT:  Okay.

MR. GELERNT:  But I would say that they are obviously near as Venezuela.

We have reached, through either individual lawyers or directly with them, a handful of people who have made it out thus far.  But I think it would -- I do not want to represent that we know all the people because a lot of them are in hiding.  We will reach them through a variety of

means.  Thus far, we have sort of nailed down a handful of people who have made it out.

What we are being told is that people could make it out if this becomes an option, and I suspect there are many more people who have actually already made it out.

But the number is definitely not zero.  So if Your Honor were to order that, this would not be an academic exercise by any means.  And the people we have spoken to who have made it to a third country are very interested in clearing their name because this designation is traveling with them and makes it very difficult for them to do anything.  So it would not by any means be just sort of a null set.

THE COURT:  And do you expect that any will actually attempt to make it to a U.S. port of entry?

MR. GELERNT:  Without the government's permission and a court order?  I don't know whether anybody would take that risk.  I'd say if --

THE COURT:  Let's say with a court order.

MR. GELERNT:  Okay.

THE COURT:  If the court order said, government, you have to parole people into the country if they make it to a port of entry, although, they, again, would be detained, there's no argument that they should be in this country at liberty, right --

MR. GELERNT: We are not certainly making that argument.

THE COURT: -- at this point?

MR. GELERNT: Right. We know people who would come back. I think if the option to do a remote hearing were available, they might take that first because they are fearful of what happens. I think it's less fear of detention than it is of ending up somewhere remote, I mean, either back at CECOT or somewhere, you know, South Sudan, as you pointed out last hearing, Your Honor.

But there are definitely people who are ready to come back if that's the only choice. You know, but obviously the government is not giving them that choice. The government's giving them -- I don't see anything the government has agreed to. But yes, there are people who very much want to come back and flee and seek asylum. But I think they are nervous about coming back before they had a remote hearing. But if it ends up that the only way to do this is by coming back, then they are going to take that option.

THE COURT: So if they get a remote hearing --

MR. GELERNT: Right.

THE COURT: -- and either they could submit papers or they actually get a hearing --

MR. GELERNT: Right.

THE COURT: -- and they prevail, then isn't the

remedy that they would be brought back and placed in custody, in other words, they would be placed in the same position they were before deportation?

MR. GELERNT:  Right, Your Honor.  So that's a fair question.  The reason they wouldn't be in the exact same position is now if they come back and they're still designated AEA and the government says we are going to send you as an alien enemy to any one of a number of countries, they are in trouble.

But if they prevail in their hearing and they are no longer consider TdA and, therefore, no longer AEA or FTO, then they would come back and be placed back in immigration hearings where their asylum claims would go forward.

Now, they would be probably be in detention.  I suspect that's what the government would do.  But that's almost the least of their problems.  I mean, if they prevail for asylum, then they will get to stay.  If they don't, you're right, then they could be removed again.

But right now, if they come back and they are designated as AEA and the government decides, well, you are an alien enemy and you haven't prevailed yet, we are going to try and remove you to any one of a number of countries, besides the political theater of it, the whole practical reason they wanted to use the AEA is to take people out of immigration proceedings and not let them apply for asylum.

So if they did prevail --

(There was an interruption by the court reporter.)

MR. GELERNT:  I apologize.

If they were to prevail in the remote hearing and show that they were not TdA members and, therefore, didn't fall under the AEA or the foreign terrorist organization label, then they would come back and be in regular immigration proceedings and they would have the opportunity to show that they are eligible for asylum and deserve asylum just like they were trying initially before the proclamation.

THE COURT:  But then practically, and we are not at that stage, but if they prevailed from a third country or from Venezuela on the papers, then is the relief you would be seeking for the government to actively retrieve them to bring them back and place them in --

MR. GELERNT:  Yeah, I think you're right, we're not there.  Whether it's a government plane or whether it's just the government says if you get to a port of entry, I think given the situation, we would hope the government would facilitate it.  But then it would be like any other unlawful removal where the courts routinely say the government needs to facilitate the return just in a regular immigration proceeding if they violated an immigration order, a stay of removal, the government has to facilitate the return.

You know, the exact mechanics of it, I think, we are a ways away from, but yes, we would say then they would be able to return and apply for asylum just like they were originally trying to do.

THE COURT: Okay. So on the challenges, so let's say they are in a third country and they file, similarly, if they are in Venezuela and they file, your point throughout your papers anyway are we would like to be able -- we want to be able to show and we believe we can show that many of these folks are not TdA.

But you don't mention -- and it was something that I did talk about in my opinion. And you don't talk about it, and the government doesn't talk about it, so maybe I am missing something. But I am surprised. Why isn't the first argument you are making on the papers for all of these people that the proclamation is invalid whether they are TdA or not?

MR. GELERNT: That's a very fair question, Your Honor. I think it is true that would be the first argument.

THE COURT: Because then -- because if the issue is -- the government's raised a lot of issues about the logistics of remote hearings and perjury questions and reliability questions and technical questions. But if the AEA was invalidly invoked by the proclamation, you don't need to have any of that. It's just done, right?

MR. GELERNT:  You are absolutely right, Your Honor. Let me just be sort of candid about how we are seeing this. Right now, you may be aware of this, but the Fifth Circuit just heard en banc --

THE COURT:  Sure.

MR. GELERNT:  Right, and so the Supreme Court has sort of made that the test case, and all the other cases have been held in abeyance.

THE COURT:  Yes.

MR. GELERNT:  So I think the question is I think we are more than happy for you, and I think you're right that that would be the logical first step, to rule on that as well.  The only thing I would say in talking to individuals is we have had to be honest with them and say it's unlikely that any lower court that rules that the proclamation is inconsistent with the AEA is going to end the matter until SCOTUS gets it.

And so it's a little bit of a timing thing because there are some people who feel like they have absolutely zero connection to TdA and there's nothing the government can put in that will remotely create a genuine issue of fact.  And if they can get out from under it individually sooner than the Supreme Court, now it looks like its next term, deciding that, and so that's the only question, but I think you're right that whatever you do, you ought to

probably decide that as well because it doesn't sort of logically make sense to skip over it.  And I think that's our fault for not making that clear.

But I do think ultimately --

THE COURT:  I mean, I agree the Supreme Court is ultimately going to decide this.  But if you win, unless it's stayed pending Supreme Court review, then they could be returned at that point.  And certainly there's a lot of briefing, I know.  The only judge in our circuit to have looked at this, Judge Henderson found the proclamation was invalid.

MR. GELERNT:  Right.  So, Your Honor, I think that's right.  I don't know how it's going to play out.  I think the government is probably going to seek a stay and say that all the other circuits are holding it in abeyance pending the Fifth.

So I don't want to die on this hill by any means because I think you are right, as a logical matter, you probably ought to decide it.

Now, if the Circuit or Supreme Court doesn't stay it, so be it, then people should be allowed back.  I just don't know how this is going to play out, whether, you know, the government's going to say, look, if all the other cases are being stayed and the Fifth Circuit is the test case, but I do think you are right about that, so I don't know.

I guess I would say you probably ought to try and do both.

THE COURT:  Because, you know, when you say this could be done on the papers, you know, it would be quite something.  It wouldn't surprise -- nothing surprises me in this case, unfortunately, but my first reaction would be it would certainly be surprising if none of the 137 people is a TdA member.  That would be quite something.

But if the arguments are on the papers this person is not a TdA member, here are declarations and photographs of tattoos and declarations of family members, aren't those going to raise quintessential factual questions where the government says no, no, no, that tattoo is -- we have somebody who says that tattoo is TdA or we have somebody who says based on X or --

MR. GELERNT:  Yeah, I don't disagree --

(There was an interruption by the court reporter.)

MR. GELERNT:  I'm sorry.

THE COURT:  My point is, isn't it going to be hard to do TdA determinations purely on the papers?

MR. GELERNT:  So yeah.  I mean, let me start from where I think you are coming from is that it's clear you can do the paper ruling whether the proclamation satisfies the AEA.  And it sounds like, I think, that's what you think you should do.  And we are not disagreeing with that.

What we think is, though, that the people who will immediately seek hearings probably are so far removed from TdA that the government is not going to be able to put in anything. I mean, what's happened in the two cases we are aware of that were just sort of quirky cases, the government basically folded because there was nothing they could say. They put in the same tattoos. There was just overwhelming evidence that a Chicago Bulls tattoo does not make you a TdA member. In fact, TdA doesn't actually use tattoos to identify themselves.

But if there are some cases like that, I think then we would have to decide whether there's remote hearings. We are simply saying that for people who it's so clear are not TdA, they should have the right to start. But you're right, if a genuine issue of fact arises and the government is unwilling to bring them back or do remote hearings and Your Honor doesn't want to order that, then I think you're right, that then it would be difficult to get too far along.

But we do think there are going to be people who the government will literally not be able to say anything about. So that's why we think we ought to start -- if someone is actually a TdA member, then I suspect -- I don't know that they are immediately going to jump at the chance to file --

THE COURT: And I have a sense, maybe you have a better sense than I, I'm sure you do, that whether what's

happened in Venezuela is beneficial for your clients or detrimental or neither, in other words, if their fear was government targeting, maybe that's changed. If their fear was targeting by gangs, maybe that hasn't. I don't know if you even want to respond to that.

MR. GELERNT: Yeah, I would be speculating a little. But based on, I think, what we are hearing, people are still very worried about the government. I don't know that there is that big a gap between the vice president taking over. And so I think what we are hearing is that things are not great for people, and they are still in hiding and they are being surveilled.

Now, will things change? You know, I don't know. But I think people are definitely worried about it.

And, Your Honor, I think -- I mean, you are putting your finger on exactly all the difficult questions. And I guess from where we are sitting, it's, you know, both to decide whether the proclamation is consistent with the AEA, fine, obviously that's the logical first step.

In terms of just moving it along for individuals who feel like there's nothing the government can connect me to, I think the process ought to start. But I think the government is going to stand up and say, even if you were to move the hearing to this afternoon, they are going to appeal.

And so I'm not sure that we need to figure out -- I mean, you obviously want to have a blueprint going forward.

THE COURT:  And I'm not going to rule today.  They might appeal anyway today because that seems to be the MO in this case.

MR. GELERNT:  I think as soon as you order anything, they're going to appeal.  So I think we probably -- I mean, I realize you would have liked to have a sort of map of where we are going to go.  But ultimately, I think questions about if they put in enough to create a genuine issue of fact or the Circuit stays your ruling about the proclamation not being consistent with the AEA is probably down the line because I think they are going to stand up here and say, no matter what you order, no matter how reasonable, they are going to appeal.  And so that's where we are going to be, unfortunately.

THE COURT:  So a couple of other issues, Mr. Gelernt, before I talk to Mr. Davis.

So one point the government makes is, on the jurisdictional question, which is, well, if you're filing new habeas actions, then if that's the triggering date, clearly you are not in custody now.  And so, I mean, is your answer that the habeas has already been filed and these are supplemental filings that relate to the large class action habeas that you have already filed, or is there another

response?

MR. GELERNT:  No, I think there is another response, but you're right, that is the first response.  I just want to -- sort of the overriding point I want to make, and then I want to get to the very specifics of it, is the government is sort of doing a catch 22.  Your Honor originally said, you know, they need to return to U.S. custody.  And the government said, well, we won't bring them back and you can't do anything from abroad because you are not in custody.  So it's a little bit of a catch 22.

But as to the specifics, I think there's two ways you can deal with it.  The first is exactly what you said, is the original complaint encompasses people getting hearings, and obviously those hearings assume that that's what would happen in the hearings, people could raise any defenses they had to the AEA designation.  So I don't think that we would be needing to file new habeas petitions.

But the other thing I wanted to say is Your Honor, I think, was very clear in your latest opinion that the constructive custody habeas was an alternative holding and that you said on page 9 of the slip opinion nothing upends my original decision that there's an equitable due process.

At the end of the day, even if Your Honor didn't want to -- or you could do alternative holdings again, even if Your Honor --

(There was an interruption by the court reporter.)

MR. GELERNT:  I'm sorry.  I know I'm talking fast.

Even if Your Honor wanted to have an additional ground to rule, it could say, the Court could say, these claims are encompassed within the original habeas petition so there doesn't need to be new habeas petitions.

But in addition, an alternative way to do it is just equitable due process complaints which don't require custody because that just goes back to the catch 22.  The government can't say you have to do habeas.  We are going to remove you without the chance to file habeases.  And then once you're out of the country, you're stuck.

So I think either way is fine probably.  Given that the government is going to appeal, it makes sense to do both.  But we certainly don't think a new habeas petition would have to be filed.  It will certainly be encompassed within the original habeas petition.  And Your Honor has obviously found constructive custody at the time of that filing.

THE COURT:  Okay.  One last issue was on the passports and identity documents.  Has there been progress on that given what the -- the government says that some of them were transferred to El Salvador in March 2025.  To the extent that any remain, defendants are prepared to turn those over upon an individual request from a counsel who

represents that individual petitioner.

I don't quite follow that since you are the lawyer who represents them all.

MR. GELERNT:  Right.

THE COURT:  But have you made the request, and have you heard anything?

MR. GELERNT:  So we have not, only because we wanted to first clear with you that we could be the counsel.  I don't understand why -- most of them don't have individual counsel.  They are out of the country.  I don't see why we couldn't be the counsel.

THE COURT:  No.  I think you represent them.

MR. GELERNT:  Right.

THE COURT:  And to the extent that you are waiting for that, you can make that request.

MR. GELERNT:  And we will.  And just to be clear, what we are hearing from individuals is some of them know that their passports got to El Salvador but then didn't travel with them to Venezuela.  So we would request that the government ask El Salvador, do you have these passports.

Some of them don't think their passports even made it to El Salvador, which would suggest that they are in DHS hands.  But we will make the request for each individual we believe has lost their passports in the transit, and hopefully the government will diligently look for it and

will report back to you about that.

THE COURT:  All right.  Thank you very much.

MR. GELERNT:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Davis.

All right.  Why don't we just start with this last issue.  So if Mr. Gelernt makes a request for the documents and names each of the people they are requesting, if you have them, any problem with returning them?

MR. DAVIS:  Not if they are in our possession.  We will definitely look for them.  I mean, I think reaching out to El Salvador to negotiate with them is a separate sort of problem if they have them, which our understanding was at least the vast majority were transferred to El Salvador.

THE COURT:  We can discuss whether you will be required to ask El Salvador for those or make some efforts with El Salvador.

Okay.  So what's your response to Mr. Gelernt's proposal?  Again, most of your briefing talks about how there are difficulties on the ground in Venezuela, and of course, things are certainly in flux there and have changed since December when I first acted, and I want to be respectful of that.  So Mr. Gelernt is saying let's hold on for that and you can update us.

But for people who make it to a third country, what's the objection to having remote hearings or letting them file

papers?

MR. DAVIS:  I think the fundamental objection, which you touched on at the very end, and obviously noticeable that petitioners didn't answer that question until you pried it out of them and didn't address it, is the fact that they wouldn't have any jurisdiction because they are no longer in custody, and these would be separate individualized habeas filings that would require them to be in custody.

Now, I believe what my opposing counsel said was, well, this is sort of encompassed within the original habeas petition.  That's not been their position this entire time.  Our sort of understanding has always been we are facilitating their ability to file individual habeas, so those would be separate.  We don't think that those are encompassed within the original petition.

So I think that that would be a real problem in that the nature of those individualized petitions would be separate by themselves even if they were filed in this case.  And they would all end up in front of you if that was the case.  But we don't think that there's jurisdiction to necessarily just rope them all into this case.

THE COURT:  Okay.  So let's say I disagree with you either because I find it is part of the underlying petition or because I believe they have a standalone due process claim.  So if I find there's not a jurisdictional issue,

then what's the government's objection to letting them do that?

MR. DAVIS:  So can I just start with the due process point?  Your Honor recognized before that that was mutually exclusive from the constructive custody, so I don't see how that could work as a standalone.

Also, the remedy there was to facilitate them filing habeas, so I think that's sort of a step removed, and then we are back to the same problem.  And again, I think the individualized nature of these habeas petitions, and this has happened across the country, are filed individually.  Sometimes they'll file class one such as in the Fifth Circuit --

(There was an interruption by the court reporter.)

MR. DAVIS:  Yeah.

-- about the validity of the proclamation but not necessarily whether they, themselves, are members of TdA.

And then as far as if we got to that point, you know, obviously appeal and everything, I think our biggest concern would be, one, there's the due process.  You sort of raised due process concerns.

I remember in the May 7 hearing, I think this was on pages 37 and 38, opposing counsel said that they had due process concerns if we did this in Gitmo, which was Your Honor's suggestion, because they might have problems with

accessing evidence and accessing counsel.

Well, that's doubly true for any third country.  We don't have any control over what happens in the third countries necessarily.

THE COURT:  Right, but hold on.  They're saying they were worried about their due process, that they wouldn't be able to access counsel.  But here they want to go forward.  So they're not saying it's going to be a problem.  So if they are happy to go forward and they believe there is sufficient process, what is your problem with it?

MR. DAVIS:  Well, I don't think they have conceded that there would be sufficient process.  And I think in a vacuum, it's hard to know what these hearings would look like and if --

THE COURT:  But if they believe it's sufficient, then my question is, what's your problem with it?

MR. DAVIS:  I mean, if they are willing to concede that for all of the hearings, I would be kind of shocked if they would, I still think there are practical problems.  If they are in third countries, we might have to reach out to that country in order to do it.  We would have trouble providing sensitive information across unsecured lines.

For example, it's unclear whether it's within the diplomatic scope of embassies to take evidence.  That's not really within the Vienna Convention for diplomatic missions.

It might have to go through the Hague Convention.  We might have to reach out to third countries.  And opposing counsel won't even say what third countries they are in, so, like, there could be various difficulties depending on the third country.  It's kind of hard to speculate in a vacuum.

THE COURT:  Right, but how about the paper filings?  That doesn't raise any of those problems.  What's the concern with permitting them to make -- to at least file and say we either aren't members of TdA or the proclamation is invalid?

MR. DAVIS:  I think a couple responses, Your Honor.  There's obviously the jurisdictional problem that I laid out, but put that aside.  I think the other issues are if it's just about the proclamation, as opposing counsel said, we think that that's before the Fifth Circuit, very likely to go up to the Supreme Court.  This would be in abeyance anyways.

I think the second problem is I'm not sure what remedy that would necessarily provide them.  So let's say that you find that the proclamation is illegal.  Well, they're still designated FTO members, and so they wouldn't necessarily come back.  And even if they did come back --

THE COURT:  Well, wait.  But didn't the Supreme Court already address that in Abrego Garcia?

MR. DAVIS:  How so, Your Honor?

THE COURT:  So in other words, doesn't -- the Supreme Court said, the United States alleges, however, that Abrego Garcia has been found to be a member of the gang MS-13, a designated foreign terrorist designation, and that his return to the United States would pose a threat to the public?

That's the point you are making, right?

But they said, nonetheless, quote, the district court's order properly requires the government to facilitate Abrego Garcia's release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador.  And, in fact, he was brought back, right?

MR. DAVIS:  Yes.  We can --

THE COURT:  So then why don't you have to do at least what the Supreme Court ordered the government to do in Abrego Garcia?

MR. DAVIS:  Well, I think part of Abrego is contesting that designation, where here, if it were just talking about the proclamation, that's not going to undo the FTO designation.

THE COURT:  Well, but here the government argued there was an FTO designation for Abrego.  And if they are not a TdA member, then you don't get an FTO designation anyway, right?

MR. DAVIS: Two responses. One, I am talking about if you just deal with the proclamation and you say the proclamation is invalid, that doesn't fix the FTO member problem.

THE COURT: But my point was the FTO wasn't an impediment in Abrego.

MR. DAVIS: Right. As an individualized case, because he was contesting it, we brought him back under court order. Obviously, if we are ordered to, we can do that. But we see that as a separate barrier to entry. I mean, it even takes away discretionary relief like asylum. And so we can't just on our own bring him back for that reason.

And usually the cases where we do these sort of things are individualized. It's kind of hard in a vacuum to know what these individuals, if they have other designations, if they have other barriers to entry, what that would look like.

THE COURT: Right. But you agree that given what the Supreme Court said in Abrego, if these people were illegally removed either because the proclamation wasn't valid or their due process rights were violated, then the remedy has to be the same as in Abrego, which is to bring them back and permit them to have the hearing -- to put them in the same place they were before they were illegally deported, right?

MR. DAVIS:  Again, Your Honor, we think there's a difference between doing that individually versus on a class basis.  It would sort of depend on each individual. Obviously if the Court ordered that, we could do that.

But I also don't know that that provides, if we are just talking about the proclamation, that much of a remedy to them to do that on the papers because then the remedy, if they succeed, is to bring them back and they are in detention and they are FTO members and they are sort of back in the same situation.

THE COURT:  It's an interesting issue that we have talked about and that I have raised with Mr. Gelernt at multiple hearings, which is, are you sure this is what you want.  In other words, we all agree, plaintiffs entirely concede that they are not brought back and released into the United States, that they would be brought back and they would be detained and put in the same position they were when they were improperly deported.

And so but if that's what they want, and it seems like some of them want that, isn't that appropriate to do?

MR. DAVIS:  I don't think so for all the reasons we have laid out.  I think we obviously have problems with all the remedies, but the one that is probably the least problematic would be allowing them to parole back in.  And we can do that sort of on an individualized basis or at a

port of entry.  Then they are in custody.  If they are in our custody, they surely can file habeas petitions and then that can be determined.  But again, they will be in detention still.  They could still be subject to Title 8 removal and --

THE COURT:  Sure.  And I think the point, which I made at the very first hearing in this case, is I have never said and the plaintiffs have never said that they are not deportable.  The only question in this whole case is are they deportable pursuant to the AEA and the proclamation and were they given due process before they were removed.  And I found they were not given due process before they were removed.  I have not yet ruled on the validity of the AEA.

But all they are asking in this whole case is let us come back and proceed in immigration proceedings the same way we were before this mass deportation occurred in the middle of the night.

MR. DAVIS:  My point is just I don't see what the remedy for just doing a remote hearing is when the end point is the same, especially when we have these jurisdictional problems.  Even if you say the proclamation is invalid, they would just come back, end up in detention, and face all the same situations plus the fact they would still be FTO members if it's just on the proclamation.

So I don't really see how that's a particular remedy

to redress their injuries.

THE COURT:  Well, if that's what they want, if they would prefer to be back in the United States in custody going through immigration and other proceedings, that's their choice, right?

MR. DAVIS:  Sure.  But I think the way to do that if we have to take some of the options on the table, and obviously we object to all of them, would be to lower domestic barriers, parole them, not to do remote hearings, and then have to parole them later if they win anyways.

THE COURT:  If you are agreeing -- we can see what plaintiff says, but if you are agreeing that -- I guess there are two issues.  If you are agreeing that if they arrive at a U.S. port of entry, that you will parole them in and you would rather do that than remote hearings and so they can proceed with their hearings once they are here if they want to do that, that sounds fine.  So that's what you're saying?

MR. DAVIS:  We will obviously require a court order to parole people in.

THE COURT:  Sure.

MR. DAVIS:  We're not just going to do it on our own. We will obviously comply with the court order.  But yes, we think as far as the options on the table, remote hearings for legal, jurisdictional, practical problems are the worst.

We think letting them back in paroled through a port of entry is the easiest because that is something we have done in other circumstances.

Now, again, those other circumstances tend to be individualized.  And we don't necessarily know all the different barriers individual class members have, but --

THE COURT:  But we don't know -- but, again, you know, here we are talking about 137 people.  But, you know, as Mr. Gelernt said earlier when I asked him where we are, I mean, the term he used was a handful of people.  So I don't -- I understand your sort of concern about being overwhelmed, but practically, that doesn't sound like where we are.

MR. DAVIS:  That very well may be true, but we have never really gotten an answer from opposing counsel on who wants to come back and under what circumstances they want to come back.  So it's kind of hard, again, in sort of a vacuum without that factual basis to know what it would look like to bring these people back and then what sort of the barriers would be.

THE COURT:  But maybe just for economic and logistical reasons, they would think it's going to be much easier to get to a third country and have a hearing than it is to get to a U.S. port of entry, unless you are also willing to give them, like -- let me ask it this way.

Would you prefer to give them boarding letters, which again, this is one of the remedies in the immigration playbook at 11061.1, which is entitled facilitating the return to the United States of certain lawfully removed aliens.  And here we've got unlawfully removed aliens.  But to facilitate an alien's return, at 3.1, it states, to engage in activities which allow a lawfully removed alien to travel to the United States such as by issuing a boarding letter to permit commercial air trial, and if warranted, parole the alien into the United States upon his or her arrival at a U.S. port of entry.

So I guess my question is, would you prefer a boarding letter to a third country remote hearing?

MR. DAVIS:  So I understand boarding letters to be sort of a right to return, almost like a passport, not necessarily that the government pays for a ticket in particular.  That's something that has been done before as well.  But yes, we would prefer that over a remote hearing, that they come back.  We think both jurisdictionally, practically it's much more common to do that in the immigration space than it is to have remote hearings which are quite rare and typically in immigration proceedings which have a lot less formality, a lot less sort of due process protections than an Article III habeas hearing.

THE COURT:  And when we talked about the

proclamation, so if I rule that the proclamation invalidly invoked the AEA, I certainly think that the Supreme Court is going to hear the issue and very likely based on the Fifth Circuit's decision once that comes out.

But if such a ruling by me hypothetically issued, if that were not stayed pending Supreme Court review, then don't you agree that there would be a requirement to bring people back if they have been assuming your other objections are dealt with?

MR. DAVIS:  I mean, I think putting aside the jurisdictional objections, we are kind of just back in the same situation of, like, okay, now what does the remedy look like.  Do you bring them back and they're in detention for Title 8 purposes, or do we do remote hearings for immigration?  Like, I think we're kind of back in the same position at that point.

THE COURT:  All right.  But I'm just clear that your preferred mode of operating is arrival at port of entry or boarding letter to remote hearings in third countries?

MR. DAVIS:  Yes.  From the options we have heard, we think that that's the one that most often happens in immigration situations.  That's the one that likely requires the least outreach to foreign countries and also doesn't have the jurisdictional and due process concerns that we have with remote hearings.

Obviously we have our concerns with that as well, but out of the options, we think that that's the least problematic.

THE COURT:  Okay.  Anything else you want to respond to, Mr. Davis?

MR. DAVIS:  This isn't a particularly major point, Your Honor, but my opposing counsel sort of talked about, you know, people are concerned about whether they would be removed.  But if they are in Title 8 and have asylum claims, that sort of ameliorates that.  Even if they are in Title 8 removals, they can be sent to a third country.  So I don't think that that necessarily fixes that concern for them.

I do think with regard to CECOT, I can't rule out any options, but nobody has been sent there since March.  And the arrangement lapses quite soon, so that seems very unlikely.  Obviously there are now removal flights back to Venezuela, so that seems like the more likely outcome.

THE COURT:  Because it's a one-year arrangement, so it lapses when?

MR. DAVIS:  March, I believe, or -- yeah, early March.  And nobody else has been sent there since, I believe -- at least not TdA members.  Maybe El Salvador MS-13 people have, but not under the arrangement.

THE COURT:  All right.  And again, I agree with you if there -- I don't know the particulars of how Title 8

would proceed, but there's nothing that I can do related to this case if their determination is made at Title 8.  I agree with that.

Thank you very much.

Mr. Gelernt, let's go back to a couple of things.

Given what the government has said in terms of their preferences, I mean, maybe it's an economic issue, maybe there are other issues, but it would also seem then to avoid the jurisdictional issue if they arrive at a port of entry or issue a boarding letter, so why wouldn't those be preferred options for you as well?

MR. GELERNT:  I mean, this is obviously the first we are hearing of this.  And I don't know that the government is not going to appeal immediately even if that's what you order.  I don't hear them saying one way or the other.  But I suspect they are going to appeal that either way.

The only thing I would say is, one is, if they are going to come back, that should be at government expense. And I would just look at potentially Judge Sabraw's decision in the family separation case, Ms. L.  He issued a decision, I think, Friday where people were illegally removed, and he said -- and the government said, well, they should find their way back and pay for it themselves.  And he said, no, if you illegally remove them, you have to facilitate it and do it at government expense.

So I think we would say that that has to be in there. There has to be some ability to get them back because people are stranded in third countries.  They are not going to be able to get back.

So at a minimum, if that's going to be the solution, the government needs to have what you, you know, what you suggested as boarding letters, and it would be at government expense because there's planes going back and forth all the time.

But in addition, I think given the predicament that the government has put these people in, to suggest that's the only way around it and that there can't be remote hearings, to me seems untenable.  I don't really understand all the government's issues about the Hague Convention. Remote hearings are done all the time.  We cited the El-Hadad case from the D.C. Circuit.  There's also an Eleventh Circuit case.  Remote hearings, remote testimony are done all the time whether there's an extradition treaty or not.  And they certainly, as Your Honor suggested, started out on the papers.

Now, if the government actually puts in a genuine dispute of fact, maybe then you will have to decide should I do a remote hearing or should I say come back.  But I do think it's unfair given the predicament the government has put these individuals in.

You know, in part we are being asked to put a square peg in a round hole because the government started this whole thing.  And every time we try to find a solution, the government is coming up with something, and certainly as to the due process.  I mean, this, I don't need to dwell on you.  You hit it already.  But it's a little bit rich of the government to worry about our due process rights all of a sudden.

So I would say if you want to start with the third countries --

THE COURT:  But, I mean, in trying to do this in measured steps, which has been my intent all along here, why not, starting with the filing of papers and hearings can be -- that can be sort of the next issue because, as the government says, you would certainly have to identify what the third country is.  You would also have to identify the third country -- if you want a boarding letter, you've got to tell them where they are, right?

MR. GELERNT:  Yeah, no, Your Honor.  I apologize for not being clear.  We will certainly identify the third country to the government and even to you.  I would prefer right this moment not to say it in open court if that's okay.

THE COURT:  Sure.

MR. GELERNT:  But if it has to be, you know, I will

do it.

THE COURT:  I understand.  Well, then why don't you -- if you can file something under seal that's available to the government and --

MR. GELERNT:  For sure.

THE COURT:  -- and me regarding the --

MR. GELERNT:  And I suspect --

THE COURT:  -- if you can tell us even number of people and particular countries, that would be helpful.

MR. GELERNT:  Yeah, no, for sure, Your Honor.  And I just -- you know, I mean, we can go through all the objections, but I have just never heard of the government not being able to hold testimony or hearings from a third country where we have full diplomatic relations.  There's the El-Hadad case from this circuit where it was Egypt.  There's -- we didn't cite it, but there's the Eleventh Circuit decision in U.S. v. Approximately $299,000, I can give you the cite, where -- that was also a situation where Judge Pryor said on the Eleventh Circuit, you know, if you don't want to bring them back, let -- the plaintiffs had forfeited the right to do remote hearings essentially, and remote hearings would have been fine.

So I don't see any of these issues really with -- starting obviously with paper filings, but even remote hearings.  But I do think at the end of the day there should

be the option of whether they come back or not.  And if they do come back, the government should facilitate it at their expense.

But, you know, again, I don't know whether the government is planning on, no matter what you rule, appealing, so we could be a little far down the road.

THE COURT:  We could, and it wouldn't surprise me. But again, I've got to formulate an order that is explicit and clear.  So I guess the question is you would have to then have your clients make an election, it would seem to me, which would be we would prefer to file our papers from this third country or third countries, or we would prefer a boarding letter.  And it would seem that --

MR. GELERNT:  We would be put to that.  And let me just be clear about why it's hard for me at this stage right now, but you are absolutely right, at some point, they will have to make a decision.  Because when we talk to them, they say, well -- the first thing they ask is has the court said these are options.  Because for them to get their minds around it given the trauma they have suffered is very difficult in the abstract.

And so what we have continuously said is it's a little bit of chicken and egg because the court really wants to know what you want to do, and they keep asking us what options will the court give.

But at some point, I think that's exactly the order we would like is let's start with third countries, give the government time on Venezuela.  Although, I think still people could file papers from Venezuela.  But put aside, the remote hearings are coming back, Venezuela, third countries, all the options, start with filing papers or coming back, and then people will have to make a choice.  And I think not everyone will make the same choice depending on their situation.

But once there's an order, we will say to our clients this is now what the judge has said are the options, and now it's time to make this election.

THE COURT:  And I will likely give you a deadline for such election, and if you want to seek an extension of that, I'm sure the government is --

MR. GELERNT:  Right.  And the only other thing I was going to mention to you, Your Honor, about deciding the threshold question of whether the AEA -- whether the proclamation is consistent with the AEA, I think what the government is going to do is say even if that shouldn't be stayed, they are going to say this is different from the Fifth Circuit because there's a threshold jurisdictional question --

(There was an interruption by the court reporter.)

MR. GELERNT:  What I was saying, sorry, a little

slower, is I think that unlike the other cases around the country where the individuals are in the country, I think that the government is going to seek a stay not only of whether the proclamation is consistent with the AEA, but unlike in the other circuits, a question about whether there's jurisdiction.

And we think it's clear that you were right on both the equitable due process and the constructive custody. But I suspect that's how it will get framed going up. But that's not a reason for you not to decide it by any means. And that's our fault for not making it clear that that was the logical prior question.

THE COURT: All right. Thank you, both sides, very much. I appreciate it. I will try to get something out certainly by next week on this. Thanks, everyone.

MR. GELERNT: Thank you, Your Honor.

(The hearing concluded at 10:51 a.m.)

- - -

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription of the proceedings in the above-entitled

matter.



2/9/26                        s/ Tammy Nestor
                              Tammy Nestor, RMR, CRR
                              Official Court Reporter
                              333 Constitution Avenue NW
                              Washington, D.C. 20001
                              tammy_nestor@dcd.uscourts.gov