UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G., *et al.*,

    Plaintiffs,

LIYANARA SÁNCHEZ, as next friend on behalf of FRENGEL REYES MOTA, *et al.*,

    Petitioners-Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

    Respondents-Defendants.

Civil Action No. 25-766 (JEB)

**MEMORANDUM OPINION AND ORDER**

On December 22, 2025, this Court issued a Memorandum Opinion finding that the Government had denied due process to a class of Venezuelans it deported to El Salvador last March in defiance of this Court's Order. See J.G.G. v. Trump, 2025 WL 3706685, at *19 (D.D.C. Dec. 22, 2025). The Court offered the Government the opportunity to propose steps that would facilitate hearings for the class members on their *habeas corpus* claims so that they could "challenge their designations under the [Alien Enemies Act] and the validity of the [President's] Proclamation." Id. Apparently not interested in participating in this process, the Government's responses essentially told the Court to pound sand. See ECF Nos. 229 (Gov. Resp.), 239 (Gov. Reply). Believing that other courses would be both more productive and in line with the Supreme Court's requirements outlined in Noem v. Abrego Garcia, 145 S. Ct. 1017 (2025), the Court will now order the Government to facilitate the return from third countries of those

1

Plaintiffs who so desire.  It will also permit other Plaintiffs to file their habeas supplements from abroad.

I.      **Background**

Given that the background of this case has featured in numerous prior Opinions, see, e.g., J.G.G. v. Trump, 772 F. Supp. 3d 18 (D.D.C. 2025), the Court will not retread old ground.  It notes simply that some of the 137 Venezuelans who were deported to the Center for Terrorism Confinement (CECOT) in El Salvador and subsequently released into Venezuela as part of a prisoner swap seek to further press their habeas claims.  At this week's hearing on remedies, even Plaintiffs' counsel could not represent how many of the 137 are still in Venezuela and how many wish to proceed with habeas.  Counsel nonetheless did inform the Court that at least a handful desire to go forward at this point.

Understanding that the situation in Venezuela remains in flux — given the United States's recent "law-enforcement action" there — and crediting the Government's assertion that these matters implicate foreign affairs, see, e.g., Gov. Resp. at 2 ("[T]he Secretary of State has determined that either path that the Court has suggested would risk material damage to U.S. foreign policy interests at this delicate juncture."), Plaintiffs have commendably sought measured steps from the Court.  See ECF No. 234 (Pl. Resp.) at 1.

As explained at the hearing, they are asking only that they be permitted to file supplemental habeas pleadings on behalf of certain of the 137 deported individuals, that those individuals in third countries — i.e., not Venezuela or the United States — could proceed with potential remote hearings if necessary, and that the Government provide at its expense returns to the U.S. from third countries for those so desiring.  Plaintiffs acknowledge, as they must, that anyone who is flown back or paroled into the United States after arriving at a port of entry will

be taken into U.S. custody during the pendency of further proceedings and would also potentially be subject to redeportation at the conclusion of their legal challenges.

Plaintiffs' prudent approach has not been replicated by their Government counterparts. Although the Supreme Court in Abrego Garcia upheld Judge Paula Xinis's order directing the Government "to facilitate and effectuate the return of" that deportee, see 145 S. Ct. at 1018, Defendants at every turn have objected to Plaintiffs' legitimate proposals without offering a single option for remedying the injury that they inflicted upon the deportees or fulfilling their duty as articulated by the Supreme Court. See Gov. Resp. at 2 ("Defendants do not believe there is any feasible way to allow class members to file habeas petitions at this time."). After extended questioning at the hearing, the Government finally represented that it prefers the return of the deportees (not, however, on its dime) to remote hearings, given its concerns with logistics and other evidentiary issues at such hearings.

## II.    Analysis

Our starting point is the Court's prior finding that the deportees were denied due process, J.G.G., 2025 WL 3706685, at *18 ("By any measure, the detainees surely fell victim to constitutionally inadequate process."), a conclusion that it has reached more than once and one consonant with the Supreme Court's earlier analysis of the issue. See A.A.R.P. v. Trump, 605 U.S. 91, 94–95 (2025). In such an instance, again according to the Supreme Court in the analogous case of Abrego Garcia, the Government must "ensure that [their] case is handled as it would have been had [they] not been improperly sent to El Salvador." 145 S. Ct. at 1018. In other words, it is up to the Government to remedy the wrong that it perpetrated here and to provide a means for doing so. Were it otherwise, the Government could simply remove people from the United States without providing any process and then, once they were in a foreign

country, deny them any right to return for a hearing or opportunity to present their case from abroad.

As Justice Sotomayor's separate Statement pointed out: "[T]he proper remedy is to provide Abrego Garcia with all the process to which he would have been entitled had he not been unlawfully removed to El Salvador. That means that the Government must comply with its obligation to provide Abrego Garcia with 'due process of law,' including notice and an opportunity to be heard, in any future proceedings." Id. at 1019 (statement of Sotomayor, J.) (citing Reno v. Flores, 507 U.S. 292, 306 (1993)). Indeed, she noted that "it has been the Government's own well-established policy to 'facilitate [an] alien's return to the United States if . . . the alien's presence is necessary for continued administrative removal proceedings' in cases where a noncitizen has been removed pending immigration proceedings." Id. (quoting U.S. Immigration and Customs Enforcement, Directive 11061.1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens, § 2 (Feb. 24, 2012)).

Against this backdrop, and mindful of the flagrancy of the Government's violations of the deportees' due-process rights that landed Plaintiffs in this situation, the Court refuses to let them languish in the solution-less mire Defendants propose. The Court will thus order Defendants to take several discrete actions that will begin the remedial process for at least some Plaintiffs, as the Supreme Court has required in similar circumstances. It does so while treading lightly, as it must, in the area of foreign affairs. See Abrego Garcia, 145 S. Ct. at 1018 (recognizing "deference owed to the Executive Branch in the conduct of foreign affairs").

Respecting the Government's preference, as indicated at the most recent hearing, the Court will require it to parole into United States custody any Plaintiff who appears at a U.S. port of entry. This number, at least according to Plaintiffs, would likely be very small if not zero. In

addition, the Government shall offer a boarding letter to any Plaintiff in a third country who requests commercial air travel to the United States. See Directive 11061.1, ¶ 3.1 (defining "Facilitate an Alien's Return" as "[t]o engage in activities which allow a lawfully removed alien to travel to the United States (such as by issuing a Boarding Letter to permit commercial air travel) and, if warranted, parole the alien into the United States upon his or her arrival at a U.S. port of entry"); see also Application to Vacate Injunction at 17, Noem v. Abrego Garcia, No. 24A949 (S. Ct. Apr. 7, 2025) (acknowledging such actions are "entirely within the United States' control"). Once again, at this point, we are not talking about a substantial number of people — particularly because the Court, mindful of the previously mentioned foreign affairs concern, does not extend this requirement to deportees remaining in Venezuela — and such individuals would be detained upon arrival.

Plaintiffs also request that such boarding letter include Government payment of the cost of the air travel. Given that the Court has already found that their removal was unlawful — as opposed to the situation contemplated by the cited Directive, which notes that "[f]acilitating an alien's return does not necessarily include funding the alien's travel," Directive 11061.1, ¶ 3.1 (emphasis added) — the Court deems that a reasonable request. It is unclear why Plaintiffs should bear the financial cost of their return in such an instance. See Ms. L. v. U.S. Immig. & Customs Enf't ("ICE"), 2026 WL 313340, at *4 (S.D. Cal. Feb. 5, 2026) (requiring Government to "bear the expense of returning these family units to the United States" given that "[e]ach of the removals was unlawful, and absent the removals, these families would still be in the United States"). It is worth emphasizing that this situation would never have arisen had the Government simply afforded Plaintiffs their constitutional rights before initially deporting them.

5

Plaintiffs in third countries or in Venezuela may also file supplemental habeas pleadings seeking to show that the Proclamation under which they were deported unlawfully invoked the Alien Enemies Act and/or that they are not members of Tren del Aragua and thus not subject to the Proclamation. Whether hearings will be required and the logistics of such hearings may be determined at a future date. In addition, to the extent that the Government contends that such pleadings are independent habeas petitions for which the Court has no jurisdiction given Plaintiffs' current lack of custody, it may offer such arguments in opposition to any forthcoming filing by a Plaintiff. The Court, however, need not address this question today.

### III.   Conclusion

The Court, accordingly, ORDERS that:

1. Plaintiffs shall file under seal (but not *ex parte*) by February 20, 2026, a Notice indicating which Plaintiffs are currently in which third countries;

2. Plaintiffs shall by February 27, 2026, file a Notice noting the number of Plaintiffs who wish to travel independently to a U.S. port of entry or who wish to be flown from a third country to the United States for their court proceedings, understanding that in both scenarios they will be detained upon arrival. Plaintiffs shall simultaneously file a separate Notice under seal listing the names of such individuals;

3. Plaintiffs shall by March 9, 2026, file a Notice giving the number of Plaintiffs (in Venezuela or third countries) who wish to file supplements to their habeas class petition, including challenges to the Proclamation or their identification as TdA members. Plaintiffs shall likewise file a simultaneous Notice under seal listing those individuals' names;

4. The Government shall promptly return to Plaintiffs upon written request by their

current counsel all passports and identification documents that any agency currently retains, and it shall make good-faith efforts to obtain any of Plaintiffs' passports or identification documents that were transferred to El Salvador; and

5. The Government shall file a Status Report by March 13, 2026, explaining how and when it will transport any Plaintiff seeking return to the United States from a third country.  In that Status Report, the Government shall also inform the Court as to the feasibility of returning Plaintiffs still in Venezuela who wish to return for their proceedings.  It shall also describe the steps taken to obtain any passports or identification documents from El Salvador.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  February 12, 2026