In the United States District Court
for the District of Columbia

| | |
|---|---|
| J.G.G. et al., <br><br> *Plaintiffs*; <br><br> LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, et al., <br><br> *Petitioners–Plaintiffs,* <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> *Respondents–Defendants.* | Case No. 1:25-cv-00766-JEB <br><br><br><br> **RESPONDENTS–DEFENDANTS' RENEWED MOTION TO STAY ORDER PENDING APPEAL** |

**Introduction**

Defendants previously requested a stay pending appeal of any injunction in their Opposition to Petitioners' Motion for a Preliminary Injunction. ECF 182 at 40. This Court granted judgment to Petitioners and certified a class on December 22, 2025 without addressing Defendants' request for a stay. ECF 215. After the Court's February 12 order, that request is now ripe. ECF 247. The Court has "now order[ed] the Government to facilitate the return from third countries of those Plaintiffs who so desire. It will also permit other Plaintiffs to file their habeas supplements from abroad." *Id.* at 1-2. The Court has also ordered Defendants to return documents to Petitioners, including by negotiating with the sovereign nation of El Salvador. *Id.* at 6. Moreover, the Court has directed Defendants to "inform the Court as to the feasibility of returning Plaintiffs still in Venezuela who wish to return for their proceedings" on March 13. *Id.* at 7. As a result, Defendants move to stay this Court's February 12, 2026 order pending appeal. ECF 247.[1]

For the reasons stated in Defendants' prior brief, this Court should stay its order. ECF 182 at 40. As explained across several briefs, Defendants are likely to succeed on the merits that this Court lacks habeas jurisdiction over Petitioners' claims. ECFs 108, 182. The remaining equitable factors also favor a stay. If the Government ultimately loses this appeal, Petitioners can be returned then. They suffer no harm in the meantime because they are living free and any "collateral

---

[1] Defendants met and conferred with Petitioners on this motion, who oppose. L.R. 7(m).

1

consequences" are speculative and hypothetical, especially on a classwide basis. But if the Government must return dangerous criminal aliens for additional habeas proceedings in the short-term, winning this appeal will come too late. Indeed, this is why the Court converted the preliminary injunction motion into summary judgment: the remedy is final and cannot be unrung. As an equitable matter, this is an easy call—it clearly makes more sense to give the D.C. Circuit an opportunity to review the Court's novel and significant jurisdictional rulings before forcing the Government to engage in more diplomatic outreach and parole dangerous aliens into the country.

    That is especially true when Defendants have gotten relief or at least an administrative stay of every injunction in this case. The Supreme Court vacated the Court's original temporary restraining orders because it lacked habeas jurisdiction. *Trump v. J.G.G.*, 604 U.S. 670 (2025). The D.C. Circuit then granted mandamus relief and vacated this Court's attempt to get to the same place by threatening to initiate criminal contempt unless the Government facilitated the aliens' return from El Salvador. *J.G.G. v. Trump*, 147 F.4th 1044 (D.C. Cir. 2025). For the second injunction based on a standalone due process theory, the D.C. Circuit administratively stayed the injunction for months before vacating and remanding due to changed circumstances. *J.G.G. v. Trump*, 2025 WL 2317650, at *1 (D.C. Cir. Aug. 8, 2025). Given all of this, the Court should allow the D.C. Circuit sufficient time to review the important legal issues in this case.

## LEGAL STANDARD

In considering whether to grant a stay pending appeal, this Court asks whether the applicant (1) "is likely to succeed on the merits," (2) "will be irreparably injured absent a stay," (3) whether a stay will not "substantially injure" other interested parties, and (4) whether a stay is in the "public interest." *Nat'l Treasury Emps. Union v. Trump*, 2025 WL 1441563, at *1 (D.C. Cir. May 16, 2025).

## ARGUMENT

### I.  The Government Is Likely to Prevail on the Merits.

For all of the reasons previously briefed, the United States is likely to succeed on the merits that this Court lacks habeas jurisdiction over the class members. The Court reasoned its way to jurisdiction by holding that (i) the United States exercised "constructive custody" over Petitioners in CECOT when they filed their petition; and (ii) collateral consequences of their AEA designations defeat mootness. Neither is correct.

#### A.  The United States never had constructive custody of Petitioners at CECOT.

As previously explained, constructive custody requires control. *See United States ex rel. Keefe v. Dulles*, 222 F.2d 390, 391 (D.C. Cir. 1954); *see also Koki Hirota v. Gen. of the Army MacArthur*, 338 U.S. 197, 198 (1948) (per curiam) (rejecting habeas petition against General MacArthur because petitioners were Japanese citizens in Japanese custody, even though MacArthur had established military tribunals); *Al Maqaleh v. Gates*, 605 F.3d 84, 97 (D.C. Cir. 2010) (no habeas jurisdiction over leased military base because U.S. lacked *de facto* sovereignty).

Here, it is clear that the United States had no custody over those housed in a foreign prison controlled by a foreign sovereign: El Salvador did. *See Opati v. Sudan*, 590 U.S. 418, 420 (2020) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute."). Diplomatic notes show that El Salvador committed to accept TdA members and accommodate them as El Salvador saw fit; the decision was not up to the United States. ECF 177-11. And senior U.S. diplomats provided sworn testimony reiterating that the United States did not have control over the detainees in CECOT and could not produce them upon command—in other words, lacked custody. ECFs 129 ¶¶9-10;182-1 ¶4; 182-2 ¶2-3; *see Kiyemba v. Obama*, 561 F.3d 509, 515 & n.7 (D.C. Cir. 2009) (concluding from government declaration that foreign sovereign is not a United States agent); *Gul v. Obama*, 652 F.3d at 12, 17-18 & n.\* (D.C. Cir. 2011) (crediting United States' declaration that it no longer had custody or control of Guantanamo Bay detainees transferred to Afghanistan and Sudan).

Even under the *Abu Ali* factors, Defendants did not have constructive custody. *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 47 (D.D.C. 2004). Indeed, *Abu Ali* itself warns that circumstances "where the United States is correctly deemed to be operating through a foreign ally as an intermediary for purposes of habeas jurisdiction will be exceptional, and a federal court's inquiry in such cases will be substantially circumscribed by the separation of the powers." 350 F. Supp. 2d at 41.

El Salvador's custody of Petitioners was not solely at the United States' (i) "behest," and (correspondingly) (ii) El Salvador was not "indifferent" to Petitioners'

4

detention. Indeed, the Court itself previously ruled that El Salvador had "reasons … to detain [Petitioners] at CECOT" and said it was outside its "ken" to second guess. ECF 148 at 24. That ruling was correct. It was consistent with declarations saying as much and with the fact that Salvadoran President Bukele had proposed transferring Petitioners to the Maduro regime and ultimately chose to release them as part of a political deal. *Id.* at 22–24.

Petitioners also could not be (iv) released on mere request by the United States. Again, the Court originally and correctly agreed. ECF 148 at 24. Bukele had offered to transfer detainees to the Maduro regime. *Id.* ¶9. And, ultimately, El Salvador *did* release Petitioners and allowed their transfer to Venezuela, in exchange for the freeing of Venezuelan political prisoners and American wrongful detainees; that trade allowed El Salvador to be seen as a major player on the international stage against its primary regional rival. ECF 182 at 18-19. It is not for the Court to second guess the motivations behind that foreign exchange, as it previously recognized. And even though it has nothing to do with custody, the last *Abu Ali* factor is not satisfied here either. The United States was not trying to (iii) dodge the court's jurisdiction— it did not have jurisdiction to begin with. *J.G.G.*, 604 U.S. at 672.

The Court had no basis to change its interpretation of the Arrangement, the weight it afforded to the declarations, or its rejection of various public statements. The only new evidence the Court had was the ambiguous United Nations working group document about "refoulment" and declarations reporting hearsay from Salvadorans with no apparent personal knowledge. *See Klayman v. Jud. Watch, Inc.*,

5

6 F.4th 1301, 1315 (D.C. Cir. 2021) ("sheer hearsay … counts for nothing on summary judgment."). Moreover, on a motion for summary judgment, the court must view evidence in the light most favorable to the nonmovant. *Talvera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). Yet the district court entered judgment against the United States only by viewing all evidence *against* the Government, using the standard for a Rule 12(b)(1) factual attack. Op.7. A district court cannot make factual determinations merely because the issue is jurisdictional: rather, because the motion was treated as one for summary judgment, Petitioners had the burden to prove jurisdiction to the same extent as any other matter on summary judgment. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). This error permeated the Court's analysis and necessitates a stay.

> **B. In all events, the habeas claims became moot when El Salvador released Petitioners.**

Even if Petitioners had been in the constructive custody of the United States while in El Salvador, that would not support the continued exercise of habeas jurisdiction after their release. That release rendered any habeas claims moot. "The Supreme Court has cautioned against extension of the presumption of collateral consequences." *Gul*, 652 F.3d at 16. Because it was Petitioners' burden to demonstrate collateral consequences, they had to show both (1) that they had a concrete continuing injury caused by their AEA designations, and (2) that a favorable decision would likely redress that injury. *Gul*, 652 F.3d at 14, 17-21. Petitioners did not make either showing.

6

The D.C. Circuit held that a similar designation of "enemy combatant" did not constitute collateral consequence, even though it restricted the ability to travel, return to the United States, could result in detention, and created consequences in third countries. *Gul*, 652 F.3d at 14, 17-21. Here, Petitioners do not dispute that if they return, they will be detained and likely removed again even if they prevail in their petitions. ECF 244 at 7-8. Indeed, many of the 19 who wish to return are removable, some under expedited removal and one already has a final order of removal under Title 8. Ex. A ¶ 14. As for asylum, it's a discretionary benefit that can be denied categorically, *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730–31 (D.C. Cir. 2022), and ineligibility for a discretionary benefit does not qualify as a cognizable collateral consequence even if the designations erect a categorical bar to that benefit, *see Bacilio-Sabastian v. Barr*, 980 F.3d 480, 483 (5th Cir. 2020) (discretionary benefits do not create collateral consequences).

Petitioners' additional concerns about travel restrictions to third-party countries is speculative—indeed, many have safely travelled to other countries. ECF 251; *Gul*, 652 F.3d at 18 (restrictions from third countries irrelevant). Petitioners also worried they could be subject to asset forfeiture by virtue of their designations as members of foreign terrorist organizations. But that too is completely speculative and unsubstantiated. *See Gul*, 652 F.3d at 20 (while petitioners could be recaptured due to their designation, this was "speculative" and they had "no basis whatsoever for believing" that would occur). Petitioners never provided evidence that property was seized under these authorities.

7

This Court distinguished *Gul* because there additional statutes could bar reentry. But the same is true here. Petitioners here may still not be able to return to the United States, will be detained, and likely removed again under various provisions, including Title 8 and expedited removal. Ex. A ¶ 14. Moreover, Petitioners have been determined to be members of a foreign terrorist organization (FTO), which is separate and independent from their AEA status. *See* 8 U.S.C. § 1189; *Gul*, 652 F.3d at 20 (determination that petitioner was members of a "member of a terrorist organization" "involves a separate legal standard" than "enemy combatant").[2] That designation itself precludes admission to the United States and many forms of discretionary relief. *See* 8 U.S.C. §§ 1182 (a)(3)(B)(i)(IV)-(V); 1227 (a)(1)(A); 1158(b)(2)(A)(v); *J.G.G.*, 147 F.4th at 1055 (Katsas, J., concurring). Petitioners would face substantial barriers to entering the United States irrespective of the AEA designation; none of them has any right to remain here regardless and would be readily removed under the Immigration and Nationality Act. At a minimum, these supposed consequences cannot support classwide habeas jurisdiction (if that were ever proper, ECF 183). Petitioners did not prove similarities among the collateral consequences for all the putative class's members. *See* ECF 183 at 13; ECF 234 at 6 (approximately a quarter of Petitioners had criminal records); Ex. A ¶¶ 12-14 (different criminal histories and removal processes apply); *Arnold v. Panora*, 593 F.2d

---

[2] Defendants believe even a ruling that they are not TdA for AEA purposes would not remove the separate FTO designation given the separate statutory schemes and requirements. But at a minimum, if a Petitioner succeeds in challenging the legality of the Proclamation itself that could not redress their FTO designation.

161, 164 n.9 (1st Cir. 1979) (plaintiff was not representative of class because his revocation period did not qualify as a collateral consequence compared to others).

### III. The Remaining Factors Favor a Stay.

The other equitable factors also favor a stay. As relevant here, the Court primarily ordered the Government to "transport any Plaintiff seeking return to the United States from a third country" so that those aliens can be paroled into the United States, be detained (again) by the United States, and then pursue a habeas petition. Order 7. Setting aside the merits, it is obvious that the equities favor staying such a remedy until after this appeal is adjudicated.

From Petitioners' perspective, there is no need for urgency. While this case started as time-sensitive when Petitioners were contesting their removals, and arguably continued to be time-sensitive while Petitioners were detained at CECOT, they have now been free for months and, as far as the Government knows, are living in their home country of Venezuela or, in some cases, in third countries to which they voluntarily traveled. ECFs 251, 253. Petitioners will thus suffer no harm from a stay of the district court's order pending appeal. Indeed, returning to the United States will result in detention and likely removal, as none of the class members has a right to be in the United States even absent the AEA designation. The Court acknowledged at the hearing that is the likely outcome even if they prevail on their remote hearings. ECF 244 at 7-10. Indeed, six would be subject to expedited removal, one has a final order of removal under Title 8, and all of the others have been placed in removal proceedings. Ex. A ¶ 14. In short, if the Government loses this appeal, the class members can be returned then; they suffer no harm in the meantime as free men.

9

On the other hand, insisting on compliance with the Court's order now, before this appeal is adjudicated, will cause irreparable harm to the Government and the public interest, which merge in this context. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Transporting members of an FTO from another country will likely require diplomacy bearing on "sensitive and weighty interests of national security and foreign affairs." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33-35 (2010). This is especially true because all 19 of the class members who wish to return are in Venezuela. ECF 253. While the Court indicated it will not currently require the Government to extract people from Venezuela given the developing political situation there, it has requested updates "as to the feasibility" of their direct return. Order 7. But even revealing those details can imperil extremely fluid and sensitive negotiations bearing on national security. ECF 222-1 (Rubio Declaration). And the Court may eventually decide to order their return directly from Venezuela.

The order also threatens public safety and security because, even detained, TdA members have recruited other members and threatened the safety of staff and other detainees. ECF 72-1 ¶¶15-25; ECF 72-2 ¶9; Ex. A ¶¶ 6-8. Of the 19 class members who currently wish to return, four have criminal investigations, including one for serious offenses such as homicide, kidnapping, and firearms charges. Ex. A ¶ 12. And even those who do not were determined by DHS to be members of an incredibly dangerous transnational organization. Ex. A ¶¶ 13-15. An order requiring the Government to return these individuals to the United States would frustrate the

10

"public interest in effective measures to prevent the entry of illegal aliens." *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981).

Other aspects of the Court's remedies also threaten irreparable harm. In particular, allowing class members to file remote habeas petitions—without regard to the custody requirement—poses serious practical and security concerns that the court failed to adequately consider. Order 6; ECF 239 at 1-4. Having to conduct potentially over 100 minitrials remotely from foreign countries where the United States cannot enforce perjury rules, procure secure lines for sensitive evidence, or ensure due process is a non-starter and would irreparably harm Defendants.

All told, the equities clearly favor the Government: it makes sense to give the D.C. Circuit an opportunity to review the Court's significant jurisdictional rulings before forcing the Government to engage in diplomatic outreach, parole dangerous aliens into the country, and hold sensitive mini-trials through unprecedented remote means. If the Court denies a stay and the Government has to parole the 19 class members back, the purpose of the appeal will largely be undermined, as the Government cannot immediately remove them again if it ultimately wins on appeal. A significant portion of the harm will already be inflicted. Given the D.C. Circuit's multiple actions in this case, this Court should stay its order pending appeal.

## CONCLUSION

This Court should stay its order pending appeal.

Respectfully submitted,

**Brett A. Shumate**
Assistant Attorney General
Civil Division

11

        **Yaakov M. Roth**
Principal Deputy Assistant Attorney General
Civil Division

**Drew C. Ensign**
Deputy Assistant Attorney General

**August Flentje**
Special Counsel for Immigration

  <u>s/Tiberius T. Davis</u>
**Tiberius T. Davis**
Counsel to the Assistant Attorney General
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 514-2000
tiberius.davis@usdoj.gov

**Anthony Nicastro**
Acting Director
Office of Immigration Litigation

**Ernesto Molina**
Deputy Director

Dated: March 9, 2026                  *Counsel for Respondents–Appellants*